# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE BRIDGESTONE INVESTMENT CORPORATION LIMITED

BRIDGESTONE INVESTMENT CORPORATION LIMITED,

Petitioner,

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO,

Respondent,

KALMAN ISAACS; et al.,

Real Parties in Interest.

No. 19-70031

D.C. No. 18-cv-04865-EMC
Northern District of California,
San Francisco

**DISTRICT COURT'S RESPONSE RE PETITION FOR WRIT OF MANDAMUS**

Docket No. 204

In response to Bridgestone Investment Corporation Limited's ("Bridgestone") petition for a writ of mandamus, challenging this Court's decision to appoint Glen Littleton as Lead Plaintiff in the above securities class action, the Ninth Circuit issued an order providing that this Court "may address the petition if it so desires." Docket No. 204 (Order at 1). Below is the Court's response.

According to Bridgestone, this Court chose Mr. Littleton over Bridgestone as Lead Plaintiff because he had greater diversity in investment in Tesla securities (*e.g.*, both long and short positions), and ignored the fact that Bridgestone had a

greater financial interest (a loss of approximately $3.87 million compared to Mr. Littleton's loss of approximately $3.52 million) in contravention of the PSLRA. *See* 15 U.S.C. § 78u-4(3)(B)(iii). This is not an accurate characterization of the Court's rulings.

The Court did not ignore the financial interests of the competing parties. The Court well recognized that, under the PSLRA, a "court shall adopt a presumption that the most adequate plaintiff . . . is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(3)(B)(iii). The Court analyzed each competing parties' claim in order of the asserted size of loss. *See* Pet.'s Ex. C (Order at 3) (ordering the proposed Lead Plaintiffs "from greatest to smallest total asserted loss").

However, determining the magnitude of the parties' financial interests in this case was far from simple. Unlike the situation in *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002), the Court was confronted with vigorous challenges to losses asserted by the competing parties. *Compare id.* at 730 n.4 (stating that, "[b]ecause the calculation is not in dispute here, we need not decide the scope of the district court's discretion in determining which plaintiff has the greatest financial interest in the litigation"). In particular, the amount of Bridgestone's asserted loss was squarely challenged by Mr. Littleton. Although Bridgestone claimed a loss of approximately $3.87 million, there was a legitimate argument that the loss was overstated by approximately $1.64 million – an amount that dwarfs the difference between the loss claimed by Bridgestone and that claimed by Mr. Littleton – $300,000. The $1.64 million of Bridgestone's asserted loss was based on its purchase of $450 call options on August 7, 2018 (*i.e.*, the day that Elon Musk tweeted about taking Tesla private for $420). Mr. Littleton argued with reasonable force that Bridgestone did *not* rely on Mr. Musk's tweet in purchasing the $450 call

2

options because Mr. Musk stated he was considering taking Tesla private at only $420 per share – significantly less than $450 per share paid by Bridgestone. *See* Pet.'s Ex. C (Order at 6-7). In other words, "'[i]t . . . makes no sense that Bridgestone would have invested $2,156,496 to buy January 2019 $450 call option contracts relying on Musk's tweet . . . when they would expire worthless when Musk took Tesla private at $420.'"[1] Pet.'s Ex. C (Order at 7).

In response, Bridgestone argues, and this Court acknowledged, that "as suggested by several analysts – it was possible that the acquisition would go higher than $420 per share." Pet.'s Ex. D (Order at 7). But notably, many of the analysts' comments cited by Bridgestone were equivocal. *See* Docket No. 170 (Abadou Decl., Ex. B) ("We think it is also possible that [Mr. Musk] wants to get a price higher than $420 . . . ."); Docket No. 170 (Abadou Decl., Ex. D) ("Some analysts . . . think that there's even a small chance the $420 bid will be raised to placate investors who potentially aren't able to participate in a private Tesla . . . ."); Docket No. 170 (Abadou Decl., Ex. E) ("'We think some shareholders may demand a steeper premium than the $420 mark, and we think shares could move higher as

---

[1] Bridgestone argues that "the District Court turned decades of black letter securities law regarding reliance on its head by holding that only an investor that purchases an issuer's securities '*before*' a false statement can prove reliance. Those, like Bridgestone, who purchased Tesla's securities '*after*' a false statement is made and publicly-disseminated, 'never relied.'" Pet. at 6. Bridgestone has mischaracterized the Court's statements.

First, the Court proceeded on the assumption that Bridgestone purchased the $450 call options *after* Mr. Musk's tweet but simply noted that that fact did not foreclose an argument that Bridgestone did not, in fact, rely on the tweet in making the purchases.

Second, the Court referred to Mr. Littleton's call option purchases made *before* Mr. Musk's tweet only because Bridgestone made the argument that the Court's questioning of its call option purchases greater than $420 should also lead the Court to question Mr. Littleton's call option purchases greater than $420. *See* Pet.'s Ex. D (Order at 7). The Court did not call into question Mr. Littleton's call option purchases greater than $420 because Bridgestone did not point to any such purchases made after Mr. Musk's tweet – which was necessary in order for an argument to be made that no purchase could in fact have relied on the tweet because the tweet only contemplated taking Tesla private for $420 (*i.e.*, less than $450).

3

shorts cover and investors demand a higher price to go private . . . .'"; "'At \$420 it would be a \$70 [billion] company without a profit.  Public or private, that is a valuation that is beyond the sensible.  However, if Saudi Arabia really is behind this and prepared to bankroll [Mr.] Musk then it could be viable.'").  Missing from Bridgestone's submission to this Court was any direct evidence that, in making the purchase of the \$450 option, Bridgestone relied on Mr. Musk's tweet.

Under the PSLRA, the Court was required to make a "determination" as to whether Bridgestone had the "largest financial interest."  15 U.S.C. § 78u-4(3)(B)(iii).  Mr. Littleton's challenge to Bridgestone's asserted loss was met by only weak circumstantial evidence and no direct evidence.  Determination of Bridgestone's actual financial interest did not present the typical situation where the order of financial interests was clear (such as in *Cavanaugh*).  A definitive determination of financial interest here would have required the Court to adjudicate, at a very early stage of the case, key substantive elements of reliance and loss.  The Court would have had to hear and assess evidence going to Bridgestone's credibility[2] and in all likelihood competing expert evidence.  Adjudication would also entail procedural complexities.[3]

Because Bridgestone's total loss was uncertain and could not be readily ascertained, the Court did not determine that Bridgestone had the largest financial interest.  *See* Pet.'s Ex. C (Order at 7) ("This is not to say that a causally related loss based on Bridgestone's purchase of the January 2019 call options cannot be proven; but it does make a substantial portion of its loss assertion uncertain for purposes of

---

[2] The dispute did not involve simply a choice of accounting methodology (*cf. In re Cavanaugh*, 36 F.3d at 730 n.4 (noting that district court "may select accounting methods that are both rational and consistently applied"), but rather core factual questions.

[3] For instance, would Defendants – and not just the parties seeking appointment as Lead Plaintiff –need to be given an opportunity to weigh in on Bridgestone's financial interest?  Would the Court's determination of financial interest have a binding effect on some or all of the parties for the remainder of the litigation?  Does the Seventh Amendment require a jury determination on the question?

United States District Court
Northern District of California

the pending motions."). Such a conclusive determination was not necessary here because, even if Bridgestone had the largest financial interest in the case, there were significant problems with Bridgestone's adequacy or typicality. *See* 15 U.S.C. § 78u-4(3)(B)(iii) (providing that a "court shall adopt a presumption that the most adequate plaintiff . . . is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure"). *See In re Cavanaugh*, 306 F.3d at 732. In particular, because of the questionability of Bridgestone's financial interest, "it is plausible that Defendants would subject Bridgestone to a unique defense if a large amount of its loss was not sufficiently tied to the alleged fraud." Pet.'s Ex. D (Order at 7). No doubt $1.64 million of Bridgestone's $3.87 million in claimed loss would be vigorously contested by Defendants.

The Court also considered whether Bridgestone, who held only long positions, could under the circumstances adequately represent all members of the class which included not only those who took long positions but also those who took short positions. Bridgestone contends that "neither the PSLRA nor the law of this Circuit enable a District Court to reject a presumptive lead plaintiff as inadequate simply because that investor did not short a security." Pet. at 10; *see also* Pet. at 5 (arguing that equity conflict is present in almost every large, complex securities case and that virtually every court has rejected the position that equity conflict defeats adequacy). But the fact that Bridgestone held only long positions was not the sole factor. It was one factor that informed adequacy and typicality.

The Court acknowledges that those who hold long positions and those who hold short positions are not in conflict in all respects. For example, both long and short positions have the same interest in showing a fraudulent statement was made. Also, the injury sustained by both comes from buying securities at an artificially inflated price, though typically at different points in the respective transactions.

5

However, there is a risk that the interests of long and short positions may diverge at some juncture. For example, as noted by one of the parties seeking appointment as Lead Plaintiff, "plaintiffs that established short positions prior to the Class Period and covered those positions after defendants' first alleged misstatement – Musk's first tweet – will have no [or at least less] reason to seek to prove that subsequent corrective disclosures caused the stock price to decline." Docket No. 117 (Opp'n at 3). And as this Court noted in its order, conflicts may develop between different claims of investors if a limited fund is available, as often happens in settlement. *See* Pet.'s Ex. C (Order at 4 n.2) (noting that some "moving parties argued that there are no real conflicts [among the different types of investors], at least as to liability, but admitted that there may be conflicts as to damages if there is a limited fund available (a prospect that is plausible whether or not the case settles)").

In addition, short positions may be subject to unique defenses. *See, e.g.*, Docket No. 108 (Opp'n at 17) (arguing that "[s]hort sellers buying to cover should receive a presumption of reliance[, ] [b]ut Defendants will surely argue that they can rebut the presumption for shorts who covered to avoid posting collateral or who were forced out of their positions by third parties"); Docket No. 113 (Opp'n at 5) (also noting that "Defendants are . . . likely to attack short sellers['] ability to utilize the presumption of reliance to defeat class certification").

Finally, in the instant case, short positions may have an interest in telling a specific narrative – *i.e.*, that Mr. Musk has a history of disliking short sellers and that the tweet at issue was designed to harm them specifically. *See, e.g.*, Docket No. 1 (Compl. ¶ 3) (alleging that an article from the Wall Street Journal, dated shortly before the tweet at issue, stated that Mr. Musk's "'extraordinary use of Twitter to battle short sellers has often been followed by a jump in Tesla's stock price, hurting shorts in the process'"). Long positions may not share the same interest in establishing that narrative. *See* Pet.'s Ex. D (Order at 6) (indicating that short sellers

6

are in a unique position (compared to long purchasers) "because there are allegations that Mr. Musk took his actions precisely because he wanted to hurt short sellers"). Accordingly, Bridgestone is incorrect in arguing that Mr. Musk's "intent (*i.e.*, scienter) . . . is wholly irrelevant" with respect to "its adequacy and typicality." Pet. at 12 (emphasis omitted).

This is not to say – and the Court did not so hold – that "a long investor was inadequate or atypical in a securities class action for that reason alone." Pet. at 5. The question of adequacy and typicality arose not only from differences in the breadth of investments held respectively by Bridgestone and Mr. Littleton, but also from the particular facts of this case, including the unique defense affecting over 40% of Bridgestone's damages claim.

In sum, the Court complied with, and did not ignore, the directives of the PSLRA.

Dated: April 2, 2019

_____
EDWARD M. CHEN
United States District Judge