**SAXENA WHITE P.A.**
Maya Saxena (admitted *pro hac vice*)
msaxena@saxenawhite.com
Lester R. Hooker (SBN 241590)
lhooker@saxenawhite.com
Dianne M. Pitre (SBN 286199)
dpitre@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: 561.394.3399
Fax: 561.394.3382

*Counsel for Lead Plaintiff Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Lead Counsel for the Class*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**[PROPOSED] ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hearing Date: April 28, 2022<br>Time: 1:30 pm<br>JUDGE: Hon. Edward M. Chen<br>COURTROOM: 5 – 17th Floor |

The pending matter involves a securities class action against FibroGen, Inc. ("FibroGen" or the "Company"), Enrique Conterno, James Schoeneck, Mark Eisner, Pat Cotroneo and K. Peony Yu (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Docket No. 97 ("CAC"). Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association ("Plaintiffs") have brought this lawsuit on behalf of all investors who purchased or otherwise acquired FibroGen securities, including options, between December 20, 2018 through July 15, 2021, inclusive (the "Class Period"), and who were damaged thereby. ¶2.[1] Plaintiffs allege that Defendants made materially false and misleading statements about the efficacy, safety and prospects for receiving FDA approval of FibroGen's flagship drug, a pill to treat anemia in kidney patients called Roxadustat. According to the CAC, Defendants manipulated Roxadustat's clinical trial data by making "*post hoc* changes" to nine separate safety analyses of the drug in order to make Roxadustat appear significantly better and safer than it really was, and then touted the purportedly "outstanding" and "compelling" data throughout the Class Period.  ¶3. The alleged truth was revealed to the market in a series of disclosures that caused FibroGen's share price to lose 75% of its value, including an April 6, 2021 press release in which Defendants admitted to making the *post hoc* changes and issued corrections to all nine safety analyses.  *Id*.

Pending before the Court are motions to dismiss the CAC filed by (i) Defendants FibroGen, Conterno, Schoeneck, Eisner and Cotroneo (Docket No. 106); and (ii) Defendant Yu (Docket No. 109). Having considered the parties' briefs, accompanying submissions and oral argument of counsel, the Court hereby DENIES the motions to dismiss.

On a motion to dismiss, courts consider the complaint in its entirety, "accept all factual allegations … as true," and construe them in the light most favorable to the plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007).  To succeed on a claim under Section 10(b) and Rule 10b–5, a plaintiff must prove the following: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase

---

[1] All paragraph references are to the CAC.

[PROPOSED] ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS
CASE NO. 3:21-CV-02623-EMC

or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 921 (N.D. Cal. 2020).  Defendants here only challenge the elements of falsity and scienter.[2]

With respect to falsity, a statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Once securities issuers "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Id.* at 705 (internal citations omitted).  A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs*, 551 U.S. at 324-26. The test is simply "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id*. at 322-23 (emphasis in original).

**A.** **Plaintiffs Have Alleged That The Statements Were False Or Misleading When Made**

In response to this Court's Standing Order pertaining to allegations of securities violations, Plaintiffs submitted a chart setting forth each alleged false or misleading statement or omission. Docket No. 91-2.  The parties group the statements into four main categories (though there is some overlap and relation among them): (1) statements about Roxadustat's safety; (2) statements about Roxadustat's non-inferiority margin; (3) statements regarding Roxadustat's label and FDA approval; and (4) statements regarding Roxadustat's efficacy.[3]

---

[2] Defendants have also filed a motion requesting that the court consider, in addition to the CAC's allegations, 57 exhibits totaling over 2,200 pages.  The Ninth Circuit has counseled against the "unscrupulous use of extrinsic documents to resolve competing theories against the complaint," a risk that is "especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 98, 998 (9th Cir. 2018). Thus, for purposes of this 12(b)(6) motion, the Court considers only the allegations of the CAC and the documents properly incorporated by reference therein.

[3] Defendants identify a fifth category, "Miscellaneous" statements; however, these statements have been categorized by Plaintiffs in their opposition into one of the four main categories.

[PROPOSED] ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS
CASE NO. 3:21-CV-02623-EMC

### 1.    *Safety Statements*

Plaintiffs allege that, throughout the Class Period, Defendants repeatedly touted the Roxadustat safety data as "outstanding," "robust," and "extremely clean," claiming that such data demonstrated "compelling evidence confirming [R]oxadustat's cardiovascular safety" that was "superior to Epogen." Defendants further emphasized that Roxadustat's safety data had shown a significant "reduction in [cardiovascular] risk" in incident dialysis patients, a critical subgroup of less severe CKD patients representing a highly lucrative market, which was "huge" and "differentiated" Roxadustat from Epogen. To bolster these claims, Defendants released nine separate safety analyses of the Roxadustat data, each of which purportedly confirmed the drug's safety—and claimed that these analyses had been vetted by the FDA, thus giving Defendants a "high level of conviction" that Roxadustat would receive FDA approval. ¶¶77-83.[4] Plaintiffs allege that, contrary to these claims, Defendants had in fact manipulated all nine analyses of the safety data *post hoc*—meaning that Defendants had improperly and selectively changed the data results after the trial results had been fully unblinded in order to falsely demonstrate that Roxadustat was safer than it in fact really was. ¶¶77-88. As a result of these manipulations, FibroGen admitted, among other things, that based on the unmanipulated data, FibroGen "cannot conclude that Roxadustat reduces the risk of . . . [major adverse cardiac events] . . . in incident dialysis patients compared to [Epogen]." ¶81.

The Court finds that the Complaint has adequately alleged these statements were false when made. Defendants have admitted that the safety results they had been publicly touting to investors for two years were inaccurate, and that Defendants had changed after-the-fact each of the nine analyses that they had publicly reported in order to make Roxadustat appear safer than the true, undisclosed data showed. Such information was obviously material to investors. *Arena*, 840 F.3d at 708 (drug-maker's statements about clinical trial data were false where it "express[ed] confidence by claiming that all of the data was running in [drug's] favor" when "[i]t was not"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005) (defendants' touting

---

[4] *See, e.g.*, ¶¶167, 192, 193, 205.

of selective sub-study results showing drug slowed progression of HIV to AIDs while concealing that broader FDA-sanctioned Phase 3 study showed the exact opposite were materially false and misleading).  Indeed, Defendants' admission of the *post hoc* changes not only required them to completely restate all nine previously reported safety analyses, each of which had been manipulated to make Roxadustat look safer than it was, but also to admit that their prior repeated claims emphasizing that Roxadustat's safety was superior to Epogen's in incident dialysis patients could not be supported by the real data.  Defendants further admitted that they had submitted the manipulated data to the FDA in the Roxadustat NDA, necessitating that FibroGen "promptly . . . clarify this issue with the FDA."  ¶¶84-85.  Defendants continued to mislead investors even after these admissions by withholding other prespecified FDA analyses—known as "sensitivity" analyses—that revealed that Roxadustat was too unsafe to be approved at all.  ¶¶11, 106-11.

The misleading nature of Defendants' statements is further evidenced by the universal outrage expressed by sophisticated market analysts and members of the medical community, who universally condemned FibroGen for "touting false heart safety data [for Roxadustat] for at least two years," as the real prespecified data "look[ed] meaningfully worse" and constituted a "material change" to Roxadustat's safety profile.  ¶¶10, 90-101.  Plaintiffs allege that these commentators concluded that the manipulations had to have been deliberate, as they noted that "the fact that all nine analyses . . . looked less favorable for [R]oxadustat after the change raises the suspicion that someone within FibroGen carefully selected the new criteria to make [Roxadustat] look better."  ¶¶10, 82, 95.  The FDA AdCom's near-unanimous vote against approval of Roxadustat for all studied patient populations based on the prespecified sensitivity analyses that Defendants never disclosed to investors—resulting in the drug never being approved by the FDA for any patient population—also demonstrates the falsity and materiality of these statements.  ¶112.

### 2.    *Non-Inferiority Margin Statements*

Plaintiffs also allege that Defendants falsely stated that Roxadustat had achieved non-inferiority because its hazard ratio was below the 1.3 threshold that the FDA purportedly "commonly applied," and which the FDA would supposedly be looking for in reviewing Roxadustat's MACE results.  However, as the CAC alleges, the FDA revealed during the July 15,

2021 AdCom that these statements were false and misleading, as the FDA had expressly rejected "[FibroGen's] proposed [non-inferiority margin] of 1.3" during the pre-NDA meetings because "it was defined [by FibroGen] after the results of the study were known," *i.e.*, *post hoc*. ¶¶55, 152. Furthermore, the FDA informed FibroGen during those meetings that it "had a goal of 1.25, and that's what we discussed during meetings[,] [s]o that's why there was not an agreement on 1.3." *See e.g.,* ¶¶55, 110, 152. Moreover, under the FDA prespecified sensitivity analyses that FibroGen never disclosed to investors—and which were in fact disclosed by the FDA for the first time during the AdCom—Roxadustat's hazard ratio margins were significantly worse than, and in fact greatly exceeded, 1.25 and 1.3 in every key endpoint. ¶¶175, 183, 204, 228; *see Khoja,* 899 F.3d at 1010 ("[O]nce Orexigen chose to tout the apparently positive 25 percent interim results, Orexigen had the obligation also to disclose that they were likely unreliable"); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 135 S.Ct. 1318 (2015) ("[L]iteral accuracy is not enough: an issuer must as well desist from misleading investors by saying one thing and holding back another.").

### 3.    *Black Box Label and FDA Approval Statements*

The CAC alleges that Defendants repeatedly and falsely represented that the Company had "the very best chance basically to have a label without a 'Black Box,'" an issue that was of paramount importance to investors because it was what would distinguish Roxadustat from Epogen, which was not recommended for less severe CKD patients due to its "Black Box" warning.[5] Defendants further repeatedly averred that they had "high level of conviction" in FDA approval by the PDUFA date. ¶69. Specifically, Defendants represented that they "had all the guidance from the FDA [they] needed to put together a winning submission" that would avoid a "Black Box" warning, that the data did not warrant such a warning because it showed Roxadustat was "comparable" to placebo, and that "FibroGen's NDA submission was complete and transparent" and was expected to result in FDA approval.[6] Even after FibroGen announced on March 1, 2021 that the FDA had unexpectedly scheduled an AdCom late in the regulatory process, Defendants

---

[5] *See e.g.,* ¶¶160, 165, 184, 187, 192, 196, 201.
[6] *See e.g.,* ¶¶145, 148, 167, 169, 178, 179, 198, 199, 207, 208, 212.

[PROPOSED] ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS
CASE NO. 3:21-CV-02623-EMC

continued to assure investors as to the "completeness of the NDA" and how the Company would "have a good showing." ¶¶218, 219, 231; *In re MannKind Sec. Actions,* 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011).

The Court finds that these statements were false, as they were based on Defendants' *post hoc* manipulations of the Roxadustat safety data. Additionally, as the FDA would reveal during the AdCom, and as Defendants already knew, the undisclosed FDA prespecified sensitivity analyses showed that Roxadustat was statistically less safe than Epogen—which itself already had a "Black Box" warning—and that the drug in fact had far too many serious safety issues to be approved at all. *In re BioMarin Pharm. Inc. Sec. Litig.,* 2022 WL 164299, at \*9 (N.D. Cal. Jan. 6, 2022). Additionally, Plaintiffs' confidential witnesses ("CWs") show that, by no later than the fall of 2020, the FDA had indicated to FibroGen that at the very least, Roxadustat's alarming safety issues would undoubtedly require a "Black Box." ¶¶128-131. *MannKind,* 835 F. Supp. 2d at 811 ("Defendants' statements concerning 'approval'…by the FDA 'necessarily implied that there would be no serious impediments to timely FDA approval.' The natural effect of these statements would be to create the impression for investors that… 'it was in the bag'").

#### 4. *Efficacy Statements*

The CAC alleges that Defendants repeatedly overstated Roxadustat's efficacy while simultaneously concealing the Company's unfavorable clinical trial results. Defendants claimed that Roxadustat had "achieved superiority in efficacy not only against placebo but also over [Epogen]" and touted "efficacy benefits" of Roxadustat, including "lower transfusions" and "improvement in quality of life." ¶¶142, 148, 155, 163, 187, 189, 190.

Plaintiffs have alleged that these statements were false and misleading. The purportedly positive efficacy of Roxadustat touted by Defendants was based on Defendants' *post hoc* manipulations. Moreover, as the AdCom and the FDA would determine, the drug's numerous safety issues rendered its efficacy moot—indeed, Roxadustat was never approved by the FDA. ¶¶105-106; *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc*., 780 F. App'x 480, 483 (9th Cir. 2019) ("companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities"); *Khoja,* 899 F.3d at 1010 ("once [the Company]

6

chose to tout the apparently positive [] results, [the Company] had the obligation also to disclose that they were likely unreliable"). The FDA also concluded that the claimed reduction in blood transfusions versus Epogen was "unclear" and likely nonexistent at untested lower doses the Company was ultimately forced to propose, and the AdCom found that based on the drug's true, undisclosed analyses there was "a surprising lack of improvement in quality of life" in NDD patients taking Roxadustat. ¶112.

### 5.     *The Challenged Statements Are Not Opinions*

Defendants argue that nearly every statement is a non-actionable opinion. However, Defendants' presentation of nine separate safety analyses of Roxadustat—all of which Defendants had altered to make Roxadustat look much safer than it was—were not opinions. Rather, these were false representations of clinical trial safety data for FibroGen's most important drug. *Arena*, 840 F.3d at 709 ("It is the failure to disclose 'issues' and 'concerns' with the Rat Study and the FDA's interest in the outcome of those studies—not who was ultimately right about the underlying science—that matters."). Even if deemed opinions, in *Omnicare*, the Supreme Court explained that opinion statements are actionable if they are not sincerely held, do not "fairly align[] with the information in the issuer's possession," or omit facts that "conflict with what a reasonable investor would take from the statement." *Omnicare,* 575 U.S. at 189-90; *In re Intuitive Surgical Sec. Litig*., 2017 WL 4355072, at *2 (N.D. Cal. Sept. 29, 2017). Defendants' statements here could not have been sincerely made given Plaintiffs' allegations of Defendants' intentional data manipulations. ¶¶53-55, 78, 79, 244-45.

### 6.     *The Challenged Statements Do Not Constitute Inactionable "Puffery"*

Defendants contend that certain statements in the CAC are "mere puffery." The Court finds that it cannot so conclude. Roxadustat was FibroGen's most critical drug, representing nearly all of its revenues, and all of the challenged statements concerned Defendants' reporting of Roxadustat's crucial Phase 3 data upon which FDA approval depended. *Rihn v. Acadia Pharms. Inc*., 2016 WL 5076147, at *7 (S.D. Cal. Sept. 19, 2016) ("Defendants' statements were factual representations regarding Acadia's preparedness for the NDA submission and were material"); *Todd v. STAAR Surgical Co*., 2016 WL 6699284, at *6 (C.D. Cal. Apr. 12, 2016) (statement that

[PROPOSED] ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS
CASE NO. 3:21-CV-02623-EMC

"we are extremely pleased with the panel's recommendation and vote of confidence and look forward to working with the FDA staff to complete review of the ICL" was false due to "Defendants' omission of facts suggesting a possible delay in [regulatory] approval."). Such statements were clearly not puffery and highly material to investors, as evidenced by the market's universal shock and outrage, and the massive stock price declines, when the truth of Defendants' manipulations was exposed. *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003); *Khoja,* 899 F.3d at 1012–13.

### 7.  *The PSLRA Safe Harbor Does Not Apply*

The Court finds that the statements enumerated by Defendants are not protected by the PSLRA's "safe harbor," which protects only wholly forward-looking statements that are either accompanied by meaningful cautionary language or made without actual knowledge of their propensity to mislead. 15 U.S.C. § 78u-5. Defendants' statements that Roxadustat "met the safety standards"; "based on what we have seen, we are pretty comfortable with safety"; and "we had all the guidance from the FDA we needed to put together a winning submission"—are misstatements of past or current fact, and thus ineligible for safe harbor protection. ¶¶153, 160, 178. *See Immune*, 375 F. Supp. 2d at 1034 ("To the extent that Agouron highlights Study 806 results that were already available at the time, such statements are not forward-looking and therefore are not eligible for such safe harbor protection."). Nor are any of these statements accompanied by "meaningful" cautionary language, as Defendants' boilerplate warnings about FDA non-approval nowhere warned investors that they had applied *post hoc* manipulations to all nine analyses of the Roxadustat data to make the drug appear safer than it was. *BioMarin*, 2022 WL 164299, at *8 (warnings geared toward "general concerns," such as changes in FDA rules, failed to discredit specific false statements about clinical trial data and FDA approval); *MannKind*, 835 F. Supp. 2d at 817 ("boilerplate" warnings "concerning the risks inherent in [the FDA approval] process" insufficient to immunize false statements about interactions with the FDA).

### B.  Plaintiffs Have Sufficiently Alleged Scienter

The CAC contains extensive allegations to support a strong inference of scienter. Defendants admitted on April 6, 2021, that FibroGen had made *post hoc* manipulations to all nine

8

analyses of the Phase 3 safety data for Roxadustat—which represented nearly all of the Company's revenues—thus rendering false the safety data Defendants had previously reported and touted to the market throughout the Class Period.  This gives rise to a strong inference of scienter.  *Immune Response*, 375 F. Supp. 2d at 1022 ("The fact that defendants published statements [about clinical trial results] when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *BioMarin*, 2022 WL 164299, at *14 (finding scienter where, "[p]ut simply, the defendants allegedly told the market things that were allegedly not true and that [they] must have known were not true by their nature").

The nature of Defendants' manipulations also confirm they were intentional.  Defendants manipulated all nine safety analyses to make Roxadustat look significantly safer than it was under the actual FDA prespecified analyses. This inference is bolstered by the fact that analysts, medical, pharmaceutical and prominent biotechnology journals and publications—all of whom were familiar with clinical trials, how they are conducted, and how clinical trial data is reported—universally concluded that the nature of Defendants' *post hoc* manipulations confirmed that they were intentional and that FibroGen management was complicit in the scheme.  ¶¶239-42.[7]

Finally, Plaintiffs' allegations regarding Defendants' compensation tied to Roxadustat and their insider sales, totaling over $42 million, contribute to an inference of scienter.  ¶¶253-54. FibroGen's former CEO Neff sold $32 million in insider sales in the first eight months of the Class Period.  Defendant Cotroneo sold nearly 40% of his total vested securities, with the largest sale coming just weeks after Defendants' adamant denial of any issues with Roxadustat's trial data. ¶253; *BioMarin*, 2022 WL 164299, at *14 (stock sales of $23 million in case involving doomed drug "help[] contribute to an inference of scienter").  Defendant Yu reaped over $10 million in stock and option awards directly tied to completing the manipulated Roxadustat MACE safety

---

[7] Plaintiffs have also sufficiently alleged scienter under the core operations theory, as FibroGen derived "substantially all" of its revenue from milestone payments for Roxadustat. ¶246; *MannKind*, 835 F. Supp. 2d at 814-15.  Plaintiffs' CWs also support scienter, as these witnesses provided mutually corroborating particularized allegations showing that, among other things, Defendants were aware starting in November 2020 of red flags indicating that the FDA might not approve Roxadustat, and that a "Black Box" warning would most certainly be required. ¶¶121, 129, 130; *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015).

analysis and the submission of the misleading Roxadustat NDA, on top of a $1.4 million raise and selling $2 million worth of stock during the Class Period.[8] ¶254.  *Am. W. Holding Corp.,* 320 F.3d at 944; *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019).[9]

For the foregoing reasons, the Court DENIES Defendants' motions to dismiss.[10]  This order disposes of Docket Nos. 106, 107, 108, and 109.[11]

**IT IS SO ORDERED.**

Dated: _____

_____
HONORABLE EDWARD M. CHEN
UNITED STATES DISTRICT COURT

---

[8] Defendant Yu's abrupt resignation is also highly suspicious and indicative of scienter. ¶258; *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017).  Accordingly, the allegations in the CAC are sufficient to plead scienter.

[9] There is no group pleading here. *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1095 (N.D. Cal. 2017).  Plaintiffs have sufficiently alleged each Individual Defendant's (and Neff's) scienter.

[10] As Plaintiffs have stated a Section 10(b) claim against Defendants, Defendants' motions to dismiss the Section 20(a) claim are DENIED.

[11] Defendants appear to have filed identical motions to dismiss in Docket Nos. 106 and 107.  To the extent this Court addresses Docket No. 107 it also addressed Docket No. 106.

10