1  COOLEY LLP
   JOHN C. DWYER (136533)
2  (dwyerjc@cooley.com)
   JESSICA VALENZUELA SANTAMARIA (220934)
3  (jvs@cooley.com)
   TIJANA M. BRIEN (286590)
4  (tbrien@cooley.com)
   ALEXANDER J. KASNER (310637)
5  (akasner@cooley.com)
   3175 Hanover Street
6  Palo Alto, California  94304-1130
   Telephone:     +1 650 843 5000
7  Facsimile:     +1 650 849 7400

8  Attorneys for Defendants
   FibroGen, Inc., Enrique Conterno, James Schoeneck,
9  Mark Eisner, and Pat Cotroneo

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13  IN RE FIBROGEN, INC., SECURITIES          Case No. 3:21-cv-02623-EMC
    LITIGATION
14                                            **CLASS ACTION**

15                                            **DEFENDANTS' REPLY IN FURTHER
                                              SUPPORT OF MOTION TO DISMISS
16                                            PLAINTIFFS' CONSOLIDATED CLASS
                                              ACTION COMPLAINT**
17
                                              Hearing Date:  April 28, 2022
18                                            Time:          1:30 pm
                                              Courtroom:     5
19                                            Judge:         Hon. Edward M. Chen

20

21

22

23

24

25

26

27

28

COOLEY LLP

1

**TABLE OF CONTENTS**

2

**Page**

3  I.    INTRODUCTION ................................................................................................. 1

4  II.   PLAINTIFFS' ARGUMENTS REST ON AN INACCURATE AND
       MISLEADING NARRATIVE THAT IS NOT SUPPORTED BY THE
5      ALLEGATIONS IN THE CAC.......................................................................... 3

   III.  ARGUMENT ....................................................................................................... 5
6
       A.   Plaintiffs Fail to Plead a Cogent or Coherent Theory of Scienter ......... 5
7
            1.   The Only Compelling Inference To Be Drawn From The
8                Allegations And Undisputed Facts Is That Defendants Acted In
                 Good Faith.................................................................................... 6
9
            2.   Plaintiffs Cannot Plead Scienter Against Defendants As A Group,
10               and the Individualized Allegations Are Deficient......................... 9

            3.   Plaintiffs' Additional Allegations Fail to Establish Scienter ................... 11
11
       B.   The CAC Fails To Adequately Allege Falsity Of Any Challenged
            Statement...................................................................................... 12
12
            1.   Black Box Warning Statements ................................................. 12
13
            2.   Statements About FDA Interactions ......................................... 13
14
            3.   Non-Inferiority Margin Statements............................................ 14

            4.   Efficacy Statements.................................................................. 15
15
            5.   Pooled CV Safety Analyses Statements.................................... 16
16
                 a.   FibroGen Analyzed Safety Data in Accordance with the
                      PSAPs............................................................................. 16
17
                 b.   FibroGen's Statements About the Results of the Pooled
18                    Safety Analyses Are Inactionable Opinion ................................. 17

            6.   Puffery/Opinion Statements....................................................... 18
19
            7.   Forward-Looking Statements..................................................... 19

20 IV.   CONCLUSION................................................................................................. 20

21

22

23

24

25

26

27

28

Cooley LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ................................................................ 6

*In re AstraZeneca Securities Litigation*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008) .................................................. 8, 9

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ................................................ 6

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ...................................... 12

*Cheung v. Keyuan Petrochemicals, Inc.*,
2012 WL 5834894 (C.D. Cal. Nov. 1, 2012) ........................................ 9

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................ 6

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) .................................................. 19

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .............................................................. 19

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...................................... 6

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .................................................. 18

*Ingram v. VIVUS, Inc.*,
591 F. App'x 592 (9th Cir. 2015) .......................................................... 15

*Jackson v. Fischer*,
No. C 11-2753 PJH, 2015 WL 1143582 (N.D. Cal. Mar. 13, 2015) ...... 11

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ...................................... 15

*In re MannKind Securities Actions*,
835 F. Supp. 2d (C.D. Cal. 2011) ..................................................... 13, 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................ 11

1

2

**TABLE OF AUTHORITIES**
**(CONT.)**

3

Page(s)

4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008).............................................................................. 6, 7

5

6

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)..................................................................................... 9

7

*Nozak v. N. Dynasty Mins. Ltd.*,
    804 F. App'x 732 (9th Cir. 2020) ............................................................................. 6

8

9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................... 17

10

11

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)............................................................................... 20

12

13

*In re QuantumScape Sec. Class Action Litig.*,
    2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ....................................................... 17

14

*In re Rigel Pharm., Inc. Sec. Litig.*,
    2009 WL 5125344 (N.D. Cal. Dec. 21, 2009) ..................................................... 20

15

16

*Rudolph v. UTStarcom*,
    560 F. Supp. 2d 880 (N.D. Cal. 2008) .................................................................... 9

17

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) ............................................................ 15, 17

18

19

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016)................................................................................. 18

20

21

*Taormina v. Annie's, Inc.*,
    2015 WL 1743585 (N.D. Cal. Apr. 16, 2015) ..................................................... 12

22

23

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ................................................................. 17

24

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................. 18

25

26

*In re Wells Fargo & Co. Shareholder Derivative Litigation*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017). (Opp. 35.)............................................. 10

27

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    2022 WL 853252 (9th Cir. March 23, 2022) ....................................................... 19

28

Cooley LLP

REPLY IN FURTHER SUPPORT
OF MOTION TO DISMISS
3:21-CV-02623-EMC

1
2

# TABLE OF AUTHORITIES
## (CONT.)

3

**Page(s)**

4

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................. 9

5
6

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999)................................................................................. 18

7

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)................................................................. 5, 6, 11, 12

8
9

**Statutes**

PSLRA ......................................................................................................... 1, 9, 10

10
11

**Other Authorities**

12

Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities:
    https://www.fda.gov/regulatory-information/search-fda-guidance-
    documents/cpg-sec-120100-fraud-untrue-statements-material-facts-bribery-
    and-illegal-gratuities ............................................................................................ 5

13
14

*https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review* ...................... 13

15

https://www.statista.com/statistics/245473/market-share-of-the-leading-10-global-
    pharmaceutical-markets/ ....................................................................................... 6

16
17
18
19
20
21
22
23
24
25
26
27
28

Cooley LLP

iii

## I.   INTRODUCTION

Plaintiffs' Consolidated Class Action Complaint ("CAC") challenges nearly one hundred statements about roxadustat over a two-and-a-half-year period based on the fiction that Defendants "manipulated" or "hid" certain pooled safety analyses.  But the CAC never actually alleges any such manipulation or concealment.  Indeed, stripped of conjecture, conclusory allegations, and unsupported facts, the CAC fails to adequately allege any false or misleading statement, or scienter.

As an initial matter, Plaintiffs' arguments fail to take into account the context in which the challenged statements were made.  The roxadustat Phase III program, one of the largest ever conducted, contained numerous complexities in study design, patient population, and results, including a higher-than-expected dropout rate in the NDD studies.  As a result, the assessment of safety was to be based on a totality of evidence approach, and, unlike with many double-blind studies, FibroGen and the FDA continued to discuss the endpoints, statistical thresholds, and analytical methodologies after the data had been unblinded.  The statical analysis plan for pooling the safety data also specifically contemplated that FibroGen would conduct both pre-specified and not pre-specified analyses.  The Company disclosed these complexities, the totality of evidence standard, and the ongoing discussions with the FDA to investors throughout the Class Period, including when it announced topline safety data in May 2019.  Indeed, it was not until the pre-NDA meeting in July 2019, seven months into the Class Period and after the May 2019 disclosure of topline safety results, that the Company and the FDA reached agreement on the primary safety endpoint and primary analytical methodologies.  This context, which Plaintiffs' Opposition ignores, and the underlying facts, which Plaintiffs do not dispute, undermine all of Plaintiffs' arguments about falsity and scienter.

The Court need not even reach falsity because it is now abundantly clear from Plaintiffs' Opposition that the CAC does not come close to pleading facts that give rise to a plausible, let alone cogent and compelling, inference of scienter.  In attempting to meet its pleading burden, Plaintiffs continue to rely principally on group pleading and stock sales.  Group pleading simply does not, as a matter of law, satisfy the heightened pleading requirements of the PSLRA.  As for the stock sales, they fundamentally undercut any inference of scienter and, indeed, provide compelling support for

1   the competing inference of good faith.  Of the five Individual Defendants, three sold *fewer* shares

2   during the Class Period than during the comparable period before the alleged fraud; another sold

3   *no* FibroGen shares at all during the Class Period; and the fifth didn't sell any shares and actually

4   *purchased* shares during the Class Period.  And non-defendant Neff, selling pursuant to a 10b5-1

5   plan, continued a remarkably consistent pattern of transactions dating to well before the beginning

6   of the Class Period.  It is impossible to infer from these allegations anything other than an absence

7   of intent.   Against this compelling evidence, the CAC fails to reference a single email,

8   contemporaneous document or confidential witness from which one could infer scienter.

9   Moreover, the Opposition largely ignores one of the principal facts underlying the Company's

10  optimism regarding roxadustat's data and potential approval: the drug had received approval for

11  the treatment of anemia in CKD patients (the same indication for which it sought approval by the

12  FDA) in many of the largest markets in the world.  When viewed holistically, the only cogent

13  inference to be drawn from the facts is that Defendants acted in good faith.

14          Should the Court address the adequacy of the CAC's falsity allegations, the result is the

15  same: the CAC falls short.  Other than to repeat the word "manipulation," the Opposition does not

16  meaningfully engage with the arguments raised in Defendants' Motion to Dismiss.  All that

17  Plaintiffs have alleged at this point is that the Company undertook multiple analyses of the pooled

18  safety data.  But investors knew – because the Company repeatedly told them – that it would

19  conduct multiple analyses of the pooled safety data, including both pre-specified and non-

20  prespecified analyses, that it would submit these analyses to the FDA, and that the FDA might

21  disagree with the Company's conclusions.  As Plaintiffs concede, the Company did not have a duty

22  to disclose all possible analyses of the safety data, and investors knew that the Company conducted

23  many analyses that it did not disclose publicly.  That the Company decided to later share one of

24  those additional sets of analyses (which the FDA agreed were "qualitatively similar" and thus did

25  not impact the FDA's evaluation of roxadustat) does not render the original disclosures false or

26  misleading.  Nor does it render false or misleading other statements about roxadustat's potential

27  label, NDA, the non-inferiority margin used in evaluating safety data, or efficacy.

28          Accordingly, Defendants respectfully request that the CAC be dismissed with prejudice.

## II.   Plaintiffs' Arguments Rest On An Inaccurate and Misleading Narrative That Is Not Supported By the Allegations In the CAC.

The Opposition is premised on a series of "facts" conjured out of FibroGen's April 6, 2021 press release sharing additional safety data.  But to construct their "manipulation" theory, Plaintiffs entirely ignore the complexities in the design and reporting of FibroGen's pooled safety analyses.  Stripped of supposition, conjecture, and speculation, Plaintiffs' narrative collapses.[1]

*First*, the roxadustat Phase III clinical program was one of the largest and most complex CKD anemia programs in history.  (*See, e.g.*, Ex. A at 83.)  There were multiple studies, designed and initiated at different times with multiple collaboration partners, for regulators in multiple jurisdictions, with multiple comparators, patient populations, endpoints, and analytical methods.  (Mot. at 4-5.)  To generate sufficient data to meaningfully ascertain MACE risk, FibroGen and AstraZeneca, in consultation with the FDA, pooled the safety data from six of those studies.  (*Id*.)  However, each individual study had its own separate study-specific Statistical Analysis Plan ("SAP"), meaning that FibroGen and AstraZeneca had to determine how to best pool this already complicated data from multiple studies.  (*Id*.)  The PSAPs that FibroGen and AstraZeneca submitted to the FDA provided that the data would be analyzed many different ways, using both stratification factors set forth in the study-specific SAPs for each of the six trials (which were different), and other "common" stratification factors used to assess clinical data.  (*Id*.)

*Second*, further complicating the safety analyses was uncertainty as to the analytical frameworks and endpoints.  The NDD studies had a much higher rate of patients in the placebo arm dropping out than patients receiving roxadustat.  (Ex. J at 14; *see also* Ex. XX at 69-70; Ex. VV at 13.)  Because one analytical framework for the NDD studies measured adverse events only while a patient was "on treatment," the studies did not accumulate as many adverse events in the placebo arm, potentially skewing the results.  (*See* Ex. J at 5-6, 17.)  The DD studies faced another complexity – after the study treatment period, the majority of roxadustat patients were treated with

---

[1] Plaintiffs do not oppose Defendants' Request for Judicial Notice. (Dkt. No. 108.)  Nor do they contest the authenticity of any exhibit submitted to the Court therewith.  Thus, Plaintiffs implicitly concede that the 43 documents incorporated by reference in the CAC and the 57 documents subject to judicial notice are properly before the Court.

1   the comparator (epoietin-alfa).  (Ex. WW at 121.)  Any analysis evaluating adverse events after the

2   treatment period would again skew results, as adverse events while on the subsequent treatment

3   would be attributed to roxadustat.  (*Id*.)  When the Company shared topline safety results in May

4   2019 (*after* the data was unblinded), it made clear that it did not have agreement with the FDA on

5   the primary analytical frameworks or endpoints, and that these would be discussed at the pre-NDA

6   meeting in July 2019.  (Ex. J at 6, 12, 17.)  At the pre-NDA meeting, the FDA finally agreed that

7   the Company could use an ITT framework for the NDD group and OT-7 for the DD group and that

8   MACE would be the primary endpoint.  (Ex. N at 9; Ex. S at 28; Ex. PP at 1.)

9        *Third*, just as FibroGen had received some clarity from the FDA regarding the pooled safety

10  analyses and was preparing to submit the NDA, its founder and CEO for over 25 years, Neff,

11  unexpectedly passed away.  (¶ 5, n.1.)  The Company was forced to replace its leader at this critical

12  stage: first with interim CEO Schoeneck, who served in that role for four months, and then

13  Conterno, who joined the Company as permanent CEO on January 6, 2020.  (¶¶ 19, 21.)  A year

14  later, Dr. Yu retired as Chief Medical Officer and was succeeded in this role by Dr. Eisner.  (¶ 23.)

15       *Fourth*, given these and other complexities, FibroGen made clear to investors that the

16  FDA's evaluation would be based on the "totality of evidence," and, accordingly, the Company

17  would analyze the data many different ways.  (*See, e.g.*, Ex. I at 2; Ex. R at 12.)  For example, the

18  Company made clear that it would "present to regulatory authorities certain pre-specified and not

19  pre-specified sub-populations and sub-group analyses (for example, incident dialysis), multiple

20  secondary endpoints, and multiple analytical methods."  (*See, e.g.*, Ex. L at 46.)  The Company also

21  stated that "additional supportive analyses and sensitivity analyses as well as subgroup analyses"

22  would be submitted.  (Ex. S at 28.)  In December 2019, it did just that, submitting an NDA that

23  included many different analyses.  (Ex. YY at 86.)  Thus, when the Company publicly disclosed

24  the safety results in 2019 (and thereafter), investors were fully informed that other analyses existed.

25       Plaintiffs' claim seems to boil down to a disagreement about which analyses should have

26  been shared with investors.  But, while FibroGen shared additional safety analyses in April 2021,

27  Plaintiffs do not allege that any of the previously-shared data was incorrect, altered, or falsified or

28  that Defendants did not believe them to be the most reasonable way to interpret the data at the time.

1   Indeed, in the April press release, the Company made clear that there was "no change in the

2   underlying Roxadustat data" (that is, no manipulation of data) (PP at 1), a statement that Plaintiffs

3   do not challenge.  Moreover, both analyses (among others) had been submitted in the December

4   2019 NDA, with an explanation of what stratification factors were used and why.  (Ex. QQ at 7.)

5   In April 2021, new management reached a different conclusion about which analyses should be

6   labeled as primary in the NDA.  As it explained on April 6, the Company then "had a meeting with

7   the FDA to ensure that it was clear" and then in an effort to be transparent "communicate[d] [to]

8   the scientific and investment community" these other analyses.  (*Id*. at 7, 10.)  Although Plaintiffs

9   now argue that Defendants somehow misled the FDA, the CAC makes no such claim and is devoid

10   of any well-plead allegations to that effect.  There is no negative commentary from the FDA

11   regarding the Company's use of post-hoc stratification factors or its presentation of the various

12   analyses in the NDA.  (*See, e.g.* Ex. VV.)  This should come as no surprise as the PSAPs filed with

13   the FDA permitted the Company to use "other common stratification factors."  (Ex. B at 137; *see*

14   Ex. YY at 86.)  Indeed, the FDA staff explicitly approved of the Company's approach in its Briefing

15   Document: "The MACE meta-analysis included pre-specified, trial-specific stratification factors.

16   The applicant also provided results using common stratification factors defined post hoc.  The

17   findings were qualitatively similar, regardless of the stratification factors."  (Ex. VV at 47; *see also*

18   Ex. XX at 169-71.)  Had the FDA felt "deceived" as Plaintiffs contend, it would have made its

19   concerns known and taken appropriate action.[2]  The CAC alleges no such action, as there was none.

20          None of this context is meaningfully addressed in the Opposition.

21   **III.    ARGUMENT**

22          **A.    Plaintiffs Fail to Plead a Cogent or Coherent Theory of Scienter**

23          Arguing that "scienter here is self-evident" (Opp. at 28), Plaintiffs seek to avoid their burden

24   to plead specific facts supporting a "malicious inference [of scienter that] is at least as compelling

25   as any opposing innocent inference."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991

26   (9th Cir. 2009).  Whether viewed holistically or individually, the CAC fails to plead a cogent or

---

[2] *See* Compliance Policy Guide, CPG Sec. 120.100 Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-120100-fraud-untrue-statements-material-facts-bribery-and-illegal-gratuities.

coherent inference of scienter.  *Id.* at 990  This is fatal to Plaintiffs' claims.[3]

### 1.     The Only Compelling Inference To Be Drawn From The Allegations And Undisputed Facts Is That Defendants Acted In Good Faith

Viewing Plaintiffs' scienter allegations and the undisputed facts holistically, the only plausible inference that can be drawn is that Defendants acted in good faith.

*First*, Defendants' optimism regarding roxadustat's safety data, its risk-benefit profile, and its approval prospects should come as no surprise given FibroGen's global success with roxadustat. By August 2019, the medicine was approved in China – the second largest pharmaceutical market in the world – to treat anemia in patients with CKD.[4]  (Ex. W at 3.)  A month later, Japan – the world's third largest market – also approved the drug.  (*Id.*)  And on August 19, 2021, within days of the end of the Class Period, the European Commission approved roxadustat, covering the next five biggest markets (Germany, France, Italy, UK, and Spain).  (Ex. ZZ.)  Plaintiffs' thesis that roxadustat was "too unsafe to be approved at all" (Opp. at 22) is simply untrue.

*Second,* rather than being indicative of scienter as Plaintiffs claim, Defendants'' stock sales support the opposite conclusion. While stock sales "dramatically out of line with prior trading practices" can provide circumstantial evidence of scienter, non-discretionary[5] and consistent stock sales negate such an inference.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1066-67 (9th Cir. 2008); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).  When defendants collectively sell a greater number of shares during an equal period of time *before* the class period than they did *during* it, or sell no shares at all, any adverse inference is rebutted.  *In re Apple Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989); *see also In re Downey Sec. Litig.*, 2009 WL 2767670, at \*13–14 (C.D. Cal. Aug. 21, 2009).

---

[3] Contrary to Plaintiffs' assertion (Opp. 35 n.30), Defendants do not concede that the CAC alleges scienter as to FibroGen.  Because Plaintiffs do not plead scienter as to any individual defendant, they cannot plead scienter as to FibroGen.  *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1120 (C.D. Cal. 2012); *Nozak v. N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020) (noting that Ninth Circuit has not adopted the corporate scienter doctrine).
[4] https://www.statista.com/statistics/245473/market-share-of-the-leading-10-global-pharmaceutical-markets/
[5] Plaintiffs' only response to the fact that all the pre-Class and Class Period sales at issue were made pursuant to 10b5-1 plans is to argue that Defendants do not identify when the plans were adopted. (Opp. 33 n.26.)  But it is *Plaintiffs' burden* to show that stock sales are suspicious; they do not.

It is hard to imagine a more compelling set of stock sales in support of an inference of good faith than that presented in this case.  Defendants' stock analysis goes essentially unchallenged by Plaintiffs.  It is undisputed that: (1) the Individual Defendants, along with Neff, collectively sold nearly 3 million shares of FibroGen stock in the 31 months before the Class Period compared to fewer than 900,000 shares during the 31-month Class Period; (2) Conterno sold no shares during the Class Period and, instead, *purchased* shares; (3) Eisner sold no shares during the Class Period; and (4) the two remaining defendants – Yu and Cotroneo – sold significantly fewer shares during the Class Period than in comparable periods before the alleged fraud took place.  (Mot. at 24-26.)

Plaintiffs' primary response is that Neff sold 683,448 shares in the first 8 months of the Class Period before he died compared to 584,904 shares (or 14% fewer) during the eight-months immediately preceding the Class Period.  (Mot. at 25.)  This is hardly "dramatically out of line with prior trading practices" required to infer scienter.  *Metzler*, 540 F.3d at 1066-67.  In fact, Neff's Class Period trades were fully consistent with his prior trading practices[6]:

| Class Period Sales 8 months (12/20/18 – 8/25/19) | Pre-Class Period 8 Months (4/20/18-12/20/18) | Pre-Class Period 8 months (8/20/17–4/20/18) | Pre-Class Period 8 months (12/20/16-8/20/17)[7] |
|---|---|---|---|
| 683,448 | 589,904 | 700,448 | 614,824 |

The stock sales provide compelling evidence supporting an inference of good faith.

*Third*, far from being an "admission" of fraudulent intent (*see, e.g.*, Opp. at 9), the fact that the Company voluntarily shared additional information with investors in the April 6, 2021 press release undermines any inference of scienter.  As explained during a call with investors that same day, Company management identified the issue in the NDA, proactively informed the FDA, and then, to be transparent to investors and the scientific community, issued the press release.  (QQ at 4, 10.)  Such conduct is simply inconsistent with an effort to deceive investors.

---

[6] Neff's stock sales were remarkably consistent.  In the three months before his death (June 1 to August 25, 2019), he sold 237,816 shares. (Kasner Decl. App'x D.)  He sold *exactly* the same number– 237,816 – in each preceding three-month period, both during the Class Period (March 1 to May 31, 2019, and December 1, 2018 to February 28, 2019) and before (September 1 to November 30, 2018, June 1 to August 31, 2018, and March 1 to May 31, 2018).  This consistency is even reflected in the arbitrary period Plaintiffs use to argue that Neff "furiously unloaded" 317,000 shares in the three months (106 days actually) after the May 2019 press release (Opp. at 32).  In the 106-day period before then, he sold 306,360 shares. (Kasner Decl. App'x D.)

[7] While Appendix D does not reflect these results, they can be calculated by adding the numbers in the "# Shares Sold" column for the applicable date range.

*Fourth,* Plaintiffs do not dispute that FibroGen was faced with the challenging task of combining six separate clinical trials (with different trial designs, study-specific stratification factors, and individual statistical analyses plans) into two pooled data sets. Nor do Plaintiffs dispute that the PSAPs contemplated that the Company would use both study-specific *and other common* stratification factors. Plaintiffs also do not dispute that FibroGen was transparent throughout the Class Period that it was conducting both "**pre-specified and not pre-specified"** analyses (Ex. S at 57); that "additional supportive analyses and sensitivity analyses," including some showing higher hazard ratios, would be included in the NDA (Ex. S at 28; Ex. SS at 10); that the FDA would "conduct [its] own benefit-risk analysis and may use additional statistical analyses other than those agreed with the FDA" and other than the "primary" analyses disclosed to investors (Ex. S at 28); and that the FDA might disagree with the Company's interpretation of the data (Ex. W at 65).

*In re AstraZeneca Securities Litigation*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008) is particularly instructive. There, plaintiff alleged that AstraZeneca misled investors into thinking that a drug was safer than the data showed. Plaintiff claimed the company's statements that, among other things, the medicine had a "favourable safety profile" and the safety data demonstrated "non-inferiority" were false because the company failed to disclose potential liver toxicity. *Id.* at 460-61. They alleged that the truth was revealed in the FDA's briefing book to the AdCom, which expressed concerns about safety risks not previously disclosed. *Id.* at 458. Ultimately, the AdCom voted to recommend against approval, and the FDA declined to approve the NDA. *Id.* at 463. The court dismissed the complaint for failure to plead scienter, finding that there were no facts pled that suggested management did not honestly believe its statements about the positive safety profile of the drug. *Id.* at 470-72. In reaching this conclusion, the court noted the company's warnings that the FDA would need to conduct a risk-benefit evaluation and it was uncertain what the outcome would be. *Id*. at 471. Further, even though the FDA briefing book was unfavorable and AstraZeneca's briefing document painted a much more positive assessment, the court concluded "[i]t is impossible to read the FDA document and the AstraZeneca document without concluding that both present the honest analysis and conclusions of their authors." *Id*. Given, among other things, the drug's approval in Europe, it was not unreasonable for defendants to believe in their

product. *Id.* That the FDA ultimately did not approve the drug does not "mean that the information issued publicly over the course of more than a year was dishonest or recklessly disseminated." *Id.*

The facts are even more compelling here as roxadustat had received regulatory approval in some of the largest markets in the world and the Company provided robust disclosures around the evolving standards and analyses it expected the FDA to consider, including that the FDA would undertake its own risk-benefit analysis. Further, the AdCom's recommendation was not focused solely on either of the analyses shared with investors; they also took into account other sensitivity analyses, the complexity of the data, and other safety risks, such as thrombosis, which the Company had warned investors could happen. (See Mot. at 10-11.) In light of those and other facts discussed herein, Plaintiffs' core theory that Defendants hoped to inflate the stock price for some indeterminate period knowing that the truth would come out and they would then "face the inevitable fallout" has what the Ninth Circuit has called a "first level problem:" it "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

### 2. Plaintiffs Cannot Plead Scienter Against Defendants As A Group, and the Individualized Allegations Are Deficient.

Because they cannot point to any particularized facts – no contemporaneous emails, reports, or communications with Defendants are alleged in the CAC – Plaintiffs continue to accuse the "Defendants" as a group of engaging in a coordinated fraud over two-and-a-half years. But the PSLRA requires that scienter must be pleaded "separately for ***each*** alleged misrepresentation and ***each*** defendant." *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007) (emphasis added). Plaintiffs cannot "mak[e] generalized allegations" of scienter "that group the Individual Defendants together." *Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *4 (C.D. Cal. Nov. 1, 2012)*; see also Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 891 (N.D. Cal. 2008) ("plaintiff must plead facts showing that each individual defendant acted with scienter, not only the one or two defendants currently implicated by the confidential witnesses").

As set forth in the Motion, Plaintiffs' scienter allegations are rife with group pleading generalities that lack requisite specificity as to any Individual Defendant and, in many cases, simply make no sense. (Mot. at 26.) Plaintiffs' Opposition doubles down on these untethered allegations.

9

1    For example, Plaintiffs claim that "Defendants" admitted to personally participating in the pre-

2    NDA meeting, but never allege which Defendants "admitted" to it.  (Opp. at 29.)  As the meeting

3    happened before Schoeneck, Conterno, and Eisner were employed by FibroGen, the allegation

4    makes no sense.  Similarly, Plaintiffs contend that "Defendants [] shamelessly touted [] falsified

5    data to the market <u>for over two years</u>."  (*Id.*)  However, Cotroneo made no statements about

6    roxadustat's safety data, nor would it make sense for him to do so as CFO.  And the only challenged

7    statements by Eisner, who joined the Company in December 2020, were made in March and April

8    2021.  (*See also* Mot. at 28-30.)  The PSLRA simply does not allow such imprecise allegations.

9        In an effort to justify their attempt to plead scienter collectively, Plaintiffs rely on *In re*

10   *Wells Fargo & Co. Shareholder Derivative Litigation*, 282 F. Supp. 3d 1074 (N.D. Cal. 2017).

11   (Opp. 35.)  But, in *Wells Fargo*, the court held "that Plaintiffs cannot prevail on their Section 10(b)

12   claims purely under a group pleading theory."  *Wells Fargo*, 282 F. Supp. 3d at 1094.  Instead, the

13   court found that plaintiff had alleged scienter based on particularized allegations that each

14   defendant knew or had access to information as they served on committees with knowledge of the

15   fraud, testified before Congress and made public statements about the issues, and reviewed and

16   maintained metrics revealing the fraud.  *Id.* at 1099.  The detailed allegations in *Wells Fargo*

17   underscore the CAC's deficiencies here.

18       Plaintiffs' reliance on group pleading is further demonstrated by the almost total absence of

19   several of the Individual Defendants from Plaintiffs' Opposition.  Schoeneck is mentioned just *one*

20   time in the entire brief, in a footnote on page 1 identifying him as a Defendant. (Opp. 1 n.1.)  In

21   addition to identifying him in the same footnote, the Opposition's only other reference to Eisner is

22   in yet another footnote in which Plaintiffs argue that his lack of stock sales should not negate

23   scienter.  (Opp. 32 n. 25.)  The only reference to Cotroneo, in addition to the two footnotes, relate

24   to his stock sales, which, as discussed above, do not support an inference of scienter.  (Opp. 32.)

25   The Opposition mentions Conterno a handful of times, claiming that he "personally reviewed"

26   roxadustat's safety data and was "preparing in-depth for the AdCom."  (Opp. 8, 31 n.22.)  Neither

27   allegation supports an inference of scienter.  Although there are a few more arguments in the

28   Opposition regarding Yu and Neff, none of them come close to constituting a well-plead factual

1   allegation that either did not believe in his or her public statements.

2   In short, the CAC and Opposition are silent as to the state of mind of any Defendant. They

3   lack any particularized allegations regarding the role of any Defendant in the decisions regarding

4   which analyses to disclose, which to consider "primary" or "sensitivity," or any other detail from

5   which one could infer that any Defendant engaged in "an extreme departure from the standards of

6   ordinary care." *Zucco*, 552 F.3d at 991. Plaintiffs do nothing more than implore the Court to

7   assume from their sensationalized "manipulation" mantra that *all* Defendants "must have known."

8   But asserting that falsity is "so egregious" that "defendants 'must have known'" is an argument

9   "without merit" which has "been repeatedly rejected by courts in the [Ninth] Circuit." *Jackson v.*

10  *Fischer*, No. C 11-2753 PJH, 2015 WL 1143582, at *17 (N.D. Cal. Mar. 13, 2015).

11  ### 3.   Plaintiffs' Additional Allegations Fail to Establish Scienter

12  **Commentary in the Scientific and Finance Communities.** Plaintiffs cite "scathing

13  criticism," "outrage," and "shock" by analysts and life sciences media. According to Plaintiffs,

14  that these third parties "universally concluded that the Defendants' manipulations were intentional

15  in nature," "bolsters an inference of scienter." (Opp. 30; *see also id.* 2–3, 4, 11–13, 14, 16–17.)

16  But Plaintiffs' reliance is misplaced. Media reports "should be credited only to the extent that other

17  factual allegations would be—if they are sufficiently particular and detailed to indicate their

18  reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a

19  newspaper article than from plaintiff's counsel." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.

20  Supp. 2d 1248, 1272 (N.D. Cal. 2000). Neither the CAC nor the Opposition supports that the

21  commentary was based on anything other than speculation. The articles do not reference

22  communications with Defendants (or anybody else at FibroGen) or access to internal Company

23  documents. That third party commentators had "***suspicion*** that ***someone*** within FibroGen carefully

24  selected the new criteria" (Opp. 3) simply does not support an inference of scienter.[8] This is

25  especially true when the FDA said nothing negative about FibroGen's conduct.

26  **Core Operations Inference.** Plaintiffs repeat their assertion that roxadustat was

27
28  [8] Dr. Coyne's work as a "site investigator in the roxadustat trials" (Opp. 30 n.21) says nothing about whether he had knowledge of clinical trial results or data analyses (he did not, *see* ¶ 10).

FibroGen's "core operation" to argue that "it would be absurd to suggest that top management was unaware of" issues. (Opp. 30–31.) But beyond invoking the inference by name, Plaintiffs do not explain what purported "issues" Defendants should have known, which Defendants should have known them, or when. As *Browning v. Amyris, Inc.* makes clear, merely invoking "core operations" does not grant an "automatic presumption of comprehensive knowledge on the part of management." 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014).

Furthermore, the mere fact that the Company issued additional information about the safety analyses is not indicative of scienter. Even where companies issue actual corrective statements – such as financial restatements – courts still require particularized allegations of an intent to mislead. In *Zucco*, for example, defendants announced that they had improperly accounted for internal software expenditures and had to restate six quarters of earnings. *Zucco Partners*, 552 F.3d at 988. The court analyzed a "legion" of scienter allegations, including CW statements, executive resignations, bonuses, and stock sales, and ultimately concluded that none supported a "specific intent to fabricate the accounting misstatements at issue." *Id*. at 1007; *see also Taormina v. Annie's, Inc.*, 2015 WL 1743585, at *4 (N.D. Cal. Apr. 16, 2015) (dismissing claims where plaintiffs failed to "allege any contemporaneous facts suggesting that the Individual Defendants believed at the time that the methodology used to account for promotional costs was inappropriate"). As in *Zucco* and *Annie's*, Plaintiffs fail to plead any particularized facts that Defendants intentionally "fabricated" the safety analyses or believed they were analyzing the data inappropriately.

The CAC fails to plead scienter, and the Motion should be granted.

**B.     The CAC Fails To Adequately Allege Falsity Of Any Challenged Statement**

**1.     Black Box Warning Statements**

Plaintiffs allege that Conterno, Yu, and non-defendant Neff's statements regarding whether the FDA would require a "black box" warning on roxadustat's label were false and misleading. (Opp. at 22.) But Defendants never represented to investors that roxadustat would not have a "black box" warning. To the contrary, Defendants warned investors that the label *could* have a black box warning and that "what the FDA puts on the label is something . . . we may not have much control over." (Mot. at 12; #21.) This was reiterated throughout the Class Period, with Cotroneo telling

1   investors in September 2020 that it was "difficult to handicap what we'll end up with the FDA."

2   (Ex. EE at 6.)  And investors were not misled; the great "debate" among analysts and investors was

3   whether roxadustat would receive a black box.  (*Id.*)  Plaintiffs principally rely on an allegation

4   attributed to CW3 that "in the fall of 2020 . . . close to December . . . it became clear that we were

5   likely going to have a [Black Box] warning."  (Opp. at 22; ¶ 130.)  Even if true, that allegation

6   sheds no light on whether the black box statements were false *when made.* The only challenged

7   statements addressing a potential black box were made between May 2019 and June 2020, well

8   *before* CW3's alleged revelation that a black box was likely.  (*See* Appendix ## 21, 24, 42, 51, 54-

9   55.)  Although Plaintiffs challenge some later responses to inquiries about a potential label (##56,

10   60, 67-68), in which the Company refused to comment due to ongoing discussions with the FDA,

11   none of those responses were substantive.  And each occurred prior to December 2020.  Finally,

12   there is no indication in the CAC or elsewhere, that the FDA has actually taken a position as to

13   whether a black box warning would be required upon roxadustat's approval.  That is, even if

14   Defendants had stated (which they did not) that the FDA would not require a black box warning

15   upon approval, the statement could not be false as no label was ever finalized for the drug.

16                          **2.     Statements About FDA Interactions**

17          Plaintiffs argue that Defendants made "patently false" statements about the NDA

18   submission – for example, that they "had all the guidance from the [FDA] they needed," that

19   "interaction with the FDA was positive," and that the "NDA submission was complete and

20   transparent."  (Opp. at 21-22.)  The Opposition fails to identify a single fact that contradicts these

21   statements.  The fact that the FDA accepted the NDA for review refutes any argument that the NDA

22   was not "complete."[9]   The CAC also fails to allege any facts that suggest the Company had

23   interactions with the FDA that were not "positive."  Plaintiffs cite *In re MannKind Securities*

24   *Actions*, 835 F. Supp. 2d, 797, 811 (C.D. Cal. 2011), to argue "that statements concerning

25   'approval'…by the FDA 'necessarily implied that there would be no serious impediments to timely

26   _____

27   [9]   *See   https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review*   ("Once
     FDA receives an NDA, the review team decides if it is complete. If it is not complete, the review
28   team can refuse to file the NDA. If it is complete, the review team has 6 to 10 months to make a
     decision on whether to approve the drug.")

1   FDA approval.'"  (Opp. at 22.)  But the statements challenged by Plaintiffs say nothing about
2   *approval* of the NDA.  Furthermore, the facts of *MannKind* bear no resemblance to the facts here.
3   There, defendants allegedly misled investors by claiming that the FDA had "vetted" and
4   "approved" a clinical study's design, when defendants had designed, enrolled, and conducted the
5   bulk of the study before meeting with the FDA, and the FDA had previously criticized a prior study
6   with the same design.  835 F. Supp. 2d at 811-12.  No similar facts are alleged here.

7       Plaintiffs' attempt to twist Yu's November 2019 statement that the disclosed analyses "were
8   based on the agreed analysis plan that we have made with the FDA" into an assurance about the
9   stratification factors likewise fails.  (*See* Opp. at 8; ¶ 64.)  The Company never commented on the
10  stratification factors to be used in the analyses, thus it would be illogical to assume (in hindsight)
11  that Yu's general statement was suddenly a reference to them.  And the context surrounding Yu's
12  statement makes clear that she could only have been referring to the agreement reached at the pre-
13  NDA meeting in July 2019 as to the specific analytical methods that would be used for NDD (ITT)
14  and DD (OT-7).  (Ex. R at 12, 15.)  There was nothing false about Yu's statement.

15          **3.    Non-Inferiority Margin Statements**

16      Plaintiffs argue that Defendants falsely suggested that the safety data would be assessed
17  using a 1.3 non-inferiority margin.  In support, Plaintiffs point solely to the comment during the
18  AdCom by one FDA member, Dr. Farrell, that some unidentified "we" "had a goal of 1.25."  (*See,*
19  *e.g.,* ¶ 55.)  Plaintiffs come nowhere close to pleading falsity of these statements.

20      First, it is simply not true that Defendants assured investors that the FDA would apply a 1.3
21  non-inferiority margin.  The Company was clear in its public statements that, because the FDA had
22  not provided guidance regarding the non-inferiority margin for CKD studies (Ex. U at 8), it
23  analyzed the data based on a "commonly applied" non-inferiority margin of 1.3 that the FDA had
24  accepted for other drugs, such as diabetes medicines.  (*See* ## 8, 9, 19, 20, 32, 38, 43, 45.)  Second,
25  while the Opposition argues that "the FDA had emphatically rejected 1.3 as invalid and had stated
26  all along that its goal was an upper bound of 1.25" (Opp. at 20), there are no well-plead allegations
27  to support the assertion.  In fact, it is directly contradicted by the FDA's AdCom Briefing
28  Document:  "The FDA did not agree prospectively on a risk margin and did not agree on the

interpretation of the results using strictly a non-inferiority hypothesis testing approach." (Ex. VV at 47.)  Third, Dr. Farrell's statement was made in July 2021, months after the last challenged statements regarding the non-inferiority margin.  Fourth, to the extent 1.25 was indeed the FDA's target, Dr. Farrell's statement does not indicate whether it was communicated to any Defendant or anyone else at FibroGen or, if so, when.  Finally, if there was an agreed non-inferiority margin of 1.25, it makes no sense that FibroGen would have lied about it.  *All* pooled safety results presented using the "post-hoc" stratification factors were *below* 1.25.  (Ex. P at 4-5.)

### 4.    Efficacy Statements

Plaintiffs argue that Defendants misled investors by claiming that roxadustat "achieved superiority in efficacy" and by "tout[ing]" "efficacy benefits" such as "lower transfusions" and "improvement in quality of life."  (Opp. at 23.)  Plaintiffs argue that the purported "manipulation" of safety data "render[s] efficacy moot."  (Opp. at 24.)  But this is illogical – a medicine can be effective and also have side-effects and other risks relevant to a benefit-risk analysis.  Purported issues with "safety" do not render statements about the separate concept of "efficacy" false.  *See Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, *9 (N.D. Cal. Sept. 27, 2012), aff'd sub nom. *Ingram v. VIVUS, Inc.*, 591 F. App'x 592, 593 (9th Cir. 2015) (rejecting plaintiff's attempt to challenge statements regarding efficacy by identifying safety risks that defendants allegedly concealed).

Plaintiffs do not otherwise plead facts to support falsity.  The FDA confirmed in its Briefing Document to the AdCom that "efficacy is not in question" as "[a]ll studies … demonstrated efficacy."  (RJN Ex. VV at 7.)  In response, Plaintiffs rely on commentary by one AdCom member in July 2021 that roxadustat's reduction of blood transfusions – a secondary endpoint – was "'unclear' and likely nonexistent at the untested lower doses.'"  (Opp. at 23.)  The CAC does not allege that this opinion was shared with FibroGen before the AdCom or that FibroGen agreed with that view.  Further, that speculative comment says nothing about roxadustat's efficacy based on doses *actually tested*.  *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) ("mere disagreement with how [defendants] chose to interpret the results" is not fraud).

Plaintiffs' litigation-driven allegations contradict both the FDA's assessment and the conclusions reached by regulators in China, Japan, and the EU.  (Mot. at 23.)

### 5.      Pooled CV Safety Analyses Statements

Plaintiffs seem to contend that FibroGen misled investors when disclosing the results of the pooled safety analyses because it did not disclose that they purportedly did not comply with the "pre-specified" methodology agreed upon with the FDA and were changed after the data was unblinded. For these reasons, Plaintiffs argue that FibroGen "manipulated" and "doctored" data to "make the medicine appear safer than it was."[10] (Opp. at 15, 17.) Both factual premises are flawed. Moreover, the CAC fails to allege that the Company did not "sincerely believe" the statements about the pooled safety analyses. As a result, they cannot form the basis of a fraud claim.

#### a.      FibroGen Analyzed Safety Data in Accordance with the PSAPs

*First*, as set forth above, the PSAPs that FibroGen submitted to the FDA expressly contemplated that the data would be analyzed using *both* study-specific (*i.e.,* "pre-specified") *and* "other common" stratification factors. Thus, the use of "post-hoc" stratification factors was *indeed* part of the methodology submitted to the FDA. FibroGen told investors throughout the Class Period that it would be analyzing the data many ways and that it would submit certain sensitivity analyses to the FDA.[11] (*See, e.g.*, Ex. S at 28.) Investors could not have been misled into thinking that there was only one way to analyze the data or that FibroGen had not conducted any other analyses.

*Second*, the Company was transparent with investors that there was no agreement with the FDA about the analytical framework for the pooled safety analyses until the pre-NDA meeting in July 2019 – *after* the data was unblinded and *after* the safety results were first disclosed that May. Because of the size and complexity of the studies, and the unanticipated issues that arose (like the placebo-dropout rate in NDD), FibroGen and the FDA continued to assess the analytical approach

---

[10] Although Plaintiffs' "manipulation" theme features prominently in the Opposition, the CAC does not allege that safety data (or *any* data for that matter) was inaccurate, altered, or falsified. And rather than "admit" to manipulation, as Plaintiffs contend, FibroGen confirmed that there was "no change in the underlying roxadustat data, or to the efficacy analyses from the Phase 3 program." (*See* Ex. PP at 1; Ex. QQ at 4.) Plaintiffs do not challenge that statement as false.
[11] Plaintiffs argue that FibroGen did not disclose other "sensitivity analyses" purportedly showing "an increased risk of MACE" in the NDD population. (Opp. at 16, 19.) But FibroGen's 10-Q, filed on November 12, 2019, the day after the detailed pooled safety results were *first* disclosed, told investors that "additional supportive analyses **and sensitivity analyses** as well as subgroup analyses will also be included in the NDA and MAA." (Ex. S at 28; *see also* Ex. W at 9.) The Company also made clear that some of the sensitivity analyses would make the hazard ratios "in some cases, higher." (Ex. SS at 10.) To suggest that FibroGen "hid" anything is simply not true.

1    for the pooled safety analyses.  The primary analytical methods (ITT and OT-7) and primary

2    endpoint were not settled until *after* the data was unblinded and were fully endorsed by the FDA.

3              **b.      FibroGen's Statements About the Results of the Pooled Safety
                        Analyses Are Inactionable Opinion**

4

5              As "publicly stated interpretations of the results of various clinical studies … are essentially

6    no different than opinions," the Company's disclosures about the pooled safety analyses cannot

7    form the basis of a fraud claim unless the CAC pleads with particularity that the statements were

8    not "sincerely held."  *Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d at 567; *See Omnicare, Inc. v.*

9    *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015) (a sincerely held

10   opinion statement is not actionable even if the "stated opinion ultimately proves incorrect").  In

11   their Opposition, Plaintiffs do not dispute that this is the law.[12]  But, instead of identifying any

12   particularized facts to support the falsity of these opinions, Plaintiffs offer only the bald conclusion

13   that the statements "could not have been sincerely made."  The arguments they make to support

14   such conclusion each fail.

15             *First*, they claim that statements about efficacy and safety may be actionable "if the

16   underlying clinical data contradicts or does not support them."  (Opp. at 25, n.6.)  But the CAC

17   pleads no facts that demonstrate the underlying clinical data did not support the results that

18   FibroGen disclosed.  Plaintiffs do not plead that Defendants did not honestly believe that they

19   presented an accurate view of roxadustat's safety profile in May 2019, November 2019, or any

20   other time those results were repeated.  That AstraZeneca shared the same results (and only those

21   results) further bolsters the reasonableness of the Company's opinions.  (Ex. Q.)  While Plaintiffs

22   attempt to downplay this fact by pointing to allegations attributed to former AstraZeneca employees

23   (Opp. at 26), none of them are alleged to have had any role in clinical development, data analysis,

24

25   ──────────────
     [12] Plaintiffs instead argue that the statements in question "were strident and specific proclamations
26   of fact," relying on cases outside of the clinical trial data context.  (Opp. at 24 & n.15, citing *In re
     QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at **15-16 (N.D. Cal. Jan. 14, 2022)
27   (statements about battery tests) and *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903 (N.D. Cal.
     2020) (statement about Tesla going private)).  But it is precisely because data analysis and
28   interpretation does not "lend[] itself to objective conclusions," that these types of statements are
     assessed under the opinion framework.  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d at 567
     n.20.  Plaintiffs' cited authorities are inapposite.

or regulatory decision-making.  (Mot. at 28.)  And none of them are alleged to have had any interactions with any Defendant that would provide them with knowledge of their intentions or understandings.  *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (rejecting CWs because they had no "contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind").

The absence of *any* facts *expressly* contradicting FibroGen's public statements distinguishes this case from the authority on which Plaintiffs rely.  *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 701-02 (9th Cir. 2016) (statement that drug was safe based on all animal studies and company had "favorable results on everything that we've compiled so far" false where complaint alleged defendants were aware of a rat study showing drug caused multiple forms of cancer); *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 997 (S.D. Cal. 2005) (defendants claimed HIV drug was effective relying only on a sub-study and secondary endpoint where larger, pivotal study did not meet the primary endpoint and failed to show efficacy).

*Second*, Plaintiffs claim that the April 2021 press release was an "admission" that the results disclosed earlier were manipulated.  (*See, e.g.*, Opp. at 9, 13.)  But the fact that new management decided a different set of analyses should be identified as primary in the NDA, discussed the issue with the FDA, and then disclosed the additional analyses publicly does not make the previously-shared information false.  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) (for a later statement to establish scienter it must be "a statement similar to 'I knew it all along'").

*Third*, Plaintiffs dedicate pages of the Opposition to the reactions of various third parties following the April 2021 press release.  (Opp. at 16.)  These hindsight reactions of outsiders do not support that Defendants' opinions about the pooled safety analyses were not sincerely held, or that the statements were otherwise misleading.  They say *nothing* about what any Defendant believed at the time.  *See supra* at 11.

### 6.    Puffery/Opinion Statements

Plaintiffs dispute that statements characterizing roxadustat safety data as "clean," "positive," and "strong" are not corporate optimism.  (Opp. at 26-27; *e.g.*, ## 23, 40, 56, 58, 72, 74, 85, 88-89, 95).  They ignore case law holding that statements that results were "very positive" or

1  the company had a "strong" product "constitute run-of-the-mill corporate optimism on which no

2  reasonable investor would rely." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 869

3  (N.D. Cal. 2004); *see also* Mot. at 19-20.  As the Ninth Circuit recently affirmed, statements

4  constituting vague expressions of corporate optimism or "puffing" cannot form the basis for a

5  securities claim as they are not "'capable of objective verification." *Weston Fam. P'ship LLLP v.*

6  *Twitter, Inc.*, 2022 WL 853252, at *4 (9th Cir. March 23, 2022).  Plaintiffs instead argue that

7  statements regarding the pooled safety data are not puffery because Defendants allegedly "falsified"

8  data. (Opp. at 26.)  But, as discussed in Section II, the CAC simply does not allege that any data

9  was falsified.  Further, the principle underlying the cases holding that statements of corporate

10  optimism cannot form the basis for a securities claim are premised on the unremarkable proposition

11  that reasonable investors do not rely on such statements as they understand them for what they are.

12  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  The same must be true whether

13  the underlying data forming part of the basis for the optimistic statement is good or bad.

### 7.  Forward-Looking Statements

15  As set forth in the Motion, numerous statements are immunized from liability under the

16  PSLRA's safe harbor.  In their Opposition, Plaintiffs do not meaningfully challenge that the

17  statements are forward-looking.  (*See* Opp. at 27-28.)  Rather, they argue that the cautionary

18  language accompanying the statements was "boilerplate" because Defendants did not "warn[]

19  investors that they had manipulated" the safety data.  (Opp. at 28.)  The argument fails.

20  *First*, Plaintiffs ignore the fact that the first prong of the PSLRA's safe harbor immunizes

21  statements identified as forward-looking and accompanied by meaningful cautionary language

22  regardless of the defendant's state of mind. *Cutera*, 610 F.3d at 1113.  To deprive a defendant from

23  the protections afforded by that prong of the safer harbor based on an alleged failure to essentially

24  confess fraud, simply cannot be reconciled with this well-established principle.

25  *Second*, many of the forward-looking statements were identified as such and the Company's

26  risk disclosures accompanying the statements were robust and particularized, directly addressing

27  the specific circumstances of the *roxadustat* NDA and interpretation of *roxadustat* data.  (*See*

28  Appendix ## 1, 5-6, 11, 14, 21, 34, 44, 49, 56, 63, 89.)  For example, in its 10-Q accompanying the

May 2019 disclosure of topline safety data, the Company said:

- "We may be unable to obtain regulatory approval for our product candidates in other countries, or such approval may be delayed or limited, due to a number of factors, many of which are beyond our control . . . [w]e have not obtained regulatory approval for any of our product candidates in other countries and it is possible that roxadustat and pamrevlumab will never receive regulatory approval in any country. *Other regulatory authorities may take actions or impose requirements that delay, limit or deny approval of Roxadustat or pamrevlumab for many reasons, including, among others* . . .

  - *our failure to adequately demonstrate to the satisfaction of regulatory authorities that roxadustat is safe and effective*. . .

  - *regulatory authorities may not agree with our interpretation of the data from our preclinical trials and clinical trials* . . ." (Ex. L at 41) (emphasis added);

- "The FDA and EMA will do their own benefit risk analysis and may reach a different conclusion than we or our partners have internally, and these regulatory authorities may base their approval decision on different analyses, data, and statistical methods than ours . . .*While we will present to regulatory authorities certain pre-specified and not pre-specified sub-populations and sub-group analyses (for example, incident dialysis)*, multiple secondary endpoints, and multiple analytical methods (such as long-term follow up analyses), including adjusted and censored data, *regulatory authorities may reject these analyses, methods, or even parts of our trial design or certain data from our studies*" (Ex. L at 46) (emphasis added);

These and many other warnings were repeated when the Company disclosed the more detailed results in November 2019.  (Ex. S at 51-52, 57.)  To trigger the safe harbor, cautionary statements need only "identify 'important factors that could cause actual results to differ materially from those in the forward-looking statement.'"  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017).  FibroGen's cautionary language went much farther, with lengthy warnings about numerous risks specific to the roxadusat clinical program, including that the FDA might reject its analyses, analytical methods, and data, and might disagree with its interpretation of data.

*Third*, as to the forward-looking statements challenged by Plaintiffs that were not identified as such (##42, 51, 55, 67, 93), they are entitled to protection under the "actual knowledge" prong of the safe harbor.  Plaintiffs fail to plead "actual knowledge" with regard to any statement or any Defendant. (*See* Mot. at 20.)

## IV.   CONCLUSION

For the foregoing reasons, the CAC should be dismissed with prejudice.[13]

---

[13] Plaintiffs' inability to state a Section 10(b) claim requires dismissal of the Section 20(a) claim. *In re Rigel Pharm., Inc. Sec. Litig.*, 2009 WL 5125344, at *8 (N.D. Cal. Dec. 21, 2009).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: April 8, 2022

COOLEY LLP

By:   *Jessica Valenzuela Santamaria*
        Jessica Valenzuela Santamaria

Attorneys for Defendants
FibroGen, Inc., Enrique Conterno, James
Schoeneck, Mark Eisner, and Pat Cotroneo