**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

_____

| | | |
|---|---|---|
| **Peifa Xu, et al.,** | ) | |
| | ) | No.   **3:21-cv-2623** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | San Francisco, California |
| | ) | April 28, 2022 |
| **FibroGen, Inc., et al.,** | ) | 2:34 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE EDWARD M. CHEN, JUDGE**

**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**Z O O M**
**A P P E A R A N C E S**

For the Plaintiffs:
     Saxena White
     By:  **Maya Saxena**, Esq.
     7777 Glades Road, Suite 300
     Boca Raton, Florida 33434

For Defendants FibroGen, Conterno, Schoeneck, Eisner and
Cotroneo:
     Cooley LLP
     By:  **John C. Dwyer**, Esq.
          **Jessica Valenzuela Santamaria**, Esq.
     3175 Hanover Street
     Palo Alto, California 94304

     Cooley LLP
     By:  **Alexander J. Kasner**, Esq.
     1299 Pennsylvania Avenue, NW, Suite 700
     Washington, DC 20004

For Defendant Yu:
     Pillsbury Winthrop Shaw Pittman
     By:  **Bruce A. Ericson**, Esq.
     Four Embarcadero Center, 22nd Floor
     San Francisco, California 94111

(Proceedings begin at 2:34 p.m.)

THE CLERK:  The court is now calling the case Xu versus FibroGen, Inc., et al., case number 21-2623.

Counsel, please state your appearance for the record beginning with the plaintiff.

MS. SAXENA:  Good afternoon, Maya Saxena on behalf of lead plaintiffs.

THE COURT:  Good afternoon, Miss Saxena.

MR. DWYER:  Good afternoon, Your Honor, John Dwyer on behalf of FibroGen and individual defendants Conterno, Schoenick, Cotroneo and Eisner.

THE COURT:  All right.

MR. DWYER:  And, Your Honor, with me today are my colleagues Jessica Valenzuela Santamaria and Alex Kasner.

THE COURT:  All right.  Welcome.

MR. ERICSON:  Good afternoon, Your Honor, Bruce Ericson appearing for defendant Peony Yu, M.D.  And with my co-counsel Eric Wei.

THE COURT:  All right.  Thank you, Mr. Ericson.

Obviously I'm not going to cover everything here, but there's a couple of issues I want to focus on.

Is -- is there -- what is the falsity claim with respect to the efficacy allegations?  I understand with respect to safety and the manipulation of the studies and all of that, but it's less clear to me about the efficacy statements.

What -- it seems to me it's less clear what the allegations and the indicators are of falsity there.

MS. SAXENA:  Your Honor, would you like me to address that?

THE COURT:  Yes.

MS. SAXENA:  Certainly.

So the efficacy statements are really intertwined with the safety statements.  And the gist of those statements is that, based on the dosing levels, which the company knew were unsafe, this drug would not be efficacious.  And that's, in fact, what we see happening in the AdCom hearing.  We see that the company tried to, as a last ditch effort, to --

THE COURT:  Tied to the safety question.

MS. SAXENA:  It is, Your Honor.  And Your Honor is accurate in saying that they're a little bit different.          00:02:35

Those statements about efficacy and the black box are misleading.  The statements that go to the safety data, the numbers, the statements about it being 30 percent less dangerous than Epogen in the incident dialysis population, and the figures that they manipulated during the class period,          00:02:57 that's really the heart of the case.

THE COURT:  All right.  Let me hear from the other side on that.

MR. DWYER:  Thank you, Your Honor.

John Dwyer.          00:03:11

UNITED STATES DISTRICT COURT

There are no allegations, no well-pled factual allegations that I'm aware of, either in the complaint or elsewhere, that suggest any of the company's statements with regard to efficacy of the drug -- and to remind Your Honor, the primary endpoint, from an efficacy perspective was, the increase in hemoglobin levels after treatment.

Obviously, decreased hemoglobin levels are a sign of anaemia, so it was hemoglobin levels increasing.

The company publically stated at the very beginning of the class period and at other times, based upon some of the underlying individual studies, that efficacy was established. And there's not a single well-pled factual allegation to suggest any of those statements were false.

And just -- not to spend too much time on this, Your Honor, it's also clear the FDA believed that.

So in July 2021 -- this is Exhibit BB at 7, or ECF 111 at 782 -- the FDA state unequivocally that efficacy is not in question.  And there really is no efficacy issue here, Your Honor.

THE COURT:  Well, there was some questioning -- I thought the agency said it was unclear in terms of the efficacy.  There was some clarity about whether there truly was it was a efficacious as was represented.

MR. DWYER:  Your Honor, it's very unclear to me -- it's unclear to me, reading their complaint, what

statement that the company made with regard to efficacy they believe is false.

What they do is exactly what my colleague just did a moment ago, which is say it's all tied into safety.  And what the FDA needs to do is balance benefits and safety.  And so, therefore, their questions about safety somehow it impacts efficacy or benefits.

The efficacy and safety are two separate issues.

And, again, I just don't know what the statement is. It's certainly not in the complaint, the statement on efficacy that they've identified as being false, either because we exaggerated the hemoglobin increases or some other issue.

THE COURT:  Miss Saxena, anything you can point out -- I've got the complaint up, the consolidated complaint.  Do you want to focus my attention on a paragraph or two where there's a clear efficacy -- false efficacy statement?

MS. SAXENA:  So the -- actually the statement that begins the class period is a statement about efficacy.  And that's on --

THE COURT:  Tell me what paragraph.

MS. SAXENA:  Sure.

That would be 142, Your Honor.

THE COURT:  142.  Okay.  Hang on.

MS. SAXENA:  And again, you know, this point, as Your Honor noted, is very intertwined with the safety

discussion, because in that statement, beginning the class period, they also talk about their preliminary safety studies being consistent with earlier studies.

At this time it's important to remember that they had in hand the results of the unblinded data. So there's really not one statement of efficacy that doesn't also have safety components in it. So it's really not something that is the core of our theory.

THE COURT: Okay. Well, I didn't think so. I didn't want to spend a whole lot of time.

MS. SAXENA: Yeah, you're right.

THE COURT: Now when --

MR. ERICSON: Your Honor, could I be heard for just a second on that --

THE COURT: Yeah.

MR. ERICSON: -- before we pass it?

I agree with everything Mr. Dwyer said on that subject, but I would like to add a thought or two.

Anything my client said, Dr. Xu, that is on this subject -- and that includes paragraph 142 that counsel has just referred to -- these are all in the law statements of opinion expressed as such, that, therefore, are subject to the *Omnicare* test. For them to be false -- inactionable as false, plaintiffs need to allege facts showing that the statements were both objectively and subjectively false.

THE COURT:  How about the statement -- there's a quote here, and I don't know if it's allegedly to be false, but is says, the press release said in a prespecified secondary efficacious analysis roxadustat -- if I'm pronouncing that correctly -- treated patients at a 33-percent reduction of risk of blood transfusion compared to Epogen.

That's not just opinion, that's pretty concrete.

MR. ERICSON:  Well, it's an opinion as to what the studies show.

And I think the case law is pretty clear that that kind of expressing of view about what studies show is an opinion as to which one must show objective and subjective falsity.  And that's not done here.

As Mr. Dwyer points out, this drug is efficacious.  It fights anemia, it decreases the red blood cell count, and as he noted, the FDA agrees.

So I really don't see any well pled allegations of falsity as to efficacy, Your Honor.

THE COURT:  All right.  Let's move on to the core ones about safety.

So this case in that regard is quite different.  And I think it colors the analysis about puffery, opinion, forward-looking statements, safe harbor, et cetera, et cetera, when the allegation is that there was deliberate -- it couldn't be anything other than deliberate, it seems to me, manipulation

of the studies to get a result that was contrary to the truth.

Now I assume that's going to be vigorously opposed and challenged and all that.  But if we assume those allegations to be true, I don't see how the defendants can possibly argue there's no allegation of falsity here.

00:09:01

We'll get to scienter.  That may be a bigger issue.  But I don't know if I have to spend a lot of time -- I know there's some certain statements that don't really go to that, and maybe those are some peripheral statements that maybe are of more predictive opinion.  But the core ones about safety, I just -- you know, given the very bold and specific allegations here, I don't know if we have to spend a lot of time on the core of this.

00:09:19

But I'll hear the defendants if there's something I'm missing.

00:09:38

MR. DWYER:  Thank you, Your Honor.

And because it's an incredibly complicated set of allegations, and an incredibly complicated clinical trial that we're talking about, it is hard to unpack some of the falsity issues around safety, which is, in part, why we emphasized scienter in our reply brief.

00:09:52

But, Your Honor, we do not think they've adequately alleged falsity with regard -- with regard to safety.

And so as you suggested, Your Honor, I'm not going to talk about the peripheral statements, I'm talking about the

00:10:04

core statements with regard to safety that are really the heart of this litigation.

I think it's really important, Your Honor -- and if Your Honor will stick with me for just a couple of minutes, I think it's really important to address a couple of high level issues with regard to the clinical trial setup that is very different than any clinical trial that I've ever seen, and perhaps different from any clinical trial that Your Honor has ever seen.

The idea -- the idea that statistical analytical framework should be established and set in stone before the unblinding of any data is well founded. And there is no question that there are lots of studies, and there's some case law out there involving manipulation of the statistical analysis after the unblinding of the data in order to get a good result.

And my concern, Your Honor, is that's the way they've sort of painted this picture. But it glosses over what was actually happening here.

So there's three points that I want to make about this clinical trial that I think it really important in understanding the allegations with regard to safety.

The first is -- and I think this part is pretty clear in the brief. The first is that the six studies that became part of the cold CV safety study -- there were three studies

involving patients with chronic kidney disease who were on dialysis, there were three studies involving patients with chronic kidney disease who were not on dialysis. Those three studies were not powered -- that is, they weren't sized, nor were they designed to measure CV risk.                    00:11:49

In fact, that's why the FDA and FibroGen decided at one point that the way they were going to address this CV safety risk part of this was to combine all of it. But that's a real important point. Because this Phase III program, Your Honor, was already one of the largest and most complex                    00:12:07 anemia programs in history. And the pulling of the data simply increased that complexity. And let me walk through a little bit of that.

Each of the three -- so let's talk, Your Honor, just to try and make it a little bit simpler. There's three                    00:12:21 nondialysis studies, there's three dialysis studies. I'll just talk about the nondialysis now. The arguments I'm going to make apply to the three studies for dialysis as well.

But each of the three individual studies for nondialysis had its own statistical analysis claim. We've                    00:12:37 included some of those as exhibits. They had different enrollment criteria and different factors as to who would be enrolled in these studies.

The -- at the time of unblinding, it was clear that there were some -- well, the first and most important here is                    00:12:59

Your Honor, the statistical methodology was not decided until after unblinding.  So that makes this case fundamentally different than all the other cases really cited in the briefing back and forth, and that the Court might be familiar with, and certainly that I've been familiar with.

00:13:16

Everybody understood, the FDA understood, FibroGen understood, and our investors and the public understood that the statistical methodology had not been agreed to.  That was made clear at the very beginning of the class period, in November of 2018, but also in May of 2019 when we disclosed the results of the -- the initial results of the pooled data.

00:13:33

That's number one.

Number two, interesting things were happening that added to the complexity and required additional modifications and statistical plan.  In the NDD population, the nondialysis population, there was an unexpected occurrence.  And that occurrence was that people dropped out -- there were two arms of each of these studies, there were people that were taking placebo and there were people that were taking Roxadustat.

00:13:51

The people on placebo dropped out at a much higher rate than anyone expected.  To some extend you expected that, because if you're taking a placebo and you're not feeling better and it's not working with you, you would expect those people to drop out a little bit earlier.  But it was at a much, much higher rate than anyone expected.

00:14:10

00:14:26

And this is set forth somewhat at Exhibit XX of 46, which is the AdCom transcript.

The problem was, that 20 percent of the people in the nondialysis arm -- and is this is all set out in the documents -- 20 percent of the people in the nondialysis arm were deadly sick.  They were in full kidney failure.  That was unexpected.  Remember, Your Honor, these are people that have chronic kidney disease, but they're not on dialysis yet.

These are people -- in some of records you'll see a reference to ETF scores -- I'm sorry, ETFR.  ETFR is simply a medical measure of how well --

THE COURT:  Hold on, Mr. Dwyer.  I want to give you the time you need, I don't have an hour.  This is not a jury trial, so I don't need -- I understand there's an explanation on your side of the facts, but this is summary judgment.  So get to the point.  Tell me why none of the allegations can hold here.  Not that you've got counter evidence, but on summary judgment, where I have to assume the facts true, tell me -- sum it up, please.

MR. DWYER:  I'm sorry.

So the Court has to accept the well-pled factual allegations as true, absolutely agree with that.

So let's talk about the May 2019 press release, which is really the first statement about the full safety analysis.  That's really what this case is about.

Your Honor, there's not a allegation, there's no well-pled factual allegation. They use hyperbolic language, they talk about manipulation, but there's not a single well-pled factual allegation that in May of 2019 any of the defendants -- the only ones that, really, at the company at the time were Dr. Xu and Mr. Cotroneo. But the others weren't even at the company.

But there's no well-pled factual allegations that either of those individuals did not believe what was stated in that press release.

And, Your Honor, when you look at that press release, it is very clear. What the press release says is, we believe -- and then there's several different things they believe. But, in essence, we believe that Roxadustat is not inferior to a placebo with regard to the nondialysis.

When look at that press release, Your Honor -- and it's at exhibit -- give me one second, I'll identify it for you.

It's Exhibit I. They are statements of belief. And as my colleague, Mr. Ericson had mentioned before, these statements are all clearly articulated statements of belief.

Furthermore, Your Honor, just let me say one more thing about that. At the same time, in May of 2019, and shortly thereafter, we made clear repeatedly to investors that the FDA -- that we were submitting multiple analyses to the

00:16:00

00:16:31

00:17:04

00:17:27

FDA, and that the FDA was going to do their own analyses.  That the FDA was going to do its own analyses, some with prespecified factors, some with nonprespecified factors.

And let me just read you one of the risk factors that we have, Your Honor.  And this actually found in the 10Q from November that year.  And it's the paragraph right before the information that is included with regard to the pooled safety analysis that is included in the table.

It says, quote, the below cardiovascular safety analyses reflect the pulling strategy and analytical approach we agreed on with the FDA.

Similar sets of analyses will be submitted to Europe to serve as the basis for potential approval there.  And additional supportive analyses and sensitivity analyses, as well as statistical analyses will also be included in the NDA.

However, the FDA will conduct its own benefit risk analysis.  And the use of additional statistical analyses other than those agreed with the FDA are set below.  Including but not limited to prespecified or other analyses that may not sufficiently address the differential dropout rate.

And I'll make one more point, Your Honor, because I don't want to test your patience, obviously.

The next big event, obviously, is the press release that takes place on April 6th, 2021.  So it's an important point to understand that with regard to the information that

was disclosed in 2019, nobody has ever alleged that either the data was manipulated in any way, the underlying data itself, nor does anybody allege that the analytical approach was not accurately performed, nor has anybody alleged that we did not -- FibroGen, the individuals at FibroGen, did not believe it was the best representation of pooled safety data.

00:19:25

What happens, Your Honor -- and I actually -- I don't know if this is science or luck, but I give the company a lot of credit in some ways.  Mr. Neff passes away, the CEO.  Dr. Xu leaves the company because she's completed the clinical program for the drug.  And new management comes in.  And they look at this, and as they're preparing for the AdCom that takes place in July of 2021, they look at the data and they decide, you know what, we don't think this analysis that was disclosed in November 2019 should be considered the primary analysis.

00:19:41

00:20:05

What they say is, instead, we think a primary analysis for analytical purposes should be the analysis using the stratification factors set forth in each of the three underlying NDA studies.

They don't say that earlier numbers are wrong. There's no admission that their earlier numbers are wrong. There's no allegation that anybody believed that any of the company's public statements were wrong, or more importantly, that any of the speakers believed that the way they presented the information ran a serious risk of misleading the public.

00:20:26

00:20:41

THE COURT:  All right.  Let me hear the response.  Let me hear the response.

MR. ERICSON:  May I have just a minute, Your Honor?

THE COURT:  No, I want to hear the response.  I'll give you a word later.

MR. ERICSON:  Okay.  Thank you, Your Honor.

MS. SAXENA:  Your Honor, it's important to remember that this wasn't an evolving process.  The FDA had set forth in the statistical analysis plans, which were established in August and September of 2018, analyses which required prespecified stratification factors.  Those analyses also had a made safety end point, and governed how these studies would run.

Those Phase III tests were conducted prior to the class period and the data was unblinded.

Now in July of 2019, in the preNDA meeting was when defendants actually agreed with the FDA, which would constitute the primary safety analysis and which would constitute a sensitivity analysis.

And that's key, because those two tests really form the cornerstone of the NDA submission.  And for the nondialysis patients, it was going to be an ITT, or intention to treat analysis.  With the dialysis patients it was going to be an OT7, on treatment plus seven.

Now they knew what the FDA was looking for.  They had

UNITED STATES DISTRICT COURT

those specifications prior to the class period.  The testing was completed prior to the class period.

So if this data is actually accurate, why was it retracted from scientific journals?  Why did they come forward in April of 2021 and say, the data that we have been touting to the market for the past two years, that we essentially passed off as the primary safety analysis, was data that included post hoc stratification factors?

Obviously they were representing that this was the primary safety analysis, even though it included post hoc manipulation in nine different categories of safety analyses. Which the market, as you can see in the complaint, absolutely flipped over.  I've never seen market reaction to these types of statements, where you have an investigator who actually worked on the FDA clinical trials for this product saying, the statements are wildly misleading.  I feel misled.

So there's really no question that the data that they were presenting to the market, they never told investors that this was post hoc data, because post hoc data is inherently less reliable.  And that's what the market commentators say. When they reveal what that true analysis was, they -- it becomes quite clear that the market was misled.

And these aren't just regular market accommodators, these are scientists who have been following the company for years.

Now with respect to what Mr. Dwyer said about some additional sensitivity analyses, well, that's even more significant.  Because Your Honor noted the allegations with respect to the manipulations of the data that were revealed in April 6th.  But there's another shoe here, and that other shoe is that in 2018, and certainly by the time of the July 2019 preNDA meeting, defendants knew that they were going to be submitting a sensitivity analysis for the NDD population, which was going to be an On Treatment plus seven analysis.

They knew that the results of this analysis, which is evidenced in the July AdCom meeting, were horrendous.

So not only do they report in April that, based on the nonpost hoc data, the drug is no longer superior for incident dialysis patients, they now have to admit -- which they actually don't, it's the FDA that sets forth the data -- that based on this sensitivity analysis that they knew they had to do, that the drug is not safe for any population, including the all important nondialysis population which really represented the cornerstone of the market potential for this product.

MR. DWYER:  Your Honor, may I just make two points in response?

THE COURT:  Yeah.

MR. DWYER:  Just at a high level.

The constant reference to post hoc manipulation suggests -- suggesting that there's something inherently wrong

about that, is simply incorrect, Your Honor, given -- that applies generally.  But there's no question, everybody understood that all of the discussions with the FDA, or the vast majority of the discussions with the FDA about the way in which the pooled safety data was to be analyzed was all after blind.

00:25:57

So the way my opposition is using the word post hoc, I believe she's talking about after blind.  After unblinding.  I'm sorry.  That's the way I understand what she's saying.

But everybody knew that the very most fundamental parts of the statistical analysis were all being done post hoc.  Everybody knew that.

00:26:14

And let me just point --

THE COURT:  Well, are you suggesting nothing was wrong?  That the market got it wrong?  I mean, what about the critique?  I mean, yes, post hoc is not inherently bad.  But they're saying in this case it was.  It wasn't just post hoc, it was altering or manipulating the data to make it look a certain way.  That may or may not be true.  It's not just a general indictment of post hoc.  That may be part of it, but that's not all of it.

00:26:25

00:26:49

MR. DWYER:  But, Your Honor, their collapsing both post hoc and somehow manipulating the data.  If, in fact, everybody understood that the statistical methodology was going to be discussed with the FDA after unblinding, which everyone

00:27:04

did here -- and I called the Court's attention to the May 9, 2019 Exhibit J where Mr. Neff said, quote, we will continue to discuss the specific steps of the statistical standards with the FDA.  He says, we have yet to agree with the FDA on specific analyses to be done.  And remarkably, he also said, we have not agreed on a single end point with regard to the FDA.

So what he's saying at that point is, the most fundamental aspects of the statistical analysis have not been agreed to.  We have not yet had an agreement whether or not the end point will be MACE, which is one way to measure or CV issues, or MACE plus, which is a different way.  We have not yet reached an agreement with the FDA as to how to deal with this differential dropout rate from the nondialysis people. That is, in fact, what we are saying.

So what happens is, they enter into discussions with the FDA, they agree in July of 2019 with regard to those major issues, and they present the results of that.

I understand -- I can see, Your Honor, that the market was troubled by what had happened.  I think the market looked at this as a question having to do with increased uncertainty with regard to that clinical program.  I think they reacted very badly.

But, Your Honor, everybody understood that there would be statistical analyses that were taking place.  And to this day no one has ever said, you know what, here's an allegation

that Dr. Xu or somebody else did not believe what they said back in 2019.

And sometimes what happens is, there might be a restatement, or the same management people a year or two later might change course and say, we made a mistake.

That's not what happened here.  It was a new management team that said we simply disagree with what could be the primary analysis and that what was shared as the primary analysis back in 2019.

And then one final point on that, Your Honor, there's no question in my mind -- and this is critical.  Plaintiffs have done a great job making a big deal of this, but the FDA addressed this issue once.  There's no allegations that the FDA was ever concerned about this.  There's a single document in which the FDA addressed the stratification failure, and it's in the FDA briefing document, it's Exhibit BB, at page 47, ECF 111 at 823.  And this is the entirety of what FDA had to say about this issue:  The MACE meta-analysis -- that's the pooled analysis.  The MACE meta-analysis included prespecified trial-specific stratification factors.  The applicant also provided results using common stratification factors defined post hoc.  That's what we're talking about.

The findings were qualitatively similar, regardless of the stratification factors.

That's the conclusion of the FDA.  That's the only

00:28:54

00:29:06

00:29:24

00:29:48

00:30:02

statement by the FDA on this issue.

And then my final point, Your Honor, my opposition mentioned that this drug -- she shouldn't quite say it this way, but was not safe anywhere.  And as we set forth, Your Honor, listen, there's no question that the United States FDA did not approve the drug for use in the United States.  But the United States is a little bit of an outlier there.  It has been approved in seven of the ten largest countries, it's a prescription prescribed around the world.  It had been approved in China, Japan, Germany, France, Italy, the UK, Spain, South Korea, Chili.  I can give you all the cites.

This week, Your Honor, it's not in the record, and they're much smaller jurisdictions, but this week the United Emirates and Uruguay both approved the drug.  It's just not true that it's some sort of toxic drug that's not safe.  The FDA is not comfortable with it, there's no question about it.  The FDA at this point has decided that the benefits don't warrant the risks, but many other governments have come at it differently.

THE COURT:  Mr. Ericson, you wanted to make a comment.

MR. ERICSON:  Yeah, I'll try to hold it to 90 seconds, Your Honor.

Just to underscore a point Mr. Dwyer made, this would be a very different case if defendants had said, we're going in with everything we're presenting is prespecified, was all

determined pre-unblinding.  And then they didn't do that.  That would be falsity, but that's not this case.

This is a case where defendants, including my clients, said over and over that what -- we haven't settled on the analyses yet as of unblinding, we need to discuss it with the FDA.  So everyone knew these things were not settled as of unblinding.

In fact, the very day -- counsel for the plaintiffs mentioned May 9th, I think Mr. Dwyer did also, there was a press release that day, there was a conference call.  That very day FibroGen put out a 10Q that said, we will present to the regulatory authorities certain prespecified and not prespecified sub populations and sub group analyses.  And they go on in that vein to describe what they're going to present.

None of this was cast in concrete as of unblinding, but the market knew that.  It was made very clear that ECF number 110 at page 497, Your Honor can see what the 10Q says.

The only other point I'd make, Your Honor, is that counsel for plaintiff suggested that the -- back in 2018 that the statistical analyses said that -- something to the effect that only prespecified stratification factors would be used.

Again, it's not correct, Your Honor.  If you look at Exhibit D, again, ECF 110 at page 302, you will see that they said, we will use both prespecified and common stratification factors.

So the FDA knew, the market knew that this -- maybe somewhat unusually, but this was a case where things were not all decided pre -- unblinding.

My final point is my client, at least, and I don't think any other defendant either, ever spoke to stratification factors. That's one very small part of the overall analytical picture. And my client simply never spoke to stratification factors. And under authority such as *Brody* you're not required to talk about everything. And if you didn't speak, you didn't mislead. And that's certainly the situation here, Your Honor.

THE COURT: All right. Let me ask Miss Saxena just to respond to the analysis wasn't settled as of the time of unblinding, it was anticipated that there was going to be more analyses worked out and, therefore, this whole post hoc language is overblown.

MS. SAXENA: Well, Your Honor, first of all, in Exhibit C on page 14, it does clearly list pre-prescribed stratification factors.

And in exhibit QQ, which is the -- I believe the April transcript of the conference call when they announced the changes to the stratification factors, they then admit that the primary safety analysis had stratification factors. So that's simply incorrect.

And clearly that argument is completely blown out of the water after July of 2019. Because at that time they knew

that they would be submitting these two separate analyses, the ITT and the OT plus seven, both of which had prespecified stratification factors.

It simply wouldn't make any sense to have this evolving study if the FDA is trying to find clear and transparent cardiovascular safety data to allow a company to continue making changes to data that had already been compiled. What would the purpose of a double blind study be then?

So I think it's very telling, if you look at paragraph 171, which is a November 2019 statement -- now, the data that was included in November, and in the conference that's mentioned here, this data was retracted from scientific journals because it no longer had scientific integrity.

They're saying here that Roxadustat reduced the risk of MACE by 30 percent in the crucial incident dialysis population. Well, that's not correct. When you use the actual prespecified stratification factors, the company admits that the product is not superior in that population. And that is the exact population that defendants touted throughout the class period as a crucial subset of the population to verify the safety results.

In fact, Defendant Cotroneo said that this population itself is the anchor of the entire NDA submission.

So the market was very intently focused on their statements about this population in particular, which the

post hoc stratification factor manipulations distinctly changed.

THE COURT:  All right.  Let me ask you to address -- we need to move on.  Let me ask you to address the scienter questions.                                    00:36:41

MS. SAXENA:  Sure.

THE COURT:  I think I understand it with respect to Defendant Yu.  Tell me about the others, Conterno, Schoeneck, Eisner and Cotroneo.

MS. SAXENA:  Certainly, Your Honor.          00:36:53

With respect to Defendant Yu, as Your Honor noted, there are different states of mind here.  With respect to Defendant Yu we allege that she was the primary hands-on person responsible for the entire clinical trial.  And she shared that responsibility and information with Mr. Neff, who is deceased.    00:37:11

But frankly, Your Honor, it's very unusual to have a securities fraud case like this that really checks every box for scienter factors.

We have an SEC investigation.  The SEC is looking into these exact same disclosures which are at issue here.  That's    00:37:31 an ongoing investigation.

We have insider selling by the defendants.  We have the deliberate --

THE COURT:  Well, all right.  Some of those are not as strong as others.  The insider selling, I mean, if you look at    00:37:45

it preclass period there were also substantial sales.  You can argue that, yeah, there it was higher than what one would expect.  But it doesn't -- it's not extremely remarkable.

Tell me what the strongest factors are, for instance, for Conterno?  What are the specific factors, other than the core operations theory, which I understand.

MS. SAXENA:  Certainly, Your Honor.

And I do think this is an instance where under Your Honor's opinion in the *Zosano* case, the core operations theory would fit very well for all the individual defendants.

But specifically with respect to Mr. Conterno -- his name is very close to the CFO's, so hopefully I will get it right.

But what Conterno did is, he came in after the data was unblinded, after the doctored data had been released to the market.  And instead of saying, I'm new to the company, I need to evaluate the safety data, I'm not prepared to release information to the market right now, he did exactly the opposite.  He said publically, based on my decades of experience in the bio-pharma industry, based on my specific experience overseeing cardiovascular safety clinical trials, I've personally reviewed this data, and this data is extremely clean and extremely compelling.

That's in paragraphs 67 and paragraphs 184 of our complaint.

So on the one hand he's coming in and saying, I'm really experienced, I know what I'm doing, I've looked through everything, I'm entirely comfortable with this data, this data comports with what we've agreed with the FDA.  And then on April 6th he's really blowing that theory out of the water because he's saying, wait a second, we don't know what happened here.  I don't know what happened.  We were preparing for the AdCom meeting.  Which they then had to come clean, because they knew there would be increased scrutiny from the FDA AdCom proceedings.

THE COURT:  How do we know as of February 25th, 2020, when he said he personally reviewed the data, extremely clean and all that, he knew to the contrary?

MS. SAXENA:  Well, Your Honor, I think it's certainly a reasonable inference.  And it puts some obligation on him. If he's saying that, if he's making those representations to the market, there has to be some basis for it.

THE COURT:  Is there something that would have been obvious to him?

MS. SAXENA:  It would have been, Your Honor.

Is it possible that Defendant Yu gave him a different set of data?  It might be.  But that's something that discovery will uncover.

THE COURT:  Let me ask you about the -- about the core operations theory.

00:39:29

00:39:49

00:40:02

00:40:18

00:40:38

So this particular drug was estimated to be -- to constitute or translate into 85, 90 percent of FibroGen's market value?

MS. SAXENA:  Yes, Your Honor.

THE COURT:  Was it the -- essentially the only drug?          00:40:57

MS. SAXENA:  It wasn't the only drug, but it was the lion's share of this company's potential revenues.  And it was really, in essence, an existential product for the company.

The new market for this product on the NDD patients and the new market potential alone was around $3 billion.  So          00:41:20 this was an extraordinary important approval process for the company.  And also, the individual defendants' compensation was very directly linked to the success of the NDA trial and the NDA submission.

THE COURT:  Well, I saw there's reference to that for          00:41:37 Defendant Yu.  Where is the evidence that their salaries were linked to the NDA approval, for the other defendants?

MS. SAXENA:  That's certainly for Defendant Yu.  It's a factor with the other defendants, and that is in our complaint.  I know it's in the defendants' section.  So that          00:41:56 would be in the beginning of the complaint.  And it is in -- paragraphs 19 through 34 details their compensation that was linked to the NDA.

And also, another factor here is that they had a significant amount of milestone payments coming from          00:42:36

AstraZeneca that would have amounted to over a billion dollars, $1.2 billion.

And in one year alone, when they actually submitted the NDA, it triggered a payment that amounted to a very significant portion of the company's revenues for that year alone.

00:42:53

So certainly this was a product that the entire company was very intently focused on.

THE COURT:  And these milestones were predicated on the NDA stages?

00:43:04

MS. SAXENA:  They were predicated on a few different milestones, Your Honor, the first being submission of the NDA.

THE COURT:  All right.  Let me hear the response about why there's no scienter here.

MR. DWYER:  Thank you, Your Honor.

00:43:22

We, as we set forth in our brief, believe that this is on all fours with *Endologix versus Nguyen*, which is obviously the case that this Court relied on in its decision in *Carr*.

In this Court's decision in *Carr* -- and I'm going to quote it, it says, quote, plaintiffs have plausibly shown that FDA approval of Qtrypta, which was the drug there, was central to Zosano's survival.  Not that the individual defendants were personally aware of the relevant clinical data or that they believed the data would be material to the FDA's approval.

00:43:48

Your Honor, there is -- so I'm going to put Yu aside

00:44:05

for one minute, because you wanted to talk first about Conterno.  So let me talk about Conterno as an example of someone.

There is -- and this applies to -- Yu is a little more difficult.  But Conterno, there's not a single well-pled allegation.  At some point they have to point to something that suggests that he was aware that the information was misleading.  00:44:23

Now he joins the company in January of 2020.  He does make a statement saying that he's looked at the data.  He's doesn't say that he's looked at everything.  But he's looked at the data and it's very clean.  00:44:43

Your Honor, the Court -- there's no question that Roxadustat was the most important drug in the pipeline for this company.  There's no question about it.  But I don't think the core operations doctrine has ever been invoked in such a way that you say a drug is of great importance to a company, and as a result everything about that drug and about the clinical programs is implied to the speakers.  I've never seen anything like that.  00:44:54

And to give yourself a sense of this -- or to give the Court a sense of this, we talk about -- plaintiffs' counsel talked about this would be obvious, that the stratification types were changed.  I think the Court can take judicial notice that NDAs -- an NDA was filed back in early -- or late 2019, December of 2019, right before Mr. Conterno joined the company,  00:45:10

00:45:30

tend to be very, very, very large documents.

In this case the NDA was filed -- it's not in the record, Your Honor, I'm sorry, but just to give you a sense, 109 gigabytes, 20.7 million pages.  The integrated summary of safety -- so this was the integrated summary of safety was about 20,000 pages.  And to give you a sense, Your Honor, that submission included analyses of 61 preclinical studies and 54 clinical studies.

And to suggest that Mr. Conterno or anybody else would know all the details about stratification factors.  Your Honor, one of the problems with litigation always is it elevates the importance of whatever it is the focus of.  But let's be clear, nobody ever talked about stratification factors until the company issued the press release in April of 2021.  We weren't talking about stratification factors, people didn't care about stratification factors.  This is sort the green eyeshade back room technical kind of stuff.

THE COURT:  What about the fact that Mr. Conterno said he personally reviewed the MACE, not just generally, but specifically the MACE safety data.  And based on his extensive experience in looking at cardiovascular studies, he sort of knew what to look for, that the safety data was extremely clean and highly compelling.  It wasn't like, here's 50,000 pages and go at it.  He looked at specifically this area.

MR. DWYER:  And, Your Honor, what -- I'm sorry, can

you identify the paragraph that you are referring to, just so I have it?

THE COURT:  I believe it's -- is it paragraph --

Maybe you can help me out, Miss Saxena.

MS. SAXENA:  Yeah, it's 184.  And also mentioned in paragraph 67.  But 184 is one of the primary paragraphs.

THE COURT:  I know I saw it.

MS. SAXENA:  67 and 184, Your Honor.

THE COURT:  And 184 has his statement about cardiovascular safety specifically.

MR. DWYER:  And he says that we think the data is compelling.  When we looked at the data, we basically show it to comparable, and our data is extremely clean, dot, dot, dot, from my perspective when it comes to cardiovascular safety.

Your Honor, I do not think -- and the law is clear that when somebody makes a statement, you have to assume a reasonable investor understands -- can analyze it in the appropriate context.

In no way was this -- I mean, I don't believe that the appropriate way to read that statement is that he was in any way guaranteeing or suggesting that he read 50,000 pages of safety analyses or --

THE COURT:  No, it goes to his scienter, his knowledge.  This is not being cited to -- necessarily just on the issue of falsity or reliance.  This is going to what he

knew.  I think that's what this is about.

So he's in a slightly different position, it seems to me, than somebody who is coming in and who doesn't have the clinical background and doesn't make any admission or representation about looking at this particular data.

That's why, frankly, the case of scienter against Yu and Conterno do seem qualitatively stronger than against the other three.

MR. DWYER:  But, Your Honor, there's -- to me that doesn't indicate -- what that indicates is that he's been there for a month, everybody understood that.  He's looked hard at the data, with the help of others, and that he believes it is positive.

There's no indication that he did not believe that to be the case at the time.  And I don't know how a statement that can be made, that nobody challenges as being -- well, it might be challenged as being false, but there's no well-pled factual allegation that it is false, could form the basis of a scienter finding.  Especially in light of all of the other factors that cut against scienter, some of the things that we identified.

Obviously this drug had been remarkably successful and continued to be successful.  At this time of this statement I think it had been approved in China, the world's second biggest market, and Japan was right around the corner, the third biggest market.  And I told you earlier about some of the other

approvals.

The interactions with FDA at that point had been going quite well.

And one of the things, Your Honor, that we did not mention in our brief, because I didn't really realize it until earlier this week, they rely on a confidential witness named confidential witness 3.  They rely on that confidential witness primarily for the argument that in December of 2020 that confidential witness, who was an AstraZeneca marketing employee learned that the FDA might require a black box.

Now we mentioned that in our brief to emphasize the point that, to the extent they challenged the statements made by the company and others with regard to the potential of a black box, the last of those statements was in June of 2020.

So the fact that CW 3 might have some information that in December of 2020 the FDA was suggesting a black box was possible is totally irrelevant.  It's temporally irrelevant.

But, Your Honor, I want to emphasize another point. In that same paragraph, paragraph 130, CW 3 says that in December they were having negotiations with the FDA with regard to the label.

The negotiations -- that is the very last step before approval.  We the date was December 20th, which was the date that the FDA needed to make the decision.  And in December they were having discussions with the FDA with regard to labeling.

That, of course, also informs the mindset.

And then let me just mention a few other things.

I believe the clarifying disclosure in April of 2021 cuts against scienter with regard to Mr. Conterno.  He at that point had been there for some time.  Dr. Eisner had joined the company.  They were reviewing the data even more closely.  Obviously something came up that ultimately made him decide that it was worth issuing a clarifying press release so that everybody understood that in the company's view as of that time the primary analysis upon which the FDA should focus was slightly different than the analysis that had been disclosed in November of 2019.

Other issues with regard to scienter, Your Honor, it's hard -- they try to make much of the fact that Dr. Yu left in late 2020.  The Court's well aware of all the case law that says there's something highly unusual about a departure, that does not support an inference of scienter.

But I think what's more interesting from a scienter perspective is the fact that Mr. Conterno and later Dr. Eisner join the company.  You know, if somebody's departure can be some suggestion of scienter, the fact that they were being attracted to this company -- and Mark Eisner -- or Dr. Eisner had commercial experience.  The company was clearly preparing, clearly believed that this was going to be approved.  They brought Dr. Eisner in, in part, because of his experience --

and this is set forth in Exhibit JJ at 2 -- with regard to commercial products.

The company was in discussions with dialysis organizations and other payors working closely with AstraZeneca on that.  That was discussed in the November 19th, 2020 conference.

And another point -- well, so when you look at the scienter and the lack of any allegations, there's no CW allegation of any CW who had any interaction with any of the defendants.  The CW allegations are wholly conclusory, they're by people who were not in positions that I believe the Court can assume that they would have any knowledge.  They were involved with marketing.  But none of them had direct interactions with any of the defendants.

What they said is FibroGen seemed a little bit shady.  In the absence of any CW allegation, in light of the doc trade, which we set out in some detail, were significantly less during the class period for the individual defendants than they were before, and given the lack of allegations of anybody having any discussion or contemporaneous email, or anything else suggesting that any of these individuals believed what they were doing was wrong, I don't think they've pled scienter.  And at the most -- at least as compelling an inference, and the more compelling inference is, these folks were acting in good faith, and they ultimately decided that they believed that the

primary analysis should be different than the one they originally had identified, and they took the extraordinary step, most likely understanding that there would some fallout by the investors, they took the step of issuing a clarifying document.

00:54:40

And I do not know how one could conclude that the issuance of that clarifying document, when Mr. Conterno was the CEO of the company, could somehow be supportive of scienter with regard to Mr. Conterno.  And, in fact, I think it actually negates any possible inference of scienter with regard to Mr. Conterno.

00:54:59

THE COURT:  All right.  I'll give you a brief chance to respond, especially to the point of sort of Mr. Conterno demonstrating his good faith through the April disclosure.

MS. SAXENA:  Sure, Your Honor.

00:55:11

Well, my opposing counsel mentioned the *Endologix* case.  I would refer Your Honor to the *Arena* case, which is frankly exactly on point here.

And *Arena* says, once a defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against positive information.

00:55:29

Well, Mr. Conterno didn't have to go and say that he had personally reviewed this data.  He didn't have to make any of those statements.  He chose to because he knew that the

00:55:47

market was very, very intently focused on the CV cardiovascular safety results.  And he knew that that was a crucial dataset for FDA approval.

Really the *Arena* case is almost exactly on point, Your Honor.  I would say the one difference in the *Arena* case is that they omitted to mention a significant study that showed a link between rats and cancer and the product.  Here, our case goes even further than that, because we have deliberate manipulations of the underlying data.

And one thing I don't hear mention of in any of the discussions is the sensitivity analysis.  Clearly in July of 2019 defendants were 100 percent aware that the FDA had mandated an OT 7 analysis -- sensitivity analysis for the NDD population, and an ITT analysis for the nondialysis patients.

So where is the discussion of this sensitivity analysis?  Why is this sensitivity analysis, which really exceeded any acceptable safety margins in all categories, that's not even mentioned at all.  And that puts this case squarely under the rationale of the *Arena* case.  They knew that they had to submit this sensitivity analysis and they didn't.

THE COURT:  What about the disclosures in April for Mr. Conterno showing -- you know, indicating his good faith?

MS. SAXENA:  Well, let's look at the circumstances under which he made those disclosures.  The company had learned that there would be an AdCom committee meeting convened very

late in the FDA approval process, which was unusual.  And again, defendants knew that through the AdCom process this data, the manipulated data would not withstand scrutiny.  So he really had no choice but to come clean.

And I note, Your Honor, partially clean because he still didn't reveal the results of the OT 7 sensitivity analysis for the NDD population.

But he really had no choice.  He was under the gun because he knew that the company had submitted to the FDA.  And that's noted in paragraph 84.  And I think one of the misconceptions here is that they were just trying to fool investors.  Well, they were actually trying to pass off this safety analysis as the primary safety analysis to the FDA also.  So they were trying to use the manipulated data to gain FDA approval for a patient population that they knew the drug would be unsafe for.

So this isn't a situation where they just said, oh, let's just release another set of data to the market.  This is a situation where they knew they were going to be facing scrutiny.  They knew they had submitted data to the FDA, which as they admit they had to immediately clarify.  And there you have it.  It's the same information and the same disclosures that the SEC is now investigating.

I think in terms of scienter this is an extremely compelling situation.

00:58:02

00:58:17

00:58:37

00:58:53

00:59:13

THE COURT:  All right.  I'll take the matter under submission.  Thank you, counsel.

MS. SAXENA:  Thank you, Your Honor.

MR. ERICSON:  Your Honor, I didn't get a chance to speak on scienter.  Could I have a --

THE COURT:  Yeah, all right, I'll give you a chance.  Go ahead.

MR. ERICSON:  Thank you.  I appreciate it.  And I realize that I'm -- given Your Honor's remarks, it's a little uphill.  But let me try.

Let's focus on what plaintiffs do and do not allege as to my client Dr. Yu.  They don't really argue that she disbelieved what she said.  They don't really argue that her statements lack support in the analysis that was deemed primary in 2019, the analysis submitted to the FDA and revealed to the nephrologist.

Rather, their argument is that she supposedly could not have believed what she said because the analyses included some post hoc stratification factors.

We've already discussed that, Your Honor, and there's just nothing to that, because the FDA and the market knew that these factors and the other parts of the analyses were not settled as of unbinding.

So really their argument that her statements were not believed by her, or that there's some indicia of intend to

defraud, it's a collapsing house of cards.  As I said earlier, she never spoke publically about stratification factors.

Second point, the core operations doctrine, we're talking about for just a minute here, because it doesn't really apply.

01:00:41

Of course, Dr. Yu knew what she was doing and so on. But core operations doctrine applies only if she believed that the factors that she was applying, that the primary analysis was inappropriate as of the time it was submitted.  There's nothing that suggests she thought that.

01:01:06

There's nothing that suggest she thought that the switch should have been made that was made in 2021.  That's not her belief then, it's not her belief now.  She thinks she submitted the appropriate analysis in 2019, and she still thinks that.  And there's really nothing cogent to subject to the contrary.

01:01:23

Just two other points very quickly.

Her salary was not tied to approval.  Her bonuses were not tied to approval.  They were tied to submitting the NDA, which was done.  So the notion that she would lie to get approval is simply belied by the facts here as alleged and judicially noticed.

01:01:37

Counsel made a point about sensitivity analyses, suggesting that there was an obligation to disclose those. That's not what the Ninth Circuit said in *Regal*, it's simply

01:01:56

44

not the law.  It's not what the First Circuit case in a case -- the name starts with C, I'm forgetting it now.  But it's cited in our brief.

And finally the notion that the FDA was fooled about sensitivity analysis, well, that's belied by paragraph 107 in complaint which says, as do the SEC filings, that the NDA included both the primary and the sensitivity analyses.

So nobody was fooled about this, and there's certainly no cogent presentation of facts that suggest my client disbelieved what she said or said anything knowing it to be untrue.

So I'd ask Your Honor to take another look at those things, because I think when you consider it, really, the inference for scienter is much weaker than the inference against it.

Thank you, Your Honor.

THE COURT:  All right.  Appreciate your comments.

I'll take the matter under submission.

Thank you, counsel.

(Proceedings concluded at 3:37 p.m.)

-oOo-

C E R T I F I C A T E


I, CANDY L. POTTER, do hereby certify that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED this 12th day of May, 2022.


s/Candy L. Potter_____
Candy L. Potter, RMR, CRR


UNITED STATES DISTRICT COURT