**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Class*

*[Additional Counsel listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **<u>CLASS ACTION</u>** <br><br> LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF <br><br> Date: June 8, 2023 <br> Time: 1:30 p.m. <br> Dept.: 5 – 17th Floor <br> Judge: Hon. Edward M. Chen |

**[REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED]**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................iii

NOTICE OF MOTION AND MOTION ........................................................................vii

ISSUES TO BE DECIDED.............................................................................................vii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

PRELIMINARY STATEMENT.......................................................................................1

STATEMENT OF FACTS................................................................................................4

ARGUMENT ...................................................................................................................8

I. Securities Class Actions Are Ideally Suited for Class Certification ....................8

II. The Requirements of Rule 23(a) Are Satisfied ..................................................9

    A. The Proposed Class is So Numerous that Joinder Is Impracticable...............9

    B. The Proposed Class Shares Common Questions of Law and Fact ...............10

    C. Lead Plaintiffs' Claims Are Typical of the Class .........................................10

    D. The Proposed Class Representatives and Class Counsel Are Adequate......11

III. The Predominance and Superiority Requirements of Rule 23(b)(3) Are Satisfied..............13

    A. Common Questions of Law and Fact Predominate.......................................14

        1. Lead Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic* ...........15

            a. FibroGen Common Stock Was Listed and Traded on The NASDAQ, a Presumptively Efficient Market............16

            b. The *Cammer* Factors Demonstrate That FibroGen Common Stock Traded in an Efficient Market ....................16

                i. *Cammer* 1: FibroGen Common Stock Traded at a Large Average Weekly Volume ...............17

                ii. *Cammer* 2: Numerous Analysts Followed and Reported on FibroGen..................18

                iii. *Cammer* 3: Existence of Market Makers........................................18

                iv. *Cammer* 4: Eligibility to File SEC Form S-3 .................................19

                v. *Cammer* 5: Price Reaction to New Information..............................19

i

       c.    The *Krogman* Factors and Additional Factors Support a Finding of Market Efficiency For FibroGen Common Stock ....................................21

   2.    The Presumption of Reliance Also Applies to Trading in Options on FibroGen's Common Stock ..................................................................22

   3.    Damages Are Measurable Using a Common Methodology ..............................23

B.    Class Treatment is Superior to Other Methods of Adjudication ................................24

IV.   Proposed Class Counsel Satisfy Rule 23(g) ........................................................................25

CONCLUSION ..................................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ....................................................................................................... 14, 22

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................................. 14

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
568 U.S. 455 (2013) .....................................................................................................9, 14, 15

*Angley v. UTi Worldwide Inc.*,
311 F.Supp.3d 1117 (C.D. Cal. 2018) ................................................................................... 19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................................... 14, 15

*Berner v. Lazzaro*,
730 F.2d 1319 (9th Cir. 1984) ................................................................................................ 8

*Booth v. Strategic Realty Trust, Inc.*,
2015 WL 3957746 (N.D. Cal. June 28, 2015) ........................................................................ 2

*Brown v. China Integrated Energy Inc.*,
2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) ..................................................................... 18

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................... 16, 17, 18, 19

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ....................................................................... 24

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2022 WL 1459567 (N.D. Cal. May 9, 2022) ......................................................................9, 11

*Deutschman v. Beneficial Corp.*,
132 F.R.D. 359 (D. Del. 1990) ............................................................................................. 12

*Deutschman v. Beneficial Corp.*,
841 F.2d 502 (3d Cir. 1988) ................................................................................................. 22

*Epstein v. MCA, Inc.*,
50 F.3d 644 (9th Cir. 1995) .................................................................................................... 2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
(*Halliburton I*), 563 U.S. 804 (2011).................................................................................... 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  (*Halliburton II*), 573 U.S. 268 (2014) ................................................................................ 15

*Hayes v. MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 & n.2 (N.D. Cal. Dec. 22, 2016) ............................................................ 18

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ....................................................................... 14

*Hodges v. Akeena Solar, Inc.*,
  274 F.R.D. 259 (N.D. Cal. 2011) ......................................................................................... 16

*Huberman v. Tag-It Pac. Inc.*,
  314 F. App'x 59 (9th Cir. 2009) ........................................................................................... 16

*In re Banc of Cal. Sec. Litig.*,
  326 F.R.D. 640 (C.D. Cal. 2018) .......................................................................................... 23

*In re Barrick Gold Secs. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................................................ 14

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ............................................................................. 18, 19, 23

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013) ........................................................................ 9, 18, 19, 24

*In re Enron Corp.,*
  *Sec.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................................... 22

*In re Gaming Lottery Sec. Litig.*,
  2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) .......................................................................... 22

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ...................................................................... 10

*In re LendingClub Sec. Litig.*,
  282 F.Supp.3d 1171 (N.D. Cal. 2017) ...................................................................... 11, 12, 23

*In re Mattel, Inc. Sec. Litig.*,
  2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ........................................................................... 8

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  2013 WL 396117 (D.N.J. Jan. 30, 2013) .............................................................................. 12

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ...................................................................... 17

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) ........................................................................................... 19

*In re Petrobras,*
  *Sec.*, 862 F.3d 250 (2d Cir. 2017)...........................................................................................17

*In re SanDisk LLC Sec. Litig.,*
  2018 WL 4293336 (N.D. Cal. Sept. 4, 2018)...........................................................................11

*In re Sci-Atlanta, Inc. Sec. Litig.,*
  571 F. Supp. 2d 1315 (N.D. Ga. 2007)......................................................................................21

*In re Twitter Inc. Sec. Litig.,*
  326 F.R.D. 619 (N.D. Cal. 2018) ..............................................................................................25

*In re Vale S.A. Sec. Litig.,*
  2022 WL 122593 (E.D.N.Y. Jan. 11, 2022)..............................................................................19

*In re VeriSign, Inc. Sec. Litig.,*
  2005 WL 7877645 (N.D. Cal. Jan. 13, 2005)..................................................................8, 11, 24

*In re Wells Fargo & Co. S'holder Deriv. Litig.,*
  445 F.Supp.3d 508 (N.D. Cal. 2020)..........................................................................................13

*Junge v. Geron Corp.,*
  2022 WL 1002446 (N.D. Cal. Apr. 2, 2022).......................................................................10, 21

*Krogman v. Sterritt,*
  202 F.R.D. 467 (N.D. Tex. 2001)...............................................................................................21

*Malriat v. QuantumScape Corp.,*
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022).........................................................................20

*Milbeck v. TrueCar,*
  2019 WL 2353010 (C.D. Cal. May 24, 2019)...........................................................................20

*Miller v. Thane Int'l, Inc.,*
  615 F.3d 1095 (9th Cir. 2010) ...................................................................................................16

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) .....................................................................................................10

*Petrie v. Elec. Game Card, Inc.,*
  308 F.R.D. 336 (C.D. Cal. 2015)..........................................................................................21, 22

*Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.,*
  2021 WL 1659848 (E.D. Va. Apr. 23, 2021) ............................................................................13

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.,*
  2020 WL 5757695 (D. Minn. Sept. 28, 2020)...........................................................................12

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.,*
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021)...................................................................16, 20, 22

*Pub. Emp. Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
  2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ..............................................................................20

*Purple Mountain Trust v. Wells Fargo & Co.*,
  2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ................................................................... 17, 21

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) .........................................................................23

*Sci.-Atlanta*,
  571 F. Supp. ...........................................................................................................................23

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020) ............................................................................... 9, 10, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................................................8

*Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ..............................................................................................18

*Vinh Nguyen v. Radient Pharm. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012) ...................................................................................... 18, 21

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ................................................................................................ 15, 19

**RULES**

Fed. R. Civ. P. 23 .............................................................................................................*passim*

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995) ....................................................................................3, 12

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on June 8, 2023, at 1:30 p.m., or as soon thereafter as this matter may be heard, before The Honorable Edward M. Chen, United States District Court for the Northern District of California, Courtroom 5, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Court-appointed Lead Plaintiffs Employees' Retirement System of the City of Baltimore ("Baltimore Employees"), City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund"), and Plymouth County Retirement Association ("Plymouth County") (collectively "Lead Plaintiffs" or "Plaintiffs") will, and hereby do, respectfully move this Court for an entry of an Order in the above-captioned action (the "Action"): (1) certifying the Class (defined below) pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure (the "Rules"); (2) appointing Lead Plaintiffs as Class Representatives; and (3) appointing Saxena White P.A. ("Saxena White") as Counsel for the Class. This Motion is based upon the Memorandum of Points and Authorities below, the Declaration of David R. Kaplan in support thereof (the "Kaplan Declaration" or "Kaplan Decl.") and exhibits attached thereto, including the Expert Report of Chad Coffman, CFA (the "Coffman Report") (Ex. 1), the declarations of Lead Plaintiffs' representatives (Exs. 2-4), the pleadings and records on file in this Action, and such further arguments and matters as the Court may consider. A proposed form of Order is also submitted herewith.

**ISSUES TO BE DECIDED**

The issues to be decided on this motion are:

1.      Whether to certify the proposed Class pursuant to Rules 23(a) and 23(b)(3);

2.      Whether to appoint Baltimore Employees, Philadelphia Pension Fund, and Plymouth County as Class Representatives; and

3.      Whether to appoint Saxena White as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

In this securities fraud class action, Defendants made materially false and misleading statements to investors about the safety and efficacy of FibroGen's single most important drug, an experimental anemia pill for kidney patients known as Roxadustat.[1] The Complaint asserts that Defendants repeatedly assured investors that Roxadustat's critical Phase 3 trial results showed that the drug was "superior" to Epogen, the current standard of care for dialysis-dependent patients, and even safer than a placebo. Defendants further represented that Roxadustat's "unbelievable" safety data would lead to FDA approval not only for patients on dialysis, but also less severe kidney disease patients either not on dialysis or just beginning dialysis, which represented an untapped multi-billion-dollar market. In truth, Defendants deliberately manipulated each and every one of nine clinical safety analyses, making improper *post hoc* changes to its analyses after the data had been fully unblinded in order to make Roxadustat appear better and safer than it was, and to conceal its serious safety risks. The truth emerged when Defendants were forced to *admit* their data manipulations to the market, and an FDA panel subsequently voted near-unanimously against approving Roxadustat for *any* patient population—causing FibroGen's stock price to plummet nearly 75%, wiping out $3.8 billion in shareholder value. In the wake of these disclosures, numerous securities analysts, prominent nephrologists, and noted medical journals uniformly excoriated FibroGen management for their "staggering admission," emphasizing that Defendants had been "touting false heart safety data for [Roxadustat] for at least two years," that Defendants' fraud represented "the worst case of data manipulation in years," and that Defendants' prior representations were "wildly misleading" and "could [not have] happen[ed] accidentally."

On July 15, 2022, the Court entered an order sustaining Lead Plaintiffs' securities fraud claims. ECF No. 126 ("MTD Order"). The Court found Plaintiffs adequately alleged falsity and

---

[1] Capitalized but undefined terms herein have the meanings given to them in the operative Consolidated Class Action Complaint (the "Complaint") (ECF No. 97). Unless otherwise stated, all emphasis is added and internal citations and quotation marks are omitted. "Ex. _" references are to the exhibits attached to the Kaplan Declaration filed simultaneously herewith. "¶" references are to paragraphs of the Complaint. "Coffman ¶" references are to paragraphs of the Coffman Report.

1

scienter for over ninety material misstatements and omissions alleged in the Complaint. *Id.* at 50-51. Notably, Defendants did not challenge the issue of loss causation, or the proposed Class Period, and the Court did not dismiss any of the alleged partial corrective disclosures. Further, documents produced in discovery already contain striking evidence supporting Plaintiffs' allegations, including:

[REDACTED]

Lead Plaintiffs now seek to certify a class pursuant to Rules 23(a) and 23(b)(3) on behalf of themselves and those persons or entities who purchased or otherwise acquired the publicly traded securities of FibroGen, including options, during the period from December 20, 2018 through July 15, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2] As set forth below, this is a straightforward securities class action that is ideally suited for class treatment under Rule 23. Indeed, the Ninth Circuit and courts in this District have repeatedly underscored that securities fraud claims fit Rule 23 "like a glove." *Booth v. Strategic Realty Trust, Inc.*, 2015 WL 3957746, at *9 (N.D. Cal. June 28, 2015) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995)). This case is no exception and readily satisfies all of the requirements of Rule 23.

*First*, Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy are easily satisfied. The proposed Class is estimated to consist of hundreds of thousands of

---

[2] Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of Defendants; (iii) the subsidiaries and affiliates of Defendants; (iv) any person who is an officer, director, or controlling person of any Defendant; (v) any entity in which any Defendant has a controlling interest; (vi) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vii) the legal representatives, heirs, successors, or assigns of any such excluded party.

2

shareholders, and joinder would be impracticable, satisfying numerosity. This Action presents many common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, and damages, thereby satisfying commonality. Plaintiffs' claims are also typical of other Class Members, as they were injured by the same wrongful conduct, thereby satisfying typicality. Plaintiffs are clearly adequate, as they are precisely the type of sophisticated institutional investors that Congress sought to lead securities class actions when enacting the PSLRA, and have amply demonstrated their commitment to the vigorous prosecution of this action. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; *see also* Exs. 2-4. Moreover, Plaintiffs have selected Saxena White as Class Counsel, which has an extensive track record of successfully prosecuting securities class actions and other complex litigation in this Circuit and nationwide, recovering over $2 billion for aggrieved investors.

*Second*, the requirements of Rule 23(b)(3) are also readily satisfied. Courts routinely find that predominance is met where, as here, Defendants engaged in a common course of conduct, the securities traded in an efficient market, and damages can be calculated on a Class-wide basis. To demonstrate market efficiency, Plaintiffs submit the Expert Report of Chad Coffman, a widely respected expert whose opinions have been relied upon to certify classes in numerous securities class actions in this District and across the country. *See infra* at pp. 19-20, 22-23. The Coffman Report demonstrates that: (i) each and every factor courts routinely consider in evaluating whether Plaintiffs have established market efficiency are easily met here, and (ii) damages in this action can reliably be measured on a Class-wide basis, as courts have regularly found in myriad securities class actions. Additionally, proceeding as a class action is clearly superior to other available methods for fairly and efficiently adjudicating Class Members' claims.

*Third*, Lead Counsel meet the requirements to serve as Class Counsel under Rules 23(a)(4) and (g). Saxena White has substantial experience in securities fraud cases, has devoted extensive time and resources to prosecuting this action, and is dedicated to continuing to do so.

Plaintiffs respectfully submit that their motion should be granted in its entirety.

3

**STATEMENT OF FACTS**

FibroGen is a pharmaceutical company whose financial condition depended on the success of its single most important drug, an experimental anemia pill for kidney patients called Roxadustat, which comprised nearly 100% of the Company's revenues. ¶¶39, 43. During the Class Period, FibroGen sought to develop Roxadustat as an alternative to the existing standard of care, a drug called Epogen, which had a significant drawback: it caused Major Adverse Cardiac Events ("MACE") in patients. ¶¶39, 40. Defendants made clear that if Roxadustat's Phase 3 trials could establish similar efficacy as Epogen without the same safety risks, FibroGen could gain FDA approval for Roxadustat and thereby access a highly lucrative $3.5 billion market that included less-severe chronic kidney disease ("CKD") patients who were either non-dialysis-dependent ("NDD") or had just started dialysis ("incident dialysis" or "ID"), for whom Epogen was not recommended precisely because of those serious safety issues. ¶¶40-42.

Throughout the approximately 2½ year Class Period, Defendants repeatedly assured investors that the Phase 3 data for Roxadustat: (i) was derived pursuant to the FDA's objective, prespecified criteria across each of the studied endpoints; (ii) had unequivocally confirmed the drug's superiority in safety and efficacy to Epogen in dialysis patients; and (iii) was just as safe as placebo in non-dialysis patients. ¶57. For example, on December 20, 2018, the first day of the Class Period, Defendants proclaimed that preliminary Phase 3 data had shown that Roxadustat had "achieved superiority in efficacy not only against placebo but also over [Epogen]." ¶51. On May 9, 2019, FibroGen released top-line MACE safety data, and the Company's then-CEO Thomas B. Neff ("Neff") highlighted that the results demonstrated a "statistically significant advantage over [Epogen]" in the critical incident dialysis group. ¶53. Defendant Conterno also made statements touting the drug's safety, such as that "the data [was] extremely clean from my perspective when it comes to cardiovascular safety" and that "we showed a 30% reduction in MACE risk" for incident dialysis patients, which differentiated Roxadustat from its competition. ¶¶67-68. Conterno also stated that "there's no warrant [for a] Black Box" warning—the strongest warning the FDA can mandate for prescription drugs—due to the "compelling" cardiovascular safety data. ¶¶40, 69. Defendant Yu similarly hailed Roxadustat as the first anemia drug likely to avoid a Black Box

warning. ¶¶5, 53. Defendants reaffirmed these purportedly favorable trial study results for Roxadustat throughout the end of the Class Period. ¶¶53-70.

Further, in an investor conference call following a pre-NDA meeting between the FDA and FibroGen in August 2019, Neff represented that FibroGen had "reached an agreement with the [FDA] on the content of the NDA including the cardiovascular safety analysis[.]" ¶167. Yu underscored that "Phase 3 results confirmed the cardiovascular safety of Roxadustat." *Id.*

In November 2019, FibroGen issued a press release announcing "Positive Phase 3 Pooled Roxadustat Safety and Efficacy Results" based on nine studies. ¶171. The press release declared that Roxadustat "demonstrate[d] a cardiovascular safety profile comparable with placebo in patients not on dialysis, and comparable or in some cases better than that of epoetin alfa in patients on dialysis" by reducing "risk of MACE by 30% and MACE+ by 34% compared to [Epogen]" in the crucial incident dialysis population." *Id.* In support of these statements, Defendants published the results of nine data analyses that purportedly showed Roxadustat's risks of MACE and death to be either comparable to or lower than that of Epogen for the DD and ID populations, and comparable to or better than placebo for the NDD population. ¶¶63, 171-72.

Fueled by Defendants' numerous false statements regarding Roxadustat's purportedly extremely favorable Phase 3 data, FibroGen's stock price surged, reaching a Class Period high of $59.91 per share on March 1, 2019—an increase of over 46% from its $41 price on the first day of the Class Period. ¶134.

FibroGen's fraud began to unravel through a series of disclosures beginning on May 9, 2019, when FibroGen issued a press release disclosing topline results from the pooled safety analyses from its Phase 3 Roxadustat trials, including MACE results. The Company revealed that the largest three patient populations in its Global Phase 3 Program did not meet the requisite statistical threshold to claim that Roxadustat was not inferior to Epogen. ¶263. On this news, FibroGen's stock price fell 20%. *Id.* Then, on November 27, 2020, FibroGen abruptly announced the sudden "retirement" of Defendant Yu—FibroGen's Chief Medical Officer who was directly responsible for the Roxadustat trial data. ¶72. Just three weeks later, on December 18, 2020, FibroGen issued a press release announcing that the FDA extended review of the drug by three

months. ¶73. Then, on March 1, 2021, FibroGen announced that the FDA would hold an Advisory Committee ("AdCom") meeting to review Roxadustat's NDA, which was a surprising setback so late in the FDA approval timeline. ¶74. In response, FibroGen's stock price fell 32%. ¶75. Nevertheless, FibroGen misleadingly assured investors that the Company "[c]ontinued to have confidence in the completeness of the NDA submission and the strength of the [R]oxadustat data," and continued to emphasize the claimed statistically significant MACE results for incident dialysis patients in particular as "some of our strongest data." ¶76.

However, on April 6, 2021, with FDA public scrutiny now assured, Defendants were forced to admit that they had made *post hoc* manipulations to ***all nine*** of the previously reported safety analyses of Roxadustat. ¶¶77, 85. In each and every instance, Defendants' manipulations made Roxadustat appear to be significantly better and safer than it really was. *Id*. The manipulations were so significant that Defendants were forced to admit that based on the real "prespecified" data—and despite their prior repeated claims that Roxadustat lowered MACE risk in the crucial incident dialysis population by 30%—FibroGen could not "conclude that Roxadustat reduces the risk of . . . [MACE] in incident dialysis [patients] compared to [Epogen]" at all. ¶81. Significantly, Defendants further admitted that they had not only presented the manipulated data to investors, nephrologists and vulnerable CKD patients, but also to the FDA in the Roxadustat NDA—and thus had to "promptly . . . clarify this issue with the FDA." ¶84. Once Defendants' *post hoc* manipulations were corrected, the true data revealed that there were substantial safety concerns— including increased risk of thrombosis, seizures, stroke, and even death—and that Roxadustat was significantly less effective and less safe than a placebo or even Epogen, which already carried the "Black Box" warning. ¶7. In response to these shocking disclosures, FibroGen's share price was virtually halved, falling 45% from $34.64 per share on April 6, 2021, to $18.81 per share on April 8, 2021. ¶88.

Finally, on July 15, 2021, the FDA's AdCom met to review Roxadustat's NDA and unequivocally concluded that FibroGen's own undisclosed, prespecified sensitivity analyses demonstrated that the drug's efficacy over Epogen was inconclusive at best. ¶104. Moreover, with regard to safety, the drug caused "greater rates of some important adverse events [] than even

[Epogen]," including a higher rate of death and other major side effects. ¶106. Thus, the AdCom voted virtually unanimously against approval for Roxadustat for any patient population, even with a "Black Box" warning. ¶111. The following day, FibroGen's stock price plummeted over 42%, or $10.49 per share, from $24.84 to $14.35 per share on July 16, 2021. ¶113.

All told, the revelation of Defendants' fraud caused FibroGen's stock price to plummet by approximately 75% from its Class Period high, thereby causing substantial financial harm to Plaintiffs and members of the proposed Class. ¶13.

On July 15, 2022, the Court denied Defendants' motion to dismiss, holding that Plaintiffs adequately pleaded materiality and falsity as to over ninety statements about the safety and efficacy of Roxadustat because the Complaint's particularized allegations demonstrated, among other things, Defendants manipulated Roxadustat's clinical trial data to show a reduction in MACE risk when there was no evidence of it. MTD Order at 20-26. The Court also held that Plaintiffs sufficiently pleaded scienter based on, among other things, Defendant Yu's direct responsibility for the manipulated data and Defendant Conterno's personal review of the Roxadustat MACE safety data. *Id*. at 47-48.

7

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

Remarkably, Defendants' own documents confirm that FibroGen knew that the NDA the Company had submitted to the FDA was false and misleading. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

**ARGUMENT**

**I.     Securities Class Actions Are Ideally Suited for Class Certification**

The Supreme Court and the Ninth Circuit have repeatedly recognized the importance of securities class actions in redressing violations of the federal securities laws and serving as an enforcement mechanism to supplement government regulation of the securities markets. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)."); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir. 1984) (similar), *aff'd*, 472 U.S. 299 (1985). Furthermore, "[c]lass actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants." *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005). Accordingly, "the law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *3 (C.D. Cal. Oct. 6, 2021).

8

Class certification in this action is a two-step process. The movant "must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 282 (N.D. Cal. 2020). Next, the movant must meet the prerequisites of Rule 23(b)(3): "'that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting Rule 23(b)(3)). The Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013). Merits questions are relevant "'only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting *Amgen*, 568 U.S. at 466). Here, the proposed Class readily satisfies each of these prerequisites, thus amply supporting class certification.

## II. The Requirements of Rule 23(a) Are Satisfied

### A. The Proposed Class is So Numerous that Joinder Is Impracticable

Rule 23(a) requires the proposed class to be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). In the Ninth Circuit, "[n]umerosity is presumed where the plaintiff class contains forty or more members." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *3 (N.D. Cal. May 9, 2022). Here, the proposed Class is estimated to consist of thousands of members, given that FibroGen had between 85 and 93 million shares of common stock outstanding during the Class Period with an average weekly trading volume of over 4 million shares. Coffman ¶¶28, 69 & Exs. 3, 12. In addition, FibroGen had a total volume of 416,070 call option contracts and 316,541 put option contracts that traded during the Class Period. *Id.* at ¶79 n.83. Accordingly, numerosity is easily satisfied. *See SEB Inv.*, 335 F.R.D.

at 282-83 (numerosity met where "plaintiff estimates that there are hundreds-of-thousands of investors in the proposed class" based on 600,000 outstanding shares).

**B.    The Proposed Class Shares Common Questions of Law and Fact**

Rule 23(a) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To show commonality, a plaintiff "need not show… that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). "In securities fraud cases, commonality is often satisfied as a result of the inherent nature of such cases. That is, courts have easily found commonality where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *4 (N.D. Cal. Dec. 22, 2016).

Here, numerous questions of law and fact are common among Plaintiffs and the putative Class, including whether: (1) Defendants violated the federal securities laws; (2) Defendants misrepresented or omitted material facts; (3) Defendants acted with scienter; (4) the Individual Defendants controlled FibroGen and its violations of the federal securities laws; (5) Defendants' misrepresentations and omissions caused Class members to suffer a compensable loss; and (6) Class members have sustained damages, and the proper measure of damages. These are the exact types of issues that regularly satisfy the commonality requirement in federal securities fraud cases. *See Junge v. Geron Corp.*, 2022 WL 1002446, at *2 (N.D. Cal. Apr. 2, 2022) (commonality established where plaintiffs alleged the same public misrepresentations in SEC filings and earnings calls defrauded investors and investors suffered similar losses as a result).

**C.    Lead Plaintiffs' Claims Are Typical of the Class**

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require that the putative class members share "substantially identical" claims. *SEB Inv.*, 335 F.R.D. at 283. Instead, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members." *Id.*

Plaintiffs' claims are typical of the claims or defenses of the Class. Plaintiffs and Class members all purchased FibroGen securities and assert the same Section 10(b) claims, based on the same misstatements and omissions by Defendants, and the same Section 20(a) claims of "control person" liability. Plaintiffs and Class members thus share the same basic claims, legal theories, and evidence. Where, as here, "[t]he core factual and legal questions in this case, including whether the statements and omissions at issue were material and misleading, and whether the price of [company's] shares was artificially inflated as a result of them, are common to the class, and the lead plaintiffs allege injuries typical of the class," typicality is satisfied. *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *1 (N.D. Cal. Sept. 4, 2018). Nor are Plaintiffs subject to any "unique defenses," much less any that "threaten to become the focus of the litigation." *In re LendingClub Sec. Litig.*, 282 F.Supp.3d 1171, 1179 (N.D. Cal. 2017).

### D.    The Proposed Class Representatives and Class Counsel Are Adequate

Rule 23(a)(4) requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court's inquiry focuses on two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members[,] and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Oracle*, 2022 WL 1459567, at *4. Here, Lead Plaintiffs readily satisfy both requirements.

*First*, neither Lead Plaintiffs nor Lead Counsel Saxena White have any conflicts with the proposed Class. Like other potential Class members, Lead Plaintiffs purchased FibroGen common stock at artificially inflated market prices during the Class Period and were injured by the same material misrepresentations and omissions. Thus, Plaintiffs' and the putative Class's interests in establishing Defendants' liability and maximizing recovery are aligned. *See Verisign*, 2005 WL 7877645, at *8 (no conflict between lead plaintiffs' claims and unnamed class members' claims

because, as here, "[t]hey all arise out of the same set of facts—Defendants' alleged misrepresentations during the Class Period").[3]

*Second*, as set forth in their respective Declarations in support of this motion, Plaintiffs have demonstrated their adequacy by consistently taking an active role in and exerting control over this litigation to protect the interests of the Class, including by seeking appointment as Lead Plaintiffs, filing a highly detailed Complaint, defeating Defendants' motion to dismiss, vigorously pursuing fact discovery from Defendants and multiple third parties, responding to document requests and interrogatories served by Defendants, and receiving frequent status updates from counsel. *See* Declaration of David Randall at ¶¶5-6; Declaration of Christopher R. DiFusco at ¶¶5-6; Declaration of Timothy J. Smyth at ¶¶6-7 (attached as Exhibits 2, 3, and 4, respectively, to the Kaplan Decl.). This level of oversight and direction is more than sufficient to establish adequacy. *See LendingClub*, 282 F.Supp.3d at 1182 ("To establish adequacy lead plaintiffs need only be familiar with the basis for the suit and their responsibilities as lead plaintiffs.").

*Third*, as public pension funds with substantial assets under management, experienced professional staff, and significant financial stakes in the action, Baltimore Employees, Philadelphia Pension Fund, and Plymouth County are precisely the kind of plaintiffs Congress intended to serve as class representatives. *See* Ex. 2, ¶¶2, 4, 7; Ex. 3, ¶¶2, 4, 7; Ex. 4, ¶¶2, 5, 8; H.R. Conf. Rep. No. 104-369, at 34 (Congress enacted the PSLRA to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel"); *see, e.g.*, *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *7 (D. Minn. Sept. 28, 2020) (certifying class and noting that adequacy was established as Plymouth County was the type of "large, institutional lead plaintiff[]

[3] The fact that the Class contains investors in both stock and options has no effect on the certification analysis. *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *5, 12, 15 (D.N.J. Jan. 30, 2013) (certifying class containing stock and options traders and rejecting, *inter alia*, defendants' argument that because none of the lead plaintiffs purchased a call option or sold a put option, they have no "standing" to litigate Rule 10b–5 claims on behalf of absent class members who traded in options contracts); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359 (D. Del. 1990) (appointing lead plaintiff who purchased only call options to represent class of purchasers of call options and common stock).

12

envisioned by Congress when the PLSRA was enacted").

*Fourth*, as demonstrated by its extensive experience in prosecuting and resolving complex securities class actions in courts in the Ninth Circuit throughout the nation, Saxena White is well-qualified to prosecute this Action on behalf of Lead Plaintiffs and the Class. Kaplan Decl. Ex. 11 (Saxena White Firm Resume); *see In re Wells Fargo & Co. S'holder Deriv. Litig.*, 445 F.Supp.3d 508, 522 (N.D. Cal. 2020) (approving $320 million derivative settlement and noting that the landmark recovery "represents an excellent result for the shareholders"); *In re Merit Medical Sys. Inc., Sec. Litig.*, No. 8:19-cv-02326-DOC-ADS (C.D. Cal. 2022) (ECF 119) (approving $18.25 million securities class action settlement and noting that Saxena White "fairly and adequately represented the Settlement Class"); *Milbeck v. TrueCar, Inc.*, 2:18-cv-02612-SVW-AGR (C.D. Cal. 2020) (ECF No. 189) (approving $28 million securities class action settlement); *Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.*, 2021 WL 1659848, at *5 (E.D.Va. Apr. 23, 2021) (approving $25 million securities class action settlement and noting that Saxena White had "conducted the litigation… with skill, perseverance and diligent advocacy"). Here, as Court-appointed Lead Counsel, Saxena White has amply demonstrated its willingness to commit substantial time and resources to vigorously represent the Class by, among other things, preparing the detailed Complaint sufficient to withstand Defendants' motion to dismiss; pursuing extensive discovery from Defendants and multiple third parties; and assembling a qualified and diverse team of attorneys and staff to prosecute this Action.

In sum, Lead Plaintiffs and Class Counsel are highly capable of prosecuting this Action and will fairly and adequately protect the interests of the proposed Class.

**III.     The Predominance and Superiority Requirements of Rule 23(b)(3) Are Satisfied**

This Action also satisfies the requirements of Rule 23(b)(3), which authorizes certification where: (1) the "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are met here.

## A.    Common Questions of Law and Fact Predominate

Predominance under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591,623 (1997). Where common questions of law or fact outnumber those affecting only individual Class Members, predominance is satisfied. *See Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis in original). As the Supreme Court has held, "[p]redominance is a test readily  met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 625. Indeed, as the above analysis of Plaintiffs' allegations under Rule 23(a)(2)'s commonality standard demonstrates (*see infra* at II.B.), there are an overwhelming number ofquestions of law and fact common to Plaintiffs and the proposed Class that predominate over any perceived or potential individual issues. *See id*.

To recover damages in a private securities fraud action under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460–61. The elements of falsity, materiality, scienter, and loss causation are common merits issues, thus proof of those elements is not a prerequisite to class certification. *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *4 (N.D. Cal. Sept. 4, 2018). Thus, the predominance inquiry for Plaintiffs' Section 10(b) claims "turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 810 (2011).

Here, common questions of law and fact predominate because Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); *In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) ("plaintiffs can meet their burden of proving predominance by establishing their entitlement to the *Basic* presumption").

14

### 1. Lead Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic*

Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed so long as the stock traded in an efficient market. *Basic*, 485 U.S. at 247. The premise underlying the fraud-on-the-market theory is that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business … Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241- 42 (alteration in original); *see also Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 268, 270 (2014) ("the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations" (quoting *Basic*, 485 U.S. at 246)); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price"). As a result, "reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action." *Halliburton II*, 573 U.S. at 268 (alteration in original) (quoting *Basic*, 485 U.S. at 246-47).

Under *Basic* and *Halliburton II*, Plaintiffs may invoke the presumption of reliance by showing: (1) the alleged misrepresentations were publicly known; (2) the plaintiff traded in the stock between the making of those misrepresentations and the alleged revelation of the truth; and (3) the stock at issue traded in an efficient market. *Halliburton II*, 573 U.S. at 277-78. With respect to the required showing of an efficient market, "the Supreme Court has suggested that the burden required to establish market efficiency is not an onerous one." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017).

Here, Plaintiffs readily establish each prerequisite to invoke the fraud-on-the-market presumption. *First*, Defendants' alleged misrepresentations and omissions were made in public statements to the market at large.[4] *Second*, Plaintiffs and all other members of the Class purchased

---

[4] The Complaint details Defendants' alleged publicly made false and misleading statements and omissions in FibroGen's public SEC filings, including in each of its Forms 10-Q for 2019 and its Form 10-Q for Q2 2020, as well as in statements contained in the Company's press releases and

FibroGen stock or call options or sold FibroGen put options, between the date of the first alleged misrepresentation and the alleged revelation of Defendants' fraudulent conduct. *Third*, as discussed below and in the Coffman Report, FibroGen common stock and options traded in an efficient market during the Class Period.

### a. FibroGen Common Stock Was Listed and Traded on The NASDAQ, a Presumptively Efficient Market

At all relevant times, FibroGen common stock was listed and actively traded on the NASDAQ. ¶¶259, 275; Coffman ¶40. The listing of a security on a major exchange such as the NASDAQ strongly weighs in favor of a finding of market efficiency and supports invoking the presumption of reliance. *See Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59, 63 (9th Cir. 2009) (where defendant company's stock "was traded on a national exchange and the stock prices reflected public information an efficient market is present"); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) ("[p]laintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied" where company's stock "was actively traded on an efficient market – the NASDAQ").

### b. The *Cammer* Factors Demonstrate That FibroGen Common Stock Traded in an Efficient Market

In addition to listing on a major securities exchange, when analyzing market efficiency, courts nationwide routinely consider the "*Cammer* factors" set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). *E.g.*, *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102-03 (9th Cir. 2010); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021). The *Cammer* factors are: (1) weekly trading volume; (2) amount of securities analyst coverage; (3) existence of market makers and arbitrageurs; (4) eligibility of the company to file a Form S-3 registration statement; and (5) demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security's prices. *Cammer*, 711 F. Supp. at 1286-87. The first four *Cammer* factors "examine indirect indicia of market efficiency for

on conference calls. ¶¶142-43, 145, 147-48, 153, 155, 157-58, 160, 162-65, 167-69, 171-72, 177-79, 181, 184, 187, 189-90, 192-93, 195-96, 198-99, 201-02, 205, 207-08, 210-12, 217-19, 222-26, 230-31, 233-34.

a particular security," while the fifth factor looks to direct evidence. *In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *8 (N.D. Cal. Apr. 21, 2016) (same). No single factor is essential or dispositive. *Id.*

Here, as demonstrated in the Coffman Report and described herein, each and every one of the *Cammer* factors supports a finding that the market for FibroGen common stock was efficient during the Class Period. As a result, Plaintiffs and the Class are entitled to the fraud-on-the-market presumption. Coffman ¶¶24-79 & Ex. 1 (providing summary of market efficiency factors and summary of findings that FibroGen common stock traded in an efficient market).

> **i.    *Cammer* 1: FibroGen Common Stock
> Traded at a Large Average Weekly Volume**

A high average trading volume tends to show market efficiency because it suggests "significant investor interest in the company" and, in turn, a "likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one" and "one percent would justify a substantial presumption." *Id.*

During the Class Period, FibroGen common stock had an average weekly trading volume of 4.65% of outstanding shares—roughly 4.14 million shares—compared to 2.49% for the average weekly trading volume on both the NASDAQ and NYSE exchanges. Coffman ¶28. FibroGen's Class Period trading volume thus far exceeds the 1%-2% *Cammer* threshold, supporting a finding of efficiency. *Id.* ¶28 & Ex. 3; *see Purple Mountain Trust v. Wells Fargo & Co.*, 2022 WL 3357835, at *4 (N.D. Cal. Aug. 15, 2022) (an average weekly trading volume of 2% of total shares outstanding "supports a strong presumption of market efficiency").[5]

---

[5] Mr. Coffman also determined that FibroGen's "annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms," supports efficiency. Coffman ¶¶29-30. Specifically, FibroGen common stock's turnover velocity ratio during the Class Period was 232% vs. the NASDAQ and NYSE average of 130%. *Id.*

17

### ii. *Cammer* 2: Numerous Analysts Followed and Reported on FibroGen

During the Class Period, at least 111 analyst reports on FibroGen were issued by 8 firms, including major firms such as Jefferies LLC, Mizuho, and Raymond James & Associates (Coffman ¶34 & Ex. 4), which is another indicator of an efficient market as it shows that new information on the Company was rapidly being disseminated and acted upon by investors. *See Cammer*, 711 F. Supp. at 1286. The widespread coverage of FibroGen by securities analysts further supports that FibroGen's stock traded in an efficient market. *See Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *5 & n.2 (N.D. Cal. Dec. 22, 2016) (coverage by "only four or six analysts" weighs in favor of market efficiency); *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. Feb. 17, 2015) (coverage by five analysts "weighs in favor of market efficiency").[6]

### iii. *Cammer* 3: Existence of Market Makers

Market makers "help[] establish a market for securities by reporting bid-and-asked quotations . . . and . . . stand[] ready to buy or sell at these publicly quoted prices." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009). Where, as here, a stock trades on a major national exchange such as the NASDAQ with reporting on trades and trade volume and generally high liquidity, the number of market makers is not especially significant to a finding of efficiency. Coffman ¶¶38-41; *see Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Cal. 2012) (finding stock trading on a major exchange through designated market makers sufficient to support market efficiency). Nonetheless, there were over one hundred market makers for FibroGen common stock during the Class Period, thus supporting market efficiency. Coffman ¶42; *see Carpenters Pen. Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) ("anywhere between six and twenty market makers is sufficient to support a finding of market efficiency"); *Diamond Foods*, 295 F.R.D. at 248 (nineteen market makers sufficient).

---

[6] Mr. Coffman also notes that there was substantial public press coverage of FibroGen—for example, a search of the database Factiva for articles relating to FibroGen resulted in 1,479 unique articles during the Class Period. Coffman ¶36.

#### iv.    *Cammer* 4: Eligibility to File SEC Form S-3

"[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. This is because the filing of Form S-3 "is predicated on the Commission's belief that the market operates efficiently" for the company. *Id.* at 1284; *see In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 411 (E.D. Va. 2015) ("[W]hen an issuer of securities meets Form S-3's requirements, the market for its securities is likely one that quickly assimilates material public information into the price because the market is well developed and trading is robust."). Here, prior to, during, and after the Class Period, FibroGen filed Form S-3ASRs, and met the eligibility criteria for filing a Form S-3 throughout the Class Period, which further supports market efficiency. Coffman ¶45; *Diamond Foods*, 295 F.R.D. at 248 (describing significant threshold requirements for Form S-3 eligibility which "tends to support a finding of efficiency"); *In re Countrywide*, 273 F.R.D. at 613 n.82 (noting traditional prominence of S-3 filing eligibility as an important *Cammer* factor).

#### v.    *Cammer* 5: Price Reaction to New Information

Evidence that the price of a security regularly reacts to unexpected corporate events or the issuance of financial releases about the issuer is strong evidence of an efficient market. *See Cammer*, 711 F. Supp. at 1287. While prior case law emphasized the importance of this factor, direct, empirical evidence of efficiency is not required where, as here, indirect evidence of market efficiency is strong. *See Waggoner*, 875 F.3d at 99 (affirming that district court was not required to assess direct evidence of efficiency where there was strong indirect evidence of efficiency); *Angley v. UTi Worldwide Inc.*, 311 F.Supp.3d 1117, 1121 (C.D. Cal. 2018) ("Because there is no evidence disputing the first four *Cammer* factors and the *Krogman* factors weigh in favor of market efficiency, the Court finds Plaintiff has met its burden of showing market efficiency."); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *8 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ("[I]f the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider—and a plaintiff need not submit—evidence supporting *Cammer* factor 5").

19

Notwithstanding, the fifth *Cammer* factor is readily established. To establish *Cammer* factor five, Mr. Coffman conducted an event study and a series of statistical analyses to determine whether FibroGen securities reacted to company-specific, new information. Coffman ¶¶49-67. Mr. Coffman's event study analysis, which is akin to those regularly accepted by courts in evaluating *Cammer* factor five, establishes that there is a consistent and strong cause-and-effect relationship between the disclosure of material information and FibroGen stock price, thus further supporting a finding of market efficiency. *Id.*, & Exs. 5-8.

Among other things, Mr. Coffman analyzed the relationship between FibroGen stock returns on days when it issued earnings announcements and other press releases versus trading days with no news. Mr. Coffman concluded that there was "powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of FibroGen Common Stock" based on his finding that there was a statistically significant price reaction at the 95% confidence level or greater on nearly 30% of the earnings announcements and other press release dates, but when compared to days with no FibroGen-related news, there was only 3.69% statistically significant reactions. *Id.*, ¶62; *see Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022) (certifying class where expert performed a standard event study showing statistical significant price movements at 90% or 95% levels in response to company specific news and no such movements on days without company specific news).

Notably, "dozens of cases" have accepted similar analyses by Mr. Coffman in finding market efficiency. *Pub. Emp. Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) (noting "dozens of cases in which Coffman's expert opinions have supported the certification of a class" in federal securities class actions); *see also, e.g.*, *Granite*, 2021 WL 229310, at *6 (certifying class where "Lead Plaintiff's expert, Chad Coffman, CFA, analyzed efficiency during the class period" using tests "regularly considered by financial economists and courts in determining whether the market for a particular security is efficient"); *Milbeck v. TrueCar*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) ("Various courts have considered the same Coffman report as that offered in this case and have found it sufficient . . . .").

### c.   The *Krogman* Factors and Additional Factors Support a Finding of Market Efficiency For FibroGen Common Stock

Courts in this Circuit also consider the three factors noted in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float"). *See, e.g., Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349, 356-57 (C.D. Cal. 2015). Here, these and additional factors set forth below further support a finding that FibroGen securities traded in an efficient market.

*First*, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. During the Class Period, FibroGen's market capitalization averaged $3.61 billion—a market capitalization ranging from the 67th to 80th percentile of the combined NASDAQ and NYSE markets.  Coffman ¶69 & Exs. 9-10. Courts routinely find that similar or even far lower market capitalization levels support market efficiency. *See, e.g., Junge,* 2022 WL 1002446, at *4 (finding average market capitalization of less than $732 million supports efficiency).

*Second*, the narrow bid-ask spreads for FibroGen common stock also support efficiency. *See Krogman*, 202 F.R.D. at 478 (noting that a "large bid-ask spread is indicative of an inefficient market"). During the Class Period, FibroGen's stock had a time-weighted average bid-ask spread between 0.034% and 0.133%–well below the range courts routinely find sufficient to establish efficiency. ¶72 & Ex. 11; *see Petrie*, 308 F.R.D. at 356 (certifying class and finding that bid-ask spread of 2.91% supported efficiency); *Radient*, 287 F.R.D. at 574 (bid-ask spread of 0.58% supported efficiency); *In re Sci-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (bid-ask spread that "never exceeded 1.9%" weighed "heavily" in favor of efficiency).

*Third*, when evaluating efficiency, "courts also consider the percentage of shares held by the public rather than insiders" with a large "float" further supporting market efficiency. *Krogman*, 202 F.R.D. at 478. Here, during the Class Period, over 91% of all FibroGen shares were held by non-insiders—again, consistent with levels courts routinely find sufficient. *Id.* at ¶73 & Ex. 12; *see Purple Mountain Tr.*, 2022 WL 3357835, at *5 (approximately 90% float); *Petrie*, 308 F.R.D. at 357 (approximately 87% float).

*Finally*, in addition to the *Cammer* and *Krogman* factors, numerous additional factors strongly support a finding of efficiency:

- Institutional ownership of FibroGen stock was robust, with institutions holding the vast majority of the float. *Id*. at ¶74 & Ex. 12 (472 institutions collectively held on average over 74% of total outstanding shares during the Class Period); *see Petrie,* 308 F.R.D. at 356-57 (noting that courts have found as few as 70 institutional owners holding as little as 11% of total outstanding shares weighed in favor of market efficiency).

- There is no evidence of serial correlation, or "autocorrelation"— essentially, the ability of past price movements to predict future price movements—in FibroGen's stock prices. Coffman ¶78 & Ex. 13; *see Petrie*, 308 F.R.D. at 356 (explaining that lack of autocorrelation supports efficiency); *In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency where stock "did not exhibit autocorrelation").

- There was considerable option trading in FibroGen's common stock during the Class Period, another factor that supports market efficiency because, as Mr. Coffman explains: "Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks." Coffman ¶79; *see Granite*, 2021 WL 229310 at *6 ("considerable options trading" points to efficiency).

For all of the reasons discussed above, the evidence set forth in the Coffman Report shows that the market for FibroGen common stock was efficient throughout the Class Period. Accordingly, the *Basic* presumption of reliance applies; common issues will predominate; and the action can and should proceed as a class action.[7]

### 2. The Presumption of Reliance Also Applies to Trading in Options on FibroGen's Common Stock

Courts hold that stock options trade in an efficient market when the underlying common stock trades in an efficient market because "[t]he market price for options is directly responsive … to changes in the market price of the underlying stock, and to information affecting that price." *See Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988) (seminal case); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006) ("The value of these derivative securities

---

[7] Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*, 406 U.S. 128, because the Complaint alleges over 90 misstatements, many of which are premised on highly material omissions. *See* MTD Order at 24, 50 (affirming Plaintiffs' Section 10(b) claims based on undisclosed *post-hoc* changes to Roxadustat trial data analyses).

[options] depended upon the value of Enron common stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options."). Because of this linkage, numerous courts have concluded that a plaintiff seeking to certify a class including options traders need only establish the efficiency of the underlying common stock market to satisfy the *Basic* presumption for options. *See Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *14 (S.D. Tex. Nov. 13, 2019) (finding market efficiency for common stock is sufficient to prove options market efficiency); *Countrywide*, 273 F.R.D. at 609 n.74 ("efficiency is very nearly a nonissue for Countrywide common stock and options"); *Sci.-Atlanta*, 571 F. Supp. at 1329 (collecting cases holding that options traders are "generally entitled to a rebuttable presumption of reliance" "upon proof of market efficiency in the underlying stock"). The academic literature is in accord. *See* Coffman ¶83 n.92 (academic literature supports the conclusion that an option price is driven by the price of the underlying stock, and if the stock price changes, the option price must also adjust).

Accordingly, market efficiency should be presumed for FibroGen's stock options because, as discussed above, Plaintiffs have amply demonstrated that the market for FibroGen common stock was efficient during the Class Period. Nonetheless, Mr. Coffman has undertaken an analysis of the efficiency of the market for FibroGen stock options during the Class Period by performing a standard put-call parity evaluation as well as a robust cause-and-effect analysis. Coffman ¶¶86-92 & Exs. 14-17. Based on his analysis, Mr. Coffman confirmed that FibroGen's options contracts traded in an open, developed, and efficient market during the Class Period. *Id.*, ¶92; *see Rougier*, 2019 WL 6111303, at *14 (finding similar put-call parity test demonstrated that options traded in an efficient market).

### 3. Damages Are Measurable Using a Common Methodology

Proof of damages is not a prerequisite to class certification. *See LendingClub*, 282 F. Supp. 3d. at 1184. Nor does the calculation of damages present individual issues capable of predominating over common ones. *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018). Lead Plaintiffs intend to prove damages and economic loss though the "out-of-pocket" methodology and employ an event study, "the standard method for damages in virtually every

Section 10(b) class action." *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018); *see also SEB*, 335 F.R.D. at 288 ("Plaintiff's proposed out of pocket damages methodology, which uses an event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders."). As set forth in the Coffman Report, the "out of pocket" methodology is capable of calculating damages on a class-wide basis, consistent with Lead Plaintiffs' theory of the case. *See* Coffman ¶¶93-98; *see Diamond Foods*, 295 F.R.D. at 251 (because plaintiff's expert stated that "damages 'will be calculated using an event study analysis similar to the event study analysis' regarding market efficiency," that is sufficient). Plaintiffs have plainly shown that damages can be calculated on a class-wide basis.

**B.    Class Treatment is Superior to Other Methods of Adjudication**

Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors to guide this analysis: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed R. Civ. P. 23(b)(3). Examination of each factor demonstrates that litigating this case as a class action is the superior method.

*First*, the proposed class consists of a large number of investors who are geographically dispersed and whose individual damages are likely small enough to render individual litigation prohibitively expensive.[8] *Second*, Plaintiffs are aware of no other related individual actions and, in any event, concentrating the litigation in this forum is desirable to avoid wasting significant judicial resources litigating separate actions based on the same operative facts. Additionally, litigating this case as a class action will eliminate the possibility of inconsistent rulings across

---

[8] *See VeriSign*, 2005 WL 7877645, at *9 ("Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants.").

different jurisdictions. *Finall*y, there will be no difficulties in managing this case as a class action. Federal securities class actions are routinely certified and raise no unusual manageability issues. *See, e.g., In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 631 (N.D. Cal. 2018) ("Courts in this district have recognized the utility of the class action device in securities case.").

**IV.    Proposed Class Counsel Satisfy Rule 23(g)**

Rule 23(g) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1)(a). "In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* Saxena White has extensive experience litigating securities class actions and has demonstrated its willingness to commit substantial resources to the successful prosecution of this Action. For these reasons, and as further discussed in Section II.D above, Saxena White should be appointed under Rule 23(g) to serve as Class Counsel.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant this motion and: (1) certify this Action as a class action pursuant to Rules 23(a) and (b)(3); (2) appoint Lead Plaintiffs as Class Representatives pursuant to Rules 23(a) and (b)(3); and (3) appoint Saxena White as Class Counsel pursuant to Rule 23(g).

Dated: January 27, 2023                      Respectfully submitted,

                                             */s/ David R. Kaplan*

                                             **SAXENA WHITE P.A.**

                                             David R. Kaplan (SBN 230144)
                                             dkaplan@saxenawhite.com
                                             Emily Bishop (SBN 319383)
                                             ebishop@saxenawhite.com
                                             505 Lomas Santa Fe Drive, Suite 180
                                             Solana Beach, CA 92075
                                             Tel.: (858) 997-0860
                                             Fax: (858) 369-0096

Steven B. Singer
ssinger@saxenawhite.com
Kyla Grant (admitted *pro hac vice*)
kgrant@saxenawhite.com
Sara DiLeo (admitted *pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (admitted *pro hac vice*)
jsaltzman@saxenawhite.com
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611

Maya Saxena (admitted *pro hac vice*)
msaxena@saxenawhite.com
Lester R. Hooker (SBN 241590)
lhooker@saxenawhite.com
Dianne M. Pitre (SBN 286199)
dpitre@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiff Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on January 30, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

*/s/ David R. Kaplan*
David R. Kaplan

27