COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
TIJANA M. BRIEN (286590)
(tbrien@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
ZANETA J. KIM (317844)
(zkim@cooley.com)
AMIE L. SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California  94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

Attorneys for Defendants
FibroGen, Inc., Enrique Conterno, James Schoeneck,
Mark Eisner, and Pat Cotroneo

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: June 8, 2023<br>Time: 1:30 p.m.<br>Dept.: 5 – 17th Floor<br>Judge: Hon. Edward M. Chen |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND.............................................................2

    A.     Plaintiffs' Theory of Fraud .......................................................................................2

    B.     Plaintiffs' Motion for Class Certification .................................................................3

        1.     Plaintiffs' "Manipulation" Theory ................................................................4

        2.     Plaintiffs' "Sensitivity Analyses" Theory.....................................................7

    C.     Plaintiffs Are Not Entitled to the Presumption of Reliance After April 6, 2021 Because the Alleged Misstatements Had No Price Impact After That Date. ........................................................................................................................10

        1.     The Only Allegedly Concealed Information After April 6 Was "Prespecified Sensitivity Analyses" Which Were Fully Disclosed Before the July 15 Alleged Corrective Disclosure .....................................12

        2.     Disclosure of the Sensitivity Analyses in the July 13, 2021 FDA Briefing Document Did Not Impact FibroGen's Stock Price.......................14

        3.     The July 16, 2021 Stock Price Decline Was Not in Response to Disclosure of the Sensitivity Analyses Because That Information Was Published Three Days Earlier. ......................................................................16

    A.     Plaintiffs Fail to Propose a Damages Methodology Consistent with Their Theories of Liability Under Comcast. ......................................................................18

        1.     Coffman Fails to Engage with the Facts of This Case................................19

        2.     Plaintiffs' Proposed Methodology Is Inconsistent with Their Theory of Liability after April 6, 2021.....................................................................21

II.    LEAD PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES, AS REQUIRED BY RULE 23(A).............................................................................................23

III.   CONCLUSION....................................................................................................................25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i

**DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)........................................................................................................11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................................10, 11

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) .........................................................................................24

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) .......................................................................................11

*In re BP p.l.c. Sec. Litig. ("BP I")*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)..................................................................22

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ................................................................12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................................................. *passim*

*In re ConAgra Foods, Inc.*,
302 F.R.D. 437 (C.D. Cal. 2014) ...................................................................................20

*Curtis v. Extra Space Storage, Inc.*,
2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ..........................................................19, 23

*In re Enron Corp. Sec. Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ............................................................................24

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)...................................................................15

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................................20

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1959 (2013)......................................................................................12, 21, 22

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) .........................................................................................18

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) .......................................................................................11

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

*Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*),
573 U.S. 258 (2014) ..........................................................................................................10, 11

*Ind. Pub. Ret. Sys. v. AAC Holdings., Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ......................................................................22

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ............................................................................................25

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal July 21, 2015) ..........................................................................20

*Mulderrig v. Amyris, Inc.*,
340 F.R.D. 575 (N.D. Cal. 2021) ............................................................................................22

*In re POM Wonderful LLC*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........................................................................23

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..........................................................12, 17, 18

*Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) .................................................................................................24

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) .............................................................................................25

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ...................................................................................................11

*Ward v. Apple Inc.*,
784 F. App'x 539 (9th Cir. 2019) ...........................................................................................19

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................................24

*Werdebaugh v. Blue Diamond Growers*,
2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ........................................................................23

**Statutes**

Exchange Act § 10(b) ....................................................................................................................21

Private Securities Litigation Reform Act of 1995 .......................................................................24

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

Rule 10b-5 ......................................................................................................................................11

Cooley LLP
Attorneys at Law
Palo Alto

iii

**Defendants' Opposition to**
**Mot. for Class Certification**
**3:21-cv-02623-EMC**

## I.      INTRODUCTION

The Court should deny Plaintiffs' motion for class certification for failing to satisfy Federal Rule of Civil Procedure 23.  <u>First</u>, if a class is certified (it should not be), the class period must end no later than April 6, 2021, because Plaintiffs cannot show that any challenged statement impacted FibroGen's stock price beyond that date.  This lack of price impact makes it impossible for Plaintiffs to invoke the "fraud-on-the-market" presumption of reliance, and without that presumption, Plaintiffs cannot show that common issues will predominate under Rule 23(b)(3).

More specifically, for the period from April 6 through July 15, 2021, Plaintiffs claim that FibroGen made false or misleading statements by failing to disclose "prespecified sensitivity analyses" of cardiovascular safety for FibroGen's drug, Roxadustat.  Plaintiffs claim that these "sensitivity analyses" were revealed to the market at the July 15, 2021 FDA Advisory Committee meeting, leading to a stock price decline the next trading day, July 16.  But the "prespecified sensitivity analyses" that Plaintiffs claim were concealed from investors during this period were fully disclosed ***three days earlier on July 13 with no statistically significant stock price movement***.  As explained by Defendants' expert, Dr. Paul Zurek, the fact that the sensitivity analyses were disclosed on July 13 means that the July 16 price decline could not have been a reaction to those analyses.  In other words, after April 6, the alleged fraud could not have impacted FibroGen's stock price, defeating the presumption of reliance on the alleged misstatements.  Thus, to the extent a class is certified, the class period must be shortened to end on April 6, 2021, as opposed to July 15.  The difference between a class period ending on April 6 and one ending on July 15, 2021, is significant, as Plaintiffs seek to benefit from a 42% ($10.49) decline on July 16 caused by the announcement of the Advisory Committee vote not to recommend approval of Roxadustat.  Shortening the class period would significantly trim the size of their case.

<u>Second</u>, Plaintiffs fail to propose a methodology capable of calculating damages on a class-wide basis consistent with their theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Plaintiffs propose the "out-of-pocket method" for calculating damages, as set forth in the report of Chad Coffman.  (Pls.' Ex.[1] 1 at 93.)  But Coffman made no effort to tether that

---

[1] ("Pls.' Ex.") refers to Exhibits submitted with the Kaplan Decl. in Support of Lead Plaintiffs' Motion for Class Certification.  (ECF No. 147-1.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

"methodology" to this case. Further, Plaintiffs' proposed methodology is impossible to apply after April 6, 2021, providing another basis to shorten the class period to end on April 6 (to the extent a class is certified). Plaintiffs' "event study" methodology assumes that the stock drop at the end of the class period was the same amount as the artificial inflation earlier in the class period. But as discussed above, the July 16 stock drop was unrelated to any alleged fraud, meaning that the stock price decline attributable to fraud was *zero*.

Finally, Plaintiffs are not adequate class representatives because they are just pawns for their counsel, as they are not engaged in the litigation and fail to even have the most basic understanding of the facts at issue. For example, Plaintiffs' core theory is that FibroGen "manipulated" Roxadustat data that it presented to investors, yet Plaintiffs did not know what the alleged "manipulation" was. Plaintiffs' representatives also expressed views *inconsistent* with their own allegations, admitting for example, that post hoc changes "may be appropriate" and that data could be interpreted a number of different ways without rendering any one interpretation false.

For these reasons, and as discussed below, Defendants respectfully request that the Court deny Plaintiffs' Motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiffs' Theory of Fraud

This case arises from FibroGen's unsuccessful effort to get FDA approval for a drug called Roxadustat, for treatment of anemia in patients with chronic kidney disease. According to Plaintiffs, FibroGen misled investors by publishing certain cardiovascular ("CV") safety data that FibroGen had "deliberately manipulated" to make Roxadustat appear safe when it was not. (Mot. at 1.) They argue that the alleged fraud "began to unravel through a series of disclosures beginning on May 9, 2019." (*Id*. at 5.) On that date, FibroGen allegedly disclosed that the three largest patient populations in its Phase 3 program did not meet the statistical threshold for "non-inferiority," leading to a 20% stock drop. (*Id*.) But Plaintiffs fail to explain how such disclosure related to, let alone "revealed," any purported manipulation.[2] Nor do they explain how FibroGen had any intent to commit fraud given

---

[2] Plaintiffs' theory as to this alleged corrective disclosure is also nonsensical since the Company never told investors that the data would demonstrate "non-inferiority." Thus, nothing was being "corrected" on May 9, 2019.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

its transparent and allegedly sobering disclosure to investors on May 9. Instead, Plaintiffs contradict their own allegations by insisting that Defendants then continued to misrepresent Roxadustat's safety data for the next two years.

Plaintiffs then claim the market learned the "truth" about FibroGen's "manipulation" on April 6, 2021, when FibroGen issued a press release disclosing an amendment to its New Drug Application (NDA) for Roxadustat, along with additional safety analyses. After this disclosure, the price of FibroGen's stock declined by $15.83, or 45%. (*Id.* at 6.)

According to Plaintiffs, however, the April 6, 2021, press release was only a partial corrective disclosure, because even after April 6, investors remained unaware of certain "prespecified sensitivity analyses" showing that Roxadustat was unsafe. (¶ 103.[3]) Plaintiffs claim the market first learned the "truth" about these "prespecified sensitivity analyses" during a July 15, 2021, Advisory Committee meeting (which was open to the public), during which the Advisory Committee recommended that the FDA not approve Roxadustat. (*Id.*) After the Advisory Committee and vote, the price of FibroGen's stock declined by $10.49, or 42%. (Mot. at 7.)

**B.    Plaintiffs' Motion for Class Certification**

Plaintiffs' Motion for Class Certification seeks to certify a class of individuals who purchased FibroGen securities between December 20, 2018 and July 15, 2021 (the putative "class period"). (*Id.* at 2.) Plaintiffs' Motion focuses primarily on market efficiency: In an effort to invoke the "fraud on the market" presumption of reliance, Plaintiffs cite a report from their expert, Chad Coffman, who opines that FibroGen's stock traded in an efficient market during the proposed class period. (*See* Pls.' Ex. 1 ¶ 8.) For purposes of this Motion, Defendants do not contest that FibroGen's stock traded in an efficient market, but note that the "fraud-on-the-market" presumption is rebuttable, and as discussed in more detail below, Defendants submit that it has been rebutted for the latter part of the class period, from April 6, 2021, through July 15, 2021. *See* Section V.A *infra*.

Plaintiffs also argue that damages can be calculated on a class-wide basis consistent with their theories of liability. (Mot. at 16, 23-24.). This, of course, is a requirement of Rule 23(b)(3). *Comcast*, 569 U.S. 27. Coffman opined that the "out-of-pocket method"—measuring artificial inflation at the

---

[3] ("¶ __") refers to the [Corrected] Consolidated Class Action Complaint. (ECF No. 97.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

3

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

time of purchase minus inflation at the time of sale—can be used to calculate damages on a class-wide basis. (Pls.' Ex. 1 ¶ 93.) Notably, however, Coffman discusses his damages opinion in just six paragraphs of his 100-paragraph report. Those six paragraphs do not mention any fact relating to this case. (*See id.* at ¶¶ 93-98.) Nor do they discuss any details of Plaintiffs' theory of liability, let alone describe how those theories are consistent with his proposed damages methodology. (*Id.*) As discussed in more detail below, Defendants submit that Coffman's "trust me" approach to calculating damages does not satisfy the requirements of Rule 23(b)(3), as interpreted by the Supreme Court in *Comcast*, and this is especially true for the latter part of the class period, from April 6, 2021 to July 15, 2021. *See* Section V.B *infra*.

Likewise, Plaintiffs devote just two pages to their effort to show that they are adequate representatives of the proposed class. (Mot. at 11-13.) They do not address their failure to understand the basic facts and theories of their own case and submit only boilerplate declarations in support of their Motion. As discussed below, *see* Section VI *infra*, Plaintiffs have failed to show that they are adequate representatives of the class.

**1.      Plaintiffs' "Manipulation" Theory**

Plaintiffs' core theory is that FibroGen "manipulated" the cardiovascular safety data that it first presented to investors in November 2019. (Mot. at 4-8.) They claim that such manipulation was "revealed" to the market through an April 6, 2021 press release. (¶¶ 7-8, 77-79.) In truth, however, the April 6 press release did not say FibroGen had "manipulated" any data. (*See* Ex. 17.[4]) Rather, it informed investors that FibroGen—then led by a new Chief Executive Officer and a new Chief Medical Officer, neither of whom had been involved in submitting the NDA for Roxadustat—had clarified the CV safety analyses in the Roxadustat NDA with the FDA. The NDA included several different analyses of CV safety data, one of which was designated the "primary analysis," with others designated "sensitivity analyses." (*Id.*) The effect of the amendment announced in the April 6 press release was to change the analysis designated as "primary": the analysis originally designated as "primary" was redesignated as a "sensitivity analysis," while a different analysis (previously

---

[4] ("Ex.") refers to exhibits attached to the Declaration of Tijana M. Brien submitted concurrently herewith. All emphasis is added unless otherwise noted.

Cooley LLP
Attorneys at Law
Palo Alto

4

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

designated as a "sensitivity analysis") became the "primary analysis." (*Id.*) The original "primary analysis" had used certain "stratification factors" that were determined after the data from the underlying studies were fully unblinded. (*Id.*) In contrast, the newly designated "primary analysis" used stratification factors that had been "prespecified" before the data were unblinded. (*Id.*)

It is the use of stratification factors determined after the underlying data were unblinded that Plaintiffs refer to as "manipulation" of the data. (Mot. at 4-8.) But that characterization is based entirely on public comments by a handful of outside observers, none of whom knew what stratification factors FibroGen had used, or why, or what FibroGen had disclosed to the FDA about stratification factors. In truth, although FibroGen changed from one "primary analysis" to another, the original "primary analysis" was not withdrawn or disavowed, but rather it remained a part of the "totality of evidence," consisting of numerous analyses of the CV data, that FibroGen presented in the Roxadustat NDA. (*See* Ex. 17.) And despite the overwrought reactions from a handful of uninformed observers, neither the Advisory Committee nor the FDA ever expressed any concerns about FibroGen's use of adjusted stratification factors, or about FibroGen's choice of "primary" versus "sensitivity" analyses. (*See, e.g.,* Ex. 20; Ex. 8.)

In their Motion, Plaintiffs claim that evidence produced in discovery bolsters their "manipulation" theory. (Mot. at 4-8.) But in doing so, Plaintiffs blatantly mischaracterize the evidence. For example, Plaintiffs claim that REDACTED (*Id.* at 7.) But the one document Plaintiffs cite for this proposition REDACTED (Pls.' Ex. 5.) REDACTED (*Id.*) REDACTED

As FibroGen repeatedly disclosed to investors, FibroGen believed that the "on treatment" approach was improperly biased against Roxadustat, because non-dialysis dependent patients in the placebo arm (those who

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC



were not receiving any treatment for their anemia) tended to drop out of the study much earlier than patients receiving treatment with Roxadustat, which resulted in an artificially low number of major adverse cardiovascular events for that group compared with the treatment arm. (*E.g.*, Ex. 18; Ex. 19.)

REDACTED

(Ex. 3 at FGEN-CA-0112867; *see* Ex. 4 at FGEN-CA-0613944.)    In other words, the email Plaintiffs cite is not evidence of "manipulation."

REDACTED

Similarly, Plaintiffs claim that REDACTED (Mot. at 7.)    But the documents Plaintiffs cite contain no warnings. (*See, e.g.*, ¶ 77.)    For example, Plaintiffs misrepresent REDACTED

REDACTED

(*See, e.g., id.*)    Plaintiffs mischaracterize the focus of the discussion and REDACTED

(Ex. 3 at FGEN-CA-0112867.)

Finally, Plaintiffs misleadingly claim that REDACTED

(*See* Pls.' Ex. 8.) Plaintiffs again REDACTED

[5] (*Id.*)    Plaintiffs also ignore that REDACTED

(*Id.* at FGEN-CA-0016561 REDACTED

REDACTED    Had Astellas believed that FibroGen's conduct

[5] Plaintiffs' citation to a REDACTED

Ex. 9 at FGEN-CA-0016265-267.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

manipulation in years," (Mot. at 1), it surely would not have [REDACTED] .[6] Plaintiffs' cherry-picking of the phrase [REDACTED] from documents is misleading and does not support their "manipulation" theory.[7]

### 2. Plaintiffs' "Sensitivity Analyses" Theory

While Plaintiffs claim that FibroGen's alleged manipulation was revealed on April 6, 2021, they claim that investors remained unaware of several additional "prespecified sensitivity analyses" allegedly showing the "true" data results that "doom[ed] Roxadustat's FDA approval prospects in their entirety, for any patient population." (¶¶ 102-03, 249.) Those sensitivity analyses yielded hazard ratios from the non-dialysis dependent and dialysis dependent patient populations, as set forth in the Complaint:[8]

| Non-Dialysis Dependent (NDD) | | |
| --- | --- | --- |
| Endpoint | ... | True, Undisclosed FDA Pre-Specified "Sensitivity" Analysis |
| MACE | ... | 1.38 (1.11, **1.70**) |
| ACM | | 1.40 (1.08, **1.82**) |

| Dialysis Dependent (DD) | | |
| --- | --- | --- |
| Endpoint | ... | True, Undisclosed FDA Pre-Specified "Sensitivity" Analysis |
| MACE | ... | 1.14 (1.00, **1.30**) |
| ACM | | 1.17 (1.02, **1.35**) |

(¶ 108; *see also* ¶ 109 (arguing that these analyses were significant because their upper bounds were at or above the commonly used "non-inferiority" margin of 1.3).) Plaintiffs contend that these

---

[6] Plaintiffs also cite a [REDACTED] . (Pls.' Ex. 7.) [REDACTED]

[REDACTED]

[7] Plaintiffs reference a board presentation that is the subject of a privilege dispute. (Mot. at 10.) Defendants maintain that this document is privileged and do not believe it is proper to discuss its contents while the dispute is pending. Without responding to the document's contents, Defendants observe that this was a draft document created in March 2021 by someone who was not involved in the NDA submission and did not join the Company until December 2020.

[8] In their Motion, Plaintiffs claim that the Advisory Committee "unequivocally concluded that FibroGen's own ***undisclosed, prespecified sensitivity analyses*** demonstrated that ***the drug's efficacy*** over Epogen was inconclusive at best." (Mot. at 6 (emphasis added).) The committee made no such conclusion and Plaintiffs misstate their own allegations. The Complaint alleges that the "FDA briefing document" concluded that one secondary measure of efficacy, the red blood cell transfusion benefit, was "inconclusive at best." (¶ 104.) That conclusion had nothing to do with the "undisclosed prespecified sensitivity analyses" which related to the pooled *safety* analyses of MACE. *See* Section II.B.1 *supra*. Moreover, as discussed below, that conclusion was included in the July 13 FDA briefing document.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

7

**DEFENDANTS' OPPOSITION TO**
**MOT. FOR CLASS CERTIFICATION**
**3:21-CV-02623-EMC**

"sensitivity analyses" were "revealed" at a July 15, 2021 Advisory Committee meeting.  (¶ 103 ("The full extent of Defendants' fraud was finally revealed on July 15, 2021, when investors learned that Defendants had completely withheld from public disclosure *additional critical prespecified 'sensitivity' analyses*." (emphasis added)).)  Plaintiffs claim that the Advisory Committee voted against recommending approving Roxadustat because of these sensitivity analyses.  (*Id.*)

Importantly, the FDA published a briefing document *two days earlier*, on the morning of July 13, 2021, containing the underlying data and analyses that would be discussed at the July 15 Advisory Committee meeting, including the "critical prespecified sensitivity analyses."  (Ex. 8 at 47, 50-51.) Specifically, the FDA briefing document identified the same non-dialysis dependent hazard ratios identified in the Complaint: *1.38, 1.11, 1.70* for major adverse cardiac events and *1.40, 1.08, 1.83* for all cause mortality.  (*Id.* at 49, 52.)  And it also identified the same dialysis-dependent hazard ratios set forth in the Complaint: *1.14, 1.00, 1.30* for major adverse cardiac events and *1.17, 1.02, and 1.35* for all cause mortality.  (*Id.*)

Analysts read and digested the FDA's briefing document and the referenced sensitivity analyses that same day.  (Exs. 9-16.)  At least 8 analysts published reports just hours later and several specifically commented on the FDA's sensitivity analyses:

- **Bank of America:** "The FDA flagged safety risk of roxa with discordant safety analyses (primary analysis vs. FDA's sensitivity analysis), though the FDA caveated by flagging limitations of its sensitivity analysis, thus we don't see documents as conclusive for how the panel will vote on NDD approval." (Ex. 9.)
- **Cowen:** "As expected, briefing documents for roxadustat's cardiorenal AdCom hearing this week are fairly ominous and reiterate the agency's anticipated focus on the drug's safety profile relative to ESAs.… *in NDD OT+7 sensitivity analysis showed 277 MACE events in the roxadustat arm vs 131 on placebo (HR of 1.38)*." (Ex. 10.)
- **Goldman Sachs**: "Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, *which we think was somewhat expected* by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE . . . . [O]n safety, *the FDA in its analysis of MACE in the non-dialysis (NDD) dependent population noted meaningful differences between the on treatment (OT) analysis and ascertainment window sensitivity analysis (i.e. OT+7), with the latter less favorable for roxa with the lower bound of the 95% CI exceeding 1.00 (HR: 1.38, 1.11-1.70)* though the agency stated that higher placebo arm dropout rates confounded its assessment.  **In its MACE analysis of the dialysis dependent (DD) population, the FDA similarly found that there was higher risk in its OT+7 analysis** (HR: 1.14, 1.00-1.30) compared to the OT analysis though the difference was not stat sig." (Ex. 11.)
- **Raymond James**: "*As expected, the FDA conducted its own statistical analyses of the safety data generated and roxadustat performed worse than placebo* (non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD) on all key measures (all cause

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

mortality, thrombosis, sepsis, seizures). …. *As expected, roxa's cardiovascular (MACE) safety profile was center focus for the FDA*." (Ex. 12.)

- **William Blair:** "we believe that while the document highlights several areas of concern, none of which were entirely surprising . . . ." (Ex. 13.)

(*See also* Ex. 1 ¶¶ 40, 46.)  In line with the above analyst commentary, FibroGen's stock price did not react to the briefing documents, nor the sensitivity analyses disclosed therein on July 13 or 14, 2021.  (*Id.*; *see also* Ex. 2 at 81:2-23 (observing no statistically significant price movement on July 13, 2021 and that the stock price actually increased on July 14, 2021).)

On July 15, 2021, the Advisory Committee voted against recommending approval of Roxadustat.  The next day, FibroGen's stock price fell over 42%, or $10.49 from $24.84 to $14.35 per share. (¶ 267.)  Defendants' expert concludes that, as is obvious, the July 16 stock price drop was in reaction to the Advisory Committee vote of July 15 and not in reaction to the Advisory Committee's discussion of some sensitivity studies that were disclosed in its public briefing document three days earlier.

## III.    PLAINTIFFS FAIL TO SATISFY RULE 23(B)

Plaintiffs fail to prove that a class can be certified under Rule 23(b).  Plaintiffs move for class certification under Rule 23(b)(3), which requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The predominance analysis under Rule 23(b) is "rigorous." *Comcast*, 569 U.S. at 34.

Plaintiffs' securities fraud claims require Plaintiffs to prove (among other things) reliance and damages.  *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 267 (2014).  Ordinarily, those elements require individual proof that precludes a finding that common issues predominate.  But Plaintiffs propose to dispense with individualized evidence of reliance by invoking the "fraud-on-the-market" theory.  However, as discussed below, Plaintiffs cannot meet the requirements for that theory for the period from April 6 through July 15, 2021.  Regarding damages, Plaintiffs have failed to meet their burden of proving that damages can be calculated on a class-wide basis in a way that is consistent with their theory of liability, as required by the Supreme Court's

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

decision in *Comcast*, 569 U.S. at 27. This problem impacts the entire proposed class period, but is particularly acute with respect to April 6 through July 15, 2021.

**C.      Plaintiffs Are Not Entitled to the Presumption of Reliance After April 6, 2021 Because the Alleged Misstatements Had No Price Impact After That Date.**

Plaintiffs do not contend that they read or otherwise relied on any alleged misstatement before purchasing FibroGen stock. Instead, they argue that they and the putative class members are entitled to benefit from the fraud-on-the-market presumption to establish reliance. (Mot. at 15.) But as discussed below, that presumption is rebutted as to every alleged misstatement after April 6, 2021. This means that the reliance element must be litigated on an individualized basis after April 6, precluding class certification after that date. Because Plaintiffs cannot certify a class beyond April 6, they necessarily cannot recover *any* damages from the $10.49 stock price decline two months later, on July 15, decreasing the size of the case.

Whether an investor relies on alleged misstatements is typically an individualized inquiry. However, the Supreme Court has recognized a presumption of reliance on public statements because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). When the presumption applies, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," and therefore relies on alleged misstatements. *Id.* at 247.[9] Conversely, "[b]ecause publicly available information in an efficient market is generally

---

[9] Plaintiffs claim in a one-sentence footnote that they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972). (Mot. at 22 n.7.) They are wrong. The *Affiliated Ute* presumption is "*narrow* . . . [and] limited to cases that *primarily* allege omissions." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). Specifically, "[t]he presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions." *Id.* (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999)). Indeed, in *Volkswagen*, the court held that the plaintiff was not entitled to the presumption despite alleging that defendants made statements rendered misleading by the omission of certain financial data. *Id.* The court found persuasive that the plaintiff characterized the challenged statements as both "misrepresentations and omissions." *Id.* It elaborated that "the mere fact of [alleged] concealment cannot transform affirmative conduct into omissions . . . [t]o do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely." *Id.* Fatally, Plaintiffs do not even argue that their case involves primarily omissions. Rather, they claim that "many" alleged misstatements "are premised on highly material omissions," which is insufficient. Further, while

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

reflected in the price of a security, the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

The presumption of reliance is **rebuttable**, and "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. That is because "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* Importantly, Defendants can rebut the presumption by showing that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock"—that is, there was no "price impact." *Halliburton II*, 573 U.S. at 264, 279-80. "**Price impact is thus an essential precondition for any Rule 10b-5 class action.**" *Id.* at 282. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 278.

One way to rebut price impact is to show that the market already knew of the allegedly omitted information, in which case the stock price could not have been inflated or maintained through the misrepresentation or omission of that information. *See Basic*, 485 U.S. at 248 ("[P]etitioners could show that the 'market makers' were privy to the truth . . . and thus that the market price would not have been affected by their misrepresentations."); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 n.5 (S.D.N.Y. Mar. 23, 2020) ("[A] court should review the 'newness' of a corrective disclosure [to rebut price impact] at the class certification stage."); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (finding no price impact because the allegedly omitted information was previously disclosed to the market). Ultimately, the district court is tasked with assessing "all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1959, 1963 (2021). "[C]ourts should be open to **all**

they allege that FibroGen omitted "sensitivity analyses," they focus on the allegedly false and misleading touting of Roxadustat's safety through affirmative statements. Finally, for *Affiliated Ute* to apply, the alleged omission (*i.e.*, the sensitivity analyses) must be material. Plaintiffs have provided no facts to make that showing. To the contrary, as demonstrated above and below, there was no statistically significant stock price movement after the disclosure of the "sensitivity analyses" and the market was not surprised by the disclosure of the information.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 1960. The Supreme Court has counseled that courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Id.* at 1961 & n.2.

Here, Plaintiffs claim that after April 6, Defendants made false or misleading statements by concealing certain "pre-specified sensitivity analyses." (¶ 103.) They claim these prespecified sensitivity analyses were "finally revealed" to the market at the July 15, 2021 FDA Advisory Committee meeting, causing a 42% stock price decline the next trading day, July 16. But those very "pre-specified sensitivity analyses" were fully disclosed *three days earlier*, in a July 13, 2021 FDA briefing document, with no statistically significantly significant stock price decline. As a result, the stock price decline on July 16 could not have been a response to disclosure of the prespecified sensitivity analyses. Because they had no price impact when disclosed, Plaintiffs cannot show that the alleged concealment of that information ever inflated the price of FibroGen's stock.

### 1. The Only Allegedly Concealed Information After April 6 Was "Prespecified Sensitivity Analyses" Which Were Fully Disclosed Before the July 15 Alleged Corrective Disclosure

Plaintiffs claim that by April 6, 2021, FibroGen had disclosed all allegedly concealed information except for "prespecified sensitivity analyses," which were supposedly "revealed" to investors for the first time during the FDA's advisory committee meeting on July 15, 2021. (¶ 103 ("The full extent of Defendants' fraud was finally revealed on July 15, 2021, when investors learned that Defendants had completely withheld from public disclosure additional critical *prespecified 'sensitivity' analyses*."); ¶ 108 ("[I]t was the [July 15] FDA AdCom . . . that finally revealed these FDA-mandated sensitivity analyses to the investing public.").)

Thus, Plaintiffs' theory assumes that FibroGen's "pre-specified sensitivity analyses" were first disclosed at the FDA's July 15, 2021 Advisory Committee meeting. (¶ 103.) On that basis, Plaintiffs cite the stock price decline the next trading day (July 16) as evidence that the prior concealment of the sensitivity analyses artificially inflated the price of FibroGen's stock. (¶ 267.) Critically, the *only* sensitivity analysis data the Complaint identifies as "revealing the truth" are hazard ratios from the dialysis dependent and non-dialysis dependent patient populations:

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

| Non-Dialysis Dependent | |
|---|---|
| MACE | 1.38 (1.11, 1.70) |
| ACM | 1.40 (1.08, 1.82) |

| Dialysis Dependent | |
|---|---|
| MACE | 1.14 (1.00, 1.30) |
| ACM | 1.17 (1.02, 1.35) |

(*See* ¶ 108.)  But these **_exact_** hazard ratios were disclosed in the FDA briefing book published two days earlier, as shown below.  (Ex. 8 at 47-53, 58.)

Figure 8: MACE and its Components for Studies in the NDD Population (On-study Analysis)
Figure 12: MACE and its Components for Studies in the DD Population (On-study Analysis)

Moreover, every other piece of information conceivably related to the sensitivity analyses that Plaintiffs claim was first disclosed on July 15, 2021, was actually first disclosed in the July 13 briefing document, as shown below.

| Information Plaintiffs Claim First Disclosed on July 15 | That Exact Information Was Disclosed Two Days Earlier in July 13 Briefing Document |
|---|---|
| The AdCom said that the "***benefits are difficult to calculate here***," including the purported red cell blood transfusion benefit which the FDA briefing document found was inconclusive at best. (¶ 104) | *The benefits are difficult to calculate here*.  The data show that roxadustat decreases the need for [ ] transfusions relative to placebo, which is expected and reassuring.  The data comparing roxadustat to epoetin alfa with respect to [ ] transfusions are less conclusive.  (Ex. 8 at 12.) |
| The AdCom concluded that "*[t]he rate of death was higher in patients who had received [R]oxadustat*" as compared to Epogen, with the "leading causes of death [being] infections, 'renal' deaths, and sudden cardiac deaths." (¶ 104) | *The rate of death was higher in patients who had received roxadustat* . . . . The leading causes of death (and the largest contributors to the risk difference) were infections, "renal" deaths, and sudden cardiac deaths.  (Ex. 8 at 32.) |
| The AdCom highlighted "***serious thromboembolic events***," sepsis, stroke, seizures, congestive heart failure, and hypoglycemia, among others. (¶ 104) | [T]here are important risks of ***serious thromboembolic events***, as well as other risks with roxadustat. . . . [*S]epsis*/septic shock is an obvious concern . . . . There are also trends for higher rates of ***stroke*** . . . . [T]he numbers of subjects with |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

| Information Plaintiffs Claim First Disclosed on July 15 | That Exact Information Was Disclosed Two Days Earlier in July 13 Briefing Document |
|---|---|
| | serious adverse events of *seizure* are relatively small . . . . Signals for nausea and *congestive heart failure* are also obvious . . . . Other signals of concern include serious adverse events of *hypoglycemia* . . . . (Ex. 8 at 12, 34, 41, 44, 48.) |
| FibroGen's alleged main strategy for the AdCom meeting was not to defend its Phase 3 trial data, but to present a "dose mitigation strategy" for Roxadustat . . . However, FibroGen had never tested the proposed lower dosing . . . ." (¶ 105) | [T]he applicant speculates that thromboembolic risks might be reduced through use of a lower roxadustat starting dose. Their prediction seems plausible, but is unproven. (Ex. 8 at 12.) |
| AdCom noted that "*there were greater rates of some important adverse events with Roxadustat than even epoetin alfa [Epogen]*," in addition to "thrombotic events in particular," which were a significant issue for CKD patients since "vascular access . . . is a lifeline in dialysis patients." (¶¶ 106, 111) | (table below) |

|  | Patients with Events N (%) | | Events (per 100 PY) | |
|---|---|---|---|---|
|  | Roxadustat | ESA | Roxadustat | ESA |
|  | N = 1940 | N = 1940 | 3315 P-Y | 3744 P-Y |
| **Thombotic Events** | | | | |
| Thrombosis | 241 (12.42) | 201 (10.36) | 7.27 | 5.37 |
| Device/shunt thrombosis | 121 (6.24) | 94 (4.85) | 3.65 | 2.51 |
| Deep vein thrombosis (term) | 24 (1.24) | 7 (0.36) | 0.72 | 0.19 |
| **Miscellaneous** | | | | |
| Hypoglycemia FDA | 29 (1.49) | 25 (1.29) | 0.87 | 0.67 |
| Gastroenteritis | 27 (1.39) | 16 (0.82) | 0.81 | 0.43 |
| Seizure FDA | 26 (1.34) | 19 (0.98) | 0.78 | 0.51 |
| Pancreatitis FDA | 20 (1.03) | 11 (0.57) | 0.60 | 0.29 |

(Ex. 8 at 41, Tbl. 23.)

Accordingly, the pre-specified sensitivity analyses—the only information allegedly omitted after April 6—was fully disclosed to the market no later than July 13, 2021.

> **2.** **Disclosure of the Sensitivity Analyses in the July 13, 2021 FDA Briefing Document Did Not Impact FibroGen's Stock Price.**

Both Dr. Zurek and Coffman agree that company-specific news, including the sensitivity analyses detailed in the July 13 FDA briefing book, did not affect FibroGen's stock price on July 13 or 14. (Ex. 1 ¶¶ 19, 47-48; Ex. 2 at 81:2-23.) This is important because FibroGen's stock price would have absorbed company specific news within a trading day at most. (*Id.*) In fact, Coffman opines that FibroGen stock trades in an efficient market. (Pls.' Ex. 1 ¶ 6.) An efficient market is "said to digest or impound news into the stock price in a matter of minutes." *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017). To that end, Coffman's report assumes that FibroGen's stock price absorbed company-specific news within a day. (Ex. 2 at 70:23-71:1 (**Q.** [Y]our event study assumes that the market absorbs FibroGen-specific news within a day, right? **A.** That's the period over which I'm measuring it.); *id.* at 72:4-8 (confirming that his "event study does

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

not include the price reaction beyond one day after each announcement").)  Accordingly, any stock price movement due to disclosure of the sensitivity analyses on July 13 would have occurred by close of market that same day.  (Ex. 1 at 42.)

This did not happen, meaning that the July 13 disclosure of the sensitivity analyses in the briefing materials had no impact on FibroGen's stock price.  Both experts conducted "event studies" to determine whether FibroGen's stock price reacted to company-specific news on each day of the class period.[10]  Neither expert found that there were statistically significant stock price movements on July 13 or 14. (Ex. 1 ¶ 19; Ex. 2 at 81:2-23.)  Coffman admitted as much at his deposition: "**Q**. [T]here was no statistically significant stock price movement on July 13th; right?  **A**. July 13, 2021, correct.  **Q**.  [T]here is not any statistically significant stock price movement on . . . July 14th, 2021, either; correct?  **A**. Correct." (Ex. 2 at 81:3-10.)  Coffman even conceded that FibroGen's stock price ***increased*** on July 14, which is completely inconsistent with disclosure of the sensitivity analyses negatively impacting FibroGen's stock price: "**Q**. FibroGen's stock price increased on July 14th, 2021; right?  **A**. Relative to where it closed on the prior day, yes." (*Id.* at 81:20-23.)

Plaintiffs may argue that the FDA briefing document was a long and complicated document that would have taken days for the market to fully absorb.  Not so.  First, many investment analysts issued reports on July 13 and 14, demonstrating that they quickly reviewed the FDA briefing document and understood its contents.  (Ex. 1 ¶ 40.)  Coffman even testified that the issuance of analyst reports the same day as a disclosure is strong evidence that the market absorbed the information: "**Q**. [I]f analyst reports are issued the same day as company-specific news talking about that company-specific news, . . . that's really strong evidence that the market is absorbing the company-specific news on . . . that same day; right?  **A**. Well, it certainly provides evidence that there are analysts who are taking information from the company, considering it, analyzing it, and publishing reports on it, and that -- so that suggests that the information was widely distributed. It ex- -- it dis- -- it suggests that the analyst considered it important enough to report on. And so, I think it

---

[10] An event study is a statistical tool used to measure the impact of a specific news event on the stock price, as measured by changes in the stock price. (Ex. 1, ¶ 32, 47.)  If stock price movement is statistically significant, that means the company-specific information affected the stock price. (*Id.*) The most commonly accepted measure of statistical significance in social science is a 5% confidence level. (Ex. 1, ¶ 32 n.50.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

-- it provides supporting evidence for market efficiency. Yes." (Ex. 2 at 98:4-17.)

To that end, on July 13, Raymond James commented on the dialysis dependent and non-dialysis dependent sensitivity analyses – the *same* analyses Plaintiffs claim were first disclosed two days later: "As expected, the *FDA conducted its own statistical analyses* of the safety data generated and roxadustat performed worse than placebo *(non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD)* on all key measures (all cause mortality, thrombosis, sepsis, seizures). . . . As expected, roxa's cardiovascular (MACE) safety profile was center focus for the FDA." (Ex. 12.) Similarly, Goldman Sachs commented on July 13 that "[o]verall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE." (Ex. 11.) And Bank of America commented that "[t]he FDA flagged safety risk of roxa with discordant safety analyses (primary analysis vs. FDA's sensitivity analysis), though the FDA caveated by flagging limitations of its sensitivity analysis…." (Ex. 9.) This is just a sampling of the 8 analyst reports published on July 13, 2021, reacting to the FDA briefing book. Three of those reports were published within four hours of when the FDA published its briefing document, demonstrating that the market absorbed the information within the briefing book on July 13.

Second, the FDA briefing document was only 64 pages, which could be read well-within a day. In fact, Coffman testified that he reviewed *hundreds of pages* of FibroGen earnings call transcripts in just two hours: "**Q**. [Y]ou reviewed those couple hundred pages in two hours? **A**. Yes." (Ex. 2 at 19:17-19.) Also, within those two hours, he determined that the earnings call transcripts did not change any of his opinions. (*Id.* at 19:17-20:1.) If a couple hundred pages can be read in two hours, it is inconceivable that 64 pages would take more than a day to read and digest.

> **3.     The July 16, 2021 Stock Price Decline Was Not in Response to Disclosure of the Sensitivity Analyses Because That Information Was Published Three Days Earlier.**

As Dr. Zurek determined, "FibroGen's July 16, 2021, stock price decline cannot be attributed to reiteration of the Prespecified Sensitivity Analyses' that Plaintiffs allege were corrective . . . following the July 13, 2021 publication of the FDA Briefing Document." (Ex. 1 ¶ 55.) He explains that "in an efficient market, FibroGen's stock price would not have reacted on July 16,

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

2021 to information that was disclosed no less than two days earlier (*i.e.*, no later than at market open on July 13, 2021).  In fact, if the price decline observed on July 16, 2021 was a reaction to the release of the allegedly corrective information disclosed on July 13, 2021, then the market for FibroGen's stock could not have been efficient." (*Id*. at ¶ 50.)

Even Coffman agrees that "[i]n an efficient market, it would be unlikely for the stock price to react for the first time to company-specific news days later." (Ex. 2 at 47:10-18.)  And he has seen no evidence that the market would react to FibroGen-specific news for the first time days after it was first disclosed: "**Q**. Based on all the analysis and event study calculations that you performed in this matter, you've seen no evidence that the stock price of FibroGen reacted for the first time to company-specific news days later during the class period; correct? **A**. I don't have any evidence in mind that -- that -- that I recall that happening during the class period." (*Id.* at 48:3-11.)

*Qualcomm* is instructive.  There, plaintiffs alleged that news relating to Qualcomm's device licensing practices were corrective disclosures.  However, the court denied class certification as to certain corrective disclosures because the allegedly corrective information – the device licensing practices – had previously been disclosed.  The court explained:

> As a whole, the evidence suggests that—prior to the alleged corrective disclosures—the market was exposed to statements about Defendants' "broad" and "competitive" licensing practices while also privy to information that Defendants licensed only at the device level and refused to license chips to chipmakers. ***The alleged corrective disclosures only repeated already public information—that Qualcomm licensed only at the device level and refused to license competing chipmakers. At a "common sense," level, this evidence makes it less likely that Defendants' alleged misrepresentations inflated Qualcomm's stock price on the front end and the information in the disclosures caused the price drop on the back end***.

2023 WL 2583306, at \*13; *see also Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

As in *Qualcomm*, the allegedly corrective information on July 15, 2021—the prespecified sensitivity analyses—had been previously disclosed to the market, making "it less likely that Defendants' alleged misrepresentations inflated [FibroGen's] stock price on the front end and the information in the [July 15] disclosures caused the price drop on the back end." *Qualcomm*, 2023 WL 2583306, at \*13.  This inference is supported by the fact that ***none*** of the alleged misstatements

Cooley LLP
Attorneys at Law
Palo Alto

17

Defendants' Opposition to
Mot. for Class Certification
3:21-cv-02623-EMC

after April 6 prompted any statistically significant stock price movement.  Coffman admitted as much during his deposition: "Q. . . . [T]here was no statistically significant stock price movements on the days any of [the] remaining challenge[d] statements were made, right?  . . . **A.** I believe that's correct." (Ex. 2 at 86:10-17.)  FibroGen's stock price dropped on July 16, 2021, following the FDA Advisory Committee's vote against recommending approval of Roxadustat.  Plaintiffs do not claim that Defendants knew how the Advisory Committee would vote before any challenged statement (nor could they).  Simply put, the lack of any stock price reaction to the July 13, 2021 disclosure of the "prespecified sensitivity analyses"—the only information Plaintiffs claim was concealed from the market after April 6, 2021—cuts against any inference that FibroGen's prior failure to disclose those analyses impacted FibroGen's stock, which means that Plaintiffs cannot invoke the "fraud-on-the-market" presumption for the period from April 6, 2021.  *See Qualcomm*, 2023 WL 2583306, at *13.

### A.    Plaintiffs Fail to Propose a Damages Methodology Consistent with Their Theories of Liability Under Comcast.

Class certification should be denied for the independent reason that Plaintiffs have not shown that they will be able to calculate damages attributable to their theories of liability under *Comcast*. To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must demonstrate that their damages are measurable on a class-wide basis using a common methodology that is consistent with their theory of liability.  *Comcast*, 569 U.S. at 35.  This means "that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.*  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*; *see also Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (explaining plaintiff must "offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class").  This requires a "***rigorous analysis***."  *Comcast*, 569 U.S. at 35 (emphasis added).  Here, Plaintiffs fail to establish predominance under Rule 23(b)(3), because their proposed damages methodology, which is entirely derived from Coffman's report, is untethered from their theories of liability.  And, even if the Court finds that Plaintiffs have proposed a methodology by suggesting that they will use an "event study" to calculate "out-of-pocket damages" (they have not),

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18

**DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC**

that methodology is inconsistent with their theory of liability for the alleged misstatements after April 6, 2021.

### 1.      Coffman Fails to Engage with the Facts of This Case.

Coffman refuses to commit to using a methodology for calculating artificial inflation in this case, and instead generically identifies methods "typically used." (Ex. 2 at 128:5-11.)  Coffman asks this Court to, in essence, "trust me" that he would be able to fashion a methodology at some point down the line consistent with Plaintiffs' theories of liability.  (Pls.' Ex. 1 ¶¶ 96, 98.)  But Plaintiffs' "burden is not met by asking the Court simply to trust them."  *See BP II*, 2014 WL 2112823, at *12; *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019) (affirming denial of class certification where the plaintiffs' expert "merely asserted that he would be able to develop a model at some point in the future").

In *Loritz v. Exide Technologies*, 2015 WL 6790247 (C.D. Cal. July 21, 2015), the plaintiff's expert in a securities class action failed to propose a sufficient damages methodology because he only "discusse[d] general techniques for computing damages in securities fraud cases."  *Id*. at *22. The court explained that the expert failed to tie those techniques "to the facts of th[e] case or to each other – in other words, he fails to propose one model explaining how he would use these techniques in concert to calculate damages in this case."  *Id*.  Similarly, in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014), the court denied class certification in a securities class action where the expert would not commit to a particular methodology.  *Id.* at 142. The court explained that, "without assurance beyond [the expert's] *say-so*, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."  *Id*.

As in *Loritz* and *Forth Worth*, Coffman's failure to identify the specific methodologies necessary to calculate damages in this case "amounts to 'no damages model at all.'"  *Loritz*, 2015 WL 6790247, at *22; *Fort Worth*, 301 F.R.D. at 142.  Instead, Coffman lists examples of valuation techniques in his Report, without opining whether any of them would be appropriate to the facts of this case despite his assertion that "the nature of this analysis is intensely factual, [and] case-specific." (Pls.' Ex 1 ¶ 96 ("listing "fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.*, price to earnings multiples, price to EBITDA multiples, price to

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery.").)  This is insufficient.  *In re ConAgra Foods, Inc.*, 302 F.R.D. 437, 552 (C.D. Cal. 2014) (denying class certification and granting motion to strike expert declaration in part because plaintiffs' expert "provide[d] no damages model at all" by merely describing methodologies capable of calculating damages without identifying any variables to build into the model or data to apply the model to).  In fact, after refusing to answer the question numerous times during deposition, Coffman finally acknowledged that a methodology may not exist to reliably calculate damages in this case: "**Q**. . . . It is possible that there is not an appropriate methodology for measuring artificial inflation in this case; correct?  **A**. . . . Can I completely rule that out?  I guess I can't."  (Ex. 2 at 127:9-128:3.)

Further, Coffman's report is 100 paragraphs, but only six of those are in his "Damages" section.  Those six paragraphs do not mention Roxadustat, the FDA, or a single fact relating to this case. (Pls.' Ex. 1 ¶¶ 93-98.)  Indeed, Coffman did not contest that the damages section of his report is nearly identical to eleven other reports he has prepared for other cases, involving vastly different facts, and even boasted that "that's the very point" of his report: "**Q**.  Would you dispute that you have used essentially the same damages section in at least 11 other reports?  **A**.  That would not surprise me at all.  That's the very point I'm making which is that there's a widely accepted methodology for calculating class-wide damages in these types of cases." (Ex. 2 at 106:24-107:5.)

Coffman's generic approach fails to tie a damages methodology to the specific theories of liability at issue in ***this case***.  He effectively suggests that courts across the country (including this one) should rubber stamp his damages opinions for any securities case, regardless of the facts or theories at issue.  (Pls.' Ex. 1 ¶ 93 ("There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act.").)  The Supreme Court's mandate that plaintiffs propose a damages methodology consistent with their theories of liability ***must*** require more than recycling boilerplate damages language that fails to articulate a methodology to calculate damages ***in this case*** given the theory of liability Plaintiff asserts.  Granting Plaintiff's motion "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36.  Coffman's failure compels denial of the Motion.

Cooley LLP
Attorneys at Law
Palo Alto

20

Defendants' Opposition to
Mot. for Class Certification
3:21-cv-02623-EMC

**2.      Plaintiffs' Proposed Methodology Is Inconsistent with Their Theory of Liability after April 6, 2021.**

Despite Coffman's failure to commit to a specific methodology for calculating artificial inflation, Plaintiffs suggest that they may "employ an event study." (Mot. at 23-24.)  In other words, Plaintiffs may "point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman*, 141 S. Ct. at 1961.  But tellingly, that approach does not work for the alleged misstatements made after April 6.  As discussed above, the $10.49 stock price decline at the end of the putative class period, July 16, 2021, was not in response to allegedly corrective information.  Because that stock drop was unrelated to alleged fraud, it would be improper for Plaintiffs to infer that FibroGen's stock price was artificially inflated by $10.49 per share (or any amount) after April 6.  As stated by the Supreme Court, "[T]hat final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . which means that there is less reason to infer front-end price inflation [] from the back-end price drop." *Id.*

Indeed, FibroGen's stock price declined on July 16 in response to the FDA Advisory Committee's July 15 vote to not recommend Roxadustat for FDA approval.  Plaintiffs do not contend that any Defendant knew how the Advisory Committee vote before the meeting (they could not).  Instead, Plaintiffs appear to allege that the outcome of the meeting was a materialization of a ***concealed*** heightened risk of non-recommendation.[11]  But again, all purportedly omitted information

---

[11] Even if Plaintiffs show that there was a concealed heightened risk of a non-recommendation vote as of July 15, their proposed class still cannot be certified because that materialization of the risk theory is inconsistent with Plaintiffs' proposed "model" of using an event study to calculate class-wide damages.  Numerous courts (including one which evaluated a similar event study methodology proposed by Coffman) have denied class certification where plaintiffs propose to use an "out-of-pocket" methodology based on an event study—as Plaintiffs do here—to calculate damages for a materialization of the risk theory of liability.  *See, e.g., Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590 (N.D. Cal. 2021); *In re BP p.l.c. Sec. Litig. ("BP I")*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (evaluating a damages methodology proposed by Coffman).  As the court in *Indiana Public Retirement Systems v. AAC Holdings., Inc.* recently explained, an out-of-pocket, or event study, methodology is not consistent with a materialization of the risk theory because "a materialized risk is not curative in the same way that a corrective disclosure is curative; a materialized risk (once revealed) may 'cure' inflation in stock price by potentially removing the inflation, but it does not correct prior information," therefore any proposed damages model cannot measure inflation from the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

was disclosed two days earlier, informing the market of any increased risk of an adverse vote by July 13 at the latest.  Accordingly, at most, the vote was a realization of a ***known risk***, where any resulting stock price drop is not recoverable.

Coffman agrees: "**Q**. If the full extent of a risk is known, materialization of that risk is not corrective; right? . . . **A**. Well, again, I -- I think if – if the predicate hypothetical is there's a risk out there that's been fully and sufficiently disclosed, and then that risk happens and a stock price falls, that generally would not be considered a corrective disclosure." (Ex. 2 at 102:24-103:8.)

Dr. Zurek elaborates in his report that "while the price of a company's stock traded in an efficient market would not react (on July 16, 2021 in FibroGen's case) to the repetition of the information that had already been released previously (on July 13, 2021), the price could react to the realization of a then already known risk that the drug might not be recommended for approval.  Given the uncertainty regarding the AdCom's assessment of the known safety and efficacy profile of Roxadustat, prior to the AdCom's vote, an efficient market would have incorporated some probability that the AdCom would not recommend its approval, but likely not the certainty of non-recommendation.  Once the non-recommendation vote took place on July 15, 2021, it would not be surprising for FibroGen's stock price to have declined in response due to the resolution of this uncertainty.  However, that price decline would not be a result of the disclosure of the Prespecified Sensitivity Analyses because publicly available information demonstrates those results were already disclosed at the latest on July 13, 2021." (Ex. 1 at ¶¶ 55-56.)

Because the July 16 stock price decline is not recoverable, Plaintiffs cannot use an event study to work backwards from that $10.49 decline.  Thus, their "event study" methodology is inconsistent with their theory of liability and damages must be litigated on an individualized basis.  *See Curtis*, 2013 WL 6073448, at *4 (denying class certification in consumer class action because plaintiffs failed to "offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class"); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *8-14 (N.D.

---

stock price's reaction to the disclosure but must instead factor in the risk, which requires the model to take into account "whether a class member would have bought stock at all (or at a lower price) had the risk been accurately disclosed."  2023 WL 2592134, at *24-25 (M.D. Tenn. Feb. 24, 2023) (quoting *Amyris, Inc.*, 340 F.R.D. at 590).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

Cal. Dec. 15, 2014) (decertifying class because proposed regression methodology failed to compute damages due to complications in product data); *In re POM Wonderful LLC*, 2014 WL 1225184, at *2 (C.D. Cal. Mar. 25, 2014) (decertifying consumer class action based on "full refund" methodology being inconsistent with theories of liability).

## II.    LEAD PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES, AS REQUIRED BY RULE 23(A).

Lead Plaintiffs have the burden to prove that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a)(4). It is "Congress's emphatic command" that in securities class actions governed by the PSLRA, "competent plaintiffs, rather than lawyers, direct such cases" *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001), and an adequate class representative must be able to "check the otherwise unfettered discretion of counsel in prosecuting the suit." *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994). When a class representative is "strikingly unfamiliar" with the case and completely relies on counsel to direct the litigation, they are inadequate. *Welling*, 155 F.R.D at 654, 660 (representative's "apparent unfamiliarity with the allegations in the amended complaint and the overall status of the proceedings" dictated no adequacy); *Rolex,* 136 F.R.D. at 666 (no adequacy where plaintiff did not know "the basic elements of the case, including what the allegations of the complaint are and which allegations of the complaint pertain to which defendants").

Here, the depositions of Lead Plaintiffs' representatives revealed that they are "strikingly unfamiliar" with their own allegations and should be disqualified from serving as class representatives. *See, e.g., In re Enron Corp. Sec. Litig.*, 529 F. Supp. 2d 644, 732 (S.D. Tex. 2006) (class representatives inadequate where "[t]hey were unable to articulate specific facts supporting their vague allegations" and lacked knowledge "beyond conclusory allegations of fraud"). One or more of the Lead Plaintiffs' representatives in this case:

- could not identify the defendants in this action;[12]
- could not describe their data manipulation theory that is the basis of this lawsuit;[13]

[12] (Ex. 5 at 60:3-15.)
[13] (*Id.* at 75:17-76:7, 99:23-101:18 ("**Q**. [I]n which way was the safety data manipulated? . . . **A**. I don't know. . . . **Q**. . . . [W]hat is plaintiffs' allegation about the manipulation of the safety data, then?

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

- were unfamiliar with the terms "post hoc" and "stratification factors" and could not explain how they related to the alleged manipulation theory;[14]
- could not answer whether "FibroGen's disclosures about pooled cardiovascular safety results for Roxadustat…[we]re false";[15]
- could not explain why some of the analyses FibroGen disclosed were allegedly "false" and others were "true" and testified that they "ha[d] no knowledge" of whether FibroGen ever disclosed the allegedly "true" safety results to investors, including the April 6, 2021 press release central to their allegations;[16] and
- had not reviewed any FibroGen press releases, SEC filings, or documents Defendants produced in the litigation, despite ongoing discovery for over 6 months and Defendants having produced at least 100,000 documents to Plaintiffs.[17]

This disturbing lack of knowledge and understanding of their own allegations indicates Lead Plaintiffs are not adequate to represent the class and that this lawsuit is lawyer-driven.[18]  *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 147 (N.D. Tex. 2014) (representative inadequate where she had not seen "the central document in the case and could not point to the false statements in the document" and did not know timing or cause of stock drop).

Further, at times, Lead Plaintiffs' representatives even expressed views *inconsistent* with their own allegations.  For example, while the Complaint alleges that FibroGen's statements were false and misleading because the safety analyses contained post hoc changes to the stratification factors and the FDA views *any* changes after unblinding as improper data dredging, (¶¶ 7, 78-79), Lead Plaintiffs' representatives testified that post hoc changes "may be appropriate" "in certain circumstances."  (Ex. 7 at 99:2-102:2, 102:4-103:19; *see also* Ex. 6 at 83:12-86:17 ("it depends on the scope of the changes").)  Lead Plaintiffs' representatives also admitted that clinical trial data could be interpreted a number of different ways without rendering any one interpretation false, (Ex. 6 at

**A.** I don't know."); Ex. 6 at 105:7-19, 140:14-142:12) ("I do not know how they were manipulated").)

[14] (Ex. 6 at 82:12-83:11, 85:24-88:12, ("I'm just not exactly sure what 'post hoc' means."), 105:7-105:19 ("I believe FibroGen was misleading.  If, you know, we're talking stratification, then . . . you're losing me a little bit."); Ex. 5 at 77:19-78:3 ("**Q.** [D]o you know what a stratification factor is? **A.** Technically, no. . . . I guess it's a measurement.").)

[15] (Ex. 6 at 127:7-128:2; Ex. 5 at 131:24-132:5.)

[16] (Ex. 5 at 134:3-14; Ex. 6 at 130:16-131:2; Ex. 7 at 166:19-167:12 ("**Q.** Are you able to describe generally with respect to any of the corrective disclosure alleged in the complaint what that corrective disclosure disclosed to the market? **A.** No, . . . I don't think I can.").)

[17] (Ex. 7 at 19:15-22:2; Ex. 6 at 22:5-23:7, 35:12-20; Ex. 5 at 23:3-24:13, 190:3-22.)

[18] A Declaration submitted in support of class certification contained a prominent factual inaccuracy that Plaintiffs only corrected after Defendants brought it to their attention at a deposition.  (*See* Ex. 6 at 29:14-30:21 (testifying that "Boston Company . . . not LMCG was . . . the [investment] manager of record" despite that the Declaration listed LMCG); ECF No. 147-5; ECF No. 173.)  This lack of diligence further "counsel[s] against a finding of adequacy."  *See Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 317 (E.D. Va. 2007).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC

136:10-23, 142:13-143:13, 165:1-8; Ex. 7 at 155:2-156:21; Ex. 5 at 202:17-203:25), yet the Complaint alleges that there was only one "true" analysis. (¶¶ 7-8, 71.) These inconsistent positions cast doubt on whether Lead Plaintiffs can adequately represent the class.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Class Certification.

Dated: May 12, 2023

COOLEY LLP

By: /s/ *Patrick E. Gibbs*
     Patrick E. Gibbs

Attorneys for Defendants
FibroGen, Inc., Enrique Conterno,
James Schoeneck, Mark Eisner,
and Pat Cotroneo

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:/s/ *Bruce A. Ericson*
     Bruce A. Ericson
     Lee Brand

WEI GROUP LLP
Eric S. Wei

Attorneys for Defendant
K. Peony Yu, M.D.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

25

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
3:21-CV-02623-EMC