COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
TIJANA M. BRIEN (286590)
(tbrien@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
ZANETA J. KIM (317844)
(zkim@cooley.com)
AMIE L. SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California  94304-1130
Telephone:   +1 650 843 5000
Facsimile:    +1 650 849 7400

CAITLIN MUNLEY (*Pro Hac Vice*)
(cmunley@cooley.com)
ALEXANDRA EBER (*Pro Hac Vice*)
(aeber@cooley.com)
1299 Pennsylvania Ave., N.W., Suite 700
Washington, DC 20004-2400
Telephone:   +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Defendants
FibroGen, Inc., Enrique Conterno, James Schoeneck,
Mark Eisner, and Pat Cotroneo

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **CLASS ACTION** <br><br> **DECLARATION OF TIJANA M. BRIEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date: June 8, 2023 <br> Time: 1:30 p.m. <br> Dept.: 5 – 17th Floor <br> Judge: Hon. Edward M. Chen |

I, Tijana M. Brien, declare:

1.      I am an attorney at the law firm Cooley LLP, counsel for Defendants FibroGen, Inc., Enrique Conterno, James Schoeneck, Mark Eisner, and Pat Cotroneo (collectively, "FibroGen Defendants"), in the above-captioned matter.  I submit this declaration in support of Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification.  The information set forth herein is true to the best of my knowledge, information, and belief, and if called upon to testify, I could and would testify to the following.

2.      **Exhibit 1** attached hereto is a true and correct copy of the Expert Report of Paul Zurek, Ph.D., dated May 12, 2023.

3.      **Exhibit 2** attached hereto is a true and correct copy of the deposition transcript of Chad Coffman, taken remotely on April 4, 2023.

4.      **Exhibit 3** attached hereto is a true and correct copy of the document produced by Defendants bearing the Bates range FGEN-CA-0112863 to FGEN-CA-0112902.

5.      **Exhibit 4** attached hereto is a true and correct copy of the document produced by Defendants bearing the Bates range FGEN-CA-0613910 to FGEN-CA-0613950.

6.      **Exhibit 5** attached hereto is a true and correct copy of excerpts of the deposition transcript of David Randall, a witness Lead Plaintiff Employees' Retirement System of the City of Baltimore designated to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6), taken remotely on April 13, 2023.

7.      **Exhibit 6** attached hereto is a true and correct copy of excerpts of the deposition transcript of David Jude Sullivan, a witness Lead Plaintiff Plymouth County Retirement Association designated to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6), taken remotely on April 11, 2023.

8.      **Exhibit 7** attached hereto is a true and correct copy of excerpts of the deposition transcript of Christopher DiFusco, a witness Lead Plaintiff City of Philadelphia Board of Pensions and Retirement designated to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6), taken remotely on April 18, 2023.

Cooley LLP
Attorneys at Law
Palo Alto

2

Brien Decl. ISO Defendants'
Opposition to Mot. for Class Cert
3:21-cv-02623-EMC

9.    **Exhibit 8** attached hereto is a true and correct copy of the FDA Advisory Committee Briefing document titled *FDA Briefing Document: Cardiovascular and Renal Drugs Advisory Committee Meeting, July 15, 2021, Roxadustat*. This document is published on the FDA's website and is publicly available at https://www.fda.gov/advisory-committees/advisory-committee-calendar/updated-time-information-july-15-2021-meeting-cardiovascular-and-renal-drugs-advisory-committee.

10.    **Exhibit 9** attached hereto is a true and correct copy of a Bank of America analyst report titled *Roxa Adcom Briefing Docs: A few -ve's in FDA sensitivity analysis, but inconclusive*, published on July 13, 2021.

11.    **Exhibit 10** attached hereto is a true and correct copy of a Cowen analyst report titled *Roxa AdCom an Uphill Battle with Uncertain Outcome: Safety Concerns a Key Focus*, published on July 13, 2021.

12.    **Exhibit 11** attached hereto is a true and correct copy of a Goldman Sachs analyst report titled *FibroGen Inc. (FGEN): Thoughts on the roxa AdCom briefing documents*, published on July 13, 2021.

13.    **Exhibit 12** attached hereto is a true and correct copy of a Raymond James analyst report titled *Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks*, published on July 13, 2021.

14.    **Exhibit 13** attached hereto is a true and correct copy of a William Blair analyst report titled *No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat*, published on July 13, 2021.

15.    **Exhibit 14** attached hereto is a true and correct copy of a Jefferies analyst report titled *Adcom book very mixed, FDA maybe open for some form of approval or black box*, published on July 13, 2021.

16.    **Exhibit 15** attached hereto is a true and correct copy of a Stifel analyst report titled *Roxadustat AdCom Briefing Docs Raise Question of Addressing Safety with Titration or Additional Studies*, published on July 13, 2021.

Cooley LLP
Attorneys at Law
Palo Alto

3

Brien Decl. ISO Defendants'
Opposition to Mot. for Class Cert
3:21-cv-02623-EMC

17. **Exhibit 16** attached hereto is a true and correct copy of a SVB Leerink analyst report titled *FDA Finds Significant Risks in Roxa – NDD Questionable, Black Box Certain*, published on July 13, 2021.

18. **Exhibit 17** attached hereto is a true and correct copy of a press release issued by FibroGen on April 6, 2021, titled *FibroGen Provides Additional Information on Roxadustat*. The press release is publicly available on FibroGen's website at https://investor.fibrogen.com/news-releases/news-release-details/fibrogen-provides-additional-information-roxadustat.

19. **Exhibit 18** attached hereto is a true and correct copy of excerpts of a transcript of FibroGen's Earnings Call for the first quarter of 2019 held on May 9, 2019, published by S&P Global Market Intelligence.

20. **Exhibit 19** attached hereto is a true and correct copy of excerpts of a transcript of FibroGen's Earnings Call for the second quarter of 2019 held on August 8, 2019, published by S&P Global Market Intelligence.

21. **Exhibit 20** attached hereto is a true and correct copy of the minutes of the Cardiovascular and Renal Drugs Advisory Committee Meeting, held on July 15, 2021. This document is published on the FDA's website and is publicly available at https://www.fda.gov/media/151422/download.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of May, 2023, at Moss Beach, California.

*/s/ Tijana M. Brien*
_____
Tijana M. Brien

Cooley LLP
Attorneys at Law
Palo Alto

4

**Brien Decl. ISO Defendants'
Opposition to Mot. for Class Cert
3:21-cv-02623-EMC**

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Civil Action No. 3:21-cv-02623-EMC<br><br>CLASS ACTION |

EXPERT REPORT OF PAUL ZUREK, PH.D.

MAY 12, 2023

# Table of Contents

I.     Qualifications ................................................................................................................ 1

II.    Assignment and Compensation ..................................................................................... 1

III.   FibroGen, Roxadustat, and Plaintiffs' Allegations ...................................................... 2

IV.    Summary of Opinions .................................................................................................... 7

V.     Implications of Market Efficiency ................................................................................ 8

VI.    Event Study Analysis ................................................................................................... 12

       A.     Overview of the Event Study Approach ................................................................ 12

       B.     Regression Model for FibroGen's Stock Returns ................................................. 13

VII.   The Remaining Alleged Concealed Information Did Not Impact FibroGen's Stock Price
       after the April 6, 2021 Alleged Corrective Disclosure ................................................ 13

       A.     The Remaining Alleged Concealed Information Was Disclosed on July 13, 2021
              ............................................................................................................................... 14

       B.     There Is No Economic Evidence That the Remaining Alleged Concealed
              Information Impacted FibroGen's Stock Price ..................................................... 20

       C.     In an Efficient Market, the Observed Price Decline on July 16, 2021 Could Not
              Have Occurred as a Result of the Disclosure of the Remaining Alleged Concealed
              Information ............................................................................................................. 22

## I.    Qualifications

1.    I am a Vice President at Cornerstone Research, a financial and economic consulting firm. I hold Ph.D. and M.A. degrees in finance and a B.S. degree in economics from the Wharton School at the University of Pennsylvania.  My research and work experience span a number of areas in financial economics, with a focus on asset pricing, valuation, and statistical analysis of financial data.  A copy of my curriculum vitae is attached as **Appendix A**.

2.    I have authored textbook chapters on issues in finance and economics.  I have taught valuation, corporate finance, risk management, and asset pricing, including in executive education programs, at the Wharton School at the University of Pennsylvania and at Stanford Law School.

3.    I have more than a decade of experience conducting economic analyses on complex matters at all stages of litigation.  At Cornerstone Research, I have consulted on many litigation matters, including securities lawsuits by shareholders.  My work has involved issues of market efficiency, price impact, loss causation, and valuation, as well as the calculation of per share damages.  I have previously served as an expert in litigation, including in securities matters, testified in arbitration, and presented findings of my analyses to regulators.  I have also spoken on various matters related to securities litigation.  A list of my prior testimony is included as part of **Appendix A**.

## II.    Assignment and Compensation

4.    I understand that Plaintiffs seek to certify a class comprising "themselves and those persons or entities who purchased or otherwise acquired the publicly traded securities of FibroGen, including options, during the period from December 20, 2018 through July 15, 2021, inclusive" (the "Proposed Class Period"), "and were damaged thereby" (the "Proposed Class").[1] In support of their Class Certification Motion, Plaintiffs submitted the Expert Report of Chad Coffman, CFA ("Mr. Coffman"), dated January 27, 2023 (the "Coffman Report").

---

[1] Lead Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC*,* January 27, 2023 ("Class Certification Motion," p. 2).

5.      I have been retained by counsel for FibroGen, Inc. ("FibroGen" or the "Company") to assess economic evidence whether the alleged misrepresentations had an impact on FibroGen's stock price after the penultimate alleged corrective disclosure on April 6, 2021.

6.      In undertaking this assignment, I have examined various materials, including legal pleadings, academic literature, securities analyst reports, press articles, and various other public sources including data from the Center for Research in Security Prices ("CRSP") and Refinitiv. A list of materials that I have considered in forming my opinions is attached as **Appendix B**.

7.       I have been assisted in the preparation of this report by staff of Cornerstone Research, who worked under my direction.  Cornerstone Research is being compensated for my work in this matter at an hourly rate of $900.  My compensation is not affected by the outcome of this matter.  My work in this matter is ongoing, and I reserve the right to supplement my opinions if additional information becomes available and/or Mr. Coffman expresses additional opinions in this matter.

### III.      FibroGen, Roxadustat, and Plaintiffs' Allegations[2]

8.      The "[Corrected] Consolidated Class Action Complaint for Violations of the Federal Securities Laws" dated November 19, 2021[3] (the "Complaint") makes allegations regarding FibroGen and its "flagship" drug, Roxadustat:

> FibroGen is a biopharmaceutical company whose flagship drug, Roxadustat, is an experimental pill that is designed to treat anemia in patients with chronic kidney disease ("CKD").  In 2013, FibroGen secured an agreement with AstraZeneca to commercially develop Roxadustat, which was contingent on FibroGen achieving various milestones in the drug's [U.S. Food and Drug Administration ("FDA")] new-drug-application ("NDA") approval process.  The current standard of care to treat anemia in CKD patients, Epogen, is only used in severe cases for patients already on dialysis ("DD patients") because it leads to an increased risk of major adverse cardiac events ("MACE").  As a result, Epogen is not used on patients

---

[2] I use the term "alleged misrepresentations" in this report to encompass both alleged misstatements and any alleged omissions.

[3] [Corrected] Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC, November 19, 2021.

with less severe CKD who have just begun dialysis ("incident dialysis" patients) or who have not yet started dialysis (non-dialysis or "NDD" patients).[4]

9.      According to the Complaint, prior to the start of the Proposed Class Period, FibroGen "completed its Phase 3 clinical trials for Roxadustat, which involved over 9,000 CKD patients across three key patient populations that were expected to use Roxadustat."[5]  The Complaint alleges that "the key to securing critical FDA approval for Roxadustat was to demonstrate, through Phase 3 clinical trial data, that Roxadustat was at least as effective as Epogen, while avoiding the significant safety issues that prevented Epogen from being used to treat incident dialysis and NDD patients."[6]  More specifically, the Complaint alleges:

> For Roxadustat to obtain FDA approval, it was critical for FibroGen to demonstrate not only that Roxadustat was at least as safe as the existing standard of care for DD patients, Epogen, but also that it was at least as safe as placebo and thus did not require a "Black Box" warning—meaning that it could be recommended to NDD and incident dialysis patients representing, in the words of market analysts, the "***key upside***" for Roxadustat.…  FibroGen needed to demonstrate that, in DD and incident dialysis patients, Roxadustat did not cause more adverse safety events than Epogen, and in NDD patients, that it did not cause more adverse safety events than placebo.  Defendants evaluated this by looking at three key safety endpoints in each patient population, namely (i) MACE, a crucial metric the FDA primarily evaluated when considering an NDA for anemia treatments; (ii) all-cause mortality, or "ACM," which evaluated deaths caused by Roxadustat for any reason and would also be a focus of the FDA; and (iii) "MACE+," a composite endpoint that included all MACE events in addition to hospitalizations, which was the primary focus of European regulatory authorities (and not the FDA).  The resulting safety data for Roxadustat would therefore produce nine separate analyses of the safety of the drug—MACE, MACE+ and ACM for each of the three patient populations: DD, NDD and incident dialysis patients—which would purportedly unequivocally ensure that Roxadustat had shown its "non-inferiority" to placebo and Epogen.[7]

---

[4] Complaint, ¶ 4.

[5] The studies included "(i) four studies involving dialysis-dependent or DD patients; (ii) one study specifically focused on a subpopulation consisting of new-to-dialysis or 'incident dialysis patients,' in which Roxadustat was compared against Epogen; and (iii) three studies of NDD patients in which Roxadustat was compared to placebo (since Epogen was not typically used to treat anemia in NDD patients)" (Complaint, ¶ 46).

[6] Complaint, ¶ 4.

[7] Complaint, ¶ 47 (emphasis in original).

10.     I understand that Plaintiffs allege that "Defendants falsely represented the safety and efficacy data of [Roxadustat] and falsely assured investors that the safety data was derived pursuant to FDA-sanctioned analysis."[8]  According to the Complaint:

> Defendants repeatedly assured investors that the extraordinarily positive Roxadustat efficacy and safety data they had presented to the market—including unprecedentedly low hazard ratios across each of nine analyses in all three patient populations—were the result of the "prespecified" analyses that they had purportedly agreed upon with the FDA.  These representations were false.  In truth, the data that Defendants had touted for two years was *not* the "prespecified" analyses agreed upon with the FDA, but was in fact data that Defendants had changed "*post-hoc*"—*i.e.*, meaning that Defendants altered the data after it had been fully unblinded (so Defendants knew which patients had received Roxadustat and which had not) by manipulating certain variables in the data to make the drug appear better and safer than it really was.[9]

11.     Plaintiffs allege that "FibroGen's fraud began to unravel beginning in the fall of 2020, [nearly two years into the Proposed Class Period,] as the truth regarding Roxadustat's true inferior safety profile slowly emerged."[10]  The "Loss Causation" section of the Complaint appears to point to alleged corrective disclosures on four days—May 9, 2019, March 1, 2021, April 6, 2021, and July 15, 2021—and claims that the ensuing stock price declines "establish loss causation."[11, 12]  The analysis in this report focuses on the period between the final two alleged corrective disclosures.[13]

---

[8] Order Denying Defendants' Motion to Dismiss, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC, July 15, 2022, p. 2.

[9] Complaint, ¶ 71 (emphasis in original).

[10] Complaint, ¶ 72.

[11] Complaint, Section VIII and ¶¶ 262–267.

[12] In a section titled "The Truth Regarding Defendants' Fraud Slowly Emerges," the Complaint describes an additional stock price decline allegedly attributable to a press release published after trading hours on December 18, 2020 ("FibroGen issued a press release after trading hours announcing that the FDA had 'extended the review period of the [NDA] for Roxadustat … by three months,' with a new [Prescription Drug User Fee Act] date of March 20, 2021") (Complaint, ¶ 73).

[13] Regarding the May 9, 2019 disclosure, the Complaint states that "FibroGen issued a press release disclosing topline results from the pooled safety analyses from its Phase 3 Roxadustat trials, including MACE results… [and] revealed that the largest three patient populations in its Global Phase 3 Program did not meet the requisite statistical threshold to claim that Roxadustat was not inferior to Epogen" (Complaint, ¶ 263).  Regarding the March 1, 2021 disclosure, the Complaint states that "FibroGen announced that the FDA would unexpectedly hold an AdCom meeting to review Roxadustat's NDA, well over a year after its initial submission," claiming that "[t]he FDA decision was a significant setback to the Company's much anticipated March 20, 2021 FDA approval of the drug and indicated a problem with the application" (Complaint, ¶ 264).

12.     According to the Complaint, on April 6, 2021, "FibroGen issued a statement 'provid[ing] clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the [R]oxadustat Phase 3 program for the treatment of anemia of [CKD].'"[14]  In particular, the Complaint includes a chart "based on information given in Defendants' April 6, 2021 press release" comparing the "*post-hoc* manipulated data" with the "actual FDA pre-specified data," which Plaintiffs claim "demonstrates the significant manipulations Defendants made to Roxadustat's data across ***all nine*** safety analyses."[15]  The Complaint alleges that "once Defendants' *post hoc* manipulations were corrected, the true data revealed that Roxadustat was … ***significantly less effective and less safe*** than placebo or even Epogen," and the data thus "failed to support FDA approval in ***any patient population at all***, effectively dooming [Roxadustat's] FDA approval prospects."[16]

13.     However, the truth behind the alleged misrepresentations was allegedly not fully revealed as of April 6, 2021, because FibroGen "had ***completely withheld*** from public disclosure *additional* critical prespecified 'sensitivity' analyses [(the "Prespecified Sensitivity Analyses")]."[17]  Specifically, Plaintiffs allege that a final corrective disclosure revealing the results from those Prespecified Sensitivity Analyses occurred on July 15, 2021 when the FDA's Advisory Committee ("AdCom") met to review Roxadustat's NDA:

> Remarkably, even at this point [after the April 6, 2021 alleged corrective disclosure], Defendants did not reveal the full extent of their fraud.  Rather, Defendants attempted to minimize the disclosure and continued to claim that Roxadustat was purportedly still just as safe as placebo and had comparable safety to Epogen.  However, *unbeknownst to investors, Defendants had in their possession other prespecified FDA analyses—known as "sensitivity" analyses—* that revealed that Roxadustat's safety issues were so significant that the drug could not be approved at all.  These facts were not disclosed until July 15, 2021, when the FDA's AdCom met to review Roxadustat's NDA and the AdCom revealed that the drug's issues were even worse than what Defendants had previously represented.  Indeed, as the AdCom unequivocally concluded that day, FibroGen's own undisclosed, prespecified sensitivity analyses of Roxadustat demonstrated that the drug's efficacy over Epogen was inconclusive at best, and with regard to safety, the drug caused "greater rates of some important adverse

---

[14] Complaint, ¶ 265.  *See also* Complaint, ¶¶ 77–88.
[15] Complaint, ¶ 80 (emphasis in original).
[16] Complaint, ¶ 7 (emphasis in original).
[17] Complaint, ¶ 103 (emphasis in original).

events [] than even [Epogen]," including a higher rate of death and other major side effects.[18]

The full extent of Defendants' fraud was finally revealed on July 15, 2021, when *investors learned that Defendants had completely withheld from public disclosure additional critical prespecified "sensitivity" analyses that had been mandated by, and ultimately revealed by, the FDA.* These critical analyses conclusively demonstrated that the true data results for Roxadustat were even worse than what Defendants publicly revealed on April 6, 2021—and showed that the drug was in fact materially inferior to both placebo and Epogen—thereby dooming Roxadustat's FDA approval prospects in their entirety, for any patient population at all.[19]

14.    Consistent with these allegations, I understand that the only alleged concealed information remaining after the April 6, 2021 alleged corrective disclosure comprises certain statements that Plaintiffs allege were false due to the failure to disclose the results of the Prespecified Sensitivity Analyses (the "Remaining Alleged Concealed Information").[20]  As discussed below, Plaintiffs erroneously claim that investors learned about the Prespecified Sensitivity Analyses on July 15, 2021.[21]  Trading in FibroGen's stock was halted on July 15, 2021 in anticipation of the AdCom's vote.[22]  Plaintiffs thus seek to recover from a stock price decline that occurred on July 16, 2021.  The Complaint alleges that "[w]hen trading reopened the following day and the market understood the full extent of Defendants' prior misrepresentations concerning Roxadustat's safety profile and the drug's exceedingly slim prospects for FDA approval, the Company's stock price plummeted, falling over 42%, or $10.49 per share, from a

---

[18] Complaint, ¶ 11 (original emphasis removed; emphasis added in italics).

[19] Complaint, ¶ 103 (original emphasis removed; emphasis added in italics).

[20] For April 6, 2021, Plaintiffs claim that "Defendants *still* did not disclose the FDA's prespecified and equally important *sensitivity* analyses—*i.e.*, analyses that were indisputably a key part of the 'totality' of the data—which Defendants had wholly withheld from investors throughout the Class Period."  Complaint, ¶ 227 (emphasis in original).  For May 10, 2021 and May 13, 2021, Plaintiffs claim that "while Defendants purported to come clean by releasing data showing the real hazard ratios under the FDA's prespecified *primary* analyses on April 6, 2021, significantly, Defendants still had not disclosed the FDA's prespecified and equally important *sensitivity* analyses—*i.e.*, indisputably a key part of the 'totality' of the data—which unequivocally confirmed that, contrary to Defendants' public statements, Roxadustat was significantly inferior to placebo *and* Epogen in the MACE *and* all-cause mortality endpoints."  Complaint, ¶ 232 (emphasis in original).  For June 4, 2021 and June 10, 2021, Plaintiffs claim that "Defendants knew that they had still not disclosed the FDA's prespecified and equally important *sensitivity* analyses showing that, contrary to their public statements, Roxadustat was significantly inferior to placebo *and* Epogen in the MACE *and* all-cause mortality endpoints, in addition to causing a host of other undisclosed risks and side effects."  Complaint, ¶ 235 (emphasis in original).

[21] Complaint, ¶ 103.

[22] FibroGen stock trading was halted on July 15, 2021 from 6:55:01 AM ET to 6:55:00 PM ET due to "News Pending."  *See* "NYSE Trading Halts," NYSE, available at https://www.nyse.com/trade-halt-historical.

prior close of $24.84 per share [on July 14, 2021] to close at $14.35 per share on July 16, 2021."[23]

## IV.    Summary of Opinions

15.    Based on the analyses described in my report, I have reached the following opinions.

16.    *First*, as discussed in **Section VII.A**, the Remaining Alleged Concealed Information (i.e., results of the Prespecified Sensitivity Analyses) became publicly available on July 13, 2021. Approximately at the time the market opened that day, the FDA publicly released a briefing document that provided information related to the AdCom meeting scheduled two days later, on July 15, 2021 ("FDA Briefing Document").[24]  The FDA Briefing Document contained results from FibroGen's Prespecified Sensitivity Analyses in addition to other information regarding Roxadustat.

17.    *Second*, as demonstrated in **Section VII.B**, the Prespecified Sensitivity Analyses disclosed on July 13, 2021 did not impact FibroGen's stock price, as an economic matter.  There was no statistically significant stock price movement on July 13, 2021.[25]

18.    *Third*, as demonstrated in **Section VII.C**, the stock price decline on July 16, 2021 that I understand Plaintiffs claim was a result of the alleged misrepresentations could not have been in response to disclosure of the Remaining Alleged Concealed Information because that information was publicly disclosed three days earlier.  Specifically, assuming FibroGen's stock traded in an efficient market during the Proposed Class Period,[26] repetition of previously disclosed information would not have impacted FibroGen's stock price.

---

[23] Complaint, ¶ 267.

[24] "FDA Briefing Document – Cardiovascular and Renal Drugs Advisory Committee Meeting July 15, 2021," July 13, 2021.  SAC Tracker, a third-party regulatory intelligence service, reported via Twitter that the FDA briefing materials were accessible to the public at 9:31 AM ET on July 13, 2021.  *See* SAC Tracker (FDAadcomm), "FDA posts meeting materials ahead of Thursday's advisory committee review of FibroGen's #roxadustat $FGEN," Twitter, July 13, 2021 9:31 AM ET.  I have also identified a Bloomberg article published at 9:33AM ET on July 13, 2021 that included a link to the FDA Briefing Document.  *See* "FDA Releases Briefing Documents on FibroGen's Roxadustat Tablets," Bloomberg, July 13, 2021.

[25] As discussed in **Section VII.B**, I would expect FibroGen's stock price to incorporate the disclosure of the results of the Prespecified Sensitivity Analyses within one trading day, by the close of market on July 13, 2021.  I note that there was no statistically significant stock price movement on July 14, 2021 either.

[26] Mr. Coffman states that he evaluated the market for FibroGen common stock during the Proposed Class Period and that his analyses "support the conclusion that FibroGen Common Stock traded in an open, developed, and efficient market throughout the Class Period" (Coffman Report, ¶ 25).  For the purposes of my analysis in this report, I have been asked to assume that FibroGen's stock traded in an efficient market during the Proposed Class Period as Mr. Coffman claims.

19.     Thus, if FibroGen's stock traded in an efficient market, as an economic matter, no alleged misrepresentation impacted FibroGen's stock price following the penultimate alleged corrective disclosure on April 6, 2021.

## V.     Implications of Market Efficiency

20.     Market efficiency is a fundamental concept in financial economics dating back to the seminal work of Nobel Prize–winning economist Professor Eugene Fama in the 1960s.[27] Professor Fama defined an efficient market for a security as one where the security's price reflects the value implications of available information:

> In general terms, the ideal is a market in which prices provide accurate signals for resource allocation: that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time "fully reflect" all available information. A market in which prices always "fully reflect" available information is called "efficient."[28]

21.     Empirical tests of market efficiency concern three different sets of information with respect to which efficiency is examined. Tests of so-called weak form market efficiency examine whether security prices incorporate information that can be obtained from historical prices and dividends. Tests of semi-strong form market efficiency examine whether security prices incorporate all publicly available information.[29] Finally, tests of strong form market efficiency consider whether security prices incorporate all information, including private information that is not publicly available.[30] Markets are generally not considered to be strong form efficient.[31]

---

[27] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417 ("Fama I").

[28] Fama I, p. 383.

[29] If markets are semi-strong form efficient, they will also necessarily be weak form efficient, because all publicly available information includes information regarding historical prices and dividends.

[30] Fama I, p. 383. *See also* Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed., McGraw-Hill/Irwin, 2005, p. 356 ("Ross, Westerfield, and Jaffe (2005)").

[31] Berk, Jonathan, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed., Pearson Education Limited, 2019, p. 348 ("Berk, DeMarzo, and Harford (2019)") ("Mutual fund managers and fundamental analysts, such as those who work for brokerages and make stock recommendations, believe that mispricing can be uncovered by careful analysis of company fundamentals. There is evidence that traders with

22.     Plaintiffs allege that "[a]t all relevant times, the market for FibroGen's securities was an open, efficient and well-developed market"[32] and that, as such, "the market for FibroGen's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of FibroGen's securities."[33] This is consistent with semi-strong form market efficiency in which security prices rapidly and fully incorporate all publicly available information (such that information is "always" and "at any time" reflected, as in Professor Fama's definition).  Moreover, Mr. Coffman uses the semi-strong form of market efficiency as the basis for his analysis.[34]

23.     I understand that the form of market efficiency that is most relevant in the present context is semi-strong market efficiency.[35]  In other words, the relevant question is whether security prices quickly and fully incorporate all publicly available information.[36]

24.     Information is incorporated rapidly into a security's price in an efficient market, in many cases within minutes of the information becoming public.[37]  An important feature of securities

---

inside information about upcoming merger or earnings announcements can make abnormal returns by trading (illegally) on that information, so the market is clearly not strong form efficient.").

[32] Complaint, ¶ 269.

[33] Complaint, ¶ 270.

[34] *See* Coffman Report, ¶¶ 14, 18.

[35] For example, the concurrence in the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), citing its decision in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), states: "Specifically, the Court relied upon the 'semi-strong' version of that theory, which posits that the average investor cannot earn above-market returns (*i.e.*, 'beat the market') in an efficient market by trading on the basis of publicly available information" (*Halliburton II* at 289).

[36] Unless otherwise specified, any references to market efficiency and efficient markets in this report refer to the semi-strong form of market efficiency.

[37] *See* Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617 ("Fama II"), pp. 1601–1602 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.  The result is so common that this work now devotes little space to market efficiency.  The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues.").  An article by Patell and Wolfson that studies news releases of earnings and dividend announcements found that, while some impact persists for longer than a few minutes, "returns earned by simple trading rules dissipate within five to ten minutes" of announcement (Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, no. 2 (1984): 223–252, p. 223).  Busse and Green find that "prices of stocks discussed positively during the Midday Call report on CNBC experience a statistically and economically significant increase beginning seconds after the stock is initially mentioned and lasting approximately one minute.  The response to negative reports is larger but more gradual.  Prices continue falling for 15 minutes after airing…" (Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3 (2002): 415–437, p. 435).  Chordia, Roll, and Subrahmanyam find that "pattern[s] of intra-day serial dependence [reveal] that it takes more than five minutes but less than sixty minutes" for sophisticated investors to react to order imbalances (Chordia, Tarun, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2 (2005): 271–292, p. 271).  Finally, Greene and Watts find that for stocks on the NASDAQ and the NYSE "the majority of the price response to nontrading-hours earnings announcements is realized during the opening trade… [W]hen clock time is considered, price adjusts rapidly over

that are traded in efficient markets is that security prices are the sum of discounted expected future cash flows based on the market's assessment of publicly available information.[38]  As explained in finance textbooks, a market is semi-strong form efficient when *all information* that is publicly available is reflected in prices:

> A market is [semi-strong form] efficient if prices reflect (incorporate) *all publicly available information*, including information such as published accounting statements for the firm as well as historical price information.[39]

> [Market efficiency] implies that securities will be fairly priced, based on their future cash flows, *given all information that is available to investors*…. Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or *other public data sources*.[40]

25.     According to Professor Fama, if the market is semi-strong form efficient, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs."[41]  Given that the marginal cost of obtaining and acting on public information is relatively low, the marginal benefit of acting on public information is essentially zero if the market is efficient—that is, the value-relevant content of public information is incorporated fully into a security's price.  Notably, the existence of an efficient market does not require all investors to access, analyze, and trade on publicly available information.  It is sufficient for some (potentially the most sophisticated) investors to identify and trade on new public information such that it is rapidly incorporated in market prices.  For example, short selling shares is one way through which negative information is incorporated into

---

the first post-announcement half hour for both types of announcements on both exchanges" (Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42, pp. 19–20, 41).

[38] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017 ("Brealey, Myers, and Allen (2017)"), p. 336 ("In an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows … and the opportunity cost of capital.").

[39] Ross, Westerfield, and Jaffe (2005), p. 356 (emphasis added).

[40] Berk, DeMarzo, and Harford (2019), p. 348 (emphasis added).

[41] Fama II, p. 1575.

prices, while an investor optimistic about the prospects of a company may bid up the market price by purchasing shares.[42]

26.    A corollary of the efficient market hypothesis is that, because a semi-strong form efficient market rapidly incorporates all publicly available information that affects future cash flows and risks as soon as that information first becomes public (as soon as it enters the market's "information set"), the market will not react to subsequent repetition of previously available public information.  In fact, this very idea was used to introduce the concept of market efficiency by the economist Burton Malkiel in a chapter on the efficient market hypothesis in The New Palgrave's *Finance* (1989):

> A capital market is said to be efficient if it fully and correctly reflects all relevant information in determining security prices. Formally, the market is said to be efficient with respect to some information set … if security prices would be unaffected by revealing that information to all participants. Moreover, efficiency with respect to an information set … implies that it is impossible to make economic profits by trading on the basis of [that information set].[43]

27.    In other words, if a particular piece of information (e.g., the results of a particular analysis) is already part of the market's information set at some point in time, and if the market is semi-strong form efficient, subsequent repetition of that information to market participants (e.g., in a subsequent company press release or during an FDA hearing) would not cause the security price to react further to the re-release of this information.

28.    Finally, a semi-strong form efficient market would also not react to information that is not value-relevant, because only information that affects the assessment of future cash flows and risks (i.e., is value-relevant) impacts security prices in an efficient market.

---

[42] Short sellers are investors who borrow shares and sell them at the prevailing price, anticipating that the price declines in the future when the shares are re-purchased and returned to the lender.  The act of selling borrowed shares can put downward pressure on the stock price, resulting in a lower market price.  *See, e.g.*, Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276, for a discussion of short selling.

[43] Malkiel, Burton G., "Efficient Market Hypothesis," in *Finance*, John Eatwell, Murray Milgate, and Peter Newman (eds.), Palgrave Macmillan, 1989: 127–134, p. 127.

## VI.    Event Study Analysis

### A.    Overview of the Event Study Approach

29.    An event study is a statistical tool that is used to measure the impact of a specific news event on value, as measured by changes in the stock price (or the price of another security).[44]  An event study generally involves three steps.[45]  First, a researcher selects the specific event to be examined and identifies when the information associated with that event first became public, as well as the appropriate event window, the period over which the stock prices will be examined; for example, the effect of an earnings announcement for a particular company as measured by the price reaction over a one-day window.  Second, a statistical regression model is used to calculate the abnormal or residual return accounting for market and industry movements, which is the portion of the observed return that is unexpected based on a model of expected returns— that is, the portion that cannot be attributed to market or industry price movements according to the statistical model employed.[46]  Third, a statistical hypothesis regarding the residual return is constructed and tested.  For example, a researcher may test a hypothesis (a so-called "null hypothesis") that the residual return equals zero following the release of information—that is, that there is no security price reaction to the event after controlling for market and industry factors.  Hypothesis testing is a statistical technique that evaluates whether the null hypothesis (zero residual return in the example) can be rejected for a given significance threshold (conventionally 5%) based on the observed data.[47]  In an efficient market, the rejection of the null hypothesis of zero residual return supports a finding that information disclosed during the event window affected the security's price.

---

[44] *See* MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39 ("MacKinlay (1997)"), for an overview of event studies in financial economics.

[45] *See* MacKinlay (1997), pp. 14–16.

[46] Note that an event study is a joint test of whether the model used to calculate residual returns is correct and whether residual returns are zero.

[47] Whenever statistical significance is discussed in this report without specifying a confidence level, a 5% level using a two-tail test is applied.  *See, e.g.*, Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 3rd ed., The National Academies Press, 2011: 211–302, pp. 251–252 (footnote omitted) ("In practice, statistical analysts typically use levels of 5% and 1%.  The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure.… These levels of 5% and 1% have become icons of science and the legal process.  In truth, however, such levels are at best useful conventions.").

**B.      Regression Model for FibroGen's Stock Returns**

30.      For my analysis of FibroGen's stock price movements,[48] I used a two-factor (market and industry) linear regression model to estimate the statistical relationship between daily FibroGen stock returns and the daily returns of market and industry indices.  The market index used is the CRSP value-weighted NYSE/AMEX/Nasdaq/ARCA Market Index.  The industry index used is the market-capitalization-weighted Nasdaq Biotechnology Total Return Index.[49]  The residual return is the actual, observed FibroGen return less the return predicted by the two-factor model. To estimate FibroGen's residual returns on July 13, 14, and 16, 2021, I used a 120 preceding trading day estimation window ending July 12, 2021.[50]

**VII.    The Remaining Alleged Concealed Information Did Not Impact FibroGen's Stock Price after the April 6, 2021 Alleged Corrective Disclosure**

31.      I was asked to assess economic evidence whether the alleged misrepresentations had an impact on FibroGen's stock price after the penultimate alleged corrective disclosure on April 6, 2021.  To do so, I determined whether the Remaining Alleged Concealed Information, which allegedly rendered the purported misrepresentations to continue to be misleading after April 6, 2021, affected FibroGen's stock price.

32.      I understand that the alleged misrepresentations on or after April 6, 2021 concern the failure to disclose the results of the Prespecified Sensitivity Analyses; therefore, my assessment of their price impact analyzes FibroGen's stock price movement at the time the Remaining Alleged Concealed Information (i.e., the results of the Prespecified Sensitivity Analyses) was disclosed.[51]

---

[48] *See* **Exhibit 1**.

[49] Consistent with Mr. Coffman's approach, I do not exclude FibroGen from the industry index.  The industry index contained 190 companies as of December 19, 2018, the last trading day before the start of the Proposed Class Period, and FibroGen represented a small percentage of the index (approximately 0.42%).  *See* Refinitiv.

[50] MacKinlay (1997), p. 15 ("Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").  I exclude from the estimation of my regression model the returns corresponding to the impact dates of the alleged misstatements and alleged corrective disclosures, as described in the Complaint.  My results are further robust to using an estimation window of 252 trading days.  *See* **Exhibit 2** for the regression estimation results.

[51] To the extent Plaintiffs may assert that FibroGen's stock price increased in response to the alleged misrepresentations on May 10, 2021, May 13, 2021, June 4, 2021, and June 10, 2021, such an assertion has no support in Mr. Coffman's event study.  Mr. Coffman's event study does not find positive and statistically significant

33. *First*, notwithstanding Plaintiffs' claim that the Remaining Alleged Concealed Information was disclosed on July 15, 2021, that information was in fact disclosed on July 13, 2021 through the release of the FDA Briefing Document (**Section VII.A**).

34. *Second*, FibroGen's stock price did not react statistically significantly to the disclosure of the Remaining Alleged Concealed Information on July 13, 2021, indicating that such disclosure did not impact the share price (**Section VII.B**).[52]

35. *Third*, in an efficient market, FibroGen's stock price decline on July 16, 2021 (the trading day after the AdCom meeting) could not have been in response to disclosure of the Remaining Alleged Concealed Information, which was made public three days earlier.  In other words, if FibroGen's stock price decline on July 16 was in response to disclosure of the Remaining Alleged Concealed Information, then FibroGen's stock did not trade in an efficient market (**Section VII.C**).

### A.    The Remaining Alleged Concealed Information Was Disclosed on July 13, 2021

36. Plaintiffs claim that the Remaining Alleged Concealed Information—the results of the Prespecified Sensitivity Analyses—was disclosed on July 15, 2021:

> The full extent of Defendants' fraud was finally revealed on July 15, 2021, when investors learned that Defendants had completely withheld from public disclosure additional critical prespecified "sensitivity" analyses that had been mandated by, and ultimately revealed by, the FDA.[53]

---

residual returns following any of these alleged misrepresentation dates.  *See* COFFMAN_0003103; COFFMAN_0003047, Sheet "Reg."  This is also consistent with Mr. Coffman's testimony during his deposition. *See* Deposition of Chad Coffman, CFA, dated April 4, 2023 ("Coffman Deposition"), pp. 82–83, 85–86, 101.

[52] As discussed in **Section V**, in an efficient market new information released to the market is rapidly reflected in the security price, generally within one trading day if not within minutes or hours.  As discussed in **Section VII.B**, to the extent FibroGen's stock failed to rapidly react on July 13, 2021, as I would expect if the market for FibroGen's stock was efficient, I note that the residual return on July 14, 2021 was not statistically significant either.

[53] Complaint, ¶ 103 (emphasis removed).

However, two days earlier, at approximately market open on July 13, 2021,[54, 55] the FDA published the FDA Briefing Document that contained information concerning the Remaining Alleged Concealed Information—the results of the Prespecified Sensitivity Analyses, as discussed below.[56, 57]

37.    The Complaint expressly identifies what Plaintiffs allege as the "'sensitivity' analyses mandated by the FDA, which Defendants never revealed and which were only revealed by the FDA AdCom in July 2021:"[58]

| Non-Dialysis Dependent (NDD) | | |
| --- | --- | --- |
| Endpoint | ... | True, Undisclosed FDA Pre-Specified "Sensitivity" Analysis |
| MACE | ... | 1.38 (1.11, **1.70**) |
| ACM | | 1.40 (1.08, **1.82**) |

---

[54] SAC Tracker, a third-party regulatory intelligence service, reported via Twitter that the FDA briefing materials were accessible to the public at 9:31 AM ET on July 13, 2021. *See* SAC Tracker (FDAadcomm), "FDA posts meeting materials ahead of Thursday's advisory committee review of FibroGen's #roxadustat $FGEN," Twitter, July 13, 2021 9:31 AM ET.  I have also identified a Bloomberg article published at 9:33AM ET on July 13, 2021 that included a link to the FDA Briefing Document. *See* "FDA Releases Briefing Documents on FibroGen's Roxadustat Tablets," Bloomberg, July 13, 2021.

[55] FibroGen's stock price declined by approximately $1.09 from market close on July 12, 2021 to market open on July 13, 2021, before any identified public mention of the FDA Briefing Document.  The price increased by approximately $0.29 between market open on July 13, 2021 and market close on that same day. *See* **Exhibit 3**.

[56] The Company's own briefing document was also published on this day. *See* "FibroGen, Roxadustat, Cardiovascular and Renal Drugs Advisory Committee, Meeting Date: 15 July 2021, Advisory Committee Briefing Materials," July 13, 2021 ("FibroGen Briefing Document").

[57] I also reviewed analyst reports and public press during the period from April 7, 2021 through July 12, 2021, inclusive, to identify whether there was any information released during this period regarding the results of the Prespecified Sensitivity Analyses.  For the analyst reports, I performed a keyword search across all analyst reports covering FibroGen during the period from April 7, 2021 through July 12, 2021 for the terms "sensitivity analys," "OT +," "OT+," "OT7," "on-treatment," "ITT analys," "prespecified," "pre-specified," "other analys," or "other set of analys."  For the public press, I reviewed all articles published during the same period that I was able to obtain from Factiva, with the keywords "FibroGen" or "FGEN" anywhere in the article or tagged by Factiva as regarding FibroGen, and conditional on having either of these phrases in the article: "sensitivity analys," "OT +," "OT+," "OT7," "on-treatment," "ITT analys," "prespecified," "pre-specified," "other analys," or "other set of analys."  I also reviewed articles from publications available on Bloomberg Law with the same keywords mentioned within the article.  As a robustness check, I also reviewed articles published during the same period from April 7, 2021 through July 12, 2021 from both Factiva and Bloomberg Law that do not include the keywords "FibroGen" or "FGEN" anywhere in the article, but conditional on having keywords "Roxadustat" and either of these phrases in the article: "sensitivity analys," "OT +," "OT+," "OT7," "on-treatment," "ITT analys," "prespecified," "pre-specified," "other analys," or "other set of analys."  Overall, I did not identify any news released during this period regarding the results of the Prespecified Sensitivity Analyses.

[58] Complaint, ¶ 108. *See also* Complaint, ¶ 228.  The chart from which the above was excerpted appears as part of Plaintiffs' allegations in the Complaint.

| Dialysis Dependent (DD) | | |
|---|---|---|
| Endpoint | ... | True, Undisclosed FDA Pre-Specified "Sensitivity" Analysis |
| MACE | | 1.14 (1.00, **1.30**) |
| ACM | ... | 1.17 (1.02, **1.35**) |

Specifically, the only data the Complaint appears to point to from the Prespecified Sensitivity Analyses are results from the NDD and DD patient populations, as set forth in the above charts. In addition to including the charts, the Complaint also discusses these results:[59]

- "[F]or NDD patients, under the undisclosed FDA prespecified sensitivity analyses the estimated MACE hazard ratio was **1.38**, or nearly 30% higher than the estimated MACE hazard ratio of 1.08 Defendants had originally disclosed pursuant to the doctored post hoc analysis—and the upper bound for that endpoint was higher still, at **1.7**, or nearly 40% higher than the upper bound of 1.24 Defendants had originally disclosed. The same was true for the ACM endpoint in the NDD patient population, for which the FDA's sensitivity analysis showed an estimated hazard ratio of 1.4, or over 30% higher than the estimated hazard ratio Defendants originally disclosed of 1.06, with the upper bound for that endpoint reaching as high as **1.82**—or 48% higher than the upper bound of 1.23 Defendants had disclosed pursuant to the manipulated post hoc analysis."

- "[For DD patients,] the upper bound for the MACE endpoint was **1.3**, or over 15% higher than the upper bound of 1.13 Defendants originally disclosed—and for the ACM endpoint, the prespecified sensitivity analysis showed an upper bound of **1.35**, which was also over 15% higher than the upper bound of 1.17 Defendants had presented under the manipulated post hoc analysis."

38.    As shown below, the FDA Briefing Document published on July 13, 2021 included these exact results from the Prespecified Sensitivity Analyses, as discussed in the Complaint.[60]

---

[59] Complaint, ¶ 228 (original emphasis removed; bold emphasis added).
[60] FDA Briefing Document, pp. 49, 52 (highlighting added).

Figure 9: MACE and its Components for Studies in the NDD Population (OT+7 Analysis)



| | Number of Events/ PY/ Rate | | HR [95% CI] |
|---|---|---|---|
| | Roxadustat (N = 2,386) | Placebo (N = 1,884) | |
| **MACE** | | | |
| All Studies | 277/ 3843/ 7.2 | 131/ 2332/ 5.6 | 1.38 [1.11, 1.70] |
| 060 | 40/ 1124/ 3.6 | 11/ 382/ 2.9 | 1.19 [0.60, 2.35] |
| 608 | 40/ 470/ 8.5 | 18/ 201/ 9.0 | 0.89 [0.50, 1.59] |
| 001 | 197/ 2249/ 8.8 | 102/ 1749/ 5.8 | 1.51 [1.19, 1.92] |
| **Myocardial Infarction** | | | |
| All Studies | 72/ 3869/ 1.9 | 37/ 2340/ 1.6 | 1.22 [0.81, 1.84] |
| 060 | 18/ 1133/ 1.6 | 4/ 382/ 1.0 | 1.49 [0.50, 4.46] |
| 608 | 11/ 473/ 2.3 | 3/ 201/ 1.5 | 1.41 [0.37, 5.44] |
| 001 | 43/ 2264/ 1.9 | 30/ 1757/ 1.7 | 1.16 [0.72, 1.85] |
| **Stroke** | | | |
| All Studies | 48/ 3888/ 1.2 | 21/ 2350/ 0.9 | 1.53 [0.91, 2.57] |
| 060 | 9/ 1138/ 0.8 | 2/ 383/ 0.5 | 1.88 [0.40, 8.82] |
| 608 | 6/ 477/ 1.3 | 3/ 202/ 1.5 | 0.83 [0.20, 3.41] |
| 001 | 33/ 2273/ 1.5 | 16/ 1765/ 0.9 | 1.65 [0.91, 3.01] |
| **All-cause Mortality** | | | |
| All Studies | 183/ 3914/ 4.7 | 85/ 2358/ 3.6 | 1.40 [1.08, 1.82] |
| 060 | 18/ 1146/ 1.6 | 6/ 383/ 1.6 | 0.82 [0.32, 2.14] |
| 608 | 24/ 480/ 5.0 | 14/ 202/ 6.9 | 0.72 [0.36, 1.42] |
| 001 | 141/ 2287/ 6.2 | 65/ 1773/ 3.7 | 1.68 [1.25, 2.26] |

Source: FDA analysis

← Favor roxadustat      Hazard Ratio      Favor ESA →

Figure 12: MACE and its Components for Studies in the DD Population (On-Study Analysis)

| | Number of Events/ PY/ FAIR | | HR [95% CI] |
|---|---|---|---|
| | Roxadustat (N = 1,940) | ESA (N = 1,940) | |
| **MACE** | | | |
| All Studies | 482/ 3898.9/ 12.4 | 451/ 4151.0/ 10.9 | 1.14 [1.00, 1.30] |
| 063 | 85/ 1004.5/ 8.5 | 82/ 1048.7/ 7.8 | 1.07 [0.79, 1.45] |
| 064 | 112/ 725.2/ 15.4 | 102/ 824.1/ 12.4 | 1.24 [0.94, 1.62] |
| 002 | 285/ 2169.2/ 13.1 | 267/ 2278.1/ 11.7 | 1.13 [0.95, 1.33] |
| **Myocardial Infarction** | | | |
| All Studies | 124/ 3917.5/ 3.2 | 115/ 4174.1/ 2.8 | 1.14 [0.88, 1.47] |
| 063 | 17/ 1010.7/ 1.7 | 14/ 1061.5/ 1.3 | 1.24 [0.61, 2.51] |
| 064 | 37/ 732.1/ 5.1 | 41/ 832.2/ 4.9 | 0.95 [0.61, 1.49] |
| 002 | 70/ 2174.7/ 3.2 | 60/ 2280.4/ 2.6 | 1.24 [0.88, 1.75] |
| **Stroke** | | | |
| All Studies | 58/ 3986.3/ 1.5 | 60/ 4235.6/ 1.4 | 1.04 [0.72, 1.50] |
| 063 | 11/ 1016.7/ 1.1 | 15/ 1061.4/ 1.4 | 0.74 [0.34, 1.61] |
| 064 | 13/ 752.3/ 1.7 | 8/ 860.0/ 0.9 | 2.01 [0.82, 4.92] |
| 002 | 34/ 2217.3/ 1.5 | 37/ 2314.2/ 1.6 | 0.98 [0.61, 1.56] |
| **All-Cause Mortality** | | | |
| All Studies | 413/ 4178.7/ 9.9 | 369/ 4396.3/ 8.4 | 1.17 [1.02, 1.35] |
| 063 | 74/ 1025.2/ 7.2 | 66/ 1075.7/ 6.1 | 1.19 [0.85, 1.66] |
| 064 | 92/ 767.5/ 12.0 | 72/ 874.8/ 8.2 | 1.43 [1.05, 1.96] |
| 002 | 247/ 2386.1/ 10.4 | 231/ 2445.8/ 9.4 | 1.09 [0.91, 1.31] |

Source: FDA analysis

← Favor roxadustat      Hazard Ratio      Favor ESA →

39.      The information in the FDA Briefing Document was also widely discussed by securities analysts.[61]  At least eight analysts published reports on July 13, 2021 discussing their observations regarding the FDA Briefing Document.[62]

40.      Moreover, securities analysts commented specifically on the Remaining Alleged Concealed Information, consistent with the finding that the Remaining Alleged Concealed Information was disclosed to market participants on July 13, 2021.  For example (see **Exhibit 4** for additional examples):

> (***BofA Securities, July 13, 2021***)  The FDA flagged safety risk of roxa with discordant safety analyses (primary analysis vs. FDA's sensitivity analysis), though the FDA caveated by flagging limitations of its sensitivity analysis, thus

---

[61] I note that, per the Coffman Report, "[analyst] reports serve[] the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors" (Coffman Report, ¶ 34).  The commentary from securities analysts is also consistent with the discussion published in public press following the release of the dates.  *See* Factiva; Bloomberg Law.

[62] "Roxa Adcom Briefing Docs: A few –ve's in FDA Sensitivity Analysis, But Inconclusive," BofA Securities, July 13, 2021 ("Roxa Adcom Briefing Docs: A few –ve's in FDA sensitivity analysis, but inconclusive… Overall, we view the briefing docs as neutral but no clear disqualification of approval in both NDD and DD."); "Roxa AdCom an Uphill Battle with Uncertain Outcome: Safety Concerns a Key Focus," Cowen, July 13, 2021 ("FDA released briefing documents for roxadustat's AdCom this week highlighting multiple key concerns that make the drug's future even more uncertain."); "Thoughts on the Roxa AdCom Briefing Documents," Goldman Sachs, July 13, 2021 ("This morning, the FDA published the briefing documents [] for the upcoming Advisory Committee meeting on Thursday, July 15th that will evaluate roxadustat for the treatment of anemia in patients with chronic kidney disease (CKD). Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE."); "Adcom Book Very Mixed, FDA Maybe Open for Some Form of Approval or Black Box," Jefferies, July 13, 2021 ("FDA Adcom documents appear very mixed and not clearly in support nor completely against approval."); "Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks," Raymond James, July 13, 2021 ("After a thorough review of FDA's briefing documents for roxadustat's Ad Com meeting this week, we think it is highly unlikely that the committee will be supportive of approval."); "Roxadustat AdCom Briefing Docs Raise Question of Addressing Safety with Titration or Additional Studies," Stifel, July 13, 2021 ("Roxadustat AdCom briefing documents released this morning pointed to several key questions, not surprisingly around cardiovascular safety, which forms the basis of the key voting questions to the panel—should Roxa be approved for CKD-related anemia in NDD and DD with discussion points being around whether risks can be addressed through modification of the treatment algorithm."); "FDA Finds Significant Risks in Roxa – NDD Questionable, Black Box Certain," SVB Leerink, July 13, 2021 ("This morning FDA released briefing documents for FGEN's roxadustat ahead of Thursday's cardio-renal advisory committee meeting.  The major controversies about the approval are (a) approval or not, (b) black box warning or not and (c) breadth of label including non-dialysis or not.  The briefing documents are important signals of the FDA's views on these controversies and the likely debate on them this week."); "No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat," William Blair, July 13, 2021 ("Before the markets opened on Tuesday, July 13, the FDA published draft questions, the agency briefing document, and FibroGen briefing document for the advisory committee meeting scheduled for Thursday, July 15.  We believe the briefing document does not materially change investor perception regarding the outcome of roxadustat's approval, and the full committee meeting will be required to gain additional insight into the probability of roxadustat's approval.").

we don't see documents as conclusive for how the panel will vote on NDD approval.[63]

(*Goldman Sachs, July 13, 2021*)  Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE…. [O]n safety, the FDA in its analysis of MACE in the non-dialysis dependent (NDD) population noted meaningful differences between the on treatment (OT) analysis and ascertainment window sensitivity analysis (i.e. OT+7), with the latter less favorable for roxa with the lower bound of the 95% CI exceeding 1.00 (HR: 1.38, 1.11-1.70) though the agency stated that higher placebo arm dropout rates confounded its assessment.  In its MACE analysis of the dialysis dependent (DD) population, the FDA similarly found that there was higher risk in its OT+7 analysis (HR: 1.14, 1.00-1.30) compared to the OT analysis though the difference was not [statistically significant].[64]

(*Raymond James, July 13, 2021*)  After a thorough review of FDA's briefing documents for roxadustat's Ad Com meeting this week, we think it is highly unlikely that the committee will be supportive of approval.  As expected, the FDA conducted its own statistical analyses of the safety data generated and roxadustat performed worse than placebo (non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD) on all key measures (all cause mortality, thrombosis, sepsis, seizures).  There was a specific emphasis on thrombosis events and exploratory analyses were conducted which showed higher rates of thrombotic events with higher rates of [hemoglobin] change.[65]

(*SVB Leerink, July 13, 2021*)  We view the FDA's documents as negative for potential FDA approval in the larger non-dialysis dependent (NDD) indication and at best neutral for approval in dialysis dependent (DD) chronic kidney disease (CKD) anemia.…  The agency found a higher hazard ratio (point estimates >1) for major adverse cardiovascular events (MACE) for roxa treatment vs. placebo for the NDD population and higher MACE risk for roxa vs ESA standard of care in the DD population as well (Exhibit 1 and 2).…  We believe that the AdCom may well suggest additional safety studies in NDD if they consider roxa approvable in that population at all.[66]

---

[63] "Roxa Adcom Briefing Docs: A few –ve's in FDA Sensitivity Analysis, But Inconclusive," BofA Securities, July 13, 2021.

[64] "Thoughts on the Roxa AdCom Briefing Documents," Goldman Sachs, July 13, 2021.

[65] "Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks," Raymond James, July 13, 2021 (emphasis removed).

[66] "FDA Finds Significant Risks in Roxa – NDD Questionable, Black Box Certain," SVB Leerink, July 13, 2021.

41.     In sum, as I demonstrate above, the results of the Prespecified Sensitivity Analyses that Plaintiffs claim revealed the "full extent of [the] fraud"[67] were publicly available on July 13, 2021.

**B.      There Is No Economic Evidence That the Remaining Alleged Concealed Information Impacted FibroGen's Stock Price**

42.     I demonstrated in the prior section that the Remaining Alleged Concealed Information was in fact disclosed on July 13, 2021 and not on July 15, 2021 as the Complaint claims.  I now turn to the question of whether FibroGen's stock price was impacted by the disclosure of this information on July 13, 2021, as would be expected in an efficient market if the information were new and value-relevant.  As I discuss in this section, there is no economic evidence that any disclosure of the Remaining Alleged Concealed Information impacted FibroGen's stock price on July 13, 2021, or on the subsequent trading day on July 14, 2021.

43.     As discussed in **Section VI**, an event study is a statistical tool that can be used to measure the impact of a specific news event on the price of a security, as measured by the change in the security price.  My event study regression model (also discussed in **Section VI**) finds that FibroGen's residual stock price movement on July 13, 2021—a decline of 2.23% (p-value = 0.42)—was not statistically significant.  In other words, my event study analysis does not support a finding that Company-specific information disclosed on July 13, 2021 impacted FibroGen's stock price. The price movement on that day is consistent with statistical noise.

44.     Likewise, Mr. Coffman's event study methodology also finds no statistical significance and thus does not support a finding that Company-specific information disclosed on July 13, 2021 impacted FibroGen's stock price.  According to that analysis, FibroGen's residual return on July 13, 2021 was -2.13% (p-value = 0.41).[68]  In Mr. Coffman's own language describing event studies, "the deviation from expected price movements" on July 13, 2021 is not "sufficiently large that simple random movement can be rejected as the cause."[69]  Likewise, there was no statistically significant residual return on July 14, 2021.[70]

---

[67] Complaint, ¶ 103.
[68] *See* COFFMAN_0003103; COFFMAN_0003047, Sheet "Reg."
[69] Coffman Report, ¶ 48.
[70] Plaintiffs and Mr. Coffman both claim that the market for FibroGen's stock was efficient during the Proposed Class Period (Complaint, ¶ 259; Coffman Report, ¶ 25).  As discussed in **Section V**, in an efficient market new

45.    As part of my analysis, I also reviewed information disclosed, analyst reports, and public press published on July 13, 2021 and July 14, 2021 and did not identify any Company-specific information other than information discussing the FDA Briefing Document, the FibroGen Briefing Document, and the upcoming AdCom meeting and vote.

46.    Consistent with the lack of a statistically significant stock price decline, several securities analysts characterized the contents of the briefing documents as being generally consistent with prior expectations.  For example:

(*Goldman Sachs, July 13, 2021*)  Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE.[71]

(*Raymond James, July 13, 2021*)  As expected, the FDA conducted its own statistical analyses of the safety data generated and roxadustat performed worse than placebo (non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD) on all key measures (all cause mortality, thrombosis, sepsis, seizures)….  As expected, roxa's cardiovascular (MACE) safety profile was center focus for the FDA.[72]

(*William Blair, July 13, 2021*)  Overall, we believe that while the document highlights several areas of concern, none of which were entirely surprising, investors will likely have to wait for additional clarity during the committee meeting on Thursday.  In particular, the FDA requested the committee members to vote, separately, on whether roxadustat should be approved in non-dialysis-dependent and dialysis-dependent anemia due to chronic kidney disease.  This situation opens the possibility that roxadustat might receive approval in neither, either, or both indications.  On Thursday, we expect the panelists to discuss and

---

information released to the market is rapidly reflected in the security price, generally within a trading day if not within minutes or hours.  This is consistent with the design of the event study that Mr. Coffman uses to test for market efficiency.  His regression model uses daily returns, meaning that it is designed to test whether information is incorporated in the stock price within a single trading day (Coffman Report, ¶ 50).  *See also* Coffman Deposition, pp. 44, 46 ("[I]n terms of how I tested for efficiency, I used one day of the event windows that I tested.…  I used a single-day event window for purposes of my event study in this matter.").  To the extent FibroGen stock failed to rapidly react on July 13, 2021, as I would expect if the market for FibroGen's stock was efficient, I also considered the return on July 14, 2021.  The residual return on July 14, 2021 is not statistically significant according to both my event study (a residual return of 2.29% with a p-value of 0.41) and Mr. Coffman's event study (a residual return of 2.58% with a p-value of 0.32) (*See* COFFMAN_0003103; COFFMAN_0003047, Sheet "Reg").  Mr. Coffman further acknowledged in his deposition that there was no statistically significant stock price movement on July 14, 2021, and therefore the residual return on July 14, 2021 was statistically indistinguishable from zero (Coffman Deposition, p. 81).

[71] "Thoughts on the Roxa AdCom Briefing Documents," Goldman Sachs, July 13, 2021.

[72] "Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks," Raymond James, July 13, 2021.

rationalize the benefit/risk symmetry, which could inform the Street about the prospect of approval and roxadustat's potential role in the real-world setting.[73]

(*Cowen, July 14, 2021*)  Neither consultant was particularly surprised by the contents of the briefing documents but agree that the FDA's line of inquiry appears to offer adequate cover to the panelists to recommend approval in both segments despite the concerns mentioned.[74]

### C.    In an Efficient Market, the Observed Price Decline on July 16, 2021 Could Not Have Occurred as a Result of the Disclosure of the Remaining Alleged Concealed Information

47.    As discussed in the preceding section, neither my event study nor Mr. Coffman's event study finds a statistically significant price reaction following the disclosure of the Remaining Alleged Concealed Information.  However, my event study does find a statistically significant price decline on July 16, 2021—the trading day on which I would expect to observe any stock price impact of the July 15, 2021 AdCom meeting and AdCom's recommendations regarding Roxadustat.[75]

48.    As discussed in this section, the residual price decline on July 16, 2021 cannot be due to the disclosure of the Remaining Alleged Concealed Information if, as Plaintiffs assert and Mr. Coffman concludes, FibroGen's stock traded in an efficient market during the Proposed Class Period.  As discussed in **Section V**, stock prices rapidly incorporate value-relevant information in an efficient market.  Moreover, if a particular piece of information (e.g., the results of the Prespecified Sensitivity Analyses) is already part of the market's information set, and if the market is efficient, subsequent repetition of that information would not cause the security price to react further to the re-release of this information.

49.    In his own description of an efficient market, Mr. Coffman states:

---

[73] "No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat," William Blair, July 13, 2021.

[74] "Roxadustat KOL Webinar: Approval Likely But Tough Commercial Headwinds Await," Cowen, July 14, 2021.

[75] FibroGen stock trading was halted on July 15, 2021 from 6:55:01 AM ET to 6:55:00 PM ET due to "News pending."  *See* "NYSE Trading Halts," NYSE, available at https://www.nyse.com/trade-halt-historical.  The return on July 16, 2021 is calculated based on the closing price on July 14, 2021 given the trading halt on July 15, 2021. The residual return on July 16, 2021 was -44.22% and statistically significant.  Mr. Coffman's event study analysis does not extend beyond July 14, 2021 according to the materials he produced with his report.  *See* COFFMAN_0003103; COFFMAN_0003047, Sheet "Reg."

> "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.[76]

50.     As demonstrated in **Section VII.A**, the results of the Prespecified Sensitivity Analyses that Plaintiffs claim revealed the full extent of the Remaining Alleged Concealed Information were publicly disclosed at approximately market open on July 13, 2021. In an efficient market, FibroGen's stock price would have reacted to and rapidly incorporated that information. In an efficient market, FibroGen's stock price would not have reacted on July 16, 2021 to information that was disclosed no fewer than two days earlier (i.e., the morning of July 13, 2021). In fact, if the price decline observed on July 16, 2021 was a reaction to the release of information disclosed on July 13, 2021, then the market for FibroGen's stock could not have been efficient.

51.     Consistent with the discussion in **Section VII.A** showing that the results of the Prespecified Sensitivity Analyses that Plaintiffs allege revealed the full extent of the Remaining Alleged Concealed Information were already disclosed on July 13, 2021, a review of information about the July 15, 2021 AdCom meeting does not identify new information regarding the Prespecified Sensitivity Analyses. Instead, the new information that was disclosed on July 15, 2021 included the outcome of the AdCom's vote and recommendation, which I understand is not corrective information. Although not corrective, the outcome of the vote could be itself value-relevant because it would presumably be expected to factor into the FDA's approval decision. I understand this outcome was uncertain prior to the AdCom's vote, even with the knowledge of the results of the Prespecified Sensitivity Analyses, as discussed by analysts quoted in **Section VII.A** and **Exhibit 4**.

52.     Whereas FibroGen's July 16, 2021 stock price decline cannot be attributed to reiteration of the results of the Prespecified Sensitivity Analyses that Plaintiffs allege were corrective, it can be due to the resolution of uncertainty as to how the AdCom would ultimately vote that remained following the July 13, 2021 publication of the FDA Briefing Document. Securities analysts discussed uncertainty prior to the AdCom meeting. For example, commentary on July 13, 2021 and July 14, 2021 included:

---

[76] Coffman Report, ¶ 18.

(**BofA Securities, July 13, 2021**)  Overall, we view the briefing docs as neutral but no clear disqualification of approval in both NDD and DD.  We maintain our Buy rating and we view favorable risk/reward into the Adcom/FDA approval events.[77]

(**Cowen, July 13, 2021**)  FDA released briefing documents for roxadustat's AdCom this week highlighting multiple key concerns that make the drug's future even more uncertain.  Key questions will center on higher risk of thromboembolic events, sepsis and seizures vs ESAs, lack of clarity on dosing flexibility, and insufficient data in ESA hyporesponders.  Even if approved, roxa's label is likely to heavily curtail uptake.[78]

(**Goldman Sachs, July 13, 2021**)  Given the multiple concerns and uncertainties raised in the briefing docs, we maintain our Neutral rating and $28 12-month [price target].[79]

(**Jefferies, July 13, 2021**)  FDA Adcom documents appear very mixed and not clearly in support nor completely against approval.  The FDA reviewer raises concerns on some of the [cardiovascular] risk data in both DD and NDD, and thus benefit/risk and ultimately asks the panel to vote if they would approve in each of DD and NDD.  Maintain HOLD.[80]

(**William Blair, July 13, 2021**)  We believe the briefing document does not materially change investor perception regarding the outcome of roxadustat's approval, and the full committee meeting will be required to gain additional insight into the probability of roxadustat's approval.[81]

(**H.C. Wainwright, July 14, 2021**)  In all, we view the FDA as tilted to the negative side and the Adcom (July 15) will likely have a great impact on the FDA's final decision on roxa.  We maintain our Neutral rating with no [price target], given the uncertainties around roxa Adcom/approval, potential label and commercial launch.[82]

---

[77] "Roxa Adcom Briefing Docs: A few –ve's in FDA Sensitivity Analysis, But Inconclusive," BofA Securities, July 13, 2021.

[78] "Roxa AdCom an Uphill Battle with Uncertain Outcome: Safety Concerns a Key Focus," Cowen, July 13, 2021.

[79] "Thoughts on the Roxa AdCom Briefing Documents," Goldman Sachs, July 13, 2021.

[80] "Adcom Book Very Mixed, FDA Maybe Open for Some Form of Approval or Black Box," Jefferies, July 13, 2021.

[81] "No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat," William Blair, July 13, 2021.

[82] "Roxa Safety Profile Concerns FDA; Adcom Opinions Will Be Critical," H.C. Wainwright, July 14, 2021.

53.     Moreover, a review of securities analyst commentary on July 15, 2021 and July 16, 2021 reveals discussion consistent with the materialization of the known risk that Roxadustat might not be recommended for approval.  For example:

> (*Raymond James, July 15, 2021*)  Our long-standing view that roxadustat's risks outweigh its benefits was confirmed at today's Advisory Committee (Ad Com) meeting.[83]

> (*SVB Leerink, July 15, 2021*)  The panel's decisive vote is in line with our observations after reviewing the briefing documents released earlier this week but still suggests a worst-case outcome for the application.[84]

54.     While certain analysts discussed being negatively surprised regarding the outcome of the AdCom vote, they pointed to previously disclosed information, rather than new information disclosed for the first time during the proceedings, as being the AdCom's focus.  For example:

> (*Cowen, July 15, 2021*)  We are surprised the committee voted against approval in both the non-dialysis-dependent (NDD) and dialysis-dependent (DD) segments, though the panel's discussion of roxadustat's safety profile relative to ESAs raised several key points that we think support the decision.  The panel focused on multiple safety signals across both segments that suggest patients on roxadustat have increased risk of seizures, sepsis, and thromboembolic events relative to ESAs or placebo (see our note on the briefing documents [on July 13, 2021] here and from our [key opinion leader] [("KOL")] webinar [on July 14, 2021] here).[85]

55.     In other words, while the price of a company's stock traded in an efficient market would not react (on July 16, 2021 in FibroGen's case) to the repetition of the information that had already been released previously (on July 13, 2021), the price could react to the realization of a then already known risk that the drug might not be recommended for approval.  Given the uncertainty regarding the AdCom's assessment of the known safety and efficacy profile of Roxadustat, prior to the AdCom's vote, an efficient market would have incorporated some probability that the AdCom would not recommend its approval, but likely not the certainty of non-recommendation.

---

[83] "As We Suspected, Ad Com Panel Votes Against Approval of Roxadustat in Both NDD & DD Settings," Raymond James, July 15, 2021.

[84] "Roxa Fails in a Farrago of Mortality, Morbidity and Mis-Analysis; Restructure?," SVB Leerink, July 15, 2021.

[85] "AdCom Rejects Roxa in Both CKD Anemia Segments – Worst Case Outcome," Cowen, July 15, 2021.

56.    Once the AdCom non-recommendation vote took place on July 15, 2021, it would not be surprising for FibroGen's stock price to have declined in response to the resolution of this uncertainty.[86]  However, that price decline would not be a result of the disclosure of the results of the Prespecified Sensitivity Analyses, because publicly available information demonstrates that those results were already disclosed on July 13, 2021.[87]

Executed this 12th day of May, 2023

_____
Paul Zurek, Ph.D.

---

[86] There is an important economic distinction between the market's reaction to the public disclosure of a risk (i.e., the reaction to a disclosure of the possibility that a negative outcome *could* occur, which I understand is what Plaintiffs allege should have effectively been disclosed by FibroGen), and the market's reaction to the materialization of that risk (i.e., the reaction to learning that a negative outcome *did* occur, such as the AdCom vote in this case).  When a risk materializes, a company's stock price will generally decline even if that risk was fully disclosed to market participants; that is, the price will decline even if there was no prior inflation.

[87] This finding has implications for the calculation of damages attributable to Plaintiffs' theory of liability.  As an economic matter, a damages methodology would need to measure damages stemming only from the allegedly concealed information as opposed to from the consequences of already disclosed facts or the materialization of known risks.  Given that (1) the results of the Prespecified Sensitivity Analyses (the Remaining Alleged Concealed Information) were disclosed on July 13, 2021 and given that I have found no disclosures of the results of the Prespecified Sensitivity Analyses on other dates between April 6, 2021 and July 13, 2021 (see **Section VII.A**), and that (2) there was no statistically significant residual return following the July 13, 2021 disclosure using either my or Mr. Coffman's event study model (see **Section VII.B**), one cannot simply use an event study to measure the alleged inflation stemming from the Remaining Alleged Concealed Information.  Moreover, because FibroGen's July 16, 2021 stock price decline cannot be attributed to disclosure of the results of the Prespecified Sensitivity Analyses, it cannot be used as a measure of either alleged inflation removed on July 16, 2021 or alleged inflation earlier in the Proposed Class Period.  Use of the statistically significant decline on July 16, 2021 to measure alleged inflation would not be consistent with the liability theory that the Remaining Alleged Concealed Information after the April 6, 2021 alleged corrective disclosure comprised the results of the Prespecified Sensitivity Analyses.

**Appendix A**

**PAUL ZUREK, Ph.D.**
**Vice President**

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

2002 – 2008 **The Wharton School, University of Pennsylvania**      Philadelphia, Pennsylvania
*Ph.D. and M.A. in Finance*
Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

1998 – 2002 **The Wharton School, University of Pennsylvania**      Philadelphia, Pennsylvania
*B.S. in Economics, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

7/08 – Present **Cornerstone Research, Inc.**                New York and San Francisco
*Vice President*
Experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations.  Design and oversee development of quantitative analysis models. Provide testimony and presentation of findings to regulators and arbitration panels.

3/23 – 6/23 **Stanford University Law School**                Palo Alto, California
Lecturer in Law

6/10 – 03/11 **United Poles Federal Credit Union**                Perth Amboy, New Jersey
*Director and ALCO Committee Member*
Member of the Board of Directors.  Advised on issues of strategy and risk.

9/02 – 12/07 **Kimberton International Associates – The Banking Group**   Kimberton, Pennsylvania
*Senior Consultant*
Designed executive education programs for banking and financial services.  Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management.  Worked with clients in the United States, Europe and Latin America.

5/01 – 8/01 **Credit Suisse First Boston**                San Francisco, California
*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages.  Performed financial statement, precedent transaction and comparable company analysis.  Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

**Appendix A**

---

**TEACHING EXPERIENCE**

| | |
|---|---|
| Stanford Law School<br>*Lecturer, teaching Corporate Finance* | 2023 |
| Wharton / Ping An Bank Executive Education Program<br>*Taught global economics and credit risk modeling in Beijing, China.* | 2015 |
| Wharton China Asset Management Company Executive Development Program<br>*Taught global financial markets and market microstructure.* | 2011 |
| Risk Management Association and Wharton Advanced Risk Management Program<br>*Instructor (2007–2009) and Academic Co-Director (2009)* | 2007 – 2009 |
| Wharton Hana Financial Hana Leaders Academy Global Course<br>*Instructor in Risk Management* | 2008 |
| Merrill Lynch Investment Banking Institute<br>*Teaching Assistant* | 2006, 2007 |
| Investment Management, Derivative Securities, International Banking,<br>Venture Capital, Corporate Finance, Macroeconomics, Microeconomics<br>*Teaching Assistant* | 2002 – 2008 |

**RESEARCH AND PUBLICATIONS**

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.

"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.

The Guide to Damages in International Arbitration. Chapter 16:  Market Approach or Comparables (with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November 2018.

Commodities:  Markets, Performance, Strategies. Chapter 14:  Commodity Mutual Funds (with Gustavo Camilo and Janko Cizel), Oxford University Press 2018.

"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos), Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

**HONORS AND AWARDS**

| | |
|---|---|
| Outstanding Doctoral Student Paper Award at the Southern Finance Association<br>Annual Meeting, Western Finance Association Doctoral Student Travel Grant | 2008 |
| Weiss Center for International Financial Research Summer Fellowship | 2007 |
| Dean's Fellowship for Distinguished Merit | 2002 |
| Class of 1939 Fellowship | 2002 |

**Appendix A**

---

**INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS**

| | |
|---|---|
| "Securities Litigation Trends in 2022: Notable Developments and Challenges" webcast, The Knowledge Group | 2022 |
| "The Rise of Special Purpose Acquisition Companies (SPACs): How to Minimize Securities Litigation Risks" webcast, The Knowledge Group | 2021 |
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape:  Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019:  Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

**CONFERENCE PARTICIPATION**

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

\* Paper Discussant or Presenter

**Appendix A**

OTHER ACTIVITIES

Refereed for the Journal of Economic Dynamics and Control and Finance Research Letters. Fellow at the Wharton Financial Institutions Center.

TESTIMONY AND EXPERT REPORTS

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation, arbitration testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC)), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al. (3:18-cv-104), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al. (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231), expert report and deposition, April 2019.

In Re: Novo Nordisk Securities Litigation (3:17-cv-00209), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579), expert report and deposition, June 2019.

Margaret Tinsley, et al. v. Michael Faust, et al. (2:15-cv-00185), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000), expert declaration, February 2020.

**Appendix A**

Matt Karinski v. Stamps.com, Inc. et al. (2:19-cv-01828), expert report, August 2020, deposition, October 2020.

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al. (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (3:19-cv-00407), expert report, September 2021, deposition June 2022.

Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated v. Umpqua Bank (3:20-cv-5905-RS), expert report, March 2022, deposition, April 2022.

Lewis Stein, Individually and on Behalf of All Others Similarly Situated v. U.S. Xpress Enterprises, Inc. et al (1:19-cv-00098), expert report, October 2022, deposition, November 2022.

In Re Maxar Technologies, Inc. Shareholder Litigation (19CV357070, Superior Court of the State of California, County of Santa Clara), expert report, December 2022.

In Re Jernigan Capital, Inc. Securities Litigation (1:20-cv-09575), expert report, February 2023, deposition, March 2023.

**Appendix B**

# Documents Considered by Paul Zurek, Ph.D.

**Academic Articles**

- Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276

- Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3 (2002): 415–437

- Chordia, Tarun, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2 (2005): 271–292

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617

- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ:  The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39

- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, no. 2 (1984): 223–252

**Analyst Reports**

- "Roxa Update:  NT Credibility Hit, but Upside Likely on Probable Approval (Our View)," BofA Securities, April 6, 2021

- "The Roxa Saga Continues:  This Episode We Find Out the MACE Data We Were Presented Aren't Real," Raymond James, April 6, 2021

- "Updated Statistical Analysis Complicates Roxadustat's FDA Review," Cowen, April 7, 2021

- "Further Regulatory Complications for Roxa; PT to $32," Goldman Sachs, April 7, 2021

**Appendix B**

- "Latest Disclosure of MACE Analyses Disappointing; Downgrade to Neutral," H.C. Wainwright, April 7, 2021

- "More Uncertainty in Line W/Cautious View – Thinking about Floor Levels – Hold," Jefferies, April 7, 2021

- "Higher Risk Ahead of AdCom Following Safety Data Update; Downgrade to Neutral/$29 PT," Mizuho, April 7, 2021

- "A Self-Inflicted Wound in Roxa's Regulatory Saga; TP to $55," Stifel, April 7, 2021

- "Mis-Presented or Mis-Represented?  Roxa More Risky, Less Valuable; PT to $56," SVB Leerink, April 7, 2021

- "Inconsistent Data Analysis Methodology Further Clouds Roxa's Clinical Profile; AdCom Now Tentatively Scheduled for July 15," William Blair, April 7, 2021

- "1Q21 Recap:  All Eyes on the AdCom," Goldman Sachs, May 10, 2021

- "US Adcom Uncertainty in July, Though Astellas Guiding EU Approval and Revenue," Jefferies, May 10, 2021

- "Solid 1Q for Roxa in China. US Still a Risk; Few Comments on AdCom Were Not Very Reassuring," Raymond James, May 10, 2021

- "1Q21:  Pulling Out Roxa Benefits for AdCom Under Comparable Safety to EPO–China Should Serve as Indication," Stifel, May 10, 2021

- "1Q EPS Takeaways from Our Biotech Coverage: FGEN, CARA," BofA Securities, May 11, 2021

- "Q1 Roxadustat Sales Solid but All Eyes on July 15 AdCom – New PT $21 (-$23)," Cowen, May 11, 2021

- "Quick Thoughts on Upcoming Roxa Adcom and ex-US Market; 1Q21 Recap," H.C. Wainwright, May 11, 2021

- "Roxadustat China Launch Progressing Impressively, but Focus Is on July 15 AdCom," Mizuho, May 11, 2021

- "Roxa Doing Well in China and Signals from US and EU Approvals are Encouraging," SVB Leerink, May 11, 2021

- "China Market Remains a Bright Spot for Roxadustat as Investors Await Upcoming Advisory Committee Meeting on July 15," William Blair, May 11, 2021

**Appendix B**

- "Vegas Virtual:  What Caught Our Attention, Day 3 of BofA Healthcare Conference," BofA Securities, May 13, 2021

- "MORF Phase II Planning, FGEN EU Decision Soon, MTCR Data YE – HC Conf Tidbits," Jefferies, June 4, 2021

- "GS Annual Global Healthcare Conference – Key Takeaways," Goldman Sachs, June 10, 2021

- "Needs to Be on Your Radar -> Roxa CHMP Opinion May Be Released Next Week," Mizuho, June 18, 2021

- "Roxa Is on CHMP Meeting Agenda -> Opinion to be Released Friday," Mizuho, June 21, 2021

- "William Blair Biopharma Catalyst Watch Third Quarter 2021," William Blair, June 24, 2021

- "Positive CHMP Recommendation for Roxa Marks Third Major Approval; FDA Next," BofA Securities, June 25, 2021

- "CHMP Recommends Broad EU Approval for Roxadustat in DD & NDD CKD Anemia," Cowen, June 25, 2021

- "EU Positive CHMP Opinion on Roxadustat; Awaiting US Adcom on July 15," H.C. Wainwright, June 25, 2021

- "Introducing PRS-220; New Initiative in IPF Gets a Cash Jump Start," H.C. Wainwright, June 25, 2021

- "EU Approval is Welcome Positive…Thoughts on FDA Scenarios," Jefferies, June 25, 2021

- "Positive CHMP Opinion for Roxa in DD/NDD.  Next Catalyst:  AdCom Briefing Doc," Mizuho, June 25, 2021

- "Positive CHMP Opinion for Evrenzo (Roxadustat) in Broad CKD Population Sends Positive Signals for a US Outcome," Stifel, June 25, 2021

- "Positive Opinion by the EMA a Step in the Right Direction, Though Differing Viewpoints by Regulators Complicate Read-through," William Blair, June 25, 2021

- "KOL Discussion Suggests Roxa Will Find a Path Forward," Stifel, July 1, 2021

- "Previewing Roxa's 7/15 Adcom:  NDD Approval Vote Remains Key Outcome," BofA Securities, July 11, 2021

- "Thoughts on Upside/Downside Scenarios into Adcom," Jefferies, July 12, 2021

**Appendix B**

- "Roxa Adcom Briefing Docs:  A Few -ve's in FDA Sensitivity Analysis, But Inconclusive," BofA Securities, July 13, 2021

- "Roxa Adcom an Uphill Battle with Uncertain Outcome:  Safety Concerns a Key Focus," Cowen, July 13, 2021

- "Thoughts on the Roxa AdCom Briefing Documents," Goldman Sachs, July 13, 2021

- "Adcom Book Very Mixed, FDA Maybe Open for Some Form of Approval or Black Box," Jefferies, July 13, 2021

- "Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks," Raymond James, July 13, 2021

- "Roxadustat AdCom Briefing Docs Raise Question of Addressing Safety with Titration or Additional Studies," Stifel, July 13, 2021

- "FDA Finds Significant Risks in Roxa – NDD Questionable, Black Box Certain," SVB Leerink, July 13, 2021

- "No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat," William Blair, July 13, 2021

- "Roxadustat KOL Webinar:  Approval Likely But Tough Commercial Headwinds Await," Cowen, July 14, 2021

- "Roxa Safety Profile Concerns FDA; Adcom Opinions Will Be Critical," H.C. Wainwright, July 14, 2021

- "Downgrade to Neutral Post -ve Adcom; Ex-US Roxa Approvals + Pamrev Underpin PO," BofA Securities, July 15, 2021

- "Adcom Rejects Roxa in Both CKD Anemia Segments – Worst Case Outcome," Cowen, July 15, 2021

- "Roxa Hits the Rocks - New PT $16 (-$5)," Cowen, July 15, 2021

- "Panel Stings Roxa-NNE…Though Its Approval in EU and China and Japan…," Jefferies, July 15, 2021

- "Unclear So Far, but There's a Small Chance for NDD Approval W/Black Box," Jefferies, July 15, 2021

- "As We Suspected, Ad Com Panel Votes Against Approval of Roxadustat in Both NDD & DD Settings," Raymond James, July 15, 2021

- "Roxa Faced Stiff Scrutiny in Negative AdCom, Likely Delaying Approval; Downgrade to Hold," Stifel, July 15, 2021

**Appendix B**

- "Roxa Fails in a Farrago of Mortality, Morbidity and Mis-Analysis; Restructure?," SVB Leerink, July 15, 2021

- "Advisory Committee Votes against Roxadustat Approval; Lower PT to $24," Goldman Sachs, July 16, 2021

- "Roxa Adcom Overwhelmingly Negative; US Approval Unlikely, in Our View," H.C. Wainwright, July 16, 2021

- "Lowering PT from $32 to $18 on Negative AdCom Vote in Approval of Roxa in DD/NDD," Mizuho, July 16, 2021

- "Lowering PT to $35, Cutting Roxa in US to Zero; Restructuring Expenses," SVB Leerink, July 16, 2021

- "Negative Votes Cloud Roxadustat's Future in the United States, Though Its Future Might Hinge on ESA Hyporesponsive Population," William Blair, July 16, 2021

- "We View Out-Licensing of the Recombinant Collagen Platform as Prudent, Though Commercial Potential Is Incremental," William Blair, July 19, 2021

**Data**

- Bloomberg Law

- Center for Research in Security Prices (CRSP)

- Factiva

- Refinitiv

- Tick Data

**Depositions**

- Deposition of Chad Coffman, CFA, dated April 4, 2023

**Expert Reports**

- Expert Report of Chad Coffman, CFA dated January 27, 2023, including all documents cited therein and backup materials

**Appendix B**

**FDA Documents**

- "FDA Briefing Document – Cardiovascular and Renal Drugs Advisory Committee Meeting July 15, 2021," July 13, 2021

- "FibroGen, Roxadustat, Cardiovascular and Renal Drugs Advisory Committee, Meeting Date: 15 July 2021, Advisory Committee Briefing Materials," July 13, 2021

- Documents published on fda.gov

**Legal Documents and Pleadings**

- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

- [Corrected] Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC, November 19, 2021

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)

- Lead Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC, January 27, 2023

- Order Denying Defendants' Motion to Dismiss, *In re FibroGen, Inc. Securities Litigation*, Case No. 3:21-cv-02623-EMC, July 15, 2022

**Produced Documents**

- Coffman Report Exhibits, COFFMAN_0003047

- Returns and Event Study Results, COFFMAN_0003103

**Public Press**

- "FibroGen Provides Additional Information on Roxadustat," FibroGen, April 6, 2021

- "FDA Releases Briefing Documents on FibroGen's Roxadustat Tablets," Bloomberg, July 13, 2021

- "FibroGen Announces Outcome of FDA Advisory Committee Review of Roxadustat for Treatment of Anemia of Chronic Kidney Disease," FibroGen, July 15, 2021

**Appendix B**

- Articles obtained from Bloomberg Law and Factiva

**Textbooks**

- Berk, Jonathan, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed., Pearson Education Limited, 2019

- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017

- Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 3rd ed., The National Academies Press, 2011

- Malkiel, Burton G., "Efficient Market Hypothesis," in *Finance*, John Eatwell, Murray Milgate, and Peter Newman (eds.), Palgrave Macmillan, 1989

- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed., McGraw-Hill/Irwin, 2005

**Websites**

- "NYSE Trading Halts," NYSE, available at https://www.nyse.com/trade-halt-historical

- SAC Tracker (FDAadcomm), "FDA posts meeting materials ahead of Thursday's advisory committee review of FibroGen's #roxadustat $FGEN," Twitter, July 13, 2021 9:31 AM ET

**All documents cited and referenced in this report and exhibits.**

Exhibit 1

# FibroGen, Inc.
# Closing Stock Price and Volume
## 9/21/18 – 10/13/21



Source:  CRSP; Complaint; "NYSE Trading Halts," NYSE, https://www.nyse.com/trade-halt-historical

Note:  FibroGen stock trading was halted on 7/15/21 from 6:55 AM to 6:55 PM ET.

**Exhibit 2**

# FibroGen, Inc.
# Regression Estimation Results
## Dependent Variable: FibroGen Returns

| | Estimation Period: 1/20/21 – 7/12/21[1] | | Estimation Period: 7/13/20 – 7/12/21[2] | |
|---|---|---|---|---|
| | **Coefficient** | **p-value[3]** | **Coefficient** | **p-value[3]** |
| Market Index[4] | -0.375 | 0.360 | 0.021 | 0.927 |
| Nasdaq Biotechnology Index[5] | 1.314 | 0.000 ** | 1.072 | 0.000 ** |
| Intercept | 0.003 | 0.287 | 0.001 | 0.450 |
| | | | | |
| Observations | 111 | | 230 | |
| Adjusted R-Squared | 0.235 | | 0.286 | |
| Standard Error | 0.028 | | 0.025 | |

Source:  CRSP; Refinitiv; Complaint

Note:
[1]  The two-factor regression model with market and industry indices is estimated for 7/13/21 using the 120 trading days ending on July 12, 2021 (i.e., 1/20/21 – 7/12/21), excluding the impact dates of any alleged misrepresentations and corrective disclosures as alleged in the Complaint.
[2]  The two-factor regression model with market and industry indices is estimated for 7/13/21 using the 252 trading days ending on July 12, 2021 (i.e., 7/13/20 – 7/12/21), excluding the impact dates of any alleged misrepresentations and corrective disclosures as alleged in the Complaint.
[3]  p-values marked with the asterisks ** and * denote statistical significance at the 1% and 5% level (corresponding to using the 99% and 95% confidence interval), respectively, using a two-tailed test.
[4]  Market Index represents the returns on the CRSP value-weighted NYSE/AMEX/Nasdaq/ARCA Market Index.
[5]  Nasdaq Biotechnology Index represents the returns on the Nasdaq Biotechnology Total Return Index.

**Exhibit 3**

# FibroGen, Inc.
# Summary of Stock Price Movements[1]
## 7/12/21 – 7/16/21

| Date | Price | |
|------|-------|---|
| 7/12/21 | $25.39 | Market Close |
| 7/13/21 | $24.30 | Market Open |
| 7/13/21 | $24.59 | Market Close |
| 7/14/21 | $24.65 | Market Open |
| 7/14/21 | $24.84 | Market Close |
| 7/15/21 | $25.03 | Last Traded Price Before Trading Halt |
| 7/15/21 | $17.00 | First Traded Price After Trading Resumed |
| 7/16/21 | $15.07 | Market Open |
| 7/16/21 | $14.35 | Market Close |

Source:  CRSP; Tick Data; Complaint; "NYSE Trading Halts," NYSE, https://www.nyse.com/trade-halt-historical

Note:
[1]  The closing price is obtained from CRSP.  The opening price represents the volume weighted average price at the second interval for the first trades at or after 9:30:00 AM ET.  FibroGen stock trading was halted on July 15, 2021 from 6:55:01 AM to 6:55:00 PM ET.  The last trades and respective prices before the trading halt on 7/15/21 were at 6:40:08 AM ET.  The first trades and respective prices after the trading halt on 7/15/21 were at 6:55:00 PM ET.  Prices around the trading halt are the volume weighted average price at each second interval.

**Exhibit 4**

# FibroGen, Inc.
# Analyst Reports Following the Publication of the FDA Briefing Document
## Sample Commentary Related to the Prespecified Sensitivity Analyses
## 7/13/21 – 7/14/21

| Date | Contributor | Analyst Report Excerpt[1] |
|---|---|---|
| 7/13/21 | BofA Securities | On key regulatory considerations: 1) NDD approvability... **The FDA flagged safety risk of roxa with discordant safety analyses (primary analysis vs. FDA's sensitivity analysis), though the FDA caveated by flagging limitations of its sensitivity analysis**, thus we don't see documents as conclusive for how the panel will vote on NDD approval; 2) DD approvability – the FDA framed roxa's safety in DD pts as neutral based on the primary analysis **whereas the FDA's sensitivity analysis did not favor roxa**, opening likely panel discussion around whether thrombotic safety (MACE component) is approvability issue or something that can be managed through modified (unproven) dosing changes; overall – DD commentary was largely inconclusive on approvability risk. |
| 7/13/21 | Cowen | Our Take: Briefing Docs Highlight FDA's Concerns About Roxa's Safety And Incompletely Characterized Profile In ESA Hyporesponders. <br><br> As expected, briefing documents for roxadustat's cardiorenal AdCom hearing this week are fairly ominous and reiterate the agency's anticipated focus on the drug's safety profile relative to ESAs…. Many parts of the briefing documents were anticipated, but a few key elements are new/more concerning, adding even more uncertainty to the outcome of the panel. <br><br> Overall, we expect the discussion will focus on four key points: <br> 1. Safety in the non-dialysis setting <br>    **a. MACE analysis looks approvable in the dialysis setting, but in NDD OT+7 sensitivity analysis showed 277 MACE events in the roxadustat arm vs 131 on placebo (HR of 1.38)** <br>    b. Key safety concerns include 5.4-fold higher risk of seizures, higher pulmonary edema, and sepsis <br> 2. Lack of clarity on lower starting doses/titration schemes in terms of safety/efficacy <br> 3. Higher risk of thromboembolic risks vs ESAs <br> 4. Lack of adequate data supporting efficacy in ESA hyporesponsive patients. |
| 7/13/21 | Goldman Sachs | Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE.…[O]n safety, the FDA in its analysis of MACE in the non-dialysis dependent (NDD) population noted meaningful differences between the on treatment (OT) analysis and **ascertainment window sensitivity analysis (i.e. OT+7), with the latter less favorable for roxa** with the lower bound of the 95% CI exceeding 1.00 (HR: 1.38, 1.11-1.70) though the agency stated that higher placebo arm dropout rates confounded its assessment. In its MACE analysis of the dialysis dependent (DD) population, the FDA similarly found that there was higher risk in its OT+7 analysis (HR: 1.14, 1.00-1.30) compared to the OT analysis though the difference was not stat sig. |

**Exhibit 4**

# FibroGen, Inc.
## Analyst Reports Following the Publication of the FDA Briefing Document
Sample Commentary Related to the Prespecified Sensitivity Analyses
7/13/21 – 7/14/21

| Date | Contributor | Analyst Report Excerpt[1] |
|---|---|---|
| 7/13/21 | Jefferies | Overall we maintain our HOLD as there are too many risks and scenarios that preclude an obvious win. We think documents read mixed with a view the drug may offer benefits but states the "benefits are difficult to calculate" (they cite only ~10% benefit on reduction of tran[s]fusions); then the comments suggest CV data is murky and difficult to interpret and inconclusive but with some analyses not favoring roxa.<br><br>FDA commentary shows they have concerns: (1) they state roxa efficacy is "comparable" to that of ESAs; (2) but "there are important risks of serious thromboembolic events, as well as other risks, with Roxa"; and both ESAs and Roxa have pro-thromblic effects (suggests FDA might be OK as class-label Black Box); (3) They also cite the oral route as only beneficial in NDD and IV is preferred for DD.<br><br>FDA says the CV data is mixed at best and inconclusive; w/ signals of higher risk for Roxa: MACE was examined on-study and 7 days post treatment for NDD and DD though data looks mixed and difficult to interpret; briefing docs tried to be balanced and attribute differences to dropouts in some cases and other confounding factors: **(1) In NDD, HR=1.10 (0.96, 1.27) on-study was higher 1.38 (1.11, 1.70) 7 days post. FDA seems to attribute the latter to high discontinuation rates in placebo so there's greater exposure and risk to roxa that may bias the HR and not a fair comparison. (2) In DD, HR was 1.02 (0.88, 1.20) 7 days post and 1.14 (1.00, 1.30) on treatment though the Kaplan Meiers look similar**; they dont really discuss the incident dialysis population much at all. |
| 7/13/21 | Raymond James | After a thorough review of FDA's briefing documents for roxadustat's Ad Com meeting this week, we think it is highly unlikely that the committee will be supportive of approval. As expected, the FDA conducted its own statistical analyses of the safety data generated and roxadustat performed worse than placebo (non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD) on all key measures (all cause mortality, thrombosis, sepsis, seizures). There was a specific emphasis on thrombosis events and exploratory analyses were conducted which showed higher rates of thrombotic events with higher rates of Hb change.<br><br>Multiple safety issues with roxadustat highlighted in FDA briefing documents. As expected, roxa's cardiovascular (MACE) safety profile was center focus for the FDA. Other risks highlighted by the agency included all-cause mortality, seizures, and sepsis. Given known complications interpreting FGEN's NDD data due to the imbalance in study dropouts in the placebo arm, **the FDA conducted its own sensitivity analysis (OT+7/+28, on-treatment + 7 or +28 days) to help better understand the results**. Using this analysis, roxa performed worse across the board. |

**Exhibit 4**

# FibroGen, Inc.
## Analyst Reports Following the Publication of the FDA Briefing Document
### Sample Commentary Related to the Prespecified Sensitivity Analyses
### 7/13/21 – 7/14/21

| Date | Contributor | Analyst Report Excerpt[1] |
|---|---|---|
| 7/13/21 | Stifel | Roxadustat AdCom Briefing Docs Raise Question of Addressing Safety with Titration or Additional Studies [¶]… The safety question appears to revolve primarily around the risk of thrombotic effects, whether they are on- or off-target, and whether they can be addressed by different dosing schemes. This seems not to be addressed in the randomized controlled studies conducted but rather in exploratory analyses. Hence, FDA is posing whether additional studies should be conducted prior to approval, post- or not at all. While we have no way of handicapping, we think the last question is causing pressure on FGEN shares today—the answer to which will only be addressed by the AdCom. |
| 7/13/21 | SVB Leerink | We view the FDA's documents as negative for potential FDA approval in the larger non-dialysis dependent (NDD) indication and at best neutral for approval in dialysis dependent (DD) chronic kidney disease (CKD) anemia…. The agency found a higher hazard ratio (point estimates >1) for major adverse cardiovascular events (MACE) for roxa treatment vs. placebo for the NDD population and higher MACE risk for roxa vs. ESA standard of care in the DD population as well (Exhibit 1 and 2)…. We believe that the AdCom may well suggest additional safety studies in NDD if they consider roxa approvable in that population at all. |
| 7/14/21 | H.C. Wainwright | Roxa Safety Profile Concerns FDA; Adcom Opinions Will Be Critical [¶] FDA raises a series of questions on roxa safety. The FDA released its briefing document ahead of the roxa Adcom on Thursday. In the briefing document, the FDA raised a series of questions on roxa safety with the agency's own data analysis. The MACE and thrombosis events are at the center of the safety concerns, which we will discuss later with more details. |

Source:  Analyst Reports

Note:
[1]  Emphasis added.

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC.,                 ) Case No.
SECURITIES LITIGATION.                ) 3:21-cv-02623-EMC
                                      )
                                      )
                                      )
                                      )
                                      )
                                      )
                                      )
                                      )
                                      )
_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

CHAD COFFMAN

Tuesday, April 4, 2023

Remotely Testifying from Chicago, Illinois

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5846470

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC.,    ) Case No.
SECURITIES LITIGATION.    ) 3:21-cv-02623-EMC
)
)
)
)
)
)
)
)
)
_____ )

Virtual videoconference video-recorded deposition of CHAD COFFMAN, remotely testifying from Chicago, Illinois, on Tuesday, April 4, 2023, pursuant to the stipulations of counsel thereof, before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

Page 2

REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

For Plaintiffs:

SAXENA WHITE P.A.
BY: DAVID R. KAPLAN, ESQ.
12750 High Bluff Drive, Suite 475
San Diego, California 92130
858.997.0860
dkaplan@saxenawhite.com


For Defendants FibroGen, Inc., Enrique Conterno,
James Schoeneck, Mark Eisner, and Pat Cotroneo:

COOLEY LLP
BY: BRETT H. DE JARNETTE, ESQ.
BY: AMIE L. SIMMONS, ESQ.
BY: CAITLIN MUNLEY, ESQ.
BY: ZANETA J. KIM, ESQ.
3175 Hanover Street
Palo Alto, California 94304-1130
650.843.5000
bdejarnette@cooley.com
asimmons@cooley.com
zkim@cooley.com
cmunley@cooley.com

Page 3

REMOTE APPEARANCES OF COUNSEL: (CONTINUED)

For Defendant Kin-Hung Peony Yu, M.D.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BY: BRUCE A. ERICSON, ESQ.
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
415.983.1000
bruce.ericson@pillsburylaw.com
-and-
WEI GROUP LLP
BY: ERIC S. WEI, ESQ.
One World Trade Center, Suite 8500
New York, New York 10007-0103
212.248.0808
ewei@weillp.com

Also Present:

SAMER SEMAAN, Cornerstone Research
CASSIA LEET, Videographer

Page 4

INDEX OF EXAMINATION

WITNESS: CHAD COFFMAN
EXAMINATION                        PAGE
   BY MR. DE JARNETTE:           9

Page 5

2 (Pages 2 - 5)

**Page 6**

INDEX OF EXHIBITS

COFFMAN DEPOSITION EXHIBITS                    PAGE

Exhibit 20   "Defendants' Notice of          10
            Deposition of Lead Plaintiffs'
            Class Certification Expert Chad
            Coffman, CFA"; 4 pages

Exhibit 21   "Exhibit 1" "Expert Report of    12
            Chad Coffman, CFA, January 27,
            2023"; 90 pages

Exhibit 22   Excel spreadsheet; Bates nos.    77
            COFFMAN_0003103

Exhibit 23   "[CORRECTED] Consolidated Class  138
            Action Complaint for Violations
            of the Federal Securities Laws";
            126 pages

                    --o0o--

**Page 7**

Remotely Testifying from Chicago, Illinois

Tuesday, April 4, 2023; 11:06 a.m., CDT

          --o0o--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 11:06 a.m. on April 4th, 2023.

Please note that this deposition is being conducted virtually.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Chad Coffman taken by counsel for Defendants in the matter of in re FibroGen, Inc., Securities Litigation filed in the United States District Court, Northern District of California. Case number 321 cv 02623 EMC.

My name is Cassia Leet from Veritext Legal Solutions.  And I am the videographer.

The court reporter is Hanna Kim of Veritext Legal Solutions.

I am not related to any party in this action, nor am I financially interested in the outcome.

Would counsel and everyone attending

**Page 8**

remotely please state your appearances and affiliations for the record, beginning with the noticing attorney.

MR. DE JARNETTE:  Brett De Jarnette from Cooley on behalf of Defendants.  With me are Caitlin Munley, Zaneta Kim and Amie Simmons, also from Cooley.  Also with me is Samer Semaan from Cornerstone Research.

THE COURT REPORTER:  Mr. Kaplan?

MR. KAPLAN:  Hello.  This is Dave Kaplan of Saxena White on behalf of the Plaintiffs and the witness.

THE VIDEOGRAPHER:  Thank you.  Will the court reporter please swear in the witness and then counsel may proceed.

MR. ERICSON:  Oh, I didn't state my appearance yet.

Bruce Ericson of Pillsbury Winthrop Shaw Pittman appearing for Defendant Kin-Hung Peony Yu, M.D.

THE COURT REPORTER:  And, Mr. Wei.

MR. WEI:  Yes.  Eric Wei of Wei Group, LLP re- -- appearing on behalf of Dr. Peony Yu.

///
///

**Page 9**

          CHAD COFFMAN,

having been duly administered an oath over videoconference as stipulated by all counsel, was examined and testified as follows:

THE COURT REPORTER:  And I ask that all the speakers that are not speaking to please mute themselves if you're not going to be speaking. Thank you.

          EXAMINATION

BY MR. DE JARNETTE:

Q.  Hi, Mr. Coffman.  How are you?

A.  Good.  How are you?

Q.  I -- I -- I don't know if you remember, but we -- we previously spent the day together.

A.  I do.  You -- you look familiar.  I don't remember what matter that was.  But I -- I do recall meeting you before.  Nice to see you.

Q.  Sure.

I -- I -- I was in a different location, but I -- I -- I think -- I think it was a couple years ago.  Anyway, it's good -- good to see you again.

Do -- do you have access to the Veritext Exhibit Share folder?

A.  I do.

Q.  Can -- can you pull up what has been marked as Exhibit 20.

THE COURT REPORTER:  Are you marking this as a new exhibit, Counsel?          11:10:28

MR. DE JARNETTE:  Yes -- yes, Hanna. This -- this is Exhibit 20.

(Coffman Deposition Exhibit 20 was marked electronically.)

THE WITNESS:  It's not showing up there          11:10:35 yet.  But -- and I've refreshed a couple times, so I don't know if it's just being put up there now.

MR. DE JARNETTE:  I -- I'm being told it's -- it's taking a while to upload.  Let -- let -- let's give it one minute.          11:10:54

THE WITNESS:  Sure.

MR. DE JARNETTE:  All right. For -- for some reason, we're having technical difficulties.  I -- I don't -- I don't think we need but...          11:11:30

BY MR. DE JARNETTE:

Q.  Do -- do you understand that you're appearing here today pursuant to a notice and subpoena?

A.  Yes.          11:11:34

Page 10

Q.  Did -- did -- did you receive a copy of that notice and subpoena?

A.  I do recall seeing it and looking at it briefly.

Q.  You -- you've been deposed before; right?   11:11:40

A.  I have.

Q.  Ballpark, how -- how many times?

A.  Probably on the order of 75 to a hundred.

Q.  I -- I'm going to skip over most of the rules because I know you know them.  But you -- you   11:11:57 understand that you're testifying here today under oath; correct?

A.  I do.

Q.  And your testimony is subject to the penalty of perjury?          11:12:07

A.  Yes.

Q.  Is -- is there any reason that you can't provide complete and truthful testimony here today?

A.  No.

Q.  Okay.  Can -- can we -- can we load as          11:12:15 ex- -- as Exhibit 20, Mr. Coffman's report?

MS. SIMMONS:  Yeah, just a minute.

BY MR. DE JARNETTE:

Q.  Mr. Coffman, while we're waiting for that to be uploaded, do -- do you have a hard copy of          11:12:48

Page 11

your report in front of you?

A.  I don't have a hard copy.  I -- I mean, I -- I have a PDF version of it I could bring up onto my screen if -- if you let me go into my computer network, but I don't have a copy in front     11:13:00 of me.

Q.  Sure.  Let -- let -- let's just wait for it to be uploaded.  We could use that.

A.  All right.  It just came up.  It says "Exhibit 21," I believe is what it says on it.          11:13:48

MR. DE JARNETTE:  Give -- give -- give me one second.  Apologies.

THE WITNESS:  Sure, I have it open now.

MR. DE JARNETTE:  All right. Let -- let's do this:  Let -- let -- let's   11:14:24 leave your report marked as Exhibit 21.  And I -- I was going to mark the notice as Exhibit 20, and we -- we can -- we can re-upload that one, once it -- once it gets onto the system.

THE WITNESS:  Okay.          11:14:39

(Coffman Deposition Exhibit 21 was marked electronically.)

BY MR. DE JARNETTE:

Q.  So you -- you're -- you have in front of you what's been marked Exhibit 21; correct?          11:14:42

Page 12

A.  Yes.

Q.  And this -- this is the expert report that you submitted in this matter; right?

A.  It appears to be a copy of it, yes.

Q.  The -- the first page says "EXHIBIT 1";          11:14:52 right?

A.  It does, yes.

Q.  Do -- do you understand that it says "EXHIBIT 1" because it was attached as an exhibit to Plaintiffs' motion for class certification?          11:15:00

A.  That does not surprise me.  I did not prepare that Exhibit 1 cover page, but my understanding is that it was being submitted for purpose of class certification.

Q.  Did -- did you review a copy of or a draft   11:15:15 of Plaintiffs' motion for class certification before it was filed?

A.  No.

Q.  Did -- have you reviewed Plaintiffs' motion for class certification sitting here today?     11:15:28

A.  I have not.

Q.  Is there anything in your report that you would like to change at this time?

A.  Yeah.  I noted a couple of typos I'd like to go through and then raise one other -- one other   11:15:40

Page 13

4 (Pages 10 - 13)

thing. So Footnote 96.

Q. Give -- give me one second to get there.

A. Yeah. It's on page 38 of the report.

Q. Go ahead.

A. In the first sentence it says "To 11:16:08 summarize, I tested put-call parity for FibroGen Call and FibroGen Options."

There should be the word "put" before that second option. So it should be -- it should read "FibroGen Call and FibroGen Put Options." 11:16:22

Q. Okay.

A. And then in Footnote 99, five lines down, towards the end of the line, it says, "day t multiplied." It should be "day t-1 multiplied."

Q. Got it. 11:16:53

A. And then the other thing I wanted to mention is in -- in preparation for my deposition, it came to my attention that I had not compiled or reviewed in -- in the preparation of the report, the conference call transcripts that the company had 11:17:10 held. And it was not listed on Appendix A.

And upon realizing that, I collected that material, reviewed it to ensure it did not change anything I -- any of my opinions or any calculations I needed to make. And it did not. 11:17:29

Page 14

So -- but that was material that I had meant to review in preparation of the report, but had -- had -- that was an oversight that I had not reviewed that material directly.

Q. So at -- at -- at the time your expert 11:17:47 report was submitted, you did not review a single FibroGen earnings call transcript?

A. I had not. Obviously, there were a number of references to them in the complaint. The number of references to the call -- to calls in the analyst 11:18:00 reports, so I had -- I had certainly seen what analysts had taken from those calls and reported on, but I had not reviewed the -- the transcripts themselves myself.

Q. But you -- you mentioned that you became 11:18:12 aware of -- of your lack of reviewing these conference call transcripts in a deposition prep session; is that right?

A. It wasn't in a session. It was just me preparing for the deposition. But, yes, that's 11:18:26 correct.

Q. Okay. And -- and how long ago was that?

A. That was yesterday, yesterday morning.

Q. You also mentioned two clarifications to footnotes in your report; right? 11:18:44

Page 15

A. That's correct, yes.

Q. When -- when did you discover those errors?

A. The one in -- both came to my attention yesterday -- actually, I think the -- the one from 11:18:55 Footnote 99 I -- I noted on Sunday evening, now that I think about it. The one in Footnote 96 came to my attention yesterday.

Q. Any other errors or changes to your report? 11:19:16

A. No.

Q. Do you plan to submit an amended report to correct these errors?

A. I don't have a plan to do that unless somebody tells me it's necessary. 11:19:28

Q. Who -- who -- who is responsible for the errors?

MR. KAPLAN: Objection. Misstates testimony.

THE WITNESS: Well, the -- the -- I don't 11:19:41 think there were any errors in the -- in the footnotes. Those were just typos.

The -- the calcula- -- for example, the typo in -- in Footnote 99, the calculations were done as -- as I've described now in terms of having 11:19:56

Page 16

that focus on T minus 1 multiplied by the abnormal return -- or the expected return on the next day. So that was just a -- it was just a typo.

And then obviously I talk about call and put options throughout, you know, different sections 11:20:13 of the report. And so the -- the -- leaving out the word "put" was clearly just a clerical order.

In terms of the not reviewing the -- the conference call transcripts, it was just an oversight. I think I had seen so many references to 11:20:30 those in the -- like I said, in the earnings announcements and in the Complaint, that it -- it was just an oversight that I had not reviewed those.

I -- I don't have any further explanation than that. 11:20:45

BY MR. DE JARNETTE:

Q. Corr- -- correct me if I'm wrong, but I -- I think -- I think you mentioned that you reviewed all the earnings call transcripts yesterday; is that right? 11:20:54

A. That's correct, yes.

Q. So you -- you -- you reviewed every single one?

A. I did, yes.

Q. Word -- word for word? 11:21:00

Page 17

5 (Pages 14 - 17)

A.   I skimmed over certain parts of them if they were talking about a subject that wasn't particularly relevant, but I -- I certainly scanned and -- and skimmed all of them from start to finish.

And some of them I read word for word.    11:21:16 Some sections I -- if it was clear they were talking about something I wasn't particularly interested in, I would -- -- I would skip over particular paragraphs.

THE COURT REPORTER:  Excuse me.  One    11:21:26 second.  I'm hearing some background noise, so I was wondering if both of you could just speak a little slower.

THE WITNESS:  Sure.

THE COURT REPORTER:  Thank you.

BY MR. DE JARNETTE:

Q.   How long would you say you reviewed the earnings call transcripts yesterday?

A.   Probably about two hours.

Q.   Do you -- do you recall roughly how many    11:21:48 earnings call transcripts there were?

A.   I don't know that I can give you an exact number, but there were roughly 10 or 11 earnings call transcripts.  Maybe more.  It could have been 12, 13, something -- no, it was probably more than    11:22:05

Page 18

that.  It was probably about 14.

And then there were a number of special calls.  I think there was a -- a couple of shareholder trans- -- meeting transcripts as well as a -- well, I think something that was referred to as    11:22:16 a special call.

And then there were a number of presentation transcripts as well, probably about 10 or 11 of those.

Q.   Is it fair to say that all -- all in all    11:22:24 the earnings call transcripts were probably a couple hundred pages?

A.   That's correct.  That's probably right. Like I said, there were -- there were portions of it I certainly as -- as they were covering things I    11:22:39 wasn't particularly interested in.

Q.   And -- and you reviewed those couple hundred pages in two hours?

A.   Yes.

Q.   And within the two hours, you made the    11:22:52 determination that those earnings call transcripts did not change your opinions?

A.   Well, it was a combination of reading those and making sure there was nothing I saw in those transcripts that changed my opinion in any    11:23:04

Page 19

way, as well as asking a staff member to make sure that all of the -- the -- the dates on which those occurred weren't classified as no news days so that it wouldn't have changed any of the calculations that we did in the report.  So I had a staff member    11:23:20 confirm that.

Q.   Just to make sure I understand, you confirmed that none of the days in which there was an earnings call you deemed to be a non-news day for purposes of your -- of your report?    11:23:37

A.   In terms of what I called a, quote/unquote, "no news days," that's correct, yes.

Q.   Mov- -- moving on, are there any opinions you have been asked to offer in this case that are not in your report?    11:23:50

A.   No.

Q.   Any opinions that you intend to testify to in this case that are not identified in your report?

A.   I don't have an intent to testify on anything else.  If at a later stage in the case I    11:24:03 was asked to form opinions, you know, that's something I would -- I would consider and analyze and -- and -- and, you know, potentially be willing to offer testimony in the future on other subjects. But I haven't been asked to or agreed to full --    11:24:16

Page 20

analyze any other issues in this case.

Q.   Just -- just to be clear, Plaintiffs have not asked you if this case were to advance to the merit stage, to provide a -- a lost causation and damages report?    11:24:34

A.   They have not, and I have not agreed to one way or the other to do that even if asked.

Q.   If they were to ask you, would you?

A.   I don't know.  I would have to think about it.    11:24:43

Q.   Does your report contain a complete basis for all the opinions you intend to offer in this case?

A.   I believe it provides a summary of -- of the bases, yes.  Obviously I have years and years    11:24:53 of -- of experience and formal training in areas that are subsets of what's in here.

So I -- I would -- I think it's fair to say, it -- it certainly summarizes the -- the entire basis.  But I certainly have knowledge and    11:25:09 experience that goes beyond what's in the four corners of the report that helps provide that basis for -- for giving these opinions.

Q.   So aside from your knowledge and experience, your report contains the complete bases    11:25:20

Page 21

6 (Pages 18 - 21)

for all of your opinions you intend to offer in this case?

A. I believe it provides a complete summary of the basis for my opinions, yes.

Q. Do you have any intent to amend or add to any of your opinions at this time?

A. As I sit here, I don't. I haven't been asked to analyze any other issues, and I have not changed my opinions in any way.

Q. Are there any circumstances under which you might amend or add to the opinions contained in your report?

MR. KAPLAN: Objection. Calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. DE JARNETTE:

Q. All right.

Let's go to Exhibit -- or, apologies, page 4 of your report.

A. Okay.

Q. Page 4 includes a summary of your opinions in this matter; correct?

A. It extends on to page 5; but, yes that's where it starts.

Q. Can -- can -- you -- you offered two

Page 22

opinions in this case; correct?

A. Correct. There's two over- -- overarching opinions, yes.

Q. Can you tell me at a high level what your first opinion is?

A. Sure. And I -- I would even break that first opinion into a couple different pieces. I mean, my -- the first opinion is that the market for FibroGen common stock is efficient.

I also offer the opinion that the market for FibroGen option contracts is efficient.

And then the -- the final opinion is that damages in this matter can be calculated on a class-wide basis using a -- a -- a -- a -- formulaically on a class-wide basis.

Q. The first two opinions you referenced, market efficiency with respect to options and common stock, that's reflected in paragraph 6 of your report; correct?

A. Yes.

Q. Is it okay with you if we call that opinion your market efficiency opinion?

A. Sure.

Q. And paragraph 7 reflects your opinion that damages can be calculated on a class-wide basis?

Page 23

THE COURT REPORTER: Did you say "cost-wide" or "class-wide"? I can't hear you.

MR. DE JARNETTE: Class.

THE WITNESS: "Class-wide basis using a common methodology" is the -- the phrase I use.

BY MR. DE JARNETTE:

Q. Are you -- are you okay if you -- if we refer to that as your damages opinion?

A. Sure.

Q. Do you know who the Lead Plaintiffs are in this case?

A. I know I listed them at the beginning of the report, but I -- I don't know it off top of my head, so I'd have to go refer to the report to know who that is.

Q. Have -- have you met any representative from Lead Plaintiffs?

A. Other than their counsel, no.

Q. Is it fair -- fair to say that no one from any of the Lead Plaintiffs have -- have interviewed you?

A. That's correct.

Q. Have you been interviewed by other plaintiffs before in other cases?

A. Are you restricting that to questions

Page 24

about class action securities litigation? Because clearly outside of that I have.

But I guess if you want to limit it in some way, I might be able to give a clearer answer.

Q. Sure.

Have you been interviewed by plaintiffs in securities class actions before?

A. If I have, it's been very infrequently. I recall one case where I interacted with -- with a representative of the plaintiff itself, but I -- that -- that's a -- it's not the usual protocol.

Q. Apologies if you don't remember, but I actually think in -- in the case that -- that we spent the day together, Geron, you were interviewed by the lead plaintiff in that case.

Do you recall that?

A. I don't recall if I've been interviewed. I -- I -- I recall having a conversation in that matter with a representative of -- of the plaintiff. I don't recall if I -- if -- if they interviewed me. It's just been long enough I just don't remember.

Q. Fair enough.

When did Plaintiffs' counsel first contact you about serving as an expert in this litigation?

A. I don't recall specifically.

Page 25

7 (Pages 22 - 25)

Q. Do you think it was more than six months ago?

A. It's possible. I just don't recall.

Q. Do -- do you remember who contacted you?

A. I don't have a clear recollection of the first contact.

Q. Do you think it was Dave Kaplan?

A. It's possi- -- it's certainly possible, but I just don't recall.

Q. Aside from Dave Kaplan, have you interfaced with anyone else from Saxena White in this matter?

A. I believe there may have been others on -- on conference calls at certain time [verbatim], but I -- I don't recall.

Q. So it's possible that the only attorney from Saxena White that you've interfaced with on this matter is Dave Kaplan?

A. No, I -- I seem to have a -- a recollection of there being other representatives of Saxena White on -- on calls at different times. I just don't -- as I sit here right now, I don't recall who that was.

Q. What -- what calls are you referring to?

A. Just calls I had with the Saxena White

Page 26

firm during the time I was preparing the report.

Q. Were those calls about the drafting process of your report?

A. No.

Q. Then what -- what were they about?

A. I think really just providing updates on what work we were doing and some of the things we were -- some of the results of the analysis we were performing.

Q. Before you were contacted about serving as an expert in this case, have you heard of FibroGen?

A. I don't believe so, no.

Q. So I take it you never owned FibroGen stock before?

A. Certainly not directly. I mean, it -- it's theoretically possible it was in a mutual fund I owned, but not directly, no, I don't own FibroGen and have not owned FibroGen stock.

Q. Just to confirm, you -- you -- you don't recall when you were formally retained by Plaintiffs' counsel; correct?

A. I don't recall, no.

Q. And -- and just -- just so I'm clear, are you retained by Saxena White or by the Lead Plaintiffs in this matter?

Page 27

A. My firm, Global Economics Group, is -- contracts with the law firm Saxena White.

Q. So you have no formal engagement with any of the Lead Plaintiffs in this matter; is that right?

A. That's correct.

Q. Do you have an engagement letter with Saxena White?

A. Our standard practice is to have an engagement letter. I'm not usually in the process of -- of making sure that always happens. I know there have been certain cases where it's meant to have happened, but didn't get finalized.

I -- my -- my -- so there likely is an engagement letter. I just don't know for absolute certainly that there is.

Q. Have you worked with Saxena White on other matters before?

A. I have, yes.

Q. Would -- would you expect an engagement letter you would have with Sax- -- Saxena White to be specific to that matter?

A. Yes.

Q. Fair -- fair to say that Saxena White is paying you for -- for your work on this matter?

Page 28

A. Yes. I submit invoices to Saxena White for time I and my staff work on this matter and -- and have been paid or expect to get paid on recent work.

Q. So Lead Plaintiffs are not paying you; correct?

A. That's not my understanding of the arrangement. Again, I don't see the actual checks, and I -- I -- but the engagement is with Saxena White, and that's who -- who I understand is paying us.

Q. Just -- just to be clear, you've had absolutely no communication with any of the three Lead Plaintiffs in this matter; correct?

MR. KAPLAN: Objection. Asked and answered.

THE WITNESS: That's correct.

BY MR. DE JARNETTE:

Q. You're being paid $900 per hour for your work in this matter; correct?

A. Global Economics Group is being paid $900 per hour for my work, yes.

Q. And you're president of Global Economics Group?

A. That's correct.

Page 29

8 (Pages 26 - 29)

Q. Is -- is $900 the typical rate you charge for expert work?

A. For -- I believe that was my rate for matters that started in 2022. So I believe it's 950 per matters that start in 2023, and it would have been less for matters that started earlier than that. But that was -- it was my standard rate at the time.

Q. And you're -- you're still charging Saxena White 90- -- $900 an hour?

A. Correct. My rate doesn't change once I take a case.

Q. Got it.

Do you -- do you charge a different rate for other types of consulting?

A. No.

Q. So you charge $900 an hour for all of the work you perform; correct?

A. That's my standard rate -- or it was my standard rate in 2022 for matters that started in 2022, yes.

Q. Do you ever provide alternative fee arrangements or -- or exceptions to your $900 an hour?

A. Throughout my ex- -- throughout my career,

Page 30

there have been times, I believe, there were negotiated rates for certain matters, but that's not my standard practice.

Q. You earn a salary from Global Economics Group; correct?

A. It's not technically a salary, no.

Q. How would you describe it?

A. I'm on a draw-based system, so I get paid regularly. And then based on the work I perform, there's -- I receive credits. And then whatever credits -- however much the credits exceed that -- those draws, I get paid.

So I essentially get paid based upon the work I perform -- upon the billings I -- I generate.

Q. So your salary is not set at the beginning of the year -- or -- or your compensation is not set at the beginning of the year?

MR. KAPLAN: Objection. Asked and answered. And it's also outside the scope of the expert's task and it's just a completely irrelevant line of questioning.

THE WITNESS: My compensation is not set at the beginning of the year, no.

BY MR. DE JARNETTE:

Q. So fair -- fair to say that the more that

Page 31

you bill, the more compensation you receive?

A. Yes. The more hours I work, the more compensation I receive, yes.

Q. In -- in addition to billings that you generate, do -- do you -- strike that.

Do you receive any additional compensation like bonuses?

A. I don't receive bonuses. I -- I'm also entitled to receive compensation based on the amount of billings of the staff that are working on matters that are -- for which I'm considered the finder of the matter.

And then as an equity holder in Global Economics Group, I'm entitled to a share of the profits of Global Economics Group.

Q. Got it.

Just -- just so I understand, the more that your team works on this matter, for instance, the more compensation you receive?

A. That's fair, yes.

Q. To that end, you -- you were assisted by others at Global Economics Group in preparing your report; correct?

A. Yes.

Q. How -- how many individuals would you say?

Page 32

A. There's five people I know that worked on it besides myself. There may have been others that did smaller pieces of work. But I think there were -- there were five individuals that I know did -- assisted in some ways on this report.

Q. And -- and their -- their rates were between 230 and $470 an hour; right?

A. That's correct. I think that -- let me double-check those amounts from the report. But yes, I believe that's right.

Yes, that's correct.

Q. And you were looking at paragraph 2; right?

A. That's correct. Yes.

Q. What -- what were the backgrounds and qualifications of those five individuals?

A. Well, one is Mark Hedstrom and he has a mas- -- MBA.

One was Guillermo Rodriguez, and he has a masters in economics.

One is Shafeen Ahmed, and he has a masters in statistics.

Another is Kelly Bryant, and she has a BA, I believe, in economics. It could be in finance. But it's either economics or finance, I believe.

Page 33

9 (Pages 30 - 33)

And then Nicoletta Peters who has a BA in, again, economics or finance. I don't remember which.

Q. Do all these individuals report to you?

A. Yes.                                    11:40:23

Q. Is this the same team you've worked with on every single one of your reports?

A. No. Mark Hedstrom is -- is sort of my chief of staff, so he works on virtually all of my matters, not -- not every single one, but virtually all of them.                                  11:40:36

Then there's a number of staff members that work on different matters. So no, this is not the same team that works on all my case.

Q. Do you know the amount that you billed to Saxena White on this matter to this date?    11:40:49

A. I don't know that as I sit here.

Q. Ballpark?

A. More than 50,000; less than a hundred 50,000 would be my ballpark estimate. Again, we have billing records that reflect that, but I'd -- I'd be surprised if it fell outside of that range.    11:41:04

Q. Is that generally what you would expect in preparing an expert report in connection with class certification in a securities class action?    11:41:27

Page 34

A. You know, the -- the cost of those things can vary, depending on the nature of the -- the securities and what, exactly, I'm being asked to evaluate.

That wasn't -- I would say it's not    11:41:41 outside the norm of what -- what I -- what I would expect, given the scope of what I was asked to do in this matter.

Some cases can be more if there's particular issues that arise, but it -- it does not    11:41:53 surprise me, the amount of work that was performed on this case.

Q. Do you have an idea of how many hours you personally spent drafting your report?

A. I don't have an exact number, but it    11:42:07 certainly would have been more than 25, probably less than 80, so somewhere in that range.

And, again, it was more than just drafting the report. It was directing the staff and performing analyses and evaluating data and analyses    11:42:27 and -- and obviously, directing the preparation of the report as well.

Q. So all of that would be included in the 25 hours?

A. Well, again, I -- I said it was somewhere    11:42:42

Page 35

between 25 and 80, I believe was the number I gave.

Q. You can't be any more specific than between 25 and 80 hours?

A. Like I said, I have -- I have billing records that reflect it. I just don't recall off    11:42:59 the top of my head exactly how many hours I worked on this.

Q. Any sense of how many hours your team spent on your report?

A. I don't have an exact number. It would    11:43:10 certainly be in the hundreds of hours. Whether it's more than a thousand, I just don't recall. I -- I don't think it's -- it's probably not more than a thousand. It's -- but it's certainly in the hundreds.                                  11:43:22

Q. So your -- your -- your team spent significantly more time than you did on your report; correct?

A. In terms of doing things at my direction, yes.                                  11:43:34

Q. Do -- do you know if you've been paid yet for your on this matter?

A. I don't know for certain. I believe certainly for a portion of the work, I -- I believe we have. Whether -- whether it's current, I just --    11:43:49

Page 36

I -- I haven't looked.

Q. Apologies if you've already answered this. But you -- you've done other work for -- for Saxena White before; correct?

A. Outside of this case, yes, I have.    11:44:01

Q. Do you remember how many matters?

A. I don't. It's probably at least five; probably not more than ten.

Q. Do you have a sense of the percentage of your income you receive from Saxena White?    11:44:24

A. That's not anything that I've ever calculated. It would certainly be a minority.

Q. Can you go to paragraph 4 of your report.

A. Okay.

Q. You write, "My experience in securities    11:44:52 class actions includes work for plaintiffs, defendants, D&O insurers, and prominent" -- [As read]

THE COURT REPORTER: I'm sorry. Counsel, could you slow down if you're reading, please.    11:45:01 Thank you.

MR. DE JARNETTE: Sure.

BY MR. DE JARNETTE:

Q. In paragraph 4 in the middle of the page, you write, "My experience in securities class    11:45:08

Page 37

10 (Pages 34 - 37)

actions includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator." [As read]

Do you see that?

A. I do.

Q. Do you do the majority of your expert work 11:45:23 for plaintiffs?

A. If -- if you're talking about recent time periods, yes. But --

Q. Is it --

A. -- that hasn't been necessarily true 11:45:42 throughout my career, but over -- over the last several years, yes.

Q. But let me be more specific.

In -- in the last five years, have you done the majority of your expert work for 11:45:51 Plaintiffs?

A. Yes.

Q. In the last five years, do you recall ever serving as an expert for a defendant in a securities class action? 11:46:06

A. I've been engaged, but have not testified for defendants.

Q. How many matters?

A. There's two that come to mind. I -- I can't recall if there are others. But I -- I -- 11:46:29

Page 38

there's two that come to mind.

Q. Can you tell me what those are, are you -- or are -- are you subject to confidentiality obligations?

A. I'm subject to confidentiality obligations 11:46:40 on those matters.

Q. But in -- in neither of those matters, you submitted an expert report; correct?

A. That's correct.

Q. So in the last five years in the cases in 11:46:50 which you submitted an expert report, none of those were on behalf of defendants; correct?

A. In class action security cases, that's correct. I'll leave my answer there.

Q. Sure. 11:47:21

Did you meet with anyone to prepare for your deposition today?

A. Yes.

Q. Who?

A. Mr. Kaplan. 11:47:31

Q. Anyone else?

A. I -- I interacted with a couple members of my staff, just asking questions and gathering materials, but I did not meet in person with them.

Q. Did you meet in person with Mr. Kaplan? 11:47:45

Page 39

A. I did.

Q. Did you meet with anyone else from Saxena White to prepare for your deposition today?

A. No.

Q. How many times did you meet with 11:47:54 Mr. Kaplan?

A. Once.

Q. How long?

A. It's about an hour and a half to two hours -- 11:48:05

Q. What --

A. -- probably close -- yeah, an hour and a half to two hours.

Q. When was that?

A. Yesterday. 11:48:10

Q. Did you review any documents during your meeting?

A. No. I mean, other than my report, I pulled --

(Interruption in audio/video.) 11:48:33

THE COURT REPORTER: I'm sorry. Something got caught in -- on the audio. I pulled up...

THE WITNESS: I -- I -- I reviewed a copy -- I pulled up a copy of my report. Other than that, no. 11:48:39

Page 40

BY MR. DE JARNETTE:

Q. So during your meeting, you reviewed a copy of your report; is that right?

A. Well, it was open. We didn't review it completely. There was just a -- I -- I mean, a 11:48:48 topic of conversation where I wanted to refer to something in my report. So that was the only document I recall referencing during our meeting.

I also look- -- I -- I -- now I recall, I also looked at the Complaint during our meeting at one 11:49:09 point.

Q. The -- the Amended Complaint filed by Plaintiffs in this matter?

A. Yeah, the one that's referenced in my Appendix A, the -- that Complaint. 11:49:20

MR. DE JARNETTE: What -- let's take a five-minute break and go off the record.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 11:49 a.m. 11:49:31

(Short recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 12:02 p.m.

BY MR. DE JARNETTE:

Q. Hi, Mr. Coffman. Welcome back from break. 12:03:12

Page 41

11 (Pages 38 - 41)

A. Thank you.

Q. You determined that FibroGen common stock traded in an efficient market during the class period; right?

A. That's correct.                12:03:23

Q. An -- an efficient market is one which rapidly reflects new information; right?

A. That's a fair characterization, yes.

Q. In fact, the characterization you used in paragraph 21 of your report; right?        12:03:42

A. Well, there, I believe actually I'm quoting someone. There are other points in the report in which I describe market efficiency in a way that's consistent with that. But those -- that -- that particular sort of shorter version     12:04:01 of -- of the summary is something I actually quoted.

Q. In paragraph 21, you quote that "An efficient market is one which rapidly reflects new information in price."

Do you see that?        12:04:20

A. I do, yes.

Q. And it follows that quote in paragraph 21 you state that you adopt that definition; right?

A. Yes.

Q. What does "rapidly" mean in that       12:04:35

Page 42

definition?

A. In my view, when I talk about rapidly or when I think of rapidly, I think within a day or within a small number of days.

Q. What does "small number of days" mean?       12:04:50

A. Typically -- I mean, I've -- I've just seen in my experience circumstances and -- and analyses and -- and -- and literature that talks about how it can take slightly longer than a day for -- for information to be fully reflected in       12:05:19 price, especially if it's complex information or -- or information that there's follow-up analyst coverage of.

So I usually think of it as -- as -- it's -- it's not unusual to see a price reaction       12:05:35 that can take up two or three days. But it often occurs within one day. So it -- it -- there's some, you know, fact-specific considerations and circumstances that -- that one needs to take into account. But when I -- when I use the term       12:05:51 "rapidly," I mean within a day or within a very small number of days, two or three.

Q. Have you heard reference to in an efficient market, news is absorbed in a matter of minutes?        12:06:07

Page 43

A. Well, I -- I certainly think there's some academic literature that it shows stock prices can react in a matter of minutes.

That's different a question than whether it's -- fully reflects the -- the value of the       12:06:15 information. And there are certainly circumstances where -- where that can occur. But I don't think that occurs every single time.

Q. For purposes of FibroGen, "rapidly" means within a day; right?        12:06:31

A. I think for purposes of how I conducted certain of my analyses, it means within a day. But I could certainly see circumstances where if in a full market reaction might take more than a single day. And I haven't ruled that out in this matter.     12:06:49

But in terms of how I tested for efficiency, I used one day of the event windows that I tested.

Q. Have you seen any evidence, given all the analyses that you performed, that it would take       12:07:02 longer than a day for the market to absorb FibroGen-specific news?

A. It could, especially if that information was confusing or complex to investors and -- and that there was further discussions between the       12:07:16

Page 44

company and analyst and then analyst issuing reports, not instantaneously, that -- is -- is it possible that under certain circumstances, one might want to look at a multiple-day event window for -- for news related to FibroGen. It -- I can't rule       12:07:38 that out, as I sit here.

Q. You're -- you're -- you're just speculating, though; right?

A. When you say "speculating," I -- I'm saying there could be circumstances that -- that       12:07:49 that would -- that longer a one-day event window may make sense, given -- given those considerations.

I haven't determined for FibroGen whether there's any of those circumstances. But there -- there certainly have been many other publicly traded   12:08:05 companies in efficient markets that I have looked at multiple-day windows for, so I don't know see why FibroGen would be any different.

Q. But for pur- -- purposes of your report and your event study, you didn't look at       12:08:20 multiple-day windows, did you?

A. Given the opinion I'm being asked to evaluate -- or -- or the question I'm being asked to evaluate, there was no need to do that.

If the question was different, there might   12:08:32

Page 45

12 (Pages 42 - 45)

be some circumstance in which looking at a multiple-day window would be -- would be relevant.

But for the purposes of doing the tests I was doing, no, I didn't have any need to do that.

Q. But just so I'm clear, for purposes of your report and your event study, you did not use a multiple-day window; correct?

A. That's correct. I used a single-day event window for purposes of my event study in this matter.

Q. And your event study only makes sense using a one-day window if the market absorbed FibroGen-specific news within a day; right?

A. Well, when you say it "only makes sense," I mean, again, I -- I think whether the market is -- you know, I was testing for whether or not there was a cause-and-effect relationship and whether there was statistical evidence of a cause-and-effect relationship.

That doesn't rule out that there could be certain circumstances where the -- where the information could get fully reflected over more than one day.

Certainly based on the tests I performed, there's lots of evidence the market prices did react

Page 46

generally within a day, but that doesn't mean there couldn't be a single circumstance or -- or a fact-specific issue that would cause one to look at a multiple-day window.

I just haven't made any determination that would be necessary in any circumstance. But for purposes of my event study and evaluating whether there's cause and effect, I looked at one-day windows.

Q. In an efficient market, it would be unlikely for the stock price to react for the first time to company-specific news days later; right?

A. Generally speaking, that -- that's right. If there's new information, it's -- it's not -- I -- I haven't seen a circumstance in too many cases where news is released and then the first evidence of the market reacting to it comes more than one day afterwards.

Q. And you certainly haven't seen that --

A. I'm sorry, I'm -- I'm sorry, I'm not done yet.

I mean, I've certainly seen a couple of circumstances where that's a possibility and was considered. And under certain circumstances it actually made sense, but gen- -- if we're talking in

Page 47

very general terms, that's -- that's not the usual -- what you would normally expect to see.

Q. Based on all the analysis and event study calculations that you performed in this matter, you've seen no evidence that the stock price of FibroGen reacted for the first time to company-specific news days later during the class period; correct?

A. I don't have any evidence in mind that -- that -- that I recall that happening during the class period.

Q. You -- you touched on this a little bit, but one -- one of the most convincing ways to demonstrate market efficiency is by showing a cause-and-effect relationship between company disclosures and resulting stock price movements; right?

A. I agree with that.

Q. And an event study, which we were just talking about, is a common technique used to show a cause-and-effect relationship; right?

A. That's fair, yes.

Q. And -- and you performed an event study here?

A. I did.

Page 48

Q. And -- and based on your event study, you found a clear cause-and-effect relationship between new public information about FibroGen and FibroGen's stock price; right?

A. I did, yes.

Q. As part of your event study, you determined the predicted return on each day of the cause period; is that right?

A. Or I think I referred to it as expected or predicted return. And those terms are used interchangeably, yes.

Q. I -- I think it was predicted return, but can you tell me what "predicted return" means?

A. It means that given the movement in the broad market index and the industry index in this case, how much would you expect, given the -- the statistical relationship between FibroGen common stock and those factors, how much would you expect FibroGen common stock to move just based on the movement of those factors.

Q. You also determined actual returns in FibroGen's stock price in connection with your event study; right?

A. Yes.

Q. What -- what is an "actual return"?

Page 49

13 (Pages 46 - 49)

A.  The actual return I'm calculating is the percentage change in the closing price from one day to the next -- one trading day to the next.

Q.  And the -- the difference between actual and predicted returns is called an "abnormal return"; right?

A.  A residual return or an abnormal return. Those terms are used interchangeably, yes.

Q.  I -- I think I have a basic understanding, but -- but just -- just to help me, can -- can you explain in your own words what an abnormal return is?

A.  Sure.  It's the -- it's the portion of the stock price movement that's observed on that day that can't be explained by the factors you're controlling for.

So it's -- it's the portion of the -- the return that isn't explained in this case by the industry index or the broad market index.

Q.  As part of your event study, you determined whether the abnormal return in each day of the class period was statistically significant at a 95 percent confidence level; correct?

A.  Correct.  Part of my calculation was to determine whether the abnormal return on any given

Page 50

day was statistically different from zero with 95 percent confidence.

Q.  So when -- when your report talks about whether a day was statistically significant or not, that is based on a 95 percent confidence level; right?

A.  I think I talked about that broadly as significant, defined as significant.

I also make clear when things are significant at the 90 percent level or the 99 percent level.  But as the -- as the baseline approach, I'm -- I'm using the 95 percent confidence level.

Q.  Why are -- why are you using 95 percent?

A.  It's one of the most standard applications of the concept of statistical significance is to look at things that are statis- -- significant with -- with 95 percent confidence.

Q.  Is there -- is there a basis that you're referring to, some sort of academic authority?

A.  Well, I think there's academic authority and academic literature out there that looks at -- at various different thresholds for statistical significance, including the -- the 90 percent level and the 95 percent level.

Page 51

I think the 95 percent level is probably the most common that you see in the academic literature, but it's certainly not the only one.

Q.  To -- to back up a little bit, what -- what is "statistical significance"?

A.  It means that whatever you're observing, and in this -- I'll -- I'll use, you know, my event study in this case as -- as the example.

What it means is that you're observing an abnormal return that's sufficiently large that you can rule out random chance with greater than 95 percent confidence.

Q.  Can you turn to page 24 of your report?

A.  Okay.

Q.  Please go down to Footnote 57.  In Footnote 57, you refer to a 90 percent threshold for significance; right?

A.  I do.  I'm citing to literature that talks about -- also identifies 90 percent as a -- a -- as a relevant threshold that's identified in the literature.

Q.  You -- you did not use 90 percent as the baseline here; correct?

A.  Well, I mean, I certainly provide information about whether certain returns are

Page 52

significant at the 90 percent threshold, and I certainly don't mean to imply in any way that looking at the 90 percent threshold would be wrong.

But I do use 95 percent in the -- in the summary tests that I report, but I also provide information about things that are significant at the 90 percent level as well.

So for exam- -- as -- for example, if you go to Exhibit 7, you'll --

Q.  Give me a second to get there.

A.  Sure.

THE COURT REPORTER:  And, Mr. Coffman, if you can speak -- slow down a little bit, please.

THE WITNESS:  Sure.

BY MR. DE JARNETTE:

Q.  Sorry, I'm -- I'm there.

Go ahead.

A.  So if you go to Exhibit 7, the first line item there, you know, Event 1 that I test, over on the far right there's a column called "Sig Level."

And in this particular case, I list -- I show three asterisks there under that.  And the footnote at the bottom of Exhibit 7, which you have to go forward a few pages, but the footnote, Footnote 2 to this table, shows that those -- the

Page 53

14 (Pages 50 - 53)

three asterisks denote that it's statistically significant at the 99 percent level or greater.

I also have notes there saying that if it was significant at the 95 percent level only and not 99, there would be two asterisks. And if it's significant at the 90 percent level, there would be one asterisk. So I certainly considered those different levels of significance in my event study.

Furthermore, in the options section, if you look at Exhibit 15 to my report and you look at the titles to Exhibit 15, I performed different counts of how many option series are significant at the 90 percent level, the 95 percent level, and the 99 percent level.

So, you know, for some of my broader tests, I talk about 95 percent in the text to the report, but I clearly had the 90 percent level threshold in mind as well when I was performing these tests.

Q. Do you think it's appropriate to use a 90 percent threshold?

A. I think a 90 percent threshold for drawing inferences in statistics is -- is not outside the bounds of -- of what's done in -- in the literature and is a fairly standard thing to report on.

Page 54

So I think it's -- you know, whether you use a 90 percent level or a 95 percent level, there's no -- I don't think there's any -- any magic to either one of those. It's a convention.

And it's really a question of given the circumstances of what you're analyzing, what's the -- you know, how willing are you to make a type one error.

A type one error is where you draw an inference based on data where you're -- the -- the -- the amount of time you would conclude something is significant even though there was really no relationship.

You know, when you use the 95 percent confidence level, you're accepting a 5 percent chance of type one error. When you use the 90 percent level, you're accepting a 10 percent chance of type one error.

So, you know, depending on the context of what the standard of proof is or what the -- what the circumstances are and what the costs of a type one versus type two error, you know, that could -- that could lead people to different conclusions about which threshold is most appropriate.

In the economics and finance literature,

Page 55

you see people making inferences -- or at least drawing inferences based on both of those thresholds at different times. So I don't think it's necessarily wrong to look at or inappropriate, in any way, to look at.

Q. To your knowledge, has a court disagreed with you regarding whether a 90 percent confidence level is appropriate?

A. I believe there have been times that courts have ruled that 95 percent significance is -- is required. I don't think that's universal, but there certainly have been examples of times that's occurred.

Q. Have you personally been criticized by a court by using a 90 percent confidence level?

A. I don't think "criticized" is the right word. I think the -- the court determined that for purposes of the ruling they were making that they were going to apply the 95 percent confidence interval as the appropriate standard to apply.

But I -- I don't know that I was particularly criticized for it, but that was the threshold they drew in that -- in one case I recall.

Q. Are you referring to Halliburton?

A. That's the case I have in mind, yes.

Page 56

Q. So from -- from your perspective, the Halliburton court did not criticize you for using a 90 percent confidence level?

A. I don't recall exactly what the court said, but I recall the court ruling based on using the 95 percent confidence interval rather than the 90, and that's -- that's what the court was requiring in that particular circumstance.

I just don't -- I don't recall as I sit here today there being -- necessarily being -- having been a criticism simply for reporting results based on the 90 percent level.

Q. But we -- we -- we can agree that the court did not determine that the 90 percent level was the appropriate level for purposes of that case; right?

A. Again, they applied -- I -- I recall they applied the 95 percent confidence interval as -- as the relevant thing they were going to consider.

Whether -- you know, they -- they determined that was the most appropriate in that -- in that circumstance. That's all I recall.

Q. Do you recall the Moody's case?

A. I recall the Moody's case, yes.

Q. Do -- do you recall that court criticizing

Page 57

15 (Pages 54 - 57)

you for using a 90 percent confidence level?

A. It's been a long time since I've looked at that opinion. I just don't remember whether that was a component of -- of that opinion or not.

Q. Sitting here today, do you disagree that the court criticized for using a 90 percent confidence level?

A. Again, I don't know if "criticized" is the right characterization, but I -- I -- I -- I just don't recall. It's -- it's been a long enough I don't want to speculate about what that court said.

Q. But af- -- after the two decisions came down in those cases, you're still referring to your 90 percent confidence level for purposes of this report; right?

A. I think there is nothing inappropriate about providing facts and evidence to the Court where things are significant at the 90 percent level and -- and drawing conclusions, if appropriate, based upon that.

Again, I -- I think in my field of -- of economics and -- and finance, it is not unusual at all for researchers to draw inferences from things that are significant either at the 90 percent level or 95 percent level.

Page 58

Q. Just so I'm clear, are you providing an opinion about which confidence level, 90 percent or 95 percent, is appropriate to use for purposes of market efficiency?

A. I'm not providing an opinion one way or the other. I think either could be appropriate. Obviously the -- the -- in -- for some of my -- my high-level tests that I'm drawing my opinions from, I'm -- I am using the 95 percent level. That's what's being used, for example, in Exhibit 8.

So, you know, I'm adopting the 95 percent as my primary threshold in this case, but I don't think there would be anything inappropriate about using the 90 percent level either.

Q. Did you determine whether or not FibroGen common stock trades in an efficient market if you were to use a 99 percent confidence level?

A. If -- well, I think -- there are lots of different factors here that I'm using to evaluate market efficiency that have nothing to do with using a 95 percent or 99 percent confidence level.

I think what you're asking me is do I know if I recomputed the numbers and tests on Exhibit 8, whether it would be significant at the 99 percent level.

Page 59

I don't know that for certain, although I would be exceptionally surprised, given that most of the events -- most of the earnings announcement and press release events I analyze are significant at the 99 percent level and not just the 95 percent level.

I see only one event -- oh, no, there's three, I guess, that are significant at the 95 and not 99.

I don't know the answer, whether that test would be significant or not if I applied the 99 percent threshold. But I don't see a need -- a need to do that. I've adopted the 95 percent threshold as -- as the appropriate test here.

Q. But you just told me that you're not providing an opinion about what the appropriate confidence level is; right?

A. Well, no, I think apply- -- I -- I think you're not understanding what I'm saying. I'm saying the 95 percent threshold is appropriate. That doesn't mean it's the only appropriate threshold that one could use. I think within the context of the finance and economics literature, if one adopted the 90 percent threshold, I don't think there's a reason to somehow conclude that's

Page 60

inappropriate.

So I'm not saying that one is appropriate and the other is inappropriate. I'm just saying I think 95 percent threshold, as I've applied in this case, is an appropriate methodology.

Q. Just so I understand, for purposes of determining market efficiency, you did not employ either a 99 percent or a 90 percent confidence level; correct?

A. Again, I -- I want to go back to your question because I -- I think, you know, we're talking specifically about the cause-and-effect factor here. Outside of cause and effect, there's -- there's not a -- a -- a -- the only portion of my analysis that relies on an event study is Cammer factor five. None of the other factors rely on that.

The -- I did not specifically do a test on the equivalent of Exhibit 8 using an alternative threshold of 90 percent or 99 percent.

Q. So just to close the loop on this, for purposes of Cammer factor five, you did not use either a 99 percent or a 90 percent level; correct?

A. Well, for the primary test on Exhibit 8, which is looking at -- comparing the treatment

Page 61

16 (Pages 58 - 61)

group, so to speak, which is the earnings announcements and press releases versus the control group, which is the days with no news.

In performing that test, I had in my mind using the 95 percent threshold, certainly for which days are statistically significant for that test, I used the 95 percent threshold.

And then in the footnotes to Exhibit 8, I note that the differences between the treatment group and the control group are significant and beyond the 95 percent -- or 99 percent level.

So I have a very strong empirical basis to conclude there is a cause-and-effect test beyond the -- cause-and-effect relationship well beyond the 99 percent significance level.

But in terms of identifying which days individually were statistically significant, I used the 95 percent threshold in the calculations in Exhibit 8.

But in some of the detail work that I provide of showing each event, I clearly also show whether things are significant at the 90 or 99 percent level. I don't -- I can't -- I don't think I can give you a more complete answer than that.

Page 62

Q. To determine statistical significance, you calculate what is called a t-statistic; right?

A. That's a piece of it, yes.

Q. What -- what -- what is a t-statistic?

A. It's a measurement of how many standard deviations away from 0 the abnormal return is in this context. I mean, generally speaking, it's a measure of the number of standard deviations your measurement is away from your null hypothesis.

In the particular case, we're talking about how many standard deviations the abnormal return is from zero.

Q. Sorry. A -- a -- a lot -- a lot of that went over my head. But just -- just to -- to perhaps simplify it, there -- there is a statistically significant stock price movement at a 95 percent confidence level if the t-statistic is greater than 1.96 or less than negative 1.96; right?

A. That's the -- that's the sort of rule of thumb, certainly, when you have a large enough dataset and -- and the precise threshold can change, depending on how many observations you're using in your regression.

And there is a statistic called a p-value that more precisely translates t-statistics into

Page 63

probabilities. And so we use the p-value ultimately. You need a p-value below .05, but that usually -- when there's -- when there's a -- a -- a large enough data sample, that usually is a number very close to 1.96.

Q. Okay. Can -- can you go to paragraph 55 of your report.

A. Yes.

Q. In paragraph 55, you -- you state that you determined statistical significance using a -- a t-statistic; right?

A. Yes, part of the process of testing for significance is to calculate a t-statistic, yes.

Q. So I might have missed it, but this section doesn't talk about using a p-value, does it?

A. It doesn't. Again, I -- this description is meant to provide information to the Court that summarizes how -- how these tests are done, and I was trying to do it in a digestible way.

And underneath this, a t-statistic gets converted to a p-value, and that p-value is ultimately what's used to conclude exactly whether it goes over the threshold or not. And 1.96 is rounded, obviously. So there's just another step that goes beyond this that's not described in the --

Page 64

(Interruption in audio/video.)

THE COURT REPORTER: Is not described in the what?

THE WITNESS: In the text of my report. But this is certainly describing how the t-statistic is calculated and roughly what the threshold is for significance.

BY MR. DE JARNETTE:

Q. Got it.

We're jumping around a little bit, but let's go back to your Exhibit 7.

A. Okay.

Q. This is an analysis of price reactions to FibroGen's press releases during the class period; right?

A. Earnings announcements and -- and press releases related to their drug development, et cetera; yes. That's correct. Yeah, earnings announcements and press releases.

Q. And -- and I think we briefly discussed this at the beginning of the day. But when you say "earnings announcements," that wouldn't have included earnings calls; right?

A. Well, the earnings calls occurred on the same day as the earnings announcements. So yes, it

Page 65

17 (Pages 62 - 65)

would effectively include them in the analysis because they held a conference call on the same day as the earnings announcements.

Q. When you refer to "earnings announcements," are you talking about press releases that announce earnings?

A. Yeah, that's typically how the company did it. They would release a press release that had earnings information in it and some text along with that, and then they would hold a conference call that same day.

Q. And the conference call would typically take place after the press release was issued; right?

A. I would have to check if that occurred every single time, but it -- generally, yes, I -- that's my recollection.

Q. Now, in -- in the two hours that you reviewed the earnings call transcripts yesterday, did -- did you determine at what time those earnings call -- calls happened in relation to the press releases that were issued?

A. I recall seeing that they had occurred on the same day or within the same market day, for sure. I do believe there were timestamps on those.

Page 66

And I believe that -- again, I -- I think they're general practice. And I didn't see any -- I don't recall any exceptions to this, but their general practice was to have a call after the press release.

And just before we move on, because you pointed me to Exhibit 7, I just wanted to point out that there is a column on Exhibit 7, the second-to-the-last column that converts a t-statistic to a p-value. And so I do report the p-values as well. And anything with a p-value below .05 would be significant at the 95 percent level.

Q. And if it was above .05, it wouldn't be; correct?

A. At the 95 percent level, that's correct, yes.

Q. You -- you talked about a column to the right that says "Sig Level" earlier; right?

A. Yes.

Q. If there's no asterisks, is it fair to say that that day is not statistically significant at the 95 percent level?

A. That's correct, yes.

Q. Now, you -- you pointed me earlier to the first -- the first row, December 20th, 2018; correct?

Page 67

A. Yes.

Q. Now, that row references a press release issued at "7:00 AM" on that day; right?

A. Yes.

Q. And -- and that row determines whether or not there's statistical stock price movement within that same day; correct?

A. In this case, since it -- it occurred before market, the "Market Date," which is the fourth column there, is the day that I'm evaluating for whether there is a statistically significant movement in price, and in this case, there was.

So, for example, just to make clear what that distinction is, if you look at row 2, which is February 27, 2019, there was an announcement after market at "4:07 PM." The mar- -- so the relevant market date to evaluate would be the next trading day. So that's why the market date says "2/28/2019."

Q. If we use row 2, you're still determining whether or not there's statistically significant stock price movement within a trading day; right?

A. Yeah, my analysis goes from the closing price on -- in this particular case, a closing price on February 27, 2019, to the closing price on

Page 68

February 28th, 2019. So the event window is one day long -- one trading day long.

Q. Just so I know, what -- what do you mean by "one-day event window"?

A. Meaning when I'm measuring the abnormal return, one thing you -- one thing that needs to be specified that you're calculating that return over is the event window.

So you can look at a one-hour return, a one-day return, a one-week return, a one-month return, a one-year return, right. So here in -- in this analysis, I'm looking at one-trading-day return. So that's what I mean by the event window here is that the price reaction I'm measuring occurs over one trading day -- one full trading day.

Q. Why did you use a one-day event window?

A. That's a fairly standard approach in doing these types of analyses for this purpose.

Q. But in using a one-day event window, you're confident that you've demonstrated market efficiency; right?

A. Well, I'm confident that I've demonstrated a cause-and-effect relationship between new firm-specific news and movements in FibroGen securities prices.

Page 69

18 (Pages 66 - 69)

As I describe in my report, there's no direct conclusive test for market efficiency.

So do I believe this provides important critical evidence for -- that supports market efficiency, yes.    12:41:10

Q. You believe that you have demonstrated a cause-and-effect relationship between FibroGen-specific news and FibroGen's stock price by using a one-day event window; right?

A. That's the methodology I employed, yes.    12:41:26

Q. And a one-day event window signifies that the market absorbed company-specific news within a day; right?

A. Well, I don't know that it signifies that. It -- it is testing whether -- so the -- the way the    12:42:03 measurement is done is to test whether there's a stock price movement within a day on average when there's news versus when there's no news.

So I think the more proper way to say it is that that's the measurement window over which I'm    12:42:24 trying to test whether there's an observable cause-and-effect relationship.

Q. So to put it another way, your event study assumes that the market absorbs FibroGen-specific news within one trading day; right?    12:42:43

Page 70

A. That's the period over which I'm measuring it. Again, I -- I think in -- where I want to be careful is there could be times that you could measure that the price reaction or at least some price reaction occurs much quicker than that. You    12:43:08 can do an hourly event study.

In some specific cases you might be interested in whether there's evidence that -- that the market took more than a day to react to certain information in certain circumstances, so you might    12:43:21 choose an event window that's longer. I don't think there's a -- a magic to the one-day event window. It's a commonly used approach. It certainly tests whether there's evidence of rapid price movements, but it's certainly not the only window one could    12:43:36 choose.

Q. Then -- then why didn't you use a longer or shorter window?

A. Because I think the one-day event window is -- is a fairly standard approach in the -- in    12:43:54 this context and also in the literature when looking at returns for companies that trade in efficient markets.

Again, it -- it's not universal in the sense that it's the only thing that makes sense to    12:44:09

Page 71

do in all circumstances. But I would say it's certain- -- daily event studies are the probably most often observed things in this context.

Q. But just to confirm, your event study does not include the price reaction beyond one day after    12:44:23 each announcement; right?

A. In how I'm performing these tests, it does not, that's correct.

Q. You also used a one-day event window for non-news days; right?    12:44:35

A. Correct.

Q. And just so I understand, your entire event study used a one-day window; right?

A. Throughout my event study analysis, I used one-day event windows, yes.    12:44:51

MR. DE JARNETTE: All right. We've -- we've been going another 45 minutes. Let's -- let's take a quick break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Okay. This marks the    12:45:07 end of Volume I, Media Unit 1, of the deposition of Chad Coffman.

The time is 12:45 p.m. We're off the record.

(Short recess taken.)    12:45:22

Page 72

THE VIDEOGRAPHER: We are back on the record at 1:00 p.m.

This marks the beginning of Volume 1, Media Unit 2, of the deposition of Chad Coffman.

Please continue.    13:01:09

BY MR. DE JARNETTE:

Q. Mr. Coffman, you're currently in Chicago; right?

A. Correct.

Q. And you testified that you met with    13:01:13 Mr. Kaplan in person?

A. Yesterday, yes.

Q. So he -- he -- he's in Chicago as well?

A. He is, yes.

Q. Is he in the same room as you?    13:01:23

A. He is, yes.

Q. Dur- -- during the break, did you have substantive conversations with Mr. Kaplan about your testimony?

A. No.    13:01:32

Q. Before the break, you testified that a p-value of less than .05 is the measure of statistical significance; correct?

A. Well, that would -- I think what I said was that a p-value of less than .05 would suggest    13:02:07

Page 73

19 (Pages 70 - 73)

that something was statistically significant at the 95 percent confidence level.

Obviously at different thresholds for statistical significance it would be a different p-value.                13:02:23

So if we are talking about 90 percent significance, that would be where the p-value is below .10.

Q.  You haven't determined whether it's appropriate in this case to use a p-value below .10;  13:02:36 correct?

A.  I'm sorry, could I have that read back?

Q.  All right.  I -- I can re-ask the question.

A.  Yeah.  Thanks.  I just -- I'm so sorry, I  13:02:49 didn't -- I didn't hear one of the words quite right, I don't think.

Q.  Sure.

You have not determined for purposes of this case whether it is appropriate or not to use a  13:02:58 p-value less than .10 to determine statistical significance; correct?

A.  I don't think I said that.  I think -- I -- I think I've testified that using p-values less than .05, which corresponds to the 95 percent  13:03:24

Page 74

standard for statistical significance, is an appropriate thing to do in this case given the tests I'm running in the context of what I'm doing.

I think I also testified that testing for things at the 90 percent level is not necessarily  13:03:42 inappropriate.  So I -- I -- I'm not suggesting that a 90 percent significance level would be an inappropriate standard to apply.

I'm saying that I think using the 95 percent threshold is an appropriate methodology,  13:04:03 which I've employed for the purposes of this report.

Q.  Just to be clear, for purposes of your report, you only determined statistical significance using a .05 p-value; correct?

A.  Well, again, I -- I -- I want to be clear  13:04:22 about this.  For the primary cause-and-effect tests that are reflected on Exhibit 8 for the common stock and different exhibits for the options, but for -- for the -- for the common stock for the purpose of performing the calculations on Exhibit 8 to test for  13:04:45 cause and effect, I relied upon a 95 per- -- 95 percent confidence interval, a -- a -- a -- or a threshold p-value of .05.

In my view, that's an appropriate approach and method to draw the inferences which I'm drawing.  13:05:05

Page 75

I'm just not suggesting that's the one and only appropriate thing one could do.  There -- someone could apply a lower confidence threshold, and that would not necessarily be inappropriate.

And, in fact, in some of the exhibits in  13:05:25 my report, including Exhibit 7 and -- and elsewhere, I do describe when certain events are significant whether considering the 90, the 95, or the 99 percent confidence interval.

So I'm clearly suggesting that those are  13:05:45 thresholds that are often considered.  But for the purposes of my primary tests of cause and effect, I'm relying on the 95 percent confidence threshold.

Q.  Let -- let's turn to your Exhibit 8.

A.  Okay.                13:06:14

Q.  In your opinion, Exhibit 8 demonstrates that there's a cause and effect between FibroGen-specific news and FibroGen's stock price; correct?

A.  I believe the statistical analysis  13:06:27 summarized there provides reliable statistical evidence of a cause-and-effect relationship between new news and movements in FibroGen common stock, yes.

Q.  And just to close the loop on this, you  13:06:43

Page 76

generated Exhibit 8 only using a .05 p-value to measure statistical significance; correct?

A.  That's what's reflected in the calculations under Exhibit 8, yes.

Q.  So for purposes of Exhibit 8, you did not  13:06:58 employ either a 90 percent or a 99 percent confidence level; correct?

A.  That was not the threshold level at which I was performing that test, that's correct.

Q.  Can we please pull up what has been marked  13:07:18 as Exhibit 22.

(Coffman Deposition Exhibit 22 was marked electronically.)

THE WITNESS:  Okay.

BY MR. DE JARNETTE:                13:07:38

Q.  It is an Excel file with the Bates identifier Coffman_0003103.

Do you see that?

A.  I see that, yes.

Q.  This is an Excel containing the outputs  13:07:57 from your event study; right?

A.  I believe that's right, but give me just a second to review a couple of things.

Q.  Sure.  Take -- take your time.

A.  Yes, that's what this appears to be.  13:08:31

Page 77

20 (Pages 74 - 77)

Q. And I take it you've seen this document before?

A. Yes.

Q. If we go -- actually, be- -- before we get into specifics, at -- at high level can you describe this -- this exhibit to me?

A. Sure. So this is a -- this file reflects on a daily basis some of the -- or the inputs to the regression analysis that's -- is -- is summarizing the event study and -- and the outputs from that regression analysis and the tests for each day as to whether -- what the p-value is and whether it's statis- -- each day is statistically significant or not based on the event study regression I've performed.

I mean, obviously I could go through and give you exactly what each column is, but that's -- that's a summary of what that is.

Q. Yeah, no -- no need for that. I'll -- I'll direct you to specific columns.

Let's start with column W.

A. Okay.

Q. Row 1 says "SIG_95."

Do you see that?

A. Yes.

Page 78

Q. I take it that this column indicates whether there is statistical stock price movement at a 95 percent confidence level; is that right?

A. It actually provides information on all three thresholds of 90, 95, and 99.

So, for example, in row 21, there's an indicator there of two "++." That means it's statistically significant in a positive direction at a 95 percent confidence level. One "+" would be 90 percent confidence. Three "+++" would be 99 percent confidence.

Q. I also see minuses in row 31.

What does that refer to?

A. So it has the same interpretation except that would be a statistically significant price decline rather than increase.

Q. Just out of curiosity, why does column W say "SIG_95"?

A. It's just a labeling convention. It -- it -- it isn't meant to describe exactly -- I mean, there's more informa- -- I mean, that's -- whether something's significant at the 95 percent level or not can certainly be determined based on what's in that column, but there's actually more information than just that.

Page 79

Q. Just so I understand, if column W does not have either a plus or a minus, there's no statistical stock price movement on that day; right?

A. I think you meant to say "statistically significant." I just -- Maybe you just want to ask a clearer question. Because I think you said just said "statistical."

Q. Okay. Thanks for helping me with my question.

So if there is no plus or minus in column W, that indicates that there's no statistically significant stock price movement on that day, right?

A. That's correct at -- at any of the levels we've talked about, 90, 95, or 99.

Q. Can we scroll down to row 666.

A. Okay.

Q. And you -- you can go back over to -- to column A.

A. Okay.

Q. Row 666 is for July 13th, 2021; right?

A. Yes.

Q. If you go back to row -- or column W for row 666, there are no plus or minus signs; right?

A. That's correct.

Q. So according to your event study, there is

Page 80

no statistical stock price -- sorry, strike that.

So according to your event study, there is no statistically significant stock price movement on July 13th; right?

A. July 13, 2021, correct.

Q. Now, if you go down to row 667, according to your event study, there is not any statistically significant stock price movement on July -- July 14th, 2021, either; correct?

A. Correct.

Q. If you look at July 14th, 2021, you can see that the stock price actually increased; right?

A. You're saying on July 14, 2021, the stock price is higher than at the -- on the close of that day than on July 13th, 2021; correct?

Q. Correct.

A. Yes.

Q. Let -- let me just ask the question one more time so it's not muddled.

FibroGen's stock price increased on July 14th, 2021; right?

A. Relative to where it closed on the prior day, yes.

Q. Bear with me. I'm going to navigate to some other days.

Page 81

21 (Pages 78 - 81)

On May 10th, 2021, -- or, actually, can you go to -- to row 662 that refers to May 10th, 2021?

A. I think you mean 622.

Q. Apologies.                    13:15:59

Can you go to row 622 that refers to May 10th, 2021.

A. Yes.

Q. If you'd go to column W, that shows that there is no statistically significant stock price    13:16:13 movement on May 10th, 2021; correct?

A. That's correct.

Q. Nor was there a statistically significant stock price movement the next day; correct?

A. That's correct.                    13:16:37

Q. Let's go to row 625.

A. Okay.

Q. That refers to May 13th, 2021.

Do you see that?

A. I do.                    13:16:53

Q. If you go over to row -- if you go over to column W, that shows that there's no statistically significant stock price movement on that day; right?

A. That's correct.

Q. Nor was there any statistically    13:17:12

significant stock price move- -- movement the next day; right?

A. On May 14, 2021, that's correct.

Q. Let's go down to row 640.

A. Okay.                    13:17:32

Q. That refers to June 4th, 2021.

Do you see that?

A. Yes.

Q. If you go over to column W, it shows that there is no statistically significant stock price    13:17:48 movement on June 4th, 2021; right?

A. Correct.

Q. Nor is there any statistically significant stock price movement the next day; right?

A. Correct. The next trading day, which is    13:18:01 June 7th, that must be a weekend over -- in that gap. But, yes, there's no significant reaction on June 7th, 2021.

Q. Okay. Fair enough.

Are you aware that Plaintiffs are alleging    13:18:17 that there was a corrective disclosure made on April 6th, 2021?

A. I'm sorry, repeat the date.

April?

Q. 6th, 2021.                    13:18:38

A. Give me just a second.

Q. What -- what are you referring to?

A. I wanted to go back to my report for just a second.

Q. Take your time.                    13:19:06

A. Yes, I'm aware that on April 6th, after market hours, is when FibroGen announced that there was going to be an FDA Advisory Committee to review Roxadustat, and that that's alleged -- and that that's alleged as a corrective disclosure.    13:19:45

So the market date for that would be April 7th, 2021.

Q. Do you have any reason to dispute that after April 6th, 2021, the only challenge statements were made on May 10th, May 13th, and June 4th, 2021?    13:20:05

MR. KAPLAN: Objection. Form.

THE WITNESS: As I sit here right now, I don't have a reason to dispute that, but I -- I have not committed all the alleged misstatements and their timing to memory.                    13:20:27

So, I mean, the Complaint speaks for itself on that. But as I sit here right now, I don't have any basis to challenge that.

I mean, I could go -- if you want to show me the Complaint, I could go look at it. But as I    13:20:36

sit here right now, I don't have a reason to challenge that.

BY MR. DE JARNETTE:

Q. Okay. But assuming that after April 6th, 2021, the only remaining challenge statements were    13:20:46 made on May 10th, May 13th, and June 4th, you would agree that there is no statistically significant stock price movement on any of those remaining challenge statement days; correct?

A. I think those are the days we just went    13:21:06 over. But let -- just out of an abundance of caution, can we go one by one with -- on those?

So what was the first date?

Q. May 10th, 2021.

A. Okay.                    13:21:28

And what was the second date?

Q. May 13th, 2021.

A. Okay.

And what was the next one?

Q. June 4th, 2021?                    13:21:37

A. Okay. Yeah, I didn't -- I don't find a statistically significant stock price movement on any of those days.

Now, I don't know if you're quoting me appropriate market dates, given the timing of those    13:21:53

22 (Pages 82 - 85)

Veritext Legal Solutions
866 299-5127

statements. But on those particular market dates, there was no statistically significant stock price movement.

Q. Nor was there any statistically significant stock price movement the following day for each of those days; right?

A. That's correct. I don't see any.

Q. So let -- let me -- let me go back to the question I originally asked.

If we assume that the only remaining challenge statements after April 6, 2021, are from May 10th, May 13th, and June 4th, then there was no statistically significant stock price movements on the days any of those remaining challenge statements were made; right?

MR. KAPLAN: Objection. Form.

THE WITNESS: I believe that's correct.

BY MR. DE JARNETTE:

Q. Gen- -- generally speaking, in an efficient market, does the stock price react to the re-publication of information that was previously disclosed?

A. I would say it -- it -- if -- if the context and circumstances have -- have not changed in some way, then the answer is no. But if the

Page 86

context or circumstances have changed in some important way, then -- then the answer might not be no. So I think you really have to analyze it in -- in context.

So for ex- -- you know, just to give a -- an example, if a company says, you know -- you know, We have a billion dollars in the bank in our -- in -- in cash in the bank. And then, you know, a -- a quarter later, after they've, you know, supposedly had, you know, great cash flow, they say, again, We have a billion dollars in the bank, there might be a question of why that didn't change. Right.

So I -- I'm just giving an -- an example of where the exact same statement under different context would be new news and -- and cause market participants to change their views about a company.

But if -- if we're talking about an unchanged context where a company simply repeats something it said before, then you wouldn't nec- -- you wouldn't expect the stock price to move.

Q. Do -- do you know what I'm referring if I said "corrective information"?

A. I have an understanding of what you mean by -- generally, by "corrective information" in class action securities cases, if that's what you're

Page 87

talking about.

Q. Yes.

What -- what is your understanding?

A. Well, the way I think of corrective information is it's -- it's a disclosure that reveals some portion of the relevant truth that's been concealed by misstatements or omissions.

Q. In other words, a revelation of truth?

A. A revelation of some portion of the relevant truth. I -- I think that's -- that's the best way I can phrase it because that's phrasing I've used over and over again is a -- a -- a revelation of some portion of the relevant truth that had been concealed.

Q. In -- in an efficient market, if allegedly corrective information is disclosed, you expect it to be absorbed rapidly; right?

A. Yes, using the definition of rapidly I described earlier today.

Q. And -- and disclosure of corrective information dissipates artificial inflation; right?

A. Well, let me take a step back. I -- I want to be very careful about my prior answer. When we say "disclosure of corrective information" there's -- I'm assuming as part of your question,

Page 88

you're talking about information that is widely distributed and widely available. There can be some dispute over what that -- what that means.

But if -- if there's widely distributed, widely available information that's -- that's disclosed, then I would expect the stock price to react to that rapidly.

Q. Un- -- understood.

Not -- not sure I got an answer to the previous question --

A. Yeah, I -- I -- I think I went back to the prior question and wanted to clarify it. So if you want to re-ask the -- the other question, I -- I -- I'd like to have that fresh in my mind.

Q. Well, will -- will do.

The disclosure of corrective information dissipates artificial inflation; right?

A. It can.

Q. Are there circumstances where it wouldn't in an efficient market --

A. Well, yeah. I mean, if -- if the corrective information was somehow not material, it wouldn't necessarily move the stock price.

Q. When I said "corrective," I -- I assume that the information would be material. So in -- in

Page 89

23 (Pages 86 - 89)

your understanding of corrective information, are you not assuming that the information is material?

A. I guess I wasn't starting from that assumption that it had to be material, no. I mean, I -- there can be -- you know, I -- I'm thinking 13:27:50 about circumstances where there can be financial statement -- you know, misstatements that, you know, clearly aren't material that you could have a corrective disclosure of that, and you can say, We misstated our earnings by, you know, a penny a share 13:28:04 and -- and the market might not think of that as being material for some reason. So I wasn't taking as part of your question an assumption of materiality.

Q. All right. 13:28:18

I'll -- I'll -- I'll be a little bit more specific in my question.

Disclosure of material corrective information dissipates artificial inflation in an efficient market; right? 13:28:30

A. That's typically the mechanism by which artificial inflation is dissipated or it is a -- a way artificial inflation can be dissipated. It's not the only way, but it's -- if in an efficient market, if there's material misstatements, and those 13:28:44

Page 90

misstatements are then corrected by some form of corrective disclosure, that can re- -- dissipate artificial inflation.

Q. So if -- if a company disclosed all corrective information and discloses different 13:29:16 non-corrective information days later, the second disclosure is not corrective; right?

A. So you're asking me to assume that a company makes a full and complete corrective disclosure without further hiding anything, and then 13:29:38 at some later point in time discloses something different, that that disclosure of the different information wouldn't be corrective? Is that -- I -- I think that's -- under the specific hypothetical you're giving me, that sounds like it would be true. 13:29:58

Q. Which -- which means under the hypothetical, there, presumably, would not be price impact from the corrective information that was disclosed days earlier; right?

A. I don't think your question presumed that. 13:30:17

Q. How did it not?

MR. KAPLAN: Objection. Form.

THE WITNESS: I think you said -- you just asked me to assume that there was a complete disclosure at some point, and then days later, there 13:30:32

Page 91

was some unrelated information revealed. I don't think you gave me an assumption about whether the price dropped or not on the initial disclosure.

BY MR. DE JARNETTE:

Q. Well, let -- let's assume that the price 13:30:47 didn't drop on initial disclosure, but did on the second one.

You with me?

A. Yes.

Q. So under that hypothetical, presumably 13:30:54 there would not be a price impact from the disclosure of corrective information days earlier; right?

A. I think if -- if all elements of what you described as the hypothetical were true, then that 13:31:15 sounds right, that the -- and just to be clear, that the -- that the initial disclosure was a complete and total corrective disclosure where there was nothing that remained hidden and the later event was -- didn't disclose anything that was partially 13:31:36 corrective. Then under those circumstances, I think what you're describing is correct.

Q. You -- you -- you told me at the beginning of today that you determined that both FibroGen common stock and put and call options traded in an 13:31:58

Page 92

efficient market; right?

A. Yes.

Q. We -- we talked a lot so far about determining market efficiency for -- for common stock; right? 13:32:13

A. Yes.

Q. Did -- did you ever perform any independent analysis with respect to market efficiency for options other than the put parity test? 13:32:28

A. Well, there's the put/call parity test. And then there's the cause-and-effect test.

Q. Can you describe what the cause-and-effect test was for options?

A. Sure. 13:32:41

It -- it -- it's really the same overall methodology that I used for the common stock which is to say, I looked at what I considered a treatment group of market dates, which is to look at dates where there was either earnings announcements or 13:32:58 press releases by the company. That's the treatment group.

And then there were days in which there was no FibroGen news, what I call the no-news dates. And I compared results between those two groups on 13:33:12

Page 93

24 (Pages 90 - 93)

three different dimensions:

One was the frequency with which I saw statistically significant movements in the option prices.

The second was whether the overall 13:33:26 magnitude of price movements between the two groups.

And then third was the average volume in the option series between those two groups. And found that there were statistically significant differences from the treatment group to the control 13:33:46 group for all three of those measures.

And that -- that's reflected on -- and -- and I did that separately for calls and puts. If you'd like me to point to the exhibits in my report, I can -- I can do that. I don't have it up at the 13:34:05 moment.

Q. Yeah. Let -- let -- let's -- let's hold off for now.

Just so -- so I understand, put and call options don't necessarily mean that you actually 13:34:21 execute trades in the security; right, or in the underlying common stock; right?

A. You're not necessar- -- when you enter into a put op -- a contract or a call contract, you're not transacting directly in the underlying 13:34:37

Page 94

security, that's correct.

Q. Just -- just -- just because -- or strike that.

If FibroGen common stock traded in an efficient market, that doesn't necessarily mean that 13:34:56 put and call options do as well; right?

A. My understanding is often that's presumed in this context. But it -- from a -- from a -- from a pure economic or finance standpoint, that's correct.                          13:35:13

It -- it's -- just because the stock is efficient doesn't necessarily mean the option markets are efficient.

Q. You -- you just testified that it's your understanding that that relationship is presumed in 13:35:23 this context.

What -- what's your basis for that?

A. No. I just understand from conversations with -- with counsel, not only in this case, but in other cases, often courts will presume the options 13:35:37 are efficient if the stock is efficient. I'm not suggesting that's -- that is -- is my view. I'm just saying that often that is presumed.

I also just testified that just because the stock is efficient from a pure finance 13:35:58

Page 95

perspective doesn't mean the option markets are efficient.

Q. I -- I assume the conversations with counsel that you're referring to are Plaintiffs' counsel?                          13:36:17

A. The ones I have in my mind right now, yes.

Q. Aside from conversations with Plaintiffs' counsel who -- who told you that it is presumed in this context that if common stock trades in an efficient market, options do as -- as -- as well, 13:36:31 you got no other basis for your understanding; right?

MR. KAPLAN: Objection. Misstates prior testimony.

THE WITNESS: I think I may have seen 13:36:44 opinions, legal opinions in the past that -- that drew that conclusion, but I'm not citing to those. That's -- I'm not suggesting that's my opinion. I -- I -- I just have seen that -- that concept used in the past. And -- and -- and I -- I recall seeing 13:37:02 certain court decisions that said that. But I -- that's -- I'm not giving that opinion.

BY MR. DE JARNETTE:

Q. Well, what is your opinion?

A. My opinion is -- I think I was clear in my 13:37:13

Page 96

prior answer -- that just because a stock is efficient, does not mean the options are necessarily efficient.

Q. For -- for -- for market efficiency of common stock, you analyzed the five Cammer factors 13:37:26 and the three Krogman factors; right?

A. That's part of what I analyze. I also analyze a couple other factors, I believe.

Q. You -- you -- you didn't analyze all those factors for options, did you?                          13:37:42

A. Well, it's unclear how to apply some of those factors to options. And some of those factors apply to options just as well as they do common stock.

So, for example, you know, S-3 13:37:58 eligibility, you know, doesn't differ between common stock and options. The presence of analyst reports doesn't change between common stock and options. So I didn't reanalyze those things.

You know, the -- you know, options are 13:38:14 different than common stock, and you can't necessarily apply the same factors. I applied what I view are two important factors for answering -- for analyzing the question.

Q. I have one question that's a little -- a 13:38:28

Page 97

25 (Pages 94 - 97)

little bit off topic, and then I think we can take a break.

But for purposes of market efficiency of -- of common stock, if analyst reports are issued the same day as company-specific news talking about that company-specific news, that -- that's really strong evidence that the market is absorbing the company-specific news on -- on that same day; right?    13:38:55

A. Well, it certainly provides evidence that there are analysts who are taking information from the company, considering it, analyzing it, and publishing reports on it, and that -- so that suggests that the information was widely distributed. It ex- -- it dis- -- it suggests that the analyst considered it important enough to report on. And so, I think it -- it provides supporting evidence for market efficiency. Yes.    13:39:15    13:39:35

Q. Within that same day; correct?

A. Well, I don't think it even has to be within that same day, but it -- it -- the fact if you do see it within the same day, then I think that provides particularly good support that that information was widely distributed and analyzed.    13:39:56

Q. But within -- within my hypothetical where analysts are -- are reporting on news issued that    13:40:09

day, that provides strong evidence that the market is absorbing that news within that day; right?

A. Well, again, I think it can depend on how complex that information is and at the time of the day the analyst reports are issued.    13:40:26

So, for example, if in the morning the company provides some new piece of information and it's complex and unexpected and then, you know, you go almost the entire day and then analysts are reporting in the afternoon or even in the evening, those are the sorts of circumstances where, you know, you can see evidence of the market taking more than one day to react.    13:40:41

So I wouldn't say just because there's an analyst report on the same day necessarily means the price fully responded within one day. I mean, it clearly indicates there's distribution of the information which is supportive of efficiency. It clearly reflects that the analysts were -- were con- -- considering that information and -- and providing investment recommendations based on that information.    13:40:53    13:41:11

But I don't think you can jump to the conclusion that that makes it -- based on that information alone, that it makes it more likely that    13:41:22

the price fully responded within one day because it depends some on the nature of the information, the timing and how complex it is and what the evidence shown on the following day.

In other words, if there's even more analyst coverage the next day and high volume and high -- and substantial changes in the price, there could be strong evidence that it took more than one full day to react.    13:41:38

MR. DE JARNETTE: Let -- let -- let's pause there and -- and take a break and go off the record.    13:41:52

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 1:41 p.m.    13:41:57

(Lunch recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 2:31 p.m.

BY MR. DE JARNETTE:

Q. Hi, Mr. Coffman. Welcome back from the break.    14:32:01

A. Thank you.

Q. Did you have any substantive discussions about your testimony with Mr. Kaplan during the break?    14:32:18

A. No.

Q. Can we turn back to Exhibit 22, which is an Excel of your event study.

A. Yes.

Q. Let me know when you're there.    14:32:27

A. Yeah, I'm there.

Q. Okay. Can we go to row 644?

A. Okay.

Q. That refers to June 10th, 2021; right?

A. Correct, yes.    14:32:52

Q. If you go to row W, that shows that there's no statistically significant stock price movement on that day; right?

A. There's -- correct. There is no statistically significant stock price movement that day.    14:33:07

Q. And on June 11th, there is no statistically significant stock price movement on that day at a 95 percent confidence level; right?

A. Correct. It is significant at the 90 percent level but not at the 95 percent level.    14:33:28

Q. Do you know what I mean when I say "materialization of a known risk"?

A. I've heard that phrase used in lots of different ways in -- whether it's talking about    14:33:49

26 (Pages 98 - 101)

legally or economically, but I -- I have a general idea of what you mean, yes.

Q. What is your general idea?

A. It's the idea that there's some risk that's been disclosed to the market, but you don't 14:34:06 know the outcome of that risk yet and then some event happens that tells you whether or not that risk has actually materialized.

Q. But by definition, the materialization of a known risk is not corrective; right? 14:34:20

A. I don't know.

MR. KAPLAN: Vague. Form.

Objection. Sorry. Vague.

THE WITNESS: Well, I don't know if you mean -- I don't -- I don't know that. That sounds 14:34:30 like a legal question. I mean, there's certainly times where I've seen cases where there's an allegation that the risk itself is known, but not the -- or the general risk is known, but the probability of that risk is somehow misstated. So I 14:34:49 don't think just based on what you gave me, I -- I would draw that conclusion, no.

BY MR. DE JARNETTE:

Q. If the full extent of a risk is known, materialization of that risk is not corrective; 14:35:07

Page 102

right? MR. KAPLAN: Objection. Form.

THE WITNESS: Well, again, I -- I think if -- if the predicate hypothetical is there's a risk out there that's been fully and sufficiently 14:35:22 disclosed, and then that risk happens and a stock price falls, that generally would not be considered a corrective disclosure.

Again, I think there could be disputes over what it means to be fully and correctly 14:35:41 disclosed. But I think if -- if there is no alleged misstatement or no omission related to that risk, then when that risk happens and the stock price falls, then that would generally not be considered corrective. 14:35:58

BY MR. DE JARNETTE:

Q. Let's go to page 41 of your report.

A. All right.

Give me just a second.

You said "page 41" or paragraph 41? 14:36:28 Sorry.

Q. Page -- page 41. I -- I'm -- I'm taking you to your damages section.

A. Got it. Thank you.

All right. I'm there. 14:36:41

Page 103

Q. The damages portion of your report begins at paragraph 93; correct?

A. Yes.

Q. And this damages section is the basis you provide for your overarching damages opinion; right? 14:37:01

A. I'm sorry. Could you repeat that? I just -- I -- I think I missed something in that question.

Q. Sure.

This -- this damages section provides your 14:37:11 basis for your overarching damages opinion; correct?

A. It -- it's certainly a summary of that, yes.

Q. Is -- is it fair to say that paragraphs -- well, actually, let -- let me back up. 14:37:31

And that damages section goes from paragraph 93 to paragraph 98; right?

A. Yes.

Q. This damages section between paragraphs 93 and 98 is near identical to other damages sections 14:37:54 you've used in other expert reports you filed in securities class actions; right?

A. Yes. That's -- that's kind of the point is the same overall damages approach when there's claims of investors purchasing an artificially 14:38:13

Page 104

inflated prices due to misstatements, there is a standard approach to calculating class-wide damages, so there is no need for the -- the words of my report to change from case to case, if the claims are generally consistent and economically coherent 14:38:30 with -- with those other cases.

Q. So it's your position that the theory of liability advance in all those cases is the same as the theory of liability advance in this case?

MR. KAPLAN: Objection. Misstates the 14:38:47 testimony.

THE WITNESS: No, not at all. I mean, the theory of what was misstated and the theory of what was omitted and the theory of how the -- the information came to light and -- and the underlying 14:38:56 facts and circumstances of the case are -- cases are all clearly very different.

But in each one, there was an allegation that the alleged misstatements and omissions by the Defendants artificially inflated the market price of 14:39:13 the security; and therefore, an appropriate damages methodology to use would be the out-of-pocket methodology, which measures damages as the inflation at the time of purchase minus the inflation at the time of sale. 14:39:32

Page 105

27 (Pages 102 - 105)

So -- and -- and the -- and that -- that approach can be used class-wide and formulaically once you've determined what the artificial inflation per share is from a loss-causation analysis.

So, in that respect, they're -- they're 14:39:53 all very similar in -- in the economic logic of their claims, but obviously the facts and circumstances and the nature of the claims themselves in terms of what was being misrepresented and how and the time period over which it was is 14:40:04 obviously very different.

BY MR. DE JARNETTE:

Q. Did you largely copy and paste this damages section into this report from another report? 14:40:17

A. Once I was comfortable that I understood the nature of Plaintiffs' claims and their theory of liability and -- and how damages would be -- the -- the use of the out-of-pocket methodology was applied just as well in this case as in any of the other 14:40:35 cases that I've -- that I've issued this language for, then yes, it was essentially copied and pasted in.

Q. Would you dispute that you have used essentially the same damages section in at least 11 14:40:49

Page 106

other reports?

A. That would not surprise me at all. That's the very point I'm making which is that there's a widely accepted methodology for calculating class-wide damages in these types of cases. 14:41:01

Q. But you -- you -- you just testified a few minutes ago that the theory of liability in all of cases is vastly different; right?

MR. KAPLAN: Objection. Misstates testimony. 14:41:13

THE WITNESS: Well, the economic theory of liability, in terms of how investors were damaged in terms of the mispricing of the security at a -- at a conceptual level, that's not different.

But certainly the nature of the theory of 14:41:27 liability based on exactly what was alleged to have been misrepresented and over what time period and the -- the logic of -- of, you know, what the corrective disclosures were and how that -- that inflation came out of the stock and over which 14:41:43 events, those are obviously very case-specific, fact-specific. But the overarching economic logic of this type of claim doesn't change from case to case.

BY MR. DE JARNETTE: 14:41:59

Page 107

Q. You -- you were talking about how those other cases involved different facts from this case. For -- for example, some of those cases involved sporting goods; is that right?

A. Sure. Yes. 14:42:20

Q. Some of them in- -- involved the energy industry; is that right?

A. Yes.

Q. Any other industry outside of the pharmaceutical context? 14:42:32

A. I don't know that I can remember them all. But certainly, I'm sure there were, yes.

Q. And I think you would agree with me that that those cases involved different alleged misstatements than those at issue here; correct? 14:42:47

A. Yes.

Q. Now, your -- your damages section in paragraphs 93 through 98 does not mention FibroGen at all, does it?

A. It doesn't specifically mention FibroGen, 14:43:00 but it certainly talks about the -- the theory of liability that -- that I understand is being alleged in this case.

Q. Do -- do you -- do you know what the drug at issue here is called? 14:43:21

Page 108

A. I think it's -- I -- I -- I might mispronounce, but it's Roxadustat, I think. I might be butchering the pronunciation of that, but that's my understanding of the drug at issue.

Q. Roxadustat is not mentioned in your 14:43:35 damages section; correct?

A. No, for the reasons I described. I -- I'm describing the economic logic of -- of how damages are calculated this type of case and that it's a standard approach. It has nothing specifically to 14:43:53 do with -- like I wouldn't take a different damages approach whether it was Roxadustat or Tylenol or any other -- whatever the drug was that there were allegedly misrepresentations of that.

Q. To -- to -- to that point, do you think 14:44:08 that the out-of-pocket method can be applied to every single securities class action there is?

A. No. I think the claims -- I mean, what I do is satisfy myself that the claims are economically coherent; in other words, I've -- you 14:44:24 know, when someone brings a case to me and asks me whether I believe I can calculate it -- whether damages can be calculated on a class-wide basis, I make sure I understand the nature of what the claims are and what is alleged to have been misrepresented 14:44:41

Page 109

28 (Pages 106 - 109)

at -- at a high level and what -- how the -- the inflation was -- was allegedly dissipated and to make sure it makes economic sense. I don't, obviously, test all the facts or do a loss-causation analysis, but I want to make sure it makes at least economic sense that the type of misrepresentations that are being alleged could plausibly inflate the stock price and the types of events that are being alleged could plausibly dissipate inflation.

So, no, I -- I don't -- there have certainly been cases that have been brought to me where I've told attorneys, This case doesn't make any sense to me and I don't -- you know, I don't see how -- how your -- these types of claims could ever lead to inflation in the stock price. So I -- it's -- it certainly -- I -- I would not give this opinion universally for any claim. I just -- I make sure it makes economic sense to me.

Q. Which means that there are circumstances where the out-of-pocket method may not be consistent with Plaintiffs' theory of liability; right?

A. Well, I think there, though, it's -- it's not necessarily the -- the -- the out-of-pocket method wouldn't be the right method to think about it. I have just come across case where it just --

Page 110

the -- the claims themselves didn't make any sense to me. So I wasn't -- you know, in those cases, I wasn't willing to serve as an expert to give this opinion or any other opinion in -- in those matters.

Q. I -- I -- I take it you're familiar with the BP case.

A. Yes.

Q. And you're -- you're far more familiar with that case than I am. But the -- the Court determined that the damages methodology you prepared was inconsistent with Plaintiffs' theory of liability; correct?

A. Well, I -- I think that case is -- is -- is obviously complex. There were two different subclasses. One was the post-spill subclass which was relying on a standard out-of-pocket methodology based on looking at how the -- how the stock was mispriced over the time of the -- the misinformation was in the market. That -- that class was certified.

Then for the pre-spill class, plaintiffs were seeking something beyond the out-of-pocket methodology. They were seeking to recover for declines in the stock price that clearly would not have occurred at the time of the misrepresentations,

Page 111

even if the full truth had been told.

So it clearly deviated and I said in my report it deviated from the -- the usual out-of-pocket methodology where inflation was measuring the alternative but-for stock price.

So -- and you're right, in that case, the -- the Court found for a -- a number of reasons, that the -- that it was not going to certify the pre-spill class. I forget exactly what words were used, but they didn't certify the -- the pre-spill class. But that was clearly something very different than the out-of-pocket methodology that was -- that plaintiffs were seeking in that case, for that class -- for that subclass.

Q. Do -- do -- do you recall that the Court found that the out-of-pocket method was inappropriate for the pre- -- pre-spill class as well?

A. I don't remember that finding. I -- I recall -- I recall after the decision was made I had actually put in an affidavit describing how you could do the out-of-pocket methodology, and I believe the Court just said that -- that it was -- it was sort of too late and the plaintiffs weren't -- weren't going to be allowed to pursue

Page 112

that methodology.

But I -- I don't remember the Court broadly saying out of pocket was -- was inappropriate for that case -- for that claim. I think the concern was the damages methodology --

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, excuse me, could you start the sentence over again, please.

THE WITNESS: Sure.

I think the Court was concerned that it didn't -- the method that was being proposed didn't match with the typical out-of-pocket methodology.

BY MR. DE JARNETTE:

Q. Just -- just -- just to back up a little bit, you -- you would agree -- or strike that.

You -- you understand that for purposes of class certification, plaintiffs are required to propose a damages methodology consistent with their theory of liability; right?

A. That sounds like a legal question to me about what they're required to do that I'm not a -- an expert in.

Q. So you don't -- you do not have that understanding?

A. Well, I mean, I have a general

Page 113

Veritext Legal Solutions
866 299-5127

understanding that -- that, you know, plaintiffs have to specify something about their dam- -- about damages and their damages theory, but I'm certainly not going to presume what the court may or may not require on that -- with respect to that.    14:49:58

Q. What -- what is your understanding of Plaintiffs' theory of liability in this case?

A. Well, I think at a broad level -- at -- at a broad economic level they're alleging that the market prices of FibroGen securities were distorted    14:50:12 by alleged misrepresentations and omissions.

If we're talking about the stock, the specific allegation is that the price -- market price of the common stock was inflated as a result of -- of misrepresentations and omissions.    14:50:35

And I -- my general high-level understanding of what those misrepresentations and omissions were was that they failed to properly disclose the safety and efficacy profile of Roxadustat during the class period.    14:50:52

Q. Turning back to your damages section, your damages section doesn't reference a single fact about this case, does it?

A. Well, the very first sentence of paragraph 93, which specifies the question I was asked, is "to    14:51:42

Page 114

opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability."    14:52:01

So I -- the -- the last phrase in that sentence makes specific reference to "Lead Plaintiffs' theory of liability" in this case. And I describe that in an -- what that is in an earlier section.    14:52:13

In Section --

Q. IV?

A. -- IV, starting at page 5, I provide an overview of the company and my understanding of the allegations at a very high level.    14:52:32

And clearly through the questions I've answered here today I've described what I understand the -- the overarching theory of -- of Plaintiffs consist.

So I don't specifically use words    14:52:41 specifically related to FibroGen, but certainly the idea that I considered Lead Plaintiffs' theory of liability in this particular case is right there in the first sentence of paragraph 93.

Q. We'll -- we'll -- we'll get -- we'll get    14:52:54

Page 115

to -- to Section IV, but just -- just to close the loop, as a technical matter, your damages section doesn't reference any fact about this case; right?

MR. KAPLAN: Objection. Asked and answered.    14:53:08

THE WITNESS: I don't know what you mean by "as a technical matter." I mean, if you're -- if the question is do I use the word "FibroGen" or describe any FibroGen-specific allegations in detail in Section IX, the answer's no.    14:53:23

But I am referencing in the first sentence of paragraph 93, Lead Plaintiffs' theory of liability. And I described what that was in an earlier section.

BY MR. DE JARNETTE:    14:53:37

Q. Let's go to that section, Section IV on page 5.

A. Okay.

Q. Section IV of your report describes your understanding of Plaintiffs' theory of liability;    14:53:56 right?

A. At a very high level, yes. Again, you know, I -- I -- but, yes, it describes it at a very high level, what I -- what I understand their claims are.    14:54:07

Page 116

Q. So it doesn't reflect your complete understanding of Plaintiffs' theory of liability?

A. Well --

MR. KAPLAN: Objection. Misstates the testimony.    14:54:13

THE WITNESS: Well, I -- you know, I talk --

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry. One second. It Misstates the testimony.    14:54:24

If you could just slow down a little bit so I can catch everybody.

Thank you.

THE WITNESS: Mm-hmm.

You know, it talks about the Complaint.    14:54:25 Clearly I listed the Complaint as -- as something I relied upon or considered. So I -- I certainly read the Complaint and -- and had that in mind as I was drafting this.

I also had discussions with Lead    14:54:39 Plaintiffs' counsel to make sure I understood the general nature of their claims. And then I provided a short summary description here of my high-level understanding of what their claims are.

BY MR. DE JARNETTE:    14:54:53

Page 117

30 (Pages 114 - 117)

Q. Did you personally draft this section?

A. There may have been a -- I may have asked somebody to per- -- put together an initial draft, but I certainly recall reviewing and editing this section of my report.                    14:55:09

Q. How -- how did you determine what information to include and not to include in this section?

A. Well, again, I think for paragraph 10, I provided a description of the -- I was -- I was    14:55:25 looking to describe the company generally.

I used the company's own words from its SEC filings to do that.

In paragraph 11, I wanted to give a general sense of the -- the size of the company    14:55:39 and -- and, you know, with the ticker that it traded under and where it traded. So that -- that's why I put the information in 11.

Paragraph 12 describes at a very high level, consistent with what I described in one of my    14:56:00 prior answers, the economic logic of damages behind Plaintiffs' claim such that they were claiming that the stock price was artificially inflated and that investors were damaged when that artificial inflation was dissipated.                    14:56:20

And then in paragraph 13 I tried to provide some additional high-level detail of what the specific nature of the -- of the misrepresentations and omissions were and that -- then ultimately that the relevant truth, according    14:56:39 to the Plaintiffs, had been revealed.

So that's sort of the -- the general structure of this and what I wanted to convey in -- in this section, and so that's how I chose what to put in here.                    14:56:51

Q. You -- you testified that you reviewed this section.

Do you recall making any edits to it?

A. I don't have a specific recollection of that.                    14:57:00

Q. Let's go to paragraph 13.

A. Okay.

Q. The first sentence reads, "More specifically, the Complaint alleges that throughout the Class Period, FibroGen falsely represented the    14:57:17 safety and efficacy data of its drug, Roxadustat, and falsely assured investors that the safety data was derived pursuant to FDA-sanctioned analysis."

Do you see that?

A. Yes.                    14:57:35

Q. What -- what's -- what's your basis for that sentence?

A. My reading of the Complaint and discussions with Plaintiffs' counsel to gain an understanding of their -- to assure I understood    14:57:48 their allegations.

Q. You -- you -- you don't cite anything after that sentence; correct?

A. Well, I think I go on to describe in more detail what I mean by that and provide footnotes to    14:57:59 the Complaint for every sentence or -- or a number of the sentence after that.

So I don't drop a footnote to that sentence which summarizes, but then for the details that I provide in the following sentences, I -- I    14:58:15 provide citations.

Q. So you -- you deliberately did not include a cite for that sentence?

A. I think I was trying to summarize in that -- at a broader level in that sentence, and so    14:58:25 I -- I think it's supported by the sentences that are below that.

Q. What does "FDA-sanctioned analysis" mean?

A. Well, my understanding is that relates to the communications that FibroGen had had with the    14:58:38

FDA about what types of analysis it was expecting to see in its NDA.

Q. Do you have specific communications that you're referencing?

A. No. It's -- again, this is meant to be a    14:58:57 very high-level description of what I understand Plaintiffs' claims are.

I understand one element of their claim is that Defendants misrepresented the degree to which the FDA had already agreed on a -- on protocols for    14:59:14 how the statistical analysis would be done and what the thresholds for that statistical analysis would be. And I understand Plaintiffs are alleging that they did not tell the full truth about that.

Q. Let's go back to your damages section in    14:59:32 paragraph 93.

A. Okay.

Q. The damages awarded in Section 10(b) cases are commonly referred to as out-of-pocket damages; right?                    15:00:39

A. I've heard them referred to that way, yes.

Q. Fair to say that out-of-pocket damages are the artificial inflation at the time of purchase less -- less that at the time of sale?

A. That's how I understand the -- that's what    15:01:05

31 (Pages 118 - 121)

I understand as the out-of-pocket method generally, yes.

Q. You -- you did not actually calculate damages in this case; correct?

A. That's correct.    15:01:13

Q. So you -- you haven't determined whether Plaintiffs have actually suffered any damages in this case; is that right?

A. That's correct.

Q. It's possible that you could apply your    15:01:25 out-of-pocket methods in this case and there would be zero damages; right?

A. That's theoretically possible, if there was no inflation per share.

Q. In paragraph 93 of -- of your report, in    15:01:37 the first sentence you use the term "methodology."

Do you see that?

A. Yes.

Q. What do you mean by "methodology"?

A. Well, in this particular context, I mean    15:01:53 the application of the out-of-pocket methodology, which is to compute damages based on the inflation per share at time of purchase minus the inflation per share at time of sale subject to certain limitations that I -- I also discuss.    15:02:10

Page 122

Q. Is another way to describe methodology the process to perform a task?

A. I could see how it could be described that way. I don't know that that's the only way to describe it. But, yeah, I mean, it -- it's the --    15:02:43 the steps you undertake to complete a task.

Q. In -- in your report, you also use the term "method." I take it method and methodology can be used interchangeably?

A. I -- I think it might -- certainly within    15:02:55 paragraph 93, when I use the word "method," I -- that -- that's consistent.

I might use the word "method" in other places that might have a slightly different context. I don't know. But certainly within that paragraph I    15:03:14 mean it to be synonymous.

Q. To -- to calculate out-of-pocket damages you need a methodology to calculate artificial inflation at the time of purchase; correct?

A. I'm sorry, can you repeat that question?    15:03:49

Q. To calculate out-of-pocket damages, you need a methodology to calculate artificial inflation at the time of purchase; right?

A. To actually do the calculation of damages based on that -- on the out-of-pocket methodology,    15:04:06

Page 123

you would also have to have the input of artificial inflation per share, which itself would require a methodology to compute, yes.

Q. And to calculate out-of-pocket damages, you also need a methodology to calculate reduction    15:04:25 of inflation at the time of sale; right?

A. Well, when you say reduction at the time of sale, I'm -- I'm a little confused by that language because it's really just the level of artificial inflation at time of purchase minus the    15:04:36 level of artificial inflation at time of sale.

Obviously in between there can be a -- a -- a decrease or decline in -- in the artificial inflation at a time between those dates. But I'm a little confused by the wording of your question, so    15:04:54 if you could rephrase it.

Q. I'm -- I'm going to move on for now.

So with- -- without a method to calculate artificial inflation at the time of purchase, you cannot calculate out-of-pocket damages; right?    15:05:06

A. You would need a way to -- to quantify artificial inflation to actually compute damages, yes.

Q. Let's go to paragraph 95.

Are you there?    15:05:33

Page 124

A. Yes.

Q. You write, "Nevertheless, whatever the method for determining the artificial inflation per share, it would need to be common to all class members." [As read]    15:05:42

Do you see that?

A. I think you put the word "need" in there where it wasn't, but I -- other than that, the sentence you read is proper -- or what I wrote there.    15:05:51

Q. Okay. Can -- can you -- can you read the correct version into the record, please.

A. Sure.

"Nevertheless, whatever the method for determining the artificial inflation per share, it    15:06:01 would be common to all class members."

Q. So based -- based on that sentence, you -- you have not committed to use any particular methodology to calculate artificial inflation in this case; correct?    15:06:19

A. That's correct.

Q. So it's -- it's possible that there's no appropriate methodology for calculating artificial inflation in this case; correct?

A. I would find that extremely surprising if    15:06:34

Page 125

32 (Pages 122 - 125)

that were the case based on my experience in -- in working on literally hundreds of these types of matters. I've never come across a case where it was literally impossible to somehow make a reasonable estimation of what the artificial inflation per    15:07:15 share was.

In some cases, zero might be the best answer you can come up. In other cases, you know, it's pretty cut and dry how you would do it. In other cases, it's a more sophisticated    15:07:28 loss-causation analysis that requires dealing with a number of different issues, so...

But I don't recall ever coming across one in my over 20 years of doing this that I just threw my hands up and said, "There's no reasonable way to    15:07:41 do this," that that -- and there are clearly standard methodologies that are often used in these types of cases to -- and certainly at least a starting point for measuring artificial inflation per share.    15:07:59

Often that needs to be adjusted for a variety of different considerations that are case specific. But, you know, can I -- can I rule out completely that -- that is the -- the one case that you just couldn't do it? I mean, I -- I -- I've --    15:08:14

Page 126

I've learned enough about this case to believe I -- I think there is a -- a way to do that -- that's -- that's reasonable. There's a lot of things that would have to be considered, but I haven't done the analysis yet.    15:08:30

Q. So I appreciate your answer. I don't think you've answered my question, but -- so -- so I'll ask it again.

It is possible that there is not an appropriate methodology for measuring artificial    15:08:43 inflation in this case; correct?

MR. KAPLAN: Objection to form. Calls for speculation.

THE WITNESS: I -- I think in part of my answer I describe clearly that based on my    15:08:55 understanding of this case and my experience in looking at hundreds of these cases over 20 years, that I don't believe in this case it would be impossible to measure artificial inflation.

Can I completely rule that out? I guess I    15:09:13 can't. But this case has many features that I've seen in a number of different other -- a number of other cases.

I don't think it would be -- there's nothing I've seen in this case that would make it    15:09:28

Page 127

impossible, in my mind, to calculate artificial inflation if -- after a -- a thorough lost causation analysis.

BY MR. DE JARNETTE:

Q. Then -- then can you provide me what an    15:09:39 appropriate methodology here would be to calculate artificial inflation?

A. Well, I think in paragraph 96 I start to describe some of the methodologies that are, you know, typically used and would certainly, I think,    15:09:50 be a starting point in this case.

Q. But you -- you don't opine to any of them that are appropriate to use in this case; correct?

A. That's correct. I have not gone to the -- to the level of actually having performed it or    15:10:03 analyzed exactly how lost causation could or should be analyzed in this case.

Q. Your -- your damages section starting at paragraph 93 doesn't discuss options; correct?

A. Well, I think Footnote 104 describes how    15:10:48 for the sellers -- for the sell- -- for sellers of put options, the formula should focus on the change in artificial deflation instead rather than inflation, but the economic concept that the damages are based on the change and the distortion of the    15:11:22

Page 128

price caused by the misrepresentations or the omissions is precisely the same.

So, again, for call options, it's really the same formula, which is artificial inflation at the time of purchase minus artificial inflation at    15:11:34 the time of sale. And for puts, you would just reverse it and focus on deflation. So yeah, I did discuss it in this section in that footnote.

And also, just to be clear, the first sentence of paragraph 93 talks about all class    15:11:53 members. It's not specific to common stock.

Q. If -- if an option holder didn't exercise the option, they wouldn't have suffered damages; correct?

A. That's not clear to me.    15:12:09

Q. How so?

A. Well, if I bought a call option at $10 and a corrective disclosure made the value of that option $5, then -- and the investor didn't sell before the end of the class period or exercised    15:12:49 before the end of the class period, they suffered damages of $5. They overpaid for the -- for the call by $5, and suffered a loss at the time of the corrective disclosure of $5. So it has nothing do with whether or not they exercised the option later    15:13:06

Page 129

33 (Pages 126 - 129)

after that.

Q.  I mean, correct me if I'm wrong, but my -- my understanding of put and call options, is you -- you -- you purchase those options based on a strike price at the time of purchase; correct?

A.  Well, one feature of the option contract is the strike price, but, for example, in the -- in what I just described, let's say we're talking about a call with a strike price of $30, and the current stock price is $25.  So that call option at that moment is out of the money, but based on the anticipated volatility between that date and the ex- -- and the expiration of the option, the market value of that option is $10.  So the investor pays $10 to obtain that option contract.

And then if there's corrective information that causes the stock price to fall from 25, let's say, down to 15, and now that the value of that option contract goes from $10 per option down to $5 per option, that investor has been harmed by the misrepresentations and the dissipation of the inflation that is present in the price of the call option as a result of that disclosure.  Whether they ultimately exercised that option in the money or it -- it expires out of the money, has nothing to do

Page 130

whether or not they lost $5 as a result of the representations, they clearly did.  So no, I don't think it depends at all on the exercise of the option.

MR. DE JARNETTE:  Let -- let -- let's go off the record.

THE VIDEOGRAPHER:  Okay.  This marks the end of Volume I, Media Unit 2 of the deposition of Chad Coffman.

The time is 3:15 p.m.  We're off the record.

(Short recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 3:26 p.m.  This marks the beginning of Volume I, Media Unit 3 of the deposition of Chad Coffman.

Please continue.

BY MR. DE JARNETTE:

Q.  Mr. Coffman, can you go back to paragraph 96 of your report.

A.  Sure.

I'm there.

Q.  You -- you testify that you listed various techniques for calculating artificial inflation in this paragraph; correct?

Page 131

A.  Yes.

Q.  None -- none of the techniques here in paragraph 96 are applicable to options, though; correct?

A.  The first sentence would apply to options.  So widely used technique to quantify artificial inflation would start from an event study that measures price reactions to disclosures that revealed the relevant truth.  And there's no reason that can't be applied to options.

Q.  But -- but that -- that's measuring reactions to the stock price, not to options themselves; correct?

A.  No, there's no reason you couldn't do that.  So it -- I've already in -- I have performed an event study in this report related to the options that focuses on the changes in the option prices at the time of different disclosures.  There's no reason you couldn't do that in the loss -- context of a lost-causation analysis as well.  So no, that applies equally to options as it does to common stock.

Q.  For pur- -- pur- -- for purposes of this report, you have not determined whether an appropriate methodology exists here to calculate the

Page 132

artificial inflation of options; correct?

A.  No, I have.  I -- well, I -- I'm sorry.  Let me take -- I've certainly opined that the common -- that the standard out-of-pocket method can be applied to options.  The same types of analyses you apply to common stock to evaluate artificial inflation can also be used with respect to options.

So the -- the types of analyses I'm discussing here in terms of event studies and looking at valuation models to value confounding information, et cetera, those would apply equally to -- to options as well.

Q.  But like with common stock, you cannot be sure whether an appropriate methodology exists for calculating artificial inflation as it applies to options; right?

A.  Well, again, I -- I think in -- in any case I've ever come across, there's some reasonable way to estimate artificial inflation.  There are specific methodologies that are typically employed to attempt to measure artificial inflation in securities.

I have not done a loss-causation analysis in this case, so I haven't determined exactly what methodologies could or would be used to calculate

Page 133

34 (Pages 130 - 133)

the artificial inflation.

So I have no reason to believe there isn't one. But it -- you know, again, is -- is -- if -- look, if there was no reliable way to evaluate loss causation or what the artificial inflation was, then 15:30:48 obviously, you know, the finder of fact can set the artificial inflation to 0 and the common out-of-pocket methodology still works. It just returns damages of 0.

So I think I'll finish my answer there. I 15:31:02 don't -- I don't have anything else to say about that.

Q. Can you go back to paragraph 93 of your report.

A. Sure.                    15:31:16

Q. The first sentence reads: "Counsel for Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all Class Members under Section 10(b) of the Exchange Act using a common methodology that is consistent with 15:31:33 the Lead Plaintiffs' theory of liability."

Do you see that?

A. Yes.

Q. Now, if you go to paragraph 7, your -- your overarching damages opinion --          15:31:47

Page 134

A. Yes.

Q. -- you say, "I have also formed the opinion that damages in this action can be calculated on a class-wide basis using a" -- "using a common methodology for FibroGen Securities." [As 15:32:06 read]

Do you see that?

A. Yes.

Q. Paragraph 7 doesn't make any reference to any damages methodology being consistent with 15:32:17 Plaintiffs' theory of liability, does it?

A. I -- that language consistent with Plaintiffs' liabil- -- theory of liability does not appear in that sentence. But clearly in my more detailed description of the basis for my opinion, I 15:33:00 include that language.

Q. You include that language as part of your assignment; correct, because you -- you don't -- you don't actually say that that -- that is the conclusion you reach; correct?          15:33:13

A. I think, given the way I phrased the question that I was being asked, that's implied in my answer. But it -- just for -- to -- to -- to be absolutely clear, I have al- -- also formed the opinion that damages in this action can be          15:33:40

Page 135

calculated on a class-wide basis using a common methodology for FibroGen securities consistent with Plaintiffs' theory of liability.

Q. Then why not use consistent with Plaintiffs' theory of liability in -- in your report 15:33:54 for your opinion --

A. I -- I could have. I don't see that there is a substantive difference, given the question I was answering.

Q. Well, why did you include it for the          15:34:05 assignment but not your -- your opinion?

A. I don't know that there is a specific reason why. I -- I think I was giving an affirmative answer to the question I was asked. I didn't repeat every single word from the question in 15:34:20 the answer. But that is clearly my opinion.

Q. So you -- you don't think it's necessary to amend your report to -- to update your opinion?

A. No, I think the opinion speaks for itself, given the question I was asked.          15:34:37

Q. You understand that Plaintiffs are alleging that there was a corrective disclosure on July 15th, 2021?

A. I understand that's part of their allegations, yes.          15:35:12

Page 136

Q. Do you understand that Plaintiffs are alleging that on July 15th, FibroGen disclosed -- or strike that.

Are you aware that on July 15th, Plaintiffs are claiming that the revelation of truth 15:35:34 was additional critical prespecified sensitivity analyses?

A. I recall that being part of what they alleged, yes.

Q. What do you mean by "part of what they 15:35:45 alleged"?

A. Well, I think Plaintiffs are also alleging that the -- that another event that occurred on that day is that the FDA did -- or that the AdCom was recommending not approving the drug.          15:36:10

Q. But there -- there is no allegations that FibroGen knew that before July 15th; correct?

A. I'm not aware of any allegation that they knew what the AdCom was going to do. I'm aware that they're generally alleging that FibroGen and          15:36:28 Defendants had -- had misrepresented the safety and efficacy profile which may have impacted the market's assessment of what the probability of what the AdCom was doing going to do. But I'm not aware of them alleging that the -- they knew before          15:36:46

Page 137

35 (Pages 134 - 137)

Case 3:21-cv-02623-EMC    Document 180-1    Filed 05/12/23    Page 88 of 343

July 15th precisely what the AdCom was going to do.

MR. DE JARNETTE: Can -- can we mark as Exhibit 23, the Amended Complaint.

(Coffman Deposition Exhibit 23 was marked electronically.)                    15:36:58

THE WITNESS: Okay. I have that up.

BY MR. DE JARNETTE:

Q. Do you recognize this document as the Amended Complaint you reviewed in connection with preparing your expert report?          15:37:41

A. Yeah, I think several times you've called it the "Amended Complaint." I think it's the -- the way I've always understood, it's been titled as "Corrective Complaint." But this is the document that -- that I recall having seen that I refer to       15:37:54 my -- in my report to the -- as "the Complaint."

Q. Fair -- fair enough.

Could you please turn to paragraph 103.

A. Okay.

Q. That paragraph states "The full extent of    15:38:20 Defendants' fraud was finally revealed on July 15th, 2021, when investors learned that the Defendants had completely withheld from public disclosure additional critical prespecified sensitivity analyses that had been mandated by and ultimately       15:38:38

Page 138

revealed by the FDA." [As read]

Do you see that?

A. I see that.

Q. Given that paragraph, isn't it true that Plaintiffs are alleging that the full extent of the    15:38:55 fraud was revealed when the sensitivity analyses were disclosed to the market?

A. Give me just a second.

Q. Take your time.

A. (Witness reviews.)                    15:39:45

MR. KAPLAN: Before you give an answer --

THE WITNESS: Well --

MR. KAPLAN: -- I just want to object on the ground that this seeks testimony outside the scope of what Mr. Coffman has -- has -- it's beyond    15:40:35 his assigned tasks in his report.

BY MR. DE JARNETTE:

Q. You -- you may answer.

A. Yeah, I mean, the -- the Complaint goes on to describe for several more long paragraphs, the       15:40:51 interaction between those sensitivity analyses and what the AdCom panel thought and discussed and determined as well as how that influenced FibroGen's strategy at the AdCom and talking about what the AdCom actually decided.                    15:41:17

Page 139

So it -- it's not at all clear to me and I -- you know, that what's corrective is limited to the sensitivity analyses. The Complaint talks about a lot more things here. And, frankly, this is not, you know, an aspect that I was -- I was focused in    15:41:42 my analysis. So I -- I -- I don't feel like I can -- I'd be speculating to say what -- what Plaintiffs' ultimate theory about this -- this disclosure is or what other discovery might show about this disclosure. So I just don't have a -- I    15:41:58 don't think I can give you an opinion on that.

Q. Which means that you -- you can't tell me, one way or another, what information is allegedly corrective or not corrective on July 15th; correct?

MR. KAPLAN: Same objections.          15:42:14

THE WITNESS: I have not performed an analysis exactly what information was or was not corrective on the -- on July 15th.

BY MR. DE JARNETTE:

Q. So sitting here today, you just don't       15:42:23 know, right?

MR. KAPLAN: Objection. Same objection. Asked and answered.

THE WITNESS: Correct. I -- I have a general idea of like some of the things that       15:42:29

Page 140

occurred and the -- the general theory of the case, but I have not done a specific analysis of what is properly considered corrective or not corrective on that date.

MR. DE JARNETTE: Let -- let's -- let's go   15:42:46 off the record.

THE VIDEOGRAPHER: Going off the record. The time is 3:42 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: Back on the record.       15:49:21 The time is 3:49 p.m.

BY MR. DE JARNETTE:

Q. Mr. -- Mr. Coffman, for -- for some cleanup, could you please pull up Exhibit 20.

A. Yes.                    15:49:45

Q. This is the notice for your deposition here today; correct?

A. Yes.

Q. And you've seen this document before; right?                    15:49:55

A. I have, yes.

Q. You -- you understand that Plaintiffs are alleging that there are multiple alleged corrective disclosures; right?

A. Yes.                    15:50:07

Page 141

36 (Pages 138 - 141)

Veritext Legal Solutions
866 299-5127

Q. You -- you haven't undertaken the independent analysis of what information was corrective or not corrective on any of those dates; right?

A. That's correct.                          15:50:21

MR. DE JARNETTE: I have no further questions at this time.

THE COURT REPORTER: Mr. Kaplan?

MR. KAPLAN: Hold on.

I have nothing for the witness.          15:50:40

THE COURT REPORTER: May we go off the record, please?

THE VIDEOGRAPHER: Do you want to go off or do you want me to conclude?

THE COURT REPORTER: Are we concluding,     15:50:52 Counsel?

MR. KAPLAN: I have nothing --

MR. DE JARNETTE: Not -- not -- nothing more from -- from us.

THE VIDEOGRAPHER: Okay. Then this        15:50:57 concludes today's deposition of Chad Coffman. The number of media used was three, and will be retained by Veritext Legal Solutions.

The time is 3:50 p.m. We're off the record.                                   15:51:06

Page 142

JURAT

I, CHAD COFFMAN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken remotely via videoconference on Tuesday, April 4, 2023; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this _____ day of _____, 2023, at _____.

_____
CHAD COFFMAN

Page 144

(Proceedings concluded, 3:50 p.m., CDT, on April 4, 2023.)

Page 143

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely via videoconference and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the origin_____ n in a federal case, befo_____ eedings, review of the tra_____ requested.

In _____ reunto subscribe

Dated: 4

Hanna Kim
CLR, CSR No. 13083

Page 145

37 (Pages 142 - 145)

Brett De Jarnette

bdejarnette@cooley.com

April 6, 2023

RE: In Re Fibrogen, Inc., Securities Litigation

4/4/23, CHAD COFFMAN, JOB NO. 5846470

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 146

In Re Fibrogen, Inc., Securities Litigation

CHAD COFFMAN (#5846470)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

WITNESS                        Date

Page 148

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 147

38 (Pages 146 - 148)

# EXHIBIT 3

# "DOCUMENT SOUGHT TO BE UNDER SEAL"

# EXHIBIT 4

# "DOCUMENT SOUGHT TO BE UNDER SEAL"

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE FIBROGEN, INC.,                 ) Case No.

SECURITIES LITIGATION.                ) 3:21-cv-02623-EMC

                                      )

_____ )




VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

DAVID RANDALL


Thursday, April 13, 2023

Remotely Testifying from Baltimore, Maryland






Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5839238


PAGES 1 - 222

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC.,                    ) Case No.

SECURITIES LITIGATION.                   ) 3:21-cv-02623-EMC

                                         )

_____)

          Virtual videoconference video-recorded deposition of DAVID RANDALL, remotely testifying from Baltimore, Maryland, on Thursday, April 13, 2023, pursuant to the stipulations of counsel thereof, before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

                                            Page 2

REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

For Lead Plaintiffs and Plymouth County:

SAXENA WHITE P.A.

BY:  LESTER R. HOOKER, ESQ.

BY:  EMILY BISHOP, ESQ.

7777 Glades Road, Suite 300

Boca Raton, Florida 33434

561.206.6708

lhooker@saxenawhite.com

ebishop@saxenawhite.com

For Defendants FibroGen, Inc., Enrique Conterno,

James Schoeneck, Mark Eisner, and Pat Conterno:

COOLEY LLP

BY:  AMIE L. SIMMONS, ESQ.

BY:  ZANETA J. KIM, ESQ.

BY:  TIJANA BRIEN, ESQ.

BY:  REGI VALDEZ, ESQ.

BY:  KIMBERLEY BISHOP, ESQ.

3175 Hanover Street

Palo Alto, California 94304-1130

650.843.5000

asimmons@cooley.com

Page 3

REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)

For Defendant Kin-Hung Peony Yu, M.D.

   PILLSBURY WINTHROP SHAW PITTMAN LLP

   BY:  ELIZABETH CHEEVER, ESQ.

   Four Embarcadero Center, 22nd Floor

   San Francisco, California 94111-5998

   415.983.1000

   elizabeth.cheever@pillsburylaw.com

Also Present:

   JEFREE ANDERSON, VIDEOGRAPHER

Page 4

INDEX OF EXAMINATION


WITNESS:  DAVID RANDALL

EXAMINATION                                                      PAGE

        BY MS. SIMMONS:                                          11

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS


RANDALL DEPOSITION EXHIBITS                                    PAGE

Exhibit 39       Notice of 30(b)(6) Deposition of    15
                 Employees' Retirement System of
                 the City of Baltimore; 8 pages

Exhibit 40       "Statement of Investment            31
                 Objectives and Policies for the
                 Board of Trustees of the
                 Employees' Retirement System of
                 the City of Baltimore"; Bates
                 nos. BALTIMORE_EMPLOYEES_0000001
                 through '12

Exhibit 41       "Declaration of David Randall in    42
                 Support of Lead Plaintiffs'
                 Motion for Class Certification"
                 filed with the court,
                 January 27, 2023; 5 pages

Exhibit 42       Document filed with the Court,      44
                 October 29, 2021, in this
                 action, "Certificate and
                 Authorization"; 9 pages

Exhibit 43       Excel document; Bates nos.          47
                 BALTIMORE_EMPLOYEES_0000393


                                          Page 6

INDEX OF EXHIBITS (CONTINUED)

RANDALL DEPOSITION EXHIBITS                                PAGE

Exhibit 44      Lead Plaintiffs' Notice of          158
                Motion for Class Certification;
                Memorandum of Points and
                Authorities in Support Thereof;
                36 pages

Exhibit 45      Amended and Restated License,        163
                Development and
                Commercialization Agreement
                between Fibrogen and
                AstraZeneca; Bates nos.
                FGEN-CA-0615419 through '577

Exhibit 46      News Release, 10 May 2019; Bates     170
                nos. FGEN-CA-0165721 through
                '724

Exhibit 47      Press release titled "FibroGen       177
                Announces Positive Phase 3
                Pooled Roxadustat Safety and
                Efficacy Results for Treatment
                of Anemia in Chronic Kidney
                Disease"; 8 pages

Page 7

INDEX OF EXHIBITS (CONTINUED)

RANDALL DEPOSITION EXHIBITS                             PAGE

Exhibit 48      "Roxadustat Phase III programme    179
                pooled analyses show positive
                efficacy and no increased
                cardiovascular risk in patients
                with anemia from chronic kidney
                disease"; 8 pages

Exhibit 49      "Exhibit E," e-mail chain,          192
                October 11, 2019; Bates nos.
                FGEN-CA-0016561 through '567; 8
                pages


PREVIOUSLY MARKED EXHIBITS REFERENCED               PAGE

Deposition Exhibit 28                               75

Deposition Exhibit 29                               80

Deposition Exhibit 30                               88

Deposition Exhibit 31                               109

Deposition Exhibit 38                               118

Deposition Exhibit 32                               121

Deposition Exhibit 33                               146

Deposition Exhibit 34                               150

--o0o--

Page 8

Remotely Testifying from Baltimore, Maryland

Thursday, April 13, 2023; 12:02 p.m., EDT

--o0o--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 12:02 p.m., Eastern Time.                  12:02:50

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of David Randall taken by counsel for the   12:03:06 Defendant in the matter of in re FibroGen, Incorporated., Securities Litigation filed in the United States District Court, Northern District of California.  Case number is 321 cv 02623 EMC.

This deposition is being conducted              12:03:28 remotely using virtual technology.

My name is Jefree Anderson representing Veritext, and I am the videographer.  The court reporter is Hanna Kim from the firm Veritext.

Counsel and all present will now state             12:03:44 their appearances and affiliations for the record, beginning with the noticing attorney.

MS. SIMMONS:  This is Amie Simmons appearing on behalf of Cooley LLP and FibroGen Defendants and individual Defendants along with my     12:03:53

Page 9

colleagues Tijana Brien, Regi Valdez, Zaneta Kim, and Kimberley Bishop.

MR. HOOKER:  And this is Lester Hooker from Saxena White on behalf of the Lead Plaintiffs in Baltimore.  With me is my colleague, Emily Bishop.                                              12:04:20

I did just want to let counsel know that there is a Veritext concierge in the room.  His name is Chris Nelson.  We could ask him to step out of the room, if that's your preference or he could          12:04:32 stay.  So it's entirely up to you.

MS. SIMMONS:  It's fine for him to stay in the room.  I don't think we have a preference.

MR. HOOKER:  Okay.

MS. CHEEVER:  This is Elizabeth Cheever      12:04:43 with Pillsbury appearing on behalf of Defendant Dr. Yu.

THE VIDEOGRAPHER:  Okay.  Thank you.

Will the court reporter please swear in the witness and then counsel may proceed.          12:04:58

DAVID RANDALL,

having been duly administered an oath over videoconference as stipulated by all counsel, was examined and testified as follows:

Page 10

prepare for this deposition other than your counsel?

A.   No.

Q.   Okay.  Did you review any documents during your meeting last week with Saxena White to prepare?

A.   The documents that were submitted to the    12:18:08 courts.

Q.   Do you recall what those documents were that you reviewed that were submitted to the court?

A.   Offhand, no.  It was the deposition.  It was the -- the filing -- the two filings, in fact.    12:18:25 And it was the request for the class -- for us to become lead plaintiff, along with Plymouth County and the City of Philadelphia.

Q.   Okay.  Did you review any company press releases or SEC filings from FibroGen?    12:18:48

A.   If it was filed with the court, we did go over it.

Q.   Okay.  Did you review -- so you mentioned several filings.  Did you review the exhibits to those filings?    12:19:02

A.   Yes, if it was filed, yes.

Q.   Okay.  So you reviewed sort of the complete filing, exhibits included?

A.   I want to say, yes.  However, it was (indicating), oh, my God.  So, you know, if -- yes    12:19:18

Page 23

and no.  I -- I don't know, it's kind of difficult to answer that.  I did -- I'm -- I'm aware that they exist.  But as far as absolutely reading them, completely and totally understanding and so forth, that's a different story.                              12:19:36

Q.   Okay.  Would you say you read through the entire -- so you wouldn't -- you didn't read through the entire filings, but you reviewed them generally; would that fairly characterize it?

A.   Yes, without -- yes.                      12:19:48

Q.   Okay.  Did you review any e-mails or any documents that were produced in the litigation?

A.   No, not if they weren't officially filed.

Q.   Okay.  Thank you.

So we discussed Baltimore Employees a      12:20:09 little bit at the very top of this deposition. You -- you described generally the structure, that was very helpful.  Could you just generally describe what -- what's the mission Baltimore Employees as an organization?                                  12:20:28

A.   Yes.  The mission of Employees' Retirement System is to provide timely benefits to our retirees and beneficiaries to oversee the prudent investments of the system's assets and -- and protect those assets accordingly.                              12:20:43

Page 24

A.   We are one of three plaintiffs, Lead Plaintiffs, that is correct.

Q.   And who are the defendants in this action?

A.   The name -- it's like a test almost.  I'm aware of -- of the CEO, Conterno.  I'm -- I'm -- I am really probably messing their names up.  I'm bad at names.

And one that really stuck out was the medical -- chief medical officer, Yu.  And her replacement.

And there were [sic] an acting -- I'm sorry, yeah, an acting CEO at the time of that investment period.  Forgive me for not knowing the names off the top of my head, but those two kind of stuck out.

Q.   Okay.  And has Baltimore Employees ever had any direct communications with any of the defendants in this action?

A.   No.

Q.   And is -- are you aware that Baltimore Employees filed a motion on June 11th, 2021, to represent a put- -- putative class of FibroGen shareholders as a Lead Plaintiff?

A.   I am.

Q.   And your counsel today is Saxena White?

13:11:44

13:12:07

13:12:24

13:12:33

13:12:52

Page 60

MS. SIMMONS:  Zaneta, let's please introduce previously marked Exhibit 28, our tab 20.

(Previously marked Deposition Exhibit 28 was referenced.)

BY MS. SIMMONS:                              13:49:05

Q.   And this is the -- while she's pulling that up, this is the "[Corrected] Consolidated Class Action Complaint" filed November 19th, 2021.

Let me know when it's up.

A.   I have it.                              13:49:32

Q.   Okay.  So please turn to page 4, paragraph 7.

Are you there --

A.   I'm sorry -- no, no, I'm sorry, what page?

Q.   Page 4 of the Complaint, paragraph 7.    13:49:47

A.   Okay.  I'm there.

Q.   Okay.  So do you see on line 20 Plaintiffs allege that, "Defendants admitted that they had deliberately manipulated the data, making a series of statistically significant and improper 'post hoc    13:50:13 changes' to every single one of nine clinical trial analyses after the data had been fully unblinded"? Right?

A.   I did read that along, yes.

Q.   Okay.  So what changes are being referred    13:50:27

Page 75

Veritext Legal Solutions
866 299-5127

to here?

A.   I don't know.

Q.   Okay.  So it says, "'Post hoc changes' to every single one of nine clinical trial analyses." That's changes to stratification factors; right?          13:50:42

A.   Technically speaking, I'm assuming so. I -- you know -- I don't know.

Q.   Let's turn to the next page.

Do you see paragraph 8?

A.   Yes.                                                   13:51:02

Q.   So if you go down to starting at line 9 on paragraph 8, the document states that "Faced with impending AdCom review that would ensure increased FDA scrutincy" -- "scrutiny and possible public disclosure of the previously concealed Roxadustat    13:51:22 safety data, just weeks later, on April 6, 2021, FibroGen was forced to admit, for the first time, that Defendants made 'post-hoc changes to the stratification factors' in Roxadustat's Phase 3 trial results." [As read]                                    13:51:38

Do you see that?

A.   I do.

Q.   So the post-hoc changes that Plaintiffs' allegations relate to, those relate to stratification factors?                                    13:51:46

Page 76

A.   I'm sorry.  Was that a question?

Q.   Yes.

Is that what the allegation, the Plaintiffs' allegation, is saying, that the post-hoc changes are to stratification factors?   13:52:02

A.   Based on the Complaint, I would have to say yes.

Q.   Okay.  And I'm just trying to understand Baltimore Employees as Lead Plaintiffs' allegations, not -- that that is what I'm asking about, if that   13:52:11 helps.

A.   Yes, as per the -- that's why I have to answer, as per the Complaint.

Q.   Understood.

And are there any other changes that   13:52:20 Plaintiffs claim resulted in the alleged manipulation?

A.   Not to my knowledge.

Q.   And do you know what a stratification factor is?   13:52:34

A.   Technically, no.  But just by the definition, yes --

Q.   What is it?

A.   -- if that makes sense.

It's -- it's -- it's -- I guess it's a   13:52:45

Page 77

measurement.  And any type of change in a measurement from one result to another would be the strat [verbatim].

Q.    All right.

And in this context, so the Complaint says    13:53:01 "post-hoc changes to stratification factors." [As read]

Do you know what post hoc means in this context?

A.    Post is definitely after.  So you have to    13:53:10 take it for what it is.  Post.  After.

Q.    Okay.  And so after what?  Does it mean after clinical sty- -- studies had ended and ta- -- data was unblinded?

A.    I can definitely say after.  I don't    13:53:29 understand -- I mean, I -- I can't give you the definition of "hoc."

Q.    Okay.  So you just know post hoc means generally after, but you're not sure what?

A.    That's correct.    13:53:40

Q.    Okay.  So we're just trying to understand Plaintiffs' allegations here.  So the -- the allegation in paragraph 7 is that there were "improper 'post-hoc changes' to the clinical trial analyses."  [As read]    13:53:55

Page 78

Q.   It states that, "The positive Roxadustat efficacy and safety data Defendants touted was based on Defendants' own improper post hoc manipulations."

In what way was the efficacy data manipulated?                                    14:19:45

MR. HOOKER:  Objection to form.

THE WITNESS:  I don't know.

BY MS. SIMMONS:

Q.   And does paragraph 144 say anything about how or why -- or how the efficacy data was            14:19:51 manipulated?

MR. HOOKER:  Objection to form.

THE WITNESS:  It doesn't say how; just that it was.

BY MS. SIMMONS:                                   14:20:01

Q.   And did FibroGen ever correct or modify any of the efficacy results it had previously discussed to investors?

MR. HOOKER:  Objection to form.

THE WITNESS:  Not to my knowledge.            14:20:12

BY MS. SIMMONS:

Q.   And -- okay.

Let's turn to safety.  This paragraph also states that the safety data was based on improper post hoc manipulations; right?                          14:20:26

Page 99

A.    Based on the things on -- yes.

Q.    Okay.  And in which way was the safety data manipulated?

MR. HOOKER:  Objection to form.

THE WITNESS:  I don't know.    14:20:40

BY MS. SIMMONS:

Q.    So it states there were post hoc manipulations.  Were those to the stratification factors that we had mentioned previously?

MR. HOOKER:  Same objection.    14:20:53

THE WITNESS:  I don't know.

BY MS. SIMMONS:

Q.    Okay.  If we can turn back to paragraph 8, which I think is on page 7 or 8.

A.    Of the same document?    14:21:04

Q.    Sorry, page 4.  Yes, of the Complaint.

Yeah, page 4 and 5.

So in paragraph -- actually, paragraph 7, line 20 it states, "De-" -- "Defendants admitted they had deliberately manipulated the data, making a    14:21:22 series of statistically significant and improper 'post hoc changes.'"  [As read]

And then on paragraph 8, it states on line 11, "FibroGen was forced to admit, for the first time, the Defendants had made 'post-hoc changes to    14:21:38

Page 100

Veritext Legal Solutions
866 299-5127

the stratification factors.'"  [As read]

Do you see that?

A.    I do.

Q.    So the manipulation to the safety data, was that -- those -- was that to the stratification  14:21:51 factors?

MR. HOOKER:  Objection to form.

THE WITNESS:  I don't know.

BY MS. SIMMONS:

Q.    Okay.  So is -- it's Plaintiffs'  14:22:00 allegation that -- what is Plaintiffs' allegation about the manipulation of the safety data, then?

A.    I don't know.

Q.    Okay.  And did FibroGen ever correct or modify any of the safety results that it had  14:22:26 disclosed to investors?

MR. HOOKER:  Objection to form.

THE WITNESS:  I don't know.

MS. SIMMONS:  Well, we've been going for, I don't know, almost another hour.  Do you want to  14:22:49 take another break and go off the record for a second?

MR. HOOKER:  Sure.

THE VIDEOGRAPHER:  Going off the record. The time is 2:22 p.m.  14:22:58

Page 101

or otherwise?

MR. HOOKER:  Objection to form.  Calls for speculation.  Calls for a legal conclusion.

THE WITNESS:  I don't know.

BY MS. SIMMONS:                                    15:09:27

Q.   Do you know that the FDA's never taken any action against FibroGen for changes to stratification factors?

MR. HOOKER:  Objection to form.

THE WITNESS:  No, I do not know.        15:09:35

BY MS. SIMMONS:

Q.   Okay.  So changing gears a little bit, Plaintiffs claim that when FibroGen began disclosing the pulled CD safety results for Roxadustat during the class period --                              15:09:59

(Interruption in audio/video.)

THE COURT REPORTER:  I'm sorry.  There was -- could you start that over again, please.

MR. SIMMONS:  Of course.

BY MS. SIMMONS:                                    15:10:07

Q.   Switching gears to some of the public disclosures that this case about, that Fi- -- that Lead Plaintiffs have alleged are false or misleading.  So Plaintiffs claim that when FibroGen began disclosing the pooled cardiovascular safety        15:10:21

Page 131

results for Roxadustat during the class period, those results were false; right?

MR. HOOKER:  Objection to form.  To the extent it calls a -- calls for a legal conclusion.

THE WITNESS:  I don't know.                    15:10:40

BY MS. SIMMONS:

Q.   Okay.

A.   If it's --

Q.   Let's go back to the Complaint.  I -- sorry.  I didn't mean to interrupt you.       15:10:45

A.   No, no, no.  I was going to say if it's in the Complaint.

Q.   Okay.  Let's -- let's go back to the Complaint.  I believe Exhibit 28, paragraph -- let's go to 171, I think that's on page 72.       15:10:57

Let me know when you've got it up.

A.   I have it up.

Q.   So this part of the Complaint, as you can see on -- under Section F, titled "November 2019 Statements"; right?                           15:11:28

A.   Yes.

Q.   So here, it's discussing some of the statements FibroGen made in November 2019 when it issued a press release.  You can see on line 16 the Complaint states that, "FibroGen issued a press       15:11:38

Page 132

release announcing 'Positive Phase 3 Pooled

Roxadustat Safety and Efficacy Results' that had

been presented at the American Society of Nephrology

Kidney Week 2019.

Do you see that?                                    15:11:53

A.    I do see it.

Q.    Do you want to -- please take a minute

just to read the rest of the paragraph.

So rest of the paragraph is basically just

describing the results that were disclosed in that     15:12:12

press release; right?

A.    Yes.

Q.    Okay.  And so, moving on to page 73, line

14 in paragraph -- paragraph 173, explains that the

statements in that press release described in          15:12:31

paragraphs 171 and 172 "were materially false and

misleading and omitted material facts when made."

Do you see that?

A.    I do.

Q.    And so, then the paragraph contains some      15:12:43

allegations about why those results were false,

claiming on line 19 that they "were materially false

because Defendants had post hoc manipulated the data

to make the drug appear significantly better and

safer than it was."                                    15:13:00

Page 133

Right?

A.    Yes.

Q.    So the Complaint is containing a claim that when FibroGen announced pooled cardiovascular safety analyses in November 2019 during the class 15:13:11 period, that some of those analyses were false; right?

A.    Yes.

Q.    And to your knowledge, did the investors and the public ever learn the true results from 15:13:23 FibroGen?

MR. HOOKER:    Objection to form.    Calls for speculation.

THE WITNESS:    Not to my knowledge.

BY MS. SIMMONS:                                        15:13:31

Q.    Okay.    Let's turn to paragraph 221 of the Complaint.    This is on page 92.    Actually, sorry. Strike that.

Let's go to paragraph 81, actually, which is on 34.                                              15:14:05

Let me know when you're there.

A.    I am there.

Q.    So paragraph 81 states on line 6, "As disclosed on April 6, 2021, Roxadustat's true FDA pre-specified data unequivocally demonstrated that,    15:14:23

Page 134

I believe we could pull up Exhibit 41, which is your declaration in support of the motion.

So did you review -- when -- when you said you signed it, did you review your -- the declaration bef- -- and then sign it or did you review the motion for class certification before it was filed?

A.   The document that I'm on now and also that I signed, it's the declaration I reviewed and signed.

And so what was your other question?  You kind of had two questions there.

Q.   I apologize.  I'll break that up.

So turning back to the motion for class certification, which was Exhibit --

A.   Yeah.

Q.   -- 44, this document, did you review that as well --

A.   I -- I've seen it, yes.

Q.   Okay.  So you reviewed that before it was filed?

A.   Yes.

Q.   Okay.

A.   Counsels Saxena White provided everything to us prior to -- all three of us.

17:01:09

17:01:33

17:01:41

17:01:58

17:02:07

Page 190

voted no for the reasons stated.  I found the

analysis, with the biased included, difficult to

interpret." [As written]

Do you see that?

A.   Are you on page 2 --                         17:26:24

Q.   Page 2 --

A.   -- 95?

Q.   I'm on page 296.

A.   Oh, 296.  I'm sorry, cause I was, like --

I'm not a speed reader, but I was, like, I don't see   17:26:34

that.

Yes.  I do see it.  Yes.

Q.   And then on line 20 of page 296,

Mr. Conway states, "I voted no, with difficulty."

Do you see that?                           17:26:54

A.   I do.

Q.   So here, multiple members of the AdCom who

are voting said that it was a difficult decision to

vote against approval of Roxadustat in this patient

population; right?                              17:27:06

MR. HOOKER:   Objection to form.

THE WITNESS:   Yes.

BY MS. SIMMONS:

Q.   Okay.  And let's -- and that's consistent

that that there might be multiple interpretations or   17:27:18

Page 202

views of -- of the safety data; right?

MR. HOOKER:   Objection to form.

THE WITNESS:   If I take it for face value, they voted no.   So I'm not sure if I answered your question.

BY MS. SIMMONS:

Q.   Well, let me put it a different way. So --

A.   Yes, please.   Thank you.

Q.   -- there are several -- sure.

So that -- we just looked at several statements --

A.   Mm-hmm.

Q.   -- about various people who voted no, and they -- they stated they voted with difficulty, they voted no.

A.   Mm-hmm.

Q.   One individual said they voted yes and explained their reasons why.

A.   Mm-hmm.

Q.   That's all consistent with different members of this AdCom could have different views and interpretations of the same thing they were all -- they were looking at; right?

A.   Yes.

Page 203

Veritext Legal Solutions
866 299-5127

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely via videoconference and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name this 17th day of April, 2023.

Hanna Kim, CLR, CSR No. 13083

Page 218

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC.,                    ) Case No.

SECURITIES LITIGATION.                   ) 3:21-cv-02623-EMC

                                         )

                                         )

                                         )

                                         )

                                         )

                                         )

                                         )

                                         )

                                         )

_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

DAVID JUDE SULLIVAN

(30(b)(6) of Plymouth County Retirement Association)

Tuesday, April 11, 2023

Remotely Testifying from Boston, Massachusetts

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5839257

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE FIBROGEN, INC.,                ) Case No.

SECURITIES LITIGATION.               ) 3:21-cv-02623-EMC

                                     )

                                     )

                                     )

                                     )

                                     )

                                     )

                                     )

                                     )

                                     )

_____ )


          Virtual videoconference video-recorded

deposition of DAVID JUDE SULLIVAN, remotely testifying

from Boston, Massachusetts, on Tuesday, April 11,

2023, pursuant to the stipulations of counsel

thereof, before Hanna Kim, CLR, Certified Shorthand

Reporter, No. 13083.

                                              Page 2

REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

For Lead Plaintiffs and Plymouth County:

SAXENA WHITE P.A.

BY:  LESTER R. HOOKER, ESQ.

BY:  SCOTT KOREN, ESQ.

7777 Glades Road, Suite 300

Boca Raton, Florida 33434

561.206.6708

lhooker@saxenawhite.com

skoren@saxenawhite.com

For Defendants FibroGen, Inc., Enrique Conterno,

James Schoeneck, Mark Eisner, and Pat Conterno:

COOLEY LLP

BY:  PATRICK GIBBS, ESQ.

BY:  AMIE L. SIMMONS, ESQ.

BY:  TIJANA BRIEN, ESQ.

BY:  ZANETA J. KIM, ESQ.

3175 Hanover Street

Palo Alto, California 94304-1130

650.843.5000

pgibbs@cooley.com

Page 3

REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)

For Defendant Kin-Hung Peony Yu, M.D.

          PILLSBURY WINTHROP SHAW PITTMAN LLP

          BY:  ELIZABETH CHEEVER, ESQ.

          Four Embarcadero Center, 22nd Floor

          San Francisco, California 94111-5998

          415.983.1000

          elizabeth.cheever@pillsburylaw.com


Also Present:

          CASSIA LEET, VIDEOGRAPHER

Page 4

INDEX OF EXAMINATION

WITNESS:  DAVID JUDE SULLIVAN

EXAMINATION                                                    PAGE

BY MR. GIBBS:                                           12

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS

SULLIVAN DEPOSITION EXHIBITS                                PAGE

Exhibit 24     Notice of 30(b)(6) Deposition of      20
               Plymouth County Retirement
               Association, 2023-03-28; 8 pages

Exhibit 25     Declaration of Tim Smyth in           28
               Support of Lead Plaintiffs'
               Motion for Class Certification; 6
               pages

Exhibit 26     Purchase Report by Trade Date         44
               from State Street, December 1st,
               2018, to October 31st, 2021;
               Bates nos.
               PLYMOUTH_COUNTY_0000101 through
               '105

Exhibit 27     "Certification and                    48
               Authorization"; 10 pages

Exhibit 28     Corrected Consolidated Class          63
               Action Complaint; 126 pages

Exhibit 29     "Pooled Statistical Analysis          91
               Plan"; Bates nos. FGEN-CA-0613910
               through '3950

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS (CONTINUED)

SULLIVAN DEPOSITION EXHIBITS                    PAGE

Exhibit 30    Letter from the United States    95
              Food & Drug Administration and
              meeting minutes between FibroGen
              and the FDA on July 30th, 2019;
              Bates nos. FGEN-CA-0112863
              through '902

Exhibit 31    "Cardiovascular Safety Endpoint   110
              Analysis Report Roxadustat";
              Bates numbered FGEN-CA-0110214
              through '253

Exhibit 32    Copy of transcript of            119
              "Cardiovascular and Renal Drugs
              Advisory Committee Meeting" held
              on Thursday, July 15th, 2021; 343
              pages

Exhibit 33    Press release, "FibroGen         144
              Announces Positive Topline
              Results from Pooled Safety
              Analyses of Roxadustat Global
              Phase 3 Program," May 9, 2019;
              Bates nos. FGEN-CA-0165725
              through '728

                                        Page 7

INDEX OF EXHIBITS (CONTINUED)

SULLIVAN DEPOSITION EXHIBITS                          PAGE

Exhibit 34    Copy of Form 10-Q filed by          147
              FibroGen for quarterly period
              ended September 30th, 2019; Bates
              nos. FGEN-CA-0108245 running
              through '8345

Exhibit 35    Copy of screen print of a Tweet     172
              from Plymouth County Retirement
              Association, dated July 8th,
              2022; 1 page

Exhibit 36    Copy of FDA's slides for            174
              July 15th, 2021, advisory
              committee meeting, "Roxadustat
              for the Treatment of Anemia Due
              to Chronic Kidney Disease in
              Adult Patients not on Dialysis
              and on Dialysis FDA
              Presentation"; Bates nos.
              FGEN-CA-0115137 through '115225

Exhibit 37    Copy of "Complete Response"         176
              letter sent to FibroGen by the
              FDA; Bates nos. FDACDER001546
              through '1555

Page 8

INDEX OF EXHIBITS (CONTINUED)

SULLIVAN DEPOSITION EXHIBITS                          PAGE

Exhibit 38    "FDA Briefing Document" for the      179

              "Cardiovascular and Renal Drugs

              Advisory Committee Meeting,

              July 15th, 2021," for

              "Roxadustat"; Bates nos.

              FGEN-CA-0115068 through '5134

--oOo--

Page 9

Remotely Testifying from Boston, Massachusetts

Tuesday, April 11, 2023; 12:02 p.m., EDT

--o0o--

THE VIDEOGRAPHER:  Good afternoon.  We are going on the record at 12:02 p.m., on April 11th, 2023.    12:02:06

Please note that this deposition is being conducted virtually.

Audio and video recording will continue to take place unless all parties agree to go off the record.    12:02:17

This is Media Unit 1 of the video-recorded deposition of 30(b)(6) witness for Plymouth County Retirement Association, David Sullivan, taken by counsel for Defendants in the matter of In Re FibroGen, Inc., Securities Litigation, filed in the United States District Court, Northern District of California, Case Number 3:21-cv-02623-EMC.    12:02:39

My name is Cassia Leet, from Veritext Legal Solutions, and I am the videographer.    12:03:01

The court reporter is Hanna Kim of Veritext Legal Solutions.

I am not related to any party in this action, nor am I financially interested in the outcome.    12:03:13

Page 10

Would counsel and everyone attending remotely please state your appearances and affiliations for the record, beginning with the noticing attorney.

MR. GIBBS:  Good morning.  This is Patrick Gibbs from Cooley on behalf of the Defendants.    12:03:22

And with me are my colleagues Tijana Brien, Amie Simmons, and Zaneta Kim.

MR. HOOKER:  Good morning.  This is Lester Hooker from Saxena White on behalf of the Lead Plaintiffs and Plymouth County.    12:03:38

And with me is my colleague Scott Koren.

MS. CHEEVER:  Good morning.  This is Elizabeth Cheever from Pillsbury on behalf of Defendant Dr. Yu.    12:03:50

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please swear in the witness, and then counsel may proceed.


DAVID JUDE SULLIVAN,

having been duly administered an oath over videoconference as stipulated by all counsel, was examined and testified as follows:

///

///

Page 11

designated you to testify on its behalf with respect
to all of the topics referenced in this deposition
notice?

A.   I do.

Q.   Okay.  What did you do to prepare for
today's deposition?

A.   Well, I re- -- reviewed, you know, the --
the case as I know.  And then last Friday, Lester
and I had a -- a Zoom meeting to prepare.  Last
night, here in Boston, we prepared again.

Q.   How long was the meeting Friday?

A.   Friday's meeting was between one and two
hours.

Q.   How about the meeting last night?

A.   Last night it was longer.  Probably, I'd
say, close to three hours.

Q.   And then before that you said that you had
spent some time reviewing the case.  Do you mean
you'd reviewed some of the pleadings and other
documents involved in the case?

A.   Yes.

Q.   And do you recall which documents you
reviewed?

A.   The -- you know, the initial Complaint,
the Amended Complaint, and any other -- you know,

Page 22

most of the other filings with the Court.

Q.   Anything else that comes to mind specifically?

A.   Just the -- you know, the -- the notice that's up here, you know, the notice for deposition as well, the -- you know, the topics that would be covered.

Q.   Do you recall when you were first contacted about the possibility of testifying on behalf of Plymouth County in this deposition?

A.   Yes, I do.

Q.   When was that?

A.   It was some point in March of 2023.

Q.   Your meeting with Mr. Hooker Friday, was anyone else present for that meeting?

A.   It was just the two of us.

Q.   And the meeting last night with Mr. Hooker, was anyone else present for that one?

A.   Again, just the two of us.

Q.   Of the documents that you reviewed, did any of them refresh your memory about anything involving this case?

A.   Yes.  I mean, I -- I remember this case from a few years when I was executive director.

Q.   Okay.  Do you recall which of the

Page 23

BY MR. GIBBS:

Q.   Let me know when you have that in front of you, please.

A.   Populating now.

And it's -- it's up.                                    12:27:28

Q.   Okay.  And first of all, again, Mr. Smyth is your successor as the executive director of Plymouth County Retirement Association?

A.   That's correct.

Q.   Is Mr. Smyth's declaration one of the      12:27:40 documents you reviewed to prepare for your testimony today?

A.   It is.

Q.   Let me ask you to focus on paragraph 3 of Mr. Smyth's declaration, about two-thirds -- a      12:27:55 little over half of the way down through that paragraph on the right side of the page, there's a sentence that begins "LMCG Investments," comma, "LLC is one such investment manager."

Do you see that sentence?      12:28:12

A.   I do.

Q.   It goes on to say, "which exercised its discretionary authority to purchase shares of FibroGen, Inc.," parens, "('FibroGen')" in quotes, close parens, "common stock during the period from      12:28:24

Page 29

December 20, 2018, through July 15th, 2021." [As read]

Do you see that?

A.    I do.

Q.    Is that correct?                                    12:28:31

A.    I -- I don't think it is.  My memory was that -- and I didn't pick up on this during review. My memory is that it was the Boston Company, not -- not LMCG was the -- the manager of record.

Q.    Do you have any idea why Mr. Smyth's            12:28:54 declaration says that it was LMCG that purchased FibroGen stock for Plymouth County?

A.    I -- I do not know why -- why that happened.

Q.    Okay.  But as -- as far as you know, it        12:29:05 was not, in fact, LMCG that purchased FibroGen stock for Plymouth County, but instead it was -- it was Boston?

A.    It -- it's my understanding it was; The        12:29:20 Boston Company was the manager of record in this case.

Q.    Okay.  Well, in -- in absence of anything more definitive, then, I will proceed with questions with the understanding that it was The Boston Company that -- that made those purchasing sale        12:29:34

Page 30

Q.   And so, again, focusing specifically on FibroGen, as far as you know, during the period in which Plymouth County invested in FibroGen stock, no one who actually worked for Plymouth County did anything to -- to monitor information about FibroGen    12:35:06 or its business?

A.   That's --

MR. HOOKER:  Objection to form.

THE WITNESS:   That's my understanding.

Correct.    12:35:14

BY MR. GIBBS:

Q.    And no one who worked for Plymouth County actually reviewed FibroGen's periodic SEC filings, for example?

A.    That would be my understanding.    12:35:24

Q.    And no one employed by Plymouth County listened into or reviewed transcripts of earnings calls for FibroGen during that period; is that correct?

A.    I believe that to be correct.    12:35:36

Q.   What kinds of due diligence did -- did Plymouth County expect its investment managers to employ when deciding whether and when to invest in individual stocks?

A.   Proper due diligence at their discretion.    12:35:59

Page 35

Okay?

A. Okay.

Q. All right.

So one of the allegations that Plymouth County is making in this case is that FibroGen and its executives deliberately manipulated Phase 3 data for Roxadustat; is that correct?

MR. HOOKER: Objection to form.

THE WITNESS: If -- if that's in the Complaint, it's correct.

BY MR. GIBBS:

Q. All right.

And -- well, let's look at the Complaint. Let's look at paragraph 7 of the Complaint.

And if you look at line 20 on page 4 in paragraph 7 of the Complaint, Plymouth County alleges, quote, "To the contrary, Defendants admitted that they had deliberately manipulated the data, making a series of statistically significant and improper 'post hoc changes,' close quote, to every single one of nine clinical trial analyses after the data had been fully unblinded," end quote.

Do you see that?

A. I do.

Q. What does "post hoc" mean in that context?

Page 82

A.    That's a -- a legal term that, you know, not being a lawyer I -- I don't -- I don't feel qualified to, you know, properly explain.

Q.    All right.

What does it mean to say, quote, "after the data had been fully unblinded"?    13:51:58

A.    Well, I would say, you know, the "unblinded" to me would seem to indicate that, you know, after something had been revealed.

Q.    So you don't know what?    13:52:18

A.    Specifically, no.

Q.    Am I correct in understanding this sentence to be asserting that Plymouth County claims FibroGen, quote, "deliberately manipulated the data" by making changes to the statistical analysis after    13:52:40 the data were fully unblinded; is that fair?

MR. HOOKER:    Objection to form.

THE WITNESS:    It sounds fair.

BY MR. GIBBS:

Q.    Okay.  Is it Plymouth County's position    13:52:52 that once the data are fully unblinded, it's improper to make any changes to a statistical analysis in support of a new drug application like this?

MR. HOOKER:    Objection to form.    13:53:05

Page 83

THE WITNESS:  I -- I -- I -- I believe, you know, changes occur, you know, on a regular basis.

BY MR. GIBBS:

Q.  So it's not necessarily improper to make    13:53:26 changes to a statistical analysis after the data are fully unblinded?

MR. HOOKER:  Objection to form.

THE WITNESS:  I think on the materiality, and some -- some changes are going to be more    13:53:41 dramatic, you know, than others.  Some changes could be minor.

BY MR. GIBBS:

Q.  Okay.  So am I understanding you to be saying in you view, at least, it's not necessarily    13:53:53 improper to make post hoc changes to a statistical analysis in this setting?

MR. HOOKER:  Objection to the form.

THE WITNESS:  It depends on the scope of the changes is my opinion.    13:54:07

BY MR. GIBBS:

Q.  Does it depend on anything else in your view?

A.  Nope.

Q.  Is it Plaintiff's position that any    13:54:11

Page 84

statistical analysis that includes post hoc changes is false or misleading?

MR. HOOKER:   Objection to form to the extent it calls for a legal conclusion.

THE WITNESS:   Yeah, again, this is where I re- -- where we rely on counsel.

BY MR. GIBBS:

Q.    So you don't know?

A.    I -- I don't try and draw legal conclusions, so I -- you know, I try and stay in my lane and let the lawyers do the legal work.

Q.    Yeah.  But just to be clear, I'm not asking you for a legal conclusion.  I'm not asking you to give me a legal opinion.  I -- I'm asking for an understanding of Plymouth County's allegations in this case.

I understand you may not be familiar with all the details of all the allegations, but I'm only asking for your understanding of the allegations that Plymouth County is making in this litigation.

Okay.  So are -- do you understand where I'm coming from on that?

A.    I think so.

Q.    All right.

So I -- I -- I was asking whether it is

Page 85

Plymouth County's position that any statistical analysis that includes post hoc changes is false or misleading.  I don't -- I don't think you said yes or no to that.

Do you have a view, one way or the other?    13:55:26

A.    I --

MR. HOOKER:  Objection to the form and to the extent it calls for a legal conclusion.

THE WITNESS:  I think you using "any" is -- is too general.  So, I mean, I -- I think    13:55:36 there -- there could be some.  But you saying "any" to me reads anything.

So, you know, it could be a minor change and that -- it's one thing.  But, again, that's what I was -- I think I was trying to say earlier, it    13:55:51 just depends on the -- the scope of the change or the -- the magnitude of it.

BY MR. GIBBS:

Q.    Okay.  Well, let's -- let's assume we're talking about a change that does result in a -- in a    13:55:59 different outcome, a different set of conclusions. Okay?  So I'm excluding something that's minor or immaterial, to use your word.

So if you assume a change that does have an impact on the outcome of the analysis, as you    13:56:13

Page 86

understand it, is it Plymouth County's position in this case that any such post hoc change to a statistical analysis in a new drug application context is improper?

MR. HOOKER:   Objection to the extent it 13:56:28 calls for a legal conclusion and calls for speculation.

THE WITNESS:   And -- and -- and, again, I'm -- I'm just not exactly sure what "post hoc" means.   So that's -- that's part of my, you know, 13:56:41 uncertainty here is -- is what -- what is the definition or what is my understanding of post hoc. I'm -- I'm not really clear on what -- what that exactly means.

BY MR. GIBBS:                                       13:56:49

Q.   All right.

I -- I should have known better.   I'll get the Latin out of it.

Let me ask you this way.   As far as you understand it and setting aside minor or immaterial 13:56:57 changes, is it Plaintiff -- is it Plymouth County's position in this case that any changes made to a statistical analysis after the underlying data are fully unblinded is improper?

MR. HOOKER:   Objection to form to the 13:57:14

Page 87

extent it calls for a legal conclusion.

THE WITNESS:  Again, I wouldn't use the word "any."  So, to me, you saying "any" is just too general.  So that's -- that's -- that's where you're kind of losing me, in saying "any changes."           13:57:28

BY MR. GIBBS:

Q.    So is that a "no"?

A.    It is -- it is my opinion that, you know, any -- yeah, it's -- it is a no because I think, yeah, "any changes," you know, is just too general a           13:57:51 term, you know, and so, you know, it's just too broad and encompassing in -- in -- in my mind.

Q.    Okay.  So just to -- to draw what I think is the implication of that, then, Plymouth County's position in this case is that there could be changes           13:58:08 made to a statistical analysis after the underlying data are fully unblinded, which change the result, but are not necessarily improper?

MR. HOOKER:  Objection to form.  Misstates the testimony.  And objection to the extent it calls           13:58:24 for a legal conclusion.

THE WITNESS:  Yeah, again, I just -- I just think we're being, you know, too broad here in general just talking about "any."  It's just, you know, too wide or broad to me that -- you know.           13:58:38

Page 88

motion to dismiss this case; correct?

MR. HOOKER:  Object to the form.

THE WITNESS:  I don't remember -- recall all the issues with the -- in the -- involved in the motion to dismiss.                                           15:15:51

BY MR. GIBBS:

Q.  Okay.  But you -- you do understand that one of the assertions that Plymouth County is making in this case is that FibroGen changed the stratification factors used in the pooled safety        15:16:05 analyses in order to mislead the FDA into approving Roxadustat; is that right?

MR. HOOKER:  Objection to the form.

THE WITNESS:  I -- I believe FibroGen was misleading.  If, you know, we're talking              15:16:20 stratification, then -- then you're -- you're losing me a little bit.  But, you know, the fact that there was, you know, misleading and false statement I -- I believe is part of the claim.

BY MR. GIBBS:                                                 15:16:33

Q.  Okay.

Let's look back at the Complaint.

Okay.  So let me -- let me ask you to turn back to Exhibit 28, please.  That's the Complaint.

A.  Okay.                                                    15:16:59

Page 105

not say it's -- I certainly can say it's an

absolute, you know, part of her -- whatever her

decision or opinion is; but, you know, she's

entitled to make a -- a comment, and she's doing

that here.                                                    15:42:12

BY MR. GIBBS:

Q.   All right.

Well, let me turn to a -- a -- a somewhat

related topic.

You -- you -- you mentioned that Dr. Lewis    15:42:32

is entitled to her opinion, and Dr. Unger is

entitled to his opinion and the like.

So I want to talk about the cardiovascular

safety results generally for Roxadustat.  Okay?

And I want to begin, as I have before,        15:42:50

with making sure I'm correctly understanding

Plaintiffs' claim about that.

So as I understand it, Plymouth County and

the other Lead Plaintiffs in this case are claiming

that when FibroGen initially began disclosing pooled    15:43:09

cardiovascular safety results for Roxadustat during

the class period, those results were false.

Is that correct?

MR. HOOKER:  Objection to form.

THE WITNESS:  I -- I don't specifically    15:43:23

Page 127

know which -- you know, I wouldn't say those reports were false, but I know there were false reports involved in this entire process.

BY MR. GIBBS:

Q.   So -- so you -- you don't think that FibroGen's disclosures about pooled cardiovascular safety results for Roxadustat during the class period were false?                                      15:43:36

MR. HOOKER:  Objection to form.

THE WITNESS:  I'm -- I'm not -- I don't feel capable right now specifically citing which exact statements were false.                          15:43:49

BY MR. GIBBS:

Q.   All right.

Well, let's -- let's take a look back at the Complaint.  Maybe that will help you.  It's Exhibit 28 again.  It's -- it's your Complaint. By "you," I obviously mean Plymouth County.   15:44:03

And I think I want to focus on -- sorry, bear with me just a moment, please.          15:44:43

I want to focus on paragraph 72 -- sorry, page 72 of the Complaint, paragraph 171.

Let me know when you're there.

A.   We are there.

Q.   Okay.  So this is the part of the          15:45:06

Page 128

Complaint where Plymouth County and the other Lead

Plaintiffs have laid out each of the specific

statements by FibroGen and the -- and the other

Defendants that Plymouth County and the Plaintiffs

claim were false or misleading, just to orient you.    15:45:24

And Heading F just above paragraph 171 is

labeled "November 2019 Statements."

Do you see that?

A.    I do.

Q.    Okay.  And then one of the statements          15:45:40

that's referenced here, as -- as among the allegedly

false or misleading statements, is a reference to a

November 8, 2019, press release from FibroGen.  That

discussion begins on line 16 of page 72.

Do you see that?                                      15:45:55

A.    I do.

Q.    Okay.  And the press release is identified

as announcing, quote, "Positive Phase 3 Pooled

Roxadustat Safety and Efficacy Results" presented at

the American Society of Nephrology Kidney Week 2019.   15:46:10

Do you see that?

A.    I do.

Q.    And you can see in the rest of the

paragraph, I won't -- I won't read it, but you can

see the rest of the paragraph is describing a -- a    15:46:23

Page 129

series of results of the pooled statistical analysis

that FibroGen was announcing in early November 2019;

correct?

A.    Correct.

Q.    And then if you -- if you turn to the next    15:46:39

page, paragraph 173, it says, quote, "The statements

in paragraph 171 through 72 were materially false

and misleading, and omitted material facts when

made." [As read]

And then it goes on to -- to repeat the    15:46:55

allegations we've been talking about before about

FibroGen manipulating the pooled statistical

analysis.

Do you see that?

A.    I do.    15:47:07

Q.    So you -- you agree with me that among the

Plaintiffs' claims in this case is a claim that when

FibroGen announced pooled safety analyses during the

class period, some of them were false; is that

right?    15:47:23

A.    Some of them.

Q.    Okay.   To -- to your knowledge, did

investors ever learn what were the true results?

MR. HOOKER:   Objection to form.

THE WITNESS:   I -- I do not -- I do not    15:47:37

Veritext Legal Solutions
866 299-5127

know.  Not to my knowledge.  I have -- I have no knowledge of that.

BY MR. GIBBS:

Q.   All right.

Well, let's -- let's turn to -- let's turn    15:47:43
to paragraph 221 of the Complaint.

A.   Okay.

Q.   And I -- again, I won't read it to you,
but you -- you can see this is another version of --
of some of the language we have been talking about    15:48:15
before about the company's April 6, 2021, press
release that the Plaintiffs say was an admission
that -- that the data had been manipulated.

Do you see that?

A.   I do.                                         15:48:27

Q.   Do you understand Plymouth County to be
alleging that -- that it was through this April 6,
2021, press release that the market learned, at
least in part, what were the true results of the
pooled safety analysis?                               15:48:43

MR. HOOKER:  Objection to form.

THE WITNESS:  I'm not sure I'd leap to the
conclusion that it was the true results, but it was
a -- you know, a -- a -- a change in the results
that was.  You know, caused, you know, the -- the     15:49:09

Page 131

to comprehend.

Q.   I -- I'm not asking you to explain the data.  I'm just asking you to explain or tell me, if you know, what would make one set of results true and what would make one set of results false?   15:53:46

A.   I do not --

MR. HOOKER:  Objection to form.

THE WITNESS:  I do not know.

BY MR. GIBBS:

Q.   Do you -- do you know whether it's   15:53:55
possible in -- in performing a statistical analysis of a given dataset to reach different results by using different methods?

MR. HOOKER:  Objection to form.  Calls for speculation.   15:54:12

THE WITNESS:  You know, I -- I know statistics can be interpreted differently by different people.

BY MR. GIBBS:

Q.   Okay.  And -- and different   15:54:28
interpretations are not necessarily true or false; correct, they're interpretations?

A.   That -- that they are interpretations.

Q.   Let me take you back, if I could, to paragraph 228 of the Complaint and -- and this part   15:55:06

Page 136

BY MR. GIBBS:

Q.   -- in the -- in -- we -- we see the 108 [verbatim] number under "Post-Hoc Manipulated Analysis."  So that's an estimated MACE hazard ratio of 1.08 as in the sentence we were just looking at.   15:58:42

Right?

A.   Yes.

Q.   And then over in the right-hand column, there's the -- the -- the 1.38, which is the estimated hazard ratio under the "True, Undisclosed   15:58:50 FDA Pre-Specified 'Sensitivity' Analysis."

Do you see that?

A.   I do.

Q.   Okay.  So first of all, do you know what an estimated hazard ratio is?   15:59:03

A.   I do not.

Q.   Do you know what its significance is for purposes of FDA approval?

A.   I do not.

Q.   All right.   15:59:10

And what about the upper bound and -- and lower bound, which I take to be the two numbers in parentheses next to each of those.  So, for example, next to the 1.08, there's a 0.94, comma, 1.24.

And then next to the 1.38, there is in   15:59:19

Page 140

parentheses --

THE COURT REPORTER:  Counsel, can you slow down just a little bit, please?

MR. GIBBS:  Yeah.  Sorry.

BY MR. GIBBS:                                          15:59:31

Q.   Next to the 1.38 in parentheses, there is 1.11 and a 1.70.  And the 1.70 is in red, which I think is important.

Do you see that?

A.   I do.                                            15:59:44

Q.   Okay.  So if I'm understanding this part of your Complaint correctly, it -- Plymouth County is saying that the 1.08 estimated hazard ratio for MACE in the NDD population, that's false.

But the estimated hazard ratios under the        16:00:00 other two columns, 1.10 and 1.38, those are true.

Am -- am I understanding this correctly?

A.   I wouldn't use the word "false" and "true."  I would use the words "manipulated" and "true."                                                16:00:22

Q.   Okay.  That's fine.  You did -- in fact, you did use those words right there in your Complaint.

By the way, can you explain to me what manipulated means in that context?  What numbers          16:00:34

Veritext Legal Solutions
866 299-5127

were manipulated and how were they manipulated?

A.   I do not know how they were manipulated.

Q.   Do you know what numbers were manipulated?

A.   I would say the post-hoc analysis of the -- the numbers on the -- of the three columns and the column on the far left.

Q.   The 1.08, 1.06, et cetera, on down that column?

A.   Yes.

Q.   Okay.  But you can't tell me how they were manipulated?

A.   I cannot.

Q.   Okay.  Well, so, let's -- let's set aside the post hoc manipulated analysis for now and just focus on the other two columns.

So again, for example, for the NDD group for the MACE endpoint, you have two different hazard -- estimated hazard ratio numbers, one of them is 1.10 and one of them is 1.38.

Which of those two is true?

MR. HOOKER:  Objection to form.

THE WITNESS:  I -- I believe them both to be true.

BY MR. GIBBS:

Q.   How can that be?  How can two different

16:00:48

16:01:01

16:01:11

16:01:28

16:01:40

Page 142

numbers both be true?  Doesn't it have to be one true number?

MR. HOOKER:  Objection to form.

THE WITNESS:  My reading of it is they're two different analysises [verbatim].                    16:01:53

BY MR. GIBBS:

Q.  Okay.  And so, I take it you're saying you might have different analyses, generating different estimates of this hazard ratio that come out differently, and they could both be true?            16:02:03

MR. HOOKER:  Objection to form.

THE WITNESS:  Depending on the criteria used, yes.

BY MR. GIBBS:

Q.  All right.  Let me change subjects here.    16:02:30

Do you know whether FibroGen told investors that the FDA would review the Roxadustat NDA under a, quote, "totality of evidence standard"?

A.  I do not know.

Q.  All right.                                    16:02:54

Hang on just a moment.  Okay.  All right.

So I want to mark our next exhibit.  I think this takes us to 33, if I'm keeping track. And, Amie, it's our Tab 23, please.

(Sullivan Deposition Exhibit 33 was marked    16:03:22

Page 143

Q.   Okay.  Okay.

So all of this discussion it seems to me is consistent with our earlier discussion about the fact that there -- there was room for different interpretations of the safety data for Roxadustat;   16:45:13 correct?

MR. HOOKER:   Objection to form.

THE WITNESS:   Correct.

BY MR. GIBBS:

Q.   All right.                                        16:45:23

Do you know what the vote was for the other population at issue, the dialysis dependent population?

A.   I do not.

Q.   Okay.  If you scroll forward in the       16:45:33 transcript to page 326, starting at line 8, it's Dr. Lewis again queueing up a question for the committee to vote upon.

And the question is, quote, "Should roxadustat be approved for the treatment of anemia   16:45:50 due to CKD in adult patients on dialysis?"

Do you see that?

A.   We're not there yet.

Q.   Okay.  Oh, you're not there yet, I'm sorry.                                                 16:46:01

Veritext Legal Solutions
866 299-5127

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely via videoconference and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: 13th day of April, 2023

Hanna Kim

CLR, CSR No. 13083

Page 190

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC., SECURITIES   )
LITIGATION                         )
                                   ) CASE NO.
                                   ) 3:21-cv-02623-EMC
                                   )
                                   )
                                   )
                                   )
_____)

REMOTE VIDEOTAPED DEPOSITION OF CHRISTOPHER DIFUSCO, PMK

April 18, 2023

--ooOoo--

JOB NO.:5839266

REPORTED BY: MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423

Page 1

Veritext Legal Solutions
866 299-5127

REMOTE VIDEOTAPED DEPOSITION OF CHRISTOPHER DIFUSCO, TAKEN ON BEHALF OF DEFENDANTS, COMMENCING AT 12:01 P.M., TUESDAY, APRIL 18, 2023, AT PHILADELPHIA, PENNSYLVANIA, BEFORE MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423.

APPEARANCES OF COUNSEL:
(ALL PARTIES APPEARING REMOTELY)

FOR PLAINTIFFS:

                    SAXENA WHITE, P.A.
                    BY: LESTER R. HOOKER, ESQ.
                        SCOTT GUARCELLO, ESQ.
                    7777 Glades Road, Suite 300
                    Boca Raton, Florida 33434
                    561.394.3399
                    lhooker@saxenawhite.com
                    sguarcello@saxenawhite.com

                    PILLSBURY WINTHROP SHAW PITTMAN, LLP
                    BY: ELIZABETH CHEEVER, ESQ.
                    Four Embarcadero Center, 22nd Floor
                    San Francisco, California 94111
                    415.983.1154
                    elizabeth.cheever@pillsburylaw.com

Page 2

APPEARANCES OF COUNSEL (CONTINUED):


FOR DEFENDANTS:

                    COOLEY, LLP
                    BY: ZANETA J. KIM, ESQ.
                        AMIE L. SIMMONS, ESQ.
                        PATRICK E. GIBBS, ESQ.
                    3175 Hanover Street
                    Palo Alto, California 94304
                    650.843.5000
                    zkim@cooley.com
                    asimmons@cooley.com
                    pgibbs@cooley.com


Also Present:
CASSIA LEET - THE VIDEOGRAPHER
DANIEL GRBICH - VERITEXT CONCIERGE

Page 3

```
                        I N D E X

WITNESS            EXAMINATION BY              PAGE

CHRISTOPHER DIFUSCO

                   (BY MS. KIM)                 6
```

```
                   E X H I B I T S

NUMBER            PAGE                DESCRIPTION

EXHIBIT 50         10                 NOTICE OF DEPOSITION

EXHIBIT 51         26                 INVESTMENT STATEMENT

EXHIBIT 52         34                 RHUMBLINE SCHEDULE A

EXHIBIT 53         51                 CERTIFICATION AND

                                      AUTHORIZATION


EXHIBIT 54         55                 TRANSACTION HISTORY

EXHIBIT 55         62                 REDDY EMAIL

EXHIBIT 56         80                 REPRESENTATION

                                      AGREEMENT


(Exhibits 28 through 34 and 38 previously marked.)
```

Veritext Legal Solutions
866 299-5127

PHILADELPHIA, PENNSYLVANIA

Tuesday, April 18, 2023; 12:01 p.m. EST

THE VIDEOGRAPHER:  Good morning.  We are going on   12:01
the record at 12:01 p.m. on April 18th, 2023.  Please
note that this deposition is being conducted virtually.
Audio and video recording will continue to take place
unless all parties agree to go off the record.

This is media unit 1 of the video recorded   12:01
deposition of PMK for City of Philadelphia Board of
Pensions and Retirement, Christopher DiFusco, taken by
counsel for defendant in the matter of In Re FibroGen,
Inc., Securities litigation, filed in the United States
District Court, Northern District of California.  Case   12:01
number 3:21-cv-02623-EMC.

My name is Cassia Leet from Veritext Legal
Solutions and I am the videographer.  The court reporter
is Michelle Sabado of Veritext Legal Solutions.

I am not related to any party in this action,   12:02
nor am I financially interested in the outcome.  Would
counsel and everyone attending remotely please state your
appearances and affiliations for the record, beginning
with the noticing attorney.

MS. KIM:  Hello, this is Zaneta Kim with Cooley,   12:02

Page 5

LLP on behalf of defendants FibroGen, Inc. and individual   12:02

defendants Enrique Conterno, James Schoeneck, Mark Eisner

and Pat Cotroneo and with me are my colleagues, Patrick

Gibbs and Amie Simmons.

MR. HOOKER:  Good morning.  This is Lester Hooker   12:02

from Saxena White on behalf of the lead plaintiffs in the

class and with me is my colleague Scott Guarcello and I

will note for the record that Daniel Grbich from Veritext

is also in the room and he's the technical concierge for

Veritext.   12:03

MS. CHEEVER:  Good morning.  This is Elizabeth

Cheever with Pillsbury on behalf of defendant Dr. Yu.

THE VIDEOGRAPHER:  Thank you.

Would the court reporter please swear in the

witness and then counsel may proceed.   12:03

CHRISTOPHER DIFUSCO,

having been first duly sworn by the Reporter, was

examined and testified as follows:

12:03

EXAMINATION

BY MS. KIM:

Q   All right.  Mr. DiFusco, thank you for being

here today.  Would you please state and spell your name

for the record.   12:03

Page 6

Q    Understood.  Thank you for that                    12:23

clarification.

Did you discuss this deposition with anyone

other than your counsel?  And by "your counsel," I'm

referring to both city solicitor and your outside        12:23

counsel.

A    Other than to let, you know, my superior,

colleagues, my spouse know that I would be testifying in

a deposition today so they knew where I was, that would

be the only discussion I had with anyone else.  I didn't  12:23

discuss the substance of the matter or anything else,

just "hey, I have a deposition today in a securities

litigation matter.  Here's where I'll be."  Beyond that,

no, I only discussed it with Adam and with Lester.

Q    All right.  And you mentioned that you              12:23

reviewed certain documents during these meetings.  Did

any of these documents refresh your recollection of the

plaintiffs' allegations or what transpired?

A    Yes.

Q    Which documents?                                    12:24

A    In particular, the -- the initial complaint

and then the -- the consolidated complaint that was filed

after that.  Those were -- those were the two I think

that were most beneficial in refreshing my recollection.

Q    And was that the first time you've seen those       12:24

Page 19

filings?                                                          12:24

A     It was not.

Q     All right.  Any e-mails you reviewed that
refreshed your recollection?

A     No.                                                        12:24

Q     Any company meaning FibroGen, any company
press releases?

A     No.

Q     SEC filings?

A     No.                                                        12:25

Q     The company's earnings call transcripts?

A     No.

Q     Have you seen any of those documents in
connection with previous filings?

A     Unless they were included as exhibits or          12:25
referenced in any of the filings, not -- not to my
knowledge, no.

Q     All right.  Any analyst reports you reviewed
in preparation for this deposition?

A     No analyst reports.                                12:26

Q     All right.  Any documents you produced in
this litigation?  And by you, meaning Philadelphia.

A     The investment -- the city's -- or the
Board's, excuse me, investment policy statement and I
believe a couple of printouts or -- yeah, printouts of   12:26

Page  20

the buy and sell transactions during the relevant class     12:26
period.

Q     And when you say "class period," can you
specify the dates for us?

A     Sure.  December 20th, 2018 to July 15th,     12:26
2021.

Q     All right.  And when I say "class period"
during this deposition, you understand that it refers to
time period of December 20, 2018 to July 15th, 2021,
correct?     12:27

A     I do.  I do.

Q     Thank you.

And did you review any documents not
identified or selected by counsel in preparation for this
deposition?     12:27

A     Could you -- could you repeat that?  I'm
sorry.

Q     Sure.

A     I just want to make sure I understood what
you asked.     12:27

Q     Yeah.  Let me try this again.  Did you review
any documents that were not identified or selected by
counsel or, in other words, shown to you by counsel on
your own in preparation for this deposition?

A     Thank you for clarifying.  No, those were     12:27

Page 21

the -- those were the only documents that I reviewed.  No    12:27
outside research, no outside documents.

Q    Great.  Thank you.  All right.

Now I'm turning to questions about the
Philadelphia Pension Fund.  You've told us a little bit    12:28
about the Philadelphia's corporate structure.  Can you
tell us about the investment committee?

A    Sure.  The invest -- the investment committee
would be the -- the same nine folks or nine trustees,
excuse me.  Ten if you count the nonvoting member that I    12:28
referred to previously.  So the chairman of the -- the
Board, the finance director, and the four elected
trustees from the civil service ranks -- or elected by
the civil service employees, excuse me, the city
controller and then the three other members of the    12:29
mayor's administration, in addition to the nonvoting City
Council delegate, those -- those comprise the -- the
Board is the investment committee.

Q    Understood.  And what are they charged with?
What are their responsibilities?    12:29

A    So they have a fiduciary duty to oversee all
assets in the retirement system, to invest them prudently
so that there will be sufficient funds, you know, in --
to perpetuity or for as long as the Fund is in existence
to pay current and future retirees and beneficiaries of    12:29

Page 22

BY MS. KIM:                                              04:05

Q      Okay.   And what is your understanding as to what a stratification factor is?

A      I guess I would describe it -- and again, not being a -- you know, doctor or scientist, but I guess       04:06 it -- I would describe it as the types of analysis that's being used or done as part of the -- part of the study. So you know, which -- if you have a study, you know which -- which data you're going to include, which data you're not going to include based on these -- based on        04:06 these stratification factors that are referenced in paragraph 8.

Q      Okay.   And I think you previously described post hoc as after-the-fact changes.   Is that correct?

A      Yes.                                             04:06

Q      And when you say "after the fact," does it mean after clinical studies have ended and the data has been unblinded?

A      Yes, and I believe that's how the -- if I recall from a prior question, I believe that's how a --       04:07 how it's discussed in one of the prior paragraphs.  Yeah, paragraph 7.   Post hoc changes -- I'm quoting now from the complaint, "Post hoc changes to every single one of nine clinical trial analysis" -- italics -- "after the data had been fully unblinded."                           04:07

Veritext Legal Solutions
866 299-5127

Q      Okay.  And is it plaintiffs' position that 04:07
once data is unblinded, it is improper to make any
changes to the statistical analyses?

MR. HOOKER:  Objection to form.

THE WITNESS:  No, that -- that -- that's -- again, 04:07
not being a scientist or a doctor but that -- even with
that limitation, no, that's not my -- my understanding.
Certain -- certain changes or clarifications may be
appropriate but I think they're generally done in a very
limited fashion and I think they're usually -- they're 04:08
viewed with an even more critical eye if something
happens kind of after the fact.  So it's not that it's
never improper but I would say it -- it -- my
understanding is it happens less -- less often and folks
are more skeptical of it when it does. 04:08

BY MS. KIM:

Q      Okay.  So in your view, it's not necessarily
improper to make changes to a statistical analysis after
clinical data has been unblinded; is that correct?

MR. HOOKER:  Objection.  Form. 04:08

THE WITNESS:  In certain circumstances, yes, it may
be proper.  Not in all circumstances but yes, in certain
circumstances, it can be proper.

BY MS. KIM:

Q      Can you give us an example of circumstances 04:09

Page 100

in which it may be proper? 04:09

A    I would -- I would -- I mean, broadly speaking, if there was some clear -- clear error with how the -- if there -- if there wasn't a problem with the study itself but perhaps there was a -- a clear error 04:09 with -- that was easily rectifiable with folks who were or were not being included in a particular study and it was like a clear and kind of cut and dry, everyone kind of agreed, then it might be proper.  I know that's not a great example but I would just go back to while it might 04:09 not always be improper, I think its use is generally viewed somewhat skeptically and it should only be done in limited -- limited circumstances.

Q    So if, let's say during a clinical trial there is a high drop out rate in patients on placebo, 04:10 which in turn biased the data, would it be proper to kind of take that high drop out into analysis post hoc?

MR. HOOKER:  Objection.  Calls for speculation.

THE WITNESS:  I would think that that would be extremely fact specific.  I would need to know more about 04:10 the study, the parameters, the -- the drop out rate, what was being analyzed.  I could certainly see where that would be something the researcher or the folks, the doctors conducting the study would look at.  But without more information and, quite frankly, more experience in 04:11

Page 101

that field, I can't say for certain whether it would be

appropriate or not.

BY MS. KIM:

Q    Okay.  Would you say that post hoc changes are improper if FDA agreed to it?

MR. HOOKER:  Objection.  Calls for speculation.

THE WITNESS:  I would say it's less -- perhaps less likely that they're improper.  It would be -- still be fact -- very fact specific and study specific but I would likely agree that it's, you know, less likely to be improper if the FDA signed off on it.

BY MS. KIM:

Q    Let's quickly go back to your understanding of what a stratification factor is.  You said that stratification factor may be used to either include or exclude certain types of data; is that correct?

MR. HOOKER:  Objection to form.

THE WITNESS:  I think that's -- I think that's what I said.  I think that the -- that the term as I understand it is -- excuse me -- is somewhat perhaps better explained in lines 15 -- sorry, 14 and 15 where it talks about "so significant that FibroGen needed to promptly clarify the issue with the FDA to make sure which analysis used which factors pre-specified and post hoc."  That, I think, is a good summary of my

Page 102

understanding of what is being referenced by    04:13

stratification factors.

BY MS. KIM:

    Q    Sorry.  I'm trying to follow.  So I don't

think that necessarily answers my question.  So my    04:13

question to you is, is it your understanding that use of

certain stratification factor tends to exclude or include

certain types of data?

    MR. HOOKER:  Same objection.

    THE WITNESS:  No, I -- no, I don't -- no, I -- I    04:13

would say that my understanding is the stratification

factors referenced here are talking about specifically

which analysis -- which analysis used in the study,

which -- which -- sorry.  Which analysis or studies used

-- used which factors and I think that's -- again, I may    04:14

not be answering the question super well, but that --

that's my understanding of what's being talked about in

those -- in those lines 12 to 15, same paragraph as where

you referenced previously.

BY MS. KIM:    04:14

    Q    Okay.  Do you know what a statistical

analysis plan is?

    A    No, I don't believe I do.

    Q    Okay.  Are you aware that FibroGen had both

individual and pooled statistical analysis plans in place    04:15

BY MS. KIM:                                                          05:55

Q    Okay.  All right.  So do you agree that when you perform various statistical analyses, results may appear better in one set of statistical analysis compared to another?                                                      05:55

MR. HOOKER:  Objection to form.

THE WITNESS:  I believe that can happen, yes.

BY MS. KIM:

Q    Does your answer imply that that can't happen?                                                             05:56

A    Well, assuming I understood your question correctly and if I didn't, I apologize.  But you could -- depending on how you present two sets of seemingly identical data that the presentation, how it's displayed, how it's shown could lead -- at least, you know, could   05:56 lead to different -- different conclusions or different inferences.  So if I misunderstood, I apologize.

Q    No, appreciate the response.

So would you agree that statistical -- different statistical analyses are different ways of     05:56 interpreting the underlying data?

MR. HOOKER:  Objection to form.

THE WITNESS:  Different statistical analysis -- analyses of the same data?  That -- that's how I should understand the question?                                        05:57

Page 155

BY MS. KIM:                                                    05:57

Q      Yes.

A      Yes, then yes.

Q      So it's not necessarily that one statistical

analyses -- or strike that.                                    05:57

It's not that the outputs of a one particular

statistical analyses is false or the other set of

statistical analyses are true, correct?  They're just

different interpretations of the underlying data?

MR. HOOKER:  Objection to form.  Calls for          05:57

speculation.

THE WITNESS:  I think what you just stated is

reasonable, generally -- yes.  I think that's generally

correct, yes.

BY MS. KIM:                                                    05:58

Q      Okay.  So in performing a statistical

analysis, it is possible to reach different results by

using different methods, right?

MR. HOOKER:  Objection to form.  Calls for

speculation.                                                   05:58

THE WITNESS:  Yes.

MS. KIM:  All right.  Apologies.  Looking at how

much more I have here.

(A pause in the proceedings.)

MS. KIM:  All right.  Can we please pull up what's    05:59

Page 156

land or something, I might not.  But generally speaking,    06:14
yes, I -- I understand the term.

Q    What is your understanding of the term?

A    So essentially, you know, if you've disclosed
something to the public or to the Court or, you know, in    06:15
a -- you know, legal document and you come to realize,
you know, within a reasonable or prescribed amount of
time that you omitted something, you misstated something,
you would issue a new disclosure or a new document to
that effect, indicating what -- what data or what    06:15
information was misstated or not -- not provided
initially.

Q    I think I got most of that, although, there
was a very loud siren in the back.

A    Do you need me to try to -- I don't know what    06:15
the court reporter got or didn't get.

THE REPORTER:  I heard it.

MS. KIM:  I will go back.  Thank you.

Q    Do you know how many corrective disclosure
plaintiffs are alleging in this action?    06:16

MR. HOOKER:  Objection to form to the extent it
calls for a legal conclusion.

THE WITNESS:  No, I don't -- I don't know what
number might be alleged in the -- in the complaint, no.

///    06:16

Page 166

BY MS. KIM:                                                    06:16

Q    Do you know the dates of any of the corrective disclosures alleged in the complaint?

A    Not that I can recall offhand, no.

Q    Are you able to describe generally with    06:16 respect to any of the corrective disclosure alleged in the complaint what that corrective disclosure disclosed to the market?

MR. HOOKER:  Objection to form and to the extent it calls for a legal conclusion.                                06:16

THE WITNESS:  No, I don't -- I don't -- I don't think I can.

MS. KIM:  Okay.  Can we take a quick five minute break?  I think I'm almost done here.

MR. HOOKER:  Sure.                                            06:17

THE VIDEOGRAPHER:  Okay.  This marks the end of volume 1, media unit 3 of the deposition of PMK Christopher DiFusco.  The time is 6:17 p.m.  We're off the record.

(Whereupon a recess was held from 6:17      06:17 p.m. to 6:22 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 6:22 p.m.  This marks the beginning of volume 1, media unit 4 of the deposition of PMK Christopher DiFusco.

Please continue.                                    06:23

Page 167

I, MICHELLE MEDEL SABADO, RPR, CRR, CSR NO. 7423, IN AND FOR THE STATE OF CALIFORNIA, HEREBY CERTIFY:

THAT PRIOR TO BEING EXAMINED, THE WITNESS NAMED IN THE FOREGOING DEPOSITION WAS DULY SWORN BY ME TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH;

THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION, AND THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT OF SAID PROCEEDINGS;

THAT IF THE FOREGOING PERTAINS TO THE ORIGINAL TRANSCRIPT OF AN EXAMINATION IN A FEDERAL CASE, BEFORE COMPLETION OF THE PROCEEDINGS, REVIEW OF THE TRANSCRIPT { } WAS  { X } WAS NOT REQUIRED.

I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE EVENT OF THE ACTION.

WITNESS MY HAND THIS 19TH DAY OF APRIL, 2023.

MICHELLE MEDEL SABADO

RPR, CRR, CSR NO. 7423

Page 170

# EXHIBIT 8

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

# FDA Briefing Document

# Cardiovascular and Renal Drugs Advisory Committee Meeting

# July 15, 2021

# Roxadustat

*The committee will discuss the safety and efficacy of the New Drug Application (NDA) 213805 for roxadustat, an oral film-coated tablet submitted by FibroGen, Inc. The proposed indication is for the treatment of anemia due to chronic kidney disease (CKD) in adult patients not on dialysis and on dialysis.*

*Date Prepared: June 14, 2021*

**Division of Nonmalignant Hematology**

**and**

**Office of Cardiology, Hematology, Endocrinology, and Nephrology**

**Office of New Drugs**

**Center for Drug Development & Research**

**US Food & Drug Administration**

**Silver Spring, MD 20993**

**Department of Health & Human Services**

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

DISCLAIMER STATEMENT

The attached package contains background information prepared by the Food and Drug Administration (FDA) for the panel members of the advisory committee. The FDA background package often contains assessments and/or conclusions and recommendations written by individual FDA reviewers. Such conclusions and recommendations do not necessarily represent the final position of the individual reviewers, nor do they necessarily represent the final position of the Review Division or Office. We have brought roxadustat to this Advisory Committee in order to gain the Committee's insights and opinions, and the background package may not include all issues relevant to the final regulatory recommendation and instead is intended to focus on issues identified by the Agency for discussion by the Advisory Committee. The FDA will not issue a final determination on the issues at hand until input from the Advisory Committee process has been considered and all reviews have been finalized. The final determination may be affected by issues not discussed at the Advisory Committee meeting.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

# Contents

Table of Tables ........................................................................................................................ 4

Table of Figures ..................................................................................................................... 5

List of Acronyms .................................................................................................................... 6

Introduction ........................................................................................................................... 7

    Roxadustat ......................................................................................................................... 8

    Anemia of Chronic Kidney Disease ................................................................................... 8

    Erythropoiesis Stimulating Agents .................................................................................... 9

    Hypoxia-inducible Factor Prolyl Hydroxylase Inhibitors ................................................ 11

    Commentary for the Committee ...................................................................................... 11

Draft Points to Consider ...................................................................................................... 13

Evidence of Efficacy ............................................................................................................ 14

    NDD Indication ................................................................................................................ 15

        Study Designs ............................................................................................................. 15

        Results ........................................................................................................................ 16

        Primary Endpoint ....................................................................................................... 18

        Study 610 ................................................................................................................... 20

    DD Population .................................................................................................................. 22

        Study Designs ............................................................................................................. 22

        Results ........................................................................................................................ 24

        Primary Endpoint ....................................................................................................... 27

        Study 613 ................................................................................................................... 28

Safety ................................................................................................................................... 29

    Analyses of Adverse Events ............................................................................................ 30

        Methods ..................................................................................................................... 30

        Results ........................................................................................................................ 31

    Laboratory Findings ........................................................................................................ 45

        NDD population .......................................................................................................... 45

        DD population ............................................................................................................ 45

    Analysis of MACE ............................................................................................................ 46

        NDD Patient Population ............................................................................................. 46

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

DD Patient Population: ................................................................................................50

Study 613 ..................................................................................................................53

Relation Between Thrombotic Events, Roxadustat Dose, Hb Level, and Hb Rate of Change..............53

Thromboembolic Events in Relation to Drug Dose ....................................................54

Thromboembolic Events in Relation to Hb Concentration ........................................56

Thromboembolic Events in Relation to Hb Rate of Change.......................................57

Summary of Important Risks........................................................................................58

NDD Population...........................................................................................................59

DD Population.............................................................................................................62

References.........................................................................................................................66

Appendix...........................................................................................................................66

Approved Epogen Label ..............................................................................................66

Adverse Event Preferred Terms Used in Key Queries................................................67

# Table of Tables

Table 1: US-Licensed ESAs for the Treatment of Anemia Due to Chronic Kidney Disease (CKD)............. 9
Table 2: Major Trials in the NDD Population...........................................................................15
Table 3: Roxadustat Dose Adjustment Algorithm for NDD-CKD Subjects..............................16
Table 4: Selected Demographics and Baseline Disease Characteristics—NDD Trials............................17
Table 5: Patient Disposition (NDD Safety Population) ..............................................................18
Table 6: Drug Exposure in NDD Population ..............................................................................19
Table 7: Efficacy Endpoints for NDD Trials...............................................................................19
Table 8: Selected Demographic and Baseline Disease Characteristics—Study 610.............................21
Table 9: Efficacy Results for Trial 610 (Ns Represent Numbers in the Per-protocol Analysis Set)...........22
Table 10: Major Trials in the DD Patient Population ..................................................................24
Table 11: Roxadustat Dosage Adjustment for Studies 063, 064, and 002...........................................24
Table 12: Selected Demographics and Baseline Disease Characteristics for DD Trials.........................25
Table 13: Patient Disposition DD Safety Population (002, 063, 064).................................................26
Table 14: Duration of Exposure in DD Population (002, 063, 064)..................................................27
Table 15: Efficacy Results for the DD Trials.............................................................................28
Table 16: Selected Demographic and Baseline Disease Characteristics—Study 613...........................29
Table 17: Adjudicated Causes of Death—Studies 001, 060, 068; Ascertainment Window OT+28..........32
Table 18: Serious Adverse Events—Studies 001, 060, and 608; Ascertainment Window OT+7 ............33
Table 19: Serious Adverse Events—Study 610 .........................................................................35
Table 20: All Adverse Events—Studies 001, 060, and 608; OT+7, OT+28, and OT+All Ascertainment
Windows .................................................................................................................37
Table 21: All Adverse Events—Study 610...............................................................................38
Table 22: Adjudicated Causes of Death—Studies 002, 063, 064; Ascertainment Window OT+28..........39

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 23: Serious Adverse Events—Studies 002, 063, and 064; OT+7 Ascertainment Window ..............41
Table 24: Serious Adverse Events—Study 613 ...............................................................................42
Table 25: All Adverse Events—Studies 002, 063, 064; OT+7 Ascertainment Window...........................43
Table 26: All Adverse Events—Study 613........................................................................................44
Table 27: Summary of MACE Analysis Results in the NDD Population...............................................47
Table 28: Summary of MACE Results in Study 610...........................................................................50
Table 29: Summary of MACE Analysis Results in the DD Population..................................................51
Table 30: Important Risks in the NDD Patient Population; Combined Data Sources............................60
Table 31: Major Risks by Subgroup in the NDD Population (All Adverse Events; OT+7 Analysis) ...........61
Table 32: Important Risks in the DD Patient Population....................................................................63
Table 33: Major Risks by Subgroup in the DD Population (All Adverse Events; OT+7 Analysis)..............64
Table 34: Terms in Key Adverse Event Queries ..............................................................................67

## Table of Figures

Figure 1: Changes in Hb over Time—NDD Studies..........................................................................20
Figure 2: Hb Change from Baseline by Time (mean ± 95% CI)—Study 610 (figure adapted from applicant)
...................................................................................................................................22
Figure 3: Subject Retention for the DD Population—Studies 002, 063, 064.......................................26
Figure 4: Kaplan-Meier Curves for Time to Death—Study 613, OT+28 (left); On-study (right) ..............40
Figure 5: NDD population—Plot of Hepatocellular Injury (Total Bilirubin vs. ALT or AST).....................45
Figure 6: DD population—Plot of Hepatocellular Injury (Total Bilirubin vs. ALT or AST).......................46
Figure 7: Time to First MACE— On-study Analysis (Left); OT+7 Analysis (Right) .................................48
Figure 8: MACE and its Components for Studies in the NDD Population (On-study Analysis)................49
Figure 9: MACE and its Components for Studies in the NDD Population (OT+7 Analysis).....................49
Figure 10: Time to First MACE—OT+7 Analysis (Left); On-study Analysis (Right) ................................51
Figure 11: MACE and its Components for Studies in the DD Population (OT+7 Analysis) ......................52
Figure 12: MACE and its Components for Studies in the DD Population (On-Study Analysis).................52
Figure 13: All-cause Mortality—Study 613; OT+28 Ascertainment Window .......................................53
Figure 14: Thromboembolic Events vs. Overall Total Weight-adjusted Dose of Study Agent—NDD
Population ...................................................................................................................54
Figure 15: Thromboembolic Events vs. Weight-adjusted Dose of Study Agent—Received in Preceding 4
Weeks (Left); Received at Onset of Event (Right)—NDD Population.................................................55
Figure 16: Thromboembolic Events vs. Overall Total Weight-adjusted Dose of Study Agent—DD
Population ...................................................................................................................55
Figure 17: Thromboembolic Events vs. Weight-adjusted Dose of Study Agent—Received in Preceding 4
weeks (Left); Received at Onset of Event (Right)—DD Population ...................................................56
Figure 18: Thromboembolic Events vs. Hb at the Time of Event—NDD Population.............................56
Figure 19: Thromboembolic Events vs. Hb at the Time of Event—DD Population...............................57
Figure 20: Thromboembolic Events vs. Hb Rate of Change Leading to Event—NDD Population............58
Figure 21: Thromboembolic Events vs. Hb Rate of Change Leading to Event—DD Population...............58
Figure 22: Time to First Thrombotic Event—All Events (Left); Serious Events (Right) for the DD Population
(Studies 002, 063, and 064); OT+7 Ascertainment Window .........................................................65

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

# List of Acronyms

| | |
|---|---|
| AE | adverse event |
| ALT | alanine aminotransferase |
| ANCOVA | analysis of covariance |
| AST | aspartate aminotransferase |
| BMI | body mass index |
| CI | confidence interval |
| CHF | congestive heart failure |
| CKD | chronic kidney disease |
| eGFR | estimated glomerular filtration rate |
| ESA | erythropoiesis-stimulating agent |
| ESRD | end stage renal disease |
| Hb | hemoglobin |
| HD | hemodialysis |
| HIF | hypoxia-inducible factor |
| HR | hazard ratio |
| LSM | least squares mean |
| MACE | major adverse cardiovascular events |
| MI | myocardial infarction |
| NI | non-inferiority |
| PHI | prolyl hydroxylase inhibitor |
| PD | peritoneal dialysis |
| P-Y | patient-year |
| RBC | red blood cell |
| SAE | serious adverse event |
| TBL | total bilirubin |
| TIW | three times weekly |
| ULN | upper limit of normal |
| US | United States |

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

# Introduction

This is the FDA briefing material for the July 15, 2021 meeting of the Cardiovascular and Renal Drugs Advisory Committee. The Committee will discuss the data in support of New Drug Application 213805 for roxadustat, to consider its benefits and risks for the applicant's proposed indication: "Roxadustat is indicated for the treatment of anemia due to chronic kidney disease (CKD) in adult patients not on dialysis and on dialysis."

Erythropoiesis stimulating agents (ESAs), such as epoetin alfa and darbepoetin alfa, are typically used in the treatment of the anemia of CKD, and they increase red blood cell (RBC) mass through the same mechanism as endogenous erythropoietin. Roxadustat is an orally administered reversible inhibitor of hypoxia inducible factor (HIF)-prolyl hydroxylases (PH). Inhibition of HIF-PH is thought to increase levels of endogenous erythropoietin, thereby increasing erythropoiesis. By avoiding supra-physiologic plasma levels of exogenous erythropoietin analogues, the applicant hypothesizes that there will be fewer undesirable effects, thus providing a safer alternative to ESAs. The applicant also believes that roxadustat has salutary effects on iron metabolism that will reduce the requirements for iron in these patients. If approved, roxadustat would represent the first drug in this class in the United States (US). Importantly, additional drugs in this class are in late-stage development, and may be submitted to FDA for evaluation.

The NDA includes an extensive database in support of roxadustat's efficacy and safety for both the NDD and DD populations. The development of roxadustat for the two populations proceeded concurrently; therefore, results of the DD studies were not available for the planning of the NDD studies, and vice versa.

For the NDD patient population, three similarly designed, adequate and well-controlled studies support roxadustat's efficacy for the treatment of anemia. These studies, referred to as anemia "correction" studies, enrolled patients with CKD who were anemic at baseline (mean hemoglobin [Hb] ~9 g/dL), and randomized them to roxadustat or placebo. A fourth study was unique—with randomization to roxadustat or darbepoetin alfa—and provides the ability to compare the efficacy and safety of roxadustat to an ESA in this population.

For the DD patient population, there were also three principal studies; these enrolled patients with CKD and incident or stable dialysis. At baseline, the mean Hb was slightly higher than in the studies in the NDD population, about 9.6 g/dL overall. These studies compared roxadustat to epoetin alfa. A unique study, considered separately, was conducted in Europe and permitted the use of two different ESAs (epoetin alfa or darbepoetin alfa). One of the ESAs (Eprex, epoetin alfa) is not licensed in the US and is not considered to be the same as US licensed Procrit/Epogen (epoetin alfa).

As is the case with ESAs, roxadustat is titrated to achieve a target Hb level, and roxadustat's efficacy is not in question. All studies in both the NDD and DD patient populations demonstrated efficacy. The principal issue before the Committee is the drug's safety, and safety with respect to the specific CKD patient populations.

During the development of drugs for the treatment of anemia of CKD, we have generally asked sponsors to demonstrate noninferiority (or superiority) with respect to major adverse cardiovascular events (MACE) for both the dialysis and non-dialysis populations (vs. an active comparator and placebo,

7

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

respectively). In this development program, MACE included the following events: all-cause mortality (ACM), non-fatal myocardial infarction (MI), and non-fatal stroke. (The MACE composite here differs slightly from the composite typically used in cardiovascular outcome trials; here all-cause mortality, rather than cardiovascular mortality, was used.) The applicant has provided these MACE assessments, as requested, and they represent an important part of this application.

Placebo-controlled studies in the NDD patient population enrolled subjects with significant anemia, and because anemia was less likely to improve in subjects who received placebo, they were more likely to discontinue from the study. Thus, for the three trials overall, completion rates were 62% and 41% in patients randomized to roxadustat and placebo, respectively. The difference in completion rates confounded a number of the safety analyses; in particular, the MACE results are sensitive to the duration of post-treatment observation.

Beyond MACE, a number of safety issues merit consideration and are described herein.

## Roxadustat

As noted above, roxadustat is an orally administered reversible inhibitor of HIF- PH, intended to improve anemia in patients with CKD in both the NDD and DD populations.

Roxadustat is proposed to be available as a film-coated tablet for oral administration containing 20, 50, 70, 100, or 150 mg of roxadustat. The proposed recommended starting dose for patients on dialysis or patients who are not on dialysis and not on an ESA is 70 mg three times per week (TIW) in patients weighing <100 kg and 100 mg TIW in patients weighing ≥100 kg.

Roxadustat is not marketed in the US, but has marketing authorization in the People's Republic of China (December, 2018) and Japan (September, 2019). Both countries approved use first for the treatment of anemia due to CKD for patients on dialysis followed by an approval for patients not on dialysis. Based on the safety data submitted in this NDA, the People's Republic of China has updated the English language version of their label to include safety information for cardiovascular events, vascular access thrombosis, deep vein thrombosis, seizures, and serious infections. The English language version of the Japanese label has a Boxed Warning for serious thromboembolism including cerebral infarction, myocardial infarction (MI), and pulmonary embolism. Additional notable adverse reactions in the Japanese labeling are thromboembolism, including shunt occlusion, and seizures.

## Anemia of Chronic Kidney Disease

Anemia is a common complication of CKD that develops early in the course of the disease and worsens as CKD progresses. The overall prevalence of CKD in the US adult population is estimated at 15%, with an estimated 17.2 million having Stages 3-5 CKD. The prevalence of anemia increases as the glomerular filtration rate (GFR) declines [1, 2]. It is estimated that 50% of patients with Stage 4 and 5 CKD not on dialysis and 90% of patients requiring dialysis are anemic. The etiology of anemia of CKD is multifactorial and includes erythropoietin deficiency, impaired ability to absorb iron (iron deficiency), inability to utilize stored iron (chronic disease), blood loss, and shortened RBC survival. Symptoms of anemia include fatigue, reduced exercise tolerance, and dyspnea.

Currently available therapeutic options for anemia of CKD include iron, ESAs, and RBC transfusions. Patients with CKD are routinely monitored for evidence of iron deficiency and treated with iron if deficient. Approximately 8% of patients with Stage 4 and 13% of patients with Stage 5 CKD receive an

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

ESA. Pre-end-stage renal disease use of an ESA in the adult population by age category ranges from approximately 12% to 17% [3]. Most patients with CKD receiving hemodialysis (HD) require ESAs to correct anemia and reduce the need for RBC transfusion and its attendant risks, including the risks of alloreactivity and rejection after kidney transplantation. In order to place roxadustat into proper context in the armamentarium of therapies for the anemia of CKD, some general background on ESAs is important.

## Erythropoiesis Stimulating Agents

Epoetin alfa is a glycoprotein manufactured by recombinant DNA technology that contains the identical amino acid sequence of isolated natural erythropoietin and has the same biological effects as endogenous erythropoietin. ESAs bind to and activate the human erythropoietin receptor and stimulate red blood cell production in the bone marrow. ESA use for these indications has spanned over 30 years.

Currently marketed ESAs include epoetin alfa, darbepoetin alfa, methoxy polyethylene glycol-epoetin beta, and epoetin alfa-epbx. Dosing can vary from three times a week to monthly, depending on the specific agent and setting. All are administered by the intravenous or subcutaneous routes; none can be orally administered.

Table 1: US-Licensed ESAs for the Treatment of Anemia Due to Chronic Kidney Disease (CKD)

| Product Names<br><br>Established (trade) | Approval Year |
|---|---|
| epoetin alfa (Epogen/Procrit) | 1989 |
| darbepoetin alfa (Aranesp) | 2001 |
| methoxy polyethylene glycol-epoetin beta (Mircera) | 2007 |
| epoetin alfa-epbx (Retacrit) | 2018 |

Subsequent to the initial approval of an ESA for patients with CKD in 1989, the ESA labeling has undergone significant revisions because of accumulating knowledge from safety surveillance and clinical trials. These labeling revisions have included the addition of a Boxed Warning for increased mortality, serious cardiovascular and thromboembolic events; warnings for hypertension, seizures, and thrombotic events including vascular access thrombosis; and in dosage and administration, a reduction in the recommended "target Hb," and a recommendation to discontinue the ESA in patients in whom Hb does not respond adequately over a 12-week escalation period. Other major adverse reactions of ESAs include thrombosis, hypertension, seizures, and pure red cell aplasia.

ESA use in patients with CKD can confer an increased risk of MACE. Clinical trial data have established that targeting higher rather that lower Hb levels increases the risk of MACE, yet the Hb target that best balances benefits and risks has never been identified for any of the ESAs.

The US Normal Hematocrit Trial [4] was the first in a series of randomized controlled trials (RCTs) designed to test the hypothesis that a higher target hematocrit in subjects receiving hemodialysis (HD)

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

would result in improved outcomes. A cohort of 1233 patients with end-stage renal disease (ESRD) on HD with symptomatic heart failure or ischemic heart disease was randomized (open-label) to either partial treatment of anemia (hematocrit of 30 ± 3%) or full correction (hematocrit of 42 ± 3%). The primary endpoint was death or first non-fatal MI, analyzed by time to event. The trial was terminated at the third interim analysis for futility and potential harm in the full anemia correction group. There were 202 primary endpoint events in the full correction group compared to 164 events in the partial correction group: risk ratio 1.3 (95% confidence interval [CI] 0.9–1.9). Also, 39% of subjects in the full anemia correction group had vascular access clotting vs. 29% in the partial treatment arm (P = 0.001).

The CHOIR study [5] was a randomized, open-label, active-controlled clinical trial in patients with NDD-CKD that aimed to show superiority of full anemia correction by ESA administration in terms of cardiovascular events and death. In this trial, 1,432 patients with CKD and anemia (Hb < 11 g/dL) received epoetin alfa and were randomly assigned to a target Hb of either 13.5 g/dL or 11.3 g/dL. The primary endpoint was a composite of death, MI, hospitalization for congestive heart failure, or stroke. The study was also prematurely stopped for futility after an interim analysis at a median study duration of 16 months because it was considered unlikely that benefit would be demonstrated for the primary composite cardiovascular endpoint. In fact, there were 125 events among 715 subjects in the high-Hb group vs. 97 events among 717 subjects in the low-Hb group (hazard ratio [HR], 1.34; 95% CI, 1.03 to 1.74; P = 0.03), with death and hospitalization for heart failure accounting for 75% of the events.

The CREATE study [6] in 603 patients with CKD stages 3–5 (26% with diabetes) failed to demonstrate the superiority of full anemia correction (Hb target 13.0 to 15.0 g/dL) with respect to cardiovascular events, as compared to partial correction of anemia (Hb target 11.0 to 12.5 g/dL), when starting ESA therapy at an earlier stage than ESRD.

Subsequently, TREAT, by far the largest trial, examined cardiovascular and kidney outcomes in 4038 patients with Stage 3 and 4 CKD [7]. TREAT was the only large placebo-controlled study to assess cardiovascular outcomes. Patients received either darbepoetin-alfa to achieve a Hb target of 13.0 g/dL or matching placebo with rescue darbepoetin-alfa when the Hb concentration was < 9.0 g/dL. The HR for the first co-primary endpoint, the composite of death or a cardiovascular event, was 1.05 (p=NS). The HR for the second co-primary endpoint, death or ESRD, was 1.06 (p=NS). There was, however, a nearly two-fold increased risk of stroke (HR 1.92; 95% CI 1.38–2.68) in the higher vs. lower Hb group, in patients both with and without a past history of stroke. In addition, venous thromboembolic events occurred significantly more frequently in the high Hb arm (2.0%) compared to the placebo arm (1.1%, p=0.02).

Based on these clinical trial data and safety surveillance, the ESA labeling was revised again to include the aforementioned warnings.

The international 2012 Kidney Disease Improving Global Outcomes (KDIGO) Clinical Practice Guideline for the Evaluation and Management of Anemia of Chronic Kidney Disease [8] recommends addressing all correctable causes of anemia (including iron deficiency and inflammatory states) prior to initiation of ESA therapy. The guideline recommends balancing the potential benefits of reducing blood transfusions and anemia-related symptoms against the risks of harm in individual patients (e.g., stroke, vascular access loss, hypertension) (1B). For adult patients with NDD-CKD and Hb concentration < 10.0 g/dL, the decision whether to initiate ESA therapy can be individualized based on the rate of fall of Hb concentration, prior response to iron therapy, the risk of needing a transfusion, the risks related to ESA

10

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

therapy, and the presence of symptoms attributable to anemia (2C). For adult patients with NDD-CKD and Hb concentration ≥ 10.0 g/dl, ESA therapy is not recommended (2D). For adult patients with CKD stage 5 on dialysis, ESA therapy is recommended when the Hb is between 9.0 and 10.0 g/dL (2B), and the KDIGO Guideline advises against use to maintain Hb above 11.5 g/dL (2C).

## Hypoxia-inducible Factor Prolyl Hydroxylase Inhibitors

Hypoxia-inducible factor prolyl hydroxylase inhibitors (HIF PHIs) represent a new class of orally administered ESAs. The applicant states the following in the Mechanism of Action section of their proposed roxadustat label:

> "Through the inhibition of HIF-PH, roxadustat stimulates a coordinated erythropoietic response that includes the increase of plasma endogenous erythropoietin (EPO) levels, regulation of iron transporter proteins and reduction of hepcidin. This results in improved iron bioavailability, increased hemoglobin production and increased red cell mass."

The applicant hypothesizes that by avoiding the undesirable effects of excess exogenous erythropoietin, roxadustat may have advantages over currently available ESAs, beyond the convenience of an oral dosing form.

## Commentary for the Committee

Erythropoiesis stimulating agents are indicated to treat the anemia of CKD based on their ability to increase Hb; however, clinical benefits (i.e., improvements in how patients feel, function, or survive) have not been demonstrated in adequate and well controlled trials. The anemia of CKD has been associated with decreased energy, well-being, and quality of life, as well as cognitive impairment. Although ESAs have been purported to improve these parameters, adequate and well controlled trials have not borne this out. As noted above, sizable randomized trials have attempted to demonstrate that use of ESAs to raise Hb to higher targets improves clinical outcomes, but instead, all have shown (or tended to show) adverse cardiovascular outcomes, leading to limitations on Hb targets as well as a boxed warning, the highest level of warning in product labeling.

ESAs can reduce the need for RBC transfusions, a clear benefit. Although the direct risks of transfusion are now rare (blood-borne infections, transfusion reactions, fluid overload), transfusion avoidance is particularly important in the ESRD population. Importantly, RBC transfusions can cause allosensitization that increases the likelihood of transplant rejection.

The cost of reduced RBC transfusions can be sizable. When ESAs are used to target excessive Hb concentrations, they increase the risk of death, MI, stroke, congestive heart failure, thrombosis of vascular access, and other thrombotic events. They can also cause hypertension and seizures. ESAs also carry warnings for shortened overall survival and increased risk of tumor progression/recurrence in patients with certain malignancies. Given that all of the Hb targeting studies have shown increased cardiovascular risks with higher, rather than lower, Hb targets, it might be assumed that these risks can be reduced by targeting lower Hb values, but it is not known if they can be prevented at any Hb target. No study has identified the optimum Hb target.

In light of these concerns, in 2010, FDA asked the Cardiovascular and Renal Drugs Advisory Committee to opine on whether ESA's indication for the treatment of anemia should be withdrawn in the NDD

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

patient population. Votes were strongly in favor of continued marketing: 1 "yes," 15 "no," and 1 abstention.

Roxadustat is a first-in-class inhibitor of HIF-PH enzymes. By reducing exposure to intermittent supraphysiologic doses of erythropoietin and improving iron metabolism and availability, the drug was hoped to achieve efficacy at least comparable to ESAs, with fewer safety issues. Moreover, the agent's oral route of administration is unquestionably an important convenience factor for patients who are not on hemodialysis. For patients on hemodialysis, ESAs are recommended to be given by the intravenous route, and the advantage of an oral preparation seems less obvious.

You will discover that roxadustat's efficacy is comparable to that of ESAs; however, there are important risks of serious thromboembolic events, as well as other risks, with roxadustat. Thus, both ESAs and roxadustat have pro-thrombotic effects. This observation raises important questions for discussion. First, how should roxadustat's risks be considered in the context of its benefits? Second, what are the causes of the thrombotic risk that is now observed across classes, and what are the contributing factors? It may help to revisit the questions that arose from the Hb targeting studies [9]. Is the thrombotic risk an on-target effect, mediated through effects on RBC production and related factors, or is it an off-target effect? If the risks are an on-target effect, they may be related to excess Hb concentration, Hb overshoots, excessive rates of Hb rise, rapid fluctuations in Hb, and changes in blood viscosity or volume. Although off-target effects cannot be ruled out, none are known, and, if such effects exist, they must be related to erythropoietin, whether given exogenously (in the case of ESAs) or stimulated indirectly (in the case of roxadustat). Assuming the thrombotic risk is an on-target effect, it seems plausible that less aggressive dosing schemes (e.g., lower starting doses, smaller dose increments during titration, lower Hb targets) could reduce thrombotic risk; however, this has not been established in any randomized controlled study.

We conducted exploratory analyses to elucidate associations between thromboembolic events and roxadustat dose, Hb concentrations, and Hb rates of rise and decline, identical to those undertaken in FDA's 2001 review of the darbepoetin alfa marketing application [10]. In this case, we asked the applicant to corroborate our findings, and they were able to do so. Indeed, higher rates of Hb rise (and decline) were found to be associated with higher rates of thromboembolic events. In light of these findings, the applicant speculates that thromboembolic risks might be reduced through use of a lower roxadustat starting dose. Their prediction seems plausible, but is unproven. Our findings show only *associations*, without proven cause and effect.

FDA's approval standards state that drugs must be both effective and safe to be approved. Our standards do not state that a drug must be more effective than existing treatment(s) to merit approval, or be safer than existing treatments. Yet when weighing the approval of a new drug, we do consider its benefits and risks in context, including the availability of other therapies. The benefits are difficult to calculate here. The data show that roxadustat decreases the need for RBC transfusions relative to placebo, which is expected and reassuring. The data comparing roxadustat to epoetin alfa with respect to RBC transfusions are less conclusive. And if one believes that the risk of thromboembolic events is greater with roxadustat than ESAs, a critical question is whether lowering the roxadustat starting dose will reduce risk importantly.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

The applicant makes the case that ESA hyporesponsiveness in patients with CKD is an important problem in need of better therapies. We agree with this viewpoint; however, the applicant did not generate data showing that patients who are hyporesponsive to ESAs are responsive to roxadustat.

Finally, we note that the roxadustat development program was carried out in two distinct patient populations, with important differences. In the dialysis population, subjects were randomized to roxadustat or epoetin alfa, and subject retention was similar with both treatments. Overall exposure differed by ~11%. Thus, for the purpose of safety analyses, the correction needed for disparate time on study was relatively small, and interpretation of the results of safety analyses is clear-cut.

In the NDD patient population, the applicant carried out placebo-controlled studies in patients who were anemic at baseline, with the possibility of "rescue" therapy if needed. These placebo-controlled studies had the advantage of assessing the safety of roxadustat against a "clean" background; however, many subjects dropped out of the studies, and data from these subjects cannot be considered 'missing at random.' Patients with more advanced disease whose Hb was poorly responsive to the study drug were more likely to leave the study, and experience has shown that such patients are at greater risk of cardiovascular events. As patients who received placebo were more likely to remain anemic, they were more likely to drop out of the study than patients who received roxadustat. Thus, there was a considerable disparity in subject retention between the roxadustat and placebo groups, challenging the interpretation of safety analyses. It seems plausible that the patients who dropped out of the placebo groups in higher numbers were at greater risk of adverse events, yet their time of observation—when they were capable of contributing adverse events—was shortened. Conversely, subjects randomized to roxadustat remained in the studies longer, with greater opportunity to experience adverse events.

Given the above, the assessment of adverse events in the NDD subject population is not straightforward. The results of the analyses depend on how the data were analyzed; specifically, whether the time of observation was limited to the time on-treatment (plus 7 days), extended to last contact (on-study analysis), or truncated at a point between these extremes (e.g., on-treatment plus 28 days). These considerations affect all of the safety analyses, including analyses for MACE.

# Draft Points to Consider

The applicant is seeking approval of roxadustat, an oral agent for treatment anemia due to CKD, in adult patients not on dialysis and on dialysis.

Non-dialysis-dependent population:

1. Discuss the benefits and risks of roxadustat in the non-dialysis-dependent (NDD) population.
2. If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target hemoglobin (Hb), starting dose, titration scheme, monitoring paradigm.
   a. If you favor changes to the treatment algorithm to enhance safety, should they be tested prior to approval?

Dialysis population:

3. Discuss the benefits and risks of roxadustat in the dialysis-dependent (DD) population.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

4. If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target Hb, starting dose, titration scheme, monitoring paradigm.
   a. If you favor changes to the treatment algorithm to enhance safety, should they be tested prior to approval?

5. Should roxadustat be approved for treatment anemia due to CKD, in adult patients not on dialysis?
   a. If not, provide your rationale, as well as recommendations for additional data and/or analyses that would support a favorable benefit-risk profile and approval of roxadustat.
6. Should roxadustat be approved for treatment anemia due to CKD, in adult patients on dialysis?
   a. If not, provide your rationale, as well as recommendations for additional data and/or analyses that would support a favorable benefit-risk profile and approval of roxadustat.

# Evidence of Efficacy

Roxadustat's evidence of effectiveness for the treatment of anemia due to CKD in adult patients is based primarily on six adequate and well-controlled trials.

**Non-dialysis dependent (NDD) population:** principal studies included three randomized, placebo-controlled, double-blind studies:

- 1517-CL-0608/ALPS (henceforth referred to as "608" in this document)
- FGCL-4592-060/ANDES (referred to as "060" in this document)
- D5740C00001/OLYMPUS (referred to as "001" in this document)

Study 1517-CL-0610/DOLOMITES (referred to as "610" in this document) differed from those above because it employed an active comparator (darbepoetin alfa), was not double-blind, and was conducted solely in Eastern and Western Europe. The study was ongoing at the time the applicant submitted the New Drug Application, and we received the clinical study report early in the review period.

**Dialysis-dependent (DD) population:** principal studies included 3 randomized, active-controlled (epoetin alfa), open-label studies:

- FGCL-4592-063/HIMALAYAS (referred to as "063" in this document)
- FGCL-4592-064/SIERRAS (referred to as "064" in this document)
- 5740C00002/ROCKIES (referred to as "002" in this document)

Study 1517-CL-0613/PYRENEES (referred to as "613" in this document) provides supplemental information; the study differs from those above because it employed two active comparators (darbepoetin alfa and epoetin alfa), was conducted exclusively in Europe, and permitted use of an ESA that is not licensed in the US.

In light of the safety concerns of the ESAs, the Division has asked sponsors to assess MACE in development programs for drugs for the treatment of anemia of CKD, in both the NDD and DD populations, as noted above. For the NDD indication, studies 608, 001, and 060 were included in a meta-analysis for MACE. For the DD indication, studies 002, 063 and 064 were included in a MACE meta-analyses. Trials 610 and 613 were not considered sufficiently similar to the others to allow inclusion in the meta-analyses.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## NDD Indication

### Study Designs

The Phase 3 studies for the NDD population are summarized in Table 2. All were multicenter (global), randomized, controlled studies that evaluated the efficacy of roxadustat in correcting Hb. All patients had stage III to V CKD with baseline eGFR < 60 mL/min/1.73 m$^2$. The primary efficacy endpoint for the US was the mean Hb change from baseline to the mean level during the evaluation period, defined as Week 28 until Week 52. The proportions of subjects with RBC transfusions was a secondary endpoint.

Table 2: Major Trials in the NDD Population

| Design Feature | Placebo-controlled | | | ESA-controlled |
|---|---|---|---|---|
| | Study 001 | Study 060 | Study 608 | Study 610 |
| Blinding | Double-blind | Double-blind | Double-blind | Open-label |
| Control | Placebo | Placebo | Placebo | Darbepoetin |
| Planned Treatment Duration (weeks) | 52 - 208 | 52 - 208 | 52 - 104 | 104 |
| Number of Patients | 2761 | 922 | 594 | 616 |
| Randomization | 1:1 | 2:1 | 1:1-->2:1 | 2:1 --> 1:1 |
| Baseline Hb (g/dL) | < 10.0 | ≤ 10.0 | ≤ 10.0 | ≤ 10.5 |
| Hb target - Correction Period (g/dL) | 11.0 ± 1.0 | ≥ 11.0 and ≥ 1.0 from baseline | ≥ 11.0 and ≥ 1.0 from baseline | ≥ 11.0 and ≥ 1.0 from baseline |
| Hb target - Maintenance Period (g/dL) | 10.0 - 12.0 | 10.0 - 12.0 | 10.0 - 12.0 | 10.0 - 12.0 |
| Roxadustat starting dose (dose given 3 times/week) | | | | |
| body weight < 70 kg: | 70 mg | 70 mg | 70 mg | 70 mg |
| body weight > 70 kg: | 70 mg | 100 mg | 100 mg | 100 mg |

Patients with New York Heart Association Class III or IV congestive heart failure (CHF) at enrollment, and patients who had an MI, acute coronary syndrome, stroke, seizure, or a thromboembolic event within 12 weeks prior to randomization were excluded. Patients with uncontrolled hypertension were also excluded. The trials had recommendations for rescue therapy (i.e., iron, ESAs, or transfusion).

The algorithm for dosage adjustments is shown in Table 3. Adjustment was based on the Hb level and the change in Hb over the previous 4 weeks.

15

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 3: Roxadustat Dose Adjustment Algorithm for NDD-CKD Subjects

| Change in Hb over Past 4 weeks (g/dL) | Correction Period* | Maintenance Period | | | |
|---|---|---|---|---|---|
| | | Hb < 10.5 g/dL | Hb 10.5-11.9 g/dL | Hb 12.0-12.9 g/dL | Hb ≥13.0 g/dL |
| < -1.0 | ↑ | ↑ | ↑ | No change | Hold dosing, check Hb and resume dosing when Hb <12.0 g/dL, at a dose that is reduced by two dose steps |
| -1.0 to 1.0 | ↑ | ↑ | No change | ↓ | |
| > 1.0 | No change | No change | ↓ | ↓ | |

Abbreviations:    ↑ = dose increase; ↓ = dose reduction; Hb = hemoglobin

Source: FibroGen Summary of Clinical Efficacy p. 147

Dose increases and reductions:

- Roxadustat dose increases (↑) and reductions (↓) were intended to be preset according to dose steps: 20, 40, 50, 70, 100, 150, 200, 250, and 300 mg. For example, a dose increase at 70 mg would result in a new dose of 100 mg. A dose reduction at 200 mg would result in a new dose of 150 mg.
- The suggested maximum dose was 3.0 mg/kg or 300 mg per administration, whichever was less.

Dose adjustment for rapid Hb increase:

- For Hb increases >2.0 g/dL in 4 weeks, the dose was to be reduced by one dose step immediately.
- Only one dose reduction for rapid Hb increase was recommended within a 4-week period.

## Results

### Demographic and Baseline Characteristics:
Demographic and baseline disease characteristics were generally well balanced between the two treatment groups for the three trials. The mean age of patients was approximately 63 years. Twenty-one percent of patients were age 75 or greater. A majority of the patients were female (58%). Approximately half the patients were Caucasian, 8% were Black, and 36% were Asian. Most were not on prior ESA treatment. Approximately one-quarter of patients were from the US. More than one-third of patients had a history of cardiovascular, cerebrovascular, or thromboembolic disease. More than 90% of trial participants reported hypertension, and diabetes mellitus was reported as a baseline condition by 37% to 65% of trial participants. The baseline Hb was 9.1 g/dL in both treatment groups. The mean eGFR at baseline was approximately 20 mL/min/1.73 m$^2$ for all studies.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

### Table 4: Selected Demographics and Baseline Disease Characteristics—NDD Trials

| Trial | 001 | | 060 | | 608 | |
| Characteristic | Roxadustat (N=1384) | Placebo (N=1377) | Roxadustat (N=616) | Placebo (N=306) | Roxadustat (N=391) | Placebo (N=203) |
|---|---|---|---|---|---|---|
| Age in years mean (SD) | 60 9 (14.7) | 62.4 (14.1) | 64.9 (12.6) | 64.8 (13.2) | 60.6 (13.5) | 61.7 (13.8) |
| Female, n (%) | 820 (59.2) | 774 (56.2) | 375 (60 9) | 176 (57 5) | 222 (56.8) | 104 (51.2) |
| Race, n (%) | | | | | | |
| White | 623 (45.0) | 611 (44.4) | 176 (28.6) | 99 (32.4) | 335 (85.7) | 182 (89.7) |
| Black | 112 (8.1) | 115 (8.4) | 76 (12.3) | 28 (9.2) | 10 (2.6) | 3 (1.5) |
| Asian | 544 (39.3) | 539 (39.1) | 310 (50 3) | 151 (49 3) | 9 (2.3) | 0 (0) |
| Native Hawaiian or other Pacific Islander | 0 (0) | 2 (0.1) | 2 (0.3) | 4 (1.3) | NR | NR |
| American Indian or Alaska Native | 24 (1.7) | 29 (2.1) | 6 (1.0) | 1 (0.3) | NR | NR |
| Other | 81 (5.9) | 82 (6.0) | 46 (7.5) | 23 (7.5) | 37 (9.5) | 18 (8.9) |
| Ethnic Group, n (%) | | | | | | |
| Hispanic or Latino | 344 (24.9) | 357 (25.9) | 165 (26.8) | 84 (27.5) | NR | NR |
| eGFR (mL/min/1.73m$^2$) (SD) | 19.7 (11.7) | 20.0 (11.7) | 21.9 (11.5) | 22.4 (11.4) | 16.5 (10.2) | 17 2 (11.7) |
| Hb Mean (SD) | 9.11 (0.73) | 9.10 (0.74) | 9.10 (0.75) | 9.09 (0.69) | 9.08 (0.76) | 9.10 (0.72) |
| Prior ESA use, n (%) | 15 (1.1) | 13 (0.9) | 130 (21 3) | 48 (15.7) | 45 (11.5) | 24 (11.8) |
| Iron Replete, n (%) | 809 (58.5) | 799 (58.0) | 373 (60.6) | 170 (55.6) | 204 (52.2) | 109 (53.7) |
| Diabetes, n (%) | 793 (57.3) | 807 (58.6) | 395 (64.6) | 199 (65 2) | 146 (37.3) | 89 (43.8) |
| Cardiovascular disease, n (%) | 410 (29.6) | 420 (30.5) | 210 (34.4) | 101 (33.1) | 141 (36.1) | 89 (43.8) |
| Cerebrovascular disease, n (%) | 105 (7.6) | 120 (8.7) | 81 (13.3) | 39 (12.8) | 26 (6.6) | 20 (9.9) |
| Thromboembolic disease, n (%) | 30 (2.2) | 22 (1.6) | 11 (1.8) | 3 (1.0) | 9 (2.3) | 2 (1.0) |

**Patient Disposition and Discontinuation:** For the three studies overall, 62% and 41% of patients randomized to roxadustat and placebo, respectively, completed the treatment period. Decisions to withdraw by either the patient or physician accounted for approximately half of all discontinuations in both groups (Table 5). Discontinuation for ESA rescue therapy was ~4 times higher in patients who received placebo (13.4%) than in roxadustat-treated patients (3.2%). The percentage of patients who discontinued in association with an adverse event(s) was higher among patients treated with roxadustat (6.3%) than in subjects randomized to placebo (4.4%). Deaths were also more frequent in patients randomized to roxadustat (3.4%) than in those randomized to placebo (1.6%).

17

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 5: Patient Disposition (NDD Safety Population)

| N (%) | Roxadustat (N=2386) | Placebo (N=1884) |
|---|---|---|
| **Intent-to-treat population** | 2391 | 1886 |
| **Treated patients** | 2386 (99.8) | 1884 (99.9) |
| **Completed treatment** | 1485 (62.2) | 769 (40.8) |
| **Discontinued treatment early** | 901 (37.8) | 1115 (59.2) |
| Adverse events | 150 (6.3) | 83 (4.4) |
| Death | 81 (3.4) | 30 (1.6) |
| Received > 2 courses of ESA rescue therapy | 76 (3.2) | 252 (13.4) |
| Lost to follow-up | 33 (1.4) | 74 (3.9) |
| Dialysis initiation or kidney transplant | 47 (2.0) | 20 (1.1) |
| Physician decision | 49 (2.1) | 67 (3.6) |
| Subject decision | 250 (11.0) | 390 (20.7) |
| Withdrawal by subject or guardian | 144 (6.1) | 144 (7.7) |
| Other | 71 (2.9) | 55 (2.9) |

**Drug Exposure:** Overall, the duration of study drug exposure was greater in patients treated with roxadustat (mean 84.6 weeks per patient; total 3871 patient-years) than in patients who received placebo (mean 64.3 weeks per patient; total 2323 patient-years). Approximately 71% of roxadustat-treated patients received the drug for > 52 weeks and 34% received it for > 104 weeks. The applicant attributed the higher overall drug exposure in roxadustat-treated patients to the 2:1 randomization ratio (roxadustat:placebo) in the two smaller studies (060 and 608) and the higher dropout rate in patients who received placebo, mainly due to lack of efficacy in all three studies.

## Primary Endpoint

As noted above, the primary endpoint in the three principal studies was the mean change in Hb from baseline to the evaluation period (mean value during Weeks 28-52), regardless of rescue therapy, using the intention-to-treat (ITT) analysis set. Efficacy analyses were performed separately for each study. Roxadustat would be considered superior to placebo if the difference in the mean change from baseline between the two treatment groups was statistically significant ($p < 0.05$) using a multiple imputation analysis of covariance (ANCOVA) method. All three studies demonstrated statistically significant results with respect to change in Hb, and FDA was able to corroborate the applicant's findings (Table 7).

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Table 6: Drug Exposure in NDD Population

| | Roxadustat (N=2386) | Placebo (N=1884) |
|---|---|---|
| Duration of exposure (weeks) | | |
| Mean (SD) | 84.6 (48.8) | 64.3 (44.8) |
| Median (min, max) | 87.1 (0, 235) | 57.1 (0, 208) |
| Exposure (patient-years [PY]) | 3870.7 | 2323.2 |
| Study 001 | 2263.1 | 1747.6 |
| Study 060 | 1134.9 | 377.3 |
| Study 608 | 472.7 | 198.3 |
| Weeks of exposure, n (%) | | |
| ≤ 4 Weeks | 86 (3.6) | 81 (4.3) |
| > 4 Weeks | 2300 (96.4) | 1803 (95.7) |
| > 26 Weeks | 2020 (84.7) | 1389 (73.7) |
| > 52 Weeks | 1694 (71.0) | 1005 (53.3) |
| > 104 Weeks | 812 (34.0) | 397 (21.1) |
| Duration of exposure in patients with baseline eGFR <10 (weeks) | (N=481) | (N=358) |
| Mean (SD) | 72.3 (50.2) | 47.8 (41.2) |
| Median (min, max) | 67.7 (0, 216) | 32.3 (0, 164) |

## Table 7: Efficacy Endpoints for NDD Trials

| Trial/Treatment Arm | 001 | | 060 | | 608 | |
|---|---|---|---|---|---|---|
| | Roxadustat N=1384 | Placebo N=1377 | Roxadustat N=616 | Placebo N=306 | Roxadustat N=391 | Placebo N=203 |
| Mean baseline Hb (SD) | 9.11 (0.73) | 9.10 (0.74) | 9.10 (0.75) | 9.09 (0.69) | 9.08 (0.76) | 9.10 (0.72) |
| Mean Hb Week 28–52 (SD) | 10.84 (0.86) | 9.50 (1.18) | 11.10 (0.70) | 9.25 (1.06) | 11.16 (0.84) | 9.60 (1.02) |
| Hb change from baseline to average Hb in Weeks 28 to 52 (SE) | 1.75 (0.03) | 0.40 (0.03) | 2.00 (0.95) | 0.16 (0.89) | 1.99 (0.95) | 0.41 (0.98) |
| Least squares mean (LSM) difference roxadustat from placebo (95% CI) | 1.35 (1.27, 1.43) P < 0.001 | | 1.85 (1.74, 1.97) P < 0.0001 | | 1.69 (1.52, 1.86) P < 0.001 | |
| Subjects with RBC transfusions, N (%) | 176 (12.7) | 320 (23.3) | 34 (5.6) | 47 (15.4) | 33 (8.5) | 39 (19.2) |
| Hazard Ratio; Nominal P-value | 0.37; <0.001 | | 0.26; < 0.001 | | 0.34; <0.001 | |

Figure 1 shows the results graphically for the three individual studies as well as the pooled studies. On average, the Hb appears to plateau at target at approximately 12 weeks (~8 weeks in study 608).

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Figure 1: Changes in Hb over Time—NDD Studies



Source: FDA analysis

## Study 610

Study 610 was a multicenter, European, randomized, controlled trial in patients with NDD-CKD. The study differed from the others in that there was an active comparator (darbepoetin alfa), the study was open-label, and the study was conducted exclusively in Europe. The randomization scheme was initially 2:1 (version one of protocol) but changed to 1:1 (version two).

The starting roxadustat dose was 70 mg for body weight < 70 kg and 100 mg for body weight ≥ 70 kg three times a week. Dose titration was conducted based upon the Hb target of 11 ± 1 g/dL. Darbepoetin alfa was dosed subcutaneously or intravenously according to the EU labeling.

The primary efficacy endpoint was the percentage of Hb responders during the first 24 weeks of treatment. A responder was defined as a subject who attained a Hb response as follows:

- Hb ≥ 11.0 g/dL and an increase from baseline ≥ 1.0 g/dL (subjects with baseline Hb > 8.0 g/dL); or
- An increase from baseline ≥ 2.0 g/dL (subjects with baseline Hb ≤ 8.0 g/dL)

Patients receiving rescue therapy were non-responders.

Noninferiority was to be declared if the lower bound of the two-sided 95% CI was > -15%. The primary endpoint was to be analyzed using the Per Protocol Analysis set, consisting of all randomized patients who received ≥ 1 dose of study drug, had ≥ 1 post-dose Hb assessment, and did not meet any exclusion criteria.

20

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Demographic and baseline disease characteristics were comparable between the two treatment groups (Table 8). Mean age was 66 years. The majority of patients were Caucasian (95%), and approximately 56% were women. Approximately 30% were from Western Europe, with 70% from Eastern Europe. In both treatment groups, the mean baseline Hb was 9.55 g/dL and the mean baseline eGFR was 20.3 mL/min/1.73 m$^2$. Just under half of all patients had a history of cardiovascular, cerebrovascular, or thromboembolic disease.

Table 8: Selected Demographic and Baseline Disease Characteristics—Study 610

|  | Treatment Groups | |
|---|---|---|
|  | Roxadustat (N=323) | Darbepoetin (N=293) |
| Age in years mean (SD) | 66.8 (13.6) | 65.7 (14.4) |
| Female, n (%) | 178 (55.1%) | 164 (56.0%) |
| Race, n (%) |  |  |
| Caucasian | 306 (94.7%) | 281 (95.9%) |
| Black | 8 (2.5%) | 2 (0.7%) |
| Asian | 9 (2.8%) | 10 (3.4%) |
| Baseline eGFR (mL/min/1.73m$^2$) (SD) | 20.3 (11.5) | 20.3 (10.7) |
| Baseline Hb mean (SD) | 9.55 (0.75) | 9.55 (0.69) |
| Baseline iron replete, n (%) | 182 (56.3%) | 152 (51.9%) |
| Diabetes, n (%) | 150 (46.5%) | 137 (46.7%) |
| History of cardiovascular, cerebrovascular, or thromboembolic disease, n (%) | 152 (47.1%) | 142 (48.5%) |

**Patient Disposition and Discontinuations**

Study retention was similar in the two treatment groups: 22.9% of patients in the roxadustat group vs. 19.8% in the darbepoetin alfa group withdrew before the Week 24 cutoff. The most frequent reasons for discontinuation in the roxadustat group were withdrawal by patient (9.9%), death (8.4%), and adverse events (6.5%). The most common reasons for discontinuation in the darbepoetin group were death (10.2%), withdrawal by patient (6.8%), and adverse event (2.7%).

**Efficacy Endpoint**

For the per-protocol analysis set, 89.5% of patients in the roxadustat group vs. 78.0% in the darbepoetin alfa group were responders (Table 9). The difference in proportions was 11.5%, favoring roxadustat, and the 95% CI of the response rate difference excluded -15%, meeting the study's efficacy objective.

The changes in Hb are shown graphically in Figure 1. Although the rate of Hb rise was not evaluated as a study endpoint, a trend showing more rapid Hb increase in the roxadustat group is clearly evident, which may have ramifications for safety.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 9: Efficacy Results for Trial 610 (Ns Represent Numbers in the Per-protocol Analysis Set)

|  | Roxadustat N=286 | Darbepoetin alfa N=272 |
|---|---|---|
| Number of responders | 256 (89.5%) | 213 (78.0%) |
| 95% CI | (85.4%, 92.8%) | (72.6%, 82.8%) |
| Difference of proportions (roxadustat – darbepoetin alfa) | 11.5% | |
| 95% CI of difference | (5.66%, 17.36%) | |

Figure 2: Hb Change from Baseline by Time (mean ± 95% CI)—Study 610 (figure adapted from applicant)



## DD Population

### Study Designs

Roxadustat's efficacy for the treatment of anemia in adult patients with DD-CKD is supported by three randomized, active controlled, non-inferiority trials: 002, 063, and 064. These were similarly designed, open-label studies where subjects were randomized 1:1 to roxadustat or epoetin alfa. All subjects had Stage 3 to 5 CKD with a baseline Hb level < 10 g/dL (if not on an ESA) or < 12 g/dL (if on an ESA). All trials excluded patients with New York Heart Association Class III or IV CHF at enrollment, and patients with a history of MI, acute coronary syndrome, stroke, seizure, or thrombotic event within 12 weeks prior to enrollment. Patients with uncontrolled hypertension were also excluded. The intended duration was ≥ 52 weeks. The trials had recommendations for rescue therapy using ESAs or transfusion in the roxadustat group and transfusion in the epoetin alfa group. The roxadustat dose was titrated to achieve a Hb target of 10.0 to 11.0 g/dL in the US and 10.0 to 12.0 g/dL outside the US. The primary endpoint for the three studies was the mean change in Hb from baseline to Weeks 28 to 52, regardless of rescue therapy. Having determined the mean treatment effect in both groups, non-inferiority (NI) of roxadustat to epoetin alfa was to be declared if the lower bound of the 95% CI of the inter-group difference

(roxadustat - epoetin alfa) was greater than the pre-defined NI margin -0.75 g/dL, i.e., the 95% CI excluded a difference of 0.75 g/dL or more. The proportions of subjects with RBC transfusions was a secondary endpoint. Major design features are summarized in Table 10.

Study 002 enrolled patients with ESRD who were receiving, or had initiated, hemodialysis or peritoneal dialysis at least 30 days prior to enrollment. Amendment #6, designed to increase enrollment of US patients with incident dialysis, changed the dialysis criterion to receiving at least 2 weeks and not more than 4 months. At enrollment, subjects could be on an ESA (with Hb <12.0 g/dL) or not on an ESA (with Hb <10 g/dL). For patients not on an ESA, the roxadustat starting dose was 70 mg orally thrice weekly regardless of body weight; for patients on an ESA, the starting dose was calculated on the basis of the ESA dose (range: 70 to 200 mg thrice weekly).

Study 063 enrolled patients with CKD and incident dialysis (2 weeks to 4 months prior to randomization), with baseline Hb $\leq$ 10 g/dL. The roxadustat starting dose was 70 mg for body weight < 70 kg and 100 mg for body weight $\geq$ 70 kg, thrice weekly.

Study 064 enrolled subjects who were on a stable ESA dose $\geq$ 4 weeks prior to and during screening, with an allowable Hb range of 8.5 to 12.0 g/dL. Amendment #1 and #2 encouraged the enrollment of more patients considered to have incident dialysis as defined for Study 063. The starting roxadustat dose was 70 to 200 mg thrice weekly, calculated on the basis of the prior ESA dose.

Only Study 063 enrolled exclusively incident dialysis. The other studies amended their protocols to enroll incident dialysis and planned to later compare results between incident and stable dialysis subgroups. Incident dialysis did not have a standard definition. Because of the multiple amendments and lack of a standardized definition, FDA did not further analyze this subgroup.

Study 613, described separately, was conducted in Eastern, Central, and Western Europe, and used both darbepoetin alfa and epoetin alfa as comparators. Use of an ESA, approved in the EU but not licensed in the US, was permitted.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 10: Major Trials in the DD Patient Population

| Design Feature | Major Studies | | | Supportive Study |
|---|---|---|---|---|
| | Study 002 | Study 063 | Study 064 | Study 613 |
| Blinding | Open-label | Open-label | Open-label | Open-label |
| Control | Epoetin alfa | Epoetin alfa | Epoetin alfa | Epoetin alfa/ darbepoetin alfa |
| Planned treatment duration (years) | < 4 | < 4 | < 4 | 1 - 2 |
| Number of Patients | 2106 | 1043 | 741 | 836 |
| Randomization | 1:1 | 1:1 | 1:1 | 1:1 |
| Baseline Hb (g/dL) | < 10.0 ‡; <12.0 | ≤ 10.0 | 9.0 † to 12.0 | 9.5 to 12.0 |
| Stable dialysis (SD); incident dialysis (ID); dialysis-dependent (DD) | SDD and ID-DD | ID-DD | SDD and ID-DD | SDD |
| Hb target - Maintenance Period (g/dL) | 10.0 - 12.0 § | 10.0 - 12.0 § | 10.0 - 12.0 § | 10.0 - 12.0 |
| Hb correction or conversion | Correction and conversion | Correction | Conversion | Conversion |

† ≥ 8.5 g/dL for ID-DD patients; ‡ For subjects not on an ESA
§ 10.0 to 11.0 g/dL in the US; 10.0 to 12.0 g/dL outside the US
ID-DD = incident dialysis; SDD = stable dialysis-dependent

Dosage adjustment was based on the Hb level and the change in Hb over the previous 4 weeks, and was the same for all three studies (Table 11).

Table 11: Roxadustat Dosage Adjustment for Studies 063, 064, and 002

| Changes in Hb over past 4 weeks | Hb <10.5 g/dL | Hb 10.5 to 11.9 g/dL | Hb 12.0 to 12.9 g/dL | Hb ≥13.0 g/dL |
|---|---|---|---|---|
| <-1.0 | ↑ | ↑ | No change | Dose withheld and resumed when Hb was ≤11.9 g/dL, at a dose that was to be reduced by 2 dose steps |
| -1.0 to 1.0 | ↑ | No change | ↓ | |
| >1.0 | No change | ↓ | ↓ | |

Source: Modified FibroGen Table 6 from Clinical Study Report for Study 002

## Results

### Demographics & Baseline Disease Characteristics

The demographics and baseline disease characteristics for all three trials were generally balanced between the two groups. Overall, approximately 45% of patients were enrolled in US sites. Mean age

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

was 54 to 58 for all studies. At baseline, most patients were male (58%), White (varied by study), on prior ESA treatment, and on stable dialysis. Study 064 was conducted solely in the US, and 42% of participants were Black. More than 90% of trial participants reported hypertension as a baseline medical condition. Diabetes mellitus was reported as a baseline condition by 28% to 65% of trial participants. Overall, about half of the subjects had a history of cardiovascular, cerebrovascular, or thromboembolic disease. The mean baseline Hb was similar between the two groups, averaging 9.6 g/dL over the three studies. Overall, approximately, 90% of patients in both treatment groups were receiving hemodialysis, and the rest were receiving peritoneal dialysis.

## Table 12: Selected Demographics and Baseline Disease Characteristics for DD Trials

| Trial | 002 | | 063 | | 064 | |
|---|---|---|---|---|---|---|
| Characteristic | Roxadustat (N=1051) | Epoetin alfa (N=1055) | Roxadustat (N=522) | Epoetin alfa (N=521) | Roxadustat (N=370) | Epoetin alfa (N=371) |
| Age mean (SD) (years) | 53.5 (15.3) | 54 5 (15.0) | 53.8 (14.7) | 54.3 (14.6) | 57.6 (13.6) | 58.4 (13.3) |
| Female, n (%) | 426 (40.5) | 429 (40.7) | 213 (40.8) | 214 (41.1) | 183 (49.5) | 156 (42.0) |
| Race, n (%) | | | | | | |
| White | 597 (56.8) | 598 (56.7) | 415 (79.5) | 400 (76.8) | 165 (44.6) | 184 (49.6) |
| Black | 148 (14.1) | 158 (15.0) | 44 (8.4) | 50 (9.6) | 158 (42.7) | 156 (42.0) |
| Asian | 208 (19.8) | 198 (18.8) | 43 (8 2) | 51 (9.8) | 21 (5.7) | 15 (4.0) |
| Native Hawaiian or other Pacific Islander | 5 (0.5) | 3 (0.3) | NR | NR | 1 (0.3) | 3 (0.8) |
| American Indian or Alaska Native | 50 (4.8) | 62 (5.9) | 1 (0.2) | 4 (0.8) | 10 (2.7) | 7 (1.9) |
| Other | 43 (4.1) | 36 (3.4) | 19 (3.6) | 16 (3.1) | 15 (4.1) | 6 (1.6) |
| Hispanic or Latino | 268 (25.5) | 271 (25.7) | 99 (19.0) | 77 (14.8) | 137 (37.0) | 129 (34.8) |
| US subjects, n (%) | 385 (36.6) | 391 (37.1) | 127 (24.3) | 125 (24.0) | 370 (100) | 371 (100) |
| Hemodialysis, n (%) | 938 (89.2) | 938 (88.9) | 469 (89.8) | 462 (88.7) | 354 (95.7) | 354 (95.4) |
| Peritoneal Dialysis, n (%) | 111 (10.6) | 117 (11.1) | 53 (10.2) | 58 (11.1) | 16 (4.3) | 17 (4.6) |
| Dialysis Duration > 4 months, n (%) | 852 (81.1) | 841 (79.8) | 2 (0.4) | 2 (0.4) | 334 (90.3) | 336 (90.6) |
| Baseline Hb Mean (SD) (g/dL) | 9.99 (1.20) | 10.02 (1.24) | 8.43 (1.04) | 8.46 (0.96) | 10.30 (0.66) | 10.31 (0.66) |
| Diabetes, n (%) | 459 (43.7) | 454 (43.0) | 205 (39.3) | 204 (39.2) | 250 (67.5) | 255 (68.8) |
| History of cardiovascular, cerebrovascular, or thromboembolic disease, n (%) | 305 (29.0) | 304 (28.8) | 219 (42.0) | 224 (43.0) | 229 (61.9) | 210 (56.6) |

## Patient Disposition

Of 3890 patients randomized, 3880 were treated (roxadustat = 1940; epoetin alfa = 1940). Treatment completion rates were 58.5% and 66.3% in the roxadustat and epoetin alfa groups, respectively, and reasons for discontinuation are shown in Table 13. Discontinuations were disproportionately higher in the roxadustat group for adverse events, death, and the need for ESA rescue therapy.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 13: Patient Disposition DD Safety Population (002, 063, 064)

| N (%) | Roxadustat (N=1940) | Epoetin Alfa (N=1940) |
|---|---|---|
| **Intent-to-treat population** | 1943 | 1947 |
| **Treated patients** | 1940 (99.8) | 1940 (99.6) |
| **Completed treatment** | 1135 (58.5) | 1287 (66.3) |
| **Discontinued treatment Early** | 805 (41.5) | 653 (33.7) |
| Adverse events | 110 (5.7) | 54 (2.8) |
| Death | 141 (7.3) | 129 (6.6) |
| Received > courses of ESA rescue therapy | 32 (1.6) | 0 (0) |
| Kidney transplant | 115 (5.9) | 147 (7.6) |
| Subject decision | 135 (7.0) | 88 (4.5) |
| Withdrawal by subject or guardian | 78 (4.0) | 78 (4.0) |
| Physician decision | 68 (3.5) | 32 (1.6) |
| Lost to Follow-up | 10 (0.5) | 5 (0.3) |
| Others | 116 (6.0) | 120 (6.1) |

## Drug Exposure

Figure 3 shows the differential retention of subjects in the roxadustat and ESA groups for the three studies. As predicted by the figure, the mean duration of study drug exposure was shorter in patients randomized to roxadustat (89.2 weeks) than to epoetin alfa (100.7 weeks). Total durations of exposure were 3315 and 3744 patient-years, respectively. The percentages of patients who received the study drug through Week 52 (the end of the assessment period for the primary endpoint) were 63% for roxadustat and 71% for epoetin alfa.

Figure 3: Subject Retention for the DD Population—Studies 002, 063, 064



FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 14: Duration of Exposure in DD Population (002, 063, 064)

| | Roxadustat (N = 1940) | Epoetin Alfa (N = 1940) |
|---|---|---|
| Duration of exposure (weeks) | | |
| Mean (SD) | 89.2 (58.6) | 100.7 (57.5) |
| Median (min, max) | 87.9 (0, 228) | 107.5 (0, 227) |
| Duration of exposure, mean (years) | 1.71 | 1.93 |
| Exposure by study (patient-years) | | |
| Total | 3315.3 | 3743.6 |
| Study 002 | 1800.1 | 2032.7 |
| Study 063 | 890.7 | 759.3 |
| Study 064 | 624.5 | 951.6 |
| Exposure, n (%) | | |
| ≤ 4 Weeks | 71 (3.7) | 34 (1.8) |
| > 4 Weeks | 1869 (96.3) | 1906 (98.2) |
| > 26 Weeks | 1572 (81.0) | 1683 (86.8) |
| > 52 Weeks | 1223 (63.0) | 1370 (70.6) |
| > 104 Weeks | 831 (42.8) | 1010 (52.1) |
| > 156 Weeks | 302 (15.6) | 385 (19.8) |

## Primary Endpoint

All three studies demonstrated non-inferiority of roxadustat vs. epoetin alfa (Table 15), as the lower bound of the 95% CI of the treatment difference (roxadustat - epoetin alfa) exceeded the prospectively-defined NI margin of -0.75 g/dL. Statistically significantly fewer subjects received RBC transfusions in the roxadustat group than in the epoetin alfa group in Study 064; however, Studies 002 and 063 showed opposite trends (Table 15). Moreover, it is important to recognize that the transfusion data are confounded. Subjects who were randomized to roxadustat could receive ESAs or RBC transfusions as a rescue therapy, whereas subjects who were randomized to epoetin alfa could receive only a transfusion as rescue therapy. Thus, it cannot be concluded that subjects who received roxadustat required fewer RBC transfusions than subjects who received epoetin alfa.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 15: Efficacy Results for the DD Trials

| Study/Treatment Arms | 002 | | 063 | | 064 | |
|---|---|---|---|---|---|---|
| | Roxadustat N=1051 | Epoetin alfa N=1055 | Roxadustat N=522 | Epoetin alfa N=521 | Roxadustat N=370 | Epoetin alfa N=371 |
| Mean Baseline Hb (SD) | 9.99 (1.2) | 10.02 (1.24) | 8.43 (1.04) | 8.46 (0.96) | 10.30 (0.66) | 10.31 (0.66) |
| Hb averaged over Weeks 28–52 (SD) | 10.83 (0.94) | 10.74 (1.02) | 11.00 (0.82) | 10.83 (0.88) | 10.69 (0.76) | 10.22 (0.68) |
| Change from baseline in Hb average over Weeks 28 to 52 (adjusted mean) (SE) | 0.77 (0.04) | 0.68 (0.04) | 2.38 (0.04) | 2.20 (0.04) | 0.28 (0.07) | -0.19 (0.06) |
| Difference: Roxadustat minus Epoetin alfa (95% CI) | 0.09 (0.01, 0.18) | | 0.18 (0.08, 0.29) | | 0.48 (0.37, 0.59) | |
| Subjects with RBC transfusions, N (%) | 103 (9.8) | 139 (13.2) | 38 (7.3) | 33 (6.4) | 46 (12.5) | 78 (21.1) |
| Hazard Ratio; Nominal P-value | 0.83; 0.15 | | 1.26; 0.33 | | 0.67; 0.04 | |

## Study 613

Study 613 (Pyrenees) was a randomized, open-label, non-inferiority trial in patients with DD-CKD on stable hemodialysis or peritoneal dialysis for ≥ 4 months and on stable ESA treatment for ≥ 8 weeks. The study was conducted at multiple sites in Eastern, Central, and Western Europe. Patients were randomized 1:1 to roxadustat or continued treatment with their prior ESA: darbepoetin alfa or epoetin alfa. (Of note, randomization was not stratified by prior ESA.) Use of an ESA, approved in the EU but not licensed in the US, was permitted. Eligible patients were required to have a baseline Hb between 9.5 and 12.0 g/dL. The US primary efficacy endpoint was the change in Hb from baseline to the mean level during the evaluation period (weeks 29 through 52), regardless of rescue therapy. Hypothesis testing was conducted with a NI margin of -0.75 g/dL as it was for Studies 002, 063, and 064: i.e., NI would be declared if the 95% CI of the difference excluded 0.75 g/dL or more.

The starting dose of roxadustat was based on the previous ESA dose and the protocol provided for adjusting the roxadustat dose to maintain Hb between 10 and 12 g/dL.

**Study Patients:** Enrolled patients were randomized to roxadustat (n=415) or continued ESA treatment (n=422) for an intended treatment duration of ≥ 52 weeks (≤ 104 weeks). Approximately 62% of patients had been using epoetin alfa, and approximately 38% had been using darbepoetin alfa.

**Demographics and Baseline Characteristics:** The demographics and baseline characteristics were generally well balanced between the two groups. The mean age of patients was approximately 61 years. Most patients were male (58%), White (97%), and on hemodialysis (94%). Mean baseline Hb values were approximately 10.8 g/dL in both groups, and the majority of patients were iron replete at baseline.

28

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Study completion rates were 60% in the roxadustat group and 73% in the ESA group. Deaths occurred in 14.9% of subjects in the roxadustat group vs. 11.2% of subjects in the ESA group.

Table 16: Selected Demographic and Baseline Disease Characteristics—Study 613

| | Roxadustat (N=415) | Continued ESA Treatment (N=422) |
|---|---|---|
| Age, mean (SD) | 61 (13.8) | 61.8 (13.4) |
| Female, n (%) | 169 (40.8) | 285 (44) |
| Race, n (%) | | |
| White | 405 (97.8) | 407 (96.9) |
| Black | 6 (1.4) | 6 (1.4) |
| Asian | 1 (0.2) | 3 (0.7) |
| Other | 2 (0.5) | 4 (1.0) |
| Hemodialysis, n (%) | 379 (91.5) | 405 (96.4) |
| Peritoneal Dialysis, n (%) | 35 (8.5) | 15 (3.6) |
| Baseline Hb (g/dL), mean (SD) | 10.75 (0.62) | 10.77 (0.63) |
| Diabetes, n (%) | 104 (25.1) | 133 (31.6) |
| History of cardiovascular, cerebrovascular, or thromboembolic disease, n (%) | 169 (40.8) | 201 (47.9) |

**Efficacy Endpoint**

For the primary endpoint of Hb change from baseline averaged over Weeks 28 to 52 regardless of rescue therapy, the study met the noninferiority margin of -0.75 g/dL. The least squares mean difference between roxadustat vs. ESA in the ITT was 0.17 (95% CI: 0.082, 0.26) with $p < 0.001$ (one-sided).

# Safety

Safety is divided into four sections: (1) analyses of adverse events; (2) analyses of laboratory data; (3) analyses of MACE; and (4) explorations of the relationships between thromboembolic events, drug dose, Hb concentration, and rate of change of Hb concentration. In each section, data for the NDD and DD patient populations are presented sequentially. All of these analyses contribute importantly to the assessment of roxadustat's safety.

Studies in the NDD patient population are placebo-controlled. Consequently, they offer the opportunity to assess the safety of roxadustat against a "clean" background. On the other hand, these studies suffer from disparate rates of discontinuation in two treatment groups. As noted above, patients who were doing poorly, some of whom required RBC transfusions, were more likely to discontinue from treatment and discontinue from the study, such they could no longer contribute adverse events. It follows that adverse event rates are dependent on time of observation. Even when adjusted for observation time, the results may be somewhat skewed against roxadustat. Thus, smaller differences in adverse event rates between the roxadustat and placebo groups in the NDD population may be factitious and should be interpreted carefully. (Larger differences, in contrast, merit concern.) In the DD population, studies

29

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

were active-controlled (against epoetin alfa) and rates of discontinuation were similar; therefore, interpretation of adverse event rates in this population is straightforward.

# Analyses of Adverse Events

## Methods

Pooling: Given that the three studies in the NDD population were similar in terms of their patient populations, durations, and Hb targets, simple pooling was used to combine them for the main safety analyses. Of note, however, the randomization ratios differed across the studies (1:1 in study 001, 2:1 in studies 060 and 608), and the studies differed in size, leading to the potential for Simpson's paradox. Nevertheless, we found that the signals that emerged from the pooled analyses were generally consistent across the individual studies.

Definition of "Treatment-emergent": A "treatment emergent" adverse event is defined as an adverse event that was not present prior to treatment but occurs during treatment (or, if present at treatment initiation, an event that worsens in intensity or frequency on-drug). Only treatment-emergent adverse events are considered in this document, as is customary.

Ascertainment Window: When patients are monitored after treatment discontinuation, it is essential to define the "ascertainment window"—the time on-treatment plus the interval of additional monitoring beyond which a causal relationship between the drug and effect would not be reasonably likely. Typical ascertainment windows are the treatment period plus 5 half-lives; however, in many cases, a week or a month are selected—somewhat arbitrarily.

Establishment of the ascertainment window requires careful consideration. For example, alpha$_1$ adrenoreceptor blocking agents would not be expected to cause orthostatic hypotension once they are no longer in the circulation. In contrast, some drugs have the potential to cause long-term sequelae, e.g., pulmonary fibrosis. Thus, it is important to define the ascertainment window, and this is usually done prospectively.

The applicant conducted analyses based on multiple ascertainment windows: on-treatment plus 7 days (OT+7), on-treatment plus 28 days (OT+28), and on-treatment plus all (OT+All), i.e., On-Study. Although longer "windows" have the potential to detect adverse events with longer latency, they also have greater potential for confounding. (For example, some patients initiated other treatments for anemia after discontinuing the study drug that could confound analyses using longer ascertainment windows.) Thus, results for all three "windows" were considered in some of our analyses and are considered complementary. More detail is provided in the section on MACE.

Adverse Event Queries: Study investigators report adverse events using their own language, i.e., 'verbatim terms,' which must be translated into appropriate, standard preferred terms prior to analysis. For example, the verbatim term 'hypotension w/ sepsis from pneumococcus' would be translated to the standard preferred term 'pneumococcal sepsis.'

Verbatim terms can include substantial detail, and disparate but related terms must be combined in order to represent the various safety signals completely and accurately. Thus, the terms 'wound sepsis,' 'neutropenic sepsis,' 'urosepsis,' 'septic shock,' etc. all indicate 'sepsis' and need to be combined. The combination of medically similar and/or related preferred terms for analysis is called a "query." To be

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

clear, tabulation of individual preferred terms <u>without</u> queries can be highly deceptive. For example, the adverse event term 'sepsis' was reported for 81 patients who received roxadustat in the NDD population, whereas a query for 'sepsis,' including multiple additional adverse events, finds 132 patients. The preferred terms used in some of the more important queries are shown in the appendix.

Standardized MedDRA queries have been available for many years; however, they are not well suited for assessing adverse events in new drug applications. For this reason, FDA is developing a standard set of queries for new drugs. FDA's new queries, as well as other queries developed over many years by FDA staff, were used to assess the adverse events in the roxadustat development program.

Event rate: In the analysis of adverse events, event rates are reported per 100 patient years (P-Y). These calculations include only the incident event (i.e., recurrent events are not counted) and utilize an overall total exposure (dependent upon the ascertainment window applied) across the set of adverse events. In other words, for subjects who experienced an adverse event, follow-up time was not censored after the event in these analyses. For patients who experienced a particular adverse event, the applicant truncated the time of exposure at the time of event (in some analyses). This is a reasonable approach that differs slightly the approach we used; however, the differences in calculated patient exposure are minimal, with essentially no effect on the results.

Drug-relatedness: The most important consideration when assessing adverse events in the consideration of drug safety is relatedness. Merely identifying a risk difference in an adverse event that disfavors a drug does not constitute causality. In our formulation of causality, we considers a drug's mechanism of action, non-clinical (animal) findings, known effects of other drugs in-class, relationship of the adverse event to dose/exposure, consistency of signals in studies across a development program, and consistency across related adverse events (e.g., signals for orthostatic hypotension and falls are self-reinforcing). Finally, consistency between the total numbers of adverse events and serious adverse events can be important, and may play an important role in considering the overall benefit-risk profile.

## Results

### NDD Patient Population

The NDD patient population included all 4270 randomized subjects who received $\geq$ 1 dose of study drug in the three major randomized, double-blind, placebo-controlled studies (001, 060, 068). No subjects were on dialysis at the time of randomization, although some initiated dialysis during the study. Some of the adverse events are relatively specific to hemodialysis (e.g., vascular access thrombosis) or peritoneal dialysis (e.g., peritonitis); however, the actual denominators (i.e., numbers of subjects) are unknown. Thus, although the relative risks of such events may be accurate, their absolute risk differences will be underestimated. Analyses are shown separately for Study 610, which employed an active control group instead of a placebo group.

**Deaths**

Causes of death were adjudicated by an independent event committee and are summarized in Table 17, as reported by the applicant. Their analysis is based on the OT+28 ascertainment window. The "Patients with Events" columns list the numbers of subjects along with the corresponding percentages of patients. As noted above, however, the mean and total time-on-study differed between the roxadustat and placebo groups; therefore, expression of a simple frequency of adverse events (% of patients) is

31

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

potentially misleading. The "Events per 100 P-Y" columns (P-Y = patient-year) is corrected for duration of treatment, and provides a more appropriate basis for comparison between the treatment groups. The "Risk Difference" column (red bars) shows the absolute risk difference between the roxadustat and placebo groups, and represents a simple subtraction expressed per 100 P-Y. The "Relative Risk" column (blue bars) is the ratio of the risks (roxadustat/placebo) based on events per 100 P-Y.

Table 17: Adjudicated Causes of Death—Studies 001, 060, 068; Ascertainment Window OT+28

| | Patients with events (%) | | Events (per 100 PY) | | Risk Difference (per 100 P-Y) | Relative Risk Based on P-Y |
|---|---|---|---|---|---|---|
| | Roxadustat N = 2386 | Placebo N = 1884 | Roxadustat 4038 P-Y | Placebo 2460 P-Y | | |
| Total Deaths | 260 (10.9) | 122 (6.48) | 6.44 | 4.96 | 1.48 | 1.30 |
| Cardiovascular-related | 105 (4.4) | 60 (3.18) | 2.60 | 2.44 | 0.16 | 1.07 |
| Sudden cardiac death | 48 (2.01) | 26 (1.38) | 1.19 | 1.06 | 0.13 | 1.12 |
| Acute MI | 18 (0.75) | 14 (0.74) | 0.45 | 0.57 | -0.12 | 0.78 |
| Stroke | 13 (0.54) | 8 (0.42) | 0.3 | 0.3 | -0.01 | 0.99 |
| Heart failure | 10 (0.42) | 10 (0.53) | 0.25 | 0.41 | -0.16 | 0.61 |
| Other cardiovascular | 9 (0.38) | 2 (0.11) | 0.22 | 0.08 | 0.14 | 2.74 |
| Cardiovascular procedure | 6 (0.25) | 0 (0) | 0.15 | 0.00 | 0.15 | - |
| Non-cardiovascular-related | 128 (5.36) | 49 (2.6) | 3.17 | 1.99 | 1.18 | 1.59 |
| Infection | 55 (2.31) | 16 (0.85) | 1.36 | 0.65 | 0.71 | 2.09 |
| Renal | 44 (1.84) | 16 (0.85) | 1.1 | 0.7 | 0.44 | 1.68 |
| Malignancy | 6 (0.25) | 2 (0.11) | 0.15 | 0.08 | 0.07 | 1.83 |
| Hemorrhage | 5 (0.21) | 3 (0.16) | 0.12 | 0.12 | 0.00 | 1.02 |
| Undetermined | 27 (1.13) | 13 (0.69) | 0.67 | 0.53 | 0.14 | 1.27 |

Data are compiled from Table 50 in the applicant's Integrated Summary of Safety; P-Y = patient-year

The rate of death was higher in patients who had received roxadustat; the overall risk difference was 1.48 deaths per 100 P-Y, with a relative risk of 1.30. Somewhat fewer than half the deaths were cardiovascular in nature. The leading causes of death (and the largest contributors to the risk difference) were infections, "renal" deaths, and sudden cardiac deaths. Deaths will be discussed in greater detail in the MACE section. The numbers of adjudicated deaths from malignancy are small, but there are more deaths from malignancy in patients who received roxadustat (estimated relative risk = 1.8). Malignancy is of interest because it is a labeled adverse drug reaction for the ESAs.

**Deaths in Study 610**

In this study of 616 subjects, there were 22 (6.8%) and 18 (6.1%) deaths in the roxadustat and darbepoetin alfa groups, respectively, in the OT+28 analysis. For the On-study analysis, there were 29 (9.0%) and 22 (7.5%) deaths in the respective groups. The numbers of deaths were greater in the roxadustat group, but the difference is too small to be conclusive.

32

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Serious Adverse Events**

Table 18 shows the serious adverse events and adverse event queries for the pooled studies in the NDD patient population for the OT+7 ascertainment window. The tabulation (and many that follow in this document) shows a mixture of serious adverse event *queries* and individual serious adverse event *preferred terms*, with the later denoted by "term or "actual term." Subjects with more than one serious adverse event for a given preferred term or more than one event within the same query were counted only once.

Adverse events and adverse event queries for which the event rate (per 100 P-Y) is ≥ 0.5 with a relative risk ≥ 1.3 are shown, along with adverse events of special interest.

Table 18: Serious Adverse Events—Studies 001, 060, and 608; Ascertainment Window OT+7

| | Patients with events (%) | | Events (per 100 PY) | | Risk Difference (per 100 P-Y) | Relative Risk Based on P-Y |
|---|---|---|---|---|---|---|
| | Roxadustat N = 2386 | Placebo N = 1884 | Roxadustat 3871 P-Y | Placebo 2323 P-Y | | |
| **Thromboembolic** | | | | | | |
| Thrombotic events | 140 (5.87) | 58 (3.08) | 3.62 | 2.50 | 1.1 | 1.45 |
| Device/shunt thrombosis | 36 (1.51) | 8 (0.42) | 0.93 | 0.34 | 0.6 | 2.70 |
| Deep vein thrombosis (term) | 20 (0.84) | 2 (0.11) | 0.52 | 0.09 | 0.4 | 6.00 |
| Myocardial infarction FDA | 54 (2.26) | 31 (1.65) | 1.40 | 1.33 | 0.1 | 1.05 |
| Stroke | 53 (2.22) | 26 (1.38) | 1.37 | 1.12 | 0.3 | 1.22 |
| Ischemic stroke | 31 (1.30) | 14 (0.74) | 0.80 | 0.60 | 0.2 | 1.33 |
| Pulmonary embolism (term) | 8 (0.34) | 1 (0.05) | 0.21 | 0.04 | 0.2 | 4.80 |
| **Central Nervous System** | | | | | | |
| Intracranial hemorrhage | 24 (1.01) | 6 (0.32) | 0.62 | 0.26 | 0.4 | 2.40 |
| Seizure FDA | 9 (0.38) | 1 (0.05) | 0.2 | 0.0 | 0.2 | 5.40 |
| **Infection** | | | | | | |
| Sepsis/septic shock | 87 (3.65) | 22 (1.17) | 2.25 | 0.95 | 1.3 | 2.37 |
| Urinary tract infection | 100 (4.19) | 53 (2.81) | 2.58 | 2.28 | 0.3 | 1.13 |
| Infection, bacterial | 49 (2.05) | 17 (0.9) | 1.27 | 0.73 | 0.5 | 1.73 |
| Cellulitis | 36 (1.51) | 13 (0.69) | 0.93 | 0.56 | 0.4 | 1.66 |
| Bacteremia | 30 (1.26) | 10 (0.53) | 0.8 | 0.4 | 0.4 | 1.80 |
| Peritonitis | 28 (1.17) | 10 (0.53) | 0.72 | 0.43 | 0.3 | 1.68 |
| **Miscellaneous** | | | | | | |
| Acute kidney injury (term) | 75 (3.14) | 34 (1.8) | 1.94 | 1.46 | 0.5 | 1.32 |
| Hyperkalemia (term) | 56 (2.35) | 22 (1.17) | 1.45 | 0.95 | 0.5 | 1.53 |
| Fracture | 45 (1.89) | 19 (1.01) | 1.16 | 0.82 | 0.3 | 1.42 |
| Gastrointestinal hemorrhage | 58 (2.43) | 29 (1.54) | 1.50 | 1.25 | 0.3 | 1.20 |
| Hyponatremia (term) | 22 (0.92) | 9 (0.48) | 0.57 | 0.39 | 0.2 | 1.47 |
| Malignancy FDA | 37 (1.55) | 23 (1.22) | 0.96 | 0.99 | 0.0 | 0.97 |

Listings labeled "term" represent individual preferred terms.

All other listings represent queries that combine multiple, related adverse event terms.

FDA = FDA query; P-Y = patient-year

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Given the problem of differential dropout from the two treatment groups, relative risks less than ~1.3 seem difficult to interpret. The ESAs are known to increase the risk of thrombotic events, and they are listed as adverse drug reactions in their labeling. Roxadustat also shows an obvious signal for serious thrombotic events, with an estimated risk difference (vs. placebo) of 1.1 events per 100 P-Y and a relative risk of 1.45.[1] The largest contributors to the thrombosis query are MI, with 54 events in the roxadustat group, and stroke with 53 events. The numbers of subjects with deep vein thrombosis and pulmonary embolism are relatively small; however, the relative risks are concerning: 6.0 and 4.8, respectively. Importantly, as noted above, the risk difference for device/shunt thrombosis is considerably underestimated, because the analysis assumes that all patients were on dialysis, which is untrue. (Fortunately, additional estimates of the risk of device/shunt thrombosis are available from studies in the DD patient population, shown later, where all subjects are on dialysis and the denominators are certain.)

Seizure is another serious adverse event of special interest, as seizures are an adverse drug reaction with ESAs. Although the numbers of subjects with serious adverse events of seizure are relatively small, the relative risk of 5.4 merits concern (9 vs. 1 event).

The signal of serious infection was unexpected, but sepsis/septic shock is an obvious concern (risk difference 1.3 per 100 P-Y; estimated relative risk = 2.37), and it is reinforced by signals for serious urinary tract infections, bacterial infections, cellulitis, and peritonitis. Again, as noted above, it is safe to assume that most subjects who reported peritonitis were on peritoneal dialysis. Although the relative risk of peritonitis may be reasonably accurate, the risk difference may be underestimated here.

Other notable serious adverse events include acute kidney injury, hyperkalemia, fracture, gastrointestinal hemorrhage, and hyponatremia.

One might reasonably ask whether some serious adverse events were more common in the placebo groups than in the roxadustat groups. Queries for pulmonary edema, anemia, angina, fatigue, hypotension, and dyspnea favored roxadustat, with event rates exceeding 0.5 per 100 P-Y in the placebo groups ($\geq$ 11 events) and relative risks < 0.75.

**Study 610**

Unlike the placebo-controlled studies above, Study 610 employed darbepoetin alfa as an active comparator, and time-on-treatment was similar between the two groups. Thus, serious adverse events are expressed as simple percentages, without correction for time-on-study. Of note, the total number of subjects in Study 610 was ~1/7 the number of subjects in the three pooled studies.

Table 19 shows serious adverse events (and queries) where the frequency in the roxadustat group was > 5% and the relative risk vs. darbepoetin alfa exceeded ~1.3. Note: the threshold for inclusion of serious adverse events in this table differed from the threshold for the pooled analyses of Studies 001, 060, and 608; however, they correspond to similar numbers of adverse events in roxadustat-treated groups.

---

[1] The list of adverse event terms in the query is shown in the appendix.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Signals for both serious thrombosis and infection events are again apparent. The thrombosis difference is particularly important because it is evident when compared here to darbepoetin alfa, which is itself known to predispose to thrombotic events.

### Table 19: Serious Adverse Events—Study 610

| N (%) | Roxadustat N = 323 | Darbepoetin alfa N = 293 | Risk Difference (%) | Relative Risk |
|---|---|---|---|---|
| Infection, all | 48 (14.9%) | 34 (11.6%) | 3.3 | 1.28 |
| Bacterial infectious disorders | 18 (5.6%) | 7 (2.4%) | 3.2 | 2.33 |
| Pneumonia FDA | 19 (5.9%) | 12 (4.1%) | 1.8 | 1.44 |
| Thrombosis | 20 (6.2%) | 13 (4.4%) | 1.8 | 1.41 |

All listing are queries; FDA = FDA query

One might reasonably question whether there were serious adverse events that occurred at a frequency of 5% in the darbepoetin group with a relative risk favoring *roxadustat*. The frequencies for congestive heart failure (query) were 5.0% and 7.5% in subjects treated with roxadustat and darbepoetin alfa, respectively. No other serious adverse events (or queries) were found that favored roxadustat over darbepoetin alfa.

**All Adverse Events**

Table 20 lists the results of pooled analyses of adverse events and adverse event queries for the three major studies in the NDD patient population, where the event rate was > 2 per 100 P-Y in the roxadustat groups, and the relative risk (vs. placebo) was > 1.2. This listing of all adverse events includes the serious adverse events described above.

Table 20 is similar to the previous table, with the addition of estimated relative risks for all ascertainment windows. The heights of the vertical violet bars at right represent the estimated relative risks for the OT+7, OT+28, and OT+All (On-Study) analyses, respectively. Thus, the height of the violet bar at left corresponds to the relative risk for the OT+7 analysis, which matches the relative risk in the column 'Relative Risk Based on P-Y.' The center and right violet vertical bars show the results for the OT+28 and on-study analyses. Inspection of the three violet bars for each listing shows how the risk ratios differ across the ascertainment windows. The relative risks are fairly consistent across the OT+7, OT+28, and On-study ascertainment windows for most of these adverse events. Device/shunt thrombosis/occlusion and sepsis/septic shock are exceptions, where the relative risk decreases somewhat for the OT+All ascertainment window.

Again, there are notable signals for thrombotic events, sepsis/septic shock, bacterial infections, seizures, and hyperkalemia. There is a signal for face edema with a small number of events, but a substantial relative risk (8.4). There are signals for insomnia, rash, peripheral edema, acute kidney injury, and fracture; however, the risk differences are small. Peripheral edema and the query 'edema, fluid retention overload' show risk differences around 1 per 100 P-Y range, and are risks of ESAs. Nausea, vomiting, and dyspepsia all have estimated relative risks of 1.2 with risk differences ~1 per 100 P-Y, and the fact that they were detected together suggests drug-relatedness. Malignancy is neutral.

35

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Considering the large number of adverse events and queries examined, it is reasonable to consider whether there are signals that favored *placebo*. The only adverse events reported at a rate > 2 per 100 P-Y in patients who received placebo with a relative risk < 0.8 (i.e., worse in the placebo groups) were anemia, asthenia, fatigue, hypotension, and myocardial ischemia.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Table 20: All Adverse Events—Studies 001, 060, and 608; OT+7, OT+28, and OT+All Ascertainment Windows

| | Adverse Events On-treatment (OT) Plus 7 Days | | | | | | Relative Risk; On-treatment plus 7, 28, 99 Days |
|---|---|---|---|---|---|---|---|
| | Patients with events (%) | | Events (per 100 P-Y) | | Risk Difference (per 100 P-Y) | RR Based on P-Y | |
| | Rox | Pbo | Rox | Pbo | | | |
| Numbers of patients -> | 2386 | 1884 | | | | | |
| Patient-years           -> | | | 3870 | 2323 | | | |
| **Thombotic Events** | | | | | | | |
| Device/shunt thrombosis, occlusion, malfunction, stenosis # | 88 (3.7) | 20 (1.1) | 2.3 | 0.9 | 1.4 | 2.6 | |
| Device/shunt thrombosis (VAT) # | 71 (3) | 17 (0.9) | 1.8 | 0.7 | 1.1 | 2.5 | |
| Thrombosis # | 195 (8.2) | 76 (4) | 5.0 | 3.3 | 1.8 | 1.5 | |
| Stroke (includes ischemic and hemorrhagic) # | 57 (2.4) | 29 (1.5) | 1.5 | 1.2 | 0.2 | 1.2 | |
| **Infections** | | | | | | | |
| Sepsis/septic shock # | 100 (4.2) | 28 (1.5) | 2.6 | 1.2 | 1.4 | 2.1 | |
| Bacterial infectious disorders HLGT # | 207 (8.7) | 102 (5.4) | 5.3 | 4.4 | 1.0 | 1.2 | |
| Nasopharyngitis FDA N # | 129 (5.4) | 66 (3.5) | 3.3 | 2.8 | 0.5 | 1.2 | |
| **Laboratory Abnormalities** | | | | | | | |
| Hyperkalemia # | 274 (11.5) | 134 (7.1) | 7.1 | 5.8 | 1.3 | 1.2 | |
| Iron deficiency # | 114 (4.8) | 49 (2.6) | 2.9 | 2.1 | 0.8 | 1.4 | |
| **Gastrointestinal** | | | | | | | |
| Nausea FDA N # | 242 (10.1) | 117 (6.2) | 6.3 | 5.0 | 1.2 | 1.2 | |
| Dyspepsia FDA N # | 155 (6.5) | 76 (4) | 4.0 | 3.3 | 0.7 | 1.2 | |
| Vomiting FDA N # | 148 (6.2) | 75 (4) | 3.8 | 3.2 | 0.6 | 1.2 | |
| Decreased appetite (actual term) | 97 (4.1) | 49 (2.6) | 2.5 | 2.1 | 0.4 | 1.2 | |
| **Miscellaneous** | | | | | | | |
| Face oedema (actual term) | 14 (0.6) | 1 (0.1) | 0.4 | 0.0 | 0.3 | 8.4 | |
| Seizure FDA N # | 24 (1) | 3 (0.2) | 0.6 | 0.1 | 0.5 | 4.8 | |
| Insomnia FDA N # | 131 (5.5) | 46 (2.4) | 3.4 | 2.0 | 1.4 | 1.7 | |
| Rash FDA N # | 110 (4.6) | 53 (2.8) | 2.8 | 2.3 | 0.6 | 1.2 | |
| Oedema peripheral (actual term) | 275 (11.5) | 140 (7.4) | 7.1 | 6.0 | 1.1 | 1.2 | |
| Acute kidney injury FDA N # | 125 (5.2) | 63 (3.3) | 3.2 | 2.7 | 0.5 | 1.2 | |
| Fracture # | 102 (4.3) | 52 (2.8) | 2.6 | 2.2 | 0.4 | 1.2 | |
| Edema, fluid retention, overload # | 515 (21.6) | 289 (15.3) | 13.3 | 12.4 | 0.9 | 1.1 | |
| Systemic hypertension FDA N* | 411 (17.2) | 224 (11.9) | 10.6 | 9.6 | 1.0 | 1.1 | |
| Malignancy FDA N # | 43 (1.8) | 34 (1.8) | 1.1 | 1.5 | -0.4 | 0.8 | |

Listings labeled "actual term" represent individual preferred terms.

# All other listings represent queries that combine multiple, related adverse event terms.

"FDA N" = FDA query; P-Y = patient-year; RR = relative risk

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Study 610**

Table 21 shows all adverse events and adverse event queries that were reported at a frequency of > 5% in the roxadustat group, and > 2% higher than in the darbepoetin alfa group in Study 610. (As previously noted, roxadustat was compared to darbepoetin alfa in this study rather than placebo, and time-on-treatment was similar between the two treatment groups.)

Table 21: All Adverse Events—Study 610

| N (%) | Roxadustat N = 323 | Darbepoetin alfa N = 293 | Risk Difference (%) | Relative Risk |
|---|---|---|---|---|
| Hyperphosphatemia (term) | 23 (7.1%) | 9 (3.1%) | 4.0 | 2.29 |
| Edema, fluid retention, overload | 62 (19.2%) | 45 (15.4%) | 3.8 | 1.25 |
| Peripheral edema FDA | 45 (13.9%) | 35 (11.9%) | 2.0 | 1.17 |
| Insomnia FDA | 18 (5.6%) | 6 (2%) | 3.6 | 2.80 |
| Muscle spasms (term) | 23 (7.1%) | 12 (4.1%) | 3.0 | 1.73 |
| Dyspnea FDA | 18 (5.6%) | 8 (2.7%) | 2.9 | 2.07 |
| Thrombosis | 25 (7.7%) | 15 (5.1%) | 2.6 | 1.51 |
| Arrhythmia FDA | 38 (11.8%) | 28 (9.6%) | 2.2 | 1.23 |
| Nausea (term) | 26 (8%) | 17 (5.8%) | 2.2 | 1.38 |
| Constipation FDA | 19 (5.9%) | 11 (3.8%) | 2.1 | 1.55 |
| Headache FDA | 18 (5.6%) | 10 (3.4%) | 2.2 | 1.65 |
| Hypotension FDA | 17 (5.3%) | 9 (3.1%) | 2.2 | 1.71 |
| Bronchitis (term) | 20 (6.2%) | 12 (4.1%) | 2.1 | 1.51 |

Adverse events denoted by "term" are individual preferred terms.  All others are queries.
FDA = FDA query

Signals for peripheral edema, edema, fluid retention/overload, insomnia, thrombosis, and nausea have been observed in other studies, and their observation here is reinforcing. In particular, thrombosis and fluid retention/overload are labeled adverse drug reactions for ESAs. Adverse events not heretofore observed include hyperphosphatemia, muscle spasms, dyspnea, arrhythmia, constipation, headache, hypotension, and bronchitis. Analyses of adverse events in the DD patient population will provide a far more robust comparison between roxadustat and darbepoetin alfa.

## DD Patient Population

The DD patient population includes 3880 randomized subjects who received $\geq$ 1 dose of study drug in the three major randomized, double-blind, active-controlled studies (002, 063, 064). Study 063 enrolled subjects who had initiated dialysis within 4 months of randomization. Studies 002 and 064 enrolled such subjects, as well as subjects who had been stable on dialysis and were using an ESA. Subjects were randomized to roxadustat or epoetin alfa. Analyses are shown separately for Study 613, which was conducted in Europe and included randomization to either roxadustat or darbepoetin alfa. Because ESAs were used as active controls for these trials, the adverse event tables include most of the adverse drug reactions currently in the ESA labels.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Deaths

Table 22 provides a tabulation of adjudicated deaths in the DD patient population, with numbers compiled from the applicant's table. There is a slight trend toward a higher rate of death in patients who received roxadustat vs. epoetin alfa. The risk difference was 0.62 deaths per 100 P-Y, with a relative risk of 1.08. Slightly more than half the deaths were cardiovascular in nature. The leading causes of cardiovascular death (and the largest contributors to the risk difference) were acute MI and sudden cardiac death. The leading non-cardiovascular causes of death were infection and "renal" deaths. Deaths will be discussed in greater detail in the MACE section.

### Table 22: Adjudicated Causes of Death—Studies 002, 063, 064; Ascertainment Window OT+28

| | Patients with events (%) | | Events (per 100 PY) | | Risk Difference (per 100 P-Y) | Relative Risk Based on P-Y |
|---|---|---|---|---|---|---|
| | Roxadustat N = 1940 | Epoetin alfa N = 1940 | Roxadustat 3447 P-Y | Epoetin alfa 3874 P-Y | | |
| Total Deaths | 282 (14.54) | 293 (15.1) | 8.18 | 7.56 | 0.62 | 1.08 |
| Cardiovascular-related | 159 (8.2) | 160 (8.25) | 4.61 | 4.13 | 0.48 | 1.12 |
| Sudden cardiac death | 86 (4.43) | 85 (4.38) | 2.50 | 2.19 | 0.31 | 1.14 |
| Acute MI | 26 (1.34) | 16 (0.82) | 0.75 | 0.41 | 0.34 | 1.83 |
| Heart failure | 20 (1.03) | 17 (0.88) | 0.6 | 0.4 | 0.14 | 1.32 |
| Stroke | 14 (0.72) | 25 (1.29) | 0.41 | 0.65 | -0.24 | 0.63 |
| Other cardiovascular | 7 (0.36) | 7 (0.36) | 0.20 | 0.18 | 0.02 | 1.12 |
| Non-cardiovascular-related | 101 (5.21) | 102 (5.26) | 2.93 | 2.63 | 0.30 | 1.11 |
| Infection | 47 (2.42) | 46 (2.37) | 1.36 | 1.19 | 0.17 | 1.15 |
| Renal | 15 (0.77) | 10 (0.52) | 0.44 | 0.26 | 0.18 | 1.69 |
| Hemorrhage | 7 (0.36) | 5 (0.26) | 0.20 | 0.13 | 0.07 | 1.57 |
| Gastrointestinal | 5 (0.26) | 10 (0.52) | 0.15 | 0.26 | -0.11 | 0.56 |
| Malignancy | 5 (0.26) | 7 (0.36) | 0.15 | 0.18 | -0.03 | 0.80 |
| Undetermined | 22 (1.13) | 31 (1.6) | 0.64 | 0.80 | -0.16 | 0.80 |

Data are compliled from Table 117 in the applicant's Integrated Summary of Safety; P-Y = patient-year

## Deaths in Study 613

Study 613 was a European study that randomized stable DD subjects 1:1 to roxadustat (N = 414) or ESA (N = 420). According to the applicant, within the OT+28 ascertainment window, there were 64 (9.7 per 100 P-Y) and 51 (6.8 per 100 P-Y) all-cause deaths in the roxadustat and ESA treatment groups, respectively. The applicant's estimated HR is 1.588 (95% CI 1.096, 2.300); P = 0.015. The risk difference is 2.9 deaths per 100 P-Y.

For the On-study analysis, there were 78 (10.6 per 100 P-Y) vs. 59 (7.4 per 100 P-Y) deaths for the roxadustat and ESA groups, respectively. The applicant's estimated HR was 1.562 (95% CI 1.112, 2.195); p = 0.010. The risk difference is 3.2 deaths per 100 P-Y.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Kaplan-Meier survival curves are shown for the OT+28 and On-study analyses in Figure 4, left, and right. In accord with the applicant's analyses, the log-rank p-values are nominally statistically significant in these unadjusted Kaplan-Meier analyses. Causes of death were not adjudicated, and no predominant causes were apparent based on the preferred terms of adverse events that were cited as leading to death.

Figure 4: Kaplan-Meier Curves for Time to Death—Study 613, OT+28 (left); On-study (right)



**Serious Adverse Events**

Table 23 shows the serious adverse events and serious adverse event queries for the pooled studies in the DD patient population (OT + 7 ascertainment window). Events and queries are shown for those where the event rate (per 100 P-Y) is ≥ 0.5 and the relative risk ≥ 1.3, along with adverse drug reactions from the ESA labeling.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Table 23: Serious Adverse Events—Studies 002, 063, and 064; OT+7 Ascertainment Window**

| | Patients with Events N (%) | | Events (per 100 PY) | | Absolute Δ Risk (per 100 P-Y) | Relative Risk Based on P-Y |
|---|---|---|---|---|---|---|
| | Roxadustat | ESA | Roxadustat | ESA | | |
| | N = 1940 | N = 1940 | 3315 P-Y | 3744 P-Y | | |
| **Thombotic Events** | | | | | | |
| Thrombosis | 241 (12.42) | 201 (10.36) | 7.27 | 5.37 | 1.90 | 1.4 |
| Device/shunt thrombosis | 121 (6.24) | 94 (4.85) | 3.65 | 2.51 | 1.14 | 1.5 |
| Deep vein thrombosis (term) | 24 (1.24) | 7 (0.36) | 0.72 | 0.19 | 0.53 | 3.9 |
| **Miscellaneous** | | | | | | |
| Hypoglycemia FDA | 29 (1.49) | 25 (1.29) | 0.87 | 0.67 | 0.20 | 1.3 |
| Gastroenteritis | 27 (1.39) | 16 (0.82) | 0.81 | 0.43 | 0.38 | 1.9 |
| Seizure FDA | 26 (1.34) | 19 (0.98) | 0.78 | 0.51 | 0.27 | 1.6 |
| Pancreatitis FDA | 20 (1.03) | 11 (0.57) | 0.60 | 0.29 | 0.31 | 2.1 |
| **Adverse Drug Reactions Known for ESAs** | | | | | | |
| Systemic hypertension FDA | 89 (4.59) | 110 (5.67) | 2.68 | 2.94 | -0.26 | 0.9 |
| Myocardial infarction FDA | 88 (4.54) | 85 (4.38) | 2.65 | 2.27 | 0.38 | 1.2 |
| Infusion site reaction (term) | 0 (0) | 0 (0) | 0.00 | 0.00 | 0.00 | - |
| Injection site reaction (term) | 0 (0) | 0 (0) | 0.00 | 0.00 | 0.00 | - |
| Bronchospasm FDA | 7 (0.36) | 4 (0.21) | 0.21 | 0.11 | 0.10 | 2.0 |
| Toxic epidermal necrolysis (term) | 0 (0) | 1 (0.05) | 0.00 | 0.03 | -0.03 | 0.0 |
| Stevens-Johnson syndrome (term) | 1 (0.05) | (0) | 0.03 | 0.00 | 0.03 | - |
| Dyspnea FDA | 11 (0.57) | 17 (0.88) | 0.33 | 0.45 | -0.12 | 0.7 |
| Peripheral edema FDA | 5 (0.26) | 2 (0.1) | 0.15 | 0.05 | 0.10 | 2.8 |
| Edema, fluid retention/overload | 76 (3.92) | 76 (3.92) | 2.29 | 2.03 | 0.26 | 1.1 |
| Angina | 27 (1.39) | 30 (1.55) | 0.81 | 0.80 | 0.01 | 1.0 |
| Rash FDA | 2 (0.1) | 2 (0.1) | 0.06 | 0.05 | 0.01 | 1.1 |

All listed adverse events are queries except those denoted by "term," which are individual preferred terms.
FDA = FDA query; P-Y = patient-year

Serious thrombotic events and seizures are again prominent. In the NDD patient population, they were detected against a placebo background; importantly, here they are evident even against epoetin alfa, which is itself known to pose these risks. Other signals of concern include serious adverse events of hypoglycemia, gastroenteritis, and pancreatitis.

Many of the adverse drug reactions known for ESAs (Table 23, bottom) are low in frequency and the results are uninterpretable. For the more frequent serious adverse events that are listed as adverse drug reactions for ESAs (e.g., systemic hypertension and edema, fluid retention/overload), event rates with roxadustat are similar to those for epoetin alfa, which would support including them in roxadustat's labeling if the drug is approved. For MI, the relative risk is 1.2. Myocardial infarction will be discussed in detail in the MACE section.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Study 613**

Table 24 shows the serious adverse events in that occurred at a frequency > 5% in the roxadustat group with a relative risk (vs. ESAs) that exceeded 1.3. As has been mentioned previously, thrombosis of vascular access is listed as an adverse drug reaction in the ESA labeling (as a warning). The risk of congestive heart failure is also listed as an adverse drug reaction when ESAs are used to target excessive Hb concentrations. Thus, these signals from Study 613 are quite concerning (both with a relative risk of 2 vs. ESAs), because they suggest that roxadustat's risks are even greater than those of ESAs. Moreover, serious bacterial infections were more frequent with roxadustat than with the ESAs, also as noted in studies in the NDD patient population where roxadustat was compared to placebo. Serious adverse events consistent with other adverse drug reactions from the ESA label were infrequent (not shown).

Table 24: Serious Adverse Events—Study 613

| N (%) | Roxadustat N = 414 | ESA N = 420 | Risk Difference (%) | | Relative Risk | |
|---|---|---|---|---|---|---|
| Congestive heart failure | 31 (7.5%) | 16 (3.8%) | 3.7 | | 2.0 | |
| Arteriovenous fistula thrombosis (term) | 29 (7%) | 15 (3.6%) | 3.4 | | 2.0 | |
| Device/shunt thrombosis | 35 (8.5%) | 22 (5.2%) | 3.3 | | 1.6 | |
| Bacterial infectious disorders | 23 (5.6%) | 16 (3.8%) | 1.8 | | 1.5 | |
| Thrombosis | 52 (12.6%) | 43 (10.2%) | 2.4 | | 1.2 | |

All listed adverse events are queries except those denoted by "term," which are individual preferred terms.

**All Adverse Events**

Table 25 lists all adverse events in the three principal studies in the DD patient population where the adverse event rate was > 2 per 100 P-Y and the relative risk (vs. ESAs) exceeded 1.3. The OT+7 ascertainment window was used; however, results were essentially the same when analyzed with the OT+28 and OT+All windows (data not shown). The listings at the bottom of the table show the adverse events that correspond to adverse drug reactions in the ESA labeling.

Roxadustat shows a strong thrombosis signal here, even when compared to epoetin alfa, a drug for which thrombosis is a labeled adverse drug reaction. With 91% of study subjects on hemodialysis, the rates of device/shunt thrombosis (vascular access thrombosis) are approximately 8.2 and 6.1 per 100 P-Y for roxadustat and epoetin alfa, for a risk difference of 2.1 per 100 P-Y and a relative risk of 1.3. Note that this comparison is based on a large number of adverse events: 271 vs. 228 in the roxadustat and epoetin alfa groups, respectively. Deep vein thrombosis is infrequent (29 vs. 19 events), but the relative risk is 1.7. Vomiting appears here and also appears as a risk in the NDD patient population.

Among the adverse events that correspond to adverse drug reactions in the ESA labeling, the signals for rash, malignancy, MI, peripheral edema, and hypertension are most prominent. In fact, all of the adverse events that correspond with the adverse drug reactions of ESAs show relative risks near or above unity (Stevens-Johnson syndrome and toxic epidermal necrolysis excepted; they are rare). Based on these data, the adverse drug reactions in the ESA labeling should convey to the labeling of roxadustat, if approved.

42

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Table 25: All Adverse Events—Studies 002, 063, 064; OT+7 Ascertainment Window

| | Events, N (%) | | Events (per 100 PY) | | Risk Difference (per 100 P-Y) | Relative Risk Based on P-Y |
|---|---|---|---|---|---|---|
| | Roxadustat | Epoetin alfa | Roxadustat | Epoetin alfa | | |
| | N = 1940 | N = 1940 | 3315 P-Y | 3744 P-Y | | |
| **Thombotic Events** | | | | | | |
| Device/shunt thrombosis/ occlusion/malfunction/stenosis | 319 (16.44) | 276 (14.23) | 9.62 | 7.37 | 2.25 | 1.31 |
| Device/shunt thrombosis | 271 (13.97) | 228 (11.75) | 8.17 | 6.09 | 2.08 | 1.34 |
| Thrombosis | 392 (20.21) | 344 (17.73) | 11.82 | 9.19 | 2.63 | 1.29 |
| Deep vein thrombosis (term) | 29 (1.49) | 19 (0.98) | 0.87 | 0.51 | 0.36 | 1.72 |
| **Gastrointestinal** | | | | | | |
| Vomiting FDA | 161 (8.3) | 134 (6.91) | 4.86 | 3.58 | 1.28 | 1.36 |
| Gastroenteritis | 86 (4.43) | 68 (3.51) | 2.59 | 1.82 | 0.77 | 1.43 |
| **Miscellaneous** | | | | | | |
| Headache FDA | 198 (10.21) | 157 (8.09) | 5.97 | 4.19 | 1.78 | 1.42 |
| Hypotension FDA | 230 (11.86) | 199 (10.26) | 6.94 | 5.32 | 1.62 | 1.31 |
| Fatigue FDA | 115 (5.93) | 97 (5) | 3.47 | 2.59 | 0.88 | 1.34 |
| Pruritus FDA | 103 (5.31) | 85 (4.38) | 3.11 | 2.27 | 0.84 | 1.37 |
| Muscle spasms (term) | 107 (5.52) | 92 (4.74) | 3.23 | 2.46 | 0.77 | 1.31 |
| Hypoglycemia FDA | 79 (4.07) | 70 (3.61) | 2.38 | 1.87 | 0.51 | 1.27 |
| Tachycardia FDA | 73 (3.76) | 60 (3.09) | 2.20 | 1.60 | 0.60 | 1.37 |
| **Adverse Drug Reactions Known for ESAs** | | | | | | |
| Systemic hypertension FDA | 365 (18.81) | 367 (18.92) | 11.01 | 9.80 | 1.21 | 1.12 |
| Edema, fluid retention, overload | 234 (12.06) | 260 (13.4) | 7.06 | 6.95 | 0.11 | 1.02 |
| Dyspnea FDA | 129 (6.65) | 150 (7.73) | 3.89 | 4.01 | -0.12 | 0.97 |
| Peripheral edema FDA | 98 (5.05) | 95 (4.9) | 2.96 | 2.54 | 0.42 | 1.16 |
| Myocardial infarction FDA | 91 (4.69) | 87 (4.48) | 2.74 | 2.32 | 0.42 | 1.18 |
| Rash FDA | 67 (3.45) | 53 (2.73) | 2.02 | 1.42 | 0.60 | 1.43 |
| Angina | 50 (2.58) | 76 (3.92) | 1.51 | 2.03 | -0.52 | 0.74 |
| Bronchospasm FDA | 13 (0.67) | 18 (0.93) | 0.39 | 0.48 | -0.09 | 0.82 |
| Angioedema FDA | 4 (0.21) | 5 (0.26) | 0.12 | 0.13 | -0.01 | 0.90 |
| Anaphylactic reaction FDA | 3 (0.15) | 4 (0.21) | 0.09 | 0.11 | -0.02 | 0.85 |
| Injection site reaction | 2 (0.1) | 2 (0.1) | 0.06 | 0.05 | 0.01 | 1.13 |
| Infusion site reaction, reaction | 1 (0.05) | 7 (0.36) | 0.03 | 0.19 | -0.16 | 0.16 |
| Stevens-Johnson syndrome (term) | 1 (0.05) | 0 (0) | 0.03 | 0.00 | 0.03 | - |
| Toxic epidermal necrolysis (term) | 0 (0) | 1 (0.05) | 0.00 | 0.03 | -0.03 | 0.00 |
| Malignancy FDA | 38 (1.96) | 36 (1.86) | 1.15 | 0.96 | 0.19 | 1.19 |
| Seizure FDA | 45 (2.32) | 33 (1.7) | 1.36 | 0.88 | 0.48 | 1.54 |

Adverse events denoted by "term" are individual preferred terms. All others are queries.

FDA = FDA query; P-Y = patient-year

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Study 613

Table 26 shows the adverse events in that occurred at a frequency > 5% in the roxadustat group with a relative risk (vs. ESAs) that exceeded 1.3, as well as other significant adverse events. The thrombotic adverse events are once again prominent, even against the background of ESAs. (Of note, there are only a few strokes and MIs, and these favor the roxadustat group over the ESA group.) Signals for nausea and congestive heart failure are also obvious, and have been observed in other trials. With respect to the adverse events that correspond to adverse drug reactions in the ESA labels, the only adverse event with a significant number of events is systemic hypertension, which slightly favors roxadustat vs. ESAs.

### Table 26: All Adverse Events—Study 613

| N (%) | Roxadustat N = 414 | ESA N = 420 | Risk Difference (%) | | | Relative Risk |
|---|---|---|---|---|---|---|
| **Thrombotic Events** | | | | | | |
| Thrombosis | 77 (18.6%) | 65 (15.5%) | 3.10 | | | 1.2 |
| Deep vein thrombosis (term) | 6 (1.4%) | 0 (0%) | 1.40 | | | - |
| Pulmonary embolism (term) | 4 (1%) | 2 (0.5%) | 0.50 | | | 2.0 |
| Device/shunt thrombosis | 64 (15.5%) | 45 (10.7%) | 4.80 | | | 1.4 |
| Arteriovenous fistula thrombosis (term) | 50 (12.1%) | 31 (7.4%) | 4.70 | | | 1.6 |
| Myocardial infarction FDA | 10 (2.4%) | 17 (4%) | -1.60 | | | 0.6 |
| Ischemic stroke | 1 (0.2%) | 6 (1.4%) | -1.20 | | | 0.2 |
| **Miscellaneous** | | | | | | |
| AV fistula thrombosis/occlusion/malfunction/stenosis | 71 (17.1%) | 57 (13.6%) | 3.50 | | | 1.3 |
| Nausea FDA | 30 (7.2%) | 8 (1.9%) | 5.30 | | | 3.8 |
| Congestive heart failure | 34 (8.2%) | 20 (4.8%) | 3.40 | | | 1.7 |
| Pruritus FDA | 25 (6%) | 12 (2.9%) | 3.10 | | | 2.1 |
| Dizziness FDA | 25 (6%) | 17 (4%) | 2.00 | | | 1.5 |
| **Adverse Drug Reactions Known for ESAs** | | | 0.00 | | | - |
| Systemic hypertension FDA | 79 (19.1%) | 85 (20.2%) | -1.10 | | | 0.9 |
| Edema, fluid retention, overload | 18 (4.3%) | 23 (5.5%) | -1.20 | | | 0.8 |
| Dyspnea FDA | 16 (3.9%) | 15 (3.6%) | 0.30 | | | 1.1 |
| Myocardial infarction FDA | 10 (2.4%) | 17 (4%) | -1.60 | | | 0.6 |
| Peripheral edema FDA | 10 (2.4%) | 9 (2.1%) | 0.30 | | | 1.1 |
| Rash FDA | 9 (2.2%) | 11 (2.6%) | -0.40 | | | 0.8 |
| Angina | 8 (1.9%) | 12 (2.9%) | -1.00 | | | 0.7 |
| Bronchospasm FDA | 1 (0.2%) | 1 (0.2%) | 0.00 | | | 1.0 |
| Toxic epidermal necrolysis | 1 (0.2%) | 0 (0%) | 0.20 | | | - |
| Infusion site reaction | 0 (0%) | 0 (0%) | 0.00 | | | - |
| Injection site reaction | 0 (0%) | 0 (0%) | 0.00 | | | - |
| Stevens-Johnson syndrome | 0 (0%) | 0 (0%) | 0.00 | | | - |

All listed adverse events are queries except those denoted by "term," which are individual preferred terms. FDA = FDA query

44

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Laboratory Findings

Laboratory findings were analyzed separately for the NDD and DD patient populations. The only important finding was related to abnormal hepatic laboratory values. We obtained expert consultation from the Division of Hepatology and Nutrition, who conferred with the Office of Surveillance and Epidemiology.

## NDD population

Figure 5 is a standard eDISH scatterplot of total bilirubin (x upper limit of normal [ULN]) by peak alanine aminotransferase (ALT) or aspartate aminotransferase (AST) (x ULN) for the three principal studies in the NDD population. There were nine cases of increased total and direct bilirubinemia in the roxadustat treatment arms, vs. none in placebo (left upper cholestasis quadrant, yellow highlighted area). Few appeared in the right upper quadrant of the cholestatic scatterplot (data not shown), indicating that most of these jaundiced, cholestatic cases did not have significant elevations in alkaline phosphatase (AP). There was also a modest overall shift in patients in the roxadustat arm toward the upper right part of the eDISH plot (higher ALT/AST, higher bilirubin).

Figure 5: NDD population—Plot of Hepatocellular Injury (Total Bilirubin vs. ALT or AST)



## DD population

The eDISH scatterplot (Figure 6) does not show the same general shift in roxadustat-treated patients toward the upper right quadrant as was observed in the NDD trials. With equal randomization to roxadustat or epoetin alfa, there tend to be fewer roxadustat-treated patients in the Hy's Law and Temple's Corollary quadrants.

As was observed in the NDD studies, however, in the left upper cholestasis quadrant (yellow highlighted area) there are 19 roxadustat-treated subjects vs. 1 in epoetin alfa-treated subject. Few subjects

45

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

appeared in the right upper quadrant of the cholestatic scatterplot (data not shown). These findings also suggest direct hyperbilirubinemia, not accompanied by significant AP elevations.

Figure 6: DD population—Plot of Hepatocellular Injury (Total Bilirubin vs. ALT or AST)



For both the NDD and DD patient populations, our experts reviewed narratives and clinical details on all patients with important abnormalities in liver tests, and found a total of 19 patients of potential concern for severe DILI with jaundice, either cholestatic, hepatocellular, or mixed pattern. They assessed all cases as unlikely to represent liver injury due to roxadustat. All had a more likely competing diagnosis (e.g., sepsis, gallstone disease, shock liver, congestive hepatopathy, acute viral hepatitis), latency inconsistent with DILI, or resolution despite continuation of drug and/or negative re-challenge.

In summary, roxadustat may cause bland cholestasis (elevated bilirubin without significant elevation in hepatic transaminases), but no significant hepatocellular injury. For the overall NDD and DD populations, there were 19 cases in 4326 roxadustat-treated subjects, i.e., a rate of 0.44%. There were no Hy's Law cases; indeed, careful analysis of all suspicious cases revealed no cases of obvious DILI.

Bland cholestasis generally carries a good prognosis if the inciting event is resolved or the drug is held. Examples of drugs that cause DILI-related bland cholestasis include estrogens and androgens. The recommendation from our consultants was that bland cholestasis would not merit a Warning in labeling; however, for elevations of bilirubin/AP, the drug should be held until resolution, absent clear evidence of another cause, e.g., sepsis.

## Analysis of MACE

### NDD Patient Population

The objective of the NDD MACE assessment was to demonstrate non-inferiority of roxadustat compared with placebo with respect to cardiovascular risk, based on a meta-analysis of the three principal phase 3

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

randomized, placebo-controlled trials (001, 060, 608). As noted above, MACE was a composite endpoint that included MI, stroke, and all-cause mortality. Study endpoints were adjudicated by an independent clinical endpoint committee, whose members were blinded to treatment assignment.

The FDA did not agree prospectively on a risk margin and did not agree on the interpretation of the results using strictly a non-inferiority hypothesis testing approach. As such, our interpretation focuses on the estimation of the MACE risk and the uncertainty around it (95% confidence interval) in the NDD patient population.

The MACE meta-analysis included pre-specified, trial-specific stratification factors. The applicant also provided results using common stratification factors defined post hoc. The findings were qualitatively similar, regardless of the stratification factors.

**Event Ascertainment Window:** The ascertainment window for the primary analysis included the entire study duration, regardless of treatment exposure after randomization, referred to as the On-study analysis. An analysis using the OT+7 ascertainment window was conducted as a sensitivity analysis.

**Analysis Model:** For each trial, Cox regression was used to model the treatment effect (roxadustat vs. placebo), stratified by baseline Hb values (< 8 g/dL vs. $\geq$ 8 g/dL); history of cardiovascular, cerebrovascular, or thromboembolic diseases (yes vs. no); baseline eGFR (< 30 vs. $\geq$ 30); and geographic region (US vs. others for Studies 001 and 608; Western Europe vs. others for Study 608). Hazard ratios from each trial were combined using weights inversely proportional to the variance of the study-specific log HR estimates, thereby providing an overall estimate of the HR and its uncertainty (95% CI). This approach preserves the randomization of each trial and avoids a naïve assumption that the patient samples in each trial are exchangeable.

**MACE Composite Endpoint—NDD Population:** Results for time to first MACE for both the on-study and OT+7 analyses are shown in Table 27.

Table 27: Summary of MACE Analysis Results in the NDD Population

|  | On-study Analysis (Primary) | | OT+7 Analysis (Sensitivity) | |
|---|---|---|---|---|
|  | Roxadustat<br>N = 2386<br>PY = 4509.6 | Placebo<br>N = 1884<br>PY = 3406.2 | Roxadustat<br>N = 2386<br>PY = 3843.2 | Placebo<br>N = 1884<br>PY = 2331.6 |
| Events (rate) | 480 (10.6) | 350 (10.3) | 277 (7.2) | 131 (5.6) |
| HR (95% CI) | 1.10 (0.96, 1.27) | | 1.38 (1.11, 1.70) | |

There is a considerable difference between the estimated HRs for the primary On-study analysis and the OT+7 sensitivity analyses, with HRs (95% CI) of 1.10 (0.96, 1.27) and 1.38 (1.11, 1.70), respectively. Whereas the results seem reassuring for the On-study analysis, the lower limit of the 95% CI for the OT+7 sensitivity analysis (1.11) excludes 1.0. Although the exclusion of 1 in the OT+7 analysis merits concern, the differential exposure between roxadustat and placebo complicates the interpretation of the OT+7 analysis in isolation, as this may not represent a fair randomized comparison. For example, subjects who discontinue treatment early (higher in placebo than roxadustat) are censored at the point of treatment discontinuation. In a population in which MACE occurs at a rate > 5 per 100 PY, because subjects in the roxadustat arm are exposed to treatment for a longer duration, they are at risk for a

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

longer period of time. Thus, the differential dropout may contribute to a biased estimate of the treatment effect in the OT+7 analysis that disfavors roxadustat.

Figure 7 shows the Kaplan-Meier survival curves for MACE. Of note, the OT+7 analysis includes ~22% less follow-up time than the On-study analysis. Event rates (roxadustat vs. placebo) were 10.6 and 10.3 per 100 P-Y in the On-Study analysis, and 7.2 and 5.6 per 100 P-Y in the OT+7 analysis. Many events occurred beyond the 7-day post-treatment window of the OT+7 analysis, with disproportionately more events in the placebo group, especially for all-cause death.

Figure 7: Time to First MACE— On-study Analysis (Left); OT+7 Analysis (Right)



Source: FDA analysis.

MACE results are shown graphically by study, as well as by its components, for the On-study analysis (Figure 8) and the OT+7 analysis (Figure 9).[2] For the On-study analysis where the overall estimated HR for MACE is 1.10, there are trends for increased stroke, and particularly increased MI, in the roxadustat treatment groups (Figure 8). For the OT+7 analysis where the overall estimated HR for MACE is 1.38, there is a nominally statistically significant finding for all-cause mortality (not favoring roxadustat), which is driven by the Study 001, the largest study (Figure 9). There are also trends for higher rates of stroke and MI for roxadustat, and these trends are fairly consistent across the three studies.

---

[2]  Note that for this composite endpoint, the sums of the individual component events do not equal the total numbers of first MACE.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Figure 8: MACE and its Components for Studies in the NDD Population (On-study Analysis)



Source: FDA Analysis

Figure 9: MACE and its Components for Studies in the NDD Population (OT+7 Analysis)

Source: FDA analysis

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**MACE in Study 610**

Study 610 compared roxadustat to darbepoetin alfa, rather than a placebo. Results for time to first MACE are shown in Table 28 for the On-study and OT+7 approaches. For both analyses, the estimated HRs tended to favor roxadustat over darbepoetin alfa; however, the results were not statistically significant.

Table 28: Summary of MACE Results in Study 610

|  | On-study Analysis | | OT+7 Analysis | |
|---|---|---|---|---|
|  | Roxadustat N = 323 PY = 575.7 | Darbepoetin alfa N = 293 PY = 522.6 | Roxadustat N = 323 PY = 517.7 | Darbepoetin alfa N = 293 PY = 477.1 |
| Events (rate per 100 P-Y) | 49 (8.5) | 48 (9.2) | 31 (6.0) | 39 (8.2) |
| HR (95% CI) | 0.89 (0.60, 1.33) | | 0.70 (0.44, 1.12) | |

PY = patient years; OT+7 = On-treatment + 7 days analysis

## DD Patient Population:

The objective of the MACE assessment in the DD population was to demonstrate non-inferiority of roxadustat to ESA, based on a meta-analysis of the three principal, phase 3, randomized, ESA-controlled trials (002, 063, 064). MACE was defined as it was for the NDD Population: the composite of all-cause mortality, MI, and stroke, and study endpoints were adjudicated by a blinded, independent clinical endpoint committee. The FDA did not agree prospectively on a risk margin using strictly a non-inferiority hypothesis testing approach. As such, our interpretation focuses on the estimation of the MACE risk and the uncertainty around it (95% CI) in the DD patient population. The primary analysis of MACE was based on the meta-analysis using pre-specified, trial-specific stratification factors.

**Event Ascertainment Window:** Two ascertainment windows were pre-specified in the protocol. The window of event ascertainment for the primary analysis was to include MACE that occurred after the first dose date and within 7 days after the last dose of study drug, or until the first dose of another anemia drug other than the randomized treatment. This is referred to as the OT+7 analysis.

As a sensitivity analysis, an On-study analysis was conducted that included events occurring during the study regardless of the treatment exposure after randomization.

**Analysis Model:** For each trial, Cox regression was used to model the treatment effect (roxadustat vs. ESA), stratified by geographic region (US vs. non-US); history of cardiovascular, cerebrovascular, or thromboembolic diseases (yes vs. no); screening Hb values ($\leq$ 8 g/dL vs. > 8 g/dL for Study 063; $\leq$ 10.5 g/dL vs. > 10.5 g/dL for Studies 064 and 002); average prescribed weekly ESA dose in the 4 weeks prior to randomization (epoetin alfa dose, or equivalent epoetin alfa dose for patients on non-epoetin alfa ESA at baseline, of $\leq$ 150 vs. > 150 IU/kg/week for Study 064; not included as a stratification variable for Studies 063 and 002); and incident vs. stable dialysis (dialysis duration $\leq$ 4 months vs. > 4 months for Study 002; not included as stratification variable for Studies 063 and 064). HRs were estimated for each study and then combined using weights inversely proportional to the variance of the study-specific log HR estimates to provide an overall estimate of the HR and its uncertainty (95% CI).

**On-treatment Analysis Result (Primary Analysis):** Comparing roxadustat to epoetin alfa, the estimated HR (95% CI) for time to first MACE event was 1.02 (0.88, 1.20), i.e., neutral (Table 29). There were 306

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

and 339 subjects with MACE in the roxadustat and ESA groups, respectively, with follow-up time-adjusted incidence rates of 9.4 and 9.3 per 100 P-Y.

**On-study Analysis Result (Sensitivity Analysis):** The estimated HR (95% CI) for time to first MACE event was 1.14 (1.00, 1.30), such that the difference was nearly statistically significant (Table 29). There were 482 and 451 subjects with MACE in the roxadustat and ESA groups, respectively, with follow-up time-adjusted incidence rates of 12.4 and 10.9 per 100 P-Y. The HR was driven by differences in all-cause mortality and MI; stroke was neutral.

Table 29: Summary of MACE Analysis Results in the DD Population

| | OT+7 Analysis (Primary) | | On-Study Analysis (Sensitivity) | |
| --- | --- | --- | --- | --- |
| | Roxadustat N = 1940 PY = 3261.2 | ESA N = 1940 PY = 3660.3 | Roxadustat N = 1940 PY = 3898.9 | ESA N = 1940 PY = 4151.0 |
| Events (rate per 100 P-Y) | 306 (9.4) | 339 (9.3) | 482 (12.4) | 451 (10.9) |
| HR (95% CI) | 1.02 (0.88, 1.20) | | 1.14 (1.00, 1.30) | |

Kaplan-Meier plots for time to first MACE are shown for the OT+7 and On-study analyses in Figure 10.

Figure 10: Time to First MACE—OT+7 Analysis (Left); On-study Analysis (Right)



Source: FDA analysis.

Figure 11 and Figure 12 show the results by MACE component and by study for the OT+7 and On-study analyses, respectively. [3] The study-specific estimates and confidence intervals are illustrated for comparison.

---

[3] Note that for this composite endpoint, the sums of the individual component events do not equal the total numbers of first MACE.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Figure 11:** MACE and its Components for Studies in the DD Population (OT+7 Analysis)



Source: FDA Analysis

**Figure 12:** MACE and its Components for Studies in the DD Population (On-Study Analysis)

Source: FDA analysis

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

**Adjudicated Death:** During the OT+7 period in the combined DD studies, there were 207 and 232 deaths in roxadustat and epoetin alfa treated subjects, respectively, with exposure-adjusted rates of 6.2 and 6.1 per 100 P-Y. The estimated HR was 1.02 (0.84, 1.23) (Figure 11).

In the On-Study analysis, the HR was 1.17, with a 95% CI that excluded 1 (1.02, 1.35) (Figure 12). There were 413 and 369 deaths in roxadustat and epoetin alfa treated subjects, respectively, with exposure-adjusted rates of 9.9 and 8.4 per 100 P-Y. The estimated HRs for all-cause mortality were fairly consistent across the 4 studies, and ranging from 1.09 to 1.43.

### Study 613

Study 613 was not part of the pooled analysis because of differences in study design, however, there were 57 deaths (8.9 per 100 PY) in roxadustat-treated patients (N = 414) vs. 45 (6.3 per 100 PY) in the ESA group (N = 420) in the OT+7 ascertainment window. The nominal HR was 1.54, and the 95% CI (1.04, 2.28) excluded 1. There were additional deaths in the OT+28 and On-study analyses; however, the estimated HRs were similar and the 95% CIs also excluded 1.

Figure 13 shows the Kaplan-Meier graph for all-cause mortality for Study 613, OT+28 ascertainment window.

Figure 13: All-cause Mortality—Study 613; OT+28 Ascertainment Window



## Relation Between Thrombotic Events, Roxadustat Dose, Hb Level, and Hb Rate of Change

The relation between the risk of adverse cardiovascular events, ESA dose, Hb concentration, and Hb rate of change has been of longstanding interest to FDA. The issues were initially raised in FDA's 2001 review of the Biologics License Application for darbepoetin alfa [10]. Given the similar nature of the safety signals for darbepoetin alfa and roxadustat and questions about roxadustat dose and excursions in Hb, we performed similar analyses for thromboembolic adverse events for the key studies in the roxadustat application, and asked the applicant to conduct the analyses to corroborate our findings.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Analyses were conducted for the OT+7 ascertainment window, separately for the NDD and DD populations. Only the first thromboembolic event was considered for patients who experienced more than one event.

## Thromboembolic Events in Relation to Drug Dose

A.      The mean study drug dose (adjusted for weight) was calculated for each subject, and subjects were arranged in quintiles on this basis (by treatment group). The numbers of thromboembolic events were tabulated by dose quintile for both treatment groups and expressed as percent of subjects with events.

B.      Because these drugs are titrated to effect throughout the treatment period, an alternative analysis was conducted using a moving average of the dose. Specifically, for each week on treatment, the mean weight-adjusted dose was calculated for the preceding 4 weeks. For example, the dose at Week 16 was the mean dose during Weeks 12 through 16. Based on the mean weight-adjusted dose for each week, the patient-weeks were divided into quintiles, and the numbers of thromboembolic events were tabulated by quintile for both treatment groups. Event rates were expressed as events per 52 patient-weeks (P-Y). A similar analysis was conducted on the basis of the weight-adjusted dose during 2-week intervals preceding the events. Finally, the analysis was conducted on the basis of the weight-adjusted dose most proximal to the event (previous week).

### NDD Patient Population

The relation between overall weight-adjusted study agent dose and thromboembolic events is shown in Figure 14 for the NDD subject population. The figure shows the 5 quintiles from lowest (Q1) to highest (Q5) dose. The y-axis shows the percent of subjects with events, and the numbers in each bar represent the numbers of subjects with events. There appear to be fewer events in Q1, the quintile with the lowest overall weight-adjusted dose.

Figure 14: Thromboembolic Events vs. Overall Total Weight-adjusted Dose of Study Agent—NDD Population



Figure 15 shows the relation between the rate of thromboembolic events (per 52 patient-weeks) and the weight-adjusted doses administered in the 4 weeks preceding the event (left) and the week preceding the event (right). The numbers inside the bars represent the numbers of events. Here, there are fairly strong associations between the preceding dose and thromboembolic events in roxadustat-

treated subjects. As expected, no association is evident in subjects who received placebo. The results for the 2 analyses are similar.

Figure 15: Thromboembolic Events vs. Weight-adjusted Dose of Study Agent—Received in Preceding 4 Weeks (Left); Received at Onset of Event (Right)—NDD Population



## DD Patient Population

Figure 16 shows relations between weight-adjusted study agent dose and thromboembolic events. There appears to be a weak association between total dose and probability of a thromboembolic event in roxadustat-treated subjects. For subjects who received ESAs, there is no clear association.

Figure 16: Thromboembolic Events vs. Overall Total Weight-adjusted Dose of Study Agent—DD Population



For subjects who received ESAs, the association is not clear. The results for the two analyses are similar.

Figure 17 shows a reasonable association between weight-adjusted dose and the rate of thromboembolic events in subjects who received roxadustat. For subjects who received ESAs, the association is not clear. The results for the two analyses are similar.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Figure 17: Thromboembolic Events vs. Weight-adjusted Dose of Study Agent—Received in Preceding 4 weeks (Left); Received at Onset of Event (Right)—DD Population



## Thromboembolic Events in Relation to Hb Concentration

Hb values were estimated for all subjects for all weeks on-treatment, and the patient-weeks were placed into quintiles on this basis, separately by treatment arm. The numbers of thromboembolic events were assessed for each quintile for both treatment arms and expressed as rate per 52 patient-weeks.

### NDD Patient Population

Figure 18 shows the relation between the rate of thromboembolic events and Hb concentration. It has been observed in a number of Hb target studies that subjects with lower Hb values are at higher risk of cardiovascular events. Thus, the relation seen in the figure is not surprising, although the increase in events in the highest quintile (Q5) in roxadustat-treated subjects suggests that targeting higher Hb values may lead to excess thromboembolic events.

Figure 18: Thromboembolic Events vs. Hb at the Time of Event—NDD Population



### DD Patient Population

Figure 19 shows the relation between the rate of thromboembolic events and Hb concentration in the DD population, and once again there are greater numbers of cardiovascular events with lower Hb

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

values. The greater event rate in Q5 in the roxadustat subjects is not observed here as is was in the NDD population.

Figure 19: Thromboembolic Events vs. Hb at the Time of Event—DD Population



## Thromboembolic Events in Relation to Hb Rate of Change

The Hb rate of change (g/dL/week) was estimated for each week that each subject was on treatment by fitting a linear regression line through the Hb values obtained during the preceding 4 weeks. Patient-weeks with a rising Hb level (Hb vs. time slope was ≥ 0) were placed in quintiles. The adverse events were tabulated for each quintile for both treatment arms, and results were expressed as adverse events per 52 patient-weeks (P-Y). A similar analysis was conducted for Hb rate of decline, based on patient-weeks with a falling Hb level (Hb vs. time slope < 0). Of note, rates of rise and decline could be estimated for only a limited number of events because Hb assessments were scheduled less frequently later in the trials, and two values were necessary to calculate a slope. The majority of the thromboembolic events occurred when only one Hb assessment was available and rate of change could not be estimated.

### NDD Patient Population

Figure 20 shows the relation between thromboembolic events an Hb rate of rise leading up to the event. The numbers of events are quite small; most events did not have two Hb values leading up to the event that were necessary to calculate a slope. Nevertheless, there appears to be an association suggesting that limiting Hb rate of rise could decrease the incidence of thromboembolic events.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Figure 20: Thromboembolic Events vs. Hb Rate of Change Leading to Event—NDD Population



## DD Patient Population

For the DD population, there were greater numbers of thromboembolic events for which a Hb slope could be calculated (Figure 21). There is a notable association between thromboembolic events and slope for both treatment groups, suggesting that measures to limit Hb rate of rise could decrease the frequency of thromboembolic events.

Figure 21: Thromboembolic Events vs. Hb Rate of Change Leading to Event—DD Population



# Summary of Important Risks

## Death

The results for all-cause mortality are difficult to interpret. In both the NDD and DD patient populations, the results of the meta-analyses are nearly neutral for the primary analyses, but nominally statistically significantly unfavorable for roxadustat in the sensitivity analyses. Specifically, for the NDD patient population, the estimated HR for the primary on-study analysis is 1.08, whereas there is a nominally statistically significant finding (not favoring roxadustat) for the OT+7 sensitivity analysis (HR = 1.40; 95% CI 1.08, 1.82). For the DD population, the estimated HR for the primary OT+7 analysis was 1.02, whereas the HR for the on-study sensitivity analysis was nominally statistically significant (HR 1.17, 95% CI 1.02,

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

1.35). Although Study 613 was not one of the studies in the meta-analysis, its mortality finding is a concern. In general, concordance between primary statistical analyses and sensitivity analyses provides confidence in the validity of the results. With the observed discordance here, the results are inconclusive.

Other important risks of MI, stroke, thrombosis, device/shunt thrombosis, systemic hypertension, seizure, and malignancy are summarized separately for the NDD and DD populations.

## NDD Population

Table 30 summarizes the more important risks in the NDD patient population, as extracted from the principal data sources in the NDA. Note that the sample sizes and methods of expression differ among the sources. For studies 001, 060, and 068, the numbers in parentheses in the "Roxadustat" and "Comparator" columns represent rates per 100 P-Y. For study 610, the numbers in parentheses represent percent of subjects. Risk differences and relative risk are based on events per 100 P-Y for Studies 001, 060, 068, and percent of subjects for Study 610. For relative risk, the vertical dashed line is set to 1.0.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Table 30: Important Risks in the NDD Patient Population; Combined Data Sources

| | Roxadustat | Comparator | Risk Difference | | Relative Risk | |
|---|---|---|---|---|---|---|
| **Myocardial Infarction** | | | | | | |
| Studies 001, 060, 068; MACE - On-study | 86 (1.9) | 52 (1.5) | 0.4 | | | 1.3 |
| Studies 001, 060, 068; MACE - OT+7 | 72 (1.9) | 37 (1.6) | 0.3 | | | 1.2 |
| Studies 001, 060, 068; Serious AEs | 54 (1.4) | 31 (1.3) | 0.1 | | | 1.1 |
| Study 610 | 7 (2.2%) | 8 (2.7%) | -0.5 | | | 0.8 |
| **Stroke** | | | | | | |
| Studies 001, 060, 068; MACE - On-study | 56 (1.2) | 36 (1.1) | 0.1 | | | 1.3 |
| Studies 001, 060, 068; MACE - OT+7 | 48 (1.2) | 21 (0.9) | 0.3 | | | 1.5 |
| Studies 001, 060, 068; Serious AEs | 53 (1.3) | 26 (1.1) | 0.3 | | | 1.2 |
| Study 610 | 2 (0.6%) | 5 (1.7%) | -1.1 | | | 0.4 |
| **Thrombosis** | | | | | | |
| Studies 001, 060, 068; Serious AEs | 140 (3.6) | 58 (2.5) | 1.10 | | | 1.5 |
| Studies 001, 060, 068; All AEs | 195 (4.1) | 76 (2.0) | 2.10 | | | 2.0 |
| Study 610; Serious AEs | 20 (6.2%) | 13 (4.4%) | 1.80 | | | 1.4 |
| Study 610; All AEs | 25 (7.7%) | 15 (5.1%) | 2.60 | | | 1.5 |
| **Device/Shunt Thrombosis** | | | | | | |
| Studies 001, 060, 068; Serious AEs | 36 (0.9) | 8 (0.3) | 0.60 | | | 2.7 |
| Studies 001, 060, 068; All AEs | 88 (1.8) | 20 (0.5) | 1.30 | | | 3.4 |
| **Systemic Hypertension** | | | | | | |
| Studies 001, 060, 068; Serious AEs | 75 (1.9) | 46 (2.0) | 0.40 | | | 1.3 |
| Studies 001, 060, 068; All AEs | 411 (8.6) | 224 (6.0) | 2.60 | | | 1.4 |
| Study 610; Serious AEs | 9 (3%) | 8 (3%) | 0.00 | | | 1.0 |
| Study 610; All AEs | 87 (27%) | 90 (31%) | -4.0 | | | 0.9 |
| **Seizures** | | | | | | |
| Studies 001, 060, 068; Serious AEs | 9 (0.2) | 1 (0) | 0.20 | | | 5.4 |
| Studies 001, 060, 068; All AEs | 24 (0.5) | 3 (0.1) | 0.40 | | | 6.2 |
| Study 610; Serious AEs | 2 (0.6%) | 0 (0%) | 0.60 | | | - |
| **Malignancy** | | | | | | |
| Studies 001, 060, 068; Serious AEs | 37 (1.0) | 23 (1.0) | 0.00 | | | 1.0 |
| Studies 001, 060, 068; All AEs | 43 (0.9) | 34 (0.9) | 0.00 | | | 1.0 |
| Study 610; Serious AEs | 9 (3%) | 7 (2%) | 0.40 | | | 1.2 |

Relative to placebo, there are signals for all of the thrombotic adverse events, particularly the thrombosis query (RR $\cong$ 1.6) and device/shunt thrombosis (RR $\cong$ 3). Seizures have a RR $\cong$ 6. Malignancy is neutral. Myocardial infarction, stroke, and hypertension have RRs in the 1.2- to 1.3-range, which are difficult to interpret given the differential rates of dropout between subjects who received roxadustat and placebo.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Adverse Events by Subgroup

Table 31 shows adverse events in the OT+7 ascertainment window for four major risks by subgroup. The numbers in the table represent events per 100 P-Y. Relative risks (RR) are unitless. Continuous variables are shown in quartiles, e.g., age, body mass index (BMI), baseline Hb, and baseline GFR.

**Table 31: Major Risks by Subgroup in the NDD Population (All Adverse Events; OT+7 Analysis)**

| Events per 100 P-Y | | Percent of Subjects | Thrombosis, all | | | Device/shunt thrombosis, occlusion, malfunction, stenosis | | | Sepsis | | | Seizure | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Rox | Pbo | RR | Rox | Pbo | RR | Rox | Pbo | RR | Rox | Pbo | RR |
| All | All | 100% | 5.0 | 3.3 | 1.5 | 2.3 | 0.9 | 2.6 | 2.6 | 1.2 | 2.1 | 0.6 | 0.1 | 4.8 |
| Sex | Female | 58% | 4.8 | 2.7 | 1.8 | 2.5 | 0.8 | 3.2 | 2.4 | 0.8 | 3.0 | 0.7 | 0.1 | 4.7 |
| | Male | 42% | 5.5 | 4.2 | 1.3 | 1.9 | 1.0 | 2.0 | 2.8 | 1.8 | 1.6 | 0.5 | 0.1 | 4.9 |
| Baseline age quartile | 18-53 | 24% | 3.7 | 1.8 | 2.1 | 3.4 | 1.4 | 2.4 | 2.0 | 0.8 | 2.5 | 1.0 | 0.4 | 2.4 |
| | 54-63 | 26% | 5.9 | 4.3 | 1.4 | 2.4 | 0.9 | 2.9 | 2.4 | 1.2 | 2.0 | 0.6 | 0.0 | - |
| | 64-72 | 24% | 5.3 | 3.5 | 1.5 | 2.0 | 0.5 | 3.9 | 3.5 | 1.0 | 3.5 | 0.5 | 0.0 | - |
| | 73-100 | 25% | 5.2 | 3.3 | 1.6 | 1.3 | 0.8 | 1.6 | 2.4 | 1.7 | 1.4 | 0.4 | 0.2 | 2.7 |
| Age ≥ 65 | No | 53% | 4.9 | 3.3 | 1.5 | 2.9 | 1.1 | 2.5 | 2.2 | 1.0 | 2.3 | 0.7 | 0.2 | 4.1 |
| | Yes | 47% | 5.3 | 3.3 | 1.6 | 1.6 | 0.6 | 2.6 | 3.1 | 1.5 | 2.1 | 0.5 | 0.1 | 5.9 |
| Age ≥ 75 | No | 79% | 5.1 | 3.1 | 1.7 | 2.5 | 0.9 | 2.8 | 2.5 | 1.1 | 2.4 | 0.6 | 0.1 | 5.8 |
| | Yes | 21% | 4.7 | 3.9 | 1.2 | 1.4 | 0.7 | 1.9 | 2.7 | 1.7 | 1.6 | 0.5 | 0.2 | 2.8 |
| Baseline BMI quartile | 15-22.78 | 25% | 2.9 | 1.9 | 1.5 | 2.3 | 0.7 | 3.3 | 2.2 | 0.9 | 2.5 | 0.6 | 0.5 | 1.1 |
| | 22.79-25.82 | 25% | 5.2 | 4.4 | 1.2 | 2.0 | 0.8 | 2.4 | 3.2 | 1.0 | 3.1 | 0.4 | 0.0 | - |
| | 25.83-29.76 | 25% | 5.6 | 3.7 | 1.5 | 2.5 | 1.2 | 2.0 | 2.8 | 1.4 | 2.0 | 0.7 | 0.0 | - |
| | 29.77-60.3 | 25% | 6.6 | 3.0 | 2.2 | 2.4 | 0.7 | 3.5 | 2.1 | 1.5 | 1.4 | 0.7 | 0.0 | - |
| Race | Asian | 36% | 3.5 | 2.6 | 1.3 | 1.7 | 0.4 | 4.7 | 3.0 | 1.6 | 1.9 | 0.6 | 0.1 | 4.9 |
| | Black | 8% | 4.9 | 4.3 | 1.1 | 1.2 | 1.4 | 0.9 | 1.8 | 0.9 | 1.9 | 1.2 | 0.0 | - |
| | Other | 8% | 5.2 | 1.5 | 3.4 | 1.0 | 0 | - | 2.6 | 0.5 | 5.2 | 0.7 | 0.0 | - |
| | White | 47% | 6.4 | 3.9 | 1.7 | 3.2 | 1.3 | 2.5 | 2.3 | 1.1 | 2.1 | 0.5 | 0.2 | 2.8 |
| Baseline hemoglobin quartile | 4.9-8.72 | 25% | 5.8 | 4.3 | 1.3 | 3.0 | 0.9 | 3.5 | 4.0 | 1.9 | 2.1 | 0.8 | 0.2 | 3.7 |
| | 8.73-9.23 | 25% | 4.6 | 3.7 | 1.3 | 2.1 | 1.3 | 1.6 | 3.0 | 0.9 | 3.3 | 0.8 | 0.0 | - |
| | 9.24-9.63 | 25% | 5.2 | 2.7 | 1.9 | 2.1 | 0.3 | 6.6 | 2.3 | 1.3 | 1.8 | 0.3 | 0.3 | 1.0 |
| | 9.64-10.57 | 25% | 4.7 | 2.8 | 1.7 | 2.0 | 1.0 | 2.0 | 1.2 | 0.9 | 1.3 | 0.6 | 0.0 | - |
| History of CV disease | No | 68% | 4.4 | 2.5 | 1.8 | 2.3 | 0.8 | 3.0 | 2.3 | 1.1 | 2.2 | 0.6 | 0.1 | 4.4 |
| | Yes | 32% | 6.4 | 4.9 | 1.3 | 2.3 | 1.1 | 2.2 | 3.1 | 1.5 | 2.2 | 0.8 | 0.1 | 5.8 |
| Baseline eGFR quartile | 1.6-11.07 | 25% | 7.9 | 5.6 | 1.4 | 6.2 | 2.2 | 2.8 | 3.6 | 1.8 | 2.0 | 0.7 | 0.4 | 1.5 |
| | 11.1-16.97 | 25% | 6.5 | 3.5 | 1.9 | 2.5 | 1.1 | 2.3 | 2.6 | 1.1 | 2.4 | 0.5 | 0.0 | - |
| | 17.0-25.99 | 25% | 3.0 | 3.3 | 0.9 | 0.5 | 0.7 | 0.8 | 1.6 | 1.0 | 1.6 | 0.7 | 0.2 | 4.3 |
| | 26.0-75.2 | 25% | 3.2 | 1.7 | 1.9 | 0.4 | 0 | - | 2.7 | 1.1 | 2.4 | 0.6 | 0.0 | - |
| History of diabetes | No | 43% | 4.9 | 3.1 | 1.6 | 3.2 | 1.5 | 2.1 | 1.8 | 1.0 | 1.8 | 0.6 | 0.3 | 1.9 |
| | Yes | 57% | 5.1 | 3.4 | 1.5 | 1.5 | 0.4 | 4.0 | 3.2 | 1.3 | 2.4 | 0.7 | 0.0 | - |

Rox = roxadustat; Pbo = placebo; RR = relative risk; BMI = body mass index; eGFR = estimated glomerular filtration rate

For thrombosis (yellow column), the RRs are fairly consistent across subgroups; however, there are subgroups where risk trends higher. For example, a higher risk of thrombosis is evident in subjects with higher BMI, lower baseline Hb, and lower eGFR. The risk of sepsis (blue column) tends to be higher in

61

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

older subjects, as well as subjects with lower baseline Hb, lower baseline eGFR, and a history of CV disease or diabetes. Seizure risk (purple column) is higher in younger subjects. It is important to recognize that these are relatively small numbers of events; therefore, these estimates are subject to considerable uncertainty.

## DD Population

Table 32 shows the important risks in the DD patient population. Note that the sample sizes and methods of expression differ among the sources. For studies 002, 063, and 064, the numbers in parentheses in the "Roxadustat" and "ESA" columns represent rates per 100 P-Y. For study 613, the numbers in parentheses represent percent of subjects. Risk differences and relative risk are based on events per 100 P-Y for Studies 002, 063, 064, and percent of subjects for Study 613. For relative risk, the vertical dashed line is set to 1.0. Note there are far more adverse events here than in the NDD subject population.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Table 32: Important Risks in the DD Patient Population

| | Roxadustat | ESA | Risk Difference | Relative Risk |
|---|---|---|---|---|
| **Myocardial Infarction** | | | | |
| Studies 002, 063, 064; MACE - OT+7 | 103 (3.1) | 109 (3.0) | 0.1 | 1.07 |
| Studies 002, 063, 064; MACE - On-study | 124 (3.2) | 115 (2.8) | 0.4 | 1.14 |
| Studies 002, 063, 064; Serious AEs | 88 (2.7) | 85 (2.3) | 0.4 | 1.2 |
| Study 613 | 10 (2.4%) | 17 (4.0%) | -1.6 | 0.6 |
| **Stroke** | | | | |
| Studies 002, 063, 064; MACE - OT+7 | 45 (1.4) | 50 (1.3) | 0.1 | 1.0 |
| Studies 002, 063, 064; MACE - On-study | 58 (1.5) | 60 (1.4) | 0.1 | 1.0 |
| Studies 002, 063, 064; Serious AEs | 51 (1.5) | 49 (1.3) | 0.2 | 1.2 |
| Study 613 | 4 (1%) | 8 (2%) | -0.9 | 0.5 |
| **Thrombosis** | | | | |
| Studies 002, 063, 064; Serious AEs | 241 (7.3) | 201 (5.4) | 1.9 | 1.4 |
| Studies 002, 063, 064; All AEs | 392 (11.8) | 344 (9.2) | 2.6 | 1.3 |
| Study 613; Serious AEs | 52 (13%) | 43 (10%) | 2.4 | 1.2 |
| Study 613; All AEs | 77 (19%) | 65 (16%) | 3.1 | 1.2 |
| **Device/Shunt Thrombosis** | | | | |
| Studies 002, 063, 064; Serious AEs | 121 (3.7) | 94 (2.5) | 1.1 | 1.5 |
| Study 613; Serious AEs | 35 (9%) | 22 (5%) | 3.3 | 1.6 |
| **Systemic Hypertension** | | | | |
| Studies 002, 063, 064; Serious AEs | 89 (2.7) | 110 (2.9) | -0.30 | 0.9 |
| Studies 002, 063, 064; All AEs | 365 (11.0) | 367 (9.8) | 1.20 | 1.1 |
| Study 613; Serious AEs | 13 (3%) | 8 (2%) | 1.20 | 1.2 |
| Study 613; All AEs | 79 (19%) | 85 (20%) | -1.1 | 0.9 |
| **Seizures** | | | | |
| Studies 002, 063, 064; Serious AEs | 26 (0.8) | 19 (0.51) | 0.27 | 1.6 |
| Studies 002, 063, 064; All AEs | 45 (1.4) | 33 (0.9) | 0.50 | 1.5 |
| Study 613; Serious AEs | 2 (0.5%) | 4 (1%) | -0.50 | 0.5 |
| **Malignancy** | | | | |
| Studies 002, 063, 064; Serious AEs | 23 (0.7) | 28 (0.8) | -0.10 | 0.9 |
| Studies 002, 063, 064; All AEs | 42 (1.3) | 48 (1.3) | 0.00 | 1.0 |
| Study 613; Serious AEs | 15 (4%) | 15 (4%) | 0.00 | 1.0 |

Relative to epoetin alfa, there are signals for MI (RR $\cong$ 1.1), thrombosis (RR $\cong$ 1.3), device/shunt thrombosis ($\cong$ 1.5), and seizures (RR $\cong$ 1.5). Stroke, hypertension, and malignancy are neutral (again, however, relative to epoetin alfa, for which these are labeled adverse drug reactions).

### Adverse Events by Subgroup

Table 33 shows adverse events in the OT+7 ascertainment window for four major risks by subgroup. The numbers in the table represent events per 100 P-Y. Relative risks (RR) are unitless. Continuous variables are shown in quartiles, e.g., age, body mass index (BMI), baseline Hb, and baseline GFR

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Table 33: Major Risks by Subgroup in the DD Population (All Adverse Events; OT+7 Analysis)

| Events per 100 P-Y | | Percent of Subjects | Thrombosis, all | | | Device/shunt thrombosis, occlusion, malfunction, stenosis | | | Sepsis | | | Seizure | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Rox | EPO | RR | Rox | EPO | RR | Rox | EPO | RR | Rox | EPO | RR |
| All | All | 100% | 9.4 | 7.8 | 1.2 | 7.6 | 6.3 | 1.2 | 3.2 | 3.0 | 1.1 | 1.1 | 0.8 | 1.4 |
| Sex | Female | 58% | 10.0 | 8.1 | 1.2 | 8.7 | 7.0 | 1.2 | 3.0 | 3.0 | 1.0 | 0.8 | 0.6 | 1.4 |
| | Male | 42% | 8.9 | 7.7 | 1.2 | 6.9 | 5.8 | 1.2 | 3.3 | 3.0 | 1.1 | 1.2 | 0.9 | 1.5 |
| Baseline age quartile | 18-44 | 25% | 5.6 | 5.5 | 1.0 | 6.0 | 5.5 | 1.1 | 1.9 | 1.7 | 1.1 | 1.6 | 1.1 | 1.5 |
| | 45-56 | 26% | 9.6 | 6.8 | 1.4 | 8.0 | 5.5 | 1.5 | 3.5 | 3.1 | 1.1 | 1.1 | 0.5 | 2.1 |
| | 57-65 | 25% | 8.9 | 8.7 | 1.0 | 8.0 | 6.9 | 1.2 | 3.4 | 3.3 | 1.0 | 0.8 | 0.9 | 1.0 |
| | 66-94 | 24% | 14.3 | 10 3 | 1.4 | 8.9 | 7.2 | 1.2 | 4.0 | 3.9 | 1.0 | 0.8 | 0.6 | 1.3 |
| Age ≥ 65 | No | 73% | 7.8 | 7.0 | 1.1 | 7.2 | 5.9 | 1.2 | 2.9 | 2.7 | 1.1 | 1.2 | 0.8 | 1.4 |
| | Yes | 27% | 14.2 | 10 3 | 1.4 | 9.0 | 7.4 | 1.2 | 4.0 | 3.9 | 1.0 | 0.8 | 0.5 | 1.5 |
| Age ≥ 75 | No | 91% | 9.0 | 7.4 | 1.2 | 7.5 | 6.0 | 1.2 | 3.0 | 2.8 | 1.1 | 1.1 | 0.8 | 1.5 |
| | Yes | 9% | 14.0 | 12 3 | 1.1 | 8.8 | 8.8 | 1.0 | 4.9 | 4.8 | 1.0 | 0.3 | 0.5 | 0.6 |
| Baseline BMI quartile | 14.6-22.83 | 25% | 8.2 | 5.2 | 1.6 | 6.2 | 4.5 | 1.4 | 2.6 | 2.2 | 1.2 | 1.2 | 0.6 | 2.0 |
| | 22.83-26.37 | 25% | 8.5 | 7.7 | 1.1 | 7.4 | 5.7 | 1.3 | 2.8 | 2.5 | 1.1 | 1.1 | 0.9 | 1.2 |
| | 26.37-30 9 | 25% | 8.5 | 7.8 | 1.1 | 6.8 | 7.0 | 1.0 | 2.8 | 3.1 | 0.9 | 1.2 | 0.7 | 1.8 |
| | 31-64.9 | 25% | 12.1 | 10.4 | 1.2 | 9.8 | 7.7 | 1.3 | 4.5 | 4.1 | 1.1 | 0.8 | 0.8 | 1.0 |
| Race | Asian | 14% | 7.5 | 5.1 | 1.5 | 5.0 | 4.3 | 1.2 | 3.4 | 4.3 | 0.8 | 1.7 | 0.8 | 2.2 |
| | Black | 18% | 13.0 | 9.4 | 1.4 | 11.9 | 8.6 | 1.4 | 4.0 | 2.7 | 1.5 | 1.3 | 0.8 | 1.6 |
| | Other | 7% | 6.1 | 5.6 | 1.1 | 5.6 | 4 | - | 4.3 | 3.2 | 1.3 | 2.2 | 1.9 | 1.2 |
| | White | 61% | 9.0 | 8.1 | 1.1 | 7.0 | 6.1 | 1.2 | 2.8 | 2.9 | 1.0 | 0.8 | 0.7 | 1.2 |
| Baseline hemoglobin quartile | 4.3-8.8 | 25% | 8.2 | 7.0 | 1.2 | 7.3 | 5.7 | 1.3 | 2.3 | 1.7 | 1.4 | 1.6 | 0.5 | 3.2 |
| | 8.8-9.8 | 25% | 10.0 | 8.2 | 1.2 | 8.9 | 6.5 | 1.4 | 3.1 | 2.5 | 1.2 | 1.0 | 0.8 | 1.3 |
| | 9.8-10.66 | 25% | 10.5 | 9.6 | 1.1 | 7.3 | 7.8 | 0.9 | 3.5 | 4.7 | 0.7 | 1.0 | 1.0 | 1.0 |
| | 10.67-12 2 | 25% | 8.8 | 6.5 | 1.3 | 7.2 | 5.1 | 1.4 | 3.5 | 2.9 | 1.2 | 0.8 | 0.7 | 1.1 |
| History of CV disease | No | 57% | 7.4 | 5.5 | 1.3 | 6.5 | 4.7 | 1.4 | 2.2 | 2.3 | 0.9 | 1.1 | 0.7 | 1.6 |
| | Yes | 43% | 12.2 | 11.0 | 1.1 | 9.2 | 8.4 | 1.1 | 4.6 | 4.0 | 1.1 | 1.0 | 0.8 | 1.2 |
| Type of Dialysis | HD | 90% | 9.9 | 8.2 | 1.2 | 8.3 | 6.7 | 1.2 | 3.3 | 3.0 | 1.1 | 1.0 | 0.7 | 1.5 |
| | PD | 10% | 4.4 | 4.2 | 1.1 | 1.6 | 2.1 | 0.7 | 1.6 | 3.1 | 0.5 | 1.6 | 1.3 | 1.2 |
| History of diabetes | No | 53% | 7.0 | 6.4 | 1.1 | 6.5 | 5.5 | 1.2 | 1.9 | 2.0 | 0.9 | 1.0 | 0.5 | 1.8 |
| | Yes | 47% | 12.4 | 9.6 | 1.3 | 9.1 | 7.2 | 1.3 | 4.7 | 4.2 | 1.1 | 1.2 | 1.0 | 1.2 |

Rox = roxadustat; EPO = epoetin alfa; RR = relative risk; HD = hemodialysis; PD = peritoneal dialysis

For thrombosis (yellow column), the RRs are fairly consistent across subgroups; however, there are subgroups where risk trends higher. For example, a higher risk of thrombosis is evident in older subjects, subjects with higher BMI, subjects with a history of cardiovascular disease, subjects on hemodialysis, subjects with diabetes, and possibly females. The risk of device/shunt thrombosis (orange column) follows the same pattern. Note that for subjects on hemodialysis, the rates of device/shunt thrombosis, occlusion, malfunction, stenosis are 8.3 and 6.7 per 100 P-Y for roxadustat and epoetin alfa, respectively, for a risk difference of 1.6 events per 100 P-Y. The risk of sepsis (blue column) increases with age, BMI, a history of cardiovascular disease, diabetes, and hemodialysis (the latter for roxadustat only). Seizure risk (purple column) is higher in younger subjects and possibly subjects with low baseline Hb. It is important to recognize that these are relatively small numbers of events; therefore, these estimates are subject to considerable uncertainty.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

Given the importance of thromboembolic events, we performed a Kaplan-Meier time-to-first thrombotic event analysis for the DD subject population (Figure 22) for all (left) and serious (right) events. The OT+7 ascertainment window was used for the analyses.

Figure 22: Time to First Thrombotic Event—All Events (Left); Serious Events (Right) for the DD Population (Studies 002, 063, and 064); OT+7 Ascertainment Window

 

**Source: FDA analysis**

The excess risk accrues continuously throughout the three studies.

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

# References

1. Hsu, C, 2002, Epidemiology of Anemia Associated with Chronic Renal Insufficiency, Curr Opin Nephrol Hypertens, 11(3):337-341.
2. Hsu, C, C McCulloch, and G Curhan, 2002, Epidemiology of Anemia Associated with Chronic Renal Insufficiency among Adults in the United States: Results from the Third National Health and Nutrition Examination Survey, J Am Soc Nephrol, 13(2):504–510..
3. United States Renal Data System (USRDS) 2020 Annual Report (https://adr.usrds.org/2020) [accessed 6/16/2021]
4. Besarab, A, W Bolton, J Browne, J Egrie, A Nissenson, D Okamoto, S Schwab, and D Goodkin, 1998, The Effects of Normal as Compared with Low Hematocrit Values in Patients with Cardiac Disease Who Are Receiving Hemodialysis and Epoetin, N Engl J Med, 339(9):584-590.
5. Singh, A, L Szczech, K Tang, H Barnhart, S Sapp, M Wolfson, D Reddan, and CHOIR Investigators, 2006, Correction of Anemia with Epoetin Alfa in Chronic Kidney Disease, N Engl J Med, 355(20):2085-2098.
6. Drueke, T, F Locatelli, N Clyne, K Eckardt, I Macdougall, D Tsakiris, H Burger, A Scherhag, and CREATE Investigators, 2006, Normalization of Hemoglobin Level in Patients with Chronic Kidney Disease and Anemia, N Engl J Med, 355(20):2071–2084.
7. Lewis, E, M Pfeffer, A Feng, H Uno, J McMurray, R Toto, S Gandra, S Solomon, M Moustafa, I Macdougall, F Locatelli, P Parfrey, and TREAT Investigators, 2011, Darbepoetin Alfa Impact on Health Status in Diabetes Patients with Kidney Disease: A Randomized Trial, Clin J Am Soc Nephrol, 6(4):845–855.
8. MacMurray, J. et al., Kidney Disease: Improving Global Outcomes (KDIGO) Anemia Work Group. KDIGO Clinical Practice Guideline for Anemia in Chronic Kidney Disease. Kidney Int Suppl 2012; 2(4):279–335.
9. Unger, E, A Thompson, M Blank, R Temple, 2010, Erythropoiesis-Stimulating Agents—Time for a Reevaluation, N Engl J Med, 362(3):189–192.
10. Unger, E.F., "Clinical Review of Darbepoetin alfa;" Food and Drug Administration (https://www.fda.gov); archived at Wayback Machine (https://web.archive.org/); https://web.archive.org/web/20161024172128/http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/TherapeuticBiologicApplications/ucm086019.pdf [accessed 6/9/2021]

# Appendix

# Approved Epogen Label

https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/103234s5369lbl.pdf (accessed 6/21/2021)

FDA Roxadustat Briefing Document: Roxadustat; NDA 213805

## Adverse Event Preferred Terms Used in Key Queries

Table 34: Terms in Key Adverse Event Queries

| Thrombosis | Device/shunt thrombosis/ occlusion/malfunction/stenosis | Stroke |
|---|---|---|
| Cerebral infarction | Thrombosis in device | Cerebral infarction |
| Embolic cerebral infarction | Arteriovenous fistula thrombosis | Embolic cerebral infarction |
| Ischaemic stroke | Arteriovenous graft thrombosis | Ischaemic stroke |
| Cerebellar infarction | Vascular access site thrombosis | Cerebellar infarction |
| Lacunar stroke | Vascular graft thrombosis | Lacunar stroke |
| Embolic stroke | Medical device site thrombosis | Embolic stroke |
| Brain stem stroke | Device occlusion | Brain stem stroke |
| Lacunar infarction | Arteriovenous fistula occlusion | Lacunar infarction |
| Thrombosis in device | Vascular access site occlusion | Cerebrovascular accident |
| Arteriovenous fistula thrombosis | Vascular access complication | Haemorrhagic stroke |
| Arteriovenous graft thrombosis | Vascular access malfunction | Brain stem haemorrhage |
| Vascular access site thrombosis | Arteriovenous graft site stenosis | |
| Vascular graft thrombosis | Shunt occlusion | **Sepsis/septic shock** |
| Graft thrombosis | Shunt malfunction | |
| Shunt thrombosis | Vascular graft stenosis | Device related sepsis |
| Acute myocardial infarction | Anastomotic stenosis | Enterococcal sepsis |
| Myocardial infarction | Vascular access site complication | Sepsis |
| Deep vein thrombosis | Vascular graft occlusion | Urosepsis |
| Thrombosis | | Streptococcal sepsis |
| Atrial thrombosis | **Device/shunt thrombosis** | Pseudomonal sepsis |
| Peripheral artery thrombosis | | Staphylococcal sepsis |
| Subclavian vein thrombosis | Thrombosis in device | Septic shock |
| Brachiocephalic vein thrombosis | Arteriovenous fistula thrombosis | Sepsis syndrome |
| Subclavian artery thrombosis | Arteriovenous graft thrombosis | Biliary sepsis |
| Vena cava thrombosis | Vascular access site thrombosis | Bacterial sepsis |
| Thrombophlebitis superficial | Vascular graft thrombosis | Fungal sepsis |
| Arterial thrombosis | Graft thrombosis | Citrobacter sepsis |
| Thrombophlebitis | Shunt thrombosis | Listeria sepsis |
| Jugular vein thrombosis | Medical device site thrombosis | Abdominal sepsis |
| Venous thrombosis | Device related thrombosis | Septic encephalopathy |
| Pelvic venous thrombosis | Injection site thrombosis | Escherichia sepsis |
| Venous thrombosis limb | | |
| Cardiac ventricular thrombosis | **Seizure FDA** | |
| Intracardiac thrombus | | |
| | Epilepsy | |
| | Epileptic encephalopathy | |
| | Seizure | |
| | Generalised tonic-clonic seizure | |
| | Idiopathic partial epilepsy | |
| | Partial seizures | |
| | Tonic convulsion | |

# EXHIBIT 9

BofA GLOBAL RESEARCH

BofA SECURITIES

# FibroGen Inc.

## Roxa Adcom Briefing Docs: A few –ve's in FDA sensitivity analysis, but inconclusive

Maintain Rating: BUY | PO: 43.00 USD | Price: 25.39 USD

### Adcom: quick take neutral, clarity on Thursday

This morning, FGEN shares are underperforming (-5% vs. -1% XBI) on mixed and arguably inconclusive FDA briefing documents posted ahead of FGEN/AZN's roxadustat Advisory Panel (Adcom; 7/15) for CKD anemia. On key regulatory considerations: 1) **NDD approvability:** the Agency didn't draw a 'line in the sand' on a non-inferiority margin (upper bound), thus no clear cut rationale for rejecting on the basis of roxa's 1.27 upper bound (primary analysis). The FDA flagged safety risk of roxa with discordant safety analyses (primary analysis vs. FDA's sensitivity analysis), though the FDA caveated by flagging limitations of its sensitivity analysis, thus we don't see documents as conclusive for how the panel will vote on NDD approval; 2) **DD approvability** – the FDA framed roxa's safety in DD pts as neutral based on the primary analysis whereas the FDA's sensitivity analysis did not favor roxa, opening likely panel discussion around whether thrombotic safety (MACE component) is approvability issue or something that can be managed through modified (unproven) dosing changes; overall – DD commentary was largely inconclusive on approvability risk; 3) **unmet need** – the FDA called into question some of roxa's purported unmet needs including whether the drug reduced transfusions vs. ESA's and benefit in hyporesponsive pts, but did view drug satisfying unmet need for oral therapy in NDD; 4) **panel questions** and discussion around hemoglobin targets (safety risk) call into question whether roxa will get expanded Hb target (important commercial consideration). Overall, we view the briefing docs as neutral but no clear disqualification of approval in both NDD and DD. We maintain our Buy rating and we view favorable risk/reward into the Adcom/FDA approval events. *Key panel excerpts*:

### Key excerpts from FDA briefing documents

**DD on-treatment MACE primary analysis framed as "neutral":** *"The primary analyses for major adverse cardiovascular events (MACE) were neutral; however, sensitivity analyses did not favor roxadustat. Analyses of adverse events in the dialysis population demonstrated higher risks for roxadustat (versus ESAs) with respect to thrombotic events, including thrombosis of vascular access, events for which ESAs carry a Boxed Warning. Vascular access patency is crucial to perform dialysis. There was also a higher risk of seizures with roxadustat compared to ESAs, another adverse drug reaction for which there is a warning in ESA labeling."*

**FDA commentary on unmet need:** *"The agent's oral route of administration is an important convenience factor for patients who are not on hemodialysis. For patients on hemodialysis, ESAs are recommended to be given by the intravenous route, and the advantage of an oral drug seems less clear."*

**FDA view on hb target:** "The data show that roxadustat's efficacy is comparable to that of ESAs; however, in many cases the dosing regimen used in the trials led to overshoot of the hemoglobin target, based on mean hemoglobin responses." **Continued on pg. 2…**

Continued on pg. 2…

**13 July 2021**

Equity

**Jason M. Gerberry**
Research Analyst
BofAS
jason.gerberry@bofa.com

**Chi M. Fong**
Research Analyst
BofAS
chi.fong@bofa.com

**Ashwani Verma**
Research Analyst
BofAS
ashwani.verma2@bofa.com

### Stock Data

| | |
|---|---|
| Price | 25.39 USD |
| Price Objective | 43.00 USD |
| Date Established | 7-Apr-2021 |
| Investment Opinion | C-1-9 |
| 52-Week Range | 18.12 USD - 57.21 USD |
| Mrkt Val (mn) / Shares Out (mn) | 2,339 USD / 92.1 |
| Average Daily Value (mn) | 21.73 USD |
| BofA Ticker / Exchange | FGEN / NAS |
| Bloomberg / Reuters | FGEN US / FGEN.OQ |
| ROE (2021E) | -30.7% |
| Net Dbt to Eqty (Dec-2020A) | -128.7% |
| **ESGMeter™** | **Medium** |

ESGMeter is a proprietary metric based on quantitative analysis and fundamental analyst inputs that reflects our assessment of a company's ESG-related attributes. It is intended to indicate a company's likelihood of experiencing stronger financial stability (higher ROE and lower earnings and price volatility) over the next three years relative to its peer group. There are three ESGMeter levels – Low, Medium, and High. Refer to "BofA ESGMeter Methodology". **ESGMeter is not intended to be indicative of a company's future stock price performance and is independent of the BofA Global Research fundamental equity analyst's investment rating, volatility risk rating, income rating or price objective for that company.**

NDD: non-dialysis dependent

DD: dialysis dependent

CKD: chronic kidney disease

MACE: major adverse cardiovascular events

ESA: Erythropoiesis-stimulating agents
E

**BofA Securities does and seeks to do business with issuers covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.**
**Refer to important disclosures on page 4 to 6. Analyst Certification on page 3. Price Objective Basis/Risk on page 2.** 12302270

Timestamp: 13 July 2021 12:20PM EDT

Unauthorized redistribution of this report is prohibited. This report is intended for shelley_vitale@bofa.com

**Thrombotic events issue with both ESA and roxa:** *"Thus, both ESAs and roxadustat have pro-thrombotic effects.... Assuming the thrombotic risk is an on-target effect, it seems*

*plausible that less aggressive dosing schemes (e.g., lower starting doses, smaller dose increments during titration, lower Hb targets) could reduce thrombotic risk; however, this has not been established in any randomized controlled study...the applicant speculates that thromboembolic risks might be reduced through use of a lower roxadustat starting dose. Their prediction seems plausible, but is unproven. Our findings show only associations, without proven cause and effect."*

**NDD MACE disparity on subject retention flagged as key issue**: *"there was a considerable disparity in subject retention between the roxadustat and placebo groups, challenging the interpretation of safety analyses. It seems plausible that the patients who dropped out of the placebo groups in higher numbers were at greater risk of adverse events, yet their time of observation—when they were capable of contributing adverse events—was shortened. Conversely, subjects randomized to roxadustat remained in the studies longer, with greater opportunity to experience adverse events...Given the problem of differential dropout from the two treatment groups, relative risks less than ~1.3 seem difficult to interpret."*

**Upper bound to CI not specified...FDA sensitivity analysis flagged as concern but inconclusive**: *"The **FDA did not agree prospectively on a risk margin** and did not agree on the interpretation of the results using strictly a non-inferiority hypothesis testing approach. As such, our interpretation focuses on the estimation of the MACE risk and the uncertainty around it (95% confidence interval) in the NDD patient population...The MACE meta-analysis included pre-specified, trial-specific stratification factors. The applicant also provided results using common stratification factors defined post hoc. **The findings were qualitatively similar, regardless of the stratification factors**" "There is a considerable difference between the estimated HRs for the primary On-study analysis and the OT+7 sensitivity analyses, with HRs (95% CI) of 1.10 (0.96, 1.27) and 1.38 (1.11, 1.70), respectively. Whereas the results seem reassuring for the On-study analysis, the lower limit of the 95% CI for the OT+7 sensitivity analysis (1.11) excludes 1.0. **Although the exclusion of 1 in the OT+7 analysis merits concern, the differential exposure between roxadustat and placebo complicates the interpretation** of the OT+7 analysis in isolation, **as this may not represent a fair randomized comparison**. Thus, the differential dropout may contribute to a biased estimate of the treatment effect in the OT+7 analysis that disfavors roxadustat"*

**Benefit roxa reducing transfusions:** *"The data show that roxadustat decreases the need for RBC transfusions relative to placebo, which is expected and reassuring. **The data comparing roxadustat to epoetin alfa with respect to RBC transfusions are less conclusive**"*

**Hypo-responder benefit:** *"The applicant makes the case that ESA hyporesponsiveness in patients with CKD is an important problem in need of better therapies. We agree with this viewpoint; however, the applicant did not generate data showing that patients who are hyporesponsive to ESAs are responsive to roxadustat"*

## Price objective basis & risk

### FibroGen Inc. (FGEN)

Our $43 PO is based on risk-adj DCF. We assume: (1) risk-adjustment (% POS) to roxa programs include approx. blended 71% for CKD, 55% for MDS cancer, and 45% for CIA (chemotherapy). For pamrevlumab, we assume low POS of 35% in IPF and 10% in LAPC, (2) the biggest value driver to our DCF is roxa in CKD, comprising approx. 70% value, (3) 9.5% discount rate, consistent with our other SMID Biotech coverage, and no terminal



BofA GLOBAL RESEARCH

value as we forecast through the end of roxa patent life (2033).

Upside risks to our PO: (1) Roxa CKD launch performs better than our forecast, (2) roxa labeling for cardiovascular risk/cancer is better than our expectations, (3) competitor data readouts show weaker efficacy/safety profile relative to roxa, and (4) pamrevlumab achieves key clinical derisking milestones in 2022-23.

Downside risks to our PO: (1) Roxa launch underperforms vs. our projections, due to low demand and/or lower net pricing, (2) roxa is approved with label broadly in-line with ESA's, and (3) competitor data is superior to roxa on efficacy/safety.

## Analyst Certification

I, Jason M. Gerberry, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers.  I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.



BofA GLOBAL RESEARCH

# Disclosures

## Important Disclosures

**FibroGen (FGEN) Price Chart**



FGEN ——    No Coverage ▨    PO ▨

B: Buy, N: Neutral, U: Underperform, PO: Price Objective, NA: No longer valid, NR: No Rating

The Investment Opinion System is contained at the end of the report under the heading "Fundamental Equity Opinion Key". Dark grey shading indicates the security is restricted with the opinion suspended. Medium grey shading indicates the security is under review with the opinion withdrawn. Light grey shading indicates the security is not covered. Chart is current as of a date no more than one trading day prior to the date of the report.

**Equity Investment Rating Distribution: Health Care Group (as of 30 Jun 2021)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 220 | 61.45% | Buy | 151 | 68.64% |
| Hold | 77 | 21.51% | Hold | 44 | 57.14% |
| Sell | 61 | 17.04% | Sell | 24 | 39.34% |

**Equity Investment Rating Distribution: Global Group (as of 30 Jun 2021)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 1947 | 60.07% | Buy | 1252 | 64.30% |
| Hold | 637 | 19.65% | Hold | 395 | 62.01% |
| Sell | 657 | 20.27% | Sell | 340 | 51.75% |

* Issuers that were investment banking clients of BofA Securities or one of its affiliates within the past 12 months. For purposes of this Investment Rating Distribution, the coverage universe includes only stocks. A stock rated Neutral is included as a Hold, and a stock rated Underperform is included as a Sell.

FUNDAMENTAL EQUITY OPINION KEY: Opinions include a Volatility Risk Rating, an Investment Rating and an Income Rating. *VOLATILITY RISK RATINGS*, indicators of potential price fluctuation, are: A - Low, B - Medium and C - High. *INVESTMENT RATINGS* reflect the analyst's assessment of both a stock's: absolute total return potential as well as its attractiveness for investment relative to other stocks within its *Coverage Cluster* (defined below). There are three investment ratings: 1 - Buy stocks are expected to have a total return of at least 10% and are the most attractive stocks in the coverage cluster; 2 - Neutral stocks are expected to remain flat or increase in value and are less attractive than Buy rated stocks and 3 - Underperform stocks are the least attractive stocks in a coverage cluster. Analysts assign investment ratings considering, among other things, the 0-12 month total return expectation for a stock and the firm's guidelines for ratings dispersions (shown in the table below). The current price objective for a stock should be referenced to better understand the total return expectation at any given time. The price objective reflects the analyst's view of the potential price appreciation (depreciation).

| Investment rating | Total return expectation (within 12-month period of date of initial rating) | Ratings dispersion guidelines for coverage cluster* |
|---|---|---|
| Buy | ≥ 10% | ≤ 70% |
| Neutral | ≥ 0% | ≤ 30% |
| Underperform | N/A | ≥ 20% |

* Ratings dispersions may vary from time to time where BofA Global Research believes it better reflects the investment prospects of stocks in a Coverage Cluster.

*INCOME RATINGS*, indicators of potential cash dividends, are: 7 - same/higher (dividend considered to be secure), 8 - same/lower (dividend not considered to be secure) and 9 - pays no cash dividend. *Coverage Cluster* is comprised of stocks covered by a single analyst or two or more analysts sharing a common industry, sector, region or other classification(s). A stock's coverage cluster is included in the most recent BofA Global Research report referencing the stock.

Price Charts for the securities referenced in this research report are available on the Price Charts website, or call 1-800-MERRILL to have them mailed.
BofAS or one of its affiliates acts as a market maker for the equity securities recommended in the report: FibroGen.
BofAS or one of its affiliates is willing to sell to, or buy from, clients the common equity of the issuer on a principal basis: FibroGen.
BofA Global Research personnel (including the analyst(s) responsible for this report) receive compensation based upon, among other factors, the overall profitability of Bank of America Corporation, including profits derived from investment banking. The analyst(s) responsible for this report may also receive compensation based upon, among other factors, the overall profitability of the Bank's sales and trading businesses relating to the class of securities or financial instruments for which such analyst is responsible.

## Other Important Disclosures

From time to time research analysts conduct site visits of covered issuers. BofA Global Research policies prohibit research analysts from accepting payment or reimbursement for travel expenses from the issuer for such visits.
Prices are indicative and for information purposes only. Except as otherwise stated in the report, for the purpose of any recommendation in relation to: 1) an equity security, the price referenced



BofA GLOBAL RESEARCH

is the publicly traded price of the security as of close of business on the day prior to the date of the report or, if the report is published during intraday trading, the price referenced is indicative of the traded price as of the date and time of the report; or 2) a debt security (including equity preferred and CDS), prices are indicative as of the date and time of the report and are from various sources including BofA Securities trading desks.

The date and time of completion of the production of any recommendation in this report shall be the date and time of dissemination of this report as recorded in the report timestamp.

Recipients who are not institutional investors or market professionals should seek the advice of their independent financial advisor before considering information in this report in connection with any investment decision, or for a necessary explanation of its contents.

Officers of BofAS or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.

Refer to BofA Global Research policies relating to conflicts of interest.

"BofA Securities" includes BofA Securities, Inc. ("BofAS") and its affiliates. Investors should contact their BofA Securities representative or Merrill Global Wealth Management financial advisor if they have questions concerning this report or concerning the appropriateness of any investment idea described herein for such investor. "BofA Securities" is a global brand for BofA Global Research.

Information relating to Non-US affiliates of BofA Securities and Distribution of Affiliate Research Reports:

BofAS and/or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") may in the future distribute, information of the following non-US affiliates in the US (short name: legal name, regulator): Merrill Lynch (South Africa): Merrill Lynch South Africa (Pty) Ltd., regulated by The Financial Service Board; MLI (UK): Merrill Lynch International, regulated by the Financial Conduct Authority (FCA) and the Prudential Regulation Authority (PRA); BofASE (France): BofA Securities Europe SA is authorized by the Autorité de Contrôle Prudentiel et de Résolution (ACPR) and regulated by the ACPR and the Autorité des Marchés Financiers (AMF). Note that BofA Securities Europe SA has registered address at 51 rue la Boétie, 75008 Paris, is registered under no. 842 602 690 RCS Paris, and its share capital can be found on BofASE's disclaimer webpage; BofA Europe (Milan): Bank of America Europe Designated Activity Company, Milan Branch, regulated by the Bank of Italy, the European Central Bank (ECB) and the Central Bank of Ireland (CBI); BofA Europe (Frankfurt): Bank of America Europe Designated Activity Company, Frankfurt Branch regulated by BaFin, the ECB and the CBI; BofA Europe (Madrid): Bank of America Europe Designated Activity Company, Madrid Branch, regulated by the Bank of Spain, the ECB and the CBI; Merrill Lynch (Australia): Merrill Lynch Equities (Australia) Limited, regulated by the Australian Securities and Investments Commission; Merrill Lynch (Hong Kong): Merrill Lynch (Asia Pacific) Limited, regulated by the Hong Kong Securities and Futures Commission (HKSFC); Merrill Lynch (Singapore): Merrill Lynch (Singapore) Pte Ltd, regulated by the Monetary Authority of Singapore (MAS); Merrill Lynch (Canada): Merrill Lynch Canada Inc, regulated by the Investment Industry Regulatory Organization of Canada; Merrill Lynch (Mexico): Merrill Lynch Mexico, SA de CV, Casa de Bolsa, regulated by the Comisiôn Nacional Bancaria y de Valores; Merrill Lynch (Argentina): Merrill Lynch Argentina SA, regulated by Comisiôn Nacional de Valores; BofAS Japan: BofA Securities Japan Co., Ltd., regulated by the Financial Services Agency; Merrill Lynch (Seoul): Merrill Lynch International, LLC Seoul Branch, regulated by the Financial Supervisory Service; Merrill Lynch (Taiwan): Merrill Lynch Securities (Taiwan) Ltd., regulated by the Securities and Futures Bureau; BofAS India: BofA Securities India Limited, regulated by the Securities and Exchange Board of India (SEBI); Merrill Lynch (Indonesia): PT Merrill Lynch Sekuritas Indonesia, regulated by Otoritas Jasa Keuangan (OJK); Merrill Lynch (Israel): Merrill Lynch Israel Limited, regulated by Israel Securities Authority; Merrill Lynch (Russia): OOO Merrill Lynch Securities, Moscow, regulated by the Central Bank of the Russian Federation; Merrill Lynch (DIFC): Merrill Lynch International (DIFC Branch), regulated by the Dubai Financial Services Authority (DFSA); Merrill Lynch (Brazil): Merrill Lynch S.A. Corretora de Títulos e Valores Mobiliários, regulated by Comissão de Valores Mobiliários; Merrill Lynch KSA Company: Merrill Lynch Kingdom of Saudi Arabia Company, regulated by the Capital Market Authority.

This information: has been approved for publication and is distributed in the United Kingdom (UK) to professional clients and eligible counterparties (as each is defined in the rules of the FCA and the PRA) by MLI (UK), which is authorized by the PRA and regulated by the FCA and the PRA - details about the extent of our regulation by the FCA and PRA are available from us on request; has been approved for publication and is distributed in the European Economic Area (EEA) by BofASE (France), which is authorized by the ACPR and regulated by the ACPR and the AMF; has been considered and distributed in Japan by BofAS Japan, a registered securities dealer under the Financial Instruments and Exchange Act in Japan, or its permitted affiliates; is issued and distributed in Hong Kong by Merrill Lynch (Hong Kong) which is regulated by HKSFC; is issued and distributed in Taiwan by Merrill Lynch (Taiwan); is issued and distributed in India by BofAS India; and is issued and distributed in Singapore to institutional investors and/or accredited investors (each as defined under the Financial Advisers Regulations) by Merrill Lynch (Singapore) (Company Registration No 198602883D). Merrill Lynch (Singapore) is regulated by MAS. Merrill Lynch Equities (Australia) Limited (ABN 65 006 276 795), AFS License 235132 (MLEA) distributes this information in Australia only to 'Wholesale' clients as defined by s.761G of the Corporations Act 2001. With the exception of Bank of America N.A., Australia Branch, neither MLEA nor any of its affiliates involved in preparing this information is an Authorised Deposit-Taking Institution under the Banking Act 1959 nor regulated by the Australian Prudential Regulation Authority. No approval is required for publication or distribution of this information in Brazil and its local distribution is by Merrill Lynch (Brazil) in accordance with applicable regulations. Merrill Lynch (DIFC) is authorized and regulated by the DFSA. Information prepared and issued by Merrill Lynch (DIFC) is done so in accordance with the requirements of the DFSA conduct of business rules. BofA Europe (Frankfurt) distributes this information in Germany and is regulated by BaFin, the ECB and the CBI. BofA Securities entities, including BofA Europe and BofASE (France), may outsource/delegate the marketing and/or provision of certain research services or aspects of research services to other branches or members of the BofA Securities group. You may be contacted by a different BofA Securities entity acting for and on behalf of your service provider where permitted by applicable law. This does not change your service provider. Please refer to the Electronic Communications Disclaimers for further information.

This information has been prepared and issued by BofAS and/or one or more of its non-US affiliates. The author(s) of this information may not be licensed to carry on regulated activities in your jurisdiction and, if not licensed, do not hold themselves out as being able to do so. BofAS and/or MLPF&S is the distributor of this information in the US and accepts full responsibility for information distributed to BofAS and/or MLPF&S clients in the US by its non-US affiliates. Any US person receiving this information and wishing to effect any transaction in any security discussed herein should do so through BofAS and/or MLPF&S and not such foreign affiliates. Hong Kong recipients of this information should contact Merrill Lynch (Asia Pacific) Limited in respect of any matters relating to dealing in securities or provision of specific advice on securities or any other matters arising from, or in connection with, this information. Singapore recipients of this information should contact Merrill Lynch (Singapore) Pte Ltd in respect of any matters arising from, or in connection with, this information. For clients that are not accredited investors, expert investors or institutional investors Merrill Lynch (Singapore) Pte Ltd accepts full responsibility for the contents of this information distributed to such clients in Singapore.

General Investment Related Disclosures:

Taiwan Readers: Neither the information nor any opinion expressed herein constitutes an offer or a solicitation of an offer to transact in any securities or other financial instrument. No part of this report may be used or reproduced or quoted in any manner whatsoever in Taiwan by the press or any other person without the express written consent of BofA Securities.

This document provides general information only, and has been prepared for, and is intended for general distribution to, BofA Securities clients. Neither the information nor any opinion expressed constitutes an offer or an invitation to make an offer, to buy or sell any securities or other financial instrument or any derivative related to such securities or instruments (e.g., options, futures, warrants, and contracts for differences). This document is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of, and is not directed to, any specific person(s). This document and its content do not constitute, and should not be considered to constitute, investment advice for purposes of ERISA, the US tax code, the Investment Advisers Act or otherwise. Investors should seek financial advice regarding the appropriateness of investing in financial instruments and implementing investment strategies discussed or recommended in this document and should understand that statements regarding future prospects may not be realized. Any decision to purchase or subscribe for securities in any offering must be based solely on existing public information on such security or the information in the prospectus or other offering document issued in connection with such offering, and not on this document.

Securities and other financial instruments referred to herein, or recommended, offered or sold by BofA Securities, are not insured by the Federal Deposit Insurance Corporation and are not deposits or other obligations of any insured depository institution (including, Bank of America, N.A.). Investments in general and, derivatives, in particular, involve numerous risks, including, among others, market risk, counterparty default risk and liquidity risk. No security, financial instrument or derivative is suitable for all investors. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. Investors should note that income from such securities and other financial instruments, if any, may fluctuate and that price or value of such securities and instruments may rise or fall and, in some cases, investors may lose their entire principal investment. Past performance is not necessarily a guide to future performance. Levels and basis for taxation may change.

This report may contain a short-term trading idea or recommendation, which highlights a specific near-term catalyst or event impacting the issuer or the market that is anticipated to have a short-term price impact on the equity securities of the issuer. Short-term trading ideas and recommendations are different from and do not affect a stock's fundamental equity rating, which reflects both a longer term total return expectation and attractiveness for investment relative to other stocks within its Coverage Cluster. Short-term trading ideas and recommendations may be more or less positive than a stock's fundamental equity rating.

BofA Securities is aware that the implementation of the ideas expressed in this report may depend upon an investor's ability to "short" securities or other financial instruments and that such action may be limited by regulations prohibiting or restricting "shortselling" in many jurisdictions. Investors are urged to seek advice regarding the applicability of such regulations prior to executing any short idea contained in this report.



BofA GLOBAL RESEARCH

Foreign currency rates of exchange may adversely affect the value, price or income of any security or financial instrument mentioned herein. Investors in such securities and instruments, including ADRs, effectively assume currency risk.

UK Readers: The protections provided by the U.K. regulatory regime, including the Financial Services Scheme, do not apply in general to business coordinated by BofA Securities entities located outside of the United Kingdom.

BofAS or one of its affiliates is a regular issuer of traded financial instruments linked to securities that may have been recommended in this report. BofAS or one of its affiliates may, at any time, hold a trading position (long or short) in the securities and financial instruments discussed in this report.

BofA Securities, through business units other than BofA Global Research, may have issued and may in the future issue trading ideas or recommendations that are inconsistent with, and reach different conclusions from, the information presented herein. Such ideas or recommendations may reflect different time frames, assumptions, views and analytical methods of the persons who prepared them, and BofA Securities is under no obligation to ensure that such other trading ideas or recommendations are brought to the attention of any recipient of this information.

In the event that the recipient received this information pursuant to a contract between the recipient and BofAS for the provision of research services for a separate fee, and in connection therewith BofAS may be deemed to be acting as an investment adviser, such status relates, if at all, solely to the person with whom BofAS has contracted directly and does not extend beyond the delivery of this report (unless otherwise agreed specifically in writing by BofAS). If such recipient uses the services of BofAS in connection with the sale or purchase of a security referred to herein, BofAS may act as principal for its own account or as agent for another person. BofAS is and continues to act solely as a broker-dealer in connection with the execution of any transactions, including transactions in any securities referred to herein.

**BofA ESGMeter Methodology:**

ESGMeter is a proprietary metric based on quantitative analysis and fundamental analyst inputs that reflects our assessment of a company's Environmental, Social and Governance-related attributes. The ESGMeter is intended to indicate a company's likelihood of experiencing stronger financial stability (higher return on equity and lower earnings and price volatility) over the next three years relative to peer group. There are three ESGMeter levels - Low, Medium, and High - which indicate whether a company has attributes most likely to translate into superior financial stability (in the case of a High level) or weaker financial stability (in the case of a Low level) over the next three years relative to its peer group. A Medium level suggests that a company exhibits ESG characteristics that are likely associated with financial stability results in line with its peer group over the next three years. Full details of our methodology, financial stability definition and disclaimers are available at BofA ESGMeter methodology. ESGMeter is not intended to be indicative of a company's future stock price performance and is independent of the BofA Global Research fundamental equity analyst's investment rating, volatility risk rating, income rating or price objective for that company.

**Copyright and General Information:**

Copyright 2021 Bank of America Corporation. All rights reserved. iQprofile℠, iQmethod℠ are service marks of Bank of America Corporation. iQdatabase® is a registered service mark of Bank of America Corporation. This information is prepared for the use of BofA Securities clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of BofA Securities. BofA Global Research information is distributed simultaneously to internal and client websites and other portals by BofA Securities and is not publicly-available material. Any unauthorized use or disclosure is prohibited. Receipt and review of this information constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained herein (including any investment recommendations, estimates or price targets) without first obtaining express permission from an authorized officer of BofA Securities.

Materials prepared by BofA Global Research personnel are based on public information. Facts and views presented in this material have not been reviewed by, and may not reflect information known to, professionals in other business areas of BofA Securities, including investment banking personnel. BofA Securities has established information barriers between BofA Global Research and certain business groups. As a result, BofA Securities does not disclose certain client relationships with, or compensation received from, such issuers. To the extent this material discusses any legal proceeding or issues, it has not been prepared as nor is it intended to express any legal conclusion, opinion or advice. Investors should consult their own legal advisers as to issues of law relating to the subject matter of this material. BofA Global Research personnel's knowledge of legal proceedings in which any BofA Securities entity and/or its directors, officers and employees may be plaintiffs, defendants, co-defendants or co-plaintiffs with or involving issuers mentioned in this material is based on public information. Facts and views presented in this material that relate to any such proceedings have not been reviewed by, discussed with, and may not reflect information known to, professionals in other business areas of BofA Securities in connection with the legal proceedings or matters relevant to such proceedings.

This information has been prepared independently of any issuer of securities mentioned herein and not in connection with any proposed offering of securities or as agent of any issuer of any securities. None of BofAS any of its affiliates or their research analysts has any authority whatsoever to make any representation or warranty on behalf of the issuer(s). BofA Global Research policy prohibits research personnel from disclosing a recommendation, investment rating, or investment thesis for review by an issuer prior to the publication of a research report containing such rating, recommendation or investment thesis.

Any information relating to the tax status of financial instruments discussed herein is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.

The information herein (other than disclosure information relating to BofA Securities and its affiliates) was obtained from various sources and we do not guarantee its accuracy. This information may contain links to third-party websites. BofA Securities is not responsible for the content of any third-party website or any linked content contained in a third-party website. Content contained on such third-party websites is not part of this information and is not incorporated by reference. The inclusion of a link does not imply any endorsement by or any affiliation with BofA Securities. Access to any third-party website is at your own risk, and you should always review the terms and privacy policies at third-party websites before submitting any personal information to them. BofA Securities is not responsible for such terms and privacy policies and expressly disclaims any liability for them.

All opinions, projections and estimates constitute the judgment of the author as of the date of publication and are subject to change without notice. Prices also are subject to change without notice. BofA Securities is under no obligation to update this information and BofA Securities ability to publish information on the subject issuer(s) in the future is subject to applicable quiet periods. You should therefore assume that BofA Securities will not update any fact, circumstance or opinion contained herein.

Subject to the quiet period applicable under laws of the various jurisdictions in which we distribute research reports and other legal and BofA Securities policy-related restrictions on the publication of research reports, fundamental equity reports are produced on a regular basis as necessary to keep the investment recommendation current.

Certain outstanding reports or investment opinions relating to securities, financial instruments and/or issuers may no longer be current. Always refer to the most recent research report relating to an issuer prior to making an investment decision.

In some cases, an issuer may be classified as Restricted or may be Under Review or Extended Review. In each case, investors should consider any investment opinion relating to such issuer (or its security and/or financial instruments) to be suspended or withdrawn and should not rely on the analyses and investment opinion(s) pertaining to such issuer (or its securities and/or financial instruments) nor should the analyses or opinion(s) be considered a solicitation of any kind. Sales persons and financial advisors affiliated with BofAS or any of its affiliates may not solicit purchases of securities or financial instruments that are Restricted or Under Review and may only solicit securities under Extended Review in accordance with firm policies.

Neither BofA Securities nor any officer or employee of BofA Securities accepts any liability whatsoever for any direct, indirect or consequential damages or losses arising from any use of this information.

# EXHIBIT 10

# COWEN

**Biotechnology**

# FIBROGEN

## EQUITY RESEARCH

July 13, 2021

**Price: $25.39** (07/12/2021)
**Price Target: $21.00**

**MARKET PERFORM (2)**

**ESG SCORE: 54/100**

**Yaron Werber, M.D.**
646 562 1415
yaron.werber@cowen.com

**Brendan Smith, Ph.D.**
646 562 1417
brendan.smith@cowen.com

**Gabriel Schneider, M.D.**
646 562 1401
gabriel.schneider@cowen.com

**Eve Reilly, Ph.D.**
646 562 1375
eve.reilly@cowen.com

**Key Data**

| | |
|---|---|
| Symbol | NASDAQ: FGEN |
| Market Cap | $2.3B |

Click here for the full company update from our latest quarterly report.

QUICK TAKE: COMPANY UPDATE

# ROXA ADCOM AN UPHILL BATTLE WITH UNCERTAIN OUTCOME: SAFETY CONCERNS A KEY FOCUS

## THE COWEN INSIGHT

FDA released briefing documents for roxadustat's AdCom this week highlighting multiple key concerns that make the drug's future even more uncertain. Key questions will center on higher risk of thromboembolic events, sepsis and seizures vs ESAs, lack of clarity on dosing flexibility, and insufficient data in ESA hyporesponders. Even if approved, roxa's label is likely to heavily curtail uptake.

**Our Take: Briefing Docs Highlight FDA's Concerns About Roxa's Safety And Incompletely Characterized Profile In ESA Hyporesponders**

As expected, briefing documents for roxadustat's cardiorenal AdCom hearing this week are fairly ominous and reiterate the agency's anticipated focus on the drug's safety profile relative to ESAs.

Recall that questions have remained about roxadustat's path to approval in the US after recent safety data updates showing the drug's CV safety profile is no longer superior to ESAs (see our note **here**). Many parts of the briefing documents were anticipated, but a few key elements are new/more concerning, adding even more uncertainty to the outcome of the panel.

We expect the panel will heavily focus on roxadustat's safety in the non-dialysis setting where the agency has not been impressed with the benefit/risk profile thus far. We were also surprised that FDA appears unconvinced that FibroGen/AstraZeneca have adequately characterized roxadustat's profile in ESA hyporesponsive patients. In response to FDA's concerns about a higher risk of thromboembolic events vs ESAs, FibroGen/AstraZeneca have suggested you can start with a lower dose, but the briefing documents suggest the FDA does not believe these lower doses with an appropriate titration scheme have been sufficiently tested for safety/efficacy.

One of the key questions for the committee to discuss is whether additional studies will be needed for approval, not needed at all, or can potentially be carried out on a post-marketing basis. Regardless, we anticipate that roxadustat's label, if approved, would be more similar to ESAs than different albeit with no risk of cancer promotion, but higher risk of seizures and sepsis.

Overall, we expect the discussion will focus on four key points:

1. Safety in the non-dialysis setting
   a. MACE analysis looks approvable in the dialysis setting,but in NDD OT+7 sensitivity analysis showed 277 MACE events in the roxadustat arm vs 131 on placebo (HR of 1.38)
   b. Key safety concerns include 5.4-fold higher risk of seizures, higher pulmonary edema, and sepsis
2. Lack of clarity on lower starting doses/titration schemes in terms of safety/efficacy
3. Higher risk of thromboembolic risks vs ESAs
4. Lack of adequate data supporting efficacy in ESA hyporesponsive patients

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**Fibrogen**
July 13, 2021

**Panel Outcome Difficult To Call – Reasonable Basis For Approval, But Label Would Likely Curtail Uptake**

Based on the briefing documents, we think the outcome of the panel is difficult to call. There is reasonable basis to support approval at least in dialysis while non-dialysis is difficult to call, though we expect FibroGen/AstraZeneca will need to sufficiently assuage concerns about the drug's multiple safety risks and convince the agency that the benefit to patients outweighs these concerns.

We think it is more likely the drug will be approved in the dialysis setting than non-dialysis as FDA appears to view the data in NDD as significantly confounded with a concerning risk profile (higher risk of thromboembolic events, seizures, and sepsis).

Recall that the hope of this drug was for it to be dosed orally three times a week with broad hemoglobin parameters, unlike ESAs. Importantly, the briefing documents suggest that FDA views roxadustat's differentiation vs IV ESAs as marginal which puts the drug's path forward in this setting at even higher risk, especially given the agency's view that the data does not adequately characterize roxadustat's clinical profile in ESA hyporesponders.

We expect that even if approved in both settings, much like ESAs the label will call for close dose titrations with a black box warning. Importantly, roxadustat's black box warning would likely not include the risk of cancer promotion seen with ESAs but would note the higher risk of seizures.

The risk/reward profile is challenging given the complexity of the data; thus approval will require the committee to show flexibility and take risk in supporting approval. Regardless, we anticipate that if approved, roxadustat will face high commercial challenges and that the label will dramatically curtail its commercial appeal and bolster resistance to adoption across the CKD anemia market.

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**COWEN**
EQUITY RESEARCH

**Fibrogen**
July 13, 2021

## VALUATION METHODOLOGY AND RISKS

### Valuation Methodology

**Biotechnology:**

In calculating our 12-month target price, we employ one or more valuation methodologies, which include a discounted earnings analysis, discounted cash flow analysis, net present value analysis and/or a comparable company analysis. These analyses may or may not require the use of objective measures such as price-to-earnings or price-to-sales multiples as well as subjective measures such as discount rates.

We make investment recommendations on early stage (pre-commercial) biotechnology companies based upon an assessment of their technology, the probability of pipeline success, and the potential market opportunity in the event of success. However, because these companies lack traditional financial metrics, we do not believe there are any good methodologies for assigning a specific target price to such stocks.

### Investment Risks

**Biotechnology:**

There are multiple risks that are inherent with an investment in the biotechnology sector. Beyond systemic risk, there is also clinical, regulatory, and commercial risk. Additionally, biotechnology companies require significant amounts of capital in order to develop their clinical programs. The capital-raising environment is always changing and there is risk that necessary capital to complete development may not be readily available.

### Risks To The Price Target

Forecasting sales for any product is difficult, and the outlook could be altered by competition, clinical development failures, or reimbursement changes. New competition could also impact our sales estimates and pipeline products might fail in development. Risks include clinical development, regulatory, pricing, and commercial challenges that may prevent our financial forecasts from materializing. The clinical safety profile of novel therapeutics like roxadustat (and the potential inclusion of a black box warning if ultimately approved) may impact uptake and ultimately pose risks to the price target, particularly in such a highly competitive market. Conversely, approval with a clean label for roxadustat alongside clinical failure of other competitor drugs within the HIF-PHI class, may allow for broad, rapid adoption and provide significant upside risk to our PT.

3

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

## ADDENDUM

### Stocks Mentioned In Important Disclosures

| Ticker | Company Name |
| --- | --- |
| FGEN | Fibrogen |

### Analyst Certification

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

### Important Disclosures

Cowen and Company, LLC and or its affiliates make a market in the stock of Fibrogen securities.

Cowen and Company, LLC compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking, sales and trading or principal trading revenues. Cowen and Company, LLC does not compensate research analysts based on specific investment banking transactions or specific sales and trading or principal trading revenues.

### Disclaimer

Cowen leverages technology from Truvalue Labs to generate our ESG scores. Truvalue Labs uses artificial intelligence to capture the stakeholder view of how companies are performing on ESG metrics, using the Sustainability Accounting Standards Board (SASB) materiality framework ([www.sasb.org](www.sasb.org)). (See below.) These data are leveraged to calculate a score for each company, which allows Cowen to have a **common framework** and uniform way to approach ESG discussions with our clients. Cowen ESG scores appear on Company and Company Quick Take notes and are updated daily.

The process begins with capturing unstructured data from more than 100,000 sources, in 14 languages. These data are culled from a wide range of sources with varied perspectives, including industry publications, news outlets, NGOs, trade unions, government sources, legal and regulatory filings, and academic publications.

Natural language processing is used to interpret semantic content from the original sources and generate analytics by applying criteria consistent with established sustainability and ESG frameworks. Performance is scored on a 0 to 100 scale. **A score of 50 represents a neutral impact**. Scores above 50 indicate more positive performance, and scores below reflect more negative performance. A score of NA means not enough data is available on the company to generate a score.

The algorithms are sensitive to both **intensity** and **frequency**. Truvalue Labs data contribute an indication of how stakeholder issues and potential controversies may affect a company, based on real-time information. Truvalue assesses positive and negative ESG events contained in unstructured data and assigns a score per topic for each passage based on the magnitude of sentiment. The score reflects not only whether performance is positive or negative, but also how positively or negatively the company is performing on the topic reflected in the datapoint. For example, the algorithms would assign a relatively more negative score to a catastrophic oil spill affecting multiple workers and communities than to a workplace incident that caused a minor injury to one worker. In both cases, the sentiment-based score would be negative, but performance would be evaluated as significantly more negative in the first case than in the second case.

Cowen introduced its own ESG scoring methodology because we believe that existing ratings systems are mostly backward-looking. Data are often supplied by companies and thus are subject to "greenwashing" (i.e., using data selectively to spin a story that is better than it actually is). In addition, most ratings systems generally don't align with SASB, which we think is emerging as a standard on the buy side.

Dynamic Materiality™ is Truvalue Labs' approach acknowledging that companies, industries, and sectors have unique materiality signatures that evolve over time, determined by factors such as shifts in business models, changing consumer preferences, emerging technologies, and new regulations. Dynamic Materiality™ is driven by how stakeholders respond to events, behaviors, and externalities experienced in relation to a company or an industry. This stands in contrast to the view that materiality is relatively static and can be defined by a company. For example, if a company appeared in 100 different sources over a trailing 12-month period, and 30 of the sources were related to the SASB Employee Health & Safety category, the Employee Health & Safety Dynamic Materiality™ would be 30%. Furthermore, 30% of the company's overall score would be driven by the Employee Health and Safety Insight Score.

Our research reports are simultaneously available to all clients are on our client website. Research reports are for our clients only. Not all research reports are disseminated, e-mailed or made available to third-party aggregators. Cowen and Company, LLC is not responsible for the redistribution of research by third party aggregators. Selected research reports are available in printed form in addition to an electronic form. All published research reports can be obtained on the firm's client website, [https://cowenlibrary.bluematrix.com/client/library.jsp](https://cowenlibrary.bluematrix.com/client/library.jsp).

The information, opinions, estimates and forecasts are as of the date of this report and subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Research reports are published at irregular intervals as appropriate in the analyst's judgement.

Further information on subject securities may be obtained from our offices. This research report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Other than disclosures relating to Cowen and Company, LLC, the information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. The opinions and recommendations herein do not take into account individual client circumstances, objectives or needs and are not intended as recommendations of investment strategy. The recipients of this report must make their own independent decisions regarding any securities subject to this research report. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. To the extent that this report discusses any legal proceedings or issues, it has not been prepared to express or intended to express any legal conclusion, opinion or advice. Our salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions that are contrary to the opinions expressed in our research. Our principal trading area and investing businesses may make investment decisions that are inconsistent with recommendations or views expressed in our research. Cowen and Company, LLC maintains physical, electronic and procedural information barriers to address the flow of information between and among departments within Cowen and Company, LLC in order to prevent and avoid conflicts of interest with respect to analyst recommendations.

For important disclosures regarding the companies that are the subject of this research report, please contact Compliance Department, Cowen and Company, LLC, 599 Lexington Avenue, 20th Floor, New York, NY 10022. In addition, the same important disclosures, with the exception of the valuation methods and risks, are available on the Firm's disclosure website at [https://cowen.bluematrix.com/sellside/Disclosures.action](https://cowen.bluematrix.com/sellside/Disclosures.action).

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**COWEN**
EQUITY RESEARCH

**Fibrogen**
July 13, 2021

**Equity Research Price Targets:** Cowen and Company, LLC assigns price targets on all companies covered in equity research unless noted otherwise. The equity research price target for an issuer's stock represents the value that the analyst reasonably expects the stock to reach over a performance period of twelve months. Any price targets in equity securities in this report should be considered in the context of all prior published Cowen and Company, LLC equity research reports (including the disclosures in any such equity report or on the Firm's disclosure website), which may or may not include equity research price targets, as well as developments relating to the issuer, its industry and the financial markets. For equity research price target valuation methodology and risks associated with the achievement of any given equity research price target, please see the analyst's equity research report publishing such targets.

**Cowen Cross-Asset Research:** Due to the nature of the fixed income market, the issuers or debt securities of the issuers discussed in "Cowen Cross-Asset Research" reports do not assign ratings and price targets and may not be continuously followed. Accordingly, investors must regard such branded reports as providing stand-alone analysis and reflecting the analyst's opinion as of the date of the report and should not expect continuing analysis or additional reports relating to such issuers or debt securities of the issuers.

From time to time "Cowen Cross-Asset Research" analysts provide investment recommendations on securities that are the subject of this report. These recommendations are intended only as of the time and date of publication and only within the parameters specified in each individual report. "Cowen Cross-Asset Research" investment recommendations are made strictly on a case-by-case basis, and no recommendation is provided as part of an overarching rating system or other set of consistently applied benchmarks. The views expressed in "Cross-Asset Research" report may differ from the views offered in the firm's equity research reports prepared for our clients.

**Notice to UK Investors:** This publication is produced by Cowen and Company, LLC which is regulated in the United States by FINRA. It is to be communicated only to persons of a kind described in Articles 19 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. It must not be further transmitted to any other person without our consent.

**Notice to European Union Investors:** Individuals producing recommendations are required to obtain certain licenses by the Financial Regulatory Authority (FINRA). You can review the author's current licensing status and history, employment history and, if any, reported regulatory, customer dispute, criminal and other matters via "Brokercheck by FINRA" at http://brokercheck.finra.org/. An individual's licensing status with FINRA should not be construed as an endorsement by FINRA. General biographical information is also available for each Research Analyst at www.cowen.com.

Additionally, the complete preceding 12-month recommendations history related to recommendation in this research report is available at https://cowen.bluematrix.com/sellside/Disclosures.action

The recommendation contained in this report was produced at July 13, 2021, 11:58 ET. and disseminated at July 13, 2021, 11:58 ET.

**Copyright, User Agreement and other general information related to this report**

© 2021 Cowen and Company, LLC. All rights reserved. Member NYSE, FINRA and SIPC. This research report is prepared for the exclusive use of Cowen clients and may not be reproduced, displayed, modified, distributed, transmitted or disclosed, in whole or in part, or in any form or manner, to others outside your organization without the express prior written consent of Cowen. Cowen research reports are distributed simultaneously to all clients eligible to receive such research reports. Any unauthorized use or disclosure is prohibited. Receipt and/or review of this research constitutes your agreement not to reproduce, display, modify, distribute, transmit, or disclose to others outside your organization. All Cowen trademarks displayed in this report are owned by Cowen and may not be used without its prior written consent.

**Cowen and Company, LLC. New York** 646 562 1010 **Boston** 617 946 3700 **San Francisco** 415 646 7200 **Chicago** 312 577 2240 **Cleveland** 440 331 3531 **Atlanta** 866 544 7009 **Stamford** 646 616 3000 **Washington, D.C.** 202 868 5300 **London** (affiliate) 44 207 071 7500

**COWEN AND COMPANY EQUITY RESEARCH RATING DEFINITIONS**

**Outperform (1):** The stock is expected to achieve a total positive return of at least 15% over the next 12 months

**Market Perform (2):** The stock is expected to have a total return that falls between the parameters of an Outperform and Underperform over the next 12 months

**Underperform (3):** Stock is expected to achieve a total negative return of at least 10% over the next 12 months

**Assumption:** The expected total return calculation includes anticipated dividend yield

## Cowen and Company Equity Research Rating Distribution

**Distribution of Ratings/Investment Banking Services (IB) as of 06/30/21**

| Rating | Count | Ratings Distribution | Count | IB Services/Past 12 Months |
|---|---|---|---|---|
| Buy (a) | 579 | 69.84% | 185 | 31.95% |
| Hold (b) | 241 | 29.07% | 20 | 8.30% |
| Sell (c) | 9 | 1.09% | 0 | 0.00% |

(a) Corresponds to "Outperform" rated stocks as defined in Cowen and Company, LLC's equity research rating definitions. (b) Corresponds to "Market Perform" as defined in Cowen and Company, LLC's equity research ratings definitions. (c) Corresponds to "Underperform" as defined in Cowen and Company, LLC's equity research ratings definitions. Cowen and Company Equity Research Rating Distribution Table does not include any company for which the equity research rating is currently suspended or any debt security followed by Cowen Credit Research and Trading.

Note: "Buy", "Hold" and "Sell" are not terms that Cowen and Company, LLC uses in its ratings system and should not be construed as investment options. Rather, these ratings terms are used illustratively to comply with FINRA regulation.

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**COWEN**
EQUITY RESEARCH

**Fibrogen**
July 13, 2021



Fibrogen Rating History as of 07/12/2021
powered by: BlueMatrix

**Legend for Price Chart:**

I = Initiation | 1 = Outperform | 2 = Market Perform | 3 = Underperform | UR = Price Target Under Review | T = Terminated Coverage | $xx = Price Target | NA = Not Available | S=Suspended

6

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

# COWEN ESG SCORES

## HOW ARE COWEN'S ESG SCORES CALCULATED?

Cowen leverages technology from Truvalue Labs to generate our ESG scores. Truvalue Labs uses artificial intelligence to capture the stakeholder view of how companies are performing on ESG metrics, using the Sustainability Accounting Standards Board (SASB) materiality framework (www.sasb.org). (See below.) These data are leveraged to calculate a score for each company, which allows Cowen to have a **common framework** and uniform way to approach ESG discussions with our clients. Cowen ESG scores appear on Company and Company Quick Take notes and are updated daily.

### UNIVERSE OF 26 SUSTAINABILITY ISSUES ACROSS 5 AREAS



Product Design & Lifecycle Management
Business Model Resilience
Supply Chain Management
Materials Sourcing & Efficiency
Physical Impacts of Climate Change

Human Rights & Community Relations
Customer Privacy
Data Security
Access & Affordability
Product Quality & Safety
Customer Welfare
Selling Practices & Product Labeling

Business Ethics
Competitive Behavior
Management of the Legal & Regulatory Environment
Critical Incident Risk Management
Accident and Safety Management

GHG Emissions
Air Quality
Energy Management
Water & Wastewater Management
Waste & Hazardous Materials Management
Ecological Impacts

Employee Engagement, Diversity & Inclusion
Employee Health & Safety
Labor Practices

## HOW DOES THE PROCESS WORK?

The process begins with capturing unstructured data from more than 100,000 sources, in 14 languages. These data are culled from a wide range of sources with varied perspectives, including industry publications, news outlets, NGOs, trade unions, government sources, legal and regulatory filings, and academic publications.

Natural language processing is used to interpret semantic content from the original sources and generate analytics by applying criteria consistent with established sustainability and ESG frameworks. Performance is scored on a 0 to 100 scale. **A score of 50 represents a neutral impact**. Scores above 50 indicate more positive performance, and scores below reflect more negative performance. A score of NA means not enough data is available on the company to generate a score.

The algorithms are sensitive to both **intensity** and **frequency**. Truvalue Labs data contribute an indication of how stakeholder issues and potential controversies may affect a company, based on real-time information. Truvalue assesses positive and negative ESG events contained in unstructured data and assigns a score per topic for each passage based on the magnitude of sentiment. The score reflects not only whether performance is positive or negative, but also how positively or negatively the company is performing on the topic reflected in the datapoint. For example, the algorithms would assign a relatively more negative score to a catastrophic oil spill affecting multiple workers and communities than to a workplace incident that caused a minor injury to one worker. In both cases, the sentiment-based score would be negative, but performance would be evaluated as significantly more negative in the first case than in the second case.

## WHY DO WE BELIEVE THAT OUR APPROACH IS BETTER THAN OTHERS?

Cowen introduced its own ESG scoring methodology because we believe that existing ratings systems are mostly backward-looking. Data are often supplied by companies and thus are subject to "greenwashing" (i.e., using data selectively to spin a story that is better than it actually is). In addition, most ratings systems generally don't align with SASB, which we think is emerging as a standard on the buy side.

## DYNAMIC MATERIALITY™

Dynamic Materiality™ is Truvalue Labs' approach acknowledging that companies, industries, and sectors have unique materiality signatures that evolve over time, determined by factors such as shifts in business models, changing consumer preferences, emerging technologies, and new regulations. Dynamic Materiality™ is driven by how stakeholders respond to events, behaviors, and externalities experienced in relation to a company or an industry. This stands in contrast to the view that materiality is relatively static and can be defined by a company. For example, if a company appeared in 100 different sources over a trailing 12-month period, and 30 of the sources were related to the SASB Employee Health & Safety category, the Employee Health & Safety Dynamic Materiality™ would be 30%. Furthermore, 30% of the company's overall score would be driven by the Employee Health and Safety Insight Score.

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**Fibrogen**
July 13, 2021



Fibrogen (FGEN) ESG Score History as of 07/13/2021

ESG performance is scored on a 0 to 100 scale. A score of 50 represents a neutral impact. Scores above 50 indicate more positive performance, and scores below reflect more negative performance. A score of NA means not enough data is available on the company to generate a score.

Source: TruValue

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

**COWEN**
EQUITY RESEARCH

**Fibrogen**
July 13, 2021

## POINTS OF CONTACT

**Reaching Cowen**

### Main U.S. Locations

**New York**
599 Lexington Avenue
New York, NY 10022
646 562 1010
800 221 5616

**Boston**
Two International Place
Boston, MA 02110
617 946 3700
800 343 7068

**Cleveland**
20006 Detroit Road
Suite 100
Rocky River, OH 44116
440 331 3531

**San Francisco**
One Maritime Plaza, 9th Floor
San Francisco, CA 94111
415 646 7200
800 858 9316

**Atlanta**
3424 Peachtree Road NE
Suite 2200
Atlanta, GA 30326
866 544 7009

**Chicago**
181 West Madison Street
Suite 3135
Chicago, IL 60602
312 577 2240

**Stamford**
262 Harbor Drive
Stamford, CT 06902
646 616 3000

**Washington, D.C.**
2900 K Street, NW
Suite 520
Washington, DC 20007
202 868 5300

### International Location

**Cowen International Limited**

**London**

1 Snowden Street - 11th Floor
London EC2A 2DQ
United Kingdom
44 20 7071 7500

  COWENRESEARCH     COWEN     COWEN INC.

mtung@Fibrogen.com Michael Tung 07/13/21 04:32:16 PM Fibrogen

EXHIBIT 11

Goldman Sachs | Equity Research

13 July 2021 | 12:55PM EDT

# FibroGen Inc. (FGEN): Thoughts on the roxa AdCom briefing documents

**Briefing docs ask tough questions on roxa's benefit/risk profile heading into the AdCom.** This morning, the FDA published the briefing documents (LINK) for the upcoming Advisory Committee meeting on Thursday, July 15th that will evaluate roxadustat for the treatment of anemia in patients with chronic kidney disease (CKD). Overall, we view the FDA's comments and analysis as neutral to incrementally negative for FGEN, which we think was somewhat expected by investors given roxa's complicated data history and the lack of agreement on a prospective analysis of MACE. On efficacy, the FDA's comments generally seem to be favorable toward roxa with it not being challenged materially or a focus of the briefing doc. However, on safety, the FDA in its analysis of MACE in the non-dialysis dependent (NDD) population noted meaningful differences between the on treatment (OT) analysis and ascertainment window sensitivity analysis (i.e. OT+7), with the latter less favorable for roxa with the lower bound of the 95% CI exceeding 1.00 (HR: 1.38, 1.11-1.70) though the agency stated that higher placebo arm dropout rates confounded its assessment. In its MACE analysis of the dialysis dependent (DD) population, the FDA similarly found that there was higher risk in its OT+7 analysis (HR: 1.14, 1.00-1.30) compared to the OT analysis though the difference was not stat sig. While the AdCom will have separate votes on whether to approve roxa in NDD and DD, both indications have questions around whether additional testing should be done (either before or after approval). In our view, the discussion of whether to evaluate potential modifications to the treatment algorithm (Hb target, starting dose, titration schedule, monitoring), which were not assessed in the trials, prior to a potential approval constitutes the biggest risk going into the AdCom. Given the multiple concerns and uncertainties raised in the briefing docs, we maintain our Neutral rating and $28 12-month PT.

## Key takeaways

**1. The benefit vs. risk discussion is multifaceted**. In the briefing documents, the FDA stated that the efficacy of roxadustat is not in question as studies in both the DD and NDD populations demonstrated comparable efficacy to ESAs. Rather, the committee will focus on the drug's safety in the two different CKD patient populations. The documents point out that roxa demonstrated risks of serious

Paul Choi
+1(212)902-5217 | paul.k.choi@gs.com
Goldman Sachs & Co. LLC

Aliza Seidenfeld
+1(212)357-9501 |
aliza.seidenfeld@gs.com
Goldman Sachs & Co. LLC

Corinne Jenkins
+1(917)343-1445 |
corinne.jenkins@gs.com
Goldman Sachs & Co. LLC

Charlie Ferranti, Ph.D.
+1(212)902-3669 |
charlie.ferranti@gs.com
Goldman Sachs & Co. LLC

For the exclusive use of CCARRICO@FIBROGEN.COM

Goldman Sachs does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. For Reg AC certification and other important disclosures, see the Disclosure Appendix, or go to www.gs.com/research/hedge.html. Analysts employed by non-US affiliates are not registered/qualified as research analysts with FINRA in the U.S.

For the exclusive use of CCARRICO@FIBROGEN.COM

thromboembolic events as has been seen with the use of ESAs. This risk leads to questions around roxa's benefit-risk profile as well as an evaluation around the causes of thrombotic risk. We expect a discussion around potential dosing adjustments (lower starting dose, smaller dose increments in titration, lower Hb targets — as outlined) to address thrombotic risk as an on-target effect, though it has not been ruled out as an off-target effect either. Corroborating previous findings, an analysis showed that increased rates of Hb increase were associated with higher rates of thromboembolic events suggesting that risk could be reduced by adjusting dosing as discussed above, though the associations have not been proven in trial and potentially could be required as pre- or post-approval requirement.

**2. Ease of administration key consideration**. A key differentiator between roxadustat and use of erythropoiesis stimulating agents (ESAs) is the route of administration; ESAs are administered intravenously or subcutaneously whereas roxa is administered orally. While we expect the key focus of the committee meeting to remain on the benefit-risk profile and analysis of roxa, we note that ease of administration could be a factor and potential differentiator from approved ESAs. There could specifically be a benefit for patients not on hemodialysis who are not yet undergoing invasive treatment.

**3. Safety event analysis in NDD muddied**. The agency typically requests noninferiority or superiority of MACE events in DD (vs. active comparator) and NDD populations (vs. placebo). In the DD populations, patients were randomized to roxa or EPO with similar retention across the arms and an exposure difference of ~11%. However, in the NDD population, patients were administered roxa or placebo with the opportunity for rescue therapy if needed, and many patients dropped out of the studies. Patients with advanced disease and poor Hb response have been shown to be at high risk for CV events, and are also more likely to drop out of study. There is also a large delta in patients who remained on study between the roxa and placebo groups also leading to various amounts of time to experience adverse events. We therefor expect considerable discussion around the confounding variables influencing the adverse events analysis in the NDD population. Data observation will influence the conversation, specifically if time of observation was to time on-treatment+7 days, to last contact, or at some point in between.

**4. Additional trials could be recommended**. The agency outlined draft points for consideration in the NDD and DD populations surrounding the benefits and risks of roxadustat. However, we note that a recurring question in both populations is if any concerns should be addressed in additional studies prior to approval (e.g. target Hb adjustment, titration scheme, etc.). We expect keen investor focus on the ultimate recommendation from the committee and any additional recommended studies.

**Valuation**: Our 12-month price target of $28 is based on a DCF with an unchanged 13% discount rate and 2% terminal growth rate

**Key risks (upside and downside):** include regulatory decisions on roxadustat, pipeline success/failure with pamrevlumab, and business development.

Goldman Sachs                                                                FibroGen Inc. (FGEN)

| FGEN | 12m Price Target: **$28.00** | Price: **$25.39** | Upside: **10.3%** |

## Neutral

### GS Forecast

Market cap: $2.3bn
Enterprise value: $2.0bn
3m ADTV: $22.7mn
United States
Americas SMID Biotechnology
M&A Rank: 3

|  | 12/20 | 12/21E | 12/22E | 12/23E |
|---|---|---|---|---|
| Revenue ($ mn) | 179.8 | 374.6 | 392.6 | 547.6 |
| EBITDA ($ mn) | (164.3) | (146.9) | (170.9) | (41.1) |
| EBIT ($ mn) | (186.3) | (156.7) | (173.7) | (43.8) |
| EPS ($) | (2.05) | (1.64) | (1.77) | (0.37) |
| P/E (X) | NM | NM | NM | NM |
| EV/EBITDA (X) | NM | NM | NM | NM |
| FCF yield (%) | 2.1 | (9.4) | (1.6) | 0.5 |
| Dividend yield (%) | 0.0 | 0.0 | 0.0 | 0.0 |
| Net debt/EBITDA (X) | – | – | – | – |

|  | 3/21 | 6/21E | 9/21E | 12/21E |
|---|---|---|---|---|
| EPS ($) | (0.78) | (0.05) | (0.03) | (0.77) |

Source: Company data, Goldman Sachs Research estimates, FactSet. Price as of 12 Jul 2021 close.

For the exclusive use of CCARRICO@FIBROGEN.COM

Goldman Sachs                                                                                      FibroGen Inc. (FGEN)

# Disclosure Appendix

## Reg AC

We, Paul Choi, Aliza Seidenfeld, Corinne Jenkins and Charlie Ferranti, Ph.D., hereby certify that all of the views expressed in this report accurately reflect our personal views about the subject company or companies and its or their securities. We also certify that no part of our compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

Unless otherwise stated, the individuals listed on the cover page of this report are analysts in Goldman Sachs' Global Investment Research division.

## GS Factor Profile

The Goldman Sachs Factor Profile provides investment context for a stock by comparing key attributes to the market (i.e. our coverage universe) and its sector peers. The four key attributes depicted are: Growth, Financial Returns, Multiple (e.g. valuation) and Integrated (a composite of Growth, Financial Returns and Multiple). Growth, Financial Returns and Multiple are calculated by using normalized ranks for specific metrics for each stock. The normalized ranks for the metrics are then averaged and converted into percentiles for the relevant attribute. The precise calculation of each metric may vary depending on the fiscal year, industry and region, but the standard approach is as follows:

**Growth** is based on a stock's forward-looking sales growth, EBITDA growth and EPS growth (for financial stocks, only EPS and sales growth), with a higher percentile indicating a higher growth company. **Financial Returns** is based on a stock's forward-looking ROE, ROCE and CROCI (for financial stocks, only ROE), with a higher percentile indicating a company with higher financial returns. **Multiple** is based on a stock's forward-looking P/E, P/B, price/dividend (P/D), EV/EBITDA, EV/FCF and EV/Debt Adjusted Cash Flow (DACF) (for financial stocks, only P/E, P/B and P/D), with a higher percentile indicating a stock trading at a higher multiple. The **Integrated** percentile is calculated as the average of the Growth percentile, Financial Returns percentile and (100% - Multiple percentile).

Financial Returns and Multiple use the Goldman Sachs analyst forecasts at the fiscal year-end at least three quarters in the future. Growth uses inputs for the fiscal year at least seven quarters in the future compared with the year at least three quarters in the future (on a per-share basis for all metrics).

For a more detailed description of how we calculate the GS Factor Profile, please contact your GS representative.

## M&A Rank

Across our global coverage, we examine stocks using an M&A framework, considering both qualitative factors and quantitative factors (which may vary across sectors and regions) to incorporate the potential that certain companies could be acquired. We then assign a M&A rank as a means of scoring companies under our rated coverage from 1 to 3, with 1 representing high (30%-50%) probability of the company becoming an acquisition target, 2 representing medium (15%-30%) probability and 3 representing low (0%-15%) probability. For companies ranked 1 or 2, in line with our standard departmental guidelines we incorporate an M&A component into our target price. M&A rank of 3 is considered immaterial and therefore does not factor into our price target, and may or may not be discussed in research.

## Quantum

Quantum is Goldman Sachs' proprietary database providing access to detailed financial statement histories, forecasts and ratios. It can be used for in-depth analysis of a single company, or to make comparisons between companies in different sectors and markets.

## Disclosures
**The rating(s) for FibroGen Inc. is/are relative to the other companies in its/their coverage universe:** Acceleron Pharma Inc., Allakos Inc., Amarin Corp., Axcella Health Inc., Biohaven Pharmaceutical, BridgeBio Pharma, Clovis Oncology Inc., Esperion Therapeutics Inc., FibroGen Inc., Foghorn Therapeutics, Frequency Therapeutics, Global Blood Therapeutics Inc., HUTCHMED, Kiniksa Pharmaceuticals, Kinnate Biopharma Inc., Magenta Therapeutics Inc., Myovant Sciences Ltd., NGM Biopharmaceuticals, Odonate Therapeutics Inc., PMV Pharmaceuticals Inc., Phathom Pharmaceuticals, Puma Biotechnology Inc., Radius Health Inc., Repare Therapeutics, Silverback Therapeutics Inc., SpringWorks Therapeutics Inc., Turning Point Therapeutics Inc., Urogen Pharma, Vir Biotechnology

## Company-specific regulatory disclosures
The following disclosures relate to relationships between The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs") and companies covered by the Global Investment Research Division of Goldman Sachs and referred to in this research.

Goldman Sachs beneficially owned 1% or more of common equity (excluding positions managed by affiliates and business units not required to be aggregated under US securities law) as of the month end preceding this report: FibroGen Inc. ($25.39)

Goldman Sachs expects to receive or intends to seek compensation for investment banking services in the next 3 months: FibroGen Inc. ($25.39)

Goldman Sachs had an investment banking services client relationship during the past 12 months with: FibroGen Inc. ($25.39)

Goldman Sachs makes a market in the securities or derivatives thereof: FibroGen Inc. ($25.39)

## Distribution of ratings/investment banking relationships
Goldman Sachs Investment Research global Equity coverage universe

| | Rating Distribution | | | Investment Banking Relationships | | |
|---|---|---|---|---|---|---|
| | Buy | Hold | Sell | Buy | Hold | Sell |
| Global | 52% | 34% | 14% | 64% | 56% | 47% |

As of July 1, 2021, Goldman Sachs Global Investment Research had investment ratings on 3,011 equity securities. Goldman Sachs assigns stocks as Buys and Sells on various regional Investment Lists; stocks not so assigned are deemed Neutral. Such assignments equate to Buy, Hold and Sell for the purposes of the above disclosure required by the FINRA Rules. See 'Ratings, Coverage universe and related definitions' below. The Investment Banking Relationships chart reflects the percentage of subject companies within each rating category for whom Goldman Sachs has provided investment banking services within the previous twelve months.

For the exclusive use of CCARRICO@FIBROGEN.COM

## Price target and rating history chart(s)



The price targets shown should be considered in the context of all prior published Goldman Sachs research, which may or may not have included price targets, as well as developments relating to the company, its industry and financial markets.

## Regulatory disclosures

### Disclosures required by United States laws and regulations

See company-specific regulatory disclosures above for any of the following disclosures required as to companies referred to in this report: manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/co-managed public offerings in prior periods; directorships; for equity securities, market making and/or specialist role. Goldman Sachs trades or may trade as a principal in debt securities (or in related derivatives) of issuers discussed in this report.

The following are additional required disclosures: **Ownership and material conflicts of interest:** Goldman Sachs policy prohibits its analysts, professionals reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage. **Analyst compensation:** Analysts are paid in part based on the profitability of Goldman Sachs, which includes investment banking revenues. **Analyst as officer or director:** Goldman Sachs policy generally prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director or advisor of any company in the analyst's area of coverage. **Non-U.S. Analysts:** Non-U.S. analysts may not be associated persons of Goldman Sachs & Co. LLC and therefore may not be subject to FINRA Rule 2241 or FINRA Rule 2242 restrictions on communications with subject company, public appearances and trading securities held by the analysts.

**Distribution of ratings:** See the distribution of ratings disclosure above. **Price chart:** See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the Goldman Sachs website at https://www.gs.com/research/hedge.html.

### Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, except to the extent already made above pursuant to United States laws and regulations. **Australia:** Goldman Sachs Australia Pty Ltd and its affiliates are not authorised deposit-taking institutions (as that term is defined in the Banking Act 1959 (Cth)) in Australia and do not provide banking services, nor carry on a banking business, in Australia. This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act, unless otherwise agreed by Goldman Sachs. In producing research reports, members of the Global Investment Research Division of Goldman Sachs Australia may attend site visits and other meetings hosted by the companies and other entities which are the subject of its research reports. In some instances the costs of such site visits or meetings may be met in part or in whole by the issuers concerned if Goldman Sachs Australia considers it is appropriate and reasonable in the specific circumstances relating to the site visit or meeting. To the extent that the contents of this document contains any financial product advice, it is general advice only and has been prepared by Goldman Sachs without taking into account a client's objectives, financial situation or needs. A client should, before acting on any such advice, consider the appropriateness of the advice having regard to the client's own objectives, financial situation and needs. A copy of certain Goldman Sachs Australia and New Zealand disclosure of interests and a copy of Goldman Sachs' Australian Sell-Side Research Independence Policy Statement are available at: https://www.goldmansachs.com/disclosures/australia-new-zealand/index.html. **Brazil:** Disclosure information in relation to CVM Resolution n. 20 is available at https://www.gs.com/worldwide/brazil/area/gir/index.html. Where applicable, the Brazil-registered analyst primarily responsible for the content of this research report, as defined in Article 20 of CVM Resolution n. 20, is the first author named at the beginning of this report, unless indicated otherwise at the end of the text. **Canada:** Goldman Sachs Canada Inc. is an affiliate of The Goldman Sachs Group Inc. and therefore is included in the company specific disclosures relating to Goldman Sachs (as defined above). Goldman Sachs Canada Inc. has approved of, and agreed to take responsibility for, this research report in Canada if and to the extent that Goldman Sachs Canada Inc. disseminates this research report to its clients. **Hong Kong:** Further information on the securities of covered companies referred to in this research may be obtained on request from Goldman Sachs (Asia) L.L.C. **India:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (India) Securities Private Limited, Research Analyst - SEBI Registration Number INH000001493, 951-A, Rational House, Appasaheb Marathe Marg, Prabhadevi, Mumbai 400 025, India, Corporate Identity Number U74140MH2006FTC160634, Phone +91 22 6616 9000, Fax +91 22 6616 9001. Goldman Sachs may beneficially own 1% or more of the securities (as such term is defined in clause 2 (h) the Indian Securities Contracts (Regulation) Act, 1956) of the subject company or companies referred to in this research report. **Japan:** See below. **Korea:** This research, and any access to it, is intended only for "professional investors" within the meaning of the Financial Services and Capital Markets Act, unless otherwise agreed by Goldman Sachs. Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (Asia) L.L.C., Seoul Branch. **New Zealand:** Goldman Sachs New Zealand Limited and its affiliates are neither "registered banks" nor "deposit takers" (as defined in the Reserve Bank of New Zealand Act 1989) in New Zealand. This research, and any access to it, is intended for "wholesale clients" (as defined in the Financial Advisers Act 2008) unless otherwise agreed by Goldman Sachs. A copy of certain Goldman Sachs Australia and New Zealand disclosure of interests is available at: https://www.goldmansachs.com/disclosures/australia-new-zealand/index.html. **Russia:** Research reports distributed in the Russian Federation are not advertising as defined in the Russian legislation, but are information and analysis not having product promotion as their main purpose and do not provide appraisal within the meaning of the Russian legislation on appraisal activity. Research reports do not constitute a personalized investment recommendation as defined in Russian laws and regulations, are not addressed to a specific client, and are prepared without analyzing the financial circumstances, investment profiles or risk profiles of clients. Goldman Sachs assumes no responsibility for any investment decisions that may be taken by a client or any other person based on this research report. **Singapore:** Goldman

For the exclusive use of CCARRICO@FIBROGEN.COM

For the exclusive use of CCARRICO@FIBROGEN.COM

Sachs (Singapore) Pte. (Company Number: 198602165W), which is regulated by the Monetary Authority of Singapore, accepts legal responsibility for this research, and should be contacted with respect to any matters arising from, or in connection with, this research. **Taiwan:** This material is for reference only and must not be reprinted without permission. Investors should carefully consider their own investment risk. Investment results are the responsibility of the individual investor. **United Kingdom:** Persons who would be categorized as retail clients in the United Kingdom, as such term is defined in the rules of the Financial Conduct Authority, should read this research in conjunction with prior Goldman Sachs research on the covered companies referred to herein and should refer to the risk warnings that have been sent to them by Goldman Sachs International. A copy of these risks warnings, and a glossary of certain financial terms used in this report, are available from Goldman Sachs International on request.

**European Union and United Kingdom:** Disclosure information in relation to Article 6 (2) of the European Commission Delegated Regulation (EU) (2016/958) supplementing Regulation (EU) No 596/2014 of the European Parliament and of the Council (including as that Delegated Regulation is implemented into United Kingdom domestic law and regulation following the United Kingdom's departure from the European Union and the European Economic Area) with regard to regulatory technical standards for the technical arrangements for objective presentation of investment recommendations or other information recommending or suggesting an investment strategy and for disclosure of particular interests or indications of conflicts of interest is available at https://www.gs.com/disclosures/europeanpolicy.html which states the European Policy for Managing Conflicts of Interest in Connection with Investment Research.

**Japan:** Goldman Sachs Japan Co., Ltd. is a Financial Instrument Dealer registered with the Kanto Financial Bureau under registration number Kinsho 69, and a member of Japan Securities Dealers Association, Financial Futures Association of Japan and Type II Financial Instruments Firms Association. Sales and purchase of equities are subject to commission pre-determined with clients plus consumption tax. See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

## Ratings, coverage universe and related definitions

**Buy (B), Neutral (N), Sell (S) -**Analysts recommend stocks as Buys or Sells for inclusion on various regional Investment Lists. Being assigned a Buy or Sell on an Investment List is determined by a stock's total return potential relative to its coverage universe. Any stock not assigned as a Buy or a Sell on an Investment List with an active rating (i.e., a stock that is not Rating Suspended, Not Rated, Coverage Suspended or Not Covered), is deemed Neutral. Each region's Investment Review Committee manages Regional Conviction lists, which represent investment recommendations focused on the size of the total return potential and/or the likelihood of the realization of the return across their respective areas of coverage. The addition or removal of stocks from such Conviction lists do not represent a change in the analysts' investment rating for such stocks.

**Total return potential** represents the upside or downside differential between the current share price and the price target, including all paid or anticipated dividends, expected during the time horizon associated with the price target. Price targets are required for all covered stocks. The total return potential, price target and associated time horizon are stated in each report adding or reiterating an Investment List membership.

**Coverage Universe:** A list of all stocks in each coverage universe is available by primary analyst, stock and coverage universe at https://www.gs.com/research/hedge.html.

**Not Rated (NR).** The investment rating and target price have been removed pursuant to Goldman Sachs policy when Goldman Sachs is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances. **Rating Suspended (RS).** Goldman Sachs Research has suspended the investment rating and price target for this stock, because there is not a sufficient fundamental basis for determining, or there are legal, regulatory or policy constraints around publishing, an investment rating or target. The previous investment rating and price target, if any, are no longer in effect for this stock and should not be relied upon. **Coverage Suspended (CS).** Goldman Sachs has suspended coverage of this company. **Not Covered (NC).** Goldman Sachs does not cover this company. **Not Available or Not Applicable (NA).** The information is not available for display or is not applicable. **Not Meaningful (NM).** The information is not meaningful and is therefore excluded.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs on a global basis. Analysts based in Goldman Sachs offices around the world produce research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy. This research is disseminated in Australia by Goldman Sachs Australia Pty Ltd (ABN 21 006 797 897); in Brazil by Goldman Sachs do Brasil Corretora de Títulos e Valores Mobiliários S.A.; Public Communication Channel Goldman Sachs Brazil: 0800 727 5764 and / or contatogoldmanbrasil@gs.com. Available Weekdays (except holidays), from 9am to 6pm. Canal de Comunicação com o Público Goldman Sachs Brasil: 0800 727 5764 e/ou contatogoldmanbrasil@gs.com. Horário de funcionamento: segunda-feira à sexta-feira (exceto feriados), das 9h às 18h; in Canada by either Goldman Sachs Canada Inc. or Goldman Sachs & Co. LLC; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs New Zealand Limited; in Russia by OOO Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman Sachs & Co. LLC. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom.

Effective from the date of the United Kingdom's departure from the European Union and the European Economic Area ("Brexit Day") the following information with respect to distributing entities will apply:

Goldman Sachs International ("GSI"), authorised by the Prudential Regulation Authority ("PRA") and regulated by the Financial Conduct Authority ("FCA") and the PRA, has approved this research in connection with its distribution in the United Kingdom.

**European Economic Area:** GSI, authorised by the PRA and regulated by the FCA and the PRA, disseminates research in the following jurisdictions within the European Economic Area: the Grand Duchy of Luxembourg, Italy, the Kingdom of Belgium, the Kingdom of Denmark, the Kingdom of Norway, the Republic of Finland, Portugal, the Republic of Cyprus and the Republic of Ireland; GS -Succursale de Paris (Paris branch) which, from Brexit Day, will be authorised by the French Autorité de contrôle prudentiel et de resolution ("ACPR") and regulated by the Autorité de contrôle prudentiel et de resolution and the Autorité des marches financiers ("AMF") disseminates research in France; GSI - Sucursal en España (Madrid branch) authorized in Spain by the Comisión Nacional del Mercado de Valores disseminates research in the Kingdom of Spain; GSI - Sweden Bankfilial (Stockholm branch) is authorized by the SFSA as a "third country branch" in accordance with Chapter 4, Section 4 of the Swedish Securities and Market Act (Sw. lag (2007:528) om värdepappersmarknaden) disseminates research in the Kingdom of Sweden; Goldman Sachs Bank Europe SE ("GSBE") is a credit institution incorporated in Germany and, within the Single Supervisory Mechanism, subject to direct prudential supervision by the European Central Bank and in other respects supervised by German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, BaFin) and Deutsche Bundesbank and disseminates research in the Federal Republic of Germany and those jurisdictions within the European Economic Area where GSI is not authorised to disseminate research and additionally, GSBE, Copenhagen Branch filial af GSBE, Tyskland, supervised by the Danish Financial Authority disseminates research in the Kingdom of Denmark; GSBE - Sucursal en España (Madrid branch) subject (to a limited extent) to local supervision by the Bank of Spain disseminates research in the Kingdom of Spain;  GSBE - Succursale Italia (Milan branch) to the relevant applicable extent, subject to local supervision by the Bank of Italy (Banca d'Italia) and the Italian Companies and Exchange Commission (Commissione Nazionale per le Società e la Borsa "Consob") disseminates research in Italy; GSBE - Succursale de Paris (Paris branch), supervised by the AMF and by the ACPR disseminates research in France; and GSBE - Sweden Bankfilial (Stockholm branch), to a limited extent, subject to local supervision by the Swedish Financial Supervisory Authority (Finansinpektionen) disseminates research in the Kingdom of Sweden.

FibroGen Inc. (FGEN)

## General disclosures

This research is for our clients only. Other than disclosures relating to Goldman Sachs, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management, and brokerage business. We have investment banking and other business relationships with a substantial percentage of the companies covered by our Global Investment Research Division. Goldman Sachs & Co. LLC, the United States broker dealer, is a member of SIPC (https://www.sipc.org).

Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. Our asset management area, principal trading desks and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

The analysts named in this report may have from time to time discussed with our clients, including Goldman Sachs salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the equity securities discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such stocks. Any such trading strategies are distinct from and do not affect the analyst's fundamental equity rating for such stocks, which rating reflects a stock's return potential relative to its coverage universe as described herein.

We and our affiliates, officers, directors, and employees, excluding equity and credit analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives, if any, referred to in this research.

The views attributed to third party presenters at Goldman Sachs arranged conferences, including individuals from other parts of Goldman Sachs, do not necessarily reflect those of Global Investment Research and are not an official view of Goldman Sachs.

Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report.

This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors. Investors should review current options and futures disclosure documents which are available from Goldman Sachs sales representatives or at https://www.theocc.com/about/publications/character-risks.jsp and https://www.fiadocumentation.org/fia/regulatory-disclosures_1/fia-uniform-futures-and-options-on-futures-risk-disclosures-booklet-pdf-version-2018. Transaction costs may be significant in option strategies calling for multiple purchase and sales of options such as spreads. Supporting documentation will be supplied upon request.

**Differing Levels of Service provided by Global Investment Research:** The level and types of services provided to you by the Global Investment Research division of GS may vary as compared to that provided to internal and other external clients of GS, depending on various factors including your individual preferences as to the frequency and manner of receiving communication, your risk profile and investment focus and perspective (e.g., marketwide, sector specific, long term, short term), the size and scope of your overall client relationship with GS, and legal and regulatory constraints. As an example, certain clients may request to receive notifications when research on specific securities is published, and certain clients may request that specific data underlying analysts' fundamental analysis available on our internal client websites be delivered to them electronically through data feeds or otherwise. No change to an analyst's fundamental research views (e.g., ratings, price targets, or material changes to earnings estimates for equity securities), will be communicated to any client prior to inclusion of such information in a research report broadly disseminated through electronic publication to our internal client websites or through other means, as necessary, to all clients who are entitled to receive such reports.

All research reports are disseminated and available to all clients simultaneously through electronic publication to our internal client websites. Not all research content is redistributed to our clients or available to third-party aggregators, nor is Goldman Sachs responsible for the redistribution of our research by third party aggregators. For research, models or other data related to one or more securities, markets or asset classes (including related services) that may be available to you, please contact your GS representative or go to https://research.gs.com.

Disclosure information is also available at https://www.gs.com/research/hedge.html or from Research Compliance, 200 West Street, New York, NY 10282.

**© 2021 Goldman Sachs.**

**No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.**

For the exclusive use of CCARRICO@FIBROGEN.COM

# EXHIBIT 12

# RAYMOND JAMES

US RESEARCH | PUBLISHED BY
RAYMOND JAMES & ASSOCIATES

## FIBROGEN, INC.  (FGEN-NASDAQ)

Biotechnology

**Danielle Brill, PharmD** | (212) 885-1891 | danielle.brill@raymondjames.com

JULY 13, 2021 | 1:38 PM EDT
COMPANY BRIEF

## Roxa's Approval Chances Not Lookin Good; FDA Calls Out Unclear Benefits & Severe Safety Risks

**After a thorough review of FDA's briefing documents for roxadustat's Ad Com meeting this week, we think it is highly unlikely that the committee will be supportive of approval.** As expected, the FDA conducted its own statistical analyses of the safety data generated and roxadustat performed worse than placebo (non-dialysis dependent, NDD) and ESAs (dialysis dependent, DD) on all key measures (all cause mortality, thrombosis, sepsis, seizures). There was a specific emphasis on thrombosis events and exploratory analyses were conducted which showed higher rates of thrombotic events with higher rates of Hb change.

The panel will vote separately for NDD and DD on whether roxadustat's benefits outweigh its risks. There will be a discussion prior to each vote about whether a treatment algorithm (dose titration, Hb target levels) could enhance safety. Given unclear benefits of roxa, we do not expect the panel to be supportive of approval until evidence for proposed thrombosis risk mitigation strategies are generated. Furthermore, there were multiple other safety imbalances with roxadustat (all cause mortality, infections, seizures) highlighted by the agency which should preclude approval, in our opinion.

**Multiple safety issues with roxadustat highlighted in FDA briefing documents.** As expected, roxa's cardiovascular (MACE) safety profile was center focus for the FDA. Other risks highlighted by the agency included all-cause mortality, seizures, and sepsis. Given known complications interpreting FGEN's NDD data due to the imbalance in study dropouts in the placebo arm, the FDA conducted its own sensitivity analysis (OT+7/+28, on-treatment + 7 or +28 days) to help better understand the results. Using this analysis, roxa performed worse across the board.

- **Key NDD Safety findings:** Higher rate of death with roxa (risk difference 1.48 per 100 P-Y; RR 1.3). Leading cause of deaths was infections. Serious AEs: thrombotic events (risk difference 1.1 per 100 P-Y; RR 1.45); sepsis (risk difference 1.3 per 100 P-Y; RR 2.37); seizures (risk difference 0.2 per 100 P-Y; RR 5.4). The small trial that compared roxa to darbepoeitin, showed an increased risk for infections (risk difference 3.3 per 100 P-Y; RR 1.28) and thrombosis (risk difference 1.8; RR 1.44) with roxa. *As noted by the FDA, the thrombosis risk here is particularly important because it is evident even when compared to an agent that itself poses a risk.*

  - **NDD MACE Analysis.** On study (primary) analysis HR was 1.1 (0.96, 1.27) for roxa vs. 1.38 (1.11, 1.7) with OT + 7. FDA notes OT+7 may not be a fair analysis given differences in total treatment exposure. Still, the nominal stat sig difference is worth noting. *All cause mortality was also significantly higher w/ roxa vs. placebo, and trends for higher rates of stroke and MI were observed as well.* In the small study that compared roxa to darbepoietin, MACE HRs tended to favor roxa but were not stat sig.

- **Key DD Safety findings.** Slight trend for higher risk of death with roxa vs. epo (risk difference 0.62 per 100 P-Y; RR 1.08); leading cause of non-cardiovascular related deaths were again infections, and renal disease. Of note, PYRENEES (EU supportive study, not included in pooled analysis due to study design differences) showed a stat sig higher risk of death w/ roxa vs. ESAs (HR >1.5; risk difference ~3 per 100 P-Y). *Serious AEs: thrombosis and seizures were again prominent, which is concerning as the signal is detected on top of ESAs which also pose these*

---

| | | | | |
|---|---|---|---|---|
| **Underperform 4** | | | | |
| Suitability | | | | A/ACC |

**MARKET DATA**

| | |
|---|---|
| Current Price (Jul-13-21) | $24.47 |
| Market Cap (mln) | $2,253 |
| Current Net Debt (mln) | $(492) |
| Enterprise Value (mln) | $1,761 |
| Shares Outstanding (mln) | 92.1 |
| 30-Day Avg. Daily Value (mln) | $22.8 |
| Dividend | $0.00 |
| Dividend Yield | 0.0% |
| 52-Week Range | $18.12 - $57.21 |

**KEY FINANCIAL METRICS**

| | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| GAAP EPS ($, Dec FY) | | | | |
| 2020A | (0.89) | (0.95) | 0.35 | (0.64) |
| 2021E | (0.78) A | (0.20) | (0.20) | 0.18 |
| 2022E | (0.98) | (0.92) | (0.91) | (0.89) |

| | 2020A | 2021E | 2022E |
|---|---|---|---|
| GAAP EPS ($, Dec FY) | (2.11) | (0.95) | (3.58) |
| P/E (GAAP EPS) | NM | NM | NM |
| Revenue (mln) ($, Dec FY) | 176 | 380 | 162 |
| EV/Revenue | 10.0x | 4.6x | 10.9x |

*Source: Thomson One, Raymond James & Associates. Quarterly figures may not add to full year due to rounding.*

---

**Please read domestic and foreign disclosure/risk information beginning on page 3 and Analyst Certification on page 4.**

INTERNATIONAL HEADQUARTERS: THE RAYMOND JAMES FINANCIAL CENTER | 880 CARILLON PARKWAY | ST. PETERSBURG FLORIDA 33716

*risks.* FDA also noted concerns about RR of 2 vs. ESAs for CHF and AV fistula thrombosis in PYRENEES,

- ○ **DD MACE Analysis.** On study (primary) analysis HR 1.14 (1.00, 1.30) for roxa vs. ESAs. OT+7 analysis was slightly more forgiving to roxa w/ a HR of 1.02 (0.88, 1.20). *In the primary on-study analysis, all-cause mortality was significantly higher in roxa than ESAs, with trends for higher rates of MI.* The FDA made special note of the significant all-cause mortality HR in PYRENEES for roxa in all ascertainment windows (on-study, OT+7, & OT+28); OT+7 HR was 1.54 (1.04, 2.28).

**Background on panelists.** Background and recent voting history for Cardiac and Renal Drugs Advisory Committee (CRDAC) members highlighted in the table attached. Of note, Milton Packer received a special waiver from the FDA to participate (due to financial interests in either FGEN/AZN and a competitor company exceeding $25,000). Milton Packer has recently published on the role of HIF isoforms in cardiovascular and renal diseases. Importantly, his work suggests selective stabilization of HIF-2a drives cardio benefits while long-term activation of HIF-1a can impair cardiovascular functioning. According to preclinical data generated, roxadustat stabilizes both HIF isoforms.

**Our take and expectations for the stock.** We think best case scenario at this juncture is a BBW and restrictive labeling (i.e. Hb target). However, given the number of severe safety signals identified and considering roxa's overall safety profile appears inferior to ESAs, we think it is highly unlikely that the panel will vote in-favor of approval in either setting. ***As such, we think FGEN shares (without roxa in the U.S.) are worth ~$18-20.***

**Ad Com Members Voting History & Background**

| Panelists | Specialty | Institution | Individual Voting History | | |
|---|---|---|---|---|---|
| | | | Dec 20, Entresto (12-1 YES) | Jul 20, Terlipressin (8-7 YES) | Dec 19, Vernakalant (2-11 NO) |
| Julia B Lewis (Committee Chair) | Internal Med, Nephrology | Vanderbilt | NO | NO | NO |
| Jacqueline D. Alikhaani | Consumer Representative | American Heart Association | YES | YES | NO |
| Noel Bairey Merz | Cardiology | Cedars-Siniai Medical Center | YES | YES | |
| Javid Butler | Cardiology, Heart Failure | University of Mississippi | | NO | |
| Peter E. Carson | Cardiology | Georgetown, VA | | | |
| Thomas Cook | Biostatistics | University of Wisconsin | YES | NO | |
| Edward K Kasper | Cardiology, Heart Failure | Johns Hopjkins | YES | YES | |
| Csaba Kovedsy | Nephrology | University of Tennessee, VA | | | |
| David J. Moliterno | Cardiology | University of Kentucky | YES | YES | NO |
| Christopher O'Connor | Cardiology | Duke | YES | | |
| Ravi I Thadhani | Nephrology | Mass Gen Brigham | YES | NO | |
| Milton Packer (temp) | Cardiology | Baylor | | | NO |

### COMPANY DESCRIPTION

Fibrogen is a biopharmaceutical company using its background in hypoxia-inducible factors (HIF) and connective tissue growth factors (CTGF) to develop therapeutics that target indications across anemia, fibrotic disease, and cancer. It has two main assets: 1) Roxadustat (HIF-PH inhibitor) partnered with Astellas and AstraZeneca to treat anemia caused by chronic kidney disease (CKD) with earlier stage studies being conducted in anemia caused by myelodysplastic syndromes (MDS) and chemotherapy, and 2) Pamrevlumab (anti-CTGF human mab) in later stage development for the treatment of idiopathic pulmonary fibrosis (IPF) and pancreatic cancer.



## IMPORTANT INVESTOR DISCLOSURES

Unless otherwise specified, the term "Raymond James" shall denote, where appropriate, Raymond James & Associates, Inc. (RJA), Raymond James Ltd. (RJL), and their affiliates, subsidiaries and related entities.

## Analyst Information

**Analyst Compensation**: Research analysts and associates at Raymond James are compensated on a salary and bonus system. Several factors enter into the compensation determination for an analyst, including: i) research quality and overall productivity, including success in rating stocks on an absolute basis and relative to the local exchange composite index and/or sector index; ii) recognition from institutional investors; iii) support effectiveness to the institutional and retail sales forces and traders; iv) commissions generated in stocks under coverage that are attributable to the analyst's efforts; v) net revenues of the overall Equity Capital Markets Group; and vi) comparable compensation levels for research analysts at competing peer firms.

**Registration of Non-U.S. Analysts**: The analysts listed on the front of this report who are not employees of, or associated with, RJA are not registered/qualified as research analysts under FINRA rules and are not subject to FINRA Rule 2241 restrictions on communications with covered companies, trading securities held by a research analyst account, and obligations related to identifying and managing conflicts of interest.

This global disclosure considers all entities of Raymond James and its affiliates. The jurisdiction where the analyst(s) is registered will determine what is permitted. For example, if the persons responsible for the content of this report are not licensed as research analysts in accordance with applicable rules promulgated by the regulatory organization(s) where this report is distributed, any client wishing to effect trades in any security should contact their Raymond James representative.

**The analyst Danielle Brill, primarily responsible for the preparation of this research report, attests to the following: (1) that the views and opinions rendered in this research report reflect his or her personal views about the subject companies or issuers and (2) that no part of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views in this research report. In addition, said analyst(s) has not received compensation from any subject company in the last 12 months.**

## Company Specific Disclosures

**Methodology:** The Raymond James methodology for assigning ratings and target prices includes a number of qualitative and quantitative factors, including an assessment of industry size, structure, business trends, and overall attractiveness; management effectiveness; competition; visibility; financial condition; and expected total return, among other factors. Collectively, these factors are subject to change depending on overall economic conditions or industry- or company-specific occurrences.

**Target Prices:** The information below indicates Raymond James' target price and rating changes for any subject companies over the past three years.



**Valuation Methodology**

**FibroGen, Inc.**

Our valuation of FGEN is based on a 10-year DCF (discount rate 12%, terminal growth rate 1%), and includes probability-adjusted revenues for Roxadustat in the U.S. (dialysis dependent [DD] 90% PoS, non-dialysis dependent [NDD] 50% PoS max) and Pamrevlumab (PoS 50%).

**General Risk Factors**

Following are some general risk factors that pertain to the businesses of the subject companies and the projected target prices and recommendations included on Raymond James research: (1) Industry fundamentals with respect to customer demand or product/service pricing could change and adversely impact expected revenues and earnings; (2) issues relating to major competitors or market shares or new product expectations could change investor attitude toward the sector or this stock; (3) Unforeseen developments with respect to the management, financial condition or accounting policies or practices could alter the prospective valuation.

**Company Specific Risk Factors**

**FibroGen, Inc.**

As FibroGen does not yet generate meaningful revenue and there is no guarantee that the development of its pipeline will be successful, we assign an **Aggressive Risk** suitability rating.

**Clinical risk**

All novel products are currently in clinical trials and susceptible to failures in efficacy and/or safety issues.

**Regulatory risk**

The company may fail to secure approval for novel pipeline products, including Roxadustat. The FDA, EMA, or other regulatory bodies may have a different view on the benefit-risk balance demonstrated in clinical testing from the company seeking approval.

**Commercial risk**

Fibrogen doesn't have substantial experience in the commercialization of novel therapeutics in the U.S. and EU, and will require the resources and bandwidth of partnered companies Astellas and AstraZeneca to generate revenue from the products if approved.

Entrenched competitors include the ESA class, which has been used in the treatment of anemia in CKD for more than 20 years, and potential future competitors include others developing their own HIF-PH inhibitors including GSK, Bayer, Akebia, and Zydus.

**Financial Risk**

If either collaboration agreement were to be terminated, the company would require significant additional capital to develop either of the two drug candidates.

**Intellectual property risk**

Protection of novel drugs and processes is dependent on issued or pending patents and in-house knowledge. One or more parties often challenge the intellectual property estate of a successful product, claiming priority for other patents or that the patents are invalid or infringed upon.

**Relationship Disclosures**

Certain affiliates of Raymond James expect to receive or intend to seek compensation for investment banking services from all companies under research coverage within the next three months. The person(s) responsible for the production of this report declare(s) that, as far as they are aware, there are no relationships or circumstances (including conflicts of interest) that may in any way impair the objectivity of this recommendation directly or indirectly. This statement applies equally to any persons closely associated with him or her. However, it is possible that persons making communications in relation to a security may have a holding in that security and this will be disclosed. As stated, Raymond James has controls in place to manage such risks.

In the event that this is a compendium report (i.e., covers six or more subject companies), Raymond James may choose to provide specific disclosures for the subject companies by reference. To access these disclosures, clients should refer to: raymondjames.bluematrix.com/sellside/Disclosures.action or call toll free at 1.800.237.5643 in the United States or 1.800.667.2899 in Canada. In other jurisdictions, please contact your local Raymond James' representative.

| Company Name | Disclosure |
|---|---|
| FibroGen, Inc. | Raymond James & Associates, Inc. makes a market in the shares of FibroGen, Inc.. |

## Investor Disclosures

In the United States (or U.S.), RJA is registered with the Financial Industry Regulatory Authority (FINRA) as a member firm. RJA is responsible for the preparation and distribution of reports created in the United States. RJA is located at The Raymond James Financial Center, 880 Carillon Parkway, St. Petersburg, Florida 33716 (Raymond James Financial (RJF) Corporate Headquarters), 727.567.1000. Raymond James Financial Services, Inc. (RJFS) is registered with FINRA as a Member Firm. RJFS is located at the RJF Corporate Headquarters.

RJA non-U.S. affiliates, which are not FINRA member firms (with the exception of Raymond James (USA) Ltd.), include the following entities, which are responsible for the creation or distribution of reports in their respective areas:

In Canada, RJL is registered with the Investment Industry Regulatory Organization of Canada (IIROC) as a member firm. RJL is responsible for the preparation and distribution of reports created in Canada. RJL is located at Suite 2100, 925 West Georgia Street, Vancouver, BC V6C 3L2 (RJL Head Office), 604.659.8200. Raymond James (USA) Ltd. (RJLU) is registered with FINRA as a member firm, which is responsible for the distribution of reports created in Canada and the United States to both American clients living in Canada and Canadian clients living in the United States. RJLU is located at the RJL Head Office.

In the United Kingdom, Raymond James Financial International Ltd. (RJFI) and Raymond James Investment Services, Ltd. (RJIS) are authorised and regulated by the Financial Conduct Authority (FCA). RJFI and RJIS are located at Ropemaker Place, 25 Ropemaker Street, London, England, EC2Y 9LY, +44 203 798 5600.

This report is not directed to, or intended for distribution to or use by, any person or entity that is a citizen or resident of or located in a locality, state, province, country, or other jurisdiction where such distribution, publication, availability, or use would be strictly prohibited or contrary to law or regulation. The securities discussed in this report may not be eligible for sale in some jurisdictions. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It is not investment advice and does not constitute a personal recommendation, nor does it take into account the particular investment objectives, financial situations, or needs of individual clients. Information in this report should not be construed as advice designed to meet the individual objectives of any particular investor. Investors should consider this report as only a single factor in making their investment decision. Some investments discussed in this report may have a high level of volatility. High volatility investments may experience sudden and large falls in their value causing losses when that investment is realized. Those losses may equal your original investment. Consultation with your Raymond James representative is recommended. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Nothing in this report constitutes investment, legal, accounting or tax advice or is a representation that any investment or strategy is suitable or appropriate to your individual circumstances or otherwise constitutes a personal recommendation to you.

The information provided is as of the date above and is subject to change and may or may not be updated. This report should not be deemed a recommendation to buy or sell any security. Certain information has been obtained from third-party sources Raymond James considers reliable, but Raymond James does not guarantee that such information is accurate or complete. Persons within Raymond James may have information that is not available to the contributors of the information contained in this report. Raymond James, including affiliates and employees, may execute transactions in the securities listed in this report that may not be consistent with the ratings appearing in this report.

With respect to materials prepared by Raymond James, all expressions of opinion reflect the judgment of the Research Departments of Raymond James, or its affiliates, as of the date above and are subject to change. Raymond James may perform investment banking or other services for, or solicit investment banking business from, any company mentioned in this report.

Raymond James reports are disseminated and available to Raymond James clients simultaneously via electronic publication to Raymond

James' internal proprietary websites (RJA: RJ Client Access & raymondjames.com; RJL: RJL ECM Client Access, RJL Retail Client Access & raymondjames.ca). Not all reports are directly distributed to clients or third-party aggregators. Certain reports may only be disseminated on Raymond James' internal proprietary websites; however, such reports will not contain estimates or changes to earnings forecasts, target price, valuation, or investment or suitability rating. Individual Raymond James associates may also opt to circulate published reports to one or more clients electronically. This electronic communication distribution is discretionary and is done only after the report has been publically disseminated via RJ's internal proprietary websites. The level and types of communications provided by Raymond James associates to clients may vary depending on various factors including, but not limited to, the client's individual preference as to the frequency and manner of receiving communications. For reports, models, or other data available on a particular security, please contact your Raymond James representative or financial advisor or visit for RJA: RJ Client Access & raymondjames.com; RJL: RJL ECM Client Access, RJL Retail Client Access & raymondjames.ca.

Raymond James' policy is to update reports as it deems appropriate, based on developments with the subject company, the sector or the market that may have a material impact on the research views or opinions stated in a report. Raymond James' policy is only to publish reports that are impartial, independent, clear, and fair and not misleading. Any information relating to the tax status of the securities discussed in this report is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.

Links to third-party websites are being provided for information purposes only. Raymond James is not affiliated with and does not endorse, authorize, or sponsor any of the listed websites or their respective sponsors. Raymond James is not responsible for the content of any third-party website or the collection or use of information regarding any website's users and/or members. Raymond James has not reviewed any such third-party websites and takes no responsibility for the content contained therein. Such address or hyperlink (including addresses or hyperlinks to Raymond James' own website material) is provided solely for your convenience and information, and the content of any such website does not in any way form part of this report. Accessing such website or following such link through this report or Raymond James' website shall be at your own risk. Additional information is available on request.

All right, title, and interest in any Raymond James reports is the exclusive property of Raymond James Financial, Inc. and its affiliates, except as otherwise expressly stated. Raymond James® is the registered trademark of Raymond James Financial, Inc. All trademarks, service marks, slogans, logos, trade dress and other identifiers, third-party data and/or market data ("intellectual property") displayed in the Raymond James reports are the property of Raymond James, or of other parties. The names of other companies and third-party products or services or other intellectual property mentioned in the Raymond James reports may be the copyright, trademarks, or service marks of their respective owners. U.S. and foreign copyright, trademark, common law rights and statutes protect this intellectual property. You are prohibited from using any intellectual property for any purpose including, but not limited to, use on other materials, in presentations, as domain names, or as metatags, without the express written permission of Raymond James or such other party that may own the marks.

**Notice to RJA PCG Financial Advisors** - Non-U.S. securities discussed in this report are generally not eligible for sale in the U.S. unless they are listed on a U.S. securities exchange. This report may not be used to solicit the purchase or sale of a security in any state where such a solicitation would be illegal. By accessing this report, you agree to not solicit the purchase or sale of any security mentioned in the report that is not listed on a U.S. securities exchange, or is not otherwise registered under applicable state Blue Sky laws. Furthermore, you acknowledge that you will be solely responsible for any and all costs associated with the rescission of trades in unregistered securities. Please contact the International Research Liaison with any questions at 727.567.5559.

## Ratings and Definitions

**RJA (U.S.) Definitions: Strong Buy (SB1)** The security is expected to appreciate, produce a total return of at least 15%, and outperform the S&P 500 over the next six to 12 months. For higher yielding and more conservative equities, such as REITs and certain MLPs, a total return of at least 15% is expected to be realized over the next 12 months. **Outperform (MO2)** The security is expected to appreciate or outperform the S&P 500 over the next 12-18 months. For higher yielding and more conservative equities, such as REITs and certain MLPs, an Outperform rating is used for securities where Raymond James is comfortable with the relative safety of the dividend and expects a total return modestly exceeding the dividend yield over the next 12-18 months. **Market Perform (MP3)** The security is expected to perform generally in line with the S&P 500 over the next 12 months and could potentially be used as a source of funds for more highly rated securities. **Underperform (MU4)** The security is expected to underperform the S&P 500 or its sector over the next six to 12 months and should be sold. **Suspended (S)** The security's rating and price target have been suspended temporarily. This action may be due to market events that made coverage impracticable or to comply with applicable regulations or firm policies in certain circumstances. When a security's research coverage has been suspended, the previous rating and price target are no longer in effect for this security, and they should not be relied upon.

**RJL (Canada) Definitions: Strong Buy (SB1)** The security is expected to appreciate and produce a total return of at least 15% and outperform the S&P/TSX Composite Index over the next six to 12 months. **Outperform (MO2)** The security is expected to appreciate and outperform the S&P/TSX Composite Index over the next 12-18 months. **Market Perform (MP3)** The security is expected to perform generally in line with the S&P/TSX composite Index over the next 12 months and could potentially be used as a source of funds for more highly rated securities. **Underperform (MU4)** The security is expected to underperform the S&P/TSX Composite Index or its sector over the next six to 12 months and should be sold. **Suspended (S)** The security's rating and price target have been suspended temporarily. This action may be due to market events that made coverage impracticable or to comply with applicable regulations or firm policies in certain circumstances or may otherwise have a perceived

conflict of interest. When a security's research coverage has been suspended, the previous rating and price target are no longer in effect for this security, and they should not be relied upon.

| | Coverage Universe Rating Distribution* | | Investment Banking Relationships | |
|---|---|---|---|---|
| | RJA | RJL | RJA | RJL |
| **Strong Buy and Outperform (Buy)** | 61% | 78% | 26% | 41% |
| **Market Perform (Hold)** | 35% | 22% | 15% | 12% |
| **Underperform (Sell)** | 4% | 0% | 6% | 0% |

*\* Columns may not add to 100% due to rounding.*

**RJA Suitability Ratings (SR)**

**Moderate Risk/Provide Income (M/INC)** Larger capitalization, lower volatility (beta) equities of companies with sound financials, consistent earnings, and dividend yields meaningfully above that of the S&P 500. Many securities in this category are structured with a focus on providing a consistent dividend or return of capital. **Moderate Risk/Wealth Accumulation (M/ACC)** Larger capitalization equities of companies with sound financials, consistent earnings growth, the potential for long-term price appreciation, and often a dividend yield. **Moderately Aggressive Risk/Provide Income (MA/INC)** Generally equities of companies that are structured with a focus on providing a dividend meaningfully above that of the S&P 500. These companies typically feature sound financials, positive earnings, and the potential for long-term price appreciation. **Moderately Aggressive Risk/Wealth Accumulation (MA/ACC)** Generally equities of companies in fast growing and competitive industries with less predictable earnings (or losses), potentially more leveraged balance sheets, rapidly changing market dynamics, and potential risk of principal. **Aggressive Risk/Provide Income (A/INC)** Generally equities of companies that are structured with a focus on providing a meaningful dividend but may face less predictable earnings (or losses), more leveraged balance sheets, rapidly changing market dynamics, financial and competitive issues, higher price volatility (beta), and meaningful risk of loss of principal. Securities of companies in this category may have a more volatile income stream from dividends or distributions of capital. **Aggressive Risk/Wealth Accumulation (A/ACC)** Generally equities of companies with a short or unprofitable operating history, limited or less predictable revenues, high risk associated with success, high volatility (beta), potential significant financial or legal issues, and the meaningful risk of loss of principal.

**RJL Suitability Ratings**

RJL has developed a proprietary algorithm for risk rating individual securities. The algorithm utilizes data from multiple vendors, and all data is refreshed at least monthly. Accordingly, suitability ratings are updated monthly. The suitability rating shown on this report is current as of the report's published date. In the event that a suitability rating changes after the published date, the new rating will not be reflected until the analyst publishes a subsequent report.

## International Disclosures

**For clients of RJA:** Any foreign securities discussed in this report are generally not eligible for sale in the United States unless they are listed on a U.S. exchange. This report is being provided to you for informational purposes only and does not represent a solicitation for the purchase or sale of a security in any state where such a solicitation would be illegal. Investing in securities of issuers organized outside of the United States, including ADRs, may entail certain risks.

The securities of non-U.S. issuers may not be registered with, nor be subject to, the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on such securities. Investors who have received this report may be prohibited in certain states or other jurisdictions from purchasing the securities mentioned in this report. Please ask your RJA financial advisor for additional details and to determine if a particular security is eligible for purchase in your state.

**For clients of RJFS:** This report was prepared and published by Raymond James and is being provided to you by RJFS solely for informative purposes. Any person receiving this report from RJFS should direct all questions and requests for additional information to their RJFS financial advisor.

**For clients of RJL:** In the case where there is Canadian analyst contribution, the report meets all applicable IIROC disclosure requirements. RJL is a member of the Canadian Investor Protection Fund.

**For clients of RJFI:** This report is prepared for and distributed by RJFI, and any investment to which this report relates is intended for the sole use of the persons to whom it is addressed, being persons who are Eligible Counterparties or Professional Clients as described in the FCA rules or persons described in Articles 19(5) (Investment professionals) or 49(2) (High net worth companies, unincorporated associations, etc.) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended) or any other person to whom this promotion may lawfully be directed. It is not intended to be distributed or passed on, directly or indirectly, to any other class of persons and may not be relied upon by such persons and is, therefore, not intended for private individuals or those who would be classified as retail clients.

**For clients of RJIS:** This report is prepared for and distributed by RJIS, and is for the use of professional investment advisers and managers and is not intended for use by retail clients.

For purposes of the FCA requirements, this report is classified as independent with respect to conflict of interest management. RJFI and RJIS are authorised and regulated by the FCA.

**For clients of Raymond James Euro Equities (RJEE):** RJEE is authorised and regulated by the Autorite de Controle Prudentiel et de Resolution and the Autorite des Marches Financiers. As of 30 November, 2020, RJEE is an unaffiliated entity of Raymond James. RJEE is located at SAS, 45 Avenue George V, 75008, Paris, France, +33 1 45 61 64 90. This report is prepared for and distributed by RJEE pursuant to an agreement with Raymond James, and any investment to which this report relates is intended for the sole use of the persons to whom it is addressed, being persons who are Eligible Counterparties or Professional Clients as described in "Code Monetaire et Financier" and Reglement General de l'Autorite des Marches Financiers. It is not intended to be distributed or passed on, directly or indirectly, to any other class of persons and may not be relied upon by such persons and is, therefore, not intended for private individuals or those who would be classified as retail clients.

**For recipients in Brazil:** This is a strictly privileged and confidential communication between Raymond James & Associates and its selected clients. This communication contains information addressed only to specific individuals in Brazil and is not intended for distribution to, or use by, any person other than the named addressee. This communication (i) is provided for informational purposes only, (ii) should not be construed in any manner as any solicitation or offer to buy or sell any investment opportunities or any related financial instruments, and (iii) should not be construed in any manner as a public offer of any investment opportunities or any related financial instruments. If you are not the named addressee, you should not disseminate, distribute, or copy this communication. Please notify the sender immediately if you have mistakenly received this communication.

The investments analyzed in this report may not be offered or sold to the public in Brazil. Accordingly, the investments in this report have not been and will not be registered with the Brazilian Securities and Exchange Commission (Comissão de Valores Mobiliários, the "CVM"), nor have they been submitted to the foregoing agency for approval. Documents relating to the investments in this report, as well as the information contained therein, may not be: (i) supplied to the public in Brazil, as the offering of investment products is not a public offering of securities in Brazil; nor (ii) used in connection with any offer for subscription or sale of securities to the public in Brazil.

**For clients in Australia:** Despite anything in this report to the contrary, this report is prepared for and distributed in Australia by RJFI with the assistance of RJA, and RJA at times will act on behalf of RJFI. This report is only available in Australia to persons who are "wholesale clients" (within the meaning of the Corporations Act 2001 (Cth)) and is supplied solely for the use of such wholesale clients and shall not be distributed or passed on to any other person. You represent and warrant that if you are in Australia, you are a "wholesale client". This research is of a general nature only and has been prepared without taking into account the objectives, financial situation, or needs of the individual recipient. RJFI and RJA do not hold an Australian financial services license. RJFI is exempt from the requirement to hold an Australian financial services license under the Corporations Act 2001 (Cth) in respect of financial services provided to Australian wholesale clients under the exemption in ASIC Class Order 03/1099 (as continued by ASIC Corporations (Repeal and Transitional) Instrument 2016/396). RJFI is regulated by the UK FCA under UK laws, which differ from Australian laws. RJA is acting on behalf of RJFI with respect to distribution and communications related to this report.

**For clients in New Zealand:** In New Zealand, this report is prepared for and may only be distributed by RJFI to persons who are wholesale clients pursuant to Section 5C of the New Zealand Financial Advisers Act 2008.

## Proprietary Rights Notice

By accepting a copy of this report, you acknowledge and agree as follows:

This report is provided to clients of Raymond James only for your personal, noncommercial use. Except as expressly authorized by Raymond James, you may not copy, reproduce, transmit, sell, display, distribute, publish, broadcast, circulate, modify, disseminate, or commercially exploit the information contained in this report, in printed, electronic, or any other form, in any manner, without the prior express written consent of Raymond James. You also agree not to use the information provided in this report for any unlawful purpose.

This report and its contents are the property of Raymond James and are protected by applicable copyright, trade secret or other intellectual property laws (of the United States and other countries). United States law, 17 U.S.C. Sec. 501 et. seq., provides for civil and criminal penalties for copyright infringement. No copyright claimed in incorporated U.S. government works.

© 2021 Raymond James Financial, Inc. All rights reserved.

© 2021 Raymond James & Associates, Inc.

© 2021 Raymond James Ltd., Member Canadian Investor Protection Fund

# EXHIBIT 13

Equity Research
**Healthcare | Biotechnology**

*William Blair*

July 13, 2021

**Andy T. Hsieh, Ph.D.**  +1 312 364 5051
ahsieh@williamblair.com

# FibroGen, Inc.

## No Surprises in the Briefing Document; Committee Vote on Thursday Could Determine the Regulatory Fate of Roxadustat

Before the markets opened on Tuesday, July 13, the FDA published draft questions, the agency briefing document, and FibroGen briefing document for the advisory committee meeting scheduled for Thursday, July 15. We believe the briefing document does not materially change investor perception regarding the outcome of roxadustat's approval, and the full committee meeting will be required to gain additional insight into the probability of roxadustat's approval. We offer additional commentary in the note below.

- **Overall, we believe that while the document highlights several areas of concern, none of which were entirely surprising, investors will likely have to wait for additional clarity during the committee meeting on Thursday.** In particular, the FDA requested the committee members to vote, separately, on whether roxadustat should be approved in non-dialysis-dependent and dialysis-dependent anemia due to chronic kidney disease. This situation opens the possibility that roxadustat might receive approval in neither, either, or both indications. On Thursday, we expect the panelists to discuss and rationalize the benefit/risk symmetry, which could inform the Street about the prospect of approval and roxadustat's potential role in the real-world setting.

- **Regarding the issue of a black box warning, based on the commentary by the FDA, it is our view that the outcome is all but certain for roxadustat.** In the document that contains draft questions, the agency noted, "Analyses of adverse events in the dialysis population demonstrated higher risks for roxadustat (versus ESAs) with respect to thrombotic events, including thrombosis of vascular access, events for which ESAs [erythropoietin-stimulating agents] carry a boxed warning. Vascular access patency is crucial to perform dialysis. There was also a higher risk of seizures with roxadustat compared to ESAs, another adverse drug reaction for which there is a warning in ESA labeling." Accordingly, our interpretation is that the agency believes that on the safety front, roxadustat is not differentiated compared with standard-of-care ESAs, and therefore it is reasonable and prudent to inform the prescribing community regarding the compound's adverse event profile.

| Stock Rating: | | | **Market Perform** |
|---|---|---|---|
| Symbol: | | | FGEN (NASDAQ) |
| Price: | | $25.39 (52-Wk.: $18-$57) | |
| Market Value (M): | | | $2,339 |
| Dividend/Yield: | | | $0.00/0.00% |
| Fiscal Year End: | | | December |

| | | **2020A** | **2021E** | **2022E** |
|---|---|---|---|---|
| **Estimates** | | | | |
| EPS | Q1 | $(0.89) | $(0.78) | $0.07 |
| | Q2 | $(0.95) | $(0.65) | $(0.56) |
| | Q3 | $0.35 | $0.65 | $(0.52) |
| | Q4 | $(0.64) | $0.07 | $(0.49) |
| | FY | $(2.11) | $(0.69) | $(1.51) |
| Sales (M) | Q1 | $24.4 | $38.4 | $116.2 |
| | Q2 | $42.9 | $45.2 | $56.9 |
| | Q3 | $44.0 | $167.4 | $60.8 |
| | Q4 | $65.0 | $113.7 | $64.6 |
| | FY | $176.3 | $364.7 | $298.5 |
| **Valuation** | | | | |
| FY P/E | | NM | NM | NM |
| CY P/E | | NM | NM | NM |
| EV/Sales | | 10.6x | 5.1x | 6.2x |

**Trading Data (FactSet)**

| | |
|---|---|
| Shares Outstanding (M): | 92.1 |
| Float (M): | 84.1 |
| Avg. Daily Volume (90-day): | 1,347,578 |

**Financial Data (FactSet)**

| | |
|---|---|
| Book Value Per Share (MRQ): | $4.03 |
| Return on Equity (TTM): | (44.1)% |
| Enterprise Value (M): | $1,861 |

**Two-Year Price Performance Chart**



Sources: FactSet, William Blair & Company estimates

FibroGen's lead product candidate, roxadustat, is approved in China with U.S. approval potentially taking place this year. In parallel, the company's wholly owned pamrevlumab is in Phase III studies in idiopathic pulmonary fibrosis, pancreatic cancer, and Duchenne muscular dystrophy.

**Please refer to important disclosures on pages 4 – 6. Analyst certification is on page 4.**
**William Blair or an affiliate does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. This report is not intended to provide personal investment advice. The opinions and recommendations herein do not take into account individual client circumstances, objectives, or needs and are not intended as recommendations of particular securities, financial instruments, or strategies to particular clients. The recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein.**

William Blair

- **In our view, roxadustat's starting dose could emerge as a topic of interest on Thursday among the panelists.** Based on FDA's internal analysis, there appears to be a correlation between the rate of hemoglobin increase and/or absolute levels and thromboembolic events. Therefore, it is reasonable to assume that by starting at a lower dose, this effect could be mitigated. However, it is the agency's view that this hypothesis is purely theoretical and has not been thoroughly investigated. We highlight there is a potential risk for FibroGen that the FDA could request another study to explore the most reasonable starting dose before the approval. Overall, we believe that many of these topics mentioned above will be clarified during the discussion on Thursday.

- **Historically, FibroGen has characterized ESA hyporesponders as the population that could derive the most benefit from roxadustat treatment.** We agree with FibroGen's assessment since these patients are facing two concurrent challenges. Hyporesponders require a higher dose of ESA to achieve the same level of benefit. However, supraphysiological erythropoietin levels could lead to increased incidence of cardiovascular adverse events. Taken together, it is reasonable to assume that ESA hyporesponders could especially benefit from roxadustat treatment, which acts through a different mechanism of action. In the briefing document, the FDA noted that this population was not adequately studied. Therefore, the role of roxadustat in this subpopulation cannot be determined. We look forward to the panelists' interpretation of the data, since their threshold for clinical evidence might differ from the agency.

- **There is an additional observation from the briefing document that we view could influence the panelists' perception of roxadustat's clinical profile.** FibroGen previously presented data that demonstrated roxadustat's ability to reduce the need for transfusion compared with ESAs. However, the FDA questions the validity of the clinical implication. Specifically, since dialysis-dependent patients randomized to roxadustat have a different rescue protocol compared to the ESA arm (either transfusions or ESAs versus transfusions only), it could be improper to compare the outcomes of these two arms.

**Our Take and Stock Thoughts**

We believe the briefing document does not materially change investor perception regarding the outcome of roxadustat's approval. Based on historical precedent, it is difficult to predict how the panelists will react to the data presented both by FibroGen and the FDA. We therefore believe that Thursday's committee meeting will likely provide more meaningful read-through into the prospect of approval for roxadustat.

It is our opinion that even in the event of the approval, it is difficult to predict the exact wording of the black box warning and the content of the label. Our stance that the commercial uptake of roxadustat in the United States will likely be gradual remains unchanged. Given the absence of additional catalyst events in the short and midterm that could generate additional investor excitement, we are reiterating our Market Perform rating on FibroGen shares.

**ESG Considerations**

From an environmental perspective, the biopharma industry is a resource-intensive field, generating hazardous waste and disposables from the manufacturing and preclinical and clinical testing of therapeutic candidates. We are not aware of additional environmentally focused initiatives at the company. Socially, FibroGen, through its partners AstraZeneca and Astellas, is developing roxadustat as a treatment for various anemias and pending positive regulatory interactions will likely initiate programs to maximize patient access around the globe. The company is also developing pamrevlumab for the treatment of devastating rare diseases such as idiopathic pulmonary fibrosis, Duchenne muscular dystrophy, and pancreatic cancer. In terms of diversity, we note that 16% of the executive team (2 out of 12 members) are women and 8% (1 out of 12 members) are persons of color. Further, 42% (5 out of 12 members) of the board comprises women and/or from minority racial and ethical groups. As of January 31, 2021, women represented 54% of the company's workforce and 27% of leadership (VP or above). In terms of governance, we note that the company adheres to a previously established code of conduct and business ethics. However, it does not apply to the company's strategic partners or suppliers.

**Valuation**

FibroGen is currently trading at $24.28 with a market cap of $2.24 billion and $682.6 million in cash at the end of the first quarter. While we believe in the potential for roxadustat to emerge as an alternative treatment for anemia in chronic kidney disease patients, given physicians' comfort and experience in using epoetin alfa or similar erythropoiesis-stimulating agents, the launch will likely be gradual. Beyond roxadustat, the company's wholly owned pamrevlumab is in three Phase III programs, idiopathic pulmonary fibrosis, pancreatic cancer, and Duchenne muscular dystrophy; however, we highlight that the top-line results will likely be released in the back half of 2022 at the earliest. Accordingly, we view FibroGen shares as fairly valued and reiterate our Market Perform rating.

**Risks**

While we do not have detailed visibility into the FDA's decision behind convening an advisory committee prior to approval, a more favorable briefing document and positive tone at the committee could spark renewed investor interest. In addition, positive momentum in the early commercial launch could indicate a rapid uptake by the medical community and ultimately lead to material shareholder returns.

William Blair

**FibroGen, Inc.**
Company Rating: Market Perform
7/8/2021

# Income Statement

(dollars in thousands except EPS and shares in thousands)

| | 2020A | Q1A | Q2E | Q3E | Q4E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| License and milestone revenue | 14,323 | 0 | 0 | 120,000 | 62,500 | 182,500 | 62,500 | 0 |
| Collaboration services and other revenue | 80,592 | 14,587 | 23,000 | 23,000 | 23,000 | 83,587 | 92,000 | 92,000 |
| Product Revenue | 72,498 | 15,362 | 15,844 | 17,002 | 19,269 | 67,477 | 89,295 | 108,687 |
| Drug product revenue | 8,906 | 8,480 | 6,339 | 7,395 | 8,452 | 30,665 | 34,144 | 34,486 |
| Roxadustat royalty | 0 | 0 | 0 | 0 | 482 | 482 | 20,553 | 58,044 |
| Pamrevlumab sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total revenues** | **$176,319** | **$38,429** | **$45,183** | **$167,397** | **$113,702** | **$364,712** | **$298,493** | **$293,217** |
| | | | | | | | | |
| Cost of revenue | 8,869 | 3,401 | 3,327 | 3,416 | 3,881 | 14,025 | 17,401 | 20,211 |
| Gross profit | 167,450 | 35,028 | 41,855 | 163,982 | 109,821 | 350,687 | 281,091 | 273,006 |
| R&D | 252,924 | 74,676 | 73,000 | 73,500 | 74,000 | 295,176 | 301,000 | 314,000 |
| SG&A | 190,806 | 30,779 | 31,000 | 31,500 | 32,000 | 125,279 | 135,000 | 145,000 |
| Outside service expenses - ChinaAmendment | (84,400) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total operating expenses | 368,199 | 108,856 | 107,327 | 108,416 | 109,881 | 434,480 | 453,401 | 479,211 |
| | | | | | | | | |
| **Income from operations** | **($191,880)** | **($70,427)** | **($62,145)** | **$58,982** | **$3,821** | **($69,768)** | **($154,909)** | **($185,994)** |
| | | | | | | | | |
| Total interest and other, net | 2,949 | (954) | 2,030 | 2,020 | 2,010 | 5,106 | 8,100 | 8,100 |
| | | | | | | | | |
| Net income before income taxes | (188,931) | ($71,381) | ($60,115) | $61,002 | $5,831 | (64,662) | (146,809) | (177,894) |
| | | | | | | | | |
| Income tax benefit/(Provision) | (360) | (134) | 0 | 0 | 1,225 | 1,091 | 1,129 | 0 |
| Investment loss in unconsolidated variable interest entity | 0 | (240) | 0 | 0 | 0 | (240) | 0 | 0 |
| | | | | | | | | |
| **Net income** | **($189,291)** | **($71,755)** | **($60,115)** | **$61,002** | **$7,056** | **($63,812)** | **($145,679)** | **($177,894)** |
| | | | | | | | | |
| Non-GAAP net income per common share basic | ($2.11) | ($0.78) | ($0.65) | $0.65 | $0.07 | ($0.69) | ($1.51) | ($1.77) |
| **Non-GAAP net income per common share diluted** | **($2.11)** | **($0.78)** | **($0.65)** | **$0.65** | **$0.07** | **($0.69)** | **($1.51)** | **($1.77)** |
| | | | | | | | | |
| Non-GAAP weighted-average common shares basic | 89,854 | 91,688 | 92,591 | 93,503 | 94,424 | 93,052 | 96,772 | 100,642 |
| Non-GAAP weighted-average common shares diluted | 89,854 | 91,688 | 92,591 | 93,503 | 94,424 | 93,052 | 96,772 | 100,642 |

https://williamblair.bluematrix.com/sellside/Disclosures.action?ajax&page=ajax/williamblairDisclosures.jsp&firmId=18877&companySymbol=FGEN

FGEN

Sources: FibroGen reports and William Blair Equity Research

3 | Andy T. Hsieh +1 312 364 5051

William Blair

**IMPORTANT DISCLOSURES**

William Blair or an affiliate is a market maker in the security of FibroGen, Inc.

William Blair or an affiliate expects to receive or intends to seek compensation for investment banking services from FibroGen, Inc. or an affiliate within the next three months.

Officers and employees of William Blair or its affiliates (other than research analysts) may have a financial interest in the securities of FibroGen, Inc.

This report is available in electronic form to registered users via R*Docs™ at https://williamblairlibrary.bluematrix.com or www.williamblair.com.

Please contact us at +1 800 621 0687 or consult williamblair.com/Research-and-Insights/Equity-Research/Coverage.aspx for all disclosures.

Andy T. Hsieh attests that 1) all of the views expressed in this research report accurately reflect his/her personal views about any and all of the securities and companies covered by this report, and 2) no part of his/her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed by him/her in this report. We seek to update our research as appropriate. Other than certain periodical industry reports, the majority of reports are published at irregular intervals as deemed appropriate by the research analyst.

DOW JONES: 34996.20
S&P 500: 4384.63
NASDAQ: 14733.20



Source: FactSet & William Blair

Additional information is available upon request.

**Current Rating Distribution (as of July 13, 2021):**

| Coverage Universe | Percent | Inv. Banking Relationships * | Percent |
|---|---|---|---|
| Outperform (Buy) | 77 | Outperform (Buy) | 29 |
| Market Perform (Hold) | 23 | Market Perform (Hold) | 11 |
| Underperform (Sell) | 1 | Underperform (Sell) | 0 |

*Percentage of companies in each rating category that are investment banking clients, defined as companies for which William Blair has received compensation for investment banking services within the past 12 months.

The compensation of the research analyst is based on a variety of factors, including performance of his or her stock recommendations; contributions to all of the firm's departments, including asset management, corporate finance, institutional sales, and retail brokerage; firm profitability; and competitive factors.

William Blair

## OTHER IMPORTANT DISCLOSURES

Stock ratings and valuation methodologies: William Blair & Company, L.L.C. uses a three-point system to rate stocks. Individual ratings reflect the expected performance of the stock relative to the broader market (generally the S&P 500, unless otherwise indicated) over the next 12 months. The assessment of expected performance is a function of near-, intermediate-, and long-term company fundamentals, industry outlook, confidence in earnings estimates, valuation (and our valuation methodology), and other factors. Outperform (O) - stock expected to outperform the broader market over the next 12 months; Market Perform (M) - stock expected to perform approximately in line with the broader market over the next 12 months; Underperform (U) - stock expected to underperform the broader market over the next 12 months; not rated (NR) - the stock is not currently rated. The valuation methodologies include (but are not limited to) price-to-earnings multiple (P/E), relative P/E (compared with the relevant market), P/E-to-growth-rate (PEG) ratio, market capitalization/revenue multiple, enterprise value/EBITDA ratio, discounted cash flow, and others. Stock ratings and valuation methodologies should not be used or relied upon as investment advice. Past performance is not necessarily a guide to future performance.

The ratings and valuation methodologies reflect the opinion of the individual analyst and are subject to change at any time.

Our salespeople, traders, and other professionals may provide oral or written market commentary, short-term trade ideas, or trading strategies-to our clients, prospective clients, and our trading desks-that are contrary to opinions expressed in this research report. Certain outstanding research reports may contain discussions or investment opinions relating to securities, financial instruments and/or issuers that are no longer current. Always refer to the most recent report on a company or issuer. Our asset management and trading desks may make investment decisions that are inconsistent with recommendations or views expressed in this report. We will from time to time have long or short positions in, act as principal in, and buy or sell the securities referred to in this report. Our research is disseminated primarily electronically, and in some instances in printed form. Research is simultaneously available to all clients. This research report is for our clients only. No part of this material may be copied or duplicated in any form by any means or redistributed without the prior written consent of William Blair & Company, L.L.C.

This is not in any sense an offer or solicitation for the purchase or sale of a security or financial instrument. The factual statements herein have been take from sources we believe to be reliable, but such statements are made without any representation as to accuracy or completeness or otherwise, except with respect to any disclosures relative to William Blair or its research analysts. Opinions expressed are our own unless otherwise stated and are subject to change without notice. Prices shown are approximate.

This material is distributed in the United Kingdom and the European Economic Area (EEA) by William Blair International, Ltd., authorised and regulated by the Financial Conduct Authority (FCA). William Blair International, Limited is a limited liability company registered in England and Wales with company number 03619027. This material is only directed and issued to persons regarded as Professional investors or equivalent in their home jurisdiction, or persons falling within articles 19 (5), 38, 47, and 49 of the Financial Services and Markets Act of 2000 (Financial Promotion) Order 2005 (all such persons being referred to as "relevant persons"). This document must not be acted on or relied on by persons who are not "relevant persons."

"William Blair" and "R*Docs" are registered trademarks of William Blair & Company, L.L.C. Copyright 2021, William Blair & Company, L.L.C. All rights reserved.

**William Blair & Company, L.L.C.** licenses and applies the SASB Materiality Map® and SICSTM in our work.

*William Blair*

# Equity Research Directory

**John F. O'Toole, Partner    Manager and Director of Research    +1 312 364 8612**
**Kyle Harris, CFA, Partner    Operations Manager    +1 312 364 8230**

## CONSUMER

**Sharon Zackfia, CFA, Partner    +1 312 364 5386**
Group Head–Consumer
*Lifestyle and Leisure Brands, Restaurants, Automotive/E-commerce*

**Jon Andersen, CFA, Partner    +1 312 364 8697**
*Consumer Products*

**Dylan Carden    +1 312 801 7857**
*Consumer Technology, Specialty Retail*

**Daniel Hofkin    +1 312 364 8965**
*Hardlines, Specialty Retail*

**Ryan Sundby, CFA    +1 312 364 5443**
*Outdoor and Recreation*

## FINANCIAL SERVICES AND TECHNOLOGY

**Adam Klauber, CFA, Partner    +1 312 364 8232**
Co-Group Head–Financial Services and Technology
*Financial Analytic Service Providers, Insurance Brokers, Property & Casualty Insurance*

**Robert Napoli, Partner    +1 312 364 8496**
Co-Group Head–Financial Services and Technology
*Financial Technology, Specialty Finance*

**Cristopher Kennedy, CFA    +1 312 364 8596**
*Financial Technology, Specialty Finance*

**Jeff Schmitt    +1 312 364 8106**
*Financial Services Distributors, Property & Casualty Insurance*

## HEALTHCARE

### Biotechnology

**Tim Lugo, Partner    +1 415 248 2870**
Group Head–Biotechnology
*Biotechnology*

**Andy T. Hsieh, Ph.D.    +1 312 364 5051**
*Biotechnology*

**Myles R. Minter, Ph.D.    +1 312 364 5283**
*Biotechnology*

**Matt Phipps, Ph.D.    +1 312 364 8602**
*Biotechnology*

**Raju Prasad, Ph.D.    +1 312 364 8469**
*Biotechnology*

### Healthcare Technology and Services

**Ryan Daniels, CFA, Partner    +1 312 364 8418**
Co-Group Head–Healthcare Technology and Services
*Healthcare Technology, Healthcare Services*

**John Kreger, Partner    +1 312 364 8597**
Co-Group Head–Healthcare Technology and Services
*Distribution, Outsourcing, Pharmacy Benefit Management*

**Margaret Kaczor, CFA, Partner    +1 312 364 8608**
*Medical Technology*

### Life Sciences

**Brian Weinstein, CFA, Partner    +1 312 364 8170**
Group Head–Life Sciences
*Diagnostics, Life Science Tools, Medical Technology*

**Matt Larew    +1 312 364 8242**
*Healthcare Delivery, Life Science Tools*

## GLOBAL INDUSTRIAL INFRASTRUCTURE

**Nick Heymann    +1 212 237 2740**
Co-Group Head–Global Industrial Infrastructure
*Multi-industry*

**Larry De Maria, CFA    +1 212 237 2753**
Co-Group Head–Global Industrial Infrastructure
*Capital Goods*

**Louie DiPalma, CFA    +1 312 364 5437**
*Aerospace, Defense, and Government Software*

**Brian Drab, CFA, Partner    +1 312 364 8280**
*Industrial Technology*

**Ryan Merkel, CFA    +1 312 364 8603**
*Building Products, Specialty Distribution*

## GLOBAL SERVICES

**Tim Mulrooney    +1 312 364 8123**
Group Head–Global Services
*Commercial Services, Staffing*

**Andrew Nicholas, CPA    +1 312 364 8689**
*Consulting, HR Technology, Information Services*

## TECHNOLOGY, MEDIA, AND COMMUNICATIONS

**Jason Ader, CFA, Partner    +1 617 235 7519**
Co-Group Head–Technology, Media, and Communications
*Infrastructure Software*

**Bhavan Suri, Partner    +1 312 364 5341**
Co-Group Head–Technology, Media, and Communications
*IT Services, Software, Software as a Service*

**Arjun Bhatia, CPA    +1 312 364 5696**
*Software as a Service*

**Jim Breen, CFA    +1 617 235 7513**
*Internet Infrastructure and Communication Services*

**Jonathan Ho, Partner    +1 312 364 8276**
*Cybersecurity, Security Technology*

**Kamil Mielczarek, CFA    +1 212 237 2714**
*Software*

**Maggie Nolan, CPA    +1 312 364 5090**
*IT Services*

**Matthew Pfau, CFA    +1 312 364 8694**
*Software as a Service*

**Ralph Schackart III, CFA, Partner    +1 312 364 8753**
*Digital Media, Internet*

**Stephen Sheldon, CFA, CPA    +1 312 364 5167**
*Vertical Technology – Real Estate, Education, Restaurant/Hospitality*

**Matt Stotler    +1 212 237 2755**
*Software, Software as a Service*

**Alessandra Vecchi    +1 212 237 2764**
*Semiconductors/Wireless*

## ECONOMICS

**Richard de Chazal, CFA    +44 20 7868 4489**

## EDITORIAL AND SUPERVISORY ANALYSTS

**Steve Goldsmith, Head Editor and SA    +1 312 364 8540**
**Audrey Majors, Editor and SA    +1 312 364 8992**
**Beth Pekol Porto, Editor and SA    +1 312 364 8924**
**Lisa Zurcher, Editor and SA    +44 20 7868 4549**

# EXHIBIT 14

# Jefferies

EQUITY RESEARCH
FibroGen Inc (FGEN)

## FibroGen

## Adcom book very mixed, FDA maybe open for some form of approval or black box

July 13, 2021

**FLASH NOTE**

USA | Biotechnology

| | |
|---|---|
| RATING | **HOLD** |
| TICKER | **FGEN** |
| PRICE | **$25.39^** |
| PRICE TARGET (PT) | **$22.00** |
| MARKET CAP | **$2.3B** |

^Prior trading day's closing price unless otherwise noted.

### Key Takeaway

**FDA Adcom documents appear very mixed and not clearly in support nor completely against approval. The FDA reviewer raises concerns on some of the CV risk data in both DD and NDD, and thus benefit/risk and ultimately asks the panel to vote if they would approve in each of DD and NDD. Maintain HOLD.**

**Overall we maintain our HOLD as there are too many risks and scenarios that preclude an obvious win.** We think documents read mixed with a view the drug may offer benefits but states the "benefits are difficult to calculate" (they cite only ~10% benefit on reduction of tranfusions); then the comments suggest CV data is murky and difficult to interpret and inconclusive but with some analyses not favoring roxa. Strangely or not, the FDA doesnt seem to ever talk about incident dialysis and seems less positive on DD approval than expected, although still somewhat open to NDD (more important market).

**FDA commentary shows they have concerns:** (1) they state roxa efficacy is "comparable" to that of ESAs; (2) but "there are important risks of serious thromboembolic events, as well as other risks, with Roxa"; and both ESAs and Roxa have pro-thrombolic effects (suggests FDA might be OK as class-label Black Box); (3) They also cite the oral route as only beneficial in NDD and IV is preferred for DD.

**Good news is the FDA does seem to think a possible titration or lower starting dose could be better because they do think "higher Hg" means higher CV risk.** So they ask the panel perhaps this could be a way to mitigate risk. Specifically, FDA says "higher rates of Hb rise were found to be associated with higher rates of thromboembolic events...." and the sponsor was able to corroborate our findings; hence a lower starting dose might reduce risk - this is plausible - but this is unproven. FDA findings show only associations, without proven cause and effect.

**The FDA asks the panel to vote:** (1) discuss the risk and benefit of Roxa in each indication of DD (dialysis) and NDD (non-dialysis) and if there are concerns, is there a way to address this through modification of the treatment algorithm, starting dose, or monitoring; To us, this actually reads slightly positive, suggesting the FDA would be open to approving and figure out a way that is amenable to use this for each of DD and NDD; Then FDA asks (2) VOTE if Roxa should be approved in DD and also NDD.

**FDA says the CV data is mixed at best and inconclusive; w/ signals of higher risk for Roxa:** MACE was examined on-study and 7 days post treatment for NDD and DD though data looks mixed and difficult to interpret; briefing docs tried to be balanced and attribute differences to dropouts in some cases and other confounding factors: **(1)** In NDD, HR=1.10 (0.96, 1.27) on-study was higher 1.38 (1.11, 1.70) 7 days post. FDA seems to attribute the latter to high discontinuation rates in placebo so there's greater exposure and risk to roxa that may bias the HR and not a fair comparison. **(2)** In DD, HR was 1.02 (0.88, 1.20) 7 days post and 1.14 (1.00, 1.30) on treatment though the Kaplan Meiers look similar; *they dont really discuss the incident dialysis population much at all.*

Michael J. Yee *
Equity Analyst
(415) 229-1535
michael.yee@jefferies.com

Andrew Tsai *
Equity Analyst
(415) 229-1566
atsai@jefferies.com

Kelechi Chikere, Ph.D. *
Equity Analyst
(415) 229-1570
kchikere@jefferies.com

Aryeh Gold *
Equity Associate
(415) 229-1475
agold1@jefferies.com

Dennis Ding *
Equity Associate
(212) 336-7325
dding@jefferies.com

**Please see analyst certifications, important disclosure information, and information regarding the status of non-US analysts on pages 2 to 7 of this report.**

* Jefferies LLC / Jefferies Research Services, LLC

# Jefferies

## Company Description

**FibroGen**

FibroGen is a San Francisco-based biopharmaceutical company focused on the discovery, development and commercialization of novel therapeutics to treat anemia, fibrosis and cancer. The company's lead anemia product candidate roxadustat is an oral small molecule inhibitor of HIF-PH, partnered with AstraZeneca and Astellas around the world. Its lead IPF drug candidate FG-3019 is a monoclonal antibody that is also in development for pancreatic cancer and liver fibrosis and DMD.

## Company Valuation/Risks

**FibroGen**

Our PT is based on a probability-adjusted DCF (WACC 8%; TG -10%) for Roxa and FG-3019. Risks include safety and efficacy, and reimbursement/competition.

## Analyst Certification:

I, Michael J. Yee, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Andrew Tsai, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Kelechi Chikere, Ph.D., certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Aryeh Gold, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Dennis Ding, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

As is the case with all Jefferies employees, the analyst(s) responsible for the coverage of the financial instruments discussed in this report receives compensation based in part on the overall performance of the firm, including investment banking income. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Aside from certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgement.

## Investment Recommendation Record

(Article 3(1)e and Article 7 of MAR)

| | |
|---|---|
| Recommendation Completion | July 13, 2021 , 10:39 ET. |
| Recommendation Distributed | July 13, 2021 , 10:39 ET. |

## Company Specific Disclosures

Jefferies Group LLC makes a market in the securities or ADRs of FibroGen Inc.

## Explanation of Jefferies Ratings

Buy - Describes securities that we expect to provide a total return (price appreciation plus yield) of 15% or more within a 12-month period.

Hold - Describes securities that we expect to provide a total return (price appreciation plus yield) of plus 15% or minus 10% within a 12-month period.

Underperform - Describes securities that we expect to provide a total return (price appreciation plus yield) of minus 10% or less within a 12-month period.

The expected total return (price appreciation plus yield) for Buy rated securities with an average security price consistently below $10 is 20% or more within a 12-month period as these companies are typically more volatile than the overall stock market. For Hold rated

**Jefferies**

securities with an average security price consistently below $10, the expected total return (price appreciation plus yield) is plus or minus 20% within a 12-month period. For Underperform rated securities with an average security price consistently below $10, the expected total return (price appreciation plus yield) is minus 20% or less within a 12-month period.

NR - The investment rating and price target have been temporarily suspended. Such suspensions are in compliance with applicable regulations and/or Jefferies policies.

CS - Coverage Suspended. Jefferies has suspended coverage of this company.

NC - Not covered. Jefferies does not cover this company.

Restricted - Describes issuers where, in conjunction with Jefferies engagement in certain transactions, company policy or applicable securities regulations prohibit certain types of communications, including investment recommendations.

Monitor - Describes securities whose company fundamentals and financials are being monitored, and for which no financial projections or opinions on the investment merits of the company are provided.

## Valuation Methodology

Jefferies' methodology for assigning ratings may include the following: market capitalization, maturity, growth/value, volatility and expected total return over the next 12 months. The price targets are based on several methodologies, which may include, but are not restricted to, analyses of market risk, growth rate, revenue stream, discounted cash flow (DCF), EBITDA, EPS, cash flow (CF), free cash flow (FCF), EV/EBITDA, P/E, PE/growth, P/CF, P/FCF, premium (discount)/average group EV/EBITDA, premium (discount)/average group P/E, sum of the parts, net asset value, dividend returns, and return on equity (ROE) over the next 12 months.

### Jefferies Franchise Picks

Jefferies Franchise Picks include stock selections from among the best stock ideas from our equity analysts over a 12 month period. Stock selection is based on fundamental analysis and may take into account other factors such as analyst conviction, differentiated analysis, a favorable risk/reward ratio and investment themes that Jefferies analysts are recommending. Jefferies Franchise Picks will include only Buy rated stocks and the number can vary depending on analyst recommendations for inclusion. Stocks will be added as new opportunities arise and removed when the reason for inclusion changes, the stock has met its desired return, if it is no longer rated Buy and/or if it triggers a stop loss. Stocks having 120 day volatility in the bottom quartile of S&P stocks will continue to have a 15% stop loss, and the remainder will have a 20% stop. Franchise Picks are not intended to represent a recommended portfolio of stocks and is not sector based, but we may note where we believe a Pick falls within an investment style such as growth or value.

## Risks which may impede the achievement of our Price Target

This report was prepared for general circulation and does not provide investment recommendations specific to individual investors. As such, the financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions based upon their specific investment objectives and financial situation utilizing their own financial advisors as they deem necessary. Past performance of the financial instruments recommended in this report should not be taken as an indication or guarantee of future results. The price, value of, and income from, any of the financial instruments mentioned in this report can rise as well as fall and may be affected by changes in economic, financial and political factors. If a financial instrument is denominated in a currency other than the investor's home currency, a change in exchange rates may adversely affect the price of, value of, or income derived from the financial instrument described in this report. In addition, investors in securities such as ADRs, whose values are affected by the currency of the underlying security, effectively assume currency risk.

# Jefferies



**Rating and Price Target History for: FibroGen Inc (FGEN) as of 07-12-2021**

| 03/01/2021 | HOLD:$45.00 | 04/07/2021 | HOLD:$25.00 | 05/11/2021 | HOLD:$22.00 |

**Notes:** Each box in the Rating and Price Target History chart above represents actions over the past three years in which an analyst initiated on a company, made a change to a rating or price target of a company or discontinued coverage of a company.

Legend:

I: Initiating Coverage

D: Dropped Coverage

B: Buy

H: Hold

UP: Underperform

## Distribution of Ratings

| Distribution of Ratings | | | | | | |
|---|---|---|---|---|---|---|
| | | | IB Serv./Past12 Mos. | | JIL Mkt Serv./Past12 Mos. | |
| | Count | Percent | Count | Percent | Count | Percent |
| **BUY** | 1787 | 63.26% | 163 | 9.12% | 27 | 1.51% |
| **HOLD** | 912 | 32.28% | 24 | 2.63% | 4 | 0.44% |
| **UNDERPERFORM** | 126 | 4.46% | 1 | 0.79% | 0 | 0.00% |

# Jefferies

**Other Important Disclosures**

Jefferies does business and seeks to do business with companies covered in its research reports, and expects to receive or intends to seek compensation for investment banking services among other activities from such companies. As a result, investors should be aware that Jefferies may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

Jefferies Equity Research refers to research reports produced by analysts employed by one of the following Jefferies Group LLC ("Jefferies") group companies:

**United States:** Jefferies LLC which is an SEC registered broker-dealer and a member of FINRA (and distributed by Jefferies Research Services, LLC, an SEC registered Investment Adviser, to clients paying separately for such research).

**United Kingdom:** Jefferies International Limited, which is authorized and regulated by the Financial Conduct Authority; registered in England and Wales No. 1978621; registered office: 100 Bishopsgate, London EC2N 4JL; telephone +44 (0)20 7029 8000; facsimile +44 (0)20 7029 8010.

**Hong Kong:** Jefferies Hong Kong Limited, which is licensed by the Securities and Futures Commission of Hong Kong with CE number ATS546; located at Suite 2201, 22nd Floor, Cheung Kong Center, 2 Queen's Road Central, Hong Kong.

**Singapore:** Jefferies Singapore Limited, which is licensed by the Monetary Authority of Singapore; located at 80 Raffles Place #15-20, UOB Plaza 2, Singapore 048624, telephone: +65 6551 3950.

**Japan:** Jefferies (Japan) Limited, Tokyo Branch, which is a securities company registered by the Financial Services Agency of Japan and is a member of the Japan Securities Dealers Association; located at Tokyo Midtown Hibiya 30F Hibiya Mitsui Tower, 1-1-2 Yurakucho, Chiyoda-ku, Tokyo 100-0006; telephone +813 5251 6100; facsimile +813 5251 6101.

**India:** Jefferies India Private Limited (CIN - U74140MH2007PTC200509), licensed by the Securities and Exchange Board of India for: Stock Broker (NSE & BSE) INZ000243033, Research Analyst INH000000701 and Merchant Banker INM000011443, located at 42/43, 2 North Avenue, Maker Maxity, Bandra-Kurla Complex, Bandra (East), Mumbai 400 051, India; Tel +91 22 4356 6000.

**Australia:** Jefferies (Australia) Securities Pty Limited (ACN 610 977 074), which holds an Australian financial services license (AFSL 487263) and is located at Level 22, 60 Martin Place, Sydney NSW 2000; telephone +61 2 9364 2800.

This report was prepared by personnel who are associated with Jefferies (Jefferies International Limited, Jefferies Hong Kong Limited, Jefferies Singapore Limited, Jefferies (Japan) Limited, Tokyo Branch, Jefferies India Private Limited), Jefferies (Australia) Pty Ltd; or by personnel who are associated with both Jefferies LLC and Jefferies Research Services LLC ("JRS"). Jefferies LLC is a US registered broker-dealer and is affiliated with JRS, which is a US registered investment adviser. JRS does not create tailored or personalized research and all research provided by JRS is impersonal. If you are paying separately for this research, it is being provided to you by JRS. Otherwise, it is being provided by Jefferies LLC. Jefferies LLC, JRS, and their affiliates are collectively referred to below as "Jefferies". Jefferies may seek to do business with companies covered in this research report. As a result, investors should be aware that Jefferies may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only one of many factors in making their investment decisions. Specific conflict of interest and other disclosures that are required by FINRA and other rules are set forth in this disclosure section.

* * *

If you are receiving this report from a non-US Jefferies entity, please note the following: Unless prohibited by the provisions of Regulation S of the U.S. Securities Act of 1933, as amended, this material is distributed in the United States by Jefferies LLC, which accepts responsibility for its contents in accordance with the provisions of Rule 15a-6 under the US Securities Exchange Act of 1934, as amended. Transactions by or on behalf of any US person may only be effected through Jefferies LLC. In the United Kingdom and European Economic Area this report is issued and/or approved for distribution by Jefferies International Limited ("JIL") and is intended for use only by persons who have, or have been assessed as having, suitable professional experience and expertise, or by persons to whom it can be otherwise lawfully distributed.

JIL allows its analysts to undertake private consultancy work. JIL's conflicts management policy sets out the arrangements JIL employs to manage any potential conflicts of interest that may arise as a result of such consultancy work. Jefferies LLC, JIL and their affiliates, may make a market or provide liquidity in the financial instruments referred to in this report; and where they do make a market, such activity is disclosed specifically in this report under "company specific disclosures".

For Canadian investors, this material is intended for use only by professional or institutional investors. None of the investments or investment services mentioned or described herein is available to other persons or to anyone in Canada who is not a "Designated

# Jefferies

Institution" as defined by the Securities Act (Ontario). In Singapore, Jefferies Singapore Limited ("JSL") is regulated by the Monetary Authority of Singapore. For investors in the Republic of Singapore, this material is provided by JSL pursuant to Regulation 32C of the Financial Advisers Regulations. The material contained in this document is intended solely for accredited, expert or institutional investors, as defined under the Securities and Futures Act (Cap. 289 of Singapore). If there are any matters arising from, or in connection with this material, please contact JSL, located at 80 Raffles Place #15-20, UOB Plaza 2, Singapore 048624, telephone: +65 6551 3950. In Japan, this material is issued and distributed by Jefferies (Japan) Limited to institutional investors only. In Hong Kong, this report is issued and approved by Jefferies Hong Kong Limited and is intended for use only by professional investors as defined in the Hong Kong Securities and Futures Ordinance and its subsidiary legislation. In the Republic of China (Taiwan), this report should not be distributed. The research in relation to this report is conducted outside the People's Republic of China ("PRC"). This report does not constitute an offer to sell or the solicitation of an offer to buy any securities in the PRC. PRC investors shall have the relevant qualifications to invest in such securities and shall be responsible for obtaining all relevant approvals, licenses, verifications and/or registrations from the relevant governmental authorities themselves. In India, this report is made available by Jefferies India Private Limited. In Australia, this report is issued and/or approved for distribution by, or on behalf of, Jefferies (Australia) Securities Pty Ltd. It is directed solely at wholesale clients within the meaning of the Corporations Act 2001 of Australia (the "Corporations Act"), in connection with their consideration of any investment or investment service that is the subject of this report. This report may contain general financial product advice. Where this report refers to a particular financial product, you should obtain a copy of the relevant product disclosure statement or offer document before making any decision in relation to the product. Recipients of this document in any other jurisdictions should inform themselves about and observe any applicable legal requirements in relation to the receipt of this document.

This report is not an offer or solicitation of an offer to buy or sell any security or derivative instrument, or to make any investment. Any opinion or estimate constitutes the preparer's best judgment as of the date of preparation, and is subject to change without notice. Jefferies assumes no obligation to maintain or update this report based on subsequent information and events. Jefferies, and their respective officers, directors, and employees, may have long or short positions in, or may buy or sell any of the securities, derivative instruments or other investments mentioned or described herein, either as agent or as principal for their own account. This material is provided solely for informational purposes and is not tailored to any recipient, and is not based on, and does not take into account, the particular investment objectives, portfolio holdings, strategy, financial situation, or needs of any recipient. As such, any advice or recommendation in this report may not be suitable for a particular recipient. Jefferies assumes recipients of this report are capable of evaluating the information contained herein and of exercising independent judgment. A recipient of this report should not make any investment decision without first considering whether any advice or recommendation in this report is suitable for the recipient based on the recipient's particular circumstances and, if appropriate or otherwise needed, seeking professional advice, including tax advice. Jefferies does not perform any suitability or other analysis to check whether an investment decision made by the recipient based on this report is consistent with a recipient's investment objectives, portfolio holdings, strategy, financial situation, or needs.

By providing this report, neither JRS nor any other Jefferies entity accepts any authority, discretion, or control over the management of the recipient's assets. Any action taken by the recipient of this report, based on the information in the report, is at the recipient's sole judgment and risk. The recipient must perform his or her own independent review of any prospective investment. If the recipient uses the services of Jefferies LLC (or other affiliated broker-dealers), in connection with a purchase or sale of a security that is a subject of these materials, such broker-dealer may act as principal for its own accounts or as agent for another person. Only JRS is registered with the SEC as an investment adviser; and therefore neither Jefferies LLC nor any other Jefferies affiliate has any fiduciary duty in connection with distribution of these reports.

The price and value of the investments referred to herein and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

This report may contain forward looking statements that may be affected by inaccurate assumptions or by known or unknown risks, uncertainties, and other important factors. As a result, the actual results, events, performance or achievements of the financial product may be materially different from those expressed or implied in such statements.

This report has been prepared independently of any issuer of securities mentioned herein and not as agent of any issuer of securities. No Equity Research personnel have authority whatsoever to make any representations or warranty on behalf of the issuer(s). Any comments or statements made herein are those of the Jefferies entity producing this report and may differ from the views of other Jefferies entities.

July 13, 2021

6

Please see important disclosure information on pages 2 - 7 of this report.

# Jefferies

This report may contain information obtained from third parties, including ratings from credit ratings agencies such as Standard & Poor's. Reproduction and distribution of third party content in any form is prohibited except with the prior written permission of the related third party. Jefferies does not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and is not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of such content. Third-party content providers give no express or implied warranties, including, but not limited to, any warranties of merchantability or fitness for a particular purpose or use. Neither Jefferies nor any third-party content provider shall be liable for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including lost income or profits and opportunity costs) in connection with any use of their content, including ratings. Credit ratings are statements of opinions and are not statements of fact or recommendations to purchase, hold or sell securities. They do not address the suitability of securities or the suitability of securities for investment purposes, and should not be relied on as investment advice.

Jefferies research reports are disseminated and available electronically, and, in some cases, also in printed form. Electronic research is simultaneously made available to all clients. This report or any portion hereof may not be reprinted, sold or redistributed without the written consent of Jefferies. Neither Jefferies nor any of its respective directors, officers or employees, is responsible for guaranteeing the financial success of any investment, or accepts any liability whatsoever for any direct, indirect or consequential damages or losses arising from any use of this report or its contents. Nothing herein shall be construed to waive any liability Jefferies has under applicable U.S. federal or state securities laws.

For Important Disclosure information relating to JRS, please see https://adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=483878 and https://adviserinfo.sec.gov/Firm/292142 or visit our website at https://javatar.bluematrix.com/sellside/Disclosures.action, or www.jefferies.com, or call 1.888.JEFFERIES.

© 2021 Jefferies Group LLC

# EXHIBIT 15

# STIFEL

**FibroGen, Inc.**
FGEN – NASDAQ

**July 13, 2021**                                                                                    Biotechnology

**BUY**
Price $24.33 (intraday 7/13/21)

**FLASH NOTE**

## Roxadustat AdCom Briefing Docs Raise Question of Addressing Safety with Titration or Additional Studies

## Summary

Roxadustat AdCom briefing documents released this morning pointed to several key questions, not surprisingly around cardiovascular safety, which forms the basis of the key voting questions to the panel—should Roxa be approved for CKD-related anemia in NDD and DD with discussion points being around whether risks can be addressed through modification of the treatment algorithm. The safety question appears to revolve primarily around the risk of thrombotic effects, whether they are on- or off-target, and whether they can be addressed by different dosing schemes. This seems not to be addressed in the randomized controlled studies conducted but rather in exploratory analyses. Hence, FDA is posing whether additional studies should be conducted prior to approval, post- or not at all. While we have no way of handicapping, we think the last question is causing pressure on FGEN shares today—the answer to which will only be addressed by the AdCom.

## Key Points

**Thromboembolic events occur with both ESAs and Roxadustat, but FDA posing to panel whether they can be mediated:** Roxadustat (as an inhibitor of HIF-PH enzymes) was expected to reduce exposure to supraphysiologic doses of erythropoietin, improve iron metabolism and availability, and achieve efficacy comparable to ESAs with fewer safety issues. Roxa efficacy was indeed found to be comparable to ESAs, yet Roxa was found to have "important risks of serious thrombembolic events". This raises important questions for FDA to consider, namely what is the source of the pro-thrombotic effect—on-target mediated by excess Hb concentrations, overshoots, excessive rates of rise, fluctuation or viscosity, OR off-target related to erythropoietin (though none are known). FDA has conducted exploratory analyses (under the assumption that the events are on-target) to determine whether this effect can be mediated through dosing algorithms, with findings corroborated by FGEN. Higher rates of Hb rise and decline were found to be associated with the thrombotic events, and FGEN believes that the risks could be reduced through a lower starting dose. FDA appears to believe the prediction is plausible, but this has not been established in randomized controlled trials. We note that Roxa has been approved in China and Japan, with the risks established in the label, and CHMP in EU recently recommended approval of Roxa in both DD and NDD with a warning of risk for thrombotic events.

**Risk/benefit in dialysis hinges on hyporesponders:** In the dialysis setting, Roxa reduced the need for RBC transfusions, though relative to EPO, the benefit was less conclusive according to FDA particularly if one believes the risk of thromboembolic events is higher with Roxa than ESAs. This goes back to the critical question of whether lowering the Roxa starting dose will reduce risk. The second benefit raised was with regard to ESA hyporesponders. However, FDA did not believe that FGEN clearly demonstrated that patients who are hyporesponsive to ESAs are responsive to Roxadustat. This will be an important point to clarify as the medical community and FDA agree this is a population in need of better therapies.

**Non-dialysis comparison confounded by uneven dropout in PBO:** Roxa was studied versus PBO in the NDD population, with the possibility of "rescue" therapy if needed. These studies had the advantage of assessing Roxa safety against a clean background, as well as comparing Roxa to current standard of care given that only ~15% of anemic patients in NDD are treated. However, FDA took issue with the uneven dropout between arms. Patients with more advanced disease and who had poor response or received placebo were more likely to leave the study (and have greater risk of CV events) than patients who received Roxa—resulting in great disparity in study retention and challenging the interpretation of safety analyses. Yet the time of observation was shortened and perhaps not sufficient to assess the event. Conversely, the Roxa patients stayed on therapy longer perhaps increasing the opportunity to experience the events. According to FDA, this confounds the safety assessment in the NDD population and the results depend on the observation time. We expect this analysis to be clarified to the panel. We note, FDA did cite the 616-patient EU study comparing Roxa to darpoietin alpha where Roxa was successfully established non-inferiority, but Roxa resulted in a more rapid rise in Hb, potentially impacting safety. We think this goes back to the primary question of whether safety issues can be addressed by titration.

**Annabel Samimy** | (212) 271-3823 | asamimy@stifel.com
**Nick C. Rubino** | (212) 271-3756 | rubinon@stifel.com
**Stifel Equity Trading Desk** | (800) 424-8870

**Stifel does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.**
**All relevant disclosures and certifications appear on pages 3 - 5 of this report.**

# FibroGen, Inc.

Flash Note                                                                                   **FGEN – NASDAQ**

**July 13, 2021**                                                                                   Biotechnology

**Investment Thesis**

*FibroGen focuses on the development of two potential first-in-class drug candidates. Roxadustat is an oral HIF-PH inhibitor mimicking natural erythropoiesis for the treatment of anemia associated with chronic kidney disease (CKD). For CKD, roxadustat has been approved for the DD and NDD population in China, with a US AdCom scheduled for 7/15/21. We view roxadustat as a safer and better alternative to ESAs, which currently has annual sales of approximately $6 billion. Pamrevlumab is an anti-CTGF mAb that targets various fibrotic diseases with significant unmet medical need. Positive top-line data from Phase 2 studies for IPF seem compelling and the drug is also being tested in pancreatic cancer and DMD.*

**Target Price Methodology/Risks**

Our 12-month target price of $55/share represents the valuation of our DCF methodology, using a terminal growth rate of 2% and discount rate of 11% with earnings projections out to 2030. Risks to our target price include dependence on success pipeline products, potential for clinical trial failures, regulatory and commercial hurdles, and the need for additional capital.

**Company Description**

FibroGen, Inc. is a development stage biotechnology company headquartered in San Francisco, CA. Its lead product candidate, roxadustat, is being developed for the treatment of anemia associated with chronic kidney disease. The company has two large partnerships for the development of roxadustat with Astellas and AstraZeneca. Other product candidates include wholly-owned pamrevlumab, a fully human monoclonal antibody that inhibits the activity of connective tissue growth factor in development for IPF, LAPC, and DMD.



**FibroGen, Inc.**

Flash Note                                                                                    **FGEN – NASDAQ**

**July 13, 2021**                                                                              Biotechnology

### Important Disclosures and Certifications

**I, Annabel Samimy, certify that the views expressed in this research report accurately reflect my personal views about the subject securities or issuers; and I, Annabel Samimy, certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in this research report.**

**Our European Policy for Managing Research Conflicts of Interest is available at www.stifel.com/institutional/ImportandDisclosures.**

**FibroGen, Inc. (FGEN) as of July 12, 2021 (in USD)**



*Represents the value(s) that changed.

Buy=B; Hold=H; Sell=S; Discontinued=D; Suspended=SU; Discontinued=D; Initiation=I

**For a price chart with our ratings and target price changes for FGEN go to
http://stifel2.bluematrix.com/sellside/Disclosures.action?ticker=FGEN**

Prior to July 10, 2020, a different Stifel research analyst provided research coverage of FibroGen, Inc. and its securities. FibroGen, Inc.'s price chart for the period prior to July 10, 2020 reflects the rating and price target history of the former Stifel research analyst for such issuer and its securities.

Stifel or an affiliate expects to receive or intends to seek compensation for investment banking services from FibroGen, Inc. in the next 3 months.

Stifel or an affiliate is a market maker or liquidity provider in the securities of FibroGen, Inc..

The equity research analyst(s) responsible for the preparation of this report receive(s) compensation based on various factors, including Stifel's overall revenue, which includes investment banking revenue.

### Investment Rating System

Our investment rating system is defined as follows:

**Buy** - We expect a total return of greater than 10% over the next 12 months with total return equal to the percentage price change plus dividend yield.

**Speculative Buy**[1] **-** We expect a total return of greater than 30% over the next 12 months, with total return equal to the percentage price change plus dividend yield, accompanied by substantially higher than normal risk including the possibility of a binary outcome.

**Hold** - We expect a total return between -5% and 10% over the next 12 months with total return equal to the percentage price change plus dividend yield.

**Sell** - We expect a total return below -5% over the next 12 months with total return equal to the percentage price change plus dividend yield.

Occasionally, we use the ancillary rating of **Suspended (SU)** to indicate a long-term suspension in rating and/or target price, and/or coverage due to applicable regulations or Stifel policies. Alternatively, **Suspended** may indicate the analyst is unable to determine a "reasonable basis" for rating/target price or estimates due to lack of publicly available information or the inability to quantify the publicly available information provided by the company and it is unknown when the outlook will be clarified. **Suspended** may also be used when an analyst has left the firm.

[1] This rating is only utilised by Stifel Canada.

Of the securities we rate, 57% are rated Buy, 1% are rated Speculative Buy, 28% are rated Hold, 2% are rated Sell and 12% are rated Suspended.

Within the last 12 months, Stifel or an affiliate has provided investment banking services for 25%, 8%, 0% and 8% of the companies whose shares are rated Buy (includes Speculative Buy), Hold, Sell and Suspended respectively.



**FibroGen, Inc.**

Flash Note | **FGEN – NASDAQ**

**July 13, 2021** | Biotechnology

Within the last 12 months, Stifel or an affiliate has provided material services for 42%, 60%, 20%, 23% and 14% of the companies whose shares are rated Buy, Speculative Buy, Hold, Sell and Suspended respectively.

**Additional Disclosures**

The enclosed materials include information derived from market research information provided by IQVIA, Inc. and its affiliated companies ("IQVIA"). IQVIA market research information is proprietary to IQVIA and available on a confidential basis by subscription from IQVIA. IQVIA market research information reflects estimates of marketplace activity and should be treated accordingly.

Please visit the Research Page at www.stifel.com for the current research disclosures and respective target price methodology applicable to the companies mentioned in this publication that are within the Stifel coverage universe. For a discussion of risks and changes to target price including basis of valuation or methodology please see our stand-alone company reports and notes for all stocks.

The information contained herein has been prepared from sources believed to be reliable but is not guaranteed by us and is not a complete summary or statement of all available data, nor is it considered an offer to buy or sell any securities referred to herein. Opinions expressed are as of the date of this publication and are subject to change without notice. These opinions do not constitute a personal recommendation and do not take into account the particular investment objectives, financial situation or needs of individual investors. Employees of Stifel, or its affiliates may, at times, release written or oral commentary, technical analysis or trading strategies that differ from the opinions expressed within. Stifel or any of its affiliates may have positions in the securities mentioned and may make purchases or sales of such securities from time to time in the open market or otherwise and may sell to or buy from customers such securities on a principal basis; such transactions may be contrary to recommendations in this report. Past performance should not and cannot be viewed as an indicator of future performance. Unless otherwise noted, the financial instruments mentioned in this report are priced as of market close on the previous trading day and presumed performance is calculated always over the next 12 months.

As a multi-disciplined financial services firm, Stifel regularly seeks investment banking assignments and compensation from issuers for services including, but not limited to, acting as an underwriter in an offering or financial advisor in a merger or acquisition, or serving as a placement agent in private transactions.

**Affiliate Disclosures**

References to "**Stifel**" (collectively "Stifel") refer to SFC and other associated affiliated subsidiaries including (i) Stifel, Nicolaus & Company, Incorporated ("**SNC**"); (ii) Keefe, Bruyette & Woods, Incorporated ("**KBWI**"), which are both U.S. broker-dealers registered with the United States Securities and Exchange Commission ("**SEC**") and members of the Financial Industry National Regulatory Authority ("**FINRA**"), respectively; (iii) Stifel Nicolaus Canada, Incorporated. ("**Stifel Canada**"), which is authorised and regulated by Investment Industry Regulatory Organization of Canada ("**IIROC**"), and also trades under the names "**Stifel GMP**" and/or "**Stifel FirstEnergy**"; (iv) Stifel Nicolaus Europe Limited ("**SNEL**"), which is authorised and regulated by the Financial Conduct Authority ("**FCA**") (FRN 190412) and is a member of the London Stock Exchange and also trades under the name Keefe, Bruyette & Woods Europe ("**KBW Europe**"); and (v) Stifel Europe Bank AG ("**SEBA**"), which is regulated by the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht; "BaFin") and is a member of Deutsche Boerse and SIX Swiss Exchange and (vi) Stifel Schweiz AG ("**STSA**"), which is representative of SEBA in Switzerland and regulated by the Eidgenössische Finanzmarktaufsicht ("**FINMA**"). SNEL, SEBA and STSA are collectively referred to as **Stifel Europe**.

**Registration of non-US Analysts:** Any non-US research analyst employed by Stifel contributing to this report is not registered/qualified as a research analyst with FINRA and is not an associated person of the US broker-dealer and therefore may not be subject to FINRA Rule 2241 restrictions on communications with a subject company, public appearances, and trading securities held by a research analyst account.

**Global Research Notes:** Stifel Global Research (Cross-Border Research) notes are intended for use only by Institutional or Professional Clients. Research analysts contributing content to these reports are subject to different regulatory requirements based on the jurisdiction in which they operate. Clients seeking additional information should contact the Stifel entity through which they conduct business.

**SEBA & STSA Sponsored research:** At SEBA & STSA, analysts may produce issuer paid research ('sponsored research'). This research is produced by analysts in accordance with local regulatory requirements relating to such research. In certain jurisdictions, this issuer paid research may be deemed to be independent research albeit not produced to the same conflicts of interest standards required by all jurisdictions for independent research. Where research has been paid for by an issuer, this will be clearly labelled. Please see our European Policy for Managing Research Conflicts of Interest for additional information.

**Country Specific and Jurisdictional Disclosures**

**United States:** Research produced and distributed by Stifel Europe is distributed by Stifel Europe to "Major US Institutional Investors" as defined in Rule 15a-6 under the US Securities Exchange Act of 1934, as amended. SNC may also distribute research prepared by Stifel Europe directly to US clients, including US clients that are not Major US Institutional Investors. In these instances, SNC accepts responsibility for the content. Stifel Europe is a non-US broker-dealer and accordingly, any transaction by a US client in the securities discussed in the document must be effected by SNC. US clients wishing to place an order should contact their SNC representative.

**UK:** This report is distributed in the UK by SNEL, which is authorised and regulated by the Financial Conduct Authority (FCA). In these instances, SNEL accepts responsibility for the content. Research produced by Stifel Europe is not intended for use by and should not be made available to retail clients as defined by the FCA.



**FibroGen, Inc.**

Flash Note

**FGEN – NASDAQ**

**July 13, 2021**

Biotechnology

**European Economic Area (EEA)**: This report is distributed in the EEA by SEBA, which is authorized and regulated by the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht; "BaFin"). In these instances, SEBA accepts responsibility for the content. Research produced by Stifel Europe is not intended for use by and should not be made available to retail clients as defined under MiFID II.

The complete preceding 12-month recommendations history related to recommendation(s) in this research report is available at https://stifel2.bluematrix.com/sellside/MAR.action

**Australia:** Research produced by Stifel is distributed by SNEL under the Australian Securities and Investments Commission ("ASIC") Class Order [CO 03/1099] exemption from the requirement to hold an Australian Financial Services Licence ("AFSL"). This research may only be distributed to a "Wholesale Client" within the meaning of section 761G of the Corporations Act 2001 (Cth).

**Brunei:** This document has not been delivered to, registered with or approved by the Brunei Darussalam Registrar of Companies, Registrar of International Business Companies, the Brunei Darussalam Ministry of Finance or the Autoriti Monetari Brunei Darussalam. This document and the information contained within will not be registered with any relevant Brunei Authorities under the relevant securities laws of Brunei Darussalam. The interests in the document have not been and will not be offered, transferred, delivered or sold in or from any part of Brunei Darussalam. This document and the information contained within is strictly private and confidential and is being distributed to a limited number of accredited investors, expert investors and institutional investors under the Securities Markets Order, 2013 ("Relevant Persons") upon their request and confirmation that they fully understand that neither the document nor the information contained within have been approved or licensed by or registered with the Brunei Darussalam Registrar of Companies, Registrar of International Business Companies, the Brunei Darussalam Ministry of Finance, the Autoriti Monetari Brunei Darussalam or any other relevant governmental agencies within Brunei Darussalam. This document and the information contained within must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which the document or information contained within is only available to, and will be engaged in only with Relevant Persons.

**Canadian Distribution:** Research produced by Stifel Europe is distributed in Canada by SNC in reliance on the international dealer exemption. This material is intended for use only by professional or institutional investors. None of the investments or investment services mentioned or described herein is available to other persons or to anyone in Canada who is not a "permitted client" as defined under applicable Canadian securities laws.

**Republic of South Africa:** Research produced by Stifel is distributed by SNEL to "Clients" as defined in FSCA FAIS Notice 20 of 2018 (the "FAIS Notice") issued by the Financial Services Conduct Authority. Research distributed by SNEL is pursuant to an exemption from the licensing requirements under Section 7(1) of the Financial Advisory and Intermediary Services Act, 2002.

In jurisdictions where Stifel is not already licensed or registered to trade securities, transactions will only be affected in accordance with local securities legislation which will vary from jurisdiction to jurisdiction and may require that a transaction is carried out in accordance with applicable exemptions from registration and licensing requirements. Non-US customers wishing to effect transactions should contact a representative of the Stifel entity in their regional jurisdiction except where governing law permits otherwise. US customers wishing to effect transactions should contact their US salesperson.

The securities discussed in this report may not be available for sale in all jurisdictions and may have adverse tax implications for investors. Clients are advised to speak with their legal or tax advisor prior to making an investment decision.

The recommendation contained in this report was produced at 13 July 2021 12:31EDT and disseminated at 13 July 2021 12:31EDT.

**Additional Information Is Available Upon Request**

© 2021 Stifel. This report is produced for the use of Stifel customers and may not be reproduced, re-distributed or passed to any other person or published in whole or in part for any purpose without the prior consent of Stifel.



# EXHIBIT 16

# FIBROGEN, INC.

(NASDAQ: FGEN)

**OUTPERFORM**



Biotechnology

## FDA Finds Significant Risks in Roxa – NDD Questionable, Black Box Certain

July 13, 2021

- **Bottom Line: This morning FDA released briefing documents for FGEN's roxadustat ahead of Thursday's cardio-renal advisory committee meeting. The major controversies about the approval are (a) approval or not, (b) black box warning or not and (c) breadth of label including non-dialysis or not. The briefing documents are important signals of the FDA's views on these controversies and the likely debate on them this week.**

- **We view the FDA's documents as negative for potential FDA approval in the larger non-dialysis dependent (NDD) indication and at best neutral for approval in dialysis dependent (DD) chronic kidney disease (CKD) anemia.** The briefing documents are available HERE for the Cardiovascular and Renal Drugs Advisory Committee (AdCom) meeting to discuss FGEN's hypoxia-inducible factor prolyl hydroxylase (HIF-PH) drug roxadustat (roxa).

- **Safety:** Roxa's cardiovascular safety has been the key controversy heading into the AdCom. FDA's analysis found an association between roxa and risk of serious thromboembolic events in both NDD and DD populations. The briefing documents disclosed that FDA asked FGEN to confirm the agency's analysis of the association between thromboembolic events and Hb increases, and report that both parties identified a positive association. The numerical imbalance against roxa was confirmed in both FGEN and the FDA's analysis for pulmonary embolism (with imbalances in fatal events), DVT and vacular access thrombosis. FDA noted that a causal link (roxa treatment vs. thromboembolic events) is not established, however we expect this will be a key variable for evaluating the drug's benefit-risk profile. The agency found a higher hazard ratio (point estimates >1) for major adverse cardiovascular events (MACE) for roxa treatment vs. placebo for the NDD population and higher MACE risk for roxa vs. ESA standard of care in the DD population as well (Exhibit 1 and 2). FDA noted that length of the adverse event monitoring interval has a large impact on the MACE hazard ratios which we expect will be an important AdCom discussion topic. The agency noted the dropout rate in the placebo arm for the NDD trials likely hinders the interpretation of safety in that population. We believe that the AdCom may well suggest additional safety studies in NDD if they consider roxa approvable in that population at all. We believe the FDA's view of roxa's safety is

Reason for report:
**FLASH NOTE**

### Key Stats

| | |
|---|---|
| **S&P 500 Health Care Index:** | **1,504.15** |
| Price: | **$24.18** |
| 52 Week High: | $57.21 |
| 52 Week Low: | $18.12 |
| Shares Outstanding (mil): | 97.8 |
| Market Capitalization (mil): | 2,364.8 |

**Geoffrey C. Porges, MBBS**
(212) 277-6092
geoffrey.porges@svbleerink.com

**Anna Baran, CFA**
(212) 277-6204
anna.baran@svbleerink.com

**Na Sun**
(212) 277-6218
na.sun@svbleerink.com

*Source: Company Information and SVB Leerink LLC Research.*
*General: Intra day price.  Revenues in $M; GAAP EPS presented. .*

**Please refer to page 11 for Important Disclosures, Price Charts and Analyst Certification.**

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



incrementally negative compared to FGEN's previous commentary and is also worse than our prior expectations. We believe that the briefing documents suggest a black box warning for roxa for risk of thromboembolic events is nearly certain. Other imbalances include seizure risk, risk of serious (including fatal) bacterial infections and malignancy risks and we expect all of these imbalances to be reflected in the label.

- **Efficacy:** The agency's analysis of efficacy found that roxa was only comparable to erythropoietin stimulating agents (ESAs) in terms of increasing hemoglobin (Hb) levels in patients with anemia due to chronic kidney disease (CKD) (Exhibits 3 and 4). This contrasts with the superior efficacy vs. ESAs that some had been expecting. FDA noted that roxa treatment was associated with a reduced need for red blood cell transfusions, as expected and similar to ESAs. The agency raised questions about whether the drug's efficacy would still be meaningful if lower dosing was required to address potential safety concerns. The company and the agency appear to be in agreement that certain pharmacodynamic factors (rate of Hb correction, corrected Hb level) may be associated with these events and further follow up, and/or exploration of alternative dosing schedules, may be one request coming out of the AdCom.

- **Label:** The ultimate question that investors are hoping to gauge from the briefing documents and the AdCom's review is the scope of the product label. Based on the briefing documents at least, it seems that the FDA is certainly planning for a significant black box warning in the roxa label, and may be inclined to restrict the approval to just dialysis dependent CKD. It is not out of the realm of possibility that the agency issues a complete response letter (CRL) asking for additional clinical trials. This is likely to remain the most important question during and after the AdCom, particularly in the context of the still uncertain FDA action date on the entire application.

- **Key questions we expect the AdCom to discuss:** (1) the risk of serious thromboembolic events and their association with higher hemoglobin increases, (2) risk and significance of other imbalanced serious adverse events (3), whether a lower roxa dose could mitigate the potential risk of thromboembolic and other adverse events, particularly in the NDD population, and (4) whether additional safety trials in NDD are required.

- **FGEN shares readthrough:** We expect that FGEN shares will suffer (trading down ~7% intraday) based on the briefing documents until the AdCom and could suffer further downside depending on the tone of the AdCom's discussion and votes regarding the breadth of the labelled indication. The briefing documents suggest that our expectations for a 3Q21 US launch for roxa (see also our earlier preview note) could be at risk.

- **Cardiovascular and Renal Drug Advisory Committee will meet Thursday, July 15, at 9.30AM ET.** Briefing documents are posted here. Webcast information should be available on the meeting page on the day of the AdCom.

2

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



*Continued with exhibits inside…*

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 1: FDA's NDD Safety Analysis

Table 27: Summary of MACE Analysis Results in the NDD Population

| | On-study Analysis (Primary) | | OT+7 Analysis (Sensitivity) | |
|---|---|---|---|---|
| | Roxadustat N = 2386 PY = 4509.6 | Placebo N = 1884 PY = 3406.2 | Roxadustat N = 2386 PY = 3843.2 | Placebo N = 1884 PY = 2331.6 |
| Events (rate) | 480 (10.6) | 350 (10.3) | 277 (7.2) | 131 (5.6) |
| HR (95% CI) | 1.10 (0.96, 1.27) | | 1.38 (1.11, 1.70) | |



*Source: [FDA briefing documents](#)*

4

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 2: FDA's DD Safety Analysis

Table 29: Summary of MACE Analysis Results in the DD Population

| | OT+7 Analysis (Primary) | | | On-Study Analysis (Sensitivity) | |
|---|---|---|---|---|---|
| | Roxadustat N = 1940 PY = 3261.2 | ESA N = 1940 PY = 3660.3 | | Roxadustat N = 1940 PY = 3898.9 | ESA N = 1940 PY = 4151.0 |
| Events (rate per 100 P-Y) | 306 (9.4) | 339 (9.3) | | 482 (12.4) | 451 (10.9) |
| HR (95% CI) | 1.02 (0.88, 1.20) | | | 1.14 (1.00, 1.30) | |



*Source: FDA briefing documents*

5

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 3: FDA's NDD Efficacy Analysis

### Table 7: Efficacy Endpoints for NDD Trials

| Trial/Treatment Arm | 001 | | 060 | | 608 | |
|---|---|---|---|---|---|---|
| | Roxadustat N=1384 | Placebo N=1377 | Roxadustat N=616 | Placebo N=306 | Roxadustat N=391 | Placebo N=203 |
| Mean baseline Hb (SD) | 9.11 (0.73) | 9.10 (0.74) | 9.10 (0.75) | 9.09 (0.69) | 9.08 (0.76) | 9.10 (0.72) |
| Mean Hb Week 28–52 (SD) | 10.84 (0.86) | 9.50 (1.18) | 11.10 (0.70) | 9.25 (1.06) | 11.16 (0.84) | 9.60 (1.02) |
| Hb change from baseline to average Hb in Weeks 28 to 52 (SE) | 1.75 (0.03) | 0.40 (0.03) | 2.00 (0.95) | 0.16 (0.89) | 1.99 (0.95) | 0.41 (0.98) |
| Least squares mean (LSM) difference roxadustat from placebo (95% CI) | 1.35 (1.27, 1.43) P < 0.001 | | 1.85 (1.74, 1.97) P < 0.0001 | | 1.69 (1.52, 1.86) P < 0.001 | |
| Subjects with RBC transfusions, N (%) | 176 (12.7) | 320 (23.3) | 34 (5.6) | 47 (15.4) | 33 (8.5) | 39 (19.2) |
| Hazard Ratio; Nominal P-value | 0.37; <0.001 | | 0.26; < 0.001 | | 0.34; <0.001 | |

*Source: FDA briefing documents*

## Exhibit 4: FDA's DD Efficacy Analysis

### Table 15: Efficacy Results for the DD Trials

| Study/Treatment Arms | 002 | | 063 | | 064 | |
|---|---|---|---|---|---|---|
| | Roxadustat N=1051 | Epoetin alfa N=1055 | Roxadustat N=522 | Epoetin alfa N=521 | Roxadustat N=370 | Epoetin alfa N=371 |
| Mean Baseline Hb (SD) | 9.99 (1.2) | 10.02 (1.24) | 8.43 (1.04) | 8.46 (0.96) | 10.30 (0.66) | 10.31 (0.66) |
| Hb averaged over Weeks 28–52 (SD) | 10.83 (0.94) | 10.74 (1.02) | 11.00 (0.82) | 10.83 (0.88) | 10.69 (0.76) | 10.22 (0.68) |
| Change from baseline in Hb average over Weeks 28 to 52 (adjusted mean) (SE) | 0.77 (0.04) | 0.68 (0.04) | 2.38 (0.04) | 2.20 (0.04) | 0.28 (0.07) | -0.19 (0.06) |
| Difference: Roxadustat minus Epoetin alfa (95% CI) | 0.09 (0.01, 0.18) | | 0.18 (0.08, 0.29) | | 0.48 (0.37, 0.59) | |
| Subjects with RBC transfusions, N (%) | 103 (9.8) | 139 (13.2) | 38 (7.3) | 33 (6.4) | 46 (12.5) | 78 (21.1) |
| Hazard Ratio; Nominal P-value | 0.83; 0.15 | | 1.26; 0.33 | | 0.67; 0.04 | |

*Source: FDA briefing documents*

**6**

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 5: FDA's NDD Safety Summary Analysis

Table 31: Major Risks by Subgroup in the NDD Population (All Adverse Events; OT+7 Analysis)

| Events per 100 P-Y | | Percent of Subjects | Thrombosis, all | | | Device/shunt thrombosis, occlusion, malfunction, stenosis | | | Sepsis | | | Seizure | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Rox | Pbo | RR | Rox | Pbo | RR | Rox | Pbo | RR | Rox | Pbo | RR |
| All | All | 100% | 5.0 | 3.3 | 1.5 | 2.3 | 0.9 | 2.6 | 2.6 | 1.2 | 2.1 | 0.6 | 0.1 | 4.8 |
| Sex | Female | 58% | 4.8 | 2.7 | 1.8 | 2.5 | 0.8 | 3.2 | 2.4 | 0.8 | 3.0 | 0.7 | 0.1 | 4.7 |
| | Male | 42% | 5.5 | 4.2 | 1.3 | 1.9 | 1.0 | 2.0 | 2.8 | 1.8 | 1.6 | 0.5 | 0.1 | 4.9 |
| Baseline age quartile | 18-53 | 24% | 3.7 | 1.8 | 2.1 | 3.4 | 1.4 | 2.4 | 2.0 | 0.8 | 2.5 | 1.0 | 0.4 | 2.4 |
| | 54-63 | 26% | 5.9 | 4.3 | 1.4 | 2.4 | 0.9 | 2.9 | 2.4 | 1.2 | 2.0 | 0.6 | 0.0 | - |
| | 64-72 | 24% | 5.3 | 3.5 | 1.5 | 2.0 | 0.5 | 3.9 | 3.5 | 1.0 | 3.5 | 0.5 | 0.0 | - |
| | 73-100 | 25% | 5.2 | 3.3 | 1.6 | 1.3 | 0.8 | 1.6 | 2.4 | 1.7 | 1.4 | 0.4 | 0.2 | 2.7 |
| Age ≥ 65 | No | 53% | 4.9 | 3.3 | 1.5 | 2.9 | 1.1 | 2.5 | 2.2 | 1.0 | 2.3 | 0.7 | 0.2 | 4.1 |
| | Yes | 47% | 5.3 | 3.3 | 1.6 | 1.6 | 0.6 | 2.6 | 3.1 | 1.5 | 2.1 | 0.5 | 0.1 | 5.9 |
| Age ≥ 75 | No | 79% | 5.1 | 3.1 | 1.7 | 2.5 | 0.9 | 2.8 | 2.5 | 1.1 | 2.4 | 0.6 | 0.1 | 5.8 |
| | Yes | 21% | 4.7 | 3.9 | 1.2 | 1.4 | 0.7 | 1.9 | 2.7 | 1.7 | 1.6 | 0.5 | 0.2 | 2.8 |
| Baseline BMI quartile | 15-22.78 | 25% | 2.9 | 1.9 | 1.5 | 2.3 | 0.7 | 3.3 | 2.2 | 0.9 | 2.5 | 0.6 | 0.5 | 1.1 |
| | 22.79-25.82 | 25% | 5.2 | 4.4 | 1.2 | 2.0 | 0.8 | 2.4 | 3.2 | 1.0 | 3.1 | 0.4 | 0.0 | - |
| | 25.83-29.76 | 25% | 5.6 | 3.7 | 1.5 | 2.5 | 1.2 | 2.0 | 2.8 | 1.4 | 2.0 | 0.7 | 0.0 | - |
| | 29.77-60.3 | 25% | 6.6 | 3.0 | 2.2 | 2.4 | 0.7 | 3.5 | 2.1 | 1.5 | 1.4 | 0.7 | 0.0 | - |
| Race | Asian | 36% | 3.5 | 2.6 | 1.3 | 1.7 | 0.4 | 4.7 | 3.0 | 1.6 | 1.9 | 0.6 | 0.1 | 4.9 |
| | Black | 8% | 4.9 | 4.3 | 1.1 | 1.2 | 1.4 | 0.9 | 1.8 | 0.9 | 1.9 | 1.2 | 0.0 | - |
| | Other | 8% | 5.2 | 1.5 | 3.4 | 1.0 | 0 | - | 2.6 | 0.5 | 5.2 | 0.7 | 0.0 | - |
| | White | 47% | 6.4 | 3.9 | 1.7 | 3.2 | 1.3 | 2.5 | 2.3 | 1.1 | 2.1 | 0.5 | 0.2 | 2.8 |
| Baseline hemoglobin quartile | 4.9-8.72 | 25% | 5.8 | 4.3 | 1.3 | 3.0 | 0.9 | 3.5 | 4.0 | 1.9 | 2.1 | 0.8 | 0.2 | 3.7 |
| | 8.73-9.23 | 25% | 4.6 | 3.7 | 1.3 | 2.1 | 1.3 | 1.6 | 3.0 | 0.9 | 3.3 | 0.8 | 0.0 | - |
| | 9.24-9.63 | 25% | 5.2 | 2.7 | 1.9 | 2.1 | 0.3 | 6.6 | 2.3 | 1.3 | 1.8 | 0.3 | 0.3 | 1.0 |
| | 9.64-10.57 | 25% | 4.7 | 2.8 | 1.7 | 2.0 | 1.0 | 2.0 | 1.2 | 0.9 | 1.3 | 0.6 | 0.0 | - |
| History of CV disease | No | 68% | 4.4 | 2.5 | 1.8 | 2.3 | 0.8 | 3.0 | 2.3 | 1.1 | 2.2 | 0.6 | 0.1 | 4.4 |
| | Yes | 32% | 6.4 | 4.9 | 1.3 | 2.3 | 1.1 | 2.2 | 3.1 | 1.5 | 2.2 | 0.8 | 0.1 | 5.8 |
| Baseline eGFR quartile | 1.6-11.07 | 25% | 7.9 | 5.6 | 1.4 | 6.2 | 2.2 | 2.8 | 3.6 | 1.8 | 2.0 | 0.7 | 0.4 | 1.5 |
| | 11.1-16.97 | 25% | 6.5 | 3.5 | 1.9 | 2.5 | 1.1 | 2.3 | 2.6 | 1.1 | 2.4 | 0.5 | 0.0 | - |
| | 17.0-25.99 | 25% | 3.0 | 3.3 | 0.9 | 0.5 | 0.7 | 0.8 | 1.6 | 1.0 | 1.6 | 0.7 | 0.2 | 4.3 |
| | 26.0-75.2 | 25% | 3.2 | 1.7 | 1.9 | 0.4 | 0 | - | 2.7 | 1.1 | 2.4 | 0.6 | 0.0 | - |
| History of diabetes | No | 43% | 4.9 | 3.1 | 1.6 | 3.2 | 1.5 | 2.1 | 1.8 | 1.0 | 1.8 | 0.6 | 0.3 | 1.9 |
| | Yes | 57% | 5.1 | 3.4 | 1.5 | 1.5 | 0.4 | 4.0 | 3.2 | 1.3 | 2.4 | 0.7 | 0.0 | - |

Rox = roxadustat; Pbo = placebo; RR = relative risk; BMI = body mass index; eGFR = estimated glomerular filtration rate

*Source: FDA briefing documents; PE pulmonary embolism, DVT deep vein thrombosis*

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 6: FDA's DD Safety Summary Analysis

Table 33: Major Risks by Subgroup in the DD Population (All Adverse Events; OT+7 Analysis)

| Events per 100 P-Y | | Percent of Subjects | Thrombosis, all | | | Device/shunt thrombosis, occlusion, malfunction, stenosis | | | Sepsis | | | Seizure | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Rox | EPO | RR | Rox | EPO | RR | Rox | EPO | RR | Rox | EPO | RR |
| All | All | 100% | 9.4 | 7.8 | 1.2 | 7.6 | 6.3 | 1.2 | 3.2 | 3.0 | 1.1 | 1.1 | 0.8 | 1.4 |
| Sex | Female | 58% | 10.0 | 8.1 | 1.2 | 8.7 | 7.0 | 1.2 | 3.0 | 3.0 | 1.0 | 0.8 | 0.6 | 1.4 |
| | Male | 42% | 8.9 | 7.7 | 1.2 | 6.9 | 5.8 | 1.2 | 3.3 | 3.0 | 1.1 | 1.2 | 0.9 | 1.5 |
| Baseline age quartile | 18-44 | 25% | 5.6 | 5.5 | 1.0 | 6.0 | 5.5 | 1.1 | 1.9 | 1.7 | 1.1 | 1.6 | 1.1 | 1.5 |
| | 45-56 | 26% | 9.6 | 6.8 | 1.4 | 8.0 | 5.5 | 1.5 | 3.5 | 3.1 | 1.1 | 1.1 | 0.5 | 2.1 |
| | 57-65 | 25% | 8.9 | 8.7 | 1.0 | 8.0 | 6.9 | 1.2 | 3.4 | 3.3 | 1.0 | 0.8 | 0.9 | 1.0 |
| | 66-94 | 24% | 14.3 | 10 3 | 1.4 | 8.9 | 7.2 | 1.2 | 4.0 | 3.9 | 1.0 | 0.8 | 0.6 | 1.3 |
| Age ≥ 65 | No | 73% | 7.8 | 7.0 | 1.1 | 7.2 | 5.9 | 1.2 | 2.9 | 2.7 | 1.1 | 1.2 | 0.8 | 1.4 |
| | Yes | 27% | 14.2 | 10 3 | 1.4 | 9.0 | 7.4 | 1.2 | 4.0 | 3.9 | 1.0 | 0.8 | 0.5 | 1.5 |
| Age ≥ 75 | No | 91% | 9.0 | 7.4 | 1.2 | 7.5 | 6.0 | 1.2 | 3.0 | 2.8 | 1.1 | 1.1 | 0.8 | 1.5 |
| | Yes | 9% | 14.0 | 12 3 | 1.1 | 8.8 | 8.8 | 1.0 | 4.9 | 4.8 | 1.0 | 0.3 | 0.5 | 0.6 |
| Baseline BMI quartile | 14.6-22.83 | 25% | 8.2 | 5.2 | 1.6 | 6.2 | 4.5 | 1.4 | 2.6 | 2.2 | 1.2 | 1.2 | 0.6 | 2.0 |
| | 22.83-26.37 | 25% | 8.5 | 7.7 | 1.1 | 7.4 | 5.7 | 1.3 | 2.8 | 2.5 | 1.1 | 1.1 | 0.9 | 1.2 |
| | 26.37-30 9 | 25% | 8.5 | 7.8 | 1.1 | 6.8 | 7.0 | 1.0 | 2.8 | 3.1 | 0.9 | 1.2 | 0.7 | 1.8 |
| | 31-64.9 | 25% | 12.1 | 10.4 | 1.2 | 9.8 | 7.7 | 1.3 | 4.5 | 4.1 | 1.1 | 0.8 | 0.8 | 1.0 |
| Race | Asian | 14% | 7.5 | 5.1 | 1.5 | 5.0 | 4.3 | 1.2 | 3.4 | 4.3 | 0.8 | 1.7 | 0.8 | 2.2 |
| | Black | 18% | 13.0 | 9.4 | 1.4 | 11.9 | 8.6 | 1.4 | 4.0 | 2.7 | 1.5 | 1.3 | 0.8 | 1.6 |
| | Other | 7% | 6.1 | 5.6 | 1.1 | 5.6 | 4 | - | 4.3 | 3.2 | 1.3 | 2.2 | 1.9 | 1.2 |
| | White | 61% | 9.0 | 8.1 | 1.1 | 7.0 | 6.1 | 1.2 | 2.8 | 2.9 | 1.0 | 0.8 | 0.7 | 1.2 |
| Baseline hemoglobin quartile | 4.3-8.8 | 25% | 8.2 | 7.0 | 1.2 | 7.3 | 5.7 | 1.3 | 2.3 | 1.7 | 1.4 | 1.6 | 0.5 | 3.2 |
| | 8.8-9.8 | 25% | 10.0 | 8.2 | 1.2 | 8.9 | 6.5 | 1.4 | 3.1 | 2.5 | 1.2 | 1.0 | 0.8 | 1.3 |
| | 9.8-10.66 | 25% | 10.5 | 9.6 | 1.1 | 7.3 | 7.8 | 0.9 | 3.5 | 4.7 | 0.7 | 1.0 | 1.0 | 1.0 |
| | 10.67-12 2 | 25% | 8.8 | 6.5 | 1.3 | 7.2 | 5.1 | 1.4 | 3.5 | 2.9 | 1.2 | 0.8 | 0.7 | 1.1 |
| History of CV disease | No | 57% | 7.4 | 5.5 | 1.3 | 6.5 | 4.7 | 1.4 | 2.2 | 2.3 | 0.9 | 1.1 | 0.7 | 1.6 |
| | Yes | 43% | 12.2 | 11.0 | 1.1 | 9.2 | 8.4 | 1.1 | 4.6 | 4.0 | 1.1 | 1.0 | 0.8 | 1.2 |
| Type of Dialysis | HD | 90% | 9.9 | 8.2 | 1.2 | 8.3 | 6.7 | 1.2 | 3.3 | 3.0 | 1.1 | 1.0 | 0.7 | 1.5 |
| | PD | 10% | 4.4 | 4.2 | 1.1 | 1.6 | 2.1 | 0.7 | 1.6 | 3.1 | 0.5 | 1.6 | 1.3 | 1.2 |
| History of diabetes | No | 53% | 7.0 | 6.4 | 1.1 | 6.5 | 5.5 | 1.2 | 1.9 | 2.0 | 0.9 | 1.0 | 0.5 | 1.8 |
| | Yes | 47% | 12.4 | 9.6 | 1.3 | 9.1 | 7.2 | 1.3 | 4.7 | 4.2 | 1.1 | 1.2 | 1.0 | 1.2 |

Rox = roxadustat; EPO = epoetin alfa; RR = relative risk; HD = hemodialysis; PD = peritoneal dialysis

*Source: FDA briefing documents; PE pulmonary embolism, DVT deep vein thrombosis*

8

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



### Exhibit 7: FGEN's NDD MACE Analysis

**Table 37:    Pooled NDD Studies: Primary Analysis of MACE, MACE+, and All-Cause Mortality**

| On-Study Analysis NDD Set | MACE | | MACE+ | | ACM | |
|---|---|---|---|---|---|---|
| | Roxadustat | Placebo | Roxadustat | Placebo | Roxadustat | Placebo |
| | (n=2386) | (n=1884) | (n=2386) | (n=1884) | (n=2386) | (n=1884) |
| Total PY | 4509.6 | 3406.2 | 4368.9 | 3272.4 | 4797.7 | 3721.4 |
| No. patients with events | 480 | 350 | 578 | 432 | 400 | 301 |
| IR/100 PY | 10.6 | 10.3 | 13.2 | 13.2 | 8.3 | 8.1 |
| HR (95% CI) | 1.10 (0.96, 1.27) | | 1.07 (0.94, 1.21) | | 1.08 (0.93, 1.26) | |

Abbreviations: ACM=all-cause mortality; CI=confidence interval; HR=hazard ratio; IR=incidence rate; on-study analysis=analysis evaluation period to include on-treatment and off-treatment long-term follow-up, until end of study; MACE=major adverse cardiovascular event (all-cause mortality, myocardial infarction, and stroke); MACE+=MACE, plus hospitalization for unstable angina or congestive heart failure; PY=patient follow-up years.
Note: Safety Population; On-study analysis, NDD Pool: Studies 001, 060,608.

*Source: FGEN briefing documents*

### Exhibit 8: FGEN's DD MACE Analysis

**Table 41:    Pooled DD Studies: Primary Analysis of MACE, MACE+, and All-Cause Mortality**

| DD OT+7 | MACE | | MACE+ | | ACM | |
|---|---|---|---|---|---|---|
| | Roxadustat | EPO | Roxadustat | EPO | Roxadustat | EPO |
| | (n=1940) | (n=1940) | (n=1940) | (n=1940) | (n=1940) | (n=1940) |
| Total PY | 3315.3 | 3743.6 | 3315.3 | 3743.6 | 3315.3 | 3743.6 |
| No. of patients with events | 306 | 339 | 373 | 458 | 207 | 232 |
| IR/100 PY | 9.2 | 9.1 | 11.3 | 12.2 | 6.2 | 6.2 |
| HR (95% CI) | 1.02 (0.88, 1.20) | | 0.91 (0.80, 1.05) | | 1.02 (0.84, 1.23) | |

Abbreviations: ACM=all-cause mortality; CI=confidence interval; DD=dialysis-dependent; EPO=epoetin alfa; IR=incidence rate; HR=hazard ratio; MACE=major adverse cardiovascular event (all-cause mortality, myocardial infarction, and stroke); MACE+=MACE, plus hospitalization for unstable angina or congestive heart failure; OT+7=on-treatment plus 7 days; PY=patient years.
Note: Safety Population, OT+7 analyses, DD Pool: Studies 002, 063, 064

*Source: FGEN briefing documents*

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Exhibit 9: FGEN's DVT/PE Analysis – NDD and DD

**Table 11:     NDD and DD Studies: DVT and PE Adverse Events (OT+28)**

| Preferred Term | Roxadustat N=2386 | | Placebo N=1884 | |
|---|---|---|---|---|
| **NDD Population** | n (%) | IR/100 PY | n (%) | IR/100 PY |
| Deep vein thrombosis or Pulmonary embolism | 35 (1.5) | 0.9 | 9 (0.5) | 0.4 |
| Deep vein thrombosis | 28 (1.2) | 0.7 | 6 (0.3) | 0.2 |
| Pulmonary embolism | 10 (0.4) | 0.2 | 3 (0.2) | 0.1 |
| | Roxadustat N=1940 | | Epoetin Alfa N=1940 | |
| **DD Population** | n (%) | | n (%) | |
| Deep vein thrombosis or Pulmonary embolism | 41 (2.1) | | 36 (1.9) | |
| Deep vein thrombosis | 30 (1.5) | | 19 (1.0) | |
| Pulmonary embolism | 13 (0.7) | | 17 (0.9) | |

Abbreviations: DD=dialysis-dependent; DVT=deep vein thrombosis; IR=incidence rate; NDD=non-dialysis-dependent; OT+28=on-treatment plus 28 days; PE=pulmonary embolism; PY=patient years.
Note: Safety Population, OT+28 analysis, NDD Pool: Studies 001, 060,608; DD Pool: Studies 002, 063, 064

*Source: FGEN briefing documents*

## Exhibit 10: FGEN's VAT Analysis – NDD and DD

**Table 10:     NDD and DD Studies: Adjudicated VAT Adverse Events**

| | Roxadustat N=2386 | | Placebo N=1884 | |
|---|---|---|---|---|
| **NDD Population** | n (%) | IR/100 PY | n (%) | IR/100 PY |
| Vascular Access Thrombosis (OT+28) | 58 (2.4) | 1.5 | 7 (0.4) | 0.3 |
| | Roxadustat N=1940 | | Epoetin Alfa N=1940 | |
| **DD Population** | n (%) | | n (%) | |
| Vascular Access Thrombosis (OT+28) | 252 (13.0) | | 204 (10.5) | |
| Baseline arteriovenous fistula | 120/794 (15.1) | | 92/745 (12.3) | |
| Baseline arteriovenous graft | 30/76 (39.5) | | 18/70 (25.7) | |

Abbreviations: DD=dialysis-dependent; IR=incidence rate; NDD=non-dialysis-dependent; OT+28=on-treatment plus 28 days; PY=patient year.
Note: Safety Population, OT+28 analysis; NDD Pool: Studies 001, 060,608; DD Pool: Studies 002, 063, 064

*Source: FGEN briefing documents*

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Disclosures Appendix

Completion: July 13, 2021 11:59 A.M. EDT.
Distribution: July 13, 2021 11:59 A.M. EDT.

## Analyst Certification

I, Geoffrey C. Porges, MBBS, certify that the views expressed in this report accurately reflect my views and that no part of my compensation was, is, or will be directly related to the specific recommendation or views contained in this report.



OP = Outperform MP = Market Perform UP = Underperform D = Drop Coverage I = Initiate SC = Suspended Coverage

**Created by: BlueMatrix**

## Valuation

Our 12-month price target for FGEN is $56/share and is based on DCF methodology. We include probability-weighted roxadustat royalties and milestone payments from Astellas (EU and Japan) and AZN (US and ROW) and the 50% roxadustat profit-share with AZN in China. We assume 30-65% probabilities of success (PoS) for the dialysis dependent and non-dialysis dependent chronic kidney disease (CKD) indication in various geographies. We currently model 35% PoS for pamrevlumab in idiopathic pulmonary fibrosis (IPF), 25% for pancreatic cancer, and 25% for Duchene muscular dystrophy (DMD). We assume an 11.0% discount rate, which we believe is appropriate given our probability-weighted sales, and include a -22% terminal growth rate beyond 2034E.

## Risks to Valuation

The main risks to our valuation for FibroGen include any delay or disappointment with the development, regulatory approval, and commercialization of their two clinical development programs, roxadustat and pamrevlumab. The main risks to the outlook and value of roxadustat are any uncertainty, data irregularities, or other liabilities identified by the FDA in their review of the application, or any failure to secure broad labelling for CKD indications in the initial launch label. The main risks to pamrevlumab are that the confirmatory phase III trials now, or soon to be, underway in pancreatic cancer, IPF, and DMD fail to confirm the positive signals that emerged from the phase II trials.

**11**

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021





## Valuation

We value AstraZeneca (AZN) at $64 per ADS based on the results of our discounted cash flow (DCF) analysis, which contemplates our free cash flow forecasts through 2030, assuming a 1.5% terminal growth rate and a weighted average cost of capital (WACC) of 7.0%.

## Risks to Valuation

- Clinical trial risk: AstraZeneca has numerous late-stage clinical assets, including Enhertu (trastuzumab deruxtecan) and roxadustat, as well as several approved products with meaningful label expansion opportunities dependent on successful clinical trials, including Imfinzi, Lynparza, and Calquence. Clinical trial failure for late-stage clinical assets represents a risk to our current price target.

- Regulatory risk: Even with positive clinical trial results, marketing authorization requires approval from regulators in various jurisdictions. Regulatory delays or rejections of applications for key pipeline products would represent a risk to our current valuation.

- Competitive risk: AstraZeneca markets products in competitive therapeutic areas, including oncology, renal/cardiovascular, and respiratory. This competition could lead to AZN product sales that are materially below our estimates, representing a risk to our current price target.

- Pricing and reimbursement: Legislation affecting drug pricing, including proposed legislation in the U.S. that could link drug prices to international benchmarks, is a risk for all commercial pharmaceutical companies, including AstraZeneca.

**12**

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



| Distribution of Ratings/Investment Banking Services (IB) as of 06/30/21 | | | | |
|---|---|---|---|---|
| | | | IB Serv./Past 12 Mos. | |
| **Rating** | **Count** | **Percent** | **Count** | **Percent** |
| **BUY [OP]** | **196** | **76.3** | **101** | **51.5** |
| **HOLD [MP]** | **57** | **22.2** | **9** | **15.8** |
| **SELL [UP]** | **4** | **1.6** | **0** | **0.00** |

## Explanation of Ratings

<u>Outperform (Buy):</u> We expect this stock to outperform its benchmark over the next 12 months.

<u>Market Perform (Hold/Neutral):</u> We expect this stock to perform in line with its benchmark over the next 12 months.

<u>Underperform (Sell):</u> We expect this stock to underperform its benchmark over the next 12 months.

The degree of outperformance or underperformance required to warrant an Outperform or an Underperform rating should be commensurate with the risk profile of the company.

For the purposes of these definitions the relevant benchmark will be the S&P 600® Health Care Index for issuers with a market capitalization of less than $2 billion and the S&P 500® Health Care Index for issuers with a market capitalization over $2 billion.

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

**FIBROGEN, INC.**

July 13, 2021



## Important Disclosures

**This information (including, but not limited to, prices, quotes and statistics) has been obtained from sources that we believe reliable, but we do not represent that it is accurate or complete and it should not be relied upon as such. All information is subject to change without notice. The information is intended for Institutional Use Only and is not an offer to sell or a solicitation to buy any product to which this information relates. SVB Leerink LLC ("Firm"), its officers, directors, employees, proprietary accounts and affiliates may have a position, long or short, in the securities referred to in this report, and/or other related securities, and from time to time may increase or decrease the position or express a view that is contrary to that contained in this report. The Firm's research analysts, salespeople, traders and other professionals may provide oral or written market commentary or trading strategies that are contrary to opinions expressed in this report. The Firm's asset management group and proprietary accounts may make investment decisions that are inconsistent with the opinions expressed in this document. The past performance of securities does not guarantee or predict future performance. Transaction strategies described herein may not be suitable for all investors. This document may not be reproduced or circulated without SVB Leerink's written authority. Additional information is available upon request by contacting the Editorial Department, SVB Leerink LLC, One Federal Street, 37th Floor, Boston, MA 02110. Like all Firm employees, research analysts receive compensation that is impacted by, among other factors, overall firm profitability, which includes revenues from, among other business units, Institutional Equities, Research, and Investment Banking. Research analysts, however, are not compensated for a specific investment banking services transaction. To the extent SVB Leerink research reports are referenced in this material, they are either attached hereto or information about these companies, including prices, rating, market making status, price charts, compensation disclosures, Analyst Certifications, etc. is available on https://svbleerink.bluematrix.com/bluematrix/Disclosure2. SVB Leerink MEDACorp LLC ("MEDACorp") is a global network of independent healthcare professionals (Key Opinion Leaders and consultants). MEDACorp is a wholly-owned subsidiary of SVB Leerink Holdings LLC and an affiliate of SVB Leerink LLC. MEDACorp provides industry and market insights to SVB Leerink and its clients.**

**SVB Leerink LLC makes a market in FibroGen, Inc. and AstraZeneca PLC.**

**In the past 12 months, an affiliate of SVB Leerink LLC has received compensation for providing non-securities services to AstraZeneca PLC.**

**This document may not be reproduced or circulated without our written authority.**

**© 2021 SVB Leerink LLC. All Rights Reserved. Member FINRA/SIPC. SVB Leerink LLC is a member of SVB Financial Group.**

**14**

# EQUITY RESEARCH TEAM

# SVBLEERINK

## RESEARCH MANAGEMENT

**Jim Kelly**
Director of Equity Research
(212) 277-6096
jim.kelly@svbleerink.com

**Geoffrey C. Porges, MBBS**
Director of Therapeutics Research
(212) 277-6092
geoffrey.porges@svbleerink.com

**Christian Clark**
Associate Director of Equity Research
(212) 277-6117
christian.clark@svbleerink.com

## DIVERSIFIED BIOTECHNOLOGY

**Geoffrey C. Porges, MBBS**
(212) 277-6092
geoffrey.porges@svbleerink.com

Na Sun
(212) 277-6218
na.sun@svbleerink.com

Anna Baran, CFA
(212) 277-6204
anna.baran@svbleerink.com

## TARGETED ONCOLOGY

**Andrew Berens, M.D.**
(212) 277-6108
andrew.berens@svbleerink.com

Christopher Liu, Pharm.D.
(212) 277-6192
christopher.liu@svbleerink.com

## IMMUNO-ONCOLOGY

**Daina M. Graybosch, Ph.D.**
(212) 277-6128
daina.graybosch@svbleerink.com

Dilip Joseph
(212) 277-6148
dilip.joseph@svbleerink.com

Jeffrey La Rosa
(212) 277-6103
jeffrey.larosa@svbleerink.com

## EMERGING ONCOLOGY

**Jonathan Chang, Ph.D., CFA**
(617) 918-4015
jonathan.chang@svbleerink.com

## GENETIC MEDICINE

**Mani Foroohar, M.D.**
(212) 277-6089
mani.foroohar@svbleerink.com

Rick Bienkowski, Ph.D.
(212) 277-6109
rick.bienkowski@svbleerink.com

Greco Song, Ph.D.
(212) 277-6221
Greco.song@svbleerink.com

## IMMUNOLOGY & METABOLISM

**Thomas J. Smith**
(212) 277-6069
thomas.smith@svbleerink.com

Mike Kratky, CFA
(212) 277-6111
mike.kratky@svbleerink.com

## NEUROSCIENCE

**Marc Goodman**
(212) 277-6137
marc.goodman@svbleerink.com

Rudy Li, Ph.D.
(212) 277-6127
rudy.li@svbleerink.com

## RARE DISEASE

**Joseph P. Schwartz**
(617) 918-4575
joseph.schwartz@svbleerink.com

Joori Park, Ph.D.
(617) 918-4098
joori.park@svbleerink.com

Kelly Girskis, Ph.D.
(617) 918-4838
kelly.girskis@svbleerink.com

## LIFE SCIENCE TOOLS & DIAGNOSTICS

**Puneet Souda**
(212) 277-6091
puneet.souda@svbleerink.com

Westley Dupray, CFA
(617) 918-4549
westley.dupray@svbleerink.com

Scott Mafale
(212) 277-6107
scott.mafale@svbleerink.com

## MEDICAL DEVICES, CARDIOLOGY

**Danielle Antalffy**
(212) 277-6044
danielle.antalffy@svbleerink.com

Rebecca Wang, CFA
(212) 277-6087
rebecca.wang@svbleerink.com

Priya Sachdeva
(212) 277-6095
priya.sachdeva@svbleerink.com

## MEDICAL DEVICES, ORTHOPEDICS

**Richard Newitter**
(212) 277-6088
richard.newitter@svbleerink.com

Jaime L. Morgan
(212) 277-6073
jaime.morgan@svbleerink.com

Erin S. Fahey
(212) 277-6136
erin.fahey@svbleerink.com

## HEALTHCARE TECHNOLOGY & DISTRIBUTION

**Stephanie Davis, CFA**
(212) 277-6153
stephanie.davis@svbleerink.com

Joy Zhang, CFA
(212) 277-6021
joy.zhang@svbleerink.com

Joseph Civello
(212) 277-6093
joseph.civello@svbleerink.com

## EDITORIAL

### SR. EDITOR/SUPERVISORY ANALYST

Thomas A. Marsilio
(212) 277-6040
thomas.marsilio@svbleerink.com

### SUPERVISORY ANALYSTS

Randy Brougher
randy.brougher@svbleerink.com

Robert Egan
bob.egan@svbleerink.com

Emily Singletary
(212) 277-6115
emily.singletary@svbleerink.com

Amy N. Sonne
amy.sonne@svbleerink.com

David A. Williamson, CFA
david.williamson@svbleerink.com

**BOSTON | NEW YORK | SAN FRANCISCO | CHARLOTTE**
© 2021 SVB Leerink LLC. All rights reserved. Member FINRA/SIPC. SVB Leerink is a member of SVB Financial Group.

**AN SVB COMPANY**
**SVBLEERINK.COM**

mtung@Fibrogen.com Michael Tung 07/13/21 04:42:42 PM Fibrogen

# EXHIBIT 17



**Investors and Media**

**Press Release**

 View printer-friendly version

« Back

**FibroGen Provides Additional Information on Roxadustat**

*Company Continues to be Confident in the Benefit / Risk Profile of Roxadustat*

*Company to Host Investor Call Today at 5:00 p.m. Eastern Time (2:00 p.m. Pacific Time)*

SAN FRANCISCO, April 06, 2021 (GLOBE NEWSWIRE) -- FibroGen, Inc. (Nasdaq: FGEN) (the "Company") today provided clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the roxadustat Phase 3 program for the treatment of anemia of chronic kidney disease ("CKD").

"As members of senior management were preparing for the upcoming FDA Advisory Committee meeting, we became aware that the primary cardiovascular safety analyses included post-hoc changes to the stratification factors," said Enrique Conterno, Chief Executive Officer, FibroGen. "While all of the analyses set forth below, including the differences in the stratification factors, were included in the NDA, we promptly decided to clarify this issue with the FDA and communicate with the scientific and investment communities."

Mr. Conterno continued, "It is important to emphasize that this does not impact our conclusion regarding the comparability, with respect to cardiovascular safety, of roxadustat to epoetin-alfa in dialysis-dependent (DD) patients and to placebo in non-dialysis dependent (NDD) patients. We continue to have confidence in roxadustat's benefit risk profile."

FibroGen continues to prepare for the FDA Advisory Committee meeting and will work closely with the FDA to bring this important new treatment to patients living with anemia of CKD.

There is no change in the underlying roxadustat data, or to the efficacy analyses from the Phase 3 program. The Company has begun a comprehensive internal review to ensure such issues do not occur in the future.

**Pooled Cardiovascular Safety Data**

As previously disclosed, the Company agreed with the FDA in the pre-NDA meeting that the primary analysis in non-dialysis would be ITT (intention to treat with long-term follow up) and in dialysis would be OT-7 (on-treatment plus 7 days). MACE, a composite endpoint of all-cause mortality, stroke, and myocardial infarction, was the primary safety endpoint agreed on with the FDA.

The table below describes the cardiovascular safety results using the post-hoc stratification factors reported at the American Society of Nephrology conference in November 2019, as well as the analyses with the pre-specified stratification factors which have not been previously publicly reported.

| | Analyses with post-hoc stratification factors | Analyses with pre-specified stratification factors |
|---|---|---|
| | HR (95% Confidence Interval) | HR (95% Confidence Interval) |
| **Non Dialysis** (OLYMPUS, ANDES, ALPS N=4,270); ITT | | |
| MACE | 1.08 (0.94, 1.24) | 1.10 (0.96, 1.27) |
| MACE+ | 1.04 (0.91, 1.18) | 1.07 (0.94, 1.21) |
| ACM | 1.06 (0.91, 1.23) | 1.08 (0.93, 1.26) |

| **Dialysis Dependent** (HIMALAYAS, SIERRAS, ROCKIES N=3,880); OT-7 | | |
|---|---|---|
| MACE | 0.96 (0.82, 1.13) | 1.02 (0.88, 1.20) |
| MACE+ | 0.86 (0.74, 0.98) | 0.91 (0.80, 1.05) |
| ACM | 0.96 (0.79, 1.17) | 1.02 (0.84, 1.23) |
| **Incident Dialysis** (N=1,526); OT-7 | | |
| MACE | 0.70 (0.51, 0.96) | 0.82 (0.60, 1.11) |
| MACE+ | 0.66 (0.50, 0.89) | 0.78 (0.59, 1.02) |
| ACM | 0.76 (0.52, 1.11) | 0.82 (0.57, 1.18) |

ITT: intention to treat with long-term follow up

OT-7: on-treatment plus 7 days

Major Adverse Cardiovascular Event (MACE): a composite endpoint of all-cause mortality, stroke, and myocardial infarction.

(MACE+): in addition to the components in MACE, includes hospitalization due to heart failure or unstable angina.

(ACM): all-cause mortality.

As reflected in the table, the analyses with the pre-specified stratification factors result in higher hazard ratios (point estimates of relative risk) and 95% confidence intervals. For MACE+ in dialysis and for MACE and MACE+ in incident dialysis, the 95% confidence intervals include 1.0. While these hazard ratios remain below 1.0, based on these analyses we cannot conclude that roxadustat reduces the risk of (or is superior to) MACE+ in dialysis, and MACE and MACE+ in incident dialysis compared to epoetin-alfa.

These analyses do not change the Company's assessment that roxadustat is comparable to placebo in non-dialysis dependent patients and to epoetin-alfa in dialysis dependent patients using MACE to measure cardiovascular safety.

As previously announced, roxadustat has been launched in China and Japan for the treatment of anemia of CKD in both NDD and DD adult patients. These approvals were based on different studies conducted in the relevant geographies. In Europe, the Marketing Authorization Application for roxadustat for the treatment of anemia of CKD in patients both on dialysis and not on dialysis was filed by FibroGen's partner Astellas and accepted by the European Medicines Agency for review in May 2020.

**Conference Call and Webcast Details**

FibroGen will host a conference call and webcast today, April 6, 2021, at 5:00 pm Eastern Time (2:00 p.m. Pacific Time) to discuss this matter. Interested parties may access a live audio webcast of the conference call via the FibroGen website at https://fibrogen.gcs-web.com/events-and-presentations/events. It is recommended that listeners access the website 15 minutes prior to the start of the call to download and install any necessary audio software.

Dial-In Information

Live (U.S./Canada): (877) 658-9081

Live (International): (602) 563-8732

Confirmation number: 5297733

A replay of the webcast and investor presentation will be available shortly after the call for a period of 30 days. To access the replay, please dial (855) 859-2056 (domestic) or (404) 537-3406 (international), and use passcode 5297733.

**About Anemia of CKD**

Chronic kidney disease (CKD) is generally a progressive disease characterized by gradual loss of kidney function that may eventually lead to kidney failure or end stage renal disease, requiring dialysis or kidney transplant. CKD is estimated to occur in approximately 10-12% of adults worldwide and is predicted to become the fifth most common cause of premature death globally by 2040.

Anemia, a serious medical condition in which patients have insufficient red blood cells and low levels of hemoglobin, is a common early complication of CKD, affecting approximately 20% of CKD patients. Anemia of CKD is associated with an increased risk of hospitalization, cardiovascular complications, and death, and can also cause significant fatigue, cognitive dysfunction and reduced quality of life. Blood transfusions are used for treating severe anemia, however, they may reduce a patient's opportunity for kidney transplant and can increase the risk of infection and/or complications such as heart failure and allergic reactions.

**About Roxadustat**

Roxadustat, an oral medicine, is the first in a new class of medicines, HIF-PH inhibitors that promote erythropoiesis, or red blood cell production, through increased endogenous production of erythropoietin; improved iron absorption and mobilization; and downregulation of hepcidin. Roxadustat is also in clinical development for anemia associated with myelodysplastic syndromes (MDS) and for chemotherapy-induced anemia (CIA).

Roxadustat is approved in China, Japan, and Chile for the treatment of anemia of CKD in adult patients on dialysis (DD) and not on dialysis (NDD). In Europe, the Marketing Authorization Application for roxadustat for the treatment of anemia of CKD in patients both on dialysis and not on dialysis was filed by our partner Astellas and accepted by the European Medicines Agency for review on May 2020. Several other licensing applications for roxadustat have been submitted by Astellas and AstraZeneca to regulatory authorities across the globe, and are currently in review.

Astellas and FibroGen are collaborating on the development and commercialization of roxadustat for the potential treatment of anemia in territories including Japan, Europe, Turkey, Russia and the Commonwealth of Independent States, the Middle East, and South Africa. FibroGen and AstraZeneca are collaborating on the development and commercialization of roxadustat for the potential treatment of anemia in the U.S., China, other markets in the Americas, in Australia/New Zealand, and Southeast Asia.

**About FibroGen**

FibroGen, Inc. is a biopharmaceutical company committed to discovering, developing, and commercializing a pipeline of first-in-class therapeutics. The Company applies its pioneering expertise in hypoxia-inducible factor (HIF) and connective tissue growth factor (CTGF) biology to advance innovative medicines for the treatment of unmet needs. The Company is currently developing and commercializing roxadustat, an oral small molecule inhibitor of HIF prolyl hydroxylase activity, for anemia associated with chronic kidney disease (CKD). Roxadustat is also in clinical development for anemia associated with myelodysplastic syndromes (MDS) and for chemotherapy-induced anemia (CIA). Pamrevlumab, an anti-CTGF human monoclonal antibody, is in clinical development for the treatment of locally advanced unresectable pancreatic cancer (LAPC), Duchenne muscular dystrophy (DMD), and idiopathic pulmonary fibrosis (IPF). For more information, please visit www.fibrogen.com.

**Forward Looking Statements**

This release contains forward-looking statements regarding the Company's prospects, including statements regarding the safety and efficacy profile of our product candidates and regulatory results, strategy and interactions, including those of our partners. Forward-looking statements include, but are not limited to, statements about our plans, objectives, representations and contentions and are not historical facts and typically are identified by use of terms such as "may," "will", "should," "on track," "could," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," "continue" and similar words, although some forward-looking statements are expressed differently. Our actual results may differ materially from those indicated in these forward-looking statements due to risks and uncertainties related to the continued progress and timing of our various programs, including the enrollment and results from ongoing and potential future clinical trials, and other matters that are described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020 filed with the Securities and Exchange Commission (SEC), and the risk factors set forth therein, including without limitation, risks related to obtaining regulatory approval and the planned FDA Advisory Committee meeting. Investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this release, and we undertake no obligation to update any forward-looking statement in this press release, except as required by law.

**Contacts:**
**FibroGen, Inc.**

**Investors**:
Michael Tung, M.D.
Corporate Strategy / Investor Relations
1.415.978.1434
mtung@fibrogen.com

**Media:**
Jennifer Harrington
+1.610.574.9196
Jennifer.Harrington@gcihealth.com



Source: FibroGen, Inc

# EXHIBIT 18

**S&P Global**
Market Intelligence

# FibroGen, Inc. NasdaqGS:FGEN
# FQ1 2019 Earnings Call Transcripts

## Thursday, May 09, 2019 9:00 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ1 2019- | | | -FQ2 2019- | -FY 2019- | -FY 2020- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.68) | (0.53) | NM | (0.38) | (1.00) | 0.04 |
| **Revenue (mm)** | 20.44 | 23.86 | ▲16.73 | 44.59 | 237.78 | 337.19 |

Currency: USD
Consensus as of  Apr-18-2019 5:22 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ2 2018** | (0.59) | (0.28) | NM |
| **FQ3 2018** | (0.44) | (0.50) | NM |
| **FQ4 2018** | 0.09 | 0.23 | ▲155.56 % |
| **FQ1 2019** | (0.68) | (0.53) | NM |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

In the U.S., we believe that major adverse cardiac events or MACE endpoint, defined as the time to first occurrence of death, myocardial infraction or stroke, will be the primary basis upon which the FDA will assess the safety of roxadustat.

In Europe, we believe that MACE+, which consists of the defined MACE components plus hospitalization due to heart failure or unstable angina, will be the primary endpoint for safety assessment by European regulators.

In the EU, we have agreed with regulators on a noninferiority margin. And in the U.S., we have had extensive discussions on this topic and expect to finalize standards in our pre-NDA meeting.

We discuss today some of the most important initial safety results based on a totality of data that we've analyzed to date. In addition, we want to highlight important results from other clinical measures that we are analyzing, such as change in renal function in nondialysis patients as measured by change in eGFR, efficacy of roxadustat as compared to epoetin alfa in the presence of patient inflammation and relevant quality-of-life measures in nondialysis compared to placebo.

While the FDA and EMA will make their ultimate approval decisions upon their own analyses of benefit/risk profile of roxadustat, the applicable patient populations -- nonetheless, we and our partners believe the data is strongly supportive of the efficacy and safety of roxadustat.

I would now like to walk through our MACE and MACE+ results from the adjudicated pool of Phase III data, which have been reviewed by our -- with our U.S. partner, AstraZeneca; and our EU partner, Astellas.

In dialysis-dependent CKD, in the pooled analysis, roxadustat was shown to be noninferior to epoetin alfa and MACE+ analysis. For the U.S., where there were several analyses, we believe there was no clinically meaningfully difference between roxadustat and epoetin alfa in MACE risk.

In incident dialysis, as noted above, we examined the results from the incident population who are patients in newly initiating dialysis approximately 4 months' time before they initiate anemia therapy. We believe this dialysis subpopulation is the fairest setting for comparison of roxadustat versus ESA as this period of treatment has substantially increased levels of patient mortality, where the stable dialysis population continues the twin biases of patients who have survived the incident period and are already on stable doses of ESA after dose titration.

In incident dialysis, roxadustat demonstrated superiority to epoetin alfa and time to first MACE+ analysis. And in the time to MACE analysis, there is a trend towards reduced risk for patients on roxadustat as compared to epoetin alfa.

We would highlight for you this robust result of superiority came from the 1,500-patient pool with 1:1 randomization versus epoetin alfa.

In the NDD CKD population, 4,300 patients were randomized over 3 studies conducted by AstraZeneca, Astellas and FibroGen. These studies represent the first investigation in the CKD population where median eGFR levels are much lower than prior studies. This is a study that was started after FDA restricted the use of ESAs to below hemoglobin 10 and no retreatment at levels above 10. In nondialysis, roxadustat was shown to be noninferior to placebo in time to first MACE+. In the MACE safety analysis of this population, we believe there is no clinically meaningful difference between roxadustat and placebo.

Another way to view the NDD population results is to test the ITT analysis with long-term follow-up as a majority of patients in this pool followed through the end of the study. This is a conservative way to evaluate long-term safety. In the NDD population, patients on roxadustat received treatment for longer periods than placebo patients because some of the placebo patients dropped out for lack of efficacy. Since safety data were also collected in the post-treatment period, we were able to add in ITT analysis, one, from follow-up as the majority of the patients in this pool followed through the end of the study. As to the intent-to-treat results, in multiple analyses of both MACE and MACE+, MACE-free survival and MACE+-free survival, CV MACE and CV MACE+, roxadustat was comparable to placebo. These results were below the commonly applied noninferiority margin of 1.3.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The ITT long-term follow-up analysis is one of several methods that have been discussed with the FDA to address the differential dropout rate. As to -- apart from MACE data results -- sorry, a correction I have to make which is that we have not yet spoken with FDA. These -- there is a discussion planned with the FDA about these various analyses. So it is planned to be, not has happened.

All of these evaluations help to better understand additional benefits of roxadustat apart from the MACE and MACE+ safety analyses. It is important to note that we enrolled a unique population, eGFR was from 0 to 60, including even the sickest patients with median eGFR in the study pool between 15 and 20, as large prior studies such as TREAT were enrolling patients must healthier. This is the first time a patient population this sick has been studied.

We have results in the eGFR versus placebo comparison for change in renal function over time. We evaluated whether the treatment with roxadustat could slow the rate of decline of renal function and clinically relevant matter. Evaluations were performed across all NDD/CKD populations. We also included the more conventional baseline cutoffs for nondialysis patients, meaning the patients with eGFR above 10, as well as the population eGFR above 15.

Since receiving the unblinded data after adjudication, we have completed the 1-year analysis of roxadustat versus placebo. Data evaluation in this study continues. In the 1-year data, we have observed statistically significant slower rate of eGFR decline in the roxadustat-treated patients versus placebo-treated patients in the NDD pool as well as both subgroups. In the pooled analysis of eGFR change over time from the 3 NDD studies in patients with baseline eGFR above 15, they showed a treatment difference from baseline of 1.62 at 12 months. We believe the results observed over time in this analysis suggests that the roxadustat treatment may slow renal function decline in a clinically meaningful manner. We are examining the data in more detail, including stratified by level of disease progression, to understand the degree of difference and the impact of different subgroups at baseline over the longer term.

In other measures efficacy of roxadustat, we are pleased to have shown statistically significant improvement in the multiple standard quality of life measurements and to have confirmed roxadustat's efficacy in the presence of inflammation as measured by CRP where EPO requires increased doses over time. Dr. Peony Yu will describe these results in more detail later in the call.

We are on track for roxadustat's submission for U.S. NDA, September, October time period, with the European MAA submission to follow.

Let me now turn to updates regarding China. Our NDA for roxadustat was approved in December 2018 by the National Medical Products Administration, NMPA, for the treatment of anemia caused by CKD in dialysis patients. We are pleased that all clinical site inspections for the Phase III nondialysis study have now been completed by the Food and Drug Administration division, or CFDI of NMPA. And we expect the population of nondialysis CKD patients to be added to the CKD anemia indication in the roxadustat label in mid-2019.

We continue to work closely with our partner, AstraZeneca, to prepare for the launch of roxadustat in China and have much to report in terms of progress. Our partner, AstraZeneca, has already initiated the aggressive build-out of a dedicated roxadustat field sales force covering 5 regions in China at launch, which will be fully deployed by mid-2019. FibroGen China's medical affairs field staff now numbers over 30 professionals. The central market access team has been in place and active for over a year.

FibroGen is the marketing authorization holder, or MAH holder, in China that is responsible for pharmacovigilance. Our pharmacovigilance infrastructure in China, which includes a pharmacovigilance database and call center, has been active for over a quarter now. The commercial manufacturing readiness for both API and drug product is on schedule. We are confident about the third quarter China launch time frame.

A question we wanted to address is whether we will be added to NRDL List, or National Reimbursement Drug List. We are hopeful that roxadustat may qualify for consideration in 2019 by virtue of receiving market approval at the end of 2018. To be clear, only our dialysis label can be considered as nondialysis approval has not yet been received.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 19

**S&P Global**
Market Intelligence

# FibroGen, Inc. NasdaqGS:FGEN
# FQ2 2019 Earnings Call Transcripts

## Thursday, August 08, 2019 9:00 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ2 2019- | | | -FQ3 2019- | -FY 2019- | -FY 2020- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.55) | 1.26 | NM | (0.41) | (1.18) | (0.09) |
| **Revenue (mm)** | 29.03 | 191.57 | ▲559.90 | 61.50 | 224.81 | 331.23 |

Currency: USD
Consensus as of  Jul-25-2019 10:56 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

▲ Positive EPS Normalized surprise    ▼ Negative EPS Normalized surprise    ● Neutral EPS Normalized surprise

**- EPS NORMALIZED -**

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ3 2018** | (0.44) | (0.50) | NM |
| **FQ4 2018** | 0.09 | 0.23 | ▲155.56 % |
| **FQ1 2019** | (0.68) | (0.53) | NM |
| **FQ2 2019** | (0.55) | 1.26 | NM |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

Other updates in China, in December 2018, we announced the approval in China roxadustat for the treatment of CKD anemia and patients receiving dialysis representing the world's first approval for any HIF-PHI. We expect the nondialysis dependent or NDD portion of the CKD indication to be approved for roxadustat in the third quarter of 2019. In a few minutes Dr. Peony Yu will provide further details regarding roxadustat and Ms. Chris Chung will provide updates on China program.

Let's turn to pamrevlumab highlights for the quarter. Starting with Duchenne muscular dystrophy, we presented positive Phase II clinical findings from the first year of treatment in our ongoing study 079 at the Parent Project Muscular Dystrophy or PPMD 2019 Annual Conference in June. Our study suggests pamrevlumab has the potential treatment benefits on heart function, lung function and muscle function in DMD patients. We shall be seeking guidance from the FDA on the design of a Phase III program.

For the treatment of idiopathic pulmonary fibrosis or IPF, we initiated patient dosing in the ZEPHYRUS Phase III randomized, double-blind, placebo-controlled study of pamrevlumab with the primary endpoint of change of forced vital capacity or FVC over 52 weeks. We are enrolling more than 550 patients in this study and we expect to have more than 175 study sites globally.

Turning to pancreatic cancer. This disease is characterized by a high degree of growth of fibrosis characterized as desmoplasia, which is related to extensive CTGF expression. As an anti-CTGF agent, pamrevlumab has the potential to have a meaningful effect on pancreatic cancer. We are preparing to initiate patient dosing in the LAPIS study of Phase III randomized, double-blind, placebo-controlled study of pamrevlumab as a neoadjuvant therapy for patients with unresectable locally advanced pancreatic cancer or LAPC.

Later, on this call, Dr. Elias Kouchakji will discuss the DMD data presented at the PPMD conference and our IPF and pancreatic cancer Phase III trials in more detail. I have a few brief corporate and financial updates for the quarter. Our Chief Financial Officer, Pat Cotroneo, will provide further detail on finance later on the call. In the second quarter, we reported $116 million in net income or $1.34 per basic share or $1.26 per diluted share in EPS. As of June 30, 2019, FibroGen had $686.1 million in cash. We are privileged to welcome Ms. Suzanne Blaug as a member of FibroGen's Board of Directors. Suzanne is an experienced industry executive and advisor whose deep knowledge and critical commercial marketing and strategic planning experience will be invaluable as we advance our multiple late stage products.

I would now like to ask Dr. Peony Yu to provide updates on the anemia programs. Peony, please go ahead.

## K. Peony Yu
*Chief Medical Officer*

Thank you, Tom. Roxadustat is the first HIF-PHI for treatment of CKD anemia. And it is the largest known CKD anemia program. More than 10,000 CKD patients from 50 countries participated in our global Phase III studies. Over 8,000 of these patients are included in the dialysis or nondialysis pool for MACE analysis for the US and MACE Plus analysis for Europe as primary cardiovascular safety endpoint.

As stated by our US partner AstraZeneca, our Phase III results confirmed the cardiovascular safety of roxadustat. Together with our partners, AstraZeneca and Astellas, we recently had a very good pre-NDA meeting with the FDA on roxadustat. We reached agreement with the FDA on our proposed pool MACE analysis in dialysis and in nondialysis. We are pleased with the agreement for nondialysis as it includes an approach to account for the differential dropout between roxadustat and placebo. With agreement on NDA content and format, we are moving as quickly as we can for a submission. We do have a large submission, at this time, we are targeting October of this year.

For Europe, we are working with Astellas, our EU partner, on MAA preparation based on the Phase III results in the roxadustat program. Astellas has recently updated MAA submission timeline from calendar year 2019 to their fiscal year 2019, which ends March 2020. We look forward to present Phase III study results in upcoming medical conferences such as ASN in November and in peer reviewed journals. In Japan, Astellas submitted NDA for roxadustat treatment of anemia in dialysis-dependent CKD patients in last September. The PMDA's regulatory decision on this NDA is expected this year.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions]

**Karen L. Bergman**
*Vice President of Investor Relations & Corporate Communications*

We are set for our first question; I think it's from Michael Yee.

**Michael Jonathan Yee**
*Jefferies LLC, Research Division*

Two questions. One is for Tom, what were the 2 or 3 most important things that you guys discussed with the FDA or topics or key issues regarding approvability in your meeting? And then, separately, regarding the statistical plan, there seems to be a concern about noninferiority on MACE, not MACE Plus, but MACE. Can you talk to your confidence around the statistics and whether that's an issue for the FDA?

**Thomas B. Neff**
*Founder, Chairman & CEO*

Peony, go ahead.

**K. Peony Yu**
*Chief Medical Officer*

Hi, Mike. This is Peony. In the FDA meeting, we have accomplished what we intended for the meeting. You asked about the important agreement or achievement. I will name that. We have gained FDA's agreement on our proposal for a single primary safety cardiovascular endpoint analysis for dialysis, as well as cardiovascular safety primary endpoint for nondialysis.

And in terms of the way that the time to MACE primary endpoint is being analyzed in nondialysis, this will account for differential drop out between our drug and placebo, whereas you know that because placebo doesn't work in treating anemia, placebo patients had a tendency to drop out earlier. And we have reached agreement on statistical method that accounts for that. You have asked about our confidence on noninferiority on MACE. At this time, with these understanding, level of confidence is very high and we do believe as AstraZeneca has stated that our Phase III results confirm cardiovascular safety of roxadustat in the CKD population in both dialysis and nondialysis.

**Thomas B. Neff**
*Founder, Chairman & CEO*

And Mike, I would add that what I saw was that we gained a lot of clarity across the board and both our team and AZ's team reflected a very high degree of confidence coming out of the meeting. So, there is detailed planning right now, how to get everything done in October early and so everybody is aggressively moving ahead.

**Operator**

And the next question comes from Geoff Porges from SVB Leerink.

**Geoffrey Craig Porges**
*SVB Leerink LLC, Research Division*

And I have to ask some follow-up questions. Could you confirm whether you have written minutes from the meeting with the agency? And then, Peony, you mentioned the exposure adjusted analysis of the time to first MACE event but could you -- we haven't seen that analysis. But, presumably you have run it already. Can you tell us either what the absolute rates when you adjust for exposure between the 2 groups and nondialysis group or at least what range, where they are in terms of relation to each other?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 20

**Food and Drug Administration**
**Center for Drug Evaluation and Research**

**Final Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee Meeting**
**July 15, 2021**

Location: Please note that due to the impact of the COVID-19 pandemic, all meeting participants joined this advisory committee meeting via an online teleconferencing platform.

Topic: The committee discussed new drug application 213805, for the hypoxia inducible factor prolyl hydroxylase inhibitor, roxadustat tablets, submitted by FibroGen, Inc., for the treatment of anemia due to chronic kidney disease in adult patients not on dialysis and on dialysis.

These summary minutes for the July 15, 2021 meeting of the Cardiovascular and Renal Drugs Advisory Committee (CRDAC) of the Food and Drug Administration were approved on August 10, 2021.

I certify that I attended the July 15, 2021 CRDAC meeting of the Food and Drug Administration and that these minutes accurately reflect what transpired.


_____/s/_____           _____/s/_____
Joyce Yu, PharmD                         Julia Lewis, MD
Designated Federal Officer, CRDAC        Chairperson, CRDAC

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

**Final Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee Meeting July 15, 2021**

The Cardiovascular and Renal Drugs Advisory Committee (CRDAC) of the Food and Drug Administration, Center for Drug Evaluation and Research met on July 15, 2021. The meeting presentations were heard, viewed, captioned, and recorded through an online teleconferencing platform. Prior to the meeting, the members and temporary voting members were provided the briefing materials from the FDA and FibroGen, Inc.  The meeting was called to order by Julia B. Lewis, MD (Chairperson).  The conflict of interest statement was read into the record by Joyce Yu, PharmD (Designated Federal Officer).  There were approximately 1610 people online. There were 15 Open Public Hearing (OPH) speaker presentations.

A verbatim transcript will be available, in most instances, at approximately ten to twelve weeks following the meeting date.

**Agenda:** The committee discussed new drug application 213805, for the hypoxia inducible factor prolyl hydroxylase inhibitor, roxadustat tablets, submitted by FibroGen, Inc., for the treatment of anemia due to chronic kidney disease in adult patients not on dialysis and on dialysis.

**Attendance:**
**Cardiovascular and Renal Drugs Advisory Committee Members Present (Voting):**
Jacqueline D. Alikhaani, BA (Consumer Representative); C. Noel Bairey Merz, MD, FACC, FAHA, FESC; Thomas D. Cook, PhD, MS, MA; Edward K. Kasper, MD, FACC, FAHA; Julia B. Lewis, MD (Chairperson); David J. Moliterno, MD; Christopher M. O'Connor, MD, MACC, FESC, FHFA, FHFSA; Ravi I. Thadhani, MD, MPH

**Cardiovascular and Renal Drugs Advisory Committee Members Not Present (Voting):**
Javed Butler, MD, MPH, MBA; Peter E. Carson, MD; Csaba P. Kovesdy, MD, FASN

**Cardiovascular and Renal Drugs Advisory Committee Member Not Present (Non-Voting):**
Jerome A. Rossert, MD, PhD

**Acting Industry Representative to the Committee (Non-Voting):** David G. Soergel, MD

**Temporary Members (Voting):** Leslie S. Cho, MD, FACC, FSCAI, FESC; Paul T. Conway (Patient Representative); Susan T. Crowley, MD, MBA, FASN; Milton Packer, MD; Afshin Parsa, MD, MPH; Thomas J. Wang, MD

**FDA Participants (Non-Voting):** Ellis F. Unger, MD; Ann T. Farrell, MD; Saleh Ayache, MD; Jae Joon Song, PhD

**Designated Federal Officer (Non-Voting):** Joyce Yu, PharmD

**Open Public Hearing Speakers:** Jayant Kumar, MD; Melissia Baker; S. Wyatt Carr; Arnold L. Silva, MD, PhD; Bridget Luebbers; Subir Paul, MD, FASN; Jessica Coleman, MD; Alice Wei,

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

MD; Roberto Manllo-Karim; Amanda Dilger; Liz Griffith; Louard Crumbaugh Jr.; Anjay Rastogi MD, PhD; Leigh-Ann Williams; Michael Douglas Spigler (American Kidney Fund)

*The agenda was as follows:*

| | |
|---|---|
| Call to Order and Introduction of Committee | **Julia B. Lewis, MD**<br>Chairperson, CRDAC |
| Conflict of Interest Statement | **Joyce Yu, PharmD**<br>Designated Federal Officer, CRDAC |
| FDA Opening Remarks | **Ellis F. Unger, MD**<br>Director<br>Office of Cardiology, Hematology, Endocrinology and Nephrology (OCHEN)<br>Office of New Drugs (OND), CDER, FDA |
| **APPLICANT PRESENTATIONS** | **FibroGen, Inc.** |
| Introduction | **R. Wayne Frost, PharmD, JD**<br>Senior Vice President<br>Regulatory Affairs<br>FibroGen, Inc. |
| Unmet Need | **Roberto Pecoits-Filho, MD, PhD**<br>Nephrologist and Senior Research Scientist<br>Arbor Research Collaborative for Health |
| Efficacy Results | **Lynda Szczech, MD**<br>Vice President<br>Clinical Development and Medical Affairs<br>FibroGen, Inc. |
| Safety Results | **Dustin Little, MD**<br>Global Clinical Head<br>AstraZeneca LP |
| Clinical Perspective | **Steven Fishbane, MD**<br>Professor of Medicine<br>Chief, Division of Nephrology<br>Donald and Barbara Zucker School of Medicine |
| Clarifying Questions | |
| **BREAK** | |

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

**FDA PRESENTATIONS**

Roxadustat for the Treatment of Anemia Due to Chronic Kidney Disease in Adult Patients not on Dialysis and on Dialysis

**Saleh Ayache, MD**
Clinical Reviewer
Division of Non-Malignant Hematology (DNH)
OCHEN, OND, CDER, FDA

**Jae Joon Song, PhD**
Statistical Reviewer
Division of Biometrics VII (DB-VII)
Office of Biostatistics (OB)
Office of Translational Sciences (OTS)
CDER, FDA

Clarifying Questions

**LUNCH**

**OPEN PUBLIC HEARING**

Questions to the Committee/Committee Discussion

**BREAK**

Questions to the Committee/Committee Discussion (cont.)

**ADJOURNMENT**

---

*Questions to the Committee:*

Non-dialysis-dependent population:

1. **DISCUSSION:** Discuss the benefits and risks of roxadustat in the non-dialysis-dependent (NDD) population.

   *Committee Discussion*: *Committee members considered the convenience of roxadustat being an oral dosage form to be both a benefit and a risk. Committee members stated that while patients would no longer require an erythropoietin (EPO) injection, some members expressed concern that it would result in worse compliance with respect to monitoring of the patient's hemoglobin (Hb) levels. Committee members were also concerned about roxadustat's risks of thrombosis and mortality. Despite roxadustat's effect on Hb improvement and intravenous iron reduction, members noted a surprising lack of improvement in quality of life. There was discussion regarding the interpretability of on-study vs. on-treatment (OT) +7 pooled analyses results for analyses of major adverse*

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

*cardiovascular events (MACE) and mortality. Please see the transcript for details of the committee discussion.*

2. **DISCUSSION:**  If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target hemoglobin, starting dose, titration scheme, monitoring paradigm.

   a. If you favor changes to the treatment algorithm to enhance safety, discuss whether they should be tested (i) prior to approval, (ii) after approval, or (iii) not at all.

*Committee Discussion*: *Committee members generally agreed that changes in the treatment algorithm with respect to Hb target and starting dose were reasonable proposals to address roxadustat's safety risks; however, several members commented that such modifications should be tested prior to roxadustat approval. Some committee members expressed uncertainty as to whether the risks were caused by the drug's mechanism of action (rapid Hb rise) or rather through an unknown off-target mechanism. There were various concerns with the post-marketing assessment proposed by the Applicant; none of the Committee members seemed convinced that a post-marketing real-world study would be adequate. A committee member also commented that a Risk Evaluation and Mitigation Strategy (REMS) program could potentially be considered as a way to reduce risk. Please see the transcript for details of the committee discussion.*

3. **VOTE:**  Should roxadustat be approved for the treatment of anemia due to chronic kidney disease (CKD) in adult patients not on dialysis?

   a. If not, provide your rationale, as well as recommendations for additional data and/or analyses that would support a favorable benefit-risk profile and approval of roxadustat.

**Vote Result:**      **Yes: 1**                    **No: 13**                    **Abstain: 0**

*Committee Discussion*: *The majority of committee members voted against approval of roxadustat for the treatment of anemia due to CKD in adult patients not on dialysis. Committee members cited the following as their reasons for voting against approval: concerning safety risks, untested proposed mitigation dosing strategy with unknown efficacy, sicker patients with greater need to demonstrate safety, and difficulty in obtaining more definitive data in the post-marketing setting. One member commented that approval based on a mitigation dosing model would be non-traditional. The member who voted "Yes" commented that a REMS program could potentially be a fair strategy to mitigate the safety risks, and allow roxadustat to fulfill an unmet medical need. Please see the transcript for details of the committee discussion.*

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

<u>Dialysis-dependent population:</u>

4. **DISCUSSION:** Discuss the benefits and risks of roxadustat in the dialysis-dependent (DD) population.

   *Committee Discussion*: *Some committee members noted that roxadustat could have a benefit in EPO resistant patients. In addition, members expressed greater confidence in the risk mitigation for the DD population, as inadequate Hb monitoring would merit less concern in this setting. However, members remained concerned with the safety data given that on-study analyses of the three principal studies and Study 613 demonstrated increased mortality when compared to EPO. One committee member also commented that it was unclear whether the drug's benefit would be maintained with a lower roxadustat dose. Please see the transcript for details of the committee discussion.*

5. **DISCUSSION:** If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target hemoglobin, starting dose, titration scheme, monitoring paradigm.

   a. If you favor changes to the treatment algorithm to enhance safety, discuss whether they should be tested (i) prior to approval, (ii) after approval, or (iii) not at all.

   *Committee Discussion*: *Similarly to the NDD population, some committee members agreed that the changes to the treatment algorithm should be tested prior to approval of roxadustat in the DD population to provide clinical evidence of its efficacy and safety. Several committee members remained concerned that the Applicant's proposed dosing regimen to reduce thrombosis risks was not tested, and stated that modeling should not replace a clinical trial prior to approval. There were also comments made regarding the low percentage of African American patients studied. Please see the transcript for details of the committee discussion.*

6. **VOTE:** Should roxadustat be approved for the treatment of anemia due to CKD in adult patients on dialysis?

   a. If not, provide your rationale, as well as recommendations for additional data and/or analyses that would support a favorable benefit-risk profile and approval of roxadustat.

   **Vote Result:**     **Yes: 2**                    **No: 12**                    **Abstain: 0**

   *Committee Discussion*: *The majority of committee members voted against approval of roxadustat for the treatment of anemia due to CKD in the DD population. The majority of members stated that more information was needed on both the efficacy and safety of the proposed dosing strategy prior to approval. Some members who voted "No" recommended additional testing of the lower dose in EPO resistant patients, while other members stated they would favor initial approval for that subpopulation. Other recommendations were to include more African American patients. One member commented that an additional trial*

July 15, 2021
Cardiovascular and Renal Drugs Advisory Committee Meeting

*studying EPO hyporesponders should not be the "stand-alone" trial to support roxadustat approval. Committee members who voted "Yes" agreed with comments made by other members in regards to EPO resistant patients. These members also commented that providers would have more control in the DD setting and could therefore potentially better mitigate safety risks. Please see the transcript for details of the committee discussion.*

The meeting was adjourned at approximately 5:32 p.m.