**SAXENA WHITE P.A.**
Lester R. Hooker (SBN 241590)
lhooker@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs Employees' Retirement*
*System of the City of Baltimore, City of*
*Philadelphia Board of Pensions and Retirement,*
*and Plymouth County Retirement Association, and*
*Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **CLASS ACTION** <br><br> COMPENDIUM OF EVIDENCE FILED IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS (2 OF 11) <br><br> Hearing Date: <br> Time: 1:30 p.m. <br> Courtroom: 5-17th Floor <br> Judge: Hon. Edward M. Chen |

PUBLIC FILING

COMPENDIUM OF EVIDENCE FILED ISO LEAD PLAINTIFFS'
MOTION FOR SPOLIATION SANCTIONS, CASE NO. 3:21-cv-02623-EMC

# EXHIBIT 11

# Filed Under Seal

# EXHIBIT 12

# Filed Under Seal

# EXHIBIT 13

# Filed Under Seal

# EXHIBIT 14

# Filed Under Seal

# EXHIBIT 15

# Filed Under Seal

# EXHIBIT 16

# Filed Under Seal

# EXHIBIT 17

# Filed Under Seal

# EXHIBIT 18

# Filed Under Seal

# EXHIBIT 19

# Filed Under Seal

# EXHIBIT 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

IN RE FIBROGEN, INC.,

SECURITIES LITIGATION     Case No. 3:21-cv-02623-EMC

_____/

DEPOSITION OF K. PEONY YU, M.D.

appearing at San Francisco, California

Friday, March 10, 2023

Reported by:

Natalie Y. Botelho

CSR No. 9897

Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

IN RE FIBROGEN, INC.,

SECURITIES LITIGATION    Case No. 3:21-cv-02623-EMC

_____/

Videotaped deposition of K. PEONY YU, M.D., taken on behalf of Plaintiffs, at Four Embarcadero Center, 22nd Floor, San Francisco, California, beginning at 10:17 a.m. and ending at 3:56 p.m. on Friday, March 10, 2023, before NATALIE Y. BOTELHO, Certified Shorthand Reporter No. 9897.

Page 3

APPEARANCES:

For Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association:

    SAXENA WHITE P.A.
    BY:  DAVID R. KAPLAN, ESQ.
    BY:  EMILY BISHOP, ESQ.
    505 Lomas Santa Fe Drive, Suite 180
    Solana Beach, CA  92075
    (858)997-0860
    dkaplan@saxenawhite.com
    ebishop@saxenawhite.com

For Defendants FibroGen, Inc., Enrique Conterno, James Schoeneck, Mark Eisner, and Pat Cotroneo:

    COOLEY LLP
    BY:  TIJANA M. BRIEN, ESQ.
    BY:  ZANETA KIM, ESQ.
    3175 Hanover Street
    Palo Alto, CA  94304-1130
    (650)843-5000
    tbrien@cooley.com
    zkim@cooley.com

For Defendant K. Peony YU, M.D.:

    PILLSBURY WINTHROP SHAW PITTMAN LLP
    BY:  BRUCE A. ERICSON, ESQ.
    BY:  LEE BRAND, ESQ.
    Four Embarcadero Center, 22nd Floor
    San Francisco, CA  94111-5998
    (415)983-1000
    bruce.ericson@pillsburylaw.com
    lee.brand@pillsburylaw.com

    WEI GROUP LLP
    BY:  ERIC S. WEI, ESQ.
    One World Trade Center, Suite 8500
    New York, NY  10007-0103
    (212)248-0808
    ewei@weillp.com

Also Present:   CASSIA LEET, Videographer

Page 4

INDEX

WITNESS:  K. PEONY YU, M.D.                                    PAGE

EXAMINATION BY MR. KAPLAN                                         9

---oOo---

E X H I B I T S

NUMBER                    DESCRIPTION                        PAGE

Exhibit 1    Lead Plaintiffs' Notice of          13
             Deposition of Defendant
             K. Peony Lu

Exhibit 2    Letter dated February 16,           13
             2023, to Lee Brand, from Kyla
             Grant, with attachment

Exhibit 3    ███████████████████              45
             ███████████████████████
             ███████████████████████
             █████████████████████
             ███████████████████████

Exhibit 4    ███████████████████              59
             ████████████████████████████
             ██████████████
             ████████████████████
             ████████████████████

Exhibit 5    ████████████████████             65
             ████████████████████████████
             █████████████
             ███████████████████████
             ███████████████

Exhibit 6    ███████████████████              72
             ███████████████████
             ████████████████████
             ███████████████████████
             ███████████████████

Page 5

E X H I B I T S (continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 |  | 74 |
| Exhibit 8 | | 76 |
| Exhibit 9 | A letter dated December 6, 2022 to Sara DiLeo and Joshua Saltzman, from Lee Brand | 83 |
| Exhibit 10 | A letter dated January 16, 2023, to Joshua Saltzman, from Lee Brand | 94 |
| Exhibit 11 | | 125 |
| Exhibit 12 | | 131 |
| Exhibit 13 | A printout of the website of NerdsToGo entitled "Meet the Team" | 135 |
| Exhibit 14 | | 140 |
| Exhibit 15 | | 146 |

Page 6

E X H I B I T S (continued)

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 16 | An article by Raymond James entitled "Roxa Regulatory Risk Back On: Cardio-Renal Division Steps In At Last Minute & Calls for AdCom," dated March 1, 2021, Bates FGEN-CA-0526608 through 0526617 | 146 |
| Exhibit 17 | ███████████████████████ | 151 |
| Exhibit 18 | ███████████████████████ | 156 |
| Exhibit 19 | A document dated January 12, 2023, to Joshua H. Saltzman, from Tijana Brien | 162 |

---oOo---

Page 7

San Francisco, California, Friday, March 10, 2023

10:17 a.m.


PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:17 a.m. on March 10th, 2023.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Dr. K. Peony Yu, taken by counsel for Plaintiff in the matter of FibroGen, Inc. Securities Litigation, filed in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-02623-EMC.

The location of this deposition is Four Embarcadero Center, 22nd Floor, San Francisco, California 94111.  My name is Cassia Leet, representing Veritext Legal Solutions, and I am the videographer.  The court reporter is Natalie Botelho, from the firm Veritext Legal Solutions.  I am not related to any party in this action, nor am I financially interested in the outcome.

Will counsel and all present, including remotely, please state your appearances and affiliations for the record, beginning with the noticing attorney.

MR. KAPLAN:  Hello.  This is Dave Kaplan of Saxena White, on behalf of Lead Plaintiffs.

MS. BISHOP:  Emily Bishop from Saxena White, on behalf of Lead Plaintiffs.

MS. KIM:  Zaneta Kim from Cooley, on behalf of FibroGen defendants.

MS. BRIEN:  Tijana Brien with Cooley, on behalf of FibroGen and all the individual defendants other than Dr. Yu.

MR. BRAND:  Lee Brand of Pillsbury, on behalf of Dr. Yu.

MR. WEI:  Eric Wei, on behalf of Dr. Yu.

MR. ERICSON:  Bruce Ericson of Pillsbury Winthrop Shaw Pittman, on behalf of Dr. Yu.

THE VIDEOGRAPHER:  And counsel appearing remotely, if you could introduce yourselves.

MR. KAPLAN:  Counsel remotely will not -- they're just listening in.

THE VIDEOGRAPHER:  Okay.  Sounds good.

Would the court reporter please swear in the witness, and counsel may proceed.

Page 9

K. PEONY YU, M.D.,

having been administered an oath, was examined and

testified as follows:

EXAMINATION BY MR. KAPLAN

MR. KAPLAN:   Q.   Good morning.   My name's Dave Kaplan.   I'm an attorney at Saxena White.   As I mentioned earlier, we represent the lead plaintiffs in the FibroGen Securities Litigation matter, and I'll be asking you some questions today.   Other than this morning, we haven't met before; is that correct?

A.        Correct.

Q.        Okay.   Please state your full name for the record.

A.        Kinhung Peony Yu.

Q.        And have you gone by any other name?

A.        I've gone by Peony Yu.

Q.        Okay.   And are you represented by counsel today?

A.        Yes.

Q.        And who is representing you?

A.        Bruce Ericson, Lee Brand, and Eric Wei.

Q.        Okay.   Before we get started, I'm going to go over some basic ground rules, and I'll make this

brief, since we don't have a lot of time today, particularly given a number of new information that -- and documents that your counsel only provided to us last night.

And I'd like to state on the record that it significantly impacted our ability both to prepare for this deposition and that we might have some issues with respect to exhibit numbering and sequencing and just the logistics of the deposition because just last night you provided us with a whole set of new information that contradicted a lot of prior information that you had provided to us, and also produced a number of documents literally on the eve of the deposition.  So I did want to state that on the record, but we will go forward notwithstanding.

In terms of the ground rules, I'd ask you to first answer all questions audibly rather than nodding your head "yes" or "no," so that the tran -- the reporter can get an accurate transcription for the record.  Do you understand?

A.        Yes.

Q.        And if you don't understand a question that I ask and if I'm not clear, just ask me for clarification.  Okay?

Page 11

A.        Okay.

Q.        Okay.  And let's try not to talk over each other today.  This will allow the court reporter to ensure that she's taking a accurate account of the conversation.  So we'll pause -- try and pause between answers and -- questions and answers.  Okay?

A.        Okay.

Q.        Okay.  And if at some point you realize you gave an inaccurate answer and you feel you want to clarify your answer, feel free to let me know, and I'll give you to do that (sic).

          And also, if you feel like you need to take a break, just let me know, and I'd ask that we finish the question and the line of questioning, and then we could go ahead and take a break.  Okay?

A.        Okay.

Q.        Okay.  And you understand today that you're under oath, and that being under oath means you're sworn to tell the truth, the same as if we were in a court of law?

A.        Yes.

Q.        Okay.  Have you ever been deposed before?

A.        No.

Q.        And are you prepared to answer my questions truthfully today?

Page 12

A.        Yes.

Q.        Is there any reason why you wouldn't be able to give your most truthful testimony today?

A.        No.

Q.        Okay.  And if your counsel objects to a question, I may decide to rephrase the question, but if I don't, please go ahead and answer the question, unless your counsel specifically instructs you not to answer.

So just to be clear, a number of times during today's questioning, your counsel may interject with an objection, but that doesn't mean you don't answer the question.  You do have to proceed in answering the question, unless you're explicitly told by your counsel not to answer the question.  Do you understand?

A.        Yes.

Q.        Okay.  Do you understand that you're here today to provide testimony concerning certain topics related to the deletion or destruction of data from your FibroGen-issued laptop?

A.        Is that -- is that the question or statement?

Q.        No, that's the question.  Do you understand that that's the purpose of this

deposition today?

A.        Yes.

Q.        Okay.  I'd like to, just for the record, introduce Exhibits 1 and 2, the notice of today's deposition and my -- the e-mail that lists the topics of today's deposition that were agreed upon. This is the notice, and this is the exhibit.

          Can you provide a copy for Ms. Yu?

          (Whereupon Exhibit 1 and Exhibit 2 were marked for identification.)

          THE WITNESS:  Am I supposed to look at this one or that one?

          MR. KAPLAN:  Q.  So these are topics that were agreed upon to discuss today.

          MR. ERICSON:  1's the notice and 2's the letter?

          MR. KAPLAN:  Correct.

Q.        And at the back of the letter are the topics.  And if I refer to terms such as "laptop" and "hard drive," I'm going to be referring to the FibroGen-issued laptop that you used when you were employed by FibroGen and returned to the company on or about April 1st, 20 -- 2021, and its hard drive. Do you understand?

A.        Yes.

Page 14

Q.        Okay.  So every time I say "laptop,"
that's the laptop I'm referring to, your
company-issued laptop.  If I refer to "the hard
drive" or a "C-drive," I'm referring to the hard
drive on that laptop.  Do you understand?

A.        Yes.

Q.        Okay.  And if I refer to "roxa" today, I'm
going to be using that as short for roxadustat.  Do
you understand?

A.        Yes.

Q.        And I'm also going to -- I may also refer
to "Phase 3 clinical trials" or "studies."  And by
that I mean roxa's Phase 3 clinical trials and
studies that were used by FibroGen in connection
with seeking roxa's potential approval in the United
States.  So do you understand that when I refer to
"Phase 3 studies" or "clinical trials," that's what
I'm referring to?

A.        Can -- may I ask for a clarification?

Q.        Sure.  When I refer to "Phase 3 clinical
studies" or "trials," I'm referring to the Phase 3
clinical trials or studies that FibroGen was working
on in connection with roxa's potential approval in
the United States.  I'm not referring to Phase 3
clinical studies about other drugs.

A.        The clarification lies within, in roxadustat, there were a number of Phase 3 clinical trials around the world that were included in the NDA, and the reason I ask for a clarification is that there were pool -- there were three trials that were -- three such trials in N -- non-dialysis and three trials in dialysis that were in the -- agreed with the FDA for primary cardiovascular safety analysis.

However, there were additional trials conducted in Europe that were also included in the NDA.  We have Phase 3 roxadustat trials in China, roxadustat trials in Japan.  They all needed to be included in the New Drug Application to the FDA.

So I just wanted you to clarify whether you are talking about the six trials, the eight trials, or all of the Phase 3 trials in roxadustat.

Q.        I'm talking about the Phase 3 trials that were submitted in connection with that New Drug Application to the FDA for approval in the United States, whatever --

A.        So -- okay.  So all of these were Phase -- all of these three Phase 3 trials were included in the New Drug Application to the FDA.

Q.        Okay.  And so when I refer to "Phase 3

clinical trials," I'll be referring broadly to all -- to what you just mentioned, all of those trials that were submitted in the NDA.

A.        Okay.  Thank you for the clarification.

Q.        Sure.  And thank you.

And by "NDA," I'm referring to the New Drug Application that was submitted by FibroGen to the FDA --

A.        Yes.

Q.        -- concerning roxa.

A.        Yes.

Q.        Okay.  And I'm also going to refer periodically today to "AdCom."  And when I use that term, I'm referring to the Advisory Committee that the FDA convened to review roxa's NDA.  Do you understand that's -- by "AdCom," that's what I'm referring to?

A.        Yes.

Q.        Did you prepare for today's deposition?

A.        Yes.

Q.        And how did you prepare for today's deposition?

A.        I met with counsel.

Q.        Which counsel did you meet with?

A.        I met with Bruce, Eric, Lee, and Tijana,

Zaneta, and Patrick.

Q.        And did you all meet together?

A.        There was -- yes, we did.

Q.        And how many times did you meet to prepare for today's deposition?

A.        Roughly five times.

Q.        And about how long were each of those meetings?

A.        A few hours.

Q.        And at each of those five meetings, were all of the counsel that you just referred to present?

A.        No.

Q.        How many of those five meetings were -- well, can you describe, of those five meetings, which of those -- how many of those five meetings were all counsel present for?

A.        One meeting had all those counsels were present.

Q.        And who were present at the other four meetings?

A.        The other four meetings -- the other four meetings did not have the present -- you asked me who was present.  There were meetings that had Lee, Bruce, and Eric, and there was a meeting that was --

Page 18

did not have all of them.

Q.        Right.  So at four of the meetings, Lee, Bruce, and Eric were present, and at the fifth meeting, all of the attorneys you just mentioned were present; is that correct?

A.        No.

Q.        What was not correct about what I just said?

A.        In one of the meetings, only one attorney was present.

Q.        And who was that?

A.        Eric.

Q.        Okay.  Did you review any documents during those meetings?

A.        Yes.

Q.        And what were those documents?

A.        Those documents consist of some e-mails, text, and FDA document.

Q.        And did you also review, in preparation for today's deposition, correspondence between your attorneys and my law firm related to the laptop?

A.        Now, isn't that client-attorney communication?

MR. ERICSON:  No, no.  He's just -- listen to the question.  He didn't ask you anything that's

privileged.

THE WITNESS:  Okay.

MR. ERICSON:  You go ahead.

THE WITNESS:  Yes.

MR. KAPLAN:  Q.  So yes, you reviewed correspondence between your attorneys and my law firm regarding the laptop in connection for today's -- in connection with your preparation for today's deposition; is that correct?

A.      I reviewed one correspondence, so that's why I'm hesitant to say "correspondences."

Q.      Was it a letter?

A.      I believe so.

Q.      Okay.  And you believe you reviewed only one letter from your attorneys and counsel for Plaintiffs in this case, my firm, in connection with today's deposition?

A.      I'm trying to remember.

Q.      Is there a second letter that you reviewed as well?

A.      To the best of my recollection, one letter.

Q.      Okay.  And did you review an e-mail that your counsel sent to me last night, before today's deposition?

Page 20

A.          No.

Q.          Okay.  And outside of your preparation for today's deposition, have you reviewed any other letters or communications between your counsel and my law firm?

A.          Not that I can remember.

Q.          Just the one letter that you mentioned?

A.          Yes.

Q.          Okay.  Do you recall approximately when that letter was dated?

A.          I believe it was January.

Q.          Okay.  And in connection with your preparation for today's deposition, did you meet with anyone else besides your attorneys?

A.          No.

Q.          Did you have any discussions with anyone from NerdsToGo, which we understand is a vendor that provides computer-related services?

A.          Not since March 2021.

Q.          Your last communication with NerdsToGo was in March -- and anyone that you know is affiliated with NerdsToGo was in March 2021, correct?

A.          Correct.

Q.          Okay.  And have you listened in on any calls between your counsel and my law firm?

A.        No.

Q.        Okay.  And so just to be clear, you've had no contact with NerdsToGo or anyone with NerdsToGo, written or verbal, since March 2021; is that correct?

A.        Correct.

Q.        Okay.  You previously served as FibroGen's chief medical officer; is that correct?

A.        Yes.

Q.        And that you served approximately from 2016 through December 2020 in that capacity, correct?

A.        Correct.

Q.        And after that date, you served as FibroGen's executive advisor to the CEO until March 15th; is that correct?

A.        Yes.

Q.        Okay.  And then after March 15th, you transitioned to a consultant to FibroGen; is that correct?

A.        Yes.

Q.        And when did your relationship as a consultant with FibroGen end?

A.        August of 2021.

Q.        Okay.  And as FibroGen's former chief

medical officer -- and I'm just going to refer to chief medical officer as "CMO" -- what were your primary responsibilities?

A.        My primary responsibility was providing leadership and oversight for clinical development globally, as well as clinical development in China.

Q.        For roxa?

A.        For roxa and -- and other -- and other programs in the company.

Q.        And did a large part of your work as CMO for FibroGen include leadership and oversight for clinical development of roxa in the United States?

A.        I -- I had a substantial -- that was a substantial part of my work.

Q.        As CMO for FibroGen?

A.        Yes.

Q.        And would -- is it fair to say that was also a substantial part of your work when you transitioned to senior advisor to the CEO of FibroGen?

A.        I will say that the -- that amount of work reduced because it was an advisory role versus responsible -- being the someone -- being the executive on the project.

Q.        But as executive advisor to the CEO, your

responsibilities, even though they lessened, still included seeking U.S. approval for roxa, correct?

A.        It was an advisory role, not a leadership role.

Q.        Okay.  And --

A.        Because the -- because I no longer had any management responsibilities.

Q.        Okay.  But you continued to work on matters relating to roxa's potential approval in the United States, correct?  Is that fair to say?

A.        I continued to work on roxa on a as-needed basis per management's direction.

Q.        As executive advisor?

A.        As executive advisor.

Q.        And did you continue to work on matters relating to roxa's potential approval in the United States as a consultant to FibroGen?

A.        As a consultant, no.

Q.        So as a consultant, once you transitioned to a consultant to FibroGen, you no longer worked on any matters relating to its potential approval in the -- roxa's potential approval in the United States?

A.        Clarification:  When you say if I worked on, do you mean that I actually worked on or I was

intended to work on?

Q.        I am referring to work on broadly.  So if you had any communications with FibroGen management in FibroGen's continuing efforts to seek approval for roxa in the United States, I would consider that to be included in "work on."

A.        Okay.  The --

Q.        Does that help clarify?

A.        ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████
██████████████████████████████████████
████

Q.        So as a consultant, you had no communications with FibroGen management concerning roxa's potential approval in the United States?  Is that your testimony today?  For example, you didn't participate in any Zoom calls with FibroGen management, telephone calls with FibroGen management, or have any e-mails with FibroGen management or any of its employees, once you transitioned to a consultant, that related in any way to roxa's potential approval in the United States?

Page 25

A.        So I was not involved on Zoom calls for the -- for the AdCom, for purposes of AdCom.  Is that what you're asking?

Q.        I'm just asking generally.

A.        Okay.

Q.        Once you transitioned to a consultant, did you have any communications with FibroGen management or anyone at FibroGen regarding roxa's potential approval in the United States?

A.        So if they -- if FibroGen -- let me see here.  I didn't -- I -- so I would ask that -- there -- I would have to say that there was calls, there was call -- pressions about roxadustat.  There was -- there were e-mail exchanges about roxadustat, but it was not a direct question on roxadustat's NDA.  Does that make sense?

Q.        So let me -- I understand your response, and I'm reading your response, and you're -- you -- is it -- are you saying that there were communications, after you became transitioned into your consultant role, regarding -- with FibroGen management regarding roxadustat's potential approval in the United States?  Not necessarily the AdCom specifically, but there were communications regarding roxa's potential approval in the United

Page 26

States generally?  Do you recall communications with FibroGen management after you transitioned into a consultant role on that topic?

A.       What about -- yes, I believe there -- the answer is "yes" to your question.

Q.       Okay.  Thank you.  And as chief medical officer of FibroGen, were you issued a laptop to use?

A.       Yes.

Q.       And did you also use that laptop when you transitioned to your role as executive advisor to the CEO in connection with performing your responsibilities for FibroGen?

A.       Can you repeat the second question, the most recent question?

Q.       When you transitioned to executive advisor to the CEO, did you continue to use the same FibroGen-issued laptop in con- -- in performing your responsibilities as FibroGen -- as executive advisor to the CEO?

A.       Yes.

Q.       And it was the same laptop that you used when you were CMO?

A.       Yes.

Q.       Do you recall approximately when you

received that laptop from FibroGen?

A.        You know, this is to the -- just my recollection, is sometime either -- sometime in 2017 or early 2018.

Q.        Okay.  And was that the principal computer that you used in performing your responsibilities as CMO and executive advisor after you were issued it and received it?

A.        Yes.

Q.        Okay.  Did you also have a personal computer, like a desktop PC from FibroGen, that you used to perform your responsibilities as CMO?

A.        This was the only computer.  If you mean desktop, there was not a separate desktop.  It was one of those.  If I need to work at the desk, I clicked it onto --

Q.        Right.

A.        -- a docking station.

Q.        Okay.

A.        Does that answer your question?

Q.        I think it --

A.        That is the desktop.

Q.        Exactly.  You answered the question, so -- and I'm just going to clarify.  The Fibro- -- the laptop, the FibroGen-issued laptop, was the only

computing -- computer that you were issued by the company after you received it to perform your responsibilities as CMO, and then as executive advisor?

A.      Yes.

Q.      Were you also issued a cell phone from the company?

A.      I had a cell phone.  I can't -- I cannot remember whether I bought it or the company bought it, but it was designated for company use.

Q.      Did you have a separate cell phone for personal use?

A.      No.

Q.      So you just used the same cell phone for both personal and business use?

A.      Yes.

Q.      Okay.  But you don't recall whether FibroGen -- it was issued by the company or you just purchased it yourself?

A.      Correct.

Q.      And other than -- did you use that phone to communicate via e-mail relating to company business?

A.      Occasionally.

Q.      Okay.  And did you ever use -- do you

recall ever using the phone to communicate relating to company business or roxa via other means such as text messages, chats, or other platforms on the phone besides e-mail?

A.      Yes.  Text was occasionally used, and because we had employees in China, that we also had used V-Chat.

Q.      And V-Chat is an application on a cell phone that you used to communicate?

A.      Occasionally.

Q.      And does it function similar to a text message?

A.      Yes.

Q.      Other than -- do you recall whether your phone was an Apple phone or -- the manufacturer of your phone.  Do you recall the manufacturer of your phone?

A.      Yes, Apple.

Q.      Apple.  Okay.  Were there -- other than V-Chat and text messages or iMessages, as I believe Apple refers to them, and e-mails, do you recall any other apps or programs on your phone that you used to communicate about roxa or any company business?

A.      About roxa or company business.  Not that I recall.

Q.        Okay.  So, for example, did you have Microsoft Teams on your phone or Snapchat or Slack? I'm just naming other applications that people use to communicate over cell phones, just to see if I could, you know, jog your recollection of whether you used any other apps on your phone besides V-Chat, text messages, or e-mail relating to roxa or company business.

A.        I -- I am -- I'm trying to remember, you know, with regard to that phone.  I know that on that phone, I later on continued using it, and I might have also had other applications like -- but like -- because I also used -- later on used my phone for my -- with my next employer, and I know for sure we had used Team, had used -- done Zoom with using a cell phone, and it could be I may have used WhatsApp because I -- and I can't think of anything else.  I might have it on the phone, but I do not recall specifically using that for roxa or FibroGen business communication.

Q.        Do you recall using WhatsApp to discuss roxa or anything relating to FibroGen?

A.        I do not recall using WhatsApp doing anything related to FibroGen.

Q.        Do you recall ever discussing FibroGen or

roxa over WhatsApp?

A.         I do not remember doing so.

Q.         Okay.  And you still have the same cell phone that we're talking about that you used while you were CMO at FibroGen and executive advisor to the CEO at FibroGen?  You still have that phone?

A.         I have actually switched phone.

Q.         When did you switch phones?

A.         Around the end of May of 2 -- I'm sorry. Yes, I still have that phone.  Okay.

Q.         Okay.

A.         Yeah.

Q.         You now use a different phone?

A.         Yeah.

Q.         But you still have the phone that you used --

A.         Yes.

Q.         -- as CMO?

A.         Yes.

Q.         And have you deleted any information from that phone relating to FibroGen or roxa or your laptop?

A.         Not that I recall doing so.

Q.         Okay.  And just to be clear, at the time -- from the time you were issued the laptop

from FibroGen to perform your responsibilities as CMO and then as executive advisor to the CEO, there was only one laptop?  There were no other laptops that FibroGen issued you to perform your responsibilities?

A.        Correct.  That was the only laptop that I used to do my job.

Q.        Did you have any other devices besides the cell phone and the tablet that you used to do your job, such as a iPad or a tablet?

A.        Not -- no.

        MR. ERICSON:  Object to the form of the question.

        MR. KAPLAN:  Q.  So you did not --

        MR. BRAND:  You said "cell phone and tablet" instead of "cell phone and laptop," I think.

        MR. KAPLAN:  Thank you for the clarification.

Q.        So you don't recall -- you did not use a iPad or other tablet to perform your responsibilities as CMO or executive advisor to the CEO?

A.        Correct.

Q.        Correct.  Okay.  Thank you.

        Did FibroGen authorize you to use the

Page 33

laptop for personal use?

A.          This was never discussed.

Q.          Did you primarily use the laptop to perform your responsibilities as CMO and as executive advisor to the CEO?

A.          Yes.

Q.          Where did you work from when you were CMO? Did you have an office in the company's office?  Did you work from home?

A.          When I was working as CMO at FibroGen, I did have an office, but during COVID lockdown, I worked from home, like everyone else, to comply with law.

Q.          And both when you worked in FibroGen's office, after you were issued the laptop, whether you worked in FibroGen's office or then whether you worked at home before COVID or during COVID, that laptop was the computer that you used to perform your responsibilities?

A.          Yes.

Q.          Okay.  And did you use that laptop in connection with your work as CMO relating to getting roxa approved by the FDA?

A.          It was the same laptop that I use to forward -- forward roxadustat's NDA in the U.S.  I'm

Page 34

very careful -- I'm rephrasing your question because I understand roxadustat has not yet been approved by the FDA.

Q.        And my question was simply the lap -- you -- you used the laptop in connection with your work as CMO and then as executive advisor to the CEO in connection with potentially getting roxa approved in the United States, correct?

A.        So I want some -- you know, your -- your question that I find some -- I have some difficulty of -- doing work is one thing.  Getting something approved is something else.  I will -- I would rather use the term for work on the NDA.

Q.        And you used the laptop to work on the NDA?

A.        Yes.

Q.        Okay.  And did you use the laptop to do any work after the FDA informed you and FibroGen that it intended to convene an AdCom?

A.        Possibly, but I don't remember the detail because it was such a short time frame.

Q.        Okay.  And I'm going to ask a similar question, but --

A.        Okay.

Q.        -- phrased slightly differently.

A.        Okay.

Q.        Did you use the laptop to do any work after the FDA informed you and FibroGen that it was considering convening an AdCom?

A.        Yes.

Q.        Thank you.

Did you use the laptop for any work relating to post hoc changes or analysis of roxa trial data after that data was unblinded?

MR. ERICSON:  Object to the form of the question.

THE WITNESS:  Well, can you -- so first of all -- I mean, I am not clear as to what do you -- if you are asking me whether I had used the laptop for the ND -- is this in regard to the timing or -- trying to understand your question better.

MR. KAPLAN:  Q.  Did you use the laptop for work relating to the clinical studies that were included in the NDA?

A.        Yes.

Q.        Okay.  And I'm not going to go through every specific work-related responsibility that you used the laptop for because I understand you to be testifying today that this was the computer that you used to perform your work-related responsibilities

for FibroGen as CMO and then as executive advisor to the CEO.

So I'm going to skip going through every different work-related responsibility.  And to the extent that you performed work for FibroGen relating to roxa or its potential approval in the United States and you performed that work on the computer, am I -- is it correct that it would have been on that laptop?

A.        Yes.

Q.        Did you use the laptop for any work relating to your or FibroGen's public statements about roxa and its potential approval in the United States?  For example, statements that might have been made during conference calls with analysts?

A.        Yes.

Q.        Did you use the laptop for any work relating to your or FibroGen's -- strike that.  Going to start over.

Did you use the laptop for any work relating to FibroGen's filings with the United States Securities and Exchange Commission -- and I'm going to refer to the U.S. Securities and Exchange Commission as the "SEC."  So did you use the laptop for any work relating to FibroGen's SEC filings

during the time you were CMO or as executive advisor to the CEO?

A.      Okay.  So I'm not an SEC expert, but I want you to help clarify this.  So if my internal counsel had a question or a paragraph for SEC filing and wanted me to -- send it to me by -- to review and I looked at it and give comment, does that count?

Q.      Yes.

A.      The answer is "yes."

Q.      That would have been something that you used the laptop for?

A.      Yes.

Q.      Did you use the laptop for any work or have any discussions using the laptop relating to your departure from the company, including the reasons why you decided to leave the company?

A.      So is your primary question about whether that laptop had information about my departure?  So what else does it encompass?  Discussion on separation agreement, does that count as part of this?

Q.      Yes.  Was that something that you would have communicated about on the laptop?

A.      I believe so, yes.

Q.        And I'm asking -- I'm just trying to clarify because many of the questions I've asked today were about your work for FibroGen --

A.        Yes.

Q.        -- and whether it was done on the laptop. So I -- my last question was slightly different.  Do you recall using the laptop to communicate about why you were deciding to leave the company?

A.        I do not remember specifically using the laptop for that purpose.

Q.        Okay.  And I'm just clarifying because before, I was mainly talking about work you performed as CMO and executive advisor.  So now I'm talking -- my question was specifically just communications about why you were deciding to leave the company, which may -- you may not necessarily consider work.

A.        Mm-hmm.

Q.        But I'm asking, do you recall any discussions over the laptop about why you were leaving the company?

A.        I do not remember.

Q.        For example, if you were leaving the company because of the way the clinical testing was going for roxa or roxa's prospects for FDA approval?

A.          No.

Q.          You don't recall any discussion over the laptop over the reasons why you were leaving the company?

A.          I do not recall reasons for departure of the company being on the laptop.

Q.          Okay.  But there may -- would you -- is it fair to say there may be discussions relating to your reasons for leaving the company on the laptop, but you just don't recall them?

A.          Anything is possible, but I just have no such recollection.

Q.          Okay.  So it's possible there were communications on the laptop about why you decided to leave the company?

A.          I just don't -- don't recall.  And by the way, it has nothing to do with what the roxadustat's data were.  Just wanted to clarify that.

Q.          I'm just asking about not the content, but, you know, whether there were discussions over why you were leaving the company.  Do you recall any of that on the computer?

A.          No, I do not recall any of that.

Q.          What about on your phone?  Do you recall any communications over why you were deciding to

leave the company on your phone?

A.          No, I do not have such recollection.

Q.          Did you have any communications with anyone at FibroGen about why you were deciding to leave the company?

A.          Did I have any discussion?

Q.          Yeah.

A.          Yes.

Q.          And were all of those discussions verbally, or were any of those discussions in writing?

A.          I specifically recall only one such occasion, and it was verbal.

Q.          And who was that discussion with?

MR. BRAND:  Objection; outside the scope.

MR. KAPLAN:  Are you instructing your witness not to answer?

MR. BRAND:  No.

MR. ERICSON:  No.

THE WITNESS:  With the CEO of FibroGen.

MR. KAPLAN:  Q.  And who was that?

A.          Enrique Conterno.

Q.          Did you have any discussions with anyone in FibroGen's HR department about why you were -- decided to leave the company?

Case 3:21-cv-02623-EMC    Document 185-4    Filed 06/08/23    Page 52 of 230

A.      Yes.

Q.      Okay.  Were those discussions all oral communications, or were any in writing?

A.      Oral.

Q.      Do you recall whether the folks in HR took notes on those discussions?

A.      I do not know.

Q.      And who were the HR individuals that you had discussions with regarding your reasons for leaving the company?

A.      Rich Farley.

Q.      Anyone else?

A.      Not that I recall.

Q.      And when did those two discussions that you just mentioned with the CEO and Mr. Farley occur, approximately?

A.      Clarification:  It was in the same meeting.  It was not two separate meetings.

Q.      Oh, it was one meeting --

A.      Yes.

Q.      -- with both Mr. Conterno and Mr. Farley?

A.      Yes.

Q.      About why you were leaving the company?

A.      Yes.

Q.      And that's the only communication that you

Page 42

can recall with anyone from FibroGen regarding why you were leaving the company?

A.        Correct.

Q.        After you transitioned from executive assistant to the CEO -- strike that.

Prior to transitioning to a consultant to FibroGen, do you recall requesting that you be allowed access to your lap- -- to the laptop as a consultant?

A.        Yes.

Q.        And who do you recall having those -- that discussion with?

A.        I had the discussion with Mr. Conterno.

Q.        Okay.  And why did you believe it was important -- well, did you believe it was important for you to continue to have access to the laptop as a consultant?

A.        Yes.

Q.        Why?

A.        Because if -- because in clinical development, content is data-driven, and if I were to assist with a question, then knowing -- and assisting, answering any questions, having access to the content will -- will make me more useful to the company.

Q.        And in performing your work for FibroGen, did you save any documents to the laptop's hard drive?

A.        I believe so.

Q.        Do you recall approximately how many documents you may have saved -- and by "documents," I mean files, any sort of file or document or presentation or note.  Do you recall approximately how many you would have saved to the hard drive?

A.        I don't know.

Q.        Would it be more than 100?

A.        I never counted.

Q.        Okay.

A.        When you say "hard drive" -- look, I'm sorry, I'm not a -- very computer savvy.  Okay?  I think of -- so "hard drive" meaning data I can access regardless of whether I'm online?

Q.        A hard drive, yes.  A hard drive does allow you to access data --

A.        Mm-hmm.

Q.        -- when you're not online.

A.        Mm-hmm.

Q.        And it's commonly referred to as a C-drive, I believe.

A.        Okay.  It's hard to count.  I was able to

access e-mails even when not connected, so it's difficult for me to give -- to quantify how many files.

Q.      So those e-mails may also have been on the hard drive?

A.      Yes.

Q.      Okay.  Is it possible there were -- you testified that you used this laptop for over three years in performing your responsibilities as CMO and then as executive advisor.  Is it possible there were thousands of documents saved on the hard drive that related to roxa?

A.      Well, it is -- it is possible that there could be thousands of files, but I -- but I cannot answer.  You know, there could be thousands of files that I had access to, but I -- I cannot tell you whether they are on the hard drive or not.  I hope that makes sense.

Q.      Right.  But the thousands of files you're referring to you would have had access to even if you weren't online?

A.      I cannot recall whether those -- all -- you know, which one of those files are accessible online or offline, but I -- there could be -- I don't know whether there are hundreds or thousands.

I just cannot remember precisely.

Q.        And I'm not asking you to remember precisely.  It would be impossible for any one of us who worked with a computer for over three years in performing their responsibilities.  I'm just asking you for your best approximation.

A.        I don't recall.

Q.        █████   ████████████████

█████████

███████████████

███████████████

███████████████████████

████████████████

THE WITNESS:    ███████

MR. KAPLAN:    █   █████████████████████

████████████████████████████    ████████████████████████

████████████████████████████████████████

████████████████████████████

██████   ██████████████

A.        █████   █████████████████

Q.        ████████████████████████████████    ███████

██████████████

A.        █████████████

Q.        █████████████

A.        ██████

Page 46



Page 47



Page 48

Q. ███ ███████████████

███████████████████████

██████████████ ████████████

█████████████████████████

█████████████████████████

█████████████████

A. ███████████████████████

██████████████████████████

█████

Q. ███ █████████████████

████████████████████████

██████████████████████

████████████

A. ██████

Q. ████████████████████

A. ██████

Q. █████████████████████

█████████████████████████

█████████████

A. ████

Q. ████████████████████

██████████████████████

A. ██████████████████████

█████████████████

Q. █████████████████████



Page 50



Q. █████████████████████████

█████████████████████████████

A. ██

Q. ████████████████████████████

█████████████████████████████████

A. ██

Q. ████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████

MR. BRAND: ████████

THE WITNESS: ███████

MR. BRAND: ████ █████████

THE WITNESS: █████████████

█████████████████████████████████

███████████████████ █████████████

████████

MR. KAPLAN:  Q. ██████████████

█████████████████████████████████

███████████████████████████

A. ██████████████████████████████

Page 51



Page 52



Q.        And how did you keep your personal information separate from FibroGen-related information on the laptop?

A.        I had a folder that I could access, and so I put my Peo- -- something along the line of "Peony's personal," or something to that effect.  I

can't even remember exactly, but -- and so that's
where I put my personal information.

Q.        In a specific folder on the laptop?

A.        Correct.

Q.        And was that folder on the laptop's hard
drive?

A.        Yes.

Q.        And were there other folders on the
laptop's hard drive relating to company business?

A.        That I'm not sure.

Q.        You have no recollection today whether you
had any folders on the laptop's hard drive relating
to FibroGen's business?

A.        Well, I -- see, my files weren't really
classified, called -- you know, I go by file name --
I mean, folder name.  So it is possible that there
were.

Q.        Did you save files to the hard drive
related to company business that weren't in a
specific folder?

A.        I could, but my general practice is that
they're in the folder.

Q.        Okay.  So as part of your general practice
saving information to the hard drive, there were
folders specific to company business and folders

Page 54

specific to your personal business; is that fair to say?

MR. ERICSON:  Objection; misstates prior testimony.

THE WITNESS:  So I -- what I have said is that I did have work folder that I -- I may from -- in the course of doing work, may save -- you know, save a file on.  But as I stated before, I go by -- identify folder by folder names and not necessarily be able to say exactly whether they're on hard drive or in share drive.  I hope that answer the question.

MR. KAPLAN:  Q.  ████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████

A.  █████████████████████████

███████████████████

Q.  ███████████████████████████

A.  ██████████████████████

████████████████████████

█████████████████████████████

██████████████████████████

███  ██████████████████████

██████████████████████

Page 55



Q.

A.

MR. ERICSON:

MR. KAPLAN:

MR. ERICSON:

MR. KAPLAN:   Q.

A.

Page 56

Q.

A.

Page 57



Q.

A.

Q.

A.

Q.

A.

Q.

A.

Page 58



Q.

A.

Q.

MR. BRAND:

THE WITNESS:

MR. KAPLAN:  Q.

MR. BRAND:

THE WITNESS:

Page 59



MR. KAPLAN:   Q.

A.

MR. BRAND:

MR. KAPLAN:

MR. ERICSON:

THE VIDEOGRAPHER:

THE VIDEOGRAPHER:

MR. KAPLAN:



**Page 60**

MR. KAPLAN:   Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Page 61



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.





Page 64



Page 65

A.

Q.

A.

Q.

A.

    MR. KAPLAN:

    MR. KAPLAN:  Q.

A.

Q.

A.

Q.

Page 66



Page 67



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Q.

A.

Q.

A.

Q.

Page 68



A.

Q.

A.

Q.

A.

Q.

A.

Page 69



Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.



Page 70

A. █████████████

Q. █████████████

A. █████████████

Q. █████████████

MR. BRAND: ████████████

THE WITNESS: ██ ████████████

MR. KAPLAN: Q. ████████████

A. ████

Q. ████ ████████████

A. ████████████

Q. ████████████

Page 71



A.

Q.

A.

Q.

A.

Q.

A.

Q.

MR. BRAND:

MR. ERICSON:

Page 72

MR. KAPLAN:    Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Page 73

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

A.        ▮▮▮▮▮

Q.        During that time frame, did you tell anyone at the company -- do you recall any communications with anyone at the company in which you stated that you were not intending to send the laptop back immediately?

A.        I do not recall.

Q.        Okay.  So -- and by this time, you had already accessed the laptop, retrieved your personal information, and no longer had any access to the laptop, correct?

A.        Correct.

Q.        But you were holding on to the laptop for the concerns that you mentioned previously, correct?

A.        Correct.

Q.        And during that time period, the company had requested that you return the laptop, correct?

A.        I will say that the -- so during that time, there were a request from -- from IT personnel to ask me to return the laptop.  I followed direction from the CEO of the company.

Q.        So you recall communications from the IT department request -- between March 16th and

March 24th, this approximate one-week time, requesting that you return the computer.  Did you tell them that you were not going to follow their instructions because you followed the instructions of the CEO?

A.        We did not have such communication.

         MR. KAPLAN: ███████████████  ██████

███  ██████████  ████████

         █████████████████████████████████████

         ███████████████████████

         MR.  KAPLAN:  Q.  █████████████████████

█████████████████████████████████████████████  █

████████████████████████████████

A.        ████

Q.        ██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

A.        ████████████

Q.        █████  ██████████████████████████████

█████████████████████████████████████████

A.        ████████████████████████

Q.        █████  ████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

Page 75



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Page 76



Page 77



Page 78

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Page 79



Q.    So you recall reading -- the first time you read this e-mail, you had already deleted or instructed a vendor to delete information from the

Page 80

laptop?

A.          Correct.

Q.          Okay.  And that was not -- that deletion was not just your personal files, but was company information?

A.          Correct.

Q.          And you understood at that time that that company information belonged to the company, correct?

A.          Yes.

Q.          And had you told anyone at the company that you would be deleting information from the laptop?

A.          No.

Q.          So you did not have any authorization from the company to delete any files from the laptop?

A.          No.

Q.          ███████████████████████

███████████████████████████████████

████████████████████

A.          ████████████████████████

██████████████████████████████████████

███████████████████████████████

███████

Q.          ██████████████████████████████

Page 81



Q.    Do you recall approximately what time in the day it was that you dropped the laptop at the vendor?

A.    I do not remember what time of day.  I don't remember if I drop it off on March 26, so I mean -- or March -- you know, or March 29 or somewhere in between.

Q.    Do you recall if it was in the morning of whatever day it was that you dropped it off?

A.    I don't remember.

Page 82

Q.      Do you remember if it was light outside when you dropped it off?

A.      I think there was light out.

Q.      So it was during the day when you dropped it off?

A.      I believe there was -- I believe the sun was still out, not -- yeah, it was not nighttime.

Q.      And the store was still open?

A.      Yes.

Q.      Okay.  Do you recall whether it was around lunchtime when you dropped it off?

A.      I don't remember.

Q.      Do you recall whether it was close to close of business hours during the day when you dropped it off?

A.      Don't remember.

Q.      Do you have any recollection at all what time of day it was when you dropped the laptop off with the vendor?

A.      I don't remember.

        MR. KAPLAN:  Okay.  I'd like to take a brief break.

        MR. ERICSON:  Yeah, sure.

        MR. KAPLAN:  Just five minutes.

        THE VIDEOGRAPHER:  Going off the record,

Page 83

the time is 12:43 p.m.

(Recess taken from 12:43 p.m. to 12:52 p.m.)

THE VIDEOGRAPHER:  Back on the record. The time is 2 -- 12:52 p.m.

MR. KAPLAN:  Q.  Okay.  I'd like to --

MS. BISHOP:  Exhibit 9.

MR. KAPLAN:  Yeah, Exhibit 9.

(Whereupon Exhibit 9 was marked for identification.)

MR. KAPLAN:  Q.  Okay.  So do you recognize this document to be a letter from your counsel in this case?  If you to go the last page, it's signed by Lee Brand, who had been sitting with us a moment ago.

A.        I do not remember this document.

Q.        Okay.  So you do not recall reviewing this document in connection with your preparation for today's deposition?

A.        No, I do not recall.

Q.        Do you recall ever having seen this document?

A.        I do not remember.

Q.        Do you ever recall having seen a draft of this document?

Page 84

A.          No, I do not recall.

Q.          I'd like to direct your attention, if I please, to -- to the bottom of the first page. Says, "Also in connection with the end of her FibroGen employment, Dr. Yu searched for and returned all of her hard copy business documents to FibroGen prior to or during March 2021."  Is that true?  Did you do that?

A.          Yes.

Q.          Did you have any concerns about those documents being lost when they were sent back to the company?

A.          No.

Q.          Okay.  And you did send them back to the company?

A.          Yes.

Q.          About how many documents were there?  A box?  One box of documents?

A.          More than a box.

Q.          About how many boxes, roughly?

A.          You know, I can't remember, but I did take a picture of the boxes.

Q.          Well, you --

A.          And that's -- yeah.

Q.          So would you say there were about five

Page 85

boxes, more than ten boxes?

A.          Less than ten.

Q.          Less than ten?

A.          Anywhere from -- I mean, three to five, somewhere there.

Q.          Do you recall how you sent them back?

A.          Yes.

Q.          How?

A.          I packed them up in my home office in the Bay Area here, and then I asked my assistant to come, and I took a picture of it and say, "Carry -- take these back and show them to Mark," who's the new CMO, "and do what he says he wants you to do with them."

Q.          Do you recall if you sent them back via FedEx?

A.          No, I did not send them back to FedEx.  My ex-assistant at FibroGen went to my -- like went to my home in California to physically carry them back.

Q.          Okay.  And then I would like to direct your attention to the next page.

A.          Mm-hmm.

Q.          The paragraph at the top beginning "In March 2021."

A.          Mm-hmm.

Page 86

Q.        It says, "In March 2021, Dr. Yu shipped her FibroGen-issued laptop back to the company in connection with her retirement.  She had a vendor erase the laptop's hard drive to avoid any possible disclosure of confidential information in case the laptop went astray while in transit."  Is that a true statement?

A.        It is a true statement.

Q.        And the next sentence reads, "It is our understanding that all potentially relevant information on that machine was separately maintained on FibroGen's e-mail servers and network drive and has been preserved."  Did you do -- have -- did you ever do anything to confirm that documents relating to your work at FibroGen that had been saved on the hard drive of the laptop were also separately maintained on FibroGen's e-mail and network's drives?

A.        So this is my understanding from FibroGen's IT department.  I've been told that everything on e-mails has been backed up, and even everything on my computer gets backed up.

          And I said, "How?"

          Said, "Don't worry about it, Peony.  As soon as you plug it into the VPN or the company like

Page 87

through Wi-Fi, we back up everything on your computer."  And this goes back years ago.

Q.        And was it your -- I'm sorry.

A.        Yeah, so this is why I felt that this was the solution to avoid the company's confidential information and my private information get lost if the laptop goes astray.

Q.        Was it your understanding that when you accessed FibroGen's network, when you logged into the computer, everything on -- FibroGen had access to everything on your hard drive?

A.        Yes.

Q.        That was your understanding?

A.        Yes.

Q.        And did you ever confirm that with anybody at FibroGen?

A.        That was what head of IT had told me. What else do I need -- I never thought to confirm again.

Q.         When did that head of IT tell you that?

A.         Around the time when I first got this computer, and also on my last computer.

Q.         Okay.  Do you recall any other discussions in which you were told that the contents of your hard drive -- your company had access to the contents of the hard drive on the laptop when you logged into the laptop?

A.         There were related discussions when I needed to access some old archive e-mails.  IT had always been able to help me find them.  This occurred during my employment as CMO.

Q.         And when you -- when they assisted you --

A.         Mm-hmm.

Q.         -- in retrieving information from your laptop --

A.         Mm-hmm.

Q.         -- do you recall if they had to -- what's commonly referred to as remote in, where, you know, they request access to your laptop and you give it -- to the hard drive, and you give it to them, or do you recall whether they automatically had access to your hard drive?

MR. ERICSON:  Objection; it misstates prior testimony.

THE WITNESS:  We are talking about -- I think we are talking about two different things. I'm talking about like before COVID, I show up in that area, and I say, "I need this," and then they say, "Okay."  Then they will show me -- you know, they will show somehow -- show access and help me find some old e-mail.

And now, what you're asking is that have they remote onto my computer before?  Yes, they have.  They -- they just call me up, say, "Peony, I need to do this and that with your computer.  Are you available?"

I said "yes," and they just do it.  And I don't need to -- I don't need to do any other special -- like anything else.  I just remember that as -- they just like make sure that I'm available, and then they can get into my computer any time.

MR. KAPLAN:  Q.  Do you recall whether any of the communications that you had that you just referred to --

A.       Mm-hmm.

Q.       -- where you were told that the company had access to the laptop's hard drive whenever you logged in, do you recall whether any of those communications were in writing?

Page 90

A.          I do not recall.

Q.          Do you recall whether they occurred over the phone?

A.          I don't remember if they occur over the phone.

Q.          Do you recall if they occurred in person?

A.          Yes.

Q.          And who were they with?

A.          I believe that it was -- now, this is based on recollection.  There were several people in IT, and I believe -- there could be more than one people, but the one that I remember the best was the conversation with Carl Tadina (sic).

Q.          That -- is that the conversation you mentioned earlier when you were issued the laptop that -- when you were told that the company automatically had access to everything on the hard drive whenever you logged in?

A.          I think the idea was not necessary for him to access my hard drive.  The idea he gave me was that -- that everything on my computer gets backed up.

Q.          Automatically?

A.          Automatically.

Q.          Whenever you log in?

A.          Yes.

Q.          Including the hard drive?

A.          That was my understanding.

Q.          Based on the --

A.          Yes.

Q.          -- in-person conversation you had with Mr. Tadina?

A.          Not -- I mentioned Carl Drinkwater.  I didn't say Tadina.

Q.          Oh.

A.          Sorry if I said Tadina.  I -- I don't remember.  It could -- it was -- did I say Tadina earlier?

Q.          I believe you did say --

A.          I apologize.  I meant Carl Drinkwater.

Q.          Do you recall a conversation around the time you were issued the FibroGen laptop --

A.          Yes.

Q.          -- when Mr. Drinkwater told you that whenever you logged into the laptop, anything on the hard drive would be -- would be backed up?

A.          Yes.  That conversation, yes, with -- when I was issued a laptop.

Q.          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 92



A.

Q.

MR. ERICSON:

MR. KAPLAN:    Q.

MS. BISHOP:

MR. KAPLAN:

THE WITNESS:

MR. KAPLAN:    Q.

A.

Q.

A.

Q.



A.

Q.

MR. BRAND:

MR. KAPLAN:    Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

MS. BISHOP:  This is Exhibit 10.

MR. KAPLAN:  I'd like to introduce this as Exhibit 10.

(Whereupon Exhibit 10 was marked for identification.)

MR. KAPLAN:  Q.  Do you recognize --

MR. ERICSON:  Wait just a second.  I'd like to get a glass of water.

MR. KAPLAN:  Q.  Do you recognize this document?

A.        Looks familiar.

Q.        Is this -- earlier today, when I was asking you questions about your preparation for today's deposition, you mentioned that you recalled reviewing correspondence between counsel and the attorneys in this case around January.  Is this the correspondence that you recall reviewing that you referred to?

A.        How do you define "review"?

Q.        Did you look at this document in preparation for today's deposition?

A.        I looked at it.  I glanced at parts of this.  I'm not -- so that's why I asked you for -- does that count as review.

Q.        Yeah.  Did you -- so you looked at this

Page 95

document in connection with today's -- preparation for today's deposition?

A.        I looked at part of this document prior -- during the -- briefly in the prep- -- in the course of preparation for today's meeting.

Q.        Do you recall whether you looked at it in more -- you mentioned five different meetings that you had preparing for today's deposition.  Do you recall if you looked at this -- parts of this document in just one of those meetings or more than one of those meetings?

A.        I don't remember whether it was in just one of those meetings or in more than one of those meetings.

Q.        Do you recall looking in parts of this document in at least two of those meetings?

A.        Sorry, I cannot answer that question.

Q.        Because you don't remember?

A.        I only remember -- in my mind, I remember the one time, one meeting.  I -- so...

Q.        And who was present at that meeting?

A.        In that meeting, Lee, Bruce, and Eric.

Q.        The meeting that you recall reviewing it -- parts of this document, those were the only attorneys present?

Page 96

A.      Yes.

Q.      Okay.  Let's go to Page 3 of this letter, please, and you'll see there's a heading that says "Plaintiffs' Fundamental Misunderstandings."  And at the bottom of the page, it states, "While she had temporary access to the laptop, Dr. Yu sought out a vendor to help her retrieve its personal content, which included large video files that she could not easily save to cloud-based storage or external media on her own."  Do you see that statement?

A.      Yes.

Q.      Is that a truthful statement?

A.      So when you say "truthful," are you saying that it's -- is it true now, based on my current memory and understanding?  Or was it truthful of what I thought was going -- had happened in January?

Q.      I'm asking you whether this statement is true that you could not -- you sought out a vendor because you could not easily save to cloud-based storage or external media the personal content on the laptop on your own.  Was that a truthful statement?

A.      This is not entirely true.

Q.      In fact, earlier today you testified that you were able to download all of the personal files

Page 97

from the computer yourself without any assistance, correct?

A.      Correct.

Q.      Have you ever told Mr. Brand or any of your attorneys that this was not a truthful statement?

MR. ERICSON:  Objection; calls for attorney-client communication.  Instruct the witness not to answer.

MR. KAPLAN:  Q.  Are you going to follow your counsel's instruction?

A.      Yes, I'll follow my counsel's instruction.

Q.      Okay.  Do you recall when the meeting with counsel was -- one of the five meetings with -- that you mentioned that you had to prepare for today's deposition was when you reviewed this -- portions of this letter -- do you recall when that meeting occurred?

A.      This -- it was in one of those -- one of the meetings this week.

Q.      Would have been this week?

A.      Yes.

Q.      The first time you saw this letter was this week?

A.      Yes.

Page 98

Q.        You have never seen this letter before this week?

A.        Not that I remember.

Q.        Do you recall ever telling your attorneys that you could not access information on the computer -- your personal files on your own, and you required assistance from a vendor?

MR. ERICSON:  Objection; asks for attorney-client communications, privileged.  We'll instruct the witness not to answer.

MR. KAPLAN:  Q.  Are you going to follow your attorney's instruction?

A.        Yes.

Q.        Do you recall ever telling anybody that you could not access the personal information on the laptop that you wished to download without outside assistance?

MR. ERICSON:  Same objection, but only if anybody -- to the extent "anybody" includes her personal attorneys.  To the extent she told anybody else, she's free to answer.

THE WITNESS:  No.

MR. KAPLAN:  Q.  So you don't recall ever telling anybody, other than an attorney, which your client -- which your counsel instructed you not to

Page 99

address --

A.          Mm-hmm.

Q.          -- that you couldn't access personal content from the laptop on your own?  You don't recall telling anybody that, other than -- attorneys aside?

          MR. BRAND:  Objection; asked and answered.

          THE WITNESS:  Hmm?

          MR. KAPLAN:  Q.  The question is simple.

A.          Mm-hmm.

Q.          Did you -- do you recall ever telling anybody that you couldn't access the personal information on your laptop that you attempted to -- that you wanted to retrieve when you had access to it?

A.          Mm-hmm.

          MR. ERICSON:  Same objections, and same instruction as before, in addition -- excuse me. Wait until I finish making my objection before you answer.

          THE WITNESS:  Please.

          MR. ERICSON:  Okay.  Same objection as before.  You can answer to the extent you can answer as to people other than your attorneys.  In addition, I said it's been asked and answered.  Go

Page 100

ahead.

THE WITNESS:  Thank you.

Does it count if I -- I call up someone that I -- I don't even know now by Googling and then ask "What do I do?"  And so -- and then after that, I was able -- I got -- I forgot exactly how -- you know, what -- and then I -- I called -- I might have -- when I first got stuck, I might have called someone, and then finally, at the end, I was able to do it myself.

MR. KAPLAN:  Q.  During the 24-hour period?

A.        During the 24-hour period.

Q.        And do you recall having any communications after the 24-hour period --

A.        Mm-hmm.

Q.        -- in which you stated you were able to download those files, in which you told anybody --

A.        Mm-hmm.

Q.        -- that you couldn't download those files yourself?

A.        No.

MR. ERICSON:  Same -- same objections. Well, she's answered, so...

MR. KAPLAN:  And I'm just trying to get a

clear answer.  She's answered, so thank you.

Q.          Then the following sentence says, "During this period, Dr. Yu left the laptop with the vendor with instructions to back up that content and then erase the hard drive so it could be securely sent back to FibroGen via FedEx."  Do you see that sentence?

A.          Yes.

Q.          Is that a truthful statement?  Did you instruct the vendor to back up the content of the computer and then erase the hard drive?

A.          It is not true -- I did not instruct to back up the content.

Q.          You did not instruct the vendor to back up the content of the laptop?

A.          Correct.

Q.          What did you instruct the vendor to do?

A.          I instruct the vendor to do enough erasing so that the login cannot be discovered.

Q.          Did you instruct -- so you instructed the vendor to erase the computer?

          MR. ERICSON:  Objection; misstates her testimony.

          MR. KAPLAN:  Q.  Did you instruct the vendor to erase the computer?

A.        Yes.

Q.        Did you instruct the vendor to back up its contents before the vendor erased the computer?

A.        No, I did not.

Q.        Do you recall ever telling anybody that you did instruct the vendor to back up the contents of the laptop before it was erased?

MR. ERICSON:  Objection to the extent it calls for attorney-client communication.  If you made such a statement to somebody other than your attorneys, you're free to answer, but if -- to the extent, if at all, it calls for attorney-client communication, I object on attorney-client privilege grounds, and instruct the witness not to answer.

THE WITNESS:  I'll listen to my counsel.

MR. KAPLAN:  Q.  Your counsel --

And I don't want to put words in your mouth, but I'm trying to explain to the witness in lay speak.

I believe your counsel is telling you you can answer the question as to non-attorneys.  Did you ever tell any person other than an attorney, one of your attorneys, that you instructed the vendor to back up the contents of the laptop before erasing it?

A.        I did not tell anyone other than my attorneys on this topic.

Q.        Are you testifying that you did tell your attorneys that you told the vendor to back up the content?

MR. BRAND:  Objection.

MR. ERICSON:  Objection.  A really improper question.  You're trying to trick the witness.  She's instructed not to answer as to communications with her attorneys on this.  She answered as to others, and you're trying to get her to say things as to attorneys.  It's utterly improper.

MR. KAPLAN:  Okay.

MR. ERICSON:  You do that sort of thing again, we'll take it up with the Court.

MR. KAPLAN:  You're happy to take it up with the Court.  The witness's answer was ambiguous on whether, in fact, she had --

MR. ERICSON:  Yeah, therefore -- it was ambiguous, and then you tried to get her to answer as to attorney-client communications, knowing that I had objected on that ground and instructed the witness not to answer, and that's what I regard as utterly improper.

Page 104

MR. KAPLAN:  That's fine.

MR. ERICSON:  But go on.  I mean, there's more questions, I'm sure, so...  I think we've made a record on this point.

MR. KAPLAN:  The witness said, "I did not tell anyone other than my attorneys on this topic." That answer implies that she did tell her attorneys --

MR. BRAND:  No, it doesn't.

MR. ERICSON:  No, it doesn't.

MR. BRAND:  You're playing semantic games. This is total nonsense.  If you ask clear questions that don't call for privileged answers, this wouldn't be an issue.

MR. KAPLAN:  Q.

And so my question to you is this:  Is it a truthful statement that you went to a vendor with the laptop roughly two weeks before the

Page 105

March 29th -- roughly two weeks before March 29th?

A.       No.

Q.       Do you recall when you went to the vendor?

A.       Now, are you -- when you say "vendor," are you talking about -- back up.  When you say "vendor," do you mean go to a vendor that event -- that helped me with the -- with the removal of the content from the hard drive --

Q.       Right.

A.       -- or call somebody to ask how to transfer the --

Q.       No, I'm asking specifically -- you just testified that you went to a vendor and instructed the vendor to erase the laptop and did not instruct the vendor to back up any contents before erasing it, and I'm asking you whether that took place roughly two weeks before March 29th.

A.       No.

Q.       Do you recall when you went to the vendor and provided those instructions?

A.       I -- I do not remember the exact time.

Q.       Was it the day when you were asked not to delete anything from the laptop, and I believe you previously testified you were running around, you know, trying to return the laptop to the company?

Page 106

A.        This happened sometime between March 26 to March 29th.

Q.        When you instructed the vendor to erase the laptop?

A.        Yes.

Q.        ████ ████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

A.        ████████████████████████████████ ████

████████████████████████████████

████████████████████████ ████████████

████████████████████████

Q.        What exactly did you tell the vendor?

A.        I -- I instructed the vendor to remove the content from the hard drive.

Q.        Did you instruct the vendor to do anything else?

A.        Yes.

Q.        What?

A.        To -- to destroy the hard drive.

Q.        Why did you instruct the vendor to destroy the hard drive?

A.        Because I do not want company information to be made available to a third party, and I did not want to be in possession of company information.

Q.        But you were aware, when you gave those instructions to the vendor, that the company had asked you to return the laptop, correct?

A.        I was aware the company had instructed me to return the laptop.

Q.        At the time you told the vendor to erase it and destroy the hard drive?

A.        Yes.

Q.        Did you tell anyone at the company that you were going to instruct a vendor to destroy -- to erase or destroy the contents of the hard drive?

A.        No, I did not.

Q.        Why not?  You knew they wanted it back.

A.        They wanted it back, so they can have it back.

Q.        And did you think that they just wanted the physical laptop back?

A.        Yes.

Q.        But none of the contents on it?

A.        Yes.

Q.        They simply wanted a laptop with no contents on it?  That was why they were asking for it back?

A.        Well, as far as I know, they asked for the laptop back.  And I don't know if you recall, during

COVID people were talking about computer chip shortage.  So at first, I thought they probably have other laptop for other people, but now, if they really want it back, perhaps they can wipe it and let this be used by someone else.

Q.        You thought the company -- at the time you instructed the vendor to destroy the hard drive, you thought the reason the company wanted the laptop back was because it was short on laptops and there was a microchip shortage?

A.        That was a possibility, but I did not really question why.  You know, they want it back, it's their property, so I returned it.

Q.        Did you ask the company if they had a microchip shortage?

A.        I did not.

Q.        Did you ask the company whether they had a laptop shortage?

A.        I did not.

Q.        Do you recall the name of the vendor that you went to?

A.        So this is something that during the past week, during the -- that it came to realization, and I believe -- I now believe that it was NerdsToGo.

Q.        Nerds -- you -- was it NerdsToGo?

A.          That is to my recollection, yes.

Q.          Why do you believe it was NerdsToGo?

A.          Why?

Q.          Did you view a document or a record, say a phone record, credit card statement, an e-mail, anything indicating that it was NerdsToGo?

A.          So first of all, it looks familiar, and we were -- and this -- I came to this realization in discussion with my attorney.

Q.          Did you do anything before this past week to determine the identity of the vendor?

A.          Yes.

Q.          What did you do?

A.          I tried to go back on my memory lane.  I went through a credit card record.  Couldn't find anything.  But during this past week, I did a little Googling and some document review with my counsel, and then I realized that it -- that it should be NerdsToGo.

Q.          ████████████████████████████████████████████████████████████████████████████████████

A.          ████

Q.          ██████████████

A.          ██████████████████

**Page 110**

MR. ERICSON: ███████████████████

███████

THE WITNESS: █████   ████████████████████

████████████████████████████████████

██████████████

MR. KAPLAN:  Q.  ████████████████

███

A.  █████████████████████

████████████████████████████

██████

Q.  ████████████████████

███████████████████

A.  █████

Q.  ████████████████████

A.  █████

Q.  █████████████████

A.  ████████████████████

████████████████████████

████████████████

Q.  ████████████████████

█████████████████████████

████████

A.  █████████████████

Q.  Did he break it?

A.  Yes.

Q.        How did he break it?

A.        I think he either did this or that
(indicating).  So it was just break it with his
fingers.

Q.        He -- so you were making a -- some
gestures with your hands.  Can you explain in any --
can you explain how he broke it with his fingers?

A.        He used his finger to bend the hard drive,
and it broke.

Q.        Were you watching him when he did that?

A.        Yes.

Q.        And how do you know it broke?

A.        Because one piece became two pieces.

Q.        And where are those two pieces?

A.        They threw it away.

Q.        Did you see them throw it away?

A.        They told me they were putting it in their
trash.

Q.        Did you tell them to put it in their
trash?

A.        They offered to put it in their trash.

Q.        And did you tell them that was okay?

A.        I don't remember the exact words, but I
did not stop them.

Q.        Okay.  You did not instruct them not to

throw it away?

A.         Correct.

Q.         Did you instruct them to break it in half?

A.         I did not instruct those.  I did not tell them to break it in half.

Q.         What did you instruct them to do with regard to breaking it?

A.         I think it was a discussion as to what to do with it, and -- and they said -- and they said, "Oh, breaking it is easy.  Let me show you," and then they just did it.

Q.         And did you try and stop them?

MR. BRAND:  Objection; asked and answered.

THE WITNESS:  I do not recall.  I do not remember the exact interaction on this.

MR. KAPLAN:  Q.  Did you instruct the vendor, before breaking the laptop -- the hard drive, to erase the hard drive?

A.         I do not remember the details.  This is all new to me.  I was just learning as I went along.

Q.         Okay.  So we've talked about erasing a hard drive and breaking a hard drive, and I just am asking for clarity on what you instructed the vendor to do.  Did you instruct the vendor to erase it and break it to des- -- or just do one of those two

things?

A.        I asked the vendor on what are the -- what are the options for removing that login content. And I -- and then I learned -- my understanding was it required removal of the -- I mean, the idea was to remove the content from the hard drive.  So at the end, this is what was done to accomplish the objective of removing that content.

Q.        Did -- what options did the vendor tell you there were?

A.        I do not remember all the technical options at this point.

Q.        Do you -- I'm just asking about your discussions with the vendor, and you said the vendor told you there were a number of options.  Do you recall --

A.        I don't remember, but at the -- there were a couple options, but at the end, this was like the only choice.

Q.        The only choice for what?

A.        To accomplish the objective.

Q.        And what was the objective?

A.        Of so that the last login cannot be traced, and that the information on the laptop, even if it were -- the laptop went astray, will not be



**Page 114**

accessible to other people.

Q.

A.

Q.

MR. BRAND:

MR. ERICSON:

THE WITNESS:

MR. KAPLAN:    Q.

A.

Q.

A.

**Page 115**





Page 116

Q. ▇▇▇▇▇▇▇▇▇▇▇▇

A. ▇▇▇▇▇▇▇▇▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

A. ▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇

A. ▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇

A. ▇▇▇▇▇▇▇▇▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇

A. ▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇

A. ▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

MR. ERICSON:  ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇  ▇

▇▇▇▇▇▇▇▇▇▇

**Page 117**

MR. BRAND:

MR. KAPLAN:

Q.

A.

Q.

Page 118

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

A.

Q.

A.

Q.

A.



Page 119

Q.

A.

Q.

MR. BRAND:

THE WITNESS:

Page 120



MR. KAPLAN:   Q.

A.

Q.

A.

Q.

A.

Q.



Page 121

A.

Q.

A.

Q.

A.

Q.

Page 122

A.

Q.

A.

Q.

A.

Q.          Was a new hard drive put into the computer by NerdsToGo?

A.          Yes.

Q.          Did you instruct NerdsToGo to put a new hard drive into the computer?

A.          Yes.

Q.          Did you pay for it?

A.          Yes.

Q.          Do you recall about how much it cost?

A.          The whole -- the whole thing -- now, I'm not able -- going to be able to give you the breakdown on the cost of the hard drive versus labor versus Window, right?  I remember the total cost was somewhere around 2- to $300.

Page 123

Q.        2- to $300 for the vendor to remove the lap- -- the hard drive from the laptop --

A.        Mm-hmm.

Q.        -- break it with his fingers --

A.        Mm-hmm.

Q.        -- and put in a new lap- -- a new hard drive?

A.        Yes.

Q.        Do you recall any discussions with the vendor regarding the make or model of hard drive that would be put back into the computer?

A.        I asked, "Do you have" -- you know, "Can you do the same" -- "exact same" -- you know, "same thing, something that fits?"

         They said, "Yes."

Q.        Did you ask the vendor to put in the exact same model of hard drive that was in the computer before?

A.        I don't remember what the words were, but I told them they need to put something in that is, you know, like it was so that it works.

Q.        Right, but do you recall telling the -- did you tell the vendor to put in the same type of hard drive into the computer as the one that he broke?

A.          Yes.

Q.          Why was it important to you to have the same type of hard drive put back into the computer if it had -- if it was empty?

A.          Because I want to be able to return the company equipment as it was issued to me.

Q.          Did you ever tell the company, either before you returned the laptop or after, that you had instructed a vendor to physically break the hard drive in the laptop?

A.          No.

Q.          By requesting a vendor to install the same type of hard drive into the laptop as the one that he broke and send it back to the company, were you trying to fool the company that -- or hide from the company that the prior hard drive had been removed and destroyed?

A.          I don't recall that as the intention.

Q.          Had -- do you recall any communications with the company, after the company received the laptop, about the hard drive being empty?

A.          No.

Q.          Do you recall any conversations with the company, either -- after it received the laptop, about the hard drive on the laptop being erased?

A.          No.

Q.          So no one at the company ever communicated with you, in writing or verbally, that the laptop that you had returned to the company had a hard drive that was erased; is that true?

A.          It's true, to my recollection.

Q.

A.

Q.

MR. BRAND:

MR. KAPLAN:   Q.

A.

Q.

Page 126



A.

Q.

A.

Q.

A.

Q.



A.

Q.

Page 128



Q.      After March 15th, the company, in fact,
asked you to return the FibroGen-issued laptop,
correct --

A.      On March --

Q.      -- and sent you a FedEx label to return
it?

A.      That was by -- and I -- I'm not sure even
IT person is representing the whole company.
However, I am saying that the instruction on behalf

**Page 129**

of the company came on March 25th.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Page 130



MR. ERICSON: ████

THE VIDEOGRAPHER: ████████████████

████████████████████████████

████████  ████████████████  ████████████

████████

████████████████████████████████

THE VIDEOGRAPHER: ████████████

████████████████  ████████████████████

████████████████████████████████████

████████  ████████████████

MR. KAPLAN:   Q.  ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████

A.   ████

Q.   ████████

A.   ████

Q.   ████   ████████

████████████████████████████████████

MS. BISHOP: ████████████████████

MR. ERICSON: ████████████

MS. BISHOP: ████████████

Page 131

MR. KAPLAN:   Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Page 132



Q.      And it's your testimony today under oath
that you did not instruct him to throw away the hard
drive?

A.      What do you --

Q.      Is it your sworn testimony under oath
today --

A.      Mm-hmm.

Q.      -- that you never instructed this vendor
to throw away the broken hard drive?

A.        I did not say that.  I said I do not recall -- I do not recall the specific instruction on disposal on how -- how this broken hard drive was to be disposed of.

Q.        You don't recall any discussion that you had with this vendor as to how the hard drive would be disposed?

MR. BRAND:  Objection; misstates prior testimony.

THE WITNESS:  So it was a matter -- it was an understanding that he was to -- after he broke it, he was to throw it away.

MR. KAPLAN:  Q.  Did you tell him to throw it away after he broke it?

A.        I don't remember whether I told him to throw it away or he told me he was going to throw away.

Q.        But either he told you he was going to throw it away or you told him to throw it away?

A.        Yes.

Q.        One of those two things happened?

A.        That is my -- based on the best of my recollection.

Q.        And if he told you he was going to throw it away, you do not recall telling him not to throw

it away?

A.        Correct.

Q.        Correct.

          Let's go to the next exhibit.

          MS. BISHOP:  This will be Exhibit 13.

          MR. KAPLAN:  Q.  Do you recall any --
reviewing, in preparation with today's deposition or
otherwise, any other photos of the vendor besides
this one?

A.        Of this vendor?  I do not remember.

Q.        You don't remember if you saw any other
photos besides this one?

A.        Correct.

Q.        Preparing for today's depositions or
otherwise?

A.        Correct.

Q.        Okay.  Do you recall the vendor's name?
          Can we mark this as the next exhibit,
please?  Oh, is this my copy?

          MS. BISHOP:  Exhibit 13.  I have another
copy.

          MR. KAPLAN:  Yeah, I could use another
copy.

Q.        Do you recall the vendor's name?

A.        The vendor's name, NerdsToGo.



Page 135

Q.   ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

A.   ▮▮▮▮▮▮▮▮▮

Q.   ▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮

▮▮

A.   ▮▮▮▮

Q.   ▮▮▮▮▮▮▮▮

A.   ▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮

          MR. KAPLAN:   Q.   So this is the website

from NerdsToGo.

A.        Mm-hmm.

Q.        In Bellevue.  That's where you live,

right?

A.        Yes.

Q.        And that's where the NerdsToGo location is

that you recall -- in the last week, you recall

taking your laptop to to have the hard drive

destroyed, correct?

A.        Correct.

Q.        In Bellevue?

A.        Yes.

Q.        This morning we printed out -- you could

see at the top, at 10:02 a.m., this -- the firm or

the company website --

A.        Yes.

Q.        -- of NerdsToGo in Bellevue, Washington.
That's what I'm showing you right now.

A.        Yes.

Q.        This gentleman in the upper left-hand
corner, Michael Santiago, who it says is the local
owner, do you -- does he appear to be the gentleman
that you dealt with at NerdsToGo that is in this
photo?

A.        I had not seen the people at the store
without their mask on.

Q.        How many people do you recall seeing in
the store at that time?

A.        I do not -- I believe one or two.

Q.        You dealt with one or two people?

A.        Yes.

Q.        You recall dealing with another person
besides this person, the person in the photo that I
previously -- who's pointing to the hard drive?

A.        This is like -- look, I don't remember
what they look like.  At that time, everyone wears a
mask.  And this is like as clear as it gets, so I'm
not able to make out the rest of the face.

Q.        ███████████████████



Page 137

MR. ERICSON: █████████████████

███████████████████████████████

███████

THE WITNESS: ████  █████████████

███████  ████████████████  █████████

██████████  ████████████████████

███████████████████████

MR. KAPLAN:  Q.  ███████  ████████████

██████████████████████████████████

██████████████████████

A.  ████████████████████████████

████████████████████████

Q.  █████████████████████████████████

██████████████████████████████████

I'm sorry.  ████████████████████

MS. BISHOP: ████████████████████

MR. ERICSON: ████████  ██████

MR. KAPLAN: ████

MS. BISHOP: ██████████████████  ████

MR. KAPLAN:  Q.  █████████████████

████████████████████████████████████

██████████████████

A.  ████████████████████████████

████████████████████████████████████

██████████████████████████████████

Q.

A.

Q.        Okay.  How many visits did you have with NerdsToGo?

A.        I can -- it's somewhere between two to three visits.

Q.        And please describe what happened on each of those visits.

A.        On the very first visit, I drop off the comp- -- the laptop.  And then the first -- the disk was removed, and then I was asked if I want Windows -- so this was removed, and then a new disk was put in.  Then I was asked if I want a Window installed.  I said "yes."  So I cannot recall whether there was a visit between -- before Window install versus time of pick -- I believe that when I said "yes" on Window install, they told me to pick it up later.  So that's why I'm not very exact and clear on whether I had a total of two visits or three visits.

Q.        After you picked up the laptop from NerdsToGo, did you attempt to turn it on, access it?

A.        I recall they turned it on and showed me that the screen lights up and that works, and then turned it off.

Q.        And after that, did you yourself attempt to turn the laptop on or use it?

A.        No, I did not use it.

Q.        After you picked it up from NerdsToGo, did you plug anything into it?

A.        I did not plug anything into it.

Q.        Did you mail or FedEx the laptop back to FibroGen yourself?

A.        Yes.

Q.        After you picked up the laptop from the vendor, did you feel satisfied that all of its contents had been erased?

A.        I don't recall.  I mean, it was two years ago.  I don't -- I don't remember feelings, but I -- but I felt that this is -- you know, it's time to return the laptop to FibroGen.

Q.        ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**Page 140**

A.

Q.

MR. KAPLAN:    Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Page 141

A.

Q.

A.

Q.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

Q.

A.

Q.      Did you make any attempts to erase the laptop yourself before bringing it to the vendor?

A.      That thought crossed my mind, but I realized that I was not capable of doing it.

Q.      Do you have any records from NerdsToGo evidencing any of the services that they performed?

A.      I did.

Q.      And where are those records?

A.      I would use a singular for that.  They gave me a handwritten receipt.  I don't know where it went.

Q.      Do you recall how long you kept it for?

A.      I don't remember.  I thought I put it in someplace safe, but I cannot find it.

Q.      And you've searched for it?

A.      Yes, I looked for it.

Q.      How did you look for it?

A.      Just go through -- go through my desk.  I couldn't find it.

Q.      Okay.  About how much time did you spend looking for it?

A.      About 20 minutes.

Q.          And when was that?

A.          That was right before -- that was last week, right before I came back to the Bay Area for this.

Q.          Had you made -- before that time, did you undertake any efforts to look for any records identifying the vendor that you used before you searched your desk for 20 minutes?

A.          I believe that I had also search my -- tried to search my desk in trying to -- in about -- earlier this year, like when I was trying to figure out the vendor for this.  Perhaps January, February, when I couldn't -- I didn't even remember who the vendor was, but I was trying to find if there was any record, and I couldn't find it.

Q.          And that was January or February of this year?

A.          Yes.

Q.          And about how much time did you spend searching then?

A.          Twenty minutes.

Q.          So you searched twice for 20 minutes?

A.          Yes.

Q.          Did you search your phone?  Have you ever searched your phone for calls with the vendor or

texts with the vendor or...?

A.        Did I search my phone?  Yeah, I went -- I also look at -- went -- did I look at my phone?  I think I did look at the phone that I put aside, but I couldn't find it.

Q.        And when did you look at your phone?  Was it around the same time that --

A.        Yeah.

Q.        -- you looked in your desk?

A.        Yeah.  The first time.

Q.        The first time?

A.        Yeah.

Q.        So in January or February of this year?

A.        Yeah, mm-hmm.

Q.        Okay.  Are you aware of the nature of this lawsuit that we're here today about, that it's a securities fraud litigation involving allegedly misrepresentations to investors regarding roxa and its safety profile and prospects for approval?  Are you aware that that's what this litigation's about?

A.        Yes, I'm aware.

Q.        At the time you worked as CMO for FibroGen, were you aware that if a company misleads investors about the company's business, and -- that that could result in legal liability?

A.          Yes.

Q.          And if it's a public company and it's a publicly traded stock and investors in the company suffer losses when the matters that they were allegedly misleading -- misled about is revealed, are you -- is it your understanding as CMO that those investors could sue the company and its executives to recover those losses?

A.          Yes.

Q.          And was that general understanding that that legal liability existed -- did you know that the whole time you worked as CMO for FibroGen?

A.          Yes.

Q.          Are you aware that the announcement of the FDA's decision to convene an AdCom relating to roxa resulted in FibroGen's stock price dropping?

A.          Yes.

Q.          And are you aware that it was a large drop in the stock price that occurred after that announcement?

A.          I recall that it was a drop.  I'm going to ask you to clarify what is large and versus small.

Q.          Well, I could tell you that -- if I represented to you that FibroGen's stock price fell over 30% after that announcement was made, would

**Page 146**

that surprise you?

A.　　No, it does not surprise me.

Q.　　And would you consider a 30% decline to be a large decline?

A.　　Yes.

Q.　█████　████████████████████████████████████

MS. BISHOP:　█████████

████████████████████████████████████████

████████████████████████████

MR. KAPLAN:　Q.　█████　██████████████

███████████████████████████████

MR. ERICSON:　████████████████　███████████

███████

MR. KAPLAN:　████████████████████████████

███████████████

MR. ERICSON:　████　████　████████████████

████████████████

MR. KAPLAN:　████████████████████████████

██████████

MR. ERICSON:　███████████

MR. KAPLAN:　Q.　████████████████

████████████████████████████

A.　████████████████████████

Q.　███████████████

Page 147



Page 148

Q. █████████████████

A. ████████  █████  █████

Q. ████████████████████████
████████  ████████████████████████████
████████████████████████████████████████
████████████████████████

A. ████

Q. ████████████████████████████████
████████  ████████████████████████████
████████████████  ████████████████████
████████████████████████████

A. ████

████████████

MR. KAPLAN:  Q. ████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████  ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Page 149



MR. ERICSON:

MR. KAPLAN:

Page 150

THE WITNESS:

MR. KAPLAN:  Q.

A.

Q.

A.

Q.

A.

Q.

Page 151



A.

Q.

A.

Q.

A.

Q.

MS. BISHOP:

MR. KAPLAN:

MR. KAPLAN:   Q.

Page 152



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A. █████████████████████████████

Q. ██████   ██████████████████████

███████████████████████████████

████████████

MR. BRAND:   ████████████

THE WITNESS:   ████████████████

████████████████████████████████

MR. KAPLAN:   Q.  ███████████████

██████████████████████████████████

███████████████

A. █████████████████████████████

████████████

Q. █████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████

████████████████████  ████████████

████████████████████████

A. ████████████████████████████████

█████████████████████████████████

██████████████████████████████

███████████████████████████████

Q. ██████   █████████████████████████

██████████████████████████  ██████████

███   ████████████████████  ██████████

Page 154



MS. BISHOP:

MR. KAPLAN:

MS. BISHOP:

MR. KAPLAN:

MS. BISHOP:

THE WITNESS:

MR. ERICSON:

MS. BISHOP:

MR. KAPLAN:

THE WITNESS:

MR. KAPLAN:  Q.

MS. BISHOP:

MR. KAPLAN:

MR. BRAND:

MR. KAPLAN:

Page 155

MR. ERICSON:

MR. BRAND:

MR. ERICSON:

MR. KAPLAN:

Q.

A.

Q.



Page 156



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

MS. BISHOP:

MR. KAPLAN:    Q.

MR. KAPLAN:    Q.

A.

Q.    ███████  ████████████████████████
███████████████  ██████████████████████
█████████████████  █████████████████████
███████  ███████████████████████████

A.    ████████████

Q.    Did you have meetings with Mr. Eisner in your role as a consultant after March 5th -- March 16th, 2021?

A.    Yes.

Q.    And about how many meetings would you say occurred?

A.    I had -- when you say "meetings," do you mean -- do you count only face-to-face meeting, or do you count telephone meetings, video -- Zoom meetings?

Q.    Well, let's go one by one.  How many -- did you have any face-to-face meetings in your role as a consultant for FibroGen with Mr. Eisner?

A.    No.

Q.    Did you have any Zoom or video conference meetings with Mr. Eisner in your role as a consultant for FibroGen?

A.    Yes.

Q.    And about how many of those meetings

occurred?

A.          Two.

Q.          Do you recall approximately when they occurred?

A.          Approximately -- you know, there's one that was around March 17, March 18, around the time when he wanted to set up a call with me.

Q.          Mm-hmm.

A.          And then there was also another -- another Zoom meeting around the middle of May.

Q.          And did you have any phone calls with Mr. Eisner other than these video conferences in your capacity as a consultant for FibroGen?

A.          No, I did not.

Q.          And in the video conference --

A.          Not -- you know, I -- you know, when I say I did not, it's that not that I can -- I did not, to the best of my recollection.

Q.          That's fair.  The video conference that you just mentioned that you had with Mr. Eisner around March 17th or 18th, do you recall if there were other participants?

A.          No.

Q.          It was just the two of you?

A.          Yes.

Q.        And about how long did it last?

A.        It was less than 30 minutes.  It was -- we set it for 30 minutes, but it was -- we finished. We did not need to take extra time.

Q.        And what do you recall was discussed during that meeting?

A.        I don't remember.

Q.        Do you recall any discussions regarding AdCom and preparation for it?

A.        I don't think so.  I don't remember the word "AdCom" at that point.

Q.        You don't remember whether AdCom was a topic that was discussed at all during that video conference that you had with Mr. Eisner on or about March 17th or March 18th?

A.        Correct.

          I'm sorry.  This thing is falling off.  I don't mean to be -- act distracted, but okay.  It went down here.

Q.        Do you recall whether, during that video conference, you discussed with Mr. Eisner any public -- a potential public announcement by the company concerning roxa --

A.        I do not.

Q.        -- and the NDA?

A.          I do not recall.

Q.          Do you recall anything at all about what was discussed during that video conference with Mr. Eisner on or about March 17th or March 18th, 2021?

A.          I do not remember.

MR. BRAND:  Could we get a time check?

THE VIDEOGRAPHER:  I'm sorry, I forgot to give the ten-minute note.

MR. KAPLAN:  Where are we?

THE VIDEOGRAPHER:  Four hours and two minutes.  My mistake.

MR. KAPLAN:  Okay.  Let's go off the record real quick.

THE VIDEOGRAPHER:  Going off the record, the time is 3:34 p.m.

(Recess taken from 3:34 p.m. to 3:44 p.m.)

THE VIDEOGRAPHER:  Back on the record. The time is 3:44 p.m.

MR. KAPLAN:  Q.  ███████████████████████████████████████████████████████████████

A.  ████

Q.  ███████████████████████████████████████████████

Page 161



Page 162



A. █████████████████████████████

Q. ██████  ██████████████████████

    MS. BISHOP: ████████████████

    MR. KAPLAN: ███████████

    ████████████████████████████

    ██████████████████

    MR. KAPLAN:  Q. █████████████

█████████████████████████████

A. ██████████████

Q. ███████████████████████  █████████

████████████████████████████████

██████████████████

A. ██████████████████████████

Q. ██████████████████████

A. ████

Q. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

Page 163



A.

Q.

A.

Q.

A.

Q.

A.

MR. KAPLAN:

Page 164



Q.

MR. BRAND:

MR. KAPLAN:

Q.

A.

MS. BRIEN:

MR. KAPLAN:

MS. BRIEN:

MR. KAPLAN:

Q.

Page 165

MR. BRAND:

MS. BRIEN:

MR. KAPLAN:

MS. BRIEN:

MR. KAPLAN:

MS. BRIEN:

MR. BRAND:

MR. KAPLAN:

MR. BRAND: ▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉

MR. ERICSON: ▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

THE WITNESS: ▉▉▉▉▉▉▉▉

▉▉▉

MR. BRAND: ▉▉▉▉▉▉▉▉▉▉▉

MR. ERICSON: ▉▉▉▉▉▉▉▉▉

▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉

THE WITNESS: ▉ ▉▉▉▉▉▉

▉▉▉▉

MR. KAPLAN:  Q.  Did you have any other meetings, calls, video conferences in your role as a consultant with FibroGen, other than the two meetings you mentioned today with Mr. Eisner, with other individuals at FibroGen?

A.    There was no further meeting with Dr. Eisner.  There may -- there was a call to discuss a publication with coauthors, some of whom were still working at FibroGen.

Q.    And about when did that -- was that the video conference?

A.    I do not recall whether that was a video

conference or a phone call.

Q.          And do you recall when that occurred, approximately?

A.          Sometime in 2021.

Q.          During the first half or second half?

A.          I do not remember exactly.

MR. KAPLAN:  Okay.  And if I were to ask, with respect to the May meeting with Mr. Eisner and counsel, if the witness could answer what, if any, topics she recalls were -- was the subject of discussion at that meeting, would you instruct the witness not to answer?  Just the topics of discussion at that meeting, not the substance of them.

MS. BRIEN:  I think if the witness keeps the topics quite broad such that they would be on a privilege log, we're comfortable with letting her answer.  So, you know, general subject matter I think is okay.

THE WITNESS:  The general subject matter was a CMO-to-CMO conversation about the roxadustat program.  Is that acceptable?

MS. BRIEN:  Yeah, that was broad enough. I'm not sure if --

MR. KAPLAN:  Q.  ███████████████

Page 168



A.

MS. BRIEN:

THE WITNESS:

MR. KAPLAN:  Q.

MR. BRAND:

MR. KAPLAN:

MS. BRIEN:

THE WITNESS:

Page 169

MS. BRIEN: ▮▮▮▮

MR. KAPLAN: ▮▮▮▮▮▮▮

MR. BRAND:  Before we go off, I'd just like to say for the record, we'd like to take our 21 days to review the final transcript for confidentiality purposes.

THE VIDEOGRAPHER:  Okay.  Then this concludes today's deposition of Dr. K Peony Yu.  The number of media used was three and will be retained by Veritext Legal Solutions.  The time is 3:56 p.m. We're off the record.

THE REPORTER:  I need to get copy orders.

MS. BRIEN:  So just one copy for all the defendants.

(Whereupon the deposition concluded at 3:56 p.m.)

---oOo---

Page 170

CERTIFICATE OF REPORTER

I, Natalie Y. Botelho, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled.

The said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was|[ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: March 21, 2023

_____

Natalie Y. Botelho, CSR No. 9897

LEE BRAND, ESQ.

lee.brand@pillsburylaw.com

March 22, 2023

RE: IN RE FIBROGEN, INC., SECURITIES LITIGATION

3/10/2023, K. Peony Yu (#5799939)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 21 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**DEPOSITION ERRATA SHEET**

**DEPOSITION OF K. PEONY YU, MD**

*In Re Fibrogen, Inc., Securities Litigation*, Case No. 3:21-cv-02623-EMC

| Page: Line | Transcript Reads | Change/Correction | Reason |
|---|---|---|---|
| 25:13 | was call -- pressions | were discussions | Clarification |
| 29:7 | V-Chat | WeChat | Transcription error |
| 30:15 | Team | Teams | Clarification |
| 39:5 | departure of | departure from | Clarification |
| 55:2 | ███████████ | ██████████ | ████████ |
| 71:14 | ████ | ████ | ██████████ |
| 110:4 | ██████████ | ██████████ | ██████████ |
| 114:6-7 | █████████ | ████████ | █████████ |
| 117:22 | ██████████ | █████████ | ███████ |
| 127:22 | █████ | █████ | █████████ |
| 138:18 | a Window | Windows | Clarification |
| 138:20 | Window | Windows | Clarification |
| 138:22 | Window | Windows | Clarification |

I, K. PEONY YU, MD, do hereby declare under penalty of perjury that I have read the transcript of my deposition taken on Friday, March 10, 2023; that I have made such corrections as noted above; that my testimony, as corrected, is true and correct.

Executed on April 12, 2023.

K. Peony Yu, MD

Page 173

IN RE FIBROGEN, INC., SECURITIES LITIGATION

3/10/2023 - K. Peony Yu (#5799939)

ACKNOWLEDGEMENT OF DEPONENT

I, K. Peony Yu, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____        April 12, 2023_____

K. Peony Yu                             Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

**[& - 2021-03-15t15:16:11z]**                    Page 1

**&**

**&** 6:4 47:20 48:2 57:9 164:14 165:8

**0**

00000002 4:16
0000001 4:16
0000032 4:19
0000033 4:19
0000034 4:22
0000042 4:25
0000043 4:25
0000046 5:4
0000329 6:12
0000330 6:12
02623 1:6 2:6 7:17
0523494 6:9
0523495 6:9
0526589 5:22
0526608 6:5
0526617 6:6
0604492 5:14
0604509 5:14
0700 5:7
07:08:54 5:22
0800 5:22

**1**

1 4:10 6:5 7:12 13:4,9 45:24 47:3,6,19 57:7 58:24 59:14,20 125:24

1's 13:15
10 1:15 2:14 5:10 6:8 7:1 74:8 92:9 94:1 94:3,4 126:7 162:20,23,25
100 43:11
10007-0103 3:22
10:02 135:25
10:17 2:13 7:2 7:6
10:40 168:18
10th 7:6 152:13 152:18
11 5:12 74:7 76:13 92:10 125:16,17
11:42 59:15,16
12 5:15 6:13 130:23,24 131:1 137:2,5 137:17,18,19 137:21 138:6
125 5:12
12:05 59:17,19
12:43 83:1,2
12:52 83:3,5
12th 46:19
13 4:10,12 5:16 134:5,20 135:9 137:16
131 5:15
135 5:16

14 5:18 140:7,8
140 5:18
146 5:21 6:3
15 5:21 50:25 61:6 131:21 146:8,9,13,17 146:24
151 6:7
156 6:10
15th 21:16,18 50:20,20,22 51:2,13 61:7 61:10 125:25 128:11,16,17 154:2
16 4:12 5:10 6:3 71:14 117:8 118:1 119:3 146:8,9 146:14,18
162 6:13
16th 65:2 66:1 70:25 71:8,16 72:25 73:25 157:9
17 6:7 151:20 151:21,22 153:12 158:6
17th 64:22 65:2 65:5 157:4 158:21 159:15 160:4
18 6:10 156:19 156:20,21 158:6

180 3:6
18th 158:21 159:15 160:4
19 6:13 162:4,5 162:6
1st 13:23

**2**

2 4:12 5:22 13:4,9 31:9 59:20 83:5 122:25 123:1 130:4
2's 13:15
20 13:23 142:25 143:8 143:22 173:15
20029 170:24
2016 21:11
2017 27:3
2018 27:4
2020 5:12 21:11 148:19
2021 5:6,22 6:5 6:8 13:23 20:19,22 21:4 21:24 46:19 84:7 85:24 86:1 118:1 126:1 128:11 152:13,20 154:2 157:4,9 160:5 162:22 163:2 167:4
2021-03-15t... 4:15

**[2021-03-16t17:49:02z - able]**

**2021-03-16t...** 4:18
**2021-03-16t...** 4:21
**2021-03-17t...** 6:11
**2021-03-24t...** 4:24
**2021-03-25t...** 5:4
**2021-03-29t...** 5:19
**2022** 5:8
**2023** 1:15 2:14 4:12 5:10 6:14 7:1,7 170:23 171:3
**20th** 148:19 149:2
**21** 149:2 169:5 170:23 171:17
**212** 3:22
**22** 171:3
**22nd** 2:12 3:17 7:19
**24** 65:11 67:20 79:3 100:11,13 100:15
**248-0808** 3:22
**24th** 72:23,25 74:1
**25th** 75:2 128:8 128:10 129:1 129:12

**26** 81:20 106:1 106:11
**27** 5:12
**29** 5:6 81:21 106:11
**29th** 76:23 77:19 104:18 104:19 105:1,1 105:17 106:2 162:22 163:1
**2:05** 130:5,7
**2:47** 130:7,9

**3**

**3** 4:14 14:12,13 14:17,20,21,24 15:2,12,17,18 15:23,25 45:9 45:10,12 96:2 130:10 148:18 149:1 154:5,18 154:19 163:1
**3/10/2023** 171:5 172:2 173:2
**30** 145:25 146:3 150:25 155:23 156:3 159:2,3
**300** 122:25 123:1
**3175** 3:12
**3:21** 1:6 2:6 7:17
**3:34** 160:16,17

**3:44** 160:17,19
**3:56** 2:14 169:11,17

**4**

**4** 4:17 59:23,24 104:17 154:5,6 154:7,8,11,13 154:14
**415** 3:18
**45** 4:14
**4:40** 162:22

**5**

**5** 4:20 65:17 71:22
**505** 3:6
**5799939** 171:5 172:2 173:2
**59** 4:17
**5:00** 63:22 64:22 65:5
**5:40** 163:2
**5th** 157:8

**6**

**6** 4:23 5:8 72:1 126:3
**65** 4:20
**650** 3:13

**7**

**7** 5:3 65:15 74:9,12 129:3
**72** 4:23
**74** 5:3
**76** 5:5

**7:12** 63:14,15 63:16,22

**8**

**8** 5:5 65:16 76:12,15 92:11 92:12,13
**83** 5:8
**843-5000** 3:13
**8500** 3:21
**858** 3:7

**9**

**9** 4:4 5:8 71:21 83:7,8,9
**92075** 3:6
**94** 5:10
**94111** 7:20
**94111-5998** 3:18
**94304-1130** 3:12
**983-1000** 3:18
**9897** 1:24 2:15 170:25
**997-0860** 3:7
**9:30** 157:5

**a**

**a.m.** 2:13 7:2,6 59:15,16 135:25 157:5
**ability** 10:6 61:8,9,12 62:8 155:7
**able** 12:3 43:25 50:2,11,23,25

**[able - allegedly]** Page 3

51:2,15,17
52:2,2 54:10
56:3,5 57:24
59:4,7 66:24
67:14,15 70:12
88:11 96:25
100:6,9,17
117:16 122:22
122:22 124:5
136:24
**above** 171:6
173:7
**acceptable**
167:22
**access** 42:8,16
42:23 43:17,19
44:1,16,20
46:25 47:7
48:2,8 49:6,18
50:1,5,6,8,9,12
50:13,23,24,25
51:3,8,15
52:23 54:15,21
55:5,8,23 56:8
56:14,18,21
57:3,6,7 58:18
59:2,8,9 61:2,3
61:17 62:1,8
62:14 63:7,8
64:1,2,5,6,13
64:15 65:1,1,4
65:8,12 66:8
66:23 67:13,16
67:21,23 68:15
69:5 70:12,20

73:12 79:4
87:9,16 88:6
88:10,20,22
89:6,23 90:17
90:20 93:2
96:6 98:5,15
99:3,12,14
115:11,15
116:3,6 117:10
117:13,16,17
118:22 120:10
120:11 121:6
121:21 122:1,4
122:9 139:2
156:7
**accessed** 73:11
87:15
**accessible**
44:23 48:8
55:13 56:12,15
114:1
**accomplish**
113:7,21
**account** 11:4
66:5 70:21
163:3,5
**accuracy** 171:9
**accurate** 10:20
11:4
**acknowledge...**
173:3
**acknowledg...**
171:12
**act** 159:18

**action** 7:24
**activate** 68:20
**actual** 128:5
**actually** 23:25
24:10 31:7
125:13 153:23
**adcom** 6:5
16:13,16 25:2
25:2,23 34:19
35:4 49:22,23
145:15 149:6
149:18 150:3
150:13,18
151:2 159:9,11
159:12
**adcomm** 47:19
48:2 49:4 57:8
**adcoms** 151:11
**addition** 99:18
99:25
**additional**
15:10 148:24
**additions** 173:6
**address** 99:1
**administered**
9:2
**advisor** 21:15
22:19,25 23:13
23:14 26:11,16
26:19 27:7
28:4 31:5 32:2
32:21 33:5
34:6 36:1 37:1
38:13 44:10
46:23

**advisory** 16:14
22:22 23:3
149:6
**affiliated** 20:21
**affiliations** 8:3
**afraid** 118:11
**ago** 64:11,12
66:13 83:15
87:2 91:25
139:19
**agree** 7:10
126:10 127:5
127:10,24
128:12 129:16
129:19
**agreed** 13:6,14
15:7
**agreement** 5:13
24:9 37:21
125:8,21 126:3
127:6,13,15,23
128:2,4,13
160:23 161:6
161:21 162:1
**agreements**
126:15
**ah** 146:21
**ahead** 11:15
12:7 19:3
50:16 64:18
67:10 100:1
**alden** 5:21
**alert** 152:16
**allegedly**
144:17 145:5

**[allotted - aside]**

**allotted** 171:20
**allow** 11:3
  43:19 57:19
**allowed** 42:8
  170:17
**allowing** 63:7
**alto** 3:12
**altogether**
  62:11,12
**ambiguous**
  103:18,21
**amendment**
  148:18
**amount** 22:21
  51:4,5 55:3
**amounts**
  161:25
**analyses** 52:13
  126:15
**analysis** 15:9
  35:8 162:18
  163:10
**analyst** 147:14
  147:16,20
  148:5 149:10
  149:23 150:9
  150:17,20
**analyst's**
  150:15
**analysts** 36:15
**anemia** 49:3
**announcement**
  145:14,20,25
  149:17 150:2
  150:12,18

151:1,16
  159:22
**announcements**
  153:16
**announcing**
  151:14
**answer** 10:18
  11:9,10,24
  12:7,9,13,15
  26:5 27:20
  37:10 40:17
  44:15 50:17
  54:11 55:6,22
  58:15 68:18
  93:4 95:17
  97:9 98:10,21
  99:20,23,23
  101:1 102:11
  102:14,21
  103:9,18,21,24
  104:7 110:1
  121:13,14
  150:16 164:18
  165:9,15,20
  166:4,6,7,8
  167:9,12,18
**answered**
  27:23 99:7,25
  100:24 101:1
  103:11 112:13
**answering**
  12:14 42:23
  52:14 55:3
**answers** 11:6,6
  104:13

**anybody** 87:21
  98:14,19,19,20
  98:24 99:5,12
  100:18 102:5
  151:7
**anyone's** 67:13
**anyway** 68:15
**apologize** 91:15
  154:22
**apologizing**
  155:6
**apology** 155:11
**appear** 136:8
  152:10
**appearances**
  3:1 8:2
**appearing** 1:14
  8:19
**appended**
  170:17 173:7
**apple** 29:15,18
  29:19,21
**applicable**
  171:8
**application**
  15:14,20,24
  16:7 29:8
  47:23
**applications**
  30:3,12
**approval** 14:15
  14:23 15:20
  23:2,9,16,21,22
  24:4,17,24
  25:9,22,25

36:6,13 38:25
  61:2,16 144:19
  148:22 149:1,8
  149:16 150:11
  150:23 168:5,5
**approved**
  33:23 34:2,7
  34:12
**approximate**
  67:20 74:1
**approximately**
  20:9 21:10
  26:25 41:16
  43:5,8 63:18
  63:21 65:11
  81:16 158:3,5
  162:22 163:2
  167:3
**approximation**
  45:6
**apps** 29:22
  30:6
**april** 13:23
**archive** 88:10
**area** 85:10 89:4
  143:3
**arguments**
  52:15
**arnold** 164:14
  165:8
**article** 6:3
  140:17 141:19
  141:23
**aside** 99:6
  144:4

**[asked - back]**

**asked** 17:23 38:2 54:14 56:18 57:18 61:20 78:16 81:5 85:10 94:23 99:7,25 105:22 107:3 107:24 112:13 113:2 123:12 128:18 132:6 138:16,18
**asking** 9:10 25:3,4 35:14 38:1,19 39:19 45:2,5 49:17 55:23 56:7 57:2,5,6 58:17 58:18 59:1 61:14 64:18 66:3 70:23,24 77:1 78:15 89:8 93:14,15 94:13 96:17 105:12,16 107:22 112:23 113:13 114:17 114:17 129:13 135:4 149:22 150:6 168:2
**askleo.com.** 140:18
**asks** 98:8
**aspect** 168:11
**assist** 42:22

**assistance** 97:1 98:7,17
**assistant** 42:5 85:10,18
**assisted** 88:13
**assisting** 42:23
**association** 3:4
**assume** 78:17
**astray** 86:6 87:7 113:25
**astrazeneca** 149:14 150:1 150:21 152:8 152:12
**attach** 146:15
**attached** 147:19 148:5 171:11
**attachment** 4:13 146:16
**attachments** 146:19 148:3
**attempt** 49:23 139:2,6
**attempted** 99:13
**attempts** 142:4
**attention** 78:6 84:2 85:21 148:15 162:12
**attorney** 8:4 9:7 18:9,22 97:8 98:9,24 102:9,12,13,22 103:22 109:9

164:15 165:10 170:19 171:13
**attorney's** 98:12
**attorneys** 18:4 18:21 19:6,15 20:14 94:16 95:25 97:5 98:4,20 99:5 99:24 102:11 102:21,23 103:2,4,10,12 104:6,8 164:13 164:14 165:8 165:14
**audibly** 10:18
**audio** 7:9
**august** 21:24
**authority** 52:14 55:4 68:17
**authorization** 47:23 80:15 117:20 120:25 120:25
**authorize** 32:25
**authorized** 47:24 115:14 115:14,19 116:22 117:6 117:22
**automatically** 88:22 90:17,23 90:24 92:3,22 93:3

**available** 89:12 89:16 106:24 171:6
**avoid** 86:4 87:5
**awaiting** 72:14
**aware** 107:1,4 120:6,14,15 125:7 144:15 144:20,21,23 145:14,18 151:3,12
**azn** 148:21 149:13

**b**

**b** 4:8 5:1 6:1
**back** 6:4 13:18 57:4,10 59:18 66:4,5 68:7,11 68:20,23,24 69:8,11 70:6,9 70:19,22 71:1 71:2,3,10 73:8 75:17,19,20,22 75:24 76:5 77:2,4,20,24 78:3 79:18 83:4 84:11,14 85:6,12,15,17 85:19 86:2 87:1,2 101:4,6 101:10,13,14 102:2,6,24 103:4 105:5,15 107:13,14,15 107:17,23,25

**[back - breaking]** Page 6

108:4,9,12
109:14 121:10
123:11 124:3
124:14 130:8
139:12 143:3
153:24 160:18
**backed** 86:21
86:22 87:12,12
90:21 91:21
92:3,22 93:3
**badges** 126:24
**baltimore** 3:3
**based** 49:10,17
49:19 51:18,21
90:10 91:4
93:22 96:9,14
96:19 115:22
133:22 147:15
153:11
**basic** 9:25
**basically**
119:13
**basis** 23:12
155:24 156:3
161:18 164:18
**batch** 67:6
**bates** 4:15,18
4:21,24 5:4,13
5:15,20,22 6:5
6:8,12 45:18
45:20 46:1,7
60:4
**bay** 85:10
143:3

**beach** 3:6
**bears** 66:16
**beginning** 2:13
8:3 47:3 59:19
85:23 130:9
161:11
**begins** 148:16
162:15,17
**behalf** 2:11 8:6
8:8,10,12,15,16
8:18 128:25
152:17
**believe** 19:13
19:14 20:11
26:4 29:20
37:25 42:14,15
43:4,24 49:18
49:21 58:13
60:7,10 63:16
64:12 74:21
80:21,23 82:6
82:6 90:9,11
91:14 102:20
105:23 106:6
106:11 108:24
108:24 109:2
114:15 117:4
136:15 138:21
143:9 163:22
164:25
**believed** 150:20
**bellevue** 135:14
135:22 136:3
**belonged** 71:16
80:8

**bend** 111:8
**best** 19:21 45:6
63:2,9 90:12
133:22 158:18
**better** 35:16
76:5
**beyond** 59:8
**bills** 127:18
**binder** 71:21
**bishop** 3:5 8:7
8:7 76:12,14
83:7 92:11
94:1 130:22,24
134:5,20
137:16,19
146:8 151:20
154:3,6,8,12,18
156:19 162:4
**bit** 80:22
**black** 131:11
131:20
**board** 3:3
116:18,22
117:6
**bold** 149:4
**boss** 87:9 115:5
115:24 117:18
**botelho** 1:23
2:15 7:23
170:3,25
**bottom** 45:17
45:17,21 52:10
60:17,17 61:21
69:13 84:3
96:5

**bought** 28:9,9
**box** 84:18,18
84:19
**boxes** 84:20,22
85:1,1
**brand** 3:17
4:12 5:9,11
8:14,14 9:23
32:15 40:15,18
50:15,17 58:10
58:20 59:10
70:10 71:23
83:14 93:10
97:4 99:7
103:6 104:9,11
112:13 114:12
117:1 119:20
125:16 133:8
153:5 154:23
155:11 160:7
164:6 165:1,22
166:1,7 168:18
169:4 171:1
**break** 11:13,15
55:17 82:22
110:24 111:1,3
112:3,5,25
115:9 123:4
124:9 130:1
132:13
**breakdown**
122:23
**breaking** 112:7
112:10,17,22

**brief** 10:1 82:22
**briefly** 95:4
**brien** 3:11 6:14 8:11,11 164:17 164:22 165:6 165:16,21 167:15,23 168:9,22 169:2 169:14
**bringing** 142:5
**brings** 79:18
**broad** 167:16 167:23
**broadly** 16:1 24:2
**broke** 110:23 111:7,9,12 123:25 124:14 132:15 133:11 133:14 163:13
**broken** 131:24 132:25 133:3 139:23 141:13
**bruce** 3:16 8:17 9:23 16:25 17:25 18:3 95:22 164:15 165:23
**bruce.ericson** 3:19
**built** 49:11,15 51:22
**bullish** 148:21 149:12,25

**business** 28:15 28:23 29:2,23 29:24 30:8,20 53:9,13,19,25 54:1 82:14 84:6 144:24

**c**

**c** 14:4 43:24 61:4 62:6,13
**ca** 3:6,12,18 5:14,22 6:5,9
**calculate** 66:19
**california** 1:2 1:14 2:2,13 7:1 7:16,20 68:23 85:19
**call** 25:13 45:18 63:10,11 89:10 100:3 104:13 105:10 120:22,23 121:3,23 158:7 166:20 167:1
**called** 24:10 53:15 100:7,8
**calling** 156:16
**calls** 6:4 20:25 24:19,20 25:1 25:12 36:15 97:7 102:9,12 143:25 156:11 158:11 165:1 166:15
**capable** 142:7

**capacity** 21:11 156:15 158:13
**card** 109:5,15
**cardio** 6:4 149:5
**cardiovascular** 15:8
**cards** 126:23 126:24
**care** 69:5
**careful** 34:1
**carl** 60:22 90:13 91:8,15 115:24 116:11 117:10,23 118:21 119:1,7 120:4
**carry** 85:11,19
**case** 1:6 2:6 7:17 19:16 46:3,5 65:9 67:12,19 83:13 86:5 94:16
**cash** 160:25
**cassia** 3:25 7:20
**catch** 141:22
**cause** 170:21
**ccleaner** 140:21 141:25
**cell** 28:6,8,11 28:14 29:8 30:4,16 31:3 32:9,15,16 127:16,20

**center** 2:12 3:17,21 7:19
**ceo** 21:15 22:19 22:25 26:12,17 26:20 31:6 32:2,22 33:5 34:6 36:2 37:2 40:20 41:15 42:5 46:14,23 62:22 73:23 74:5 75:6 115:13,19 116:5,8,12,17 117:9 120:8,24 121:7 129:13 129:16,18 155:21
**ceo's** 117:20 119:5,10,15 120:18
**certain** 12:19 49:9 51:20 52:14,15
**certainly** 52:1
**certificate** 170:1
**certified** 2:15 170:3
**certify** 170:4,18
**chain** 45:11 46:17 63:25 69:20 70:1,3 72:6
**chance** 68:25

**[change - company]** Page 8

**change** 165:5
172:4,7,10,13
172:16,19
**changed** 65:8
154:20 155:1
**changes** 35:8
170:15 171:10
173:6
**chat** 29:7,8,20
30:7
**chats** 29:3
**check** 160:7
**chief** 21:8,25
22:2 26:6
**china** 15:12
22:6 29:6
**chip** 108:1
**choice** 113:19
113:20
**chronic** 49:3
**circulating**
147:12
**city** 3:3,3
**ckd** 49:1
**claims** 151:15
152:17 153:3
153:16 165:19
166:10
**clarification**
10:25 14:19
15:1,4 16:4
23:24 24:13
32:18 41:17
157:4

**clarify** 11:10
15:15 24:8
27:24 37:4
38:2 39:18
50:19 145:22
164:8
**clarifying**
38:11
**clarity** 112:23
**classified** 53:15
**clear** 10:24
12:10 21:2
31:24 35:13
101:1 104:12
121:17 136:23
138:24 165:11
**clicked** 27:16
**client** 18:22
97:8 98:9,25
102:9,12,13
103:22 165:10
**clinic** 168:17
**clinical** 14:12
14:13,17,20,22
14:25 15:2
16:1 22:5,6,12
35:18 38:24
42:20 168:13
**close** 64:15
82:13,14
**cloud** 96:9,19
**cmo** 22:2,10,15
26:23 27:7,12
28:3 31:5,18
32:2,21 33:4,7

33:10,22 34:6
36:1 37:1
38:13 44:9
85:13 88:12
144:22 145:6
145:12 167:21
167:21
**coauthors**
166:21
**code** 126:20
**colleagues** 61:2
61:15,22
**color** 131:20
**come** 68:23
85:11 149:1
**comfortable**
167:17
**comment** 37:7
**commentary**
148:21 149:12
149:25
**commission**
36:22,24
**committee**
16:14 149:6
**commonly**
43:23 88:19
**communicate**
28:22 29:1,9
29:23 30:4
38:7 121:4,24
**communicated**
37:24 125:2
**communicating**
153:22

**communication**
18:23 20:20
30:20 41:25
56:22 74:6
80:22 97:8
102:9,13
120:20,21
162:2 165:10
**communicati...**
20:4 24:3,16
25:7,20,24
26:1 38:15
39:14,25 40:3
41:3 71:7 73:6
73:24 89:19,25
98:9 100:15
103:10,22
124:19 156:11
161:23 164:1
165:25
**comp** 138:15
**company** 13:22
14:3 22:9 28:2
28:7,9,10,18,22
29:2,23,24
30:8 37:16,17
38:8,16,21,24
39:4,6,9,15,21
40:1,5,25
41:10,23 42:2
42:25 51:3
53:9,19,25
54:23 68:2,11
68:16 69:8,10
70:9,18,21

**[company - consultant]**

71:7,8,9,16
73:5,6,18,23
80:4,8,8,11,16
84:12,15 86:2
86:25 87:11
88:6 89:22
90:16 92:2
93:1,8,23
105:25 106:23
106:25 107:2,4
107:9 108:6,8
108:14,17
110:19 115:13
116:13,17,21
117:5 120:8
124:6,7,14,15
124:16,20,20
124:24 125:2,4
125:9,10 126:7
126:10,10,11
126:13 127:2,4
127:5,8,9,10,16
127:16,24
128:12,17,24
129:1,2,5,14
136:1 144:23
145:2,3,7
147:7 150:16
151:4 159:23
161:25 162:19
165:19 166:10
166:11
**company's**
33:8 71:18
87:5 144:24

150:10
**complete** 55:6
173:8
**completed**
171:17
**completely**
149:20 154:20
**completion**
170:13
**comply** 33:12
**computer**
20:18 27:5,11
27:13 28:1
33:18 35:24
36:7 39:22
43:15 45:4
50:11 61:3,8
62:10,18 63:7
64:2,20 65:12
66:23,25 67:8
68:14,23,25
69:6 74:2
86:22 87:2,16
88:3,3 89:9,11
89:17 90:21
92:1,3,22 93:2
93:20,23 97:1
98:6 101:11,21
101:25 102:3
104:22 108:1
115:15 120:10
121:6,10,21
122:1,5,12,16
123:11,17,24
124:3 126:21

127:7,21 140:1
141:8,16
170:12
**computers**
126:22
**computing**
28:1
**con** 26:18
118:15
**concern** 87:8
120:16 165:18
**concerning**
12:19 16:10
24:16 159:23
**concerns** 73:16
84:10 119:18
122:8 139:22
**concluded**
169:16
**concludes**
169:9
**conclusion**
148:23 149:16
165:2
**conducted**
15:11
**conference**
36:15 157:21
158:15,19
159:14,21
160:3 163:14
163:17,18,20
164:5,11
165:13 166:24
167:1

**conferences**
158:12 166:15
**confidential**
86:5 87:5
127:1
**confidentiality**
169:7
**confirm** 61:1
61:14 86:14
87:21,24
**confusing**
66:20
**connected** 44:1
47:17 57:15
58:23 163:1
**connection**
14:14,23 15:19
19:7,8,16
20:12 26:12
33:22 34:5,7
83:18 84:4
86:3 95:1
127:8 128:1
**consider** 24:5
24:13 38:17
67:11 68:4
146:3
**considered**
67:5 151:5
**considering**
35:4
**consist** 18:17
**consultant**
21:19,23 23:17
23:18,19,20

**[consultant - counsel]**

24:10,15,23
25:6,21 26:3
42:6,9,17 47:7
48:12 156:5,9
156:15 157:8
157:19,23
158:13 166:16
**consulting** 5:13
24:11 47:17
57:16 125:8,21
127:6,13,23
128:2
**contact** 21:3
**contain** 126:25
**content** 39:19
42:21,24 56:19
96:7,20 99:4
101:4,10,13,15
103:5 105:8
106:15 113:3,6
113:8
**contents** 88:5,7
102:3,6,24
105:15 107:11
107:19,22
139:17
**conterno** 3:9
40:22 41:21
42:13 46:13,17
48:11 51:7
54:15 55:23
56:7,18 57:2
58:18,23 60:20
61:11 62:14,17
62:25 63:6,19

63:21 64:1,7
75:5 120:8
122:3 156:14
**continue** 7:10
23:15 26:17
42:16 52:4
59:21 130:11
156:4
**continued** 5:1
6:1 23:8,11
30:11
**continues**
48:25
**continuing**
24:4
**contract**
125:25
**contradicted**
10:11
**control** 126:12
**convene** 34:19
145:15 149:17
150:2,13 151:2
**convened** 16:15
**convening** 35:4
**conversation**
11:5 47:16
62:20 90:13,14
91:6,16,22
115:23,24
117:10,14,25
118:1,2,16
120:2 167:21
168:24

**conversations**
7:9 124:23
**convey** 59:6
**conveyed** 59:7
**cooley** 3:10 8:9
8:11 164:13
165:8
**cooley.com**
3:13,14
**copied** 120:7,9
**copies** 126:11
171:14
**copy** 5:15 13:8
64:19 84:6
134:19,21,23
140:6 169:13
169:14
**copying** 60:22
**corey** 6:8 152:6
152:7
**corner** 45:17
45:21 136:7
**correct** 9:12,13
13:17 18:5,7
19:9 20:22,23
21:5,6,8,12,13
21:16,20 23:2
23:10 28:20
32:6,23,24
34:8 36:8 42:3
46:14,15,17,18
46:20,23 50:14
51:16 53:4
57:20 58:3,9
61:18 62:3

64:3,23,24
66:1,2,5 67:18
67:23 68:6
69:9 72:7 73:2
73:3,13,14,16
73:17,19 74:17
74:18 75:8
76:24 77:2,3
77:10,20 80:2
80:6,9 92:17
97:2,3 101:16
107:3 112:2
126:1 128:19
129:24 130:18
134:2,3,13,16
135:20,21
147:14,17,21
152:20 155:17
155:18 157:3
159:16 173:8
**corrections**
173:6
**corresponden...**
18:20 19:6,10
94:15,17
**corresponden...**
19:11
**cost** 122:20,23
122:24
**cotroneo** 3:10
**counsel** 7:13
8:1,19,21,25
9:19 10:3 12:5
12:8,11,15
16:23,24 17:11

17:17 19:15,24
20:4,25 37:5
46:3,5 60:6
83:13 94:15
97:14 98:25
102:15,16,20
109:17 110:4
162:9 163:24
163:24 167:9
170:18 171:14
**counsel's** 97:11
97:12
**counsels** 17:18
**count** 37:8,21
43:25 94:24
100:3 157:14
157:15
**counted** 43:12
**county** 3:3
**couple** 68:12
76:1 113:18
141:10
**course** 49:19
54:7 95:4
**court** 1:1 2:1
7:16,22 8:24
11:3,20 103:16
103:18
**cover** 146:25
147:1
**covering**
131:17
**covid** 33:11,17
33:17 89:3
108:1

**created** 163:3
**credential**
66:12
**credentials**
65:13 66:7,24
67:17 114:11
115:11 116:3
118:8,9,12
121:1,5,20,25
122:4,10
**credit** 109:5,15
126:23
**criticizing**
155:12
**crossed** 142:6
**cs** 171:15
**csr** 1:24 170:25
**current** 96:14
162:23
**customer**
126:17
**cv** 1:6 2:6 7:17

### d

**dash** 45:22,24
**data** 12:20 35:9
35:9 39:18
42:21 43:16,19
48:8 49:10
51:21 148:24
**databases**
126:20
**date** 21:14 61:5
72:22 125:10
125:25 126:9
127:11 128:1,6

128:12 129:10
148:19 149:2
172:24 173:12
**dated** 4:12 5:8
5:10,12 6:5,13
20:10 46:19
65:25 152:12
152:18 170:23
**dave** 8:5 9:7
168:19
**david** 3:5
**day** 63:20,24
66:13 77:1,24
81:6,17,19,24
82:4,14,18
105:22 106:7
173:15
**days** 76:1,3,10
129:20 169:6
171:17
**dd** 148:23
**dealing** 136:18
**dealt** 136:9,16
137:9
**decade** 49:11
49:15 51:22
**december** 5:8
21:11 148:19
**decide** 12:6
47:16 57:15
**decided** 37:17
39:14 40:25
117:20 148:4
**deciding** 38:8
38:15 39:25

40:4
**decision** 145:15
**declare** 173:4
**decline** 146:3,4
**deemed** 173:6
**defendant** 3:15
4:10
**defendants** 3:9
8:10,12 162:9
169:15
**define** 94:19
**defines** 125:24
**definitely** 55:13
**degrees** 131:21
**delay** 148:18
**delete** 78:8 79:9
79:25 80:16
81:11 91:25
92:18 93:1,7
93:19 104:22
105:23 106:8
140:20 141:16
**deleted** 31:20
78:11,21,22
79:6,13,24
81:10
**deleting** 80:12
141:7
**deletion** 12:20
78:14 80:3
**dell** 162:19
**department**
40:24 72:11
73:25 74:16,20
86:20 152:12

**[departments - document]**                                    Page 12

**departments**
  54:24
**departure**
  37:16,19 39:5
**deponent**
  170:16 171:13
  173:3
**deposed**  11:22
**deposing**
  171:13
**deposition**  1:13
  2:10 4:10 7:13
  7:18 10:7,9,14
  13:1,5,6 16:19
  16:22 17:5
  18:20 19:9,17
  19:25 20:3,13
  59:14,20 83:19
  94:14,21 95:2
  95:8 97:16
  130:4,10 134:7
  169:9,16 170:5
  170:8,13,20
**depositions**
  134:14
**des**  112:25
**describe**  17:15
  118:15 131:12
  138:12 146:23
  163:19
**described**
  163:9
**description**  4:9
  5:2 6:2

**designated**
  28:10
**desk**  27:15
  142:21 143:8
  143:10 144:9
**desktop**  27:11
  27:14,14,22
**destroy**  106:20
  106:21 107:7
  107:10,11
  108:7 130:14
**destroyed**
  110:22 114:10
  124:17 135:20
**destruction**
  12:20
**detail**  34:20
**details**  62:19
  69:23 112:19
**determine**
  109:11
**development**
  22:5,6,12
  42:21 126:16
**device**  163:1
**devices**  32:8
**dialysis**  15:6,7
**difference**
  50:21
**different**  31:13
  36:4 38:6
  66:17 89:2
  95:7
**differently**
  34:25

**difficult**  44:2
**difficulty**  34:10
**dileo**  5:8
**direct**  25:15
  78:6 84:2
  85:20 104:16
  148:15 154:1
  162:12
**direction**  23:12
  73:23 170:12
**director**  72:10
**directors**
  116:18,22
  117:6
**disclose**  164:20
**disclosed**
  150:15
**disclosure**  86:5
**discovered**
  101:19
**discuss**  13:14
  30:21 166:21
**discussed**  33:2
  61:4 62:14,16
  64:7 121:12,14
  159:5,13,21
  160:3 163:16
  163:20 164:4
  164:21,24
  165:7,12
**discussing**
  30:25
**discussion**
  37:20 39:2
  40:6,14 42:12

  42:13 63:5,19
  109:9 112:8
  118:10 128:15
  133:5 166:9,13
  167:11,13
**discussions**
  20:16 37:15
  38:20 39:8,20
  40:9,10,23
  41:2,6,9,14
  70:8 71:11
  88:4,9 113:14
  123:9 151:7
  159:8 168:3
**disease**  49:3
**disinterested**
  170:9
**disk**  138:15,17
**disposal**  133:3
**disposed**  133:4
  133:7
**distracted**
  159:18
**district**  1:1,2
  2:1,2 7:15,16
**division**  1:3 2:3
  6:4 7:17 149:5
**dkaplan**  3:7
**docking**  27:18
**document**  5:12
  6:13 18:18
  43:7 45:16,18
  46:2,4,9 55:6
  58:10,20 60:2
  60:3,5,6,8,12

**[document - e]** Page 13

65:20,25 72:4
74:13 76:18
83:12,16,18,22
83:25 94:10,20
95:1,3,10,16,24
109:4,17,21,24
110:2 125:13
125:20 132:13
140:11 146:12
146:23 147:24
154:23 156:24
156:25
**documents**
10:3,13 18:13
18:16,17 43:2
43:6,6 44:11
48:21 54:25
68:2 84:6,11
84:17,18 86:15
126:10 132:14
154:21 155:6
163:4
**doing** 30:23
31:2,23 34:11
54:7 115:19
116:21 117:4
132:8,10,10
142:7
**dorothy** 4:23
72:7
**dorsey** 164:15
**download**
67:25 78:25
96:25 98:16
100:18,20

**downloaded**
78:23 79:6,14
**dr** 7:13 8:13,15
8:16,18 59:20
84:5 86:1 96:6
101:3 130:4,10
130:12 149:22
162:19 164:18
166:20 169:9
**draft** 83:24
**drafting** 128:3
**drawings**
126:14
**drinkwater**
60:22 61:21
69:17 91:8,15
91:19 116:11
116:14,20
117:11 119:19
120:3,7,17
121:3,9,13,18
121:23
**drinkwater's**
119:9,14,25
**drive** 3:6 13:20
13:23 14:4,4,5
43:3,9,14,16,18
43:18,24 44:5
44:11,17 48:4
48:4,5,6,9,18
48:18,22 49:16
50:2,6,8,12,23
51:1,3,10,11,16
51:18,18,24
52:1,1 53:6,9

53:12,18,24
54:10,11,14,14
54:15,16,21
55:11,11,24,24
56:4,4,6,6,8,9
57:3,6,20,25
58:1,1,6,9,12
58:12,15,19
59:2,5,9,9 61:4
61:17 62:6,6
62:13 64:3
86:4,13,16
87:17 88:6,7
88:21,23 89:23
90:18,20 91:2
91:21 92:21
101:5,11 105:8
106:15,20,22
107:7,11 108:7
110:10,11,11
110:21 111:8
112:18,18,22
112:22 113:6
114:9 115:10
120:12 122:12
122:16,23
123:2,7,10,17
123:24 124:3
124:10,13,16
124:21,25
125:5 130:15
130:15 131:6
131:10,13,14
131:17,22,23
132:15,19,25

133:3,6 135:19
136:20 139:23
139:24 141:14
162:21
**driven** 42:21
**drives** 86:18
**drop** 81:20
138:14 145:18
145:21 151:1
**dropped** 81:14
81:17,24 82:2
82:4,11,15,18
**dropping**
145:16
**drug** 15:14,19
15:24 16:7
168:15
**drugs** 14:25
**duly** 170:5

e

**e** 4:8,14,14,17
4:17,20,20,23
4:23 5:1,3,5,18
5:21 6:1,7,7,10
6:10 13:5
18:17 19:23
24:21 25:14
28:22 29:4,21
30:7 44:1,4
45:11 46:12,16
46:19 47:3
48:10,15,25
51:6,7 52:5,10
52:16 54:16
56:23 57:1,3

57:19 60:15,16
60:17,19,25
61:5,11,23
62:1,7,8 63:4,6
63:13,25 64:10
64:14,16,17,18
66:16,16 69:13
69:16,20,25
70:5 71:1,2,5
72:6,22,24
74:12,15 75:3
75:12,12,16,18
75:22 76:8,20
77:6,8,9,21
78:2,7,10,12,15
78:16,20 79:17
79:18,22,24
80:18 86:12,17
86:21 88:10
89:7 91:25
92:5,14 104:18
104:20,21
106:7 109:5
119:2,4,12,13
119:16,17,24
120:7,14,15,15
120:19 121:3
121:18,20
128:8 129:3,16
140:14,23
141:2 146:17
146:20,25
147:1,1,12
148:4,5 152:8
152:10,15,23

153:21,22,24
154:1,20
155:15,18,18
155:20,22
156:12,15
157:1 172:3,3
172:3
**earlier** 9:8
  90:15 91:13
  94:12 96:24
  117:7 130:12
  141:4 143:11
  149:1
**early** 27:4 79:2
  153:24
**earnings**
  147:21
**easily** 96:9,19
**easy** 49:6 68:19
  112:10
**ebishop** 3:8
**effect** 52:25
  71:5
**effective** 47:6
**effectively**
  48:13
**efforts** 24:4
  143:6
**eight** 15:16
**eisner** 3:10
  6:11 157:1,4,7
  157:19,22
  158:12,20
  159:14,21
  160:4 163:14

163:21 165:13
166:17,20
167:8
**either** 27:3
  111:2 124:7,24
  133:18 170:19
**embarcadero**
  2:12 3:17 7:19
**embody** 126:25
**emc** 1:6 2:6
  7:17
**emily** 3:5 8:7
  45:10
**employed**
  13:22
**employees** 3:2
  24:22 29:6
  147:13
**employer** 30:14
**employment**
  84:5 88:12
**empty** 124:4,21
**encompass**
  37:20
**enrique** 3:9
  40:22 61:1
  74:24 75:5,10
  117:22 118:22
  129:7
**ensure** 11:4
  78:8 92:18
**enterprise**
  162:20
**entire** 92:21

**entirely** 96:23
**entitled** 5:17
  6:3 170:7
**entry** 126:24
**equipment**
  124:6 126:22
  127:19
**erase** 86:4
  101:5,11,21,25
  105:14 106:3
  107:6,11
  112:18,24
  142:4
**erased** 102:3,7
  110:21 114:9
  124:25 125:5
  139:17
**erasing** 101:18
  102:24 105:15
  112:21
**eric** 3:21 8:16
  9:23 16:25
  17:25 18:3,12
  95:22 164:12
**ericson** 3:16
  8:17,17 9:23
  13:15 18:24
  19:3 32:12
  35:10 40:19
  54:3 55:15,20
  59:12 71:24
  82:23 88:24
  92:7 94:7 97:7
  98:8,18 99:17
  99:22 100:23

101:22 102:8 103:7,15,20 104:2,10 110:1 114:13 116:23 130:2,23 137:1 137:17 146:13 146:17,21 149:19 154:10 155:10,12 166:3,8

**errata** 171:11 171:13,17

**especially** 117:22

**esq** 3:5,5,11,11 3:16,17,21 171:1

**europe** 15:11 47:25

**eve** 10:14

**event** 49:10,14 51:21 68:16 105:6 110:17 138:1 170:21

**eventually** 64:8 69:19

**everything's** 155:8

**evidencing** 142:9

**ewei** 3:23

**ex** 85:18

**exact** 64:14 81:7,7,12 105:21 111:23

112:15 123:13 123:16 138:23 153:25 155:7

**exactly** 27:23 48:24 49:20 53:1 54:10 56:3,25 65:7 66:14 71:12,13 76:3 100:6 106:9,13 118:14 167:6

**examination** 4:4 9:5 155:5

**examined** 9:2

**example** 24:18 30:1 36:14 38:23 48:25 58:24 127:7

**examples** 59:4 127:21 128:5

**except** 140:20 141:16

**exchange** 36:22 36:23 46:12 56:24 60:15,16 72:19 76:20 157:1

**exchanges** 25:14

**excuse** 99:18 117:11

**exec** 46:23

**executive** 21:15 22:24,25 23:13 23:14 26:11,16

26:19 27:7 28:3 31:5 32:2 32:21 33:5 34:6 36:1 37:1 38:13 42:4 44:10

**executives** 145:8

**exhibit** 4:10,12 4:14,17,20,23 5:3,5,8,10,12 5:15,16,18,21 6:3,7,10,13 10:8 13:7,9,9 45:9,12 59:23 59:24 65:15,17 72:1 74:9,12 76:12,15 83:7 83:8,9 92:9,12 92:13 94:1,3,4 125:15,17 129:3 130:21 130:22 131:1 134:4,5,18,20 135:9 137:2,5 137:15,16,21 138:6 140:7,8 146:7,9,9,24 148:1 151:20 151:21,22 153:7,12,24 154:3,5,8,11,13 154:14,18,19 155:7 156:19 156:21 162:5,6

**exhibits** 13:4 154:20 155:2

**existed** 145:11

**expect** 65:8

**expert** 37:3 153:6

**expired** 67:18

**explain** 52:7 58:4 102:18 111:6,7

**explained** 58:5

**explicit** 127:15

**explicitly** 12:15

**explore** 163:25

**expressed** 119:17 122:8

**expresses** 120:16

**expressing** 150:17

**extent** 36:5 98:19,20 99:23 102:8,12 165:2 165:7

**external** 96:9 96:20

**extra** 159:4 168:19

**f**

**face** 136:24 157:14,14,18 157:18

**fact** 70:11 96:24 103:19 116:16 128:17

**[fact - files]** Page 16

129:21 132:13
132:15
**fails** 171:19
**fair** 22:17
23:10 39:8
48:10 54:1
62:9 64:25
65:10 66:15
158:19
**fairly** 63:11
**falling** 159:17
**familiar** 46:10
94:11 109:7
**far** 107:24
121:11
**farley** 5:3,6
41:11,15,21
74:12,15,19
75:1,12,16
76:21 77:19,23
78:1,10 80:19
92:14 93:7,13
93:15,19 128:9
**farley's** 76:7
**fda** 15:8,14,20
15:24 16:8,15
18:18 33:23
34:3,18 35:3
38:25 149:5,17
150:2 151:2,10
151:10
**fda's** 145:15
150:12
**fe** 3:6

**feared** 116:1,2
**fearing** 115:24
**february** 4:12
143:12,16
144:13
**fedex** 66:5
69:23 70:6,21
71:2,3 85:16
85:17 101:6
128:21 139:12
**feel** 11:9,10,12
64:10 139:16
**feelings** 139:19
**fell** 145:24
**felt** 76:4 87:4
139:20 140:3
161:19
**fg** 74:25 129:8
**fgen** 4:16,19,22
4:25 5:4,14,22
6:5,9,12 45:22
62:6 148:21
149:13
**fi** 87:1
**fibro** 27:24
**fibrogen** 1:5
2:5 3:9 7:14
8:10,12 9:9
12:21 13:21,22
14:14,22 16:7
21:19,23 22:11
22:15,20 23:17
23:20 24:3,16
24:19,20,21
25:7,8,10,21

26:2,7,13,18,19
27:1,11,25
28:18 30:20,22
30:24,25 31:5
31:6,21 32:1,4
32:25 33:10
34:18 35:3
36:1,5 38:3
40:4,20 42:1,7
43:1 47:11,17
50:5,9,13,24
52:5,11,21
54:22 56:23
57:16 58:23
61:3 63:7 66:4
68:8 72:10,15
77:10,16 79:12
84:5,7 85:18
86:2,15 87:16
87:22 91:17
101:6 110:12
116:5 125:23
127:25 128:14
128:18 139:13
139:21 144:23
145:12 147:2,3
147:13,20
149:13 150:1
150:21 151:8
151:15 152:4
152:18 153:4
153:17 155:17
156:8 157:19
157:23 158:13
161:19,24,24

166:16,18,22
171:4 172:1
173:1
**fibrogen's** 21:7
21:15,25 24:4
33:14,16 36:12
36:18,21,25
40:24 46:13
53:13 86:12,17
86:20 87:15
145:16,24
152:11 155:21
**fifth** 18:3
**figure** 143:11
**file** 43:7 52:12
53:15 54:8
67:5,6,11
162:25
**filed** 7:15 52:7
55:13
**filer** 54:23
**files** 43:7 44:3
44:14,15,19,23
48:3 49:4,11
49:14,24 50:8
50:23 51:1,8
51:22 53:14,18
54:22 57:7
59:8 61:3,17
62:1,5,9,13,17
62:21 63:8
64:3,6,19 65:4
66:8,25 67:2,4
67:14,22 68:5
78:22,25 79:13

80:4,16 92:2 96:8,25 98:6 100:18,20 120:11 126:13

**filing** 37:5

**filings** 36:21,25

**final** 161:4,5 169:6

**finally** 69:2 100:9 163:12

**financial** 126:15

**financially** 7:25

**find** 34:10 52:2 55:5 88:11 89:7 109:15 118:25 142:17 142:22 143:14 143:15 144:5 161:19

**finds** 120:4

**fine** 55:20 63:1 64:1 104:1 118:22 120:10 165:4 168:21 169:3

**finger** 111:8 131:15,16,19 131:20

**fingers** 111:4,7 123:4

**fingertip** 131:8 131:9

**finish** 11:14 99:19

**finished** 54:25 159:3

**firm** 7:23 18:21 19:7,16 20:5 20:25 135:25 152:17 162:11

**firms** 151:13 153:3

**first** 10:18 35:12 46:16 60:17 77:14 79:23 84:3 88:2 97:23 100:8 108:2 109:7 138:14 138:15 141:18 144:10,11 148:9,11 152:22,24 167:5

**fits** 123:14

**five** 17:6,10,14 17:15,16 63:12 82:24 84:25 85:4 95:7 97:14

**fixated** 104:19

**floor** 2:12 3:17 7:19

**folder** 49:20,21 49:25 52:3,23 53:3,5,16,20,22 54:6,9,9 55:8 56:2,2

**folders** 53:8,12 53:25,25 55:10 55:12

**folks** 41:5

**follow** 47:15 63:4 74:3,24 97:10,12 98:11 119:9,12,14,25 129:7 168:25

**followed** 73:22 74:4

**following** 57:13 101:2 120:18 149:3 163:5,6

**follows** 9:3

**fool** 124:15

**forecasts** 126:14

**foregoing** 170:5 173:5

**foregone** 148:23 149:15 149:16

**forensic** 162:18

**forgot** 100:6 160:8

**form** 32:12 35:10 92:7

**former** 21:25

**forward** 10:15 33:25,25

**forwarded** 69:19

**forwarding** 155:16

**found** 162:18

**four** 2:11 3:17 7:18 17:20,22 17:22 18:2 160:11

**frame** 34:21 70:23 71:8 73:4 163:16

**francisco** 1:3 1:14 2:3,12 3:18 7:1,17,19

**fraud** 144:17 151:15

**free** 11:10 64:10 98:21 102:11

**friday** 1:15 2:14 7:1

**front** 69:13

**full** 9:14

**function** 29:11

**fundamental** 96:4

**further** 166:19 170:18

---

**g**

**games** 104:11

**gee** 67:3 81:3

**general** 53:21 53:23 145:10 167:18,20

**generally** 25:4 26:1

**generated** 163:3,4

**gentleman**
110:8 130:13
135:1 136:6,8
137:14,20,24
138:6
**gestures** 111:6
**getting** 33:22
34:7,11 120:16
122:9 161:22
168:23
**give** 11:11 12:3
37:7 44:2
88:20,21 117:9
117:13 118:21
121:1,8 122:22
160:9
**given** 10:2
64:15 65:1,12
69:4 79:3 87:7
120:4 121:7,25
122:4 128:5
173:9
**gives** 64:14
**giving** 59:3
115:11 116:3
118:11 122:9
**glanced** 94:22
**glass** 94:8
**globally** 22:6
**gmail.com** 4:15
5:3,19
**go** 7:11 9:25
10:15 11:15
12:7 19:3
35:21 47:13

50:16 53:15
54:8 56:1 57:4
62:18 64:18
65:15 67:10
71:21 74:7
76:11 79:20
83:13 96:2
99:25 104:2
105:6 109:14
117:12 134:4
142:21,21
151:10 153:23
156:18 157:17
160:13 164:6
169:4
**goes** 87:2,7
**going** 7:6 9:24
13:20 14:8,11
16:12 22:1
27:24 34:22
35:21 36:3,3
36:19,23 38:25
46:3 47:20
55:16 65:16
71:3 74:3
75:17 77:23
78:2,7 82:25
96:16 97:10
98:11 104:20
107:10 119:18
121:16,18
122:22 130:22
133:16,18,24
145:21 156:19
160:15 162:4

164:6,17 165:1
165:4,6,9,24
**good** 7:5 8:23
9:6 163:7
165:21
**googling** 100:4
109:17
**gotten** 70:12
**grainy** 131:16
**grant** 4:13
**granted** 66:23
67:21
**great** 169:2
**greenwich**
66:19
**ground** 9:25
10:17 103:23
**grounds** 102:14
**group** 3:20
**guess** 166:2
**guys** 166:5

**h**

**h** 4:8 5:1 6:1,14
172:3
**habit** 49:19
**half** 112:3,5
167:5,5
**hand** 45:17,21
68:23 69:2
110:9 136:6
**handing** 153:7
**hands** 111:6
**handwritten**
142:13

**hanover** 3:12
**happened** 64:9
96:16 106:1
114:10 120:24
133:21 138:12
**happy** 103:17
**hard** 13:20,23
14:3,4 43:2,9
43:14,16,18,18
43:25 44:5,11
44:17 48:4,5,6
48:8,18,22
49:16 50:6,8
50:12,23 51:1
51:3,11,16,18
51:24,25 52:1
53:5,9,12,18,24
54:10,14,16
55:11,24 56:4
56:6,8 57:3,6
57:20,25 58:9
58:12,15,18
59:2,5,8 61:17
62:6 64:3 84:6
86:4,16 87:17
88:6,7,21,23
89:23 90:17,20
91:2,21 92:21
101:5,11 105:8
106:15,20,22
107:7,11 108:7
110:9,11,11,21
111:8 112:17
112:18,22,22
113:6 114:9

**[hard - index]** Page 19

115:9 120:11 122:12,16,23 123:2,6,10,17 123:24 124:3,9 124:13,16,21 124:25 125:4 130:14,15 131:6,10,13,14 131:17,17 132:15,18,25 133:3,6 135:19 136:20 139:23 139:24 141:14 148:20 149:11 149:24 155:13

**he'll** 119:12,13
**head** 10:19 87:23 88:1
**heading** 48:1 57:8 96:3
**health** 52:14 55:4 68:17
**heard** 81:13
**held** 116:13,17
**hello** 8:5
**help** 24:8 37:4 55:5 59:4,7 67:13 68:18,20 88:11 89:6 96:7 117:20,22 118:23 164:8
**helped** 105:7
**helpful** 68:21 125:14

**helping** 87:9
**helps** 64:10
**hereto** 170:17 173:7
**hesitant** 19:11
**hi** 61:1
**hide** 124:15
**higher** 116:13
**highest** 116:17 116:21 117:5
**historical** 49:9 49:14 51:20
**hmm** 38:18 43:20,22 45:14 48:14,16 49:2 49:5 51:9,14 55:25 60:21 64:21 65:23 69:15,18 85:22 85:25 88:14,17 89:21 93:17,21 99:2,8,10,16 100:16,19 123:3,5 132:23 135:13 144:14 147:25 148:2 151:12 152:19 157:6 158:8 161:12,14 162:10
**hoc** 35:8
**hold** 149:5
**holding** 73:15
**home** 33:9,12 33:17 85:9,19

**hope** 44:17 47:14 54:11
**horizon** 131:21
**hour** 55:16 65:11 67:20 100:11,13,15
**hours** 17:9 79:3 82:14 141:10 155:3 160:11
**hr** 40:24 41:5,8 72:11 74:16,20 93:5
**huh** 77:18 79:5
**human** 72:10
**hundreds** 44:25 67:4,12

**i**

**i.e.** 148:23
**idea** 90:19,20 113:5
**identification** 13:10 45:13 59:25 65:18 72:2 74:10 76:16 83:10 94:5 125:18 126:24 131:2 135:10 140:9 146:10 151:23 156:22 162:7
**identify** 54:9 56:2
**identifying** 143:7

**identity** 109:11
**illegible** 5:15 5:20
**image** 110:4
**imessages** 29:20
**immediate** 115:5
**immediately** 69:8,11 71:3 71:10 73:8 75:17 81:6
**impacted** 10:6
**implies** 104:7
**important** 42:15,15 124:2
**impossible** 45:3
**improper** 103:8 103:13,25
**inaccurate** 11:9
**include** 22:11
**included** 15:3 15:11,14,23 23:2 24:6 35:19 96:8
**includes** 98:19
**including** 8:1 37:16 78:9 91:2 92:1,19 126:13,22 160:25
**inconsistencies** 150:10
**index** 4:1 131:15,19

**[indicated - involved]** Page 20

**indicated** 65:6 109:21

**indicates** 149:7

**indicating** 60:5 109:6 110:21 111:3 153:2 154:15,17

**indications** 148:24

**individual** 8:12 137:10,12,14 152:11,12

**individuals** 41:8 166:18

**information** 10:2,11,12 31:20 37:19 48:3,3,7,17 50:12 51:8,10 51:15,17,23 52:18,21,22 53:2,24 54:13 56:24 57:8,20 58:7,11,15,25 59:5 69:24 73:12 79:25 80:5,8,12 81:11 86:5,11 87:6,6,10 88:15 98:5,15 99:13 106:23 106:25 110:19 113:24 114:7 115:1,16 120:5 126:16,16,17

126:18,19,21 127:1 140:1

**informed** 34:18 35:3

**initial** 117:7

**initially** 115:21

**initiating** 162:24

**inquiring** 74:16

**inquiry** 165:12

**install** 124:12 138:21,22

**installed** 138:19 139:25 141:14 162:21 162:24

**instruct** 97:8 98:10 101:10 101:12,14,17 101:18,20,24 102:2,6,14 104:15 105:14 106:16,21 107:10 111:25 112:3,4,6,16,24 122:15 132:18 164:3 165:20 167:11

**instructed** 79:25 81:10 98:25 101:20 102:23 103:9 103:23 104:22 105:13 106:3 106:14 107:4

108:7 112:23 115:9 124:9 130:14 132:24

**instructing** 40:16 165:14

**instruction** 97:11,12 98:12 99:18 106:10 119:14,25 121:8 128:7,25 129:2,4 133:2 165:5 169:1

**instructions** 74:4,4 75:6 101:4 105:20 107:2 114:21 119:9,10 120:18

**instructs** 12:8

**intend** 70:18 71:10 75:21

**intended** 24:1,9 34:19 75:18 149:17 151:2

**intending** 73:7

**intention** 124:18 128:4 150:12

**interact** 137:13

**interacting** 137:21

**interaction** 112:15 117:8 138:2

**interested** 7:25 170:20

**interject** 12:12

**internal** 37:4 162:21

**internet** 141:21

**interpretation** 153:11,14,18 153:21

**interrupt** 67:9

**introduce** 8:20 13:4 45:8 59:22 94:2 125:12 130:21 146:6 151:19 162:3

**introduced** 155:2

**inventory** 62:19

**investigates** 152:17

**investigating** 153:3

**investigations** 153:16

**investor** 152:11

**investors** 144:18,24 145:3,7 147:11 152:3,17 153:17

**invite** 157:5

**involved** 25:1

**[involving - know]**                                                      Page 21

**involving** 72:6
  144:17
**iodd** 163:1
**ipad** 32:10,20
**iso** 162:25
**issue** 69:22
  104:14
**issued** 12:21
  13:21 14:3
  26:7,18 27:7
  27:25 28:1,6
  28:18 31:25
  32:4 33:15
  86:2 90:15
  91:17,23
  110:12 124:6
  127:25 128:14
  128:18 129:14
  151:13 162:19
**issues** 10:8
**item** 125:24
  161:1
**items** 78:10
  92:19 128:5

**j**

**james** 3:10 6:3
  147:24
**january** 5:10
  6:13 20:11
  94:16 96:16
  143:12,16
  144:13
**japan** 15:13
**job** 32:7,10

**jog** 30:5
**john** 5:21
**joshua** 5:8,10
  6:14

**k**

**k** 1:13 2:10
  3:15 4:2,11
  5:12 7:13 9:1
  59:14,20 130:4
  130:10 169:9
  171:5 172:2,24
  173:2,4,12
**kaplan** 3:5 4:4
  8:5,5,21 9:5,6,7
  13:13,17 19:5
  32:14,17 35:17
  40:16,21 45:15
  50:22 54:12
  55:18,21 58:17
  59:3,11,22
  60:1 65:15,19
  70:14 72:3
  74:7,11 76:11
  76:13,17 82:21
  82:24 83:6,8
  83:11 89:18
  92:8,12,15
  93:11 94:2,6,9
  97:10 98:11,23
  99:9 100:11,25
  101:24 102:16
  103:14,17
  104:1,5,15
  110:6 112:16
  114:17 117:2

  120:6 125:19
  130:12 131:3
  133:13 134:6
  134:22 135:11
  137:8,18,20
  140:10 146:11
  146:15,19,22
  148:14 149:22
  150:8 151:21
  151:24 153:8
  154:4,7,13,16
  154:19,25
  155:13 156:20
  156:23 160:10
  160:13,20
  162:5,8 163:25
  164:10,20,23
  165:11,17,24
  166:14 167:7
  167:25 168:17
  168:21 169:3
**keenan** 5:21
  147:2,6
**keep** 52:5,11,20
  127:14,16
  129:17,22
**keeping** 155:13
**keeps** 167:15
**kept** 49:8 51:19
  68:15 142:15
**keys** 126:24
**kidney** 49:3
**kim** 3:11 8:9,9
**kind** 126:25

**kindly** 61:1
**kinhung** 9:16
**knew** 107:13
**know** 11:10,13
  20:21 27:2
  30:5,10,10,14
  34:9 39:20
  41:7 43:10
  44:15,23,25
  49:18 52:6,12
  53:15 54:7
  55:2 56:12,13
  56:25 57:5
  58:4 62:25
  63:1 64:11
  68:22 69:4,21
  71:12 74:23
  75:4 76:9
  78:13 80:23
  81:21 84:21
  87:7 88:19
  89:5 92:24
  93:24,25,25
  100:4,7 105:25
  107:24,25
  108:12 110:18
  111:12 114:25
  114:25 115:2
  119:22 123:12
  123:13,21
  129:7 135:8
  139:20 141:21
  142:13 145:11
  147:6 148:10
  151:24 152:6,7

155:1 156:2
158:5,16,16
167:18,25
168:14
**knowing** 42:22
103:22
**known** 127:17
**kyla** 4:12

**l**

**label** 128:21
**labeled** 148:23
**labeling** 148:25
**labor** 122:23
**lack** 155:6
**lane** 109:14
**lap** 34:4 42:8
123:2,6
**laptop** 12:21
13:19,21 14:1
14:2,3,5 18:21
19:7 26:7,10
26:18,22 27:1
27:25,25 31:22
31:25 32:3,6
32:16 33:1,3
33:15,18,21,24
34:5,14,17
35:2,7,14,17,23
36:9,11,17,20
36:24 37:12,14
37:15,19,24
38:5,7,10,20
39:3,6,9,14
42:8,16 44:8
46:25 47:8

48:6 52:22
53:3 61:9,12
61:16 62:2,5
64:6 65:1,5
66:4,9 67:16
67:21,23 68:1
68:7 69:21,24
70:6,9,19,20
71:10,16 72:15
73:2,8,11,13,15
73:19,22 74:17
74:25 75:17,19
75:20,21,24
77:2,4,5,8,10
77:15,16,17,20
77:23 78:3,9
78:11,21 79:10
79:19 80:1,13
80:16 81:3,4,6
81:8,11,14,17
82:18 86:2,6
86:16 87:7
88:7,8,16,20
90:15 91:17,20
91:23 92:19
93:8 96:6,21
98:16 99:4,13
101:3,15 102:7
102:24 104:25
105:14,23,25
106:4 107:3,5
107:17,21,25
108:3,8,18
110:12 112:17
113:24,25

116:6 117:13
123:2 124:8,10
124:13,21,24
124:25 125:3
127:25 128:7
128:14,18
129:9,14,17
135:19 138:15
139:1,7,12,15
139:21 140:24
142:5 156:7
162:19
**laptop's** 43:2
53:5,9,12 86:4
89:23
**laptops** 32:3
108:9
**large** 22:10
96:8 145:18,22
146:4
**late** 62:22
79:21 154:21
**law** 11:20
18:21 19:6
20:5,25 33:13
151:13 152:16
153:3 162:11
**lawsuit** 144:16
**lay** 102:19
**lead** 3:2 4:10
8:6,8 9:8
**leadership** 22:5
22:11 23:3
**learn** 141:9

**learned** 113:4
**learning**
112:20 141:4,5
141:7
**leave** 37:17
38:8,15 39:15
40:1,5,25
80:23
**leaving** 38:21
38:23 39:3,9
39:21 41:10,23
42:2
**lee** 3:17 4:12
5:9,11 8:14
9:23 16:25
17:24 18:2
83:14 95:22
164:15 171:1
**lee.brand** 3:19
171:2
**leet** 3:25 7:20
**left** 80:19 101:3
136:6
**legal** 7:21,23
69:22 144:25
145:11 165:2
165:18 166:12
169:11 171:23
**lessened** 23:1
**letter** 4:12 5:8
5:10 13:16,18
19:12,15,19,22
20:7,10 83:12
96:2 97:17,23
98:1 104:16

162:8
**letters** 20:4
**letting** 167:17
**liability** 144:25
  145:11
**lies** 15:1
**light** 82:1,3
**lights** 139:4
**likely** 67:19
**limited** 51:4,5
  126:13,22
**line** 11:14
  52:24 55:19
  72:21 119:3
  152:15,22,24
  165:12 172:4,7
  172:10,13,16
  172:19
**list** 57:12
  151:10
**listed** 147:4,16
  147:20
**listen** 18:24
  102:15
**listened** 20:24
**listening** 8:22
  81:9
**lists** 13:5
  126:17
**literally** 10:13
**litigation** 1:6
  2:6 7:15 9:9
  60:6,8 144:17
  151:4 171:4
  172:1 173:1

**litigation's**
  144:20
**little** 66:20 73:1
  109:16 131:11
  131:20
**live** 135:14
**llp** 3:10,16,20
  152:16
**local** 136:7
**locate** 55:6
**location** 7:18
  135:17
**lockdown**
  33:11
**log** 50:11 61:8
  61:9,12,16
  62:5,10 66:23
  90:25 115:1
  121:1 156:17
  167:17
**logged** 87:15
  88:8 89:24
  90:18 91:20
  92:4,23 114:11
**login** 69:4
  101:19 113:3
  113:23 114:3,7
  114:19,25
  118:7,9,12,24
  121:8,12
**logistics** 10:9
**lomas** 3:6
**long** 17:7 62:19
  63:10 66:13
  142:15 159:1

**longer** 23:6,20
  62:1 73:12
**look** 13:11
  43:14 45:16
  49:17 54:23
  64:10 65:19
  66:13 75:13
  78:17 94:20
  119:11 126:6
  136:21,22
  138:4 141:21
  142:20 143:6
  144:3,3,4,6
  148:8 154:10
  161:6
**looked** 37:7
  72:25 91:25
  94:22,25 95:3
  95:6,9 142:19
  144:9
**looking** 77:7
  95:15 141:20
  142:24 154:17
  161:7
**looks** 46:10
  94:11 109:7
  137:12 140:14
  140:21 141:25
  152:14,21
**lose** 65:4
**losses** 145:4,8
**lost** 50:9,13
  61:7,9,12 62:8
  67:16,23 69:1
  70:20 84:11

87:6 149:20
  156:7
**lot** 10:1,11
  155:2
**lu** 4:11
**lump** 161:10,20
**lunchtime**
  82:11

**m**

**m** 3:11
**m.d.** 1:13 2:11
  3:15 4:2 9:1
**maa** 47:20,21
  47:22 48:2
  57:9
**machine** 86:11
  139:24
**made** 36:15
  102:10 104:3
  106:24 143:5
  145:25 150:21
  161:4,13,16
  170:15 173:5
**mail** 4:14,14,17
  4:17,20,20,23
  4:23 5:3,5,18
  5:21 6:7,7,10
  6:10 13:5
  19:23 25:14
  28:22 29:4
  30:7 45:11
  46:12,16,19
  47:3 48:10,15
  48:25 51:7
  52:5,10,16

54:16 56:23
57:1,3,19
60:15,16,17,19
60:25 61:5,11
61:23 62:1,8
63:4,6,13,25
64:10,14,16,17
64:18 66:16
69:13,16,20,25
70:5 71:1,2,5
72:6,22,24
74:12,15 75:3
75:12,12,16,18
75:22 76:8,20
77:6,8,9,21
78:2,7,10,12,15
78:16,20 79:17
79:18,22,24
80:18 86:12,17
89:7 91:25
92:5,14 104:18
104:20,21
106:7 109:5
119:2,4,12,13
119:16,17,24
120:7,14,15,15
120:19 121:3
121:18,20
128:8 129:3,16
139:12 140:14
140:23 141:2
146:17,20,25
147:1,1,12
148:4,5 152:8
152:10,15,23

153:21,22,24
154:1,20
155:15,18,18
155:20,22
156:12,15
157:1
**mails** 18:17
24:21 29:21
44:1,4 51:6
62:7 86:21
88:10
**maintained**
86:12,17 156:2
**major** 148:17
**majority** 56:19
**make** 9:25
25:16 42:24
46:3 72:16
89:16 92:25
123:10 136:24
142:4
**makes** 44:18
**making** 49:9
51:20 52:15
99:19 111:5
**male** 137:25
138:2,5
**man** 5:15
**managed** 67:7
**management**
23:7 24:3,16
24:20,21,22
25:7,22 26:2
148:21 149:14
150:1,21

**management's**
23:12
**manufacturer**
29:15,16
**mar** 5:6,22 6:8
**march** 1:15
2:14 6:5 7:1,6
20:19,21,22
21:4,16,18
46:19 50:20,20
50:22,25 51:2
51:13 61:6,7
61:10 64:22
65:2,2,5 66:1
70:25 71:8,16
72:23,25,25
73:25 74:1
75:2 76:23
77:19 81:20,21
81:21 84:7
85:24 86:1
104:18,19
105:1,1,17
106:1,2,11,11
117:8 118:1
119:3 125:25
128:8,10,11,16
128:16,17,20
129:1,12 149:2
152:13,18
154:2 157:4,8
157:9 158:6,6
158:21 159:15
159:15 160:4,4
162:22 163:1

170:23 171:3
**mark** 3:10 6:11
85:12 134:18
140:6 157:1
**marked** 13:10
45:12 59:24
65:17 72:1
74:9 76:15
83:9 94:4
125:17 131:1
135:9 140:8
146:10 151:22
156:21 162:6
**marketing**
47:22,23
126:17
**marking** 74:11
**marks** 59:13,19
130:3,9
**mask** 136:12,23
137:6 138:2
**material**
163:23
**materials** 51:3
126:25
**matter** 7:14 9:9
133:10 167:18
167:20
**matters** 23:9,15
23:21 145:4
**mean** 12:12
14:13 23:25
27:13 35:13
43:7 51:5
53:16 55:1,7,8

66:19 67:7,9 70:20 75:10 76:7 81:21 85:4 104:2 105:6 113:5 114:2,2 139:18 141:25 149:11 149:23 150:9 151:9 157:14 159:18 168:1,4 168:5,12,14

**meaning** 43:16 168:12

**means** 11:18 29:2

**meant** 52:7 62:4 91:15 114:18 116:25

**media** 7:12 59:14,20 96:9 96:20 130:4,10 169:10

**medical** 21:8 22:1,2 26:6 168:11

**meet** 5:17 16:24 17:2,4 20:13

**meeting** 17:18 17:25 18:4 41:18,19 95:5 95:20,21,22,23 97:13,17 149:6 157:14 158:10 159:6 164:21

164:25 165:18 166:19 167:8 167:11,13

**meetings** 17:8 17:10,14,15,16 17:21,22,23,24 18:2,9,14 41:18 95:7,10 95:11,13,14,16 97:14,20 157:7 157:11,13,15 157:16,18,22 157:25 166:15 166:17

**meichiel** 5:21 147:2,6

**member** 162:11

**memory** 79:18 96:15 109:14

**mention** 57:18

**mentioned** 9:8 16:2 18:4 20:7 41:15 62:20 73:16 90:15 91:8 94:14 95:7 97:15 106:10 114:23 119:15,24 131:23 141:4 158:20 163:13 166:17

**message** 29:12 80:24 81:1

**messages** 29:3 29:20 30:7

80:20

**met** 9:11 16:23 16:25

**michael** 6:7 135:7 136:7 151:24 152:3

**microchip** 108:10,15

**microphones** 7:7

**microsoft** 30:2

**middle** 131:19 148:16 157:2 158:10

**mince** 119:23

**mind** 95:19 142:6

**minute** 6:4 155:5 156:3 160:9

**minutes** 63:12 66:11 82:24 142:25 143:8 143:21,22 155:23 159:2,3 160:12

**misleading** 145:5

**misleads** 144:23

**misled** 145:5

**misrepresent...** 144:18

**misstates** 54:3 58:10,20,21

88:24 101:22 114:13 116:23 119:20 133:8

**mistake** 160:12

**misunderstan...** 96:4

**mm** 38:18 43:20,22 45:14 47:20 48:14,16 49:2,5 51:9,14 55:25 60:21 64:21 65:23 69:15,18 85:22 85:25 88:14,17 89:21 93:17,21 99:2,10,16 100:16,19 123:3,5 132:23 135:13 144:14 147:25 148:2 151:12 152:19 157:6 158:8 161:12,14 162:10

**mn** 57:9

**mobile** 126:23 127:7

**model** 123:10 123:17

**moment** 45:15 60:2 65:19 83:15 146:11 148:8

**moments** 91:25

**mon** 5:6
**month** 148:18
**morning** 7:5
  9:6,11 81:23
  135:24
**mounted**
  162:25
**mouth** 102:18
**move** 57:10

**n**

**n** 15:6
**name** 7:20 9:14
  9:17 53:15,16
  108:20 116:24
  119:15 134:17
  134:24,25
  135:7 152:9
**name's** 9:6
**named** 163:3
**names** 54:9
  56:2
**naming** 30:3
**natalie** 1:23
  2:14 7:22
  170:3,25
**nature** 144:15
  164:8
**nd** 35:15
**nda** 15:4,12
  16:3,6,15
  25:16 33:25
  34:13,15 35:19
  159:25
**ndd** 148:23

**necessarily**
  25:23 38:16
  54:9 56:3,5
  141:19
**necessary**
  90:19 127:5,12
  173:6
**need** 11:12
  27:15 47:7
  48:17 50:5
  55:3 57:25
  58:2 67:13
  77:10,15,20
  87:24 89:4,11
  89:14,14
  119:11,12
  121:10 123:20
  159:4 161:5
  169:13
**needed** 15:13
  23:11 24:10
  58:3,5,6,8
  68:18 69:24
  88:10 119:8,13
**needs** 47:24
  69:6 72:15
  119:24
**negotiating**
  151:14
**nerds** 108:25
**nerdstogo** 5:17
  20:17,20,22
  21:3,3 108:24
  108:25 109:2,6
  109:19,22

  110:9 122:13
  122:15 134:25
  135:12,17
  136:3,9 137:22
  138:9 139:2,9
  142:8
**network** 47:11
  47:17 49:18
  50:2,6,9,13,24
  52:2 54:21,22
  55:5,14 56:13
  56:13,16,18,20
  56:21,23 57:16
  58:24 62:6
  86:12 87:15
  156:8
**network's**
  86:18
**never** 33:2
  43:12 78:16
  87:24 98:1
  121:12,14
  132:24 156:14
**new** 3:22 10:2
  10:11 15:14,19
  15:24 16:6
  85:13 112:20
  122:12,15
  123:6,6 138:17
  139:24,25
  141:4,14 149:1
  154:21 163:2
**night** 10:4,10
  19:24 155:3,3

**nighttime** 82:7
**nodding** 10:19
**non** 15:6
  102:21
**nonsense**
  104:12
**nope** 79:11
**northern** 1:2
  2:2 7:16
**notary** 173:13
  173:19
**note** 7:7 43:8
  72:14 92:10
  160:9 171:10
**noted** 173:7
**notes** 41:6 49:8
  49:14 51:19
  126:13
**notice** 4:10
  13:4,7,15
**noticing** 8:4
**notwithstandi...**
  10:16
**november** 5:12
**number** 4:9 5:2
  5:15,20 6:2
  10:2,13 12:10
  15:2 45:19
  46:1,7 60:4
  113:15 127:17
  147:2,13,14
  153:25 155:7
  169:10
**numbering**
  10:8

ny 3:22 171:15

**o**

**oath** 9:2 11:18
11:18 115:8
132:17,21
**object** 32:12
35:10 92:7
102:13 164:17
165:1,7
**objected**
103:23
**objection** 12:12
40:15 50:15
54:3 58:10,20
70:10 88:24
93:10 97:7
98:8,18 99:7
99:19,22
101:22 102:8
103:6,7 112:13
114:12,13
116:23 119:20
133:8 153:5
**objections**
99:17 100:23
164:8
**objective** 113:8
113:21,22
114:23
**objects** 12:5
**obligated**
160:22
**obligation**
125:9

**observed** 163:4
**obtained** 67:22
**occasion** 40:13
**occasionally**
28:24 29:5,10
**occur** 41:16
90:4 117:25
118:1
**occurred** 88:12
90:2,6 97:18
106:6 145:19
151:1 157:12
158:1,4 167:2
**offered** 111:21
**office** 33:8,8,11
33:15,16 85:9
**officer** 21:8
22:1,2 26:7
**offline** 44:24
**oh** 41:19 63:1
74:7 77:14
78:22 79:20
91:10 112:10
117:11,18
129:6 134:19
137:19 146:17
146:17 154:18
**okay** 8:23 9:14
9:19,24 10:25
11:1,2,6,7,8,15
11:16,17,22
12:5,18 13:3
14:1,7 15:22
15:25 16:4,12
18:13 19:2,14

19:23 20:2,9
20:12,24 21:2
21:7,18,25
23:5,8 24:7
25:5 26:6 27:5
27:10,19 28:17
28:25 29:19
30:1 31:3,10
31:11,24 32:24
33:21 34:17,22
34:24 35:1,21
37:3 38:11
39:7,13 41:2
42:14 43:13,15
43:25 44:7
45:8,23,25
46:9 47:12
48:1,10 53:23
54:24 55:21
57:10,11 58:12
60:9,18,24
61:20,25 62:4
63:23 65:4,15
65:21,22 67:12
67:20,25 70:17
71:6,20 72:3
72:24 73:10
74:19,22 75:10
76:5,6,11 77:1
77:9,15,16,18
78:5,18,19
79:12 80:3
82:10,21 83:6
83:11,17 84:14
85:20 88:4

89:5 92:13
96:2 97:13
99:22 103:14
106:6 110:3
111:22,25
112:21 118:18
118:22 125:12
130:2,20
134:17 137:8
138:8 140:3,5
142:23 144:15
146:6,11,21
147:6 148:2,12
150:4 152:10
152:22 153:2
153:23 154:9
155:20 156:18
157:2 159:18
160:13 162:3
163:12 164:23
165:11 167:7
167:19 168:21
169:8
**old** 88:10 89:7
**once** 23:19
24:22 25:6
**ones** 48:24
**online** 43:17,21
44:21,24 68:20
**ooo** 1:4 2:4 4:6
6:16 169:19
**open** 82:8
**opens** 114:24
**operating**
139:25 140:20

141:14,17
162:20,23
**operational**
126:19
**opinion** 121:15
149:9
**opposite**
129:21
**options** 113:3,9
113:12,15,18
**oral** 41:2,4
**order** 47:4,6
50:6 58:1,6
154:19 155:1
**orders** 169:13
**original** 148:18
**originally**
162:19
**outcome** 7:25
**outside** 20:2
40:15 82:1
98:16
**overnight**
69:24
**oversight** 22:5
22:11
**owed** 161:25
**own** 96:10,21
98:6 99:4
127:18
**owner** 136:8
163:3

**p**

**p.a.** 3:4
**p.m.** 2:14 59:17
59:19 63:14,15
63:16,22,22
64:22 65:5
83:1,2,3,5
130:5,7,7,9
160:16,17,17
160:19 162:22
163:2 169:11
169:17
**pacific** 63:15
63:16 66:18
162:22 163:2
**pacina** 72:20
**pacini** 4:24
72:7,9,20
74:20
**packed** 85:9
**page** 4:2,9 5:2
6:2 60:3,4
83:13 84:3
85:21 96:2,5
104:17 126:3
162:12,14
172:4,7,10,13
172:16,19
**paid** 137:23
161:7,18,22
**palo** 3:12
**paragraph**
37:5 57:11
74:23 78:6
85:23 92:17

126:6 129:6
148:9,10,11,17
162:13,14
**paraphrasing**
149:21
**part** 22:10,14
22:18 37:21
47:2 53:23
54:18 55:9,22
55:22 61:10
95:3 117:8
121:11 127:3
131:18,22
**participants**
158:22
**participate**
24:19
**particular**
148:9
**particularly**
10:2
**parties** 7:10
170:19,22
**parts** 54:19
94:22 95:9,15
95:24
**party** 7:24
106:24
**passed** 62:22
73:1
**past** 49:11,15
51:22 108:22
109:10,16
**pat** 3:10

**patrick** 17:1
**pause** 11:5,5
148:13
**pay** 122:18
127:18
**paying** 161:20
161:25
**payment** 72:16
161:4,5,10,13
161:17
**payments**
160:21 161:15
**pc** 27:11
162:24 163:9
**pdt** 5:7
**pdufa** 148:19
149:2
**pensions** 3:3
**peo** 52:24
**peony** 1:13
2:10 3:15 4:2
4:11,14,18,21
4:24 5:12,18
6:10 7:13 9:1
9:16,18 59:14
59:21 63:2
69:23 86:24
89:10 130:5,11
169:9 171:5
172:2,24 173:2
173:4,12
**peony's** 52:25
64:2 120:10
**people** 30:3
54:24 55:12,13

90:10,12 99:24
108:1,3 114:1
118:25 136:11
136:13,16
147:2
**perception**
150:15
**perfectly**
121:17
**perform** 27:12
28:2 32:1,4,20
33:4,18 35:25
48:12 163:8
**performance**
127:5,12,22
128:1
**performed** 36:5
36:7 38:13
142:9
**performing**
26:12,18 27:6
43:1 44:9 45:5
**period** 24:12
47:18 57:16
65:11 66:22
67:21 68:1
73:18 100:12
100:13,15
101:3 119:25
161:21 170:17
**periodically**
16:13
**permission**
117:17 119:5

**permit** 127:24
129:17
**permitted**
127:3,10,22
**permitting**
128:13
**person** 69:3
90:6 91:6
102:22 116:21
117:5 122:7,8
128:24 135:4
136:18,19,19
137:9 147:3,7
170:9
**personal** 27:10
28:12,15 33:1
51:1 52:18,20
52:25 53:2
54:1 62:17,18
62:21,21 64:2
64:6 66:8
67:22 68:5
73:11 78:9,22
78:25 79:13
80:4 92:1,19
96:7,20,25
98:6,15,20
99:3,12 115:15
120:11 126:19
155:18
**personally**
152:7
**personnel**
73:21

**phase** 14:12,13
14:17,20,21,24
15:2,12,17,18
15:22,23,25
**philadelphia**
3:3
**phone** 28:6,8
28:11,14,21
29:1,4,9,15,15
29:16,17,22
30:2,6,10,11,14
30:16,18 31:4
31:6,7,10,13,15
31:21 32:9,15
32:16 39:24
40:1 62:16
63:11 67:7
70:15 90:3,5
109:5 110:4
118:5,6 120:23
127:16,16,18
127:21 143:24
143:25 144:2,3
144:4,6 158:11
167:1
**phones** 30:4
31:8
**photo** 5:15
62:21 67:11
110:6,8,14,20
131:3,6,16
132:2,3,5
135:2,5 136:10
136:19 137:14

**photograph**
67:5 110:3
**photos** 67:7
134:8,12
**phrase** 168:4
**phrased** 34:25
**physical** 107:17
**physically**
85:19 124:9
141:13
**physicians**
168:14
**pick** 7:8 69:4
138:21,22
**picked** 79:19
139:1,9,15
140:24
**picture** 84:22
85:11 130:13
130:16 131:13
132:7,9,11,12
132:14 138:3
**piece** 111:13
127:19 131:20
132:3
**pieces** 111:13
111:14 131:24
132:1 139:24
**pillsbury** 3:16
8:14,17
**pillsburylaw....**
3:19,19 171:2
**pipeline** 126:18
**pittman** 3:16
8:18

**[place - privileged]**

place 7:10
78:14 104:17
105:16 156:12
170:10
plaintiff 7:14
plaintiffs 2:11
3:2 4:10 8:6,8
9:8 19:16 96:4
104:19
planned 150:2
planning 75:24
plans 126:14
149:5
platforms 29:3
playing 104:11
please 7:7 8:2
8:24 9:14 12:7
45:16 47:5
59:21 69:22
72:13 78:8
84:3 92:18
96:3 99:21
126:4,6 130:1
130:11 134:19
138:12 140:16
146:12 148:10
157:5 163:19
plug 86:25
139:10,11
plus 150:25
plymouth 3:3
point 11:8
46:22 55:15
65:2 78:9
79:10 92:19

104:4 113:12
140:3 159:11
pointed 127:20
pointing
136:20 137:2,4
points 49:9
51:20
pomerantz
152:16,16
pool 15:5
porter 164:14
165:8
portions 97:16
pose 132:4,7
position 116:13
116:17
positive 150:22
possessing
110:18
possession
106:25 126:12
possibility
108:11
possible 39:11
39:13 44:7,10
44:13 49:13
53:16 75:1
76:7,9 86:4
129:9
possibly 34:20
post 35:8
147:20
potential 14:15
14:23 23:9,16
23:21,22 24:17

24:24 25:8,22
25:25 36:6,13
151:3,14
159:22 165:18
166:9
potentially
34:7 86:10
practice 53:21
53:23
precisely 45:1,3
prefer 52:5,11
prep 95:4
preparation
18:19 19:8
20:2,13 83:18
94:13,21 95:1
95:5 134:7
159:9
prepare 10:7
16:19,21 17:4
49:23 97:15
prepared 11:24
preparing 95:8
134:14
present 3:25
8:1 17:12,17
17:19,20,23,24
18:3,5,10
95:21,25
163:24 164:7
164:11,12,16
presentation
43:8 155:4
preserved
86:13

press 151:13
pressions 25:13
pretty 68:19
previously 21:7
73:16 105:24
136:20 150:22
price 145:16,19
145:24 150:25
primarily 33:3
primary 15:8
22:3,4 37:18
principal 27:5
print 148:4
printed 135:24
printers 126:23
printout 5:16
prior 10:12
42:6 49:1,22
49:24 52:13
54:3 58:21
72:24 84:7
88:25 95:3
114:13 117:15
124:16 133:8
153:24
private 7:8
87:6,10
privilege
102:13 109:25
163:22,23
164:18 165:10
167:17
privileged 19:1
98:9 104:13
164:25

**pro** 58:25
162:23,25
**probably** 67:12
108:2 154:4
**proceed** 8:25
12:14
**proceedings**
7:4
**produce** 60:8
**produced**
10:13 46:3,5
60:5,6,11
155:3
**production**
155:5,9
**profile** 144:19
**program**
167:22 168:2,4
168:12
**programs** 22:9
29:22
**project** 22:24
**promising**
140:21 142:1
**properly** 55:6
**property** 71:18
108:13 125:9
126:7,11,21
127:4,11
**proposals**
126:15
**proprietary**
127:1
**prospect**
126:18 150:11

168:7
**prospects**
38:25 144:19
150:23 168:5
**provide** 12:19
13:8 58:6
128:12
**provided** 10:4
10:10,12 58:25
64:5,13 67:18
70:21 105:20
127:3 154:24
170:16
**provides** 20:18
**providing** 22:4
64:1 66:4
120:10 154:21
**pst** 5:22
**public** 36:12
145:2 151:1
159:22,22
173:19
**publication**
166:21
**publications**
49:9,24 51:20
**publicly** 145:3
**pull** 48:3,17
49:23 51:10
57:19,24 58:14
**pulled** 58:12
**pulling** 59:5
**purchased**
28:19

**purpose** 12:25
38:10
**purposes** 25:2
169:7
**put** 49:21 52:24
53:2 54:25,25
102:17 111:19
111:21 122:12
122:15 123:6
123:11,16,20
123:23 124:3
138:18 139:24
142:16 144:4
**putting** 111:17

**q**

**q4** 147:21
**quantify** 44:2
**quarter** 55:16
**question** 10:23
11:14 12:6,6,7
12:13,14,16,22
12:24 18:25
25:15 26:5,14
26:15 27:20,23
32:13 34:1,4
34:10,23 35:11
35:16 37:5,18
38:6,14 42:22
50:19 54:11
58:14,22 60:11
66:21 93:4
95:17 99:9
102:21 103:8
104:23 108:12
110:18 121:13

121:16 127:9
136:25 149:20
149:21 150:5
164:2,19 165:9
165:21
**questioning**
11:14 12:11
55:19
**questions** 9:10
10:18 11:6,25
38:2 42:23
52:15 55:4,7
68:16 94:13
104:3,12
121:19 168:20
**quick** 160:14
**quite** 80:22
167:16
**quoting** 149:25

**r**

**r** 3:5 172:3,3
**rates** 49:10,14
51:21
**rather** 10:18
34:13
**raymond** 6:3
147:24
**reach** 55:15
**reaction** 79:22
**read** 47:2,4
60:2,24 69:16
70:4 77:14
78:7,16 79:24
80:18 140:16
140:16 147:18

**[read - record]** Page 32

163:5 171:9
173:5
**readable**
147:16
**reading** 25:18
48:15 49:8
52:5 69:25
70:2,5 79:16
79:23 127:15
129:10 148:11
153:7 155:22
163:6,7
**reads** 86:9
92:17 149:3
152:15 153:1
156:1
**real** 160:14
**realization**
108:23 109:8
**realize** 11:8
**realized** 109:18
142:7
**really** 53:14
103:7 108:4,12
119:23 141:3
148:15
**reason** 12:2
15:4 54:18,19
55:23 56:17,17
60:7 68:21,22
93:6,18 108:8
117:15 171:11
172:6,9,12,15
172:18,21

**reasonable**
153:9,13,14,18
153:20
**reasons** 37:17
39:3,5,9 41:9
57:13 68:13,14
69:7
**recall** 20:9 26:1
26:25 28:17
29:1,14,16,21
29:25 30:19,21
30:23,25 31:23
32:19 38:7,19
39:2,5,10,16,21
39:23,24 40:12
41:5,13 42:1,7
42:11 43:5,8
44:22 45:7
48:21 51:22
63:14,14,18
64:9 65:7
66:10 69:25
70:2,4,7,8 71:4
71:6 72:19
73:5,9,24
74:19 75:1,11
77:22,25 78:1
78:4 79:16,22
79:23 80:19
81:5,7,9,16,23
82:10,13 83:17
83:20,21,24
84:1 85:6,15
88:4,18,22
89:18,24 90:1

90:2,6 91:16
94:17 95:6,9
95:15,23 97:13
97:17 98:4,14
98:23 99:5,11
100:14 102:5
105:3,19 106:9
107:25 108:20
112:14 113:16
118:19,20
119:15 122:20
123:9,22
124:18,19,23
133:2,2,5,25
134:6,17,24
135:7,18,18
136:13,18,25
137:9,11,21,24
138:19 139:3
139:18 142:15
145:21 151:9
155:7 158:3,21
159:5,8,20
160:1,2 161:3
161:10,15,23
162:2 163:16
163:18,19
166:25 167:2
**recalled** 94:14
**recalls** 167:10
**receipt** 142:13
171:18
**receive** 66:12
128:6 160:22

**received** 27:1,8
28:2 72:15
75:16,22 106:7
124:20,24
160:20
**receiving** 78:2
**recent** 4:14,17
4:20,23 6:7,10
26:15
**recess** 59:16
83:2 130:7
160:17
**recipient**
153:22
**recognize** 46:9
60:12 72:3
74:13 75:3
76:17 83:12
94:6,9 110:5
125:20 140:10
**recollection**
19:21 27:3
30:5 39:12
40:2 53:11
63:3,9 64:11
82:17 90:10
109:1 125:6
133:23 158:18
**reconciling**
148:20 149:12
149:24
**record** 7:6,11
8:3 9:15 10:5
10:15,21 13:3
47:5 59:15,18

82:25 83:4
104:4 109:4,5
109:15 130:6,9
137:1 143:15
160:14,15,18
169:5,12
**recorded** 7:12
126:21
**recording** 7:9
**records** 62:21
126:14 142:8
142:11 143:6
**recover** 115:15
145:8
**reduced** 22:22
170:11
**refer** 13:19
14:3,7,11,16,20
15:25 16:12
22:1 36:23
114:6 120:14
**referenced**
104:20 171:6
**referred** 17:11
43:23 63:20
88:19 89:20
94:18
**referring** 13:20
14:2,4,18,21,24
16:1,6,14,17
24:2 44:20
47:8,10,11,21
48:5,7,22
49:16 52:17
61:22 114:4

115:6 131:4
138:6 149:13
149:14 155:24
155:25
**refers** 29:21
75:5 153:15
**reflect** 137:2
**refresh** 64:10
**regard** 30:10
35:15 103:24
112:7
**regarding** 19:7
25:8,21,22,25
41:9 42:1
123:10 144:18
150:11,22
159:8 161:24
165:12
**regardless**
43:17
**regular** 155:23
156:3 161:18
161:22
**regulatory** 6:3
**related** 7:24
12:20 18:21
20:18 24:23
30:24 35:22,25
36:4 44:12
52:21 53:19
88:9 148:25
170:21
**relating** 23:9
23:16,21 28:22
29:1 30:7,22

31:21 33:22
35:8,18 36:5
36:12,18,21,25
37:15 39:8
53:9,12 86:15
145:15 156:8
**relations**
147:11 152:3
152:11
**relationship**
21:22
**relative** 55:3
**releases** 151:13
**relevant** 86:10
**remember**
19:18 20:6
28:9 30:9 31:2
34:20 38:9,22
45:1,2 48:24
49:20 51:25
53:1 67:3
71:12 75:13,15
76:3 80:25,25
81:12,14,19,20
81:25 82:1,12
82:16,20 83:16
83:23 84:21
89:15 90:4,12
91:12 95:12,18
95:19,19 98:3
105:21 111:23
112:15,19
113:11,17
118:15 122:24
123:19 132:6

133:15 134:10
134:11 136:21
137:6 138:3
139:19 141:1,3
141:20 142:2
142:16 143:13
151:17,18
159:7,10,12
160:6 167:6
**remote** 88:19
89:9
**remotely** 8:2,20
8:21 68:20
**removal** 105:7
113:5
**remove** 106:14
113:6 123:1
**removed**
124:16 138:16
138:17
**removing**
113:3,8
**renal** 6:4 149:5
**rep** 164:13
**repaying**
127:22
**repeat** 26:14
60:11 149:21
**rephrase** 12:6
58:14 121:17
**rephrasing**
34:1
**reply** 75:14
**report** 147:24
148:5 149:10

**reported** 1:23
  120:1
**reporter** 2:15
  7:22 8:24
  10:20 11:3
  169:13 170:1,4
  170:16
**reports** 126:14
  126:18,19
  147:14,17,20
**represent** 9:8
  104:21 147:23
**representation**
  46:4
**represented**
  9:19 145:24
**representing**
  7:21 9:22
  128:24
**reproductions**
  127:2
**request** 57:14
  57:14 68:8
  73:21,25 88:20
**requested** 66:8
  67:22 73:19
  120:1 161:10
  170:15,15
**requesting** 42:7
  70:6 71:1 74:2
  124:12
**required** 98:7
  113:5 173:13
**requires** 56:19

**research**
  126:16
**researching**
  141:15
**reset** 162:24
  163:9
**resources**
  72:10
**respect** 10:8
  167:8
**respond** 75:14
**response** 25:17
  25:18 75:12
**responsibilities**
  22:3 23:1,7
  26:13,19 27:6
  27:12 28:3
  32:1,5,21 33:4
  33:19 35:25
  44:9 45:5
  48:12 156:9
**responsibility**
  22:4 35:22
  36:4
**responsible**
  22:23
**rest** 136:24
**result** 144:25
  155:8
**resulted** 145:16
**retain** 127:4,10
  127:25 128:13
**retained**
  169:10

**retirement** 3:2
  3:3,4 86:3
**retrieve** 66:24
  68:1 96:7
  99:14
**retrieved** 73:11
**retrieving**
  88:15
**return** 72:14
  73:19,22 74:2
  74:17,25 81:2
  81:4,6,8
  105:25 107:3,5
  124:5 125:9
  126:7,10 128:7
  128:18,21
  129:8,13,18,19
  129:22 139:21
  171:13,17
**returned** 13:22
  69:22 77:8
  84:6 108:13
  124:8 125:4
**revealed** 145:5
**review** 16:15
  18:13,19 19:23
  37:6 94:19,24
  109:17 146:12
  169:6 170:14
  171:7
**reviewed** 19:5
  19:10,14,19
  20:3 97:16
  109:21

**reviewing**
  83:17 94:15,17
  95:23 134:7
**revise** 155:4
**rich** 41:11
  92:14
**richard** 5:3,5
**right** 18:2
  27:17 44:19
  45:17,20,21
  47:14,15 52:16
  62:12,24,25
  63:3 64:8
  65:24 68:9,10
  68:11,11,13
  75:10 78:15
  87:11 92:15
  105:9 117:2
  122:24 123:22
  131:14,15,19
  135:3,4,15
  136:4 141:22
  143:2,3 147:19
  165:16
**rightfully**
  149:8
**risk** 6:3 69:3
  149:7
**role** 22:22 23:3
  23:4 25:21
  26:3,11 147:7
  147:10 156:5
  157:8,18,22
  166:15

**roughly** 17:6 84:20 104:18 104:25 105:1 105:17

**roxa** 6:3 14:7 16:10 22:7,8 22:12 23:2,11 24:5 29:2,23 29:24 30:7,19 30:22 31:1,21 33:23 34:7 35:8 36:6,13 38:25 44:12 144:18 145:15 159:23

**roxa's** 14:13,15 14:23 16:15 23:9,16,22 24:17,24 25:8 25:25 38:25 148:18 150:11 150:22

**roxadustat** 14:8 15:2,12 15:13,17 25:13 25:14 34:2 149:8 167:21 168:1,1,4

**roxadustat's** 25:15,22 33:25 39:17

**rudy** 4:17,20 60:22 115:6,23

**rudy's** 114:6,25

**rules** 9:25 10:17

**running** 81:3 105:24

**s**

**s** 3:21 4:8 5:1 6:1 47:15 172:3

**safe** 68:15 142:17

**safer** 68:24

**safety** 15:8 144:19 148:25

**salary** 161:18 161:22

**sales** 126:17,18

**saltzman** 5:9 5:10 6:14

**san** 1:3,14 2:3 2:12 3:18 7:1 7:16,19

**santa** 3:6

**santiago** 136:7

**sara** 5:8

**satisfied** 139:16

**save** 43:2 53:18 54:7,8 96:9,19 148:4 161:9

**saved** 43:6,9 44:11 51:23 86:16

**saving** 53:24

**savvy** 43:15

**saw** 97:23 130:13 134:11

**saxena** 3:4 8:6 8:7 9:7

**saxenawhite....** 3:7,8

**saying** 25:19 57:24 71:14 96:13 119:2,24 128:25 129:22 149:24 150:14

**says** 45:19,22 47:3,19 57:7 69:21 72:17 77:17 78:8 84:4 85:13 86:1 96:3 101:2 117:18 119:7,13 126:9 129:19 136:7 147:19 157:2 162:18

**schoeneck** 3:10

**scope** 40:15

**screen** 139:4

**search** 141:24 143:9,10,24 144:2

**searched** 84:5 142:18 143:8 143:22,25

**searches** 141:22

**searching** 141:20 143:20

**sec** 36:24,25 37:3,5

**second** 19:19 26:14 47:13 60:4 74:22 78:6 92:17 94:7 129:6 148:10 162:12 162:13,14,14 163:15 167:5

**secure** 56:22

**securely** 101:5 140:19 141:7 141:16

**securities** 1:6 2:6 7:14 9:9 36:22,23 144:17 151:3 151:15 153:3 171:4 172:1 173:1

**see** 25:10 30:4 45:16 53:14 72:17 74:22 77:11,17 78:5 96:3,10 101:6 111:16 114:8 114:10 118:22 125:13 129:19 131:11 132:1,3 135:25 152:9

**seeing** 136:13 139:23

**seek** 24:4

**seeking** 14:15 23:2 24:12

**seems** 147:17
**seen** 83:21,24
  98:1 136:11
**semantic**
  104:11
**send** 37:6 68:10
  69:8,22 70:18
  71:1 73:7
  75:17,18,20,21
  75:24 76:5
  77:2,23 78:2
  84:14 85:17
  121:10 124:14
  140:23 141:2
**sending** 71:5
  75:11
**senior** 22:19
  72:10 74:20
**sense** 25:16
  44:18 92:25
**sensitive** 7:8
**sent** 4:15,18,21
  4:24 5:4,6,19
  5:21 6:8,11
  19:24 61:11,25
  62:7 63:6,13
  70:25 77:6
  78:10,12,15,20
  84:11 85:6,15
  101:5 128:21
  140:15 171:14
**sentence** 47:13
  47:14 51:19
  52:8,9 57:12
  77:14 86:9

101:2,7 104:16
  147:15 148:14
  148:16 149:3
  149:11 150:5,6
  150:7 153:15
  155:22 162:17
**sentimental**
  62:23
**separate** 27:14
  28:11 41:18
  52:6,11,17,21
  121:19
**separately**
  86:11,17
**separation** 5:13
  37:21 125:8,10
  125:21,25
  126:9 127:11
  128:1,6,11
  160:22 161:6
**sequence** 78:13
  141:1 155:1,8
**sequencing**
  10:9
**serve** 58:1
**served** 21:7,10
  21:14
**server** 127:8
**servers** 86:12
  126:23
**service** 127:23
**services** 20:18
  127:6,12 128:2
  142:9

**session** 162:25
  163:9
**set** 10:11
  155:23 158:7
  159:3
**setup** 93:5
**several** 90:10
**severance**
  72:16 160:21
**share** 48:4,4,18
  48:18 50:2
  51:10,11,16,17
  51:18 54:11,14
  54:15 55:11,24
  56:4,6,8 58:1,6
  58:12 59:9
**shared** 49:1
  56:13
**shareholder**
  152:16
**shaw** 3:16 8:18
**sheet** 171:11
**ship** 66:3,5
  68:7 70:6,21
  71:3,10 79:20
**shipment** 69:23
**shipped** 86:1
**shipping** 69:1
  71:12
**shirt** 110:9
**short** 14:8
  34:21 55:17
  63:11 108:9
**shortage** 108:2
  108:10,15,18

**shorthand** 2:15
  170:4,9
**shortly** 75:24
  76:4 151:15
**show** 57:5
  85:12 89:3,5,6
  89:6 92:5
  112:10 131:7
**showed** 128:9
  139:3
**showing** 136:4
**shows** 110:23
**sic** 11:11 65:16
  72:20 90:13
  126:19
**sign** 120:4
  171:12
**signature**
  170:24
**signature's**
  60:3
**signed** 83:14
  171:20
**significant**
  149:7
**significantly**
  10:6
**signifies** 46:2
**similar** 29:11
  34:22
**simple** 99:9
**simplify** 66:20
**simply** 34:4
  57:24 107:21
  132:7

**single** 148:5
**singular** 142:12
**sir** 70:24
  106:12 114:16
  163:7
**sitting** 83:14
  93:15
**six** 15:16 71:23
  71:24
**skip** 36:3
**slack** 30:2
**slightly** 34:25
  38:6
**small** 55:3
  145:22
**snapchat** 30:2
**software**
  126:20
**solana** 3:6
**solution** 87:5
  87:11
**solutions** 7:21
  7:23 169:11
  171:23
**somebody**
  102:10 105:10
**someplace**
  142:17
**soon** 70:9 74:25
  76:7,9 86:25
  129:9
**sorry** 31:9
  43:15 67:9
  74:8 87:3
  91:11 95:17

137:15 149:19
  159:17 160:8
**sort** 43:7
  103:15
**sought** 96:6,18
**sounded**
  148:22 149:15
  149:15
**sounds** 8:23
**speak** 70:12,14
  93:13,14
  102:19
**special** 89:15
**specific** 35:22
  53:3,20,25
  54:1 109:20
  133:2 154:1
**specifically**
  12:8 25:24
  30:19 38:9,14
  40:12 105:12
  125:19 164:4
**specifications**
  126:20
**spend** 141:7,10
  142:23 143:19
**spoke** 63:21
  117:9 156:14
**stamp** 64:16
  66:16 77:7
  78:17
**stamps** 64:14
**stands** 47:22
**start** 36:19
  60:17

**started** 9:24
**starts** 47:15
  57:11
**state** 8:2 9:14
  10:5,14 51:7
  119:22
**stated** 48:5
  54:8 56:1 58:8
  73:7 100:17
  119:4 170:10
**statement**
  12:23 76:7
  86:7,8 96:10
  96:12,17,22
  97:6 101:9
  102:10 104:24
  109:5 149:23
**statements**
  36:12,14
  150:11,22
**states** 1:1 2:1
  7:15 14:16,24
  15:21 22:12
  23:10,17,23
  24:5,17,25
  25:9,23 26:1
  34:8 36:7,14
  36:22 63:13
  72:9,13 96:5
  150:23 168:6
**stating** 155:21
**station** 27:18
**steps** 6:4
**stock** 145:3,16
  145:19,24

150:25 160:25
**stop** 47:20
  59:11 111:24
  112:12
**stopped** 148:11
**storage** 96:9,20
  162:21
**store** 82:8
  136:11,14
  137:5,25
**straight** 155:14
**street** 3:12
**strictly** 148:25
**strike** 36:18
  42:5
**strip** 131:21
**stuck** 100:8
**studies** 14:12
  14:14,17,21,22
  14:25 35:18
  126:15
**study** 49:10
  51:21
**stuff** 52:6,11
**subject** 141:11
  152:15 167:10
  167:18,20
**submitted**
  15:19 16:3,7
  148:25
**subscribed**
  173:14
**subsequent**
  148:20 149:12
  155:20 161:15

161:17
**substance**
  164:1 165:25
  167:13 168:3
  168:23
**substantial**
  22:13,14,18
**sue**  145:7
**suffer**  145:4
**suggestion**
  57:12
**suite**  3:6,21
**sum**  161:10,20
**sun**  82:6
**supervision**
  170:12
**support**  47:19
  47:20 48:2,2
  57:9,9
**supportive**
  148:19,24
**supposed**  13:11
**sure**  14:20 16:5
  30:15 53:10
  55:18 67:7
  71:13 78:13
  82:23 89:16
  92:6 104:3
  119:6 128:23
  164:10 167:24
**surprise**  146:1
  146:2 150:18
**swear**  8:24
**switch**  31:8

**switched**  31:7
**switching**
  127:18
**sworn**  11:19
  132:21 170:5
  173:14
**system**  3:2
  54:22 66:17
  139:25 140:20
  141:15,17
  162:20,23

**t**

**t**  4:8 5:1 6:1
  110:9 172:3,3
**tab**  45:10 65:16
  74:7,8 76:13
  92:9
**table**  131:14,21
  147:18
**tablet**  32:9,10
  32:16,20
**tadina**  4:17,20
  60:22 61:21
  64:18 65:5
  66:3 67:17
  68:24 69:17
  70:13,17,25
  71:2 87:8
  90:13 91:7,9
  91:11,12,24
  92:16 115:10
  115:18 116:1,2
  116:25 117:1,3
  117:4,15,16,20
  118:3 119:8,17

120:9,16,17,25
  121:5,21,25
  122:4,7 140:2
  140:4
**tadina's**  65:12
  66:7,24 68:8
  70:5 114:7,11
  121:12
**take**  7:10 11:13
  11:15 45:15
  46:8 55:17
  60:2 65:19
  68:25 69:5
  82:21 84:21
  85:12 103:16
  103:17 110:16
  130:1 132:7,9
  132:11 146:11
  148:8 156:12
  159:4 169:5
**taken**  2:11 7:13
  59:16 78:14
  83:2 130:7
  160:17 170:8
**talk**  11:2 156:4
**talked**  112:21
**talking**  15:16
  15:18 31:4
  38:12,14 89:1
  89:2,3 105:5
  108:1 137:3
  146:24 147:16
  168:14
**talks**  154:4

**tangible**  126:21
**tbrien**  3:13
**team**  5:17
  30:15 48:4,19
  49:4 51:11,16
  51:18 59:1,4,8
**teams**  30:2
**technical**
  113:11 168:10
  168:11,11
**technically**
  117:12
**telephone**
  24:20 127:7
  157:15
**telephones**
  126:23
**tell**  11:19 44:16
  50:4 66:14
  70:17 73:4
  74:3 75:19
  79:12 88:1
  91:24 92:20,25
  102:22 103:1,3
  104:6,7 106:13
  107:9 111:19
  111:22 112:4
  113:9 117:23
  118:14,18
  119:8 121:24
  122:3 123:23
  124:7 133:13
  145:23 170:6
**telling**  48:11
  75:1 77:19,22

78:1 98:4,14 98:24 99:5,11 102:5,20 106:7 121:4,20 123:22 129:21 133:25

**temporary** 96:6

**ten** 63:12 85:1 85:2,3 160:9

**term** 16:14 34:13 141:24

**terms** 10:17 13:19 68:24

**test** 93:11

**testified** 9:3 44:8 96:24 105:13,24 130:13

**testifying** 35:24 103:3

**testimony** 12:3 12:19 24:18 54:4 58:21 88:25 101:23 114:14 115:8 116:24 119:21 132:17,21 133:9 170:10 171:9,18 173:8

**testing** 38:24

**text** 18:18 29:3 29:5,11,20 30:7

**texts** 144:1

**thank** 16:4,5 26:6 32:17,24 35:6 100:2 101:1 129:25 155:11 163:8

**thanks** 59:12

**thereof** 126:11 127:2

**thereto** 170:22

**thing** 34:11 56:14 103:15 122:21 123:14 131:11 159:17

**things** 56:12,15 57:25 89:2 103:12 113:1 119:23 133:21

**think** 27:21 30:17 32:16 43:16 49:17 50:3,3 56:10 59:11 81:2 82:3 89:2 90:19 92:20 93:6,18 104:3 107:16 110:23 111:2 112:8 115:18,21,22 116:9,24,25 119:4 125:13 130:23 132:14 137:1 144:4 153:8,13,20 159:10 163:14 164:7 165:4,22

166:3 167:15 167:19 168:19 169:3

**thinking** 81:3 142:3

**third** 106:24 162:17

**thought** 68:19 87:10,24 96:16 108:2,6,8 142:6,16 148:17 150:9

**thousands** 44:11,14,15,19 44:25

**thread** 4:14,17 4:20,23 6:7,10

**three** 15:5,6,7 15:23 44:8 45:4 85:4 106:12 138:11 138:25 169:10

**threw** 111:15

**throw** 111:16 112:1 132:18 132:25 133:12 133:13,16,16 133:19,19,24 133:25

**thrown** 155:8

**tijana** 3:11 6:14 8:11 16:25

**time** 10:1 14:1 31:25,25 34:21

37:1 50:20 59:15,19 61:25 62:7 63:15,17 64:14,16 66:9 66:10,11,14,16 66:17,18,19,22 68:1,23 70:10 70:19,19 71:8 71:15 73:4,10 73:18,21 74:1 77:5,5,7 78:12 78:15,17,20 79:23 80:7,18 80:22 81:16,19 82:18 83:1,5 88:2 89:17 91:17 92:3,22 95:20 97:23 105:21 107:6 108:6 117:19 128:3 130:5 136:14,22 138:21 139:20 141:6,9 142:23 143:5,19 144:7 144:10,11,22 145:12 148:20 149:11,24 150:16 158:6 159:4 160:7,16 160:19 161:9 161:21 162:23 163:2,16 164:12 168:16 168:19 169:11

**[time - trying]**

170:9 171:19
**timeframe**
171:8
**times** 12:10
17:4,6 106:12
**timing** 35:15
81:12
**title** 141:18,23
**today** 9:10,20
10:1 11:3,17
11:25 12:3,19
13:1,14 14:7
16:13 24:18
35:24 38:3
49:4 53:11
77:10,11,12,17
77:20 93:16
94:12 96:24
115:8 130:12
132:17,22
144:16 155:2
166:17
**today's** 12:11
13:4,6 16:19
16:21 17:5
18:20 19:8,9
19:17,24 20:3
20:13 83:19
94:14,21 95:1
95:2,5,8 97:15
134:7,14 149:4
149:4 155:4
169:9
**together** 17:2

**told** 12:15 60:9
66:12 71:9
75:15 77:9
80:11 86:20
87:23 88:5
89:22 90:16
91:19 97:4
98:20 100:18
103:4 107:6
111:17 113:15
116:5 117:21
118:10 121:9
123:20 129:18
133:15,16,18
133:19,24
138:22
**tomorrow**
64:22
**took** 41:5 75:6
85:11 104:17
105:16 110:14
110:17
**top** 64:16,17
65:24,25 69:20
70:5,7 72:13
85:23 104:17
135:25 155:17
**topic** 26:3
103:2 104:6
128:15 151:4
159:13 165:18
166:9
**topics** 12:19
13:6,13,19
167:10,12,16

**total** 104:12
122:24 138:24
**traced** 113:24
114:4,19
**trade** 3:21
**traded** 145:3
**tran** 10:19
**transcript**
169:6 170:14
171:6,20 173:5
173:8
**transcription**
10:20
**transfer** 105:10
**transit** 86:6
**transition** 5:13
125:7,20
**transitioned**
21:19 22:19
23:19 24:23
25:6,20 26:2
26:11,16 42:4
**transitioning**
42:6
**trash** 111:18,20
111:21
**trees** 148:4
**trial** 35:9
**trials** 14:12,13
14:17,21,22
15:3,5,6,7,10
15:12,13,16,17
15:17,18,23
16:1,3 168:13

**trick** 103:8
**tried** 103:21
109:14 143:10
**trouble** 87:9
115:4,10,19,22
116:7,9,20
117:4,24
118:11,20,25
119:18 120:3
120:17 122:9
140:2,4
**true** 56:9,11
84:8 86:7,8
96:14,18,23
101:12 125:5,6
173:8
**truth** 11:19
170:6,6,7
**truthful** 12:3
96:12,13,15,21
97:5 101:9
104:24
**truthfully**
11:25
**try** 11:2,5
112:12 117:2
**trying** 19:18
30:9 35:16
38:1 50:3 59:6
81:4,14 100:25
102:18 103:8
103:11 105:25
114:3 124:15
143:10,11,14
161:18

**tue** 5:22
**tung** 6:8 151:25
  152:3
**turn** 126:3
  139:2,7
**turned** 139:3,5
**twenty** 143:21
**twice** 143:22
**two** 41:14,18
  89:2 95:16
  104:18,25
  105:1,17
  111:13,14
  112:25 121:19
  128:5 131:24
  133:21 136:15
  136:16 137:7
  138:10,24
  139:18,23
  141:14,22
  158:2,24
  160:11 163:15
  166:16 168:14
  168:19
**type** 123:23
  124:3,13
**types** 48:21
**typewriting**
  170:11
**typically** 56:23

**u**

**u.s.** 23:2 33:25
  36:23
**uh** 77:18 79:5

**unable** 62:10
**unblinded** 35:9
**under** 11:18,18
  48:1 57:7,8
  115:8 125:7,25
  127:6,12,23
  128:2 132:17
  132:21 160:22
  161:25 170:12
**underneath**
  131:15
**understand**
  10:21,23 11:17
  12:16,18,25
  13:24 14:5,9
  14:16 16:16
  20:17 25:17
  34:2 35:16,23
  46:7 55:7
  69:10 71:15
  72:11 76:6
  87:13 149:10
  150:4,6,7,8,14
  154:25 155:25
**understanding**
  46:1,6 66:18
  86:10,19 87:14
  87:19 91:3
  93:12,22 96:15
  113:4 116:12
  116:16 133:11
  145:6,10 153:9
  156:1 165:3,3
**understands**
  149:23

**understood**
  75:8 80:7
  115:13 160:21
  168:25
**undertake**
  143:6
**unit** 7:12 59:14
  59:20 130:4,10
**united** 1:1 2:1
  7:15 14:15,24
  15:20 22:12
  23:10,16,22
  24:5,17,24
  25:9,23,25
  34:8 36:6,13
  36:21 150:23
  168:6
**universal** 66:17
**unsure** 54:13
**update** 149:4
**upeony888**
  4:15 5:3,19
**upeony888g...**
  5:6
**upper** 136:6
**ups** 52:13
**use** 16:13 26:8
  26:10,17 28:10
  28:12,15,21,25
  30:3 31:13
  32:19,25 33:1
  33:3,21,24
  34:13,17 35:2
  35:7,17 36:11
  36:17,20,24

  37:14 56:23
  114:25 118:24
  121:5,20,25
  122:3 134:22
  139:7,8 142:12
**used** 13:21
  14:14 26:22
  27:6,12 28:14
  29:5,7,9,22
  30:6,13,13,15
  30:15,17 31:4
  31:16 32:7,9
  33:18 34:5,14
  35:14,23,25
  37:12 44:8
  66:7 108:5
  111:8 114:6
  116:24 143:7
  169:10 171:20
**useful** 42:24
  52:14 56:20
**user** 163:3,4
**uses** 66:16
**using** 14:8 29:1
  30:11,16,19,21
  30:23 37:15
  38:7,9 65:12
  66:23 114:11
  121:11 162:25
**utterly** 103:12
  103:25

**v**

**v** 29:7,8,20
  30:7

**vague**  50:17
  70:10
**vaguely**  70:7
**value**  62:23
  161:1
**various**  49:10
  49:14 51:21
  54:24
**vendor**  20:17
  79:20,25 81:10
  81:15,18 82:19
  86:3 96:7,18
  98:7 101:3,10
  101:14,17,18
  101:21,25
  102:2,3,6,23
  103:4 104:24
  105:3,4,6,6,13
  105:14,15,19
  106:3,8,10,13
  106:14,16,21
  107:2,6,10
  108:7,20
  109:11 112:17
  112:23,24
  113:2,9,14,14
  114:21 115:9
  123:1,10,16,23
  124:9,12
  130:14 132:24
  133:6 134:8,10
  135:3 139:16
  140:25 141:13
  142:5 143:7,12
  143:14,25

  144:1
**vendor's**
  134:17,24,25
**verbal**  21:4
  40:13 120:2,19
  120:21
**verbally**  40:10
  125:3
**verify**  171:9
**veritext**  7:21,23
  169:11 171:14
  171:23
**veritext.com.**
  171:15
**versus**  22:22
  122:23,24
  138:21 145:22
  150:15
**video**  7:9,12
  62:22 96:8
  157:15,21
  158:12,15,19
  159:13,20
  160:3 163:13
  163:17,18,20
  164:5,11
  165:13 166:15
  166:24,25
**videographer**
  3:25 7:5,22
  8:19,23 59:13
  59:18 82:25
  83:4 130:3,8
  160:8,11,15,18
  169:8

**videotaped**
  2:10
**view**  109:4
  148:20
**visit**  138:14,20
**visits**  137:23
  138:8,11,13,24
  138:25
**voice**  80:23
**voicemail**
  80:20 81:1
**voicemails**
  81:10
**volume**  59:14
  59:20 130:4,10
**vpn**  86:25

---

**w**

---

**wait**  74:8 94:7
  99:19
**want**  10:14
  11:9 34:9 37:4
  74:23 102:17
  106:23,25
  108:4,12 115:2
  118:21 119:23
  124:5 129:7
  138:16,18
  154:10 166:5
  168:2,23
**wanted**  15:15
  37:6 39:18
  56:17 62:14
  64:19 66:25
  69:10 70:9
  99:14 107:13

  107:14,16,21
  108:8 114:9
  132:10 156:2
  158:7
**wants**  85:13
**washington**
  136:3
**watching**
  111:10
**water**  94:8
**way**  24:24
  38:24 39:17
  71:14 79:20
  127:6 165:3
  170:20
**we've**  55:16
  104:3 112:21
  114:15
**wearing**  110:8
**wears**  136:22
**website**  5:16
  135:11 136:1
  151:10
**week**  73:1 74:1
  97:20,21,24
  98:2 108:23
  109:10,16
  135:18 143:3
**weeks**  104:18
  104:25 105:1
  105:17
**wei**  3:20,21
  8:16,16 9:23
**weillp.com**
  3:23

**[went - yu]**                                            Page 43

**went** 85:18,18
86:6 104:24
105:3,13,19
108:21 109:15
112:20 113:25
137:5 142:14
144:2,3 159:19
163:23
**whatsapp**
30:17,21,23
31:1
**whispering** 7:8
**white** 3:4 8:6,8
9:7 137:25
138:2,5
**wi** 87:1
**windett** 6:8
152:6
**window** 122:24
138:18,20,22
**windows**
138:17 162:20
162:23,25
**winthrop** 3:16
8:18
**wipe** 108:4
**wished** 98:16
**witness** 4:2
8:25 13:11
19:2,4 35:12
40:17,20 45:14
50:16,18 54:5
58:11,22 70:11
89:1 92:13
97:8 98:10,22

99:8,21 100:2
102:14,15,18
103:9,24 104:5
110:3 112:14
114:15 119:22
133:10 137:4
150:4 153:6
154:9,14
165:15,20
166:5,12 167:9
167:12,15,20
168:10,25
170:4,11 171:8
171:10,12,19
**witness's**
103:18
**word** 46:8
47:14 141:23
159:11
**wording** 81:8
**words** 50:1
102:17 111:23
118:19 123:19
131:12
**wore** 138:2
**work** 22:10,14
22:18,21 23:8
23:11,15 24:1
24:2,6,11,13
27:15 33:7,9
33:22 34:6,11
34:13,14,18
35:2,7,18,22,25
36:4,5,7,11,17
36:20,25 37:14

38:3,12,17
43:1 49:19,21
49:25 52:3
54:6,7 72:11
86:15
**worked** 23:20
23:24,25 33:12
33:14,16,17
45:4 144:22
145:12 168:16
**worker** 137:5,7
137:7
**working** 14:22
33:10 46:23
166:22 168:16
**works** 93:4
123:21 139:4
147:11 152:3
**world** 3:21
15:3
**worry** 86:24
**wrap** 168:20
**write** 48:2
52:13
**writer** 153:21
**writes** 64:1
74:23
**writing** 40:11
41:3 89:25
125:3
**written** 21:4
121:7
**wrong** 116:24
157:3

**wrote** 60:24

**x**

**x** 4:8 5:1 6:1
170:14

**y**

**y** 1:23 2:15
170:3,25
**ye** 147:21
**yeah** 31:12,14
40:7 45:23
50:18 57:7
64:12 67:10
79:2 82:7,23
83:8 84:24
87:4 94:25
103:20 117:1
134:22 144:2,8
144:10,12,14
146:25 147:1
152:25 154:7
155:13 165:6
165:22 166:1,3
166:4 167:23
**year** 64:11,12
143:11,17
144:13 147:21
**years** 44:9 45:4
87:2 139:18
**yep** 49:7,12
**yesterday**
154:21
**york** 3:22
**yu** 1:13 2:10
3:15 4:2,14,16

**[yu - zoom]** Page 44

4:18,19,21,22
4:24,25 5:4,12
5:18 6:10,12
7:13 8:13,15
8:16,18 9:1,16
9:18 13:8
45:24 59:15,21
84:5 86:1 96:6
101:3 130:5,11
130:12 149:22
164:18 169:9
171:5 172:2,24
173:2,4,12
**yu's** 162:19

**z**

**z** 66:17
**zaneta** 3:11 8:9
17:1
**zkim** 3:14
**zoom** 24:19
25:1 30:15
157:5,15,21
158:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.