**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Proposed Class*

*[Additional Counsel listed on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC<br><br>**<u>CLASS ACTION</u>**<br><br>LEAD PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION<br><br>Date: July 27, 2023<br>Time: 1:30 p.m.<br>Dept.: 5 – 17th Floor<br>Judge: Hon. Edward M. Chen |

PUBLIC REDACTED VERSION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................................ii

I.      INTRODUCTION..................................................................................................................1

II.     ARGUMENT ........................................................................................................................3

        A.      Defendants Have Failed To Rebut The Presumption of Reliance...........................3

                1.      Defendants' Concessions Establish That They Have Failed To
                        Demonstrate A Complete Lack of Price Impact .........................................3

                2.      Defendants' Bid To Shorten The Class Period Relies On A Gross
                        Mischaracterization Of Plaintiffs' Claims And Raises Improper
                        Loss Causation Issues That Should Be Rejected At Class
                        Certification...............................................................................................5

        B.      Mr. Coffman's Proposed "Out-of-Pocket" Damages Methodology Has
                Been Accepted By Myriad Courts In This Circuit And Across The
                Country....................................................................................................................10

        C.      Lead Plaintiffs Are Paradigmatic Class Representatives Who Have Amply
                Demonstrated Their Adequacy Over Years Of Vigorous Litigation ....................13

III.    CONCLUSION ...................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
623 F. *Supp.* 3d 470 (E.D. Pa. 2022) ...................................................................................... 7

*Baker v. SeaWorld Ent., Inc.*,
2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ....................................................................... 12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................................ 3

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
2023 WL 2932485 (D. Conn. Apr. 13, 2023) ...................................................................... 3, 4

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
322 F. Supp. 3d 676 (D. Md. 2018) ........................................................................................ 3

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ....................................................................... 11

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2022 WL 1459567 (N.D. Cal. May 9, 2022) ......................................................................... 12

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021) ....................................................................... 13

*Goldman Sachs Grp., Inc. Sec. Litig.*,
579 F. Supp. 3d 520  (S.D.N.Y. 2021) .................................................................................... 4

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) ......................................................................................................... 3, 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ................................................................................................................ 3

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ...................................................................... 12

*Howard v. Liquidity Servs. Inc.*,
322 F.R.D. 103 (D.D.C. 2017) .............................................................................................. 12

*In re Apple Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ........................................................... 3, 10, 11, 12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..................................................................... 4, 8

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014)............................................................................................12

*In re Honest Co. Sec. Litig.*,
   2023 WL 3190506 (C.D. Cal. May 1, 2023).............................................................................15

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) .............................................................................3

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..........................................................................10

*In re Silver Wheaton Sec. Litig.*,
   2017 WL 2039171 (C.D. Cal. May 11, 2017)...........................................................................15

*In re Snap Inc., Sec. Litig.*,
   334 F.R.D. 209 (C.D. Cal. 2019)...........................................................................................12

*In re Twitter Inc. Sec. Litig.*,
   326 F.R.D. 619 (N.D. Cal. 2018) .......................................................................................3, 14

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022).............................................................................13

*In re Willis Towers Watson PLC Proxy Litig.*,
   2020 WL 5361582 (E.D. Va. Sept. 4, 2020) ............................................................................12

*In re: SanDisk LLC Sec. Litig.*,
   2018 WL 4293336 (N.D. Cal. Sept. 4, 2018)...........................................................................12

*Indiana Public Ret. Sys. v. AAC Holdings., Inc.*,
   2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)........................................................................12

*Junge v. Geron Corp.*,
   2022 WL 1002446 (N.D. Cal. Apr. 2, 2022)..................................................................2, 11, 13

*Karinski v. Stamps.com, Inc.*,
   2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) .............................................................................6

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) .................................................................................................10

*Milbeck v. TrueCar, Inc.*,
   2019 WL 2353010 (C.D. Cal. May 24, 2019)......................................................................11, 12

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) .............................................................................................4

*Mulderrig v. Amyris, Inc.*,
   340 F.R.D. 575 (N.D. Cal. 2021) ...........................................................................................15

*Pelletier v. Endo Int'l PLC*,
   338 F.R.D. 446 (E.D. Pa. 2021) ......................................................................................... 9, 10

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ........................................................................... 11

*Pub. Emp. Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
   2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ............................................................................. 12

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ......................................................................... 13

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020) ............................................................................................. 6

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
   2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ....................................................................... 4

*Strougo v. Tivity Health, Inc.*,
   606 F. Supp. 3d 753  (M.D. Tenn. 2022) ............................................................................ 4, 10

*Ward v. Apple Inc.*,
   784 F. App'x 539 (9th Cir. 2019) ........................................................................................... 12

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 ....................................................................................................................... 11

Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association (collectively, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this reply in support of their Motion for Class Certification (ECF No. 149) ("Motion").[1]

## I. INTRODUCTION

Defendants' Opposition is more noteworthy for what it concedes than what it argues. Indeed, Defendants concede that the market for FibroGen securities was efficient for the *entirety* of the Class Period, and that *all four* alleged corrective disclosures resulted in statistically significant price declines. While these concessions alone doom their Opposition, Defendants nevertheless advance three challenges to Plaintiffs' Motion that rely on gross distortions of the factual record or are wholly lacking in legal support. Defendants' arguments are meritless.

*First*, Defendants' primary argument concerns their effort to eliminate the last and final alleged corrective disclosure on July 15, 2021, when the AdCom voted virtually unanimously to reject the Roxadustat NDA due to serious safety concerns—*i.e.*, the precise subject of the fraud. Again, Defendants do not dispute that following this revelation, **FibroGen's stock price plummeted by over 42%**, nor do they dispute that this decline was statistically significant. Instead, Defendants myopically argue that the presumption of reliance has been rebutted because certain sensitivity analyses were released two days earlier, when FibroGen's stock price did not decline. This is nonsense. Indeed, the analyses were published along with a wealth of other AdCom briefing documents—including documents prepared by **FibroGen**—and analysts uniformly noted that, rather than fully informing investors of the serious issues with the drug's safety, the briefing materials were "***very mixed***"; "***murky and difficult to interpret and inconclusive***"; and as a result, "***investors will likely have to wait for additional clarity during the [AdCom]***."

---

[1] Unless otherwise stated, all emphasis is added, and internal citations and quotation marks are omitted. Capitalized terms have the same meanings as in the Motion and operative Complaint (ECF No. 97). "¶_" references are to paragraphs of the Complaint. "P's Ex. _" references are to the exhibits referenced in the accompanying Declaration of David R. Kaplan filed in support of this reply ("Kaplan Declaration"). "Coffman ¶_" references are to the Expert Report of Chad Coffman, CFA (ECF No. 147-2). "Opp. _" or "Opposition" references are to Defendants' Opposition to the Motion (ECF No. 180). "D's Ex. _" references are to the exhibits attached to the Declaration of Tijana M. Brien (ECF No. 180-1). "Zurek ¶_" references are to the Expert Report of Paul Zurek, Ph.D. (D's Ex. 1).

Moreover, the Complaint and evidentiary record make crystal clear that it was the numerous revelations *during the AdCom* that fully revealed "the full extent of Defendants' prior misrepresentations concerning Roxadustat's safety profile." ¶113. The visceral reaction of the market underscores this fact. Indeed, analysts expressly noted that the AdCom's decision to reject the drug was based on "an increased risk" of numerous significant side effects, including death, "*[a]lmost all of [which] were unknown to investors*." Moreover, analysts specifically highlighted that the AdCom revealed new material information to the market, including the fact that despite FibroGen's "*multiple previous assertions*" during the Class Period that the FDA would apply a noninferiority margin of 1.3—a reference to the critical standard by which the drug would be compared to placebo or Epogen—"*the [AdCom] confirmed that the FDA had not agreed to this and in fact preferred 1.25 as an upper-bound*." For these reasons, following the AdCom, market commentators excoriated FibroGen for its "*lack of disclosure*," emphasizing that "*not mentioning serious safety issues to shareholders, and instead letting them learn about problems during an FDA advisory committee meeting, is a permanent red flag for any biotech company*." Accordingly, there is a plethora of evidence readily establishing that the full truth concerning Roxadustat's safety profile was not disclosed until the revelations of the AdCom meeting on July 15, 2021.

*Second*, contrary to Defendants' half-hearted challenge, Plaintiffs' proposed "out-of-pocket" damages model is the *exact same model* used in virtually every PSLRA class action for decades to measure inflationary damages. As Plaintiffs' expert, Chad Coffman, CFA testified, there is nothing about the facts of this case that require departing from this widely used damages methodology—the gold standard in securities litigation. *See Junge v. Geron Corp.*, 2022 WL 1002446, at *9 (N.D. Cal. Apr. 2, 2022) (Alsup, J.) (rejecting Defendants' exact same argument and accepting Mr. Coffman's report and certifying class).

*Third*, Defendants strain the factual record to suggest that the Class should not be certified because Lead Plaintiffs' representatives did not understand certain technical scientific and medical terms during their depositions, and on that basis they should be deemed inadequate. This is baseless. In truth, Lead Plaintiffs are three paradigmatic institutional investors that Congress

specifically envisioned to lead securities class actions, and they have amply demonstrated that they are highly familiar with the pertinent facts and allegations of the case, they understand their roles in protecting the interests of all Class members, and they have actively participated in and overseen the action since its inception. The notion that Lead Plaintiffs could be found inadequate on this record is beyond absurd. *See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 628 (N.D. Cal. 2018) (there is not a single "case in this circuit finding a plaintiff inadequate on this ground").

## II.    ARGUMENT

### A.    Defendants Have Failed To Rebut The Presumption of Reliance

The Supreme Court has consistently held that where a plaintiff has met its initial burden to demonstrate market efficiency and thus invoke the presumption of reliance, the burden shifts to the defendant to rebut the presumption with evidence of a lack of price impact. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263-264, 283-284 (2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)); *see also Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) (defendant must prove a lack of price impact "by a preponderance of the evidence"). To meet this heavy burden, Defendants must do more than merely "challenge [p]laintiff on the persuasiveness of its own price impact claim." *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *10 (N.D. Cal. Feb. 4, 2022). Instead, "the inquiry is whether Defendants have proven a **complete** lack of price impact during the Class Period." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023); *see In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *4 (C.D. Cal. Oct. 6, 2021) ("Defendants bear burden of proving **no** price impact") (citing *Halliburton,* 573 U.S. at 283); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 686–87 (D. Md. 2018) ("[d]efendants must show … that the alleged misstatements caused **no price impact whatsoever**"). Defendants fail to meet their burden here.

#### 1.    Defendants' Concessions Establish That They Have Failed To Demonstrate A Complete Lack of Price Impact

In order to meet their burden, Defendants must prove a lack of both (i) "front-end" impact: that their misrepresentations did not increase or maintain the stock price; and (ii) "back-end" price impact: that the stock price did not decline in response to the alleged corrective disclosures. *See*

*Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 535 (S.D.N.Y. 2021) ("Defendants must show, by a preponderance, that the alleged misstatements had *no* price impact whatsoever."). Defendants have failed on both counts here.

*First*, with regard to back-end price impact, Defendants have conceded that ***all four*** of the alleged corrective disclosures caused large, statistically significant price declines, all of which were caused by negative news ***specific to Roxadustat***. Courts routinely hold that this concession alone is fatal to Defendants' back-end price impact argument and therefore "dooms Defendants' attempt to rebut the presumption of reliance." *Alexion*, 2023 WL 2932485, at *12 ; *Monroe Cnty. Employees' Ret. Sys. v. S. Co.,* 332 F.R.D. 370, 395 (N.D. Ga. 2019) (same); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *5 (M.D. Tenn. Sept. 30, 2022).

*Second*, "when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on [] additional back-end arguments to rebut the *Basic* presumption." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020). Although it is not Plaintiffs' burden to establish price impact, here the Complaint alleges, and Plaintiffs' expert confirms, that FibroGen's stock price experienced statistically significant increases following the December 20, 2018 and November 8, 2019 misstatements concerning Roxadustat's purportedly robust clinical safety data. ¶¶65, 70, 134; Coffman ¶¶58-61 & Ex. 7. This, alone, defeats Defendants' attempt to shorten the Class Period, as the question of what caused the stock price to decline becomes an ultimate merits question for which plaintiffs bear the burden at trial, not class certification.[2] *See, e.g., Strougo v. Tivity Health, Inc.*, 606 F. Supp. 3d 753, 766  (M.D. Tenn. 2022) (collecting cases rejecting defendants' attempt to shorten class period by showing lack of back-end price impact where defendants "ha[d] not attempted to dispute" front-end price impact).

---

[2] Defendants' front-end price impact argument for post-April 6, 2021 statements mischaracterizes Plaintiffs' fraud theory, which asserts that FibroGen's stock price remained partially inflated from pre-April 6, 2021 misstatements, including as a result of Defendants' continued misrepresentations, which was not fully removed until July 16, 2022. *E.g.*, ¶¶222-27, 230-35, 284. Moreover, Defendants do not even address front-end price impact for the vast majority of the 91 sustained misstatements—indeed, their expert, Dr. Zurek, only opined as to whether four of the alleged misstatements caused FibroGen's stock price to increase (Zurek ¶32 n.51; P's Ex. 12 at 33:5-34:23)—providing yet another independent reason to reject Defendants' challenge.

**2.    Defendants' Bid To Shorten The Class Period Relies On A Gross Mischaracterization Of Plaintiffs' Claims And Raises Improper Loss Causation Issues That Should Be Rejected At Class Certification**

Despite their utter failure to establish a lack of price impact, Defendants nevertheless attempt to shorten the Class Period by arguing that the final corrective disclosure should be eliminated from the case.  However, Defendants concede, as they must, that the July 15, 2021 disclosure focused on Roxadustat's safety issues, which were so significant that the AdCom rejected the drug for any patient population whatsoever; trading in FibroGen stock was halted on July 15, 2021 given the market's expectation that material information would be released during the AdCom; and once trading resumed the following day, the Company's stock price plummeted by *over 42%*.  Unable to reconcile these concessions with their desired outcome, Defendants resort to distorting the factual record by inventing, out of whole cloth, that Plaintiffs are actually proceeding under *two* discrete fraud theories: the "manipulation theory," which was purportedly fully disclosed on April 6, 2021 (even though Defendants claim there was no manipulation at all);[3] and the "sensitivity analysis" theory, which was purportedly fully disclosed when the sensitivity analyses were included in the lengthy briefing documents issued two days before the AdCom. Defendants' arguments wholly fail for a number of independent reasons.

*First*, nowhere in the Complaint do Plaintiffs silo their allegations concerning the July 15, 2021 disclosure to the mere release of the sensitivity analyses.  Rather, the Complaint clearly alleges that the crux of the alleged fraud is that Roxadustat's undisclosed safety profile was *far worse than publicly represented*, and that it was not until previously undisclosed information concerning Roxadustat's safety profile was released during the 8-hour AdCom meeting that

---

[3] Defendants claim that the purported "manipulation theory" is a mischaracterization "based entirely on public comments by a handful of outside observers." Opp. 5.  Defendants conveniently ignore that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████  ECF Nos. 153, 181.  Defendants' strained explanation also ignores that these purported "outside observers" were some of the nation's most sophisticated biotechnology market commentators—including prominent nephrologists, medical journals, financial analysts and industry publications—each of whom uniformly excoriated Defendants for "*touting false heart safety data for [Roxadustat] for at least two years*," and that FibroGen's "*data doctoring*" represented "*the worst case of data manipulation in years*."  ¶¶89-101, 115-19.

"investors finally understood the full extent of Defendants' prior misrepresentations concerning Roxadustat's safety profile"—including the fact that it was precisely because of the drug's alarming safety profile that the AdCom *rejected the Roxadustat NDA in its entirety*.  ¶113; *see also* ¶¶102-104 (alleging that the April 6, 2021 disclosure only *partially* corrected Defendants' prior misstatements, and that Defendants continued to misrepresent Roxadustat's safety data and chances for FDA approval even after April 6, 2021).  Numerous courts in this circuit—including cases involving Defendants' own expert—have held that Defendants' "inquiry as to precisely when the truth was fully disclosed to the market is best reserved for resolution on the merits, and *should not result in a narrowing of the class period at class certification* unless the defendant unequivocally disclosed the alleged prior misrepresentation."  *Karinski v. Stamps.com, Inc.*, 2020 WL 6572660, at *7 (C.D. Cal. Nov. 9, 2020) (rejecting similar inappropriate loss causation arguments made by Defendants' expert here, Dr. Zurek);[4] *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020) (rejecting attempt to shorten class period since it "present[ed] loss causation issues that need not be decided at the class certification stage as the issues would be common to the putative class.").

*Second*, extensive evidence shows that the July 13, 2021 briefing materials in no way revealed the full truth about Roxadustat.  Indeed, numerous financial analysts uniformly noted that the briefing materials—which included documents submitted by FibroGen *in support of the drug's approval*—were decidedly "mixed" and "inconclusive," and that as a result, investors would not obtain "additional clarity" and "meaningful read-through" until the AdCom meeting.  For example, Jefferies specifically highlighted that the AdCom briefing documents were "*very mixed and not clearly in support nor completely against approval*," and that "*[safety] data is murky and difficult to interpret and inconclusive*."  P's Ex. 13.  Bank of America similarly emphasized the "*mixed and arguably inconclusive FDA briefing documents*."  P's Ex. 14.  Stifel underscored that the briefing documents "*pointed to several key questions*" regarding the drug's safety, and specifically noted that they "*expect this analysis to be clarified to [the AdCom]*."  P's

---

[4] While the Supreme Court has noted that loss causation and price impact evidence may "overlap," it also cautioned to "resist[] the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits.'"  *Goldman Sachs*, 141 S. Ct. at 1961 n.2.

Ex. 15. William Blair similarly concluded that the AdCom briefing materials did "***not materially change investor perception regarding the outcome of roxadustat's approval***," and that "***investors will likely have to wait for additional clarity during the [AdCom] meeting***," which will "***likely provide more meaningful read-through into the prospect of approval for roxadustat***." P's Ex. 16 at 2. *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 495-496 (E.D. Pa. 2022) (rejecting truth-on-the-market price impact argument where disclosure "was artfully crafted and required additional clarifying information," including third party analysis).[5]

*Third*, both the Complaint and the evidentiary record make clear that numerous critical facts regarding Roxadustat were revealed ***during the AdCom***, which provided essential context for investors to fully understand the gravity of the drug's safety concerns and its true prospects for approval. ¶¶104-08, 110-12. Indeed, Leerink specifically linked the AdCom's virtually unanimous vote to reject the drug to "an increased risk" of numerous serious safety issues—including "death, thrombosis, stent occlusion, serious infections, seizures and [other] adverse events"; that "***[a]lmost all of these imbalances were unknown to investors***"; and that as a result, Leerink "expect[ed] investors to demand changes to the company's board, management, staffing, portfolio, and expenses ***as a result of this complete rejection***." P's Ex. 17. Moreover, while FibroGen had included a lower-dosage "mitigation" strategy in the briefing documents to purportedly address some of these safety concerns, the AdCom revealed that these strategies were only raised with the FDA at the very last minute in a "half-hearted" fashion; had virtually no evidentiary support; and were initially proposed because the doses used in the drug's Phase 3 trials were associated with a ***higher risk of death***.[6] Indeed, Leerink specifically underscored that the AdCom was "not swayed by FGEN's proposals to address safety issues"—which were "***half-hearted***" and "***appeared to be***

---

[5] For this reason, Defendants' observation that some analysts did not change their outlook on Roxadustat's approval prospects between the briefing documents and the AdCom (Opp. 16) is irrelevant here. *Allegheny*, 623 F. Supp. 3d at 497 (finding it of no moment that *some* analysts concluded that the additional clarifying information was "consistent with" their prior analyses).

[6] *See, e.g.*, P's Ex. 18 at 66, 73-78, 84-85, 148; P's Ex. 13 (noting the "[g]ood news" concerning FibroGen's mitigation strategy and that a "lower starting dose could be better"); *see also* ¶105 (it "became clear" during the AdCom that FibroGen's "main strategy . . . was not to defend its Phase 3 trial data, but to present a dose mitigation strategy" that "had never [been] tested" and pursuant to which "the drug would likely lose efficacy").

*an afterthought*"—and that "*[d]uring the AdCom discussion an FDA representative disclosed that the agency had only very recently received the proposals from FGEN, and FDA had not had any time to evaluate their merit*." *Id.* at 2-3. Leerink also noted that during the AdCom, a panelist "asked FGEN the pointed question of *whether giving more of their drug caused more deaths*," and FibroGen "*appeared to confirm this alarmingly negative dose response*." *Id*. at 2; P's Ex. 19 at 256:2-258:8.

Similarly, the AdCom revealed, for the first time, that Defendants had repeatedly misrepresented during the Class Period the "reference" noninferiority margin—the critical standard by which the drug's safety would be judged when compared to placebo or Epogen— which analysts expressly referenced in discussing the AdCom's revelations. Indeed, Cowen specifically highlighted that "*despite multiple previous assertions from FibroGen* that an upper-bound hazard ratio (HR) limit of 1.3 would be approvable, *the [AdCom] confirmed that [the] FDA had not agreed to this and in fact preferred 1.25 as an upper-bound*." P's Ex. 20; *see also* P's Ex. 19 at 166:3-7, 196:5; ¶110 ("[T]here was not an agreement on 1.3.").[7] Likewise, the AdCom revealed for the first time several additional significant issues with FibroGen's data analyses— including that certain analyses were "hope[lessly] confounded" and "fundamentally broken" (*Id.* at 277:4-279:16)—which, as analysts noted, left AdCom members "confused" and "not entirely convinced" due to the "muddied" safety data.[8] *See Chicago Bridge*, 2020 WL 1329354, at *7–8 (rejecting price impact argument and finding that additional information released shortly after initial disclosure "raised new concerns" not already apparent to the market).

Significantly, it was precisely because of the revelations during the AdCom that market

---

[7] Tellingly, neither Defendants nor their expert discuss the transcript of the AdCom meeting itself—the very corrective disclosure Defendants argue had no price impact.

[8] *See* P's Ex. 21 (HC Wainwright: AdCom "*members were confused* with the inconsistency of data interpretations"); P's Ex. 22 (Stifel: AdCom panelists "thought [certain] results were *uninterpretable*"); P's Ex. 23 (Goldman: "challenges in interpreting [] impact on MACE based on the pivotal studies"); P's Ex. 24 at 2 (Mizuho: AdCom "*not entirely convinced* by this rationale and *the disparity muddied the safety data*."); P's Ex. 25 (Raymond James: "AdCom members felt roxadustat's safety profile was *very concerning*" and "overwhelmingly felt supportive evidence for the proposed risk mitigation strategy need to be generated prior to approval"); P's Ex. 26 (Jefferies: "[AdCom] voiced concerns on NDD due to concerns on totality of CV data, mortality," and noting Company's proposal "*would not be assured to mitigate these risks*.").

commentators universally lambasted the Company precisely for its stunning "*lack of disclosure*" (P's Ex. 27), and specifically emphasized that "not mentioning serious safety issues to shareholders, and *instead letting them learn about problems during an FDA advisory committee meeting*, is a permanent red flag for any biotech company." P's Ex. 28 at 2. *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 486 (E.D. Pa. 2021) (rejecting price impact argument on disclosure that "provided successive clarifying information" to earlier information).

*Fourth*, discovery has only reinforced that FibroGen was well aware of these critical undisclosed issues concerning Roxadustat's safety profile and approval prospects, as well as the misleading portrayal of the drug that Defendants had provided to the market. ████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

[9] Defendants' attempts to downplay the devastating factual record fall flat. ████████

████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████. Thus, "[a]t face value, the [July 15] disclosure reveal[ed] much more about" Roxadustat's problems than the briefing documents made available a mere two days earlier. *See Apple*, 2022 WL 354785, at *9 (rejecting bid to shorten class period based on information purportedly revealed by earlier disclosure).

*Lastly*, as discussed above, the overwhelming weight of authority, including cases within this circuit, have outright rejected Defendants' price impact argument under circumstances similar to those here. Tellingly, Defendants cite only a *single* case in which a court found no price impact from certain statements due to the truth already being revealed to the market. Opp. 17 (citing *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023)). But in *Qualcomm*, the court found it was unlikely that the statements about Qualcomm's microchip licensing practices "deceived the market in the way" alleged because there had been "public information available" that "mirrors" certain of the corrective disclosures for ***nearly seven years***—including at the time the misstatements were made. *Id.* at **12-13. By contrast, the *Qualcomm* court rejected the defendants' argument concerning another corrective disclosure—which was similar to Defendants' argument concerning the AdCom here—because it "disclosed far more detail" than was previously known. *Id.* at *15.

Accordingly, Defendants' fact-intensive bid to shorten the Class Period at this stage is, at best, premature and should be rejected. *See Pelletier*, 338 F.R.D. at 477 ("During class certification…a class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market."); *Tivity*, 606 F. Supp. 3d at 766-67 (where defendants are unable to prove "a complete lack of price impact" efforts to shorten the class period fail, as "the question of what caused the stock price to decline is an ultimate merits questions for which plaintiffs bear the burden at trial, not at class certification") (collecting cases).

**B.    Mr. Coffman's Proposed "Out-of-Pocket" Damages Methodology Has Been Accepted By Myriad Courts In This Circuit And Across The Country**

At this stage, Plaintiffs' burden regarding damages is merely to "'show that their damages stemmed from the defendant's actions that created the legal liability' under the proposed damages

model." *Apple*, 2022 WL 354785, at *10 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). There can be no serious dispute that Plaintiffs have met this standard here.

Indeed, each Class member suffered damages traceable to the alleged misstatements and omissions when the truth was revealed on May 9, 2019, March 1, 2021, April 6, 2021, and July 15, 2021. ¶¶263-67. Mr. Coffman described the "out-of-pocket" damages methodology Plaintiffs plan to use to calculate damages on a classwide basis and conducted an event study and regression analysis quantifying abnormal returns related to the fraud. Coffman ¶¶46-78. Mr. Coffman explained how, after common liability questions are adjudicated, the out-of-pocket method can be mechanically applied to measure damages tied to Defendants' liability. *See Id.*; ¶¶93-94. Myriad courts—including numerous courts within the Circuit—have recognized that the precise out-of-pocket method described in Mr. Coffman's report is perfectly suited to Section 10(b) fraud-on-the-market cases. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (Mr. Coffman's "out-of-pocket method will be suitable and fulfills the damages element of Rule 23(b)"); *Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) ("Various courts have considered the same Coffman report as that offered in this case and have found it sufficient"); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (collecting cases and concluding that Coffman's out-of-pocket method was sufficient); *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method … [is] the standard method for calculating damages in virtually every Section 10(b) class action").

Despite this overwhelming weight of authority, Defendants nevertheless mechanically argue—as defendants in securities class actions routinely do—that Mr. Coffman has failed to "commit" to any specific damages methodology and quibble that his report "[f]ails to [e]ngage with the [f]acts of [t]his [c]ase." Opp. 18-20. However, in truth, Mr. Coffman *does* "commit" to a specific damages methodology—namely, the "widely" and "regularly" accepted out-of-pocket method. *See Apple*, 2022 WL 354785, at *12. As Mr. Coffman explained at his deposition, any argument that an expert need delve further into the facts at this stage ignores the very *"point"* that where "there's claims of investors purchasing a[t] artificially inflated prices due to misstatements,

there is a ***standard approach to calculating class-wide damages***." D's Ex. 2 at 104:23-105:6.

Not surprisingly, Defendants' arguments have been routinely rejected by courts in this District and throughout the country. For example, Judge Alsup recently rejected Defendants' exact arguments and authorities in another fraud-on-the-market case where defendants were represented by Cooley. *See Junge*, 2022 WL 1002446, at *5-7 (rejecting arguments that "Coffman [] failed to commit to any damages model" and "failed to 'engage with the facts and nuances of [the] case' in opining about calculation of damages," as they "misapprehend *Comcast's* requirements for class certification"); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *10 (N.D. Cal. May 9, 2022) (certifying class and rejecting four of Defendants' cited authorities); *In re Snap Inc., Sec. Litig.*, 334 F.R.D. 209, 217 & n.4 (C.D. Cal. 2019) (same).[10]

Judge Alsup's decision was no outlier, as ***dozens*** of securities class certification decisions around the nation have rejected the same arguments Defendants recycle here, accepted Mr. Coffman's proposed damages methodology, and granted class certification. *See, e.g.*, *TrueCar*, 2019 WL 2353010, at *4 (rejecting argument that Coffman fails to provide a specific damages model and relies on mere "general techniques"); *In re: SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) (rejecting contentions Coffman's explanation of the damages method was too "short"); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at **13-14 (S.D. Cal. Nov. 29, 2017) (dismissing argument that Coffman "made no effort to form a view as to whether the out-of-pocket model could actually apply to the specific facts of th[e] case"); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (rejecting assertion that Coffman's description of the method is "too crude"); *Pub. Emp. Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.,* 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) (rejecting argument that "Coffman has proposed the same nonspecific theory [ ] at least five times in the past four years"); *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 139-40 (D.D.C. 2017) (similar).

---

[10] Defendants' few remaining cases are inapposite. In *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019), an antitrust action, plaintiffs failed to set forth *any* model of damages. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014), is a deceptive advertising action that is not "apposite or persuasive" in the securities fraud context. *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *11 n.18 (E.D. Va. Sept. 4, 2020). As discussed below, unlike plaintiffs in *Indiana Public Ret. Sys. v. AAC Holdings., Inc.*, 2023 WL 2592134, at *23-25 (M.D. Tenn. Feb. 24, 2023), Plaintiffs here have not advanced a materialization of the risk theory.

Defendants' argument that the July 16, 2021 stock price decline "was not in response to allegedly corrective information" (Opp. 21; Zurek ¶¶48-56 & nn. 86-87) is just a repackaging of their flawed price impact argument (addressed above) and has no bearing on whether Mr. Coffman's model can be used to calculate damages on a class-wide basis. *See Apple*, 2022 WL 354785, at *12 (rejecting defendants' attacks on plaintiffs' damages model based on the purported lack of "fit between an alleged corrective disclosure and a prior alleged fraudulent statement," finding that this argument amounts to "***nothing more than [ ] attack[s] on loss causation, which plaintiff need not show as a condition of class certification***.").

Finally, Defendants are wrong that Plaintiffs assert a "materialization of the risk theory" in connection with the final corrective disclosure (Opp. 21-22, n.11), as that term appears nowhere in the Complaint or Mr. Coffman's report. *See Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *18 (S.D. Tex. Nov. 13, 2019) (citing cases in which courts have "rejected the defendants' attempt to recast the plaintiffs' fraud on the market case as a materialization of risk case" at class certification); *Junge*, 2022 WL 1002446, at *8 ("The possible existence of such a theory does not contravene *Comcast* or defeat predominance"); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *19 (E.D.N.Y. Jan. 11, 2022) (argument that "model must address the distinctions between corrective disclosures and materializations of the risk" is premature "loss causation argument in disguise"). As demonstrated above, highly material information concerning Roxadustat's safety profile was released to the market during the July 15, 2021 AdCom. Moreover, even under a materialization of the risk theory, class certification would still be entirely appropriate, as the record evidence demonstrates that ███████████████████████████ ███████████████████████████████ ██████████████████. ECF Nos. 153, 181; *see Cosby v. KPMG, LLP*, 2021 WL 1828114, at **7–8 (E.D. Tenn. May 7, 2021) ("many courts have certified classes using the out-of-pocket damages model in materialization-of-the-risk cases").

### C.  Lead Plaintiffs Are Paradigmatic Class Representatives Who Have Amply Demonstrated Their Adequacy Over Years Of Vigorous Litigation

Defendants' challenge to Lead Plaintiffs' adequacy under Rule 23(a) is utterly baseless.

Not only are Lead Plaintiffs precisely the type of representative plaintiffs Congress envisioned when enacting the PSLRA—institutional investors with large financial stakes in the Class's claims and the resources and sophistication to capably represent an investor class—but here the record clearly shows Plaintiffs' vigilant representation.  Indeed, Lead Plaintiffs have vigorously prosecuted this action for over two years, including researching, drafting and filing a highly detailed Amended Complaint sufficient to withstand Defendants' multiple motions to dismiss.  In the four months since Lead Plaintiffs filed their Motion, they have twice defeated Defendants' attempts to claw back a ███████████████████████████████████████████ ██████████████████████████████████████ (ECF Nos. 161, 181); brought a pending motion concerning intentional spoliation of evidence by Defendant Yu and FibroGen (ECF No. 185); and, with document discovery still ongoing, have already obtained from FibroGen nearly 700,000 pages of documents above and beyond that obtained by the SEC.  Kaplan Decl. at 2. Moreover, Lead Plaintiffs have searched for, identified, collected and produced a total of 7,439 pages of documents responsive to Defendants' document requests, and representatives for each of the institutional Lead Plaintiffs prepared for and sat for their class certification-related depositions. These facts, and more (Mot. 11-13), amply demonstrate Lead Plaintiffs' adequacy.

In a feeble attempt to challenge adequacy, Defendants claim that Plaintiffs lack a sufficient understanding of the case—primarily by questioning Plaintiffs' ability to recall or understand highly technical scientific and/or medical terms pertaining to Roxadustat's clinical trials.  Opp. 23-25.  In the Ninth Circuit, a class representative "will be deemed inadequate only if she is 'startlingly unfamiliar' with the case." *Twitter*, 326 F.R.D. at 628.  Here, Lead Plaintiffs' sworn deposition testimony shows a thorough understanding of the pertinent facts and allegations of the case that more than meets the applicable requirements.

For example, Baltimore Employees' representative testified that while he was "not a scientist or a doctor" he understood that the instant securities class action alleged that FibroGen misled investors by touting its "new drug for patients with anemia and kidney disease" as "a better drug than the… injectable drug [] those patients were using," while in truth, "there [were] discrepancies in the testing or results of the testing," which, when revealed, "caused the stock price

to plummet." P's Ex. 32 at 214:23-216:4.  Similarly, Philadelphia Pension Fund's representative articulated that FibroGen "manipulat[ed] … the results of the [Roxa] studies" to "ma[ke] it appear that … Roxa was far superior than the existing standard of care, as well as the … placebo," and presented Roxa to the public as being "safer," "more effective," and "easier to use," than the current standard of care.  P's Ex. 33 at 125:4-16; *see also id.* at 129:22-131:23. Likewise, Plymouth County's representative testified that Roxa was used "to treat anemia and … kidney disease," and that FibroGen sought to bring Roxadustat to market to "compete with an existing drug that was deemed risky," but "misled [] investors" with "repeated false and misleading statements about … the safety of [] the drug."  P's Ex. 34 at 43:12-44:6. Moreover, each of the Lead Plaintiff representatives accurately described the Class they seek to represent; the Class Period during which Defendants made their allegedly false and misleading statements; the Defendants by either name and/or position; and Lead Plaintiffs' obligations and responsibilities in serving as a class representative.  *See*, *e.g.*, P's Ex. 32 at 42:25-43:8, 59:24-60:24, 216:1-4; P's Ex. 33 at 21:3-6, 77:3-79:8; P's Ex. 34 at 42:21-44:11, 80:14-81:15.[11]

This detailed and accurate testimony easily satisfies the applicable standard for adequacy. *See, e.g.*, *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *7 (C.D. Cal. May 1, 2023) (plaintiff "articulate[d] the basis for the suit in lay terms and understood the nature of the injury she had suffered").  Accordingly, Defendants' challenge to Plaintiffs' adequacy should be rejected.

### III.   CONCLUSION

Plaintiffs respectfully request that the Court (1) certify this Action as a class action pursuant to Rules 23(a) and (b)(3); (2) appoint Lead Plaintiffs as Class Representatives pursuant to Rules 23(a) and (b)(3); and (3) appoint Saxena White as Class Counsel pursuant to Rule 23(g).

---

[11] While Defendants claim that Plaintiffs "could not identify the defendants in this action" (Opp. 23), this is a gross distortion of the record, as the cited testimony shows that Baltimore Employees' representative identified four of the five Individual Defendants by name and/or position.  D's Ex. 5 at 60:3-15. Regardless, courts in the Ninth Circuit routinely reject arguments that adequacy requires total recall of specific alleged misstatements and full comprehension of technical terms. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 584 (N.D. Cal. 2021) (adequacy where plaintiff "expressed a general understanding of the litigation" but "could not remember [] particulars"); *In re Silver Wheaton Sec. Litig.,* 2017 WL 2039171, at *8 (C.D. Cal. May 11, 2017) ("rudimentary knowledge of the claims asserted suffices"). Notably, Defendants rely on out-of-circuit case law applying a heightened standard of adequacy that has been expressly rejected in the Ninth Circuit. *Id.* ("[T]he Ninth Circuit has expressly rejected the holding of *Berger*.").

Dated: June 23, 2023

Respectfully submitted,

/s/ David R. Kaplan

**SAXENA WHITE P.A.**

David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

Steven B. Singer
ssinger@saxenawhite.com
Kyla Grant (admitted *pro hac vice*)
kgrant@saxenawhite.com
Sara DiLeo (admitted *pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (admitted *pro hac vice*)
jsaltzman@saxenawhite.com
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611

Maya Saxena (admitted *pro hac vice*)
msaxena@saxenawhite.com
Lester R. Hooker (SBN 241590)
lhooker@saxenawhite.com
Dianne M. Pitre (SBN 286199)
dpitre@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Lead Counsel for the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on June 23, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

> */s/ David R. Kaplan*
> David R. Kaplan