# EXHIBIT 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FIBROGEN, INC., SECURITIES   )
LITIGATION                         )
                               ) CASE NO.
                               ) 3:21-cv-02623-EMC
                               )
                               )
                               )
                               )
_____)

REMOTE VIDEOTAPED DEPOSITION OF CHRISTOPHER DIFUSCO, PMK

April 18, 2023

--ooOoo--

JOB NO.:5839266

REPORTED BY: MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423

Page 1

REMOTE VIDEOTAPED DEPOSITION OF CHRISTOPHER DIFUSCO, TAKEN ON BEHALF OF DEFENDANTS, COMMENCING AT 12:01 P.M., TUESDAY, APRIL 18, 2023, AT PHILADELPHIA, PENNSYLVANIA, BEFORE MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423.

APPEARANCES OF COUNSEL:
(ALL PARTIES APPEARING REMOTELY)

FOR PLAINTIFFS:

                    SAXENA WHITE, P.A.
                    BY: LESTER R. HOOKER, ESQ.
                        SCOTT GUARCELLO, ESQ.
                    7777 Glades Road, Suite 300
                    Boca Raton, Florida 33434
                    561.394.3399
                    lhooker@saxenawhite.com
                    sguarcello@saxenawhite.com

                    PILLSBURY WINTHROP SHAW PITTMAN, LLP
                    BY: ELIZABETH CHEEVER, ESQ.
                    Four Embarcadero Center, 22nd Floor
                    San Francisco, California 94111
                    415.983.1154
                    elizabeth.cheever@pillsburylaw.com

Page 2

APPEARANCES OF COUNSEL (CONTINUED):

FOR DEFENDANTS:

COOLEY, LLP

BY: ZANETA J. KIM, ESQ.

AMIE L. SIMMONS, ESQ.

PATRICK E. GIBBS, ESQ.

3175 Hanover Street

Palo Alto, California 94304

650.843.5000

zkim@cooley.com

asimmons@cooley.com

pgibbs@cooley.com

Also Present:

CASSIA LEET - THE VIDEOGRAPHER

DANIEL GRBICH - VERITEXT CONCIERGE

Page 3

the buy and sell transactions during the relevant class    12:26

period.

Q    And when you say "class period," can you

specify the dates for us?

A    Sure.  December 20th, 2018 to July 15th,    12:26

2021.

Q    All right.  And when I say "class period"

during this deposition, you understand that it refers to

time period of December 20, 2018 to July 15th, 2021,

correct?    12:27

A    I do.  I do.

Q    Thank you.

And did you review any documents not

identified or selected by counsel in preparation for this

deposition?    12:27

A    Could you -- could you repeat that?  I'm

sorry.

Q    Sure.

A    I just want to make sure I understood what

you asked.    12:27

Q    Yeah.  Let me try this again.  Did you review

any documents that were not identified or selected by

counsel or, in other words, shown to you by counsel on

your own in preparation for this deposition?

A    Thank you for clarifying.  No, those were    12:27

Page 21

province of the -- the solicitor's office.    02:15

    Q    Got it.

        And you understand that Philadelphia is lead plaintiffs in this action, correct?

    A    We are, I believe, one of the plaintiffs and    02:15 serving as a class representative, yes, on behalf of similarly situated investors, yes.

    Q    And you understand that Philadelphia has sued multiple defendants in this action; is that correct?

    A    Yes.    02:15

    Q    Who are they?

    A    So FibroGen, you know, broadly as a biopharmaceutical company -- I'm going to apologize in advance.  Two of the names are very similar so I may mispronounce one or both of them.  There's a Mr. Conterno    02:15 who was CEO of -- of the company.  There's a Mister -- I'll butcher his name so I'll just say the former -- or the former interim CEO is a named defendant.  There's a Dr. Yu who was the chief medical officer during a large portion of the class period.  There's a Mark Eisner who    02:16 succeeded her as chief medical officer upon her departure and then there is the company's chief financial officer. Again, the names are very similar.  I believe this one maybe a Mr. Cotroneo.  Again, the names are -- are very similar.  To my knowledge, those are the -- the named    02:16

Page 77

defendants in this particular action.    02:17

Q    Great.  Thank you.

Do you know if Philadelphia ever had any direct communication with any of the defendants you just listed?    02:17

A    Not to my knowledge, no.

Q    Okay.  And you testified earlier today that Philadelphia is a class representative and so who does Philadelphia purport to represent?

A    All similarly situated investors who had    02:17 transactions in FibroGen stock during the relevant December 20th, 2018 to July 15th, 2021 stated class period.

Q    And do you understand Philadelphia's duties and obligations to the purported class?    02:17

A    I do.

Q    And what are they?

A    So our duty -- our duties are to represent the class as -- in its entirety, not just, you know, guide or, you know, oversee the case for our own personal    02:18 benefits, for again all similarly situated folks.  That means among other things, you know, supervision or work coordination with counsel on the case, reviewing documents when necessary, sometimes signing documents after they've been reviewed if necessary, doing things    02:18

Veritext Legal Solutions
866 299-5127

like sitting for a deposition today or if required, if    02:18
the case went to trial, perhaps testifying at trial.

We'd be responsible in part for reviewing any proposed settlement offers and signing off on those because ultimately, that would be the -- the plaintiffs' decision, not the -- the outside law firms.    I think that's a good overall synopsis of our duties as a plaintiff and as a class representative in this case.    02:18

Q    Thank you.

And you're aware that Philadelphia filed a    02:19
motion back in June 2021 to represent the putative class
of FibroGen shareholders as lead plaintiffs, right?

A    Correct.

Q    And your counsel is Saxena White, correct?

A    Yes, they are.    02:19

Q    And do you recall when Philadelphia engaged
Saxena White to represent Philadelphia in connection with
this litigation?

A    I don't because that would have been done by    02:19
the -- the law department so I -- I don't know the -- the
date that that decision was entered into or -- or made by
the solicitors office, no.

MS. KIM:  All right.  Miss Simmons, can we
introduce tab nine as Exhibit 56.

///    02:20

Veritext Legal Solutions
866 299-5127

Q    Okay.  Do you have an understanding as to what changes were improper, post hoc changes?

MR. HOOKER:  Objection.  Form.

THE WITNESS:  Yeah, my -- my understanding, again at a high level, was that this drug was presented initially I'll say to the -- to the public at large or to potential users to the market as being safer than -- safer, more effective, I think easier to -- easier to use.  I think the Endogen (phonetic), if I recall right you had to come in, you had to perhaps go to the doctor, get shots.  The drug we're talking about, Roxa, was a pill.  And that by manipulating the data or the results of the studies, it made it appear that FibroGen's product Roxa was far superior than the existing standard of care, as well as the -- you know, placebo or measured against a placebo.

BY MS. KIM:

Q    I don't think that answers my question which related to what changes plaintiffs are alleging are improper.  Let me ask this another way.

A    Okay.

Q    Let's turn back to the complaint that was Exhibit 28.

A    Okay.

Q    All right.  Let's turn to page 61,

Page 125

are no references really to any of the efficacy                    04:58

endpoints, right?

    A    I believe the last sentence, "Thus, there

was, in fact, no proof of any efficacy because at the

dosage level FibroGen used in Phase 3 clinical trials,             04:59

there were far too many safety -- serious safety signals

for Roxadustat to warrant approval for any patient

population, regardless of any black -- black box

warning."

    And that's one of just several times I              04:59

believe that that word is used in the paragraph.

    Q    So there, efficacy is being mentioned in

relation to dosage level, right, and safety signals and

not efficacy endpoints, per se?

    (Document reviewed by the witness.)                  04:59

    THE WITNESS:  That -- I believe that's correct,

yes.

BY MS. KIM:

    Q    Okay.  Let's turn to safety.  So what safety

data do you believe defendants manipulated?                        04:59

    MR. HOOKER:  Objection.  Form.

    THE WITNESS:  My understanding, again broadly, is

that the data or the safety signals that were given off

or came from this study showed that there were at least

as many negative events, negative health events, if not            05:00

Page 129

more than if patients remained on EPOGEN.  I -- I can't `05:00` state, you know, specific line by line what particular piece of data was manipulated but at a broad level, my understanding is that the data was manipulated in such a way to make it appear that those health -- those `05:00` detrimental health consequences occurred far less often than they actually did.

BY MS. KIM:

Q    Okay.  So on paragraph 144, it states the safety data defendants touted was based on defendants' `05:01` own improper post hoc manipulation of the data, right?

A    Yes, that's what it states.

Q    And we've been kind of throwing around the word "manipulation" or "manipulating the data" kind of loosely, but can you describe what you mean by "post hoc `05:01` manipulation?"  So how did -- sorry.  I'll let you answer that before I ask.

MR. HOOKER:  Objection to form.  Asked and answered.

THE WITNESS:  Again, I don't -- I don't know the `05:01` specifics of every piece of data that was available or in this study, but my understanding of the complaint or my understanding of the allegations is that the company focused in on the data that made the drug look the most -- that put the drug in the most positive light and `05:02`

Page 130

ignored or otherwise downplayed the data that would have    05:02

shown that it was no better, if not worse than EPOGEN.

BY MS. KIM:

    Q    Do you have an understanding as to how the

company picked the data that it was going to disclose?    05:02

        MR. HOOKER:   Objection.   Calls for speculation.

        THE WITNESS:   Not -- not with a -- not with a high

level of -- of specificity, no.   I understand broadly

that that's what the company is alleged to have done.

BY MS. KIM:    05:03

    Q    And are you aware -- do you have an

understanding as to what plaintiffs' allegations are as

to what post hoc manipulations were?

        MR. HOOKER:   Objection to form.   Asked and

answered.    05:03

        THE WITNESS:   The post hoc manipulations of the

data, as I said generally speaking, what my understanding

of the allegations are is that the post hoc changes or

the post hoc manipulations were designed or were

presented in such a way to make the drug appear better    05:03

and safer than it actually -- actually was.   And that

data that suggested -- suggested the opposite of that was

ignored or downplayed by the company, by FibroGen.

        MS. KIM:   Okay.   Thank you.

            So I think we've been going for an hour, so    05:04

Page 131