COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
TIJANA M. BRIEN (286590)
(tbrien@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
ZANETA J. KIM (317844)
(zkim@cooley.com)
AMIE L. SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:     +1 650 843 5000
Facsimile:     +1 650 849 7400

CAITLIN MUNLEY (*Pro Hac Vice*)
(cmunley@cooley.com)
ALEXANDRA EBER (*Pro Hac Vice*)
(aeber@cooley.com)
1299 Pennsylvania Ave., N.W., Suite 700
Washington, DC 20004-2400
Telephone:     +1 202 842 7800
Facsimile:     +1 202 842 7899

Attorneys for Defendants
FibroGen, Inc., Enrique Conterno, James Schoeneck,
Mark Eisner, and Pat Cotroneo

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**FIBROGEN'S OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS**<br><br>Date:   August 31, 2023<br>Time: 1:30 p.m.<br>Dept.: 5 – 17th Floor<br>Judge: Hon. Edward M. Chen |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

        A.      FibroGen and Roxadustat's Phase III Studies. .................................... 2

        B.      FibroGen Shares Its Phase III Results. ................................................ 2

        C.      FibroGen NDA Submission. ................................................................. 4

        D.      FDA Extends the PDUFA Date and Convenes an AdCom. ................. 5

        E.      Dr. Yu's Departure From FibroGen. .................................................... 6

        F.      New Management Learns About the Stratification Factor Changes. ..... 8

        G.      The AdCom Meeting and Decision. ...................................................... 9

        H.      FibroGen's Collection and Production of Documents ........................ 10

III.    ARGUMENT ................................................................................................... 11

        A.      There Was No Duty to Preserve in March 2021. ............................... 12

                1.      The AdCom Announcement did not Trigger a Duty to Preserve............. 12

                2.      No Duty to Preserve During New Management's "Investigation"........... 14

                3.      Regardless, FibroGen Took Reasonable Steps to Preserve Dr. Yu's ESI. ..................................................... 16

        B.      Plaintiffs Have Not Demonstrated That Evidence Was Lost. .............. 17

        C.      Plaintiffs Have Not Demonstrated an Intent to Deprive Securities Litigation Plaintiffs. .................................................... 20

        D.      Dr. Yu's Post-Employment Conduct Should Not Be Imputed to FibroGen. ......... 21

        E.      Plaintiffs' Requested Sanctions Are Unwarranted. ............................ 23

IV.     CONCLUSION ................................................................................................ 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aberin v. Am. Honda Motor Co.*,
  2017 WL 6493095 (N.D. Cal. Dec. 19, 2017) .................................................................. 12, 13

*Anheuser-Busch, Inc. v. Natural Beverage Distrib.*,
  69 F.3d 337 (9th Cir. 1995) .......................................................................................................... 24

*Apple Inc. v. Samsung Elecs. Co.*,
  888 F. Supp. 2d 976 (N.D. Cal. 2012) ............................................................................... 11, 12

*Belew-Nyquist v. Quincy Sch. Dist. No. 144*,
  2020 WL 6845934 (E.D. Wash. Nov. 20, 2020)........................................................................ 18

*Best Label Co. v. Custom Label & Decal, LLC*,
  2022 WL 1525301 (N.D. Cal. May 13, 2022) .................................................................... 12, 18

*Burris v. JPMorgan Chase & Co.*,
  566 F. Supp. 3d 995 (D. Ariz 2021)...................................................................................... 12, 24

*Chinitz v. Intero Real Estate Servs.*,
  2020 WL 7389417 (N.D. Cal. May 13, 2020) .................................................................... 11, 20

*Clear-View Techs., Inc. v. Rasnick*,
  2015 WL 2251005 (N.D. Cal. May 13, 2015) .......................................................................... 23

*Colonies Partners, L.P. v. Cnty. of San Bernardino*,
  2020 WL 1496444 (C.D. Cal. Feb. 27, 2020)..................................................... 12, 17, 22, 23

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,
  2022 WL 16551632 (E.D. Cal. Oct. 31, 2022) ........................................................................ 16

*Doubleline Capital LP v. Odebrecht Fin., Ltd.*,
  2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) ................................................................... 13, 20

*E.E.O.C. v. Fry's Elecs., Inc.*,
  874 F. Supp. 2d 1042 (W.D. Wash. 2012).................................................................................. 17

*Envy Haw. LLC v. Volvo Car USA LLC*,
  2019 WL 1292288 (D. Haw. Mar. 20, 2019)............................................................................. 17

*Facebook, Inc. v. OnlineNIC Inc.*,
  2022 WL 2289067 (N.D. Cal. Mar. 28, 2022)........................................................................... 24

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*,
  2016 WL 5870218 (N.D. Cal. Oct. 7, 2016).............................................................................. 11

*Fourth Dimension Software v. DER Touristik Deutschland GmbH*,
  2021 WL 5919821 (N.D. Cal. Dec. 15, 2021) .......................................................................... 23

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

*FTC v. Lights of Am. Inc.*,
2012 WL 695008 (C.D. Cal. Jan. 20, 2012) ............................................................................. 15

*Gemsa Enters., LLC v. Specialty Foods of Ala., Inc.*,
2015 WL 12746220 (C.D. Cal. Feb. 10, 2015).......................................................................... 22

*Glaukos Corp. v. Ivantis, Inc.*,
2020 WL 5914552 (C.D. Cal. Jul. 30, 2020) ............................................................................ 14

*GN Netcom, Inc. v. Plantronics, Inc.*,
2016 WL 3792833 (D. Del. July 12, 2016)..................................................................... 16, 22, 24

*In re Google Play Store Antitrust Litig.*,
2023 WL 2673109 (N.D. Cal. Mar. 28, 2023) .......................................................................... 24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
2022 WL 18399982 (N.D. Cal. Nov. 4, 2022)........................................................................... 20

*In re Hitachi Television Optical Block Cases*,
2011 WL 3563781 (S.D. Cal. Aug. 12, 2011) ........................................................................... 21

*Hunters Cap., LLC. v. City of Seattle*,
2023 WL 184208 (W.D. Wash. Jan. 13, 2023).......................................................................... 24

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006)..................................................................................................... 24

*Lofton v. Verizon Wireless (VAW) LLC*,
308 F.R.D. 276 (N.D. Cal. 2015) .............................................................................................. 23

*Lorenzo v. S.E.C.*,
139 S. Ct. 1094 (2019) .............................................................................................................. 22

*Montoya v. Orange County Sheriff's Department*,
2013 WL 6705992 (C.D. Cal. Dec. 18, 2013) .......................................................................... 17

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) ........................................................................................ 22

*Nursing Home Pension Fund v. Oracle Corp.*,
254 F.R.D. 559 (N.D. Cal. 2008) ........................................................................................ 12, 22

*Oracle Am., Inc. v. Hewlett Packard Enters. Co.*,
328 F.R.D. 543 (N.D. Cal. 2018) ........................................................................................ 17, 19

*Ryan v. Editions Ltd. W., Inc.*,
786 F.3d 754 (9th Cir. 2015)..................................................................................................... 17

*Valley Eng'rs Inc. v. Elec. Eng'g Co.*,
158 F.3d 1051 (9th Cir. 1998).................................................................................................... 24

*Waymo LLC v. Uber Technologies, Inc.*,
2018 WL 646701 (N.D. Cal. Jan. 30, 2018) ............................................................................. 14

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

*WeRide Corp. v. Huang*,
    2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) ........................................................ 22, 25

*Wisk Aero LLC v. Archer Aviation Inc.*,
    2023 WL 2277112 (N.D. Cal. Feb. 28, 2023).................................................................. 21

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011)....................................................................................... 22

*Zucchella v. Olympusat, Inc.*,
    2021 WL 8317028 (C.D. Cal. Dec. 20, 2021) ................................................................ 12

**Other Authorities**

Federal Rule of Evidence 502(b) ............................................................................................. 15

FRCP
    37(e) ........................................................................................................................... 11, 17
    37(e)(1)............................................................................................................................. 11
    37(e)(2).......................................................................................................... 11, 21, 23, 25

Rule 37 ..................................................................................................................................... 19

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv

## I.    INTRODUCTION

Plaintiffs survived the pleading stage by alleging facts that they cannot now prove. But this failure of proof has nothing to do with the loss of any evidence. Rather, many of Plaintiffs' key allegations are affirmatively and demonstrably false. Facing that reality, Plaintiffs now want the Court to let them skip over the entire pre-trial and trial process, preclude Defendants from putting on a defense, and simply enter judgment in Plaintiffs' favor – regardless of the underlying facts and evidence – all based on the loss of a single computer hard drive and some hard copy binders, weeks before any litigation was filed. Plaintiffs' Motion for Spoliation Sanctions (the "Motion") does not come close to justifying any sanctions at all, much less the draconian sanctions Plaintiffs seek.

Plaintiffs are seeking the most severe sanction possible – a default judgment – even though:

- Plaintiffs have not cited a single case imposing a duty to preserve based on facts remotely analogous to the circumstances that existed when Dr. Yu's hard drive was destroyed and/or unspecified binders were disposed of as part of Dr. Yu's transition from FibroGen.

- Plaintiffs have made no real effort to show that any evidence was actually lost – they want the Court to assume it, which the law does not allow.

- Plaintiffs have cited no evidence to suggest that either the hard drive or the binders were destroyed with the necessary intent to deprive Plaintiffs (or any other potential securities plaintiff) of information for use in this litigation (which, again, had not yet been filed).

- Plaintiffs have cited no legal basis to hold FibroGen responsible for Dr. Yu's decision to destroy her laptop's hard drive despite FibroGen's express instruction to return it without deleting anything, at a time when Dr. Yu was no longer an employee (and certainly not a "C-level executive" as Plaintiffs claim).

- Far from proving that the sanctions they seek are the least drastic sanctions needed to cure any prejudice, Plaintiffs have failed to show any prejudice at all, and instead ask the Court to simply assume it.

The evidentiary record available to Plaintiffs in this case is enormous. It includes (among many other things) millions of emails from key custodians, including Dr. Yu, FibroGen's former CEO, Tom Neff, and the biostatisticians, regulatory, and clinical teams involved in Roxadustat's regulatory submission. It also includes all raw clinical data and analyses that were submitted to the FDA and shared with investors, draft public disclosures, and all communications with, and materials submitted to, the FDA (including the 20 million page regulatory submission). There is, in short, no reason to believe that Plaintiffs will be forced to present their case with incomplete or spotty evidence, which is the only circumstance that could possibly justify the devastating sanctions

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

that Plaintiffs' Motion seeks.  Indeed, based on the Motion, there is no reason to believe that Plaintiffs are missing any evidence at all.  Simply put, there is no showing of spoliation by anyone, and there is no evidence of harm that needs a remedy.  Plaintiffs' Motion should be denied.

## II.  STATEMENT OF FACTS

### A.  FibroGen and Roxadustat's Phase III Studies.

FibroGen, Inc. is a pharmaceutical company that has developed Roxadustat, a drug designed to treat anemia in patients with chronic kidney disease ("CKD").  (Ex. D[1] at -322.)  Between 2012 and 2018, as FibroGen sought global regulatory approval for Roxadustat, FibroGen and its development partners (Astellas and AstraZeneca) conducted Phase III trials around the world.  (Ex. AA at 31-33; Ex. D at -318.)  For U.S. and European approval, FibroGen and its partners conducted eight trials, six of which would directly support a New Drug Application ("NDA") in the U.S.  (Ex. BB at 14.)  After the Phase III trials had been designed, the FDA became increasingly concerned about the cardiovascular ("CV") risks associated with the current standard of care ("ESAs"), and so asked FibroGen to evaluate it. (Ex. A at 6; Ex. AA at 31-32.)  As designed, the studies were not large enough to adequately measure such risk (since CV events are quite infrequent), and so with the FDA, FibroGen and AstraZeneca developed a plan to pool the results of multiple studies.  (*See* Ex. A at 6; Ex. G at 390-91.) As part of this process, FibroGen submitted to the FDA pooled statistical analysis plans ("PSAPs"). (Ex. B; Ex. C.)  Among other things, the PSAPs indicated that FibroGen would analyze data using both stratification factors specified in each study's individual statistical analysis plan and "other common stratification factors."[2]  (Ex. B at 35; Ex. C at 19.)

### B.  FibroGen Shares Its Phase III Results.

[1] References to the "Autrand Decl.," "Eisner Decl.," "Gibbs Decl.," "Brien Decl.," "Dwyer Decl.," and "Lowenstein Decl." refer to the declarations submitted in support of this Opposition.  The "Yu Decl." refers to the Declaration of Peony Yu in Opposition to Lead Plaintiffs' Motion for Spoliation Sanctions.  Exhibits A-CC are attached to the Brien Decl. and references to "Pls. Ex." are to the exhibits attached to the Kaplan Declaration.

[2] As relevant here, stratification factors are used as an input in computer-generated statistical models that calculate the ultimate results.  They can control for variables that could influence the overall study and provide more accurate results.  For example, if men are more likely than women to experience heart attacks, stratifying by "sex" may help to control for any skewed results not necessarily attributable to the study drug.  Stratification factors are not used to *exclude* any patients from the analysis population.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

In December 2018, the first day of the Class Period, FibroGen issued a press release disclosing "topline" (i.e., high-level) efficacy result from three Phase III trials. (¶ 50.) At this point, however, the CV safety data was still under independent review and had not yet been adjudicated, and FibroGen had not yet pooled the results of separate studies. The fully adjudicated CV safety data was unblinded in April 2019. In May 2019, FibroGen announced "topline" results from the pooled CV safety analyses. (Ex. D.) FibroGen made clear to investors that it would be discussing the analytical methods with the FDA; its analyses were still ongoing; it would be conducting multiple different analyses of the cardiovascular safety data; and it expected the FDA to evaluate Roxadustat using a "totality of evidence" standard, which meant that no single analysis would be outcome determinative. (Ex. D at 2-4; Ex. E at -020, -052-53; Ex. F at -106 (explaining Company would continue to look at the data from "different angle[s]" using "different cut[s]").)

In November 2019, in connection with the American Society of Nephrology Conference ("ASN"), FibroGen presented detailed results from (among other things) certain pooled cardiovascular safety analyses (the "November 2019 Results"). The results shared at ASN were disclosed in press releases from both FibroGen and AstraZeneca. (Ex. H; Ex. I.) FibroGen and AstraZeneca shared the numerical results of "hazard ratios" and "confidence intervals" for certain pooled cardiovascular safety analyses, as well as their conclusions about what those results meant. (*Id.*) But FibroGen also made clear these were just some of many analyses being performed and submitted. (Ex. J at 28, 57 ("additional supportive analyses and sensitivity analyses as well as subgroup analyses will also be included in the NDA and MAA.").) Market observers understood that the November 2019 Results reflected results from just one of several different analyses, and that results of other analyses might be more or less favorable than those disclosed in November 2019. (Ex. K ("[I]t's quite clear that there is an enormous amount of data"); Ex. L ("we think there are still some aspects of the data that will continue to drive debate"); Ex. M ("the on-treatment MACE analysis for NDD patients likely looks worse that ITT").) Analysts (and FibroGen) were expecting the FDA to convene an Advisory Committee ("AdCom"), noting this would paint a more complete picture of Roxadustat's safety profile and approval prospects. (Ex. K ("we still expect an Ad Com panel to be held"); Ex. L ("we won't have clarity . . . until FDA briefing documents for an

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

3

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

Ad Com panel are released next year"); Ex. O (anticipating "an inevitable AdCom").)

**C.    FibroGen NDA Submission.**

FibroGen submitted the NDA in December 2019. (Ex. AA at 32.) In the Integrated Summary of Safety ("ISS"), which was the portion of the NDA that summarized the pooled CV safety results, FibroGen included a section titled "Changes in Stratification Factors." (Ex. N at 3.) In it, the Company explained that for the analyses the Company was submitting as the primary analyses, changes had been made to stratification factors "following database lock" (i.e., after unblinding). (*Id.* at 38-39.) The submission walked through the various changes that had been made and the reasons for each change. (*Id.*) For example, the NDA described that race (black v. non-black), body mass index (BMI), and sex had been added as stratification factors because all three presented risk factors for cardiovascular events. (*Id.* at 39-40.) The ISS also explained that analyses using the "pre-specified" stratification factors had been performed and were included as "sensitivity analyses." (*Id.* at 38-39; *see, e.g.*, ¶¶ 80-81.)

The PDUFA date for the NDA (the date by which the FDA was to issue a decision) was set for December 20, 2020. (Ex. P at -351.) Over the next 12 months, FDA staff sent positive signals about the prospects for Roxadustat's approval, including by expressing their agreement that Roxadustat had demonstrated "consistent non-inferiority" compared to ESA in DD and was "comparable to placebo" in NDD. (Ex. Q at -446.) Throughout 2020, the FDA also engaged in labeling negotiations with FibroGen (which they would not have done, if they did not intend to approve). (*See e.g.*, Ex. R (summarizing August 2020 FDA labeling comments); Ex. T (Dec. 2020 draft label, including language "the risk of MACE with [Roxadustat] was comparable to placebo")). This, together with the fact that FDA had not scheduled an AdCom (even though FibroGen had advised investors to expect one), made everyone optimistic about approval. (Ex. S at -720 ("As we approach [the PDUFA date], an adcom meeting has become increasingly unlikely. The company would not comment on the significance of this decision by the agency, but we interpret it as a positive signal.").) In the meantime, Roxadustat had already obtained regulatory approval in two large pharmaceutical markets: China and Japan. (Ex. J at 25.)

In the period before and shortly after the submission of the NDA, FibroGen underwent

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

4

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

significant executive turnover. Founder and long-time CEO Thomas Neff unexpectedly passed away in August 2019. (¶ 5 n.1.) Board member, James Schoeneck, served as interim CEO from August 2019 to January 2020. (¶ 21.) Enrique Conterno took over as CEO in January 2020 and continues to hold that position. (¶ 19.) In December 2020, as the PDUFA date approached, FibroGen's long-time Chief Medical Officer, Dr. Peony Yu was replaced in that position by Dr. Mark Eisner (who remains in that position). (Pls. Ex. 20 at 21:7-13; ¶ 26.) Dr. Yu remained employed by FibroGen as Executive Advisor to the CEO until March 15, 2021 and thereafter stayed on as a consultant until August 2021. (Pls. Ex. 20 at 21:14-24.)

### D.    FDA Extends the PDUFA Date and Convenes an AdCom.

Given the lack of an AdCom and other positive signals from FDA, FibroGen and market observers alike were surprised when, in December 2020, the FDA extended the PDUFA date by three months. (*See* Ex. U (noting they were "surprised by the timing of the request.").) FibroGen was surprised again in late February 2021,

After learning that the FDA was considering an AdCom meeting, FibroGen consulted with its long-time outside counsel at Cooley on disclosure issues. (Gibbs Decl. ¶¶ 5-7.) The Cooley team that advised FibroGen at this time included members of the securities litigation group, who frequently counsel clients about disclosure issues outside the litigation context. (*Id*. at ¶¶3-7.) Contrary to Plaintiffs' suggestion, the involvement of those lawyers as part of the Cooley team did

---

[3] Plaintiffs' characterization of the FDA's stated reasons for the AdCom (Kaplan Decl. ¶ 7; Pls. Exs. 3 & 4) is thus deeply misleading. Defendants move to strike the Kaplan Declaration because it misrepresents facts, mischaracterizes exhibits, offers testimony outside of Mr. Kaplan's personal knowledge, and is an improper attempt to circumvent page limitations.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

not mean that FibroGen expected any litigation to arise, and in fact, the subject matter of Cooley's advice at this time was disclosure, not litigation. (*Id*. at ¶7) And as it turned out, although FibroGen's stock price declined after FibroGen disclosed the AdCom, no securities lawsuits were filed in the wake of that disclosure, and only one plaintiffs' law firm issued a single press release purporting to announce an "investigation." (*Id*. at ¶¶9, 12.) That particular firm had issued at least 762 such press releases in the year preceding this announcement relating to stock price declines for 248 companies, but filed lawsuits against only 83 of those companies. (*Id*. at ¶11.)

And while analysts were surprised about the timing of the AdCom (as was the Company), they did not, as Plaintiffs claim, "raise[] 'red flags' about the integrity of the Roxadustat safety data." (Mot. at 4.) One analyst noted his belief that the FDA's decision to convene the AdCom supported his pre-existing views about Roxadustat's data (*not* data integrity). (Pls. Ex. 7.) Others acknowledged that the calling of the AdCom was likely driven by "the checkered history of ESA safety and label revisions" which was causing the FDA to take "cautious measures this time" but noted that they "remain confident in roxa's clinical profile and its approval." (Pls. Ex. 6; *see also* Ex. V ("approval seems very likely"); Ex. W ("While it is undesirable to receive an Adcom notification this late in the review cycle . . . it is just a 4-6 months delay in commercialization").) And others noted that "[i]t is hard to escape the notion that the agency may have been influenced by the various citizens' petitions filed by various constituencies (including Amgen and other EPO users and manufacturers) [i.e., FibroGen's competitors]." (Pls. Ex. 8; *see also* Ex. X.)

### E.   Dr. Yu's Departure From FibroGen.

Dr. Yu's role as Executive Advisor had been scheduled to end on March 15, 2021 and she would be moving to a consulting role. (Pls. Ex. 20 at 21:14-21.) ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The day after Dr. Yu's last day, the Company requested that Dr. Yu return her laptop. (Pls.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

6

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

Ex. 27.)



On March 29, 2021, Dr. Yu took her laptop to a vendor, and instructed him to replace the hard drive with a new one and destroy the original one, before sending the laptop back to FibroGen. (Pls. Exs. 39, 43.)  FibroGen received Dr. Yu's laptop on March 31, 2021.  (Pls. Ex. 84.)

Likewise, in connection with her departure, on March 14, 2021, Dr. Yu asked her former assistant to pick up hard copy documents in Dr. Yu's possession.[4]  (Pls. Ex. 20 at 84:2-85:19; Pls. Ex. 50.)  These documents consisted of hard copies of electronic files that Dr. Yu had asked her assistant (and, at times, others at FibroGen) to print for her.  (Autrand Decl. ¶¶ 3-4.)  Dr. Yu had a habit of printing out documents that so that she could review them in hard copy form.  (Id. ¶ 4.)  When Dr. Eisner took over as CMO, he was asked whether he wanted the hard copy versions of these documents.  (Id. ¶ 5.)  He responded that he preferred to work with electronic documents and would not be needing the hard copy versions.  (Id.)  Dr. Yu's assistant shredded the documents in question by going through each binder and placing each document into a shred bin.  (Id. ¶ 6.)  She did not see any handwritten notes on the documents.  (Id.)  Nor were there any types of notebooks or notepads.  (Id.)  As for Dr. Yu's cell phone, Dr. Yu had negotiated the right to keep it.  (Pls. Ex.

---

[4] Plaintiffs made no effort to request any information from FibroGen about the issue of the hard copy documents – they did not even mention it to FibroGen.  Their reliance on the hard copy documents appears to be nothing more than a transparent attempt to pin some form of alleged wrongdoing on FibroGen's current employees, given that Plaintiffs concede that FibroGen undertook significant efforts to obtain the return of Dr. Yu's laptop.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

7

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

20 at 125:19-127:23; Pls. Ex. 17 at -497.)  This cell phone was preserved, collected, and produced by Dr. Yu's counsel.  (Pls. Ex. 41; *see also* Pls. Ex. 20 at 31:3-23.)

**F.      New Management Learns About the Stratification Factor Changes.**

Meanwhile, on March 11, 2021, as preparations were underway for the recently announced AdCom, AstraZeneca informed FibroGen's new Chief Medical Officer, Dr. Eisner, that the pooled CV analyses designated as "primary" in the NDA (the results of which had been disclosed by FibroGen in November 2019) used certain stratification factors that were modified after data had been unblinded.  (Pls. Exs. 11, 16; Eisner Decl. ¶ 3.)  These were the same "changes in stratification factors" that had been noted in the ISS portion of the NDA, as discussed *supra* at II.C.  Dr. Eisner requested further information and met with AstraZeneca on March 15, 2021.  (Ex. Y; Pls. Ex. 12; Eisner Decl. ¶ 3.)  Dr. Eisner, who believed that the "primary" analyses should have been those that used stratification factors specified in each study's individual statistical analysis plans (rather than the modified stratification factors), discussed the matter with FibroGen's CEO on March 24, 2021, and then the two of them discussed the matter with FibroGen's General Counsel on March 25, 2021.  (Eisner Decl. ¶ 4.)  Coming out of these discussions, FibroGen's in-house counsel consulted with outside counsel at Cooley regarding potential disclosure issues, met with independent counsel at Arnold & Porter to discuss the possibility of an internal review, and prepared to update FibroGen's Board of Directors.  (Lowenstein Decl. ¶ 3.)

FibroGen's Board was informed about the changes to the stratification factors at a meeting on March 29, 2021, where the Board consulted with in-house and outside counsel and discussed potential next steps.  (*Id.* ¶ 4.)  The Board agreed to meet again before making a decision about any public disclosure.  (*Id.*)  On April 2, 2021, Dr. Eisner met with members of the FDA to discuss the labeling of the analyses and FibroGen's plan to switch the labels for the primary and sensitivity analyses.  (Pls. Ex. 44 at 739-43.)  The FDA expressed its agreement that the results between the two analyses were comparable.  (Eisner Decl. ¶ 5.)  On April 3, 3021, FibroGen's Board met again and discussed issuing a press release clarifying the pooled cardiovascular safety analyses.  (Lowenstein Decl. ¶ 5.)  On April 6, 2021, the press release was issued.  (Ex. Z.)  Dr. Yu (who was no longer employed by the Company and had transitioned into a consulting role) had no

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

involvement in these discussions and was not aware the April 6, 2021 press release was even being contemplated, until it was publicly-issued. (Yu Decl. ¶24.)

On April 6, 2021 — the same date as the press release — FibroGen instructed certain employees (as well as Dr. Yu) to preserve documents relating to Roxadustat. Six days later, on April 12, 2021, the first of several securities class action lawsuits was filed.

### G.     The AdCom Meeting and Decision.

The AdCom met on July 15, 2021. The AdCom voted against approval of Roxadustat, but the votes were not unanimous — several members of the AdCom voted to approve Roxadustat for certain patients and multiple members expressed that it was a difficult choice to vote against approval. Importantly, however, the AdCom did not express any concerns about FibroGen's use of stratification factors or about its choice of "primary" versus "sensitivity" analyses. (*See generally* Ex. AA.) In fact, in the materials the FDA submitted to the AdCom, the FDA commented that the analysis was "qualitatively similar regardless of the stratification factors." (Ex. BB at 47.) Moreover, both the FDA and the AdCom believed that the analyses that were subsequently designated as "primary" (those disclosed on April 6, 2021) also supported a finding that Roxadustat's cardiovascular safety was comparable to placebo and ESAs (and therefore based on the primary analyses could have been safe enough to approve). (Ex. BB at 47-50; Ex. AA at 169-71 ("results suggest no significant difference in the risk of MACE"); *id.* at 309 ("based on the FDA-agreed analysis . . . the data look reassuring for MACE and for all-cause mortality"); *id.* at 321-22, 329 ("[t]he primary analysis suggested neutrality for both MACE as well as all-cause mortality").)

Instead, the FDA and AdCom focused on the results of certain other "sensitivity analyses," which left both FDA and AdCom uncertain about the totality of the evidence. (Ex. AA at 167, 169-71, 179-80, 270-71, 273-74, 288, 305, 314-15, 340.) These other sensitivity analyses had nothing to do with the primary analyses that FibroGen first disclosed in November 2019. (*Cf.* Ex. BB at 47, 51 (NDD OT+7 and DD On-Study (or ITT)[5] labeled as sensitivity analyses); Ex. Z at -309-10; Ex. H at 3-5 (presenting the primary analyses, NDD ITT and DD OT-7).) And the Company had always warned investors that various analyses were being submitted and might be considered by

---

[5] "On-Study" and Intent-to-Treat (ITT) refer to the same analysis. (Ex. AA at 70.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

the FDA. (Ex. J at -273 ("additional supportive analyses and sensitivity analyses as well as subgroup analyses will also be included in the NDA and MAA.").) In contrast to the FDA's prior signals to the Company, the AdCom was also concerned about other safety signals, none of which had anything to do with the modification of any stratification factors.[6] (Ex. CC at 4-7.)

### H.    FibroGen's Collection and Production of Documents

Plaintiffs' Motion fixates on two specific sources of data, but completely ignores the broader context of document discovery in this case, which remains ongoing. (Dkt. No. 193.) To date, FibroGen has produced over 131,000 documents, and it expects to produce tens of thousands more documents before document discovery is complete. (Brien Decl. ¶¶ 3, 6.)

To meet it discovery obligations, FibroGen collected data from more than 30 custodians, including significant volumes of information for Dr. Yu, Mr. Neff, and other key individuals involved in Roxadustat's data analysis and regulatory submission. (Brien Decl. ¶ 4.)

The data that FibroGen collected includes:

- Email data for 31 custodians. That volume comprises 6.2 million email messages (exclusive of families), including:

  o   1,866,252 emails for FibroGen's former CEO, Tom Neff;

  o   291,400 emails for FibroGen's former CMO, Peony Yu;

  o   709,896 emails for members of FibroGen's statistics team, including Ming Zhong (Dir., Biostatistics), Khalil Saikali (Head of Biometrics), Laura Jiang (Sr. Manager, Biostatics), Tyson Lee (VP, Global Biometrics), and Wei Cheng (Head of Statistical Programming);

  o   710,400 emails for members of FibroGen's clinical team, including Elias Kouchakji (SVP, Clinical Dev. and Drug Safety), Robert Leong and Lynda Szczech (VPs, Clinical Dev.), and Bryant Lai (Sr. Clinical Scientist);

  o   566,100 for members of FibroGen's regulatory team, including Wayne Frost (SVP, Reg. Affairs), Michelle Wong (Sr. Dir., Reg. Affairs), Yun Ning (Medical Writing), and Jacqueline Nolen (Ex. Dir. Medical Affairs);

  o   1,072,772 emails for members of FibroGen's legal and investor relations team, including John Alden, Karen Bergman, Michael Lowenstein, Leanne Price, and Michael Tung;

  o   29,162 emails with FirmaClinical, the vendor responsible for performing the Roxadustat statistical analyses.

---

[6] Importantly, all of the information the AdCom focused on was disclosed two days earlier, with no market reaction. *See* Dkt. No. 180.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

- E-document data, totaling more than 3.5 million documents, including:

   o The personal network drives (also referred to as "h:drives" or "work folders") of 27 custodians.  This includes Dr. Yu's personal network drive, which contains more than 33,000 e-documents;

   o Over thirty group shared folders, including folders for analytical, articles, clinical, communications, drug safety, investor relations, legal, medical affairs, publications, regulatory, and safety;

   o Almost 30,000 SAS (statistical analysis software) files;

   o Formal correspondence with the FDA, meeting minutes, and the materials submitted to the FDA throughout the regulatory approval process;

   o Draft public statements;

   o Materials related to the Joint Steering Committee between FibroGen and its partners AstraZeneca and Astellas.

Moreover, and while Plaintiffs have not requested it in discovery, FibroGen has preserved the entire 20 million page NDA submission, including all of the raw data collected in years of animal and human studies (including *all* phase III studies), all of the analyses FibroGen submitted to the FDA, and all of the supporting documents submitted to the FDA.  (Lowenstein Decl. ¶ 6.)

### III.    ARGUMENT

Spoliation "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (citation omitted). When considering alleged spoliation of electronically-stored information ("ESI"), FRCP 37(e) governs exclusively and forecloses any use of the court's "inherent powers" to impose sanctions. *See Chinitz v. Intero Real Estate Servs.,* 2020 WL 7389417, at *4 (N.D. Cal. May 13, 2020).  While Plaintiffs appear to invoke both FRCP 37(e)(1) and FRCP 37(e)(2), the relief they seek is only available under FRCP 37(e)(2).  Under either provision, however, Plaintiffs have the burden to show, by a *preponderance of the evidence*, that (1) the allegedly spoliating party had a duty to preserve evidence, (2) evidence was, in fact, lost, (3) the party failed to take reasonable steps to preserve the evidence, and (4) the evidence cannot be restored or replaced through additional discovery. *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, 2016 WL 5870218, at *2 (N.D. Cal. Oct. 7, 2016).  Plaintiffs have failed to do so.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

## A.     There Was No Duty to Preserve in March 2021.

Evidence is spoliated only if it is lost *after* a duty to preserve has arisen.  It is undisputed that the conduct forming the basis of Plaintiffs' Motion occurred before any securities litigation had been filed.  And while a duty to preserve may arise before litigation is formally commenced, "[t]he future litigation must be '*probable*,' which has been held to mean more than a possibility.'" *Aberin v. Am. Honda Motor Co.*, 2017 WL 6493095, at *2 (N.D. Cal. Dec. 19, 2017) (emphasis added); *Best Label Co. v. Custom Label & Decal, LLC,* 2022 WL 1525301, at *2 (N.D. Cal. May 13, 2022) ("the mere existence of a potential claim or the distant possibility of litigation are insufficient").  Plaintiffs point to two pre-litigation events to claim that FibroGen and Dr. Yu were under a duty to preserve even though no securities litigation had been filed: (1) the announcement of the FDA convening an Advisory Committee and subsequent stock drop and (2) Dr. Eisner's inquiry into the changes to the stratification factors.  Neither triggered a duty to preserve.

### 1.     The AdCom Announcement did not Trigger a Duty to Preserve.

Plaintiffs argue that a duty to preserve arose when FibroGen's stock price dropped after its announcement of the FDA's decision to hold an AdCom, and one plaintiffs' firm issued a press release about an "investigation." (Mot. at 17-18.)  Critically, though, Plaintiffs do not cite a single case – nor has FibroGen's counsel been able to find one – where a court held that a stock drop and/or a shareholder solicitation announcement triggered a duty to preserve documents for a yet-to-be-filed securities class action.  In fact, Plaintiffs cite only two securities class action cases – one where a duty to preserve arose *after* the class action was filed and another where the duty to preserve was triggered because the company was the subject of numerous government investigations including an "investigation in the United States for a wide-ranging criminal bribery scheme."[7]  (*Id.* at 18, 22, 25 (citing *Nursing Home Pension Fund v. Oracle Corp.,* 254 F.R.D. 559,

---

[7] As for the non-securities cases Plaintiffs cite, in the vast majority, the court assessed spoliation only from the filing of a complaint.  *See, e.g.*, *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) (destruction of evidence after complaint was filed and some after discovery was propounded); *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995 (D. Ariz 2021) (numerous sources of data destroyed after filing of litigation); *Zucchella v. Olympusat, Inc.*, 2021 WL 8317028 (C.D. Cal. Dec. 20, 2021) (data destroyed after filing of litigation).  And the exception to the rule is once factually distinguishable.  In *Apple Inc. v. Samsung Elecs Co., Ltd.*,

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

565 (N.D. Cal. 2008) (duty to preserve after lawsuit was filed); *Doubleline Capital LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at \*6 (S.D.N.Y. Mar. 30, 2021) (duty to preserve after government investigation)).)  Here, a stock drop followed by a solicitation from a single plaintiffs' firm is not remotely analogous to the government investigations that triggered a duty to preserve in *Doubleline*.  Simply put, if this Court were to find that the March 2021 stock drop triggered a duty to preserve, it would be going well beyond precedent in this context.

Such a rule, moreover, would create an utterly untenable standard for public companies, whose stock prices can fluctuate without ever seeing litigation.  (*See* Gibbs Decl. ¶ 11-12.)  At most, following such a stock drop, securities class actions are possible, but "the fact that someone *could* file a complaint or *might* file a complaint is not enough."  *Aberin*, 2017 WL 6493095, at \*2 (emphasis added).  This is borne out by the history of this case.  Following the March 2021 stock price drop, no class action suit was filed, and only one plaintiffs' firm issued a press release.  (Gibbs Decl. ¶ 12.)  In the year preceding that press release, the same firm issued at least 762 such press releases against 248 companies but filed  lawsuits against only 83 of those companies.  (*Id.* ¶ 11.)  And while Plaintiffs claim that Dr. Yu testified that she was "fully aware that corrective disclosures such as this one could lead to securities litigation" (Mot. at 18), she actually said the opposite.  When asked whether she was "aware that there was the potential for securities litigation against the Company" following the AdCom announcement, or whether "that was even a topic she considered" or discussed with anyone at FibroGen, she answered with a resounding "No," noting that an AdCom announcement is not an unusual event.  (Pls. Ex. 20 at 150:25-151:11.)

Plaintiffs argue that FibroGen must have anticipated litigation because it consulted with counsel, claiming that FibroGen "retained the same litigation counsel representing them in this Action."  (Mot. at 1.)  This is another fallacy.  FibroGen has been a Cooley client since 1997.  (Gibbs Decl. ¶ 4.)  During that time, as is the case for many of Cooley's corporate clients, FibroGen has sought the advice of Cooley's securities litigators on a range of disclosure issues outside the

---

888 F. Supp. 2d 976 (N.D. Cal. 2012), Samsung had a pre-litigation duty to preserve after a CEO to CEO meeting where Apple's CEO presented a comprehensive summary of all patent infringement claims Apple had against particular Samsung products, and Samsung immediately sent a litigation hold notice to certain employees.  No such facts are present here.

Cooley LLP
Attorneys at Law
Palo Alto

13

Opposition to Motion for
Spoliation Sanctions
3:21-cv-02623-EMC

litigation context. (*Id.*)  In fact, multiple securities litigators have advised the Company on non-litigation issues since 2014, when the Company first went public. (*Id.*)  The work that Plaintiffs point to is an example of this type of non-litigation disclosure counseling that Cooley's securities litigators frequently handle. (*Id.*)  Namely, in late February and early March 2021, FibroGen sought Cooley's advice about disclosure issues arising from the FDA's feedback that it might (and eventually decided to) call an AdCom. (*Id.* ¶¶ 5-7.)  Mr. Gibbs was asked by Cooley partners, Michael Tenta and John Dwyer (who had advised FibroGen about a wide range of matters for a number of years) to help advise FibroGen regarding its disclosure obligations. (*Id.* ¶ 4.)  Mr. Gibbs was not asked to provide (nor did he provide) any litigation-related advice at that time, nor was he asked to help the company prepare for any potential (let alone, probable) litigation. (*Id.* ¶ 7.)

On the subject of consulting with counsel, Plaintiffs' authorities are again inapposite.  In *Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 5914552, at *4 (C.D. Cal. Jul. 30, 2020), for example, a duty to preserve arose when Ivantis had hired legal counsel specifically to assess Glaukos's patents and Ivantis's potential infringement of those patents, informed potential investors "that it had retained a 'top patent litigation firm,'" and asserted work product privilege over communications with that counsel.  And in *Waymo LLC v. Uber Technologies, Inc.*, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018), a duty to preserve arose when Uber had engaged legal counsel specifically for the purpose of assessing what legal claims Waymo may bring against it.  Moreover, Uber had previously argued that it anticipated litigation when it hired that counsel, in order to assert a joint-defense and common interest privilege over documents related to Uber's purchase of a company founded by former Waymo employees.  *Id.*  Here again, the fact that FibroGen consulted with Cooley about disclosure issues is not remotely analogous to the facts that triggered a duty to disclose in those cases, and the fact that the Cooley team advising on those disclosure issues included litigators does not change the analysis.  Simply put, unlike the parties in the cases Plaintiffs cite, FibroGen did not hire "litigation counsel" and did not seek advice about threatened or expected litigation following the March 2021 AdCom announcement or stock drop.

### 2. No Duty to Preserve During New Management's "Investigation"

Plaintiffs also claim that Dr. Eisner's "urgent[] investigat[ion]" into the changes to the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

stratification factors triggered a duty to preserve.  (Mot. at 18.)  This claim is belied by both the law and the facts.  As an initial matter, "[c]ommencement of an internal investigation does not, per se, put an institution on notice of potential litigation."  *FTC v. Lights of Am. Inc.,* 2012 WL 695008, at *3 (C.D. Cal. Jan. 20, 2012) (FTC was not under a duty to preserve "at the commencement of the full-phase investigation or upon the issuance of" a Civil Investigative Demand).  Nor could it.  The purpose of any investigation is to determine what occurred and what steps to take in response.

In fact, as Plaintiffs' Motion acknowledges, Dr. Eisner spent several weeks looking into the changes to the stratification factors to try to fully understand what had happened and what, if anything, should be done.  (Mot. at 4.)  And FibroGen's Board of Directors learned about the changes to the stratification factors on March 29, 2021 (Lowenstein Decl. ¶ 4) – the same day that it is alleged Dr. Yu destroyed her hard drive – and *after* it is alleged Dr. Yu's hard copy documents were shredded.[8]  But even if a decision had been made that day, nobody knew exactly what the press release would say or how the market would react to it until it was issued on April 6, 2021.  Dr. Yu was also never consulted about whether to issue a press release, nor was she advised that a press release was coming.[9]  (Yu Decl. ¶24.)  It is absurd to suggest that she anticipated securities litigation arising out a press release she did not know about, until it was publicly issued (a week after she her laptop hard drive was destroyed).

The Company's "urgent demands for the laptop's return" also do not support that a duty to preserve had arisen in March 2021.  ████████████████████████████████████ ████████████████████████████████████ (Pls. Exs. 19, 23.)  Because

---

[8] Plaintiffs once again seize on the contents of Dr. Eisner's *draft* presentation, which only communicated his personal opinion about labeling one analysis as primary v. another in the NDA. The FDA, however, has never suggested that anything FibroGen did was misleading or wrong. Moreover,  the presentation said nothing about his view on investor disclosures.  In fact, Dr. Eisner, joined the Company two years into the Class Period and had no involvement with the vast majority of disclosures.  FibroGen reiterates its objection to the production and use of this document, which it believes is subject to the attorney-client privilege, which was not waived under the parties' stipulated Protective Order or under Federal Rule of Evidence 502(b).  FibroGen re-produced this document under Court order and reserves all rights on appeal.

[9] The April 2 date in the Company's response to the Financial Industry Regulatory Authority ("FINRA"), which sought the earliest date that Dr. Yu became aware of the "events leading up to" the April 6 press release does not suggest knowledge that a press release would be issued (whether on April 6 or any other date).  In any case, whether she learned of it on April 2 or April 6, the hard drive had already been destroyed.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

Cooley had been FibroGen's advisor for many years, a group of Cooley attorneys, including Cooley's corporate and employment attorneys were consulted. (Dwyer Decl. ¶4; *see* Pls. Ex. 77.) However, as of that day, the Company had not made a decision regarding whether it would make a public disclosure, or what it might be. (Dwyer Decl., ¶¶5-6; Lowenstein Decl., ¶5.) Simply put, the fact that FibroGen consulted with its long time outside counsel does not mean that FibroGen expected securities litigation, and it did not trigger a duty to preserve documents for any such (non-then existing) litigation.

### 3.    Regardless, FibroGen Took Reasonable Steps to Preserve Dr. Yu's ESI.

While admitting that FibroGen repeatedly and "urgent[ly]" sought the return of Dr. Yu's laptop (Mot. at 19), Plaintiffs at the same time argue that FibroGen's conduct was deficient. (*Id.*) This makes no sense. Even assuming that a duty to preserve had arisen as of March 2021 (it had not), FibroGen's conduct was more than reasonable, and Plaintiffs certainly have not explained what additional steps FibroGen should have taken. Dr. Yu was a remote consultant living in Washington state, where FibroGen had no locations, during the Covid-19 pandemic. (Pls. Ex. 20 at 135:14-16; Pls. Ex. 21 at 74:20-22.) As such, it is absurd to suggest that *the Company* should be sanctioned for the loss of the hard drive.

None of Plaintiffs' authorities changes this analysis. In *GN Netcom, Inc. v. Plantronics, Inc.*, after discovering a top-level executive deleted thousands of emails after litigation had commenced, the company refused to pay the $2000-$5000 necessary to complete the forensic investigation and had prior back-ups of the deleted information "unrestored." 2016 WL 3792833, at *3 (D. Del. July 12, 2016). The company also failed to investigate and attempt to recover the emails deleted by *other* senior managers, despite knowing that the executive had also instructed others to delete their emails. *Id.* In *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 2022 WL 16551632

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

(E.D. Cal. Oct. 31, 2022), the defendants acknowledged that they did not take reasonable steps to preserve so there was no holding as to the reasonableness of their conduct. Finally, in *Colonies Partners, L.P. v. County of San Bernardino*, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020), defendant took no steps to inform a key individual (and defendant) of his duty to preserve ESI *after* litigation had commenced. None of these cases suggests that FibroGen acted unreasonably.

**B.      Plaintiffs Have Not Demonstrated That Evidence Was Lost.**

Spoliation will not be found, and "[s]poliation sanctions are not available . . . when information is not lost." *Envy Haw. LLC v. Volvo Car USA LLC*, 2019 WL 1292288, at *2 (D. Haw. Mar. 20, 2019); *Oracle Am., Inc. v. Hewlett Packard Enters. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018) ("Rule 37(e) essentially functions as a decision tree. The threshold inquiry is whether ESI has been 'lost' . . . ."). "Information is lost for purposes of Rule 37(e) only if it is irretrievable from another source, including other custodians." *Oracle*, 328 F.R.D. at 552. The *moving party* bears the burden to demonstrate *with actual evidence* that the relevant information is irretrievably lost.[10] *Envy Haw.*, 2019 WL 1292288, at *2 ("[n]ot surprisingly, [evidence] is not irreplaceable if such evidence appears to be largely duplicative"); *see also Oracle*, 328 F.R.D. at 552 ("[n]o matter how inadequate a party's efforts at preservation may be, however, sanctions are not warranted unless there is proof that some information of significance has actually been lost").

Here, Plaintiffs have not come close to meeting this burden, and in truth, they have made no real effort to do so. Despite significant documentary evidence and two depositions, the most Plaintiffs can say is that Dr. Yu stored files on her laptop that had something to do with Roxadustat. They have made no effort to show that any of those files were unique (that is, not also in Dr. Yu's emails or on her FibroGen network drive). This alone should end the inquiry. *See Ryan v. Editions*

---

Plaintiffs wrongly attempt to shift the burden to FibroGen. (*See* Mot. at 20.) It is the moving party's burden to establish that evidence was lost. Plaintiffs conflate the standard *after* spoliation (*i.e.*, the loss of irreplaceable ESI) has been established. For example, in *E.E.O.C. v. Fry's Elecs., Inc.*, the moving party had established that office computers were used to *create* documents that were not stored anywhere else, meaning that defendants were "not entitled to a presumption that the documents on the hard drives were irrelevant." 874 F. Supp. 2d 1042 (W.D. Wash. 2012). And in *Montoya v. Orange County Sheriff's Department*, the spoliating party conceded that two years' worth of server data had not been preserved and the moving party identified specific information that was not preserved during that time period. 2013 WL 6705992 (C.D. Cal. Dec. 18, 2013). Plaintiffs have made no such showing in this case.

Cooley LLP
Attorneys at Law
Palo Alto

17

Opposition to Motion for
Spoliation Sanctions
3:21-cv-02623-EMC

*Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015) (affirming denial of sanctions because movant had failed to show the documents at the center of the motion were not otherwise available from other sources); *Belew-Nyquist v. Quincy Sch. Dist. No. 144*, 2020 WL 6845934, at *11 (E.D. Wash. Nov. 20, 2020) ("The moving party has the burden of showing that ESI existed and was subsequently destroyed or not preserved . . . mere speculation that deleted documents may exist is insufficient.").

Moreover, Plaintiffs have made no effort to show that any of the files on Dr. Yu's hard drive had anything to do with any matters in dispute in this case. Dr. Yu was responsible for the *global* Roxadustat program, and Plaintiffs did not even attempt to demonstrate that any files on her hard drive had anything to do with (for example) stratification factors for the pooled CV safety analyses, the differences between the results disclosed by FibroGen in November 2019 and the results first disclosed in April 2021, or even with CV safety generally. This, too, warrants denial of Plaintiffs' Motion. *Best Label*, 2022 WL 1525301, at *5 ("[w]hile the Court appreciates that [the moving party] cannot know precisely what information a deleted filed contained, the Court expects at least some discussion about the nature of the information that is missing and its bearing on the case").

In an effort to manufacture "lost" evidence, Plaintiffs also mischaracterize Dr. Yu's communications. (Pls. Ex. 19.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

- <span style="background-color:black;color:black">████████████████████████████████████</span>
- <span style="background-color:black;color:black">████████████████████████████████████</span>
- <span style="background-color:black;color:black">████████████████████████████████████</span>

As if to underscore the total lack of proof regarding Dr. Yu's hard drive, Plaintiffs complain that "Defendants have produced *fewer than 500 documents* from Neff's files" as support for their claim of prejudice. (Mot. at 24.) But Plaintiffs never explain what this has to do with the loss of Dr. Yu's hard drive (which would not have had any unique copies of Mr. Neff's documents). In any event, the volume of documents *produced* from Mr. Neff's files is completely irrelevant. Defendants have collected more than *2 million* documents from Mr. Neff's files. (Brien Decl. ¶ 4.) The volume that was reviewed and produced was, of course, limited by the date range and search terms agreed upon by the parties. (*Id.* ¶ 3.) And in any event, Mr. Neff died just 8 months into the Class Period (and almost two years before litigation commenced), so the volume of documents *produced* from his files is hardly suspicious. If anything, the fact that FibroGen has produced even that many documents from his files just confirms the scope and breadth of FibroGen's preservation.

Plaintiffs' showing is even worse with regard to Dr. Yu's binders. Plaintiffs made no effort to ask Dr. Yu about what hard copy documents Dr. Yu had, where they came from, and whether they would have been stored elsewhere. Had Plaintiffs asked Dr. Yu (or FibroGen, for that matter) these basic questions, they would have learned that Dr. Yu's binders contained documents that were printed from Dr. Yu's email, so she could review them in hard copy form. (Autrand Decl. ¶¶ 3-4.) For example, the document that Plaintiffs call out from the hard copy documents, the "Roxadustat 2020 Brand Strategic Plan," is in FibroGen's electronic files. (Brien Decl. ¶ 4.) And Dr. Yu's former assistant confirmed that she did not see any handwritten notes on any of the documents she shredded, nor did she shred any notebooks or notepads. (Autrand Decl. ¶ 5.)

Simply put, Plaintiffs have failed to demonstrate that any evidence was "lost," and their motion should be denied on this basis alone. *See Oracle*, 328 F.R.D. at 553 (denying sanction

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

motions "[b]ecause the loss of ESI is a threshold requirement for sanctions under Rule 37"); *Chinitz*, 2020 WL 7389417, at *5 (no sanctions where "the Court [wa]s not satisfied that the emails ha[d] been 'lost' such that they 'cannot be restored or replaced through additional discovery'").

### C.     Plaintiffs Have Not Demonstrated an Intent to Deprive.

Plaintiffs seek the extraordinary remedy of terminating sanctions against Dr. Yu and FibroGen on the basis that Dr. Yu "intentionally destroyed the laptop's hard drive." But the relevant "intent" is not the intent to destroy or delete a source of information, but rather the "intent to deprive another party of the information's use *in the litigation*." *See hiQ Labs, Inc. v. LinkedIn Corp.*, 2022 WL 18399982, at *20 (N.D. Cal. Nov. 4, 2022) (Chen, J.) (emphasis added) ("The circumstances in this case suggest that hiQ destroyed, or allowed to be destroyed, the evidence at issue either negligently or with an intent to cut cost, **but not with a specific 'intent to deprive [LinkedIn] of the information's use in the litigation**."); *Doubleline Cap.*, 2021 WL 1191527, at *8 ("It is the movant's burden to demonstrate that the spoliating party acted with the intent to deprive, not merely the intent to destroy.").

Plaintiffs offer no evidence that Dr. Yu acted with the *specific* intent to deprive them (or any other plaintiffs) of information for use in litigation. As Dr. Yu stated during her deposition, she did not believe that securities litigation was possible (let alone, probable) following the AdCom announcement. (Pls. Ex. 20 at 150:25-151:11.) Likewise, she was not aware that the April 6 press release would be issued until she learned of it along with the general public. (Yu Decl. ¶24.) There is *no* evidence that Dr. Yu destroyed her laptop hard drive in order to deprive future securities litigation plaintiffs of any information. And there certainly is no such evidence as to FibroGen.

If anything, the evidence shows that Dr. Yu destroyed her laptop's hard drive ███████

███████████████████████████████████████████████████████████

█████████████████████████████ [11]  That intent is insufficient to meet Plaintiffs' burden in

---

[11] Dr. Yu's reasoning is not inconsistent on this point. (*See* Mot. at 21 n.9.) As Dr. Yu explained, she had several reasons, none of which involved potential securities litigation. (Pls. Ex. 20 at 68:7-69:12, 106:21-25, 107:9-08:13, 112:21-116:15.) Plaintiffs also mischaracterize the record on this point. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

20

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

seeking sanctions under FRCP 37(e)(2). *Wisk Aero LLC v. Archer Aviation Inc.* is instructive. 2023 WL 2277112, at *8 (N.D. Cal. Feb. 28, 2023). There, the court held that while an individual had "intentionally deleted" the information in question, it was done with a "desire to avoid an FBI inquiry" rather than "with the intent to deprive [the other party] of the information's use in the litigation." *Id.* Therefore, the deletion "was not made with the requisite intent to justify sanctions under FRCP 37(e)(2)." *Id.* at *8; *see also In re Hitachi Television Optical Block Cases*, 2011 WL 3563781, at *14 (S.D. Cal. Aug. 12, 2011) ("no evidence of intent to impede Plaintiffs' access to evidence" where "reason for deleting files was truly personal, that is, to cover up a prior misrepresentation to [employer] that he had no work files at home"). So too, here, Plaintiffs have failed to demonstrate that Dr. Yu intended to deprive them (or any other potential securities litigation plaintiffs) when the hard drive was destroyed.

Plaintiffs' half-hearted attempt to establish that FibroGen acted with an intent to deprive due to the shredding of Dr. Yu's hard-copy documents should also be rejected. (Mot. at 22.) Plaintiffs made no effort to seek discovery related to the binders and instead construct a story that has no basis in fact. The binders contained electronic files Dr. Yu emailed to her assistant and others, for printing. (Autrand Decl. ¶¶ 3-4.) Dr. Yu's former assistant recalls asking Dr. Eisner, when he took over as CMO (before any litigation had been filed or anticipated) whether he needed these hard copies and that he told her he preferred working with the electronic versions.[12] (Autrand Decl. ¶ 5.) This does not evidence an intent to deprive Plaintiffs of anything.

**D.    Dr. Yu's Post-Employment Conduct Should Not Be Imputed to FibroGen.**

While Plaintiffs admit that Dr. Yu destroyed her laptop's hard drive despite FibroGen's "urgent[]" requests to return it and not delete anything, they nevertheless claim that Dr. Yu's conduct should be imputed to FibroGen. (Mot. at 21.) Again, their position is unsupported.

When Dr. Yu destroyed the hard drive she was not, as Plaintiffs claim, "a top-level C-suite executive" – she had not been one for several months. In fact, by March 29, Dr. Yu was not even an employee of FibroGen; she was only a consultant used on an as needed basis. As such, Plaintiffs'

---

[12] Dr. Eisner has no specific recollection of such a conversation, but does work exclusively with electronic documents. (Eisner Decl. ¶6.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

cases are distinguishable.  *See, e.g.*, *Colonies Partners,* 2020 WL 1496444, at *10 (employer and employee were represented by the same counsel and, *after litigation commenced*, employer took no steps to prevent employee from destroying ESI); *WeRide Corp. v. Huang*, 2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) (company's founder was agent of company); *GN Netcom, Inc.*, 2016 WL 3792833 (*current* senior executive); *Nursing Home Pension Fund*, 254 F.R.D. 559 (*current* CEO).

However, even if Dr. Yu had been a current employee, the law makes clear that an employer will not be held vicariously liable "if the employee substantially deviates from the employment duties for personal purposes."  *Gemsa Enters., LLC v. Specialty Foods of Ala., Inc.*, 2015 WL 12746220, at *9-10 (C.D. Cal. Feb. 10, 2015).  ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████  In *Gemsa*, the Court held that the moving party "ha[d] not shown that [the employee]'s alleged destruction of evidence should be imputed to" the company, where the company had an oral policy about not deleting files, had informed the employee that all documents were to be retained, and had no advance knowledge that the employee intended to delete the files.  2015 WL 12746220 at *10.  So too here, FibroGen repeatedly requested the return of Dr. Yu's laptop and specifically told her not to delete anything on her laptop.[13]  The Court should not impute Dr. Yu's conduct to FibroGen.[14]

---

[13] That FibroGen decided not to withhold Dr. Yu's severance payments on the basis of her laptop is of no moment.  The Severance Agreement was not "clear[ly] breached" when Dr. Yu destroyed her laptop's hard drive, as Plaintiffs claim. (Mot. at 22, n. 11.)  In fact, the Severance Agreement only required Dr. Yu to *return* the physical laptop, which she did. (Pls. Ex. 17 at Section 10.)  The Company's decision not to engage in protracted litigation with Dr. Yu about her severance is not indicative of FibroGen's "intent" to deprive the Plaintiffs in this case of any information.

[14] Should the Court enter an adverse inference or default judgement against Dr. Yu, the Court should not impute liability or scienter to FibroGen because Dr. Yu was (1) no longer an employee when she undertook the conduct in question and (2) was acting contrary to FibroGen's instruction.  *See, e.g.*, *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011), abrogated on other grounds, *Lorenzo v. S.E.C.*, 139 S. Ct. 1094 (2019) (refusing to impute scienter onto company where individual defendants' conduct was "at odds with the Company's financial interests"); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 981-82 (N.D. Cal. 2015) (refusing to impute employee's scienter because he "acted out of nothing other than his own self interest, and his conduct did not benefit the corporation").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

### E.   Plaintiffs' Requested Sanctions Are Unwarranted.

Even upon a finding of intent, willfulness, or bad faith, courts are reluctant to impose the "harsh sanctions" Plaintiffs seek here. *See, e.g.*, *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 291 (N.D. Cal. 2015) (even where spoliating parties "acted with willfulness and improper purpose in the course of some its discovery conduct . . . lesser sanctions suffice"). As Plaintiffs acknowledge, prejudice is "the most important factor' for 'case dispositive sanctions.'" (Mot. at 24.) Courts generally do not impose terminating sanctions unless a moving party demonstrates both bad faith and "severe prejudice." *Fourth Dimension Software v. DER Touristik Deutschland GmbH*, 2021 WL 5919821, at *11 (N.D. Cal. Dec. 15, 2021) (finding under Rule 37(e)(2) that, where the moving party "ha[d] not shown that it suffered severe prejudice," "dismissal and default judgment—the two most severe forms of sanction—[we]re out of the question").

As described above, Plaintiffs have failed to demonstrate *any* prejudice (let alone "severe" prejudice). As such, Plaintiffs requested relief should be rejected. *See, e.g.*, *Colonies Partners*, 2020 WL 1496444, at *11-12 (finding that "[t]erminating sanctions [we]re not warranted in this case" because "[t]he record in this case does not support that Plaintiffs are so harmed by the spoliation as to be unable to present their case"); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 2251005, at *8 (N.D. Cal. May 13, 2015) (denying motion for terminating sanctions and imposing only a permissive adverse inference instruction, even though defendants got rid of phones and laptops with no efforts to back them up).

There is also no basis for Plaintiffs' other argument for terminating sanctions – namely, the accusation that FibroGen and Dr. Yu "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." (Mot. at 24.) Defendants did not make any effort to conceal the destruction of Dr. Yu's hard drive, and Plaintiffs did not (as they claim) discover this issue "on their own." (Mot. at 12.) They were directly informed of it by Dr. Yu's counsel. (Pls. Ex. 41 at 2.) Moreover, FibroGen *never* hid the destruction of the hard drive, as Plaintiffs claim, but rather pushed back on Plaintiffs' suggestion that Dr. Yu's conduct amounted to spoliation, since it occurred before any lawsuit.[15] FibroGen has been very cooperative, including by providing the

---

[15] As such, FibroGen was not obligated to identify the laptop during the parties' 26(f) conference

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

forensic analysis of Dr. Yu's laptop, preparing a corporate representative to testify as to the topic of Dr. Yu's laptop, and undertaking the review of thousands of additional documents from multiple additional custodians to attempt to answer Plaintiffs' questions. (Brien Decl. ¶¶ 8-9.)

A review of the cases that Plaintiffs cite underscores that this is not the type of conduct that warrants terminating sanctions:

- *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F.3d 337 (9th Cir. 1995): Defendant knew relevant documents had survived a fire but lied about their existence, including under oath, for years. The existence of the documents only came to light when defendant attempted to use them for its benefit.

- *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995 (D. Ariz 2021): Plaintiff destroyed numerous devices and sources of information, most after litigation was filed and some after the protective order in the case had been entered.

- *Facebook, Inc. v. OnlineNIC Inc.*, 2022 WL 2289067 (N.D. Cal. Mar. 28, 2022): Defendants destroyed significant volumes of data after filing of complaint, including some after appointment of Special Master to oversee production of information.

- *Hunters Cap., LLC. v. City of Seattle*, 2023 WL 184208 (W.D. Wash. Jan. 13, 2023): Multiple high-ranking city officials employed by defendant deleted data from their phones after litigation had commenced.

- *In re Google Play Store Antitrust Litig.*, 2023 WL 2673109 (N.D. Cal. Mar. 28, 2023): Defendant failed to turn off auto-delete on its chat functionality after litigation had been filed, despite having the ability to do so and without any assessment of financial costs to justify that decision. Defendant also misled the Court about auto-delete feature.

- *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006): Defendant wiped laptop after litigation with former employer had commenced and despite several requests to return the laptop. Former employee lied to former employer (plaintiff in the case) by requesting that he be allowed to retain access to the laptop for purposes of responding to auditors, but instead of doing so he wiped the laptop.

- *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833, at \*3, 6 (D. Del. July 12, 2016): Senior executive "intentionally deleted thousands of emails . . . and instructed others to do so," after litigation had commenced. Defendants' counsel denied that emails had been deleted even though defendant knew they had been, and hired a forensic expert to attempt to recover the emails. Defendant refused to pay $2000-$5000 to finish analysis and had backup tapes of recovered emails "unrestored."

- *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051 (9th Cir. 1998): Defendant committed "many discovery violations," including hiding a critical piece of evidence which violated "one court order after another."

---

or under the ESI rules or ESI protocol. (*See, e.g.*, ESI Protocol at 3 ("The Parties will disclose promptly upon becoming aware of them any categories or sources of *relevant* ESI in existence but not preserved ***after the time a duty to do so arose***." (emphasis added)).) And Plaintiffs' feigned confusion about FibroGen's use of the word "reformat" is disingenuous, at best. Even the cases Plaintiffs rely upon use the word, and a quick google search confirms its meaning.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

- *WeRide Corp. v. Huang*, 2020 WL 1967209 (N.D. Cal. Apr. 24, 2020): Defendants deleted numerous sources of data, most of them after the complaint against them had been filed and after a preliminary injunction was entered against them, which prohibited destruction of evidence.

Unlike in those cases, here:

1. Before any securities litigation was ever filed (and before Dr. Yu or FibroGen had any awareness of potential, probable, or actual securities litigation),

2. Dr. Yu destroyed a single device and some previously printed documents were shredded,

3. The device was used for work purposes but there is no evidence that it contained any unique information and the printed documents were duplicates of electronic files,

4. The device was destroyed, not to deprive any potential securities plaintiffs in litigation, but rather for Dr. Yu's personal reason of keeping information from her employer (and the hard copy documents were shredded because they were duplicates of information that FibroGen's new CMO intended to review electronically),

5. Significant volumes of information (including Dr. Yu's email, personal network folder, and cell phone) have been preserved, collected, and are in the process of being produced.

Stripped of Plaintiffs' sensationalism and conjecture, these facts do not remotely support terminating sanctions under FRCP 37(e)(2).

The same is true of Plaintiffs other requested relief, which they purport to couch as a request for an "adverse inference." (Mot. at 25.) By asking this Court to "instruct[] the jury to find that the elements of both falsity and scienter have been established," Plaintiffs are effectively asking this Court to enter a default judgment against FibroGen and Dr. Yu as to two key elements of any securities litigation case. Their requested relief is not supported by the cases they cite. (Mot. at 25.) Both cases involved the destruction of *numerous* sources of information *after* litigation had commenced.[16] No such conduct is alleged here – the "adverse inference" relief should be rejected on the same basis as the "terminating sanctions."[17]

**IV.   CONCLUSION**

For the foregoing reasons, and those set forth in FibroGen's concurrently-filed Motion to Strike, FibroGen respectfully request that the Court deny Plaintiffs' Motion.

---

[16] And even with that conduct, the courts did not prevent the parties from having *any* opportunity to defend against key elements of the case, as Plaintiffs ask the Court to order here.

[17] To the extent the Court believes that relief different from that requested by Plaintiffs is warranted, FibroGen respectfully requests the right for supplemental briefing on the appropriateness or necessity of any such relief.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

25

OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC

Dated:  July 17, 2023                                    COOLEY LLP


By:   _/s/ Patrick E. Gibbs_
        Patrick E. Gibbs

*Attorneys for Defendant*
*FibroGen, Inc.*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

26

**OPPOSITION TO MOTION FOR
SPOLIATION SANCTIONS
3:21-CV-02623-EMC**