PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON (SBN 76342)
bruce.ericson@pillsburylaw.com
LEE BRAND (SBN 287110)
lee.brand@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:        415.983.1000
Facsimile:        415.983.1200

WEI GROUP LLP
ERIC S. WEI (*pro hac vice*)
ewei@weillp.com
One World Trade Center, Suite 8500
New York, New York 10007-0103
Telephone:        212-248-0808
Facsimile:        212-248-0475

Attorneys for Defendant
K. Peony Yu, M.D.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO HEADQUARTERS

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**OPPOSITION OF DEFENDANT K. PEONY YU, M.D. TO LEAD PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS**<br><br>Hearing Date:  August 31, 2023<br>Time:  1:30 p.m.<br>Courtroom:  5 – 17th Floor (Via Zoom)<br>Judge:        Hon. Edward M. Chen<br><br>Filed herewith:<br>1.   Declaration of K. Peony Yu, M.D.<br>2.   Declaration of Lee Brand |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................1

III. ARGUMENT .........................................................................................................3

    A.   In March 2021, Dr. Yu Had No Duty to Preserve Evidence Because No Litigation Was Pending or Reasonably Foreseeable to a Person in Dr. Yu's Circumstances .................................................................................................4

        1.   Litigation Was Not Reasonably Foreseeable After the Advisory Committee Announcement .........................................................................4

        2.   Dr. Eisner's Concerns About the Labeling of Statistical Analyses Did Not Trigger a Duty to Preserve Because Dr. Yu Did Not Know About Any Such Concerns .................................................................................6

        3.   Dr. Yu's Other Communications With FibroGen Did Not Alert Her to Any Concerns, Much Less Anything Suggesting a Risk of Litigation .............7

        4.   Dr. Yu Had No Intent, Motive or Reason to Deprive Anyone of Any Evidence.............................................................................................8

        5.   Case Law Does Not Support a Duty to Preserve on These Facts ....................11

    B.   The Evidence at Issue Was Not Unique and Exists Elsewhere .................................13

        1.   Dr. Yu's Hard Copy Documents Were Just Printouts of E-Documents..........14

        2.   Dr. Yu's Hard Drive Contained Nothing Unique .......................................15

        3.   Dr. Yu Did Preserve and Her Counsel Has Reviewed and Produced Other Sources of Evidence That May Be Unique....................................................18

IV.  CONCLUSION....................................................................................................18

**TABLE OF AUTHORITIES**

Page

**Cases**

*Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*,
No. 14-1064 (JDB), 2017 WL 1214424 (D.D.C. Mar. 30, 2017)............................................17

*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) ..................................................................................4

*Best Label Co. v. Custom Label & Decal, LLC*,
No. 19-cv-03051-SI (VKD), 2022 WL 1525301 (N.D. Cal. May 13, 2022) ...........................4

*Doubleline Capital LP v. Odebrecht Finance, Ltd.*,
No. 17-CV-4576 (GHW) (BCM), 2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) .................12

*Envy Hawaii LLC v. Volvo Car USA LLC*,
Civ. No. 17-00040 HG-RT, 2019 WL 1292288 (D. Haw. Mar. 20, 2019) ...........................13

*Fed. Trade Comm'n v. Noland*,
No. CV 20-00047-PHX-DWL, 2021 WL 3857413 (D. Ariz. Aug. 30, 2021) .......................11

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*,
No. 15-cv-1893-HRL, 2016 WL 5870218 (N.D. Cal. Oct. 7, 2016).......................................4

*Glaukos Corp. v. Ivantis, Inc.*,
No. SACV 18-620 JVS (JDEx), 2020 WL 5914552 (C.D. Cal. Jul. 30, 2020).....................12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
No. 17-cv-03301-EMC, 2022 WL 18399982 (N.D. Cal. Nov. 4, 2022) ...............................11

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) ...............................................................................................12

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
328 F.R.D. 543 (N.D. Cal. 2018)....................................................................................13, 14

*Waymo LLC v. Uber Techs.*, Inc,
No. C 17-00939 WHA, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018)................................4, 12

*WeRide Corp. v. Kun Huang*,
No. 5:18-cv-07233-EJD, 2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) ..............................12

**Regulations**

Advisory Committee's Notes to 2015 Amendments to Rule 37.................................................13

Federal Rules of Civil Procedure
Rule 37(e).................................................................................................3, 11, 13, 17

DR. YU'S OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS

## I.    INTRODUCTION

A default judgment is an extraordinary remedy, to be saved for extraordinary situations where evidence of spoliation is clear and far-reaching.  Here sanctions of any kind are not warranted. Plaintiffs have offered no law or evidence to show Dr. Yu, FibroGen's former Chief Medical Officer ("CMO"), engaged in spoliation, let alone that a default judgment or any other sanctions are merited. Plaintiffs' Motion for Spoliation Sanctions (the "Motion") mischaracterizes Dr. Yu's deposition testimony and ignores the fact (made clear by the exhibits to Plaintiffs' Motion) that the arguments for spoliation fail at the first step of legal analysis.  Dr. Yu did have a vendor replace the hard drive in her FibroGen-issued laptop on March 29, 2021, but she did so at a time when she had no duty to preserve evidence and no inkling that litigation against herself or FibroGen was even a possibility.

Dr. Yu had no duty to preserve because she had no idea her successor as CMO had concerns about the labeling of statistical analyses of roxadustat data or that FibroGen would later issue a press release changing that labeling.  Dr. Yu had no reason or motive to destroy anything because her team's use of stratification factors chosen after data unblinding had been fully disclosed to the U.S. Food and Drug Administration ("FDA"), and explained, a year and a half before the alleged spoliation – without any hint, then or now, that the FDA disagreed with her team's choice of stratification factors.  Dr. Yu did not believe then and does not believe now that there was anything related to her duties at FibroGen that was uniquely stored on her laptop and not duplicated elsewhere on FibroGen's servers.  The hard copy documents that FibroGen shredded were, as Dr. Yu described them at the time, "waste paper and old binders" – e-documents that Dr. Yu's assistant had printed for her review in hard copy and that existed elsewhere on FibroGen's email server or network folder. Plaintiffs cite no case law finding a duty to preserve or imposing sanctions in circumstances that even vaguely resemble the facts of this case.

## II.    STATEMENT OF FACTS

The facts pertinent to this opposition are set forth in FibroGen's Opposition and the declarations supporting it, which Dr. Yu incorporates by reference, and in the Declarations of Defendant K. Peony Yu, M.D. ("Yu Decl.") and Lee Brand ("Brand Decl.") filed together with this Opposition.  We suggest that the Court review those papers first and then turn to this opposition.

---

**Laptop hard drive:**  As explained in Dr. Yu's deposition and as further detailed in her declaration, she did have a vendor replace the hard drive in her company-issued laptop and destroy the old hard drive – indeed, she made a photographic record of that (Pls. Ex. 83; citations to "Pls. Ex." are to the exhibits filed with Plaintiffs' Motion) – but she did so at a time when she did not foresee any litigation and had no idea whatsoever that her successor as Chief Medical Officer had any disagreement with the labeling of statistical analyses in the New Drug Application ("NDA") for roxadustat that FibroGen submitted to the FDA while she was CMO, much less that FibroGen would issue a press release changing the labeling of those statistical analyses (which the FDA had been reviewing without pushback for over a year).  Also, she did not believe then and does not believe now that there was anything related to her professional responsibilities at FibroGen that was uniquely stored on her laptop and not duplicated elsewhere on FibroGen's servers.  Therefore, even apart from litigation, which she did not foresee, she did not believe that she was depriving FibroGen of anything unique or of the slightest value.  Yu Decl. ¶¶ 3, 43-51.

**Hard copy documents:**  Dr. Yu had hard copy documents in her office (which she visited only rarely during COVID) and at home.  On February 16, 2021, she visited her office for the last time and left to her successor as CMO and his assistant (who had been her assistant) the decision which hard copy documents to keep – except for certain non-unique documents she suggested be shown to her successor.  On March 14, 2021, she sent back to FibroGen all hard copy documents at her house.  If documents were shredded or otherwise destroyed, that was not her decision and not her doing.  She does not believe any hard copy documents she possessed were in any way unique.  Rather, they were simply printouts of materials that existed electronically on FibroGen's system and, so far as she knows, still do exist in that electronic form.  Yu Decl. ¶¶ 4, 35-42.

**The circumstances leading up to the events at issue:**  In November 2020, Dr. Yu learned she would be leaving her role as FibroGen CMO and entered into a Transition, Separation, and Consulting Agreement with FibroGen on November 27, 2020.  Yu Decl. ¶ 12; Pls. Ex. 17.  Dr. Yu remained CMO until December 20, 2020, at which point she became an Executive Advisor.  *Id.*  Dr. Yu's employment with FibroGen ended on March 15, 2021.  *Id.*

Starting in November 2020, Dr. Yu found herself increasingly out of the loop at FibroGen.

Yu Decl. ¶¶ 23, 55. Plaintiffs' own recital of facts shows Dr. Yu was not a party to the internal discussions at FibroGen about roxadustat safety analyses. Pls. Ex. 11; Yu Decl. ¶¶ 52-55. Dr. Yu was not included in the communications about stratification factors shown in Plaintiffs' Exhibits 12 and 13. She was never informed of Dr. Eisner's presentation to the FibroGen board and did not attend the board meeting. Pls. Exs. 14-15. Dr. Yu did not participate in the April 2, 2021 call between the FDA and FibroGen and was not shown the Clinical Information Amendment FibroGen drafted as a follow-up to the April 2 call. Pls. Ex. 44. Dr. Yu did not see the script drafted for Dr. Eisner in preparation for that call with the FDA. Pls. Ex. 45.

Dr. Yu did not know Dr. Eisner had concerns about the labeling of statistical analyses of roxadustat data in the NDA and she did not know FibroGen was preparing a press release changing that labeling. Yu Decl. ¶¶ 3, 24, 53, 55. Nor was Dr. Yu involved with or informed of FibroGen's communications with outside counsel. Pls. Ex. 5; Yu Decl. ¶¶ 54-55. Dr. Yu did not receive a formal litigation hold notice until April 6, 2021, the day of FibroGen's press release. Yu Decl. ¶¶ 42, 52. None of the communications from FibroGen to Dr. Yu regarding her laptop contained a legal hold notice, and at no point before April 6 did FibroGen intimate that there was a possibility of litigation. Pls. Exs. 29, 31, 32, 33, 35, 38. Dr. Yu did not know that Enrique Conterno and Michael Lowenstein were exchanging emails with counsel at Cooley regarding her laptop on March 29, 2021. Yu Decl. ¶ 54. Before April 6, no attorney contacted Dr. Yu about her laptop. *Id.* Dr. Yu herself did not retain counsel until on or about April 22, 2021. Yu Decl. ¶ 55.

## III. ARGUMENT

To avoid burdening the Court with repetitious arguments, Dr. Yu joins in and incorporates by reference the arguments made in the FibroGen Opposition relevant to the denial of Plaintiffs' Motion as to Dr. Yu. Dr. Yu writes separately to address additional points specific to her. Plaintiffs also make a number of unfounded allegations, both in their Motion and in the Kaplan Declaration, about defense counsel. We answer those in the Declaration of Lee Brand, filed herewith.

Plaintiffs' Motion fails to establish any of the elements required to justify spoliation sanctions against Dr. Yu. To justify sanctions under Rule 37(e) of the Federal Rule of Civil Procedure, Plaintiffs must show (1) that Dr. Yu had a duty to preserve evidence, (2) that evidence

was, in fact, lost, (3), that Dr. Yu failed to take reasonable steps to preserve the evidence, and (4) that the evidence cannot be restored or replaced through additional discovery. *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-cv-1893-HRL, 2016 WL 5870218, at *2 (N.D. Cal. Oct. 7, 2016). Plaintiffs cannot show and have not shown any of these elements.

**A.     In March 2021, Dr. Yu Had No Duty to Preserve Evidence Because No Litigation Was Pending or Reasonably Foreseeable to a Person in Dr. Yu's Circumstances**

Plaintiffs' motion does not establish that Dr. Yu had a duty to preserve evidence before April 6, 2021. A party's obligation to preserve evidence for use in litigation arises when litigation is pending or becomes reasonably foreseeable. *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012); *Best Label Co. v. Custom Label & Decal, LLC*, No. 19-cv-03051-SI (VKD), 2022 WL 1525301, at *2 (N.D. Cal. May 13, 2022). Reasonable foreseeability is an objective standard that asks "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id.*; *Waymo LLC v. Uber Techs.,* Inc, No. C 17-00939 WHA, 2018 WL 646701, at *14 (N.D. Cal. Jan. 30, 2018). A reasonable medical doctor, standing in Dr. Yu's shoes, would not reasonably have foreseen litigation here as of February 16, 2021, March 14, 2021 or March 29, 2021, the dates she took the acts challenged by this motion.

Plaintiffs argue there are two reasons why Dr. Yu should have foreseen litigation: (1) the FDA's decision to convene an AdCom to evaluate the roxadustat NDA, and (2) Dr. Eisner's concerns about the labeling of the analyses of roxadustat safety data, specifically the "changed" stratification factors on which Plaintiffs base their claims in this action. Neither argument holds water. First, FibroGen made clear to investors that an AdCom was possible, and the FDA's reasons for convening an AdCom had nothing to do with the claims in this action. Second, Dr. Yu *did not know* there were internal conversations at FibroGen about changing the labeling of stratification factors, or that FibroGen was planning a press release on the subject. Whatever concerns Dr. Yu's successor (Dr. Eisner) may have had, nobody shared them with Dr. Yu.

**1.     Litigation Was Not Reasonably Foreseeable After the Advisory Committee Announcement**

FibroGen leadership, including Dr. Yu, expressed confidence in roxadustat but repeatedly

-4-

reminded investors that the FDA might convene an AdCom and that the decision whether or not to convene an AdCom was out of FibroGen's control. *See, e.g.,* Brand Decl. ¶ 23, Ex. A. Analysts noted this and at least one said – well before the April 6, 2021 press release – he was surprised the FDA had not convened an AdCom before it did. Pls. Ex. 7, at FGEN-CA-0526608.

For her part, before late February 2021, Dr. Yu did not expect an AdCom. Her interactions with the FDA gave her optimism that drug approval was likely. Feedback from the FDA at the Midcycle Review Meeting on June 26, 2020 and the Late Cycle Review Meeting on October 20, 2020, both suggested no AdCom would be convened. Yu Decl. ¶¶ 11-13.

On February 24, 2021, the FDA told FibroGen it was considering an AdCom. Pls. Ex. 3. The FDA cited concerns about risk of thrombosis, seizure and infection. Cardiovascular safety and mortality were not mentioned. *Id.* At the meeting, FibroGen asked whether the concerns could instead be addressed by changes to the proposed product labeling. Pls. Ex. 3. The FDA agreed to consider that option. Yu Decl. ¶ 14. On March 1, 2021, the FDA said it would convene an AdCom. The FDA reiterated the main concerns driving its decision to convene an AdCom were related to blood clots. MACE was discussed, but there was never any mention of problems with FibroGen's statistical analysis. Yu Decl. ¶ 15 (citing Pls. Ex. 4).

In these meetings, and thereafter, so far as Dr. Yu knew, the FDA made clear its primary concerns were about blood clots (thrombosis), not with stratification factors used in the MACE analyses. Plaintiffs' claims against FibroGen, on the other hand, are based on the statistical analysis of heart safety and mortality endpoint analyses, namely MACE, MACE+ and ACM analyses. In other words, the reasons the FDA convened an AdCom and the reasons Plaintiffs brought this lawsuit are different. Yu Decl. ¶¶ 16-17. Nothing about the announcement of the AdCom caused Dr. Yu to think roxadustat would be disapproved, much less that there might be litigation. *Id.* ¶¶ 18-19. Likewise, many of the analyst reports cited in Plaintiffs' Motion, which were sent to dozens of FibroGen employees, including Dr. Yu, expressed continuing optimism for roxadustat's approval despite the AdCom announcement. Pls. Exs. 6, 8. The single press release issued by a plaintiffs' law firm in the wake of the AdCom disclosure did not result in litigation; only a small fraction of this firm's "trolling" press releases lead to litigation. FibroGen Opp. at 6. What's more, Michael

-5-

Tung's email regarding the press release was not sent to Dr. Yu.  Pls. Ex. 10.

Even in hindsight, Dr. Yu's understanding of the reasons for the AdCom were correct.  The FDA Briefing Document submitted to the AdCom stated stratification factors made no difference in the findings of the studies presented in the NDA:  "The MACE meta-analysis included pre-specified, trial-specific stratification factors.  The applicant also provided results using common stratification factors defined post hoc.  The findings were qualitatively similar, regardless of the stratification factors."  Yu Decl. Ex. 1, at 47.  At the AdCom, there was little if any discussion of stratification factors.  Dr. Yu had no reason to believe, then or now, that the AdCom was convened because the FDA wanted to discuss the stratification factors used in the roxadustat data analyses.  Yu Decl. ¶ 20.

Plaintiffs' motion mischaracterizes Dr. Yu's deposition testimony regarding analyst reports following the March 1, 2021 AdCom announcement.  She testified she understood the contents of the analyst reports she was shown.  Pls. Ex. 20 ("Yu Dep.") 150:8-151:6.  She never testified that she believed, nor does she believe, there were inconsistencies between FibroGen's public statements about the likelihood that roxadustat would receive FDA approval and the FDA's decision to convene an AdCom.  *Id.*  Nothing in the email she was shown at her deposition gave her reason to anticipate litigation against herself or FibroGen.  *Id.*  She specifically testified that she did not anticipate or consider the possibility of litigation after the stock drop following the AdCom announcement.  Yu Dep. 150:25-151:6 ("Q: after the 30%-plus stock price drop…were you aware that there was the potential for securities litigation against the company…? A: No.").  She did not believe the AdCom announcement would lead to litigation.  Yu Decl. ¶ 21.

**2.    Dr. Eisner's Concerns About the Labeling of Statistical Analyses Did Not Trigger a Duty to Preserve Because Dr. Yu Did Not Know About Any Such Concerns**

In late 2020, because of COVID, Dr. Yu rarely came into FibroGen's office.  After her last face-to-face meeting with FibroGen's CEO on November 15, 2020, she came into the office only one more time, on February 16, 2021, to pick up her personal effects.  Yu Decl. ¶ 22.

From November 2020 on, her role at FibroGen began to shrink.  She was no longer invited to Board of Director meetings.  After she switched from CMO to Executive Advisor on December 21, 2020, she was no longer invited to executive meetings.  Until her last day as a FibroGen employee,

-6-

March 15, 2021, she did participate in some virtual meetings and some emails with the clinical team in preparing responses to FDA questions. But increasingly she was out of the loop. She never met her successor, Dr. Mark Eisner, in person. She had one short Zoom meeting with him, on March 18, 2021, but does not recall him expressing any opinion about stratification factors or MACE cardiovascular safety analyses – something she is sure she would have recalled had it happened. Yu Decl. ¶ 53.

Until April 6, 2021, when she first saw the press release of that date, she did not know that Dr. Eisner had any concerns about the labeling of the statistical analyses of roxadustat safety data. She did not know Dr. Eisner was preparing to present his concerns to FibroGen's board, and she did not know Dr. Eisner was preparing a press release swapping some labels. She did not know of Dr. Eisner's plan to switch the primary analyses in the roxadustat NDA with sensitivity analyses also included in the NDA – both sets of analyses were given to the FDA in the NDA and had been under review for one year and three months without comment or dispute. FibroGen did not inform her of its plans to release the April 6, 2021 press release or show her any drafts of it. She first found out about the press release when she read it online on April 6, 2021. She had no reason to believe FibroGen was about to do anything that might call into question her team's work or might lead to litigation. Yu Decl. ¶ 24.

**3.      Dr. Yu's Other Communications With FibroGen Did Not Alert Her to Any Concerns, Much Less Anything Suggesting a Risk of Litigation**

In March 2021, Dr. Yu received emails and calls from FibroGen about returning her company-issued laptop. But before April 6, 2021, no one from FibroGen sent her a legal hold notice. Before she received the legal hold notice on April 6, no one at FibroGen told her they anticipated litigation, or told her anything that caused her to expect litigation against FibroGen, much less litigation against her. Yu Decl. ¶ 52.

Plaintiffs' motion alleges that Mr. Conterno exchanged "numerous" emails about Dr. Yu's laptop with counsel at Cooley on March 29, 2021. She knew nothing of that and was not copied on any of those emails. Before April 6, 2021, FibroGen did not tell her it was consulting with counsel about her laptop or about potential litigation. Before April 6, no attorney contacted her about the

-7-

laptop. Yu Decl. ¶ 54.

Before April 6, 2021, no one at FibroGen told Dr. Yu they planned to retain or had retained counsel in anticipation of litigation. Her employment relationship with FibroGen had effectively ended and she was not kept in the loop. The first time she heard FibroGen had retained counsel was via an email from Michael Lowenstein (FibroGen's chief legal counsel) the evening of March 30, 2021. That counsel was not Cooley but Arnold & Porter, a firm she was told had FDA experience. Arnold & Porter interviewed her via Zoom for the first time on April 2, 2021 but did not tell her the purpose of its assessment, or tell her to preserve documents, or ask her about documents. After this interview, at which she was not represented by counsel because she saw no need for counsel, she still had no inkling that a press release, much less a dispute or litigation over stratification factors for MACE analyses, was in the works. She did not retain counsel until roughly a week and a half after she learned that she had been sued in this litigation. She retained Eric Wei on or about April 22, 2021 and the law firm of Dorsey & Whitney LLP on or about April 26, 2021. She switched from Dorsey & Whitney to Pillsbury Winthrop Shaw Pittman LLP early in June 2021. Yu Decl. ¶ 55.

**4.     Dr. Yu Had No Intent, Motive or Reason to Deprive Anyone of Any Evidence**

Plaintiffs claim the April 6, 2021 press release shows that certain heart safety data analyses for roxadustat were "manipulated" because FibroGen analyzed the data using some stratification factors that were not chosen before the data were unblinded. Plaintiffs' argument seems to be that Dr. Yu knew the data were manipulated, thought this might lead to litigation, and therefore had some motive to hide evidence of manipulation. But all parts of this argument are wrong.

Dr. Yu believed at the time and still believes that the statistical approach FibroGen took on her watch was scientifically appropriate. She never thought it was inappropriate, much less that it would lead to disputes or litigation. The choice of primary analyses of the cardiovascular endpoints was not finalized until the Pre-NDA meeting with the FDA in July 2019, which (as the public knew) was after the data had been unblinded. E.g., Dkt. 110, at 440-41, 452, 497 (SEC filings). Some analyses and the stratification factors used in some of those analyses were chosen after the data were unblinded, but this was communicated to the FDA. Dr. Yu believes FibroGen had sound scientific reasons to make these choices and she stands by them. Yu Decl. ¶ 26.

Her team's use of some stratification factors chosen post-unblinding was not concealed, not by her, and not from the FDA. FibroGen on her watch told the FDA what stratification factors it was using, and why, both in the NDA filed in December 2019 and before the NDA. Yu Decl. ¶ 27.

The FDA had all the roxadustat safety data. It had analyses using only study-specific stratification factors chosen pre-unblinding. It also had analyses combining stratification factors chosen pre-unblinding and stratification factors chosen post-unblinding. The FDA knew that some of the analyses used stratification factors chosen post-unblinding; it knew this because the NDA so stated, in its Integrated Summary of Safety, or "ISS," entitled Cardiovascular Safety Endpoint Analysis Report," a copy of which attached as Exhibit N to the Brien Declaration in support of FibroGen's Opposition to Lead Plaintiffs' Motion for Spoliation Sanctions ("Brien Decl.") being filed under seal by FibroGen as part of its response to this motion. The ISS portion of the NDA lists all the stratification factors FibroGen decided to use. It specifies which were chosen before the data were unblinded and which were added later. It explains (in § 2.8.5, Brien Decl. Ex. N at 37-40) the reasons for adding some stratification factors later. It presents analyses both ways – using some stratification factors chosen post-unblinding and using only stratification factors chosen pre-unblinding. It clearly labels which analyses used which stratification factors. Besides, all the raw data were presented to the NDA – which is why it is a document of over 20 million pages. All this – data and analyses – had been vetted and reviewed by outside statisticians and clinical development physicians. The NDA could not be finalized and filed without the approval of the roxadustat leadership teams at AstraZeneca, which FibroGen got. Also, the FDA knew that the analyses themselves were not finally selected and agreed to with the FDA until the Pre-NDA meeting of July 2021, well after all the data were unblinded. None of this was concealed from the FDA. Yu Decl. ¶¶ 28-30. Dr. Yu had no motive to hide or destroy information that could not be hidden or destroyed because it had all been given to the government over a year earlier.

The FDA never indicated that it disapproved of any stratification factors used in the roxadustat analyses, either in direct communication to FibroGen or in the AdCom briefing or meeting. The FDA never indicated it was unhappy with FibroGen's choice of stratification factors. In its mock-ups of proposed warning labels for roxadustat, the FDA used data derived from analyses

-9-

including post-unblinding stratification factors.  Yu Decl. ¶ 31, referring to Brien Decl. Ex. T at FGEN-CA-0956500.  The FDA also directed FibroGen to conduct some further analyses.  In so doing, it listed the stratification factors FibroGen had presented as primary as the stratification factors to be used in these further analyses.  Yu Decl. ¶ 31.  And, on March 1, 2021, Dr. Ellis Unger, Director of FDA Office of Cardiology, Hematology, Endocrinology and Nephrology (OCHEN) and Office of New Drugs (OND), Center for Drug Evaluation and Research (CDER), explicitly acknowledged that the safety analyses presented in the roxadustat NDA were "performed per agreement at the PreNDA meeting."  Yu Decl. ¶ 33, quoting Pls.' Ex. 4, at FGEN-CA-0007941.  So Dr. Yu had nothing to hide and no reason to think the FDA had any issues with stratification factors or their labeling.

The changes made by Dr. Eisner in April 2021 were changes in labeling – he presented no new data and no new analyses.  For NDD, he swapped the labels "primary" and "sensitivity" on ISS Tables 6 and 20.  Table 6 had been labeled "primary"; it became "sensitivity."  Table 20 had been labeled "sensitivity"; it became "primary."  Brien Decl. Ex. N, at 45, 71.  Similarly, for DD, he swapped the labels "primary" and "sensitivity" on ISS Tables 22 and 31.  Table 22 had been labeled "primary"; it became "sensitivity."  Table 31 had been labeled "sensitivity"; it became "primary."  Brien Decl. Ex. N, at 81, 96.  Similarly, for ID, he swapped the labels "primary" and "sensitivity" on ISS Tables 36 and 44.  Table 36 had been labeled "primary"; it became "sensitivity."  Table 44 had been labeled "sensitivity"; it became "primary."  Brien Decl. Ex. N, at 104, 121.  There was nothing to hide because all of this had been presented to the FDA in December 2019.  Yu Decl.  ¶¶ 32, 34.

For all these reasons, in March 2021 Dr. Yu had no reason or motive to try to hide or destroy anything.  To her knowledge nobody had questioned the labeling of the stratification factors.  And the FDA knew all about them.  Destroying something would have been futile and pointless had the idea even occurred to her, which it did not.  Yu Decl. ¶ 34.

For reasons explained below, when Dr. Yu replaced her hard drive, Dr. Yu believed and still believes it contained no unique Fibrogen-related documents that were not already saved on FibroGen's email or computer servers.  Yu Decl. ¶ 3.  What's more, Dr. Yu *documented* the actions Plaintiffs claim were intentional spoliation by *taking photographs* of (1) the vendor breaking her

-10-

hard drive (Pls. Ex. 83), and (2) the boxes of documents she sent back to FibroGen with Ms. Autrand. Pls. Ex. 51, Yu Decl. ¶ 41, Ex. 2. The photographs are not dispositive on their own, but it is implausible that a person acting with intent to deprive another party of evidence would photograph his or her own attempt at spoliation. Dr. Yu had no intent to deprive anyone of evidence, and Plaintiffs have not offered any evidence to support their argument that she did. Because there is no intent, sanctions under Rule 37(e) are not appropriate.

**5.    Case Law Does Not Support a Duty to Preserve on These Facts**

Plaintiffs cannot establish Dr. Yu acted with an intent to deprive any party of evidence for the same reason their other arguments fail: Dr. Yu did not anticipate litigation. Dr. Yu could not have acted "with the intent to deprive another party of the information's use in the litigation," because she did not conceive of litigation at all. *See hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2022 WL 18399982, at *18 (N.D. Cal. Nov. 4, 2022). Neither the circumstances nor the timing of Dr. Yu's actions show an intent to deprive anyone of evidence.

Plaintiffs cite the Court in *hiQ Labs*: "[t]he most decisive factor in the intent analysis is the timing of the offending conduct." 2022 WL 18399982, at *20 (internal brackets and quotations omitted). But the timing of Dr. Yu's conduct defeats Plaintiffs' attempt to show intent to deprive. Dr. Yu replaced her hard drive on March 29, 2021, more than one week before she learned of FibroGen's April 6 press release or received a litigation hold notice. Yu Decl. ¶¶ 24, 42, 52, 55. She turned over the contents of her office on February 16, 2021, before the FDA had even mentioned it might convene an AdCom, and she returned her six boxes of hard copy documents to FibroGen more than three weeks before FibroGen issued and she received the April 6 litigation hold. Yu Decl. ¶¶ 4, 22, 39-41. Unlike *Fed. Trade Comm'n v. Noland*, No. CV 20-00047-PHX-DWL, 2021 WL 3857413, at *12 (D. Ariz. Aug. 30, 2021), where defendants installed "elaborate encrypted privacy-focused apps" *one day after* they discovered they were being investigated by the FTC, Dr. Yu acted days and weeks before she had any idea litigation was possible. The timing of the email from Human Resources instructing Dr. Yu not to delete information from her laptop is immaterial. Even if she saw the email, it contained no hint about litigation or the events that precipitated the April 6, 2021 press release. Pls. Ex. 35.

-11-

The spoliating party in *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006), ran a program to wipe the contents of his computer *after the commencement of an employment discrimination action in which he was the plaintiff*, and well after his employer had filed its own action for declaratory judgment. Plaintiffs do not and cannot dispute that no action had been filed when Dr. Yu replaced her hard drive. The defendant in *WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 WL 1967209, at *2 (N.D. Cal. Apr. 24, 2020), who erased files from his laptops before returning them to his employer, ran internet searches for litigation-related terms ("what is employee solicit consequence penalty") before he erased the files and testified that "he was worried WeRide might sue him for soliciting WeRide's other employees." Dr. Yu has testified to the opposite: she did not anticipate or consider the possibility of litigation against FibroGen or herself when she replaced her laptop hard drive. Yu Dep. 150:25-151:6; Yu Decl. ¶ 3.

Plaintiffs cite no authority with circumstances remotely like the facts of this case. In *Glaukos Corp. v. Ivantis, Inc.*, No. SACV 18-620 JVS (JDEx), 2020 WL 5914552, at *4 (C.D. Cal. Jul. 30, 2020), Ivantis, the party subject to sanction, had instituted an auto-delete policy that led to the email loss at issue the same year it retained a patent litigation firm for the specific purpose of examining the Glaukos patents at issue in the litigation. In contrast, Dr. Yu did not retain counsel until April 22, 2021, after she had received a litigation hold from FibroGen. Yu Decl. ¶¶ 42, 55.

Plaintiffs mischaracterize the holding in *Waymo LLC v. Uber Technologies, Inc.*, 2018 WL 646701, at *15, where the court found Uber foresaw litigation because Uber *repeatedly argued* it foresaw litigation while advocating for joint-defense and common-interest privileges. In *Waymo*, the court also found it was clear from Uber's actions and the acquisition agreement at issue that the acquisition presented a high risk of litigation by Waymo specifically. *Id.* Plaintiffs' attempt to analogize that situation to our case fails because Dr. Yu had not retained counsel before she replaced her hard drive and returned boxes of documents to her former employer. Yu Decl. ¶ 55.

In *Doubleline Capital LP v. Odebrecht Finance, Ltd.*, No. 17-CV-4576 (GHW) (BCM), 2021 WL 1191527, at *2, *6 (S.D.N.Y. Mar. 30, 2021), the only authority cited by Plaintiffs that does not rely on retention of counsel to find a duty to preserve, the court found there was a duty to preserve evidence because the spoliating party "knew (and had known for months) that their international

-12-

bribery scheme was the subject of many investigations," including by authorities in the United States, Switzerland, and Brazil. When the *Doubleline* court concluded "[c]ertain types of incidents tend to trigger litigation," it contemplated "[l]arge-scale criminal bribery schemes," not a drop in stock price and a trolling press release from one plaintiffs' law firm.

**B.    The Evidence at Issue Was Not Unique and Exists Elsewhere**

Spoliation will not be found unless the movant can show ESI was, in fact, lost. *See, e.g. Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018). Sanctions under Rule 37(e) are "foreclosed if the purportedly 'lost' electronically stored information may be retrieved from additional discovery or discovery from third parties." *Envy Hawaii LLC v. Volvo Car USA LLC*, Civ. No. 17-00040 HG-RT, 2019 WL 1292288, at *3 (D. Haw. Mar. 20, 2019).

In *Oracle v. Hewlett Packard*, the court denied HP's sanctions motion, finding ESI was not "lost" for the purposes of FRCP 37(e) if it was retrievable from other custodians. 328 F.R.D. at 552. The court cited the Advisory Committee's notes to the 2015 amendment to Rule 37: "[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." *Id.*; Fed. R. Civ. P. 37 Advisory Committee's note (2015).

In *Oracle*, HP argued the alleged spoliating party (Hurd, HP's former CEO) destroyed evidence because there were documents produced by other Oracle custodians that should have also been produced by Hurd, but weren't. 328 F.R.D. at 552. Hurd's declaration explained he had "several layers of managers below him" and "did not believe that he had unique documents…that other employees did not also receive." *Id.* at 553. HP also pointed to the fact that Oracle had produced few or no documents from Hurd for two events in which Hurd was directly involved. *Id.* at 552. Despite this, the court concluded "[HP] has not shown that the documents produced from other custodians show that documents unique to Hurd are missing." *Id.* at 553.

Plaintiffs have not met their burden to show evidence was actually lost, nor can they. The circumstances in Dr. Yu's case do not even rise to the level of circumstantial evidence unsuccessfully offered in *Oracle*. Plaintiffs have not shown discrepancies between Dr. Yu's and FibroGen's productions, nor do they claim those productions appear to be missing documents. *See*

-13-

*Oracle*, 328 F.R.D. at 553 (HPE "does not have to show that specific documents are missing," but "HPE must at least show that categories of irreplaceable relevant documents were likely lost").

**1.      Dr. Yu's Hard Copy Documents Were Just Printouts of E-Documents**

As FibroGen's CMO, Dr. Yu oversaw the work of approximately 100 FibroGen employees across two continents and liaised with people at AstraZeneca and Astellas, the co-sponsors of roxadustat.  Yu Decl. ¶ 35.  Her role as a leader and supervisor required her to review documents created by colleagues in the biopharmaceutical field and employees of FibroGen and roxadustat's other sponsors, AstraZeneca and Astellas.  *Id.*  As a result, Dr. Yu spent much of her time at work reviewing and editing documents created by others, rather than creating documents herself.  *Id.*  Because the nature of her work was collaborative and her colleagues were far-flung (even before COVID), Dr. Yu received the documents she worked on via email, and she sent her comments and revisions via email.  Yu Decl. ¶¶ 35, 37.  On the rare occasion Dr. Yu generated original content or created a document herself, it was shared via email or saved to the appropriate folder on FibroGen's server.  Yu Decl. ¶¶ 37-38.  In her deposition, Dr. Yu testified to her practice of saving all documents to her work folder on the FibroGen network.  Yu Dep. 49:8-50:7.  She believed that FibroGen's IT department backed up all this material, as well as anything on her hard drive, from time to time.  Yu Decl. ¶ 38.

On August 24, 2019, Dr. Yu suffered a detached retina in her left eye.  It took three surgeries and about nine months of recovery for Dr. Yu to regain full vision in her left eye.  Dr. Yu could not drive during much of this period and it was difficult for her to read a computer or phone screen.  Because of project timelines, she was unable to take the recommended two to three months off from work to avoid eye strain.  In the six months leading up to the submission of the Roxadustat NDA, which coincided with her recovery from eye surgery, Dr. Yu had to review an unusually large number of documents.  To mitigate the discomfort of reading on a computer screen, and because she could not drive to the office, Dr. Yu had her assistant, Carrie Autrand, print and deliver documents to her home so she could review them in hard copy.  By definition, these documents were either sent via email or already accessible on the FibroGen network.  These documents were not unique.  They existed on FibroGen's servers regardless of what Dr. Yu did with the hard copies.  Yu Decl. ¶ 36.

-14-

By the time her employment at FibroGen ended in March 2021, Dr. Yu had accumulated six boxes of these printed documents at her house in Hillsborough. Yu Decl. ¶ 39; Pls. Ex. 50. Dr. Yu did not believe any of the boxes contained unique documents that did not exist elsewhere on FibroGen's network. Yu Decl. ¶¶ 39-40. When arranging for their return to Fibrogen, Dr. Yu described them as six boxes of "waste paper and old binders." Pls. Ex. 50. And return the boxes to FibroGen is what she did: Dr. Yu did not destroy the contents of the boxes and never attempted to hide what she was doing. To the contrary, she documented her actions with photographs. Yu Decl. ¶ 39; Pls. Ex. 51. People attempting spoliation do not document their actions with photographs.

Owing to COVID, Dr. Yu worked mainly from home in 2020 and 2021 and rarely went to FibroGen's offices in San Francisco. She did, however, have an office there and knew it contained some documents, as well as some personal effects. In preparation for the conclusion of her employment, she went to her FibroGen office on February 16, 2021, to pick up her personal items. She also identified some non-unique documents in her office that she thought would possibly be of interest to her successor as CMO, Dr. Mark Eisner, and asked that these be saved for Dr. Eisner. Her assistant took two photographs of these documents so that she could confirm the documents to be saved. Those photographs were attached to the message that is Pls. Ex. 49. Plaintiffs, however, did not include the photographs in their exhibit but we do. Yu Decl. ¶ 41, Ex. 2. The other documents in her office all were redundant – printouts of documents saved electronically on FibroGen's servers – so she did not suggest that these be saved. Yu Decl. ¶ 41.

**2.      Dr. Yu's Hard Drive Contained Nothing Unique**

As CMO, Dr. Yu spent much of her time reviewing the work of FibroGen employees and colleagues or partners in the biopharmaceutical industry role, sending and receiving documents by email. Yu Decl. ¶¶ 35, 38. On the rare occasion she created documents herself, Dr. Yu would attach those documents to an email or save them to her work folder on the FibroGen network. *Id.* Dr. Yu did not save personal files to the FibroGen network. As she testified in her deposition, she kept her personal files in separate folders saved to the hard drive. Yu Dep. 52:20-53:8. Dr. Yu's personal folders contained more than a decade of personal information including photographs of her children and friends, personal financial and tax documents, personal medical information protected by

-15-

HIPAA, and correspondence with friends unrelated to work. Yu Decl. ¶ 43.

On March 15, 2021, immediately after her retirement party on Zoom, Dr. Yu discovered she was locked out of her FibroGen laptop and could no longer access her personal files. Yu Decl. ¶ 44. She had a phone conversation with FibroGen CEO Enrique Conterno that evening to tell him about her personal documents and request access to her computer so she could retrieve them. Yu Decl. ¶ 45. Mr. Conterno agreed and Dr. Yu emailed him later that evening to confirm his permission for her to access her laptop. She copied two members of the FibroGen IT team on the email: Carl Drinkwater, then Vice President of IT at FibroGen, and Rudy Tadina. Yu Decl. ¶ 46; Pls. Ex. 25.

Mr. Conterno responded to the email stating "I am fine providing access to Peony's computer so she can access her personal files on the hard-drive." Pls. Ex. 25. But Plaintiffs' Motion omits a key part of the record. Mr. Drinkwater later contravened Mr. Conterno's statement that Dr. Yu could access her computer. Yu Decl. ¶ 46. In a phone conversation, Mr. Drinkwater told Dr. Yu he could not give her direct access to her laptop and personal files, but that she needed to return the laptop to FibroGen and wait for FibroGen IT to remove and return her personal files to her. Yu Decl. ¶ 46; Yu Dep. 117:3-13. Dr. Yu emailed Mr. Tadina, who was a friend at work and had often helped her with IT issues. Mr. Tadina responded to her request for access to her laptop by saying "I am told to only take direction from Carl [Drinkwater]." Yu Decl. ¶ 47; Ex. 3. This email, a continuation of the thread in Plaintiffs' Exhibit 25, is not included in Plaintiffs' Motion.

Dr. Yu was very concerned about her personal files, many of which had sentimental value. She was worried about being without her personal documents for an indeterminate period of time, and she was worried FibroGen IT might inadvertently delete the files. She appealed to Mr. Tadina for help, and he was kind enough to help her, despite the fact that he did not have permission to give her access to her laptop. Mr. Tadina said he would give Dr. Yu a limited time window to download her personal files, at which point he would change the credentials and she would no longer have laptop access. He told Dr. Yu he could get in trouble if anyone found out he had given her access to the laptop, and she feared he risked losing his job by helping her. She did not tell anyone about the login credentials. She retrieved her personal documents from the FibroGen laptop and did not retrieve or copy anything belonging to Fibrogen. Yu Decl. ¶ 48.

-16-

Dr. Yu believed that once she returned her laptop to FibroGen, the company would be able to view computer usage information and discover that Mr. Tadina had helped her gain access to the laptop to retrieve personal files. Yu Decl. ¶ 49. If she returned her laptop via FedEx, there was no guarantee that Mr. Tadina would be the one to unbox and examine her laptop. To make sure Mr. Tadina received the laptop first, Dr. Yu considered delivering it in person. However, she and her husband had moved to Bellevue, Washington. She was concerned about the health risks of a flight to San Francisco in March 2021. Not wanting to risk a flight, but fearing for her friend Mr. Tadina's job security, Dr. Yu felt the best option was to replace the hard drive on her FibroGen laptop with a new hard drive. That way, the laptop login information would not appear and expose what Mr. Tadina had done to help her. Yu Decl. ¶¶ 49-50.

On March 29, 2021, Dr. Yu drove to NerdsToGo, a vendor near her house. Yu Decl. ¶¶ 50-51. She asked the vendor to replace the hard drive in her FibroGen laptop with a new hard drive of the same model, aiming to return company equipment as it was issued to her. Dr. Yu did not believe there were any unique FibroGen documents stored on the hard drive, but she was mindful that the drive might contain confidential information, albeit information already stored elsewhere on FibroGen's network. She asked the vendor to physically destroy the old hard drive. He did so by breaking it into two pieces with his fingers, which Dr. Yu carefully photographed (Pls. Ex. 83) – again, photographing what she was having done is not the act of someone attempting spoliation. She wanted to document the destruction of the hard drive, not hide it. Dr. Yu knew she could be denied her severance payment if she kept any confidential FibroGen information, and she wanted to be able to prove she was not inappropriately keeping company property. Once the hard drive was replaced, Dr. Yu mailed her laptop back to FibroGen via FedEx. Yu Decl. ¶¶ 50-51.

Dr. Yu did not and does not believe that any FibroGen-related documents on her hard drive or in the boxes of hard copy documents were unique. Yu Decl. ¶¶ 3-4. Plaintiffs have not offered any basis for concluding these documents are lost, that is, that they are "irretrievable from another source, including other custodians." *Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, No. 14-1064 (JDB), 2017 WL 1214424, at *2 (D.D.C. Mar. 30, 2017) (finding missing documents and emails were lost for purposes of Rule 37(e) *only* because they "[did] not appear to have been stored

-17-

elsewhere," and noting deleted emails were not lost when they had been sent to another party, which therefore had copies.)  Sanctions are not available here because Plaintiffs' burden of proving uniqueness has not been met.

**3.     Dr. Yu Did Preserve and Her Counsel Has Reviewed and Produced Other Sources of Evidence That May Be Unique**

As explained above, by April 6, 2021, when she first received a legal hold and was put on notice of possible litigation, Dr. Yu no longer had her FibroGen laptop or any hard copy documents. But she did still have other electronic sources of information potentially relevant to this litigation— namely the mobile phone that she retained upon her separation from FibroGen, her personal Gmail and Hotmail accounts, and her personal Dropbox account.  Brand Decl. ¶ 5.  Dr. Yu provided counsel full access to all of these electronic sources, ensured that they were properly preserved, and facilitated the collection of over 150,000 records from her mobile phone, over 90,000 records from her email accounts, and over 200 records from her Dropbox.  *Id*.  Following a responsiveness review, counsel has produced over 10,000 pages of documents on behalf of Dr. Yu from these sources.  *Id*.  Notably, all of this production from Dr. Yu's collection is ***in addition*** to FibroGen's production from its own collection of over 600,000 documents from Dr. Yu's FibroGen emails and network drive.  *Id*. ¶ 6.

**IV.   CONCLUSION**

For the foregoing reasons, and those set forth in FibroGen's Opposition, Dr. Yu respectfully requests that the Court deny Plaintiffs' Motion for Spoliation Sanctions.

Dated:  July 17, 2023

PILLSBURY WINTHROP SHAW PITTMAN LLP
WEI GROUP LLP

*/s/ Bruce A. Ericson*
Bruce A. Ericson
Attorneys for Defendant
K. Peony Yu, M.D.