PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON (SBN 76342)
bruce.ericson@pillsburylaw.com
LEE BRAND (SBN 287110)
lee.brand@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:        415.983.1000
Facsimile:        415.983.1200

WEI GROUP LLP
ERIC S. WEI (*pro hac vice*)
ewei@weillp.com
One World Trade Center, Suite 8500
New York, New York 10007-0103
Telephone:        212-248-0808
Facsimile:        212-248-0475

Attorneys for Defendant
K. Peony Yu, M.D.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO HEADQUARTERS

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**DECLARATION OF DEFENDANT K. PEONY YU, M.D. IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS**<br><br>Hearing Date:   August 31, 2023<br>Time:   1:30 p.m.<br>Courtroom:   5 – 17th Floor (Zoom)<br>Judge:   Hon. Edward M. Chen |

I, K.  PEONY YU, M.D., declare:

1.      I am a defendant in this action.  Except as otherwise indicated below, I make this declaration on the basis of my own personal first-hand knowledge.  If called as a witness, I could and would testify competently to the matters set forth in this declaration.

2.      I served as Chief Medical Officer ("CMO") at FibroGen, Inc.  ("FibroGen") from April 2016 to December 20, 2020.  After that date, I served as Executive Advisor to the CEO at FibroGen until March 15, 2021, when I ceased to be an employee of FibroGen.  After that date, I served as a consultant to FibroGen until August 2021.  Since March 2021, I have been employed as Chief Medical Officer for Apollomics Inc., a clinical-stage biopharmaceutical company developing oncology drug candidates to address difficult-to-treat and treatment-resistant cancers.

3.      I make this declaration in opposition to the motion filed June 8, 2023 by Lead Plaintiffs for spoliation sanctions.  I did not intend to hide or destroy any evidence.  As explained at my deposition and as further detailed in this declaration, I did have a vendor replace the hard drive in my company-issued laptop and destroy the old hard drive, but I did so at a time when I did not foresee any litigation and had no idea that my successor as CMO had any disagreement with the presentation of statistical analyses in the roxadustat New Drug Application ("NDA") submitted to the U.S.  Food and Drug Administration ("FDA") by FibroGen while I was CMO, much less that FibroGen would issue a press release changing the labeling of those statistical analyses.  Also, I did not believe then and do not believe now that there was anything related to my professional responsibilities at FibroGen that was uniquely stored on my laptop and not duplicated elsewhere on FibroGen's servers.  Therefore, even apart from litigation, which I did not foresee, I did not believe that I was depriving FibroGen of anything unique or of the slightest value.

4.      Turning from my laptop to hard copy documents, I had hard copy documents in my FibroGen office (which I visited only once after mid-November 2020) and at my house in Hillsborough.  On February 16, 2021, I visited my office for the last time (to pick up personal effects) and left the documents there to my successor as CMO and his assistant (who had been my assistant) to determine what to keep – except for copies of certain documents that I asked to be kept, not because I thought they were unique (they were not) but because I wished to bring them to the

attention of my successor.  On March 14, 2021, I sent back to FibroGen and left for my successor anything and everything that had been printed out for reading at home.  If documents were shredded or otherwise destroyed, that was not my decision and not my doing.  Also, I do not believe any hard copy documents I possessed (in my office or at home) were in any way unique.  Rather, they were simply printouts of materials that existed electronically on FibroGen's system and, so far as I know, still do exist in that electronic form.

5.    In accusing me of spoliation of evidence, Plaintiffs offer various pieces of circumstantial evidence that they argue put me on notice that litigation was reasonably foreseeable.  I disagree.  For the reasons explained during my deposition and further explained in this declaration, before and during March 2021 and until April 6, 2021, I did not foresee any litigation, period.  I do not believe that any reasonable person who knew what I knew at the time would have foreseen litigation either – and certainly not litigation about the matters Plaintiffs allege.

### My Background and Work at FibroGen

6.    I received a Bachelor of Science in Chemical Engineering from the University of California, Davis, in 1983.  I received an M.D.  from the University of California, Davis, School of Medicine and completed my medical residency training at Stanford University School of Medicine in 1992.

7.    From 1992 to 2000, I worked at the Palo Alto Medical Foundation, where I founded and served as head of the Department of Physical Medicine and Rehab.  From 2000 to 2001, I was the Assistant Director of Clinical Development at Elan Corporation, a biopharmaceutical company, where I worked on the development of a novel drug candidate that was approved by the FDA in 2004.  From 2001 to 2004, I served as Director of Clinical Development at Pain Therapeutics, Inc., a research-based pharmaceutical company, where I worked on protocol design, study execution, data analysis, and regulatory interactions for multiple drug candidates.  From 2004 to 2007, I served as Director of Clinical Development at ALZA Corporation (part of Johnson & Johnson), another research-based pharmaceutical company, where I served as global clinical lead for a drug candidate in the conduct, analysis and reporting of Phase III studies, as well as preparation and defense of an NDA for approval by the FDA and a Marketing Authorization Application for approval by the EU.

-2-

From 2006 to 2008, I was Vice President of Clinical Research at Anesiva, a biopharmaceutical company, where I served as a leader for clinical development which resulted in FDA approval of a novel drug-device combination product for use in adults and later in children, as well as advancement of another drug candidate from a Phase II to a Phase III clinical program.

8.    In 2008, I joined FibroGen, a San Francisco-based pharmaceutical company that was working to develop medicines for the treatment of anemia, fibrotic disease, and cancer.  I joined FibroGen as Vice President of Clinical Development and was assigned to lead the clinical development of roxadustat.  In April 2016, I became FibroGen's Chief Medical Officer.  My primary responsibility as CMO was providing leadership and oversight for global clinical development of all FibroGen's therapeutic programs.  During my tenure, roxadustat was FibroGen's most advanced therapeutic.  Roxadustat is an oral treatment for anemia in patients with chronic kidney disease.  Its mechanism of action is based on oxygen sensing science in human cells, subject of 2019 Nobel Prize in Physiology or Medicine awarded to three outstanding scientists: Kaelin (Harvard), Semenza (Johns Hopkins), and Ratcliff (Oxford).

9.    As FibroGen CMO, my work included leadership and oversight for clinical development of roxadustat in collaboration with FibroGen's co-development partners (AstraZeneca and Astellas) globally, including the United States.  This included working with FibroGen's multi-disciplinary team (clinical development physicians, clinical operation personnel, drug safety physicians, biostatisticians, data managers, clinical operations, regulatory affairs staff, etc.) and colleagues from FibroGen's co-development partners on the conduct of phase III trials, the reporting of the study results, as well as preparing and filing an NDA with the FDA.  On December 23, 2019, FibroGen announced its filing of the roxadustat NDA.  On February 18, 2020, the FDA accepted the NDA filing.  Once the FDA accepts the filing of a New Drug Application, the agency normally has 10 months to complete its review of the drug.  This deadline is known as the PDUFA date ("PDUFA" is an acronym referring to the Prescription Drug User Fee Act of 1992, a statute that ordinarily requires the FDA to say "yes" or "no" to a New Drug Application within 10 months of its filing).  December 20, 2020 was thus the PDUFA date for the roxadustat NDA.  It was the date by which I hoped – and expected – that the FDA would approve roxadustat.

**Before April 6, 2021, I Had No Reason to Anticipate Litigation**

10.    In their motion, Plaintiffs claim there are two reasons why litigation was foreseeable by March 29, 2021: (1) the FDA decided to convene an Advisory Committee Meeting ("AdCom") to consider the roxadustat NDA, and (2) my successor as CMO, Mark Eisner, allegedly had concerns about some of the methods used to analyze roxadustat safety data, namely the "changes in stratification factors" that make up the basis for Plaintiffs' claims in this action.  Based on what I knew and what I did not know about both of these topics at the end of March 2021, I had no inkling that there was a risk of litigation related to roxadustat.  Nor do I think any other reasonable person in my shoes would have anticipated litigation at the time.

**The FDA's Reasons for Convening an AdCom Had Nothing to Do with**

**the Claims Made in this Action**

11.    During the FDA's review of the roxadustat NDA, between the NDA submission date of December 23, 2019, and the PDUFA date of December 20, 2020, the FDA did not tell FibroGen that an AdCom might be needed, but instead stated "no AdCom planned" in the Mid-Cycle Review meeting on June 26, 2020, and in Late-Cycle Review meeting on October 20, 2020, both of which I attended.  The FDA and FibroGen underwent label negotiation (discussion of the package insert) starting in August 2020, with multiple rounds of comments through November 2020.  In my experience, label negotiation usually occurs right before the FDA approves  a new medicine.  The label negotiations thus added to my sense that roxadustat would likely be approved.

12.    In November 2020, when I learned I would be leaving my role as CMO at FibroGen, I negotiated for an agreement that named December 20, 2020 as my last day as FibroGen's CMO. Pls. Ex. 17, § 2(a).  [References to "Pls. Ex." in this declaration are to the exhibits filed with Plaintiffs' motion for spoliation sanctions.]  As explained in paragraph 9 above, December 20, 2020 was the PDUFA date for the roxadustat NDA.  I believed roxadustat was a strong candidate for approval and I was anticipating the FDA would approve it on December 20, 2020.  I thus hoped to spend my last day as FibroGen CMO celebrating the approval of a drug whose clinical trials and NDA I had worked on for many years.

13.    It was not until mid-December 2020, several days before the PDUFA date of December 20, 2020, that the FDA requested a meeting with FibroGen to discuss needing more time to review the NDA.  The FDA personnel said that they were extending the PDUFA date to March 20, 2020, but likely would complete their review before then.

14.    On February 24, 2021, FibroGen representatives, including me, met with the FDA for an update on the NDA review status.  Pls. Ex. 3.  The FDA for the first time raised the possibility of convening an AdCom, citing concerns about risk of thrombosis, seizure and infection.  An FDA representative, Dr. Ann Farrell, stated **"the most compelling reason for an Advisory Committee is that it would be beneficial to hear from *nephrologists*,"** that is, kidney doctors.  Pls. Ex. 3. (emphasis added).  Cardiovascular safety endpoint analysis and mortality were not mentioned at all. Pls. Ex. 3.  FibroGen asked whether the concerns could instead be addressed by changes to the proposed product labeling.  Pls. Ex. 3.  The FDA agreed to consider that option.

15.    On March 1, 2021, the FDA said it would convene an AdCom.  Pls. Ex. 4.  The FDA reiterated the main concerns driving the AdCom decision were related to blood clots.  Pls. Ex. 4. Secondary concerns included seizure, infections, sepsis, heart attack, and stroke.  *Id.*  MACE was discussed, but there was no mention of problems with FibroGen's statistical analysis.

16.    In these meetings, and thereafter, so far as I knew, the FDA made clear its primary concerns were about blood clots (thrombosis), not about stratification factors used in the MACE analyses.  Pls.' Mot. Exs.  3, 4.

17.    Plaintiffs' claims against FibroGen, on the other hand, are based on the specific factors in the *statistical analysis of heart safety and mortality endpoints,* namely MACE, MACE+ and ACM analyses.  [**MACE** stands for Major Adverse Cardiovascular Events, which include death, myocardial infarction (or heart attack), and stroke, **MACE+** stands for MACE, Plus Hospitalization for Unstable Angina or Congestive Heart Failure, and **ACM** stands for All-Cause Mortality.]  In other words, the reasons the FDA convened an AdCom and the reasons Plaintiffs brought this lawsuit are different.

18.    FibroGen promptly and publicly announced the AdCom on March 1, 2021, the day of its meeting with the FDA at which the FDA confirmed its decision to convene an AdCom.  The

-5-

AdCom announcement did not correct any of FibroGen's prior public statements because there was nothing to correct. The FDA's ultimate decision to convene an AdCom was brand new information. FibroGen had been frank with the public about the possibility of an AdCom, and the fact that the decision was ultimately not in its control.

19.    Because I have decades of experience with the FDA approval process, I was not unduly concerned about the AdCom or the fact the FDA was raising questions about safety. After all, most pharmaceuticals come with a long list of possible health risks, and the purpose of the FDA review process is to assess whether the benefit of the drug candidate out-weights its risks. I had hoped roxadustat's NDA would be so compelling that no AdCom would be necessary, but the announcement of the AdCom gave me no reason to expect litigation. Much less would I have expected *this* litigation because the reasons for the AdCom had nothing to do with the allegations Plaintiffs make in this case.

20.    In hindsight, I believe my understanding of the reasons for the AdCom were correct. The FDA Briefing Document submitted to the AdCom regarding roxadustat said the stratification factors made no difference in the findings of the studies presented in the NDA. A true and correct copy of the FDA Roxadustat Briefing Document is attached to this declaration as Exhibit 1. On page 47, the FDA says: "The MACE meta-analysis included pre-specified, trial-specific stratification factors. Ther applicant also provided results using common stratification factors defined post hoc. The findings were qualitatively similar, regardless of the stratification factors." While I did not attend the AdCom I watched portions of it online and I have read the transcript and know that during the AdCom itself, there was little discussion of stratification factors. I had no reason to believe, then or now, that the AdCom was convened because the FDA felt it had been misled by the stratification factors used in the roxadustat data analyses.

21.    Plaintiffs' motion mischaracterizes the testimony I gave at my deposition regarding analyst reports following the March 1, 2021 AdCom announcement. I testified that I understood the contents of the analyst reports I was shown. I never testified that I believed, nor do I believe, there were inconsistencies between FibroGen's public statements and the FDA's decision to convene an AdCom. Nothing in the email I was shown at my deposition with analyst reports attached gave me

-6-

reason to anticipate litigation against myself or FibroGen. Yu Dep. 150:8-151:6. I specifically testified in my deposition that I did not anticipate or consider the possibility of litigation after the stock drop following the AdCom announcement. Yu Dep. 150:25-151:6 (**"Q: after the 30%-plus stock price drop…were you aware that there was the potential for securities litigation against the company..? A: No."**). I, too, was surprised by the FDA's decision to convene the AdCom, but I did not believe the AdCom announcement would lead to litigation.

**I Did Not Know My Successor Had Any Difference In Opinion About the Labeling of Statistical Analyses Until FibroGen Issued a Press Release Changing the Labeling**

22.     In late 2020, because of COVID, I, like others, rarely came into FibroGen's office. I did come into FibroGen's office on November 15, 2020 to meet with the CEO, in what proved to be our last face-to-face business meeting. At this meeting, I learned that I would be transitioning out of the CMO role and, as I described in paragraph 12 above, I negotiated to have the PDUFA date be my last day as CMO. After that day, I came into the office only one more time, on February 16, 2021, as described in paragraph 41 below.

23.     From November 15, 2020 on, my role at FibroGen began to shrink. I was no longer invited to Board of Director meetings. After I switched from CMO to Executive Advisor on December 21, 2020, I was no longer invited to executive meetings. Until my last day as a FibroGen employee, March 15, 2021, I did participate in some virtual meetings and some emails with the clinical team in preparing responses to FDA questions. But increasingly I was out of the loop.

24.     I have never met my successor, Dr. Mark Eisner, in person. In our one Zoom meeting, a short meeting on March 18, 2021, he did not express any opinion about MACE cardiovascular safety analyses to me. Until April 6, 2021, when I first saw the press release of that date, I did not know that Dr. Eisner had any difference in opinion about statistical analyses of roxadustat safety data or which of the analyses to present as **"Primary."** I did not know Dr. Eisner was preparing to present his difference in opinion to FibroGen's board, and I did not know FibroGen under new management was preparing a press release changing the labeling of several analyses of roxadustat data. I did not know of FibroGen's plan to switch the primary analyses in the roxadustat NDA – which had been under FDA review for one year and three months without dispute – with

-7-

sensitivity analyses also included in the NDA.  FibroGen did not inform me of its plans to release the April 6, 2021 press release or show me any drafts of it.  I first found out about the press release by reading it online on April 6, 2021, after it had been released to the public.  In other words, I had no reason to believe FibroGen was about to do anything that might call into question our team's work or might lead to litigation.

**I Never Had Any Reason to Think that I or My Team Had Done Anything Wrong in Preparing the Roxadustat NDA and Therefore Had No Reason or Motive to Hide or Destroy Anything**

25.     Plaintiffs claim the April 6, 2021 press release shows that certain heart safety data analyses for roxadustat were "manipulated" because FibroGen analyzed the data using some stratification factors that were not chosen before the data were unblinded.  Plaintiffs' argument seems to be that I knew the data were manipulated, thought this might lead to litigation and therefore had some motive to hide evidence of manipulation.  I disagree with all parts of this argument.

26.     The statistical approach that FibroGen took on my watch was scientifically appropriate.  I never thought it was inappropriate, much less that it would lead to disputes or litigation.  We did change some of our analyses and the stratification factors used in those analyses after the data were unblinded.  But we had sound scientific reasons to do so and I stand by them.

27.     Our use of some stratification factors chosen post-unblinding was not concealed, not by me, and not from the FDA.  We told the FDA we were doing so, and why, both in the NDA filed in December 2019 and before the NDA.

28.     The FDA had all the roxadustat safety data.  It had analyses using only stratification factors chosen pre-unblinding.  It also had analyses combining stratification factors chosen pre-unblinding with stratification factors chosen post-unblinding.

29.     The FDA knew that some of the analyses used stratification factors chosen post-unblinding; it knew this because the NDA so stated, in its Integrated Summary of Safety, or "ISS," entitled Cardiovascular Safety Endpoint Analysis Report," true and correct excerpts of which are attached to the Brien Declaration in support of FibroGen's Opposition to Lead Plaintiffs' Motion for Spoliation Sanctions ("Brien Decl.) as Exhibit N.  The ISS portion of the NDA lists all the

-8-

stratification factors we decided to use. It specifies which were chosen for which analysis before the data were unblinded and which were added later. It explains (in Brien Decl. Ex. N, Section 2.8.5) the reasons for adding some stratification factors later. It presents analyses both ways – using some stratification factors chosen post-unblinding and using only study-specific stratification factors chosen pre-unblinding. It clearly labels which analyses used which stratification factors. Besides, all the raw data and the analysis dataset were presented in the NDA electronically to enable the FDA to independently analyze the data – which is why it is a document of over 20 million pages. All this – data and analyses – had been vetted and reviewed by a multidisciplinary team consisting of FibroGen's employees, service providers and consultants (including statisticians), and AstraZeneca's employees. The NDA could not be finalized and filed without the approval of the partner clinical development team at AstraZeneca, which we got.

30. Also, the FDA knew that the primary cardiovascular safety analyses themselves and the key components of these analyses were not finally selected and agreed to with the FDA until the Pre-NDA meeting of July 2021, well after all the data were unblinded. None of this was concealed from the FDA.

31. The FDA never indicated that it disapproved of any stratification factors used in the roxadustat analyses, either in direct communication to FibroGen or in the AdCom briefing or meeting. The FDA never indicated it was unhappy with FibroGen's choice of stratification factors. In fact, in its mock-ups of proposed labels for roxadustat, the FDA used data derived from analyses including post-unblinding stratification factors. Attached as Exhibit T to the Brien Decl. is a true and correct copy of one such draft label, dating from December 3, 2020 and reflecting round 4 of FDA's label comments. It includes data taken directly from Tables 6 and 22 of the ISS (Brien Decl. Ex. N, pages 45 and 81 of 2156) – the tables then designated "Primary" that set forth analyses using some common stratification factors chosen after the data were unblinded. The FDA also directed us to conduct some further analyses on other safety parameters. In so doing in February 2021, it listed the stratification factors used in the "Primary" analyses as the stratification factors to be used in these further analyses of additional safety parameters.

DR. YU'S DECLARATION OPPOSING MOTION FOR SPOLIATION SANCTIONS
4877-4375-7421                                                                  No.  3:21-CV-02623-EMC

32. The changes made by Dr. Eisner in April 2021 were merely changes in labeling – he presented no new data and no new analyses, and withdrew no data or analyses. For NDD, what he did was swap the label of "primary" on Table 6 with the label of "sensitivity" on Table 20. Brien Decl. Ex. N, pages 45 and 71. Similarly, for DD, he swapped the labels on Tables 22 and 31. Brien Decl. Ex. N, pages 81 and 96. Similarly, for ID, he swapped the labels on Tables 36 and 44. Brien Decl. Ex. N, pages 104 and 121. [Brien Decl. Ex. N includes Section 2.8.5 and all the tables mentioned in this paragraph and in paragraph 29 above.]

33. Even in hindsight, I had no reason or motive to try to hide or destroy anything. On March 1, 2021, Dr. Ellis Unger, Director of FDA Office of Cardiology, Hematology, Endocrinology and Nephrology (OCHEN) and Office of New Drugs (OND), CDER, explicitly acknowledged that the safety analyses presented in the roxadustat NDA were "performed per agreement at the PreNDA meeting." Pls. Ex. 4, at FGEN-CA-0007941.

34. For all these reasons, in March 2021 I had no reason or motive to try to hide or destroy anything. To my knowledge nobody had questioned our stratification factors. And the FDA knew all about them, so destroying something would have been futile and pointless had the idea even occurred to me, which it did not.

**My Retention and Return of Hard Copy Documents**

35. As Chief Medical Officer, I reported directly to FibroGen's CEO. Vice Presidents of Clinical Development reported to me. Directly or indirectly, I oversaw the work of approximately 100 FibroGen employees across three time zones and two continents. I also needed to communicate and align with Astellas and AstraZeneca colleagues, who worked in two other time zones and another continent. My responsibilities as CMO required me to review many documents created by colleagues in the biopharmaceutical field and employees of FibroGen, as well as employees of AstraZeneca and Astellas. At my level in the hierarchy, most of what I did was review and edit documents created by others, as opposed to creating documents myself.

36. On August 24, 2019, I suffered a detached retina in my left eye. I had an extensive surgery to correct the issue on August 25, 2019, complicated by increased pressure in the left eye for a week after surgery, and temporary visual impairment from the artificial medium placed inside the

-10-

left eye to hold the repaired retina in place, further complicated by an accelerated cataract due to exposure to this medium, which in turn required a second surgery to replace the lens, and a third surgery to remove scar tissues in the left eye. It took about nine months for me to regain the majority of the visual function and it was the Spring of 2020 before my left eye became fully functional again. During this nine months of a partial and blurry vision in the left eye, I was unable to drive part of the time, and it was challenging to read on computer or phone screen. Because of project timelines at work, I was unable to follow my physician's instruction to take off two to three months from work and to avoid straining my eye. As was always the case during my tenure as FibroGen CMO, I was working long hours, and the amount of review required over the six months prior to the NDA submission was exponential of my usual workload. To overcome the challenge of visual impairment interfering with driving and difficulty with reading on computer screen in the second half of 2019, I instructed my assistant to print out electronic documents and deliver them to my home, so that I could review them in hard copy. Anything that my assistant printed out for my review resided on FibroGen's servers and thus was available to people at FibroGen other than me and would remain available to them regardless of what I did with my hard copies.

37. I tend to provide comments to colleagues via email or orally in meetings. When I marked up documents written by others or, much less frequently, created documents myself, I attached them to emails and circulated them to colleagues. I never possessed unique data sets or analyses related to roxadustat's clinical trials. All roxadustat-related data were collected by FibroGen or its partners' clinical operations and data management team members, and analyses were conducted by FibroGen's or its partners' biometrics team (consisting of statisticians, statistical programmers, and data managers), or its service providers under their supervision, usually in a computer language called SAS. I am not trained in SAS programming. All the clinical data and related analyses and reports submitted to the FDA as part of the 20-million-page NDA are housed on FibroGen servers.

38. I understood that all emails and attachments sent by or to me were preserved on FibroGen's servers. It is my understanding and belief that essentially everything I printed to review in hard copy also existed in electronic form on FibroGen's servers. Because of the nature of my

DR. YU'S DECLARATION OPPOSING MOTION FOR SPOLIATION SANCTIONS

work, the majority of my time was spent reviewing work generated by employees I oversaw at FibroGen. On the rare occasion I generated original content, it was either in an email, or attached to an email. If and when I ever created a document myself, I understood and believed that it was kept in places that FibroGen could access and periodically did back up. As I testified in my deposition, I believe the various files I accumulated over a decade at FibroGen were saved on the FibroGen network or share drive, which I also refer to as my "work folder." Yu Dep. 49:8–50:7. My recollection, understanding and belief in 2021 was that anything I generated was accessible to others at FibroGen and periodically backed up – even if the document had been saved to the hard drive on my laptop.

39. Because the disability in my left eye in the second half of 2019 led to my temporary preference for reviewing printed document at home, coupled with the need for reviewing large volumes of documents over those few months, by early 2021 I had accumulated six cardboard boxes of documents in my home office. I did not believe any of these boxes contained unique documents that did not exist elsewhere on FibroGen's email server or network folders. As I described them at the time, they contained "waste paper and old binders." Pls. Ex. 50. Early in March 2021, toward the end of my employment at FibroGen, I arranged for all of these papers to be returned to FibroGen's offices. I did not destroy any of the contents of these boxes or attempt to hide what I was doing. On the contrary, I took a photograph of the boxes before they were picked up by Carrie Autrand, my assistant and a FibroGen employee, to be returned to FibroGen. Pls. Exs. 51, 78.

40. I returned the boxes of documents to FibroGen so that FibroGen could determine what to do with them. I believed none of the documents were unique, so I had no reason to object to their being shredded. At no time during and including the period when I returned the boxes of documents to FibroGen was I aware that anyone might have any concerns about stratification factors in the analyses of MACE presented in the NDA. In short, I was not aware of any likelihood of litigation regarding roxadustat.

41. Owing to COVID, I worked mainly from home in 2020 and 2021 and rarely went to FibroGen's offices in San Francisco. I did, however, have an office there and knew it contained some documents, as well as some personal effects. In preparation for the termination of my

-12-

employment, I went to my FibroGen office on February 16, 2021, to pick up my personal items. I also identified some documents in my office that I thought would possibly be of interest to my successor as CMO, Dr. Mark Eisner, and asked that these be saved for Dr. Eisner. My assistant took two photographs of these documents so that I could confirm these were the documents to be saved. Those pictures were attached to the message that is Pls. Ex. 49. Plaintiffs did not include the photographs in their Exhibit 49. True and correct copies of those photographs are attached to this declaration as Exhibit 2. These documents were not unique, and also existed electronically, but I thought they were worth Dr. Eisner's attention. The other documents in my office also were redundant – printouts of documents saved electronically on FibroGen's servers – but I did not think they were worth his review, so I did not suggest they be saved.

42.     On April 25, 2021, after this lawsuit was filed and after I received a legal hold notice from FibroGen (that occurred on April 6, 2021), I, at my counsel's suggestion, reached back out to Carrie Autrand, who had coordinated pickup of the boxes from my house in the Bay Area, to ask what happened to the documents, and she informed me that those had been shredded per FibroGen's instruction. As I stated in my message to Carrie, this was simply to know what FibroGen had done with the documents. Pls. Ex. 53.

### My Handling of My FibroGen Laptop and Its Hard Drive

43.     During the twelve years I worked for FibroGen, FibroGen-issued laptops were the only computers I used for work or for personal matters – I owned no computer of my own. As I testified in my deposition, I received my most recent FibroGen laptop in 2017 or early 2018 and I kept my personal and work files on the laptop's hard drive. Yu Dep. 26:6-28:5, 52:20-53:8. My personal folders contained more than a decade's worth of personal information, including photos of my children, family, and friends, personal financial and tax documents, personal medical information (some covered by HIPAA), and correspondence with friends unrelated to work. In addition, my laptop was also configured so that I can access my FibroGen emails and I could write emails even when I was offline so that I could work in places without wi-fi when traveling, like on flights.

-13-

44.    On March 15, 2021, my tenure as Executive Advisor to the CEO officially concluded. I remained a non-employee company consultant, but at around 5 pm on March 15, 2021, immediately after my retirement party on Zoom, FibroGen unexpectedly locked my laptop so that I could no longer log in.  In the past, even when there was no wi-fi connection, I could still log in, but not this time.  When I called Mr. Rudy Tadina (IT) as I usually did when I had computer problems, I learned that he had been instructed to shut  off my computer.

45.    I had a phone conversation with Enrique Conterno, CEO of FibroGen, on the evening of March 15, 2021.  In that phone call, I told Mr. Conterno about the many personal documents and photographs stored on my FibroGen laptop.  I asked Mr. Conterno to grant me access to my FibroGen computer so that I could retrieve these personal files.  He agreed by phone, and I emailed him later that evening, confirming in writing that he had agreed to grant access to my laptop.  I copied two members of the FibroGen IT department on that email: Carl Drinkwater (Rudy's boss) and Rudy Tadina.  Mr. Conterno responded to my email stating **"I am fine providing access to Peony's computer so she can access her personal files on the hard-drive."**  Pls. Ex. 25.

46.    Carl Drinkwater was the Vice President of IT at FibroGen at this time.  On March 16, 2021, I talked to Mr. Drinkwater about accessing my FibroGen laptop.  Though I had copied him on my emails with Mr. Conterno authorizing my login to the laptop, Mr. Drinkwater told me that he could not give me direct access to my laptop and personal files, but rather that I would need to return the laptop to FibroGen and that he or one of his colleagues in IT would remove and return my personal files.  I testified to this during my deposition.  Yu Dep. 117:3-13.  Because Mr. Drinkwater was the Vice President of FibroGen IT, I believed he was dictating the manner of carrying out the permission that Mr. Conterno had given me to retrieve the personal files on my laptop.

47.    Rudy Tadina also worked in FibroGen IT.  Mr. Drinkwater was Mr. Tadina's supervisor.  Mr. Tadina and I had become friends while working at FibroGen.  I am no computer expert and had called on Mr. Tadina many times to help me when my computer misbehaved or I was stuck.  Around the time Mr. Drinkwater told me I would not be able to access my FibroGen laptop, Mr. Tadina told me that he did not have permission to allow me to access my FibroGen

-14-

laptop. When I emailed him asking for laptop access, noting that Mr. Conterno had authorized it, Mr. Tadina responded saying **"Hi Peony, I am told to only take direction from Carl [Drinkwater]."** A true and correct copy of this email is attached to this declaration as Exhibit 3. I understood this to mean that Mr. Drinkwater had told Mr. Tadina not to permit me to log in to my work-issued laptop, despite the fact that Mr. Conterno had given me his permission to do so.

48.     I was very concerned about losing access to my personal files, many of sentimental value including photos of friends who are no longer alive, for an indefinite period while I waited for them to be retrieved by someone else from my FibroGen laptop. I also feared that the IT staff might not find or copy my personal contents, or might inadvertently wipe the hard drive memory of the laptop while preparing it for use by the next employee who needs a laptop, especially as there was a chip shortage during the pandemic. I pleaded with my friend Mr. Tadina for his assistance, and he kindly offered to help me retrieve the files, though he told me he did not have permission to do so. He gave me his own credentials so that I could log in to my FibroGen laptop and download my personal photos and documents. Mr. Tadina gave me a limited time window until 5 pm on March 17, 2021, to download my files, at which point he would change his credentials and I would no longer have access to the laptop. Before he gave me the login credentials, Mr. Tadina asked that I not tell anyone he was giving me his credentials or access to the laptop. He told me he would get in trouble. I did not want my friend to be in trouble with his supervisor, and potentially risk losing his job for helping me. I did not tell anyone about the login credentials. On or about March 16 or 17, 2021, I used the login provided by Mr. Tadina to retrieve my personal documents from the FibroGen laptop. I did not retrieve or copy anything belonging to FibroGen, just my personal documents. I then deleted those personal files from the laptop.

49.     As noted, I'm no computer expert, but I believed that, once my laptop was returned, FibroGen would be able to see computer usage information showing I had used the credentials Mr. Tadina had given me to log in to the laptop. I worried my use of Mr. Tadina's credentials would be immediately evident because it was the most recent login to the computer. Mr. Tadina had helped me retrieve many personal files, and I did not want to get him in trouble. If I returned my FibroGen laptop via FedEx, I could not be sure that Mr. Tadina would be the one to unbox and examine the

-15-

laptop. If someone other than Mr. Tadina checked the laptop after it was delivered, I thought they would be able to see that he had given me login credentials. The only way to guarantee Mr. Tadina would unbox the laptop was to deliver it to him myself, in person, which I considered doing. But by this time my husband and I were residing in Bellevue, Washington. In March 2021, the COVID-19 pandemic was in full force, most people were still working from home, and COVID deaths were still tracked daily. I viewed air travel as a risk I wanted to minimize unless really necessary, and I was already very busy at my new job.

50.     Not wanting to fly and not having the time to drive, I felt the best option was to replace the hard drive on my FibroGen laptop with a new hard drive, so my login to the laptop would not appear and get Mr. Tadina in trouble. On March 29, 2021, I drove to a vendor near my house in Bellevue, Washington called NerdsToGo. I asked the vendor to replace the hard drive in my FibroGen laptop with a new hard drive of the same make and model. As I testified in my deposition, I wanted to replace the hard drive so that I could return the company equipment as it was issued to me.

51.     I asked the vendor to physically destroy the old hard drive. I did not believe there were any unique FibroGen documents stored on that hard drive. Other than the primary purpose of protecting Mr. Tadina, replacement of the hard drive also avoided the risk of FibroGen's confidential information – such as those emails stored in the hard drive – being exposed in the event the laptop disappeared in transit. Such email information is preserved on the FibroGen network system. The vendor destroyed the hard drive by breaking it into two pieces with his fingers. I took a photo showing the vendor destroying the old hard drive because I wanted to document its destruction, not hide it. Pls. Ex. 83. I wanted the photo to prove I was not keeping any FibroGen company property I was not entitled to. After all, the stated reason for denying me further use of the laptop during my consultancy was that I was going to work for what Mr. Conterno deemed a competitor (although my new employer is not developing drugs at all like roxadustat). I knew I could be denied my severance payment if I kept any confidential FibroGen information I was not entitled to keep. The severance payment was large, and it was important to me to have evidence that I was not inappropriately keeping company property. Hence, I took the photo. After the hard drive

-16-

was replaced, I returned my laptop to FibroGen, dropping it off at FedEx in Bellevue at 4:07 pm Pacific Time on March 30, 2021. On April 2, 2021, FibroGen confirmed receipt of the laptop. Sometime thereafter I received my severance.

**My Communications with FibroGen Did Not Alert Me to Any Concerns, Much Less Anything Suggesting a Risk of Litigation**

52. In March 2021, I received a number of emails and calls from FibroGen about returning my laptop. Before April 6, 2021, no one from FibroGen sent me a legal hold notice. Before I received the legal hold notice on April 6, no one at FibroGen told me they anticipated litigation, or told me anything that caused me to expect litigation against FibroGen, much less litigation against me.

53. On March 17, 2021, Dr. Eisner reached out to me to schedule a brief call. I had a Zoom call with Dr. Eisner the next day, March 18, 2021. As I testified during my deposition, the call lasted for less than 30 minutes. I do not remember what specifically was discussed during the call. Yu Dep. 159:1-160:6. But I am certain that Mr. Eisner did not suggest to me that he disagreed with the labeling or choice of stratification factors for primary MACE analysis in the NDA or his plans for a press release changing the labeling of the analyses presented in the NDA because such topics would have undoubtedly stuck in my memory. Also, if Dr. Eisner had raised such concerns, I believe the call would have lasted much longer than 30 minutes.

54. Plaintiffs' motion alleges that Mr. Conterno exchanged **"numerous"** emails about my laptop with outside securities litigation counsel at Cooley on March 29, 2021. I knew nothing of that and was not copied on any of those emails. Before April 6, 2021, FibroGen did not tell me it was consulting with any counsel about my laptop or about potential litigation. Before April 6, no attorney ever contacted me about the laptop.

55. Before April 6, 2021, no one at FibroGen told me they planned to retain or had retained counsel in anticipation of litigation. My employment relationship with FibroGen had effectively ended and I was not kept in the loop. The first time I heard FibroGen had retained counsel was via an email from Michael Lowenstein (FibroGen's chief legal counsel) on the evening of March 30, 2021, requesting a meeting to provide help to FibroGen. That counsel was not Cooley

-17-

but Arnold & Porter, whom I was told had FDA experience.  Arnold & Porter interviewed me via Zoom for the first time on April 2, 2021 but did not tell me the purpose of its investigation, or tell me to preserve documents, or ask me about documents.  After this interview, at which I was not represented by counsel because I saw no need for counsel, I still had no inkling that a press release, much less a dispute or litigation over stratification factors for MACE analyses, was in the works.  I did not retain counsel until roughly a week and a half after I learned that I was being sued in this litigation.  I believe I retained Eric Wei on or about April 22, 2021 and the law firm of Dorsey & Whitney LLP on or about April 26, 2021.  I switched from Dorsey & Whitney to Pillsbury Winthrop Shaw Pittman LLP early in June 2021.  After I retained counsel, I gave them full access to my cell phone and my personal Gmail account – the only things still in my possession that I believed might contain possibly relevant information.

56.    I did not and do not believe the actions I or my colleagues at FibroGen took were misleading to investors or the FDA.  I am proud of the hard work we put in to the roxadustat trials and NDA.  I never manipulated the analyses of roxadustat clinical trial results, and I feel to this day that I and my colleagues approached the study and data analysis correctly and in a scientifically and statistically sound manner.  I am hopeful roxadustat will be approved by the FDA someday in the future, much as it has been approved in many other countries.  I hope American patients can benefit from this medicine based on Nobel Prize winning science as the hundreds of thousands of Chinese patients with anemia due to chronic kidney disease over the past three years.  I was also pleased to learn from FibroGen's recent disclosure of a positive Phase III study of roxadustat for the treatment of chemotherapy-induced anemia in China, a study I contributed to its design during my tenure at FibroGen, with hope this medicine can help more patients in need there and around the world.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of July, 2023, at Bellevue, Washington.

_____
K.  Peony Yu, M.D.

-18-