SAXENA WHITE P.A.
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Counsel for Lead Plaintiffs Employees'
Retirement System of the City of Baltimore,
City of Philadelphia Board of Pensions and
Retirement, and Plymouth County
Retirement Association, and Lead Counsel
for the Proposed Class*

*[Additional counsel listed on signature page]*

COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
TIJANA M. BRIEN (286590)
(tbrien@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
ZANETA J. KIM (317844)
(zkim@cooley.com)
AMIE L. SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California  94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

*Attorneys for Defendants
FibroGen, Inc., Enrique Conterno,
James Schoeneck, Mark Eisner, and
Pat Cotroneo*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **<u>CLASS ACTION</u>** <br><br> **JOINT SUBMISSION RE: THE COURT'S REQUEST FOR INFORMATION REGARDING THE JULY 15, 2021 ALLEGED CORRECTIVE DISCLOSURE** |

The Parties hereby jointly file this supplemental submission, pursuant to the Court's request during the August 31, 2023 hearing on Lead Plaintiffs' Motion for Class Certification (ECF No. 147), for a chart identifying the information Lead Plaintiffs contend was first disclosed during the FDA's Cardiovascular Renal Drugs Advisory Committee Meeting, held on July 15, 2021 ("AdCom"), and setting forth the Parties' respective contentions as to why such information should or should not be considered a corrective disclosure.[1]

DATED: September 15, 2023

Respectfully submitted,

/s/ David R. Kaplan

**SAXENA WHITE P.A.**

David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

Steven B. Singer
ssinger@saxenawhite.com
Kyla Grant (admitted *pro hac vice*)
kgrant@saxenawhite.com
Sara DiLeo (admitted *pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (admitted *pro hac vice*)
jsaltzman@saxenawhite.com
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611

Maya Saxena (admitted *pro hac vice*)

---

[1] Capitalized but undefined terms have the meanings given to them in the operative Consolidated Class Action Complaint (the "Complaint") (ECF No. 97). "¶" references are to paragraphs of the Complaint. "P's Ex." references are to the exhibits attached to the Declaration of David R. Kaplan in Support of Lead Plaintiffs' Reply in Further Support of the Motion (ECF No. 192-1). "D's Ex." References are to the exhibits attached to the Declaration of Tijana M. Brien in Support of Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification (ECF No. 180-1). References to Exhibit letters are to the exhibits attached to this joint submission.

msaxena@saxenawhite.com
Lester R. Hooker (SBN 241590)
lhooker@saxenawhite.com
Dianne M. Pitre (SBN 286199)
dpitre@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Lead Counsel for the Proposed Class*

**COOLEY LLP**

*/s/ Patrick E. Gibbs*

*Attorneys for Defendants FibroGen, Inc., Enrique Conterno, James Schoeneck, Mark Eisner, and Pat Cotroneo*

**PILLSBURY  WINTHROP  SHAW  PITTMAN LLP**

*/s/ Bruce A. Ericson*
Bruce A. Ericson
Lee Brand

**WEI GROUP LLP**
Eric Wei

*Attorneys for Defendant K. Peony Yu, M.D.*

3

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| During the AdCom, it was revealed that: (i) the FDA "had a goal of 1.25" for the upper-bound hazard ratio for the Roxadustat trial data;[2] (ii) the FDA had previously rejected FibroGen's proposed upper bound of 1.3 because "it was defined after the results of the study were known"; and (iii) the FDA had expressly told FibroGen of its position during meetings leading up to the AdCom: as an FDA representative stated, "we had a goal of 1.25, and that's what we discussed during meetings [with FibroGen]. So that's why there was not an agreement on 1.3". AdCom Tr. 166:4-7 & 196:3-5.[3] | The AdCom revealed new information concerning the non-inferiority margin. Although the FDA Briefing Document noted (D's Ex. 8 at 47) that there was no agreement as to the upper bound of the non-inferiority margin being 1.3, there was *no information* available to the market that a 1.25 margin was the FDA's stated "goal." Indeed, prior to the release of this information during the AdCom itself, analysts had believed that the "Agency didn't draw a 'line in the sand' on a non-inferiority margin [], *thus [there was] no clear cut rationale for rejecting on the basis of roxa's 1.27 upper bound*." P's Ex. 14 (Bank of America).<br><br>After the AdCom disclosed that the FDA "had a goal of 1.25," and that this was "discussed during meetings" with FibroGen, analysts specifically highlighted this new information, stating: "*despite multiple previous assertions from FibroGen that an upperbound hazard ratio (HR) limit of 1.3 would be approvable, the [AdCom] confirmed that FDA had not agreed to this and in fact preferred 1.25 as an upper-bound*." P's Ex. 20 (Cowen, emphasis added). | A finding of "back-end" price impact requires proof that the information disclosed on July 15 was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to July 15), and (iii) "value relevant" (*i.e.,* caused at least some of the stock price decline). *Goldman Sachs Grp., Inc. v. Ark. Tchr. Rtrmt. Sys.*, 141 S. Ct. 1951, 161 (2021); *Basic v. Levison*, 485 U.S. 224, 238, 248 (1998).<br><br>The reference in the AdCom transcript to the FDA's "goal" for the upper bound of a non-inferiority margin was neither "corrective" nor "new." It certainly was not value relevant.<br><br>This information was not "corrective" because FibroGen never told investors that the FDA had agreed to an upper bound of 1.3. In fact, FibroGen clearly told investors that *no such agreement* had been reached, and the Court recognized this when it dismissed Plaintiffs' claim based on statements about agreement on noninferiority margins. (ECF No. 126 at 27.) Because FibroGen never told investors that it had an agreement with the FDA, this vague reference to the FDA's "goal" for an upper bound does not correct any challenged statement remaining in the case. |

---

[2] A hazard ratio is a key safety metric used in FibroGen's safety data analyses for Roxadustat that compared the risk of an adverse event for patients on Roxadustat as compared to either Epogen (for the DD group) or placebo (for the NDD group). ¶48.

[3] Exhibit A attached hereto is a true and correct copy of the transcript from the AdCom ("AdCom Tr."). This document is published on the FDA's website at https://www.fda.gov/media/152124/download.

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | This revelation meant that Roxadustat had failed to show non-inferiority in two key primary safety analyses, because the upper bounds of the non-manipulated analyses had exceeded the FDA's 1.25 "goal." ¶¶ 81, 175. This failure demonstrated that Roxadustat was materially inferior to placebo, which further established the falsity of multiple statements that the Court sustained in its Order denying Defendants' motions to dismiss. *Id.* (*see also* ECF No. 126-1 (false statements chart) at Statements 38 (FibroGen November 12, 2019 Form 10-Q represented, "the risk of MACE, MACE+, and all-cause mortality in Roxadustat patients were comparable to that in placebo patients based on a reference non- inferiority margin of 1.3") and 43 (on February 25, 2020, Defendant Conterno represented, "we do basically see hazard ratios about 1—slightly higher than 1, but the upper bound in each one of these cases, is below 1.3")).[4] <br><br>In its Order denying Defendants' motion to dismiss, the Court found that the 1.25 margin was "relevant" to sustained misstatements and that "there was sufficient reason for FibroGen to lie about the 1.25 figure." *See In re FibroGen, Inc.*, 2022 WL | Plaintiffs' discussion of the Court's July 15, 2022 Order is deeply misleading. The Court held that allegations regarding an upper bound of 1.25 remain "relevant" only to the extent that Plaintiffs claim FibroGen "manipulated" data to get its results below 1.25. (ECF No. 126 at 28, 50.) The discussion of this subject during the July 15, 2021 AdCom meeting does not have anything to do with any claim that FibroGen "manipulated" data to get below 1.25. Indeed, Plaintiffs' own theory is that the market learned the so-called "truth" about FibroGen's data "manipulation" through the April 6, 2021 press release. (¶¶71, 77.) <br><br>This information was not "new" because, given FibroGen's disclosures, the market clearly understood that the FDA might prefer an upper bound of 1.25 rather than 1.3. (*See, e.g.*, Ex. B[5] ("Given the ongoing debate about the acceptable NI margin (1.25 or 1.3), it's possible that the FDA now deems the dataset as inferior"); Ex. C (noting that NDD had "highest risk of approval" given that competitor "disclosed having a pre-specified NI margin of 1.25 . . . a cut-point that FGEN's NDD MACE data would not meet"); Ex. D (noting that "it is not impossible that the FDA may apply the same NI margin" of 1.25).) This is hardly |

---

[4] *See also* ECF No. 191-2 ("Reply") at 8 (explaining why the AdCom's disclosure of the FDA's 1.25 upper bound margin constituted new, corrective information).

[5] Exhibit B attached hereto is a true and correct copy of the April 6, 2021 Raymond James analyst report; Exhibit C attached hereto is a true and correct copy of the April 6, 2021 Bank of America analyst report; Exhibit D attached hereto is a true and correct copy of April 7, 2021 H.C. Wainwright & Co. analyst report.

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | 2793032, at *18 (N.D. Cal. July 15, 2022).  The Court explained that while "none of the relevant alleged statements imply an agreement with the FDA regarding the non-inferiority margin" (*id.* at *17), "***allegations that data was manipulated to conform to these margins survive*.*" *Id.* at *18. (emphasis added). | surprising, as the lack of an agreement on 1.3 necessarily meant that the FDA might prefer a lower number, and the colloquy during the AdCom meeting adds nothing new of substance.<br><br>Plaintiffs suggest that FibroGen knew all along (but failed to disclose to investors) that the FDA's "goal" was an upper bound of 1.25, but the AdCom transcript itself does not support any such conclusion.  Plaintiffs' position is based on a highly misleading quote from the transcript, removed from its context, and with deceiving language added by Plaintiffs to support their reading.<br><br>In response to the question of "what *would* have been your recommendation" (*Id.* at 195:8-12) (emphasis added), the full quote, without additions, reads:<br><br>• This is Dr. Farrell [from the FDA]. I was involved in the negotiations, and after the TREAT trial and dealing with Omontys, we had a goal of 1.25, and that's what we discussed during meetings. So that's why there was not an agreement on 1.3, and I agree with everything that Dr. Unger has said regarding it's somewhat arbitrary. (*Id.* at 196:1-7.)<br><br>Dr. Farrell never says that the FDA communicated this "goal" to FibroGen.  Dr. Farrell says the "goal" was discussed "in meetings," but does not say whether these were internal FDA meetings or meetings with FibroGen.  That is why Plaintiffs found the need to |

3

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | insert "[with FibroGen]" into the quote – but there is no factual basis for their alteration of this quote.<br><br>Plaintiffs also suggest that FibroGen knew but failed to inform investors that the FDA had previously "rejected" FibroGen's proposed upper bound of 1.3. But again, the AdCom transcript does not say that the FDA had "rejected" an upper bound of 1.3 ***at all*** (let alone, ***at any time before the AdCom meeting***), nor does it suggest that the FDA had ever previously communicated any such "reject[ion]" to FibroGen.  In fact, the FDA expressly stated that 1.3 was "reasonable." (Ex. A at 195:18.)  It also made clear that it was not rejecting a particular non-inferiority margin number, rather it was rejecting a method by which a single non-inferiority margin would be outcome determinative (*Id.* at 166:7-12.):<br><br><ul><li>I'll note the applicant and FDA did not agree prospectively on a risk margin.  Furthermore, we do not agree with the applicant's proposed margin of 1.3, as it was defined after results of the study were known.  Therefore, FDA does not agree on the interpretation of the results using strictly a noninferiority hypothesis testing approach.  Rather, our interpretation of the trial findings focuses on the estimation of MACE risk and the uncertainty around it.  (Ex. A at 166:3-12.)</li></ul>The use of the present tense – "we *do* not" agree – is inconsistent with any suggestion that the FDA had |

4

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | previously rejected 1.3 as the upper bound (much less that it had previously communicated any such rejection to FibroGen), as is the fact that the FDA acknowledged that the non-inferiority margin was "arbitrary." (*Id.* at 195:13-196:7.)<br><br>In any event, none of this information is value relevant. Common sense and the evidence show that FibroGen's stock price dropped after the AdCom meeting because the AdCom voted against approval of Roxadustat. There is no evidence that the FDA's "goal" of a 1.25 upper bound had any impact on the AdCom's vote or on the FDA's denial of the NDA.  The FDA itself confirmed in both the July 13 Briefing Document and in the AdCom transcript ***that it would not apply a non-inferiority hypothesis testing approach to evaluate the results*** of Roxadustat, meaning it would not use any particular non-inferiority margin and would instead focus on the overall estimation of MACE risk.  (D's Ex. 8 at 47, 50; Ex. A at 166:3-12.)  This is consistent with FibroGen's statements that the FDA would look at the "totality of evidence." (*See, e.g.*, ECF No. 126-1 at 11, 19, 39, 41.)  And no member of the AdCom suggested that his or her vote was based in any way on an upper bound of 1.25 or 1.3 (or any upper bound at all). Against that backdrop, it is absurd to suggest that a vague reference to a "goal" of 1.25 (or a purported rejection of 1.3) was the cause of FibroGen's stock drop. |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| The AdCom revealed that FibroGen's proposed dose mitigation strategy intended to address safety concerns was not viable for three principal reasons: (i) there was an "alarmingly negative" link between higher doses of Roxa and death, including a "dose-dependent increase in mortality," and FibroGen's own clinical data for Roxa was not "particularly conclusive," P's Ex. 17 at 2 (SVB Leerink); AdCom Tr. at 256:2-258:8; (ii) FibroGen had "no clear evidence that [its] mitigation strategy would influence other [adverse safety] events" beyond thrombosis, such as sepsis, *id.* at 132:19–133:19; and (iii) FibroGen had only recently proposed this strategy with the FDA, and thus the agency would not be able to properly evaluate it as part of the NDA. *Id.* at 187:8-14. | The AdCom revealed critical new information concerning FibroGen's proposed dose mitigation strategy. While the FDA Briefing Document noted that FibroGen's dose mitigation strategy was "plausible, but is unproven" (D's Ex. 8 at 12)—and FibroGen's own statements in support of the strategy prompted market analysts to note that a "lower starting dose could be better" (P's Ex. 13, Jefferies)—the information revealed ***during*** the AdCom showed that this strategy was not just unproven, but that it was doomed to ***fail.***<br><br>Rather than providing support for FibroGen's dose mitigation strategy, the AdCom revealed the opposite. Indeed, a prominent Wall Street pharmaceutical analyst noted that FibroGen had ***"appeared to confirm this alarmingly negative dose response"*** *at the AdCom*, thus further dooming Defendants' dose-mitigation strategy as a potential path to approval. P's Ex. 17 at 2 (SVB Leerink).<br><br>Furthermore, the information released during the AdCom concerning FibroGen's proposed dose mitigation strategy further revealed the falsity of Defendants' statements concerning the safety and efficacy of Roxadustat. For example, (i) on August 8, 2019, Defendant Yu stated that "our Phase 3 results confirmed the cardiovascular safety of [R]oxadustat" (ECF No. 126-1 at Statement 26); (ii) on March 2, 2020, Defendant Yu further represented that there was a "robust efficacy and safety profile demonstrated in our large Phase III program of over | Nothing about this theory is "corrective" or "new."<br><br>This information is not corrective for two reasons:<br><br>*First*, FibroGen did not make any statements to the market about a dose mitigation strategy prior to its mention in the July 13 Briefing Document. (*See* D's Ex. 8 at 12.) Therefore, there was nothing "corrective" about the dosing strategy. Indeed, Plaintiffs themselves argue that "FibroGen had only recently proposed this strategy with the FDA" as a "last-ditch proposal" before the AdCom. (*See* ¶ 105.) It makes no sense to suggest that the AdCom's or the FDA's reaction to a proposal that FibroGen only made at the last-minute could be deemed "corrective" of statements FibroGen had been making for months and years before the proposal even existed and which had nothing to do with dosing.<br><br>*Second*, Plaintiffs' claim that "FibroGen had 'no clear evidence that [its] mitigation strategy would influence other [adverse safety] events' beyond thrombosis, such as sepsis," does not correct any alleged fraud. FibroGen *never* purported to address anything other than thrombosis with its dose mitigation strategy and it certainly made no public statements representing that the dosing strategy was intended to address anything other than thrombosis. (*See* Ex. A at 257:2-18; D's Ex. 8 at 12.) |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | 8,000 patients" (*id.* at 44); (iii) on May 7, 2020, Defendant Yu represented "in comparison to placebo, we have demonstrated that cardiovascular safety in the MACE endpoint and MACE+ endpoint" (*id.* at 48); and (iv) on April 6, 2021, Defendant Eisner represented that use of pre-specified analyses "do not change the Company's assessment that Roxadustat is comparable to placebo in [NDD] patients and to epoetin-alpha in [DD] patients using MACE to measure cardiovascular safety" (*id.* at 83).[6] | Plaintiffs argue that the AdCom's and the FDA's reaction to the dose mitigation strategy corrected a series of general statements about the safety and efficacy. But this theory makes no sense. The AdCom briefing documents (which were publicly disclosed on July 13 to no market reaction) included all of the clinical safety data that were presented to and considered by the AdCom. (*See* D's Ex. 8; P's Ex. 18.)  Different observers reached different conclusions about that safety data, but the information itself was all disclosed. The fact that the AdCom did not support FibroGen's proposal to approve the drug and then later study whether lower doses would mitigate certain safety risks did not disclose anything "corrective" about the safety or efficacy of the drug. This was just one of a series of judgment calls made by the AdCom members based on a robust set of clinical data that was publicly disclosed two days earlier, in the July 13 briefing documents. In any event, the information about the dose mitigation strategy was also not "new" on July 15. The July 13 Briefing Document disclosed the fact that FibroGen had proposed a dose mitigation strategy but did not yet have clinical data to support |

---

[6] *See also* Reply at 7-8 (explaining why the AdCom's disclosures about FibroGen's proposed dose mitigation strategy constituted new, corrective information).

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
|  |  | it. (*See* D's Ex. 8 at 12 ("the applicant speculates that thromboembolic risks might be reduced through use of a lower Roxadustat starting dose. Their prediction seems plausible, but is unproven.")) Analysts understood this as of July 13. (D's Ex. 9 at 2; D's Ex. 10 at 1 ("the briefing documents suggest the FDA does not believe these lower doses with an appropriate titration scheme have been sufficiently tested…."); D's Ex. 12 at 1 ("we do not expect the panel to be supportive of approval until evidence for proposed thrombosis risk mitigation strategies are generated."; D's Ex. 14.)) As such, items (ii) and (iii) in Plaintiffs' list of "new" information were not "new" at all.<br><br>Item (i) on Plaintiffs' list (claiming that the AdCom revealed an "alarmingly negative" link between higher doses of Roxa and higher rates of death) was not "new" information because this assertion is false, and Plaintiffs have blatantly mischaracterized the record on this point.<br><br>As discussed at the August 31 class certification hearing, it is telling that Plaintiffs base this assertion on a single statement by a single analyst. (*See* P's Ex. 17.) The AdCom transcript, however, does not support either the analyst's statement or Plaintiffs' price impact theory.<br><br>The discussion in question (found at pages 256-257 of the AdCom transcript) was focused solely on the results of Study 613, which was one of the studies |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | that was not pooled (and was therefore unrelated to the pooled safety results FibroGen had discussed with investors during the Class Period):<br><br>• Dr. Little, an employee of AstraZeneca, indicated that "we have a few metrics suggesting that starting doses may have been too high" for study 613.<br><br>• Dr. Packer, a member of the AdCom, asked if Dr. Little was "implying that there is a dose-dependent increase in mortality with Roxadustat?"<br><br>Dr. Little responded that there was not a connection between dose and mortality, that their analysis showed a connection between dose and thrombosis: "When we look at our data to investigate for dose-dependence regarding all-cause mortality in MACE, we don't find it to be particularly conclusive. So our mitigation strategy regarding our dosing really is aimed at thrombosis." (Ex. A at 256:2-21; 257:2-18.)<br><br>Reading the transcript itself in context (rather than one analyst's characterization of it), it is clear that one member of the AdCom merely asked a question about a link between dosage and death rates, and far from confirming any such link, Dr. Little said that when they looked at the data, they were unable to draw a conclusion.  In other words, in this context, that means "no." |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | Importantly, the results of the 613 study, including that it had a higher mortality risk, were also not "new" because they were disclosed in the July 13 Briefing Document. (*See* D's Ex. 8, FDA Briefing Book at 29, 39-40, 53, 59 ("Although Study 613 was not one of the studies in the meta-analysis, its mortality finding is a concern.").) |

10

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| The AdCom revealed serious issues with FibroGen's data analyses, with the statistical expert on the panel specifically warning that they were "hope[lessly] confounded" and "fundamentally broken" because most were not based on the standard ITT window, which even Defendants touted as a "conservative" test. AdCom Tr. at 277:4-278:10; ECF No. 196-1 at Statement 8.<br><br>Further, the AdCom revealed that the only ITT analyses that FibroGen submitted were insufficient to address the serious differential dropout issue in the NDD population. *See* AdCom Tr. at 188: 5-18 & 279:9-10 (noting "around 10 percent missing data for mortality or survivorship, which is quite surprising given the illness of this cohort," which rendered FibroGen's ITT analysis not "a true ITT analysis").<br><br>The AdCom further revealed that the differential dropout | The AdCom revealed that "most" of FibroGen's Roxadustat safety data analyses were "hopelessly confounded" and "fundamentally broken" and therefore not supportive of approval of Roxadustat, which was particularly critical for the DD population, since the Sensitivity Analyses for that population – the ITT analyses – had far worse safety results than the "confounded" primary analyses.<br><br>Moreover, the AdCom revealed that the ITT analysis used as a primary analysis for the NDD population was also not viable. Specifically, while the ITT analysis was purportedly designed to solve a differential dropout issue between the Roxadustat and placebo groups, Defendants revealed during the AdCom that they lacked data for nearly 10% of the patients enrolled in the NDD trials. For this reason, during the AdCom, an AdCom member warned that "***if you wanted to really adhere to ITT, you would discount everything we've looked at today in the NDD population***." AdCom Tr. at 279:11-13. And even assuming that FibroGen's ITT analyses contained complete data, AdCom members stated that the dropout issue still could not explain the entire difference in MACE and all-cause mortality in the pooled NDD analyses between the ITT window and the OT-7 window (which were the Sensitivity Analyses for NDD).<br><br>Notably, analysts reported on this new information, highlighting in reports to investors that the "[AdCom] voiced concerns on NDD due to | This theory is asserted for the first time in this supplemental submission. It was not mentioned in the Complaint, the class certification briefing (including Plaintiffs' Reply and Response to Defendants' sur-reply), or at the motion for class certification hearing. By itself, that is a reason to disregard this theory.<br><br>Regardless, no "new" or "corrective" information is identified. Plaintiffs misleadingly cobble together quotes from separate discussions during the AdCom related to the challenges in interpreting the NDD OT-7 sensitivity analyses and ITT primary analyses, due to the higher dropout rate in the placebo group of the NDD population (the "differential dropout rate"). Information related to this issue – that patients in the placebo group (who were not getting treatment) were dropping out at a higher rate than patients on Roxadustat and the potential bias that this "differential dropout rate" caused – was disclosed to investors on July 13, 2021 and repeatedly over the prior years, particularly as the Company discussed different analytical methods to address this issue, including the fact that multiple analyses would be presented to the FDA for consideration. (*See, e.g.*, D's Ex. 18 at 5-6, D's Ex. 19 at 5-6; ECF No. 126-1 at 20-21.) The suggestion that this was a "new" issue first disclosed at the AdCom is absurd. |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| could not account for the whole imbalance in safety data between the ITT and OT-7 analyses—indeed, the AdCom revealed that there would need to be an approximately "50-100 percent increase in the risk of MACE and all-cause mortality, to fully account for the difference between the OT-plus-7 and the [ITT]." *Id*. at 274:4-15.[7] | concerns on totality of CV data, mortality" Ex. 26 (Jefferies); and noted that AdCom panelists "thought [NDD] results were uninterpretable due to discontinuation imbalances") P's Ex. 22 (Stifel). <br><br> This new information further revealed the falsity of Defendants' statements to investors. For example, in direct contrast to the revelation that FibroGen lacked sufficient data for viable ITT analyses in NDD, (i) on May 9, 2019, FibroGen issued a press release announcing that "Based on the MACE safety analyses of [NDD], we believe there is no clinically meaningful difference in risk of MACE between Roxadustat and placebo" (ECF No. 196-1 at Statement 8); (ii) on May 9, 2019, Defendant Yu represented that "in the nondialysis population, [ITT] is – will be considered a relatively conservative analysis. And the fact that we had – we are able to show non-inferiority to placebo under such conditions really illustrates the strength of our drug's safety" (*id.* at Statement 16); and (iii) on June 2, 2020, Defendant Conterno represented, "And therefore when we look at our data, I feel it basically shows that the product is safe because of the safety profile when it comes to CV [is] comparable to placebo" (*id.* at Statement 51).[8] | The only allegedly "new" *facts* that Plaintiffs reference are the percentages of patient follow-up data available discussed during the AdCom: <br><br> • Dr. Moliterno (AdCom Panelist): "I appreciate that it was balanced between the groups, but it seems like there was around 10 percent missing data for mortality or survivorship, which is quite surprising given the illness of this cohort." <br><br> • Dr. Little (AstraZeneca): "We did have 91 percent of patients complete follow-up for all-cause mortality in the NDD pool and to 92 percent of patients completed follow-up for all-cause mortality in the DD pool." (*See* Ex. A at 188:1-189:13.) <br><br> That very information, however, was disclosed in FibroGen's Briefing Book on July 13, 2021: <br><br> • "Overall, 87.8% and 91.4% of patients had complete follow-up for MACE and vital status, respectively." (P's Ex. 18 at 48.) <br><br> Everything else Plaintiffs cite in this portion of the chart are comments, reactions, and thoughts expressed by the AdCom participants based on the publicly-disclosed data in the briefing books, which |

[7] The "differential dropout issue" refers to the fact that a higher proportion of patients on placebo dropped out of the studies compared to those on Roxadustat. The "ITT analysis" and "OT-7 analysis" refer to, respectively, Intention-To-Treat Analysis and On Treatment Plus 7 Days Analysis. ¶¶53, 107.

[8] *See also* Reply at 8 (explaining why the AdCom's disclosures of these "significant issues with FibroGen's data analyses" constituted new, corrective information).

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | is not corrective, and in any event, which Plaintiffs have mischaracterized.<br><br>*First*, Plaintiffs' claim that certain analyses were "hopelessly confounded" and "fundamentally broken" is based on a comment by an AdCom panelist, Dr. Cook, who said that the NDD on-treatment analyses, in particular the OT-7 sensitivity analyses, were "hope[less]ly confounded" and "fundamentally broken" because of the differential dropout problem. (Ex. A at 276:9-278:17.) He indicated that, for this reason, he would not consider them, but would consider the primary ITT analysis. (*Id.*)<br><br>Far from correcting FibroGen's prior statements about safety, Dr. Cook's comments are completely consistent with FibroGen's view of the safety data: FibroGen used the ITT method for its primary analysis ***precisely because FibroGen believed that the "on treatment" method was not the right way to analyze the data***. The FDA, which had agreed to the ITT analysis as the primary analysis for NDD at the pre-NDA meeting in July 2019, confirmed that the "on treatment" analyses were potentially biased. (D's Ex. 8 at 8, 48.)<br><br>In any event, the OT-7 sensitivity analyses (and other on-treatment analyses) were disclosed in the AdCom briefing books (*See* D's Ex. 8 at 47-49; P's Ex. 18 at 56 (OT-28)), as were the difficulties in |

13

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | interpreting the on-treatment analyses due to the differential dropout rate: <br><br> • "Placebo-controlled studies in the NDD patient population enrolled subjects with significant anemia, and because anemia was less likely to improve in subjects who received placebo, they were more likely to discontinue from the study… The difference in completion rates confounded a number of the safety analyses." (D's Ex. 8 at 8.) <br><br> • "[T]he differential dropout may contribute to a biased estimate of the treatment effect in the OT+7 analysis that disfavors Roxadustat." (*Id.* at 48.) <br><br> Dr. Cook's comments essentially agreeing with these assessments were neither new nor corrective. <br><br> *Second*, Plaintiffs' claim that FibroGen's ITT analyses were "insufficient to address the placebo dropout rate" and "not viable" due to missing data fares no better. The survival follow-up rate had been disclosed in the briefing books, as discussed above (*see* P's Ex. 18 at 48), and no AdCom member stated that this survival follow-up rate made FibroGen's ***ITT*** analyses not a "true ITT analysis." Rather, the language Plaintiffs quote on this point is from a different commentator, 100 pages later in the transcript, regarding the ***on-treatment*** analyses, not FibroGen's ITT analysis. It does not discredit FibroGen's ITT analyses in any way. (*See* Ex. A at 278:19-279:19.) |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | Significantly, no member of the AdCom mentioned lack of patient follow-up or data as a reason when voting. (*See* Ex. A at 299:10-300:2, 338:14-339:10). Nor was it mentioned anywhere in the AdCom minutes. *See* Ex. 20 at 4-7.<br><br>*Finally*, Plaintiffs' claim that the AdCom revealed the "[d]ifferential Dropout could not account for the whole imbalance in safety data between the ITT and OT-7 analyses." This refers to a statement by one AdCom member expressing uncertainty about how to interpret the analyses in the briefing books. Specifically, the AdCom member was questioning whether the differential dropout rate completely accounted for the differences between OT-7 sensitivity analysis and the primary ITT analysis.<br><br>This statement did not reveal any "facts" at all, much less any new facts. It was, as the AdCom member himself referred to it, a "thought experiment." (Ex. A at 273:13-274:18). FibroGen could not have disclosed the AdCom member's speculative "thought experiment" comment earlier since it only happened at the AdCom. In any event, the differences between the OT-7 sensitivity analysis and the primary ITT analysis were apparent from the briefing documents filed (to no market reaction) on July 13. (*See* D's Ex. 8 at 13, 47-49, 50-51.)<br><br>FibroGen never suggested that the "[d]ifferential dropout accounted for the whole imbalance." In |

| NEW INFORMATION DISCLOSED DURING THE ADCOM | PLAINTIFFS' POSITION | DEFENDANTS' POSITION |
|---|---|---|
| | | fact, FibroGen had warned investors about the drop-out issue, that there would be numerous analyses that would go into the data's evaluation, and that on-treatment analyses may be less favorable.  As such, there was nothing "corrective" about the AdCom member's "thought experiment" on this topic. |

16

**ATTESTATION PURSUANT TO CIV. L.R. 5-1**

Pursuant to Civil Local Rule 5-1(h)(3), I attest that each of the signatories above concur in the filing of this document.

Dated:  September 15, 2023                    **COOLEY LLP**

                                              _/s/ Patrick E. Gibbs_
                                              Patrick E. Gibbs