# EXHIBIT A

FOOD AND DRUG ADMINISTRATION

CENTER FOR DRUG EVALUATION AND RESEARCH



CARDIOVASCULAR AND RENAL DRUGS ADVISORY COMMITTEE

(CRDAC)



Virtual Meeting



Thursday, July 15, 2021

9:30 a.m. to 5:33 p.m.

**Meeting Roster**

**DESIGNATED FEDERAL OFFICER (Non-Voting)**

**Joyce Yu, PharmD**

Division of Advisory Committee and

Consultant Management

Office of Executive Programs, CDER, FDA


**CARDIOVASCULAR AND RENAL DRUGS ADVISORY COMMITTEE**

**MEMBERS (Voting)**

**Jacqueline D. Alikhaani, BA**

*(Consumer Representative)*

Volunteer and Advocate

American Heart Association

Los Angeles, California


**C. Noel Bairey Merz, MD, FACC, FAHA, FESC**

Director

Barbra Streisand Women's Heart Center

Cedars-Sinai Medical Center

Los Angeles, California

**Thomas D. Cook, PhD, MS, MA**

Professor (Clinical Health Sciences)

Clinical Trials Program

Department of Biostatistics and Medical

Informatics

University of Wisconsin-Madison

Madison, Wisconsin


**Edward K. Kasper, MD, FACC, FAHA**

Director of Outpatient Cardiology

Johns Hopkins Medicine

E. Cowles Andrus Professor in Cardiology

Johns Hopkins School of Medicine

Baltimore, Maryland


**Julia B. Lewis, MD**

*(Chairperson)*

Professor of Medicine

Division of Nephrology

Vanderbilt Medical Center

Nashville, Tennessee

FDA CRDAC                     July 15 2021                         4

**David J. Moliterno, MD**

Professor and Chairman

Department of Internal Medicine

University of Kentucky Medical Center

Lexington, Kentucky


**Christopher M. O'Connor, MD, MACC,**

**FESC, FHFA, FHFSA**

Professor of Medicine, Duke University

President and Executive Director

Inova Heart and Vascular Institute

Falls Church, Virginia


**Ravi I. Thadhani, MD, MPH**

Chief Academic Officer

Massachusetts General Brigham

Professor of Medicine and Dean for Academic

Programs Mass General Brigham

Harvard Medical School

Boston, Massachusetts

FDA CRDAC                    July 15 2021                          5

**ACTING INDUSTRY REPRESENTATIVE TO THE COMMITTEE**

**(Non-Voting)**

**David G. Soergel, MD**

Global Head

Cardiovascular, Renal and Metabolism Development

Novartis Pharma

East Hanover, New Jersey


**TEMPORARY MEMBERS (Voting)**

**Leslie S. Cho, MD, FACC, FSCAI, FESC**

Section Head, Preventive Cardiology and

Rehabilitation

Professor of Medicine

Cleveland Clinic Lerner College of Medicine

Case Western Reserve Medical School

Cleveland Clinic

Cleveland, Ohio


**Paul T. Conway**

*(Patient Representative)*

Falls Church, Virginia


*A Matter of Record*
*(301) 890-4188*

FDA CRDAC                    July 15 2021                    6

**Susan T. Crowley, MD, MBA, FASN**

Professor of Medicine (Nephrology)

Yale University

Director, National Kidney Disease &

Dialysis Program

Veterans Health Administration

West Haven, Connecticut


**Milton Packer, MD**

Distinguished Scholar in Cardiovascular

Medicine

Baylor Heart and Vascular Institute

Baylor University Medical Center

Dallas, Texas


**Afshin Parsa, MD, MPH**

Senior Scientific Advisor and Program

Director

Division of Kidney, Urologic, and

Hematologic Diseases

NIDDK, NIH

Bethesda, Maryland

**Thomas J. Wang, MD**

Professor and Chair

Department of Internal Medicine

Donald W. Seldin Distinguished Chair

University of Texas Southwestern

Medical Center

Dallas, Texas


**FDA PARTICIPANTS (Non-Voting)**

**Ellis F. Unger, MD**

Director

Office of Cardiology, Hematology,

Endocrinology and Nephrology (OCHEN)

Office of New Drugs (OND), CDER, FDA


**Ann T. Farrell, MD**

Director

Division of Non-Malignant Hematology (DNH)

OCHEN, OND, CDER, FDA

**Saleh Ayache, MD**

Clinical Reviewer

DNH, OCHEN, OND, CDER, FDA


**Jae Joon Song, PhD**

Statistical Reviewer

Division of Biometrics VII

Office of Biostatistics

Office of Translational Sciences

CDER, FDA

FDA CRDAC                July 15 2021                    9

C O N T E N T S

AGENDA ITEM                                           PAGE

Call to Order

    Julia Lewis, MD                                11

Introduction of Committee

    Joyce Yu, PharmD                               11

Conflict of Interest Statement

    Joyce Yu, PharmD                               18

FDA Opening Remarks

    Ellis Unger, MD                                23

**Applicant Presentations – FibroGen, Inc.**

Introduction

    R. Wayne Frost, PharmD, JD                     28

Unmet Need

    Roberto Pecoits-Fihlo, MD, PhD                 35

Efficacy Results

    Lynda Szczech, MD                              43

Safety Results

    Dustin Little, MD                              62

Clinical Perspective

    Steven Fishbane, MD                            95

C O N T E N T S (continued)

AGENDA ITEM                                              PAGE

Clarifying Questions                                     104

**FDA Presentations**

Roxadustat for the Treatment of Anemia

Due to Chronic Kidney Disease in Adult

Patients not on Dialysis and on Dialysis

    Saleh Ayache, MD                 135

    Jae Joon Song, PhD               159

    Saleh Ayache, MD                 174

Clarifying Questions                                     180

**Open Public Hearing**                                  205

Clarifying Questions (continued)                         248

Questions to the Committee and Discussion                265

Adjournment                                              342

P R O C E E D I N G S

(9:30 a.m.)

**Call to Order**

DR. LEWIS:  Good morning and welcome.  I would like to remind everyone to please mute your line when you are not speaking.  For media and press, the FDA press contact is Chanapa Tantibanchachai.  Her email and phone number are currently displayed.

My name is Julia Lewis, and I will be chairing this meeting.  I will now call the July 15, 2021 meeting of the Cardiovascular and Renal Drugs Advisory Committee to order.  Dr. Joyce Yu is the designated federal officer for this meeting and will begin with introductions.

**Introduction of Committee**

DR. YU:  Good morning.  My name is Joyce Yu, and I'm the designated federal officer for this meeting.  When I call your name, please introduce yourself by stating your name and affiliation.

We'll start with Ms. Alikhaani.

MS. ALIKHAANI:  Good morning.  I'm

Jacqueline Alikhaani. I live in Los Angeles. I'm a heart patient and volunteered citizen scientist. I'm a community health volunteer with the American Heart Association and PCORI, the Patient-Centered Outcomes Research Institute, and the University of California, Los Angeles.

DR. LEWIS: Thank you.

Dr. Bairey Merz?

DR. BAIREY MERZ: Good morning. Noel Bairey Merz. I'm a clinical and investigative cardiologist at Cedars-Sinai Medical Center in Los Angeles, with the specialties of ischemic heart disease and women's heart disease.

DR. YU: Thank you.

Dr. Cook?

DR. COOK: This is Thomas Cook. I'm a biostatistician at the University of Wisconsin-Madison, where I specialize in clinical trials.

DR. YU: Thanks.

Dr. Kasper?

DR. KASPER: Good morning. Kevin Kasper.

I'm a cardiologist at Johns Hopkins with interest in heart failure and heart transplantation.

DR. YU:  Thank you.

Dr. Lewis?

DR. LEWIS:  Good morning.  I'm Dr. Julia Lewis.  I'm a nephrologist at Vanderbilt University.  Thank you.

DR. LEWIS:  Dr. Moliterno?

DR. MOLITERNO:  Hi.  David Moliterno.  I'm a professor of medicine and cardiologist at the University of Kentucky.

DR. YU:  Thanks.

Dr. O'Connor?

DR. O'CONNOR:  Good morning.  Chris O'Connor here.  I'm a heart-failure cardiologist interested in heart-failure clinical trials and also serve as president of the Inova Heart and Vascular Institute health system outside Washington DC.

DR. BAIREY MERZ:  Dr. Thadhani?

DR. THADHANI:  Good morning.  My name is Ravi Thadhani.  I'm the chief academic officer at Mass General Brigham and a nephrologist by

training.  Thank you.

DR. YU:  Unfortunately, Dr. Abbott is not able to participate today, in today's meeting.  He had an emergency.  So we'll move on to Dr. Cho.

(No response.)

DR. YU:  Dr. Cho, you're muted in the Adobe Connect.  Would you mind unmuting?

(Pause.)

DR. CHO:  Hi.  Leslie Cho, professor of medicine, interventional cardiologist at Cleveland Clinic.

DR. YU:  Thank you so much.

Mr. Conway?

MR. CONWAY:  Hi.  My name is Paul Conway.  I serve as chair of Policy and Global Affairs at the American Association of Kidney Patients, and I'm a 40-year kidney patient.  Thank you.

DR. YU:  Dr. Crowley?

DR. CROWLEY:  Yes.  Hi.  I'm a nephrologist for the Veterans Health Administration and a professor of medicine at Yale University.

DR. YU:  Dr. Packer?

DR. PACKER:  Yes.  I'm a cardiologist at Baylor University Medical Center with a focus on clinical trials.  I guess I should just state for the record that there is a waiver in my name that has given me an extra degree.  I do not have an MPH degree.  So Joyce, I just wanted to put that in for the record.

DR. YU:  Thanks, Dr. Packer.

DR. PARSA:  Good morning.  I'm Afshin Parsa. I'm a nephrologist and senior scientific advisor at the National Institutes of Health.

DR. YU:  Dr. Wang?

DR. WANG:  Hi.  I'm Tommy Wang.  I'm a cardiologist and chair of medicine at UT Southwestern Medical Center.

DR. YU:  Dr. Soergel?

DR. SOERGEL:  Good morning.  David Soergel. I'm a pediatric cardiologist industry representative from Novartis.

DR. YU:  We'll move on to our FDA participants.

Dr. Unger?

DR. UNGER:  I'm Ellis Unger.  I'm a cardiologist and the director of the Office of Cardiology, Hematology, Endocrinology, and Nephrology in the Office of New Drugs, Center for Drug Evaluation and Research at FDA.

DR. YU:  Thanks.

Dr. Farrell?

(No response.)

DR. YU:  Dr. Farrell, go ahead and unmute in the Adobe Connect at the top of your screen at the phone icon.  I think you're muted there.

DR. FARRELL:  Hello.  My name is Ann Farrell.  I'm a hematologist and medical oncologist, and I'm the division director of the Division of Non-Malignant Hematology in the Office of Cardiology, Hematology, Nephrology, and Endocrinology.  Thank you.

DR. YU:  Thanks, Dr. Farrell.

Dr. Ayache?

DR. AYACHE:  My name is Dr. Saleh Ayache. I'm a medical officer in the Division of Non-Malignant Hematology in the Office of

FDA CRDAC                    July 15 2021                    17

Cardiology, Hematology, Endocrinology, and Nephrology.

DR. YU:  And finally, Dr. Jae Joon Song?

DR. SONG:  Good morning.  My name is Dr. Jae Joon Song, and I am a statistical reviewer at the FDA Center for Drug Evaluation and Research, Office of Biostatistics.

DR. YU:  I'll hand it over to you, Dr. Lewis.

DR. LEWIS:  Thank you.

For topics such as those being discussed at this meeting, there are often a variety of opinions, some of which are quite strongly held. Our goal is that this meeting will be a fair and open forum for discussion of these issues and that individuals can express their views without interruption.

Thus, as a gentle reminder, individuals will be allowed to speak into the record only if recognized by the chairperson.  We look forward to a productive meeting.

In the spirit of the Federal Advisory

FDA CRDAC                    July 15 2021                    18

Committee Act and the Government in the Sunshine Act, we ask that the advisory committee members take care that their conversations about the topic at hand take place in the open forum of the meeting.

We are aware that members of the media are anxious to speak with the FDA about these proceedings, however, FDA will refrain from discussing the details of this meeting with the media until its conclusion.  Also, the committee is reminded to please refrain from discussing the meeting topic during breaks or lunch.  Thank you.

Dr. Joyce Yu will now read the Conflict of Interest Statement for the meeting.

### Conflict of Interest Statement

DR. YU:  The Food and Drug Administration is convening today's meeting of the Cardiovascular and Renal Drugs Advisory Committee under the authority of the Federal Advisory Committee Act of 1972. With the exception of the industry representative, all members and temporary voting members of the committee are special government employees, SGEs,

FDA CRDAC                    July 15 2021                    19

or regular federal employees from other agencies and are subject to federal conflict of interest laws and regulations.

The following information on the status of this committee's compliance with federal ethics and conflict of interest laws, covered by but not limited to those found at 18 U.S.C. Section 208, is being provided to participants in today's meeting and to the public.

FDA has determined that members and temporary voting members of this committee are in compliance with federal ethics and conflict of interest laws.  Under 18 U.S.C. Section 208, Congress has authorized FDA to grant waivers to special government employees and regular federal employees who have potential financial conflicts when it is determined that the agency's need for a special government employee's services outweighs his or her potential financial conflict of interest, or when the interest of a regular federal employee is not so substantial as to be deemed likely to affect the integrity of the services

which the government may expect from the employee.

Related to the discussions of today's meeting, members and temporary voting members of this committee have been screened for potential financial conflicts of interest of their own as well as those imputed to them, including those of their spouses or minor children and, for purposes of 18 U.S.C. Section 208, their employers.  These interests may include investments; consulting; expert witness testimony; contracts, grants, CRADAs; teaching, speaking, writing; patents and royalties; and primary employment.

Today's agenda involves discussion of the new drug application 213805, for the hypoxia inducible factor prolyl hydroxylase inhibitor, roxadustat tablets, submitted by FibroGen, Incorporated, for the treatment of anemia due to chronic kidney disease in adult patients not on dialysis and on dialysis.  This is a particular matters meeting during which specific matters related to FibroGen's NDA will be discussed.

Based on the agenda for today's meeting and

all financial interests reported by the committee members and temporary voting members, a conflict of interest waiver has been issued in accordance with 18 U.S.C. Section 208(b)(3) to Dr. Milton Packer. Dr. Packer's waiver involves stock holdings in affected firms.

The waiver allows this individual to participate fully in today's deliberations.  FDA's reasons for issuing the waivers are described in the waiver document, which is posted on FDA's website at: https://www.fda.gov/advisory-committees/committees-and-meeting-materials/human-drug-advisory-committees.

Copies of the waiver may also be obtained by submitting a written request to the agency's Freedom of Information division, 5630 Fishers Lane, Room 1035, Rockville, Maryland, 20857, or requests may be sent via fax to 301-827-9267.  To ensure transparency, we encourage all standing committee members and temporary voting members to disclose any public statements that they have made concerning the product at issue.

With respect to FDA's invited industry representative, we would like to disclose that Dr. David Soergel is participating in this meeting as a non-voting industry representative, acting on behalf of regulated industry.  Dr. Soergel's role at this meeting is to represent industry in general and not any particular company.  Dr. Soergel is employed by Novartis.

We would like to remind members and temporary voting members that if the discussions involve any other products or firms not already on the agenda for which an FDA participant has a personal or imputed financial interest, the participants need to exclude themselves from such involvement, and their exclusion will be noted for the record.  FDA encourages all other participants to advise the committee of any financial relationships that they may have with the firm at issue.  Thank you.

DR. LEWIS:  We will proceed with FDA opening remarks from Dr. Ellis Unger.

Dr. Unger?

**FDA Opening Remarks – Ellis Unger**

DR. UNGER:  Hi, and good morning, again, everyone.  I'd like to welcome all of you to this advisory committee meeting and in advance of the proceedings, I'd like to take the opportunity to thank the committee, the patient and industry reps, registered public speakers, the applicant, and last but not least, the patients and interested parties who are listening online for all your efforts and interest in this application.

We'll be discussing roxadustat for the treatment of anemia of chronic kidney disease, and it's a complex application.  It raises several important issues.  We convened this meeting because we sincerely seek the committee's opinions and advice here.  As usual, I'll remind you that although your votes are important, the discussion and the rationale behind your votes will likely be even more valuable to us.

Now typically, the division director would make the remarks here, but Dr. Ann Farrell has allowed me the honor of speaking in her place

because, as she puts it, I have a passion for these patients and these therapies.

I've always felt that patients with chronic kidney disease deserve a better deal.  Almost exactly 20 years ago, when I was fairly new at FDA, I was the medical officer who reviewed the application for darbepoetin alfa, which we approved, and it's still marketed for the anemia of chronic kidney disease.

When I was just beginning that review, I remember my supervisor telling me that we already knew that the drug could be titrated to raise the hemoglobin level to its target.  That wasn't the issue.  The question was whether it could do so safely.  And that's exactly the same question we face today, but now the question is for the first drug in an entirely new class, and it's the first oral drug for this indication.

The applicant's hope was that roxadustat would be as effective as the approved erythropoiesis stimulating agents, and I think that we all hoped perhaps it would be safer.  The

development program was robust.  It was aimed to show roxadustat's efficacy and safety in patients who were on and not on dialysis.

The main studies in the dialysis population were combined and the main studies in the non-dialysis populations were combined, and meta-analyses were conducted to examine major adverse cardiovascular events in both of these populations.

Now you'll see that the results of these analyses are somewhat difficult to interpret, as they're sensitive to the duration that patients were followed after they discontinued treatment, and we'll be discussing this in some detail.

In the non-dialysis population, patients with significant anemia were randomized to placebo, and not surprisingly, there were many more discontinuations in the placebo groups than in the roxadustat groups, which to some extent confounded the safety analyses.

With respect to the standard analyses of safety, there were greater rates of some important adverse events with roxadustat than even epoetin

alfa, thrombotic events in particular.  The absolute risks per patient-year are not large, but the adverse events are obviously important.  Some of those events were thrombosis of vascular access, which is a lifeline in dialysis patients.

Twenty years ago, I advanced a theory, based on my analyses within the darbepoetin alfa application, that a rapid rate of rise in hemoglobin might lead to adverse events, maybe secondary to increases in blood viscosity.  Our biometrics team performed these analyses for roxadustat, and indeed they found associations between hemoglobin rate of rise and thrombotic events.  But you'll see that these analyses are based on, really, very small numbers of adverse events and are, at best, associations.

In recent discussions with the applicant, they've embraced the view that roxadustat's risks may be reduced with a more conservative dosing strategy that would limit the hemoglobin rate of rise, but I'll note that the rate-of-rise hypothesis remains unproven, and their plan is

untested, but we'll discuss it.

Finally and importantly, I want to emphasize that our approval standards are based on demonstration that a drug is safe and effective and that there are adequate instructions for use. We generally don't reject drugs based on comparative effectiveness or comparative safety, although we do consider the benefits and risks of new drugs within the context of available therapies.

So with that, I'll cede the floor, the virtual floor, for your presentations and deliberations. And again, I thank you so much for your participation.

DR. LEWIS: Thank you, Dr. Unger.

Both the Food and Drug Administration and the public believe in a transparent process for information gathering and decision making. To ensure such transparency at the advisory committee meeting, FDA believes that it is important to understand the context of an individual's presentation.

For this reason, the FDA encourages all

participants, including FibroGen's non-employee presenters, to advise the committee of any financial relationships they may have with the sponsor such as consulting fees, travel expenses, honoraria, and interest in the sponsor, including equity interests and those based upon the outcome of the meeting.

Likewise, FDA encourages you at the beginning of your presentation to advise the committee if you do not have any such financial relationships. If you choose not to address this issue of financial relationships at the beginning of your presentation, it will not preclude you from speaking.

We will now proceed with presentations from FibroGen.

**Applicant Presentation – Wayne Frost**

DR. FROST: Good morning, members of the Cardiovascular and Renal Drugs Advisory Committee and the FDA. I'm Wayne Frost, senior vice president of regulatory affairs at FibroGen, and we're excited to be here today with our partner

FDA CRDAC                    July 15 2021                    29

AstraZeneca to share the data for roxadustat for the treatment of anemia in patients with chronic kidney disease.

Roxadustat is a novel, oral therapy to treat patients with anemia of CKD and the first major innovation in the management of this condition in 30 years. Patients with anemia of CKD need options beyond existing therapies.

Anemia is a common and burdensome complication of CKD that is associated with undesirable clinical outcomes. Many patients are underserved, especially those who are not on dialysis due to the complexities of injectable treatments, resulting in an unacceptable risk of red blood cell transfusion.

There is also a need for alternative treatment options for dialysis patients who respond inadequately to ESAs and those on home dialysis. Patients with anemia of CKD would benefit from having the choice of an oral treatment option that can be continued throughout their entire clinical course.

Roxadustat is a first-in-class oral therapy designed to consistently correct and maintain hemoglobin across the spectrum of patients with CKD anemia. Its novel mechanism of action is based on an oxygen-sensing pathway, a discovery that was awarded the 2019 Nobel Prize in physiology or medicine.

It's a small molecule inhibitor of hypoxia-inducible factor prolyl hydroxylase, or HIF-PH, the enzyme that regulates HIF activity. HIF is responsible for coordinating a physiologic response to decrease the oxygen levels. By transiently inhibiting the enzyme, roxadustat increases hemoglobin by mimicking the body's natural response to low oxygen.

Now, let's take a closer look at its novel mechanism of action. Under normal oxygen conditions, HIF-PH enzymes hydroxylate the alfa subunit of HIF. This hydroxylation targets the HIF-alfa subunit for rapid degradation via the proteasome. When oxygen levels fall, HIF-PH enzymes become inactive and HIF-alfa degradation is

prevented.  This allows the formation of an active. HIF transcription factor, which leads to increased expression of HIF target genes, including those involved in erythropoiesis.  This same pathway can be pharmacologically activated by roxadustat, which inhibits the HIF-PH enzymes.

Roxadustat stimulates a coordinated erythropoietic response the same way the body naturally responds to low oxygen.  This coordinated erythropoietic response is a key differentiator between roxadustat and currently available treatments for patients with CKD anemia.  It ensures sufficient iron availability for effective erythropoiesis to occur in the presence of physiologic levels of EPO.  This is in contrast to ESAs that do not stimulate a coordinated erythropoietic response, and therefore lead to supraphysiologic levels of EPO to increase red blood cell production.

We've worked closely with the FDA to design and adapt our phase 3 clinical development program. At the end of the phase 2 meeting in 2012, FDA

requested that our program be powered to assess CV safety for the NDD and DD population separately as a result of CV safety concerns for ESAs, which we did.

Our first phase 3 study started shortly after that meeting and our pivotal phase 3 studies were completely enrolled in 2018.  At our pre-NDA meeting in July of 2019, we reached agreement with the FDA on the final pooling strategy and the analytical methods to use for the evaluation of the ND and DD populations, respectively.  We then submitted our NDA in December of 2019. Additionally, roxadustat is approved in China and Japan, and on June 24th, we received a positive opinion from the CHMP for the approval of roxadustat in the EU.

Now, let me share the clinical development program.  We've conducted an extensive CKD clinical development program, which includes more than 13,000 patients.  Nine phase 2 studies informed the sponsor in the development of the phase 3 program.

Since patients with CKD anemia who are

dialysis-dependent and not dialysis-dependent are quite different populations, we've conducted several studies in each group.  Three NDD studies have been pooled in agreement with the FDA.  These include Studies 001, 060, and 608, and three studies in dialysis-dependent patients have been pooled in agreement with the FDA.  These include Studies 002, 063, and 064.  Additionally, we'll show supportive evidence from Study 610 that compared roxadustat to an active control in NDD patients.

Six phase 3 studies were sponsored by Astellas Pharma and conducted in Japan, two in NDD patients and four in DD patients.  Two phase 3 studies were sponsored by our affiliate in China and conducted in China, one in each population.

Data from Study 613 and safety data from these additional studies have been presented in the briefing book for your reference.  Our presentation will focus mainly on the results from our six pivotal phase 3 studies that demonstrate the efficacy and safety of roxadustat.

Today you will see that roxadustat's efficacy and safety, including CV safety, was consistently demonstrated across the spectrum of patients with CKD.  This includes patients not on dialysis and those on dialysis, whether recently started or stable and independent of information inflammation and iron status.

Each of our six pivotal studies met its primary efficacy endpoint of mean change from baseline in hemoglobin.  Roxadustat showed a statistically significant and clinically meaningful improvement versus placebo in the NDD trials and was comparable to ESA in the DD trials.  Additionally, roxadustat demonstrated a reduction in red blood cell transfusions.

The CV safety profile of roxadustat was comparable to placebo in NDD and epoetin alfa in DD and the general safety profile appears to be acceptable.  The totality of the evidence supports the use of roxadustat to increase and maintain hemoglobin levels for patients with CKD anemia who need additional treatment options.  Our proposed

indication is for the treatment of anemia due to CKD in adult patients not on dialysis and on dialysis.

With that background, I'll take you through the agenda. Next, Roberto Pecoits will describe the significant unmet need in patients with CKD anemia; then Dr. Lynda Szczech will present the efficacy data from our clinical program; followed by Dr. Dustin Little, who will present roxadustat's safety profile. Finally, Dr. Steven Fishbane will give his clinical perspective and conclude our presentation.

All external experts have been compensated for their time. We also have experts from FibroGen and AstraZeneca with us to help address your questions. Thank you. I will now turn the presentation over to Dr. Pecoits.

**Applicant Presentation – Roberto Pecoits-Filho**

DR. PECOITS-FILHO: Good morning. I'm a practicing nephrologist caring for patients with anemia CKD for 20 years. My research focus has been to observe practice patterns across the

spectrum of CKD, and I was an investigator in several of the recent CKD anemia trials. From this perspective, I'll highlight the limitations of current therapies and discuss the unmet medical need for patients with anemia CKD.

To understand and appreciate the unmet need, we must consider the CKD patient journey and how several factors influence our treatment decisions. CKD progresses across stages as kidney function declines. When eGFR approaches 15 mL per minute, some patients and their nephrologists would opt for non-dialytic conservative management. The majority begins that transition to dialysis why a few prepare for a transplant, clearly the superior form of kidney replacement therapy.

Currently in the U.S., 88 percent of patients receive in-center hemodialysis, while 11 percent receive peritoneal dialysis, and 2 percent home hemodialysis. Utilization of home dialysis is quite low and transplants are infrequent. However, there's great interest from clinicians and patients in increasing their use,

and current standard of care for anemia management presents limitations to achieve this.

With each advancing stage of CKD, the prevalence and severity of anemia increases.  The dark blue bars represent the proportion of patients who are potentially in need for anemia treatment, with hemoglobin levels lower than 10 grams per deciliter.  Note that one-third of stage 5 are candidates for treatment.  Patient symptoms, which worsen as CKD progresses, are important drivers to begin anemia treatment.

Let me now briefly review the pathophysiology of anemia in CKD.  In healthy individuals, as oxygen tension decreases in kidney and liver, the stabilization of hypoxia-inducible factor promotes the production of erythropoietin and induces the release of iron into the circulation.  Epo stimulates the differentiation of stem cells in the bone marrow, and available iron is utilized in the synthesis of hemoglobin and maturation of red blood cells.

In an anemia CKD, this process is disrupted,

but current treatment options have limited actions in this complex pathophysiology. While erythropoiesis stimulated agents, or ESAs, target step 4, iron supplementation targets step 5. HIF stabilization and its downstream consequences are simply not addressed.

Now let's review the current standards of care and its significant limitations. Our current treatment options are ESA, iron therapy, and for those not responding, blood transfusion, however, we lack therapeutic alternatives with mechanism of actions beyond just prescribing iron and ESAs.

These treatments are logistically complex, particularly in non-dialysis patients and home dialysis patients, leading to another treatment that contrasts with the evidence-based guideline recommendations.

For ESA treatment to be effective, patients must be iron replete and a separate physiological dose of intravenous iron can be required, risking vein viability for dialysis vascular access. The most challenging group of patients are those

identified as hyporesponders since they do not achieve target levels of hemoglobin despite high doses of IV iron and ESAs.

The main objective of CKD anemia treatment is to avoid transfusions, yet this remains common across the spectrum of CKD.  Transplantation, the therapy with best quality of life, survival, and rehab potential, can be compromised in transfused patients.

Let's discuss our history with anemia treatment and how it has impacted current standard of care.  Following the introduction of ESA into clinical practice, the average hemoglobin level in U.S. patients rose because of an increase in the doses of the ESAs.  Landmark studies demonstrated an increase in cardiovascular risk related to ESA treatment and led to an FDA boxed warning in 2007 and label update in 2011.  The result was lower ESA doses and hemoglobin level declines.

Since this time, the decision of when and how to best treat anemia in CKD is based on guidelines developed by more than 10 organizations,

including the global KDIGO, which recommends treatment of anemia in both dialysis and non-dialysis CKD patients to increase hemoglobin to a revised target of 9 to 11.5 grams per deciliter. The consensus of this evidence-based guideline is that the objective of treatment should be to improve patient's quality of life and to reduce the risk of red blood cell transfusions.

The cost of achieving the recommended hemoglobin level with last ESA has been an increasing IV iron therapy and supraphysiological ferritin levels. Although a goal of treatment is to avoid transfusions, they are still common in both non-dialysis and dialysis patients.

This figure shows data in older patients not on dialysis. First, know that 39 percent of those patients are not treated at all. We also see not only a 40 percent infusion rate but that transfusions are the most common treatment of anemia in this population.

Transfusion also remains common in the dialysis population, and in 2018, 23 percent of

FDA CRDAC                    July 15 2021                    41

patients on dialysis received at least one transfusion. The scenario becomes consequential when we appreciate the impact of transfusions in CKD, especially in those considering a transplant.

When I see patients with advanced CKD, the most impactful thing I can do is to help them get a kidney transplant. Transfusion results in clinically significant increases in antibody production, with a negative impact in transplant outcomes.

First, an increase in the panel reactive antibodies, or PRAs, commonly associated with transfusions delays the perspective of patients receiving a kidney transplant. Unfortunately, many transfused patients will never be transplanted since mortality rates are very high in dialysis patients on the wait list.

Also, as you can see in this graph, sensitized patients are also at high risk of rejection when they receive a kidney transplant. A failing transplant has catastrophic events from a patient's perspective, sending many dialysis

patients back to dialysis every year.  Highly sensitized patients also represent a burden to the healthcare system, as they require more complex and costly induction and immunosuppressive treatments.

The final unmet need in CKD anemia treatment is that many patients do not properly respond to current therapies.  The ESA hyporesponsive patients are often inflamed and show signs of functional iron deficiency.  They represent an important challenge to effective management, typically requiring high doses of iron and ESAs.  ESA hyporesponsive patients have higher transfusion mortality and hospitalization rates and increase health care costs compared to patients who have an adequate response to ESA therapy.

In summary, my options to care for patients with CKD anemia, or CKD, are clearly insufficient, and sometimes non-existent.  Physicians and patients would benefit from an oral therapy for anemia that promotes endogenous erythropoiesis, improves iron utilization, and offers a choice for ESA hyporesponders.

The logistical changes in the non-dialysis setting have compromised iron and ESA delivery due to the time and distance of therapies, caregiver demands, and disease burden that directly contributes to the high transfusion rates currently observed.  We need a treatment that addresses the challenges of delivering iron through the intravenous route and in high doses; one that optimizes home treatments and enables continuous therapy across a transition from the non-dialysis to the dialysis stages of disease treatment.

Finally, we need a therapy that improves access to transplant by lowering the risk of transfusions.  Thank you for your time and consideration.  I will now turn the presentation over to Dr. Szczech.

**Applicant Presentation – Lynda Szczech**

DR. SZCZECH:  Thank you, and good morning. I am Linda Szczech, vice president of clinical development and medical affairs at FibroGen, and a nephrologist.  I am pleased to be here today to present our clinical results showing that

roxadustat increases hemoglobin in patients with chronic kidney disease and anemia. I will also present data that demonstrate the efficacy of roxadustat independent of baseline iron status or inflammatory state.

We've conducted an extensive clinical development program in chronic kidney disease. I'll focus my presentation on the results from our six pivotal phase 3 studies, three in patients who are not on dialysis and three in patients who were on dialysis.

The prespecified primary efficacy endpoints were met in each individual study. To facilitate the presentation, I'll present the pooled results, as the results of the individual studies were similar in direction and magnitude. Remember, individual studies were controlled for multiplicity and this was not employed in the pooled analysis.

I'll begin with Study 001, 060, and 608 that enrolled NDD patients. These three trials were similarly designed as global, randomized, double-blind, placebo-controlled studies. Eligible

patients had baseline hemoglobin levels of less than 10 grams per deciliter.  Two of the studies were randomized 2 to 1 roxadustat to placebo and the third was randomized 1 to 1.  Treatment durations ranged from 1 to 4 years.

The primary endpoint across all three pivotal NDD studies was the mean change from baseline in hemoglobin averaged over weeks 28 to 52 regardless of rescue therapy.  Several secondary and non-hemoglobin related endpoints supported the primary analysis.  Today, I will focus on the clinically meaningful endpoints listed here.  Other secondary endpoints can be found in your briefing document.

More than 4,000 patients were enrolled in the three pivotal NDD studies, nearly 2400 to roxadustat and 1900 to placebo.  Eighty-three percent of roxadustat-treated patients and 71 percent of placebo-treated patients have data to allow the assessment of the primary efficacy endpoint.  Information on the proportion of patients completing treatment with full follow-up

on safety will be presented later during the safety presentation.

At baseline, patients were similar between groups and representative of NDD patients globally. The majority were white followed by Asian.  In the U.S., 32 percent of enrolled patients were black or African-American.  Our NDD study population had an advanced stage of CKD.

Overall, the median eGFR was about 17 milliliters per minute, with 20 percent of patients having a baseline eGFR of less than 10. This is noteworthy for two reasons.  First, most prior phase 3 studies of marketed anemia products for this population excluded patients with baseline values of less than 15; and second, the median eGFR for patients at the time of dialysis initiation in the U.S., according to the 2020 USRDS annual data report, was 9.2 milliliters per minute.

Additionally, the mean CRP was greater than 7.  For context, the mean CRP in the general population, as reported by the U.S. NHANES study, was 0.02.  Finally, roughly 40 percent of patients

were iron deplete at baseline.

Now let's turn to the primary efficacy endpoint results. In the individual trials, roxadustat met the prespecified primary endpoint. Patients treated with roxadustat experienced statistically and clinically significant improvements in mean hemoglobin regardless of rescue therapy compared to placebo.

This graph shows the change in hemoglobin over 52 weeks with a treatment difference of 1.7 grams per deciliter favoring roxadustat. We will present further results on changes to the treatment algorithm and its effect on the shape of this curve later in the presentation.

This forest plot illustrates the placebo-adjusted treatment effect for roxadustat within the individual studies. The treatment effect for each of these studies was statistically significant compared to the placebo. This significant treatment effect favored roxadustat over a wide range of subgroups.

You'll notice a clear trend that those with

the lowest baseline eGFR had the greatest change in hemoglobin from baseline.  This is because patients with the lowest eGFR at baseline also had the lowest hemoglobin levels at baseline.

Importantly, we saw that irrespective of baseline iron repletion status, patients on roxadustat have the same significant hemoglobin response.  The comparable efficacy between roxadustat-treated patients who were iron replete, and those who are iron deplete, was observed without differences in roxadustat doses or a greater need for rescue therapy with IV iron or transfusion.

Significantly fewer roxadustat-treated patients required rescue therapy or red cell transfusion compared with placebo-treated patients. Rescue therapy, on the left, included both red cell transfusion, ESA use, or IV iron.  Of importance, only 2 percent of patients in the roxadustat arm received IV iron in the first 52 weeks.

Shown on the right, roxadustat treatment also reduced the incidence of transfusions compared

to placebo.  Considering the importance of transfusion avoidance that Dr. Pecoits discussed as an unmet need, roxadustat decreased the risk of patients requiring transfusion by 74 percent.

Finally, with respect to the NDD pooled trial, I will highlight the ability of roxadustat to treat anemia during the dialysis initiation period.  Please note that patients enrolled in the NDD studies continued treatment, even if their underlying kidney disease required them to start dialysis.

Here we show hemoglobin levels for NDD patients who are receiving roxadustat when they transitioned to dialysis during the study.  In this graph, time zero is dialysis initiation.  It shows hemoglobin levels in the few months before and after the transition from NDD to begin dialysis. Roxadustat provided stable hemoglobin levels during this very challenging time in a patient's life.

Overall, roxadustat consistently corrected and maintained hemoglobin in NDD patients with anemia CKD.  Statistically significant treatment

differences favored roxadustat compared to placebo. Hemoglobin was increased regardless of baseline iron replication status and clinically meaningful reductions in red cell transfusions were achieved.

Next, I'll present our three pivotal phase 3 studies in dialysis-dependent patients, Studies 001, 063, and 064.  These were randomized, open-label trials.  The FDA requested we pool these studies because roxadustat was compared to a single comparator, epoetin alfa.  Please note that these studies included ESA-naïve patients and those converted to roxadustat from ESA treatment.

The primary endpoint was similar to the NDD trials.  Mean change from baseline in hemoglobin averaged over weeks 28 to 52 regardless of rescue therapy.  The secondary endpoints focused on hemoglobin change based on inflammatory status because of the historical underperformance of epoetin alfa in patients who are inflamed.  I'll focus on the endpoints listed here.

We randomized almost 4,000 patients to roxadustat or epoetin alfa; 79.4 percent of the

roxadustat and 85.1 percent of the epoetin alfa group have data to allow the assessment of the primary endpoint.  Baseline demographics and characteristics were similar between the groups and representative of the patients who require dialysis globally.  Eighteen percent of patients identified as black globally.  Among U.S. patients, 39 percent were African American.

The mean CRP at baseline was similar between the groups and elevated in the same manner as seen in patients with NDD.  Of note, serum ferritin levels were approximately 600 in the global cohort.  This is roughly twice that of normal, which is usually 100 to 300.

Elevated ferritin levels are common in U.S. dialysis patients.  The DOPPS Clinical Practice Monitor of August 2020 reported that the mean ferritin level in the U.S. was greater than 800.  These markedly elevated levels of ferritin in the DD population suggest impaired iron utilization, also called functional iron deficiency.  We will discuss this in detail later.

FDA CRDAC                     July 15 2021                        52

Now let's look at the results.  In the pooled DD analysis, roxadustat was comparable to epoetin alfa in the mean change in hemoglobin from baseline averaged over weeks 28 to 52.  This graph shows the change in hemoglobin with a treatment difference of 0.26 grams per deciliter favoring roxadustat.

Please recall that the DD population comprised patients whose anemia was being corrected in patients who were converting from ESA to roxadustat.  This is reflected in the absolute change in hemoglobin from baseline.  Based on the hemoglobin change, roxadustat met its primary endpoint of noninferiority across all DD studies. The treatment effect favored roxadustat compared to epoetin alfa.

Based on phase 2 data that showed that roxadustat-treated patients have the same hemoglobin response and maintenance of iron stores, whether they were treated with oral or IV iron, we evaluated the mean monthly IV iron use in our phase 3 program.

In the phase 3 studies, oral iron was encouraged and IV iron supplementation was permitted if the patient had an inadequate response to oral iron or couldn't tolerate it, and the patient was iron deficient, as determined by a ferritin of less than 100 or a TSAT of less than 20.

Shown here is the mean monthly IV iron use from week 1 through the first year on treatment. The endpoint compared IV iron use between weeks 28 to 52, and during that period, roxadustat-treated patients required less monthly IV iron use than patients receiving epoetin alfa.

Additionally, fewer patients in the roxadustat group required red cell transfusion compared to the epoetin alfa group. These results demonstrate that roxadustat is at least as efficacious as epoetin alfa and are clinically meaningful to our patients.

Finally, I will review the results from approximately 400 peritoneal dialysis patients who participated in the global trials. As compared to

epoetin alfa, roxadustat provided a similar treatment difference among patients on peritoneal dialysis in the primary endpoint of change from baseline in hemoglobin. Additionally, as shown on the right graph, patients who received roxadustat required fewer red cell transfusions during the treatment period than those who received epoetin alfa.

Next, I'll further discuss roxadustat efficacy in patients with inflammation. The effect of inflammation on erythropoiesis and anemia treatment is complicated. It is important to emphasize that hepcidin is a key negative regulator of iron homeostasis that increases with inflammation and results in iron sequestration or trapping, which can conceptually be referred to as functional iron deficiency.

In patients receiving dialysis, this inflammation as subsequent iron trapping leads to increased IV iron use to attempt to overcome the functional iron deficiency and results in even higher ferritin levels. Therefore, inflammation,

whether measured by elevated CRP or hepcidin, causes unique problems in the treatment of anemia of CKD.

I will now present data demonstrating how roxadustat mobilizes iron and benefits patients on dialysis. Hyporesponsiveness, as mentioned by Dr. Pecoits, is an important problem with ESA therapy mediated through inflammation and lack of iron availability to the bone marrow. CRP as a marker of inflammation is elevated among patients who are less responsive to ESAs due to inflammation.

While there is no single or standard definition of hyporesponsiveness, arguably, many definitions are population-specific, examining patients who are less responsive than the rest of the population. Therefore, it may be clinically relevant to look at the spectrum of responsiveness within a population to best understand the relationships with treatment.

To explore the efficacy of roxadustat across the spectrum of inflammation, we first evaluated

hemoglobin response relative to baseline levels of CRP collected in 4 of the 6 pivotal trials. As we look at increasing baseline quintiles of CRP from left to right, roxadustat treatment results in an equally robust increase in hemoglobin compared with epoetin alfa.

It is important to examine the dosing requirements now to complete this picture. Here, we see an important difference in dosing between the two treatments. In yellow, epoetin alfa-treated patients required progressively higher doses to maintain hemoglobin response at higher levels of baseline CRP.

The weekly doses of epoetin alfa rose from 112, among patients with the lowest degree of inflammation, to 139 units per kilogram in patients with the highest degree, a 24 percent increase. Conversely, roxadustat dosing requirements, in blue, did not increase at higher levels of CRP.

Next, we explored how a reduction in hepcidin may affect the sequestration of iron seen in inflammation and functional iron deficiency and

may be of a more direct benefit to patients.  I will begin with a broad overview of how roxadustat affects iron stores consistent in both NDD and DD patients, and we'll look at NDD patients first.

Hepcidin, on the right, is significantly decreased with roxadustat treatment and is associated with increased serum iron levels and decreased ferritin.  Please note that this increase in serum iron occurred with roxadustat therapy concurrent with less IV iron use -- only 2 percent received IV iron in the first 52 weeks -- and even those significant amounts of endogenous iron were being used to produce hemoglobin.

While the fact that one marker of iron stores is increasing, serum iron, while another marker is decreasing, ferritin, may seem to be a paradox, the most important thing to remember here is that ferritin is a marker of intracellular iron stores.  The decline in ferritin in roxadustat-treated patients as compared to placebo-treated patients is consistent with a reduction in hepcidin that leads to the

mobilization of trapped intracellular iron stores and their subsequent delivery to the bone marrow.

The iron results in the DD population were similar and provide us the opportunity to compare roxadustat to epoetin alfa.  In the DD trials, roxadustat increased serum iron in patients while allowing for less IV iron administration, lower transfusion rates, and slightly higher hemoglobin levels.  Conversely, serum iron decreased in patients who received epoetin alfa.

Although hepcidin and ferritin were reduced in both treatment arms, the greatest reduction occurred in the roxadustat-treated patients.  As in the NDD-treated patients, the increased iron and decreased ferritin with roxadustat treatment suggest an increased iron mobilization from previously trapped stores.  This represents a unique physiologic difference between roxadustat and epoetin alfa.  Now let's look at how it's clinically relevant to patient outcomes.

A high serum ferritin or hepcidin level could be a marker of inflammation or iron

sequestration, which contribute to hyporesponsiveness to ESA treatment.  We therefore examined the efficacy of roxadustat, on the right, and epoetin alfa, on the left, according to baseline quintiles of these values, and serum ferritin is presented in this slide.

As a reminder, the normal range for ferritin is roughly 100 to 300.  The mean serum ferritin at baseline was approximately 600, almost twice that of normal, with the highest quintile, 20 percent of the treatment arm, having values higher than 1000. In a clinical setting, high ferritin values often lead to significant doses of IV iron to attempt to overcome the inflammation-induced functional iron deficiency so that hemoglobin can be effectively produced.

Among patients treated with epoetin alfa, on the left, those with the highest ferritin levels, in red and orange, had the lowest hemoglobin levels.  This lower hemoglobin response occurred despite patients receiving higher epoetin alfa doses.  The mean difference between quintiles,

between the red and orange, and the other three quintiles was as high as 0.5 grams per deciliter at some points.  In contrast, roxadustat-treated patients, on the right, had similar increases in hemoglobin across all baseline ferritin quintiles.

To explore the clinical relevance of these observations, I will discuss the differences in transfusion rate between roxadustat-treated and epoetin alfa-treated patients, focusing on the subset of patients with functional iron deficiency due to inflammation identified here.

In this exploratory analysis of patients based on baseline ferritin levels, roxadustat-treated patients received transfusions less frequently than epoetin alfa-treated patients in all quintiles.  In the epoetin alfa arm, in yellow, when comparing the highest quintile of ferritin, on the right, to the lower four quintiles combined, on the left, the incidence of transfusion is highest in the highest quintile of ferritin, likely reflective of the lower hemoglobins achieved in this highest quintile, relative to the rest of

the epoetin alfa arm.

In short, epoetin alfa-treated patients had the highest baseline serum ferritin levels, 20 percent of the cohort; so in those patients they had both the lowest hemoglobin levels and the highest rate of transfusion in both treatment arms.

The same relationship of underperformance of epoetin alfa is seen when hemoglobin levels are compared among quintiles of hepcidin, also potentially reflective of a group with functional iron deficiency, and these analyses are described in the briefing book.

In summary, the DD clinical trials show that roxadustat was comparable to epoetin alfa regardless of baseline inflammation. Roxadustat-treated patients achieved clinically meaningful reductions in red cell transfusions and IV iron use, particularly in patients with markers of iron stores suggesting functional iron deficiency. Overall, the roxadustat clinical program provided consistent efficacy. Roxadustat increased hemoglobin and managed anemia across the

FDA CRDAC                    July 15 2021                    62

continuum of CKD.

Thank you.  I'll now turn the presentation over to Dr. Little, who will present the safety of roxadustat.

**Applicant Presentation – Dustin Little**

DR. LITTLE:  Thank you, Dr. Szczech.

I'm Dustin Little.  I'm a nephrologist, and I'm the roxadustat global clinical head at AstraZeneca, and I'll be presenting the safety results from our clinical program.

Today, I will be discussing the pooled cardiovascular safety results for our pivotal phase 3 program, a review of specific events from the program, and a summary of our risk management plan.  Let's start with some history of how the roxadustat program came to be.

The program was initially intended to consist of pivotal efficacy trials without a pooled assessment of cardiovascular safety.  Based on FDA feedback to study cardiovascular safety, a meta-analysis of pivotal phase 3 trials was planned, and Studies 001 and 002 were added to the

program.

Key endpoints include MACE, or major adverse cardiovascular events, and MACE-Plus.  MACE consisted of all-cause mortality, myocardial infarction, and stroke, and MACE-Plus is defined as MACE plus hospitalization for heart failure or hospitalization for unstable angina.  The use of all-cause mortality in the cardiovascular safety composites is consistent with precedent from prior CKD anemia cardiovascular trials and was suggested by FDA.

The aim of our program was to generate a sufficient safety database to assess the cardiovascular safety of roxadustat compared to placebo in non-dialysis-dependent CKD and compared to epoetin alfa in dialysis-dependent CKD.  The roxadustat program is the largest phase 3 CKD anemia program ever conducted.  In the placebo-controlled NDD population, we studied 4,270 patients, 830 of whom had a major adverse cardiovascular event during the study.  Due to the placebo-controlled design, we observed differences

in treatment discontinuation, which I will tell you more about on the subsequent slides.

In the epoetin alfa-controlled DD program, we studied 3,880 patients, 645 of whom had a major adverse cardiovascular event during the treatment period.  In the DD population, treatment discontinuation was more balanced by treatment group compared to NDD.

Reported cardiovascular events were sent to a blinded central independent event review committee for adjudication, and the program is monitored by an independent data monitoring committee.  The size of the program allowed for the use of a noninferiority margin of 1.3 based on precedence and an FDA guidance on the evaluation of cardiovascular safety for new drugs, which was active at the time of the design of the roxadustat program.

Let's first focus on cardiovascular safety in the NDD population.  As shown earlier, baseline characteristics were well balanced between treatment groups.  More roxadustat patients

completed treatment compared to placebo patients at 62 percent and 40 percent, respectively.  As a result of this, the mean treatment duration for roxadustat patients was 1.6 years compared to 1.2 years for placebo.

Where possible, patients were followed for cardiovascular events after treatment discontinuation, and 88 percent of roxadustat and 85 percent of placebo-treated patients were assessed for MACE through the end of the study. Vital status, whether a patient is alive or dead, could be confirmed via public record search at the end of the study for some patients, and 91 percent of patients in both treatment groups had complete follow-up for all-cause mortality.

Before we discuss the results of the cardiovascular safety analyses of the program, I'd like to take a few slides to discuss the impact of these differences in treatment discontinuation. This curve shows the proportion of patients remaining on treatment over time by treatment group.  As you can see, the maximum treatment

duration was more than 3 years.

Large differences in treatment discontinuation were noted early in the study.  For example, 20 percent of placebo patients discontinued treatment in the first approximately 4 months following randomization compared to nearly 9 months for roxadustat.  This pattern was also noted in time to discontinuation of treatment in 50 percent of patients by treatment group, which occurred approximately 6 months later in the roxadustat group.

As a result of these differences in treatment discontinuation, roxadustat-treated patients had substantially more exposure to study treatment compared to placebo patients.  To investigate whether the types of patients who stopped treatment are different for the two treatment groups, which would lead to bias in on-treatment analyses, we evaluated the characteristics of patients remaining on roxadustat over time compared to placebo.

This figure shows the median baseline

estimated glomerular filtration rate at different time points following randomization for patients remaining on roxadustat and placebo treatment. Median eGFR was balanced at baseline, however, because patients with more severe CKD tend to have more severe anemia, placebo patients with lower baseline eGFR were more likely to require anemia rescue therapy and stop treatment compared to placebo patients with less severe CKD.

As a result of this, the population of patients remaining on placebo progressively became a population of patients with less severe baseline CKD. By contrast, roxadustat patients' anemia was effectively managed, resulting in patients with more advanced CKD being able to continue with long-term treatment.

This curve shows the proportion of patients remaining on treatment following dialysis initiation by treatment group. When including patients who started dialysis after treatment discontinuation, a similar proportion of patients required dialysis initiation overall. However,

more patients started dialysis while on roxadustat treatment because placebo patients who were close to dialysis were more likely to stop placebo treatment due to low hemoglobin values and requirement for treatment of anemia; and because most dialysis patients require anemia treatment, placebo patients discontinued study drug at very high rates following dialysis initiation.

Due to these differences in treatment discontinuation, both prior to and following dialysis initiation, more patients starting dialysis were able to continue roxadustat therapy.

This slide shows the percentage of dialysis patients among patients remaining on treatment over time. For example, at 12 months following randomization, approximately 20 percent of patients remaining on roxadustat have started chronic dialysis compared to approximately 10 percent of placebo patients, and the magnitude of this difference increased over time. This is clinically important because patients starting dialysis have substantially higher risk of cardiovascular events

and other events compared to non-dialysis patients.

Although this complicates the interpretation of NDD CV safety data, it is important to note that we have a dedicated analysis of the cardiovascular safety of roxadustat compared to epoetin alfa in over 1,500 incident or new-to-dialysis patients, which I will present later.

This slide shows mortality rates by NDD CKD stage and by month following dialysis initiation in U.S. patients.  As you can see, mortality risk increases as NDD CKD becomes more severe and increases markedly with dialysis initiation.

On the prior slides, I've shown you that patients with more severe CKD and those requiring dialysis initiation were overrepresented in the roxadustat group over time due to differences in treatment discontinuation.  Because these patients have higher cardiovascular risk, this means that the balanced CV risk that was present at baseline due to randomization was not preserved among patients remaining on treatment.  Thus, on-treatment analyses will be heavily biased

against roxadustat.

So with that background, let's discuss how we can analyze the roxadustat NDD cardiovascular safety data. The ideal analysis would ensure that the effect of randomization in terms of equal risk by treatment group is preserved. This is not the case for on-treatment analyses due to differences in treatment discontinuation.

In an ideal analysis, missing data and time off treatment should be minimized and there should be an adequate number of patients with events. ITT or on-study analyses include all events which occur following randomization, including those which occur after treatment discontinuation.

This has the advantage of balancing patient risk throughout the analysis period. However, in the roxadustat program, ITT on-study analyses have some missing data, with more missing data in the placebo group, and they include a substantial proportion of time off treatment, particularly among placebo patients.

In the roxadustat NDD program, no single

analysis achieves all of these objectives in an ideal manner. However, different analyses have different strengths and weaknesses and can be used collectively to assess the cardiovascular safety of roxadustat.

This slide shows several analyses which have been performed comparing MACE risk for roxadustat to placebo. I'd like to point out that the hazard ratio and 95 percent confidence intervals cross 1 for all of the analyses except for the on-treatment analysis.

We've already discussed how the on-treatment analysis is profoundly affected by differences in treatment discontinuation and how the ITT on-study analysis is limited by greater missing data and greater time on treatment in the placebo group.

Overall, analyses which preserve the benefit of ITT analysis in terms of equal risk by treatment group, but which minimize the impact of missing data and greater time off treatment in the placebo group, have hazard ratio point estimates of close to 1.0, supporting that risk for MACE is comparable

for roxadustat compared to placebo.

These analyses include ITT on-study analyses of patients with baseline eGFR of greater than or equal to 10 milliliters per minute, which excludes the quintile of patients with the lowest baseline eGFR who were most affected by differential treatment discontinuation.

We also performed ITT on-study analysis with censoring at dialysis initiation in order to focus on the cardiovascular safety of roxadustat in non-dialysis patients, and we also performed ITT on-study analysis with censoring at one year following randomization because that is a time frame at which differences in treatment discontinuation were of a lower magnitude. Additionally, the hazard ratio point estimate for the 992 patients from the United States who were more representative of U.S. non-dialysis patients was 0.99.

In contrast to the NDD placebo-controlled data, Study 610 is an active comparator NDD study not affected by large differences in treatment

discontinuation.  The MACE hazard ratio point estimate for roxadustat compared to darbepoetin alfa was 0.81.  These results are supportive of the cardiovascular safety of roxadustat in non-dialysis patients.

Coming back to the placebo-controlled NDD program, here are the Kaplan-Meier curves from MACE risk over time for roxadustat compared to placebo. On the left is the overall ITT or on-study analysis, and on the right is the analysis with censoring at dialysis initiation.

The latter analysis is, as mentioned previously, performed in order to focus on roxadustat's cardiovascular safety in non-dialysis patients and is less affected by missing data and greater time on treatment in the placebo group.  In both figures, the curves track closely together, consistent with comparable MACE risk for roxadustat and placebo.

This figure shows the results of MACE-Plus cardiovascular mortality and each of the components of MACE-Plus.  For each event, two results are

shown, overall NDD, which is on top, and NDD with censoring at dialysis initiation, which is also known as NDD-NDD. For each event, the 95 percent confidence interval crossed 1.0.

Let's turn now to the DD population. As shown earlier, baseline characteristics were well balanced between the treatment groups. Fifty-eight percent of roxadustat compared to 66 percent of epoetin alfa patients completed treatment.

When interpreting these data regarding the proportion of patients completing treatment, it is important to remember that these were event-driven studies with a maximum treatment duration of more than three years. A similar proportion of patients were followed for MACE events through the end of the study and a similar proportion of patients in both treatment groups had complete follow-up for all-cause mortality.

As mentioned previously, the DD population included patients untreated with ESA at baseline as well as patients on ESA treatment prior to enrollment. As described earlier and consistent

with nephrology convention, incident dialysis patients were predefined as patients who were randomized to roxadustat or epoetin alfa within 4 months following dialysis initiation. Incident dialysis patients were generally not on anemia treatment at baseline or had been recently initiated on treatment prior to enrollment.

In contrast to the incident dialysis subgroup, stable or prevalent dialysis patients were mostly on long-term ESA treatment at baseline. Thus, patients randomized to roxadustat required conversion to a different mechanism of anemia treatment, whereas ESAs patients continued ESA.

Following completion of study treatment, roxadustat patients would be expected to convert to ESA particularly within the first 4 weeks following the conclusion of treatment, whereas ESA patients would be expected to continue treatment with ESA.

Here are the results of the on-treatment plus 7-days analysis set for the pooled DD assessment of MACE for roxadustat compared to epoetin alfa. This analysis window was the

FDA CRDAC                    July 15 2021                    76

agreed-upon primary analysis set with FDA.  The analysis shows similar cardiovascular risk for roxadustat compared to epoetin alfa, with a hazard ratio point estimate of 1.02 and 95 percent confidence interval upper bound of 1.20.

Results in the predefined subgroup of incident dialysis are shown.  The incident- or new-to-dialysis population is considered to be particularly relevant for three reasons.

First, anemia treatment is often initiated during the incident dialysis period.  Second, incident or new-to-dialysis patients are exposed to substantial cardiovascular risk, and it was important for us to ensure that we had no cardiovascular safety signal in this traditionally high-risk population.

And third, patients starting dialysis in our NDD program were those who were most substantially affected by differences in treatment discontinuation; so analysis of the incident dialysis subgroup of the overall dialysis population is required to fully understand

roxadustat's cardiovascular safety in patients recently initiated on dialysis.

Results in the stable dialysis subgroup of patients who were randomized to either continue ESA or convert to roxadustat are also shown.  Finally, the on-treatment plus 28-days analysis set is shown as a support of analysis.  Overall, the results are consistent with comparable risk for MACE for roxadustat and epoetin alfa.

Here's the Kaplan-Meier curve for MACE for the DD population.  The curve tracked closely together consistent with similar MACE risk for roxadustat and epoetin alfa.  The hazard ratio for MACE-Plus for roxadustat compared to epoetin alfa was 0.91.  Looking at each component of MACE-Plus, risk was similar for roxadustat and epoetin alfa.

Study 613 was an outlier in the DD program and was not pooled with the pivotal DD studies because of its unique design with two ESA comparators.  It was a study of exclusively stable dialysis patients and contained no incident dialysis patients.  Patients' short-acting ESA at

baseline were randomized to either roxadustat or epoetin alfa, whereas patients on long-acting ESA were randomized to either roxadustat or darbepoetin alfa.

All patients were from Europe, with 79 percent from Eastern or Central Europe. And another difference between 613 and the pivotal DD trials is that starting roxadustat doses were higher in Study 613.

Study 613 was not powered for the assessment of cardiovascular safety, therefore it is instructive to consider the impact of adding Study 613 to the DD pool. Although 613 was an outlier in terms of the design and the cardiovascular safety results, when pooled with the pivotal dialysis studies, the overall conclusion of comparable MACE risk for roxadustat and epoetin alfa is unchanged, as the hazard ratio point estimate was 1.08 with 95 percent confidence interval upper bound of 1.24.

Before I summarize the cardiovascular safety data in the roxadustat program, I'd like to point

out that in our program, we did not compare roxadustat to ESA dose according to the trials that demonstrated increased cardiovascular risk, but rather dosed according to current labels, which have been updated to minimize cardiovascular risk.

As you know, the normal hematocrit in CHOIR trials compared ESA dose to two different hemoglobin targets and increased cardiovascular events were noted in the groups randomized to the higher targets.

Importantly, the hemoglobin targets used in patients treated with ESA in the roxadustat program were more consistent with the control groups in normal hematocrit in CHOIR, and it is in this setting that we had MACE, MACE-Plus, and all-cause mortality hazard ratios ranging from 0.91 to 1.02 in the DD pool and of less than 1 in Study 610.

In conclusion, roxadustat's cardiovascular safety has been evaluated across the continuum of patients with CKD anemia.  In the non-dialysis-dependent population, the risk of MACE was comparable to placebo and there was no

increased cardiovascular risk noted for roxadustat compared to darbepoetin alfa in the 610 trial, which was not affected by substantial differences in treatment discontinuation.

In the overall DD population, patients receiving roxadustat had comparable risk of MACE compared with the epoetin alfa, and similarly in the incident- or new-to-dialysis and the stable dialysis subgroups, MACE risk was comparable between the treatment groups.

Next, I'll review data on the following safety topics where imbalances were noted: seizures, infections, vascular access thrombosis, and deep vein thrombosis.

Labels for approved ESAs warned about seizures, which have been observed with ESA therapy. We performed a standard metric query for convulsions to capture all adverse events potentially referring to seizures. We noted that more roxadustat patients had seizure events versus the comparators. Although the number of patients with a reported baseline history of seizure was low

in the roxadustat program, these patients disproportionally contributed to the imbalance, and we consider that patients with a history of seizure should be treated with roxadustat with caution.

Patients with severe CKD are at high risk for infection, and infection is among the leading causes of death in dialysis patients. In the NDD program, patients at highest risk for infection were more likely to discontinue placebo compared to roxadustat; therefore, differences in treatment discontinuation likely contributed to the observed imbalances in serious and fatal infection compared to placebo, particularly in on-treatment analysis as is shown here.

By contrast, in the DD program where treatment discontinuation was more balanced, the incidence of serious and fatal infection was similar between treatment groups.

This table shows all infection serious adverse events in the NDD population with an incidence of at least 1 percent in either treatment group. These adverse events are consistent with

the most common events expected in a population of patients with severe chronic kidney disease. As may be expected, considering the differences in treatment discontinuation described previously, the incidence of these infections were higher in the roxadustat group. By contrast, the incidence of the most common infection SAEs in the DD program were generally similar for roxadustat and epoetin alfa.

To summarize our infection data, we saw imbalances in serious and fatal infection in the placebo-controlled NDD program but not the active control DD program. Because ESAs aren't known to cause serious or fatal infections in CKD anemia, these results suggest that the results in the NDD program may be related to bias due to differential treatment discontinuation.

ESAs have been observed to increase thrombosis risk, particularly when treating to higher hemoglobin targets. What is reported here is an overall composite of thrombosis events, which include vascular access thrombosis, venous events

such as deep vein thrombosis, and arterial events such as myocardial infarction.  In the NDD and DD populations, the types of thrombosis reported were typical of those observed in the CKD population with no imbalances observed in rare or atypical thrombotic events.

Overall, the rates of potential arterial thrombosis events were similar between roxadustat and comparator as demonstrated by the results of adjudicated myocardial infarction and stroke. However, for both the NDD and DD populations, there were more vascular access thrombosis and deep vein thrombosis events in roxadustat-treated patients.

Weights of deep vein thrombosis pulmonary embolism were higher for roxadustat compared to placebo in non-dialysis patients.  In the DD program, the incidence of pulmonary embolism, or PE, and the overall incidence of DVT and PE was similar for roxadustat compared to epoetin alfa. However, the incidence of DVT was higher at 1.5 percent for roxadustat compared to 1 percent for epoetin alfa.

Vascular access thrombosis is a known risk of treatment of CKD anemia.  Here, the term "vascular access thrombosis," or VAT, refers to thrombosis of an arteriovenous fistula or arteriovenous graft that is used, or planned to be used, for hemodialysis vascular access.  Potential vascular access thrombosis events were centrally adjudicated by a committee which was blinded to treatment assignment, and the incidence of adjudicated VAT is what is shown here.

VAT events occurred more frequently in roxadustat-treated patients in the NDD and DD populations.  The DD data is the focus of our VAT evaluation because NDD patients would not be expected to have dialysis access at baseline and because NDD patients requiring dialysis access were those who were most affected by differential treatment discontinuation.  Among dialysis patients overall, VAT was noted in 13 percent of roxadustat compared to 10.5 percent of epoetin alfa patients.

Part of our investigation of our thrombosis data included an evaluation of the rates of

thrombosis over time.  We found that rates of thrombosis and VAT with roxadustat were highest during the initial treatment period and decreased over time, and the differences in rates for roxadustat compared to epoetin alfa were also highest during the early treatment period.

This corresponds with the time frame when differences in mean hemoglobin values were largest for roxadustat compared to epoetin alfa and when rapid rates of hemoglobin rise were most common for patients treated with roxadustat.

This figure shows rates of thrombosis and vascular access thrombosis by hemoglobin rate of rise using analytic methods agreed to between FDA and the sponsor.  In both roxadustat- and epoetin alfa-treated patients, higher rates of thrombosis were observed at higher rates of rise of hemoglobin.

Notably, rapid rate of rise of hemoglobin was observed more frequently with roxadustat treatment.  These results, taken together with the results on the previous slide, support that

thrombosis and vascular access thrombosis risks are associated with rapid rate of hemoglobin rise with roxadustat treatment.

We also evaluated the possibility of a relationship between dose and thrombosis risk, and noted that rates of thrombosis and VAT appeared to be higher at higher doses of roxadustat. Although these data have limitations and do not conclusively demonstrate that higher roxadustat doses are causative of thrombosis, we considered whether roxadustat doses could be lowered by targeting a lower hemoglobin value.

But before we discuss roxadustat dosing, I'd like to review the results of these analyses in NDD patients. In NDD patients, rates of thrombosis AEs were higher at higher rates of hemoglobin rise. We also noted in NDD that rates of thrombosis tended to be higher at higher roxadustat doses.

In light of these findings, we are proposing changes to roxadustat dosing to mitigate thrombosis risk. First, we plan to lower the hemoglobin target from 10.5 to 12 grams per deciliter to 10 to

11 grams per deciliter. As I will show you, this allows for us to use lower roxadustat doses throughout the treatment period and it also allows us to minimize hemoglobin overshoots with roxadustat treatment. Additionally, we plan to lower roxadustat starting doses both in ESA untreated and ESA conversion patients. In subsequent slides, I will show you the expected impact of these changes on the incidence of rapid hemoglobin rise.

Finally, we recommend that patients who are unresponsive to roxadustat receive no more than three consecutive increases in roxadustat dose. As above, based on the results from our clinical program, we discussed with FDA to target hemoglobin values of 10 to 11 grams per deciliter, and we knew that lowering starting doses would lower the rate of hemoglobin rise and the incidence of early hemoglobin overshoots.

We used modeling and simulation to help us decide which specific starting doses to propose and to evaluate the expected impact on roxadustat

dosing of the proposed lower hemoglobin target.  To assess the reliability of our simulations, we compared simulated mean hemoglobin values using the phase 3 roxadustat doses to the actual phase 3 hemoglobin values in the clinical program, and as you can see here, the simulation results closely matched the observed clinical results.

The left figure on this slide shows the simulated incidence of rapid rate of hemoglobin rise with the phase 3 doses compared to the proposed lower starting doses.  As you can see, the change in starting dose is anticipated to reduce the incidence of rapid rate of hemoglobin rise quite substantially, which is expected to lower risk of thrombosis and specifically vascular access thrombosis.

The figure on the right half of the slide shows simulated mean hemoglobin values over time with the phase 3 compared to the proposed dosing.  As you can see, the proposed dosing is expected to lead to mean hemoglobin values which increase into the target range, with less potential for

hemoglobin overshoots, particularly during the initial treatment period.

This slide shows similar simulation results for patients converted from ESA. Again, the incidence of rapid rate of hemoglobin rise is substantially lower and mean hemoglobin values are more stable during the initial treatment period with the proposed dosing changes.

This slide shows the simulated mean roxadustat doses with the lower starting doses and the lower hemoglobin target. Overall, this strategy is expected to reduce roxadustat doses by more than 25 percent during the treatment period.

Here, I'm showing you, once again, the incidence of thrombosis by roxadustat dose. Using the phase 3 starting doses and phase 3 target hemoglobin, the average roxadustat dose would be expected to be approximately 3 milligrams per kilogram per week, a dose above which higher rates of thromboses were observed.

By contrast, mean doses using the proposed starting dose and the proposed hemoglobin target

are expected to be 2.2 milligrams per kilogram per week, which corresponds with doses at which lower thrombosis rates were observed.

Here is the same analysis for DD patients. As you can see, the proposed updated dosing is expected to reduce roxadustat doses by more than 30 percent. This slide shows rates of thrombosis and VAT by roxadustat dose in the DD population. Once again, predicted mean dose using the phase 3 dosing corresponds with doses that are close to ranges where increased rates of thromboses were noted, whereas predicted mean dose using the proposed dosing corresponds with doses at which observed thrombosis rates were lower.

In terms of risk management, in addition to the changes to dosing, we plan to communicate all important safety information and recommendations for risk mitigation associated with the use of roxadustat in the prescribing information for healthcare providers and a medication guide for patients, and we also plan to communicate risks and educational materials for healthcare providers. We

additionally plan to utilize product labeling to mitigate risk.

In addition to the proposed dosing changes, we will also make recommendations on the appropriate frequency of hemoglobin monitoring and to consider withholding treatment for severe or life-threatening thrombosis and to manage all thromboses promptly.

We consider that patients with a history of seizure should be treated with roxadustat with caution and that patients should promptly report symptoms, new onset seizures, or increase in seizure frequency to their healthcare provider.  We also recommend to avoid starting roxadustat in patients with an active severe or serious infection, that patients be monitored for signs and symptoms of infection, and that any infection be promptly treated.

On the slide after this, I will review with you a proposal for a postmarketing study to confirm that vascular access thrombosis risks are similar for roxadustat and ESA with the proposed roxadustat

dosing regimen, but first, I'd like to point out that the practice model for U.S. dialysis patients is uniquely suited to prospectively evaluate the effectiveness of our risk minimization strategies for lowering VAT risk in the postmarketing setting using real-world evidence.

First of all, there are more than 500,000 prevalent U.S. dialysis patients with more than 100,000 patients starting dialysis each year.  This large pool of patients allows us to effectively match patients treated with the standard of care to patients treated with roxadustat.

Additionally, anemia treatment data is collected systematically with hemoglobin values assessed monthly as part of typical clinical practice.  Patients dialysis accesses are assessed for the presence of thrombosis in conjunction with every dialysis session and it is noted when patients require new dialysis access following a thrombosis event.

Finally, by studying patients treated with roxadustat in the real world, we can assess a

broader more generalizable patient population, and we would expect the results to be directly translatable to clinical practice.  So with this in mind, we're proposing a post-approval, prospective, matched cohort study of U.S. dialysis patients treated with roxadustat compared to ESA.

Both ESA untreated and conversion patients will be studied.  Patients will be treated according to approve labels, and roxadustat-treated patients will be compared to matched ESA-treated patients based on predefined criteria.

The main objectives will be to compare VAT risk for roxadustat and ESA and to assess risk factors for VAT with both treatments.  We plan to study 5,000 roxadustat-treated patients compared to 5,000 ESA-treated patients with one year of observation time per patient.  With this sample size, we expect approximately 1,000 events, which is expected to allow us to estimate the incidence rate of vascular access thrombosis in each treatment group plus or minus 1 event per 100 patient-years.

In conclusion, our large database allowed for a comprehensive evaluation of the roxadustat safety profile.  We observed comparable cardiovascular risk for roxadustat versus placebo and versus ESA in non-dialysis patients compared to ESA in dialysis patients.  Patients treated with roxadustat had an increased incidence of vascular access thrombosis, deep vein thrombosis, and seizures, and we saw a higher incidence of fatal infections versus placebo in NDD patients, but not compared to ESA in DD patients.

We are proposing several strategies to manage these risks.  First, product labeling will communicate warnings and precautions to physicians and a medication guide will communicate these risks to patients.

We're also proposing changes to dosing that will decrease the risk of thrombosis with roxadustat treatment, and we're proposing a postmarketing, real-world study of 10,000 patients to confirm that risk of VAT is similar for roxadustat and ESA with the proposed changes to

roxadustat dosing.  We will continuously evaluate, communicate, and mitigate risks, and we are committed to working with the FDA to further characterize the roxadustat safety profile in the post-approval setting.

Thank you, and I'll now turn the presentation to Dr. Fishbane.

**Applicant Presentation – Steven Fishbane**

DR. FISHBANE:  Good morning.  My name is Steven Fishbane.  I'm a practicing nephrologist and a professor of medicine of the Donald and Barbara Zucker School of Medicine at Hofstra/Northwell and chief of nephrology for the Northwell health system.  I've taken care of patients with kidney disease and have studied this condition for more than 25 years.  I'm an active member of the KDIGO global anemia and kidney disease guideline group.

From this vantage point, I'd like to share my perspective on the use of roxadustat for patients with the anemia of CKD.  The history here is important.  Treatment of anemia is critical in the care of patients with CKD.  Forty years ago,

before ESA therapy was available, hemoglobin levels in patients receiving dialysis were severely depressed.  For these patients, life was truly miserable and many were unable to function or even perform basic activities of living.

Blood transfusions were the standard of care.  There were many problems associated with repeated blood transfusions in addition to cost, patient inconvenience, and infections; but more importantly, the development of antibodies that make it difficult to get a kidney transplant and also iron overload, which was almost universal, frequently requiring chelation treatment.

The approval of ESAs in 1989 was an important advance for patients, but there's not been much innovation in anemia treatment since the first ESA approval.  I believe roxadustat now represents an important advance.

Despite the breakthrough that ESAs were in dialysis anemia, problems in dialysis anemia treatment remain today in 2021.  The first problem relates to patients who are transitioning from CKD

to begin dialysis.  These first few months on dialysis are very difficult with sharply increased hospitalizations and mortality risk.  Previously untreated anemia greatly complicates this incident dialysis period with rapid hemoglobin fluxes and high ESA doses.

On the left, the first figure from DOPPS shows what current anemia treatment looks like at the start of dialysis.  You can see how low hemoglobin levels are, and it takes months to reach a stable hemoglobin concentration.

The second figure on the right is what Dr. Szczech showed earlier, how roxadustat allows for a more orderly hemoglobin transition to dialysis.  I have long waited to be able to treat my office CKD patients for this issue with an oral agent like roxadustat that would create this kind of smooth transition to dialysis.

A second issue, once patients are on dialysis, ESA hyporesponsiveness is a frequent concern.  A poor ESA hemoglobin response leads to transfusions, high ESA doses, and an associated

increased risk of cardiovascular events.  Iron deficiency and inflammation are widely accepted as the major causes of hyporesponsiveness.  Both complicate current ESA treatment leading to very high IV iron doses and unresolved anemia of inflammation.  Roxadustat meaningfully addresses both of these leading causes of hyporesponsiveness.

We saw from the data how roxadustat improved iron availability and reduced IV iron doses in the figure on the left; and as for inflammation, how it worked well despite elevated CRP without the need for the high doses, as was true for epoetin alfa on the right.

The third issue has to do with home dialysis.  The country right now is making a major push to increase home dialysis, but both injected ESA therapy and intravenous iron complicate this effort.  In the figure, we saw data Dr. Szczech showed on how remarkably well roxadustat worked in patients on home dialysis PD.  It's clear to me that roxadustat can help with each of these current dialysis anemia problems.

Now, for patients with kidney disease not yet on dialysis, anemia management is currently even more challenging. We made strides in dialysis anemia treatment, but non-dialysis patients have truly been left behind. Up to 50 percent of these patients have anemia, yet most are untreated.

The reason is largely because of the complexities and logistical issues associated with both injected ESAs and intravenous iron and the frequent clinic visits that are required. In fact, data show that less than 15 percent of non-dialysis patients receive ESA therapy, and although two-thirds of non-dialysis patients have iron deficiency, very few receive iron treatment.

As a result, in the U.S. today, if non-dialysis patients are treated for anemia at all, it is likely with a blood transfusion. More patients receive blood transfusions than either ESAs or intravenous iron.

Now this is important. Forty percent of patients receive a blood transfusion in the two years prior to starting dialysis. Transfusions are

highly relevant, as they cause antibody production, and this makes it harder to receive a kidney transplant, clearly the best treatment for ESRD, and for those that receive a transplant, the risk of rejection is increased.

These 10 studies show that as a result of blood transfusions alloantibodies frequently develop.  With each study, the left-sided black horizontal bar shows that after transfusion, sensitization averages 20 to 40 percent.  In the white bars, the non-transfused patients, antibody production is far less.

More recent data shows that red cell transfusions result in clinically significant increases in HLA antibody strength and breadth, and these HLA antibodies, crucial for transplantation, turn out to be directly related to the specifically donated blood.

If an oral drug like roxadustat was available, the treatment of anemia in non-dialysis CKD, which is so limited today by complexity and inconvenience, would be much more readily

accomplished with the potential, as we saw in these phase 3 studies of a 74 percent reduction in blood transfusions, and that could result in far fewer issues with antibody production that delay, complicate, and prevent kidney transplantation.

It is because of the complexity and logistical issues that nephrologists uncommonly treat non-dialysis anemia, but the need is absolutely there, and that need is supported by the recommendations of global guideline groups. In fact, there are many anemia in kidney disease guideline groups throughout the world. These expert panels have examined the totality of risk and benefit data.

There is a widespread unanimous consensus that supports anemia treatment in both dialysis and non-dialysis CKD. They speak to improving symptoms and raising hemoglobin to reduce blood transfusions. Similarly, anemia treatment of both dialysis and non-dialysis CKD are also widely approved by FDA and other international regulatory agencies. The FDA labels say ESAs are indicated

FDA CRDAC                    July 15 2021                    102

for the treatment of anemia for CKD in patients on dialysis and patients not on dialysis.

Now, obviously the purpose of today's meeting is not to determine the need for anemia treatment; the world's expert guideline groups have spoken very clearly on the subject.  There is no controversy; rather, it's to determine the risk and benefit balance of this drug roxadustat.

It's my strong belief that the benefits of treating anemia with roxadustat in dialysis and non-dialysis CKD patients clearly outweigh the risks, and this novel oral therapy addresses the anemia needs of the spectrum of CKD patient populations, providing therapeutic options and specific benefits as compared and contrasted to the present standard of care.

I'd like to note that I've carefully reviewed the sponsor's plan to adjust recommended roxadustat dosing to limit hemoglobin rate of rise to mitigate thrombosis risk.  Importantly, the relationship of ESA dosing, hemoglobin, and thrombosis risk has long been known and is part of

the label for all marketed ESAs.  The clear demonstration in this program of the relationship between hemoglobin rate of rise with thrombosis points to this long known and well understood phenomenon, and the sponsor's new dosing plan should be highly effective for reducing risk.

There are a few disease states that have only one type of treatment available. Nephrologists and patients would like to have choice to be able to decide which treatment is most appropriate.  For a patient doing well on ESAs, there may be no reason to change, but for my patients, I certainly would like to have choice.

In conclusion, we saw that in dialysis there remains unmet needs that oral roxadustat could readily address.  I'd like to repeat one in particular.  The major effort in the U.S. right now to increase transplantation and home dialysis, roxadustat is uniquely situated to help with both. The reduction in transfusions would improve transplantation access and the oral route would ease the path to home dialysis.

In non-dialysis CKD, roxadustat would greatly improve the lives of many patients by making anemia treatment so much easier and thereby greatly reducing the number of transfusions and improving opportunities for transplantation.  Thank you.  I'd now like to turn the presentation over to Dr. Eisner.

DR. EISNER:  Thank you, Dr. Fishbane.

My name is Mark Eisner, and I am the chief medical officer at FibroGen.  At this time, we'd be happy to take your questions.

**Clarifying Questions**

DR. LEWIS:  We will now take clarifying questions for FibroGen.  Please use the raised-hand icon to indicate that you have a question and remember to put your hand down after you've asked your question.  When acknowledged, please remember to state your name for the record before you speak and direct your question to a specific presenter, if you can.

If you wish for a specific slide to be displayed, please let us know the slide number, if

possible.  Finally, it would be helpful to acknowledge the end of your question with a thank you and the end of your follow-up question with "That is all for my questions," so we can move on to the next panel member.

I am going to begin the questions.  I have two questions.

One, Dr. Szczech, you have spent a considerable amount of time talking about reducing iron dose.  I think on slide CO-45, it was from 52 to 66 in the two groups, reducing roxadustat dose in inflamed patients and reducing transfusion. However, disturbingly, despite those hypothetical advantages, if anything, there was an increased safety signal or certainly not a noninferior.

Can you associate any of those things, for example, the lower iron dose, with any outcome that would be clinically meaningful to a patient -- and I will give you a moment to look at that -- or even less transfusions with more transplants?

The other question is that the average dialysis patient is on 13 unique home meds, one of

which is a phosphate binder which interferes with roxadustat absorption.  This is a heavy burden for them to keep track of, and it is very difficult to do medication reconciliation.  It is not dissimilar in the CKD-5 population.  No compliance data was presented.

I wonder if you have compliance data.  I also can't figure out if the patients on dialysis actually got the pill at dialysis or somewhere else, or took it at home -- but certainly in the non-dialysis population you should have compliance data from people taking it at home -- and if there were any associations of lack of compliance with either not hitting the hemoglobin targets or rapid rises in hemoglobin.

Thank you.  Those are my two questions, and I'll wait for your answers.

DR. EISNER:  EISNER:  Thank you.  It's Mark Eisner.  Thank you for the questions.  I'll ask Dr. Szczech to address your first question about iron.

Dr. Szczech?

FDA CRDAC                     July 15 2021                     107

DR. SZCZECH:  Thank you very much.  Linda Szczech.  I don't have a slide for this, however, we did pursue differences in MACE based on differences in changes in ferritin, ferritin at baseline, and there did not appear to be any differences in the major adverse cardiovascular outcomes or any other important safety signals, based on ferritin levels at baseline or changes in ferritin levels at baseline.

I'll pause here to see if that answers your question.

DR. LEWIS:  Thank you.  That answers my question.

DR. SZCZECH:  Thank you.

The second question --

DR. EISNER:  Go ahead, Dr. Szczech, please.

DR. SZCZECH:  The second question was about transfusion and differences in transplant outcome. May I ask you to clarify that so I can give you the appropriate information?

DR. LEWIS:  Sure.  And actually you could have picked any one of them; I don't know that you

have to go through all of them.  So if less transfusions, the big advantage is more transplants, did you see more transplants in the roxadustat group?

DR. SZCZECH:  Thank you very much for that question.  Transplantation, as everyone knows, is highly dependent on multiple factors, which includes your region.  The average waiting time for a kidney unfortunately in the U.S. can be as much as four to five years in some areas.

So a reduction in transfusion benefits a patient not only initially during their NDD period but for years to come after dialysis is initiated. They get on the transplant --

DR. LEWIS:  Dr. Szczech, I'm sorry.  May I interrupt you?  Do you have data to show that your roxadustat group got more transfusions?  I understand the theoretical benefit.

DR. SZCZECH:  I was trying to explain that examination of this particular endpoint would have been out of scope for these studies because, of course, they only looked at the NDD period.  So no,

FDA CRDAC                    July 15 2021                    109

we do not have data, and I was just explaining why.

Thank you for focusing me.

DR. EISNER:  Then there was a question,

Dr. Szczech, about the compliance both in the NDD

and the DD setting.  Can you please address that

question?

DR. SZCZECH:  I would be happy to.  Linda

Szczech.

So it is important to know that roxadustat

is not dialyzable, so it can be given both on

dialysis and off dialysis.  For patients who are

dialysis-dependent, you mentioned the interaction

with phosphate binders, and we did not demonstrate

a significant issue in patients who were either on

phosphate binders or were not on phosphate binders

in our phase 2 studies.  Because this is a

titratable drug, if the bioavailability is

decreased by the phosphate binder, the drug can be

titrated up to the hemoglobin that is required.

I show you here that the interactions with

the phosphate binders are more so associated with

the sevelamer and the calcium-containing phosphate

binders.  No interaction was seen with lanthanum, and that's a minor technical point that I just wanted to share.

In terms of compliance, we found excellent compliance in our clinical trials, and I can try to get you some information after the break to break down exactly how well patients were able to comply with their therapies using the TIW regimen.

DR. LEWIS:  Did the dialysis patients receive the drug in the dialysis unit?

DR. EISNER:  Dr. Szczech, the question's for you, please.

DR. SZCZECH:  Thank you.  Linda Szczech.

We did not specify that they needed to receive the drug in the dialysis unit, but based on our knowledge, we believe that many of them did.

DR. LEWIS:  Thank you.  That's the end of my questions.

Our first question is Dr. Packer.

DR. PACKER:  Thank you so much.  I just wanted to ask just one general question and then one specific one.  The general question is the

FDA CRDAC                    July 15 2021                    111

mechanism of action.

This drug inhibits prolyl hydroxylase, but there are at least four isoforms of that enzyme, and they interact with different isoforms, hypoxia-inducible factor alfa.

Can you tell us which isoforms of prolyl hydroxylase are inhibited by roxadustat and what HIF isoforms are potentiated?

DR. EISNER:  Yes.  Thanks for your question. I'll ask Dr. Walkinshaw to address it for you.

Dr. Walkinshaw?

DR. WALKINSHAW:  Yes.  Hello.  Gail Walkinshaw here.  Roxadustat actually inhibits all three of the major isoforms of the prolyl hydroxylase enzyme, so PHD1, PHD2, PHD3.

There is a fourth enzyme which you refer to which is a transmembrane prolyl hydroxylase.  We haven't studied that specifically to know whether roxadustat inhibits that, and the function of that enzyme and its role in HIF stabilization is very unclear.  In terms of the stabilization of HIF, roxadustat stabilizes both HIF-1 alfa and HIF-2

FDA CRDAC                    July 15 2021                    112

alfa.

DR. PACKER:  Just to follow up on that, HIF-1 alfa and HIF-2 alfa often have diametrically opposite effects on tissues.  And in particular with respect to the heart, HIF-1 alfa is proangiogenic, proinflammatory, and profibrotic. HIF-2 alfa has the opposing effects.

So when you inhibit prolyl hydroxylase, depending on which enzyme your inhibiting, which enzyme is already activated and the tissue, you might have a greater potentiation of HIF-1 alfa compared with HIF-2 alfa.

Would that be fair?

DR. EISNER:  Dr. Walkinshaw, I'll ask you to respond.

DR. WALKINSHAW:  Yes.  Gail Walkinshaw here.

Yes, I think you bring up a very good point. It's one of the big challenges that we have in interpreting the literature because many people study either HIF-1 alfa or HIF-2 alfa using genetic tools, and that never really gives us an insight into what we would expect with roxadustat where

we're stabilizing both of those HIF-alfa paralogs.

Also, a lot of the published reports use the genetic tools which leads to chronic captivation of HIF-1 alfa or HIF-2 alfa, and that's, again, not what we're doing with roxadustat. We're only transiently stabilizing both of those. So really, that's why we rely heavily on our non-clinical toxicology studies because that's, really, the only way we can understand what to expect if we're just transiently stabilizing HIF-1 alfa and HIF-2 alfa.

DR. PACKER: The only reason I bring this up is because HIF-1 alfa, we really would not want to produce sustained increases in HIF-1 alfa. And the effects of prolonged activation of HIF-1 alfa could have many adverse affects biologically and pathophysiologically, which are independent of the rate of rise of hemoglobin.

That's why I asked the question because, you're right, the available basic science literature, it's really hard to make this prediction. But I make it only because of my second question, which is to segue to the endpoint

FDA CRDAC                    July 15 2021                    114

I think I would like to personally focus on, which is all-cause mortality.

The reason for focusing on that is, gee, all-cause mortality is really important and, two, all-cause mortality is fairly agnostic about mechanisms.  So if HIF-1 alfa potentiation leads to proinflammatory and profibrotic effects, you may not pick that up on a conventional MACE endpoint.

So just focusing on all-cause mortality, you have a lot of all-cause deaths in your trials, so you have a good event rate and the ability to discern what's going on.  And I agree with you that your NDD populations, the analyses are really difficult.

It's really very, very complicated to try to tease out the event rate, but you don't have that problem in the DD population.  In fact, your retention rate in the DD population is a little bit higher in the epo group than the roxa group.

Can you put up a slide on all-cause mortality in the four individual trials in the DD population?

DR. EISNER:  Yes, we will do that.  I will ask Dr. Little to respond to that question.  But while we're bringing it up, I'd like to ask Dr. del Balzo to just briefly talk to you about our preclinical data on cardiovascular issues.

Dr. del Balzo, can you summarize that for us?  And then I'll to Dr. Little on the all-cause mortality aspect of your question.  Yes, Victor does also here. Yes, thank you for the question.

DR. DEL BALZO:  Yes.  Ughetta del Balzo here.  Yes, thank you for the question.

I think it's important to just take a moment to look at our toxicology program at a high level. In this program, we have evaluated roxadustat chronically up to one year in monkeys.  In general, as observed with ESA, the high roxadustat doses induced alterations caused by exaggerated pharmacology.  So these are consequences of increased red blood cell production inducing polycythemia and hemoconcentration.

[Inaudible – audio gap].

DR. PACKER:  Hello?

FDA CRDAC                    July 15 2021                    116

DR. EISNER:  Dr. del Balzo, I think we lost you.  Why don't we go to Dr. Little for the clinical data in DD for all-cause mortality.

Dr. Little?

DR. LITTLE:  Dustin little here.

Dr. Packer, I have a slide that has the pooled all-cause mortality result and then the results for each of the three pivotal trials, and then we can bring up the slide that showed the results for 613.

The pooled hazard ratio point estimate was 1.02, and you see the hazard ratio point estimates for each of the three pivotal studies.  Overall, we didn't see a significant interaction and we saw a substantial overlap between the confidence intervals.

Now I have the slide that also shows Study 613.  When we add Study 613 to the pool, Dr. Packer, we mentioned that that study is an outlier in terms of the all-cause mortality results.  We have a hazard ratio point estimate of 1.11; but again, overall in the three pivotal study

pools, a hazard ratio point estimate of 1.02.  So we consider that there's no increased risk of all-cause mortality with roxadustat compared to epoetin alfa.

DR. PACKER:  Well, let me have you pause there for a moment, and let me just make sure that I totally understand how you're going about doing this.

This is all-cause mortality --

DR. LEWIS:  Dr. Packer?

DR. PACKER:  Yes?

DR. LEWIS:  I'm sorry.  We have a lot of questions.  Can you keep this a little bit shorter?

DR. PACKER:  Okay.

Can you explain why your analysis of all-cause mortality differs from that of the FDA?

DR. EISNER:  Dr. Little, I'll ask you to respond to the question, please?

DR. LITTLE:  Dustin Little.

Dr. Packer, I may need to ask for clarification for the analysis of all-cause mortality on differing.  What we have here are the

results for our pooled Cox regressions.

DR. PACKER:  Julia, I'm going to pause here --

DR. LEWIS:  Yes, thank you.

DR. PACKER:  -- but I just want to make the point that the analysis that they just showed is based on 264 plus 277 events.  The FDA analysis of all-cause mortality in the same population has more than 800 events.

DR. LEWIS:  Okay.  Thank you, Dr. Packer.

I'm going to go on to Dr. Bairey Merz.  And please, everybody, remember, even though I'm announcing you, to state your name for the record before you ask your question.

DR. BAIREY MERZ:  Thank you, Dr. Lewis.

Noel Bairey Merz.  This is a question for Dr. Fishbane, two just very general questions.

You said in your remarks that likely dialysis patients on epo probably would not be encouraged to change to the oral roxa, and as a guideline writer and as a representative of what likely will be future guidelines, what do you think

the guidelines will say about who would prefer to be on the oral form?  And as a second related question, would you advise for or against non-nephrology prescribing this medication?  Thank you.

DR. FISHBANE:  Yes.  Thank you for the question.  In dialysis, I'm not going to anticipate, we are going to be having a KDIGO updated global guideline group that will be coming out.  But in terms of the use of the drug in patients on dialysis, what I said before my presentation was that if I have a patient who is currently on ESA, and is doing well, and is not experiencing problems, then I wouldn't necessarily see a reason to change that patient.

On the other hand, look, I'm the chief medical officer for a 15-dialysis unit chain, and in individual dialysis units there are maybe units where we prefer not to be using our nurses running around opening up vials of medications, filling syringes, and injecting patients.  There may be places where we prefer three times a week doing

oral treatment.

Certainly, with issues related to hyporesponse, with issues related to home dialysis, and this very difficult problem we have with the transition in those first very difficult months of dialysis, I see a really important opportunity in terms of oral treatment. But I think I'm not going to go further towards anticipating what we'll do with guidelines, but I do appreciate the question.

DR. LEWIS: Dr. Fishbane, we have quite a few more questions. Could you address Dr. Bairey Merz's second question; would you recommend non-nephrologists use this drug?

DR. FISHBANE: Yes, I generally recommend that it would be best used in the hands of nephrologists who are taking care of patients, both --

DR. LEWIS: Thank you.

DR. FISHBANE: Thanks.

DR. BAIREY MERZ: Thank you.

DR. LEWIS: Thank you.

Dr. O'Connor? And please announce yourself.

DR. O'CONNOR:  Yes.  Chris O'Connor.  This is a question for Dr. Szczech or Dr. Little.  In heart-failure trials, quality of life and hospitalizations are very important outcomes.  In page 28 and page 56 of your briefing document, in 28 you provide a quality-of-life analysis of the SF-36.  Although you got a statistically significant difference despite getting an important anemia correction, there were no clinically meaningful differences.

Is it your position that this drug does not improve quality of life despite correcting anemia?  That's part A.  And part B is, what is the effect of this drug on total and cardiovascular hospitalizations?  I saw the heart failure and unstable angina trended in the right direction, but I didn't see total and cardiovascular hospitalizations.

DR. EISNER:  Yes.  This is Mark Eisner. I'll ask Dr. Fishbane to address your question on quality of life, and then Dr. Little on hospitalization.

Dr. Fishbane?

DR. FISHBANE:  Yes.  Thank you.

Look, quality of life has been a historically very difficult challenge with respect to anemia treatment. A lot's been written on the subject.  We could get into some of the issues if we want to discuss that further, but I do find that what we've seen here to be, despite the challenges, actually quite encouraging.

The key parameters in a double-blinded population with lots of patients here; we saw that for physical function of vitality, and that's where the keys have been in previous studies, a similar benefit, as we've seen previously, which gives us a sense that there is an opportunity here.

So we've got to be conservative with quality of life because of the difficulties of these studies, but I think despite the crude scales and mixed comorbidity, we're definitely seeing here an opportunity from that data to be able to do some of the guideline-recommended individualization of treatment.  Thank you.

DR. EISNER:  Thanks.

Dr. Little, can you address the hospitalization question?

DR. LITTLE:  Dustin Little.

Dr. O'Connor, I don't have a slide available for overall cardiac hospitalization, but I'd like to bring up adjudicated heart-failure hospitalization Kaplan-Meier plots for the pooled NDD and the pooled DD and just demonstrate those.

You can see that for the pooled NDD adjudicated heart failure, hospitalization was somewhat numerically lower for roxadustat, especially earlier on, and then you see the hazard ratio point estimate of 0.83 with the upper bound of 1.05 for adjudicated heart failure hospitalization.  In terms of overall hospitalization, 58.6 percent of roxadustat patients in the DD program required hospitalization compared to 59.5 percent of epoetin alfa patients.

DR. LEWIS:  Thank you.

Mr. Conway?

(No response.)

DR. LEWIS:  Mr. Conway, you may need to unmute.

MR. CONWAY:  Got it.  Thank you very much; two quick questions, a general question to the presenters.

Because we're dealing with pooled data here, can you tell me whether or not any publications have been withdrawn based on initial publication? And along that line, do you have -- please don't take this the wrong way, but I'm going to ask it. Do you have full confidence in the data that was generated by your partner in China?

Then the second question actually I have for Dr. Fishbane is, given the data that you're looking at and given the population, or probably the expanse of the patient population that you were treating that you just identified across many facilities, would you approach African American patients differently with this medication who are on dialysis given the data?

I'm interested in that specifically because of outcomes.  And by way of background, let me just

say this.  I was an ESA patient, iron infusion patient, did it before dialysis, did it while I was on home peritoneal dialysis, and I've had an adverse incident.  So I kind of have a general understanding of this in a little bit more detail, but I'm interested in those two questions.  Thanks.

DR. EISNER:  Thanks for your question.  It's Mark Eisner.  In terms of your first question, there were two parts.  One was about do we have full confidence in our trials in China, and we do.  This was conducted by FibroGen China, which is part of FibroGen overall, so we have full confidence there.

I'll ask Dr. Szczech to address your question about publications.

DR. SZCZECH:  Thank you very much.  Linda Szczech.  We have had all of our publications accepted and we're working on getting them into publications.  None of them have been withdrawn.

DR. LEWIS:  Thank you.

Dr. Parsa?

DR. EISNER:  And --

DR. LEWIS:  I'm sorry?

DR. EISNER:  Pardon me for interrupting -- it's Mark again -- but there was a question about African American patients.  Can we have a moment to dress that?

DR. LEWIS:  Surely.

DR. EISNER:  Well, first just to say that the efficacy in terms of hemoglobin was the same in African American patients versus patients of other races and ethnicities.

Let me ask Dr. Little just to briefly address the safety in African American patients.

Dr. Little?

DR. LITTLE:  Thank you.  Dustin little.

Mr. Conway, we did look at safety events by race, and we didn't see -- let me bring up as an example the MACE results in the dialysis-dependent population.  For black patients, we didn't see any interaction by race.  We consider that the overall safety results that we presented today are applicable to black patients.

I'd just like to briefly note that we're

adding a 10,000-patient postmarketing study in the United States, and we would expect there to be a substantial number of African American patients in that study for us to look further at thrombosis, vascular access thrombosis overall and in African American patients.

MR. CONWAY:  I appreciate that.  I just want to make this note.  The reason why I'm asking that question specifically is because I wanted to know what your data showed before you take it out and put it in the field, if that is the course that's taken, and expose patients to it.  Thanks.

DR. LEWIS:  Thank you.

Dr. Parsa?

DR. PARSA:  This is Afshin Parsa.

Regarding this thrombosis risk on MACE and some of the subanalyses -- and the NDD certainly has been challenging, I appreciate the efforts -- I was wondering, were there any subgroup analyses looking at people on aspirin, clopidogrel, antiplatelet or anticoagulants, and whether that changes any of the outcomes?

DR. EISNER:  I'll ask Dr. Little to address your question about whether antiplatelet agents modify the safety of roxadustat.

Dr. Little?

DR. LITTLE:  Dustin Little.  We have performed those analyses.  I don't have a slide available to show you that, but we did not observe any particular interaction in terms of cardiovascular safety or thrombosis among patients who were or were not on antiplatelet agents at baseline.

DR. LEWIS:  Thank you.

Dr. Thadhani, did that conclude your question?  If so, I'll move on to Dr. Wang.

DR. WANG:  Thanks a lot.  Tommy Wang; two quick questions.

One, I suspect a lot of the discussion is going to focus on risk-benefit, and the point was raised about risk-benefit in the dialysis patients with high CRP levels indicating inflammation as potentially favoring roxadustat because of the less of the need for escalation of dosing.

Does the sponsor have any specific data regarding either MACE events or adverse events in roxadustat compared with epo in the high CRP patients in the dialysis population?  That's one question.

The second question, just returning to the point Dr. Packer raised about VEGF, I appreciate that there were relatively few malignancies that occurred during the trials.  Can the sponsor comment on any general longer-term concerns regarding malignancies, either incident or exacerbation or latent malignancy, and how they plan to incorporate that into the postmarketing trial that they've proposed, if postmarketing is available?

DR. EISNER:  Yes, thanks for your question. I'll direct the first question on CRP in MACE to Dr. Little.

DR. LITTLE:  Dustin Little.  Yes, Dr. Wang, we did perform an analysis of MACE risk by baseline CRP.  I'll bring it up momentarily, but as Dr. Szczech mentioned during her presentation,

baseline CRP was actually only assessed in 4 of the 6 pivotal trials.  It was not assessed at baseline in the two largest pivotal trials.  In addition to the typical limitations of a subgroup analysis being post hoc and underpowered, we do have those limitations here.

In terms of the non dialysis population, we had 31 percent of patients without a CRP collected at baseline.  When we look at the pattern of those events over time, we see absolutely no difference in MACE over the first approximately 12 months; so it's likely that differences in treatment discontinuation impacted these results.

Among the dialysis-dependent population, we had about 16 percent of patients without baseline CRP available, and interestingly among those patients, the hazard ratio point estimate was numerically favorable.  I'm showing you the incident dialysis subpopulation because, simply, this is the group where we had less missing data, about 9 percent of patients, and we saw no interaction there.

I'd like to briefly bring up the subgroup analysis by baseline ferritin tertiles because we know that ferritin is also elevated in inflammation and can be a marker of inflammation, and this was not so confounded by missing data.  And in here we saw no interaction in NDD or DD.  So we don't consider that there's an interaction by inflammation, and we consider that these ferritin values are more reliable due to the completeness of the data.

DR. EISNER:  Then your second question about concern about malignancy, overall, when we look at our data overall, the short answer is we don't see an imbalance of malignancy, and we did follow patients up to four years.  So to the best of our knowledge, we don't have a risk there.

In terms of the postmarketing setting, it's a good point.  We are certainly in active discussions with FDA about the nature of the postmarketing real-world data study, and it certainly would be possible to add ascertainment of malignancy, benign or malignant tumors, to that

study.  So it's a fair point, and thanks for raising it.

DR. LEWIS:  Dr. Thadhani, I apologize.  I skipped you.  I'm going to let you have the last question.

Those of you who have had your questions answered and don't have another one, please put your hands down, and we will make a list of the remaining people who have questions that we haven't got to, and hopefully we'll have time to work those in later.

Dr. Thadhani?

DR. THADHANI:  Thank you, Dr. Lewis, and I will be brief.

The sponsor nicely showed dose-response relationships, change in hemoglobin, and a proposal in a postmarketing fashion to potentially reduce the risk of thromboembolic events by the associative data.  Certainly the adverse event profile includes other adverse events that were seen:  infections, seizures, stroke, MI, acute kidney injury.

Is there any evidence, even by way of association, that changing or the proposals that are suggested by the sponsor would have effects on some of those other adverse events?  Thank you.

DR. EISNER:  No, thanks for the question.  That's a good question.  I'll turn that to Dr. Little to respond.

Dr. Little?

DR. LITTLE:  Dustin Little.

Dr. Thadhani, when we looked through our data, the clearest association that we saw was with thrombosis events and that's what we're targeting with our risk mitigation.  We found some publications that have demonstrated that similar risk mitigation strategies appear to have decreased thrombosis risk with ESAs.

When it comes to other events, like I said, we did not see clear evidence that our mitigation strategy would influence other events.  Seizure, for example, has potentially been associated with ESAs with more rapid increases in hemoglobin and treating to higher targets, and of course our

mitigation strategy will lead to more gradual increases in hemoglobin and treating to lower targets. But in sum, our risk mitigation is aimed at the thrombosis and vascular thrombosis risk that we noted in our clinical program.

DR. LEWIS: Thank you.

We will now take a five-minute break. Panel members, please remember that there should be no chatting or discussion of the meeting topic with anyone during the break. We will resume at 11:59. Thank you.

(Whereupon, at 11:55 a.m., a recess was taken.)

DR. LEWIS: Good afternoon. My name is Dr. Saleh Ayache. I'm a medical officer in the Division of Non-Malignant Hematology.

DR. YU: Dr. Ayache?

DR. AYACHE: I'm sorry.

DR. YU: Can you give us one moment?

Dr. Lewis, could you announce our return from the break?

(Pause.)

DR. YU:  One moment, please.

Dr. Lewis, could you hear me?

DR. LEWIS:  Thank you.  I apologize. Actually, I don't think I muted myself there, but I want to ask all everybody to put their hands down.

Ms. Yu and I have made a list of the people with remaining questions, and I think it will be confusing if they stay up now.

We will now proceed with the FDA presentation, Dr. Ayache.

(No response.)

DR. YU:  Dr. Ayache, you might be  on mute. You may proceed

DR. AYACHE:  Yes.

DR. YU:  Okay.  Thanks.

**FDA Presentation – Saleh Ayache**

DR. AYACHE:  Good afternoon.  My name is Dr. Saleh Ayache.  I'm a medical officer in the Division of Non-Malignant Hematology in the Office of Cardiology, Hematology, Endocrinology, and Nephrology.  I'll be presenting the FDA's major findings from the roxadustat application along with

Dr. Jae Joon Song from the Division of Biometrics VII, Office of Biostatistics.

Here is the review team assessing the application.  This is the outline of our presentation.  We will briefly discuss the product, the regulatory history, and efficacy, but the focus for our presentation will be the safety findings. We will discuss the adverse events, major adverse cardiovascular events, all-cause mortality, and finally we will discuss some of the interrelationships between thromboembolic events, drug dose, hemoglobin, and rate of change of hemoglobin.

Roxadustat is a small molecule, oral, hypoxia-inducible factor prolyl hydroxylase inhibitor that's posited to enhance erythropoiesis by increasing endogenous erythropoietin and reducing hepcidin.  The drug is the first in its class.  The proposed indication is for the treatment of anemia due to CKD in adult patients not on dialysis and on dialysis.

Roxadustat is an orally administered tablet.

The roxadustat dose is adjusted on the basis of the hemoglobin response.  The drug is not approved in the U.S.  It has been approved in China and Japan for patients on dialysis and not on dialysis.

Anemia is associated with increased cardiovascular morbidity and mortality.  Anemia in patients with CKD is multifactorial, including erythropoietin deficiency, impaired ability to absorb and utilize iron, and blood loss and shortened RBC survival.

The current standard of care includes protein iron monitoring and supplementation of patients with iron deficiency.  Most patients require ESAs to correct anemia and to reduce the need of RBC transfusion.  However, transfusions have risks, including alloreactivity and increased risk of rejection after kidney transplantation.

ESAs are glycoproteins produced by recombinant technology.  They have been in the market in the U.S. since 1989.  There are four ESAs approved for this indication.  All are approved for patients on and not on dialysis.  All are

administered intravenously or subcutaneously.  None are oral.

Four large randomized-controlled targeted studies have shaped the labeling of ESAs:  the normal hematocrit, the CHOIR, CREATE, and TREAT. They were all designed to demonstrate that higher hemoglobin targets would result in better clinical outcomes, but instead they showed, or tended to show, adverse cardiovascular outcomes with higher rather than lower hemoglobin targets.  More than 30 years since the first approval of an ESA, the optimum hemoglobin target remains unknown.

In light of these prior results, the ESA label for CKD has undergone significant revisions, including the addition of a boxed warning and several warnings and precautions.

Here you see the boxed warning for the ESAs as related to chronic kidney disease.  It highlights the risk of death, myocardial infarction, stroke venous thromboembolism, and thrombosis of vascular access.  It also warns that targeting hemoglobin greater than 11 grams per

deciliter increases the risk of death, serious adverse cardiovascular, and stroke. The warnings and precautions section of the ESA labeling highlights other important risks of hypertension and seizure.

After the fourth large randomized trial suggested harm rather than benefit when targeting higher rather than lower hemoglobin levels, the former division discussed the three prior results at the 2010 cardio-renal drug advisory committee meeting. We asked whether the indication for treatment of anemia in patients who are not on dialysis should be withdrawn; 15 out of 17 members voted no.

The roxadustat development program proceeded concurrently in the non-dialysis-dependent, NDD, and dialysis-dependent, DD, populations. For each patient population, there were three main phase 3 studies and one additional trial. Therefore, there was a total of four studies in the NDD indication and four studies in the DD indication.

Efficacy was assessed as the change from

baseline in the mean hemoglobin levels over weeks 28 to 52.  The study tested either superiority to placebo or noninferiority to ESA with respect to hemoglobin.  For safety, the applicant assessed major adverse cardiovascular events, or MACE, comparing roxadustat to placebo in the NDD population and comparing roxadustat to epoetin alfa in the DD population.  In addition, we performed typical general safety assessment of adverse events, laboratory data, and vital signs.

As I noted, there were four major phase 3 studies in the NDD population.  The phase 3 studies on the slide, 001 060, and 608, were similarly designed multicenter, randomized, double-blinded, placebo-controlled study in patients with stage 3 to 5 CKD and anemia.

Notice that not all the randomization ratios are the same.  The primary endpoint was changed from baseline to mean hemoglobin concentration. Study 610 differed in that it was conducted in Europe with an open-label design and it compared roxadustat to active-controlled darbepoetin alfa.

Also for 610, the primary endpoint was different from the others.  It was percentages of hemoglobin responders during the first 24 weeks.

For the DD population, there were also four major phase 3 studies.  The study at the top, 002, 063, and 064, were similarly designed, multicenter, open-label, active-controlled trials that compared roxadustat to epoetin alfa.  Study 002 and 063 were global and Study 064 was conducted in the U.S.

The fourth major study was 613.  This study was conducted exclusively in Europe.  Study 613 differed from the other three studies because it employed two active comparators, darbepoetin and epoetin alfa, and permitted use of an ESA that is licensed in the U.S.  For all four studies, the primary endpoint was changed from baseline in the hemoglobin concentration.

We corroborated the applicant's efficacy results of increasing the hemoglobin and believe that the applicant has provided substantial evidence of efficacy for the indication they are seeking.  Our concern about efficacy is that the

hemoglobin concentration in the roxadustat groups in these studies tended to overshoot its target.

We will start with the efficacy results for the NDD population. Here are the results for the three placebo-controlled studies. The Y-axis shows the hemoglobin concentration and the X-axis shows time in weeks. Roxadustat is shown in blue and placebo is shown in red. Note the blue arrows. All studies appear to show overshoot of the hemoglobin target followed by downward correction. The overshoots may have been related to the roxadustat starting dose, the dosing scheme, or both.

One of the secondary endpoints was time to RBC transfusion. In Study 001, the time to RBC transfusion analysis shows a statistically significant treatment effect with a hazard ratio of 0.37. In Study 060, there was a lack of statistical significance for an endpoint more proximal in the testing sequence, so there could be no formal test of hypothesis on the time to RBC transfusion endpoint.

The treatment effect on time to RBC transfusion was nominally statistically significant. In Study 610, time to RBC transfusion was not included in the testing sequence.  An exploratory analysis indicates a nominally statistically significant treatment effect.

The figure shows the percentages of subjects who received at least one RBC transfusion in the three NDD studies.  The blue bars are for roxadustat and the red bars are for placebo.  The exploratory analysis suggests that there was absolute reduction in the percentages of patients receiving an RBC transfusion of approximately 10 percent for roxadustat over placebo in each of the three studies.

Here are the efficacy results for Study 610. The study met its primary efficacy endpoint objective in hemoglobin response.  In the graph on the right, note that the hemoglobin increases more rapidly in the roxadustat group than the darbepoetin alfa group through 4 weeks; also note that the hemoglobin level reaches nearly 12 grams

per deciliter at 12 weeks.

Now I will discuss the efficacy results for the DD population. Hemoglobin responses are shown graphically for the three studies. Roxadustat is shown in blue and epoetin alfa is shown as red. On the left top and bottom, in Study 063 and 002, you see the mean hemoglobin responses in the roxadustat groups were similar to the responses in the epoetin alfa groups.

In Study 064, which was the U.S. study, the hemoglobin in the roxadustat group trends higher than the epoetin alfa group with the mean differences of 0.5 gram per deciliter. The test for noninferiority for the difference in the hemoglobin between roxadustat and epoetin alfa of minus 0.7 gram was met for each study.

Here are the Study 613 efficacy results. 613 also demonstrated noninferiority of roxadustat with respect to ESA comparators. The graph on the right shows the mean hemoglobin response over time. The scale exaggerates the treatment effect, but note the rapid increase in hemoglobin in the

roxadustat group starting at time zero.  The difference in mean hemoglobin response developed rapidly with big treatment differences of approximately 0.8 gram for roxadustat over ESA comparator.

Now I will discuss the safety of roxadustat. Safety analyses were performed in the NDD and DD populations separately.  The mean safety analysis in the NDD population was conducted using the 4270 subjects in the three double-blind, placebo-controlled studies, Studies 001, 060, and 608.  Study 610 was analyzed separately. The main safety analysis in the DD population was conducted using 3880 subjects in Study 002, 064, and 063. Study 613 was analyzed separately.

In order to interpret the safety analyses, it's important to understand the concept of the ascertainment window.  The ascertainment window is the time on treatment plus an interval of additional monitoring time during which adverse events can be recorded.  Events that occurred outside the window are not included in the

analyses.

Analyses of adverse events were conducted using three ascertainment windows.  This slide depicts the on-treatment plus 7-days analysis and includes events from first day of treatment until 7 days after last dose.  Similarly, the time on-treatment period plus 28 days, or OT plus 28, includes the treatment period plus 28 days after the last dose of the study indication.

The term "on-study" includes all adverse events that occurred after randomization until the end of the study, regardless of whether the patient was on or off study treatment.  You can understand that the longer the period of observation, the more likely you are to collect adverse events that occurred after drug exposure and are not drug related, but for adverse events with longer latency, it's important to monitor for a longer duration.  The optimal ascertainment window can differ depending on the type of adverse event that is being considered.

For the most part, our safety analyses were

conducted using queries.  These included a combination of medically similar and/or related preferred terms.  The FDA is developing a standard set of custom queries for new drugs.  For example, the FDA query for acute kidney injury is shown in the left.  All of these terms indicate a reasonable likelihood that acute kidney injury occurred.  An example of custom query of device/shunt thrombosis is shown on the right and it includes 10 related preferred terms that all denote device or shunt thrombosis.

Now we will discuss the adverse events starting with the NDD population.  We are not showing the data by treatment group, but for each of the pooled NDD studies, the demographic and baseline disease characteristics generally well balanced between the two treatment groups.

Overall, the mean age was 63 years.  The majority of patients were female and overall white.  Note, approximately 8 percent of the study population were black.  U.S. participation varied by study but overall about a quarter of patients

were from the U.S.  Few patients had received prior ESA treatment.  One-third had a known history of cardiovascular disease.

There were significant differences in disposition between the roxadustat and placebo groups.  Thirty-eight percent of subjects in the roxadustat groups discontinued treatment early versus 59 percent of subjects in the placebo groups.  The difference was driven by the need for rescue therapy and subjects' decisions differing by about 10 percent.

This Kaplan-Meier graph illustrates the differences in drug exposure between the roxadustat groups in blue and placebo groups in red.  The mean roxadustat exposure was 85 weeks compared to 64 weeks for placebo.  The lines diverge from each other and reach peak difference at 52 weeks, at which time 71 percent of patients in the roxadustat groups and 53 percent of patients in the placebo groups remained on treatment.

Now I will begin the presentation of the adverse events in these studies.  Realize that we

looked for hundreds of signals in two groups of three studies and two individual studies.  Signals that were observed across more than one analysis or study are more likely to be drug related.  This is a tabulation of serious adverse events organized by category.

The listings are mostly adverse event queries, although there are a few individual preferred terms as well.  Individual terms are followed by word terms.  For example, deep vein thrombosis is an individual term, though it falls within the query of thrombotic events.

These two columns show the numbers and percentages of subjects with events.  These two columns show the event rate per patients-years. The column with the red bars shows the risk difference per 100 patient-years.  Finally, the column with the blue bars shows the relative risk based on patient-years.

The listed adverse events and queries are those that were reported at a rate of at least 0.5 events per 100 patient-years with roxadustat,

with a relative risk of at least 1.3.  Others are listed because they were of particular interest. The ascertainment window here is on treatment plus 7 days.  Roxadustat shows a clear signal for serious thrombotic events with a relative risk of 1.45.  Important serious adverse events that contribute to this query include device/shunt thrombosis with a relative risk of 2.7 and deep vein thrombosis where there are 20 versus 2 events and a relative risk of 6, also.  Stroke and pulmonary embolism, keep in mind that the absolute risk of device/shunt thrombosis is underestimated here because most of these patients in these studies were not on dialysis.

Other identified signals include intracranial hemorrhage and seizures.  The risk of serious infection includes increased risk for septic shock; urinary tract infection; bacterial infection as a general category; and peritonitis.

In contrast to the placebo-controlled studies, Study 610 compared roxadustat to darbepoetin alfa.  Again, note the serious adverse

events of infection, including bacterial infection and pneumonia were reported, higher percentages for roxadustat than darbepoetin alfa, and with a relative risk of 1.3 or greater.  The thrombotic risk is a particular concern here because roxadustat was compared to darbepoetin alfa, which itself is known to cause thrombosis.

Now we will examine all adverse events in the NDD pooled studies for serious and non-serious adverse events.  Again, we are showing results for analyses based on the OT-plus-7 window, and here we show events where the rate was greater than 2 per 100 patient-years in the roxadustat group and where the relative risk was greater than 1.2.

There are some adverse events of particular interest.  Again, there are notable signals for thrombosis and sepsis although the majority of these events were serious in nature and were shown in the last tabulation.  In other words, most adverse events of thrombosis and sepsis were serious.  There were relatively few non-serious events.

So if we focus on the other adverse events that are largely non-serious, we see hyperkalemia nausea, vomiting, insomnia, and peripheral edema. There are also far more seizures here, indicating that many seizures were non-serious.

For Study 610, we see the adverse events that occurred at a frequency greater than 5 percent in the roxadustat arm.  Again, there are signals for peripheral edema and fluid overload and also for thrombosis, insomnia, and nausea as we saw in other studies in the NDD population.  The new signals observed in this study included hyperphosphatemia; muscle spasms; dyspnea; also arrhythmia; constipation; headache; hypotension; and bronchitis.

Now I will discuss the adverse events in the dialysis population.  We are not showing the data by treatment arm, but the baseline demographics and disease characteristics where relatively well balanced between treatment arms for the dialysis-dependent population.

The mean age was 54 years overall.  Most

patients were male and overall white.  Overall, approximately 45 percent were from the U.S., although all subjects in Study 064 were from the U.S.  Almost 90 percent were on hemodialysis and 43 percent had a history of cardiovascular disease.

In the pooled DD population, the rate of early discontinuation was higher in the roxadustat group than the epoetin alfa group, 42 percent versus 34 percent.  The reasons for discontinuation were adverse events and subject or physician decision to leave the study.

This Kaplan-Meier graph illustrates study drug exposure for the DD population, with the blue line representing roxadustat exposure and the red line representing epoetin exposure.  Mean exposures were 89 weeks in the roxadustat-treated subjects and 101 weeks in epoetin alfa-treated subjects. Approximately 63 percent and 71 percent of patients in the roxadustat and epoetin alfa groups, respectively, received the study drug for at least 52 weeks.

This table shows serious adverse events for

the pooled studies in the DD population.  We have tabulated adverse event queries and some individual adverse event terms, where the event rate was greater than 0.5 per 100 patient-years and the relative risk was at least 1.3, as well as some other notable signals.

Because roxadustat was compared to an active ESA control group in these studies, it's important to consider known adverse drug reactions of ESA when assessing roxadustat's risks.  Thus, we show the known adverse drug reaction for ESA at the bottom of the table.

Again, you see prominent signals of serious thrombotic events, including device or shunt thrombosis, deep vein thrombosis and myocardial infarction, as well as seizure.

It's important to recognize that these signals appear against epoetin alfa as the comparator rather than placebo, and note that thrombosis, MI, and seizures are listed as adverse drug reactions in ESA labeling.  Signals for adverse events of hypoglycemia, gastroenteritis,

and pancreatitis are evident here although they were not detected in the in NDD studies.

Now for the single study in the DD population, Study 613, as you recall, Study 613 compared roxadustat to an ESA group that included darbepoetin alfa and epoetin alfa, and this study was not included in the pooled analyses. This table lists the serious adverse events that occur at a frequency greater than 5 percent in the roxadustat group, with a relative risk that exceeded 1.3 in Study 613.

Notable serious adverse events include congestive heart and thrombosis of vascular access. Both are listed as an adverse drug reaction in the ESA level. In addition, there is a risk of serious infection, which was also observed in the pooled NDD analyses.

Here are all adverse events in the pooled DD studies for the OT-plus-7 time period for serious and  non-serious. The table shows adverse event queries reported at a rate of greater than 2 per 100 patient-years in the roxadustat group,

where the relative risk for roxadustat was greater than 1.3.  Other notable adverse events are shown as well.  The thrombotic event shows up as expected, however, most of these events were serious such that the addition of non-serious events here does not add much information.

Seizures shows up again in the serious adverse events, however, almost half of the seizures were non-serious.  Again, seizures are labeled adverse drug reaction for ESAs.  There is a signal for vomiting, which is consistent with the signal observed in the pooled NDD analysis.  Small signal for hypertension, peripheral edema, and rash are apparent versus ESA, and they are labeled adverse drug reactions for ESAs.

Again, we see a signal for thrombosis. Sorry.

This slide shows all adverse events identified in Study 613 with a frequency greater than 5 percent in the roxadustat group and a relative risk that exceeded 1.3, as well as other significant adverse events.

Again, we see a signal of thrombosis with roxadustat, which included deep vein thrombosis, pulmonary embolism, and device/shunt thrombosis. Contrary to other studies in the DD population, MI and ischemic stroke favors roxadustat over ESA and are shown for completeness. There are signals for nausea and congestive heart failure in the study that are similar to those observed in other studies.

Given the strong signals of thromboembolic events, here are the Kaplan-Meier curves of all thromboembolic adverse events for the NDD population on the left and DD population on the right. These analyses are based on on-study assessment window.

The curves in the NDD population are difficult to interpret because of the marked differences in subject retention between the two groups. For the DD population, however, time at risk was similar in both groups, and about 90 percent of patients were on hemodialysis with vascular access. Roxadustat risk of thromboembolic

events versus ESA is quite clear in this population. The log-rank test show nominally statistically significant results for both analyses.

Vascular access is the lifeline for hemodialysis patients. Here are the Kaplan-Meier curves for device and shunt thrombosis in the DD population. These analyses are based on the on-study ascertainment window. On the left, the figure shows all of these adverse events for serious and non-serious. On the right, only the serious events are shown.

They both show events through 36 months or 3 years. I will remind you that the absolute risk difference for all of these events was 2.1 events per 100 patient-years, and for serious adverse events, it was 1.1 event per 100 patient-years. The vast majority of patients who developed serious events of device/shunt thrombosis required hospitalization and placement of a new vascular access.

Now, Dr. Song will present the MACE results.

**Presentation – Jae Joon Song**

DR. SONG:  Good afternoon.  My name is Dr. Jae Joon Song, and I am a statistical reviewer in the Office of Biostatistics.  In this presentation, I'm going to discuss the cardiovascular safety analysis and results.  I will also explain the differences and implications of using on-treatment and on-study analysis.

In the cardiovascular safety evaluation, MACE was defined as a composite of all-cause mortality, non-fatal myocardial infarction, and non-fatal stroke.  Study endpoints were adjudicated by an independent clinical endpoint committee whose members were blinded to treatment assignment.

One of the key analytical considerations was how the MACE event will be counted with respect to the exposure to treatment.  An ascertainment window defines period of time for which a subject is at risk of the event and determines which events will be considered in analysis.

For the MACE analysis, we considered two windows, on treatment plus 7 days, or OT plus 7,

and on-study analysis.  The two ascertainment windows can have different implications on the interpretation of results.  In the following slide, I will explain the definition and differences in these two approaches to set the stage for discussing the MACE results from the roxadustat trials.

A key issue in the assessment of safety in the roxadustat program is when a safety event occurs relative to exposure to treatment.  This slide includes an illustration of hypothetical subjects and time they're being followed in a trial.

The green line depicts a time a subject is exposed to randomize treatment.  The gray line depicts the ascertainment window after treatment exposure, which in this program was commonly defined as 7 or 28 days.  The dash line depicts time while a subject was off treatment but still being followed for the event of interest.

Events are depicted with red diamonds.  As mentioned, the assessment of MACE used two exposure

windows.  What is depicted here is the OT-plus-7 analysis, which includes only events that occur within or prior to the end of the ascertainment window.  Subjects not experiencing event within this time frame are censored at the end of the ascertainment window.

For the previous hypothetical example, only two events were contributed to the OT-plus-7 analysis.  As shown in the illustration, the on-treatment or the OT-plus-7 analysis estimates risk of MACE in patients assigned to roxadustat while receiving the assigned treatment.

This slide depicts the on-study analysis. In such an analysis, all events are included regardless of exposure to treatment.  Subjects not experiencing an event are censored at the date of last contact.  Per our hypothetical scenario, you can see two additional events contribute to the on-study analysis relative to the on-treatment analysis.

As shown in the illustration, the on-study analysis, or the treatment policy analysis,

FDA CRDAC                          July 15 2021                          162

estimates the risk of MACE in patients randomized to roxadustat versus control regardless of treatment adherence, discontinuation, or use of alternative therapies.

Having introduced the concept of on treatment versus on-study analysis, I now will discuss how these analyses estimate two different risks. In the interpretation of the estimates of risk observed in the roxadustat development program, it is important to understand the pros and cons of the two analysis approaches, which I will discuss in the next set of slides.

The first estimate which I discussed is on treatment, which estimates the risk of MACE while receiving the assigned treatment. In general, there is increased sensitivity to see drug effects with the on-treatment estimate if drug attributable risk only occurs while a subject is exposed to randomize treatment. However, the on-treatment analysis can be difficult to interpret when there is considerable disparity between treatment arms on how long subjects remain on treatment.

In other words, if there is differential treatment discontinuation between the treatment arms and if there's a reason to suspect that the differences might be related to the outcome of interest, then there is potential for obtaining a biased estimate.  Finally, the on-treatment analysis is also not suitable for assessing risk and outcomes expected to have long latency.

Now for the on-study analysis, this estimate may be important if the control arm receives a reasonable representation of current standard of care.  In this setting, the treatment policy approach can help assess what might happen to the target population with respect to the outcome if the investigational product is approved for marketing.  Also, the on-study approach may provide greater sensitivity to adverse effects and outcomes with potentially long latency periods such as malignancy.

However, the on-study approach can be less sensitive to identifying drug attributable risk when outcomes occur after treatment

discontinuation, and this can be especially concerning in the noninferiority settings because with more unexposed time, the on-study analysis is more likely to show noninferiority.  Moreover, in the presence of a rescue therapy, the unexposed time to plan treatment can include exposures to rescue therapies, which might impact the comparisons of risks.

Finally, the quality of the on-study analysis relies on how well subjects were followed up, so there can be interpretability issues when there are systematic differences between treatment arms and follow-up time.

In the assessment of MACE in all-cause mortality you will see that results depend on how the data were analyzed, and specifically whether the time of observation was limited to time on treatment or extended to last contact.  It is important to consider these pros and cons of the analysis when interpreting the safety results.

As shown earlier in Dr. Ayache's presentation, overall in the NDD trials, subjects

in the placebo arm tended to discontinue treatment early.  Notable in this Kaplan-Meier plot is a period after randomization to week 52 where subjects randomized to placebo arm appeared to have discontinued treatment in a more rapid pace compared to roxadustat.  Such differential treatment duration poses a challenge in the interpretation of the on-treatment analysis.

Specifically, the risk estimated using the OT-plus-7 analysis might be biased, for example, if the patient on the placebo arm, who are at greater underlying risk of MACE, tend to discontinue treatment early.  In the DD trials, overall there were more roxadustat subjects who discontinued treatment early, however, the discontinuation pace was roughly constant shortly after randomization.

I will now describe the methodology used to analyze MACE.  The objectives of the MACE analysis were to demonstrate noninferiority in CV risk of roxadustat compared with placebo in the NDD population.  In the DD population, the objectives of the MACE analysis were to demonstrate

noninferiority and CV risk of roxadustat compared to ESAs.

I'll note the applicant and FDA did not agree prospectively on a risk margin.  Furthermore, we do not agree with the applicant's proposed margin of 1.3, as it was defined after results of the study were known.  Therefore, FDA does not agree on the interpretation of the results using strictly a noninferiority hypothesis testing approach.  Rather, our interpretation of the trial findings focuses on the estimation of MACE risk and the uncertainty around it.

Such statistical inference appear to be appropriate because the development programs for both populations were sufficiently large to observe a meaningful number of CV events to estimate the risk, and the definition and data capture of the outcomes was of high quality.

For evaluation of CD safety in the NDD population, three phase 3 randomized, double-blind, placebo-controlled trials were prospectively agreed upon.  In addition, there were three phase 3

randomized open-label ESA-controlled trials that were prospectively agreed upon for evaluation of safety in the DD population.

The primary analysis for the NDD population was on-study with a sensitivity analysis performed as an on-treatment analysis. For each trial, Cox regression was used to model the treatment effect using prespecified trial-specific stratification factors. Hazard ratios from each trial were combined using weight inversely proportional to the variance of the study-specific log hazard ratio estimates.

The primary analysis for the DD population was on treatment with a sensitivity analysis performed as on-study analysis. Similar to the meta-analysis for the NDD population, Cox regression was used to model the treatment effect for each trial using prespecified, trial-specific stratification factors. The overall hazard ratio estimate was obtained using a meta-analysis technique that's previously described for the NDD population.

Now I will provide a summary of the MACE analysis results in the in NDD population. Presented in this slide are Kaplan-Meier curves for the analysis of MACE in the NDD population. In the primary on-study analysis, the hazard ratio comparing the risk of MACE between roxadustat and placebo was 1.1 with a 95 percent confidence interval that ranged from 0.96 to 1.27.

There was considerable difference in the hazard ratio estimate using on-treatment or OT-plus-7 analysis, with a hazard ratio of 1.38 and a 95 percent confidence interval that ranged from 1.1 to 1.7.

Results for components of MACE is presented in this table for the on-study and all OT-plus-7 analyses. As you can see, most of the MACE events were driven by all-cause mortality, which I will discuss in more detail in a later section.

In the ESA control trial 610, not considered for the meta-analysis, the estimated hazard ratio comparing roxadustat to darbepoetin alfa in the on-study analysis was 0.89 with a 95 percent

confidence interval that ranged from point 0.6 to 1.3. In the OT-plus-7 analysis, the hazard ratio was 0.7 with a 95 percent confidence interval that ranged from 0.44 to 1.2.

In summary, there was considerable difference between the estimated hazard ratios for the primary on-study analysis and the OT-plus-7 sensitivity analysis. In the NDD population, the treatment policy analysis results suggest no significant difference in the risk of MACE relative to placebo. On the other hand, the results from the on-treatment or the OT-plus-7 analysis suggest an increased risk of MACE for the roxadustat arm compared to placebo.

Although the 95 percent confidence interval for the OT-plus-7 analysis merits concern, the differential exposure between roxadustat and placebo complicates the interpretation of the OT-plus-7 analysis in isolation, as this may not represent a fair randomized comparison.

Now I will provide a summary of the MACE analysis results in the DD population. In the

primary on-treatment or OT-plus-7 analysis, the hazard ratio comparing the risk of MACE between roxadustat and ESA was approximately 1 with a 95 percent confidence interval for the estimate, ranging from 0.88 to 1.2.

On the other hand, the on-study analysis indicated a higher risk of MACE in subjects randomized to roxadustat, with a hazard ratio of 1.14 and an upper bound of the 95 percent confidence interval 1.3.

Results for the components of MACE are presented in this table for both OT-plus-7 and on-study analysis.  As you can see, a majority of MACE events were driven by all-cause mortality, which I will discuss in more detail in a later section.

In the ESA-controlled trial 613, not considered for meta-analysis, the estimated hazard ratio comparing roxadustat to ESAs were 1.29 in the OT-plus-7 analysis, with a 95 percent confidence interval that ranged from 0.91 1.85.  The on-study analysis suggested an increased risk of MACE, with

a hazard ratio of 1.39 and a 95 percent confidence interval that ranged from 1.01 to 1.91.

In summary, in the DD population, results suggested no significant difference in the risk of MACE while subjects were receiving the assigned treatment.  However, the on-study analysis suggests an increased risk of MACE relative to ESA, and the direction of such risk was also consistent in a trial that was not considered for meta-analysis.

As discussed earlier in my presentation, it is important to remember that on-study analysis represents an estimate of the treatment policy principle that compares the risk regardless of treatment adherence, discontinuation, or use of alternative therapy.

Now I will provide a summary of the all-cause mortality analysis results in the DD population.  In the on-study analysis, the hazard ratio comparing the risk of all-cause mortality in subjects randomized to roxadustat compared to placebo was 1.08 and the 95 percent confidence interval ranged from 0.93 to 1.26.

There was considerable difference in the hazard ratio estimated using an OT-plus-7 analysis, with a hazard ratio 1.40 and the 95 percent confidence interval that ranged from 1.08 to 1.82. Causes of death were adjudicated by an independent event committee.

In the OT-plus-7 analysis, fewer than half of deaths were cardiovascular in nature.  Overall, the leading causes of death were infections, renal death, and sudden cardiac death.  In the ESA-controlled trial 610, not considered for meta-analysis, hazard ratios comparing the risk of death between subjects randomized to roxadustat and darbepoetin alfa were 0.94 and 0.67, respectively, for on-study and on treatment plus 7 analysis. However, the number of deaths were considerably smaller in the meta-analysis, which results in more uncertainty in the risk estimates.

Now I will provide a summary of the all-cause mortality analysis results in the DD population.  In the on-study analysis, the results suggested higher risk of all-cause

mortality relative to epoetin alfa, with a hazard ratio of 1.17 and the 95 percent confidence interval that ranged 1.02 to 1.35.  On the other hand, in the OT-plus-7 analysis, the hazard ratio for comparing the risk of all-cause mortality between roxadustat and epoetin alfa was 1.02 and the 95 percent confidence interval that ranged from 0.85 to 1.23.

More than half of the deaths were cardiovascular related.  The leading causes of cardiovascular death were acute MI and sudden cardiac death.  The leading non-cardiovascular causes of death were infections and renal death.

In trial 613 that was not considered for meta-analysis, the risk of all-cause mortality appeared to be higher for the roxadustat arm compared to ESAs.  The estimated hazard ratio comparing roxadustat to ESAs in the on-study analysis was 1.54 with a 95 percent confidence interval that ranged from 1.09 to 2.16.  In the OT-plus-7 analysis, the estimated hazard ratio was 1.54 with a 95 percent confidence interval that

ranged from 1.04 to 2.28.

Now Dr. Ayache will provide a summary of analyses exploring the relationships between thromboembolic events, roxadustat dose, hemoglobin, and hemoglobin rate of change.

**Presentation – Saleh Ayache**

DR. AYACHE:  This slide illustrates the relationship between thrombotic events and overall weight adjusted roxadustat dose.  The mean, study drug dose was calculated for each subject in the pooled analyses and subjects were arranged in quintiles on the basis of total dose and treatment group.

For these slides, Q1 represents the lowest quintile and Q5 is the highest.  The number of thromboembolic events were calculated for each dose quintile and expressed as percent of subjects with events.  The number inside the bars represent the numbers of events.  The black bars are roxadustat and the open bars are the comparators.  Analysis for the NDD and DD populations are shown on the left and right, respectively.

We see weak association between the total weight adjusted roxadustat dose and probability of thromboembolic events.  There is no clear association in subjects who receive ESA.  Given that the doses of study agents were titrated and changed throughout the study, it makes more sense to assess thrombosis rate on the basis of the drug doses received at the onset of the event.

This slide illustrates this relationship for the NDD on the left and DD population on the right.  This figure suggests a fairly strong association between the roxadustat dose and thrombotic events, but no association in the placebo-treated patients.

The right figure for the DD population shows a reasonable association for subjects who received roxadustat but no clear association for subjects who received ESA.  An important point should be made here.  Because the doses were titrated based on the hemoglobin response, the analysis is confounded by responsiveness.  In other words, the doses tended to be increased to a greater extent in subjects who were poorly responsive to the drug.

Thus, the bars in the higher quintile -- Q3, Q4, and Q5 -- includes disproportionately more subjects who were poorly responsive to the drug. Such patients have more advanced kidney disease as well as a greater burden of concomitant diseases. As such, there were a greater risk of cardiovascular and thrombotic events. It's not possible to separate these factors.

Here you see the relationship between the thromboembolic events and hemoglobin in the NDD population on the left and the DD population on the right. Hemoglobin values were estimated for all subjects for all weeks in treatment and patient-weeks were based in quintiles on the basis of hemoglobin concentration separately by treatment arm.

The numbers of thromboembolic events were assessed for each quintile for both treatment arms and expressed as a rate per 52 patient-weeks. Q1 represents the lowest quintile and Q5 is the highest.

A number of prior studies have suggested

that subjects with lower hemoglobin values are at a higher risk of cardiovascular events, and such an association was observed here as well.  The question always arises as to whether the higher risk is related to the lower hemoglobin values per se, or whether lower hemoglobin is a marker of more advanced kidney disease and more concomitant disease, which renders patients less responsive to hemoglobin stimulating drugs are more likely to experience adverse events.  It's not possible to separate these factors easily.

This slide illustrates the relationship between thromboembolic events and hemoglobin rate of rise.  The hemoglobin rate of rise was estimated for each week that each patient was on treatment by fitting a linear regression line through the hemoglobin values obtained during the preceding 4 weeks.

Patient-weeks were placed in quintiles. Adverse events were tabulated for each quintile for both treatment arms and results are expressed, thrombotic events per 52 patient-weeks.  Q1

represents the lowest quintile and Q5 is the highest.

Note that the numbers of the events are very small, particularly on the left figure. The numbers are limited because a slope could not be calculated for many patients-weeks. Nevertheless, in both populations there are apparent associations between thrombotic events and hemoglobin rate of rise.

Such associations were also found in the darbepoetin alfa development program. While the analysis I just displayed showing thrombotic events versus hemoglobin concentration was confounded by responsiveness, this analysis is not. Specifically, patients who are more responsive to these drugs tend to achieve higher rates of hemoglobin rise, and one might reasonably ask whether these thrombotic events tended to occur near the beginning of the studies when the hemoglobin tended to rise most rapidly.

However, the Kaplan-Meier curves shown in slide 44 show that these thrombotic events tended

to occur throughout these studies and not mostly at the beginning.  Although these data are not conclusive, it's possible that limiting hemoglobin rate of rise could decrease the incidence of thromboembolic events.

In summary, the clinical trials in NDD and DD populations showed that roxadustat is effective in increasing the hemoglobin level.  Exploratory analyses show an absolute reduction of RBC transfusion of approximately 10 percent compared to placebo.

Roxadustat is administered orally, which may offer an advantage over ESAs, which are administered IV or SubQ.  If such an advantage exists, it would be for patients who do not receive hemodialysis.  Importantly however, hemoglobin intended to overshoot target in the NDD population and in Study 613, and its relation to risk is uncertain.

The risk of MACE and all-cause mortality are difficult to interpret.  The primary analyses were neutral when comparing roxadustat to placebo in the

NDD population and roxadustat to ESA in the DD population, however, the sensitivity analyses in both populations were unfavorable for roxadustat.

There are higher risks for roxadustat than both placebo in the NDD population and epoetin alfa in the DD population for thrombosis, vascular access thrombosis, and seizure. There appears to be higher risk than placebo in the NDD population and a similar risk to epoetin alfa in the DD population for myocardial infarction, stroke, and systemic hypertension. Also, there appears higher risk of serious and fatal infections than placebo in the in NDD population.

This concludes our talk. Thank you for your attention.

**Clarifying Questions**

DR. LEWIS: We will now take clarifying questions for FDA. Please use the raised-hand icon to indicate that you have a question and remember to put your hand down if you have asked your question.

When acknowledged, please remember to state

your name for the record before you speak and direct your question to a specific presenter, if you can.  If you wish for a specific slide to be displayed, please let us know the slide number, if possible.  Finally, it would helpful to acknowledge the end of your question with a thank you and the end of your follow-up question with, "That is all for my question," so we can move on to the next panel member.

I will reserve the unasked clarifying questions for the sponsor for later, so this now opens the clarifying questions for the FDA.

Mr. Conway?

(No response.)

DR. LEWIS:  Mr. Conway, you may be on mute.

MR. CONWAY:  Thank you very much; a general question for FDA.

I've had a concern in looking at the data in the summary, which I think was very detailed, about pooled data in general.  Can you tell me for first-in-class drug consideration, how common is that?  And for this particular set of data, the

FDA CRDAC                    July 15 2021                    182

pooling, is that common or was this novel in

putting it together like this?  Either presenter;

thank you.  That's my question.

DR. LEWIS:  FDA?

(No response.)

DR. LEWIS:  Do one of the FDA speakers, or

another member of the FDA present, want to answer

that question?

DR. YU:  Could Dr. Song answer the question?

DR. LEWIS:  Dr. Song, you may need to

unmute.

DR. SONG:  This is Dr. Song, FDA.  In the

MACE analysis, actually the data weren't pooled.

The hazard ratios estimated at each trial level

were combined using a meta-analysis technique.  As

for the MACE analysis and all-cause mortality

analysis, the hazard ratio estimates were based on

meta-analysis.

MR. CONWAY:  Thank you.

DR. LEWIS:  Did that answer your question,

Mr. Conway?  Because I think the question is for

first-in-class drugs; do you do this with pooling

data or one defining study, looking at cardiovascular safety?  For example, MPEG reg [ph], which is more common.

(No response.)

DR. LEWIS:  Dr. Song?

(No response.)

DR. LEWIS:  Does any member of the FDA want to further comment?

DR. UNGER:  Yes.  This is Dr. Unger.  I'll jump in.  I think the question, if I interpreted it correctly, was more about the standard safety analyses.  I think the answer is this was quite a wide and deep development program.  It's not typical that we get six trials, or more, to support the efficacy and safety of a drug.

But when we get trials that are similar in design, for any indication, for safety analyses, we do tend to pool.  We tend to use simple pooling when we can.  So it's not unusual for a development program to have this many trials, but it's somewhat unusual to have a development program that has this many trials.  I hope I've answered your question.

MR. CONWAY: You have. Thank you very much.

DR. LEWIS: Thank you, Dr. Ellis.

Dr. Cho?

DR. CHO: Yes. This is Leslie Cho. Thank you for the nice analysis, and two questions for the FDA.

One is, as far as all the roxadustat studies, it appears that they've excluded patients with history of cancer, especially hematological cancer, and then they've excluded patients unless they were cancer-free for 5 years.

Is this correct?

DR. FARRELL: Yes, some of those. I'd like to refer, though, the question to the sponsor because they have a significant database in many countries.

DR. LEWIS: Okay.

DR. CHO: And then my second question is, there was a lot of mention from the sponsors regarding hyporesponse to the epo, to the ESA class. Is there any data from the sponsor regarding the hyporesponders' response to their

drug?

DR. LEWIS:  I guess those two questions are actually to the sponsor; is that correct?

I'll let the sponsor answer.

DR. EISNER:  Dr. Lewis, it's Mark Eisner. Do you want us to address those questions now or later?

DR. LEWIS:  Yes, you can do it now since we asked them right now.

DR. EISNER:  Okay.  Let me ask Dr. Little to address your question about history of cancer, and then Dr. Szczech to answer the question about hyporesponse.

DR. LITTLE:  Dustin Little here.

Dr. Cho, across the program, in general, patients with a history of prostate cancer, breast cancer, or other malignancies were excluded with the exceptions of cancers determined to be cured or in remission for five or more years, or curatively resected basal cell or squamous cell cancers, cervical cancer in situ, or resected colonic polyps.

DR. CHO:  But all  hematological cancers appears to be one of the contra-exclusion criteria is that correct?

DR. LITTLE:  Yes, that would have been considered an exclusionary Criterion.

DR. CHO:  And the reason I ask is because I am concerned about the increased rate of thrombosis seen.  And it may not be related to the rise of hemoglobin but may be related to the class of drug itself, and that is the reason for the question. Thank you.

DR. LEWIS:  Thank you.

Dr. Moliterno?

DR. MOLITERNO:  Thank you, Dr. Lewis.  And if you want to deem this question better for later, that's fine because it's concerning a little bit of the question I had earlier.

For the sponsors or to the FDA, I think many of us on the call understand the foundational concepts of pros and cons we're considering, but what I haven't heard much discussion from either side so far is this risk mitigation modeling and

FDA CRDAC                    July 15 2021                    187

potential statistical shortfalls with some of the, I guess, assumptions or speculations.

So I'm wondering if now or later, Dr. Song, Ayache, or perhaps Dr. Unger, want to make any comments, or if we want to wait until later.

DR. LEWIS:  I think those questions can be answered by the FDA now.

DR. UNGER:  This is Dr. Unger.  In terms of both changing the paradigm for dosing and in terms of the proposal for a postmarketing study, those were put on the table by the applicant fairly recently, and we have not had a chance to discuss them or analyze them.  So they are not something we can discuss.  Thank you.

DR. LEWIS:  Thank you.  It's something maybe we can discuss in the discussion section.

DR. MOLITERNO:  Yes.  I agree completely.

And just maybe a clarifying question, not to that one; but is it correct that mortality data or long-term survivorship was missing in roughly 10 percent of the population studied?

DR. LEWIS:  That's a question for the FDA?

DR. MOLITERNO:  Well, the FDA didn't comment on it, except in the very early part, but they didn't address it specifically.  I'm happy to have either side, any concerns.  I appreciate that it was balanced between the groups, but it seems like there was around 10 percent missing data for mortality or survivorship, which is quite surprising given the illness of this cohort.

DR. FARRELL:  This is Dr. Farrell.

Would the applicant please respond to the question?

DR. EISNER:  Yes.  Let me ask Dr. Little to respond to your question about the follow-up completeness for all-cause mortality.

Dr. Little?

DR. LITTLE:  Dustin Little.  We did have 91 percent of patients complete follow-up for all-cause mortality in the NDD pool and 91 to 92 percent of patients completed follow-up for all-cause mortality in the DD pool.

If I may, I'd like to take just 20 seconds and then show a quick comparison of how the

treatment completion and study completion rates in our trials compare to CKD anemia trials that came before us.

On the left is percent of patients with treatment completion, and roxadustat is the yellow dots, and then on the right is percent of patients with study completion. Perhaps due to the high comorbidity in these patients, historically, the retention rates are lower than cardiovascular safety trials in other outcomes, and in general we had comparable rates of treatment and study completion compared to the trials that came before us.

DR. LEWIS: Thank you.

Dr. O'Connor?

(No response.)

DR. LEWIS: Dr. O'Connor, you may be on mute. I actually don't see him on our list, so we'll go on to Dr. Wang and come back to Dr. O'Connor.

Dr. Wang?

DR. WANG: Yes. Thank you. The FDA

speakers nicely showed how the results differ by ascertainment interval, which I know would be a subject of a lot of conversation.

If the FDA speaker could clarify, what was marked as the primary analysis differed in the NDD versus DD populations with the on-study interval chosen for the NDD population but the on-treatment plus 7 chosen for the DD.

Was that decision made by the FDA, was it made in discussion with the sponsor, or was it proposed by the sponsor and approved by the FDA? And secondly, was the timing of that decision at a point in time when the data had already been acquired or was it prespecified?

DR. FARRELL:  This is Dr. Farrell.  These were discussed with the sponsor during the various sponsor meetings that we have had.  Some of it had to do with when we thought for the dialysis population they would likely need to go back on to an ESA once roxadustat was stopped.  So those were some of the considerations.

Does this answer your question?

DR. WANG:  Well, if I could follow up; so that was not fully discussed?  It sounds like that was an ongoing dialogue.  I guess secondly, if you could just clarify, why was a different interval chosen for the NDD versus DD populations?

DR. FARRELL:  Most of the conversations occurred pre-data --

DR. WANG:  Okay.

DR. FARRELL:  -- pre-data.  And again, it was a consideration about one patient on dialysis would be likely needing to start therapy.  Then also based on what we had seen in the Omontys program, as well as TREAT and CHOIR.

These conversations were a long time ago, and I would ask the sponsor if they have a better recollection of why some of the time points were chosen.

DR. EISNER:  Yes.  Mark Eisner.  If I may, we agree with you, Dr. Farrell.  The primary analysis for NDD and MACE was the on-study or intention-to-treat analysis to take care of the bias introduced by informative censoring.  And for

the dialysis-dependent population, we both agreed that the OT7 was a preferred window for the reasons you stated about switching to ESA after discontinuation of roxadustat.

DR. WANG:  Thank you.

DR. LEWIS:  Dr. Thadhani?

DR. THADHANI:  Dr. Lewis, my question was identical to the previous one from Dr. Wang.  Thank you, Dr. Lewis.

DR. LEWIS:  Okay.  Ms. Alikhaani?

MS. ALIKHAANI:  Yes.  Jacqueline Alikhaani here.  I don't know if this question was answered before, but it's really for the sponsor.  I just wanted to get a little information about the reason that the data was not generated showing that patients that are hyporesponsive to ESAs are responsive to roxadustat.

So I don't know if I missed that information, but can the sponsor answer that for me now?

DR. EISNER:  Yes.  Thanks.  It's Mark Eisner.  I'll ask Dr. Szczech to address your

question about hyporesponsiveness to ESA and the role for roxadustat.

Dr. Szczech?

DR. SZCZECH:  Thank you very much.  Linda Szczech.  I hope that the slide that I just asked to be pulled up will be pulled up.

During the presentation, we presented data on CRP, ferritin, and hepcidin as present in your briefing book, looking at the mechanistic causes of hyporesponsive.  But anticipating your question about who were hyporesponsive at baseline, we can go to the stable dialysis population, those patients that converted from ESA to roxadustat, and look at the relative hierarchy of their responsiveness as they made that conversion.

So yes, this slide is up.  I just did a quick technical check.  On the left, you see patients treated with ESA; on the right, you see patients treated with roxadustat.  The patients in this slide were selected because they converted from one trial to another, therefore allowing us to make this comparison.

We stratified on baseline hemoglobin, which is one of the criteria for hyporesponsive, that you don't get the response that you want, therefore, your hemoglobin is not as high as you'd like it to be.  As you look from left to right in the graph on the left of ESA-treated patients, the hierarchy remains; that those patients who were less responsive at baseline, everyone regressed toward the mean, which we know that inflammation does go away when it's related to a short term condition, but the hierarchy of the people that were most responsive and the people that were less responsive remained the same.

On the right, you can see the roxadustat-treated patients where they had similar quartiles of responsiveness at baseline due to randomization, but as they were treated with roxadustat, that hierarchy of the blue quartile, being less responsive, no longer remained.  Those patients disappeared into the mean of that population, meaning that whatever conferred that hyporesponsiveness likely was not a factor in

roxadustat responsiveness.

MS. ALIKHAANI:  Thank you.

DR. LEWIS:  Dr. O'Connor?

DR. O'CONNOR:  I guess I'm back.  Chris O'Connor; a question for Dr. Unger.  There was a statement that the boundary of the upper limit of confidence, 0.4, was chosen by the sponsor after the blind was broken as 1.3.  What would have been your recommendation prior to blind breaking for that guidance of the upper limit confidence interval boundary, based on the large number of events in these pooled trials?

DR. UNGER:  This is Dr. Unger.

Thanks, Dr. O'Connor.  Well, first of all, I wasn't involved in the discussions because this division wasn't within my office at the time.  Second of all, we all know that, 1.3, these limits are arbitrary.  A 1.3 is reasonable.  It was used in the diabetes guidance.  It's hard for me to say what I might have done, especially now that we have the data in front of us; so it's not a great answer.

DR. FARRELL: This is Dr. Farrell. I was involved in the negotiations, and after the TREAT trial and dealing with Omontys, we had a goal of 1.25, and that's what we discussed during meetings. So that's why there was not an agreement on 1.3, and I agree with everything that Dr. Unger has said regarding it's somewhat arbitrary.

DR. LEWIS: Dr. O'Connor, does that address your question?

DR. O'CONNOR: Yes.

DR. LEWIS: Thank you.

I will move on to David Soergel.

DR. SOERGEL: Thanks. David Soergel. I have a question for Dr. Ayache about Study 610. And specifically I'm curious about the baseline characteristics in that study that may have contributed to some of the findings that were shown, and that might also be a question for the sponsor.

DR. FARRELL: Dr. Ayache?

What slide, Doctor, would you like to see up for 610, or would you rather hear from the sponsor?

DR. SOERGEL:  Let me find it for you.

DR. AYACHE:  On 610, I will defer this to the sponsor because this study was conducted exclusively in Europe and there was some imbalance between the two arms in baseline and disease characteristics.  These balances are not that totally significant, but also I defer it to the sponsor to answer this question in more detail.

DR. EISNER:  Thanks, Dr. Ayache.

This is Mark Eisner.  I'll ask Dr. Little to speak to the baseline characteristics for Study 610.

DR. LITTLE:  Yes.  Dustin Little.  I'd like to just remind everybody what Study 610 was.  Can we bring up CO-70 just for a few seconds?

Study 610 was the non-alfa study with the active control that's particularly relevant for our program because it was not confounded by large differences in treatment discontinuation, and these are the cardiovascular safety results.

One of the reasons that we thought that this was an important study for us to think about is

because, in many respects, the patient characteristics that drove the differences in treatment discontinuation, the placebo-controlled program, was mostly that being patients having relatively low hemoglobin values and patients having quite low baseline eGFR values were present in this study.

So these patients we consider are generally representative of the patients in the placebo control trial, and that's one of the reasons why we found it so reassuring that we had the cardiovascular safety results that we had in this study.

DR. LEWIS:  Thank you.

I will now turn to our leftover questions for the sponsor from earlier, clarifying questions.

Dr. Crowley, do you still have a question?

DR. CROWLEY:  Yes.  Thank you.  This is for Dr. Little or a representative from FibroGen.

In terms of your risk mitigation strategy, I was wondering if you had considered inclusion, say, of a moratorium period for people who have had a

recent seizure, or a recent myocardial infarction and a DVT; also in terms of risk mitigation, caution in the use of patients not only who have a history of seizure but have a history of hypercoagulability. I don't know if they were also that cohort of patients who were excluded from the trials as well.

DR. EISNER: Mark Eisner here. Thanks for the question. I will refer it to Dr. Little to respond.

Dr. Little?

DR. LITTLE: Dustin Little. The first part of the question I believe had to do with inclusion criteria, consideration of the types of patients to include in the postmarketing study. We're certainly willing to consider and thinking through some of the details of that study.

I think probably we would consider taking a similar approach to the approach that we took in the clinical program, where we did not exclude patients with a history of thrombosis, but rather patients with a thrombotic event within the last

12 weeks.  So I would anticipate that that would be an approach that we would strongly consider.

DR. CROWLEY:  Then may I also ask you, is there anything that we can learn already from the dosing practices in China and Japan since this medication has been approved already in those countries?  Is it typical practice to reduce the doses and to slow the rate of rise of hemoglobin?

DR. EISNER:  Let me ask Dr. Little to comment at a high level on the safety data.  If we're talking safety data from China and Japan, I think that will be a lot straighter than -- just to get very specific about dosing practices.

They are different.  The starting doses are a bit different in the two different regions, which does make it a little bit hard to compare apples to apples.  For example, the starting doses in China are actually slightly higher than they were in the global program.

But, Dr. Little, can you just speak at the high level about the postmarketing safety data?

DR. LITTLE:  Yes.  Dustin Little.  I'd

actually like to briefly show data that pertains to the question.  On the left, we have the number of vascular access thrombosis, deep vein thrombosis, and pulmonary embolism events that have been reported in China and Japan with the reporting rate per 100 patient-years compared to the combined incidence rate from the China and Japan studies.

The first thing that I'd like to point out is that in the studies in China and Japan, although they were not as large as those in our pooled program, the rates of thrombosis did appear to be quite a bit lower.  It may be that patients in those regions have different risks of thrombosis. Then I'd also like to point out that the reporting rates together between China and Japan are lower than the rates that we saw in the clinical trials in that region.

DR. LEWIS:  Okay.

Dr. Cho, do you still have a question?  I will say we have a hard stop.  We need time to set up the open public hearing, and it must start on time.  We have four more minutes, and then we will

only have a 45-minute lunch.

Dr. Cho, do you still have a question for the sponsor?

DR. CHO:  Yes.  I have one question.  Leslie Cho.

Your postmarketing study, in your regular studies for the FDA approval, patients who had MI, it seems that they were excluded for -- if they had it within the year, they were excluded, but your postmarketing study has 12 weeks.

Am I confused?  Am I wrong?

DR. EISNER:  Dr. Little, can you please address that question?

DR. LITTLE:  Dustin Little.  The exclusion for myocardial infarction, acute coronary syndrome, and stroke in the clinical studies was within 12 weeks prior to randomization.  I mentioned that that's what we would consider for the postmarketing study, but of course we would plan to discuss the details with FDA.

DR. LEWIS:  Dr. Moliterno, do you have a question for the sponsor remaining?

DR. MOLITERNO:  No, Dr. Lewis.  Thank you for asking.

DR. LEWIS:  Dr. O'Connor, I see you have your hand up.  I don't know.  Is that for the FDA?

(No audible response.)

DR. LEWIS:  Okay.

Dr. Packard, do you have a question?  And we have three minutes?

(No response.)

DR. LEWIS:  Dr. Packer, you may be on mute.

DR. PACKER:  I'm okay.

DR. LEWIS:  Okay, great.

I don't know if you've had a chance to pull up any of the compliance data that I requested or you're going to do that after the break and after the open session.

DR. EISNER:  Dr. Lewis, we'll have that prepared for after the break, after the open session.

DR. LEWIS:  Great.  Okay.

So we will now break for lunch.  We will reconvene in approximately 47 minutes at exactly

2:30 p.m.  Panel members, please remember there should be no chatting or discussion of the meeting topic with anyone during the lunch break. Additionally, you should plan to rejoin at about 2:15 p.m. Eastern Standard Time, 15 minutes prior to the return time, to ensure you are connected before we reconvene at 2:30 p.m.  Thank you.

(Whereupon, at 1:45 p.m., a lunch recess was taken.)

A F T E R N O O N   S E S S I O N

(2:30 p.m.)

**Open Public Hearing**

DR. LEWIS:  We will now begin the open public hearing session.

Both the FDA and the public believe in a transparent process for information gathering and decision making.  To ensure such transparency at the open public hearing session of the advisory committee meeting, FDA believes that it is important to understand the context of an individual's presentation.

For this reason, FDA encourages you, the open public hearing speaker, at the beginning of your written or oral statement to advise the committee of any financial relationship that you may have with the sponsor, its product, and if known, its direct competitors.  For example, this financial information may include the sponsor's payment of your travel, lodging, or other expenses in connection with your participation in the meeting.

Likewise, FDA encourages you, at the beginning of your statement, to advise the committee if you do not have any such financial relationships.  If you choose not to address this issue of financial relationships at the beginning of your statement, it will not preclude you from speaking.

The FDA and this committee place great importance in the open public hearing process.  The insights and comments provided can help the agency and this committee in their consideration of the issues before them.

That said, in many instances and for many topics, there will be a variety of opinions.  One of our goals for today is for this open public hearing to be conducted in a fair and open way, where every participant is listened to carefully and treated with dignity, courtesy, and respect. Therefore, please speak only when recognized by the chairperson.  Thank you for your cooperation.

Speaker number 1, your audio is connected now.  Will speaker number 1 begin and introduce

yourself?  Please state your name and any organization you are representing for the record.

DR. KUMAR:  First, my name is Jayant Kumar. I'm a nephrologist with Renal Medicine Associates in Albuquerque, New Mexico.  I am president of the group and also the program leader for the research program that is done at our practice.

My conflict for this presentation, it is strictly participating in phase 3 trials with roxadustat.  My research site was one of the major sites in the nation for this trial.  I have not received any direct honorarium, travel expenses, and I do not own any stock in this company.  So with that introduction, I will start my presentation.

Again, thank you for allowing me to speak at this open forum in regards to FibroGen's program of roxadustat for management of anemia in chronic kidney disease and dialysis.  As clinicians, management of anemia is one of the paramount comorbidities that we deal with on a daily basis.

Since the advent of erythropoiesis

stimulating agents like Epogen, Aranesp, Micera, and intravenous iron, the disease state has largely been unattended and the challenge to treating anemia has not been addressed to the maximum.

We all thought that since the availability of ESAs and IV iron, we have found the holy grail, but when multiple randomized-controlled trials were presented that included normal hematocrit study for patients on dialysis, CREATE, CHOIR, and TREAT studies in CKD patients, we found that treating anemia to normal goal, which is a hemoglobin of 13 to 15, was associated with higher risk of cardiovascular mortality, as well as progression of solid tumors.

So FDA inserted a black box warning for the use ESAs. Now, the hemoglobin goal after the KDIGO guideline of 2012 has decreased to 10 to 11 grams per deciliter. While this level may be enough for some people, our patients at this high altitude in New Mexico feel the effects of anemia even at this so-called recommended goal of hemoglobin correction.

My practice was one of the major sites for phase 3 clinical trials with roxadustat. We provide ESRD care to more than 1100 patients in New Mexico and correspondingly a very large number of CKD-4 and CKD-5 populations. Most of our patients live at high altitudes and have multiple comorbidities due to high prevalence of diabetes. This includes a large number of Native Americans and Hispanic patients.

As this was an open-label investigation, I could see the response in hemoglobin to roxadustat in our subjects. Roxadustat was able to increase and maintain hemoglobin quite well --

DR. LEWIS: Dr. Kumar, your time is up. I'm sorry. We have many speakers. I apologize.

DR. KUMAR: Thank you.

DR. LEWIS: Speaker number 2, your audio is connected now. Will speaker number 2 begin and introduce yourself? Please state your name and any organization you are representing for the record.

MS. BAKER: Hello. My name is Melissia Baker, and I am a 49-year-old proud, fourth

FDA CRDAC                    July 15 2021                    210

full-time adoptive mom of a sweet 8-year-old son. I do not have any financial disclosures regarding my testimony today.

As a person who has lived with type 1 diabetes for close to 40 years, I became aware of my kidney disease during my early thirties. I received a transplant and fortunately did not need dialysis during my 9-month wait for a new kidney-pancreas.

The seven years with my transplanted kidney-pancreas were wonderful. I resumed a busy life as a Red Cross volunteer and human resources admin and fulfilled my lifelong dream to become a foster parent, which eventually led to my adoption story. But despite heroic efforts by my transplant team, both organs went into rejection seven years after receiving them.

I began life-sustaining hemodialysis 10 years ago while I await a second transplant. I have a very high antibody count due to my previous transplant and because of previous blood transfusions. These factors make another organ

transplant extremely difficult.

I've suffered from anemia my entire 10 years on dialysis.  Even with close monitoring, my anemia can be unpredictable.  I have been hospitalized because I needed blood transfusions.  Those transfusions are very concerning since they contain additional antibodies.  I'm already a highly sensitized transplant candidate.  The anemia could make it more complicated for me to receive a second transplant.

In large part, my transplant wait time has been so lengthy due to my highly sensitized status and factors such as anemia.  Anemia also makes my chronic fatigue and the low energy levels frustrating.  There have been many times when my body simply cannot complete all of the tasks my brain wants to get done.

A treatment for chronic anemia would lessen my worries about future transfusions as it relates to my antigens, and a greater quality of life would help me feel more confident that I could take care of my son and be ready for transplant when the

opportunity to receive one finally comes.

I remain hopeful for a healthier future. The product you are reviewing today could be part of that hope for me and so many others like me. I ask you to consider that as you make your decision today. Thank you.

DR. LEWIS: Thank you.

Speaker number 3, your audio is connected now. Will speaker number 3 begin and introduce yourself? Please state your name and any organization you are representing for the record.

MR. CARR: Hi. My name is Wyatt Carr, Sabin Wyatt Carr. I am 76 years old and I live with my wife, Debra [ph], in California. I'm in late stage 4 CKD. I am not a statistic. I am a CKD patient with seven years of real experience with roxadustat. My story is like many people who discovered they have CKD.

In January 2010, my cardiologist noted a trend in my red blood cell count and thought I might have leukemia or blood cancer. He asked if I'd ever had my kidneys tested and ordered a

24-hour GFR test.  The test disclosed I was already in stage 3 kidney disease and had anemia.

According to the National Kidney Foundation, 1 in 10 of us will contract CKD and many will discover their illness the same way I did.  As a non-dialysis CKD patient with anemia, I have been on and off roxadustat three separate times.

First, FG-4592-041, a trial that began August 2011 and ended on December 2011; second FG-4592-059, a long-term trial that began on May 30, 2012 and ended February 27, 2019 when I was taken off due to low platelets; and third, this April I was approved for compassionate use by the FDA.

While I was on the drug, all the side effects were beneficial, including slowing the decline in my kidney function; more energy; lower blood pressure; improved eGFR readings; higher hemoglobin; less supplemental iron; and improved effectiveness of my statin.  These improvements over the past seven years while taking roxadustat allowed me to continue to work, play golf, take

walks, exercise, attend conferences, and visit companies as part of my work.

After being off of roxadustat since February 2019, I've had to have a blood transfusion in April due to severe anemia. I went from a meaningful quality of life to one where just walking from my bedroom to the living room exhausted me. My hemoglobin dropped to as low as 7.2; GFR as low as 18. I took long naps, lay on the couch most days, and was unable to do things I'd been able to do while taking roxadustat.

Due to my body's issues with inflammation, my doctors and I were concerned that I would likely be a hyporesponder to ESAs. We felt that roxadustat offered the best and possibly the only alternative. Thanks to my doctors at Kaiser, and the IRB, and the FDA, I was permitted back on roxadustat for compassionate use this March.

Again, roxadustat is having beneficial effects. All my subsequent blood tests have shown improvement. I'm extremely grateful to the doctors who helped me get access to this drug through the

FDA's compassionate use program.  I feel like it's given me my life back.  There are many others like me who need your help from this awful chronic disease.

DR. LEWIS:  Thank you, speaker number 3.

MR. CARR:  I beg of you to consider those patients.  Thank you.

DR. LEWIS:  Speaker number 4, your audio is connected now.  Will speaker number 4 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. SILVA:  Good afternoon.  I am Dr. Arnold Silva.  I'm a nephrologist and director of clinical research at Boise Kidney and Hypertension Institute in Boise, Idaho in conjunction with Frenova Renal Research.  I have served as a clinical investigator on studies evaluating the safety and efficacy of roxadustat and I am not financially compensated for my time today.

As a physician and clinical investigator who has participated in anemia clinical studies with multiple pharmaceutical sponsors for over 20 years,

I am encouraged by both the efficacy of this new oral therapy to treat anemia of chronic kidney disease that has an adverse effect profile comparable to placebo. But I believe roxadustat as an oral agent offers more than a new treatment option to raise hemoglobin in kidney patients with anemia.

In the day-to-day clinical care of patients with renal disease, access to therapy poses difficulties for a patient population that often has socio-economic challenges.

Many rural areas, of which Idaho is an example, pose transportation issues for patients who must travel to medical centers that provide injectable therapies to treat anemia of chronic kidney disease. This impacts patient compliance with treatment and ultimately can adversely affect both their quality of life and clinical outcomes, and oral therapy for anemia can reduce transportation needs and the associated financial burden for many of these patients.

Moreover, in patients with end-stage kidney

disease on renal replacement therapy, use of oral roxadustat empowers patients to take a more active role in the management of their anemia that can have beneficial effects on both compliance with treatment and their overall well-being. Furthermore, oral therapies can positively impact dialysis workflow in both in-center and home treatment programs, and provide a smoother and more efficient clinical operation.

Finally, study data and operations aside, the positive reports from patients taking roxadustat therapy, including stable hemoglobin values with improved energy levels and a preference for oral versus injectable therapies, suggest that roxadustat be given consideration for approval as an additional and important tool to treat anemia chronic kidney disease.

Thank you for the opportunity to speak today. Your consideration is most appreciated.

DR. LEWIS: Thank you, speaker number 4.

Speaker number 5, your audio is connected now. Will speaker number 5 begin and introduce

FDA CRDAC                July 15 2021                    218

yourself?  Please state your name and any organization you are representing for the record.

MS. LUEBBERS:  Hi.  My name is Bridget Luebbers.  I am a dialysis patient, and I have no financial disclosures to share.  Anemia has impacted my life in so many ways.  When I was diagnosed with kidney disease 21 years ago, the first step in my treatment was to start medication to treat my anemia.  Since that day, I have battled to keep my blood levels normal.

Being a dialysis patient, I already struggle to find energy just to complete everyday tasks like showering, doing dishes, or even just brushing my teeth, but when my blood count is low, it makes all of these things near impossible.

I have had so many ups and downs with my hemoglobin levels that at this point I just know when my numbers are low.  I can tell because breathing becomes more difficult, walking upstairs feels like climbing a mountain, and I'm forced to be still, lay down, and focus on my breathing because it feels like my lungs are never full.  My

limbs become weak, it interrupts my life, and it's a huge inconvenience.  I've even ended up at the point when my blood count is so low, and I'm not taking in enough oxygen that I pass out.

One particular instance of this stands out to me.  It was in the middle of the night, and I woke up to use the restroom.  When I stood up and took my first step, I immediately passed out and fell to the floor.  After a minute, I awoke scared and in pain from the fall.  The next morning I went straight to the emergency room, and upon triage, they rushed me back to see a doctor.  I was as white as a ghost.  They knew just from looking at me that I was severely anemic.

That resulted in a multi-day hospital stay and many units of blood transfused just to get me back to a sustainable level.  I unfortunately have had many blood transfusions over the years, and as a dialysis patient hoping for a transplant, I knew transfusions were dangerous because in addition to the everyday risks of a transfusion, when you want a kidney transplant, you could end up building

antibodies from the transfusion which would make it more difficult to find a kidney match.

So over the past 21 years, I've had multiple medications to treat my anemia and have ridden the roller coaster of ups and downs with my levels getting too high or dropping too low, having a hard time finding a balance.

Having a new treatment like this will be so helpful because many people are like me and battling this rollercoaster ride of ups and downs. We always try to stay positive, we try to keep on with our regular lives, and we try to do the best we can to be normal.  But it's hard to do that when exhaustion is your constant companion.

I ask that you remember this as you consider your decision today.  All of our bodies are different, and as more medications become available, more people in my situation will find some peace in their life as they can find the right medication for them.  Thank you for your time.

(Pause.)

DR. YU:  Dr. Lewis, are you there?

DR. LEWIS:  Speaker number 6, your audio is connected now.  Will speaker number 6 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. PAUL:  My name is Dr. Subir Paul.  I have been a practicing nephrologist in northwest Alabama, in Shoals Kidney and Hypertension Clinic in Florence, Alabama for the last 25 years.  I'm a fellow of the American Society of Nephrology.  I also trained resident physicians, medical students, and do clinical trials.  I was one of the principal investigators of the phase 3 trial and have no financial disclosures relevant to the product of roxadustat and today's talk.  I am speaking on my own behalf.

For last three decades, we have been treating anemia of CKD with various erythropoiesis stimulating agents, or ESA, and IV iron.  As intestinal iron absorption is poor in our patients, when inflammation develops in many of our CKD patients, hepcidin expression in liver goes up, preventing iron absorption and iron mobilization;

thus erythropoiesis goes down causing ESA resistance.

I became interested to be a principal investigator for this trial for a number of reasons.  Number one, it is a novel oral agent. Number two, it has a unique mechanism of action. It inhibits hypoxia inducible factor prolyl hydroxylase, and this stabilizes HIF and increases endogenous erythropoietin production.

Number three, it inhibits hepcidin and increases iron absorption and iron transport to bone marrow for erythropoiesis.  Number four, I felt that this approach is physiological and this agent will be effective and safe.

I found that the patients who are treated with roxadustat have a [indiscernible] significant rise of hemoglobin without much need for IV iron. They felt significantly better.  Their energy level improved, shortness of breath decreased, and they were highly satisfied.  It offers a very similar advantage for patients on peritoneal dialysis and for patients with CKD not on dialysis who live 56

to 70 miles away from my office or from the dialysis center.  Many are elderly who cannot drive and face problems in getting transportation.

Thus, CKD anemia patients not on dialysis while receiving ESA need frequent IV iron therapy with the vein punctures.  These repeated injuries to the veins may cause significant issues for good fistula formation and fistula functioning and increase the risk for total [indiscernible] catheter placement for hemodialysis.  Total [indiscernible] catheter increases the risk for blood stem infections and mortality.

I have seen ESA resistance in many of my patients and this probably will be of significant benefit to them.  If approved by FDA, roxadustat will be beneficial to treat anemia in patients on maintenance hemodialysis, peritoneal dialysis, and CKD patients not on dialysis.  It will be especially very useful --

DR. LEWIS:  Thank you, speaker number 6. Your time is up.

DR. PAUL:  Thank you for your attention.

DR. LEWIS:  Speaker number 7, your audio is connected now.  Will speaker number 7 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. COLEMAN:  Hi.  My name is Dr. Jessica Coleman.  I'm a private practice nephrologist with Nephrology and Hypertension Medical Associates.  I have a financial relationship with AstraZeneca through my position as a paid speaking consultant, and that's my only disclosure.  With that, I'm going to go ahead and start my three minutes.

I want to first thank the committee for this opportunity to share not only my experience, but my patients' experience with anemia of CKD and give some clinical insight into the burden of this disease state.  We know that anemia in CKD is prevalent with 5 million adults in the United States suffering from the disease, but less than 25 percent of patients provided care prior to dialysis initiation.

I'd like to give you a clinical vignette that highlights why this occurs and possibly why

having an oral agent would really be very beneficial to treat this disease state, and I really believe an oral agent would revolutionize the field. I don't need to go into the common symptoms of anemia. The previous speakers, and especially the patients, have done an eloquent job of sharing how it impacted their personal lives. But as clinicians, we know there are even more dire potential outcomes.

The subclinical symptoms of fatigue and dizziness can have end-organ damage, hypoxic injury, so that there's a really substantial impairment that occurs to the patient and to their disease process. Current guideline-directed therapy can be very difficult to achieve, so I'd like to talk about a very typical patient in my clinical practice, Ms. A.

She is a 62-year-old African American female who has stage 3B CKD with a GFR of 32 percent, diabetes, hypertension, cardiac disease, and she's a caregiver for her elderly mother and uncle, as well as two young great-grandchildren. Her average

hemoglobin is 9.8 over the last three years that I have cared for her. She routinely feels tired, run-down, and in order to treat her anemia, we have sent her to hematology so that she can receive IV iron, ESAs, and other supplemental strategies as appropriate.

However, she lives over an hour away; therefore, to come every other week to receive her injection, or not if her hemoglobin is too high, she has to arrange care for four other individuals. She has to align transportation at least 3 days prior to her appointment, and has an average of a 5-to-6-hour day just for receiving simple ESA injection, and that's assuming everything goes well with no delays. There's also a financial burden which costs an average of $40 transportation one way.

Ms. A therefore understandably has trouble appreciating her obvious time commitment, logistical difficulties, and financial burden, and whether or not that's actually worthwhile. What she doesn't understand is that by missing

appointments and not participating fully in our own health care, she's actually working against herself, and thereby perpetuating the vicious cycle of anemia in CKD.

Currently today in my office, I'm seeing 28 patients, 15 of whom have anemia of CKD and have similar appearances and challenges to Ms. A. She's --

DR. LEWIS:  Thank you, speaker number 7.

Speaker number 8, your audio is connected now.  Will speaker number 8 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. WEI:  Good afternoon.  Dr. Alice Wei speaking.  I have been a nephrologist in private practice in Harlem of New York City for over 15 years.  I've no financial disclosures to make, and I'm speaking on behalf of myself and patients.

Many inner-city groups, including patients like mine in Harlem, have difficulty accessing medical care.  Either because of frailty, health literacy, or health system inefficiencies, most

patients are unable to obtain the standard treatment for severe anemia of chronic kidney disease. Patients are afraid to inject themselves with ESAs. They find going to a doctor's office every week or month for injections taxing, and some patients who need to be referred to a hematologist or hospital setting for IV iron infusion find this too burdensome.

Anemia of CKD leads to many of the symptoms we associate with frailty as we heard from patient speakers earlier: easy fatigability, weakness, slowness of gait, and diminished cognition. It also increases the risk of CKD progression, cardiovascular morbidity, and mortality.

Since ESA trials have not shown to improve mortality or other hard outcomes, we are desperate for another option to treat anemia of CKD. Because roxadustat is an oral medication, it will be far more accessible to patients in need, and because roxadustat also enhances iron absorption from the gut, we can expect less need for IV iron infusions.

Improvement in anemia means less

transfusions, too, which leads to a better chance of patients having a successful kidney transplant. This will ultimately offer a better patient experience, better outcomes, and less utilization of services such as physician office visits, injectable or infusion medications, and transfusions.

With an option like roxadustat, I can be assured my patients can get the treatment they need, so I spend less time coordinating expensive services and more time treating patients, focusing on maintaining their kidney health and keeping patients off dialysis.

Thank you for your time and your consideration in approving roxadustat as a new treatment option for anemia of chronic kidney disease.

DR. LEWIS:  Thank you, speaker number 8.

Speaking number 9, your audio is connected now.  Will speaker number 9 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. MANLLO-KARIM:  Good afternoon.  My name is Roberto Manllo-Karim.  I am a nephrologist in a group practice in south Texas with eight additional partners.  We care for roughly 1,300 dialysis patients and over 5,000 patients with CKD.  I have been practicing nephrology for almost 30 years.  Conflict of interest, I participated as principal investigator in clinical trials for FibroGen.  I own 1000 shares of FibroGen stock.  I didn't receive any underwriting for this presentation.

I don't think I have to educate the community regarding the high prevalence of anemia in chronic kidney disease, especially stages 4 and 5.  Anemia not only causes multiple symptoms but also has an impact on cardiovascular events, progression of chronic kidney disease, and overall mortality.

One thing that practicing physicians like myself know is the level of therapeutic inertia that occurs given the limited choices available to us to treat anemia.  Basically, we have three options:  iron supplementation, erythropoietin

stimulating agents, and transfusion.

We all know about issues of tolerability of oral iron supplementation.  There are even higher risks when it comes to intravenous iron supplementation, including hypertension, allergy, and the inability to use in the setting of infections.

Erythropoietin stimulating agents carry the risk of hypertension, stroke, progression of malignancy, as well as graft thrombosis. Transfusion is out of favor due to possible allosensitization of future transplant recipients.

What my patients and I like about the use of roxadustat is that it mimics normal adaptation to altitude.  This is basic physiology as opposed to supratherapeutic doses of ESAs and very high doses of intravenous iron supplementation, which no human being ever sees in their lifetime under normal conditions.

We all know well about the role of functional iron deficiency in chronic kidney disease that limits iron availability.  Roxadustat

allows not only physiological rising EPO levels but also enhances oral iron absorption.  We frequently encounter dialysis patients with anemia that have a high ferritin but a low iron separation.  We're afraid to give a patient additional intravenous iron because of the high ferritin, but at the same time they may not respond to erythropoietin because of the low iron separation.  HIF inhibitors such as roxadustat will allow additional iron availability and increase EPO levels.

Roxadustat will be a great agent of choice for these types of patients.  In my experience, roxadustat is well tolerated, safe, and effective, and should become first-line treatment for anemia in patients with chronic kidney disease in the office.  It should also be an option for treating anemia in dialysis patients, especially peritoneal dialysis, rivaling [ph] the time-tested erythropoietin.  Thank you very much for your attention.

DR. LEWIS:  Thank you, speaker number 9.

Speaker number 10, your audio is connected

now.  Will speaker number 10 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

MS. DILGER:  Hello.  My name is Amanda Dilger and I'm speaking on behalf of my dad, Eugene Miller.  This letter is to explain how his diagnosis has affected both his and my family's lives.  We have no financial disclosures.

My dad is 67, has two kids and three grandchildren, and currently lives with my family. He worked as a self-employed truck driver for over 40 years.  He enjoys the simple things in life like farming, listening to music, and talking with friends and strangers alike.  He has a generous heart and an inquisitive personality.

When he was diagnosed, we didn't quite understand the ripple effects it would have on our lives.  With long hospital stays, long ER visits for blood, and coordinating his care, quality of life has dramatically changed.  Before CKD, he was independent and managed his own daily needs.  He was healthy and enjoying his retirement.

My dad's CKD was triggered after a MRSA infection that affected multiple joints. Unexpectedly, he became handicapped and unable to walk or use his right hand.  He had to move in with us.  As a result, we built ramps for him to better access our home, but now that limits how we can park in our garage.  To get him anywhere, we must maneuver vehicles around for him to get down the ramp, move around the vehicle, and we lift the heavy equipment in and out of the vehicle for appointments.

It most reminds me of when I would struggle to get my stroller through the door at the mall that wasn't automatic; one child in the stroller, one holding my hand, and my foot trying to pry the door open.  Physically, the in and out of the car for appointments can be incredibly painful and occasionally seems impossible.  He's always willing his body to cooperate, and I can only watch as he struggles to transfer.

Fifteen feet into the infusion building with manual doors can be quite the trek for us.  In the

early days when we were both learning, he may have accidentally rolled away from me a few times as I was trying to hold the door and wheel him into the building at the same time.  We laugh about it.

Getting him to his injection appointments isn't just a strain on us physically but logistically as well.  As a family of five plus my dad, we have a very busy schedule.  This is just the smallest glimpse into our struggles of getting him to injections outside of our home.

There's no doubt in my mind that having an oral treatment like roxadustat would be life-changing and reduce some of the physical difficulties of in-office treatment.  Thank you for your time.

DR. LEWIS:  Thank you, speaker number 10.

Speaker number 11, your audio is connected now.  Will speaker number 11 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

MS. GRIFFITH:  Hi.  My name is Elizabeth Griffith.  I am 49 years old.  I have no financial

disclosures.

When I was in grade school, I was told I had anemia due to kidney disease due to a birth defect. Up till 2016, I was able to work, go to school, and do anything I wished without thinking about it, but my life has drastically changed since 2016.  I have been unable to work due to now having ESRD and being very anemic.

My nurse has been at a wits end trying over the years to get my hemo levels constant.  Previous medication would raise my levels for a day or two, and then it would crash.  I was getting the highest dose possible and nothing was helping.

I learned about the trial for this drug from my nurse and doctor.  I was so grateful for something that could help me get my energy back and even to do the simple things that most people with normal amounts of energy take for granted, just going to the market, visiting friends, or household chores.

I started the trial in November 2020.  Since then, I've gotten my energy back and my life back.

I've been able to schedule daily activities.  Just the small things like making taco sauce, dinner, or even getting the dishes done I've been able to do without taking a break and completing the task fully.  That is something that I haven't been able to do since 2016.

I'm sharing my story with you because I hope it makes you understand just how much someone struggles with anemia because of kidney disease, the exhaustion that steals the normal things from us year after year.  Please consider me as you make your decision for this drug.  Thank you so much for the chance to speak.  Have a great day.

DR. LEWIS:  Thank you, speaker number 11.

Speaker number 12 is not going to speak.

Speaker number 13, your audio is connected now.  Will speaker number 13 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

MR. CRUMBAUGH:  Hello.  My name is Louard Crumbaugh, Jr., and I am an 82-year-old retired nuclear engineer now living in Nampa Idaho since

returning to the U.S. from living and working in Israel for three years.  About six years of being back into the country, my doctor explained to me that because of my high blood pressure, my kidneys were failing.  Using diet and medications to try to control my high blood pressure was not successful in my case.

My kidney function continued to decline until about two years ago when I was told that I was in complete kidney failure.  One of the major problems that I had was anemia.  The doctor and I tried to control it with iron supplements with limited success.  The next step was to give me iron through infusion.

Getting the infusions worked great but had a few drawbacks.  About every 3 to 4 weeks, I had to go to the infusion unit at our local hospital for my injection.  First, a sample of my blood was taken and sent to the lab to determine my hemo level, and then after the lab sent the results back to the infusion unit nurse, she would then send an order to the hospital pharmacist to make up the

required amount of medication for the infusion. And depending on the workload that the nurses had in the infusion unit, some days I was maybe in the infusion chair for 3 hours or better.

This is unusual I think. Taking my blood samples to check for my hemo levels does not sound like anything abnormal, but for me, because of my small veins, most of the nurses had a very difficult time trying to get a sample from me. Many times I'd have large bruise spots on my arms where the nurse had to stick me 3 or 4 times in an area trying to hit a vein with no luck; then after 3 weeks when the bruises were almost healed, it was time for my next iron infusion.

During a visit to my dialysis clinic, I was informed about this trial research of a product which would eliminate getting iron infusions. Would I be interested in participating? Oh boy, would I? Here was a product that would help me maintain my hemo levels without these monthly blood draw and iron injections.

For me, I feel that the results of taking 1

or 2 pills 3 times a week to give me the same, if not better, results of the iron injections that I took was a real plus.  The cost savings alone would be a big selling point.  No nurse needed to draw my blood, as well as no lab work needed.  The hemo levels could be checked during my regular routine blood work.  The hours spent sitting in the infusion chair, now I could utilize it doing something at home, reducing the size of my honey-do list.

DR. LEWIS:  Thank you, speaker number 13. Your time is up.

Speaker number 14, your audio is connected now.  Will speaker number 14 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

DR. RASTOGI:  Thank you very much.  My name is Anjay Rastogi.  I'm professor of medicine and clinical chief of nephrology at UCLA Health.  I'm not being paid for speaking today, but I've been heavily involved with CKD anemia research for the past decade and a half, and I've served as a PI on

several HIF stabilizer studies, including those conducted by FibroGen, AstraZeneca, and GSK.  I'm also on the Speakers Bureau for AstraZeneca and also act as a consultant for them as well.

Anemia of CKD is quite prevalent in the U.S., presenting a significant disease burden with roughly 5 million patients affected, and quite a few of them not being treated for multiple reasons, including access to care and also the fact that most of the drugs that we're using are injectables. Anemia of CKD also has a significant impact on quality of life and is associated with significant morbidity and mortality.

All the testimonials that we have had from our patient colleagues, I would completely agree with that; that is my patients say exactly the same things as well.

Prior to recombinant erythropoietin's launch in 1989, a blood transfusion was the main way anemia of CKD was managed.  Blood transfusion is something we want to avoid, especially in patients with CKD for the risk of alloimmunization, which

can complicate the chances of transplantation in the future.  Recombinant erythropoietin was very successful in doing this, however, we soon found out that there were significant potential risks associated with recombinant erythropoietin, including mortality, for which it received a boxed warning in 2007.

At the same time these things were happening with recombinant erythropoietin, there were significant advances being made in our understanding of anemia CKD, especially the HIF pathway, and a Nobel Prize was given out in 2019 in medicine or physiology for this.

HIF stabilizers, or hypoxia-inducible factor stabilizers, work more upstream than recombinant erythropoietin and lead to a more coordinated approach to anemia of CKD management, including utilizing endogenous Epogen and more optimal utilization of iron.

Another advantage of HIF stabilizers is that they're oral.  This is of special benefit in non-dialysis-dependent CKD patients and home

dialysis.  A couple of things to keep in mind that were not discussed so far was passing of the American Advancing Kidney Health Initiative in 2019, with a major focus on increasing home dialysis and transplantation.

We also need to keep the COVID-19 pandemic in perspective.  Our hope is that these oral agents will really push more transplantation and more home dialysis and at the same time keeping our patients safe at home.  I want to again thank you for having me participate.

DR. LEWIS:  Thank you, speaker number 14.

Speaker number 15, your audio is connected now.  Will speaker number 15 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

MS. WILLIAMS:  Hello, everyone.  My name is Leigh-Ann Williams.  I live in Monroe, Louisiana, which is right outside New Orleans, and I'm the Ambassador for the American Kidney Fund.  I thank you all for giving me the opportunity to talk about living with kidney disease and anemia.

I have a bachelors in toxicology from the University of Louisiana Monroe, a masters of science in clinical toxicology from the University of Florida, and a master of public health from LSU Health Sciences Center in New Orleans, and I currently work in the healthcare field.  So I have plenty of education and experience, but none of this has shielded me from anemia.

Given that I am used to hemodialysis and needles, the extra stick each month for an additional iron series doesn't bother me.  The part of anemia that I find most difficult is the constant lethargy, which is coupled with being tired and worn out from work and dialysis.

It is really challenging every day to get up and do daily activities, even simple things around the house.  You can manage to do a few little things, but you'll be tired from exerting even just a little bit of energy.

The constant feeling of never getting enough rest truly takes a toll on you.  Even if I somehow manage to sleep for 10 uninterrupted hours, I would

still get up and feel sluggish like I did not get enough rest, and this struggle is just to do a little bit of chores around the house.

It is hard to get up at a good time to go to work because you're always tired and sluggish. I even at one time needed to get several blood transfusions to increase my hemoglobin in my blood. Additionally, day in and day out, you're always cold. You always have to have something extra with you, even a jacket because you'll feel uncomfortably cold in neutral or regular temperatures. You can eventually feel warm enough, but this is just another example of why living with anemia is so difficult and so draining.

For us anemia patients, we need options. Everything doesn't work for everyone, so we need as many available treatments as possible. There is no one fix for all. Thank you very much for your time today, and I sincerely appreciate the opportunity to share my story about the struggles of living with kidney disease and anemia.

DR. LEWIS: The open public hearing portion

of this meeting has now concluded and we will no longer take comments from the audience.

DR. YU:  Dr. Lewis, hi.  I'm so sorry.  This is Joyce.  We have one more speaker, number 16.

DR. LEWIS:  Oh, number 16 did come.  Okay, great.  I apologize.

Speaker number 16, your audio is connected now.  Will speaker number 16 begin and introduce yourself?  Please state your name and any organization you are representing for the record.

MR. SPIGLER:  Good afternoon.  My name is Mike Spigler, and I'm the vice president of patient services [indiscernible – audio feedback] for the American Kidney Fund.  I do not have a personal financial relationship with the applicant.

[Inaudible – audio feedback].

So on behalf of the American Kidney Fund, and myself as a primary caregiver to a kidney disease patient with anemia, I want to thank you for the opportunity to address you.

Anemia is very common in people with chronic kidney disease, also known as CKD.  CKD patients

with anemia often struggle with quality of life [inaudible - audio feedback] -- just like my mom -- [inaudible].

[Inaudible].  However, over the past 5 to 10 years we've seen many innovations in rare kidney disease, [inaudible] -- innovative treatments in CKD-related anemia.  And while current anemia treatments have been an important part of effective CKD management, there is room for improvement.

As COVID-19 [inaudible] -- need greater ability to manage their own care.  This is especially true for two groups of patients [inaudible] -- and those who are doing dialysis at home.  While some patients can be taught to self administer injections at home, it is not for every patient.

[Inaudible] -- severe economic hardships, and at the American Kidney fund, transportation is the most common request for financial assistance from our safety net program.  Providing anemia treatment options for patients that will offer less travel to and from a provider for an injection

FDA CRDAC                    July 15 2021                    248

would be welcomed by many of the patients.

I want to thank you again for allowing the American Kidney Fund and some of the patients and [inaudible].

**Clarifying Questions (continued)**

DR. LEWIS:  Thank you, speaker 16, and thank you, Joyce.

The open public hearing portion of this meeting has now concluded and we will no longer take comments from the audience.  We will now take remaining clarifying questions for all the presenters thus far.

Please use the raised-hand icon to indicate that you have a question and remember to put your hand down after you have asked your question. Please remember to state your name for the record before you speak and direct your question to a specific presenter, if you can.  If you wish for a specific slide to be displayed, please let us know the slide number, if possible.

As a gentle reminder, it would be helpful to acknowledge the end of your question with a thank

you and the end of your follow-up question with, "That is all for my question," so we can move on to the next panel member.

Dr. Packer?

DR. PACKER:  Yes.  Thank you so much.

I just want to give the sponsor a chance to address the point that I raised earlier about all-cause mortality.  It's really the one safety issue I want to ask about.

Can the sponsor show slide CO-78, please?

Now, I just want to make sure; this is the only slide I think the sponsor showed on all-cause mortality in the DD trials.  Now, this excludes trial 613.

I just want to call everyone's attention to the fact that there are 1940 patients in each treatment group, and altogether there are about 439 deaths.  You can see the hazard ratio for all-cause mortality, which is not statistically significant.

Can I have the sponsor go to figure 68 in their briefing document?

FDA CRDAC                   July 15 2021                        250

DR. EISNER:  Yes, Dr. Packer.  It's Mark Eisner.  We'll work on pulling that up, and Dr. Little will be addressing this question.

DR. PACKER:  Okay.  This comes from the sponsor's briefing document. It's exactly the same set of trials.  It's the DD trials, all three DD trials, excluding 613.  It shows all-cause mortality, again.

Let me point out the denominators are the same, 1940 in each group.  Here we have all-cause mortality and we have 782 deaths.  Now, the hazard ratio here is 1.17.  It goes from 1.02 to 1.35. Now, there are 350 more deaths in this analysis than in the slide that the sponsor showed to the committee.

Can I go back to slide CO-78?  This is the slide you showed the committee.  Is it correct to say that this isn't an analysis of all-cause mortality; this is an analysis of mortality as the first event in MACE?  Is that correct?

DR. EISNER:  I'll ask Dr. Little to address your question.

(No response.)

DR. EISNER:  Dr. Little, you may be on mute.

DR. LITTLE:  I'm sorry for the delay.  This is Dustin Little.

Dr. Packer, what's reported is all-cause mortality.  All deaths are analyzed that occur in the OT-plus-7 days analysis window.

DR. PACKER:  That can't be true.  Go back to your previous slide.  Go back to figure 68.  There are 782 deaths here in the same three trials.

Now go back to the slide you just showed me.  There are 439 deaths.  This is not an analysis of all-cause mortality; this is an analysis of deaths that occurred as the first event in your MACE analysis.

Isn't that correct?

DR. LITTLE:  Dr. Packer, what we're seeing on the screen is the results for on-treatment-plus-7 days analysis set.  Then the figure that you're referring to from the briefing document, that's the so-called ITT or the on-study analysis.

I'd like to just take a minute to address

that, if I may.  Could we please go to CO-74? Let's take another look at the disposition of patients.  One of the challenges of the on-study analysis is that there are some patients with missing information.

If we can quickly go to CO-75, the FDA in their presentation, they mentioned that one of the limitations of on-study analysis can be the inclusion of rescue therapy or alternative therapies following discontinuation of the interventional treatment, and that certainly would be expected to be the case with roxadustat.

I showed you on the previous slide that we do have some missing data in our ITT analysis for all-cause mortality.  One of the three studies has more complete follow-up with actually 99 percent ascertainment of MACE.  That's Study 002, and that study has a hazard ratio point estimate for all-cause mortality of 1.09, which is more consistent with the overall results.

DR. PACKER:  I'm sorry.  Please forgive me. You're not answering my question.

Can we just go back to your figure 68 in your own briefing?

DR. EISNER:  Dr. Packer, it's Mark Eisner again.  I think the difference is in the ascertainment window.  OT-7 is a much shorter ascertainment window than on-study, where patients are followed off treatment to the end of the study; so more deaths are captured because they're followed for longer during that ascertainment window.

So I think the discrepancy that you're focusing on is not really a discrepancy.  It's just a difference between an OT-7 ascertainment window and an on-study ascertainment window, which could have followed patients for much, much longer.

Does that help?

DR. PACKER:  It does help, and I appreciate the clarification very much.  But can I maybe just ask one more thing?

You're showing a similar effect may be a slightly greater risk with your agent compared to an ESA, which is labeled for an increase in

mortality.

Now, can you put up the mortality data for the Study 613?

DR. EISNER:  We will do.  And while we're pulling it up, let me just say that the ESA doses we used in our pivotal trials were lower than those that were used in other studies such as the normal hematocrit study or CHOIR.  And what you can see on the bars on the right is our epoetin alfa dosing level versus those that are used --

DR. PACKER:  I understand that, but can you put up the all-cause mortality for Study 613?

DR. EISNER:  Yes, we're working on that.  I was just trying to clarify the epoetin alfa risk in our trials is actually lower than the --

(Crosstalk.)

DR. PACKER:  It may be, but --

DR. LEWIS:  Dr. Eisner, can we put up the slide he's requesting, please?

DR. EISNER:  Yes, we're working on that.

DR. LEWIS:  It's in your deck.

DR. PACKER:  I just want to say that it

FDA CRDAC                July 15 2021                    255

could be that the epo dose is lower, but we don't know that the epo dose that you're using is not associated with an increased risk of death.

DR. EISNER:  That's a fair point.

DR. PACKER:  Please, I don't want the meta-analysis; I want the Kaplan-Meier curves for Study 613, all-cause mortality, please.

DR. EISNER:  We will get that for you.

I believe this is what you're looking for.

DR. PACKER:  Yes.  Let me just say that the FDA did an analysis of this.  This is a comparison of roxadustat versus two different ESAs.  This was not part of the meta-analysis; this is all-cause mortality.  I believe the hazard ratio here is 1.54, with a lower bound that is greater than 1.

Is that correct?

DR. EISNER:  Let me ask Dr. Little to address that question and also to speak a little bit more about the study more generally.

Dr. Little?

DR. LEWIS:  Dr. Little, if you could confine your comments to answer Dr. Packard's questions

FDA CRDAC                    July 15 2021                    256

specifically.

DR. LITTLE:  Yes.  Dustin Little.

The hazard ratio point estimate is estimated to be 1.67 on our analysis using the study-specific stratification factors with the lower bound of 1.12.

May I have a moment to show some information on dosing?  Just briefly, we talked about how there were some differences between Study 613 and the other trials, and one of the differences was that higher starting doses of roxadustat were used in Study 613.

Just on the left, we have a few metrics suggesting that starting doses may have been too high, and we note that in the DD pool -- that's the three studies -- dose reduction, dose holds, hemoglobin overshoots, and rapid rates of hemoglobin rise were more common for roxadustat versus epoetin alfa, but that was particularly more common in Study 613.  This is one of the design differences in Study 613, which --

DR. PACKER:  I really appreciate that.

Thank you very much.

Are you implying that there is a dose-dependent increase in mortality with roxadustat? I think you just said that, right?

DR. EISNER: Dr. Little, would you like to address the question?

DR. PACKER: You said that you used higher doses and you got a hazard ratio of 1.54. You used lower doses; you got a hazard ratio of -- well, it sort of depends on which one you look at it.

Is that what you're telling us? I think that what you just said.

DR. LITTLE: Dr. Packer, when we look at our data to investigate for dose-dependence regarding all-cause mortality in MACE, we don't find it to be particularly conclusive. So our mitigation strategy regarding our dosing really is aimed at thrombosis.

I think some people would consider that the mitigations that have been undertaken with ESA, and we're undertaking similar mitigations with roxadustat, have been aimed at reducing

FDA CRDAC                 July 15 2021                    258

cardiovascular risk.  But the most clear evidence that we can provide is that we accept our dosing changes to mitigate risk of thrombosis.

We do consider that, overall, when we look at our data versus ESA in the dialysis population, including when we pooled Study 613 with the other studies, that we don't see evidence of increased cardiovascular risk with roxadustat versus ESA.

DR. LEWIS:  Thank you, Dr. Packer, and thank you, Dr. Little.

Can we go on to the compliance data?

DR. EISNER:  Yes, I'd be happy to show you that.

DR. LEWIS:  Also, Dr. Eisner, if you have how often there were dose adjustments made in the roxadustat group, I would like to see that data as well.  And we have two more questions, maybe three now, so we'll move quickly to direct answers specifically.

DR. EISNER:  Okay.  I'll ask Dr. Szczech to address your question about compliance.

Dr. Szczech?

DR. SZCZECH:  Thank you very much.  We used the protocol-specified definitions of how we would analyze compliance at greater than 75 percent to pull this side together.  As you can see in the NDD population, we had 95 to 99 percent compliance based on each study in the NDD population, and --

DR. LEWIS:  Thank you.  It's easily read and answers that part of my question.

Is there any correlation, or did you see any correlation, between non-compliance and adverse events, or hemoglobin being out of range or rising too quickly?

DR. SZCZECH:  No, we did not see any evidence of that.

DR. LEWIS:  You didn't see it or you didn't do the analysis?

DR. SZCZECH:  We didn't see it.

DR. LEWIS:  So you have an analysis to show --

DR. SZCZECH:  I don't have an analysis --

DR. LEWIS:  -- that noncompliance didn't affect that?

FDA CRDAC                    July 15 2021                    260

DR. SZCZECH:  I don't have an analysis to show you via slide.  We can try to get you that information.

DR. LEWIS:  Thank you.

DR. SZCZECH:  But there --

DR. LEWIS:  Sorry?

DR. SZCZECH:  I'm done.  Thank you.

DR. LEWIS:  Ms. Alikhaani, you have a question.

(No response.)

DR. LEWIS:  I think you're muted still.

MS. ALIKHAANI:  This is Jacqueline Alikhaani.  I'm very concerned about the safety issues presented by the FDA and I agree with those. They seem very reasonable to me, and it seems like it should be possible to better address and remedy those safety concerns and risk factors for roxadustat.

I just want to know to the sponsor, I just have this question.  Are you willing and able to work to address those concerns and come back to us with the positive outcomes?

DR. EISNER:  Thanks for the question.  As has been stated, we've conducted the largest pivotal trial program in CKD anemia, and we have an abundance of data to adequately address the safety and efficacy issues that should enable, we believe, an approval of the product, with appropriate labeling that delineates the safety and efficacy and how the product should be used so clinicians and patients can make those decisions about it.

As Dr. Little mentioned, we are proposing a postmarketing, real-world data study to test our mitigation strategy of lowering the starting dose and lowering the hemoglobin target.  Because roxadustat is a titratable drug and hemoglobin can be measured very readily, we think this strategy will be highly successful, and we are fully committed to further confirming that in a postmarketing setting.

MS. ALIKHAANI:  Thank you.

DR. LEWIS:  Dr. O'Connor?

(No response.)

DR. LEWIS:  Dr. O'Connor, your hand is up.

Are you muted?

(No response.)

DR. LEWIS:  Okay.  You are muted, for sure now.

I'm going to go on for time sake, and I'll come back to Dr. O'Connor.

Mr. Conway?

MR. CONWAY:  Thank you very much.  We heard the FDA talk about, on one of their slides, that overcorrection and overshooting was an issue, and we've seen the sponsor's slide deck here on information that shows it met the first 7 days, where there is a safety concern, in my opinion, as a patient who's gone through all the different things that were described in terms of the burden of anemia.

I'm trying to figure this out because what it seems to me is that you're trying to give us assurance on the safety based on modeling, and then you're looking at a postmarket study involving patients and that type of thing.  But in plain language, here's my question.

In plain language, can you tell the patient community that's listening why you should move forward on this if you're relying on a model to show safety and efficacy by reducing dosing and mitigation measures as opposed to waiting and seeing what that actually looks like if you do some other type of study on that?

Why should this move forward into a patient population relying on modeling?  That I think is a fair question.  That's my question. Thanks.

DR. EISNER:  No.  Thanks for the question, and I'll ask Dr. Little to respond to it.

DR. LITTLE:  Dustin Little here.

Mr. Conway, there were a few parts to your question.  One part had to do with the reliance on modeling.  I'd like to quickly show you a slide that does demonstrate from a phase 2 study the concept that, indeed, we can see we will have lower rates of hemoglobin rise and fewer overshoots with lower starting doses of roxadustat.

100 milligrams 3 times a week was the highest starting dose used in the phase 3 studies

for patients who were not on ESA at baseline, and then our recommended starting doses are 50 or 40 milligrams 3 times a week.  So in addition to modeling data, we do have clinical data that supports that we will see the expected changes in hemoglobin with lowering the starting dose.

Then the other question that you asked had to do with what we can say to patients.  We heard from Dr. Pecoits and from some of the presenters during the open public forum that there is a substantial unmet medical need now for a drug like roxadustat that has an oral mechanism of action that's effective across broad subgroups of patients, including patients for whom ESAs are not particularly effective.

We consider that our data supports a positive risk-benefit ratio currently.  We did note some safety imbalances, especially thrombosis and vascular access thrombosis, which we've spoken about quite a bit today.  We consider that we can mitigate those risks.  We plan to study that.  But of course we do consider that those data should be

in the label, and there should be warnings about that in the label so that physicians can have the option and make considerations regarding the patients in front of them in their office.

**Questions to the Committee and Discussion**

DR. LEWIS:  Thank you very much.

I apologize to my other panel members, but we do have six questions, so I think we have to move on.  We did get in the unanswered questions from previously and a few other ones, so I apologize.  If you'll please put your hands down, we will proceed with the questions to the committee and panel discussions.

I would like to remind public observers that while this meeting is open for public observation, public attendees may not participate, except at the specific request of the panel.  After I read each question, we will pause for any questions or comments concerning its wording, then we will open the question to discussion.  We will start with question number 1.

Discuss the benefits and risks of roxadustat

in the non-dialysis-dependent population.

Are there any issues or questions about the wording of the question from the panel members?

(No response.)

DR. LEWIS: I don't see any hands, so if there are no questions or comments concerning the wording of the question, we will now open the question to discussion.

(No response.)

DR. LEWIS: The question is open to discussion. I guess I'll start since everyone's getting ready to get ready for it.

I do think that patients have spoken eloquently of the convenience of not going in to receive an EPO injection, and that's clearly a benefit. That's a convenience benefit. It's also a risk because it means patients could conceivably have any physician write them a year's supply of roxadustat and never get another hemoglobin.

They do need to go in once or twice a month for hemoglobins, and in many places that could be done stat, their injection or subcutaneous

injection given, so I think it has a benefit in a risk.

Otherwise, I'm very concerned about the safety signals that we see that are certainly not inferior to those with ESA.  I think ESA, if we had known all those safety signals, may have been handled differently when it came before the committee.

I do think that those are some of the risks that are very serious, and they could be magnified when it's not under study conditions, not having pill counts, not having people reminded three times to come get their hemoglobin, and you might see far more risks or adverse events associated with the risks that have already been described.

I'll pause there.  I think my first number one is Dr. O'Connor.

DR. O'CONNOR:  Thanks, Julia.

Obviously, I have concerns about efficacy on what we've seen, obviously, with hemoglobin going up; no issue there.  But I'm confused by the quality-of-life data, Julia, and just maybe as a

nephrologist, you and your team could tell me.

We've seen significant quality-of-life improvements with iron therapy, for example, in heart-failure patients.  Why is it that in such a large study, you can't detect signals of quality-of-life improvement, even with this significant augmentation in improving anemia?

The other thing I would say is the mitigation program, my guess, with a lower target, would it result in a slightly higher transfusion rate in the active drug and sort of wash out the difference between active therapy in the DD patients?

DR. LEWIS:  I guess that was a question to the nephrologists on the panel to some extent.  I would say that it is surprising that there isn't a quality-of-life signal, and one must wonder if there's something offsetting what you would expect to see.

You also made another point, which is although reduction in IV iron was suggested as a potential benefit, you're right that the cardiology

literature currently has some evidence that it is actually a benefit to be iron replete, so that's of interest as well.

Did you want to make any more comments, Dr. O'Connor?

DR. O'CONNOR:  No, that's good.  Thanks.

DR. LEWIS:  Do any other nephrologists want to?

(No response.)

DR. LEWIS:  Okay, then we'll go on to Dr. Bairey Merz, please.

DR. BAIREY MERZ:  Thank you, Dr. Lewis.

Noel Bairey Merz.  I wanted to mirror Dr. Lewis' summary.  I completely agree with her, and I would like to also point out and feel strongly about our citizens' testimonies and how important it is to them, and yet several pointed out that this would be less costly or even more cost-effective, and we were not presented with any cost data.  We're hearing how complicated this care is, and I think we would need to be careful about making decisions about cost without any cost data.

DR. LEWIS:  I'll also emphasize, if I may, that it is complex.  And I, to some extent, disagree with Dr. Fishbane's comments that the main reason that CKD patients are anemic is the logistics of going in for an injection.  It is one more trip in some cases, but they have to go in to get their hemoglobin checked.

I think the bigger factor is that the complex algorithms to safely deliver this drug are quite daunting, and I think many consider that to be a barrier and are also concerned about the risk-benefit of raising the hemoglobin in the population.  So I don't think it's just a logistics issue.

Our next question is Dr. Packer, or our next discussion.

Dr. Packer?

DR. PACKER:  Yes.  In my previous comments, I focused on the DD population with respect to all-cause mortality, but I do want to point out figure 9 in the FDA document, which shows the effects on all-cause mortality in the NDD

population, which is what we're talking about in this question.

In all studies, in the OT-plus-7 analysis, they're reporting a hazard ratio of 1.4, a confidence interval of 1.08 to 1.82.  That's primarily driven by the 001 study, which was the biggest of all and had the most deaths.  That had a hazard ratio of 1.68 and a confidence interval of 1.25 to 2.6.  These are comparisons with placebo with a window of on treatment plus 7 days.

DR. LEWIS:  Thank you, Dr. Packer.

Dr. Thadhani?

DR. THADHANI:  Thank you, Dr. Lewis.

To add to what you had mentioned, Dr. Lewis, with regards to the monitoring of individuals in the outpatient setting, is it fair to say that the likelihood of overshoot was more common in the outpatient -- or, I'm sorry, in the NDD population as opposed to the DD population?

At least from the FDA analysis, that appeared to be the case, which would be consistent with your comments about while outpatient at-home

FDA CRDAC                    July 15 2021                    272

medications may be a convenience, the likelihood of monitoring or paying more close attention to monitoring would be more difficult.  Thanks.

DR. LEWIS:  Does somebody from the FDA want to comment on Dr. Thadhani's comment?

Dr. Song?

DR. AYACHE:  This is Dr. Ayache.

DR. LEWIS:  Oh.  Dr. Ayache?

DR. AYACHE:  Yes.  In regard to the overshoot, we saw it in all of the studies in the NDD population because that's what's compared to placebo.  As you understand, the initial correction phase, there's overshoot as I show in my slide 16.

In the DD population, we saw overshooting actually in Study 613 and also in Study 64, which was conducted in the U.S., where the response to hemoglobin increase was higher in roxadustat than epoetin alfa.  Thank you.

Does that answer your question?

DR. LEWIS:  Thanks.

DR. THADHANI:  Yes, thanks you.  That was very helpful.  Thanks.

FDA CRDAC                    July 15 2021                    273

DR. LEWIS:  Thank you.  And I will remind everyone, including myself, to state my name before I speak.

Dr. Wang, you have a question?

(No response.)

DR. LEWIS:  Dr. Wang, you may still be muted.

DR. WANG:  Thank you.  Tommy Wang.

I just wanted to make a comment, and it could be a question --

DR. LEWIS:  It's a comment.  Sorry.

DR. WANG:  Okay.  It's a comment.

I just want to call out the fact, as has been noted a number of times, that for the NDD population, in particular, the interpretation of the MACE and mortality data are really influenced by whether you're looking at the on-study analysis, which was stated to be the primary analysis, or the OT-plus-7 analysis.

I guess the comment is that I do believe that differential dropout most certainly does contribute to some of the OT-plus-7 findings.  I

found it fairly persuasive that people who dropped out of these studies were sicker than the ones who stayed in.

The issue is whether that's enough to account for the difference. I guess the thought experiment is that there was differential dropout, but it was a certain proportion of the patients. It wasn't like there are three times as many patients that dropped out. You'd have to have a pretty large increase in risk in those who dropped out compared to those who stay in, I would guess on the order of 50 to 100 percent increase in the risk of MACE and all-cause mortality, to fully account for the difference between the OT-plus-7 and the on-study.

I guess, again, the comment is I'm not sure, although there are differences, that we can ascribe that large of a differential. Thank you.

DR. LEWIS: Thank you, Dr. Wang.

Dr. Soergel?

DR. SOERGEL: Thanks, Dr. Lewis.

David Soergel. I was actually going to make

a similar comment to Dr. Wang's.  I think it's important to remember that in the non-dialysis-dependent population, the sponsor compared to placebo, so we did see this non-random dropout from the trials and we ended up getting sicker patients followed through the end of the study, so therefore, the safety profile might reflect those differences.

The second thing that I found really interesting is we thought about these two populations as being two separate populations, but when you think of an individual patient transitioning from late-stage CKD into dialysis, I found the incident dialysis data very compelling, where hemoglobin was able to be more adequately controlled in those patients as the disease progressed.  Thank you.

DR. LEWIS:  Dr. Cho?

DR. CHO:  Hi.  My comment is that it's clear that roxadustat raises hemoglobin, but I'm not convinced that by decreasing the rise of the hemoglobin that we would mitigate the risk of

thrombosis, or infection, or other side effects.  I think there are mechanisms related to the HIF inhibition that may be predisposing the increase in thrombosis.  So I remain quite concerned about the risk mitigation not being able to lower the thrombosis rate.

DR. LEWIS:  Thank you, Dr. Cho.

I believe Dr. Cook.

DR. COOK:  Yes.  This is Tom Cook, and I can't directly address this question but I can address the methodology that I've seen today.

Actually, I find it strange that I even have to make this comment, but clinical trials are fundamentally about assessing causality, and we almost never -- well, I do, but most people in our community don't ever talk about things in terms of causal language.

We know that -- I hope we know -- correlation does not imply causation, which means that if we want to assess causality, we need to have some formal basis on which we make those decisions.  Randomization plus ITT, we know

guarantees that the associations that we see are either random or they're causal because we have removed confounding.

Now, the analyses that we've seen today, most of them, which are based upon these ascertainment windows are not based on ITT, therefore there's no causal basis for doing those analyses, and in my opinion, those analyses are hopefully confounded, and I will ignore them.

So the only analysis that I pay attention to are those which are based upon the full study period, and I would hope that my fellow panel members will seriously discount any of those based on the ascertainment window, especially the 7-day window.

In fact, I would argue I've looked at this question before, and Dave DeMets and I wrote an article in 2019 in JAMA, which we explicitly addressed some of these concerns. And in the data that I've looked at, it's very easy to have a 50 percent or more difference in apparent risk when one does this kind of arbitrary censoring based

upon time on treatment.

I mean, in fact, it's the tail wagging the dog because the reason that people don't continue treatment is usually related to their clinical status, and if their health is failing and they become at high risk for mortality, then they're likely to discontinue treatment. And therefore, these kinds of analyses are just fundamentally broken, and I will pay no attention to them. Thank you.

DR. LEWIS: But the analyses that showed safety signals that were the ITT analysis, you would put weight or at least --

DR. COOK: I would, yes.

DR. LEWIS: -- consider.

DR. COOK: Yes, I would.

DR. LEWIS: Thank you, Dr. Cook.

I believe Dr. Packer is next.

DR. PACKER: I just wanted to ask Dr. Cook a question. The concept of intention to treat in any trial is that you start out with some assurance of balanced populations at the start of the study

because of randomization, and then you follow all patients for the planned duration of therapy and count all events, whether people stay on treatment or not.

When you do that, that's a true ITT analysis, and what we're seeing today doesn't approximate that standard, either the on-treatment, the on-treatment plus 7 days, or the on-treatment plus 28 days.  None of those approximate a true ITT analysis.

So if you wanted to really adhere to ITT, you would discount everything we've looked at today in the NDD population.  Now, the DD population is a little bit different because the retention rates in the two groups are actually similar or even favor epo.

Dr. Cook, do you really think that on-treatment here represents an intention-to-treat population?  I don't think so.

DR. COOK:  No, I agree a hundred percent. This is Tom Cook.  I agree a hundred percent.

DR. PACKER:  Yes.

DR. COOK:  What Dave DeMets and I say in our 2019 JAMA paper is if you see a difference or the lack of difference between two arms, it's due to one of three things, either chance, causation, or confounding.  And what randomization does, is it eliminates the confounding.  So now you look at your confidence intervals and your p-values, and you say this likely could be due to chance.  And if you rule out chance, then you know it's causal.

If I condition on being on treatment plus some period of time, I actually reintroduce confounding for the very reasons that have been discussed, except they haven't been framed in terms of causal language.  In fact, I would argue that even in the DD population --

DR. LEWIS:  If I may, I think we're straying from the question --

DR. COOK:  Yes.  But the question is how do you evaluate the evidence that's in front of us?

DR. LEWIS:  Yes.  Thank you.

We have six questions and 30 minutes, so I think I'm going to move on to the second question,

FDA CRDAC                    July 15 2021                    281

and perhaps some of you, Dr. Wang, can put your comments into the second question.

I'm now going to read the second question.

If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target hemoglobin, starting dose, titration scheme, and monitoring paradigm.

If you favor changes to the treatment algorithm to enhance safety, discuss whether they should be tested prior to approval, after approval, or not at all.

Are there any questions about the wording of the question?

Dr. Cook, do you have your hand up for a question about the wording of the question number 2?

DR. COOK:  No, I just forgot to put it down. Thank you.

DR. LEWIS:  Okay.

So if there are no questions or comments concerning the wording of the question, we will now

FDA CRDAC                    July 15 2021                    282

open the question to discussion.

Dr. Crowley?

(No response.)

DR. LEWIS:  Dr. Crowley, you're on mute.

DR. CROWLEY:  Yes.  Thank you.

I think this concept is really a very desirable patient-centered approach to treatment of anemia, and I think we can all agree that there's demonstrated efficacy.  But it seems like the real challenge here is can we control the risks that are associated with any ESA, including roxadustat in this particular consideration.

In terms of these modifications of the treatment algorithm, I guess the question is, can the prescription of this drug come with sufficient instructions and confidence that these would be followed, excluding certain patients who would be at extremely high risk for prothrombotic agents, for ensuring that providers know what they're doing with this medication and have a system in place to monitor?  It's not enough just to prescribe it, but you have to have a recommended monitoring process.

Can we have sufficient public education such that people appreciate that it's not that you're just going to get a pill and you don't need monitoring; you're still going to need monitoring. That really is a concern, that people think I can just take the pill and I don't have to get my hemoglobin checked.

So I think those are the concerns that I would have with regard to how can we mitigate these risks. I think it's possible, but that's really where I worry most, I think.

DR. LEWIS: Thank you, Dr. Crowley.

Dr. Packer?

DR. PACKER: Yes. I think what the sponsor is proposing seems like a very reasonable approach that needs to be tested. What we don't know is the degree to which the risks that we see, whether it be thrombosis, all-cause mortality, infection, whether these risks are related to the rapid increase in hemoglobin or whether it's due to potentiation of hypoxia-inducible factor 1 alfa. That uncertainty is not going to be resolved by a

FDA CRDAC                    July 15 2021                    284

stimulation; that uncertainty needs to be resolved by an actual trial.

DR. LEWIS:  I agree completely, and I think the trial needs to be prior to approval, and the hypothesis that the dose adjustments and different algorithms will mitigate those safety signals needs to be tested.

Further, I would actually think there's enough of a safety signal that there may need to be a formal dedicated cardiovascular study not like what was demanded of the hypoglycemic drugs.  I also have a concern about their ability to be able to do the postmarketing study because of not being able to find enough patients left on ESA to match.

So all those things concern me in answer to those questions.

Dr. Parsa?

DR. PARSA:  I was about to lower, but I guess I'll reiterate it because what I was thinking was also said by others.  Sorry.  This is Afshin Parsa.

I think that, yes, as mentioned before, the

FDA CRDAC                    July 15 2021                    285

ability to understand the risk here is we simply don't have sufficient data to make anything that's definitive enough.  The suggestions that were made in terms of changing the hemoglobin target, starting dose, all sound reasonable, but I think those need to be really assessed prior to approval.

I have concerns about trying to do this in a postmarketing setting once it's set free out there without being properly controlled.  I don't think we're going to get the necessary information without doing the proper trial first.

DR. LEWIS:  Thank you, Dr. Parsa.

Mr. Conway?

MR. CONWAY:  Thank you very much.  I just wanted to say I think Dr. Crowley characterized perfectly, at least from my standpoint as an [inaudible – audio gap] -- leader.

The frustrating thing here is the patient burden that's been articulated, especially during the public comment, I believe is a hundred percent accurate.  And I have to tell you, having lived with anemia, trying to get a transplant, trying to

keep a full-time job -- at the time I was the deputy secretary for the State of Virginia -- just to make it [indiscernible - audio feedback] -- Friday, come Monday, my epo started tapering down.

It's a tremendous burden, and what we're looking at is a vehicle through which patients could theoretically have less burden, which is [inaudible].  So that's kind of the idea.  However, when we get down to the drug itself that we're talking about, I'm very concerned about this idea of taking the data that we have and try and extrapolate from that, through a model or through some other kind of tangential effort, in my opinion, to show that there is safety.

So the frustrating thing in listening to this, for me, is that the patient burden is well documented, in my opinion, but the burden is on the sponsor to show why this should move forward before it's tested out as opposed to waiting and doing that postmarket.  I think we should get it checked out before it goes into patients.  I really do.  Thank you.

DR. LEWIS:  I also will make a comment that once we know what the appropriate dosing is and perhaps the other study has done it, another consideration is a REMS program, where only physicians who have gone through a certain amount of education are allowed to prescribe it.  You do one month's supply, and if the patient doesn't show up for their hemoglobin, to make sure that the dose is still correct for them.  They run out.

That's another consideration that the FDA could consider to mitigate some of the concerns that have been expressed by the committee.

Are there any other comments?

Mr. Conway, your hand is still up, and I wasn't sure if it was still up or you had another comment.

MR. O'CONNOR:  No, I don't.  Thank you very much.  I'll take it down.

DR. LEWIS:  Okay.  I'm going to make an attempt to summarize the comments on question 1 and question 2, and just for time sake, I decided to put them together.

I think the multiple members of the committee have expressed the benefit of less travel to get injections, especially for patients who live far away, and I also really appreciate the patients who made that clear to us during our open session, so we understand that part of it.

I think that several committee members have expressed concerns about the safety of the drug itself, such as the concerns about mortality expressed by Dr. Packer, the concerns about overshoot expressed by Dr. Thadhani, and the concerns about even if you look at comparing the OT—7 to the on-study, that there would have to be a tremendous increased risk to explain the mortality in the people who dropped out.  Another benefit I forgot to mention that Dr. Soergel mentioned was the very big benefit of an instant hemoglobin is better in people transitioning from CKD and non-dialysis to dialysis.

There is also obviously a concern about other adverse events that are not related perhaps to the hemoglobin or to the proposed mitigation

strategy because of other effects of HIF inhibitors that could contribute to infections and other things.

We appreciate Dr. Cook's statistical input on the analysis that are most informative to look at. I think there were several people that were concerned about doing the study after postmarketing, and that maybe prior to approval, finding the right dose and seeing if it mitigates some of the adverse events might be important. And lastly, I mentioned considering a REMS program.

If there is no further discussion -- and I'll pause in case someone wants to raise their hand or feels I missed something in that summary -- we will move on to question 3, which is a voting question, and Dr. Joyce Yu will provide the instructions for the voting.

DR. YU: Thank you.

Hi. This is Joyce Yu. Question 3 is a voting question and voting members will use the Adobe Connect platform to submit their votes for this meeting. After the chairperson has read the

voting question into the record and all questions and discussion regarding the wording of the vote question are complete, the chairperson will announce that the voting will begin.

If you are a voting member, you will be moved to a breakout room. A new display will appear where you can submit your vote. There will be no discussion in the breakout room. You should select the radio button that is the round circular button in the window that corresponds to your vote, yes, no, or abstain. You should not leave the "no vote" choice selected.

Please note that you do not need to submit or send your vote. Again, you need only to select the radio button that corresponds to your vote. You will have the opportunity to change your vote until the vote is announced as closed. Once all voting members have selected their vote, I will announce that the vote is closed.

Next, the vote results will be displayed on the screen. I will read the vote results from the screen into the record. Next, the chairperson will

go down the roster and each voting member will state their name and their vote into the record. You can also state the reason why you voted as you did, if you want to.  However, you should also address any subparts of the voting question, if any.

Are there any questions about the voting process before we begin?

(No response.)

DR. LEWIS:  Thank you, Dr. Yu.

If there are no questions, I will read the voting question.

Should roxadustat be approved for the treatment of anemia due to chronic kidney disease in adult patients not on dialysis?  If not, provide your rationale, as well as recommendations for additional data and/or analyses that would support a favorable benefit-risk profile and approval of roxadustat.

Are there any questions about the wording of the question?

(No response.)

DR. LEWIS:  If there are no questions or comments concerning the wording of the question, we will now begin the voting on question 3.

(Voting.)

DR. YU:  The voting has closed and is now complete.  Once the vote results display, I will read the results into the record.

(Pause.)

DR. YU:  Thank you.

The vote results are now displayed.  I will read the vote totals into the record.  The chairperson will go down the list and each voting member will state their name and their vote into the record.  You can also state the reason why you voted as you did, if you want to.  However, you should also address any subparts of the voting question, if any.

The vote total is 1 yes, 13 noes, and zero abstentions.  Thank you.

DR. LEWIS:  Thank you.

We will now go down the list and have everyone who voted state their name and vote into

the record.  You may also provide justification for your vote if you wish to.  However, please remember to address any of the subparts of the question that correspond to your vote.

We'll start with Dr. O'Connor.

DR. O'CONNOR:  Christopher O'Connor.  I answered no.  I'm concerned about the totality of information with respect to adverse safety signals, and I don't believe we understand whether the mitigation strategy dose will be safe.  Thank you.

DR. LEWIS:  Thank you.

Dr. Crowley?

DR. CROWLEY:  Susan Crowley.  I voted yes. I think that with the significant patient burden of anemia, the associated risks with any ESA that are similar in roxadustat, a fair way potentially to do this is to allow patients and providers to do shared decision making under a REMS program to try to mitigate some of the risks that may be increased with roxadustat.

I thought that was a potential opportunity to allow for the use of this medication to meet an

unmet need, to address patient suffering, and to try to control risks.

DR. LEWIS:  Thank you.

Dr. Cook?

DR. COOK:  Yes.  Thomas Cook.  I voted no, and this was difficult for me.  But ultimately I had to listen to the people who thought that the safety profile wasn't established, especially for the proposed new dosing strategy that the sponsor is discussing.  I didn't think that their observational study that they proposed would actually answer the questions of interest.  Thank you.

DR. LEWIS:  Thank you, Dr. Cook.

Dr. Kasper?

DR. KASPER:  Dr. Ed Kasper.  I voted no.  I would like to see the mitigation strategy tested prior to a revote or representation of this particular drug.

DR. LEWIS:  Thank you, Dr. Kasper.

Dr. Packer?

(No response.)

DR. LEWIS:  Dr. Packer?

DR. PACKER:  Sorry.  I was needed.

Milton Packer.  I voted no.  I share the reason that Dr. O'Connor, Dr. Cook, Dr. Kasper have already expressed.

I noticed that the sponsor has done all the clinical trials using a very specific strategy, but now would like approval for a strategy which has been developed only as a simulation.  If they really want people to use the new strategy in clinical practice, they really do need to test it and show its efficacy and safety.

DR. LEWIS:  Thank you, Dr. Packer.

Dr. Wang?

DR. WANG:  Yes.  Thomas Wang.  I voted no, again, for the reasons stated by my colleagues.  I did find the safety data not clear-cut for the reasons mentioned, but the totality of the safety data somewhat unsettling.  I was concerned that more definitive data to address this question would have been difficult to obtain in the postmarketing setting, so that's the reason for my vote.

DR. LEWIS:  Thank you.

Dr. Thadhani?

DR. THADHANI:  Thank you.  Ravi Thadhani.  I voted no for the reasons stated.  I found the analysis, with the biased included, difficult to interpret.

The only comment, without being redundant, I would make is in looking at how to move forward, I think we just need to acknowledge that this data set of non-dialysis patients is and will be the largest data set we have with regards to efficacy and safety, and before jumping into yet another clinical trial, to look carefully as to what clearly we would need in the most efficient fashion to get this to the finish line if that's the direction that others and the agency feel is possible.  Thank you.

DR. LEWIS:  Thank you, Dr. Thadhani.

Dr. Conway?

MR. CONWAY:  Paul Conway.  I voted no, with difficulty.  As much as I am a champion of patient care, choice, and innovation, I did not feel as

though the safety information presented was adequate. And I would like to see the mitigation strategy tested before we roll out to patients that are very vulnerable in the middle of COVID-19, but also patients that depend upon vascular access and other things to keep life going. I think there's higher burden to show for safety.

DR. LEWIS: Thank you very much, Mr. Conway.

Dr. Cho?

DR. CHO: Hi. Leslie Cho. I voted no for the reasons that everyone has stated. I do not think the rise in hemoglobin is the cause of all thrombosis and all side effects. It's uncertain to me whether that really is the cause and whether it really is HIF inhibition that may be the cause of the thrombosis. Until we test the lower dose in patient population, I find it not a viable solution.

DR. LEWIS: Thank you, Dr. Cho.

Dr. Merz?

DR. BAIREY MERZ: Hi. Noel Bairey Merz. I voted no. I thought it was quite a clear safety

signal and an unclear convenience or access signal. I also thought that FDA approval on modeling mitigation strategies would be stepping out of the bounds of certainly what we traditionally do.

DR. LEWIS:  Thank you, Dr. Merz.

Ms. Alikhaani?

MS. ALIKHAANI:  Yes.  Jacqueline Alikhaani here.  I voted no.  It was a very tough decision for me because I really value the patient voice, the consumer voice, and the testimony of the patients was very strong and clear that there's a need to get improved care for them, and improving care means safety first, to me.

I have family members living with this dreadful disease and it matters a lot on many levels for me, so it's not an easy decision to say no.  I think we do need major risk mitigation and accountability assurances to be in place to create the right pathway for approval for roxadustat.  So I hope we can do that in the future.  And whatever is done, I hope that we can also have a team of patients, and caregivers, and family members as

part of the leadership team for the trial, and the research to make sure their voices are there and they're completely informed about all of the different issues at stake, especially safety.

DR. LEWIS:  Thank you.

I voted no, and I agree with all my colleagues' previous comments.

Dr. Moliterno?

DR. MOLITERNO:  Oh, you're good, Dr. Lewis.

Hi.  David Moliterno.  I voted no.  If I rewrote the question, which I won't, I think I may have answered it differently.  I do think the drug has merit, but the question posed was the data given to us as presented by the applicant.

I think, in short, I agree with Dr. Thadhani.  I think there's a rich data set here that needs to be dwelled on further and dug into. You remember my comment at the very beginning to the agency, and Dr. Unger's response that they just received this risk mitigation strategy and those related data recently.  So I think it will take more digging, and more time, and more thinking.

FDA CRDAC                    July 15 2021                    300

Maybe this group will have the opportunity to reconsider this compound at a future time.

DR. LEWIS:  Thank you.

Dr. Parsa?

DR. PARSA:  This is Afshin Parsa, and I voted no.  Having treated many patients, I certainly empathize with the logistic challenges and the patient burden.  I really wanted this to be available as a choice for treatment, but I'm simply too concerned about the safety signal and think that we still need to work out more of these details before this can go forward.

DR. LEWIS:  Thank you very much.

I'm going to summarize quickly.  I think that the consensus is that the safety signal is concerning to the panel members, concerning enough that they feel that a mitigation study needs to be done prior to approval.  I think that many people, including Dr. Crowley who voted yes, but many other people -- and I really appreciate our consumer and patient reps here -- are very empathetic to the patient's voice of wanting an oral or an easier

therapy, but not at the expense of unknown or perhaps negative safety profile.

I think it's also important to note that there is concern about effects that will not in any way be related to the hemoglobin rise or to the mitigation study that's being proposed to be done at the recommendation of this committee prior to approval.

I think the points were well made that there should be a very careful consideration for what will most efficiently and effectively answer this question in a study, and I applaud us being reminded that we should include patients' and families' voices in feedback on that design as well.

We will take a short five-minute break now. Panel members, please remember that there should be no chatting or discussion of the meeting topic with anyone during the break  .  We will resume at 4:35 Eastern Standard Time.

(Whereupon, at 4:30 p.m., a recess was taken.)

DR. LEWIS:  Okay.  We will now go on to question 4.

Discuss the benefits and risks of roxadustat in the dialysis-dependent population.

Are there any issues or questions about the wording of this question?

(No response.)

DR. LEWIS:  If there are no questions or comments concerning the wording of the question, we will now open the question to discussion.

Will the panel members please raise their hand to participate in the discussion.

Dr. Packer?

(No response.)

DR. LEWIS:  Dr. Packer, you're still muted.

DR. PACKER:  Julia, I really apologize.  I keep forgetting to unmute myself.

Here I think the data are a little bit easier to interpret because the differential dropout issue is less marked.  In fact, the retention rate was actually greater in the epo group than the roxadustat group.

So we don't have a lot of the complications of the data that we had in the NDD population, and here we have  a comparison with a drug which is already labeled for increase in mortality and increase in risks and we're seeing estimates here that are either similar to or greater than those seen with epo.

I guess I'm really concerned about Study 613.  613, as the a sponsor said, had a little bit higher dose of roxadustat and maybe a little bit lower dose of epo, and the mortality differences became even more marked.  So there's something that this drug is doing that is maybe different than epo.  And we already know about epo's risks, and they're in the label, so this is a source of concern.

DR. LEWIS:  Thank you, Dr. Packer.

Dr. Crowley

DR. CROWLEY:  Yes.  Thanks.

As Dr. Packer was saying, I think we can have a little greater confidence in the study results because we don't have that attrition bias,

and I think we see, at least for the primary analysis for MACE, fairly neutral results.

I think in addition to that, we can have great confidence in terms of the control, the risk mitigation, because patients are coming three times a week for those that are doing in center, or if they're at home, we know they're on home dialysis, they're connected with a clinician, so their follow-up, I think we can have more confidence that patients will understand what this medication is about and that they require monitoring, and we have an opportunity for doing that monitoring.

For here, I feel a lot more confident with this for the dialysis population, although I see the greatest opportunity for the non-dialysis CKD population.

DR. LEWIS:  Thank you.

Dr. Wang?

DR. WANG:  Yes.  Tommy Wang.

I just wanted to call out the helpful comments of Dr. Cook in the last session about the potential strong effects of differential dropout,

which we talked at length about for the NDD population.  Based on his comments, I would say here, as previously pointed out, the attrition rates were much less different and we have an on-study analysis in the DD population shown in figure 12 of the FDA analysis, which show some confidence intervals for MACE and all-cause mortality that exclude one in the unfavorable direction for roxadustat.

That finding makes me concerned.  And on top of that, as Dr. Packer has noted, the comparison group here is already a drug for which there have been safety signals and a warning attached to it. So again, I think in its totality these safety data are not satisfying.  Thanks.

DR. LEWIS:  Thank you, Dr. Wang.

Dr. O'Connor?

DR. O'CONNOR:  Chris O'Connor.  I just would add to what was said previously, that really applies to the DD populations, that the extremely important RBC transfusion rate advantage is less in this population.  With the mitigation strategy

dose, it's unclear, if you look at CO-46, whether that would even hold up with the lower dose. I think one of the added benefits of this therapy may be attenuated.

DR. LEWIS: Thank you.

Dr. Parsa?

DR. PARSA: Afshin Parsa. Yes. Here I'm also seeing that the risk profile is easier to assess, as others have said, and maybe not as worrisome. But then the question becomes, what is the benefit?

We still have an increase, obviously, and some trend towards death in Study 613. The Kaplan-Meier increases over time, suggesting that maybe it's not just rate of change of hemoglobin, but not enough data to really conclude anything based on that. But there's still increased thrombosis, access clotting, which we all know as a nephrologist is a nightmare to deal with, as well as the patients, it's worse for them.

That's still a question, what's the benefit here when we're still seeing a signal for risk?

The convenience of the PO and decreasing the patient burden, which is high, is really not modified that much in this circumstance.

However, one subgroup that I was thinking in which it might be different here are 9 or 10 percent of the dialysis population that are resistant to epo treatment, so really high ferritin, or they're just not responding, or you can't get them well.

In that smaller subgroup, there might be some potential benefit here based on these signals that could mitigate some of those [indiscernible], thrombosis, or other risks that we've seen, but certainly not as a whole. But I do want to make the distinction between that subgroup and the rest of the population.

DR. LEWIS: Dr. Thadhani?

DR. THADHANI:  Thank you, Dr. Lewis.  Ravi Thadhani.

Just to clarify the transfusion issue, I think the comment was made, and that is correct, that the benefit of this treatment is treatment of

anemia and obviously reduction of transfusion.  I think an aggregate may not have been seen, but I believe -- and again I apologize that I may not have all the details -- in Study 064, there was a reduction in transfusion, which is the US-only study, I believe, obviously paying close attention to that, including over 40 percent of African Americans in that particular study.

I understand the design was such that rescue therapies involved ESA and then transfusion for the roxa arm.  But that said, there was, I believe, a reduction in transfusion in 064 but was not seen in 063 and 002.  Thank you.

DR. LEWIS:  Dr. Packer, I believe your hand is up again.  I don't mean it negatively.  I'm actually asking you is it up again?

DR. PACKER:  No, it's not.  I'm sorry.

DR. LEWIS:  Dr. Crowley, your hand is up.  Okay.

Dr. Cook?

DR. COOK:  Yes.  I just want to comment that it's not my concern about the differential in

dropout, it's the rate of dropout.  It still breaks ITT if the rates are the same but the rationale underneath is different, the reasons for dropout. So I'm not convinced just because they're the same that that actually improves my understanding of the overall result.

DR. LEWIS:  Thank you, Dr. Cook.

Dr. Soergel?

DR. SOERGEL:  Thanks, Dr. Lewis.

My view is that based on the FDA-agreed analysis, which is beyond therapy plus 7 days, the data look reassuring for MACE and for all-cause mortality.  There's clear efficacy in this population, and there's been little innovation in this space in many years.  So I think there's a place for this medicine, as was commented earlier; so that's my view.  Thank you.

DR. LEWIS:  Dr. Cook your hand is up.  Do you have another comment?

DR. COOK:  No.  Sorry.  I forgot to put it down.

DR. LEWIS:  I wonder if our patient

representative or our consumer representative have a comment.

(No response.)

DR. LEWIS: While they're thinking, Dr. Packer?

DR. PACKER: Julia, could I ask a question? There appears to be a group of patients who are resistant to erythropoietin, and these were patients with a lot of inflammation. It's a subgroup. I'm not certain how big the subgroup is, but these are patients for which epo is not a particularly viable option because they don't respond to it, and they do respond to this drug.

I'm just wondering whether there is a subgroup of the dialysis-dependent patients that would actually have an option here that they don't have with epo because of epo resistance.

DR. LEWIS: Thank you, Dr. Packer.

Mr. Conway?

MR. CONWAY: Thank you. I'm actually wondering the same thing, and based on the data that was presented, it could be an effective tool

for part of that population.

Incredibly, for me, as an advocate, I believe it should be tested out before it's deployed.  I'm not satisfied with the safety information.  It's close, but I'm just not comfortable of it holding up as a package in terms of what we're looking at.  Thank you.

DR. LEWIS:  Thank you.

Ms. Alikhaani?  I should ask you for permission to call you Ms. Jacqueline so I don't destroy your name every time.  I apologize.  I'm really bad at names, but you have your hand up.

(No response.)

DR. LEWIS:  Ms. Alikhaani?

(No response.)

DR. LEWIS:  You may be offline.  Actually, I don't see her phone.  While we're waiting to get her back online, I'll make a quick comment.

I also was impressed with the data that showed that the roxadustat group could raise their hemoglobins in the epo-resistant kind of inflamed group, but what's surprising is that it doesn't

translate, or it doesn't obviously translate, or wasn't physically translatable, into any harder outcomes.  In fact, there were more infections and more thrombosis.

I asked specifically if they had seen any positive things besides a higher hemoglobin -- which is of value, don't get me wrong -- and I guess they did not or they did not do the analysis.

I think we're back online.

Ms. Alikhaani?

MS. ALIKHAANI:  Yes?

DR. LEWIS:  Your question or comment?

MS. ALIKHAANI:  I think I got kicked out again.  Can you hear me?

DR. LEWIS:  Yes.  Sorry we got you kicked out; glad we got you back.

MS. ALIKHAANI:  Okay.  Thank you.

I'm a big champion of diversity in clinical trials because every patient is an individual and I think that matters a lot, and the more diversity you have, the better.  I was a little bit dismayed that we had such a small amount of African

Americans in the trial who documented as having the greatest disparities in care for heart disease and other related conditions.

So I really think education and awareness is very important, in general, for these conditions -- not this medication -- and the more we engage with the community, and the patients, the caregivers, the family members, and everybody involved in the trial, and the research from start to finish, I think we're going to have better outcomes all around.

I think it's really critical, and that way we can make sure the trials are designed with the patients right up front with everybody else, and also not just on the table but also at the leadership table for the trials.  Hopefully that way we can get these kinds of treatments voted in because I really wanted to vote for this; I really did.  I was very hopeful.  So hopefully we can get something done in the future.

DR. LEWIS:  I particularly appreciate that comment.  I actually wrote it down as an intended

comment myself, but for time sake hadn't mentioned it.

For the non-nephrologists, African Americans make up about 12 to 15 percent of our population, but 33 percent of our dialysis population.  It tends to also track with social determinants of health, which are known to affect medication adherence.  I think the underrepresentation, particularly in the trials overall, of only 8 percent, blacks are of concern and unfortunate, and hopefully something that could be addressed in the efficient design of a new trial.

Thank you for bringing that up.

MS. ALIKHAANI:  Thank you.

DR. LEWIS:  Are there any other comments?

(No response.)

DR. LEWIS:  Okay.  If there are no other comments, I will try to summarize our comments to this question.

I think that, in general, the committee felt that because there wasn't an uneven follow-up as much in this trial, in fact, if anything, a little

bit more ESA retention but still not a big differential, that the data was easier to interpret.  However, the on-study data and the 613 study were of particular concern since many of the MACE things excluded one unfavorable direction for roxadustat, so that remains a concern.

Then there was an issue of what potential benefit is if there were not as big a reduction in transfusions.  It was also confounded by the ability to receive ESA.  Then, of course, for the patients that are on hemodialysis and going to a center, the benefits of less travel, et cetera, would be missing.  The potential safety signal of access clotting was particularly noted to be lifelines for our patients now who are fortunately living long enough on dialysis compared to decades ago, that they do run out of the access.

One group of interest to several panel members were those who are resistant to epo and the potential for this drug to  particularly help those patients have a higher hemoglobin.

Let me just glance down the way.  Also, I

think the point was made for the first time that it's very important, like we just finished talking about, the underrepresentation of African Americans in the global trials as a whole. Study 064 did have a good representation but had increased deaths, so it still remains a concern.

If there's no further discussion on this topic, I will now read question number 5.

If you have concerns regarding these risks, discuss whether you believe they could be addressed through modification of the treatment algorithm, for example, changes in target hemoglobin, starting dose, titration scheme, and monitoring paradigm.

If you favor changes to the treatment algorithm to enhance safety, discuss whether they should be tested, 1) prior to approval, 2) after approval, or 3) not at all.

Are there any issues or questions about the wording of the question?

(No response.)

DR. LEWIS: I don't see any hands raised. So if there are no questions or comments concerning

the wording of the question, we will now open the

question to discussion.  Panel members, please

raise your hand and identify yourself.

Dr. Parsa?

DR. PARSA:  Afshin Parsa.  Just following up

on what I've said in response to question 4, which

leads into this, it is not so much in terms of the

treatment algorithm being different than what was

proposed as an update from the applicant, but so

much the risk-benefit ratio and then the subgroup

of those who are epo resistant.

I do think that since the risk is modest

overall, there's still concern.  People with epo

resistance certainly can be an issue, and I don't

mean someone who's epo resistant for a few weeks

because of a minor infection, but those that are

really more chronically hyporesponsive, requiring

high iron and still not being able to get a stable

hemoglobin level there.

There is the potential that that group could

fall in the category of -- if one defines it

properly and has reasonable thresholds, or there is

[indiscernible] and forgets it, to then have some postmarketing follow-up to see how they do while the rest is working there.  But even though it's a smaller number of dialysis patients, it's still not an insignificant number, and it could change the risk-benefit ratio, potentially.

DR. LEWIS:  Thank you, Dr. Parsa.

Do other committee members have comments on this question?

(No response.)

DR. LEWIS:  You could be able to comment again on whether you think the treatment algorithm to enhance safety should be done prior to approval, after approval, or not at all because you might have a differential feeling about it than you would for the non-dialysis population.

Dr. Packer?

DR. PACKER:  Yes.  Julia, I think you're asking us to express our views so that it makes it easy for you to summarize the sense of the committee.

I think the principle is that we described

earlier, that the proposed changes in dosing are based on simulations, and we don't know, in the absence of clinical trial evidence, whether those proposed dosing changes will mitigate the risks.

Then there's the other issue that it is possible that the proposed dosing changes will not match the efficacy of epo. We already have a situation where in our randomized trials, the retention rate is higher in the epo group than the roxadustat group, and if we lowered the dose of roxadustat, will that retention difference become even greater.

So essentially, the proposed dosing regimen should be tested in a clinical trial as opposed to being relying on the simulation.

DR. LEWIS: Thank you, Dr. Packer.

Dr. Crowley, do you want to comment on whether you favor any postmarketing study, premarketing study, for the dialysis-dependent population?

DR. CROWLEY: Yes. I guess the sponsor had eluded to, or stated actually, that they were

planning to reduce the dose.  And perhaps an assumption I'm making is that they would be in fact potentially trying to capture that data to inform us about specifically the question that was just raised, about whether efficacy is maintained and risk is reduced.

DR. LEWIS:  Okay.

DR. CROWLEY:  So I don't know if we can make it a contingency.

DR. LEWIS:  Okay.  Thank you, Dr. Crowley.

Mr. Conway?

MR. CONWAY:  Sure.  Thank you very much.

I think there could be efficacy.  Again, I kind of go back to the idea that the mitigation measures in modeling do not substitute for testing prior to approval.  Having said that, I really do understand the patient burden and the patient need here -- it's palpable -- but I think that we need to see that, especially in regard to issues related to VAT and considering that this population, in particular, is highly vulnerable.

I'd also like to echo the larger point that

has been made about diversity in the trials.  It's actually why at the front end of the conversation today, I brought up the issue about the African American population because I wanted to know from some of the nephrologists whether or not, based on the safety data they were looking at, this is something they would engage African American patients on in a clinical setting since they are such a huge part of the dialysis patient population and our membership, the American Association of Kidney Patients.

I just don't think that it lines up with confidence on the safety side before you put this out in a postmarket study situation.  Thank you.

DR. LEWIS:  Thank you, Mr. Conway.

Dr. Thadhani?

DR. THADHANI:  Thank you, Dr. Lewis.

Ravi Thadhani.  Certainly the comments that have been made are absolutely critical.  If we look at the primary analysis, I think, as was stated before for MACE on the OT-plus-7, the neutral effects, the main issue we're dealing with here is

the thromboembolic events.

I do believe there is a strong association, with the emphasis on association, between starting hemoglobin and rate of rise with that particular complication, which in a monitored setting would be, I would say, easier to manage unlike in the previous discussion.  Thank you.

DR. LEWIS:  Thank you.

Dr. Merz?

DR. BAIREY MERZ:  Thank you.

Noel Bairey Merz.  I have to agree with Ms. Alikhaani that the very low rate of testing in African Americans makes me concerned about safety signals that could be different.  I have a lot of experience about clinical trials that did not enroll enough women, and it is only 10-15 years after FDA approval we find out that it's not safe in women.  There are important facts as well as genetic differences.  It's not a stand-alone, but it is a comment, and I wanted to support her concern.

DR. LEWIS:  Thank you.

If there is no further discussion on this discussion question, we will now move on to question 6, which is a voting question, but I will summarize our discussion before we do that.

In principle, I think that, again, the committee is still hearing the voice of patients wanting an alternative, but remains concerned about the safety signal and the ability of just reducing the dose to resolve the issue of that safety signal, whether it may even be related to it or whether it would be feasible to actually conduct it in a postmarketing setting where the efficacy could be less and the retention in the roxadustat group could be even less, and make it more difficult to assess that in the way they proposed to do the postmarketing evaluation.

I think people do feel more comfortable that for the in-center patients, the mitigation modeling could be implemented more easily. But again, this is a very vulnerable population and, again, it was emphasized that it also has a insufficient data base in what is a very important population in the

U.S., African American patients.

So I am now going to a voting question, question 6, and I'm going to turn it to Dr. Yu.

DR. YU: Hi, everyone. This is just a reminder, again, before we vote, question 6 is a voting question. Voting members will use the Adobe Connect platform to submit their votes for this meeting. After the chairperson has read the voting question into the record and all questions and discussion regarding the wording of the vote question is complete, the chairperson will announce that the voting will begin.

If you're a voting number, you'll be moved to a breakout room. A new display will appear where you can submit your vote. There will be no discussion in the breakout room. You should select the radio button that is the round circular button in the window that corresponds to your vote, yes, no, or abstain. You should not leave the "no vote" choice selected.

Please note that you do not need to submit or send your vote. Again, you need only to select

FDA CRDAC                    July 15 2021                    325

the radio button that corresponds to your vote. You will have the opportunity to change your vote until the vote is announced as closed.  Once all voting members have selected their vote, I will announce that the vote is closed.

Next, the vote results will be displayed on the screen.  I will read the vote results from the screen into the record.  Next, the chairperson will go down the roster and each voting member will state their name and their vote into the record. You can also state the reason why you voted as you did, if you want.  However, you should also address any subparts of the voting question.

Are there any questions about the voting process before we begin?

DR. PACKER:  I have just a question.  The nature of this question is for the general treatment of adult patients on dialysis; is that fair?

DR. LEWIS:  That is how I would interpret the question.  It's not for a subgroup.

Does anyone from the FDA want to confirm

that interpretation?

DR. UNGER:  This is Dr. Unger.  Yes, it's for a general population.  We're not talking about any subgroups.

Does that answer your question, Dr. Packer?

DR. PACKER:  Yes, it does.  Thank you.

DR. LEWIS:  I'm going to read the question.

Should roxadustat be approved for the treatment of anemia due to CKD in adult patients on dialysis?  If not, provide your rationale, as well as recommendations, for additional data and/or analysis that would support a favorable benefit-risk profile and approval of roxadustat.

Are there any further questions or issues about the wording of the question?

Dr. Parsa, your hand is up.

DR. PARSA:  I was asking the same question that was just asked in terms of how does one put in the contingency or subgroup for the reasons that I had raised before, in terms of does one have to vote for the population as a whole or do we just keep that as a remark afterwards if we have a

contingency for the subgroup, for example, the hyporesponsive?

DR. LEWIS:  I think it's the latter, that you would leave it as a comment when you explain your vote.  Dr. Unger has made it clear that it's the population as a whole.

If there are no further questions or comments concerning the wording of the question, we will now begin the voting on question 6.

DR. YU:  Okay.  We'll now move voting numbers into the voting breakout room to vote only.  There will be no discussion in the voting breakout room.

(Voting.)

DR. YU:  The voting has closed and is now complete.  Once the vote results display, I will read the vote result into the record.

(Pause.)

DR. YU:  The vote results are now displayed.  I will read the vote totals into the record.  The chairperson will go down the list and each voting member will state their name and their vote into

the record.  You can also state the reason why you voted as you did, if you want to.  However, you should also address any subparts of the voting question.

The vote total is 2 yeses, 12 noes, and zero abstentions.  Thank you.

DR. LEWIS:  Thank you, Dr. Yu.

We will now go down the list and have everyone who voted state their name and vote into the record.  You may also provide justification for your vote, if you wish to.  However, please remember to address any of the subparts of the question that corresponds to your vote.

We'll start with Dr. O'Connor.

DR. O'CONNOR:  Christopher O'Connor.  My vote was no.  First, I want to thank the patient, sponsor, and the FDA who participated in this development program in really bringing a robust program to the committee, which allowed us to do our job to protect public safety in a more robust fashion with the large number of patients and events.

As with the NDD, I'm concerned about the adverse safety signal in the DD population, particularly OS mortality given the high baseline mortality and the absolute mortality risk.  I don't believe the modeling and mitigation strategy can replace a prospective randomized trial, but I agree with Dr. Packer, Dr. Lewis, and others that exploring the current database to look at epo resistance group as a possible narrow indication link to a post-approval, randomized trial as the lower dose could be a path forward.  Thank you.

DR. LEWIS:  Thank you, Dr. O'Connor.

Dr. Crowley?

DR. CROWLEY:  Susan Crowley.  I voted yes. I voted that based on, again, lack of the attrition bias.  The primary analysis suggested neutrality for both MACE as well as all-cause mortality. Because there is an unmet need for our home dialysis patients, as well as our epo-resistant patients, and I think that we have more control in a dialysis setting for regulating dosing, et cetera.

DR. LEWIS:  Thank you, Dr. Crowley.

Dr. Cook?

DR. COOK:  Thomas Cook.  I voted no, principally because I think we need more information on both the efficacy and safety of the dosing strategy.

DR. LEWIS:  Thank you.

Dr. Kasper?

DR. KASPER:  Dr. Ed Kasper.  Dr. Lewis, thank you very much; interesting day.

I voted no, and Dr. O'Connor I think nicely summarized my reasonings as well.  I would say that if the FDA wish to go forward with approval for roxadustat in ESA-resistant patients, that I would support that.  Thank you.

DR. LEWIS:  Thank you, Dr. Kasper.

Dr. Packer?

(No response.)

DR. LEWIS:  Dr. Packer, you're probably still muted.

DR. PACKER:  Julia, I'm so sorry.  I keep doing this.

This is Milton Packer.  I voted no.  I think there are real concerns about the safety in this population.  Particularly, these are safety signals compared with a drug that already has defined safety risks.

The real interesting opportunity here is a randomized trial of epo and roxadustat in people who are epo resistant.  The real wonderful opportunity here is that the sponsor could actually test its lower dosing strategy so that there is an increase in hemoglobin compared to epo because these are epo-resistant patients.

They could even show that the improvement in hemoglobin results in improvement in quality of life or other benefits that one would expect with an improvement in hemoglobin, and it would so straightforward to then assess benefit to risk in a defined patient population.  So the epo-resistant group seems to be a real potential for future research.

DR. LEWIS:  Thank you, Dr. Packer.

Dr. Wang?

DR. WANG?  Yes.  This is Thomas Wang.  I voted no.  I just want to say, despite my no votes on both of the voting questions, this was a challenging vote for me just because, again, lack of a clear-cut signal in one direction or another.

I do appreciate the potential benefits of this medication, as well as the unmet clinical need, especially for the ESA unresponsive patients.  I also appreciate the potential benefits of this novel mechanism of action.

My hope is that the applicant is going to be able to obtain further data regarding the benefits and the risks to provide reassurance about some of the concerns that have been raised so that this medication can move forward.  Thank you.

DR. LEWIS:  Thank you, Dr. Wang.

Dr. Thadhani?

DR. THADHANI:  Thank you, Dr. Lewis.

Ravi Thadhani.  I'm the only other person that voted yes, other than Dr. Crowley as noted.  Interestingly enough, the rationale is similar to Dr. Kasper's comment, Dr. O'Connor's comment, and

Dr. Packer's comment, and that is with a very careful label in terms of those individuals that are hyporesponsive, perhaps in lieu also of transfusion; but also going back to what Dr. Crowley said, the opportunity for individuals on peritoneal dialysis. We didn't talk about that, but there was certainly data on that.

So there is a window, an aperture, that we can take advantage of. I also am convinced that the sponsor is committed to both the risk mitigation strategies we've talked about, as well as a post-approval study perhaps in the context of the hyporesponsiveness.

Thank you, Dr. Lewis.

DR. LEWIS: Thank you, Dr. Thadhani.

Mr. Conway?

(No response.)

DR. LEWIS: Mr. Conway?

MR. CONWAY: Yes. My apologies. Paul Conway. I voted no; again, my issues with the safety and the dosing for both NDD and DD. I think we're in an era where we're pushing forward for

more transplantation, more home dialysis, more peritoneal dialysis, and I think that the patient burden is real.

I think that the convenience could be better demonstrated, but I think you have to deal with this issue of the risk and of the safety, and make certain that's clear and upfront for the patient population and the patient consumers, who are ultimately the ones who are going to be looking for guidance from FDA on safety and from their medical professionals.

In regard to the conversations that have been had here about a potential path forward, at least for some populations, I agree.  My caution would be make absolutely certain that that is representative of the dialysis population in the United States; and if it's not, I think you're going to have a hard time selling it if it's only coming from the nephrologists.  I think it has to be the combination of FDA nephrologists and the sponsor putting patients upfront in the design of any type of trial.  Thank you very much.

DR. LEWIS:  Thank you, Mr. Conway.

Dr. Cho?

DR. CHO:  Leslie Cho. I voted no for many of the reasons that have been stated before.  I am concerned about the higher discontinuation rate of the roxadustat in this dialysis-dependent population when compared to epo.  I am also concerned about the epo/hyporesponders.

I am not convinced, given the data that's been presented by the sponsor, that this particular drug would decrease, or would have equivalent thrombosis rate, or infection rate, or have less MACE or equivalent MACE.  The lack of quality-of-life assessment in the epo/ hyporesponders in this particular dialysis- dependent population is also a little bit concerning.

Like Dr. Packer, I strongly urge the sponsor to do a study in the epo/hyporesponders since so much has been made about that particular population.

DR. LEWIS:  Thank you.

Ms. Alikhaani?

MS. ALIKHAANI: Yes. This is Jacqueline Alikhaani. I voted no because the assessment of the adverse events is just not altogether clear to me. As we've been discussing all day today and all the concerns that have been identified by other members of the committee and others, a lot of discrepancies that are really critical, and they need to be addressed properly to be fair to the patient who will be relying on this medication.

Those patients are putting their faith and their trust in all of us to get it right. So we have to do due diligence on every level to make sure we get things as best as we can and as correct as we can before we move forward.

As I mentioned before, I have family members living with this issue and some that have passed away, so it's also personal for me as well. I'm really just resonating with all the testimony of the patients who spoke to us today, and I think that we have to not let them down.

A lot of the testimony has just been very

heartbreaking for me, and also the fact that we can't move forward because of these discrepancies on the safety issue. That's just as heartbreaking for me because we need to do that before we can help the patients the way they need to be helped. Thank you.

DR. LEWIS: Thank you.

Dr. Merz?

DR. BAIREY MERZ: Noel Bairey Merz. I voted no for the reasons stated. I think that these safety concerns appear quite real. I don't think FDA should approve on the basis of mitigation modeling. And because there is an alternate, we should explore more how underserved the epo-resistant patients are, and I would use this good hearing and this good information to start to plan studies to understand that better. Thank you.

DR. LEWIS: Thank you, Dr. Bairey Merz.

This is Dr. Julia Lewis. I voted no. I voted no for many of the same reasons listed above. However, I will also add that doing a study in the hyporesponsive patients would be a fantastic

adjunct study, but I don't think it would be a stand-alone study as a path to approval.

It's only 9-10 percent of our population, maybe less.  I think it's difficult to define in some cases, and their safety profile may be different than the general dialysis population or certainly the non-dialysis population.  So I think that it could be done in addition but not in place of a large, well-designed, efficient, representative population study to better explore the safety signals.

Dr. Moliterno?

DR. MOLITERNO:  Thanks, Dr. Lewis.

David Moliterno, and I voted no.  I've got a lot of notes, but others have already spoken to them.  I don't agree with all the comments from everyone else, but that's ok.

I do think this drug has great potential.  Remember, this is the only oral agent that could potentially be available in the near term, so I think that while I would love to see it for all dialysis-dependent patients as appropriate, I think

that it's ok to get a side door, even if it's 10 percent of the population who may be epo or other agent resistant. So I would encourage the sponsor to spend more time thinking about how to get initial approval in them with secondary and tertiary studies and continue to expand the label.

I look forward to seeing how the European regulatory agency views the drug, and I look forward to more data coming out of Asia as there's continued experience there. Thank you.

DR. LEWIS: Thank you, Dr. Moliterno.

Dr. Parsa?

DR. PARSA: Afshin Parsa, and I also voted no. This is more of a conditional no since there was really no mechanism for parsing out when yes and when no, so I actually somewhat agree with Dr. Thadhani and the yeses and the noes here.

At the end of the day, I think there's potential and a good path here moving forward for the epo-resistant patients, but there certainly doesn't seem to be much of a signal for the larger population, even if it's a weak [indiscernible] and

somewhat consistent trend for increased risk with otherwise not much benefit in the larger dialysis population.

DR. LEWIS:  Thank you, Dr. Parsa.

I will attempt to summarize this.  I think the two people who voted yes did so because they felt that there was an unmet need, particularly for home dialysis patients, and there was more control over this population of patients, and the patients and physicians involved would understand the risks.

There also was an interest in having a very careful label perhaps for only hyporesponsive patients and maybe home patients, and that would give a doorway to a risk mitigation and post-approval process as well.

I think the majority who had voted no are still concerned about the adverse safety signal, particularly the on-study mortality.  I don't think people are convinced that modeling supported by a phase 2 study can replace a clinical trial for safety.

I think there was a lot of interest in

particularly studying the ESA-resistant patients and maybe even a possible approval for them maybe at a reduced dose, and maybe do a study with them. But that did not substitute for, in some way, examining the safety in the wider population.

I think people felt challenged by it. I think we all felt challenged by the unmet need for alternatives in this population, but the safety concerns outweighed the desire to help meet that unmet need.

Before we adjourn, are there any last comments from the FDA?

Dr. Unger?

DR. UNGER: Hi. Well, I would like to thank everyone who participated today in this challenging application and this far-reaching discussion. I thought it was excellent. I'd like to thank all of you for your thoughtfulness, for your objectivity, and I thank the people who have tried to follow the data and the science. Those are our guiding stars at the FDA and I really appreciate that.

I know this wasn't the vote that the

applicant had hoped for, but I would like to credit the applicant for running I think a very impressive development program here.  There wasn't always agreement with the FDA, apparently, but nevertheless, it was an impressive program.  It's the largest body of data we may ever see for a drug like this, so I think a shout-out to them is in order as well.  And again, thank you to everyone.

**Adjournment**

DR. LEWIS:  I would like to also thank everyone, but I specifically thought both the FDA and the sponsor gave us very, very well-written briefing documents, which very fairly and clearly presented the data.  I do also appreciate the sponsor's quantity of data, which was also very helpful.

I want to thank all the speakers of the open hearing who joined us for sharing their time and thoughts with us.  I want to thank the panel members.  I want to thank particularly our patient and consumer reps for whom I know although this was hard -- obviously you could hear in everyone's

FDA CRDAC                    July 15 2021                    343

voices more hard decisions, but probably particularly hard for both of you -- I thank both of you for your thoughtfulness in putting patients first.

I also want to mostly thank Dr. Joyce Yu, who really keeps me going here, for all her help and support, and the rest of the FDA officers that make this meeting happen.

We will now adjourn the meeting and, again, thank you all.

(Whereupon, at 5:33 p.m., the meeting was adjourned.)