**Pages 1 - 57**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

IN RE:  FIBROGEN SECURITIES     )
LITIGATION,                     )     **NO. C 21-02623 EMC**
                                )
                                )

                        San Francisco, California
                        Thursday, August 31, 2023

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)

For Plaintiffs:
                        SAXENA WHITE
                        2424 North Federal HIghway - Suite 257
                        Boca Raton, Florida  33431
                   BY:  **LESTER R. HOOKER, ATTORNEY AT LAW**


For Defendant FibroGen, Inc.:

                        COOLEY LLP
                        3175 Hanover Street
                        Palo Alto, California   94304
                   BY:  **PATRICK E. GIBBS, ATTORNEY AT LAW**

For Defendant K. Peony Yu:
                        PILLSBURY WINTHROP SHAW PITTMAN LLP
                        Four Embarcadero Center - 22nd Floor
                        San Francisco, California  94111
                   BY:  **BRUCE A. ERICSON, ATTORNEY AT LAW**

                        WEI GROUP LLP
                        One World Trade Center - Suite F185
                        New York, New York  10007
                   BY:  **ERIC WEI, ATTORNEY AT LAW**


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**Thursday - August 31, 2023**                    **1:32 p.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK: Let me go ahead and call the case.

The Court is calling the case Xu versus FibroGen, Inc., et al. Counsel, please state -- excuse me -- case number 21-2623.

Counsel, please state your appearance for the record beginning with the Plaintiff.

MR. HOOKER: Good afternoon, Your Honor, my name is Lester Hooker from Saxena White on behalf of lead Plaintiffs and the class.

THE COURT: All right. Thank you, Mr. Hooker.

MR. GIBBS: Good afternoon, Your Honor, Patrick Gibbs from Cooley on behalf of FibroGen, Mr. Conterno, Mr. Schoeneck, Mr. Eisner and Mr. Cotroneo.

THE COURT: All right. Thank you, Mr. Gibbs.

(No response.)

THE COURT: Mr. Erickson, you are muted.

MR. ERICSON: Thank you. Good afternoon, Your Honor, Bruce Ericson of Pillsbury Winthrop Shaw Pittman appearing for K. Peony Yu, M.D. And with me is my co-counselor Eric Wei. Also Dr. Yu, I believe, is on the -- watching an attendee.

THE COURT: Okay. All right. First, let's address the class certification issue.

It appears that there is not a serious dispute with

respect to certification if the class were to sign up until the April 7th, 2021 date, and that the dispute centers on that period up to July 15th of that class period.  First of all, I want to make sure I have that right.

MR. GIBBS:  Well, Your Honor -- this is Patrick Gibbs again -- we have certainly opposed class certification across the entire class period, but certainly most of the dispute in the briefing has been over that, the issues that are unique to that latter part, but -- of the class period.

And unless the Court has questions about either the adequacy or the *Comcast* damages arguments, we are prepared to stand on the briefing on this.

THE COURT:  Okay.  Well, *Comcast* sort of comes in, to a certain extent, with respect to -- maybe to some extent with respect to that latter period but let's focus on that.  That seems to be the main gist.

Let me ask the Plaintiff representative to respond.  I know you have in the briefing.  I would like to hear your oral response to the argument that -- that there's really a lack of, as I understand it, you can call it causation but the theory just doesn't hold water with respect to the final drop in price which is after the FDA action on the -- was it the 15th?

And, therefore, there's -- you can't rely on fraud on the market kind of theory.  Why should there be class certification?

**MR. HOOKER:**  I would be happy to, Your Honor.  Thank you very much.  Again, Lester Hooker, may it please the Court.

And this is really a price impact argument that the Defendants set forth in their briefs, so they spend the bulk of their opposition and all of their sur-reply rehashing the argument.

It really is an attempt to minimize the class damages by eliminating the final alleged corrected disclosure and that did take place on July 15th, 2021, when the FDA Advisory Committee held a meeting.

Trading in FibroGen stock was halted throughout the day on July 15th, and during that eight-hour meeting -- about eight hours -- the AdCom discussed the Roxadustat safety issues.  And at the end they voted virtually unanimously to reject Roxadustat's NDA precisely because of those safety issues.

So it's our position that those safety issues really rely on the heart of the case and were the precise subject of the fraud.

Nevertheless, Defendants argue that the 42 percent stock price decline that occurred following the AdCom; had nothing to do with our theory.  It should be eliminated from the action.

And they do this by trying to rebut the presumption of reliance by trying to attempt a lack of price impact.

So let me back up there a second.  We made clear in our initial brief that there's no dispute that Plaintiffs have met

their burden -- their initial burden to demonstrate that the market for FibroGen stock was efficient throughout the class period.

So we've successfully established that the presumption of reliance applies in the first place.  The Defendants don't contest this.

Because we have invoked the presumption of reliance, the burden shifts to the Defendants to rebut that presumption by demonstrating a lack of price impact.

And in this regard it really is an exceedingly tall task. They have to show by a preponderance of the evidence that the alleged misstatements caused no price impact whatsoever.  No impact.

In order to do that, they've got to show both that there was no front end price impact; meaning that the alleged misrepresentations did not increase or maintain FibroGen stock price, and they also have to show that there was no back end price impact; meaning that the FibroGen stock price did not decline in response to the alleged corrective disclosure.

As we set forth in our reply, we believe they failed on both counts here.

With regard to front end, there is no dispute that FibroGen stock price experienced a statistically significant increase following the allegedly false statements on December 20th, 2018, that was the start of the class period, as

well as November 8th, 2019, both of which had to do with Roxadustat's Phase 3 results.

The complaint alleges it at paragraph 65, 70, and 134. And our expert confirmed it in his report.

Defendants don't challenge this.  So this is not a case where the challenged states did not cause a price increase.  We do have a price increase here.

They were statistically significant.  They were attributable to Roxadustat's specific use.

Defendants ignore this in their reply brief.  We think this is telling -- in their sur-reply, I should say.  With regard to --

THE COURT:  Your position is that even in the absence of showing back end corrective price impact, that alone is enough just to show front end increase?

MR. HOOKER:  Yes.  Our position is to sever that link -- to successfully sever that link, Defendants have to show a complete lack of price impact.  And in order to do that, there has to be a lack of front end price impact and back end price impact.

THE COURT:  All right.  Let's talk about the back end because I think that's where their briefing sort of centers on; correct?

MR. HOOKER:  Yes, absolutely.  And I will frame this first as when we look at back end price impact, it really just

confirms that Defendants' arguments should be rejected here.

They don't challenge that each of the four corrective disclosures cause large statistically significant stock price declines, and they can't challenge that those disclosures were significant to Roxadustat.  So here we have a strong case on both.

Recognizing that their fact pattern here just doesn't square with a typical price impact argument --

**THE COURT:**  Don't they argue that the disclosures on the 13th, two days before the FDA meeting, there was no significant decrease?  Isn't that their argument; that it's not -- I don't know if they have conceded each of the disclosures.  Maybe you don't count that as a disclosure, but they are saying that disclosure didn't have any meaningful impact.

**MR. HOOKER:**  Yes.  And in order to do that, they suggest that the briefing documents that were released two days before the AdCom fully revealed the fraud.

And in order to do that, they really misrepresent and mischaracterize what our theory of fraud is and in their opposition they say that we now have two fraud theories.

The first theory is a manipulation theory about the manipulated safety analyses, and the Defendants say that this was fully revealed to the market on April 6th, 2021.

And even then they say that there was no manipulation

whatsoever; that we just mischaracterized -- it was a mischaracterization based on comments from uninformed outside observers.  So they still maintain there's nothing false or misleading about their public statements.

So I just want to address that point real quick.  The notion that our case is based on uninformed outside observers who reportedly know nothing about FibroGen or Roxadustat is just not true.

These aren't some random individuals posting on a Reddit thread.  They are -- as we pointed out in our briefs, they are noted medical journals, biotechnology analysts, industry publications and nephrologists.  They followed the company closely.  They followed the statements that were made closely.  We highlight several of them in our complaints and in our briefs.

I will just really quickly highlight a few of them.  Raymond James, when the disclosure in April came out, they say the MACE data we presented were not real.

Dr. Daniel Coyne, he was a nephrologist working as a Roxadustat site investigator.  He says (as read:) "I feel very misled and I don't think there is any excuse for this.  I don't know how this can happen accidently."

Dr. Jeffrey Forbes, a very noted biotechnology analyst, he said (as read:) "This is nothing less than stunning.  The restatement reduced the benefit from Roxadustat versus controls

in every case."

And there is other publication that said that FibroGen had been touting false start safety data for at least two years, and the fact that all nine analysis look less favorable raises a suspicion that someone in FibroGen carefully selected the --

THE COURT:  All right.  Two theories.  Why don't you tell me about the second one.

MR. HOOKER:  So that's Defendants' point; that there's two theories.

THE COURT:  Right.

MR. HOOKER:  The first manipulation was supposedly fully disclosed in April.

The second theory is the sensitivity analysis which has so many holes and I will go over them right now.  There is a number of fatal problems with their argument.

The first is that Defendants say that we changed our theory of fraud through this.  And it absolutely is not true, Your Honor.

It is directly contradicted by the plain allegations of the complaint and the Court's decision denying Defendants' motion to dismiss.  We in no way stated that the full truth of Defendants' fraud was revealed solely because of the sensitivity analyses in a vacuum.

It was that Roxadustat's safety profile was far worse than Defendants had publicly represented during the entire class

period.

And it wasn't until the revelations that took place during the AdCom itself that investors understood that, and this is consistent, again, with the complaint's allegations.

We specifically pled that the April 6th disclosure only partially corrected Defendants' prior misstatements.

We specifically pled that the Defendants continued to make misrepresentations about the drug on multiple occasions after April 6th, and the Court sustained those post April 6 statements in its order at the pleading stage.

And the complaint also specifically pleads several paragraphs alleging the new information besides the sensitivity analyses that were revealed during the July 15th AdCom.

So, the argument doesn't square with our allegations, but it also doesn't square with the evidence that we have now and that we set forth in our motion.

So Defendants say that the fraud was fully revealed by the briefing documents that were released on July 13th, but there is extensive evidence that the briefing documents did no such thing.  They not only included the sensitivity analyses but they also included numerous additional materials including ones that were released by FibroGen that were published in support of approval for Roxadustat.

So there were numerous pieces of information in those documents, and our reply brief specifically noted the fact that

numerous analysts highlighted this aspect that there was numerous information released.

These are analysts like Jefferies, Bank of America, William Blair, and they describe the briefing documents using words like murky, mixed, difficult to interpret, inconclusive. And because of this, the analyst noted that there were still key questions remaining.

They expected this analysis to be clarified during the AdCom and they said that, quote, "investors will likely have to wait for additional clarity during the AdCom."

Now, we address this at pages 6 to 7 of our reply brief. We attach those analyst reports to our reply.

So it's our position that Defendants' argument makes no sense in light of these analyst comments.  If the fraud was fully revealed, why would they say investors needed clarity during the AdCom?

We also highlighted in our reply brief that there were numerous critical facts and information that were revealed during the AdCom consistent with what we pled in our complaint.

In their sur-reply Defendants suggest that none of these facts were new because certain pieces of information were included in some of the briefing documents.  But, again, we think that misses the point.

One of these issues that demonstrates our point is FibroGen's strategy to overcome the FDA's safety concerns,

which was this lower dosage mitigation strategy.

And the strategy was previewed in the materials that FibroGen submitted in the briefing documents; but during the AdCom, we learned that the company's proposals were not well received by the AdCom members.  They did not have full support or trial support.  They appeared to be an afterthought.

Analysts highlighted this after the AdCom.  They highlighted that the FDA representative disclosed that the agency had only very recently received those proposals.

So, Defendants argue against this in their sur-reply.  The way they do it, they splice together passages that were 20 pages apart in the briefing document.

**THE COURT:**  Well, let me ask.  This goes to the merits.  I mean, we are getting deep now into the actual merits and a preview of what trial might look like, but the -- why aren't these all -- I guess I should be asking Defendants this question -- however it is resolved, why aren't these all classwide common issues, whether or not there was full disclosure or not disclosure, whether it was previously disclosed or not disclosed, how murky was the earlier disclosure and was there -- why isn't that -- those are all -- everybody is affected the same way.

So what -- why is this a classwide issue?  I guess let me just get to the nub of the problem.  We are at class cert.  As you know, class cert doesn't depend on who wins, who loses.

Class cert may -- can be certified even if it is clear Defendants are going to win.

**MR. HOOKER:**  That's a --

**THE COURT:**  So why -- why?  Why not -- what's the problem here, common issues?

**MR. HOOKER:**  Well --

**MR. GIBBS:**  Thank you, Your Honor.

**MR. HOOKER:**  That's exactly our point.  Was that to Defendants, Your Honor, or to --

**THE COURT:**  Yeah, I have now switched.  And after hearing --

**MR. HOOKER:**  I'm sorry.

**THE COURT:**  Before we get -- I don't think we need to get that deep into the merits.  It just seems to me however you resolve each of those questions -- what was disclosed on the 13th?  Was there full disclosure?  Was it murky or not?  Did the 15th really matter or not?  -- those are all issues that effect everybody in the class equally, don't they?

**MR. GIBBS:**  May I respond, Your Honor?

**THE COURT:**  Yes.

**MR. GIBBS:**  The reason why this isn't a classwide issue and is instead an issue necessary to be decided at class certification is because the Supreme Court has said so.

The Supreme Court has said the reason why securities class actions are permitted to proceed as class actions in the first

place is because under certain conditions it's appropriate for there to be a presumption that every member of the class relied upon the challenged statements by virtue of purchasing the stock at the market price.

That's on the theory that the market price includes or incorporates the impact of the alleged fraud.

The Supreme Court has also said, however, that if there is a showing that severs the link between the alleged fraud and the price of the company's stock, then the basic link presumption is rebutted and you no longer have a basis for certifying a class in the first instance.

**THE COURT:**  So let's drill down on that.  Severing the link.

**MR. GIBBS:**  Yes.

**THE COURT:**  You have got two competing versions and interpretations of what the evidence shows.

Is the Court supposed to be the sole adjudicator of that question?

**MR. GIBBS:**  For this purpose.

**THE COURT:**  Or does it have to be clear, what's the burden of proof?  I mean, the burden of proof, seems to me, does shift to the Defendant if there is an initial showing that the market is efficient, et cetera, et cetera; right.

So, the burden shifts.  And what is it by a preponderance of the evidence?  And does the Court make a factual

determination about whether there was sufficient undisclosed stuff on the 13th that left more to be disclosed on the 15th? How is the Court supposed to approach that?

**MR. GIBBS:** So, I completely agree the burden is on us to rebut the presumption. I think the case law is quite clear; that we can rebut that presumption by showing with evidence that there is a -- a break in the link between the alleged misrepresentations and the stock price.

I do think that's an issue that the Court is required to decide in order to certify the class.

In other words, the Defendants having challenged price impact, put forward evidence and argument that we think severs that link pursuant to basic, I think the Court is required to make a factual finding as to whether or not we have successfully rebutted that presumption.

Now, so that gets to the question of what is it that we need to show to rebut the basic presumption to sever the link.

Mr. Hooker has claimed that we bear the burden of proving specifically no front end impact, no back end impact. I disagree with that.

Supreme Court most recently took this issue up in the *Goldman Sachs* case where the Supreme Court made very clear that the Court is required to take a common sense approach to this issue to consider all of the evidence in context.

I do not think that Supreme Court decision can be squared

with the idea that there's some sort of rigid formula requiring us to rebut both front end and back end price impact.

The Court is required to look at the evidence as a whole and consider whether we have rebutted the presumption.

Other courts in very similar contexts have held where there is a showing that the truth that the Plaintiff's claim has been concealed became public and did not cause the stock price to decline, that severs the link.  I would cite *Qualcomm* in particular for that ruling.

But this is an outgrowth of the approach that Plaintiffs' Counsel routinely take in these cases and that Plaintiffs' Counsel is taking here.

And, you know, you will note, Your Honor, that Plaintiffs' expert doesn't purport to calculate damages based on inflation at the front end.  He is not going to say:  "I'm calculating damages by looking at how much the stock price went up after the challenged statements."

He is proposing to calculate damages by saying when did the truth come out and how much did the stock price decline when the market learned the truth.  That's their proposed method for establishing damages.

In that framework, if we have shown that the facts that Plaintiffs claim were concealed became public by July 13th and there was no negative stock price reaction, I believe that does rebut the presumption of reliance because it severs the link

between the alleged misrepresentation and the stock price.

**THE COURT:**  So what if the Court were to find that -- it is a crude way of putting it -- that 85 percent had been disclosed but 15 percent had not, no price impact but it's not a hundred percent.  Then what?

**MR. GIBBS:**  Well, you are saying the Court would be finding that there was some residual price impacts such that some part of the post July 15th drop could be attributed to corrective information?

**THE COURT:**  Well, yes, that there was some additional corrective information later.  Do I have to -- is there some -- I don't have to quantify -- the Court doesn't have to quantify, right, if it finds some.  You know, at what point do we deem it's severed or partially severed or almost -- you know, what's the rule?

**MR. GIBBS:**  Well, I don't know that there is a rule that addresses that particular scenario, and I want to come back to it because I don't think that -- that would be an appropriate finding here; but I will say in that scenario if the Court believed that some portion of the post July 15th stock drop was linked in some way to the revelation of the truth, that the challenged statements allegedly concealed, if that were the case, I think then we would bleed into the *Comcast* problem.

And I'm glad Your Honor reminded me that the *Comcast* issue

does overlap here even on this latter part of the class.

Their expert has offered you absolutely no method for which he could take that post July 15th stock drop and parse it out between non-fraud factors and fraud related factors.

And just as a starting point, I think common sense -- per *Goldman Sachs*, common sense tells you that one of the primary, if not the primary driver of that stock price decline, is simply the outcome of the AdCom folks.  Obviously the stock price declined because the AdCom voted against approval.

But no one is seriously claiming that FibroGen knew that that would be the result going into the AdCom itself.  And so that's not a corrective disclosure.  That's a subsequent event.

And so at a minimum, I think if the Court were to reach that finding, then I think we shift and we have a very serious *Comcast* problem for that part of the class period; but I don't want to skip over the premise because I think the premise is flatly unsupported by the record.

And let me -- I want to back up because I -- I think that our initial reading of Plaintiffs' theory was entirely fair given the complaint.

The complaint repeatedly alludes to the fact that post April 6th press release company is failing to disclose sensitivity analyses that Plaintiffs claim showed that the drug was unsafe.

It says "sensitivity analysis" over and over and over

again.  When it identifies false statements, it says "these statements are false because" and it specifically focuses on the failure to disclose the sensitivity analyses.

So I think that our original position was well founded, but it doesn't really matter because fundamentally regardless of how many different ways Plaintiffs want to sort of reformulate their theory of the case, fundamentally they are claiming that all of the challenged statements were made -- made were false or misleading because the company failed to disclose a bunch of safety information that they claim was inconsistent with the statements the company made, a bunch of safety information about comparisons between Roxadustat and either placebo or EPA or information about adverse events among the trial participants who were taking Roxadustat.  It is all clinical and safety data.

It is, in my view, beyond legitimate dispute that the AdCom briefing documents that were released on July 13th and that were the subject of extensive and detailed analyst commentary on that date, those briefing documents contain all of the clinical and safety data that the AdCom then considered on July 15th.

There was no new clinical or safety data disclosed during the AdCom on July 15th that was not part of the AdCom briefing documents that were made public on July 13th.

That's the whole point of this thing.  It's a public

proceeding.  The materials are made available both to the AdCom and to the public.  And then they have a hearing where the members of the AdCom hear presentations from the sponsor and from the FDA, all of which are referring back to the clinical and safety data that are in the briefing documents filed two days earlier.  They have discussions.  They ask questions and then they vote.

But nobody presented any new safety or clinical data during the AdCom.  It was all in the briefing documents.  So the only thing that was left on the 15th -- the only thing new on the 15th is what was the content of that discussion, how did the AdCom members react to this information, and how did they vote.

And, Counsel -- I don't think he meant to say this -- but he sort of let it slip.  He claimed that one of the things that came out was something having to do with FibroGen's dosing strategy.

And he said during the AdCom meeting everybody learned how the AdCom was receiving this; that it wasn't well received by the AdCom.  I agree.  They did learn something about how the AdCom received it.

That's not something that FibroGen had previously concealed because it hadn't happened yet.

So learning how the AdCom reacted to the dosing strategy or how it reacted to any of the clinical information, that's

not a corrective disclosure when the clinical information itself has already been disclosed.  It's a new event.  It's not corrective.

And same point, Your Honor, about the -- about Counsel's recitation of language from the July 13th analyst reports.

This is -- I have to say -- a deeply, deeply misleading presentation on Counsel's part because if you read those analyst reports from July 13th -- and I urge the Court to please do that -- there are two things that are crystal clear.

One, these analysts have read and digested all of the AdCom briefing documents.  They understand what they are looking at.  They understand.

When they are saying that the picture is murky or mixed or inconclusive, that doesn't mean that the alleged fraud hasn't been revealed.  What they are saying is there is some data that seems to support approval, and there is some data that seems to suggest it shouldn't be approved.  So we don't know how this is going to come out.

Well, guess what?  FibroGen didn't know how it was going to come out either.  So when an analyst looks at all of the clinical data and, therefore, has in front of him or her all of the results of the analyses, all of the adverse event information that the AdCom later cites as the reason to vote against approval and says, "I don't know how this is going to come out," all the analyst is saying is you have got to see how

the AdCom votes.

So that doesn't mean there was any new clinical information previously known, concealed by FibroGen that was disclosed on the 15th.

It just means they are saying it is complicated; there's a lot of data, and we don't know how this is going to come out.

That's supporting our point, not Plaintiffs' point, not at all that.  Does not mean that there was any new clinical or safety information disclosed on January -- on July 15th that was not previously disclosed on July 13th.

So we think the record is quite clear that Plaintiffs' claim is -- whatever their claim is -- is based on an alleged failure to disclose safety data, clinical trial results analyses, adverse events and the like, all of that information was in the July 13th briefing book.  There was no new information like that that was -- (video freeze interruption).

**THE COURT:**  You are breaking up there, Mr. Gibbs.  I don't know.  Your audio kind of just started breaking up.

**MR. GIBBS:**  Is that better?

**THE COURT:**  No.  I don't know if it is us or you.

**MR. GIBBS:**  I'm using a wired connection so I hope it's not me.  I'm not sure it matters who it is.

**THE COURT:**  Well, let me ask Mr. Hooker, if, in fact -- you may not agree with this factually -- there was full disclosure of all the data, the information.  The only thing

that wasn't known is the reaction of AdCom, what they are going to do, if that were the case, you would agree that any price impact from the AdCom decision would not be properly assessed as damages. It's -- it's a disclosure of the underlying -- do you agree with that proposition?

**MR. HOOKER:** Well, that proposition is consistent with our argument. Our argument is that we learned during the eight-hour AdCom a number of pieces of new information.

We highlighted it in the complaint. We noted it in our reply brief. Dose mitigation strategy that Mr. Gibbs was referring to, we learned a number of pieces of information about that.

You know, again, I was getting to the cited passage that Defendants include in their sur-reply about the risk of death associated with Roxadustat that was revealed during the AdCom.

And the passage that they actually highlight was comparing the drug to placebo. What we learned during the AdCom is that there is a high risk of death associated with higher doses of the drug.

And the analysts actually highlighted that after the AdCom, not after the briefing documents. They highlighted that this was an alarmingly negative response. And they really rendered that the strategy that FibroGen put forth in the briefing documents implausible.

It is the same situation with the non-inferiority origin

where we knew earlier before the AdCom that there may have not been an agreement with the FDA on what the exact margin the FDA was looking for, but during the AdCom we learned the goal was 1.25, which dramatically changed the view of the drug.

So, I think your question to Mr. Gibbs was consistent with what we are arguing here.  We are arguing that Defendants are saying something else caused FibroGen's stock price to decline, not the alleged fraud.

Again, for a number of reasons, we don't agree with that. We think that's factually wrong; but from a legal perspective at the class certification stage, it doesn't have legs.

The argument concerning when the truth was fully disclosed to the argument is a merits issue touching on loss causation.

Mr. Gibbs brought up the *Goldman Sachs* Supreme Court decision.  We note on page 6 of our reply brief that Supreme Court has noted that loss causation and price impact evidence may overlap but it also cautioned to, quote, "resist the temptation to draw what may be obvious inferences from the closely related issues that must be left for the merits."

And that's 141 Supreme Court at 1961, Note 2.

**THE COURT:**  But what do I do with the argument that this Court has to decide at the class cert stage the question of whether fraud on the market can be relied upon here where that theory has been rebutted because if it is rebutted, then there is not a basis for class cert at least during that period

of time when that model can't be applied.

Do you -- do you dispute that this Court has to kind of fish or cut bait on that otherwise seemingly factual question at the class cert stage?

**MR. HOOKER:**  Well, at the class cert stage, the Court has to consider all the evidence.  That's a hundred percent true.  I agree with that.

But the question of what actually -- what actually caused the stock's price to decline is a loss causation question.  It is not a class certification question.

Our expert has not submitted a damages report yet.  We are not at the summary judgment stage.  We are at the class certification stage.

**THE COURT:**  But don't I have to decide whether that -- the Defendants have rebutted the -- met their burden of proof or rebuttal by showing that severance, which ultimately may involve some fact like determination by the Court, do you agree I have to make that determination now as a predicate to class cert?

**MR. HOOKER:**  I agree that you have to -- you have to consider Defendants' argument on whether they have rebutted the presumption, whether they have severed that link.

And there are situations where that link is severed, where the statements are so generic that there is no connection with the disclosures at the end but this isn't the case.

The here -- but here, the entire company revolved around Roxadustat. The statements were specific to Roxadustat. The disclosures were specific to Roxadustat. And we are really talking about a determination as to what, in fact, caused the stock price to decline on July 16th.

We have noted a number of pieces of information that we say and that -- the market supports us and was revealed during the AdCom. And Defendants have -- the contrary argument.

So we think that that determination as to what, in fact, caused the stock price to decline is inappropriate at the class certification stage.

Certainly the determination of whether or not Defendants have severed that link is appropriate, but for a number of reasons we think that's not the case here. We cited a number of cases at page 6 of our reply that rejected these same arguments including by Dr. Zurich in the *Stamp's* case.

Defendants brought up -- Mr. Gibbs brought up the *Qualcomm* case, which they cite in their brief. We noted that the one corrective disclosure in that case that was the subject of Mr. Gibb's argument, the information there was publicly disclosed for seven years.

And they also submitted a statement of recent decision in the *Exxon* case from Northern District of Texas, which I would like to just address because we didn't have a chance to address it.

I actually found it curious because Defendants submitted that case, and we think it actually supports our arguments on a number of levels regarding adequacy and the damages methodology.  It completely supports us.  I won't spend too much time on the adequacy.

The record on *Exxon* was much worse than the record that our three lead Plaintiffs set forth here, and the Court completely rejected the adequacy arguments.

The damages methodology is the same methodology that Mr. Kauffman is proposing here, the out-of-pocket --

**THE COURT:**  Okay, I'm not there yet.  Let me ask you: What is the standard of proof on the rebuttal?  Is it preponderance of the evidence?

**MR. HOOKER:**  Yes, preponderance of the evidence.

**THE COURT:**  All right.  Let me ask Mr. Gibbs to reply to the one example you gave that one of the things that was revealed at AdCom was higher dose results in higher death.

**MR. GIBBS:**  Yes, Your Honor, I'm glad you asked me that.

**THE COURT:**  Is that new information or not new information?

**MR. GIBBS:**  It was neither.  It wasn't disclosed.

So what Plaintiffs' Counsel are doing here is they are not citing you the AdCom transcripts to prove what was disclosed during the AdCom.

They are citing you to Plaintiffs' Exhibit 17, which is an analyst report from SVB Leerink, L-E-E-R-I-N-K, on July 15th, 2021.  So this is SVB Leerink's take on the AdCom meeting.

And it is true that the analyst claims in that report that the company confirmed that higher doses of Roxadustat lead to higher doses of death and expresses some concern about that point.

No other analyst says that.  No other analyst understood the conversation in that way.  And if you look at the AdCom transcript itself, that is not what FibroGen said.

If you look at the AdCom transcript, which is at Plaintiff's Exhibit 19, and I'm focusing on pages -- it is around pages 256 to 257 -- and the discussion there is about a single study, study 7613, which was not included in the pool statistical analysis that is kind of at the heart of this case. It is a study that involved different comparators and, therefore, was deemed not appropriate for pooling.

And Dr. Little from Astrazeneca in discussing this study said we have a few metrics suggesting the starter doses may have been too high.  That's on page 256.

Dr. Packer on the AdCom asked:  "Are you implying that there's a dose dependent increase in mortality?"

He is asking the question:  Do you have more deaths as you have more of the drug?  And Dr. Little's response did not say, yes, there's a higher death rate for a higher dose.

He said:  "When we look at our data to investigate for dose dependence regarding all core cause mortality in MACE, M-A-C-E, we don't find it to be particularly conclusive, so our mitigation strategy regarding our dosing really is aimed at thrombosis."

So try to put that in plain English.  Not conclusive is not a yes to the question.  It is a no.  Okay.

And, second of all, he is making a really important point here.  He is saying the dose mitigation strategy is aimed at thrombosis.  In other words, the theory they are proposing here is it may be that higher doses of Roxadustat are increasing incidents of thrombosis, and we think if we start with a lower dose, we can get to a lower degree of thrombosis; but there is nowhere in that AdCom transcript where FibroGen actually says and what the Leerink analyst claims, they said it is just not true.

In that regard on the dose mitigation strategy, I would note that, you know, this is kind of thematic; right.

Plaintiffs say that there's all kinds of new stuff that's disclosed during the AdCom meeting, but they never actually cite the AdCom transcript for that proposition.  They cite the analyst reports.

This is another good example.  The AdCom briefing documents from July 13th make clear that FibroGen has proposed a dose mitigation strategy to try to deal with some of the

adverse effects, principally thrombosis.

Those briefing documents make clear that this is preliminary and that there is no study to support it, and it makes clear that the FDA is skeptical that this is an appropriate approach to take post approval.

That's what the AdCom concluded as well but the -- so there isn't really anything new other than the AdCom agreeing with the FDA's skepticism.

But what Plaintiffs like to cite is some more hyperbolic and, frankly, kind of snarky language in the July 15th analyst report from Leerink to make it sound like there was some grand revelation during the July 15th AdCom but there wasn't.

It was clear on July 15th that FibroGen had proposed a doses medication strategy, but that there was not yet any clinical evidence to support it; and it was clear that the FDA was skeptical.  The only thing new on July 15, again, was how did the AdCom react to that information.

**THE COURT:**  All right.  Let me ask you -- I have asked you about the burden of proof, which is helpful that you-all agree on that.

Let me go back to the question about how complete that severance must be.  Part of that is what we are asking, how clean must that severance be.  There may be some situations where one disclosure, two disclosures, it is pretty plain; but here, at least there is some argument here -- if the Court were

to find less than a hundred percent complete unlinkage severance here, does that mean I -- I would still have to grant class cert for the period in question if there is less than complete severance?

(Pause in proceedings.)

**MR. GIBBS:** Your Honor, I don't know. There is no case law that specifically addresses it. My inclination is you probably would, but we would have other very, very serious problems with the case the way it's framed.

Meaning, I understand your question to be: If you were to find that there was information disclosed and that had a price impact -- negative price impact on July 15th, what do you do?

And so before I get to that, it can't just be some new information that caused the price impact. Obviously, there was new information on July 15th. It has to be new information that's corrective. Otherwise, it's irrelevant to the price impact argument.

**THE COURT:** Right.

**MR. GIBBS:** And so you would have to find not only was there some new and additional information revealed on July 15th that had a price impact, you would also have to conclude that that new price relevant information was correcting one or more of the prior statements.

And so, for example, you know, the dose mitigation strategy point, the company never talked about a dose

mitigation strategy.  I don't think there's any way to conclude that a discussion about the dose mitigation strategy is corrective in any way, but that's a really, really critical point.

Plaintiffs' own case, the *Chicago Ridge* case, which we think is wrong in certain respects, but even that case makes clear if you are going to lean on a back end price impact, it has got to be corrective or it doesn't prevent us from severing the link.

If you find it is corrective, it was new, and it had some impact on the price on July 15th, then I would say as to that limited portion of the case, we have not successfully rebutted price impact for this purpose; but it should significantly reshape what statements are at issue for that portion of the case, which portion of the corrective -- alleged corrective disclosure is at issue for that portion of the case; and, as I alluded to previously, they are going to have to show you that they have some means of calculating damages in a way that captures the price impacts of what you found to be new and corrective and not the price impact of all the other things that happened on July 15th.

So sorry for the long-winded answer.  The answer is "yes but."

THE COURT:  All right.  Yes but a much smaller case and the burden would be on them to show some kind of

allocational process or methodology.

So here is -- well, maybe you have done this in the narrative, but I'm wondering what would be helpful because it seems to me that's the critical question.

What new corrective disclosure was revealed on the 15th that had not been disclosed previously and is that really a disclosure or is that just a take by a commentator and not really a disclosure?

And I think it would be helpful if I could see, you know, what your positions are on specific additional disclosures. And I know you have done this kind of narratively but now that maybe we can join this, almost like a -- like a chart of what is it that Plaintiffs claim was really new in terms of corrective disclosures that was new on the 15th that had not been previously disclosed like on the 13th or any time before?

And why the Defendants feel that is not -- was not a disclosure or not a new disclosure?

And I could see what the -- what -- that would help me determine whether that severance has really been shown.  So I think that's what I want (video freeze interruption) -- really --

And so I'm going to suggest that -- that we do just a very short supplemental briefing, maybe the -- if you can get together and do a chart like the old days.  We used to do summary judgment charts.  Of course, that experiment failed.

Maybe it will work here.  Just what are the contentions, you know, and what's the response.  And I don't care if there are two items, ten times, twenty items at the end.

And then point me to the record, which would be very helpful, and I can zero in on it and determine whether or not the Defendants have made the rebuttal.  And if not, if there is something left here.

**MR. HOOKER:**  We would be happy to submit that, Your Honor.  When would you like that by?

**THE COURT:**  I don't know.  Within the next ten days, is that reasonable?  Two weeks -- ten days, two weeks?

**MR. GIBBS:**  It's reasonable to me, Your Honor, except I think we are -- I think Plaintiffs are going to start this and we are going to need to react.  So from my perspective, ten days and two weeks is reasonable depending on when we get the Plaintiffs' chart to react to.

**THE COURT:**  Okay.  Maybe if the Plaintiffs can provide their side of the chart, their contentions as to what new disclosures occurred on the 15th, and give a week to Defense to file.  So why don't we say two weeks.

**MR. HOOKER:**  Okay.  So September 14th for our submission?

**THE COURT:**  Yeah, for the joint submission.

**MR. GIBBS:**  Just to be clear, Your Honor, I understood you to be saying the Plaintiffs would deliver to us their

proposed portion of the chart within a week. We would have a week to input our information, and the parties would file it as a joint filing.

THE COURT: Yeah, yeah, so 7th and 14th.

MR. GIBBS: Understood, Your Honor. Thank you.

THE COURT: And then I can take that under submission. I mean, this is helpful because it is now really focused in on what I think are some of the pivotal points. I understand there are some other issues, but I think that is pretty critical here. So I would appreciate that. That would be helpful to me. Thank you.

MR. GIBBS: Thank you, Your Honor.

THE COURT: Remaining time I have got, let me ask the parties to address the spoliation question.

As I understand it, first with respect to FibroGen, efforts were made to get the laptop back from Dr. Yu -- and they were not successful obviously -- but there wasn't a clear command, either a litigation hold or a don't delete until just hours before she took the laptop to the establishment to have it -- have that hard drive eliminated on March 29th. Is that correct? I mean, there were efforts, to say, give it back. We need it back, et cetera, et cetera.

In fact, "before you get your severance payment, we need it back;" but there was no clear do not delete litigation hold communication until hours before she destroyed the hard drive.

**MR. GIBBS:**  I think for record purposes, Your Honor, that's correct.  In other words, the first thing we have in writing where someone (video freeze interruption), it is on March 29th, and it is some number of hours before Dr. Yu, as far as we know, takes it into the vendor.

I don't know everything that was said during every one of the telephone conversations that was happening.  Certainly no one has testified to an oral directive not to delete anything.

So as far as we have on the record, yes, that's when the company told her not to delete anything.

**THE COURT:**  Okay.  Now, is that -- one question is:  Is that enough to hold the company responsible for spoliation?  I mean, there were efforts to get it back.  There were numerous efforts to get it back, and there's no evidence suggesting that the company knew this to -- the hard drive because she gave every indication that she actually wanted to protect it and send it back in a safe way, et cetera, et cetera.

Is there a basis to find culpable conduct for spoliation purposes on the part of FibroGen, putting her aside for a moment?

**MR. HOOKER:**  Yes, Your Honor, we think that the answer is yes.  Defendants really point to those e-mails asking for the return of the laptop, but there is really no question that they knew that Ms. Yu was going to be transitioning from, at that point, an executive advisor to the CEO to a consultant

role.  They entered the severance agreement back with her in November.  It is not like this was a surprise.

The severance agreement did provide that she was not to destroy company property, tangible or intangible.  And really by that point, by March 29th, there was -- there were so many events and actions over the course of several weeks and months that pointed to the fact that litigation was not just reasonably foreseeable but really a foregone conclusion.

In terms of -- and I know you asked about the multiple steps here but we don't think it is reasonable for the company to allow her to keep it for several weeks to give her access to the laptop at that point especially when you have the severance agreement, when you have a million dollars of severance payment, and when they receive a completely wiped laptop back from her, they still give her that payment; and she is still a consultant at that point.

**THE COURT:**  In a way that's sort of water under the bridge, it seems to me.  What level of culpability -- whether you call it negligence, gross negligence, whatever it is -- is required for spoliation and sanctions -- for sanctions for spoliation when it wasn't the company itself -- assuming for a moment her acts can't be directly imputed.  Maybe we can talk about that -- but, I mean, assuming it is really their supervisory role that they fell short on, sort of what level of culpability, neglect, et cetera, must be shown in order to hold

the company responsible and make it liable for spoliation?

Is negligence -- do you need gross negligence?  Do you need willful disregard, purposeful?

**MR. HOOKER:**  Well, we think certainly the primary actor was Defendant Yu in destroying the laptop, but FibroGen knew throughout this period, throughout March, which is after a partial corrective disclosure, that she still retained this laptop; there were internal e-mails with the CEO and the Chief Information Officer saying that there were thousands of highly confidential documents on that laptop; there was e-mails to Yu where the CIO is on the e-mail thread saying that it will become a legal issue if she doesn't return it.

They let her keep it for two weeks, and really the culpability grows even stronger when you consider the fact that they commissioned through Cooley a forensic report when they received the laptop.  This is after litigation has begun.  The forensic report specifically states on its first page that the goal was to see if they could retrieve any deleted documents.

And they have this report, and throughout the entirety of discovery in this litigation they didn't breathe a word of it.  We specifically asked about it on multiple occasions.

**THE COURT:**  No.  I understand that, but I have kind of a -- more of a legal question.  At what point -- it is not strict liability; right?  I mean, I assume there has got to be some level of culpability before you can be hit with spoliation

sanctions.  And here it is failure to supervise, failure to carry out the severance agreement, failure to get something back when you know it is important and can have critical information.

Is negligence enough or do you have to find some degree of willful conduct, purposeful conduct?

MR. HOOKER:  We don't think it needs to be willful in this context, but -- and this is setting aside the fact that we still think that at this point, March 29, Defendant Yu was an agent of the company certainly under the severance agreement; and she still retained company property.

The laptop wasn't her personal property.  It was company property.  They were specifically provided for by the company.  It was her sole work computer for three years, and FibroGen knew about that.  They knew it during the entirety of March of 2021, and they took some measures -- we are not disputing that it took some measures to obtain the laptop back.

They offered to send a courier.  Did they actually send a courier?  No, they never did.  They could have done that on March 15th.  They actually gave her access to the laptop during this time.

THE COURT:  So that raises a second question that you have raised and that is agency.  The fact that she had been terminated and at the point where she destroyed the -- apparently destroyed the hard drive, she was no longer employed

but she was technically a consultant at that point.  But your position is that she is still an agent for purposes of imputation because of the severance agreement and her prior role or what is your theory there?

**MR. HOOKER:**  That's correct, Your Honor.  This is the key witness in the case.  She is a C-suite officer, the chief medical officer, who was really at the heart of the manipulations that form the basis of our claims, and this was her sole work computer.

There is no disputing that.  She used it in the office.  She worked remotely for most of the prior two years, and she was still beholden to the company.

She even testified how important the severance payments were to her.  She signed the severance agreement back in November.  So that was already in place.

She was an executive advisor to the CEO until March 15th and a consultant afterward.

And FibroGen still paid the severance payments despite the fact that they knew she had wiped the laptop clean.  And, again, they knew that there were several thousands of highly confidential documents on there.

So, yes, it's our position that she was absolutely still an agent of the company.  They obviously -- the company obviously knew throughout March that she still retained the laptop past her end date as the executive advisor and --

**THE COURT:**  Do you have a case cite that you -- I know all these facts are somewhat unique.  Is there a case cite that says somebody who has been terminated but nonetheless continues to hold property of the employer, their acts -- spoliation can be deemed attributable not by virtue of failure to supervise by the employer but just by agency theory -- under agency theory?  Are there any cases that say that?

**MR. HOOKER:**  We cited a few cases that touch on that.  Now, this is a unique fact pattern but the Facebook and Apple cases that we cited at page 18 of our reply brief touch on the -- the situations where relevant evidence is lost in the face of an employee taking steps to destroy evidence.

But, again, this is a unique situation, Your Honor, given that the central role that Ms. Yu played in these events.  But this isn't a rogue employee.  You know, this really --

**THE COURT:**  I understand that.  I understand she was a chief medical officer.  All right.  Let me just hear if there's -- what the response in terms of imputation or attribution to FibroGen, putting aside her response for a second.

**MR. GIBBS:**  Thank you, Your Honor.  So at page 22 of our opposition brief, we have cited case law including the *Gemsa Enterprises versus Specialty Foods* case for the proposition that a principal cannot be held liable for the acts of an agent or an employee if the employee substantially

deviates from employment duties.

In other words, if an agent is acting contrary to the interests of the principal, imputation is not appropriate.

And whenever one thinks of the steps that FibroGen took, it is undisputed that before the device was destroyed, FibroGen had instructed Dr. Yu to return it without deleting anything.

The steps that she took to get rid of the hard drive were contrary to the express directive of the company.  I don't see how one could possibly claim that doing that is within the scope of her consulting arrangement or her agency relationship with the company nor do I think imputation would be appropriate just given the nature of the company's conduct.

I also want to address the culpability point that you discussed at some length with Mr. Hooker, but I don't want to speak out of turn.

**THE COURT:**  Yeah, well, let me ask you about that.  I mean, you argued even when there is willfulness, there may not be -- there is reluctance but is willfulness a standard?

Putting aside imputation, I understand that.  If they act outside the scope contrary to the charge under the agency agreement, you can't impute that; but if the supervisor knows something is going to happen or likelihood that they are, you know, going to do something, at some point there is a duty to supervise and take steps; right?

**MR. GIBBS:**  There is.  But in a situation where the

employee is in Washington and all of the people at the employer are in San Francisco and we are still in the middle of a pandemic, I'm not really sure what Mr. Hooker thinks FibroGen was supposed to do short of having a courier or somebody fly up to Washington and break down her door and physically take the thing out of her hands which is obviously ridiculous.

But on the culpability point, the level of culpability required depends on the nature of the sanctions that are sought.

And here -- so, first of all, you didn't get anything approaching a straight answer on that question from opposing counsel so let me give you one.

Congress -- the Federal Rules have been amended so that Rule 37 is now the exclusive means of assessing sanctions based on the loss of electronically stored information.

That rule makes crystal clear that before a Court can impose the most drastic forms of sanctions, including the ones that Plaintiffs are seeking here -- and I think it is important to keep in mind because we are having kind of a casual discussion about sanctions and culpability -- but it is important to keep in mind what Plaintiffs are asking for.  They have asked the Court to end the case in their favor with no consideration of the evidence, no consideration of the defense, no chance for the defense and the Defendants to put on a case. That's what they are asking for.  That's the most extreme

sanction that the law can provide.

In that circumstance Rule 37(e)(2) makes crystal clear that you can only grant that kind of sanction upon a showing that the person that is the subject of the sanctions motion acted within an intent to deprive a litigant of that material.

Plaintiffs have come nowhere near making that showing as to FibroGen.  So it is no wonder that Counsel doesn't want to answer the question.  They can't.

They are -- in -- especially in a world where the company said to her "return the laptop; don't delete anything," how can one possibly claim that the company acted with an intent to deprive a litigant, even a hypothetical litigant, of that laptop?

You know, the Court hasn't asked about duty to preserve. So, again, I don't want to speak too much out of turn; but the -- Counsel's recitation of the facts and his assessment of the reasonableness of FibroGen's conduct is all putting the cart before the horse because he is assuming that his story is true.

He is asking the Court to assume there was a big fraud. Assume the company knew there was a big fraud.  Assume the company was part of the big fraud.  And when viewed through that lens, of course they should have known that there was relevant material on her laptop, and of course they should have known that she was going to destroy it; and they should have

acted with some higher degree of urgency to get the laptop back.

That's not the right way to assess this motion, and that's certainly not what the record before you supports.

The -- the facts on each day were different. I don't think they have shown you a single case that imposes a duty to preserve at all in circumstances like the ones that were facing the company as of March 29th.

But setting all of that aside, I don't see how you can possibly make a factual finding that the company here acted with an intent to deprive a litigant of that laptop especially in a world where we specifically asked her to return it without deleting anything.

**THE COURT:** Well, Rule 37 -- I guess it is (e) -- expressly talks about intent to deprive, and that seems to be the standard whether you are seeking instructions or dismissal, et cetera, et cetera.

Let me ask for Dr. Yu's point. You know, it sounds to me like in contrast to the company, there's a pretty good argument here that at least what was allegedly done was pretty willful.

(No response.)

**THE COURT:** You are muted, Mr. Erickson.

**MR. ERICSON:** Yes, I would like to address that point.

**THE COURT:** Yes.

**MR. GIBBS:** First, I need to unmute myself. Sorry

about that.

Your Honor, under Rule 37, the overarching principal applying to both subparts -- and I quote the advisory committee notes from 2015 -- quote, "the rule does not apply when information is lost before a duty to preserve arises."

There's no spoliation.  There's nothing covered by the rule unless the duty to preserve has arisen and that's -- that's viewed under an objective standard.

The advisory committee notes go on to say (as read:) quote, "in applying the rule the Court may need to decide whether and when the duty to preserve arose.  Court should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant."

And then I'm jumping ahead a little.  The note also says (as read:) "You need to realize that -- that you shouldn't be blinded by hindsight."

The note says (as read:) "It is important not to be blind to this realty by hindsight arising from familiarity when the action has actually been filed.  What you should be considering is what the person accused of spoliation knew at the time of the alleged spoliation."

Here, Dr. Yu is accused of three things.  She's accused of returning documents to FibroGen on February 16 and March 14, and she's accused of destroying the hard drive in her computer

on March 29.  Obviously, the March 29, the hard drive, is the important allegation.

But I think it's important to look at what she knew and what she didn't know as of when the hard drive was destroyed.

Let me start with what she didn't know.  At that time she knew nothing about her successors' concerns about stratification factors.  This case is all about stratification factors.  Dr. Yu had absolutely no knowledge that that was an issue for anybody.

At that -- on March 29 she did not receive a legal hold.  She didn't get a legal hold until April 6.  Yes, various -- HR had said to her -- unclear she got the message, but HR had said to her earlier on March 29 don't delete anything.  That sort of message from HR is not to be confused with a lit hold.

I would point Your Honor to the *Best Label* case decided by one of your colleagues recently where Magistrate Judge DeMarchi said that this sort of informal notice, which is the sort of notice that Dr. Yu got, that's not a lit hold, is not enough to create a duty to preserve.

And, frankly, Your Honor, Plaintiffs agree.  They have said in their reply brief -- and I quote, they say that the informal notice that all -- which is all Dr. Yu got -- is in their words a far cry from any formal litigation hold.

**THE COURT:**  Let me -- hold on for a second, Mr. Erickson.  Let me cut to the chase.  How do you explain her

evasiveness in saying, "I will send it Fed Ex.  I'll give it back to you.  Thank you.  Will do."

Doesn't do it.  And then she takes it to NerdToGo and asks the employee to physically destroy the hard drive in front of her breaking it in two.

Doesn't that seem to suggest to you she knew something was up?  Why would somebody do that?

MR. GIBBS:  She's explained that in her deposition, Your Honor -- and I would urge you to read that part of it.  It is Exhibit 20 to Plaintiffs' exhibits -- but what she says, Your Honor, is she said several reasons.

First reason is she was concerned if she simply packaged the full laptop and sent it back, she thought about flying back there from Washington State to California and taking it herself.  But with COVID, that was not something she wanted to hop on an airplane.  So she rejected that.

She thought of sending it Fed Ex.  And, of course, the company said:  "We will pay for a courier.  That's fine if you want to send it Fed Ex," but things go astray sometimes.

And her thought was:  This could go astray and I don't want this falling into the wrong hands.  It's got company material on it.  May not be unique but it has company material.

And the third reason, as she explained, is it has to do with the circumstances in which she herself had accessed the computer and removed personal information from it.

As we explained -- and she explains in her declaration, Your Honor, which I would urge you to review if you haven't -- is that when her computer was turned off on March 15, that was her last day as an employee, there was a Zoom going away party for her.

And immediately after the party, her computers turned off. She can't even turn it on anymore. She calls the CEO and says: "Hey, I can't get access to my computer. If you want me to be a consultant, I think I need access. More than that, I have got all this personal stuff on the computer. I would like to get it."

He said: "Fine, you can access it and you can take that personal stuff off."

But then the head of IT -- despite what the CEO said, the head of IT would not allow her to access the computer and remove her personal stuff.

So she went to a lower-level person in IT, a man named Rudy Tadina, who she had known for years. He helped her with a lot of computer issues, and said: "Rudy, I have got all this personal stuff. The CEO says I can take it off but your boss won't let me. Can you give me a password so I can take this stuff off."

Rudy said to her: "Look, if I do it, I will get in trouble with my boss. I really don't want to do it."

She prevailed upon him to give her his password, which he

did, and she removed her personal stuff.  Completely innocent but she knew she could get Rudy in trouble and she didn't want to do that.

So her thought process was -- and I will get to whether this was wise or not in a moment -- but her thought process was that's she testified to -- if I just send back the computer and somebody -- Rudy opens up the box and boots it up, the first thing they are going to notice is that the last person who accessed it was somebody using Rudy's password.

At that point, you know, Rudy revealed as having given me Dr. Yu's password and he is busted.  She didn't want to do that to a person who was nice enough to loan her his password.

And so she thought, you know, I better delete the whole darn thing or, you know, Rudy is going to get in trouble, maybe lose his job.

That's why she made the decision.  Was it a good decision in hindsight?  Clearly no.  But, you know, does she regret it now?  Totally knowing what's happened since but a --

**THE COURT:**  What if I don't buy --

**MR. GIBBS:**  -- spoliation, Your Honor.

**THE COURT:**  What if I don't -- what if -- what if I don't buy your explanation, that Plaintiffs' culpability smacks of spoliation?

**MR. GIBBS:**  Well, even if you don't buy it, this is what she has consistently said is her explanation.  She has

testified to it.  I would urge you to read her deposition.  I think she was very candid and good about answering the questions.  This has been her consistent statement.

Even if you don't, the fact of the matter is we get to intent.  We get to the rest of it only if there's a duty to preserve, and there's no basis here to find a duty to preserve as to her as of March 29.

As I already said, she had absolutely no inkling that anybody was re-thinking stratification factors.  She had absolutely no inkling anybody was considering a press release.  She had no inkling that FibroGen was consulting with counsel about disclosures.  She had no inkling that there might be an internal investigation.

You know, further confirming that Plaintiffs went to the step of introducing new evidence together with their reply, Exhibits 102 to 106.

Now, putting in new evidence in a reply is a bit sketchy.  Here the new evidence is actually helpful to us and not them, Your Honor, because the new evidence is internal discussions among people at Astrazeneca.  It wasn't shared with -- if you look at those e-mails, they are not copied to people at FibroGen.  They are not copied to Dr. Yu.  They are internal discussion.

And here is the important point:  While internally they may have been going back and forth about stratification

factors, externally, for purposes of dealing with Dr. Yu, for purposes of dealing with the FDA, they signed off on the approach Dr. Yu took.

They signed off on the use of stratification factors decided after unblinding of data.

And we know that because if you look at the new drug application part of it called the ISS or Integrated Summary of Safety -- it's Exhibit N to Tijana Brien's declaration in connection with this motion, Your Honor -- what we see is that the submission to the FDA expressly stated we have changed stratification factors.  We have new ones decided post unblinded.  Here they are.  Here is the data both ways and here is why we decided to add these new stratification factors.

So the inference that Plaintiffs want you to draw where there was something -- there was some manipulation that things were hidden from, the FDA -- that the FDA was fooled, that inference is totally exploded when you look at the ISS, Your Honor, because all of this was presented to the FDA.

The use of the so-called post hoc stratification factors was presented, was explained a year and a half before any of this, Your Honor.

So, again, put your -- consider a reasonable person in Dr. Yu's shoes on March 29, 2021.  She doesn't think there is an issue as to stratification factors.  She has no idea of what the company is thinking about.

What she does know is that the company on her watch submitted these factors to the FDA, these so called post hoc factors, explained it to the FDA and was very upfront, open and transparent about it.  So she does not see any likelihood of reasonable lit -- any reasonable likelihood of litigation.  She does not see any dispute.  She has no reason to think that litigation is in the offing.  And, therefore, she had no duty to preserve anything.

THE COURT:  All right.  Okay.

MR. GIBBS:  That's not just --

THE COURT:  I have got to go to the next hearing but I want to let Mr. Hooker respond to the question of duty on Dr. Yu's part.

MR. HOOKER:  Thank you, Your Honor.  Just real quick, on the question of FibroGen and the reasonable steps, Mr. Gibbs mentioned, you know, what we would have had FibroGen do.  He mentioned what -- send a courier.  And that's exactly at the minimum what FibroGen could have done at that point.  They even suggest that on several occasions including on March 29th.  And certainly they didn't --

THE COURT:  Well, all right but you got the Rule 37 intent to deprive.  Even negligence -- gross negligence is not enough under Rule 37.

MR. HOOKER:  Sure.  But I will just point you to page 19 of our motion and we talk about the affirmative

obligation that FibroGen had at that point to ensure that Dr. Yu preserved evidence.

But with regard to Mr. Ericson, what we think was sketchy in terms of what Dr. Yu did and her explanation for her actions is that her explanation and justifications have changed multiple times over the course of this case.

She first said she was concerned about the laptop getting lost in transit. We submitted Exhibit 24, an e-mail from the Chief Information Officer Drinkwater where he says that he explained to Defendant Yu that we use Fed Ex for laptop shipment all the time. Have never lost one. Again, the company ends up offering the courier.

Next, Defendant Yu in writing through the letter of her counsel in January of this year, she says that she took a laptop to the vendor two weeks before March 29th. During her deposition she admitted that was a lie.

Then she testified that she did not see the March 29th e-mail until the next day, and she said: Oh, well, what's done is done.

She has now abandoned that claim after we pointed out she responded to a second e-mail on March 29th just 90 minutes later.

So with all those excuses debunked, she now claims to this new excuse that she was trying to protect an IT employee, Rudy Tadina. He never told her to destroy the laptop. He actually

said the exact opposite.  He tells her to return it.

THE COURT:  I hear what you are saying.  I have very limited time left.  I just want you to address the question that Mr. Ericson rose as there is no duty in the first place to preserve this.  She didn't have enough information to know that she was in possession of critical information.

MR. HOOKER:  Well, by this point she knew that there was the March 1st disclosure about the AdCom.  It caused a 32 percent drop in the company's stock price.

We noted that there was a press release issued by a securities litigation firm announcing an investigation of the company for securities fraud.

She -- she has a meeting -- a Zoom meeting with her -- the new CFO Defendant Eisner -- and this is right after Eisner receives the slides from Astrazeneca that he re-purposes into that board presentation for the 29th where he says the NDA is misleading.

And tellingly she says she doesn't remember anything about that Zoom meeting.  Defendant Eisner's declaration is silent as to that Zoom meeting.

And, again, all of these events are taking place over the course of several months.  The FDA had a meeting in late February with FibroGen.  We say that there was extremely negative feedback.  The company's own documents say that it was extremely negative feedback.

So, there's a plethora of evidence indicating throughout March that litigation was reasonably foreseeable and that's an objective standard but under these circumstances, it was a virtual certainty.

Now, with regard to that press release that the securities litigation firm put out, even Defendants themselves admit that out of the 248 companies that they say in their -- in their example, 164 of them included a lawsuit being filed against them.  That's 66 percent.  That's two-thirds.  That's -- that's more than probable.

**THE COURT:**  All right.  I will take the matter under submission.  And --

**MR. ERICSON:**  Your Honor, could I get in ten seconds more?

**THE COURT:**  Literally ten seconds.  That's all I have got.

**MR. ERICSON:**  Plaintiffs' Exhibit 3 and 4, they utterly explode the theory that the holding or the announcement of an AdCom had anything to do with stratification factors or any issue that Plaintiffs are complaining about in this case. Their own evidence blows up their own theory.  Exhibits 3 and 4, please check them out.  Thank you.

**THE COURT:**  Thank you.  All right.  Pending the supplemental submission the chart that I asked for, the matter will be taken under submission.  Thank you, Counsel.

**MR. GIBBS:**  Thank you, Your Honor.

**THE CLERK:**  This hearing is concluded.

(Proceedings adjourned at 2:54 p.m.)

---oOo---

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   September 14, 2023

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter