**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge Presiding

PEIFA XU, et al.,            )
                             )
          Plaintiffs,        )
                             )
  vs.                        )     **NO. 3:21-cv-02623-EMC**
                             )
FIBROGEN, INC., et al.,      )
                             )
          Defendants.        )
_____)

                      San Francisco, California
                      Wednesday, January 31, 2024

          **TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                      SAXENA WHITE P.A.
                      2424 North Federal Highway - Suite 257
                      Boca Raton, Florida  33431
                 **BY:  LESTER HOOKER, ATTORNEY AT LAW**



          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)


For Defendants:
                         COOLEY LLP
                         3175 Hanover Street
                         Palo Alto, California   94304
                  BY:   **PATRICK GIBBS, ATTORNEY AT LAW**
                        **BRETT DE JARNETTE, ATTORNEY AT LAW**

For Defendant K. Peony Yu:
                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                         Four Embarcadero Center - Suite 2200
                         San Francisco, California   94111
                  BY:   **BRUCE ERICSON, ATTORNEY AT LAW**

**Wednesday - January 31, 2024**                    **2:35 p.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:** Court is calling the case Xu versus Fibrogen, Inc., et al, case number 21-2623.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. HOOKER:** Good afternoon, Your Honor.

My name is Lester Hooker from the law firm Saxena White on behalf of the lead plaintiffs in the class.

**THE COURT:** All right. Good afternoon, Mr. Hooker.

**MR. GIBBS:** Good afternoon, Your Honor.

Patrick Gibbs from Cooley, along with my partner Brett De Jarnette, also from Cooley, both of us representing the defendants other than Dr. Yu.

**THE COURT:** All right.

**MR. ERICSON:** Good afternoon, Your Honor.

Bruce Ericson of Pillsbury Winthrop Shaw Pittman appearing for Dr. Yu.

**THE COURT:** All right. Thank you.

I believe, is that everyone?

Okay. First of all, let me advise counsel that you have a gallery. We have this on Zoom, but we have a number of students from the law school nearby who are observing and hoping to learn something from this process. So keep in mind

you should be on your best behavior as a result, as will I.

So this is approval for the class settlement in the matter.  I understand that a settlement has been reached, at least tentatively.  And for the benefit of the students, the issue here is whether or not I should give preliminary approval to a class action settlement.

If I do, the next process will be then to notify the class of the settlement and give the class members a chance to respond and determine whether they support settlement or not and whether they want to be a part of this settlement.  And then there's a later hearing, which I will determine, after we get the response of the class, would actually give final approval to the class action settlement.

So in this matter, this is a proposed class settlement, and I believe -- I'm just kind of -- I have so many different classes -- notes here.  We did go through a class certification process, did we not?  Or have we?

**MR. HOOKER:**  That's correct, Your Honor.

**THE COURT:**  And but I think I define the cutoff limit a little bit different, and the class defined here includes investors for a period after which I found that there may not be a recovery, but there's a slightly enlarged definition of the class compared to what was certified.  Is that correct?

**MR. HOOKER:**  That is correct, Your Honor.  The class that's settled matches with the class that was pled in the

amended complaint and the class that was defined in the motion for class certification, but it is slightly longer than the class that was certified in Your Honor's order.

**THE COURT:** All right. But my order, as I understand it, is taken into account in this settlement because of a fairly heavy discount of the recovery of those in the class period that I had found had no action claimed; correct?

**MR. HOOKER:** That is correct, Your Honor. The stub period is heavily discounted to reflect Your Honor's order.

**THE COURT:** Okay. And then there is also -- did we leave for another day the question of option holders?

**MR. HOOKER:** Option holders are included in the settlement, and we've included in the plan of allocation, that we developed with the assistance of our expert, tables for option holders to participate in the settlement.

**THE COURT:** All right. And I do think that, after reviewing your papers, that including them in the class, I think they meet the requisites of Rule 23(a) and 23(b) for certification. It seems to me that the issues are amenable to class-wide treatment.

There is a -- I guess a difference in calculation of loss for option holders as opposed to straight shareholders; is that right?

**MR. HOOKER:** Yes, that's correct. The tables are included in, I believe it's table B to the plan of allocution

that's included in the notice.  But our expert did take into account all of the series for the various call and put options that are included in the settlement in order to include them in a future distribution once the claims administration process is over.

**THE COURT:**  And remind me.  There's so many ways of calculating losses experienced by those with options.  It gets a little complicated.  But at the end of the day, is it based on actual sort of market prices during the relevant period?  Or is it done through -- maybe you can explain to me briefly how the option holders and damages are sort of assessed.

**MR. HOOKER:**  Sure, Your Honor.

And we actually lay this out in the declaration of Scott Walster who is a former economist at the SEC.  That's at ECF number 236, it's page 133 of 182.  It's paragraphs -- I think it's paragraph 22 of his declaration.

But he does calculate damages based on the artificial inflation or deflation for the puts at the time of purchase subtracting the inflation at the time of sale.  So very similar to that of shareholders.

And those are set forth in Tables C and D of the proposed Plan of Allocation that's in the notice.

**THE COURT:**  All right.  So that seems like a very straightforward method of pricing that doesn't require complicated economic models?

**MR. HOOKER:**  No.   No.   It's very similar to the application that one would engage in for calculation of shareholder claims.

**THE COURT:**  All right.  And there is precedent I think you've provided for this method of calculation for option holders; correct?

**MR. HOOKER:**  That's correct, Your Honor.

**THE COURT:**  Okay.  So then putting aside those nuances regarding the who's covered by the class and the slight difference between what was certified, I'm finding that I do think if there's a discount for those who are included in the longer class period, notwithstanding my finding, but that's reflected in the lesser amount they're going to recover relative to others, the fact that option holders as well as stockholders suffered damages which are calculable and that they as a group are entitled to consideration as a part of the certified class having met the requirements of Rule 23, then the basic question is, is this a fair and adequate settlement in light of the risks involved in this case?

And here there -- maybe you can summarize briefly what you think.  This is a fairly heavy discount inasmuch as the amount of the settlement is approximately three-and-a-half to six-and-a-half percent of what the maximum damages that would be if the plaintiff were to take this to verdict and win everything; correct?  It's about a three to six percent

recovery.

**MR. HOOKER:**  That's correct, Your Honor.

**THE COURT:**  But against that, the Court is supposed to consider that but also weigh what the litigation risks are to determine what is a fair settlement.  And maybe you can summarize the main litigation risks that warrant that sort of a discount settlement.

**MR. HOOKER:**  Absolutely, Your Honor.  I'd be happy to. And I know we devote a significant amount of space in our brief to those very issues.  The fact that the settlement provides an immediate and significant benefit we think is -- supports the adequacy of the settlement in light of those risks, that continued litigation in this case in our estimation would produce an inferior result, a lower recovery and possibly no recovery at all.

As Your Honor mentioned at the beginning of today's hearing, the Court already accepted some of defendants' arguments at the class certification stage in shortening the class period.

Defendants would have continued to advocate along those same lines on loss causation grounds.  In order to further whittle the class period we anticipate at summary judgment and at trial, they would have continued to challenge liability on both falsity and scienter basis, continuing to argue that none of the challenged statements were actually

false and certainly that none were made with the requisite intent.

And we really weighed that if the Court, at summary judgment or the jury at trial or even on appeal, lent any credence to those arguments, it's not hard to envision the scenario where the class recovers nothing at all or even significantly less than the substantial benefit of the settlement.

An additional consideration here that the plaintiffs were really cognizant of was ability to pay considerations. The director and officers insurance policy tower was wasting at the time of the settlement. It would have continued to erode if we would have continued litigating.

And the company's financial condition at the time of the settlement was concerning to plaintiffs. We pointed out in our briefs what was publicly reported in terms of the stock price, the cash on hand, and the net loss that the company was experiencing at the time.

And, you know, lastly, the 28-1/2 million dollar settlement, on a pure monetary level, really compares favorably to similar settlements in similarly sized class actions. That ranks very highly. Even the percentage basis that Your Honor recited is significantly above what we see as average recoveries in these cases.

And given the procedural posture of the case and the

other issues that were involved in as far as risk goes, we think the settlement is an outstanding result for the class.

**THE COURT:**  All right.  With respect to the financial situation of the defendant, there's a wasting D&O insurance policy; correct?

**MR. HOOKER:**  That's correct.

**THE COURT:**  And is that -- I'm just curious, is there enough in that policy to fund this entire settlement, or is some of this settlement coming out of beyond the insurance coverage from the defendants?

**MR. HOOKER:**  It's my understanding from defendants that the entirety of the settlement is being funded by insurance.

**THE COURT:**  Okay.  And the 10-K reporting the cash in hand, that's after the loss, the 200-plus-million loss that's reported?

**MR. HOOKER:**  That's correct, Your Honor.

**THE COURT:**  I see.

And as I understand it, there are no other pending pharmaceutical products in the pipeline that -- for which there's an imminent prospect of substantial change in financial picture?

**MR. HOOKER:**  From what we saw in publicly available materials, no, Your Honor.

**THE COURT:**  All right.  And the fees that you're

asking for in this matter is capped by 25 percent of the settlement fund; correct?

**MR. HOOKER:**  That's correct, Your Honor.

**THE COURT:**  And that results in a negative multiplier to the lodestar?

**MR. HOOKER:**  Yes, a significantly negative multiplier of 0.5.

**THE COURT:**  So you're taking a hit in terms of the fees?

**MR. HOOKER:**  In terms of the value of the time that we spent on the case, yes, it's roughly double what we are requesting or what we anticipate requesting at the final approval stage.

**THE COURT:**  Okay.  Well, and that speaks well to the credibility of the settlement, it seems to me, because it always raises a suspicion when there's a settlement that affords a large multiplier so you have to look at that twice.

In terms of the notice, I'm trying to make sure that the notice period to the class is going to give ample time.  It seems like objections and exclusions should -- usually with those -- those are borne by a postmark date as opposed to just a date of receipt.  I'm not sure -- I mean, that seems to be that should be clarified.

And there should be -- I haven't done a calculation.  How many -- how many -- once this goes out, how much time is

there, do you calculate, will be afforded to folks to file -- or register their objections or exclusions?

**MR. HOOKER:**  Roughly 70 days, give or take.  I guess it really depends on when the final approval hearing is set. But if it's set for, say, sometime in mid to late May, class members will have about that amount of time once the notice date passes.

**THE COURT:**  Okay.  I think we want to make sure that we set, you know, clear dates in the notice and not have people try to calculate.  That's one thing I will want once we --

**MR. HOOKER:**  Absolutely, Your Honor.  Yeah, as soon as we know the final approval hearing date, we can make the calculations as far as exactly when the date for exclusion requests and objections is and the date that we will be submitting our papers which will be in advance of that date.

**THE COURT:**  Okay.  And in terms of method of notice, it looks like primarily this is done by notice packets via mail, traditional mail?

**MR. HOOKER:**  There will be notice packets via mail. There will be a website that's created.  There'll also be a press release that gets issued and a notice over PR wire as well.  And J&D, the proposed claims administrator, will also send notice to its proprietary list of broker nominees where the vast majority of the anticipated shareholders will be contacted through.

So it's a multipronged notice program that's substantially identical to the notice programs that have been used in other securities class actions over the years.

**THE COURT:**  And what about e-mail?  I think there's some reference to follow with e-mails.  Is there a reason why traditional mail notice can't be supplemented?  Do you have -- does the administrator have access to most e-mails of investors?

**MR. HOOKER:**  And we did submit a declaration from J&D, which is also in ECF number 236.  And it begins at page 135, it's Exhibit 3.

But, yes, to the extent that the claims administrator has e-mails, those will be used.  But the vast majority of the shares are held by shareholders, I guess in street name would be the jargon, where the brokers have those contact informations and the brokers provide J&D with the information to contact the shareholders, or the brokers contact their clients themselves.

But in either case, the information typically is a mailing address.  If there is an e-mail address included with that, then the shareholder will receive both a physical notice packet as well as the information e-mailed to them as well.

**THE COURT:**  So to the extent there is an available e-notice or e-mail address, that will be utilized along with the physical address then?

MR. HOOKER:  Correct, Your Honor.

THE COURT:  Okay.  And what do we -- remind me what the best guesstimate of the size of the class is?  Do we have some sense?

MR. HOOKER:  Yeah.  And it's really -- it's really a guess right now.  I believe -- and let me just -- I don't want to speak out of turn.

I believe it was something in the range of 30,000.  But it is in that declaration that we submitted.

And the one thing to keep in mind is that this class is -- the vast majority of class members are institutional shareholders.

THE COURT:  Yep.

MR. HOOKER:  I think the estimate is something about 77 percent.  So even though tens of thousands of notice packets get sent out -- I believe it looks here it might be 125,000, I'm sorry -- the vast majority of the actual shares that -- of Fibrogen shares that are included in the settlement might be held by a small subset of those shareholders because they're institutions and they own the vast majority of the shares.

So the claims administrator has provided details on what they anticipate would be the number of claims received just based on experience.  Something along the lines of 31,000 claims based on that experience.

But again it might be the situation based on both

J&D's experience and our experience as counsel that a small subset of those claims represents the most -- the vast majority of the shares that are included in the settlement.

**THE COURT:** Is there anything else you think J&D can do to make sure that notice gets out and people respond other than what you've -- what's been proposed here?

**MR. HOOKER:** To be honest with you, Your Honor, I don't think so. We actually took a very close look at Your Honor's concerns and the information requested in prior cases, as well as canvassing the notice programs that have been set forth in other securities class actions. And this multiprong notice program has been found to be the best way of doing that. We've had great results in the past.

You know, the estimated number of notice packets that get sent out are broad. We try to send out as many notice packets as possible to potential shareholders, but the actual number of shareholders is going to be significantly less. And this type of notice program is extremely effective in procuring great participation from the settlement class members in the settlement.

**THE COURT:** All right. If we -- if I give approval, indicate -- and I am going to approve -- provide preliminary approval, I think you've made the showing necessary this is a fair and adequate settlement, that the distribution and the allocation between the parties, between the class members does

not result in any unfair preferential treatment, and this was -- has all the markings of an arm's length negotiated resolution.

And although the ultimate recovery here, if the settlement goes through, is a fraction of the total amount of damages that could have been potentially recovered at trial, I think given the litigation risks, including the financial situation of the defendant and collectibility issues, warrants approval here.

What I would like you to do is to -- if you could look at the form of order that you submitted.  I think the e-mail issue is not quite so clear.  I'd like you to make that explicit that not just as a reminder notice for those that fail, but I think as an initial notice for those for whom an e-mail can be obtained, there should be a distribution of the notice packets by both mail and e-mail just in case, and hopefully pick up some of the small investors who might otherwise miss out.

And then we should set a date far enough in advance so that I get that order out and then the administrator can prepare.  And I do want to make sure that people have at least 60 days upon issuance of the notice to register objections or opt-outs.

So I don't know, if we give ourselves -- this is now end of January.  Do you suggest -- what do you suggest for the

hearing date?

**MR. HOOKER:**  If we set a final approval hearing date in at least mid May, that would be sufficient time, at least 60 days.  I think that might provide closer to 70 days for the shareholders.

**THE COURT:**  I think that's a proper calculation.

Now the only question is do we have a date in May, Vicki?

**THE CLERK:**  May 16th at 1:30, Your Honor.

**THE COURT:**  May 16th at 1:30 as the hearing date.  Does that work?

**MR. HOOKER:**  That works for plaintiffs, Your Honor.

**THE COURT:**  Okay.  Hearing no other objection, I'm going to go ahead and set that date.

If you could resubmit the form of order now with dates and clarifying the e-mail notice and with the dates -- specific dates certain that class members will have to either opt out or file objections, I'm ready to go forward with this.

**MR. HOOKER:**  We will do so, Your Honor.  Would you like us to e-mail that to chambers?

**THE COURT:**  Yeah, why don't you do that.

One procedural question is we still have unresolved, there was a pending motion about the sealing or not the sanctions motion with respect to defendant Yu.  Is that -- that's still a live issue, I take it?

**MR. ERICSON:**  It's stayed, Your Honor.  I mean, Your Honor stayed everything, and that's part of the settlement is that everything remains stayed so...

**THE COURT:**  Well, it's stayed.  But it means I still have to do something with this motion, and I just want to get your views as to whether or not that is wrapped up in this at all?

**MR. ERICSON:**  I think it's wrapped up in this and I don't think Your Honor has to do anything with that motion.

**THE COURT:**  What's the plaintiffs' view?

**MR. HOOKER:**  Our view is all the pending motions were stayed and have been mooted by the settlement.  So I agree that Your Honor doesn't have to do anything further with any of the unsealing.

**THE COURT:**  All right.  Well, this is a matter in which, you know, there is some public interest, at least based on my finding.  I'd have to give that some thought.

I understand the parties believe that the issue is mooted out and that the stay should turn into a -- I guess a leaving things as they are, right, not ruling on the motion?  Before I do anything, I'll give you notice if I do decide to do something different than that.

And I understand that the derivative action has also resolved.  I don't know if that's another matter.  But I just want to make sure I understand that that -- there's really

nothing left of this case if this case -- if this settlement is finally approved, there's no shareholder action as well that's outstanding; is my understanding correct?

MR. GIBBS:  That's correct, Your Honor.  Nothing else left before Your Honor.  There are some shareholder derivative cases in other courts, but they're not before Your Honor.

THE COURT:  Great.  All right.  Then we'll set it for that May date.  And if you would get me the order with some dates certain in there and clarification on the e-mail notice, I'll get that out as quickly as possible.

MR. HOOKER:  Thank you very much, Your Honor.

THE COURT:  Thank you.  Congratulations.

MR. ERICSON:  Thank you, Your Honor.

MR. GIBBS:  Thank you, Your Honor.

(Proceedings concluded at 3:03 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, March 13, 2024

_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter