**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **CLASS ACTION** <br><br> DECLARATION OF LESTER R. HOOKER IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES |

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................................2

II.   PROSECUTION OF THE ACTION ......................................................................................9

      A.    The Commencement of the Action, Lead Plaintiffs' Appointment, and Filing
            of the Amended Complaint ..................................................................................9

      B.    The Pleading Stage .............................................................................................9

      C.    Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts ...........................11

            1.    Discovery Obtained from Defendants.................................................................12

            2.    Discovery Obtained from Third Parties ..............................................................15

            3.    Discovery from Lead Plaintiffs ...........................................................................16

            4.    Lead Counsel's Document Review and Deposition Preparations......................16

            5.    Class Certification Briefing and Related Expert Discovery..............................17

      D.    Mediation Efforts and Settlement Negotiations ..............................................................19

      E.    Preliminary Approval of the Settlement..........................................................................19

III.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE...............................19

      A.    Risks Relating to the Class Period ...................................................................20

      B.    Risks Proving Falsity and Scienter...................................................................21

      C.    Other Risks ........................................................................................................23

      D.    The Settlement is Reasonable in Light of the Potential Recovery in the Action ........24

IV.   LEAD PLAINTIFFS COMPLIED WITH THE ORDER PRELIMINARILY
      APPROVING SETTLEMENT AND PROVIDING FOR NOTICE ...................................25

V.    THE PLAN OF ALLOCATION...........................................................................................26

VI.   THE FEE AND EXPENSE APPLICATION.......................................................................29

      A.    The Fee Application ..........................................................................................29

            1.    The Excellent Outcome is the Result of Significant Time and Labor that
                  Lead Counsel Devoted to the Action ..................................................................29

            2.    Standing and Caliber of Opposing Counsel .......................................................32

            3.    This Was a High-Risk Litigation Undertaken On a Fully Contingent
                  Basis ....................................................................................................................32

            4.    Lead Plaintiffs Support the Fee Request.............................................................33

B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable..........33

VII.  THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND
LEAD PLAINTIFFS' APPROVAL...................................................................................35

VIII. CONCLUSION ...............................................................................................................36

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Declaration of David A. Randall (Executive Director of the Employees' Retirement System of the City of Baltimore) in Support of (1) Lead Plaintiffs' Notice of Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses |
| B | Declaration of Christopher R. DiFusco (Chief Investment Officer of the City of Philadelphia Board of Pensions and Retirement) in Support of (1) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses |
| C | Declaration of Padraic P. Lydon, Esq. (Executive Director and General Counsel of Plymouth County Retirement Association) in Support of (1) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses |
| D | Declaration of Luiggy Segura (on behalf of JND Legal Administration) Regarding (A) Mailing of Notice Packet; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion to Date |
| E | Declaration of Lester R. Hooker in Further Support of Lead Counsel's Motion for An Award of Attorneys' Fees and Reimbursement of Litigation Expenses |

I, Lester R. Hooker, of Saxena White P.A. ("Saxena White" or "Lead Counsel"), respectfully submit this declaration in support of (1) Lead Plaintiffs' Motion for Final Approval of the Class Action Settlement and Plan of Allocation and (2) Lead Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Litigation Expenses.[1]  I have personal knowledge of the matters stated in this declaration based on my active supervision and participation in the prosecution and settlement of the Action.  If called upon as a witness, I would testify competently thereto.

1.    Saxena White is Lead Counsel for Lead Plaintiffs Employees' Retirement System of the City of Baltimore ("Baltimore Employees"), City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund"), and Plymouth County Retirement Association ("Plymouth County") (together "Lead Plaintiffs" or "Plaintiffs") and the Settlement Class.  I am a Director of my firm and have actively supervised and participated in the prosecution and resolution of this Action.

2.    I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Lead Plaintiffs seek final approval of the $28,500,000 Settlement for the benefit of the Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Class Members.

3.    I also submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Fee Memorandum").  As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 25% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the amount of $637,306.21.  In addition, Lead Plaintiffs request reimbursement of a

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meanings as in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Settlement Agreement" or "Stipulation") (ECF No. 236).  All citations and internal quotations are omitted, and all emphasis is added.  All exhibit ("Ex. __") references are to the exhibits submitted with this declaration.

total amount of $35,540.28 pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs incurred in connection with their representation of the Class.

## I.    PRELIMINARY STATEMENT

4.    The Court, having presided over this complex securities class action for nearly three years, is familiar with the claims and defenses asserted.  Accordingly, this declaration does not seek to detail each and every event that has occurred so far in the litigation.  Rather, it highlights certain pertinent events leading to the Settlement and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval.

5.    This is a class action that asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  Lead Plaintiffs assert claims against Defendants FibroGen Inc. ("FibroGen" or the "Company") and Defendants Enrique Conterno ("Conterno"), James Schoeneck ("Schoeneck"), K. Peony Yu ("Yu"), Mark Eisner ("Eisner"), and Pat Cotroneo ("Cotroneo") (collectively, the "Individual Defendants" and together with FibroGen, "Defendants") for alleged material misstatements and omissions during the Class Period regarding the safety and efficacy profile and Phase III trial results of FibroGen's flagship anti-anemia drug, Roxadustat.  In December 2019, FibroGen submitted a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") to obtain approval for marketing Roxadustat in the United States.  The Complaint alleges that Defendants falsely assured investors that the safety results for Roxadustat were derived pursuant to FDA-sanctioned analyses, when instead Defendants used *post-hoc* stratification factors to artificially make Roxadustat appear safer than its comparators, Epogen and placebo.  The Complaint further alleged that the price of FibroGen's publicly traded securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and the price of FibroGen's securities declined when the data manipulations were revealed to the market through a series of disclosures.

6.    On February 13, 2024, the Court granted preliminary approval of the proposed $28.5 million cash settlement with Defendants and directed notice of the Settlement to be disseminated to the Class.  ECF No. 244 (the "Preliminary Approval Order").  The Settlement will

resolve all claims asserted in the Action against Defendants by all persons who purchased or acquired FibroGen securities, including common stock or stock options, between December 20, 2018 through July 15, 2021, inclusive, and were damaged thereby.[2]  Pursuant to the Preliminary Approval Order, the Court-approved Claims Administrator, JND Legal Administration ("JND"), implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Class Members by mail and by publication.  More than 36,770 Notice Packets have been disseminated to potential Class Members and nominees.  The Summary Notice was also published through *Investor's Business Daily* and over *PR Newswire*.  *See* Ex. D.   In addition, a settlement-specific website and toll-free telephone number were established to provide potential Settlement Class Members with additional information.  Thus far, no objections have been received.

7.     By March 8, 2024, Defendants caused the $28,500,000 cash settlement to be deposited into an escrow account for the benefit of the Settlement Class.

8.     The Settlement Amount, when viewed in the context of the challenges and risks in this litigation, represents an excellent outcome for the Settlement Class.  If approved, a settlement of $28.5 million eclipses by nearly four times the $7.6 million median settlement amount in securities class actions resolved in the Ninth Circuit in the decade between 2013 and 2022, and the Class's recovery of between 3.4% and 6.4% of the potential trial damages is approximately 25-50% higher than the 1.7% to 4.3% median percentage of similar damages ranges in 2022 securities class action settlements.  Thus, the proposed Settlement provides an outstanding benefit for the Settlement Class that surpasses by a wide margin the normal range of recoveries in securities class action settlements.

---

[2] Excluded from the Settlement Class are: (1) Defendants; (2) the Officers or directors of FibroGen during the Settlement Class Period; (3) the Immediate Family members of any Defendant or any Officer or director of FibroGen during the Settlement Class Period; and (4) any entity that any Defendant owns or controls, or owned or controlled, during the Settlement Class Period.  Also excluded from the Settlement Class are those persons who file valid and timely requests for exclusion in accordance with the Preliminary Approval Order and the plaintiffs in the Opt-Out Action.

9. The recovery is also noteworthy when weighed against the substantial risks of either a reduced recovery or no recovery at all had the litigation continued, as Plaintiffs faced formidable defenses from Defendants regarding falsity, scienter, loss causation, and damages. While Plaintiffs believed that they had strong responses to these points, the risk remained that Defendants' arguments could have been accepted by this Court on summary judgment, or by a jury at trial, which would have reduced or even eliminated altogether the Class's potential recovery. Further, even a favorable jury verdict would have been subjected to an inevitable appeals process, the results of which would have been uncertain and lengthy.

10. In addition, due to FibroGen's current financial condition, even had Plaintiffs prevailed at every step of the litigation, it is highly questionable as to whether the Class would have recovered more than (or even as much as) the Settlement Amount. Indeed, on October 17, 2023, the date on which the Parties agreed to resolve the Action, FibroGen's stock price closed at approximately $0.65 per share, representing a market capitalization of only approximately $65 million. The Settlement Amount thus represents nearly half of the Company's entire market capitalization on that date. Moreover, according to FibroGen's Form 10-K filed with the SEC on February 26, 2024, at the end of 2023 the Company only had $113.7 million in cash and cash equivalents and suffered a ***net loss*** of $284.2 million for the full year 2023. The Company's significant losses and declining class position—it reported cash and cash equivalents of $678.4 million, $171.2 million, and $155.7 million, at the end of 2020, 2021, and 2022—weighed heavily on the Company's ability to satisfy a judgement if this litigation were to proceed to trial, even under the most conservative of Plaintiffs' expert's damages measures. In addition, a review of publicly available information shows that Roxadustat has never been approved in the United States and competes with similar types of anti-anemia drugs in other countries, and FibroGen's other drug candidates do not indicate a potential for success of the magnitude necessary to change the Company's trajectory. Accordingly, Defendants' directors' and officers' insurance policies ("D&O Insurers") were the only secure source of funding, but they are wasting policies that would have been significantly depleted as the Action bore on, possibly for years, as the Court recognized in granting preliminary approval of the Settlement.

11. The Settlement is thus a highly beneficial result for the Settlement Class, as it provides a substantial, certain, and immediate recovery while avoiding the risks that the Class could recover substantially less (or nothing at all) after years of additional litigation.

12. The Settlement was only reached as the result of Lead Plaintiffs' and Lead Counsel's extensive litigation efforts, which included:

   a. moving for the appointment of Lead Plaintiffs pursuant to the PSLRA (ECF Nos. 29, 52, 57);

   b. conducting an in-depth investigation of the claims giving rise to, and preparation of, the 118-page [Corrected] Consolidated Class Action Complaint ("Complaint"; ECF No. 97), which included an in-depth review and analysis of: FibroGen's SEC filings, press releases, investor conference calls, and other public statements; information concerning FibroGen and Roxadustat from the FDA; interviews with former executives and employees of AstraZeneca AB ("AstraZeneca"), FibroGen's development partner for Roxadustat; research reports prepared by securities and financial analysts regarding FibroGen; as well as working closely with financial and industry experts;

   c. successfully researching, drafting, and filing an opposition to Defendants' separate motions to dismiss (ECF No. 114), and preparing for and presenting oral arguments on the motions;

   d. engaging in comprehensive fact discovery, including obtaining approximately 281,000 documents spanning more than 4.6 million pages of documents produced by Defendants and third parties, and efficiently reviewing and analyzing the vast majority thereof;

   e. successfully rebuffing Defendants' efforts to claw back key documents under the claim of attorney-client privilege, which necessitated multiple rounds of briefing (ECF Nos. 153, 176);

f.     moving for and obtaining sanctions against Defendant Yu based on the spoliation of evidence, which involved numerous meet and confers with Defendants over the course of approximately six months, document discovery and two depositions regarding spoliation, including that of Defendant Yu and a FibroGen corporate representative, multiple briefs on the issue, and presenting oral argument on the motion (ECF Nos. 185, 205, 206, 219);

g.     obtaining class certification (ECF No. 248) after fully briefing the motion for class certification (ECF Nos. 147, 192, 212), which included:  assisting in the preparation and submission of an expert report by Chad Coffman, CFA ("Mr. Coffman") (ECF 147-2); defending the depositions of Lead Plaintiffs and Mr. Coffman; deposing Defendants' class certification expert, Dr. Paul Zurek; participating in a class certification hearing (August 31, 2023); and filing supplemental briefing on loss causation (ECF No. 221);

h.     consulting with experts in the fields of pharmaceutical clinical trials, pharmaceutical regulation, financial analysis, economic materiality, loss causation, and damages;

i.     preparing for 20 depositions of fact witnesses;

j.     submitting detailed mediation briefing setting forth Lead Plaintiffs' positions on the hotly disputed issues in the case, which incorporated highly relevant documents produced by Defendants and non-parties during the course of the litigation;

k.     preparing for and attending a formal in-person, day-long mediation session before Michelle Yoshida, Esq. of Phillips ADR Enterprises, a highly experienced mediator of securities class actions and other forms of complex shareholder litigation, followed by rigorous and extensive settlement negotiations over several months before the Parties agreed to resolve the Action;

l.       negotiating and drafting the Stipulation and related exhibits; and

m.      drafting the preliminary approval brief and supporting papers (ECF Nos. 235, 236), and the final approval briefs and supporting exhibits.

13.     Therefore, due to the extensive evidentiary and litigation record by the time of Settlement, Lead Plaintiffs and Lead Counsel had a thorough understanding of the strengths and weaknesses of the Parties' positions concerning liability and damages, their respective abilities to prove or defend the claims at trial, and Defendants' ability to pay a substantial judgment.

14.     As set forth in the moving papers, Plaintiffs respectfully submit that the Settlement represents an outstanding recovery for the Class that is supported by each of the factors that the Ninth Circuit advises courts to consider in the final approval process, as set forth in Rule 23(e)(2) of the Federal Rules of Civil Procedure and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

15.     In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation, Lead Plaintiffs engaged Global Economics Group LLC ("GEG"), a well-recognized firm of economic and financial experts with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss Amount" as calculated pursuant to the Plan of Allocation.  This methodology is standard in securities fraud class action settlements and has been approved by courts nationwide.

16.     Lead Counsel also requests an award of attorneys' fees for its efforts, and for reimbursement of its Litigation Expenses.  Specifically, Lead Counsel is applying for an attorneys' fee award of 25% of the Settlement Fund and for reimbursement of Litigation Expenses in the total amount of $637,306.21 to be paid from the Settlement Fund.  Lead Counsel's requested fee award of 25% of the Settlement Fund is consistent with the "benchmark" fee award established by the Ninth Circuit and regularly awarded by Courts, including this Court, in comparable securities class action settlements.

17.     The reasonableness of Lead Counsel's requested 25% fee is also confirmed by a lodestar cross-check that yields a multiplier of approximately 0.46, which is known as a "negative" or fractional multiplier.  This means that a 25% fee would represent less than **one-half** the total value of the attorney and staff hours invested by Lead Counsel in the prosecution of the Action. Courts have repeatedly recognized that the reasonableness of a fee request is reinforced where, as here, the percentage fee would represent a negative multiplier of the lodestar.  Furthermore, this multiplier is well below the range of *positive* multipliers routinely awarded in the Ninth Circuit.

18.     In accordance with the PSLRA, Lead Plaintiffs Baltimore Employees, Philadelphia Pension Fund, and Plymouth County seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the aggregate amount of $35,540.28.  Lead Plaintiffs together expended considerable time and effort in actively supervising the litigation over a multi-year period, including by reviewing pleadings, collecting and producing numerous documents, thoroughly preparing for their depositions and being deposed, and participating in ongoing mediation and settlement discussions.  Lead Plaintiffs' efforts are detailed in the accompanying Lead Plaintiff declarations.  *See* Exs. A-C.

19.     Significantly, although the deadline for objections and exclusions has not passed, to date, no members of the Class have objected to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fees and expense request, and no investors have requested exclusion. This unanimous, positive reaction is significant, given that a substantial percentage of the Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted.[3]  Moreover, Lead Plaintiffs—sophisticated institutional investors who fully understand their fiduciary duty to act in the best interest of the Settlement Class—wholly endorse the Settlement and Lead Counsel's requested fee award.  *See* Exs. A-C.

20.     For all the reasons discussed in this Declaration, its attached exhibits, and in the accompanying memorandum in support of Lead Plaintiffs' Motion for Final Approval of Class

---

[3] Plaintiffs' expert, Mr. Coffman, in his January 27, 2023 market efficiency report, concluded that there was a "substantial level of institutional ownership of FibroGen Common Stock during the Class Period," including "472 separate institutions … holding on average 74.74% of the public float."  ECF 147-2 at ¶74.

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.                    8
3:21-cv-02623-EMC

Action Settlement and Plan of Allocation, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and Plan of Allocation are fair, reasonable, and adequate and should be approved.  In addition, Lead Plaintiffs respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     The Commencement of the Action, Lead Plaintiffs' Appointment, and Filing of the Amended Complaint

21.     The original securities class action complaint in the Action was filed in this District on April 12, 2021 by Plaintiff Peifa Xu, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  ECF No. 1.

22.     On June 11, 2021, Lead Plaintiffs Baltimore Employees, Philadelphia Pension Fund, and Plymouth County filed a motion and accompanying documents to consolidate the related actions, appoint them as Lead Plaintiffs, and appoint Saxena White as Lead Counsel (ECF Nos. 29-36).  On that same date, similar motions were filed on behalf of several other movants. ECF Nos. 18-28, 37-47.  After opposition briefs, reply briefs, and additional briefs were filed (ECF Nos. 48-58, 67, 70, 72), this Court held a hearing on the competing motions on August 19, 2021 (ECF No. 74).  On August 30, 2021, the Court consolidated five related Actions in this Action, appointed Baltimore Employees, Philadelphia Pension Fund, and Plymouth County as Lead Plaintiffs pursuant to the requirements of the PSLRA, and approved Lead Plaintiffs' selection of Lead Counsel.  ECF No. 75 at 19.  The Court directed Lead Counsel to submit a protocol for controlling fees and costs (*id.* at 20) (the "Protocol" or the "Protocol for Controlling Fees and Costs"), which Lead Plaintiffs filed on October 29, 2021, and which was approved by the Court that day (ECF Nos. 93, 94).  Lead Counsel implemented and maintained this Protocol throughout the prosecution and proposed settlement of the Action.

### B.     The Pleading Stage

23.     After appointment, Lead Counsel continued its ongoing investigation of Plaintiffs' claims.  In addition to expanding upon the initial review and analysis of publicly available

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.          9
3:21-cv-02623-EMC

information regarding FibroGen and its partnership with AstraZeneca and Astellas Pharma US, Inc. ("Astellas"), Lead Plaintiffs' multi-faceted investigation included: (i) identifying and interviewing numerous confidential witnesses who provided detailed information that was highly important in developing and supporting Plaintiffs' claims; (ii) reviewing additional research reports by securities and financial analysts concerning FibroGen; (iii) continuing to monitor FibroGen's SEC filings and earnings call transcripts as they were filed or occurred; (iv) analyzing data reflecting the pricing of FibroGen securities; and (v) consulting with multiple experts, including experts on market efficiency, loss causation, damages, pharmaceutical regulation, clinical trials and the FDA drug approval process.  Lead Counsel's comprehensive investigation significantly vetted and bolstered the strength of Plaintiffs' claims.

24.    On November 19, 2021, Lead Plaintiffs filed their Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint" or "CAC"; ECF No. 97). The Complaint asserted claims against all Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act, covering a class period of December 20, 2018 through July 15, 2021. *Id.*  Among other things, the Complaint alleged that Defendants falsely represented the safety and efficacy of Roxadustat, and falsely assured investors that the safety data was derived pursuant to FDA-sanctioned analyses.  As the deficiencies of the data and Roxadustat's safety profile were revealed over the course of multiple alleged corrective disclosures, FibroGen's stock plummeted.

25.    On January 14, 2022, Defendants FibroGen, Conterno, Schoeneck, Eisner, and Cotroneo (collectively, the "FibroGen Defendants") and Defendant Yu each filed motions to dismiss the Complaint.  ECF Nos. 107 and 109.  The FibroGen Defendants also filed a request for judicial notice of sixty (60) exhibits.  ECF No. 108.  Defendants argued, among other things, that Plaintiffs failed to adequately allege that Defendants' statements were false and/or misleading or that they were made with scienter.

26.    On March 4, 2022, Lead Plaintiffs filed their omnibus opposition to Defendants motions to dismiss.  ECF No. 114.  Lead Plaintiffs argued that the Complaint's allegations satisfied the heightened pleading requirements of the PSLRA.  Specifically, Lead Plaintiffs contended that

the Phase III safety results Defendants repeatedly touted for over two years were not the drug's true data derived from prespecified analyses agreed upon with the FDA, but were instead data that Defendants had intentionally manipulated "*post hoc*"—meaning that Defendants had changed the data after Defendants already knew the results. By concealing the true data, Defendants were able to falsely claim Roxadustat was safer than it actually was, falsely assured investors the drug would avoid the FDA's most severe "Black Box" safety warning, and falsely stated that Roxadustat had achieved superiority in efficacy against a placebo and Roxadustat's main comparator drug, Epogen. In addition, Plaintiffs argued that Defendants' statements were not inactionable opinions, mere puffery, or otherwise shielded from liability under the PSLRA safe harbor, and the Complaint adequately alleged a strong inference of scienter.

27. On April 8, 2022, the FibroGen Defendants and Defendant Yu each filed replies in support of their motions to dismiss. ECF Nos. 115 and 116. On April 28, 2022, the Court heard oral arguments on Defendants' motions to dismiss. ECF No. 123.

28. On July 15, 2022, the Court entered an Order denying in part and granting in part Defendants' motions to dismiss. ECF No. 126. The Court found that Plaintiffs had adequately alleged that 91 out of the 96 challenged false statements were materially false and misleading, and that Plaintiffs had adequately alleged scienter on the part of all of the Individual Defendants. *Id.* at 23-24, 33; *see also* ECF No. 126-1.

29. On September 13, 2022, the FibroGen Defendants and Defendant Yu each filed Answers to the Complaint. ECF Nos. 135 and 137.

**C.    Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts**

30. With the PSLRA's automatic stay of discovery lifted following the denial of Defendants' motions to dismiss, counsel for the Parties conferred pursuant to Rule 26(f) on September 1, 2022, and on September 15, 2022, the Parties submitted a Joint Case Management Report to the Court. ECF No. 141. On September 16, 2022, the Parties exchanged initial disclosures pursuant to Rule 26(a)(1) and thereafter commenced fact discovery in earnest. On October 21, 2022, the Court granted the Parties' Stipulated Protective Order and Stipulation re Discovery of Electronically Stored Information. ECF Nos. 144 and 145.

31.     Given the length of the Class Period, the scope of Lead Plaintiffs' claims, and the complex subject matter at issue in this Action, discovery was significant.  Among other things, Plaintiffs served document requests on Defendants and subpoenaed documents from multiple non-parties, including AstraZeneca, Astellas, and the FDA.  All told, approximately 281,000 documents spanning more than 4.6 million pages were produced in discovery.  By employing a technology assisted review platform ("TAR") that prioritized the documents most relevant to Plaintiffs' claims after applying human learning (which was frequently updated and optimized by Lead Counsel as discovery progressed), Plaintiffs efficiently reviewed the overwhelming majority of the hundreds of thousands of documents produced.  At the same time, Lead Plaintiffs and Lead Counsel fulfilled Lead Plaintiffs' obligations to produce discovery, including by producing thousands of pages of documents and providing deposition testimony pursuant to Rule 30(b)(6).  The amount of work done by Lead Plaintiffs during this time period is clear and compelling evidence of Lead Plaintiffs' vigorous prosecution and commitment to effectively supervising this Action, as discussed in further detail below.

**1.     Discovery Obtained from Defendants**

32.     Plaintiffs served Defendants with their First Request for Production of Documents on September 14, 2022.  These sixty two (62) individual requests generally sought, among other things, documents concerning: (i) FibroGen's communications with the SEC and the FDA; (ii) communications concerning FibroGen's NDA and meetings with the FDA relating to the application; (iii) communications among FibroGen, AstraZeneca, and Astellas regarding the NDA and the Roxadustat Phase III trial data; (iv) the data FibroGen disclosed on certain dates; and (v) data regarding the efficacy and safety of Roxadustat.  The FibroGen Defendants served their responses and objections to Lead Plaintiffs' requests on October 14, 2022, and Defendant Yu served her responses and objections on October 28, 2022.

33.     In response to Plaintiffs' requests, Defendants and their expert produced nearly 165,000 documents spanning over 1.8 million pages in 29 separate productions, beginning on November 19, 2022 and concluding on September 18, 2023.

34.     Beginning in approximately August 2022, the Parties frequently exchanged written correspondence and held numerous meet-and-confer conferences to negotiate the appropriate scope of discovery.  Those interactions involved, among other things, lengthy disputes about which custodians to search for relevant documents, which search terms should be employed, the relevant time period for discovery, and the scope of productions from various custodians.

35.     The FibroGen Defendants served three privilege logs on Plaintiffs.  Defendant Yu served one privilege log on Plaintiffs.

36.     During the course of document discovery, the Parties conducted numerous meet-and-confers amongst themselves and with non-parties, and exchanged dozens of letters and substantive emails amongst themselves and with non-parties.  The Parties also engaged in discovery disputes on a variety of issues.  Of these, two disputes resulted in significant motion practice and victories for Plaintiffs.

37.     The first significant discovery dispute resulting in motion practice began after Lead Plaintiffs filed their motion for class certification on January 27, 2023, which attached a March 2021 presentation prepared by Defendant Eisner that had been produced in discovery.  On February 3, 2023, Defendants notified Plaintiffs that they were clawing back the document under the claim of privilege, claiming it had been inadvertently produced to Plaintiffs.  Plaintiffs strongly disagreed with Defendants' contention that the document was subject to a proper claim of privileged and could be clawed back, and after extensive efforts by the Parties to resolve the dispute, Plaintiffs informed Defendants that they would move to compel the document's production.  Accordingly, on February 15, 2023, the Parties submitted a joint letter brief regarding whether Defendants could withhold the document as privileged.  ECF No. 153.  On March 29, 2023, the Court granted Plaintiffs' motion to compel and ordered Defendants to produce the document, concluding that Defendants had waived privilege by producing the document to the SEC and not timely seeking to claw back the document after becoming aware of its production in this Action.  ECF No. 161 (sealed).  On April 10, 2023, Defendants moved for leave to file a motion for reconsideration (ECF No. 168), which the Court granted on April 13, 2023 (ECF No. 170), and Defendants filed their motion on April 21, 2023 (ECF No. 172).  Plaintiffs opposed the

motion on April 28, 2023 (ECF No. 176), and Defendants replied on May 3, 2023 (ECF No. 177). On May 15, 2023, the Court denied Defendants' motion for reconsideration. ECF No. 181. Defendants then re-produced the clawed back document to Plaintiffs, subject to certain objections.

38. The second significant discovery dispute resulting in motion practice concerned the destruction of the hard drive of Defendant Yu's FibroGen-issued laptop (the "Laptop"). On December 6, 2022, months after Lead Counsel served its document requests on Defendant Yu and Defendant Yu served her responses and objections, Defendant Yu's counsel informed Plaintiffs that Yu had "erased" the Laptop's hard drive before she returned the Laptop to the Company. On December 16, 2022, Lead Plaintiffs identified documents in Defendants' productions which Lead Plaintiffs contended demonstrated that Defendant Yu's "erasure" of the Laptop's hard drive constituted spoliation of evidence. Over the course of approximately the next six months, the Parties engaged in substantial litigation efforts related to discovery of facts concerning the "erasure" of the Laptop and Defendants knowledge thereof, including conducting at least five meet and confers and exchanging at least sixteen letters and forty substantive emails related to this issue. Defendants Yu and FibroGen each made six productions of documents related to the alleged spoliation of the Laptop's hard drive. Lead Plaintiffs also served a document subpoena to NerdsToGo—a non-party IT services and computer support vendor Defendant Yu engaged—and received documents in response. In connection with the spoliation issue, Lead Plaintiffs deposed Defendant Yu in person in San Francisco on March 10, 2023, and deposed a representative of FibroGen on May 4, 2023 pursuant to Rule 30(b)(6) concerning the spoliation issue.

39. On June 8, 2023, Lead Plaintiffs moved for sanctions against Defendants Yu and FibroGen for spoliation of the Laptop's hard drive and the above-referenced hard copy documents. ECF No. 185. On July 17, 2023, Defendants Yu and FibroGen each filed oppositions to Plaintiffs' motion. ECF Nos. 197 and 199. FibroGen also moved to strike portions of a declaration Plaintiffs' counsel filed in support of their motion. ECF No. 198. On August 11, 2023, Plaintiffs filed a reply in support of their motion for sanctions (ECF No. 205) and an opposition to FibroGen's motion to strike (ECF No. 206). On August 29, 2023, the Court denied Defendants' motion to

strike. ECF No. 216. The Court held a hearing on Plaintiffs' motion for spoliation sanctions on August 31, 2023. ECF No. 219.

40. On September 29, 2023, the Court issued an Order granting in part and denying in part Plaintiffs' motion for sanctions. ECF No. 223 (sealed). The Court granted Plaintiffs' motion as to Defendant Yu, denied Plaintiffs' motion as to Defendant FibroGen, and deferred judgement on the appropriate sanctions to award until later in the litigation. *Id.* at 14. On October 6, 2023, Defendant Yu moved for leave to file a motion for reconsideration of the Court's decision on sanctions, attaching a proposed reconsideration motion. ECF No. 226. On October 15, 2023, the Court granted Defendant Yu leave to file her motion and ordered Plaintiffs to file a response by October 20, 2023. ECF No. 229. Yu's motion was pending when the Parties reached an agreement regarding the Settlement.

**2.     Discovery Obtained from Third Parties**

41. Lead Plaintiffs sought discovery from multiple third parties, including the FDA and FibroGen's Roxadustat global development partners, AstraZeneca and Astellas.

42. Lead Plaintiffs subpoenaed AstraZeneca and Astellas (and affiliated U.S.-based entities) for documents on November 10 and 22, 2022, respectively, and subpoenaed the FDA for documents on January 4, 2023. AstraZeneca served its responses and objections to Plaintiffs' subpoena on December 19, 2022. Astellas served its responses and objection to Plaintiffs' subpoena on December 20, 2022. The FDA responded by letter to Plaintiffs' subpoena on January 12, 2023.

43. AstraZeneca and Astellas asserted numerous objections regarding the subpoenas, both procedural and substantive. After months of meet and confers and written correspondence between Lead Counsel and each of Astellas and AstraZeneca, Lead Counsel secured compliance with the subpoenas, including as to specific custodians and search terms. Thereafter, Astellas produced over 4,000 documents totaling approximately 55,000 pages in three productions beginning on April 19, 2023. For its part, AstraZeneca began the first of its eleven productions on February 28, 2023, and eventually produced almost 100,000 documents totaling approximately 2.6

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.          15
3:21-cv-02623-EMC

million pages.  In addition, the FDA produced 308 documents comprising 1,805 pages on February 15, 2023.

### 3.    Discovery from Lead Plaintiffs

44.    Defendants served their First Set of Requests for Production of Documents and their First Set of Interrogatories to Lead Plaintiffs on November 21, 2022.  The 14 interrogatories and 49 production requests sought wide-ranging information regarding this Action, Lead Plaintiffs' investments, their roles as Lead Plaintiffs and proposed Class Representatives, information supporting the false statements alleged in the Complaint, information regarding the Confidential Witnesses, and other topics.  Lead Plaintiffs each served their responses and objections on December 21, 2022.  Defendants also sought and obtained discovery from Lead Plaintiffs' relevant external investment managers.

45.    Ultimately, Lead Plaintiffs, their investment managers, and their market efficiency expert produced nearly 13,000 documents constituting over 87,000 pages over a three-month period, with Lead Plaintiffs providing Defendants their first production on January 20, 2023, and a privilege log thereafter.

### 4.    Lead Counsel's Document Review and Deposition Preparations

46.    Lead Counsel devoted substantial time to reviewing and analyzing the hundreds of thousands of documents collectively produced by Defendants, Astellas, AstraZeneca, and the FDA, generating an effective and efficient discovery plan and taking significant steps designed to efficiently identify the custodians and documents most important to uncovering the facts at the heart of the Action.  Accordingly, the extensive, well-planned, and focused discovery conducted by Lead Counsel was crucial to achieving the highly favorable Settlement for the Class.

47.    In accordance with the Protocol for Controlling Fees and Costs, Lead Counsel's discovery plan efficiently leveraged a sophisticated electronic document hosting system called Relativity, which implemented a TAR workflow whereby documents predicted via machine learning as potentially important were ranked and prioritized for review. Lead Counsel monitored and enhanced the TAR process as discovery progressed to ensure it was functioning effectively and efficiently.  To conduct first-level document review, Lead Counsel engaged a dedicated team

of document review staff attorneys with substantial experience in e-discovery and deposition and trial preparation. Attorneys on the litigation team prepared and continuously updated a highly detailed document review instruction manual and protocol. Document reviewers were trained to code documents for their level of responsiveness or importance to the case (*e.g.*, "Hot," "Warm," "Relevant," "Non-Relevant"), for case issues (for example, FibroGen's financial performance/reporting, safety and efficacy data, and scienter), for review by experts, and for potential use with particular deponents. Lead Counsel also developed and continuously updated reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, and a glossary of technical terms and acronyms used in pharmaceutical research. Throughout document discovery, senior attorneys monitored the efficiency and quality of the document review, met regularly with staff attorneys to ensure their understanding of the case, and discussed key facts uncovered by the review. In addition, staff attorneys were instructed to prepare detailed memoranda on potential witnesses and subject matters of importance to assist senior attorneys in their preparations for depositions, further discovery, motion practice, mediation/settlement, and trial.

48.     Many of the documents produced to Plaintiffs were substantively complex and laden with medical, scientific, and financial jargon and terms of art. Throughout the course of discovery, Lead Counsel consulted with Mr. Coffman and his team at GEG—who specialize in assessing economic issues related to market efficiency, loss causation, and damages. Lead Counsel also consulted with Dr. Timothy McCaffrey, a Professor of Medicine at The George Washington University School of Medicine & Health Sciences, for assistance in understanding the scientific documents and the key issues in the case.

### 5.     Class Certification Briefing and Related Expert Discovery

49.     Lead Plaintiffs filed their initial Motion for Class Certification on January 27, 2023, attaching the expert report of Mr. Coffman. ECF Nos 147, 147-2. In the filing, Lead Plaintiffs made a substantial showing that, among other things: (a) the proposed class was so numerous that joinder was impracticable; (b) common questions of law and fact existed and predominated over any questions affecting individual class members; (c) Lead Plaintiffs were typical of the proposed

class; (d) Lead Plaintiffs and their counsel would fairly and adequately protect the interests of the proposed class; and (e) a class action was the superior means to resolve the issues raised in the case. Mr. Coffman's report set forth the evidence in support of the efficiency of the market for FibroGen securities. ECF No. 147-2 at 11-41. Mr. Coffman also opined that the standard methodology and tools typically used to determine damages on a class-wide basis in securities fraud cases could be used in this Action. *Id.* at 41-44.

50. In connection with the Motion for Class Certification, Defendants deposed Mr. Coffman on April 4, 2023. Defendants took the depositions of representatives of Lead Plaintiffs Plymouth County, Baltimore Employees, and Philadelphia Pension Fund on April 11, 2023, April 13, 2023, and April 18, 2023, respectively.

51. Defendants filed their Opposition to the Motion for Class Certification on May 12, 2023, attaching the expert report of Dr. Paul Zurek. ECF Nos. 180, 180-1. On June 8, 2023, Lead Plaintiffs deposed Dr. Zurek.

52. On June 23, 2023, Lead Plaintiffs filed their reply in support of class certification. ECF No. 192. On August 17, 2023, Defendants moved for leave to file a sur-reply on class certification, attaching their proposed sur-reply. ECF Nos. 210, 210-1. Plaintiffs opposed this motion on August 21, 2023. ECF No. 212. On August 24, 2023, the Court granted Defendants' motion for leave to file a sur-reply. ECF No. 214.

53. On August 31, 2023, the Court conducted a hearing on Plaintiffs' motion for class certification (ECF No. 219), during which the Court directed the parties to file a supplemental chart regarding facts allegedly disclosed on July 15, 2021 at the FDA Advisory Committee Meeting ("AdCom") considering FibroGen's Roxadustat NDA (*i.e.*, the last alleged corrective disclosure). The parties jointly filed this supplemental briefing on September 15, 2023. ECF No. 221.

54. On October 3, 2023, the Court granted in part and denied in part the Motion for Class Certification. ECF No. 248. In its Order, the Court appointed Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, and certified a class of purchasers of FibroGen stock for a Class Period of December 20, 2018 through April 6, 2021 who were damaged

thereby.  The Court deferred certification of options holders during the Class Period and instructed the Parties to provide supplemental briefing on whether damages for options holders could be calculated on a class-wide basis.  The Parties reached an agreement regarding the Settlement of this Action before filing the supplemental briefing on the issue of options damages.

**D.    Mediation Efforts and Settlement Negotiations**

55.    On March 14, 2023, the Parties and Defendants' D&O Insurers participated in an in-person mediation session in San Francisco with mediator Michelle Yoshida of Phillips ADR. Prior to the mediation, each side submitted comprehensive mediation statements and rebuttal statements setting forth their respective positions on various legal and factual issues, which included detailed information obtained through the extensive discovery process.  During the mediation, the Parties provided their respective views on liability and damages.  At the conclusion of the mediation, the Parties were at an impasse and agreed to continue litigation efforts.  No further settlement negotiations were scheduled.

56.    In July 2023, while active litigation remained ongoing, the Parties resumed settlement discussions through Ms. Yoshida, which included numerous telephonic and video conferences.  These discussions culminated in a mediator's proposal for $28.5 million, which the Parties accepted on October 17, 2023.

**E.    Preliminary Approval of the Settlement**

57.    Lead Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement and accompanying Declaration of Lester R. Hooker on December 8, 2023.  ECF Nos. 235-236.

58.    The Court held the preliminary approval hearing on January 23, 2024 and issued an Order granting preliminary approval and providing for notice on February 13, 2024.  ECF No. 244.

**III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

59.    The $28,500,000 cash Settlement was the result of arm's length negotiations between experienced counsel, and was conducted under the oversight of Ms. Yoshida, a well-respected  independent  mediator,  special  master,  and  arbitrator  with  extensive  experience

mediating securities class actions and other forms of complex shareholder litigation. The Settlement eliminates the very real risk of protracted litigation against Defendants under circumstances where a sizeable recovery—or any recovery at all—was highly uncertain. Lead Plaintiffs and Lead Counsel accordingly believe that the Settlement is fair, reasonable, and an excellent result for the Class, considering the risk of recovering a lesser amount, or nothing at all, after substantial delays, possibly lasting several years.

60.     The Settlement provides the Class with an immediate and certain cash benefit of $28.5 million, representing as much as 6.4% of the maximum potential trial damages, which Plaintiffs' expert estimated ranged from $443 million to $818 million for shareholders (and $13 million to $33 million for option holders). The $818 million figure was calculated under the best-case scenario, *i.e.*, if Plaintiffs' claims were able to survive summary judgment largely intact despite what the Court called Defendants' "credible arguments." ECF No. 244 at 6.

61.     Although Lead Plaintiffs strongly believe in the merits of this case, they are cognizant of the significant risk that continued litigation could end in no recovery at all. While Lead Plaintiffs believe that they had strong counterarguments, Defendants made a number of credible arguments which the Court at summary judgment, a jury after trial, or an appellate court could have accepted. Indeed, the Court has already accepted several of the arguments that Defendants made in opposing class certification. Likewise, the Court has already recognized that FibroGen's precarious financial condition, uncertain future, and wasting insurance policies supports approval of the Settlement.

A.     **Risks Relating to the Class Period**

62.     Plaintiffs believed there were several arguments that Defendants would likely raise to limit the Class Period. Specifically, when ruling on the motion for class certification, the Court accepted Defendants' arguments that there was no price impact after the final corrective disclosure alleged in the Complaint, and declined to certify the full alleged class period between December 20, 2018 through July 15, 2021. ECF No. 248 at 22-27. The Court agreed with Defendants that the decline in FibroGen's share price after the July 15, 2021 AdCom was not caused by the correction of any prior statements by Defendants and merely reflected the decision of the AdCom

to not recommend approval for Roxadustat. *Id.* While Plaintiffs believe they could have successfully moved for reconsideration or appealed this decision, Defendants could have raised similar arguments at summary judgment or at trial.

63. Also, Defendants likely would have contested loss causation at summary judgment for two of the other alleged corrective disclosures. Defendants would have likely argued that the May 9, 2019 alleged disclosure did not reveal any of their prior statements as false, but rather reflected the market's disappointment that the new Roxadustat safety results were not as promising as those from the more limited earlier set. Defendants also likely would have argued that the drop following FibroGen's March 1, 2021 announcement that the FDA was convening an AdCom was not corrective of any information regarding the alleged underlying data manipulation.

64. Furthermore, Defendants likely would have continued to argue that alleged false statements prior to May 2019 concerning the pooled safety analyses should be dismissed, as the results of these analyses were not unblinded (and thus unavailable to FibroGen) until April 2019. ECF No. 197 at 3. Furthermore, FibroGen did not provide numerical results of the pooled safety analyses incorporating the *post-hoc* changes in the stratification data until November 2019. *Id.* Thus, there was a risk that the class period as certified by the Court could be whittled down even further if the Court or jury accepted these arguments.

**B.   Risks Proving Falsity and Scienter**

65. Defendants argued throughout this litigation that Lead Plaintiffs could not show their statements were false or made with scienter.

66. For instance, Defendants argued, and would continue to argue, that the *post-hoc* changes to the data were not "manipulations" whatsoever and were not misleading, as they reflected a mere disagreement between FibroGen's old and new management as to the best analyses to use. *See* ECF No. 107 at 14-15; ECF No. 122 at 22:6-9. In addition, Defendants could continue to argue that they never admitted to manipulating safety results and that Plaintiffs' allegations of manipulation were "based entirely on public comments by a handful of outside observers, none of whom knew what stratification factors FibroGen had used, or why, or what FibroGen had disclosed to the FDA about stratification factors." ECF No. 180 at 5.

67. In addition, Defendants would have continued to argue that a finding of scienter was precluded by the fact that numerous other regulators in other countries had approved Roxadustat for use. ECF No. 107 at 23. Indeed, the Court found that this was a "helpful fact for Defendants" and was "relevant" to the scienter analysis. ECF No. 126 at 36-37. Similarly, Defendants would also have argued that they lacked scienter because FibroGen and its Roxadustat development partner, AstraZeneca, both released the same safety results using the same *post-hoc* stratification factors to investors and approved the filing of the NDA. ECF No. 107 at 8.

68. Furthermore, certain Individual Defendants would likely have argued that they were not liable as they did not act with scienter. For example, Defendant Eisner began his tenure as FibroGen's chief medical officer in December 2020 (Complaint at ¶26), claimed to have only learned about the *post-hoc* changes to the data on March 11, 2021, and after investigating the matter further, alerted the FDA on April 2, 2021 (ECF No. 197 at 8). Similarly, Defendant Cotroneo would likely have argued that, as FibroGen's CFO, he had no reason to second guess what medical professionals told him about the NDA or to make conclusions about Roxadustat's safety or efficacy data.

69. In addition, the technical nature of the NDA, the interpretation of technical data, including the use of stratification factors, as well as the technical calculations of artificial inflation in FibroGen securities, meant that upcoming summary judgment motion practice and trial would lead to a difficult, highly technical, and hotly contested "battle of the experts." This creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of the Parties' competing experts. Indeed, expert testimony can often rest on many assumptions, any of which may be rejected by a jury. Lead Counsel recognizes that, in such an expert-heavy case, there is the possibility that a jury could be swayed by Defendants' experts.

70. Thus, Defendants' liability and the amount of damages that the Class would actually recover at trial, if successful on liability issues, was highly uncertain. Similarly, there was no assurance that all of Lead Plaintiffs' evidentiary documents and testimony relating to liability and damages would be admitted as evidence by the Court at trial. These issues could have

seriously affected Lead Plaintiffs' ability to successfully prosecute this Action and obtain any recovery.

71.    In sum, there was a distinct possibility that a jury could have found that there was no loss causation for the May 9, 2019 and March 1, 2021 alleged corrective disclosures, that Defendants' statements prior to May or November 2019 lacked any basis for falsity, and that some or all of the Defendants lacked scienter.  Absent settlement at this time, the Parties could face years litigating this Action to a final resolution, including further discovery, dispositive motions, trial, and likely post-trial appeals.

## C.    Other Risks

72.    Lead Counsel is aware that despite the most vigorous efforts, success in complex litigation such as this case is never assured.

73.    Furthermore, even if Plaintiffs had fully prevailed on every single aspect of the litigation and secured a judgment for maximum damages, there was a significant risk that Plaintiffs would have been unable to recover more than the Settlement Amount, and possibly nothing at all, due to FibroGen's financial and operational condition.  On October 17, 2023, the date on which the Parties agreed to resolve the Action, FibroGen's stock price closed at approximately $0.65 per share—99% below the Company's Class Period high of approximately $60 per share—representing a market capitalization of approximately $65 million.  The Settlement Amount thus represents nearly half of the Company's entire market capitalization on that date.

74.    Plaintiffs are also cognizant of the following facts based on review of publicly available documents: (i) Roxadustat has never been approved in the United States and competes with similar types of anti-anemia drugs in other countries; (ii) FibroGen's only other major drug candidate, Pamrevlumab, failed to meet its endpoint in Phase III study and has yet to be approved; and (iii) the Company's Form 10-K filed on February 26, 2024 reported that the Company had only approximately $113.7 million in cash and cash equivalents and a net loss for the year ended December 31, 2023 of approximately $284.2 million.  Notably, the Company's cash position has declined steadily and sharply as of the end of each of the three prior years, from $678.4 million in 2020, to $171.2 million in 2021, to $155.7 million in 2022.  As such, FibroGen's D&O insurance

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

23

policy was the primary source of recovery, and these funds were all wasting assets which would be vastly, if not entirely, depleted were the Action to proceed through trial and appeals.

**D.     The Settlement is Reasonable in Light of the Potential Recovery in the Action**

75.     In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  Indeed, the $28.5 million Settlement Amount is an excellent result for the Settlement Class, as it would have ranked in the top 31% of all securities class action settlements in 2022.[4]  Moreover, this Settlement exceeds (i) the median recovery size of $9.0 million for settlements between 2013 and 2022, like this one, alleging only claims under the Securities Exchange Act, (ii) the median settlement of $7.6 million in cases brought against pharmaceutical companies, and (iii) the $7.6 million median recovery size for the Ninth Circuit.[5]

76.     Plaintiffs' expert, Mr. Scott Walster, has calculated the maximum possible value of the recovery if Plaintiffs were to fully prevail on all of their claims.  The maximum damages for the class period that the Court certified in the Class Certification Order – assuming that Plaintiffs are successful on every issue and netting for pre-class period gains attributable to the alleged fraud– are approximately $818 million for shareholders and $33 million for option holders.  *See* ECF No. 236, Ex. 2, Walster Decl. at ¶5.

77.     Additionally, as noted above, Defendants made arguments that, if fully accepted by the Court or a jury, could have limited the actionable class period to November 8, 2019 through April 6, 2021, inclusive, with only one actionable corrective disclosure on April 6, 2021 (after the close of trading) (the "Minimum Damages Scenario").  In that scenario, Plaintiffs' expert estimates that damages for FibroGen common stockholders would be as low as $443 million with netting of pre-class period gains and $13 million for option holders.  *Id*. at ¶¶17, 23.

---

[4] *See* Cornerstone Research, Securities Class Action Settlements, 2022 Review and Analysis, at 4 (March 8, 2023), https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf.

[5] *Id*. at 7, 18, 19.

78.    Therefore, the $28.5 million recovery exceeds the 1.7% to 4.3% median percentage of similar damages ranges in 2022 settlements by recovering 3.4% to 6.4% of maximum likely potential damages recoverable at trial.[6]  Courts have routinely approved similar settlements as fair and reasonable.

79.    Given the meaningful litigation risks, and the immediacy and amount of the $28,500,000 recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFFS COMPLIED WITH THE ORDER PRELIMINARILY APPROVING SETTLEMENT AND PROVIDING FOR NOTICE

80.    The Court's Preliminary Approval Order, ECF No. 244, found that Lead Plaintiffs' proposed method of notice was adequate and directed that the Notice Packet (consisting of the Notice and the Claim Form) be disseminated to the Class.  The Notice contained, among other things, (1) a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement; (2) Settlement Class Members' right to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; and (3) Settlement Class Members' right exclude themselves from the Settlement Class.  The Notice also informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $715,000, including reimbursement of up to $45,000 as reimbursement to the Lead Plaintiffs for the reasonable costs and expenses they incurred directly related to their representation of the Settlement Class.

81.    The Preliminary Approval Order also set a deadline April 18, 2024, for Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum, and set a final fairness hearing date of May 16, 2024 (the "Settlement Hearing").

82.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND, the claims administrator, to, *inter alia*, disseminate copies of the Notice Packet and to publish the

---

[6] *See Securities Class Action Settlements, 2022 Review and Analysis* at 6.  The median recovery for settlements in 2022 with $500-$999 million in damages was 1.7%, and for settlements in 2022 with $250-$499 million in damages was 4.3%.

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.        25
3:21-cv-02623-EMC

Summary Notice. As set forth in the accompanying Declaration of Luiggy Segura on behalf of JND Legal Administration Regarding (A) Mailing of Notice Packet; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion to Date (the "Segura Declaration"), JND has fully complied with the notice program approved by the Court. *See* Ex. D.

83. JND has, among other things: (a) disseminated 36,771 Notice Packets to potential Class Members and nominees as of April 1, 2024 (*see id*. at ¶12); (b) caused, on March 18, 2024, the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire* (*see id*. ¶13, at Ex. B); (c) continued to maintain the tollfree telephone number for Class Members to call and obtain information about the litigation (*see id*. at ¶14); (d) maintained and updated a website, www.FibrogenSecuritiesLitigation.com, (the "Website") which became operational before March 4, 2024, and is dedicated to the litigation, where Class Members can obtain information regarding the case and settlement, file a claim, review relevant case related documents, and download the Notice Packet (*see id*. at ¶15).

V.    THE PLAN OF ALLOCATION

84. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund, *i.e.*, the $28,500,000 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiffs for their costs and expenses incurred in representing the Class); and (iv) any attorneys' fees awarded by the Court, must submit a valid Claim Form with all required information postmarked or submitted online no later than June 12, 2024. As set forth in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

85. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as result of the conduct alleged in the Complaint.

86. The Plan of Allocation is detailed in the long form Notice. *See* Ex. D, at Ex. A (Notice, ¶¶55-79). The full Notice was mailed as part of the Notice Packet and is available for

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

26

download online at the Settlement Website. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold FibroGen securities. *See id.*

87.     As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id*. at ¶55.

88.     The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiffs' allegation that Defendants' alleged false and misleading statements and material omissions caused the price of FibroGen securities to be artificially inflated during the period between December 20, 2018 through July 15, 2021. The Plan of Allocation is based on the premise that the decrease in the price of FibroGen securities following the alleged corrective disclosures that occurred on May 9, 2019, March 1, 2021, April 6, 2021, and July 15, 2021 may be used to measure the alleged artificial inflation in the price of FibroGen securities.

89.     Under the proposed Plan of Allocation, each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's pro rata share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id*. at ¶74.

90.     Plaintiffs engaged their damages and loss causation expert to prepare the Plan. In developing the Plan, Plaintiffs' expert calculated the amount of estimated artificial inflation in the

closing price of publicly traded FibroGen securities that were allegedly proximately caused by Defendants' alleged false and misleading statements.  In doing so, Plaintiffs' expert considered price changes in FibroGen securities in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces.

91.    An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many FibroGen securities the Claimant purchased, acquired, or sold during the Class Period and when that Claimant bought, acquired, or sold the securities.  If a Claimant has an overall market gain with respect to Claimant's overall transactions in FibroGen securities during the Class Period, or if the Claimant purchased securities during the Class Period, but did not hold any of those securities through the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Class Members who submit valid claims.

92.    The Net Settlement Fund in its entirety will be distributed to Authorized Claimants and if any funds remain after the initial distribution (for example, due to uncashed or returned checks), further distributions to Authorized Claimants who would receive at least $10.00 from such a re-distribution will be conducted as long as they are cost effective.  If Lead Counsel, in consultation with the Claims Administrator, deems a further distribution not cost effective, Lead Counsel will distribute the remaining balance to Investor Protection Trust, a non-sectarian, not-for-profit organization, which Lead Counsel has recommended be approved by the Court.

93.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in FibroGen securities that were attributable to the misconduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

94.    The Notice set forth and explained the proposed Plan to members of the Settlement Class.  In response to the mailing of 36,771 Notices, there have been no objections to the proposed Plan, further underscoring its fairness.

## VI.    THE FEE AND EXPENSE APPLICATION

95.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 25% the Settlement Fund (or $7,125,000, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel also requests reimbursement of the out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $637,306.21. Finally, Lead Counsel requests reimbursement to Lead Plaintiffs in the amounts of $8,268.14, $19,570, and $7,702.14 for Plaintiffs Baltimore Employees, Philadelphia Pension Fund, and Plymouth County, respectively, for costs incurred directly related to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4). The legal authorities supporting a 25% fee award and expense reimbursement are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

#### 1.    The Excellent Outcome is the Result of Significant Time and Labor that Lead Counsel Devoted to the Action

96.    Attached hereto as Exhibit E is a declaration from myself in support of an award of attorneys' fees and reimbursement of litigation expenses.  The declaration sets forth a table reflecting the lodestar of each individual and their position who worked on this case from its inception through and including March 11, 2024, a summary of expenses by category, and attaches a firm resume.  Time expended in preparing the application for fees and reimbursement of expenses has not been included.

97.    As set forth above and in detail in Exhibit E, Lead Counsel has collectively expended a total of 27,220.2 hours in the investigation and prosecution of the Action through and including March 11, 2024.   The resulting total lodestar is $15,658,027.50, consisting of

$15,109,045.00 for attorney time and $548,982.50 for professional support staff time. The requested fee of 25% of the Settlement Fund equals $7,125,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a negative (or fractional) multiplier of 0.46 to Lead Counsel's lodestar.

98.     As detailed above, the recovery obtained for the Class was the result of thorough and diligent prosecutorial and investigative efforts, motion practice, extensive discovery efforts, and hard-fought settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or a significantly lower recovery) in the absence of a settlement.

99.     With no promise of recovery, the financial burden on contingent fee counsel is far greater than on a firm that is paid on an ongoing basis. Securities class actions require substantial up-front costs. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and cover the considerable litigation costs that a case like this requires. Lead Counsel not only had to pay for their standard overhead expenses during the entirety of the litigation—including the time of numerous highly qualified and experienced attorneys—but had to advance all costs and expenses, including substantial expert and e-discovery costs, all without a guarantee of any recovery.

100.     Lead Counsel's attorneys' and professional support staff's rates have repeatedly been accepted as reasonable by other courts when performing a lodestar cross-check, including Courts in the Ninth Circuit. *See Milbeck v. Truecar, Inc.*, Case No. 18-cv-02612, ECF No. 185 (C.D. Cal. Jan. 27, 2020); *In re Merit Medical Sys., Inc., Sec. Litig.*, Case No. 19-cv-02326, ECF No. 118 (C.D. Cal. April 15, 2022); *Fulton Cnty. Employees' Ret. Sys. on Behalf of Goldman Sachs Group, Inc. v. Blankfein*, 2023 WL 350888, at *4 (S.D.N.Y. Jan. 20, 2023); *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2022 WL 2093054, at *2 (D. Minn. June 10, 2022); *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc*., Case No. 19-cv-01032, ECF No. 257 (E.D. Va. Nov. 18, 2022). Additionally, the rates billed by Lead Counsel (ranging from $400 to $795 per hour for non-partners/directors and $825 to $1,085 per hour for partners/directors) are comparable to peer

plaintiff and defense firms litigating matters of similar magnitude. *See, e.g.*, *In re Splunk, Inc. Sec. Litig.*, No. 4:20-cv-08600-JST, ECF No. 143 (N.D. Cal. Mar. 4, 2024) (Tigar, J.) (approving rates of $850-1,250 for partners and $425-825 for associates); *In re: FAT Brands Inc. Sec. Litig.*, No. 2:22-cv-01820-MCS-RAO, ECF No. 71 (C.D. Cal. Feb. 28, 2023) (approving partner rates of $925 and associate rates of $500-675); *In re Aqua Metals, Inc. Sec. Litig.*, No. 4:17-cv-07142-HSG, ECF No. 182 (N.D. Cal. Mar. 2, 2022) (Gilliam, Jr., J.) (approving rates of $765-1,065 for partners and $425-800 for associates); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (Breyer, J.) (approving fee award following lodestar cross-check where "billing rates rang[ed] from $275 to $1,600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals").

101.   The lodestar amount was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel. Time expended on the Fee Memorandum has not been included in this request. Nor does the lodestar include any of the time that will be spent preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Class Members inquiries regarding the Settlement, and briefing the Motion for Final Distribution of Settlement.

102.   Pursuant to the Protocol for Controlling Fees and Costs, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation. Each attorney that prosecuted this Action performed substantive work that directly benefited the Class. The time spent by each attorney was reasonable and beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

103.   As demonstrated by Saxena White's firm resume, attached to Exhibit E, Lead Counsel is a highly experienced and skilled law firm that focuses its practice on securities class action litigation. Indeed, Saxena White has successfully prosecuted securities class action cases

and other complex shareholder litigation in federal and state courts throughout the country. I firmly believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

### 2. Standing and Caliber of Opposing Counsel

104. The FibroGen Defendants were represented by Cooley LLP and Defendant Yu was represented by Pillsbury Winthrop Shaw Pittman LLP, both of which are firms with national reputations for the defense of class actions and other complex civil matters. In the face of this experienced and formidable opposition, Lead Counsel was able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that were highly favorable to the Class.

### 3. This Was a High-Risk Litigation Undertaken On a Fully Contingent Basis

105. The prosecution of this Action was undertaken by Lead Counsel on an entirely contingent fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and have incurred $637,306.21 in out-of-pocket litigation-related expenses in prosecuting the Action.

106. In undertaking this litigation, Lead Counsel bore the risk that no recovery would be achieved. As discussed above, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured.

107. In sum, based on the excellent results achieved for the Settlement Class, the quality of the work performed, and the risks of prosecuting the Action against Defendants, Lead Counsel

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

32

submits that the request for a 25% fee award is fair, reasonable, and consistent with or below other similar fee awards in this District, Circuit, and nationwide.

### 4. Lead Plaintiffs Support the Fee Request

108. As set forth in the declarations submitted by Lead Plaintiffs, all Lead Plaintiffs concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Class, and the risks of the Action. *See* Ex. A at ¶15; Ex. B at ¶15; Ex. C at ¶16. Lead Plaintiffs—all of whom are institutional investors—have been intimately involved in this case since its earliest stages, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### B. Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

109. Lead Counsel seeks a total of $672,846.49 in Litigation Expenses to be paid from the Settlement Fund. This includes $637,306.21 in expenses reasonably and necessarily incurred by Lead Counsel in connection with investigating, litigating, and settling the Action, as well as $35,540.28, in the aggregate, for the costs and expenses incurred by each of the Lead Plaintiffs directly related to their representation of the Class. Lead Counsel respectfully submits that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

110. The Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $715,000. The total amount requested by Lead Counsel and Lead Plaintiffs is less than the amount in the Notice. No objections have been raised as to the maximum amount of expenses set forth in the Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

111. From the inception of this Action, Lead Counsel was aware that it might not recover any of the expenses incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved. Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would

not compensate Lead Counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

112. Lead Counsel's costs and expenses are detailed in Exhibit E-3. The following is a breakdown by category of all costs and expenses incurred by Lead Counsel in the prosecution of this Action:

| CATEGORY OF EXPENSE | AMOUNT |
| --- | --- |
| Experts/Consultants | $ 334,114.80 |
| Discovery Costs | $ 120,363.77 |
| Online Legal and Factual Research | $ 75,476.28 |
| Deposition Reporting, Deposition and Hearing Transcripts, and Videography | $ 47,611.65 |
| Transportation, Meals, and Lodging | $ 34,290.19 |
| Mediator Fees | $ 16,818.75 |
| Printing and Photocopies | $ 4,311.79 |
| Postage and Delivery | $ 2,306.99 |
| Filing Fees and Service of Process | $ 2,012.00 |
| **TOTAL** | **$ 637,306.21** |

113. The largest component of expenses, $334,134.80 or approximately 52% of the total expenses, was expended on the retention of multiple experts in: (a) market efficiency, loss causation, and damages; (b) pharmaceutical regulation, clinical trials, and FDA approval for new drug applications; and (c) probate and estate law. The experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, during fact discovery, on matters related to the class certification, on matters relating to negotiation of the Settlement, and in preparation of the Plan of Allocation.

114. The second largest expense, $120,363.77, or approximately 19% of the total expenses, was expended on document management, which provided a platform for Lead Counsel to review and analyze Defendants' production of more than 4.6 million pages of documents.

115. The third largest component of expenses, $75,476.28, or approximately 12% of the total expenses, was expended on online legal research necessary to prosecute this Action.

116.    The fourth largest component of expenses, $47,611.65, or approximately 7% of the total expenses, was expended on obtaining transcripts and video recordings of the seven depositions that took place in connection with this Action, as well as certain Court hearings.

117.    The other out-of-pocket litigation expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These include, among others, travel, lodging, and meal expenses where Lead Plaintiffs, Defendants, and Lead Counsel were located in different locations and often on different sides of the country; Court fees; printing and copying costs; and postage and delivery expenses.

118.    Finally, Lead Plaintiffs seek reimbursement of their reasonable costs and expenses incurred directly in connection with representing the Class in the amount of $8,268.14 for Baltimore Employees, $19,570.00 for Philadelphia Pension Fund, and $7,204.14 for Plymouth County, for a total of $35,540.28.  The effort devoted to this Action by Lead Plaintiffs is detailed in their accompanying declarations. Exs. A-C.  Among other things, each Lead Plaintiff prepared for and provided a representative to testify in deposition, searched for and produced documents demanded by Defendants, and regularly communicated with Lead Counsel throughout the prosecution and settlement of the Action.  Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.  Based on the substantial work done by Lead Plaintiffs for the benefit of the Class, Lead Counsel respectfully requests that the Court should grant Lead Plaintiffs' request in full.

## VII.    THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND LEAD PLAINTIFFS' APPROVAL

119.    As mentioned above, consistent with the Preliminary Approval Order, a total of 36,771 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 25% of the Settlement Fund, and payment of expenses in amount not greater than $715,000, which could include an application for

reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs, up to $45,000, directly related to the representation of the Settlement Class. *See* Ex. D, at Ex. A, Notice at ¶80. Additionally, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See* Ex. D, ¶13. The Notice has also been available on the settlement website maintained by the Claims Administrator. *Id.* at ¶15.

120. Significantly, to date, not a single Member of the Settlement Class has filed an objection to any aspect of the Settlement, including the Settlement Amount or terms, the Plan of Allocation, or the request for an award of attorneys' fees and reimbursement of Litigation Expenses. This is particularly noteworthy given that the Settlement Class included a substantial number of sophisticated institutional investors who have the resources, professional staff, and financial motivations to object to the requested fee, if such an objection was warranted.

121. Moreover, Lead Plaintiffs are themselves each sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action. As discussed in the declarations submitted by Lead Plaintiffs, Lead Plaintiffs have evaluated Lead Counsel's fee and expense application and believe that Lead Counsel's requested fee is fair and reasonable in light of the work counsel performed, the risks of the litigation, and the results achieved. *See* Ex. A at ¶¶12-15; Ex. B at ¶¶12-15; Ex. C at ¶¶13-16. The support and approval of court-appointed Lead Plaintiffs weighs heavily in favor of approval of a fee request. .

122. The deadline for Class Members to object to the Settlement, Plan of Allocation, and/or to the fee request is April 18, 2024. Lead Counsel will file reply papers by May 2, 2024 that will address any objections that may be received.

VIII. CONCLUSION

123. For all the reasons discussed above and in the moving papers, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. In addition, as set forth above and in the Fee Memorandum, Lead Plaintiffs and Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, the request for

reimbursement of Litigation Expenses in the total amount of $637,306.21 should be approved, and Lead Plaintiffs' Representative Reimbursements totaling $35,540.28 should also be approved.

I declare under penalty of perjury under to the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of April, 2024.

*/s/ Lester R. Hooker*
Lester R. Hooker

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

37

# EXHIBIT A

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC |
| | **CLASS ACTION** |
| | DECLARATION OF DAVID A. RANDALL IN SUPPORT OF (1) LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (2) LEAD COUNSEL'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.

I, David A. Randall, hereby declare under penalty of perjury as follows:

1.    I am the Executive Director of the Employees' Retirement System of the City of Baltimore ("Baltimore Employees" or the "Fund"), which, along with the City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund") and Plymouth County Retirement Association ("Plymouth County") are the Court-appointed Lead Plaintiffs in the above-captioned action (the "Action" or the "Litigation").[1]  I have served in my position as Executive Director since March 22, 2019.  I respectfully submit this declaration in support of (1) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses.

2.    Baltimore Employees is aware of and understands the requirements and responsibilities of a lead plaintiff in a securities class action, including those set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Consistent with these requirements and responsibilities, the Fund has been directly involved in monitoring and overseeing the prosecution of the Action, as well as the negotiations leading to the Settlement, and could and would produce a representative to testify competently thereto.

I.    **Baltimore Employees' Oversight of the Action**

3.    Baltimore Employees is a public pension fund that provides retirement benefits to approximately 18,000 regular and permanent employees in the general administrative service of the City of Baltimore, Maryland and certain non-teacher employees of the Baltimore City Public School System.  Baltimore Employees was established in 1926 and, as of June, 2023 had approximately $2 billion in assets under management.

4.    Baltimore Employees purchased FibroGen stock during the Settlement Class Period and suffered substantial losses as a result.  In addition, pursuant to an assignment of claims from Fire and Police Employees' Retirement System of the City of Baltimore ("Baltimore F&P"),

---

[1] Unless otherwise indicated, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated December 8, 2022 (ECF No. 236) (the "Stipulation" or "Settlement Agreement").

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.          1
3:21-cv-02623-EMC

Baltimore Employees also seeks recovery for the substantial losses suffered by Baltimore F&P in connection with Baltimore F&P's purchases of FibroGen common stock during the Settlement Class Period. *See* ECF Nos. 30-5, 73. As a public pension fund, Baltimore Employees is accustomed to serving as a fiduciary, and believes that its active participation in appropriate litigation, such as this Action, is necessary to protect the interest of its participants.

5.    One of my responsibilities as the Executive Director of the Fund involves overseeing litigation brought by Baltimore Employees. As a result, I am familiar with the duties undertaken by the Fund with respect to this Action, which included monitoring Baltimore Employees' selected counsel for litigation, participating in the collection of documents on behalf of the Fund, providing deposition testimony, and participating in strategic decision making and settlement approval.

6.    On behalf of Baltimore Employees, I and my colleagues had regular communications with Court-appointed Lead Counsel Saxena White P.A. ("Saxena White" or "Lead Counsel"). Baltimore Employees received regular status reports from Lead Counsel on case developments and participated in discussions with attorneys from Lead Counsel concerning the prosecution of the Action, the strengths of and risks to the claims, and the Settlement. Through these regular status reports and communications, the Fund closely supervised and participated in the prosecution of the Action.

7.    In particular, throughout the course of this Action, other Fund representatives and I coordinated with Lead Counsel about, and participated in, the following events:

(a)    deciding to move for lead plaintiff appointment, including reviewing the Fund's lead plaintiff application, communicating with Lead Counsel, Philadelphia Pension Fund, and Plymouth County regarding the co-lead plaintiff application, participating in a joint conference call with Lead Counsel, Philadelphia Pension Fund, and Plymouth County, and executing multiple joint declarations detailing Lead Plaintiffs' commitment to efficiently and effectively litigating the Settlement Class's claims under our supervision;

(b)    working closely with and regularly corresponding with Lead Counsel, including through regular reports that provided detailed descriptions of Lead Counsel's work

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.          2
3:21-cv-02623-EMC

prosecuting the Action, litigation strategy, and the existing case status, along with detailed schedules of the time spent and expenses incurred by Lead Counsel during the period covered by the report, in accordance with the Court's Protocol for Controlling Fees and Costs (ECF No. 94);

(c)     reviewing pleadings and motions filed in this litigation, including the amended complaints, Lead Plaintiffs' opposition to Defendants' motion to dismiss, Lead Plaintiffs' motion for class certification, and other key filings throughout the Litigation;

(d)     responding to discovery requests, including searching for and producing documents and responding to Defendants' interrogatories;

(e)     preparing for and providing deposition testimony in connection with Lead Plaintiffs' motion for class certification; and

(f)     evaluating and approving the proposed Settlement.

8.     In total, the other Fund representatives and I devoted approximately 79 hours in support of Baltimore Employees' efforts in furtherance of the prosecution of this Action and to achieve this recovery on behalf of FibroGen investors during the Settlement Class Period.[2]

## II.     Baltimore Employees Strongly Endorses Approval of the Settlement

9.     Based on its participation throughout the prosecution and resolution of the claims in the Action, Baltimore Employees believes that the proposed Settlement is fair, reasonable, and adequate to the Settlement Class. The Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation.

10.     The prosecution and settlement of this Action required extensive efforts on the part of Lead Plaintiffs and Lead Counsel, particularly given the complexity of the legal and factual issues and the vigorous defense by Defendants and their counsel. The risk of no recovery was very real here, and there was no guarantee that the entirety of Lead Plaintiffs' claims would survive a motion for summary judgment, much less succeed at trial or potential appeals. The risk of no

---

[2] While Baltimore Employees devoted a significant amount of time to this Action, our request for reimbursement of costs is based on a conservative estimate of the amount of time we collectively spent on this litigation, as supported by our and Lead Counsel's records.

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.     3
3:21-cv-02623-EMC

recovery was compounded by FibroGen's deteriorating business and financial condition, including a potential bankruptcy.

11. Baltimore Employees strongly endorses the Settlement as it provides a certain, immediate, and substantial cash recovery for the Settlement Class. The Fund firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

**III.   Approval of the Attorneys' Fee Request and Litigation Expenses**

12. Baltimore Employees believes that the request for an award of attorneys' fees in the amount of 25% of the Settlement Fund is fair and reasonable in light of the exceptional work that Lead Counsel performed on behalf of the Settlement Class. A 25% award is particularly appropriate here because of the highly complex issues involved, Lead Counsel's investment of time and resources, the outstanding result achieved, the approval of the Settlement Class, and the significant risks in the Litigation.

13. The fee percentage requested is consistent with the retainer agreement that Baltimore Employees entered into with Lead Counsel, which provided that Lead Counsel shall seek no more than 25% of any settlement as its fee, subject to Court approval. After the agreement to settle the Action was reached, Baltimore Employees again evaluated Lead Counsel's proposed 25% fee request by considering the substantial recovery obtained for the Settlement Class in this Action and authorized the requested 25% fee award to the Court for its ultimate determination.

14. Baltimore Employees takes seriously its role as a Lead Plaintiff to ensure that attorneys' fees are fair in light of the result achieved for the Settlement Class and to reasonably compensate Lead Counsel for the work involved and the substantial risks Lead Counsel undertook in litigating the Action.

15. The Fund further believes that the litigation expenses being requested for payment to Lead Counsel are reasonable, and represent costs and expenses necessary for the prosecution and resolution of the claims in the Action. As discussed above, the Fund received regular reports throughout the pendency of the Action that provided detailed schedules of the time spent and expenses incurred by Lead Counsel on an ongoing basis, for each period covered by the report.

Based on the foregoing, Baltimore Employees fully supports the request for attorneys' fees and expenses.

## IV.   Baltimore Employees' Representative Reimbursement

16.   Baltimore Employees understands that reimbursement of a class representative's reasonable costs and expenses, including lost wages, directly relating to the representation of the class, is authorized under the PSLRA, 15 U.S.C. § 78u-4(a)(4). Accordingly, in connection with Lead Counsel's request for payment of litigation expenses, Baltimore Employees seeks reimbursement for the costs and expenses that it incurred in connection with its efforts in this Action, which are described above in ¶¶7-8.

17.   This request is based on a calculation of hours that my colleagues and I spent on the case. The time that other staff members of Baltimore Employees and I devoted to pursuing the Settlement Class's interests in this Action was time we otherwise would have devoted to other work for the Fund, and thus represents a direct cost to Baltimore Employees. As detailed above, we collectively devoted approximately 79 hours to this Action. In calculating the total cost of this time to the Fund, Baltimore Employees applied an hourly rate of $104.66 to the amount of time devoted to the prosecution of the Action.[3]  This calculation resulted in a total cost of $8,268.14 to Baltimore Employees, for which the Fund respectfully requests reimbursement.

## V.   Conclusion

18.   In light of the foregoing, Baltimore Employees respectfully submits that the Court should grant Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees and Expenses and approve the request to award the Fund reimbursement of $8,268.14 pursuant to 15 U.S.C. § 78u-4(a)(4) for its costs in connection with the prosecution of this Action.

---

[3] The hourly rate used for purposes of this calculation is based on the annual salary for the Executive Director of Baltimore Employees.

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.                    5
3:21-cv-02623-EMC

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of March, 2024 in Baltimore, Maryland.

David A. Randall
Executive Director
Employees' Retirement System of the City of Baltimore

DECL. OF DAVID A. RANDALL ISO
LPS' MOT. FOR FINAL APPR.                6
3:21-cv-02623-EMC

# EXHIBIT B

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC |
| | **CLASS ACTION** |
| | DECLARATION OF CHRISTOPHER R. DIFUSCO IN SUPPORT OF (1) LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (2) LEAD COUNSEL'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

DECL. OF CHRISTOPHER R.
DIFUSCO ISO LPS' MOT. FOR
FINAL APPR.

I, Christopher R. DiFusco, hereby declare under penalty of perjury as follows:

1.    I am the Chief Investment Officer of the City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund" or the "Fund"), which, along with the Employees' Retirement System of the City of Baltimore ("Baltimore Employees") and Plymouth County Retirement Association ("Plymouth County") are the Court-appointed Lead Plaintiffs in the above-captioned action (the "Action" or the "Litigation").[1]   I have served in my position as Chief Investment Officer since January 2017.  I respectfully submit this declaration in support of (1) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses.

2.    Philadelphia Pension Fund is aware of and understands the requirements and responsibilities of a lead plaintiff in a securities class action, including those set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Consistent with these requirements and responsibilities, the Fund has been directly involved in monitoring and overseeing the prosecution of the Action and the negotiations leading to the Settlement—including through the work of the City of Philadelphia Law Department (the "Legal Department"), in particular, its legal staff of, among others, Adam Coleman, Deputy City Solicitor; Renee Garcia, City Solicitor; and Benjamin Field, Chief Deputy City Solicitor—and could and would produce a representative to testify competently thereto.

I.    **Philadelphia Pension Fund's Oversight of the Action**

3.    Philadelphia Pension Fund is a public pension fund created by the Charter of the City of Philadelphia in 1956 that provides retirement benefits to approximately 65,000 active and retired police, fire, and civilian workers of the City.  As of January 31, 2024, the Fund had approximately $7.7 billion in assets under management.

---

[1] Unless otherwise indicated, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated December 8, 2022 (ECF No. 236) (the "Stipulation" or "Settlement Agreement").

DECL. OF CHRISTOPHER R. DIFUSCO ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

1

4.    Philadelphia Pension Fund purchased FibroGen securities during the Settlement Class Period and suffered substantial losses as a result. The Fund is accustomed to serving as a fiduciary, and believes that its active participation in appropriate litigation, such as this Action, is necessary to protect the interest of its participants.

5.    One of the responsibilities of the Legal Department involves overseeing litigation brought by Philadelphia Pension Fund. I am familiar with the duties that I and my colleagues undertook with respect to this Action, which included monitoring Philadelphia Pension Fund's selected counsel for litigation, participating in the collection of documents on behalf of the Fund, providing deposition testimony, and participating in strategic decision making and settlement approval.

6.    On behalf of Philadelphia Pension Fund, I and/or my colleagues in the Legal Department had regular communications with Court-appointed Lead Counsel Saxena White P.A. ("Saxena White" or "Lead Counsel"). Philadelphia Pension Fund received regular status reports from Lead Counsel on case development (including individual attorney time, tasks, and litigation expenses), and participated in discussions with attorneys from Lead Counsel concerning the prosecution of the Action, the strengths of and risks to the claims, and the Settlement. Through these regular status reports and communications, the Fund, through the active and continuous involvement by the Legal Department, as detailed below, closely supervised and participated in the prosecution of the Action.

7.    In particular, throughout the course of this Action, the Legal Department coordinated with Lead Counsel about, and participated in, the following events:

(a)    deciding to move for lead plaintiff appointment, including reviewing the Fund's lead plaintiff application, communicating with Lead Counsel, Baltimore Employees, and Plymouth County regarding the co-lead plaintiff application, participating in a joint conference call with Lead Counsel, Baltimore Employees, and Plymouth County, and executing multiple joint declarations detailing Lead Plaintiffs' commitment to efficiently and effectively litigating the Settlement Class's claims under our supervision;

DECL. OF CHRISTOPHER R.
DIFUSCO ISO LPS' MOT. FOR        2
FINAL APPR.
3:21-cv-02623-EMC

(b)    working closely with and regularly corresponding with Lead Counsel, including through regular reports that provided detailed descriptions of Lead Counsel's work prosecuting the Action, litigation strategy, and the existing case status, along with detailed schedules of the time spent and expenses incurred by Lead Counsel during the period covered by the report, in accordance with the Court's Protocol for Controlling Fees and Costs (ECF No. 94);

(c)    reviewing pleadings and motions filed in this litigation, including the amended complaint, Lead Plaintiffs' opposition to Defendants' motion to dismiss, Lead Plaintiffs' motion for class certification, and other key filings throughout the Litigation;

(d)    responding to discovery requests, including searching for and producing documents and responding to Defendants' interrogatories;

(e)    preparing for and providing deposition testimony in connection with Lead Plaintiffs' motion for class certification;

(f)    preparing for and attending mediation; and

(g)    evaluating and approving the proposed Settlement.

8.    In total, approximately 103 hours were devoted in support of Philadelphia Pension Fund's efforts in furtherance of the prosecution of this Action and to achieve this recovery on behalf of FibroGen's investors during the Settlement Class Period.[2]

## II.    Philadelphia Pension Fund Strongly Endorses Approval of the Settlement

9.    Based on its participation throughout the prosecution and resolution of the claims in the Action, Philadelphia Pension Fund believes that the proposed Settlement is fair, reasonable, and adequate to the Settlement Class.  The Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation.

10.    The prosecution and settlement of this Action required extensive efforts on the part of Lead Plaintiffs and Lead Counsel, particularly given the complexity of the legal and factual issues and the vigorous defense by Defendants and their counsel.  The risk of no recovery was

---

[2] While Philadelphia Pension Fund devoted a significant amount of time to this Action, our request for reimbursement of costs is based on a conservative estimate of the amount of time we collectively spent on this litigation, as supported by our and Lead Counsel's records.

DECL. OF CHRISTOPHER R.
DIFUSCO ISO LPS' MOT. FOR                    3
FINAL APPR.
3:21-cv-02623-EMC

very real here, and there was no guarantee that the entirety of Lead Plaintiffs' claims would survive a motion for summary judgment, much less succeed at trial or potential appeals. The risk of no recovery was compounded by FibroGen's deteriorating business and financial condition, including a potential bankruptcy.

11.     Philadelphia Pension Fund strongly endorses the Settlement as it provides a certain, immediate, and substantial cash recovery for the Settlement Class. The Fund firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

### III.     Approval of the Attorneys' Fee Request and Litigation Expenses

12.     Philadelphia Pension Fund believes that the request for an award of attorneys' fees in the amount of 25% of the Settlement Fund is fair and reasonable in light of the exceptional work that Lead Counsel performed on behalf of the Settlement Class. A 25% award is particularly appropriate here because of the highly complex issues involved, Lead Counsel's investment of time and resources, the outstanding result achieved, the approval of the Settlement Class, and the significant risks in the Litigation.

13.     The fee percentage requested is consistent with the retainer agreement that Philadelphia Pension Fund entered into with Lead Counsel, which provided that Lead Counsel shall seek no more than 25% of any settlement as its fee, subject to Court approval. After the agreement to settle the Action was reached, Philadelphia Pension Fund again evaluated Lead Counsel's proposed 25% fee request by considering the substantial recovery obtained for the Settlement Class in this Action and authorized the requested 25% fee award to the Court for its ultimate determination.

14.     Philadelphia Pension Fund takes seriously its role as a Lead Plaintiff to ensure that attorneys' fees are fair in light of the result achieved for the Settlement Class and to reasonably compensate Lead Counsel for the work involved and the substantial risks Lead Counsel undertook in litigating the Action.

15.     The Fund further believes that the litigation expenses being requested for payment to Lead Counsel are reasonable, and represent costs and expenses necessary for the prosecution and resolution of the claims in the Action.  As discussed above, Philadelphia Pension Fund received regular reports throughout the pendency of the Action that provided detailed schedules of the time spent and expenses incurred by Lead Counsel on an ongoing basis, for each period covered by the report. Based on the foregoing, Philadelphia Pension Fund fully supports the request for attorneys' fees and expenses.

## IV.     Philadelphia Pension Fund's Representative Reimbursement

16.     Philadelphia Pension Fund understands that reimbursement of a class representative's reasonable costs and expenses, including lost wages, directly relating to the representation of the class, is authorized under the PSLRA, 15 U.S.C. § 78u-4(a)(4).  Accordingly, in connection with Lead Counsel's request for payment of litigation expenses, Philadelphia Pension Fund seeks reimbursement for the costs and expenses that it incurred in connection with its efforts in this Action, which are described above in ¶¶7-8.

17.     This request is based on a calculation of hours that my colleagues in the Legal Department and I spent on the case.  The time devoted to pursuing the Settlement Class's interests in this Action was time we otherwise would have devoted to other work for the Philadelphia Pension Fund, and thus represents a direct cost to Philadelphia Pension Fund.  As detailed above, we collectively devoted approximately 103 hours to this Action.  In calculating the total cost of this time to the Fund, the Philadelphia Pension Fund recognized that its role in this Action was supervisory and representative in nature, and therefore applied a flat billing rate of $190 per hour to the amount of time each individual devoted to prosecution of the Action.  This hourly rate is therefore specific to its role in this Action and is conservative when considering that the fee schedule that the Legal Department typically applies in cases in which it is providing legal services and in which the law allows for the award of attorneys' fees ranges from $235 to $850 per hour for attorneys and $190 to $285 per hour for paralegals.[3]  Accordingly, applying this conservative

---

[3] *See* https://clsphila.org/about-community-legal-services/attorney-fees/.

$190 hourly rate to the hours incurred in this Action resulted in a total cost of $19,570 to Philadelphia Pension Fund, for which the Fund respectfully requests reimbursement.

## V.    Conclusion

18.    In light of the foregoing, Philadelphia Pension Fund respectfully submits that the Court should grant Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees and Expenses and approve the request to award the Fund reimbursement of $19,570 pursuant to 15 U.S.C. § 78u-4(a)(4) for its costs in connection with the prosecution of this Action.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of April, 2024 in Philadelphia, Pennsylvania.

Christopher DiFusco
Chief Investment Officer
City of Philadelphia Board of Pensions and Retirement

DECL. OF CHRISTOPHER R.
DIFUSCO ISO LPS' MOT. FOR       7
FINAL APPR.
3:21-cv-02623-EMC

# EXHIBIT C

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement*
*System of the City of Baltimore, City of*
*Philadelphia Board of Pensions and Retirement,*
*and Plymouth County Retirement Association, and*
*Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **CLASS ACTION** <br><br> DECLARATION OF PADRAIC P. LYDON, ESQ. IN SUPPORT OF (1) LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (2) LEAD COUNSEL'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

DECL. OF PADRAIC P. LYDON, ESQ.
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

I, Padraic P. Lydon, hereby declare under penalty of perjury as follows:

1.    I am the Executive Director of the Plymouth County Retirement Association ("Plymouth County" or the "PCRA"), which, along with the Employees' Retirement System of the City of Baltimore ("Baltimore Employees") and the City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund"), are the Court-appointed Lead Plaintiffs in the above-captioned action (the "Action" or the "Litigation").[1]  I have served in my position as Executive Director since May 2023.  I respectfully submit this declaration in support of (1) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Notice of Motion and Motion for an Award of Attorneys' Fees and Expenses.

2.    PCRA is aware of and understands the requirements and responsibilities of a lead plaintiff in a securities class action, including those set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Consistent with these requirements and responsibilities, PCRA has been directly involved in monitoring and overseeing the prosecution of the Action (primarily through the work of PCRA's former Executive Directors, in succession, David Sullivan and Timothy Smyth), as well as the negotiations leading to the Settlement, and could and would produce a representative to testify competently thereto.

I.    **PCRA's Oversight of the Action**

3.    Pursuant to Chapter 32 of Massachusetts General Laws, PCRA was created in 1937 in order to provide financial security to current and retired municipal and county employees of Plymouth County, Massachusetts.  PCRA currently has more than 12,700 members, pensioners and beneficiaries who receive approximately $130 million each year in benefits.  As of September 2023, the total value of PCRA's assets under management was approximately $1.4 billion.

4.    PCRA purchased FibroGen stock during the Settlement Class Period and suffered substantial losses as a result.  As a public pension system, PCRA is accustomed to serving as a

---

[1] Unless otherwise indicated, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated December 8, 2022 (ECF No. 236) (the "Stipulation" or "Settlement Agreement").

DECL. OF PADRAIC P. LYDON, ESQ.
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

1

fiduciary, and believes that its active participation in appropriate litigation, such as this Action, is necessary to protect the interest of its participants.

5.    PCRA's understanding of the responsibilities and fiduciary duties involved in securities class action litigation and settlements is informed by its experience serving as a lead plaintiff in other securities class actions, including with other institutional investors.  Notably, PCRA's achievements in securities class actions include: *Plymouth County Ret. Sys. v. Evolent Health, Inc.*, No. 1:19-cv-01031-MSN-WEF (E.D. Va.) ($23.5 million settlement); *Plymouth County Ret. Sys. v. Patterson Co., Inc.*, No. 0:18-cv-00871-MJD-DTS (D. Minn.) ($63 million settlement); *Medoff v. CVS Caremark Corp.*, No. 1:09-cv-00554-JNL-PAS (D.R.I.) ($48 million settlement); *In re Carter's Inc. Sec. Litig.*, No. 1:08-cv-02940-AT (N.D. Ga.) ($23.3 million settlement); *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, No. 2:20-cv-00856-RDP (N.D. Ala.) ($28 million settlement).

6.    One of my responsibilities as the Executive Director involves overseeing litigation brought by PCRA.  As a result, I am familiar with the duties undertaken by PCRA with respect to this Action, which included monitoring PCRA's selected counsel for litigation, participating in the collection of documents on behalf of PCRA, providing deposition testimony, and participating in strategic decision making and settlement approval.

7.    On behalf of PCRA, Mr. Sullivan, Mr. Smyth, and I, as well as our colleagues at PCRA, had regular communications with Court-appointed Lead Counsel Saxena White P.A. ("Saxena White" or "Lead Counsel").  PCRA received regular status reports from Lead Counsel on case developments and participated in discussions with attorneys from Lead Counsel concerning the prosecution of the Action, the strengths of and risks to the claims, and the Settlement.  Through these regular status reports and communications, PCRA closely supervised and participated in the prosecution of the Action.

8.    In particular, throughout the course of this Action, Mr. Sullivan, Mr. Smyth, and I coordinated with Lead Counsel about, and participated in, the following events:

(a)    deciding to move for lead plaintiff appointment, including reviewing PCRA's lead plaintiff application, communicating with Lead Counsel, Baltimore Employees, and

DECL. OF PADRAIC P. LYDON, ESQ.
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC                    2

Philadelphia Pension Fund regarding the co-lead plaintiff application, participating in a joint conference call with Lead Counsel, Baltimore Employees, and Philadelphia Pension Fund, and executing multiple joint declarations detailing Lead Plaintiffs' commitment to efficiently and effectively litigating the Settlement Class's claims under our supervision;

(b)    working closely with and regularly corresponding with Lead Counsel, including through regular reports that provided detailed descriptions of Lead Counsel's work prosecuting the Action, litigation strategy, and the existing case status, along with detailed schedules of the time spent and expenses incurred by Lead Counsel during the period covered by the report, in accordance with the Court's Protocol for Controlling Fees and Costs (ECF No. 94);

(c)    reviewing pleadings and motions filed in this litigation, including the amended complaints, Lead Plaintiffs' opposition to Defendants' motion to dismiss, Lead Plaintiffs' motion for class certification, and other key filings throughout the Litigation;

(d)    responding to discovery requests, including searching for and producing documents and responding to Defendants' interrogatories;

(e)    preparing for and providing deposition testimony in connection with Lead Plaintiffs' motion for class certification; and

(f)    evaluating and approving the proposed Settlement.

9.    Throughout the prosecution of the Action, PCRA was represented and supported by myself, Mr. Sullivan, Mr. Smyth, and other PCRA representatives. In total, we devoted approximately 81 hours in support of PCRA's efforts in furtherance of the prosecution of this Action and to achieve this recovery on behalf of FibroGen investors during the Settlement Class Period.[2]

II.    **PCRA Strongly Endorses Approval of the Settlement**

10.    Based on its participation throughout the prosecution and resolution of the claims in the Action, PCRA believes that the proposed Settlement is fair, reasonable, and adequate to the

---

[2] While PCRA devoted a significant amount of time to this Action, our request for reimbursement of costs is based on a conservative estimate of the amount of time we collectively spent on this litigation, as supported by our and Lead Counsel's records.

Settlement Class.   The Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation.

11.   The prosecution and settlement of this Action required extensive efforts on the part of Lead Plaintiffs and Lead Counsel, particularly given the complexity of the legal and factual issues and the vigorous defense by Defendants and their counsel.  The risk of no recovery was very real here, and there was no guarantee that the entirety of Lead Plaintiffs' claims would survive a motion for summary judgment, much less succeed at trial or potential appeals. The risk of no recovery was compounded by FibroGen's deteriorating business and financial condition, including a potential bankruptcy.

12.   PCRA strongly endorses the Settlement as it provides a certain, immediate, and substantial cash recovery for the Settlement Class.  PCRA firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

**III.   Approval of the Attorneys' Fee Request and Litigation Expenses**

13.   PCRA believes that the request for an award of attorneys' fees in the amount of 25% of the Settlement Fund is fair and reasonable in light of the exceptional work that Lead Counsel performed on behalf of the Settlement Class.  A 25% award is particularly appropriate here because of the highly complex issues involved, Lead Counsel's investment of time and resources, the outstanding result achieved, the approval of the Settlement Class, and the significant risks in the Litigation.

14.   The fee percentage requested is consistent with the retainer agreement that PCRA entered into with Lead Counsel, which provided that Lead Counsel shall seek no more than 25% of any settlement as its fee, subject to Court approval.  After the agreement to settle the Action was reached, PCRA again evaluated Lead Counsel's proposed 25% fee request by considering the substantial recovery obtained for the Settlement Class in this Action and authorized the requested 25% fee award to the Court for its ultimate determination.

15.   PCRA takes seriously its role as a Lead Plaintiff to ensure that attorneys' fees are fair in light of the result achieved for the Settlement Class and to reasonably compensate Lead

Counsel for the work involved and the substantial risks Lead Counsel undertook in litigating the Action.

16.    PCRA further believes that the litigation expenses being requested for payment to Lead Counsel are reasonable, and represent costs and expenses necessary for the prosecution and resolution of the claims in the Action.  As discussed above, PCRA received regular reports throughout the pendency of the Action that provided detailed schedules of the time spent and expenses incurred by Lead Counsel on an ongoing basis, for each period covered by the report.  Based on the foregoing, PCRA fully supports the request for attorneys' fees and expenses.

**IV.    PCRA's Representative Reimbursement**

17.    PCRA understands that reimbursement of a class representative's reasonable costs and expenses, including lost wages, directly relating to the representation of the class, is authorized under the PSLRA, 15 U.S.C. § 78u-4(a)(4).  Accordingly, in connection with Lead Counsel's request for payment of litigation expenses, PCRA seeks reimbursement for the costs and expenses that it incurred in connection with its efforts in this Action, which are described above in ¶¶8-9.

18.    This request is based on a calculation of hours that my colleagues and I spent on the case.  The time that other staff members of PCRA and I devoted to pursuing the Settlement Class's interests in this Action was time we otherwise would have devoted to other work for PCRA, and thus represents a direct cost to PCRA.  As detailed above, we collectively devoted approximately 81 hours to this Action.  In calculating the total cost of this time, PCRA applied an hourly rate of $88.94 to the amount of time each individual devoted to the prosecution of the Action.[3]  This calculation resulted in a total cost of $7,204.14, for which PCRA respectfully requests reimbursement.

**V.    Conclusion**

19.    In light of the foregoing, PCRA respectfully submits that the Court should grant Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees and Expenses

---

[3] The hourly rate used for purposes of this calculation is based on the annual salary of the Executive Director of Plymouth.

DECL. OF PADRAIC P. LYDON, ESQ.
ISO LPS' MOT. FOR FINAL APPR.                    5
3:21-cv-02623-EMC

and approve the request to award PCRA reimbursement of $7,204.14 pursuant to 15 U.S.C. § 78u-4(a)(4) for its costs in connection with the prosecution of this Action.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of March, 2024 in Plymouth, Massachusetts.

Padraic P. Lydon, Esq.
Executive Director
Plymouth County Retirement Association

DECL. OF PADRAIC P. LYDON, ESQ.
ISO LPS' MOT. FOR FINAL APPR.
3:21-cv-02623-EMC

6

# EXHIBIT D

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC |
| | **CLASS ACTION** |
| | DECLARATION OF LUIGGY SEGURA REGARDING (A) MAILING OF NOTICE PACKET; (B) PUBLICATION OF SUMMARY NOTICE; AND (C) REPORT ON REQUESTS FOR EXCLUSION TO DATE |

I, Luiggy Segura, declare as follows:

1.      I am a Vice President of Securities Class Actions at JND Legal Administration ("JND"). Pursuant to the Court's February 13, 2024 Order Preliminarily Approving Settlement and Providing for Notice ("Preliminarily Approval Order"; ECF No. 244), Lead Counsel retained JND as the Court-approved Claims Administrator in connection with the proposed settlement of the above-captioned action ("Action").[1]

2.      I am over 21 years of age and am not a party to the Action. The statements herein are based on my personal knowledge and information provided to me by JND employees under my supervision, and, if called as a witness, I could and would testify competently thereto.

3.      I submit this Declaration to provide the Court and the Parties to the Action with information regarding the dissemination of the Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") and Proof of Claim and Release Form ("Claim Form" and, together with the Notice, "Notice Packet") as well as other updates regarding notice and the settlement administration process.  Lead Counsel and JND have previously worked together in disseminating securities class action settlements, and have successfully implemented the same or substantially similar notice and claims processing program in other cases to that approved by the Court in this Action.

**Mailing of the Notice and Claim Form**

4.      Under the Preliminary Approval Order, JND was responsible for disseminating the Notice Packet to potential members of the Settlement Class. As defined in the Notice, the Settlement Class consists of all persons who purchased or acquired FibroGen, Inc. ("FibroGen" or the "Company") securities, including options, between December 20, 2018 through July 15, 2021, inclusive. A copy of the Notice Packet is attached hereto as Exhibit A.

---

[1]      Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated December 7, 2023 (ECF No. 236) ("Stipulation").

DECL. OF LUIGGY SEGURA RE
NOTICE MAILING; SUMMARY
NOTICE; AND EXCLUSION
3:21-cv-02623-EMC

1

5.      JND received a data file provided by Defendants' Counsel containing the names and mailing addresses of 203 unique potential Settlement Class Members. Prior to mailing the Notice Packets to the individuals and entities contained in the file, JND verified the mailing records through the National Change of Address ("NCOA") database to ensure the most current address was being used. As a result, 6 addresses were updated with new addresses. JND mailed Notice Packets by first-class mail to these 203 potential Settlement Class Members.

6.      JND also reviewed filings with the U.S. Securities and Exchange Commission ("SEC") on Form 13-F to identify additional institutions or entities that may have transacted in FibroGen securities during the Settlement Class Period. As a result, on March 4, 2024, JND mailed Notice Packets by first-class mail to the 507 institutions and/or entities identified.

7.      As in most securities class actions, the large majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name," *i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the respective nominees, on behalf of the beneficial purchasers. JND maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other institutions (the "JND Broker Database"). At the time of the initial mailing the JND Broker Database contained 4,079 mailing records.[2] On March 4, 2024, JND caused Notice Packets to be mailed by first-class mail to addresses for these 4,079 records.

8.      Pursuant to the Preliminary Approval Order, Brokers and other nominees who purchased or otherwise acquired FibroGen securities during the Settlement Class Period for the benefit of another person or entity were directed to either (a) within seven (7) calendar days of receipt of the Notice, request from JND sufficient copies of the Notice Packet to forward to all such beneficial owners, and within seven (7) calendar days of receipt of those Notice Packets, forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names and addresses, and email addresses where available, of all such

_____

[2]      JND continuously updates its Nominee Database with new addresses when they are received and eliminates duplicates or obsolete addresses when identified (as brokers/nominees merge or go out of business).

DECL. OF LUIGGY SEGURA RE
NOTICE MAILING; SUMMARY
NOTICE; AND EXCLUSION                    2
3:21-cv-02623-EMC

beneficial owners to JND, in which event JND shall promptly mail and email the Notice Packet when an email is available to such beneficial owners.

9.     JND caused reminder postcards to be mailed by first-class mail, postage prepaid, to the brokers/nominees and third-party filers contained in the JND Broker Database who did not respond to the Initial Mailing. The reminder postcard advised these entities of their obligation to facilitate notice of the Settlement to their clients who transacted in FibroGen securities during the Settlement Class Period.

10.     Furthermore, JND provided a copy of the Notice to the Depository Trust Company ("DTC") for posting on its Legal Notice System ("LENS"). The LENS may be accessed by any broker/nominee that participates in DTC's security settlement system.

11.     Since the Initial Mailing, JND has received an additional 14,577 names and mailing addresses (and 145 email addresses)[3] of potential Settlement Class Members from individuals, entities, or brokers/nominees requesting that Notice Packets be mailed to such persons or entities. JND has also received requests from brokers/nominees for an additional 17,405 Notice Packets, in bulk, to forward directly to their clients.

12.     As a result of the efforts described above, as of April 1, 2024, an aggregate of 36,771 Notice Packets have been disseminated to potential Settlement Class Members and nominees via first-class mail.[4]

---

[3]     Receiving email addresses for notice mailings is not a common practice in securities matters, but emails (if available) were requested by Lead Counsel in light of the 2018 amendments to Federal Rule of Civil Procedure 23. In the event that both an email address and mailing address were provided for the same potential Settlement Class Member, Notice was both emailed and mailed.

[4]     As of April 1, 2024, 34 Notices Packets have been returned by the United States Postal Service ("USPS") to JND as undelivered as addressed. The USPS informed JND that 13 of the 34 undelivered Notice Packets had an updated address, and those Notice Packets were forwarded to the updated address. JND also conducted an advanced search of the addresses on the undeliverable Notice Packets where an updated address had not been provided by the USPS, and as a result, 18 new addresses were found. JND re-mailed the Notice Packets to the updated addresses identified through the advanced search.

**Publication of the Summary Notice**

13.     Pursuant to the Preliminary Approval Order, JND was also responsible for publishing the Summary Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Summary Notice"). Accordingly, on March 18, 2024, JND caused the Summary Notice to be published once in *Investor's Business Daily*, and to be transmitted once over *PRNewswire*. Attached hereto as Exhibit B is confirmation of *Investor's Business Daily* and *PRNewswire* publications.

**Establishment of Call Center Services**

14.     Before March 4, 2024, JND established and continues to maintain a toll-free telephone helpline, 1-877-595-0137, with an interactive voice response system ("IVR") and live operators, to accommodate potential Settlement Class Members who may have questions about the Action and the Settlement.  The IVR provides callers with a series of choices to respond to basic questions. The toll-free telephone number with pre-recorded information is available 24 hours a day, 7 days a week, and provides the option to speak with a live operator during regular business hours. During other hours, callers may leave a message for a JND representative to call them back. As of April 1, 2024, there have been a total of 34 calls to the toll-free telephone number. Of these calls, 10 have been handled by a live operator. JND continues to maintain the telephone helpline and will update the IVR system as necessary throughout the administration of the Settlement.

**Establishment of the Settlement Website**

15.     In accordance with the Preliminary Approval Order, and to further assist potential Settlement Class Members, JND, established and currently maintains a website dedicated to the Action and the Settlement, www.FibroGenSecuritiesLitigation.com ("Settlement Website"). The Settlement Website became operational before March 4, 2024, and is accessible 24 hours a day, 7 days a week. Among other things, the Settlement Website includes general information regarding the Settlement and lists the exclusion, objection, and claim-filing deadline, as well as the date and

DECL. OF LUIGGY SEGURA RE
NOTICE MAILING; SUMMARY
NOTICE; AND EXCLUSION
3:21-cv-02623-EMC

4

time of the Court's Settlement Hearing. JND also posted to the Settlement Website copies of the Stipulation, Preliminary Approval Order, Notice, and Claim Form. In addition, the Settlement Website provides Settlement Class Members with the ability to submit a Claim online and also includes a link to a document with detailed instructions for institutions submitting their Claims electronically. As of April 1, 2024, the Settlement Website has received 666 visitors. JND will continue operating, maintaining, and, as appropriate, updating the Settlement Website until the conclusion of this administration. The internet address for the Settlement Website is set forth in the Notice, Claim Form, and Summary Notice.

**Report on Claims, Objections, and Exclusion Requests Received**

16.    The Notice, Summary Notice, and Settlement Website provides Settlement Class Members with clear instructions on how to timely file claims to participate in the Settlement and the information that must be included to support each such claim, as well as detailed instructions for institutions wishing to submit Claims electronically.  While the claim filing deadline will not yet have expired, JND will provide an update on claims received from Settlement Class members in a supplemental declaration after the April 18, 2024 deadline for requesting exclusion.

17.    The Notice, Summary Notice, and Settlement Website also provide Settlement Class Members with clear instructions on how to timely file objections to the Settlement or request exclusion from the Settlement.  Specifically, the Notice, Summary Notice, and Settlement Website inform Settlement Class Members that requests for exclusion from the Settlement Class are to be addressed to Exclusions, In re FibroGen, Inc., Securities Litigation, c/o JND Legal Administration, P.O. Box 91482, Seattle, WA 98111, such that they are received no later than April 18, 2024. The Notice also sets forth the information that must be included in each request for exclusion. JND monitors all mail delivered to the P.O. Box for the Settlement.

18.    As of April 1, 2024, JND has not received any objections to any aspect of the Settlement, the Plan of Allocation and/or the attorneys' fee and expense award request, and 0 requests for exclusion from the Settlement Class. JND will submit a supplemental declaration after

DECL. OF LUIGGY SEGURA RE
NOTICE MAILING; SUMMARY
NOTICE; AND EXCLUSION
3:21-cv-02623-EMC

5

the April 18, 2024 deadline for requesting exclusion that will address all valid requests for exclusion received.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 3, 2024 in New Hyde Park, New York.

_____
Luiggy Segura

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE FIBROGEN, INC.,
SECURITIES LITIGATION

No. 3:21-cv-02623-EMC

**NOTICE OF (I) PROPOSED SETTLEMENT AND PLAN OF ALLOCATION;**
**(II) SETTLEMENT FAIRNESS HEARING; AND (III) MOTION FOR AN AWARD**
**OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

*A Federal Court authorized this Notice.  This is not a solicitation from a lawyer.*
*YOU MAY BE ENTITLED TO A CASH AWARD.*

**TO: All persons who purchased or acquired FibroGen, Inc. ("FibroGen or the "Company") securities, including options, between December 20, 2018 through July 15, 2021, inclusive (the "Settlement Class Period"). You may be a member of the Settlement Class. If you do not wish to be part of the Settlement Class, you must respond to this Notice with a written request for exclusion (see below). You may be eligible to receive a share of the proceeds of the Settlement, but you must submit a Claim Form to participate in the Settlement (see below). If you are a broker or custodian, please immediately review this Notice for instructions on providing timely notification to beneficial owners.**

NOTICE OF SETTLEMENT:  This notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of California (the "Court"). Please be advised that the Court-appointed Lead Plaintiffs, Employees' Retirement System of the City of Baltimore ("ERSCB"), City of Philadelphia Board of Pensions and Retirement ("CPBPR"), and Plymouth County Retirement Association ("PCRA") (collectively, "Lead Plaintiffs"), on behalf of themselves and the Court-certified Settlement Class (as defined in paragraph 25 below), have reached a proposed settlement of the above-captioned securities class action (the "Action") for $28,500,000.00 in cash that, if approved, will resolve all claims in the Action (the "Settlement").

**PLEASE READ THIS NOTICE CAREFULLY.  This Notice explains important rights you may have, including the possible receipt of cash from the Settlement.  If you are a member of the Settlement Class, your legal rights will be affected whether or not you act.**

**If you have any questions about this Notice, the proposed Settlement, or your eligibility to participate in the Settlement, please DO NOT contact the Court, FibroGen, any other Defendants in the Action, or their counsel.  All questions should be directed to the Claims Administrator or Lead Counsel (see paragraph 96 below).**

1.    **Description of the Action and the Settlement Class**:  This Notice relates to a proposed Settlement of claims in a pending securities class action brought by investors alleging, among other things, that FibroGen  and defendants Enrique Conterno ("Conterno"), James A. Schoeneck ("Schoeneck"), Mark Eisner ("Eisner"), Pat Cotroneo ("Cotroneo"), and K. Peony Yu ("Yu") (collectively, the "Individual Defendants," and together with FibroGen, the "Defendants")[1] misrepresented the safety profile and Phase III trial results of FibroGen's flagship anti-anemia drug, Roxadustat, for which the Company had submitted a new drug application ("NDA") to the United States Food & Drug administration ("FDA") in December 2019 in order to obtain approval for marketing

---

[1] All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Stipulation" or "Settlement Agreement") which is available at www.FibroGenSecuritiesLitigation.com.  The singular forms of nouns and pronouns include the plural and vice versa.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

1

the drug in the United States.  The Complaint further alleges that FibroGen's stock price was artificially inflated as a result of Defendants' false and misleading statements, and that FibroGen's stock price declined when the alleged truth regarding Defendants' alleged misrepresentations was revealed.  A more detailed description of the Action is set forth in paragraphs 11-24 below.  The proposed Settlement, if approved by the Court, will settle the claims of the Settlement Class, as defined in paragraph 25 below.

2.    **Statement of the Settlement Class's Recovery:**  Subject to Court approval, Lead Plaintiffs, on behalf of themselves and the Settlement Class, have agreed to settle the Action in exchange for a settlement payment of $28,500,000.00 in cash (the "Settlement Amount") to be deposited into an escrow account.  The Net Settlement Fund (*i.e.,* the Settlement Amount plus any and all interest earned thereon (the "Settlement Fund") less (a) any Taxes and Tax Expenses, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, (d) any attorneys' fees awarded by the Court, and (e) any other deductions ordered by the Court) will be distributed in accordance with a plan of allocation that is approved by the Court, which will determine how the Net Settlement Fund shall be allocated among members of the Settlement Class.  The proposed plan of allocation (the "Plan of Allocation") is set forth in paragraphs 55-79 below.

3.    **Estimate of Average Amount of Recovery Per Share:**  Based on Lead Plaintiffs' damages expert's estimates of the number of shares of FibroGen common stock purchased and options traded during the Settlement Class Period that may have been affected by the conduct at issue in the Action, and assuming that all Settlement Class Members elect to participate in the Settlement, the estimated average recovery (before the deduction of any Court-approved fees, expenses, and costs as described herein) would be $0.29 per alleged damaged share (hereinafter the "damaged shares"), $1.58 per damaged call option (hereinafter the "damaged call options"), and $5.38 per damaged put option (hereinafter "damaged put options").  Settlement Class Members should note, however, that the foregoing average recovery per share or options contract is only an estimate.  Some Settlement Class Members may recover more or less than this estimated amount depending on, among other factors, when and at what prices they purchased/acquired and sold their FibroGen securities, and the total number and recognized loss amount of valid Claim Forms and electronic claims submitted.  Distributions to Settlement Class Members will be made based on the Plan of Allocation set forth herein (see paragraphs 74-79 below) or such other plan of allocation as may be ordered by the Court.

4.    **Average Amount of Damages Per Share**: The Parties do not agree on the average amount of damages per share that would be recoverable if Lead Plaintiffs were to prevail in the Action.  Among other things, Defendants deny each and all the claims and contentions alleged by Lead Plaintiffs in the Action and do not agree with the assertion that they violated the federal securities laws or that any damages were suffered by Lead Plaintiffs or any members of the Settlement Class as a result of their alleged conduct.

5.    **Attorneys' Fees and Expenses Sought:**  Lead Counsel, who have been prosecuting the Action on a wholly contingent basis since 2021, have not received any payment of attorneys' fees for their representation of the Settlement Class and have advanced the funds to pay expenses necessarily incurred to prosecute this Action.  Court-appointed Lead Counsel Saxena White P.A. will apply to the Court for an award of attorneys' fees in an amount not to exceed twenty-five percent (25%) of the Settlement Fund, or $7,125,000 plus interest.  This fee award would equate to an estimated lodestar multiplier of approximately 0.5.  In addition, Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the institution, prosecution, and resolution of the claims against the Defendants, in an amount not to exceed $715,000, which sum may include the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in an amount not to exceed $45,000.  Any fees and expenses awarded by the Court will be paid from the Settlement Fund.  Settlement Class Members are not personally liable for any such fees or expenses.  Estimates of the average costs per damaged share, damaged call option, and damaged put option, if the Court approves Lead Counsel's fee and expense application, are $0.08 per damaged share, $0.43 per damaged call option, and $1.48 per damages put option.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

2

6.    **Identification of Attorneys' Representative:**  Lead Plaintiffs and the Settlement Class are represented by Lester R. Hooker, Esq. of Saxena White P.A., 7777 Glades Road, Suite 300, Boca Raton, FL 33434, (561) 206-6708, lhooker@saxenawhite.com.

7.    **Reasons for the Settlement:**  Lead Plaintiffs' principal reason for entering into the Settlement is the substantial immediate cash benefit for the Settlement Class without the risk or the delays inherent in further litigation.  Moreover, the substantial cash benefit provided under the Settlement must be considered against a number of factors, including FibroGen's cash position and its resources that could be allocated to any settlement or recovery. Defendants, who deny all allegations of wrongdoing or liability or any violation of the law whatsoever, are entering into the Settlement solely to eliminate the uncertainty, distraction, time, burden, and expense of further protracted litigation.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM ONLINE, OR BY MAIL AND POSTMARKED, NO LATER THAN JUNE 12, 2024.** | This is the only way to be potentially eligible to receive a payment from the Settlement Fund.  If you are a Settlement Class Member and you remain in the Settlement Class, you will be bound by the Settlement as approved by the Court and you will give up any Released Plaintiffs' Claims (defined in paragraph 35 below) that you have against Defendants and the other Defendant Releasees (defined in paragraph 36 below), so it is in your interest to submit a Claim Form. <br><br> You may submit a Claim Form and still object to any part of the Settlement. <br><br> You cannot submit a Claim Form and exclude yourself. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS BY SUBMITTING A WRITTEN REQUEST FOR EXCLUSION SO THAT IT IS *RECEIVED* NO LATER THAN APRIL 18, 2024.** | If you exclude yourself from the Settlement Class, you will not be eligible to receive any payment from the Settlement Fund.  This is the only option that allows you ever to be part of any other lawsuit against any of the Defendants or the other Defendant Releasees concerning the Released Plaintiffs' Claims. <br><br> You cannot object to the proposed Settlement and cannot submit a Claim Form if you exclude yourself. |
| **OBJECT TO THE SETTLEMENT BY FILING ELECTRONICALLY OR IN PERSON WITH THE COURT, OR BY MAILING TO THE COURT A WRITTEN OBJECTION SO THAT IT IS *RECEIVED* NO LATER THAN APRIL 18, 2024.** | If you do not like the proposed Settlement, the proposed Plan of Allocation, or the request for attorneys' fees and reimbursement of Litigation Expenses, you may write to the Court and explain why you do not like them.  You cannot object to the Settlement, the Plan of Allocation, or the fee and expense request unless you are a Settlement Class Member and do not exclude yourself from the Settlement Class. <br><br> You do not need to submit a Claim Form to object. However, if you object, you must submit a Claim Form, as described above, by June 12, 2024, in order to be eligible to receive a cash payment from the Settlement Fund. <br><br> The Court can only approve or deny the Settlement and cannot change the terms. |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **GO TO A HEARING ON MAY 16, 2024 AT 1:30 P.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS *RECEIVED* NO LATER THAN APRIL 18, 2024.** | Filing a written objection and notice of intention to appear by April 18, 2024 allows you at the Settlement Hearing on May 16, 2024 at 1:30 p.m., Pacific Standard Time, to speak in Court, at the discretion of the Court, about the fairness of the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and reimbursement of Litigation Expenses. If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Court, speak to the Court about your objection. |
| **DO NOTHING** | If you are a member of the Settlement Class and you do not submit a valid Claim Form, you will not be eligible to receive any payment from the Settlement Fund. You will, however, remain a member of the Settlement Class, which means that you give up your right to sue about the claims that are resolved by the Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

## WHAT THIS NOTICE CONTAINS

Why Did I Get This Notice? ...................................................................................................Page 4

What Is This Case About? ....................................................................................................Page 5

How Do I Know If I Am Affected By The Settlement?
  Who Is Included In The Settlement Class? ........................................................................Page 8

What Are Lead Plaintiffs' Reasons For The Settlement? ...................................................Page 8

What Might Happen If There Were No Settlement? ...........................................................Page 9

How Are Settlement Class Members Affected By The Action And The Settlement? ................................Page 9

How Do I Participate In The Settlement?  What Do I Need To Do? ...................................Page 11

How Much Will My Payment Be? ......................................................................................Page 11

What Payment Are The Attorneys For The Settlement Class Seeking?
  How Will The Lawyers Be Paid? ......................................................................................Page 18

What If I Do Not Want To Be A Member Of The Settlement Class?
  How Do I Exclude Myself? ...............................................................................................Page 18

When And Where Will The Court Decide Whether To Approve The Settlement?
  Do I Have To Come To The Hearing?
  May I Speak At The Hearing If I Do Not Like The Settlement? ........................................Page 19

What If I Bought Securities On Someone Else's Behalf? ...................................................Page 20

Can I See The Court File?  Whom Should I Contact If I Have Questions? .........................Page 21

## WHY DID I GET THIS NOTICE?

8.    The Court directed that this Notice be mailed to you because you, someone in your family, or an investment account for which you serve as a custodian may have purchased or acquired FibroGen securities during the Settlement Class Period.  The Court has directed us to send you this Notice because, as a potential Settlement Class Member, you have a right to know about your options before the Court rules on the proposed Settlement. Additionally, you have the right to understand how this class action lawsuit may generally affect your legal rights. If the Court approves the Settlement, and the Plan of Allocation (or some other plan of allocation), the claims

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

administrator selected by Lead Plaintiffs and approved by the Court will make payments pursuant to the Settlement after any objections and appeals are resolved.

9.    The purpose of this Notice is to inform you of the existence of this case, that it is a class action, how you might be affected, and how to exclude yourself from the Settlement Class if you wish to do so.  It is also being sent to inform you of the terms of the proposed Settlement, and of a hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation, and the motion by Lead Plaintiffs for an award of attorneys' fees and reimbursement of Litigation Expenses (the "Settlement Hearing").  See paragraph 86 below for details about the Settlement Hearing, including the date and location of the hearing.

10.    The issuance of this Notice is not an expression of any opinion by the Court concerning the merits of any claim in the Action, and the Court still has to decide whether to approve the Settlement.  If the Court approves the Settlement and a plan of allocation, then payments to Authorized Claimants will be made after any appeals are resolved and after the completion of all claims processing.  Please be patient, as this process can take some time to complete.

## WHAT IS THIS CASE ABOUT?

11.    On April 12, 2021, this Action was commenced in the United States District Court for the Northern District of California, styled *Peifa Xu vs. FibroGen, Inc., et. al.*, Case No. 3:21-cv-02623-EMC (N.D. Cal.), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

12.    By Order dated August 30, 2021, the Court appointed ERSCB, CPBPR, and PCRA as Lead Plaintiffs and approved Lead Plaintiffs' selection of Saxena White P.A. as Lead Counsel for the class.

13.    On November 19, 2021, Lead Plaintiffs filed their Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), on behalf of the Settlement Class, reflecting the change in the case name to *In re FibroGen, Inc. Securities Litigation* and asserting claims for a putative class period of December 20, 2018 through July 15, 2021.  The Complaint alleges, among other things, that throughout the Settlement Class Period, Defendants misrepresented the safety profile and Phase III trial results of FibroGen's flagship anti-anemia drug, Roxadustat.  The Company had submitted a new drug application to the FDA in December 2019 to obtain approval for the commercialization of Roxadustat in the United States.  The Complaint alleges that the crux of Defendants' scheme was to falsely assure investors that the safety results were derived pursuant to FDA-sanctioned analyses, when in fact Defendants improperly used post-hoc stratification factors to artificially make Roxadustat appear safer than the comparators, Epogen and a placebo.  The Complaint further alleges that FibroGen's stock price was artificially inflated as a result of Defendants' false and misleading statements, and that FibroGen's stock price substantially declined when the truth regarding Defendants' alleged misrepresentations was revealed through a series of partial disclosures.

14.    The FibroGen Defendants (defendants FibroGen, Conterno, Schoeneck, Eisner, and Cotroneo collectively) and Yu were represented separately, with Cooley LLP representing the FibroGen Defendants, and Pillsbury Winthrop Shaw Pittman LLP and the Wei Law Group LLP representing Defendant Yu.  On January 14, 2022, the FibroGen Defendants and Defendant Yu each filed motions to dismiss the Complaint.  Lead Plaintiffs filed their opposition on March 4, 2022.  On April 8, 2022, the FibroGen Defendants and Defendant Yu each filed replies.  On April 28, 2022, the Court heard oral argument on Defendants' motions to dismiss.  On July 15, 2022, the Honorable Edward M. Chen entered an Order denying in part and granting in part Defendants' motions to dismiss.  The Court found that Plaintiffs had adequately alleged that 91 out of the 96 challenged false statements in the Complaint were materially false and misleading, and that Plaintiffs had adequately alleged scienter on the part of all of the Individual Defendants.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

5

15. Following the Court's Order on Defendants' motions to dismiss the Complaint, the FibroGen Defendants and Defendant Yu each filed answers to the Complaint on September 13, 2022. The Parties then commenced discovery. Lead Plaintiffs sought discovery from the FibroGen Defendants and Defendant Yu, as well as the FDA, FibroGen's partners in the development of Roxadustat, AstraZeneca and Astellas, and another third party. Defendants sought discovery from Lead Plaintiffs and Lead Plaintiffs' investment managers. Specifically, Lead Plaintiffs served their First Requests for Production of Documents to All Defendants on September 14, 2022. Defendants served their First Set of Requests for Production of Documents and their First Set of Interrogatories to Lead Plaintiffs on November 21, 2022.

16. The FibroGen Defendants served their responses and objections to Lead Plaintiffs' requests on October 14, 2022, and Defendant Yu served her responses and objections to Lead Plaintiffs' requests on October 28, 2022. Lead Plaintiffs served their responses and objections to Defendants' requests and interrogatories on December 21, 2022. Lead Plaintiffs subpoenaed AstraZeneca and Astellas for documents on November 10 and 22, 2022, respectively, and subpoenaed the FDA for documents on January 4, 2023. AstraZeneca served its responses and objections to Plaintiffs' subpoena on December 19, 2022. Astellas served its responses and objections to Plaintiffs' subpoena on December 20, 2022. The FDA responded by letter to Plaintiffs' subpoena on January 12, 2023.

17. After the Parties agreed on search terms, Defendants and their expert produced nearly 165,000 documents spanning over 1.8 million pages in 29 separate productions over the course of approximately ten months, with Defendants providing Lead Plaintiffs with their first production on November 19, 2022. Similarly, Lead Plaintiffs, their investment managers (who produced documents pursuant to subpoenas from Defendants), and their expert produced nearly 13,000 documents spanning over 87,000 pages in 26 separate productions over the course of approximately three months, with Lead Plaintiffs providing Defendants their first production on January 20, 2023. The FibroGen Defendants served three privilege logs on Plaintiffs. Defendant Yu served one privilege log on Plaintiffs. Lead Plaintiffs served one privilege log on Defendants. Pursuant to subpoena, AstraZeneca produced approximately 100,000 documents spanning over 2.6 million pages in eleven separate productions over the course of approximately eight months, with AstraZeneca making its first production on February 28, 2023. Also pursuant to subpoena, Astellas produced over 4,000 documents spanning 55,000 pages in three separate productions over the course of approximately three months, with Astellas making its first production on April 19, 2023. Also, pursuant to subpoena, the FDA produced over 300 documents spanning over 1,800 pages in one production made on February 15, 2023.

18. During the course of document discovery, the Parties conducted numerous meet-and-confers and exchanged dozens of letters and substantive emails amongst themselves and with non-parties. The Parties also engaged in discovery disputes on a variety of issues. Of these, two disputes resulted in significant motion practice.

19. Lead Plaintiffs filed their Motion for Class Certification on January 27, 2023, attaching the expert report of Mr. Chad Coffman, CFA. On April 4, 2023, Defendants took the deposition of Mr. Coffman. Defendants took the depositions of representatives of Lead Plaintiffs PCRA, ERSCB, and CPBPR on April 11, 2023, April 13, 2023, and April 18, 2023, respectively. Defendants filed their Opposition to the Motion for Class Certification on May 12, 2023, attaching the expert report of Dr. Paul Zurek. On June 8, 2023, Lead Plaintiffs deposed Defendants' expert. On June 23, 2023, Lead Plaintiffs filed their reply in support of class certification. On August 17, 2023, Defendants moved for leave to file a sur-reply on class certification, attaching their proposed sur-reply. Plaintiffs opposed this motion on August 21, 2023. On August 24, 2023, the Court granted Defendants' motion for leave to file a sur-reply. On August 31, 2023, the Court conducted a hearing on Plaintiffs' motion for class certification, during which the Court directed the Parties to file a supplemental chart regarding facts potentially disclosed on July 15, 2021 at the FDA Advisory Committee Meeting ("AdCom") considering FibroGen's Roxadustat NDA. The Parties jointly filed this supplemental briefing on September 15, 2023.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

6

20.    On October 3, 2023, the Court granted in part and denied in part the Motion for Class Certification.  In its order, the Court appointed Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, and certified a class of purchasers of FibroGen stock for a Class Period of December 20, 2018 through April 6, 2021 who were damaged thereby. While Lead Plaintiffs had moved to certify a class period of December 20, 2018 through July 15, 2021, the Court found that no new information was disseminated at the AdCom on July 15, 2021 that corrected any alleged false statement, and therefore, ended the class period for litigation purposes with the after-market disclosure on April 6, 2021.  The Court deferred certification of options holders during the class period and instructed the Parties to provide supplemental briefing on whether damages for options holders could be calculated on a class-wide basis.

21.    On March 14, 2023, the Parties and Defendants' directors' and officers' liability insurance carriers (the "D&O Insurers") participated in an in-person mediation session in San Francisco with mediator Michelle Yoshida of Phillips ADR.  Prior to the mediation, each side submitted comprehensive mediation statements and rebuttal statements setting forth their respective positions on various legal and factual issues, which included detailed information obtained through the extensive discovery process.  During the mediation, the Parties provided their respective views on liability and damages.  At the conclusion of the mediation, the Parties were at an impasse and agreed to continue litigation efforts.  No further settlement negotiations were scheduled.  In July 2023, while active litigation remained ongoing, the Parties resumed settlement discussions through Ms. Yoshida, which included numerous telephonic and video conferences.  These discussions culminated in a mediator's proposal to settle the Action for $28.5 million, which the Parties accepted on October 17, 2023.

22.    Based on their investigation, discovery, prosecution, and mediation of the case, Lead Plaintiffs and Lead Counsel have concluded that the terms and conditions of the Stipulation are fair, reasonable, and adequate to Lead Plaintiffs and the other members of the Settlement Class, and in their best interests.  Based on Lead Plaintiffs' oversight of the prosecution of this matter and with the advice of its counsel, Lead Plaintiffs have agreed to settle and release the claims raised in the Action pursuant to the terms and provisions of the Stipulation, after considering, among other things, (a) the substantial financial benefit that Lead Plaintiffs and the other members of the Settlement Class will receive under the proposed Settlement; (b) FibroGen's resources to fund a settlement; (c) the significant risks and costs of continued litigation and trial; and (d) the desirability of permitting the proposed Settlement to be consummated as provided by the terms of the Stipulation.

23.    The Stipulation and the Settlement constitute a compromise of matters that are in dispute among the Parties.  Defendants have entered into the Stipulation solely to eliminate the uncertainty, distraction, time, burden, and expense of further protracted litigation.  Each of the Defendants denies any wrongdoing, and the Settlement and Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Defendants with respect to any claim or allegation of any fault, liability, wrongdoing, or damage whatsoever, or any infirmity in the defenses that the Defendants have, or could have, asserted.  Defendants expressly deny that Lead Plaintiffs have asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing, or damages whatsoever.  The Stipulation and the Settlement also shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any Lead Plaintiffs of an infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit.

24.    On February 13, 2024, the Court preliminarily approved the Settlement, authorized this Notice to be disseminated to potential Settlement Class Members, provisionally certified the Settlement Class and scheduled the Settlement Hearing to consider, among other things, whether to grant final approval of the Settlement.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

7

**HOW DO I KNOW IF I AM AFFECTED BY THE SETTLEMENT?**
**WHO IS INCLUDED IN THE SETTLEMENT CLASS?**

25.    If you are a member of the Settlement Class, you are subject to the Settlement, unless you timely request to be excluded.  The Settlement Class consists of:

> All persons who purchased or acquired FibroGen securities, including options, between December 20, 2018 through July 15, 2021, inclusive.

Excluded from the Settlement Class are (1) Defendants; (2) the Officers or directors of FibroGen during the Settlement Class Period; (3) the Immediate Family members of any Defendant or any Officer or director of FibroGen during the Settlement Class Period; and (4) any entity that any Defendant owns or controls, or owned or controlled, during the Settlement Class Period.   Also excluded from the Settlement Class are those persons who submit valid and timely requests for exclusion in accordance with the Preliminary Approval Order, or the plaintiffs in the Opt-Out Action against Defendants.  See "What If I Do Not Want To Be A Member Of The Settlement Class?  How Do I Exclude Myself?" on page 18 below.

**PLEASE NOTE:  RECEIPT OF THIS NOTICE DOES NOT MEAN THAT YOU ARE A SETTLEMENT CLASS MEMBER OR THAT YOU WILL BE ENTITLED TO RECEIVE PROCEEDS FROM THE SETTLEMENT.  IF YOU ARE A SETTLEMENT CLASS MEMBER AND YOU WISH TO BE POTENTIALLY ELIGIBLE TO PARTICIPATE IN THE DISTRIBUTION OF PROCEEDS FROM THE SETTLEMENT, YOU ARE REQUIRED TO SUBMIT THE CLAIM FORM THAT IS BEING DISTRIBUTED WITH THIS NOTICE AND THE REQUIRED SUPPORTING DOCUMENTATION AS SET FORTH THEREIN POSTMARKED OR SUBMITTED ONLINE AT THE SETTLEMENT WEBSITE, WWW.FIBROGENSECURITIESLITIGATION.COM, NO LATER THAN JUNE 12, 2024.**

**WHAT ARE LEAD PLAINTIFFS' REASONS FOR THE SETTLEMENT?**

26.    Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit.  They recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through further motion practice, trial and appeals, as well as the very substantial risks they would face in establishing liability and damages.  Lead Plaintiffs and Lead Counsel recognized that Defendants had numerous avenues of attack that could preclude a recovery.  For example, among other things, Defendants would assert that the statements were not materially false or misleading, and that even if they were, they were not made with the requisite state of mind to support the securities fraud claims alleged.  Even if the hurdles to establishing liability were overcome, the amount of damages that could be attributed to the allegedly false statements would be hotly contested.  Lead Plaintiffs would have to prevail at several stages – including, without limitation, motions for summary judgment, trial, and if they prevailed on those, on the appeals that would likely follow.

27.    Moreover, Lead Plaintiffs and Lead Counsel took into account FibroGen's resources available to fund a settlement, including FibroGen's finite D&O insurance policies.  Further litigation, given its likely length and intensity of further litigation, would have rapidly depleted these insurance policies. Thus, had litigation continued, Lead Plaintiffs and Lead Counsel believe there was a very real risk (if not a virtual certainty) that the Settlement Class would have recovered less than the $28.5 million Settlement Amount, or even nothing at all.

28.    In light of these risks, the amount of the Settlement, and the immediacy of recovery to the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Settlement Class.  Lead Plaintiffs and Lead Counsel believe that the Settlement provides a substantial benefit to the Settlement Class, namely $28,500,000.00 in cash (less the various deductions described in this Notice), as compared to the risk that the claims in the Action would produce a smaller, or no, recovery after summary judgment, trial and appeals, possibly years in the future.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

29.    Defendants have denied each and all the claims and contentions asserted against them in the Action and deny having engaged in any wrongdoing or violation of law of any kind whatsoever.  Defendants have agreed to the Settlement solely to eliminate the burden and expense of continued litigation.  Accordingly, as noted above, the Settlement may not be construed as an admission of any wrongdoing by Defendants.

## WHAT MIGHT HAPPEN IF THERE WERE NO SETTLEMENT?

30.    If there were no Settlement and Lead Plaintiffs failed to establish any essential legal or factual element of their claims against Defendants, neither Lead Plaintiffs nor the other members of the Settlement Class would recover anything from Defendants.  Also, if Defendants were successful in proving any of their defenses, either at summary judgment, at trial, or on appeal, the Settlement Class could recover substantially less than the amount provided in the Settlement, or nothing at all.  Furthermore, even if Lead Plaintiffs successfully continued litigation (including at summary judgment, at trial, or on appeal), given FibroGen's resources available to fund any such recovery, there was a very real risk (if not a virtual certainty) that the Settlement Class would recover less than the $28.5 million settlement amount, or even nothing at all.

## HOW ARE SETTLEMENT CLASS MEMBERS AFFECTED
## BY THE ACTION AND THE SETTLEMENT?

31.    As a Settlement Class Member, you are represented by Lead Plaintiffs and Lead Counsel, unless you enter an appearance through counsel of your own choice at your own expense.  You are not required to retain your own counsel, but if you choose to do so, such counsel must file a notice of appearance on your behalf.  For more information, please consult "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

32.    If you are a Settlement Class Member and do not wish to remain a Settlement Class Member, you may exclude yourself from the Settlement Class by following the instructions in the section entitled, "What If I Do Not Want To Be A Member Of The Settlement Class?  How Do I Exclude Myself?" below.

33.    If you are a Settlement Class Member and you wish to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and reimbursement of Litigation Expenses, and if you do not exclude yourself from the Settlement Class, you may make your objection by following the instructions in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

34.    If you are a Settlement Class Member and you do not exclude yourself from the Settlement Class, you will be bound by any orders issued by the Court.  If the Settlement is approved, the Court will enter a judgment (the "Judgment").  The Judgment will dismiss with prejudice the claims against the Defendant Releasees (as defined in paragraph 36 below) and will provide that, upon the Effective Date of the Settlement, Plaintiff Releasees (as defined in paragraph 41 below), shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Plaintiffs' Claim (as defined in paragraph 35 below) against the Defendants and the other Defendant Releasees, and shall forever be barred and enjoined from commencing, instituting, prosecuting, or maintaining any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees.

35.    "Released Plaintiffs' Claims" means all claims, demands, losses, rights, liability, or causes of action, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description whatsoever, whether known or unknown, or based on federal, state, local, statutory, or common law or any other law, rule, or regulation, (including the law of any jurisdiction outside the United States), that were or could have been asserted in the Action or could in the future be asserted in any forum, whether foreign or domestic, against Defendant Releasees by Class Representatives or any member of the Settlement Class, or

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

9

their successors, assigns, executors, administrators, representatives, attorneys, and agents in their capacity as such, which arise out of, are based upon, or relate in any way to the factual predicate of the Action, including (i) any of the allegations, facts, transactions, events, matters, occurrences, acts, disclosures, oral or written statements, representations, omissions, failures to act, filings, publications, disseminations, press releases, or presentations involved, set forth, alleged, or referred to in the Action; and (ii) all claims that arise out of, are based upon, or relate in any way to the purchase, acquisition, holding, sale, or disposition of any FibroGen securities during the Settlement Class Period.  "Released Plaintiffs' Claims" shall not include any claims to enforce this Settlement or Excluded Claims.

36.    "Defendant Releasees" means each and all Defendants, Defendants' Counsel, the D&O Insurers, and their respective Related Persons.

37.    "Related Persons" means (i) with respect to Defendants, Defendants' Counsel, and the D&O Insurers, each of their respective current and former, Officers, directors, agents, parents, affiliates, subsidiaries, reinsurers, successors, predecessors, assigns, assignees, employees, and attorneys, in their capacities as such; and (ii) with respect to the Individual Defendants, their respective spouses, Immediate Family members, heirs, successors, executors, estates, administrators, attorneys, agents, accountants, insurers or reinsurers, personal representatives, trusts, community property, and any other entity in which any of them has a controlling interest, and as to such entities, each and all of their predecessors, successors, past, present or future parents, subsidiaries, affiliates, and each of their respective past or present officers, directors, shareholders, agents, partners, principals, members, employees, attorneys, advisors, trustees, auditors and accountants, insurers, and reinsurers.

38.    "Unknown Claims" means any Released Plaintiffs' Claims that Lead Plaintiffs or any other Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims that any Defendant or any other Defendant Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her, or it might have affected his, her, or its decision(s) with respect to this Settlement, including but not limited to, whether or not to object to this Settlement or to the release of any Released Claims. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and Defendants shall expressly waive, and each of the other Plaintiff Releasees and Defendant Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by California Civil Code § 1542 and any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

The Releasees acknowledge that they may hereafter discover facts in addition to or different from those which he, she, it, or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but they are, notwithstanding this potential, entering into the Stipulation and intend it to be a full, final, and permanent resolution of the matters at issue in this Action. Lead Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasees and Defendant Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

39.    The Judgment will also provide that, upon the Effective Date of the Settlement, Defendant Releasees, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim (as defined in paragraph 40 below) against the Plaintiff Releasees (as defined in

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

10

paragraph 41 below), and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants' Claims against any of the Plaintiff Releasees. This release shall not apply to any Excluded Claim.

40.    "Released Defendants' Claims" means all claims, demands, losses, rights, liability, or causes of action, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description whatsoever, whether known or unknown, or based on federal, state, local, statutory, or common law or any other law, rule or regulation, (including the law of any jurisdiction outside the United States), that were or could have been asserted in the Action or could in the future be asserted in any forum, whether foreign or domestic, against Plaintiff Releasees by Defendants or any member of Defendant Releasees, or their successors, assigns, executors, administrators, representatives, attorneys, and agents in their capacity as such, which arise out of, relate to, or are based upon, the institution, prosecution, or settlement of the claims asserted in the Action against the Defendants. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement and any Excluded Claims.

41.    "Plaintiff Releasees" means Lead Plaintiffs, all other plaintiffs in the Action, Lead Counsel, and all other Settlement Class Members, as well as each of their respective current and former Officers, directors, agents, parents, affiliates, subsidiaries, successors, predecessors, assigns, assignees, employees, and attorneys, in their capacities as such.

42.    The Judgment will also provide that, upon the Effective Date, to the extent allowed by law, the Stipulation shall operate conclusively as an estoppel and full defense in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Settlement Class Member against any of the Defendant Releasees with respect to any Released Plaintiffs' Claim, or brought by a Defendant against any of the Plaintiff Releasees with respect to any Released Defendants' Claim.

43.    The Judgment shall, among other things, provide for the dismissal with prejudice of the Action against the Defendant Releasees, without costs to any Party or the D&O Insurers, except for the payments expressly provided for in the Stipulation.

| HOW DO I PARTICIPATE IN THE SETTLEMENT?  WHAT DO I NEED TO DO? |
| --- |

44.    To be eligible for a payment from the proceeds of the Settlement, you must be a member of the Settlement Class and you must timely complete and return the Claim Form with adequate supporting documentation postmarked or submitted online no later than June 12, 2024.  A Claim Form is included with this Notice, or you may obtain one from the website maintained by the Claims Administrator for the Settlement, www.FibroGenSecuritiesLitigation.com, or you may request that a Claim Form be mailed to you by calling the Claims Administrator toll free at 1-877-595-0137.  Please retain all records of your ownership of and transactions in FibroGen securities, as they may be needed to document your Claim.  If you request exclusion from the Settlement Class or do not submit a timely and valid Claim Form, you will not be eligible to share in the Net Settlement Fund.

| HOW MUCH WILL MY PAYMENT BE? |
| --- |

45.    At this time, it is not possible to make any determination as to how much any individual Settlement Class Member may receive from the Settlement.

46.    Pursuant to the Settlement, Defendants have agreed to cause the D&O Insurers to pay twenty-eight million five hundred thousand dollars ($28,500,000.00) in cash.  The Settlement Amount will be deposited into an escrow account.  The Settlement Amount plus any and all interest earned thereon is referred to as the "Settlement Fund."  If the Settlement is approved by the Court and the Effective Date occurs, the "Net Settlement Fund" (that is, the Settlement Fund less (a) all federal, state, or local taxes on any income earned by the Settlement Fund and the

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

11

reasonable costs incurred in connection with determining the amount of and paying taxes owed by the Settlement Fund (including reasonable expenses of tax attorneys and accountants); (b) the costs and expenses incurred in connection with providing notice to Settlement Class Members and administering the Settlement on behalf of Settlement Class Members; (c) any attorneys' fees and Litigation Expenses awarded by the Court; and (d) other Court-approved deductions) will be distributed to Settlement Class Members who submit valid Claim Forms, in accordance with the proposed Plan of Allocation or such other plan of allocation as the Court may approve.

47.    The Net Settlement Fund will not be distributed unless and until the Court has approved the Settlement and a plan of allocation, and the time for any petition for rehearing, appeal, or review, whether by certiorari or otherwise, has expired.

48.    No Defendant Releasee or any person or entity that paid any portion of the Settlement Amount on Defendants' behalf are entitled to get back any portion of the Settlement Fund once the Court's order or judgment approving the Settlement becomes Final. Defendants shall not have any liability, obligation, or responsibility for the administration of the Settlement, the disbursement of the Net Settlement Fund, or the Plan of Allocation. In no instance shall any Defendant Releasee be required to pay any amount other than as expressly provided for in the Stipulation.

49.    Approval of the Settlement is independent from approval of a plan of allocation. Any determination with respect to a plan of allocation will not affect the Settlement, if approved.

50.    Unless the Court otherwise orders, any Settlement Class Member who fails to submit a Claim Form postmarked or submitted online at the Settlement website, www.FibroGenSecuritiesLitigation.com, on or before June 12, 2024, shall be fully and forever barred from receiving payments pursuant to the Settlement, but will in all other respects remain a Settlement Class Member and be subject to the provisions of the Stipulation, including the terms of any Judgment entered and the releases given. This means that each Settlement Class Member releases the Released Plaintiffs' Claims (as defined in paragraph 35 above) against the Defendant Releasees (as defined in paragraph 36 above) and will be enjoined and prohibited from filing, prosecuting, or pursuing any of the Released Plaintiffs' Claims against any of the Defendant Releasees whether or not such Settlement Class Member submits a Claim Form.

51.    Participants in and beneficiaries of a plan covered by ERISA ("ERISA Plan") should NOT include any information relating to their transactions in FibroGen securities held through the ERISA Plan in any Claim Form that they may submit in this Action. They should include ONLY those shares that they purchased or acquired outside of the ERISA Plan.

52.    The Court has reserved jurisdiction to allow, disallow, or adjust on equitable grounds the Claim of any Settlement Class Member.

53.    Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim Form.

54.    Only Settlement Class Members, *i.e.*, persons who purchased or acquired FibroGen securities during the Settlement Class Period, will be potentially eligible to share in the distribution of the Net Settlement Fund. Persons that are excluded from the Settlement Class by definition or that exclude themselves from the Settlement Class pursuant to request will not be eligible to receive a distribution from the Net Settlement Fund and should not submit Claim Forms. Only FibroGen securities, including common stock and options, are included in the Settlement.

## PROPOSED PLAN OF ALLOCATION

55.    The objective of the proposed Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged violations of the federal

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

12

securities laws. The calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial. Nor are the calculations made pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. The computations under the Plan of Allocation are only a method to weigh the claims of Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

56.    The Plan of Allocation was created with the assistance of consulting damages experts from Global Economics Group LLC, and reflects the assumption that Defendants' alleged false and misleading statements and material omissions proximately caused the price of FibroGen common stock and FibroGen call options to be artificially inflated and FibroGen put options to be artificially deflated throughout the Settlement Class Period, December 20, 2018 through July 15, 2021, inclusive.  In calculating the estimated alleged artificial inflation (deflation) allegedly caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered price changes in FibroGen common stock and call and put options (collectively, "FibroGen Securities") in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

57.    In order to have recoverable damages, the disclosure of the allegedly misrepresented information must have been the cause of the adverse change in the price of FibroGen Securities. In this case, Plaintiffs alleged that Defendants made false statements and omitted material facts during the Settlement Class Period, which had the alleged effect of artificially inflating the price of FibroGen common stock and call options and deflating the price of FibroGen put options. Plaintiffs further alleged that corrective information was released to the market on: May 9, 2019 (after the close of trading), March 1, 2021 (after the close of trading), April 6, 2021 (after the close of trading) and July 15, 2021 (after the close of trading), which partially removed the artificial inflation from the prices of FibroGen common stock and call options and the artificial deflation from the prices of FibroGen put options on: May 10, 2019, March 2-3, 2021, April 7-8, 2021, and July 16, 2021.

58.    Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation or deflation in the price of FibroGen Securities at the time of purchase and at the time of sale, or the difference between the actual purchase price and sale price. Accordingly, in order to have a Recognized Loss Amount pursuant to the Plan of Allocation, a Settlement Class Member must have held FibroGen common stock or call options purchased or acquired during the Settlement Class Period over at least one of the days when corrective information was released to the market and partially removed the artificial inflation from the price of FibroGen common stock or call options, and with respect to FibroGen put options, a Settlement Class Member must have sold (written) those options during the Settlement Class Period and such option(s) must have remained open through at least one of the days when corrective information was released to the market and partially removed the artificial deflation from the price of FibroGen put options.

59.    Based on the formulas stated below, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of FibroGen common stock and call option and each sale (writing) of FibroGen put options during the Settlement Class Period that is listed on the Claim Form and for which adequate documentation is provided. If a Recognized Loss Amount calculates to a negative number or zero under the formulas below, that number will be zero.[2]

---

[2] A full breakdown of recognized losses for each security and transactions on each day of the Settlement Class Period is provided in Tables A-D, which are appended to the end of this Notice and are available at FibroGenSecuritiesLitigation.com.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

13

60.    For each share of FibroGen common stock purchased or otherwise acquired during the period from December 20, 2018 through the close of trading on July 15, 2021, and:[3]

A.    Sold before May 10, 2019, the Recognized Loss Amount will be $0.00;

B.    Sold from May 10, 2019 through the close of trading on July 15, 2021, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A[4] *minus* the amount of artificial inflation per share on the date of sale as stated in Table A; or (ii) the purchase/acquisition price *minus* the sale price;

C.    Sold from July 16, 2021 through the close of trading on October 13, 2021, the Recognized Loss Amount will be *the least of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A ; (ii) the purchase/acquisition price *minus* the average closing price from July 16, 2021 through the date of sale as stated in Table B; or (iii) the purchase/acquisition price *minus* the sale price; or

D.    Held as of the close of trading on October 13, 2021, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A; or (ii) the purchase/acquisition price *minus* $11.99.[5]

**FibroGen Call and Put Options**

61.    Exchange-traded options are traded in units called "contracts" which entitle the holder to buy (in the case of a call option) or sell (in the case of a put option) 100 shares of the underlying security, which in this case is FibroGen common stock. Throughout this Plan of Allocation, all price quotations are *per share of the underlying security* (*i.e.*, 1/100 of a contract).

62.    Each option contract specifies a strike price and an expiration date. Contracts with the same strike price and expiration date are referred to as a "series" and each series represents a different security that trades in the market and has its own market price (and thus its own artificial inflation or deflation). Under the Plan of Allocation, the dollar artificial inflation per share (*i.e.*, 1/100 of a contract) for each series of FibroGen call options and the dollar artificial deflation per share (*i.e.*, 1/100 of a contract) for each series of FibroGen put options has been calculated by Plaintiffs' damages expert. Table C sets forth the dollar artificial inflation per share in FibroGen call options during the Settlement Class Period. Table D sets forth the dollar artificial deflation per share in FibroGen put options during the Settlement Class Period. Tables C and D[6] list only series of exchange-traded FibroGen options that expired on or after May 10, 2019—the date of the first alleged corrective disclosure.

---

[3] Any share of FibroGen common stock purchased or otherwise acquired during the period from December 20, 2018 through the close of trading on July 15, 2021 and not held over one of the alleged corrective disclosures listed above have a Recognized Loss Amount of $0.00.

[4] In Table A, artificial inflation associated with the final alleged corrective disclosure on July 15, 2021, has been discounted 90% (multiplied by 0.1) to reflect the fact that the period from April 7, 2021 through July 15, 2021 was dismissed by the Court in its Order certifying a class.

[5] Pursuant to Section 21D(e)(1) of the Exchange Act, Recognized Loss Amounts on transactions in FibroGen common stock are reduced to an appropriate extent by taking into account the closing prices of FibroGen common stock during the "90-day look-back period" after the Settlement Class Period, from July 16, 2021 through October 13, 2021. The mean (average) closing price for FibroGen common stock during this 90-day look-back period was $11.99.

[6] In line with footnote 4 above, in Tables C and D, artificial inflation (deflation) associated with the final alleged corrective disclosure on July 15, 2021, has been discounted 90% (multiplied by 0.1) to reflect the fact that the period from April 7, 2021 through July 15, 2021 was dismissed by the Court in its Order certifying a class.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

Any FibroGen options traded during the Settlement Class Period that are not found on Tables C and D have a Recognized Loss Amount of zero under the Plan of Allocation.

63.   For each FibroGen call option purchased or otherwise acquired during the Settlement Class Period (*i.e.*, from December 20, 2018 through the close of trading on July 15, 2021), and:

A.   Closed (through sale, exercise, or expiration) before May 10, 2019, the Recognized Loss Amount will be $0.00.

B.   Closed (through sale, exercise, or expiration) during the period from May 10, 2019 through the close of trading on July 15, 2021, the Recognized Loss Amount will be *the lesser of*: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C *minus* the amount of artificial inflation per share on the date of close as stated in Table C; or (ii) if closed through sale, the purchase/acquisition price *minus* the sale price, or if closed through exercise or expiration, the purchase/acquisition price *minus* the value per option on the date of exercise or expiration.[7]

C.   Open as of the close of trading on July 15, 2021, the Recognized Loss Amount will be *the lesser of*: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C; or (ii) the purchase/acquisition price *minus* the closing price of that option on July 16, 2021 (*i.e.*, the "Holding Price") as stated in Table C.

64.   For each FibroGen put option sold (written) during the Settlement Class Period (*i.e.*, from December 20, 2018 through the close of trading on July 15, 2021), and:

A.   Closed (through purchase, exercise, or expiration) before May 10, 2019, the Recognized Loss Amount will be $0.00.

B.   Closed (through purchase, exercise, or expiration) during the period from May 10, 2019 through and including the close of trading on July 15, 2021, the Recognized Loss Amount will be *the lesser of*: (i) the amount of artificial deflation per share on the date of sale (writing) as stated in Table D  *minus* the amount of artificial deflation per share on the date of close as stated in Table D; or (ii) if closed through purchase, the purchase price *minus* the sale price, or if closed through exercise or expiration, the value per option on the date of exercise or expiration[8] *minus* the sale price.

C.   Open as of the close of trading on July 16, 2021, the Recognized Loss Amount will be *the lesser of*: (i) the amount of artificial deflation per share on the date of sale (writing) as stated in Table D; or (ii) the closing price on July 16, 2021 (*i.e.*, the "Holding Price") as stated in Table D below *minus* the sale price.

**Maximum Recovery for Options:** The Settlement proceeds available for FibroGen call options purchased/acquired during the Settlement Class Period and FibroGen put options sold (written) during the Settlement Class Period shall be limited to a total amount equal to 2.5% of the Net Settlement Fund.

---

[7]The "value" of the call option on the date of exercise or expiration shall be the closing price of FibroGen common stock on the date of exercise or expiration minus the strike price of the option. If this number is less than zero, the value of the call option is zero.

[8] The "value" of the put option on the date of exercise or expiration shall be the strike price of the option minus the closing price of FibroGen common stock on the date of exercise or expiration. If this number is less than zero, the value of the put option is zero.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

15

**ADDITIONAL PROVISIONS**

65.    **Recognized Claim:** A Claimant's "Recognized Claim" will be the sum of his, her, or its Recognized Loss Amounts.

66.    **FIFO Matching:** If a Settlement Class Member made more than one purchase/acquisition or sale of FibroGen Securities during the Settlement Class Period, all purchases/acquisitions and sales of the like security will be matched on a First In, First Out ("FIFO") basis. With respect to FibroGen common stock and call options, sales will be matched first against any holdings at the beginning of the Settlement Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made during the Settlement Class Period. For FibroGen put options, purchases/acquisitions will be matched first to close out positions open at the beginning of the Settlement Class Period, and then against FibroGen put options sold (written) during the Settlement Class Period in chronological order.

67.    **"Purchase/Sale" Prices:** For the purposes of calculations under this Plan of Allocation, "purchase/acquisition price" means the actual price paid, excluding all fees, taxes, and commissions, and "sale price" means the actual amount received, not deducting any fees, taxes, and commissions.

68.    **"Purchase/Sale" Dates:** Purchases or acquisitions and sales of FibroGen Securities will be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, inheritance, or operation of law of FibroGen Securities during the Settlement Class Period shall not be deemed a purchase, acquisition, or sale of such FibroGen Securities for the calculation of a Claimant's Recognized Loss Amount, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition/sale of FibroGen Securities unless (i) the donor or decedent purchased or otherwise acquired or sold such FibroGen Securities during the Settlement Class Period; (ii) the instrument of gift or assignment specifically provides that it is intended to transfer such rights; and (iii) no Claim was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to such shares of FibroGen Securities.

69.    **Short Sales:** With respect to FibroGen common stock, the date of covering a "short sale" is deemed to be the date of purchase or acquisition of the FibroGen common stock. The date of a "short sale" is deemed to be the date of sale of the FibroGen common stock. In accordance with the Plan of Allocation, however, the Recognized Loss Amount on "short sales" and the purchases covering "short sales" is zero.

70.    In the event that a Claimant has an opening short position in FibroGen common stock, the earliest purchases or acquisitions of FibroGen common stock during the Settlement Class Period will be matched against such opening short position, and not be entitled to a recovery, until that short position is fully covered.

71.    If a Settlement Class Member has "written" FibroGen call options, thereby having a short position in the call options, the date of covering such a written position is deemed to be the date of purchase or acquisition of the call option. The date on which the call option was written is deemed to be the date of sale of the call option. In accordance with the Plan of Allocation, however, the Recognized Loss Amount on "written" FibroGen call options is zero. In the event that a Claimant has an opening written position in FibroGen call options, the earliest purchases or acquisitions of like call options during the Settlement Class Period will be matched against such opening written position, and not be entitled to a recovery, until that written position is fully covered.

72.    If a Settlement Class Member has purchased or acquired FibroGen put options, thereby having a long position in the put options, the date of purchase/acquisition is deemed to be the date of purchase/acquisition of the put option. The date on which the put option was sold, exercised, or expired is deemed to be the date of sale of the put option. In accordance with the Plan of Allocation, however, the Recognized Loss Amount on purchased/acquired FibroGen put options is zero. In the event that a Claimant has an opening long position in FibroGen put options, the earliest sales or dispositions of like put options during the Settlement Class Period

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

16

will be matched against such opening position, and not be entitled to a recovery, until that long position is fully covered.

73.   **Common Stock Purchased/Sold Through the Exercise of Options:** With respect to FibroGen common stock purchased or sold through the exercise of an option, the purchase/sale date of the security is the exercise date of the option and the purchase/sale price is the exercise price of the option.

74.   **Determination of Distribution Amount:** If the sum total of Recognized Claims of all Authorized Claimants who are entitled to receive payment out of the Net Settlement Fund is greater than the Net Settlement Fund, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund. The *pro rata* share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

75.   If the Net Settlement Fund exceeds the sum total amount of the Recognized Claims of all Authorized Claimants entitled to receive payment out of the Net Settlement Fund, the excess amount in the Net Settlement Fund will be distributed *pro rata* to all Authorized Claimants entitled to receive payment.

76.   If an Authorized Claimant's Distribution Amount calculates to less than $10.00, no distribution will be made to that Authorized Claimant.

77.   After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund after the initial distribution, if Lead Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator, no fewer than nine (9) months after the initial distribution, will conduct another distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such distribution. Additional distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determine that additional distributions after the deduction of any additional fees and expenses incurred in administering the Settlement would be cost-effective. At such time as it is determined that further distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance, subject to Court approval, will be contributed to Investor Protection Trust, a non-sectarian, not-for-profit, 501(c)(3) organization devoted to independent and unbiased investor education, research, and support of investor protection efforts.

78.   Payment pursuant to the Plan of Allocation, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants. No person shall have any claim against Plaintiffs, Plaintiffs' Counsel, Plaintiffs' damages or consulting experts, Defendants, Defendants' Counsel, or any of the other Plaintiffs' Releasees or Defendants' Releasees, or the Claims Administrator or other agent designated by Lead Counsel arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or further Orders of the Court. Plaintiffs, Defendants, and their respective counsel, and all other Defendants' Releasees, shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund; the plan of allocation; the determination, administration, calculation, or payment of any Claim or nonperformance of the Claims Administrator; the payment or withholding of Taxes; or any losses incurred in connection therewith.

79.   The Plan of Allocation stated herein is the plan that is being proposed to the Court for its approval by Plaintiffs after consultation with their damages expert. The Court may approve this plan as proposed or it may modify the Plan of Allocation without further notice to the Settlement Class. Any Orders regarding any modification of the Plan of Allocation will be posted on the case website, www.FibroGenSecuritiesLitigation.com.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

17

## WHAT PAYMENT ARE THE ATTORNEYS FOR THE SETTLEMENT CLASS SEEKING? HOW WILL THE LAWYERS BE PAID?

80.    Lead Counsel have not received any payment for their services in pursuing claims against the Defendants on behalf of the Settlement Class, nor have Lead Counsel been reimbursed for their out-of-pocket expenses. Before final approval of the Settlement, Lead Plaintiffs will apply to the Court for an award of attorneys' fees for Lead Counsel in an amount not to exceed twenty-five percent (25%) of the Settlement Fund, or $7,125,000 plus interest. It is estimated that such an award would equate to a lodestar multiplier of approximately 0.5. At the same time, Lead Counsel also intends to apply for reimbursement of Litigation Expenses in an amount not to exceed $715,000, including reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in an amount not to exceed $45,000. The Court will determine the amount of any award of attorneys' fees or reimbursement of Litigation Expenses. Such sums as may be approved by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses.

## WHAT IF I DO NOT WANT TO BE A MEMBER OF THE SETTLEMENT CLASS? HOW DO I EXCLUDE MYSELF?

81.    Each Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written request for exclusion from the Settlement Class, addressed to: Exclusions, In re FibroGen, Inc., Securities Litigation, c/o JND Legal Administration, P.O. Box 91482, Seattle, WA 98111. The exclusion request must be received no later than April 18, 2024. You will not be able to exclude yourself from the Settlement Class after that date. Each request for exclusion must (a) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities the name and telephone number of the appropriate contact person; (b) state that such person or entity "requests exclusion from the Settlement Class in *In re FibroGen, Inc., Securities Litigation*, Case No. 3:21-cv-02623-EMC"; (c) state the number of FibroGen securities that the person or entity requesting exclusion purchased/acquired and sold during the Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of shares held at the beginning of the Settlement Class Period; and (d) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

82.    If you do not want to be part of the Settlement Class, you must follow these instructions for exclusion even if you have a pending, or later file, another lawsuit, arbitration, or other proceeding relating to any Released Plaintiffs' Claim against any of the Defendant Releasees.

83.    If you ask to be excluded from the Settlement Class, you will not be eligible to receive any payment out of the Net Settlement Fund.

84.    FibroGen has the right to terminate the Settlement if valid requests for exclusion are received from persons and entities entitled to be members of the Settlement Class in an amount that exceeds an amount agreed to by Lead Plaintiffs and FibroGen, as set forth in a confidential Supplemental Agreement.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

18

| **WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?  DO I HAVE TO COME TO THE HEARING? MAY I SPEAK AT THE HEARING IF I DO NOT LIKE THE SETTLEMENT?** |
|---|

85.    **Settlement Class Members do not need to attend the Settlement Hearing.  The Court will consider any submission made in accordance with the provisions below even if a Settlement Class Member does not attend the hearing.  You can participate in the Settlement without attending the Settlement Hearing.**

86.    The Settlement Hearing will be held on May 16, 2024 at 1:30 p.m., before the Honorable Edward M. Chen at the United States District Court for the Northern District of California, Courtroom 5 – 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102-3489.  The Court reserves the right to approve the Settlement, the Plan of Allocation, Lead Plaintiffs' motion for an award of attorneys' fees and reimbursement of Litigation Expenses, and/or any other matter related to the Settlement at or after the Settlement Hearing with such modification(s) as may be consented to by the Parties to the Stipulation and without further notice to the members of the Settlement Class.

87.    Any Settlement Class Member who or which does not request exclusion may object to the Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses.  In other words, you can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object.

88.    Any objection to the proposed Settlement must be in writing. All written objections and supporting papers must clearly identify the case name and number, *In re FibroGen, Inc., Securities Litigation*, Case No. 3:21-cv-02623-EMC (N.D. Cal.).  All written objections and supporting papers must be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California, or by mailing them to the address set forth below on or before April 18, 2024.  If you object, you must still file a Claim Form, as described in paragraph 44 to receive your share of the Settlement Fund, but you do not need to file a Claim Form to object.

| **Clerk's Office** |
|---|
| Class Action Clerk<br>United States District Court<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3489 |

89.    Any objection (a) must state the name, address, and telephone number of the person or entity objecting and must be signed by the objector; (b) must contain a statement of the Settlement Class Member's objection or objections, and the specific reasons for each objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention; and (c) must include documents sufficient to prove membership in the Settlement Class, including the number of shares of FibroGen securities that the objecting Settlement Class Member purchased/acquired and sold during the Settlement Class Period (*i.e.*, between December 20, 2018 through July 15, 2021, inclusive, as well as the dates and prices of each such purchase/acquisition and sale, and the number of securities held at the beginning of the Settlement Class Period). You may not object to the Settlement, the Plan of Allocation, or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses if you exclude yourself from the Settlement Class or if you are not a member of the Settlement Class.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

90.    You may file a written objection without having to appear at the Settlement Hearing.  You may not, however, appear at the Settlement Hearing to present your objection unless you first file and serve a written objection in accordance with the procedures described above, unless the Court orders otherwise.

91.    If you wish to be heard orally at the hearing in opposition to the approval of the Settlement, the Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, and if you timely file and serve a written objection as described above, you must also file a notice of appearance with the Clerk's Office so that it is *received* on or before April 18, 2024.  Persons who intend to object and desire to present evidence at the Settlement Hearing must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the hearing. Such persons may be heard orally at the discretion of the Court.

92.    If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney, and that attorney must file a notice of appearance with the Court on or before April 18, 2024, as set forth in Paragraph 91 above.

93.    The Court may adjourn the Settlement Hearing or any adjournment thereof without further written notice of any kind to the Settlement Class.  Settlement Class Members should check the Court's PACER site (defined in Paragraph 96 below) or the Settlement website at www.FibroGenSecuritiesLitigation.com. Any updates regarding the Settlement Hearing, including any changes to the date of time of the hearing or updates regarding in-person, telephonic, or video conference appearances at the hearing, will also be posted to the Settlement website.

94.    **Unless the Court orders otherwise, any Settlement Class Member who does not object in the manner described above will be deemed to have waived any objection and shall be forever foreclosed from making any objection to the proposed Settlement, the proposed Plan of Allocation, or Lead Plaintiffs' motion for an award of attorneys' fees and reimbursement of Litigation Expenses.  Settlement Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval.**

| **WHAT IF I BOUGHT SHARES ON SOMEONE ELSE'S BEHALF?** |
| --- |

95.    If you purchased or otherwise acquired FibroGen securities during the Settlement Class Period for the beneficial interest of persons or organizations other than yourself, you must either (a) within seven (7) calendar days of receipt of this Notice, request from the Claims Administrator sufficient copies of the Notice and Claim Form (the "Notice Packet") to forward to all such beneficial owners, and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of *receipt of this Notice, provide a list of the names and addresses of all such beneficial owners to* In re FibroGen, Inc. Securities Litigation, c/o JND Legal Administration, P.O. Box 91482, Seattle, WA 98111, or to FGENSecurities@JNDLA.com.  If you choose the second option, the Claims Administrator will send a copy of the Notice and the Claim Form to the beneficial owners.  Upon full compliance with these directions, such nominees may obtain reimbursement of their reasonable expenses incurred, by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought, up to a maximum of $0.10 per name and address provided to the Claims Administrator, mailing of the Notice and Claim Form up to $0.50 per unit, plus postage at the rate used by the Claims Administrator, or emailing of the Notice and Claim Form up to $0.05 per email. Any dispute concerning the reasonableness of reimbursement of costs shall be resolved by the Court. Copies of this Notice and the Claim Form may also be obtained from the website maintained by the Claims Administrator, **www.FibroGenSecuritiesLitigation.com, or by calling the Claims Administrator toll-free at 1-877-595-0137**.

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

20

**CAN I SEE THE COURT FILE?  WHOM SHOULD I CONTACT IF I HAVE QUESTIONS?**

96.    This Notice contains only a summary of the terms of the proposed Settlement.  For more detailed information about the matters involved in this Action, you are referred to the papers on file in the Action, including the Stipulation, which are available by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov or by visiting the Office of the Clerk, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102-3489 or any other location of the United States District Court for the Northern District of California, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.  Additionally, copies of the Stipulation and any related orders entered by the Court will be posted on the website maintained by the Claims Administrator, www.FibroGenSecuritiesLitigation.com.

Inquiries, other than requests for the Notice and Claim Form, should be directed to:

| | | |
|---|---|---|
| *In re FibroGen, Inc. Securities Litigation* | | SAXENA WHITE P.A. |
| c/o JND Legal Administration | | Lester R. Hooker, Esq. |
| P.O. Box 91482 | | 7777 Glades Road, Suite 300 |
| Seattle, WA 98111 | and/or | Boca Raton, FL 33434 |
| www.FibroGenSecuritiesLitigation.com | | (561) 206-6708 |
| info@fibrogensecuritieslitigation.com | | settlements@saxenawhite.com |

**DO NOT CALL OR WRITE THE COURT, THE OFFICE OF THE CLERK OF THE COURT, DEFENDANTS, OR THEIR COUNSEL REGARDING THIS NOTICE.**

Dated: March 4, 2024

By Order of the Court
United States District Court
Northern District of California

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

**TABLE A**

**Estimated Alleged Artificial Inflation in FibroGen Common Stock
from December 20, 2018 through and including July 15, 2021**

| Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation |
|---|---|---|---|---|---|---|---|
| 12/20/2018 | $29.91 | 2/13/2019 | $39.19 | 4/5/2019 | $38.07 | 5/29/2019 | $22.41 |
| 12/21/2018 | $28.35 | 2/14/2019 | $39.19 | 4/8/2019 | $37.27 | 5/30/2019 | $22.81 |
| 12/24/2018 | $28.65 | 2/15/2019 | $39.19 | 4/9/2019 | $37.07 | 5/31/2019 | $22.85 |
| 12/26/2018 | $31.07 | 2/19/2019 | $39.19 | 4/10/2019 | $38.24 | 6/3/2019 | $23.47 |
| 12/27/2018 | $30.86 | 2/20/2019 | $39.19 | 4/11/2019 | $37.16 | 6/4/2019 | $24.35 |
| 12/28/2018 | $31.60 | 2/21/2019 | $39.19 | 4/12/2019 | $33.85 | 6/5/2019 | $24.61 |
| 12/31/2018 | $32.62 | 2/22/2019 | $39.19 | 4/15/2019 | $34.37 | 6/6/2019 | $24.16 |
| 1/2/2019 | $32.29 | 2/25/2019 | $39.19 | 4/16/2019 | $34.19 | 6/7/2019 | $24.41 |
| 1/3/2019 | $30.19 | 2/26/2019 | $39.19 | 4/17/2019 | $32.52 | 6/10/2019 | $25.19 |
| 1/4/2019 | $31.97 | 2/27/2019 | $39.19 | 4/18/2019 | $33.27 | 6/11/2019 | $24.86 |
| 1/7/2019 | $32.94 | 2/28/2019 | $39.19 | 4/22/2019 | $33.01 | 6/12/2019 | $25.35 |
| 1/8/2019 | $34.01 | 3/1/2019 | $39.19 | 4/23/2019 | $33.78 | 6/13/2019 | $26.06 |
| 1/9/2019 | $33.85 | 3/4/2019 | $39.19 | 4/24/2019 | $33.18 | 6/14/2019 | $25.65 |
| 1/10/2019 | $33.77 | 3/5/2019 | $39.19 | 4/25/2019 | $33.75 | 6/17/2019 | $27.12 |
| 1/11/2019 | $33.61 | 3/6/2019 | $39.17 | 4/26/2019 | $34.08 | 6/18/2019 | $27.78 |
| 1/14/2019 | $33.34 | 3/7/2019 | $38.79 | 4/29/2019 | $33.54 | 6/19/2019 | $28.09 |
| 1/15/2019 | $34.61 | 3/8/2019 | $38.32 | 4/30/2019 | $32.94 | 6/20/2019 | $28.02 |
| 1/16/2019 | $35.71 | 3/11/2019 | $38.19 | 5/1/2019 | $32.39 | 6/21/2019 | $27.94 |
| 1/17/2019 | $35.80 | 3/12/2019 | $38.84 | 5/2/2019 | $33.44 | 6/24/2019 | $27.46 |
| 1/18/2019 | $37.16 | 3/13/2019 | $39.19 | 5/3/2019 | $34.67 | 6/25/2019 | $26.66 |
| 1/22/2019 | $36.25 | 3/14/2019 | $39.19 | 5/6/2019 | $34.44 | 6/26/2019 | $26.65 |
| 1/23/2019 | $36.59 | 3/15/2019 | $39.19 | 5/7/2019 | $32.37 | 6/27/2019 | $28.09 |
| 1/24/2019 | $37.68 | 3/18/2019 | $39.19 | 5/8/2019 | $32.71 | 6/28/2019 | $28.49 |
| 1/25/2019 | $38.51 | 3/19/2019 | $39.19 | 5/9/2019 | $32.19 | 7/1/2019 | $28.95 |
| 1/28/2019 | $37.70 | 3/20/2019 | $38.82 | 5/10/2019 | $22.95 | 7/2/2019 | $27.99 |
| 1/29/2019 | $37.82 | 3/21/2019 | $39.19 | 5/13/2019 | $22.16 | 7/3/2019 | $27.97 |
| 1/30/2019 | $39.19 | 3/22/2019 | $37.34 | 5/14/2019 | $23.62 | 7/5/2019 | $27.96 |
| 1/31/2019 | $39.19 | 3/25/2019 | $37.39 | 5/15/2019 | $23.86 | 7/8/2019 | $26.96 |
| 2/1/2019 | $39.19 | 3/26/2019 | $38.37 | 5/16/2019 | $23.54 | 7/9/2019 | $28.27 |
| 2/4/2019 | $39.19 | 3/27/2019 | $37.79 | 5/17/2019 | $22.56 | 7/10/2019 | $28.42 |
| 2/5/2019 | $39.19 | 3/28/2019 | $38.22 | 5/20/2019 | $22.60 | 7/11/2019 | $28.49 |
| 2/6/2019 | $39.19 | 3/29/2019 | $38.31 | 5/21/2019 | $22.73 | 7/12/2019 | $28.76 |
| 2/7/2019 | $39.19 | 4/1/2019 | $39.14 | 5/22/2019 | $22.48 | 7/15/2019 | $29.28 |
| 2/8/2019 | $39.19 | 4/2/2019 | $38.41 | 5/23/2019 | $22.15 | 7/16/2019 | $29.30 |
| 2/11/2019 | $39.19 | 4/3/2019 | $38.88 | 5/24/2019 | $22.43 | 7/17/2019 | $29.14 |
| 2/12/2019 | $39.19 | 4/4/2019 | $37.21 | 5/28/2019 | $22.44 | 7/18/2019 | $30.04 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

| Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation |
|---|---|---|---|---|---|---|---|
| 7/19/2019 | $29.15 | 9/10/2019 | $26.05 | 10/30/2019 | $24.73 | 12/20/2019 | $28.57 |
| 7/22/2019 | $30.04 | 9/11/2019 | $27.39 | 10/31/2019 | $24.69 | 12/23/2019 | $28.33 |
| 7/23/2019 | $29.27 | 9/12/2019 | $26.83 | 11/1/2019 | $25.24 | 12/24/2019 | $28.91 |
| 7/24/2019 | $29.70 | 9/13/2019 | $26.17 | 11/4/2019 | $23.34 | 12/26/2019 | $29.48 |
| 7/25/2019 | $29.45 | 9/16/2019 | $26.37 | 11/5/2019 | $25.21 | 12/27/2019 | $28.31 |
| 7/26/2019 | $30.04 | 9/17/2019 | $26.11 | 11/6/2019 | $24.17 | 12/30/2019 | $27.38 |
| 7/29/2019 | $30.01 | 9/18/2019 | $25.83 | 11/7/2019 | $23.95 | 12/31/2019 | $27.05 |
| 7/30/2019 | $30.04 | 9/19/2019 | $25.00 | 11/8/2019 | $26.25 | 1/2/2020 | $27.66 |
| 7/31/2019 | $29.80 | 9/20/2019 | $25.16 | 11/11/2019 | $22.32 | 1/3/2020 | $27.17 |
| 8/1/2019 | $29.66 | 9/23/2019 | $25.76 | 11/12/2019 | $22.43 | 1/6/2020 | $27.34 |
| 8/2/2019 | $29.22 | 9/24/2019 | $24.01 | 11/13/2019 | $21.81 | 1/7/2020 | $26.91 |
| 8/5/2019 | $28.25 | 9/25/2019 | $24.09 | 11/14/2019 | $22.06 | 1/8/2020 | $27.00 |
| 8/6/2019 | $28.72 | 9/26/2019 | $23.82 | 11/15/2019 | $23.33 | 1/9/2020 | $26.81 |
| 8/7/2019 | $28.50 | 9/27/2019 | $23.84 | 11/18/2019 | $23.25 | 1/10/2020 | $26.52 |
| 8/8/2019 | $29.32 | 9/30/2019 | $23.32 | 11/19/2019 | $23.74 | 1/13/2020 | $26.35 |
| 8/9/2019 | $29.14 | 10/1/2019 | $22.87 | 11/20/2019 | $23.83 | 1/14/2020 | $26.98 |
| 8/12/2019 | $28.47 | 10/2/2019 | $22.29 | 11/21/2019 | $23.88 | 1/15/2020 | $26.79 |
| 8/13/2019 | $28.44 | 10/3/2019 | $22.85 | 11/22/2019 | $24.24 | 1/16/2020 | $28.12 |
| 8/14/2019 | $27.34 | 10/4/2019 | $23.18 | 11/25/2019 | $25.43 | 1/17/2020 | $27.97 |
| 8/15/2019 | $27.21 | 10/7/2019 | $23.26 | 11/26/2019 | $25.24 | 1/21/2020 | $27.08 |
| 8/16/2019 | $28.13 | 10/8/2019 | $22.92 | 11/27/2019 | $25.62 | 1/22/2020 | $27.57 |
| 8/19/2019 | $28.64 | 10/9/2019 | $23.07 | 11/29/2019 | $26.72 | 1/23/2020 | $27.85 |
| 8/20/2019 | $28.13 | 10/10/2019 | $23.11 | 12/2/2019 | $27.75 | 1/24/2020 | $26.36 |
| 8/21/2019 | $28.30 | 10/11/2019 | $23.52 | 12/3/2019 | $27.90 | 1/27/2020 | $26.24 |
| 8/22/2019 | $27.45 | 10/14/2019 | $23.98 | 12/4/2019 | $29.50 | 1/28/2020 | $26.44 |
| 8/23/2019 | $26.31 | 10/15/2019 | $24.51 | 12/5/2019 | $29.73 | 1/29/2020 | $26.51 |
| 8/26/2019 | $28.25 | 10/16/2019 | $25.41 | 12/6/2019 | $29.89 | 1/30/2020 | $26.66 |
| 8/27/2019 | $27.58 | 10/17/2019 | $25.55 | 12/9/2019 | $30.04 | 1/31/2020 | $26.39 |
| 8/28/2019 | $28.57 | 10/18/2019 | $24.47 | 12/10/2019 | $30.04 | 2/3/2020 | $27.35 |
| 8/29/2019 | $28.88 | 10/21/2019 | $24.75 | 12/11/2019 | $29.83 | 2/4/2020 | $28.88 |
| 8/30/2019 | $28.16 | 10/22/2019 | $24.98 | 12/12/2019 | $30.04 | 2/5/2020 | $28.98 |
| 9/3/2019 | $26.27 | 10/23/2019 | $24.49 | 12/13/2019 | $29.44 | 2/6/2020 | $28.75 |
| 9/4/2019 | $26.18 | 10/24/2019 | $25.22 | 12/16/2019 | $29.92 | 2/7/2020 | $27.29 |
| 9/5/2019 | $26.52 | 10/25/2019 | $24.99 | 12/17/2019 | $29.95 | 2/10/2020 | $27.46 |
| 9/6/2019 | $26.28 | 10/28/2019 | $25.67 | 12/18/2019 | $29.17 | 2/11/2020 | $28.15 |
| 9/9/2019 | $25.57 | 10/29/2019 | $24.80 | 12/19/2019 | $29.29 | 2/12/2020 | $28.61 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

23

| Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation |
|---|---|---|---|---|---|---|---|
| 2/13/2020 | $28.07 | 4/6/2020 | $22.64 | 5/28/2020 | $22.51 | 7/20/2020 | $28.56 |
| 2/14/2020 | $28.74 | 4/7/2020 | $21.52 | 5/29/2020 | $21.09 | 7/21/2020 | $27.68 |
| 2/18/2020 | $28.27 | 4/8/2020 | $22.19 | 6/1/2020 | $21.22 | 7/22/2020 | $27.27 |
| 2/19/2020 | $28.82 | 4/9/2020 | $22.96 | 6/2/2020 | $21.39 | 7/23/2020 | $27.04 |
| 2/20/2020 | $28.58 | 4/13/2020 | $22.28 | 6/3/2020 | $20.94 | 7/24/2020 | $26.78 |
| 2/21/2020 | $28.68 | 4/14/2020 | $23.09 | 6/4/2020 | $20.62 | 7/27/2020 | $27.34 |
| 2/24/2020 | $27.49 | 4/15/2020 | $22.30 | 6/5/2020 | $20.58 | 7/28/2020 | $25.98 |
| 2/25/2020 | $27.09 | 4/16/2020 | $23.43 | 6/8/2020 | $21.20 | 7/29/2020 | $25.69 |
| 2/26/2020 | $26.15 | 4/17/2020 | $25.03 | 6/9/2020 | $22.57 | 7/30/2020 | $26.09 |
| 2/27/2020 | $25.58 | 4/20/2020 | $24.28 | 6/10/2020 | $23.50 | 7/31/2020 | $25.52 |
| 2/28/2020 | $26.36 | 4/21/2020 | $23.48 | 6/11/2020 | $22.07 | 8/3/2020 | $26.75 |
| 3/2/2020 | $27.21 | 4/22/2020 | $23.91 | 6/12/2020 | $24.07 | 8/4/2020 | $26.39 |
| 3/3/2020 | $24.88 | 4/23/2020 | $24.87 | 6/15/2020 | $24.83 | 8/5/2020 | $26.90 |
| 3/4/2020 | $26.43 | 4/24/2020 | $25.77 | 6/16/2020 | $25.14 | 8/6/2020 | $26.14 |
| 3/5/2020 | $25.35 | 4/27/2020 | $25.16 | 6/17/2020 | $25.62 | 8/7/2020 | $27.87 |
| 3/6/2020 | $25.04 | 4/28/2020 | $24.71 | 6/18/2020 | $25.31 | 8/10/2020 | $28.47 |
| 3/9/2020 | $23.18 | 4/29/2020 | $25.07 | 6/19/2020 | $25.09 | 8/11/2020 | $28.40 |
| 3/10/2020 | $23.89 | 4/30/2020 | $23.26 | 6/22/2020 | $26.54 | 8/12/2020 | $28.44 |
| 3/11/2020 | $22.39 | 5/1/2020 | $22.06 | 6/23/2020 | $27.00 | 8/13/2020 | $28.45 |
| 3/12/2020 | $19.57 | 5/4/2020 | $23.31 | 6/24/2020 | $26.45 | 8/14/2020 | $27.88 |
| 3/13/2020 | $19.91 | 5/5/2020 | $22.90 | 6/25/2020 | $27.01 | 8/17/2020 | $28.22 |
| 3/16/2020 | $15.13 | 5/6/2020 | $22.70 | 6/26/2020 | $25.48 | 8/18/2020 | $27.99 |
| 3/17/2020 | $16.66 | 5/7/2020 | $22.97 | 6/29/2020 | $25.60 | 8/19/2020 | $26.46 |
| 3/18/2020 | $14.69 | 5/8/2020 | $22.97 | 6/30/2020 | $25.56 | 8/20/2020 | $26.06 |
| 3/19/2020 | $16.53 | 5/11/2020 | $24.98 | 7/1/2020 | $26.57 | 8/21/2020 | $26.57 |
| 3/20/2020 | $15.68 | 5/12/2020 | $23.76 | 7/2/2020 | $27.43 | 8/24/2020 | $26.68 |
| 3/23/2020 | $16.86 | 5/13/2020 | $22.76 | 7/6/2020 | $27.20 | 8/25/2020 | $26.32 |
| 3/24/2020 | $18.94 | 5/14/2020 | $22.88 | 7/7/2020 | $26.28 | 8/26/2020 | $26.19 |
| 3/25/2020 | $19.90 | 5/15/2020 | $22.76 | 7/8/2020 | $26.43 | 8/27/2020 | $26.43 |
| 3/26/2020 | $21.33 | 5/18/2020 | $23.04 | 7/9/2020 | $26.37 | 8/28/2020 | $26.83 |
| 3/27/2020 | $21.11 | 5/19/2020 | $22.35 | 7/10/2020 | $26.34 | 8/31/2020 | $28.27 |
| 3/30/2020 | $22.09 | 5/20/2020 | $23.71 | 7/13/2020 | $25.96 | 9/1/2020 | $28.22 |
| 3/31/2020 | $21.91 | 5/21/2020 | $23.07 | 7/14/2020 | $26.52 | 9/2/2020 | $28.61 |
| 4/1/2020 | $20.68 | 5/22/2020 | $23.22 | 7/15/2020 | $28.69 | 9/3/2020 | $26.54 |
| 4/2/2020 | $21.47 | 5/26/2020 | $22.89 | 7/16/2020 | $28.69 | 9/4/2020 | $27.23 |
| 4/3/2020 | $20.54 | 5/27/2020 | $23.31 | 7/17/2020 | $28.63 | 9/8/2020 | $26.59 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

24

| Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation | Date | Artificial Inflation |
|---|---|---|---|---|---|---|---|
| 9/9/2020 | $26.87 | 10/29/2020 | $24.60 | 12/21/2020 | $25.23 | 2/12/2021 | $30.04 |
| 9/10/2020 | $26.49 | 10/30/2020 | $24.20 | 12/22/2020 | $25.51 | 2/16/2021 | $30.04 |
| 9/11/2020 | $26.59 | 11/2/2020 | $24.72 | 12/23/2020 | $25.53 | 2/17/2021 | $30.04 |
| 9/14/2020 | $27.55 | 11/3/2020 | $25.24 | 12/24/2020 | $25.48 | 2/18/2021 | $30.04 |
| 9/15/2020 | $27.79 | 11/4/2020 | $26.40 | 12/28/2020 | $24.54 | 2/19/2021 | $30.04 |
| 9/16/2020 | $28.39 | 11/5/2020 | $26.78 | 12/29/2020 | $23.95 | 2/22/2021 | $30.04 |
| 9/17/2020 | $27.66 | 11/6/2020 | $26.03 | 12/30/2020 | $23.95 | 2/23/2021 | $30.04 |
| 9/18/2020 | $28.07 | 11/9/2020 | $25.75 | 12/31/2020 | $23.39 | 2/24/2021 | $30.04 |
| 9/21/2020 | $27.43 | 11/10/2020 | $25.76 | 1/4/2021 | $23.70 | 2/25/2021 | $30.04 |
| 9/22/2020 | $27.65 | 11/11/2020 | $26.05 | 1/5/2021 | $23.95 | 2/26/2021 | $30.04 |
| 9/23/2020 | $27.75 | 11/12/2020 | $25.86 | 1/6/2021 | $24.16 | 3/1/2021 | $30.04 |
| 9/24/2020 | $26.98 | 11/13/2020 | $26.54 | 1/7/2021 | $24.90 | 3/2/2021 | $18.60 |
| 9/25/2020 | $26.66 | 11/16/2020 | $27.17 | 1/8/2021 | $24.22 | 3/3/2021 | $16.29 |
| 9/28/2020 | $27.12 | 11/17/2020 | $27.82 | 1/11/2021 | $24.22 | 3/4/2021 | $16.29 |
| 9/29/2020 | $26.25 | 11/18/2020 | $26.19 | 1/12/2021 | $24.89 | 3/5/2021 | $16.29 |
| 9/30/2020 | $25.93 | 11/19/2020 | $25.71 | 1/13/2021 | $24.82 | 3/8/2021 | $16.26 |
| 10/1/2020 | $25.84 | 11/20/2020 | $25.54 | 1/14/2021 | $27.16 | 3/9/2021 | $16.29 |
| 10/2/2020 | $26.08 | 11/23/2020 | $25.35 | 1/15/2021 | $27.26 | 3/10/2021 | $16.29 |
| 10/5/2020 | $27.68 | 11/24/2020 | $26.06 | 1/19/2021 | $27.76 | 3/11/2021 | $16.29 |
| 10/6/2020 | $26.88 | 11/25/2020 | $25.24 | 1/20/2021 | $28.16 | 3/12/2021 | $16.29 |
| 10/7/2020 | $28.11 | 11/27/2020 | $25.33 | 1/21/2021 | $28.14 | 3/15/2021 | $16.29 |
| 10/8/2020 | $29.40 | 11/30/2020 | $26.05 | 1/22/2021 | $29.99 | 3/16/2021 | $16.29 |
| 10/9/2020 | $30.04 | 12/1/2020 | $26.01 | 1/25/2021 | $30.04 | 3/17/2021 | $16.29 |
| 10/12/2020 | $30.04 | 12/2/2020 | $26.49 | 1/26/2021 | $30.04 | 3/18/2021 | $15.92 |
| 10/13/2020 | $30.04 | 12/3/2020 | $25.79 | 1/27/2021 | $30.04 | 3/19/2021 | $16.29 |
| 10/14/2020 | $29.56 | 12/4/2020 | $26.33 | 1/28/2021 | $30.04 | 3/22/2021 | $16.29 |
| 10/15/2020 | $29.26 | 12/7/2020 | $26.48 | 1/29/2021 | $30.04 | 3/23/2021 | $15.81 |
| 10/16/2020 | $29.08 | 12/8/2020 | $26.63 | 2/1/2021 | $30.04 | 3/24/2021 | $15.22 |
| 10/19/2020 | $28.86 | 12/9/2020 | $25.90 | 2/2/2021 | $30.04 | 3/25/2021 | $15.26 |
| 10/20/2020 | $28.69 | 12/10/2020 | $25.40 | 2/3/2021 | $30.04 | 3/26/2021 | $15.55 |
| 10/21/2020 | $28.44 | 12/11/2020 | $25.86 | 2/4/2021 | $30.04 | 3/29/2021 | $15.11 |
| 10/22/2020 | $28.76 | 12/14/2020 | $27.69 | 2/5/2021 | $30.04 | 3/30/2021 | $15.16 |
| 10/23/2020 | $26.87 | 12/15/2020 | $26.27 | 2/8/2021 | $30.04 | 3/31/2021 | $16.29 |
| 10/26/2020 | $25.20 | 12/16/2020 | $26.46 | 2/9/2021 | $30.04 | 4/1/2021 | $16.29 |
| 10/27/2020 | $24.67 | 12/17/2020 | $27.90 | 2/10/2021 | $30.04 | 4/5/2021 | $16.29 |
| 10/28/2020 | $24.19 | 12/18/2020 | $27.73 | 2/11/2021 | $30.04 | 4/6/2021 | $16.29 |
| | | | | | | 4/7/2021 | $2.13 |
| 4/8/2021 through 7/15/2021 | | | | | | $1.11 | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

25

**TABLE B**

**90-Day Look-Back Table for FibroGen Common Stock**
**(Closing Price and Average Closing Price: July 16, 2021 – October 13, 2021)**

| Date | Closing Price | Average Closing Price Between July 16, 2021 and Date Shown | Date | Closing Price | Average Closing Price Between July 16, 2021 and Date Shown |
|---|---|---|---|---|---|
| 7/16/2021 | $14.35 | $14.35 | 8/31/2021 | $11.63 | $12.81 |
| 7/19/2021 | $13.72 | $14.04 | 9/1/2021 | $12.39 | $12.80 |
| 7/20/2021 | $14.41 | $14.16 | 9/2/2021 | $12.50 | $12.79 |
| 7/21/2021 | $14.19 | $14.17 | 9/3/2021 | $12.40 | $12.78 |
| 7/22/2021 | $13.64 | $14.06 | 9/7/2021 | $12.41 | $12.77 |
| 7/23/2021 | $13.27 | $13.93 | 9/8/2021 | $12.00 | $12.75 |
| 7/26/2021 | $13.08 | $13.81 | 9/9/2021 | $11.79 | $12.72 |
| 7/27/2021 | $13.05 | $13.71 | 9/10/2021 | $11.34 | $12.69 |
| 7/28/2021 | $13.31 | $13.67 | 9/13/2021 | $11.73 | $12.67 |
| 7/29/2021 | $12.84 | $13.59 | 9/14/2021 | $11.53 | $12.64 |
| 7/30/2021 | $13.00 | $13.53 | 9/15/2021 | $11.70 | $12.62 |
| 8/2/2021 | $13.32 | $13.52 | 9/16/2021 | $11.72 | $12.60 |
| 8/3/2021 | $13.28 | $13.50 | 9/17/2021 | $11.69 | $12.58 |
| 8/4/2021 | $13.40 | $13.49 | 9/20/2021 | $11.27 | $12.55 |
| 8/5/2021 | $13.84 | $13.51 | 9/21/2021 | $11.24 | $12.52 |
| 8/6/2021 | $13.73 | $13.53 | 9/22/2021 | $10.18 | $12.47 |
| 8/9/2021 | $13.79 | $13.54 | 9/23/2021 | $10.74 | $12.44 |
| 8/10/2021 | $13.19 | $13.52 | 9/24/2021 | $10.80 | $12.40 |
| 8/11/2021 | $12.43 | $13.47 | 9/27/2021 | $10.81 | $12.37 |
| 8/12/2021 | $12.59 | $13.42 | 9/28/2021 | $10.42 | $12.34 |
| 8/13/2021 | $12.40 | $13.37 | 9/29/2021 | $10.31 | $12.30 |
| 8/16/2021 | $12.02 | $13.31 | 9/30/2021 | $10.22 | $12.26 |
| 8/17/2021 | $11.97 | $13.25 | 10/1/2021 | $10.34 | $12.22 |
| 8/18/2021 | $12.06 | $13.20 | 10/4/2021 | $9.93 | $12.18 |
| 8/19/2021 | $11.47 | $13.13 | 10/5/2021 | $10.25 | $12.15 |
| 8/20/2021 | $12.11 | $13.09 | 10/6/2021 | $10.20 | $12.12 |
| 8/23/2021 | $12.21 | $13.06 | 10/7/2021 | $10.34 | $12.09 |
| 8/24/2021 | $12.10 | $13.03 | 10/8/2021 | $10.42 | $12.06 |
| 8/25/2021 | $11.87 | $12.99 | 10/11/2021 | $10.50 | $12.03 |
| 8/26/2021 | $11.45 | $12.94 | 10/12/2021 | $10.62 | $12.01 |
| 8/27/2021 | $11.55 | $12.89 | 10/13/2021 | $11.05 | $11.99 |
| 8/30/2021 | $11.50 | $12.85 | | | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

## TABLE C

### Estimated Alleged Artificial Inflation in FibroGen Call Options (per share) from December 20, 2018 through and including July 15, 2021, and Holding Prices

| Expiration Date | Strike Price | Call Option Artificial Inflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 5/17/2019 | $30.00 | $9.36 | $0.00 | | | | | |
| 5/17/2019 | $35.00 | $8.75 | $0.00 | | | | | |
| 5/17/2019 | $40.00 | $6.82 | $0.00 | | | | | |
| 5/17/2019 | $45.00 | $3.65 | $0.00 | | | | | |
| 5/17/2019 | $50.00 | $1.68 | $0.00 | | | | | |
| 5/17/2019 | $55.00 | $0.91 | $0.00 | | | | | |
| 5/17/2019 | $60.00 | $0.47 | $0.00 | | | | | |
| 5/17/2019 | $65.00 | $0.27 | $0.00 | | | | | |
| 5/17/2019 | $70.00 | $0.15 | $0.00 | | | | | |
| 5/17/2019 | $75.00 | $0.32 | $0.00 | | | | | |
| 5/17/2019 | $80.00 | $2.34 | $0.00 | | | | | |
| 5/17/2019 | $85.00 | $2.34 | $0.00 | | | | | |
| 6/21/2019 | $25.00 | $9.61 | $0.00 | | | | | |
| 6/21/2019 | $30.00 | $9.85 | $0.00 | | | | | |
| 6/21/2019 | $35.00 | $9.46 | $0.00 | | | | | |
| 6/21/2019 | $40.00 | $7.83 | $0.00 | | | | | |
| 6/21/2019 | $45.00 | $6.13 | $0.00 | | | | | |
| 6/21/2019 | $50.00 | $4.61 | $0.00 | | | | | |
| 6/21/2019 | $55.00 | $2.98 | $0.00 | | | | | |
| 6/21/2019 | $60.00 | $1.75 | $0.00 | | | | | |
| 6/21/2019 | $65.00 | $1.11 | $0.00 | | | | | |
| 6/21/2019 | $70.00 | $0.67 | $0.00 | | | | | |
| 6/21/2019 | $75.00 | $0.57 | $0.00 | | | | | |
| 9/20/2019 | $30.00 | $8.97 | $0.00 | | | | | |
| 9/20/2019 | $35.00 | $7.88 | $0.00 | | | | | |
| 9/20/2019 | $40.00 | $7.29 | $0.00 | | | | | |
| 9/20/2019 | $45.00 | $5.86 | $0.00 | | | | | |
| 9/20/2019 | $50.00 | $4.73 | $0.00 | | | | | |
| 9/20/2019 | $55.00 | $3.94 | $0.00 | | | | | |
| 9/20/2019 | $60.00 | $3.03 | $0.00 | | | | | |
| 9/20/2019 | $65.00 | $2.29 | $0.00 | | | | | |
| 9/20/2019 | $70.00 | $1.72 | $0.00 | | | | | |
| 9/20/2019 | $75.00 | $1.26 | $0.00 | | | | | |
| 9/20/2019 | $80.00 | $0.76 | $0.00 | | | | | |
| 12/20/2019 | $50.00 | $4.41 | $0.00 | | | | | |
| 12/20/2019 | $55.00 | $3.47 | $0.00 | | | | | |
| 12/20/2019 | $70.00 | $1.82 | $0.00 | | | | | |
| 3/19/2021 | $25.00 | | $13.62 | $2.24 | $0.00 | | | |
| 3/19/2021 | $27.50 | | $13.21 | $1.92 | $0.00 | | | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

27

| Expiration Date | Strike Price | Call Option Artificial Inflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 3/19/2021 | $30.00 | | $12.73 | $1.99 | $0.00 | | | |
| 3/19/2021 | $32.50 | | $13.14 | $1.99 | $0.00 | | | |
| 3/19/2021 | $35.00 | | $12.48 | $1.37 | $0.00 | | | |
| 3/19/2021 | $37.50 | | $11.35 | $1.27 | $0.00 | | | |
| 3/19/2021 | $40.00 | | $10.02 | $0.61 | $0.00 | | | |
| 3/19/2021 | $42.50 | | $8.33 | $0.34 | $0.00 | | | |
| 3/19/2021 | $45.00 | | $7.92 | $0.19 | $0.00 | | | |
| 3/19/2021 | $47.50 | | $5.35 | $0.16 | $0.00 | | | |
| 3/19/2021 | $50.00 | | $3.75 | $0.08 | $0.00 | | | |
| 3/19/2021 | $52.50 | | $2.67 | $0.08 | $0.00 | | | |
| 3/19/2021 | $55.00 | | $3.02 | $0.08 | $0.00 | | | |
| 3/19/2021 | $57.50 | | $1.61 | $0.05 | $0.00 | | | |
| 3/19/2021 | $60.00 | | $0.62 | $0.05 | $0.00 | | | |
| 3/19/2021 | $65.00 | | $0.92 | $0.02 | $0.00 | | | |
| 3/19/2021 | $70.00 | | $0.31 | $0.06 | $0.00 | | | |
| 3/19/2021 | $75.00 | | $2.20 | $0.00 | $0.00 | | | |
| 4/16/2021 | $17.50 | | | | $14.38 | $1.05 | $0.00 | |
| 4/16/2021 | $20.00 | | | | $12.90 | $0.55 | $0.00 | |
| 4/16/2021 | $22.50 | | | | $10.96 | $0.15 | $0.00 | |
| 4/16/2021 | $25.00 | | $22.45 | $11.07 | $8.83 | $0.13 | $0.00 | |
| 4/16/2021 | $27.50 | | $20.18 | $8.75 | $6.51 | $0.05 | $0.00 | |
| 4/16/2021 | $30.00 | | $17.49 | $6.11 | $4.25 | $0.00 | $0.00 | |
| 4/16/2021 | $32.50 | | $14.28 | $3.31 | $1.91 | $0.08 | $0.00 | |
| 4/16/2021 | $35.00 | | $12.21 | $2.16 | $0.79 | $0.03 | $0.00 | |
| 4/16/2021 | $37.50 | | $11.33 | $1.87 | $0.43 | $0.00 | $0.00 | |
| 4/16/2021 | $40.00 | | $10.23 | $0.93 | $0.17 | $0.03 | $0.00 | |
| 4/16/2021 | $42.50 | | $9.24 | $1.02 | $0.45 | $0.00 | $0.00 | |
| 4/16/2021 | $45.00 | | $7.41 | $0.52 | $0.05 | $0.00 | $0.00 | |
| 4/16/2021 | $47.50 | | $5.88 | $0.14 | $0.14 | $0.00 | $0.00 | |
| 4/16/2021 | $50.00 | | $5.42 | $0.55 | $0.05 | $0.00 | $0.00 | |
| 4/16/2021 | $52.50 | | $3.72 | $0.46 | $0.29 | $0.00 | $0.00 | |
| 4/16/2021 | $55.00 | | $3.24 | $1.13 | $0.12 | $0.00 | $0.00 | |
| 4/16/2021 | $60.00 | | $2.90 | $2.37 | $2.35 | $0.00 | $0.00 | |
| 4/16/2021 | $62.50 | | $0.94 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 4/16/2021 | $70.00 | | $2.40 | $2.40 | $2.35 | $0.00 | $0.00 | |
| 5/21/2021 | $17.50 | | | | $13.11 | $0.38 | $0.00 | |
| 5/21/2021 | $20.00 | | | | $11.82 | $0.35 | $0.00 | |
| 5/21/2021 | $22.50 | | | | $10.69 | $0.50 | $0.00 | |
| 5/21/2021 | $25.00 | | | | $8.62 | $0.40 | $0.00 | |
| 5/21/2021 | $27.50 | | | | $7.02 | $0.18 | $0.00 | |
| 5/21/2021 | $30.00 | | | | $5.25 | $0.05 | $0.00 | |
| 5/21/2021 | $32.50 | | | | $3.85 | $0.00 | $0.00 | |
| 5/21/2021 | $35.00 | | | | $2.88 | $0.08 | $0.00 | |
| 5/21/2021 | $37.50 | | | | $2.47 | $0.28 | $0.00 | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

28

| Expiration Date | Strike Price | Call Option Artificial Inflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 5/21/2021 | $40.00 | | | | $2.61 | $0.00 | $0.00 | |
| 5/21/2021 | $42.50 | | | | $2.09 | $0.00 | $0.00 | |
| 5/21/2021 | $45.00 | | | | $0.45 | $0.00 | $0.00 | |
| 5/21/2021 | $50.00 | | | | $0.72 | $0.08 | $0.00 | |
| 6/18/2021 | $17.50 | | | | $12.63 | $0.23 | $0.00 | |
| 6/18/2021 | $20.00 | | $25.42 | $14.04 | $11.84 | $0.58 | $0.00 | |
| 6/18/2021 | $22.50 | | $23.42 | $12.40 | $10.23 | $0.18 | $0.00 | |
| 6/18/2021 | $25.00 | | $20.82 | $10.68 | $8.72 | $0.10 | $0.00 | |
| 6/18/2021 | $27.50 | | $19.74 | $9.60 | $7.61 | $0.20 | $0.00 | |
| 6/18/2021 | $30.00 | | $17.63 | $7.72 | $6.39 | $0.00 | $0.00 | |
| 6/18/2021 | $32.50 | | $16.25 | $6.98 | $5.27 | $0.00 | $0.00 | |
| 6/18/2021 | $35.00 | | $13.91 | $5.10 | $3.64 | $0.20 | $0.00 | |
| 6/18/2021 | $37.50 | | $13.78 | $3.96 | $3.25 | $0.00 | $0.00 | |
| 6/18/2021 | $40.00 | | $12.47 | $4.44 | $2.86 | $0.18 | $0.00 | |
| 6/18/2021 | $42.50 | | $10.04 | $2.60 | $1.85 | $0.00 | $0.00 | |
| 6/18/2021 | $45.00 | | $9.04 | $2.57 | $1.48 | $0.05 | $0.00 | |
| 6/18/2021 | $47.50 | | $8.15 | $3.24 | $1.92 | $0.00 | $0.00 | |
| 6/18/2021 | $50.00 | | $7.30 | $1.84 | $1.16 | $0.00 | $0.00 | |
| 6/18/2021 | $52.50 | | $4.92 | $0.17 | $0.17 | $0.00 | $0.00 | |
| 6/18/2021 | $55.00 | | $5.56 | $1.34 | $1.34 | $0.08 | $0.00 | |
| 6/18/2021 | $57.50 | | $4.51 | $1.00 | $1.00 | $0.00 | $0.00 | |
| 6/18/2021 | $60.00 | | $3.70 | $0.40 | $0.40 | $0.00 | $0.00 | |
| 6/18/2021 | $65.00 | | $3.86 | $2.07 | $2.07 | $0.00 | $0.00 | |
| 6/18/2021 | $70.00 | | $2.68 | $2.24 | $2.24 | $0.05 | $0.00 | |
| 6/18/2021 | $80.00 | | $3.50 | $2.21 | $2.21 | $0.00 | $0.00 | |
| 7/16/2021 | $10.00 | | | | | | $1.08 | $4.23 |
| 7/16/2021 | $12.50 | | | | | $1.84 | $1.04 | $2.18 |
| 7/16/2021 | $15.00 | | | | | $1.65 | $0.95 | $0.03 |
| 7/16/2021 | $17.50 | | | | | $0.96 | $0.76 | $0.03 |
| 7/16/2021 | $20.00 | | | | | $0.58 | $0.58 | Holding$0.03 |
| 7/16/2021 | $22.50 | | | | | $0.41 | $0.41 | $0.03 |
| 7/16/2021 | $25.00 | | | | | $0.31 | $0.31 | $0.03 |
| 7/16/2021 | $27.50 | | | | | $0.38 | $0.20 | $0.03 |
| 7/16/2021 | $30.00 | | | | | $0.27 | $0.12 | $0.03 |
| 7/16/2021 | $32.50 | | | | | $0.26 | $0.08 | $0.03 |
| 7/16/2021 | $35.00 | | | | | $0.03 | $0.03 | $0.03 |
| 7/16/2021 | $37.50 | | | | | | $0.03 | $0.03 |
| 7/16/2021 | $40.00 | | | | | | $0.01 | $0.03 |
| 8/20/2021 | $20.00 | | | | | | $0.61 | $0.45 |
| 8/20/2021 | $22.50 | | | | | | $0.44 | $0.20 |
| 8/20/2021 | $25.00 | | | | | | $0.41 | $0.13 |
| 8/20/2021 | $27.50 | | | | | | $0.34 | $0.08 |
| 8/20/2021 | $30.00 | | | | | | $0.23 | $0.08 |
| 8/20/2021 | $32.50 | | | | | | $0.13 | $0.05 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

29

| Expiration Date | Strike Price | Call Option Artificial Inflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 8/20/2021 | $35.00 | | | | | | $0.15 | $0.05 |
| 8/20/2021 | $37.50 | | | | | | $0.12 | $0.03 |
| 8/20/2021 | $40.00 | | | | | | $0.07 | $0.03 |
| 9/17/2021 | $10.00 | | | | | | $1.02 | $4.90 |
| 9/17/2021 | $12.50 | | | | | | $0.95 | $3.10 |
| 9/17/2021 | $15.00 | | | | | | $0.85 | $1.98 |
| 9/17/2021 | $17.50 | | | | $12.80 | $1.40 | $0.70 | $1.43 |
| 9/17/2021 | $20.00 | | $24.02 | $13.74 | $11.44 | $1.03 | $0.63 | $0.83 |
| 9/17/2021 | $22.50 | | $21.97 | $11.69 | $9.80 | $0.53 | $0.48 | $0.60 |
| 9/17/2021 | $25.00 | | $20.57 | $11.25 | $9.20 | $0.81 | $0.38 | $0.53 |
| 9/17/2021 | $27.50 | | $18.31 | $9.04 | $7.83 | $0.32 | $0.32 | $0.50 |
| 9/17/2021 | $30.00 | | $17.47 | $8.79 | $6.93 | $0.40 | $0.22 | $0.33 |
| 9/17/2021 | $32.50 | | $15.17 | $7.14 | $5.96 | $0.21 | $0.21 | $0.33 |
| 9/17/2021 | $35.00 | | $15.20 | $7.40 | $6.00 | $0.58 | $0.15 | $0.25 |
| 9/17/2021 | $37.50 | | $13.04 | $5.51 | $4.45 | $0.13 | $0.13 | $0.20 |
| 9/17/2021 | $40.00 | | $11.60 | $4.99 | $4.24 | $0.23 | $0.08 | $0.23 |
| 9/17/2021 | $42.50 | | $10.68 | $4.58 | $3.15 | $0.09 | $0.06 | $0.23 |
| 9/17/2021 | $45.00 | | $8.84 | $3.24 | $2.00 | $0.57 | $0.04 | $0.23 |
| 9/17/2021 | $47.50 | | $9.44 | $3.29 | $2.11 | $0.04 | $0.04 | $0.23 |
| 9/17/2021 | $50.00 | | $8.31 | $2.57 | $2.23 | $0.04 | $0.04 | $0.23 |
| 9/17/2021 | $52.50 | | $7.49 | $3.04 | $2.17 | $0.22 | $0.02 | $0.30 |
| 9/17/2021 | $55.00 | | $5.41 | $1.32 | $0.98 | $0.01 | $0.01 | $0.30 |
| 9/17/2021 | $57.50 | | $5.08 | $1.43 | $1.00 | $0.03 | $0.03 | $0.15 |
| 9/17/2021 | $60.00 | | $4.59 | $2.25 | $1.82 | $0.01 | $0.01 | $0.30 |
| 9/17/2021 | $62.50 | | $4.72 | $2.01 | $1.47 | $0.00 | $0.00 | $0.38 |
| 9/17/2021 | $65.00 | | $5.15 | $2.40 | $2.18 | $0.23 | $0.03 | $0.10 |
| 9/17/2021 | $70.00 | | $3.24 | $1.95 | $1.39 | $0.01 | $0.01 | $0.28 |
| 9/17/2021 | $75.00 | | $1.66 | $0.19 | $0.19 | $0.00 | $0.00 | $0.55 |
| 9/17/2021 | $80.00 | | $2.15 | $1.78 | $1.33 | $0.00 | $0.00 | $0.55 |
| 12/17/2021 | $10.00 | | | | | | $0.96 | $5.55 |
| 12/17/2021 | $12.50 | | | | | | $0.85 | $4.45 |
| 12/17/2021 | $15.00 | | | | | | $0.81 | $3.05 |
| 12/17/2021 | $17.50 | | | | | | $0.71 | $2.08 |
| 12/17/2021 | $20.00 | | | | | | $0.61 | $1.90 |
| 12/17/2021 | $22.50 | | | | | | $0.48 | $1.48 |
| 12/17/2021 | $25.00 | | | | | | $0.45 | $1.38 |
| 12/17/2021 | $27.50 | | | | | | $0.33 | $1.08 |
| 12/17/2021 | $30.00 | | | | | | $0.28 | $0.95 |
| 12/17/2021 | $32.50 | | | | | | $0.24 | $0.85 |
| 12/17/2021 | $35.00 | | | | | | $0.21 | $0.60 |
| 12/17/2021 | $40.00 | | | | | | $0.15 | $0.55 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

30

**TABLE D**

**Estimated Alleged Artificial Deflation in FibroGen Put Options (per share)
from December 20, 2018 through and including July 15, 2021, and Holding Prices**

| Expiration Date | Strike Price | Put Option Artificial Deflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 5/17/2019 | $35.00 | $0.25 | $0.00 | | | | | |
| 5/17/2019 | $40.00 | $2.27 | $0.00 | | | | | |
| 5/17/2019 | $45.00 | $5.64 | $0.00 | | | | | |
| 5/17/2019 | $50.00 | $7.74 | $0.00 | | | | | |
| 5/17/2019 | $55.00 | $8.62 | $0.00 | | | | | |
| 5/17/2019 | $60.00 | $8.92 | $0.00 | | | | | |
| 5/17/2019 | $65.00 | $9.12 | $0.00 | | | | | |
| 5/17/2019 | $70.00 | $9.21 | $0.00 | | | | | |
| 6/21/2019 | $35.00 | $0.32 | $0.00 | | | | | |
| 6/21/2019 | $40.00 | $1.48 | $0.00 | | | | | |
| 6/21/2019 | $45.00 | $3.35 | $0.00 | | | | | |
| 6/21/2019 | $50.00 | $4.98 | $0.00 | | | | | |
| 6/21/2019 | $55.00 | $6.26 | $0.00 | | | | | |
| 6/21/2019 | $60.00 | $7.24 | $0.00 | | | | | |
| 6/21/2019 | $65.00 | $7.93 | $0.00 | | | | | |
| 6/21/2019 | $70.00 | $8.62 | $0.00 | | | | | |
| 6/21/2019 | $75.00 | $9.07 | $0.00 | | | | | |
| 9/20/2019 | $30.00 | $0.54 | $0.00 | | | | | |
| 9/20/2019 | $35.00 | $1.38 | $0.00 | | | | | |
| 9/20/2019 | $40.00 | $2.37 | $0.00 | | | | | |
| 9/20/2019 | $45.00 | $3.15 | $0.00 | | | | | |
| 9/20/2019 | $50.00 | $4.34 | $0.00 | | | | | |
| 9/20/2019 | $55.00 | $5.37 | $0.00 | | | | | |
| 9/20/2019 | $60.00 | $6.36 | $0.00 | | | | | |
| 9/20/2019 | $65.00 | $6.95 | $0.00 | | | | | |
| 9/20/2019 | $70.00 | $7.49 | $0.00 | | | | | |
| 9/20/2019 | $75.00 | $8.03 | $0.00 | | | | | |
| 9/20/2019 | $80.00 | $8.38 | $0.00 | | | | | |
| 12/20/2019 | $25.00 | $0.74 | $0.00 | | | | | |
| 12/20/2019 | $30.00 | $1.31 | $0.00 | | | | | |
| 12/20/2019 | $35.00 | $2.07 | $0.00 | | | | | |
| 12/20/2019 | $40.00 | $2.96 | $0.00 | | | | | |
| 12/20/2019 | $45.00 | $3.94 | $0.00 | | | | | |
| 12/20/2019 | $55.00 | $5.42 | $0.00 | | | | | |
| 12/20/2019 | $65.00 | $7.29 | $0.00 | | | | | |
| 3/19/2021 | $22.50 | | $1.84 | $0.00 | $0.00 | | | |
| 3/19/2021 | $25.00 | | $0.02 | $0.02 | $0.00 | | | |
| 3/19/2021 | $27.50 | | $0.02 | $0.02 | $0.00 | | | |
| 3/19/2021 | $30.00 | | $0.02 | $0.02 | $0.00 | | | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

| Expiration Date | Strike Price | Put Option Artificial Deflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 3/19/2021 | $32.50 | | $0.61 | $0.61 | $0.00 | | | |
| 3/19/2021 | $35.00 | | $1.17 | $0.48 | $0.00 | | | |
| 3/19/2021 | $37.50 | | $1.86 | $0.16 | $0.00 | | | |
| 3/19/2021 | $40.00 | | $3.72 | $1.88 | $0.00 | | | |
| 3/19/2021 | $42.50 | | $4.79 | $1.58 | $0.00 | | | |
| 3/19/2021 | $45.00 | | $6.78 | $2.05 | $0.00 | | | |
| 3/19/2021 | $47.50 | | $8.42 | $2.27 | $0.00 | | | |
| 3/19/2021 | $50.00 | | $9.23 | $1.89 | $0.00 | | | |
| 3/19/2021 | $52.50 | | $10.28 | $2.20 | $0.00 | | | |
| 3/19/2021 | $55.00 | | $12.02 | $2.24 | $0.00 | | | |
| 3/19/2021 | $60.00 | | $12.50 | $2.17 | $0.00 | | | |
| 3/19/2021 | $65.00 | | $12.73 | $2.17 | $0.00 | | | |
| 4/16/2021 | $17.50 | | | | $0.51 | $0.08 | $0.00 | |
| 4/16/2021 | $20.00 | | | | $1.75 | $0.40 | $0.00 | |
| 4/16/2021 | $22.50 | | | | $3.75 | $0.80 | $0.00 | |
| 4/16/2021 | $25.00 | | $6.17 | $6.17 | $5.70 | $0.90 | $0.00 | |
| 4/16/2021 | $27.50 | | $10.41 | $10.41 | $9.21 | $1.80 | $0.00 | |
| 4/16/2021 | $30.00 | | $11.98 | $11.98 | $11.48 | $2.00 | $0.00 | |
| 4/16/2021 | $32.50 | | $14.74 | $13.98 | $13.76 | $1.95 | $0.00 | |
| 4/16/2021 | $35.00 | | $15.66 | $14.70 | $14.16 | $0.90 | $0.00 | |
| 4/16/2021 | $37.50 | | $17.29 | $16.12 | $14.86 | $1.60 | $0.00 | |
| 4/16/2021 | $40.00 | | $19.00 | $17.35 | $15.38 | $1.65 | $0.00 | |
| 4/16/2021 | $42.50 | | $20.35 | $17.11 | $15.34 | $1.70 | $0.00 | |
| 4/16/2021 | $45.00 | | $21.26 | $17.54 | $15.24 | $1.60 | $0.00 | |
| 4/16/2021 | $47.50 | | $22.18 | $16.95 | $15.03 | $1.35 | $0.00 | |
| 4/16/2021 | $50.00 | | $23.11 | $17.23 | $15.03 | $1.35 | $0.00 | |
| 4/16/2021 | $60.00 | | $26.01 | $17.24 | $14.88 | $1.10 | $0.00 | |
| 5/21/2021 | $17.50 | | | | $1.12 | $0.05 | $0.00 | |
| 5/21/2021 | $20.00 | | | | $2.27 | $0.30 | $0.00 | |
| 5/21/2021 | $22.50 | | | | $3.78 | $0.45 | $0.00 | |
| 5/21/2021 | $25.00 | | | | $6.01 | $0.50 | $0.00 | |
| 5/21/2021 | $27.50 | | | | $7.84 | $1.45 | $0.00 | |
| 5/21/2021 | $32.50 | | | | $10.39 | $1.05 | $0.00 | |
| 5/21/2021 | $35.00 | | | | $11.56 | $0.35 | $0.00 | |
| 5/21/2021 | $40.00 | | | | $13.79 | $1.10 | $0.00 | |
| 5/21/2021 | $45.00 | | | | $14.68 | $1.00 | $0.00 | |
| 6/18/2021 | $20.00 | | $3.15 | $3.15 | $2.50 | $0.55 | $0.00 | |
| 6/18/2021 | $22.50 | | $4.89 | $4.89 | $3.96 | $0.35 | $0.00 | |
| 6/18/2021 | $25.00 | | $6.53 | $6.53 | $6.53 | $1.35 | $0.00 | |
| 6/18/2021 | $27.50 | | $6.99 | $6.99 | $6.99 | $1.15 | $0.00 | |
| 6/18/2021 | $30.00 | | $10.37 | $10.37 | $9.25 | $1.60 | $0.00 | |
| 6/18/2021 | $32.50 | | $11.55 | $11.16 | $9.87 | $0.65 | $0.00 | |
| 6/18/2021 | $35.00 | | $13.12 | $12.48 | $10.79 | $0.65 | $0.00 | |
| 6/18/2021 | $37.50 | | $14.88 | $12.98 | $11.58 | $0.75 | $0.00 | |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

| Expiration Date | Strike Price | Put Option Artificial Deflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 6/18/2021 | $40.00 | | $16.46 | $14.12 | $12.32 | $1.30 | $0.00 | |
| 6/18/2021 | $42.50 | | $18.94 | $14.58 | $13.31 | $1.10 | $0.00 | |
| 6/18/2021 | $45.00 | | $20.01 | $15.42 | $13.74 | $1.10 | $0.00 | |
| 6/18/2021 | $47.50 | | $21.38 | $15.96 | $14.16 | $1.05 | $0.00 | |
| 6/18/2021 | $50.00 | | $22.47 | $16.41 | $14.36 | $1.15 | $0.00 | |
| 6/18/2021 | $52.50 | | $23.20 | $16.22 | $14.79 | $1.15 | $0.00 | |
| 6/18/2021 | $55.00 | | $23.87 | $16.53 | $14.79 | $1.15 | $0.00 | |
| 6/18/2021 | $60.00 | | $25.17 | $17.00 | $15.11 | $1.05 | $0.00 | |
| 6/18/2021 | $65.00 | | $25.86 | $16.82 | $15.17 | $1.20 | $0.00 | |
| 7/16/2021 | $15.00 | | | | | $0.26 | $0.06 | $0.70 |
| 7/16/2021 | $17.50 | | | | | $0.64 | $0.26 | $2.88 |
| 7/16/2021 | $20.00 | | | | | $1.04 | $0.51 | $5.90 |
| 7/16/2021 | $22.50 | | | | | $1.27 | $0.67 | $8.50 |
| 7/16/2021 | $25.00 | | | | | $1.41 | $0.76 | $11.10 |
| 7/16/2021 | $27.50 | | | | | $1.59 | $0.89 | $13.20 |
| 7/16/2021 | $30.00 | | | | | $1.19 | $0.99 | $16.10 |
| 7/16/2021 | $32.50 | | | | | $2.05 | $1.00 | $18.40 |
| 7/16/2021 | $35.00 | | | | | $1.98 | $1.03 | $21.00 |
| 7/16/2021 | $40.00 | | | | | | $1.10 | $26.00 |
| 8/20/2021 | $12.50 | | | | | | $0.04 | $0.80 |
| 8/20/2021 | $15.00 | | | | | | $0.16 | $1.90 |
| 8/20/2021 | $17.50 | | | | | | $0.31 | $3.85 |
| 8/20/2021 | $20.00 | | | | | | $0.42 | $5.90 |
| 8/20/2021 | $22.50 | | | | | | $0.55 | $8.40 |
| 8/20/2021 | $25.00 | | | | | | $0.65 | $10.30 |
| 8/20/2021 | $27.50 | | | | | | $0.74 | $12.75 |
| 8/20/2021 | $30.00 | | | | | | $0.77 | $15.25 |
| 8/20/2021 | $32.50 | | | | | | $0.82 | $17.75 |
| 8/20/2021 | $35.00 | | | | | | $0.88 | $20.25 |
| 9/17/2021 | $12.50 | | | | | | $0.09 | $1.10 |
| 9/17/2021 | $15.00 | | | | | | $0.16 | $2.48 |
| 9/17/2021 | $17.50 | | | | | $2.28 | $0.50 | $0.32 | $4.50 |
| 9/17/2021 | $20.00 | | $3.82 | $3.82 | $3.79 | $0.70 | $0.40 | $6.65 |
| 9/17/2021 | $22.50 | | $6.39 | $6.39 | $6.34 | $1.35 | $0.55 | $8.95 |
| 9/17/2021 | $25.00 | | $8.34 | $8.34 | $7.77 | $1.83 | $0.63 | $11.25 |
| 9/17/2021 | $27.50 | | $9.91 | $8.92 | $8.38 | $2.06 | $0.71 | $13.55 |
| 9/17/2021 | $30.00 | | $11.82 | $11.13 | $10.60 | $2.28 | $0.78 | $16.05 |
| 9/17/2021 | $32.50 | | $14.32 | $11.47 | $10.60 | $1.90 | $0.85 | $18.55 |
| 9/17/2021 | $35.00 | | $13.92 | $12.47 | $11.26 | $2.23 | $0.93 | $21.00 |
| 9/17/2021 | $37.50 | | $16.33 | $11.90 | $11.59 | $2.28 | $0.93 | $23.30 |
| 9/17/2021 | $40.00 | | $16.91 | $13.10 | $12.42 | $2.58 | $0.98 | $25.90 |
| 9/17/2021 | $42.50 | | $18.95 | $13.95 | $13.02 | $2.28 | $1.03 | $28.75 |
| 9/17/2021 | $45.00 | | $19.79 | $14.37 | $13.41 | $2.15 | $1.05 | $31.10 |
| 9/17/2021 | $47.50 | | $20.80 | $15.38 | $13.83 | $2.19 | $1.04 | $33.30 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

33

| Expiration Date | Strike Price | Put Option Artificial Deflation per Share During Trading Periods | | | | | | Holding Price |
|---|---|---|---|---|---|---|---|---|
| | | 12/20/2018 through 5/9/2019 | 5/10/2019 through 3/1/2021 | 3/2/2021 | 3/3/2021 through 4/6/2021 | 4/7/2021 | 4/8/2021 through 7/15/2021 | |
| 9/17/2021 | $50.00 | | $21.78 | $16.32 | $14.30 | $2.14 | $1.04 | $35.90 |
| 9/17/2021 | $55.00 | | $22.82 | $15.48 | $14.11 | $1.76 | $1.06 | $41.00 |
| 9/17/2021 | $65.00 | | $25.57 | $17.12 | $15.41 | $2.06 | $1.06 | $51.00 |
| 9/17/2021 | $75.00 | | $27.08 | $17.76 | $16.02 | $2.19 | $1.09 | $61.00 |
| 12/17/2021 | $7.50 | | | | | | $0.04 | $0.50 |
| 12/17/2021 | $10.00 | | | | | | $0.05 | $0.68 |
| 12/17/2021 | $12.50 | | | | | | $0.10 | $1.60 |
| 12/17/2021 | $15.00 | | | | | | $0.22 | $3.28 |
| 12/17/2021 | $17.50 | | | | | | $0.33 | $5.15 |
| 12/17/2021 | $20.00 | | | | | | $0.41 | $7.25 |
| 12/17/2021 | $22.50 | | | | | | $0.49 | $9.20 |
| 12/17/2021 | $25.00 | | | | | | $0.64 | $11.70 |
| 12/17/2021 | $27.50 | | | | | | $0.66 | $13.80 |
| 12/17/2021 | $30.00 | | | | | | $0.75 | $16.30 |
| 12/17/2021 | $32.50 | | | | | | $0.79 | $18.35 |
| 12/17/2021 | $35.00 | | | | | | $0.86 | $21.25 |

Questions? Visit www.FibroGenSecuritiesLitigation.com, or call toll free at 1-877-595-0137

34

# PROOF OF CLAIM AND RELEASE FORM

**In re FibroGen, Inc. Securities Litigation**
**Toll Free Number: (877) 595-0137**
**Settlement Website: www.FibroGenSecuritiesLitigation.com**
**Email: Info@FibroGenSecuritiesLitigation.com**

To be eligible to receive a share of the Net Settlement Fund in connection with the Settlement of this Action, you must be a Settlement Class Member and complete and sign this Proof of Claim and Release Form ("Claim Form") and submit it online at www.FibroGenSecuritiesLitigation.com or mail it by first-class mail to the below address.

**Mail to:**

**In re FibroGen, Inc. Securities Litigation**
c/o JND Legal Administration
P.O. Box 91482
Seattle, WA 98111

The Claim Form must be **submitted online or postmarked no later than June 12, 2024.**

Failure to submit your Claim Form by the date specified will subject your claim to rejection and may preclude you from being eligible to recover any money in connection with the Settlement.

**Do not mail or deliver your Claim Form to the Court, the settling parties, or their counsel. Submit your Claim Form only to the Claims Administrator at the address set forth above.**

# CONTENTS

**2**    I.   **CLAIMANT INFORMATION**

**3**    II.  **GENERAL INSTRUCTIONS**

**6**    III. **SCHEDULE OF TRANSACTIONS IN FIBROGEN COMMON STOCK**

**7**    IV.  **SCHEDULE OF TRANSACTIONS IN FIBROGEN CALL OPTIONS**

**9**    V.   **SCHEDULE OF TRANSACTIONS IN FIBROGEN PUT OPTIONS**

**11**   VI.  **RELEASE OF CLAIMS AND SIGNATURE**

# PART I – CLAIMANT INFORMATION

(Please read the General Instructions below before completing this page.)

The Claims Administrator will use this information for all communications regarding this Claim Form. If this information changes, you MUST notify the Claims Administrator in writing at the address above.

Beneficial Owner's First Name

MI

Beneficial Owner's Last Name

Co-Beneficial Owner's First Name (if applicable)

MI

Co-Beneficial Owner's Last Name

Entity Name (if the Beneficial Owner is not an individual)

Representative or Custodian Name (if different from Beneficial Owner(s) listed above)

Address 1 (street name and number)

Address 2 (apartment, unit, or box number)

City

State/Province

ZIP/Postal Code

Foreign Country (only if not USA)

Last four digits of Social Security Number or Taxpayer Identification Number

Telephone Number (Home)

Telephone Number (Work)

E-mail address (E-mail address is not required, but if you provide it, you authorize the Claims Administrator to use it in providing you with information relevant to this claim.)

Account Number (account(s) through which the securities were traded)[1]

**Claimant Account Type (check appropriate box):**

☐ Individual (includes joint owner accounts)    ☐ Corporation    ☐ IRA/401K    ☐ Pension Plan

☐ Estate    ☐ Trust    ☐ Other (please specify): _____

---

[1] You may leave blank if the account number is unknown.  You may write "multiple" if the same legal entity traded through more than one account.  Please see paragraph 11 of the General Instructions for more information on when to file separate Claim Forms for multiple accounts, *i.e.*, when you are filing on behalf of distinct legal entities.

2

## PART II – GENERAL INSTRUCTIONS

1.      It is important that you completely read and understand the Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), that accompanies this Claim Form, including the Plan of Allocation of the Net Settlement Fund set forth in the Notice. The Notice describes the proposed Settlement, how Settlement Class Members are affected by the Settlement, and the manner in which the Net Settlement Fund will be distributed if the Settlement and Plan of Allocation are approved by the Court.  The Notice also contains the definitions of many of the defined terms (which are indicated by initial capital letters) used in this Claim Form.  By signing and submitting this Claim Form, you are certifying that you have read and that you understand the Notice, including the terms of the releases described therein and provided for herein.

2.      This Claim Form is directed to the proposed "Settlement Class": all persons who purchased or acquired FibroGen Securities, including options, between December 20, 2018 and July 15, 2021, inclusive (the "Settlement Class Period"). "FibroGen Securities" refers to: (1) FibroGen common stock ("FibroGen Common Stock"), (2) call options on FibroGen Common Stock ("FibroGen Call Options"), or (3) put options on FibroGen Common Stock ("FibroGen Put Options"). All persons and entities that are members of the Settlement Class are referred to as "Settlement Class Members."

3.      Excluded from the Settlement Class are: (1) Defendants; (2) the Officers and directors of FibroGen during the Settlement Class Period; (3) the Immediate Family members of any Defendant or any Officer or director of FibroGen during the Settlement Class Period; and (4) any entity that any Defendant owns or controls, or owned or controlled during the Settlement Class Period. Also excluded from the Settlement Class are those persons who file valid and timely requests for exclusion from the Settlement Class in accordance with the Preliminary Approval Order and the plaintiffs in the Opt-Out Action.

4.      If you are not a Settlement Class Member, or if you, or someone acting on your behalf, submits a request for exclusion from the Settlement Class, do not submit a Claim Form.  YOU MAY NOT, DIRECTLY OR INDIRECTLY, PARTICIPATE IN THE SETTLEMENT IF YOU ARE NOT A SETTLEMENT CLASS MEMBER.  THUS, IF YOU ARE EXCLUDED FROM THE SETTLEMENT CLASS (AS SET FORTH IN PARAGRAPH 3 ABOVE), ANY CLAIM FORM THAT YOU SUBMIT, OR THAT MAY BE SUBMITTED ON YOUR BEHALF, WILL NOT BE ACCEPTED.

5.      If you are a Settlement Class Member, you will be bound by the terms of any judgments or orders entered in the Action WHETHER OR NOT YOU SUBMIT A CLAIM FORM, unless you submit a request for exclusion from the Settlement Class that is accepted by the Court. Thus, if you are a Settlement Class Member, the Judgment will fully, finally, and forever compromise, settle, release, resolve, relinquish, waive, and discharge each and every Released Plaintiffs' Claim against the Defendants and other Defendant Releasees, and shall forever bar and enjoin the commencing, instituting, prosecuting, or maintaining of any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees.

6.      You are eligible to participate in the distribution of the Net Settlement Fund only if you are a member of the Settlement Class and you have completed and returned this form as specified below. If you fail to submit a timely, properly addressed, and completed Claim Form with the required documentation, your claim may be rejected and you may be precluded from receiving any distribution from the Net Settlement Fund.

7.      **Submission of this Claim Form does not guarantee that you will share in the proceeds of the Settlement.  The distribution of the Net Settlement Fund will be governed by the Plan of Allocation set forth in the Notice, if it is approved by the Court, or by such other plan of allocation approved by the Court.**

8.      Use the Schedules of Transactions in Part III through V of this Claim Form to supply all required details of your transaction(s) (including free transfers) in and holdings of the applicable

3

FibroGen Securities.  On the Schedules of Transactions, please provide all of the requested information with respect to your holdings, purchases, acquisitions, and sales of the applicable FibroGen Securities, whether such transactions resulted in a profit or a loss.  Failure to report all transaction and holding information during the requested time periods may result in the rejection of your claim.

9.    **Please note**:    Only FibroGen Common Stock and FibroGen Call Options purchased/acquired, and FibroGen Put Options written during the Settlement Class Period (*i.e.,* between December 20, 2018 through July 15, 2021, inclusive) are eligible under the Settlement. However, because the Plan of Allocation incorporates the "90-day look-back" provision under the Private Securities Litigation Reform Act  ("PSLRA") (described in the Plan of Allocation set forth in the Notice), you must provide documentation relating to your purchases and sales of FibroGen Securities during the period from July 16, 2021, through and including October 13, 2021 (*i.e.,* the "90-Day Lookback Period") in order for the Claims Administrator to calculate your Recognized Loss Amount under the Plan of Allocation and process your claim.

10.    You are required to submit genuine and sufficient documentation for all of your transactions and holdings of the applicable FibroGen Securities set forth in the Schedules of Transactions in Part III through V of this Claim Form.  Documentation may consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from your broker containing the transactional and holding information found in a broker confirmation slip or account statement.  The Parties and the Claims Administrator do not independently have information about your investments in FibroGen Securities.  IF SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES OR EQUIVALENT CONTEMPORANEOUS DOCUMENTS FROM YOUR BROKER.  FAILURE TO SUPPLY THIS DOCUMENTATION MAY RESULT IN THE REJECTION OF YOUR CLAIM.  DO NOT SEND ORIGINAL DOCUMENTS.  **Please keep a copy of all documents that you send to the Claims Administrator. Also, please do not highlight any portion of the Claim Form or any supporting documents.**

11.    Separate Claim Forms should be submitted for each separate legal entity (*e.g.*, a claim from joint owners should not include separate transactions through an account that is in the name of just one of the joint owners, and an individual should not combine his or her IRA transactions with transactions made through an account in the individual's name).  Conversely, a single Claim Form should be submitted on behalf of one legal entity including all transactions made by that entity on one Claim Form, no matter how many separate accounts that entity has (*e.g.*, a corporation with multiple brokerage accounts should include all transactions made in all accounts on one Claim Form).

12.    All joint beneficial owners must sign this Claim Form.  If you purchased or otherwise acquired FibroGen Securities during the Settlement Class Period and held the securities in your name, you are the beneficial owner as well as the record owner and you must sign this Claim Form to participate in the Settlement.  If, however, you purchased or otherwise acquired FibroGen Common Stock or FibroGen Call Options, or wrote FibroGen Put Options, during the Settlement Class Period and the securities were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial owner of these securities, but the third party is the record owner.  The beneficial owner, not the record owner, must sign this Claim Form.

13.    Agents, executors, administrators, guardians, and trustees must complete and sign the Claim Form on behalf of persons represented by them, and they must:

    (a)    expressly state the capacity in which they are acting;

    (b)    identify the name, account number, Social Security Number (or taxpayer identification number), address, and telephone number of the beneficial owner of (or other person or entity on whose behalf they are acting with respect to) the FibroGen Securities; and

    (c)    furnish herewith evidence of their authority to bind to the Claim Form the person

4

or entity on whose behalf they are acting.  (Authority to complete and sign a Claim Form cannot be established by stockbrokers demonstrating only that they have discretionary authority to trade stock in another person's accounts.)

14.    By submitting a signed Claim Form, you are swearing that you:

(a)    own(ed) the FibroGen Securities you have listed in the Claim Form; or

(b)    are expressly authorized to act on behalf of the owner thereof.

15.    By submitting a signed Claim Form, you are swearing to the truth of the statements contained therein and the genuineness of the documents attached thereto, subject to penalties of perjury under the laws of the United States of America.  The making of false statements, or the submission of forged or fraudulent documentation, will result in the rejection of your claim and may subject you to civil liability or criminal prosecution.

16.    If the Court approves the Settlement, payments to eligible Authorized Claimants pursuant to the Plan of Allocation (or such other plan of allocation as the Court approves) will be made after the completion of all claims processing.  This could take substantial time.  Please be patient.

17.    **PLEASE NOTE**:  As set forth in the Plan of Allocation, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund.  If the prorated payment to any Authorized Claimant, however, calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant.

18.    If you have questions concerning the Claim Form, or need additional copies of the Claim Form or the Notice, you may contact the Claims Administrator, JND Legal Administration, by email at Info@FibroGenSecuritiesLitigation.com or by toll-free phone at (877) 595-0137.  You may also download the documents from the Settlement website, www.FibroGenSecuritiesLitigation.com.

19.    NOTICE REGARDING ELECTRONIC FILES:  Certain Claimants with large numbers of transactions may request, or may be requested, to submit information regarding their transactions in electronic files.  To obtain the mandatory electronic filing requirements and file layout, you may visit the Settlement website at www.FibroGenSecuritiesLitigation.com or you may email the Claims Administrator's electronic filing department at FGENSecurities@JNDLA.com.  Any file not in accordance with the required electronic filing format will be subject to rejection.  No electronic files will be considered to have been properly submitted unless the Claims Administrator issues an email to that effect after processing your file with your claim numbers and respective account information.  Do not assume that your file has been received or processed until you receive this email.  If you do not receive such an email within 10 days of your submission, you should contact the electronic filing department at FGENSecurities@JNDLA.com to inquire about your file and confirm it was received and acceptable.

20.    NOTICE REGARDING ONLINE FILING: Claimants who are not Representative Filers may submit their claims online using the electronic version of the Claim Form found at www.FibroGenSecuritiesLitigation.com. If you are not acting as a Representative Filer, you do not need to contact the Claims Administrator prior to filing; you will receive an automated confirmation once your Claim Form has been submitted.  If you are unsure whether you should submit your claim as a Representative Filer, please contact the Claims Administrator at (877) 595-0137 or Info@FibroGenSecuritiesLitigation.com. If you are not a Representative Filer, but your claim contains a large number of transactions, the Claims Administrator may request that you also submit an electronic spreadsheet showing your transactions to accompany your Claim Form.

### IMPORTANT: PLEASE NOTE

**YOUR CLAIM IS NOT DEEMED FILED UNTIL YOU RECEIVE AN ACKNOWLEDGEMENT POSTCARD.  THE CLAIMS ADMINISTRATOR WILL ACKNOWLEDGE RECEIPT OF YOUR CLAIM FORM BY MAIL WITHIN 60 DAYS.  IF YOU DO NOT RECEIVE AN ACKNOWLEDGEMENT POSTCARD WITHIN 60 DAYS, PLEASE CALL THE CLAIMS ADMINISTRATOR AT (877) 595-0137.**

## PART III – SCHEDULE OF TRANSACTIONS IN FIBROGEN COMMON STOCK

Complete this Part III if and only if you purchased/acquired FibroGen common stock during the period between December 20, 2018 and July 15, 2021, inclusive.  Please include proper documentation with your Claim Form as described in detail in Part II – General Instructions, paragraph 10, above.  Do not include information in this section regarding securities other than FibroGen common stock purchased.

**1. BEGINNING HOLDINGS** – State the total number of shares of FibroGen common stock held as of the close of trading on December 19, 2018.  (Must be documented.)  If none, write "zero" or "0." _____

**2. PURCHASES/ACQUISITIONS DURING THE SETTLEMENT CLASS PERIOD** – Separately list each and every purchase/acquisition (including free receipts) of FibroGen common stock from after the opening of trading on December 20, 2018, through and including the close of trading on July 15, 2021.  (Must be documented.)

| Date of Purchase/Acquisition (List Chronologically) (Month/Day/Year) | Number of Shares Purchased/ Acquired | Purchase/ Acquisition Price Per Share | Total Purchase/ Acquisition Price (excluding taxes, commissions, and fees) |
|---|---|---|---|
| /     / | | $ | $ |
| /     / | | $ | $ |
| /     / | | $ | $ |
| /     / | | $ | $ |

**3. PURCHASES/ACQUISITIONS DURING THE 90-DAY LOOK-BACK PERIOD THROUGH OCTOBER 13, 2021** – State the total number of shares of FibroGen Common Stock purchased/acquired (including free receipts) from after the opening of trading on July 16, 2021, through and including the close of trading on October 13, 2021.  If none, write "zero" or "0."[2]

**4. SALES DURING THE SETTLEMENT CLASS PERIOD THROUGH OCTOBER 13, 2021** – Separately list each and every sale/disposition (including free deliveries) of FibroGen common stock from after the opening of trading on December 20, 2018 through and including the close of trading on October 13, 2021.  (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Date of Sale (List Chronologically) (Month/Day/Year) | Number of Shares Sold | Sale Price Per Share | Total Sale Price (excluding taxes, commissions, and fees) |
|---|---|---|---|
| /     / | | $ | $ |
| /     / | | $ | $ |
| /     / | | $ | $ |
| /     / | | $ | $ |

**5. ENDING HOLDINGS** – State the total number of shares of FibroGen common stock held as of the close of trading on October 13, 2021.  (Must be documented.)  If none, write "zero" or "0." _____

☐ **IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS YOU MUST PHOTOCOPY THIS PAGE AND CHECK THIS BOX.  IF YOU DO NOT CHECK THIS BOX THESE ADDITIONAL PAGES WILL NOT BE REVIEWED.**

---

[2] **Please note**:  Information requested with respect to your purchases/acquisitions of FibroGen Common Stock from after the opening of trading on July 16, 2021, through and including October 13, 2021, is needed in order to balance your claim; purchases/acquisitions during this period, however, are not eligible under the Settlement and will not be used for purposes of calculating your Recognized Loss pursuant to the Plan of Allocation.

# PART IV. SCHEDULE OF TRANSACTIONS
# IN FIBROGEN CALL OPTIONS

Complete this Part IV if and only if you purchased/acquired FibroGen Call Options during the period from December 20, 2018 through July 15, 2021, inclusive. Please include proper documentation with your Claim Form as described in detail in Part II – General Instructions, Paragraph 10, above.  Do not include information in this section regarding securities other than FibroGen Call Options.

| | |
|---|---|
| **1. BEGINNING HOLDINGS** – Separately list all positions in FibroGen Call Options in which you had an open interest as of the opening of trading on December 20, 2018.  (Must be documented.) | **IF NONE, CHECK HERE** ☐ |

| Strike Price of Call Option Contract | Expiration Date of Call Option Contract (Month/Day/Year) | Option Class Symbol | Number of Call Option Contracts in Which You Had an Open Interest (including any short holdings) |
|---|---|---|---|
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |

**2. PURCHASES/ACQUISITIONS DURING THE SETTLEMENT CLASS PERIOD THROUGH OCTOBER 13, 2021**[3] – Separately list each and every purchase/acquisition (including free receipts) of FibroGen Call Options from after the opening of trading on December 20, 2018, through and including the close of trading on October 13, 2021. (Must be documented.)

| Date of Purchase/ Acquisition (List Chronologically) (Month/Day/Year) | Strike Price of Call Option Contract | Expiration Date of Call Option Contract (Month/Day/Year) | Option Class Symbol | Number of Call Option Contracts Purchased/ Acquired | Purchase/ Acquisition Price Per Call Option Contract | Total Purchase/ Acquisition Price (excluding taxes, commissions, and fees) | Insert an "E" if Exercised Insert an "A" if Assigned Insert an "X" if Expired | Exercise Date (Month/Day/Year) |
|---|---|---|---|---|---|---|---|---|
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |

---

[3] **Please note**:  Information requested with respect to your purchases/acquisitions of FibroGen Call Option contracts from after the opening of trading on July 16, 2021, through and including October 13, 2021, is needed in order to balance your claim; purchases/acquisitions during this period, however, are not eligible under the Settlement and will not be used for purposes of calculating your Recognized Loss pursuant to the Plan of Allocation.

Questions? Visit www.FibroGenSecuritiesLitigation.com or call toll-free at (877) 595-0137
To view JND's privacy policy, please visit https://www.jndla.com/privacy-policy

**3. SALES DURING THE SETTLEMENT CLASS PERIOD THROUGH OCTOBER 13, 2021** – Separately list each and every sale/disposition (including free deliveries) of FibroGen Call Options from after the opening of trading on December 20, 2018, through and including the close of trading on October 13, 2021. (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Date of Sale (List Chronologically) (Month/Day/Year) | Strike Price of Call Option Contract | Expiration Date of Call Option Contract (Month/Day/Year) | Option Class Symbol | Number of Call Option Contracts Sold | Sale Price Per Call Option Contract | Total Sale Price (excluding taxes, commissions, and fees) | Insert an "E" if Exercised Insert an "A" if Assigned Insert an "X" if Expired | Exercise Date (Month/Day/Year) |
|---|---|---|---|---|---|---|---|---|
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |

**4. ENDING HOLDINGS** – Separately list all positions in FibroGen Call Options in which you had an open interest as of the close of trading on October 13, 2021.  (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Strike Price of Call Option Contract | Expiration Date of Call Option Contract (Month/Day/Year) | Option Class Symbol | Number of Call Option Contracts in Which You Had an Open Interest |
|---|---|---|---|
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |

☐ **IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS YOU MUST PHOTOCOPY THIS PAGE AND CHECK THIS BOX. IF YOU DO NOT CHECK THIS BOX THESE ADDITIONAL PAGES WILL <u>NOT</u> BE REVIEWED.**

Questions? Visit www.FibroGenSecuritiesLitigation.com or call toll-free at (877) 595-0137
To view JND's privacy policy, please visit https://www.jndla.com/privacy-policy

# PART V. SCHEDULE OF TRANSACTIONS IN FIBROGEN PUT OPTIONS

Complete this Part V if and only if you sold (wrote) FibroGen Put Options during the period from December 20, 2018 through July 15, 2021, inclusive.  Please include proper documentation with your Claim Form as described in detail in Part II – General Instructions, Paragraph 10, above.  Do not include information in this section regarding securities other than FibroGen Put Options.

**1. BEGINNING HOLDINGS** – Separately list all positions in FibroGen Put Options in which you had an open interest as of the opening of trading on December 20, 2018.  (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Strike Price of Put Option Contract | Expiration Date of Put Option Contract (Month/Day/Year) | Option Class Symbol | Number of Put Option Contracts in Which You Had an Open Interest (including any short holdings) |
|---|---|---|---|
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |

**2. SALES (WRITING) DURING THE SETTLEMENT CLASS PERIOD THROUGH OCTOBER 13, 2021[4]** – Separately list each and every sale (writing) (including free deliveries) of FibroGen Put Options from after the opening of trading on December 20, 2018, through and including the close of trading on October 13, 2021. (Must be documented.)

| Date of Sale (Writing) (List Chronologically) (Month/Day/Year) | Strike Price of Put Option Contract | Expiration Date of Put Option Contract (Month/Day/Year) | Option Class Symbol | Number of Put Option Contracts Sold (Written) | Sale Price Per Put Option Contract | Total Sale Price (excluding taxes, commissions, and fees) | Insert an "A" if Assigned Insert an "E" if Exercised Insert an "X" if Expired | Assignment Date (Month/Day/Year) |
|---|---|---|---|---|---|---|---|---|
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |

---

[4] **Please note**:  Information requested with respect to your sales (writing) of FibroGen Put Option contracts from after the opening of trading on July 16, 2021, through and including October 13, 2021, is needed in order to balance your claim; sales (written contracts) during this period, however, are not eligible under the Settlement and will not be used for purposes of calculating your Recognized Loss pursuant to the Plan of Allocation.

**3. PURCHASES/ACQUISITIONS DURING THE SETTLEMENT CLASS PERIOD THROUGH OCTOBER 13, 2021** – Separately list each and every purchase/acquisition (including free receipts) of FibroGen Put Options from after the opening of trading on December 20, 2018, through and including the close of trading on October 13, 2021. (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Date of Purchase/ Acquisition (List Chronologically) (Month/Day/Year) | Strike Price of Put Option Contract | Expiration Date of Put Option Contract (Month/Day/Year) | Option Class Symbol | Number of Put Option Contracts Purchased/ Acquired | Purchase/ Acquisition Price Per Put Option Contract | Total Purchase/ Acquisition Price (excluding taxes, commissions, and fees) | Insert an "A" if Assigned Insert an "E" if Exercised Insert an "X" if Expired | Assignment Date (Month/Day/Year) |
|---|---|---|---|---|---|---|---|---|
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |
| / / | $ | / / | | | $ | $ | | / / |

**4. ENDING HOLDINGS** – Separately list all positions in FibroGen Put Options in which you had an open interest as of the close of trading on October 13, 2021. (Must be documented.)

**IF NONE, CHECK HERE** ☐

| Strike Price of Put Option Contract | Expiration Date of Put Option Contract (Month/Day/Year) | Option Class Symbol | Number of Put Option Contracts in Which You Had an Open Interest |
|---|---|---|---|
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |
| $ | / / | | |

☐ **IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS YOU MUST PHOTOCOPY THIS PAGE AND CHECK THIS BOX. IF YOU DO NOT CHECK THIS BOX THESE ADDITIONAL PAGES WILL NOT BE REVIEWED.**

Questions? Visit www.FibroGenSecuritiesLitigation.com or call toll-free at (877) 595-0137
To view JND's privacy policy, please visit https://www.jndla.com/privacy-policy

## PART VI – RELEASE OF CLAIMS AND SIGNATURE

### *YOU MUST ALSO READ THE RELEASE AND CERTIFICATION BELOW AND SIGN ON PAGE 12 OF THIS CLAIM FORM.*

I (we) hereby acknowledge that as of the Effective Date of the Settlement, pursuant to the terms set forth in the Stipulation, I (we), on behalf of myself (ourselves) and my (our) successors and assigns, shall be deemed to have, and by operation of law and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Plaintiffs' Claim (as defined in the Stipulation and in the Notice) against Defendant Releasees (as defined in the Stipulation and in the Notice) and shall forever be barred and enjoined from commencing, instituting, prosecuting, or maintaining, in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting any Released Plaintiffs' Claims against any of the Defendant Releasees.

## CERTIFICATION

By signing and submitting this Claim Form, the Claimant(s) or the person(s) who represent(s) the Claimant(s) certifies (certify), as follows:

1.      that I (we) have read and understand the contents of the Notice and this Claim Form, including the releases provided for in the Settlement and the terms of the Plan of Allocation;

2.      that the Claimant(s) is a (are) Class Member(s), as defined in the Notice and in paragraph 2 on page 3 of this Claim Form, and is (are) not excluded from the Class by definition or pursuant to request as set forth in the Notice and in paragraph 3 on page 3 of this Claim Form;

3.      that I (we) own(ed) the FibroGen Common Stock and/or FibroGen Call Options and/or had an interest in the FibroGen Put Options identified in the Claim Form and have not assigned the claim against the Defendants' Releasees to another, or that, in signing and submitting this Claim Form, I (we) have the authority to act on behalf of the owner(s) thereof;

4.      that the Claimant(s) has (have) not submitted any other claim covering the same purchases/acquisitions of FibroGen Common Stock and/or FibroGen Call Options, and/or sales of FibroGen Put Options and knows (know) of no other person having done so on the Claimant's (Claimants') behalf;

5.      that the Claimant(s) submit(s) to the jurisdiction of the Court with respect to Claimant's (Claimants') claim and for purposes of enforcing the releases set forth herein;

6.      that I (we) agree to furnish such additional information with respect to this Claim Form as Lead Counsel, the Claims Administrator, or the Court may require;

7.      that the Claimant(s) waive(s) the right to trial by jury, to the extent it exists, and agree(s) to the Court's summary disposition of the determination of the validity or amount of the claim made by this Claim Form;

8.      that I (we) acknowledge that the Claimant(s) will be bound by and subject to the terms of any judgment(s) that may be entered in the Action; and

9.     that the Claimant(s) is (are) NOT subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code because (a) the Claimant(s) is (are) exempt from backup withholding or (b) the Claimant(s) has (have) not been notified by the IRS that he/she/it is subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified the Claimant(s) that he/she/it is no longer subject to backup withholding. **If the IRS has notified the Claimant(s) that he, she, or it is subject to backup withholding, please strike out the language in the preceding sentence indicating that the claim is not subject to backup withholding in the certification above.**

UNDER THE PENALTIES OF PERJURY, I (WE) CERTIFY THAT ALL OF THE INFORMATION PROVIDED BY ME (US) ON THIS CLAIM FORM IS TRUE, CORRECT, AND COMPLETE, AND THAT THE DOCUMENTS SUBMITTED HEREWITH ARE TRUE AND CORRECT COPIES OF WHAT THEY PURPORT TO BE.

_____

Signature of Claimant                                                            Date

_____

Print your name here

_____

Signature of joint Claimant, if any                                          Date

_____

Print your name here

***If the Claimant is other than an individual, or is not the person completing this form, the following also must be provided:***

_____

Signature of person signing on behalf of Claimant                  Date

_____

Print your name here

_____

CAPACITY OF PERSON SIGNING ON BEHALF OF CLAIMANT, IF OTHER THAN AN INDIVIDUAL, *E.G.,* EXECUTOR, PRESIDENT, TRUSTEE, CUSTODIAN, *ETC*. (MUST PROVIDE EVIDENCE OF AUTHORITY TO ACT ON BEHALF OF CLAIMANT – SEE PARAGRAPH 13 ON PAGE 4 OF THIS CLAIM FORM.)

# REMINDER CHECKLIST



1. Please sign the above release and certification.  If this Claim Form is being made on behalf of joint Claimants, then both must sign.

2. Remember to attach only **copies** of acceptable supporting documentation as these documents will not be returned to you.



3. Please do not highlight any portion of the Claim Form or any supporting documents.



4. Do not send original security certificates or documentation.  These items cannot be returned to you by the Claims Administrator.

5. Keep copies of the completed Claim Form and documentation for your own records.



6. The Claims Administrator will acknowledge receipt of your Claim Form by mail, within 60 days.  Your claim is not deemed filed until you receive an acknowledgement postcard.  **If you do not receive an acknowledgement postcard within 60 days, please call the Claims Administrator toll free at (877) 595-0137.**



7. If your address changes in the future, or if this Claim Form was sent to an old or incorrect address, please send the Claims Administrator written notification of your new address.  If you change your name, please inform the Claims Administrator.



8. If you have any questions or concerns regarding your claim, please contact the Claims Administrator at the address below, by email at Info@FibroGenSecuritiesLitigation.com, or toll-free at (877) 595-0137 or visit www.FibroGenSecuritiesLitigation.com.  Please DO NOT call the Court, FibroGen, or any of the other Defendants or their counsel with questions regarding your claim.

THIS CLAIM FORM MUST BE MAILED TO THE CLAIMS ADMINISTRATOR BY FIRST-CLASS MAIL, **POSTMARKED NO LATER THAN June 12, 2024**, ADDRESSED AS FOLLOWS:

**In re FibroGen, Inc. Securities Litigation**
**c/o JND Legal Administration**
**P.O. Box 91482**
**Seattle, WA 98111**

OR SUBMITTED ONLINE AT WWW.FIBROGENSECURITIESLITIGATION.COM **ON OR BEFORE June 12, 2024**.

A Claim Form received by the Claims Administrator shall be deemed to have been submitted when posted, if a postmark date **on or before June 12, 2024** is indicated on the envelope and it is mailed First Class, and addressed in accordance with the above instructions.  In all other cases, a Claim Form shall be deemed to have been submitted when actually received by the Claims Administrator.

You should be aware that it will take a significant amount of time to fully process all of the Claim Forms. Please be patient and notify the Claims Administrator of any change of address.

# EXHIBIT B

INVESTORS.COM

# MUTUAL FUND PERFORMANCE

WEEK OF MARCH 18, 2024   **A11**

## BIG CAP GROWTH ETF (SPYG) VS SMALL CAP GROWTH ETF (SLYG)

| | |
|---|---|
| Apple Inc (AAPL) | 12.63% |
| Microsoft Corp (MSFT) | 10.02% |
| Amazon.com Inc (AMZN) | 8.27% |
| Facebook Inc Cl A (FB) | 3.91% |
| Tesla Inc (TSLA) | 3.19% |
| NeoGenomics Inc (NEO) | 1.35% |
| Cleveland-Cliffs Inc (CLF) | 1.31% |
| Yeti Holdings Inc (YETI) | 1.16% |
| Omnicell Inc (OMCL) | 1.14% |
| Brooks Automation (BRKS) | 1.13% |

When the line is heading up, big cap growth funds are outperforming small cap growth funds

## GROWTH ETF (IUSG) VS VALUE ETF (IUSV)

| | |
|---|---|
| Apple Inc (AAPL) | 11.88% |
| Microsoft Corp (MSFT) | 9.42% |
| Amazon.com Inc (AMZN) | 7.78% |
| Facebook Inc Cl A (FB) | 3.68% |
| Tesla Inc (TSLA) | 3.00% |
| Berkshire Hathaway (BRKB) | 2.84% |
| JP Morgan Chase (JPM) | 2.43% |
| Walt Disney Company (DIS) | 2.06% |
| Johnson & Johnson (JNJ) | 1.56% |
| Verizon Communications (VZ) | 1.53% |

When the line is heading up, growth funds are outperforming value funds

## Top Growth Funds
Last 3 months (all total returns)

| Mutual Fund | % Change Last 3 Mo | Rating 36 mos | $ Net Assets |
|---|---|---|---|
| ProFunds:Semiconduct | +57 | A+ | 186.10 mil |
| Hennessy:Crnst Gro | +23 | A+ | 166.30 mil |
| Fidelity Focused Stk | +21 | A+ | 2.973 bil |
| Marsico Inv Fd:Glbl | +20 | B+ | 155.30 mil |
| Marsico Inv Fd:Foc | +20 | A+ | 670.10 mil |
| Fidelity SAI US Momentum | +19 | | 325.00 mil |
| Hartfd:Growth Opps | +19 | C+ | 2.52 bil |
| Fidelity Contrafund | +18 | A+ | 111.67 bil |
| Alger:Capital Apprec | +17 | A- | 862.30 mil |
| Alger Inst:Cap App | +17 | A- | 1.085 bil |
| Alger II:Spectra | +17 | B | 1.09 bil |
| MFS Growth | +17 | A+ | 12.31 bil |
| Fidelity Trend | +17 | A+ | 2.959 bil |
| JPMorgan:LgCp Gro | +17 | A+ | 18.778 bil |
| Fidelity Adv New Ins | +17 | A+ | 8.044 bil |
| PGIM Jenn Dvsfd Gro | +17 | A+ | 292.00 mil |
| FidelityAdv Srs Gro Opp | +17 | B | 824.80 mil |
| Fidelity Gro Discovery | +17 | A+ | 4.187 bil |
| Fidelity Gro Co;Series | +17 | A+ | 14.861 bil |
| AB Growth | +17 | A+ | 1.079 bil |
| Gabelli Growth | +16 | A | 702.00 mil |
| Fidelity Worldwide | +16 | A- | 2.375 bil |
| Fidelity Adv Gr Opp | +16 | B- | 8.158 bil |
| Fidelity Adv Eq Gro | +16 | A+ | 2.579 bil |
| Touchstone:Sel Gro | +16 | E | 701.80 mil |

## Top Growth Funds
Last 3 years (all total returns)

| Mutual Fund | % Change YTD | Rating 3 years | $ Net Assets |
|---|---|---|---|
| ProFunds:Semiconduct | +52 | A+ | 186.10 mil |
| Federtd Hrms MDTLC | +13 | A+ | 658.00 mil |
| Hennessy:Crnst MdCp | +12 | A+ | 403.60 mil |
| Gotham Index Plus | +11 | A+ | 605.60 mil |
| BlackRock:Exchange | +10 | A+ | 240.90 mil |
| Fidelity Sel Cnst&Hous | +9 | A+ | 669.40 mil |
| BNYM Large Cp Securities | +9 | A+ | 2.055 bil |
| Federated Hrms MDT AC | +11 | A+ | 459.60 mil |
| Third Avenue:Value | +4 | A+ | 712.30 mil |
| ProFunds:UltraNASDAQ | +13 | A+ | 837.20 mil |
| JPMorgan:US GARP Eq | +12 | A+ | 138.20 mil |
| Nicholas Fund | +8 | A+ | 3.936 bil |
| Hennessy:Crnst Gro | +21 | A+ | 166.30 mil |
| Fidelity SAI US Qual Idx | +9 | | 13.867 bil |
| GMO:Quality | +10 | A | 3.035 bil |
| Schwab Cap:Lg-Cap Gro | +12 | A+ | 344.80 mil |
| Spirit of Amer:LC Val | +14 | A+ | 155.60 mil |
| DFA US Lg Cp Gr | +10 | A+ | 3.167 bil |
| Pear Tree:Quality | +10 | A+ | 166.50 mil |
| Delaware Ivy:LCap Gro | +9 | A- | 3.645 bil |
| Columbia:Disc Gro | +11 | A+ | 147.40 mil |
| Carrillon:ClVs CA | +12 | A+ | 185.30 mil |
| Northern Fds:Lg Cp Core | +10 | A+ | 263.20 mil |
| Fidelity Lrg Cap Gro Idx | +10 | | 20.366 bil |
| Fidelity Contrafund | +16 | A+ | 111.67 bil |

### U.S. Stock Fund Cash Position   High (11/00) 6.2%   Low (12/21) 1.5%

| | | | | | |
|---|---|---|---|---|---|
| 22-Aug | 2.50% | 23-Feb | 2.26% | 23-Aug | 1.79% |
| 22-Sep | 2.50% | 23-Mar | 2.17% | 23-Sep | 1.87% |
| 22-Oct | 2.50% | 23-Apr | 2.22% | 23-Oct | 1.94% |
| 22-Nov | 2.50% | 23-May | 2.05% | 23-Nov | 1.87% |
| 22-Dec | 2.40% | 23-Jun | 1.98% | 23-Dec | 1.64% |
| 23-Jan | 2.30% | 23-Jul | 1.83% | 24-Jan | 1.63% |

## MARKETSURGE
BY INVESTOR'S BUSINESS DAILY

# The most powerful stock research platform just got better.

MarketSmith has now officially changed its name to MarketSurge, kicking off a new era for the most powerful stock research platform available to individual investors.

MarketSurge isn't just a new name—we've upgraded the infrastructure that powers the platform and added new features that help identify profitable trades in a fraction of the time.

If you've never used MarketSmith or it's been a while since you tried it, there's never been a better time to sign up and try MarketSurge—and take your investing to the next level.

Limited-time introductory price:
**Try 2 months of MarketSurge for only $59.95**

**investors.com/MarketSurge**

Scan the QR code to learn more.

© 2024 Investor's Business Daily, LLC. Investor's Business Daily, IBD, IBD Digital, IBD Live and Leaderboard are trademarks of Investor's Business Daily, LLC. MarketSmith is a registered trademark of O'Neil Capital Management Inc.



---

## LEGAL NOTICE

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

IN RE FIBROGEN, INC.,
SECURITIES LITIGATION

Case No.
3:21-cv-02623-EMC

**SUMMARY NOTICE OF (I) PROPOSED SETTLEMENT AND PLAN OF ALLOCATION; (II) SETTLEMENT FAIRNESS HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TO: All persons who purchased or acquired FibroGen, Inc. ("FibroGen" or the "Company") securities, including options, between December 20, 2018 through July 15, 2021, inclusive (the "Settlement Class Period"). You may be a member of the Settlement Class. If you do not wish to be a part of the Settlement Class, you must respond to this Notice with a written request for exclusion (see below). You may be eligible to share in the proceeds of the Settlement, but you must submit a Claim Form to participate in the Settlement (see below).**

THIS NOTICE WAS AUTHORIZED BY THE COURT. IT IS NOT A LAWYER SOLICITATION. YOU MAY BE ENTITLED TO A CASH AWARD. PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of California (the "Court"), that the above-captioned litigation (the "Action") has been certified as a class action for settlement purposes only on behalf of the Settlement Class, except for certain persons and entities who are excluded from the Settlement Class by definition as set forth in the full printed Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice").

YOU ARE ALSO NOTIFIED that the Court-appointed Lead Plaintiffs on behalf of themselves and the Court-certified Settlement Class in the Action, have reached a proposed settlement of the Action for twenty-eight million, five-hundred thousand dollars ($28,500,000.00) in cash (the "Settlement"), that, if approved by the Court, will resolve all claims in the Action.

A hearing will be held on May 16, 2024, at 1:30 p.m., before the Honorable Edward M. Chen at the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 5 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, to determine, among other things, whether: (i) the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) the Judgment as provided under the Stipulation and Agreement of Settlement (the "Stipulation") should be entered dismissing the Action with prejudice against the Defendant Releasees; (iii) the proposed Plan of Allocation should be approved by the Court as fair and reasonable; (iv) Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses should be approved. The capitalized terms herein shall have the same meaning as they have in the Stipulation.[i]

The Court may adjourn the Settlement Hearing or any adjournment thereof without further written notice of any kind to the Settlement Class. Settlement Class Members should check the Court's PACER system or the Settlement website, www.FibroGenSecuritiesLitigation.com. Any updates regarding the Settlement Hearing, including any changes to the date or time of the hearing or updates regarding in-person, telephonic or video conference appearances at the hearing, will also be posted to the Settlement website.

**If you are a member of the Settlement Class, your rights will be affected by the pending Action and the Settlement, and you may be entitled to share in the Settlement Fund.** If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by visiting the Settlement website at www.FibroGenSecuritiesLitigation.com or by contacting the Claims Administrator at:

IN RE FIBROGEN, INC., SECURITIES LITIGATION
c/o JND Legal Administration
P.O. Box 91482
Seattle, WA 98111
(877) 595-0137
www.FibroGenSecuritiesLitigation.com
info@fibrogensecuritieslitigation.com

Copies of the Notice and the Claim Form are also available by accessing the Court docket in this case, for a fee, through the Court's PACER system at https://ecf.cand.uscourts.gov, or by visiting the Office of the Clerk of Court, United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, or any other location of the Northern District of California between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

Inquiries, other than requests for the Notice or a Claim Form or for information about the status of a claim, may be made to Lead Counsel:

SAXENA WHITE P.A.
Lester R. Hooker, Esq.
7777 Glades Rd., Suite 300
Boca Raton, FL 33434
settlements@saxenawhite.com

If you are a member of the Settlement Class, in order to potentially be eligible to receive a payment under the proposed Settlement, you must submit a Claim Form *postmarked or completed online* **no later than June 12, 2024.** If you are a Settlement Class Member and do not submit a proper Claim Form, you will not be eligible to share in the distribution of the net proceeds of the Settlement, but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you are a member of the Settlement Class and wish to exclude yourself from the Settlement Class, you must submit a request for exclusion such that it is *received* **no later than April 18, 2024,** in accordance with the instructions set forth in the Notice. If you properly exclude yourself from the Settlement Class, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to share in the proceeds of the Settlement.

Any objections[2] to the proposed Settlement, the proposed Plan of Allocation, or Lead Plaintiffs' motion for attorneys' fees and reimbursement of litigation expenses must be in writing and filed electronically or in person at any location of the United States District Court for the Northern District of California or mailed to the Class Action Clerk, United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102-3489 such that they are *filed or received* **no later than April 18, 2024,** in accordance with the instructions set forth in the Notice. The Court can only approve or deny the Settlement and cannot change the terms.

**PLEASE DO NOT CONTACT THE COURT, THE CLERK'S OFFICE, DEFENDANTS, OR DEFENDANTS' COUNSEL REGARDING THIS NOTICE, THE PROPOSED SETTLEMENT, OR THE CLAIMS PROCESS.**

Dated: March 18, 2024

By Order of the Court
United States District Court
Northern District of California

[1] The Stipulation can be viewed and/or obtained at www.FibroGenSecuritiesLitigation.com, the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, by visiting the office of the Clerk of the Court, or by contacting Lead Counsel as described herein. For the precise terms of the Settlement, please see the Stipulation.

[2] You can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement; the Court can only approve or reject the Settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must clearly identify the case name and number (In re FibroGen, Inc., Sec. Litig., Case No. 21-cv-02623) and include all information required by the Court as detailed in the Notice.

www.FibroGenSecuritiesLitigation.com     (877) 595-0137

©2024 Investor's Business Daily, LLC. All rights reserved.

# Notice of Proposed Settlement Affecting All Persons who Purchased or Acquired FibroGen, Inc. Securities, Including Options, Between December 20, 2018 through July 15, 2021

NEWS PROVIDED BY
**JND Legal Administration →**
18 Mar, 2024, 09:37 ET

SEATTLE, March 18, 2024 /PRNewswire/ --

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC |
|---|---|

**SUMMARY NOTICE OF (I) PROPOSED SETTLEMENT AND PLAN OF ALLOCATION; (II) SETTLEMENT FAIRNESS HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TO:** All persons who purchased or acquired FibroGen, Inc. ("FibroGen" or the "Company") securities, including options, between December 20, 2018 through July 15, 2021, inclusive (the "Settlement Class Period"). You may be a member of the Settlement Class. If you do not wish to be a part of the Settlement Class, you must respond to this Notice with a written request for exclusion (see below). You may be eligible to share in the proceeds of the Settlement, but you must submit a Claim Form to participate in the Settlement (see below).

**THIS NOTICE WAS AUTHORIZED BY THE COURT. IT IS NOT A LAWYER SOLICITATION. YOU MAY BE ENTITLED TO A CASH AWARD. PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.**

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of California (the "Court"), that the above-captioned litigation (the "Action") has been certified as a class action for settlement purposes only on behalf of the Settlement Class, except for certain persons and entities who are excluded from the Settlement Class by definition as set forth in the full printed Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice").

YOU ARE ALSO NOTIFIED that the Court-appointed Lead Plaintiffs on behalf of themselves and the Court-certified Settlement Class in the Action, have reached a proposed settlement of the Action for twenty-eight million, five-hundred thousand dollars ($28,500,000.00) in cash (the "Settlement"), that, if approved by the Court, will resolve all claims in the Action.

A hearing will be held on May 16, 2024, at 1:30 p.m., before the Honorable Edward M. Chen at the United States District Court for the Northern District of California, San Franscisco Courthouse, Courtroom 5 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, to determine, among other things, whether: (i) the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) the Judgment as provided under the Stipulation and Agreement of Settlement (the "Stipulation") should be entered dismissing the Action with prejudice against the Defendant Releasees; (iii) the proposed Plan of Allocation should be approved by the Court as fair and reasonable; (iv) Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses should be approved.  The capitalized terms herein shall have the same meaning as they have in the Stipulation.[1]

The Court may adjourn the Settlement Hearing or any adjournment thereof without further written notice of any kind to the Settlement Class.  Settlement Class Members should check the Court's PACER system or the Settlement website, **www.FibroGenSecuritiesLitigation.com**.  Any updates regarding the Settlement Hearing, including any changes to the date or time of the hearing or updates regarding in-person, telephonic or video conference appearances at the hearing, will also be posted to the Settlement website.

**If you are a member of the Settlement Class, your rights will be affected by the pending Action and the Settlement, and you may be entitled to share in the Settlement Fund**. If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by visiting the Settlement website at **www.FibroGenSecuritiesLitigation.com** or by contacting the Claims Administrator at:

IN RE FIBROGEN, INC., SECURITIES LITIGATION

c/o JND Legal Administration

P.O. Box 91482

Seattle, WA 98111

(877) 595-0137

**www.FibroGenSecuritiesLitigation.com**

**info@fibrogensecuritieslitigation.com**

Copies of the Notice and the Claim Form are also available by accessing the Court docket in this case, for a fee, through the Court's PACER system at **https://ecf.cand.uscourts.gov**, or by visiting the Office of the Clerk of Court, United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, or any other location of the Northern District of California between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

Inquiries, other than requests for the Notice or a Claim Form or for information about the status of a claim, may be made to Lead Counsel:

SAXENA WHITE P.A.

Lester R. Hooker, Esq.

7777 Glades Rd., Suite 300

Boca Raton, FL 33434

**settlements@saxenawhite.com**

If you are a member of the Settlement Class, in order to potentially be eligible to receive a payment under the proposed Settlement, you must submit a Claim Form *postmarked or completed online* **no later than June 12, 2024.** If you are a Settlement Class Member and do not submit a proper

Claim Form, you will not be eligible to share in the distribution of the net proceeds of the Settlement, but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you are a member of the Settlement Class and wish to exclude yourself from the Settlement Class, you must submit a request for exclusion such that it is *received* **no later than April 18, 2024,** in accordance with the instructions set forth in the Notice.  If you properly exclude yourself from the Settlement Class, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to share in the proceeds of the Settlement.

Any objections[2] to the proposed Settlement, the proposed Plan of Allocation, or Lead Plaintiffs' motion for attorneys' fees and reimbursement of litigation expenses must be in writing and filed electronically or in person at any location of the United States District Court for the Northern District of California or mailed to the Class Action Clerk, United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102-3489 such that they are *filed or received* **no later than April 18, 2024,** in accordance with the instructions set forth in the Notice. The Court can only approve or deny the Settlement and cannot change the terms.

**PLEASE DO NOT CONTACT THE COURT, THE CLERK'S OFFICE, DEFENDANTS, OR DEFENDANTS' COUNSEL REGARDING THIS NOTICE, THE PROPOSED SETTLEMENT, OR THE CLAIMS PROCESS.**

By Order of the Court
United States District Court
Northern District of California

[1] The Stipulation can be viewed and/or obtained at **www.FibroGenSecuritiesLitigation.com**, the Court's Public Access to Court Electronic Records (PACER) system at **https://ecf.cand.uscourts.gov**, by visiting the office of the Clerk of the Court, or by contacting Lead Counsel as described herein. For the precise terms of the Settlement, please see the Stipulation.

[2] You can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement; the Court can only approve or reject the Settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object.  If you file a timely written objection, you may, but are not

required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must clearly identify the case name and number (In re FibroGen, Inc., Sec. Litig., Case No. 21-cv-02623) and include all information required by the Court as detailed in the Notice.

SOURCE JND Legal Administration

# EXHIBIT E

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Emily Bishop (SBN 319383)
ebishop@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs Employees' Retirement
System of the City of Baltimore, City of
Philadelphia Board of Pensions and Retirement,
and Plymouth County Retirement Association, and
Lead Counsel for the Proposed Settlement Class*

*[Additional Counsel listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FIBROGEN, INC., SECURITIES LITIGATION | Case No. 3:21-cv-02623-EMC <br><br> **CLASS ACTION** <br><br> DECLARATION OF LESTER R. HOOKER IN FURTHER SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES |

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FEES.
3:21-cv-02623-EMC

I, Lester R. Hooker, declare as follows:

1.     I am a Director of law firm Saxena White P.A. ("Saxena White" or the "Firm").  I am submitting this declaration in support of the application for award of attorneys' fees and expenses in connection with services rendered in the above-entitled action (the "Action" or themed "Litigation").[1]

2.     My Firm, as Lead Counsel of record for the Court-appointed Lead Plaintiffs Employees' Retirement System of the City of Baltimore ("Baltimore Employees"), City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund"), and Plymouth County Retirement Association ("Plymouth County"), was involved in all aspects of the prosecution and resolution of the Action, as set forth in the Final Approval Declaration.

3.     The information in this declaration regarding Saxena White's time and expenses is taken from time and expense reports and supporting documentation prepared and/or maintained by the Firm in the ordinary course of business.  I am one of the Directors who oversaw and/or conducted the day-to-day activities in the Litigation and I, together with attorneys working under my direction, reviewed the Firm's time records in connection with the preparation of this declaration.  The purpose of this review was to confirm both the accuracy of the entries as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation.  Only time that inured to the benefit of Lead Plaintiffs and the Settlement Class, and that advanced the claims resolved by the Settlement, is reflected herein.  Accordingly, some reductions were made to time.  Time expended in preparing the application for fees and expenses has not been included, and time for timekeepers who had worked fewer than ten hours on the matter was also removed.  Based on this review, I believe that the time reflected and the expenses for which payment is sought herein are reasonable and were necessary for the effective and efficient prosecution and resolution of the Litigation.

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meanings as in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Settlement Agreement" or "Stipulation") (ECF No. 236) or in the Declaration of Lester Hooker In Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Final Approval Declaration"), filed concurrently herewith.

4. After the reductions referred to above, the number of hours spent on the Litigation by the Firm from inception through March 11, 2024 is 27,220.2. The Firm maintains detailed, contemporaneous billing records reflecting the foregoing. Attached hereto as Exhibit E-1 is a chart summarizing my Firm's lodestar calculation from the inception of the Action through March 11, 2024. Attached hereto as Exhibit E-2 is a chart reflecting the hours spent by each timekeeper on each of the following task categories during the course of the Action:

(1)     Initial Investigation/ Lead Plaintiff Appointment;

(2)     Investigation/Pleadings;

(3)     Litigation Strategy and Analysis;

(4)     Court Appearances;

(5)     Motions to Dismiss;

(6)     Discovery;

(7)     Deposition;

(8)     Document Review;

(9)     Class Certification Motion (including related motions);

(10)     Settlement/Mediation;

(11)     Miscellaneous Court Filings/Motions; and

(12)     Correspondence.

5. My Firm seeks an award of $637,306.21 in expenses in connection with the prosecution of this Action. Those expenses and charges are summarized by category in Exhibit E-3.

6. The following is additional information regarding certain of these expenses:

(a)     Experts/Consultants: $334,114.80. Saxena White made payments to the following experts/consultants for consulting services:

i.     Global Economics Group ("Global Economics"): $275,391.05. Lead Counsel retained the services of Global Economics Group, an economic consulting firm, and its former employees Chad W. Coffman, MPP, CFA ("Mr. Coffman") and Scott E. Walster ("Mr. Walster"), to analyze data and provide expert opinions and consultations regarding the issues of

market efficiency, price impact, loss causation, and damages. Notably, "dozens of cases" have accepted similar analyses by Mr. Coffman, *see Pub. Emp. Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020), and Mr. Walster formerly served as Assistant Director in the Division of Economic and Risk Analysis of the U.S. Securities and Exchange Commission. The Global Economics team assisted in this Action by: (i) submitting a formal expert report concerning market efficiency and a model for calculating damages on a class-wide basis that was filed in support of Plaintiffs' motion for class certification and sitting for a deposition regarding these issues; (ii) reviewing the expert report submitted by Defendants' price impact expert, Dr. Zurek, and assisting Lead Counsel's efforts to prepare for the deposition of Dr. Zurek; (iii) providing analyses for quantifying loss causation and damages in connection with the prosecution of the Action and during the course of settlement negotiations; (iv) preparing a formal expert report on the issues of loss causation and damages that would have been submitted in support of Plaintiffs' claims had the Settlement not been reached; and (v) developing the Plan of Allocation that was included in the Notice to Settlement Class Members.

           ii.      David B. Ross, MD, PhD, MBI, LLC: $11,000. Lead Counsel retained Dr. David B. Ross ("Dr. Ross") as a pharmaceutical regulation expert and consultant. Dr. Ross is a Yale fellowship-trained, board-certified infectious disease physician who holds a medical degree from New York University School of Medicine, and an undergraduate degree in Molecular Biophysics and Biochemistry from Yale University. Dr. Ross spent 10 years with the FDA's Center of Drug Evaluation and Review (CDER) as a medical officer, senior medical reviewer, medical team leader, and new drug review office management official. Dr. Ross assisted in this Action by reviewing FibroGen's New Drug Application for Roxadustat and analyzing clinical trial data submitted therein that pertained to Lead Plaintiffs' allegations, in addition to advising on the process for new drug applications and FDA clinical trials generally.

           iii.      McCaffrey Consulting: $20,750. Lead Counsel retained McCaffrey Consulting and its principal, Dr. Timothy McCaffrey ("Professor McCaffrey"), as a pharmaceutical trial and biostatistics expert and consultant. Professor McCaffrey is a Professor of Medicine and a Professor of Microbiology, Immunology, and Tropical Medicine at The George

Washington University School of Medicine & Health Sciences. Professor McCaffrey assisted in this Action by consulting with Lead Counsel regarding statistical issues pertaining to the Roxadustat data analyses and the FDA's new drug application and approval process.

iv.     Financial Markets Analysis, LLC: $5,400. Lead Counsel retained the services of Financial Markets Analysis, an economic consulting firm, and its owner, Michael A. Marek, to analyze data and provide expert consultations regarding evaluatios of damages (including preparation of a preliminary event study), artificial inflation scenarios, issues relating to market efficiency, and loss causation.

v.     Norton Basu LLP: $2,450. Norton Basu LLP is a law firm focused on estate planning and probate issues under California law. Lead Plaintiffs retained Norton Basu as a consultant to assist in analyzing and assessing collectability issues with respect to the estate of FibroGen's former Chief Executive Officer Thomas B. Neff, who passed away in August 2019.

vi.     Cypress Holdings LLC $19,123.75. Cypress Holdings LLC ("Cypress") is a nationally recognized specialty financial services firm that provides investment banking and advisory services. Lead Plaintiffs retained Cypress as a consultant to help assess FibroGen's ability to pay a judgment should this Action proceed to trial.

(b)     Discovery Costs: $120,363.77. Saxena White paid a third-party vendor, KLDiscovery, for services that included maintaining a document database and preparing documents for production.

(c)     Online Legal and Factual Research: $75,476.28. This category includes vendors such as LexisNexis, PACER, Thomson Reuters, and Westlaw. These resources were used to obtain access to SEC filings, factual databases, legal research, and citation verification. This expense represents the expenses incurred by Saxena White for use of these services in connection with this Litigation. The charges for these vendors vary depending upon the type of services requested. For example, Saxena White has flat-rate contracts with some of these providers for use of their services. When Saxena White utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated. At the end of each billing period in which such service is used, Saxena White's costs for such

DECL. OF LESTER R. HOOKER
ISO LPS' MOT. FOR FEES
3:21-cv-02623-EMC

4

services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period. As a result of the contracts negotiated by Saxena White with certain providers, the Class enjoys substantial savings in comparison with the "market-rate" for a la carte use of such services which some law firms pass on to their clients. For example, the "market-rate" charged to others by LexisNexis for the types of services used by Saxena White is more expensive than the rates negotiated by Saxena White. The expenses pertaining to this case are reflected in the books and records of Saxena White, which are regularly prepared and maintained in the ordinary course of business. These books and records are prepared from receipts, expense vouchers, check records and other documents and are an accurate record of the expenses.

(d)    Deposition Reporting, Hearing and Deposition Transcripts, and Videography: $47,611.65. There were a total of seven depositions in this Action, three of which were noticed and taken by Lead Plaintiffs. Lead Plaintiffs ordered transcripts and video recordings of each deposition. The vendors for this category are listed in the attached Exhibit E-4.

(e)    Transportation, Meals, and Lodging: $34,290.19. In connection with the prosecution of this case, the Saxena White paid for travel expenses to, among other things, attend court hearings, attend meetings and presentations with the respective Boards and representatives of Lead Plaintiffs, witnesses, mediators, and to take or defend depositions. The date, destination and purpose of each trip is set forth in the attached Exhibit E-5.

(f)    Mediation Fees and Supplies (Phillips ADR Enterprises, P.C.): $16,818.75. These are Saxena White's share of the fees of the mediator, Ms. Michelle Yoshida, who facilitated settlement negotiations over the course of many discussions, written submissions, a mediation session, and subsequent negotiations, ultimately leading to settlement of this Litigation.

(g)    Printing and photocopies: $4,311.79. Each time an in-house copy machine is used, our billing system requires that a case or administrative billing code be entered and that is how the number of in-house copies were identified as related to the Litigation.

7.    Saxena White has extensive experience in prosecuting and resolving complex securities class actions in the Ninth Circuit and throughout the nation, as reflected by the firm resume attached hereto as Exhibit E-6.

I declare under penalty of perjury under to the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of April, 2024.

/s/ Lester R. Hooker
Lester R. Hooker

**EXHIBIT E-1**

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**
**Lodestar Calculation from Inception through March 11, 2024**

| NAME | | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Saxena, Maya | (S) | 160.8 | $ 1,085.00 | $ 174,468.00 |
| White, III, Joseph E. | (S) | 30.6 | $ 1,085.00 | $ 33,201.00 |
| Avan, Rachel | (D) | 188.4 | $ 825.00 | $ 155,430.00 |
| Grant, Kyla | (D) | 1,437.0 | $ 900.00 | $ 1,293,300.00 |
| Hooker, Lester | (D) | 923.5 | $ 990.00 | $ 914,265.00 |
| Kaplan, David | (D) | 1,065.8 | $ 900.00 | $ 959,220.00 |
| Saltzman, Joshua | (D) | 1,151.9 | $ 825.00 | $ 950,317.50 |
| Singer, Steven | (D) | 182.6 | $ 1,085.00 | $ 198,121.00 |
| DiLeo, Sara | (SA) | 155.6 | $ 795.00 | $ 123,702.00 |
| Lamet, Jonathan | (SA) | 205.7 | $ 795.00 | $ 163,531.50 |
| Pitre, Dianne | (SA) | 523.6 | $ 795.00 | $ 416,262.00 |
| Alvite, Mario | (A) | 178.0 | $ 525.00 | $ 93,450.00 |
| Bishop, Emily | (A) | 1,173.2 | $ 685.00 | $ 803,642.00 |
| Grunewald, Donald | (A) | 1848.7 | $ 575.00 | $ 1,063,002.50 |
| Guarcello, Scott | (A) | 1,294.6 | $ 685.00 | $ 886,801.00 |
| Koren, Scott | (A) | 1,178.4 | $ 465.00 | $ 547,956.00 |
| Krumper, Justin | (A) | 381.9 | $ 400.00 | $ 152,760.00 |
| Miller, Jill | (A) | 860.5 | $ 595.00 | $ 511,997.50 |
| Worms, Wolfram | (A) | 227.9 | $ 660.00 | $ 150,414.00 |
| Atkinson, Nicholas | (ST) | 184.5 | $ 460.00 | $ 84,870.00 |
| Bryan, Denise | (ST) | 64.0 | $ 460.00 | $ 29,440.00 |
| Donnelly, Christopher | (ST) | 896.5 | $ 400.00 | $ 358,600.00 |
| Fassberg, Michele | (ST) | 1,728.6 | $ 460.00 | $ 795,156.00 |
| Hakoun, Nina | (ST) | 261.5 | $ 400.00 | $ 104,600.00 |
| Heydt, Tara | (ST) | 1,690.1 | $ 460.00 | $ 777,446.00 |
| Joseph, Ryan | (ST) | 1,852.1 | $ 400.00 | $ 740,840.00 |
| Kanner Bonk, Valerie | (ST) | 810.4 | $ 400.00 | $ 324,160.00 |
| Levy, Mauri Lynn | (ST) | 302.0 | $ 400.00 | $ 120,800.00 |
| Martey, Leslie | (ST) | 198.2 | $ 400.00 | $ 79,280.00 |
| Nilsen, Rebecca | (ST) | 1,433.1 | $ 460.00 | $ 659,226.00 |
| Sciarrino, Christine | (ST) | 1,975.1 | $ 460.00 | $ 908,546.00 |
| Thompson, Karen | (ST) | 39.2 | $ 400.00 | $ 15,680.00 |
| Weisholtz, Courtney | (ST) | 1,296.4 | $ 400.00 | $ 518,560.00 |

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**
**Lodestar Calculation from Inception through March 11, 2024**

| NAME | | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Pontrelli, Jerome | (I) | 167.8 | $ 575.00 | $ 96,485.00 |
| Wroblewski, Rian | (I) | 285.0 | $ 490.00 | $ 139,650.00 |
| Grobler, Marc | (FA) | 175.0 | $ 325.00 | $ 56,875.00 |
| Jones, Samuel | (FA) | 119.8 | $ 450.00 | $ 53,910.00 |
| Joseph, Harry | (P) | 23.6 | $ 300.00 | $ 7,080.00 |
| Smith, Brandon | (P) | 456.4 | $ 350.00 | $ 159,740.00 |
| Cotrone, Alexandra | (PS) | 13.1 | $ 275.00 | $ 3,602.50 |
| Leverette, Stefanie | (PS) | 79.1 | $ 400.00 | $ 31,640.00 |
| **TOTAL** | | **27,220.2** | | **$ 15,658,027.50** |

(S) Shareholder
(D) Director
(SC) Senior Counsel
(SA) Senior Attorney
(A) Attorney
(ST) Staff Attorney
(I) In-House Investigator
(FA) Financial Analyst
(P) Paralegal
(PS) Professional Staff/Client Support

**EXHIBIT E-2**

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**
**Time by Litigation Category**
**Inception through March 11, 2024**

**Categories:**

| | | |
|---|---|---|
| (1) Initial Investigation/ Lead Plaintiff Appointment | (6) Discovery | (11) Miscellaneous Court Filings/Motions |
| (2) Investigation/Pleadings | (7) Deposition | (12) Correspondence |
| (3) Litigation Strategy and Analysis | (8) Document Review | |
| (4) Court Appearances | (9) Class Certification Motion (including related motions) | |
| (5) Motions to Dismiss | (10) Settlement/Mediation | |

| Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total Hours | Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shareholders** | | | | | | | | | | | | | | | |
| Saxena, Maya | 16.8 | 2.4 | 16.0 | 7.3 | 105.9 | 4.2 | | | | 7.2 | | 1.0 | 160.8 | $ 1,085.00 | $ 174,468.00 |
| White, III, Joseph E. | | | 14.2 | | 1.5 | 3.0 | | | | 11.9 | | | 30.6 | $ 1,085.00 | $ 33,201.00 |
| **Directors** | | | | | | | | | | | | | | | |
| Avan, Rachel | 180.8 | 4.5 | | | | | | | | 1.7 | 1.4 | | 188.4 | $ 825.00 | $ 155,430.00 |
| Grant, Kyla | | 379.8 | 22.2 | | 207.9 | 686.3 | | 14.2 | 16.5 | 110.1 | | | 1,437.0 | $ 900.00 | $ 1,293,300.00 |
| Hooker, Lester | 36.4 | 206.6 | 5.0 | 8.0 | 78.0 | 304.0 | | | 126.5 | 156.5 | 1.0 | 1.5 | 923.5 | $ 990.00 | $ 914,265.00 |
| Kaplan, David | 96.4 | 2.0 | 100.1 | | 7.6 | 535.1 | 24.0 | 54.4 | 147.9 | 82.6 | 3.7 | 11.6 | 1,065.8 | $ 900.00 | $ 959,220.00 |
| Saltzman, Joshua | | 2.5 | 98.1 | | 1.2 | 785.1 | 30.5 | 53.9 | 97.5 | 75.9 | | 7.2 | 1,151.9 | $ 825.00 | $ 950,317.50 |
| Singer, Steven | | 50.4 | 6.5 | | 111.2 | 3.0 | | | | 11.5 | | | 182.6 | $ 1,085.00 | $ 198,121.00 |
| **Senior Attorneys** | | | | | | | | | | | | | | | |
| DiLeo, Sara | | | 13.4 | | | 142.2 | | | | | | | 155.6 | $ 795.00 | $ 123,702.00 |
| Lamet, Jonathan | 156.1 | 3.2 | | | | | | | | 43.0 | 3.4 | | 205.7 | $ 795.00 | $ 163,531.50 |
| Pitre, Dianne | 1.0 | 237.6 | | | 155.5 | | | | 0.5 | 126.8 | 1.5 | 0.7 | 523.6 | $ 795.00 | $ 416,262.00 |
| **Attorneys** | | | | | | | | | | | | | | | |
| Alvite, Mario | 156.5 | 15.3 | | | 2.5 | | | | | | 3.7 | | 178.0 | $ 525.00 | $ 93,450.00 |
| Bishop, Emily | | | 13.5 | 4.2 | | 745.0 | 111.6 | 15.6 | 277.3 | 0.4 | | 5.6 | 1,173.2 | $ 685.00 | $ 803,642.00 |
| Grunewald, Donald | | 12.7 | 120.5 | | 86.7 | 634.4 | 5.5 | 386.9 | 175.2 | 403.4 | | 23.4 | 1,848.7 | $ 575.00 | $ 1,063,002.50 |
| Guarcello, Scott | 1.9 | 43.8 | 0.5 | | 0.1 | 1,205.4 | | | | 35.1 | 7.8 | | 1,294.6 | $ 685.00 | $ 886,801.00 |
| Koren, Scott | 120.4 | 4.5 | 21.8 | | 148.2 | 721.2 | | 76.7 | 48.8 | 3.1 | | 33.7 | 1,178.4 | $ 465.00 | $ 547,956.00 |
| Krumper, Justin | | | 2.7 | | | 268.7 | | 81.3 | 23.2 | 6.0 | | | 381.9 | $ 400.00 | $ 152,760.00 |
| Miller, Jill | 72.6 | 77.0 | 0.9 | | 0.2 | 24.9 | 70.9 | 572.7 | 12.6 | 12.6 | | 16.1 | 860.5 | $ 595.00 | $ 511,997.50 |
| Worms, Wolfram | 30.6 | 135.2 | 9.8 | | 38.8 | 13.3 | | | 0.2 | | | | 227.9 | $ 660.00 | $ 150,414.00 |

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**
**Time by Litigation Category**
**Inception through March 11, 2024**

**Categories:**

| | | |
|---|---|---|
| (1) Initial Investigation/ Lead Plaintiff Appointment | (6) Discovery | (11) Miscellaneous Court Filings/Motions |
| (2) Investigation/Pleadings | (7) Deposition | (12) Correspondence |
| (3) Litigation Strategy and Analysis | (8) Document Review | |
| (4) Court Appearances | (9) Class Certification Motion (including related motions) | |
| (5) Motions to Dismiss | (10) Settlement/Mediation | |

| Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total Hours | Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Staff Attorneys** | | | | | | | | | | | | | | | |
| Atkinson, Nicholas | | 184.5 | | | | | | | | | | | 184.5 | $ 460.00 | $ 84,870.00 |
| Bryan, Denise | | 64.0 | | | | | | | | | | | 64.0 | $ 460.00 | $ 29,440.00 |
| Donnelly, Christopher | | | 8.0 | | | | 8.0 | 874.0 | | 6.5 | | | 896.5 | $ 400.00 | $ 358,600.00 |
| Fassberg, Michele | 63.3 | 170.4 | | | | 270.6 | | 1,219.3 | 5.0 | | | | 1,728.6 | $ 460.00 | $ 795,156.00 |
| Hakoun, Nina | 89.0 | 172.5 | | | | | | | | | | | 261.5 | $ 400.00 | $ 104,600.00 |
| Heydt, Tara | | | 17.4 | | | 263.7 | 33.4 | 1,131.1 | 87.3 | 156.9 | | 0.3 | 1,690.1 | $ 460.00 | $ 777,446.00 |
| Joseph, Ryan | | 4.0 | 21.5 | | | 368.5 | 13.1 | 1402.3 | 40.5 | 2.2 | | | 1,852.1 | $ 400.00 | $ 740,840.00 |
| Kanner Bonk, Valerie | 127.5 | 190.0 | 6.5 | | | 6.4 | | 480.0 | | | | | 810.4 | $ 400.00 | $ 324,160.00 |
| Levy, Mauri Lynn | 133.0 | 169.0 | | | | | | | | | | | 302.0 | $ 400.00 | $ 120,800.00 |
| Martey, Leslie | | 146.0 | | | | | | 52.2 | | | | | 198.2 | $ 400.00 | $ 79,280.00 |
| Nilsen, Rebecca | | 35.2 | | | | 184.4 | 20.0 | 1,185.5 | 8.0 | | | | 1,433.1 | $ 460.00 | $ 659,226.00 |
| Sciarrino, Christine | 266.7 | 311.7 | 56.7 | | 2.8 | 111.5 | 254.5 | 937.2 | 19.0 | 15.0 | | | 1,975.1 | $ 460.00 | $ 908,546.00 |
| Thompson, Karen | | 17.0 | 10.2 | | | 12.0 | | | | | | | 39.2 | $ 400.00 | $ 15,680.00 |
| Weisholtz, Courtney | | | | | | | | 1,296.4 | | | | | 1,296.4 | $ 400.00 | $ 518,560.00 |
| **In-House Investigators** | | | | | | | | | | | | | | | |
| Pontrelli, Jerome | 12.9 | 132.7 | 14.9 | | 0.5 | 3.6 | 0.7 | | 1.0 | 1.5 | | | 167.8 | $ 575.00 | $ 96,485.00 |
| Wrobleski, Rian | 5.0 | 280.0 | | | | | | | | | | | 285.0 | $ 490.00 | $ 139,650.00 |
| **Financial Analysts** | | | | | | | | | | | | | | | |
| Grobler, Marc | 160.0 | 15.0 | | | | | | | | | | | 175.0 | $ 325.00 | $ 56,875.00 |
| Jones, Samuel | 30.7 | 53.3 | 0.7 | | 8.0 | | 2.7 | | 11.2 | 13.2 | | | 119.8 | $ 450.00 | $ 53,910.00 |
| **Paralegals** | | | | | | | | | | | | | | | |
| Joseph, Harry | | | 0.2 | | 3.4 | 2.6 | 5.4 | | 5.1 | | 6.2 | 0.7 | 23.6 | $ 300.00 | $ 7,080.00 |
| Smith, Brandon | 15.8 | 21.8 | 12.8 | | 29.0 | 203.9 | 2.8 | | 57.8 | 100.2 | 11.5 | 0.8 | 456.4 | $ 350.00 | $ 159,740.00 |
| **Client Services** | | | | | | | | | | | | | | | |
| Cotrone, Alexandra | | 13.1 | | | | | | | | | | | 13.1 | $ 275.00 | $ 3,602.50 |
| Leverette, Stefanie | 28.3 | 9.3 | 22.8 | | | 8.9 | | 0.4 | 0.6 | 3.3 | | 5.5 | 79.1 | $ 400.00 | $ 31,640.00 |
| **TOTALS:** | **1,801.7** | **3,167.0** | **616.9** | **19.5** | **989.0** | **7,512.3** | **583.1** | **9,834.1** | **1,161.5** | **1,386.8** | **40.2** | **108.1** | **27,220.2** | | **$ 15,658,027.50** |

**EXHIBIT E-3**

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**
**Expenses Incurred from Inception through March 11, 2024**

| CATEGORY | AMOUNT |
|---|---|
| Experts/Consultants | $ 334,114.80 |
| Discovery Costs | $ 120,363.77 |
| Online Legal and Factual Research | $ 75,476.28 |
| Deposition Reporting, Deposition and Hearing Transcripts, and Videography | $ 47,611.65 |
| Transportation, Meals, and Lodging | $ 34,290.19 |
| Mediation | $ 16,818.75 |
| Printing and Photocopying | $ 4,311.79 |
| Postage and Delivery | $ 2,306.99 |
| Filing Fees and Service of Process | $ 2,012.00 |
| **TOTAL** | **$ 637,306.21** |

**EXHIBIT E-4**

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**

**Deposition Reporting, Deposition and Hearing Transcripts, and Videography**

| DATE | VENDOR | PURPOSE |
|---|---|---|
| 4/4/2022 | Belle Ball, CSR | Transcript of hearing on motion to dismiss on 2/4/2022 in *Habelt v. iRhythm Technologies, Inc.*, No. 21-cv-00776-EMC |
| 4/28/2022 | Candy L. Potter, RMR, CRR | Transcript of Zoom hearing on Motions to Dismiss on 4/28/2022 |
| 3/10/2023 | Veritext | Video Services and Electronic Access for deposition of K. Peony Yu, M.D. |
| 3/10/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of K. Peony Yu, M.D. |
| 4/4/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of Chad Coffman |
| 4/11/2023 | Veritext | Video Services and Electronic Access for deposition of David Jude Sullivan (Plymouth County) |
| 4/11/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of David Jude Sullivan (Plymouth County) |
| 4/13/2023 | Veritext | Video Services and Electronic Access for deposition of David Randall (Baltimore Employees) |
| 4/13/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of David Randall (Baltimore Employees) |
| 4/18/2023 | Veritext | Video Services and Electronic Access for deposition of Christopher DiFusco (Philadelphia Pension Fund) |
| 4/18/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of Christopher DiFusco (Philadelphia Pension Fund) |
| 5/4/2023 | Veritext | Video Services and Electronic Access for deposition of Dorothy Pacini (FibroGen's 30(b)(6) Witness) |

| DATE | VENDOR | PURPOSE |
|---|---|---|
| 5/4/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of Dorothy Pacini (FibroGen's 30(b)(6) Witness) |
| 6/8/2023 | Veritext | Video Services and Electronic Access for deposition of Defendants' expert, Paul Zurek |
| 6/8/2023 | Veritext | Transcript Services, Professional Attendance, Exhibit Sharing, Virtual Services, Realtime Services, Rough Draft, Logistics, Processing, and Electronic Files for deposition of Defendants' expert, Paul Zurek |
| 8/31/2023 | MK Litigation Solutions, Inc. | Transcript of hearing on Motion for Class Certification and Motion for Spoliation Sanctions on 8/31/2023 |

**EXHIBIT E-5**

*In re FibroGen, Inc., Securities Litigation*
**Case No. 3:21-cv-02623-EMC**

**Saxena White P.A.**

**Litigation Travel Information**

| NAME | DATE | DESTINATION | PURPOSE |
|---|---|---|---|
| Kaplan, David; Emily Bishop | 3/9/2023 - 3/10/2023 | San Francisco, CA | Deposition of K. Peony Yu |
| Kaplan, David; White, III, Joseph; Grant, Kyla; Hooker, Lester; Singer, Steven | 3/13/2023 - 3/15/2023 | San Francisco, CA | Mediation |
| Kaplan, David | 3/29/2023 - 4/5/2023 | Chicago, IL | Preparation for and defending deposition of Chad Coffman, Plaintiffs' expert |
| Hooker, Lester | 4/05/2023 - 4/07/2023 | Baltimore, MD | Preparation for deposition of Employees' Retirement System of the City of Baltimore |
| Hooker, Lester | 4/10/2023 - 4/12/2023 | Boston, MA | Preparation for and defending deposition of Plymouth County Retirement Association |
| Hooker, Lester | 4/12/2023 - 4/14/2023 | Baltimore, MD | Preparation for and defending deposition of Employees' Retirement System of the City of Baltimore |
| Hooker, Lester; Saxena, Maya | 4/16/2023 - 4/18/2023 | Philadelphia, PA | Preparation for and defending deposition of City of Philadelphia Board of Pensions and Retirement |

**EXHIBIT E-6**

*In re FibroGen, Inc., Securities Litigation*
Case No. 3:21-cv-02623-EMC

**Saxena White P.A.**
**Firm Resume**



# SAXENA WHITE

"A highly experienced
group of lawyers

with national reputations in large securities class actions..."

*- Hon. Alan Gold, U.S. District Court, Southern District of Florida*

## FIRM RESUME

FLORIDA  I  NEW YORK  I  CALIFORNIA  I  DELAWARE

www.saxenawhite.com



## SAXENA WHITE

Saxena White P.A. was founded in 2006 by Maya Saxena and Joseph White. After spending many years at one of the country's largest class action law firms, we wanted to do business a different way. Our goal in forming the Firm was to become big enough to handle prominent and complex litigation while remaining small enough to offer each client responsive, ethical, and personalized service.

Today our Firm's capabilities exceed those of our largest competitors. We obtain victories against major corporations represented by the nation's top defense firms. We represent some of the largest pension funds in major securities fraud cases and have recovered billions of dollars on behalf of injured investors. We have succeeded in improving how corporations do business by requiring the implementation of significant corporate governance reforms. We have formed long-lasting relationships with our clients who know we are only a phone call away. However, the most important attribute of the Firm, and the key to its continued success, is the people. Saxena White was built upon the quality, integrity, and camaraderie, of its people — attributes that continue to be its greatest legacy.

### *What Makes us Different?*

- *We are proud to be a nationally certified woman- and minority-owned securities litigation firm specializing in representing institutional investors.*

- *We take a selective approach to litigation, recommending only a few fraud cases per year and litigating them aggressively.*

- *The securities fraud cases in which we have served as lead counsel are rarely dismissed due to our careful selection criteria.*

- *We offer tailored portfolio monitoring services to our clients that reflect their individual philosophies toward litigation.*

- *We emphasize community outreach and welcome opportunities to support our clients in their communities.*



## NOTABLE RECOVERIES

### ▪ *In re Wells Fargo & Company Shareholder Derivative Litigation*

This landmark case alleged that the Board and executive management of Wells Fargo & Company knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' consent, in an attempt to drive up "cross selling," i.e., selling complementary Wells Fargo banking products to prospective or existing customers.

Over significant competition from the top law firms in our industry, the court selected Saxena White as one of the two firms most qualified in the nation to lead this high-profile case, noting the superior quality of the work performed. Through this shareholder derivative action, Saxena White held Defendants accountable for a scandal that has significantly damaged one of America's largest financial institutions.

Saxena White zealously advocated for the interests of the company and obtained excellent results. After a thorough investigation of the relevant claims; the filing of a detailed complaint; successfully defeating two motions to dismiss; active intervention in, stays of, and dismissals of multiple state court actions; consolidation and coordination with related federal actions; extensive review of over 3.5 million pages of documents; and consultation with experts, a $240 million settlement was reached in this derivative action. The settlement included the $240 million cash payment from Defendants' insurers – which at the time was the largest insurance-funded monetary component of any shareholder derivative settlement.

In approving this historic settlement, the court remarked that "this represents an excellent result for the shareholders" of Wells Fargo. The court noted "the risk" that Saxena White "took in litigation on a contingency basis – a risk they have borne for more than three years."

### ▪ *In re Wilmington Trust Securities Litigation*

This historic $210 million recovery was the culmination of eight years of hard-fought litigation against Wilmington Trust. Our investigation revealed rampant misconduct related to Wilmington Trust's loan underwriting practices, its manipulation of the asset review process, and its violations of numerous accounting practices and standards, all designed to conceal the bank's true financial state.

Following extensive briefing and discovery, the court certified a class, and in doing so, created important precedent for aggrieved shareholders nationwide who have fallen victim to securities fraud. The court's opinion rejected Defendants' argument that the Supreme Court's opinion in Comcast Corp. v. Behrend, 569 U.S. 27 (2013) requires plaintiffs to submit a damages methodology and model at the class certification stage. Having defeated an argument that securities fraud defendants frequently relied upon to avoid liability for their illegal actions, Saxena White's precedent-setting efforts provided investors with a powerful weapon for combatting corporate wrongdoing at the class certification stage. In addition to certifying the class, the court applauded Saxena White's "excellent lawyers" and noted that Ms. Saxena's "argument was very well argued."

The Firm embarked on a monumental discovery effort, closely reviewing and analyzing nearly 13 million pages of documents. After two years of hard-fought motion practice, we successfully compelled the Federal Reserve and the Office of the Comptroller of the Currency to waive the bank examination privilege for over 35,000 documents that those regulators had withheld. Compelling the production of such documents was a rare feat and was the culmination of a multi-year effort to relentlessly fight for the information and facts that were relevant to the prosecution of the case. We also prevailed over the U.S. Attorney's Office,

successfully moving to lift the discovery stay imposed at its request. As a result, we were able to depose key fact witnesses. In all, we deposed 39 witnesses in seven states, which generated nearly 11,000 pages of testimony and almost 900 exhibits.

This remarkable settlement resulted in a recovery of nearly 40% of the class's maximum likely recoverable damages, eight times greater than the 5% median recovery in the Third Circuit in 2018. At the time of settlement, the recovery ranked among the top ten securities fraud settlements in the Third Circuit, and was in the top 5% of all securities fraud settlements since the PSLRA was enacted in 1995. Notably, the court twice observed that Saxena White achieved the recovery independently of the Government's criminal investigation. The court was also complimentary of the "legal prowess" exhibited by Saxena White's "highly experienced attorneys."

### ■ *Employees Retirement System of the City of St. Louis v. Charles E. Jones (FirstEnergy Corp. Derivative Litigation)*

Saxena White secured a landmark settlement of a shareholder derivative action against utility company FirstEnergy Corp.'s board of directors and certain officers, which included a cash payment of $180 million and unprecedented corporate governance reforms. At the time of settlement, the $180 million recovery represented the largest shareholder derivative recovery in the history of the Sixth Circuit and was among the highest derivative recoveries ever achieved, in any forum, in the history of the U.S.

The action alleged that FirstEnergy's board of directors failed to properly oversee the company's corporate political activities, allowing FirstEnergy personnel and lobbyists to bribe elected officials with over $60 million in corporate funds. Commenting on the indictments, which made national headlines, the U.S. Attorney called this illicit political spending "likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio." Saxena White aggressively pursued the derivative litigation, which spanned multiple trial courts and the U.S. Court of Appeals for the Sixth Circuit.

In addition to the $180 million monetary recovery, FirstEnergy agreed to implement unprecedented corporate governance reforms, including the departures of six defendants from the company's board of directors. The settlement also required the board to enact new reforms designed to ensure that the company's political and lobbying activities comply with the law. In approving the settlement, the federal court overseeing the litigation stated that the litigation team was "at the top of their class nationally" and noted that the reforms achieved by Saxena White were broader and more comprehensive than even those reforms imposed on the company by the Department of Justice.

### ■ *Peace Officers' Annuity and Benefit Fund of Georgia v. DaVita Inc.*

After four years of complex litigation, Saxena White secured an outstanding recovery of $135 million. At the time of settlement, the $135 million recovery represented the second largest all-cash securities class action recovery ever obtained in the District of Colorado, ranking among the Tenth Circuit's top five securities fraud class action recoveries in history. This settlement also ranked as the third largest North American securities class action settlement of 2021. Additionally, the settlement amount consisted not only of the proceeds from Defendants' insurance tower, but also included a substantial monetary contribution from DaVita—a rare occurrence in securities class actions that underscores the exceptional nature of the recovery and the tenacity of Saxena White in achieving it.

Before agreeing to settle the case against DaVita, Saxena White undertook extensive efforts to advance the class's claims and to ensure that Plaintiffs were in a position to maximize their recovery. Significantly,



Saxena White not only initiated this action by filing the initial complaint, but the Firm also filed the only leadership application at the lead plaintiff stage—a rare occurrence in these types of cases, where the PSLRA specifically requires publication of notice of the lead plaintiff deadline, typically resulting in multiple lead plaintiff applications. Thus, absent the efforts of Saxena White, it is almost certain that settlement class members would have recovered nothing for their claims.

### ▪ In re Novo Nordisk Securities Litigation

Saxena White represented Co-Lead Plaintiff Employees' Pension Plan of the City of Clearwater in a securities class action against Novo Nordisk A/S and several of its top executives, which resulted in a $100 million settlement for the class—the eighth largest shareholder class action settlement of 2022.

The complaint alleged that Novo Nordisk, a global healthcare company and one of three diabetes-drug producers that dominated the U.S. and global insulin market, defrauded investors by falsely attributing its revenues and growth to purported innovation and product-specific qualities. According to the complaint, however, Novo's financial results were driven by a scheme in which the company paid increasingly large kickbacks to pharmacy benefit managers in exchange for market access, while Novo raised list prices for its drugs in lockstep with its competitors in order to support the ever-growing kickbacks.

The $100 million settlement followed more than four years of litigation, including the review of over five million pages of documents, over 40 depositions, and extensive summary judgment briefing.

### ▪ In re Lehman Brothers Equity/Debt Securities Litigation

After conducting an extensive investigation into Lehman Brothers and its executives, Saxena White was the first firm to file a complaint alleging violations of the federal securities laws. Subsequent events, including the largest bankruptcy filing in U.S. history, interjected unique challenges to prosecuting this case – not the least of which was that because Lehman itself was in bankruptcy, damaged shareholders could not recover damages from it.

Despite these formidable obstacles, we continued to prosecute the case. Our efforts paid off. In the spring of 2012, the court approved a $90 million partial settlement with Lehman's senior executives and directors, and a $426 million settlement with several dozen underwriters of its securities. After nearly two more years of hard-fought litigation, we reached a $99 million settlement with Ernst & Young, Lehman's outside auditor, which was approved in the spring of 2014. The $99 million settlement ranks among the largest ever obtained from an outside auditor and is an outstanding recovery for damaged shareholders.

### ▪ Fulton County Employees Retirement System, derivatively on behalf of The Goldman Sachs Group, Inc. v. Blankfein

The settlement of this action by Saxena White was the culmination of more than three years of litigation on what courts across the country have noted is "possibly the most difficult legal theory in corporation law upon which a plaintiff might hope to win a judgment."

Saxena White initiated this shareholder derivative action against current and former directors and officers of Goldman Sachs in connection with a corporate scandal and criminal conspiracy involving the Malaysian sovereign wealth fund 1MDB, for which Goldman affiliates underwrote three bond issuances in 2012 and 2013. Saxena White sought to hold Goldman's board of directors accountable for breaching their fiduciary duties by disregarding these red flags and by failing to implement appropriate internal controls and reporting

S
W

systems. Multiple criminal and civil actions were filed against Goldman across the globe, resulting in billions in fines, penalties, and disgorgement.

Saxena White obtained a $79.5 million cash payment from Defendants' insurers, which at the time of settlement, represented the second largest derivative settlement in Second Circuit history and ranked among the top 20 such settlements ever. Plaintiff not only obtained this extraordinary cash recovery for Goldman, but it also negotiated the requirement that these funds be used solely for compliance purposes. As the Court noted in its preliminary approval order, "[t]his [requirement] is particularly significant because the gravamen of Plaintiff's allegations argue that the transactions would not have occurred had Goldman's compliance and controls been more robust and detected the highly suspicious deals and their terms." In addition, Saxena White secured significant corporate governance reforms aimed at strengthening compliance at Goldman, which the court noted "would likely be unachievable" had this case continued to trial.

### ■ *In re Rayonier Inc. Securities Litigation*

Saxena White prosecuted this class action against Rayonier for allegedly misleading investors about its timber inventory and harvesting rates in the Pacific Northwest. When the company's new management ultimately disclosed that Rayonier had overharvested its premium Pacific Northwest timberlands by over 40% each year for over a decade and overstated its merchantable timber by 20% in this critical region, the company's stock price declined significantly, causing investors substantial losses.

After litigating this case for nearly three years and defeating Defendants' motion to dismiss, Saxena White negotiated a $73 million cash settlement on behalf of the class, which at the time of settlement, resulted in the second largest recovery from a securities class action achieved in the Middle District of Florida. The $73 million settlement was nearly nine times the national median settlement and nearly ten times greater than the median recovery in the Eleventh Circuit. As noted by Judge Timothy J. Corrigan, this was an "exceptional result[] achieved for the benefit of the Settlement Class."

### ■ *In re Jefferies Group, Inc. Shareholders Litigation*

The settlement of this action was one of the largest merger-related settlements in the Delaware Court of Chancery. Specifically, this shareholder class action involved the merger of investment bank Jefferies Group, Inc. with holding company Leucadia National Corporation. As alleged in the complaint, Jefferies' CEO leveraged his relationship with Leucadia's founders—who were nearing retirement and who served on Jefferies' board of directors—to merge with the larger company and take over as CEO of the combined corporation. Negotiating in secret for months before informing the independent board members, Chairman Handler and Leucadia's founders structured a deal that greatly benefitted Leucadia, to the detriment of Jefferies shareholders.

After aggressively litigating this case and defeating Defendants' motion to dismiss and motion for summary judgment, the firm ultimately negotiated a settlement that required Leucadia to pay $70 million to class members, an outstanding result for former Jefferies shareholders.

### ■ *Plymouth County Retirement System v. Patterson Companies, Inc.*

Saxena White secured a $63 million recovery against dental supplier Patterson Companies, Inc., which was the product of a significant effort on many fronts, including: drafting a 94-page amended complaint, surviving defendants' motion to dismiss, fully briefing class certification to a victorious outcome, reviewing several hundred thousand pages of documents, taking or defending more than three dozen depositions, engaging in



significant expert discovery, opposing defendants' motion for summary judgment, and preparing for trial. In its decision to grant class certification, the court specifically lauded Saxena White as "experienced in leading large securities class actions and hav[ing] obtained substantial recoveries for plaintiffs in such lawsuits," as well as having "demonstrated diligence and expertise in their work in this case."

Notably, at the time of the settlement's final approval, the $63 million recovery ranked among the top ten of all settlements ever achieved in a securities class action in the District of Minnesota, the largest securities class action settlement in that District since 2012, and the third largest securities class action settlement in the Eighth Circuit over the past 10 years.

### In re Bank of America Corp. Securities, Derivative and ERISA Litigation

This derivative case arose out of Bank of America's acquisition of Merrill Lynch during the height of the financial crisis in late 2008. After successfully defending the complaint's core allegations against multiple motions to dismiss, Saxena White embarked on an extensive discovery process that included 31 depositions of senior BofA and Merrill executives and their attorneys, the review and analysis of 3 million pages of documents from BofA, Merrill, and multiple third parties, and close consultation with nationally- recognized financial and economic experts.

The settlement included a $62.5 million cash component and fundamental corporate governance reforms. The extensive corporate governance reforms included the creation of a Board-level committee tasked with special oversight of mergers and acquisitions, aimed at preventing the alleged deficiencies surrounding the Merrill Lynch acquisition. The corporate governance reforms also involved other components, including revisions to committee charters and director education requirements, which caused one noted scholar to observe that as a result, BofA was at the forefront of corporate governance practices.

### Central Laborers' Pension Fund v. SIRVA, Inc.

After two and a half years of hard-fought litigation, an extensive investigation that involved conducting nearly 120 witness interviews across North America and Europe, and the review of approximately 2.7 million documents produced by defendants, Saxena White achieved a $53.3 million settlement for shareholders of SIRVA, a then-giant among moving companies. According to the complaint, SIRVA had serious and systemic problems in its European operations, its network services segment was materially under reserved, and defendants were allegedly using the reserves and other accounting manipulations to manage SIRVA's earnings and meet SIRVA's estimates.

In addition to the significant $53.3 million cash recovery, the corporate governance changes brought about as a result of the settlement achieved by Saxena White provided considerable additional value for SIRVA shareholders. The company formally recognized, in writing, that the lawsuit was one of the main reasons it reformed its governance standards, which confirmed that Saxena White was the key catalyst compelling SIRVA to recognize the need to change the way it conducted business.

In addition, Saxena White obtained even more governance improvements by convincing SIRVA's Board to discard their plurality (or cumulative) standard for the election of their directors in favor of a modified majority standard. This important change improved director accountability by forcing directors who do not receive a majority of the votes to tender their resignation for the Board's consideration. Furthermore, SIRVA also agreed to strengthen its requirements regarding director attendance at shareholder meetings, which created more director accountability and increased shareholder input. Importantly, judges are unable to order these types of governance changes – it was only the negotiation and litigation pressures that we imposed upon the company that enabled the implementation of these changes.



### John Cumming v. Wesley R. Edens (New Senior Investment Group)

Described as a "landmark" settlement by *Law360*, in 2019, the Delaware Court of Chancery approved a $53 million settlement in a shareholder derivative action against real estate investment trust New Senior Investment Group. The suit targeted New Senior's $640 million acquisition of a portfolio of senior living properties owned by an affiliate of its investment manager, which, according to Plaintiff's experts, damaged New Senior by over $100 million. At the time, the settlement represented the largest derivative action settlement as a percentage of market capitalization in Delaware and one of the top ten derivative action settlements in the history of the Court of Chancery.

The Firm's extensive discovery efforts in the case included the review of more than 800,000 pages of documents, 16 depositions, and the filing of six motions to compel. After extensive negotiations, the parties agreed to settle the litigation in exchange for the payment of $53 million in cash to New Senior. The settlement also included valuable corporate governance reforms, including the board's agreement to approve and submit to New Senior's stockholders for adoption at the annual meeting amendments to New Senior's bylaws and certificate of incorporation, which would (a) provide that directors be elected by a majority of the votes cast in any uncontested election of directors, and (b) eliminate New Senior's staggered board, so that all directors are elected on an annual basis.

In his remarks at the final settlement hearing, Vice-Chancellor Joseph R. Slights called the settlement "impressive" and further described counsel's efforts as "hard fought, but fought in the right way to reach a productive result."

### In re HD Supply Holdings, Inc. Securities Litigation

Saxena White engaged in extensive litigation efforts against HD Supply, one of the largest commercial distributors in the country. This action was based on allegations that defendants falsely assured investors that HD Supply had successfully recovered from a massive supply chain breakdown that crippled the company's operations in the months leading up to the class period. Defendants' alleged scheme enabled HD Supply's President and Chief Executive Officer to liquidate virtually his entire stake in the company over just five trading days at prices near the class period high, for a staggering haul of over $53 million. Significantly, as a result of the filing of the complaint, the SEC subsequently commenced an investigation into HD Supply's then-CEO's alleged insider trading.

Ultimately, the parties participated in settlement negotiations through which Plaintiffs obtained a $50 million cash settlement on behalf of the class – one of the largest securities class action settlements ever achieved in the U.S. District Court for the Northern District of Georgia.

### In re AmTrust Financial Services, Inc. Stockholder Litigation

Saxena White's litigation against AmTrust and its board of directors proceeded for over four years, beginning with a shareholder derivative action filed in the U.S. District Court for the District of Delaware related to the company's allegedly fraudulent accounting practices. When the company's controlling shareholder family announced a plan to take the company private—which threatened the Plaintiffs' standing in the shareholder derivative action—Saxena White investigated the proposed take-private deal and found numerous improprieties.

Following that investigation, Saxena White filed a shareholder class action in the Delaware Court of Chancery, defeated Defendants' motions to dismiss, and ultimately negotiated a $40 million settlement.

### ▪ *City Pension Fund for Firefighters and Police Officers in the City of Miami Beach v. Aracruz Celulose S.A.*

One of our Firm's areas of expertise is litigating cases against foreign corporations. We obtained a significant victory against Brazilian corporation Aracruz Celulose. Accomplishing what no other law firm had ever done, Saxena White successfully served process on all three individual executives under the Inter-American Convention on Letters Rogatory. Our efforts included working closely with a Brazilian law firm to defeat Defendants' challenges to service in both the Brazilian trial and appellate courts.

After defeating three motions to dismiss filed by the foreign Defendants, Saxena White began the massive and highly technical discovery process. Because the vast majority of the documents were in Portuguese, we hired native Brazilian attorneys to analyze and translate the tens of thousands of documents that were produced. These documents were also incredibly complex, dealing with five dozen separate financial derivative instruments. Simply valuing one instrument required approximately 50,000 calculations. We consulted closely with highly respected industry and academic experts to gain an unprecedented understanding of the workings of these instruments and how they were valued.

In the end, our hard work paid off. Saxena White successfully negotiated a $37.5 million settlement against Aracruz and its executives. This represented up to 50% of the maximum provable damages – an outstanding result compared to the average national recovery in cases of this magnitude.

### ▪ *City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. (Covetrus, Inc.)*

Saxena White secured a $35 million recovery for Covetrus Inc. shareholders, that, at the time of settlement, was among the Eastern District of New York's top ten securities fraud class action recoveries in history and the second largest securities class action settlement achieved in the Eastern District of New York in over a decade.

Covetrus – a distributor of veterinarian products and software – was created as a result of a major spin-off and merger in the animal health industry. The complaint alleged that throughout the class period, defendants materially misled investors regarding the status of its crucial merger integration process and corresponding financial health. When Covetrus's true condition was revealed, investors lost over $1 billion, and the company's CEO and CFO were ousted.

Saxena White vigorously prosecuted this action from the outset, conducting a thorough pre-filing investigation of the claims in this matter and initiating the action on behalf of the class. The Firm's efforts resulted in a $35 million settlement for the company's shareholders.

### ▪ *In re Perrigo Company plc Securities Litigation*

This action alleged that Perrigo Company plc, a global pharmaceutical company, headquartered in Michigan but domiciled in Ireland for tax reasons, misrepresented its potential tax liability in connection with the sale of its sole remaining core asset—a 50% stake in its multiple sclerosis flagship drug—for $3.25 billion plus contingent royalty payments.

Saxena White engaged in extensive fact discovery, including depositions that spanned two continents. Ultimately, the Firm secured an excellent recovery of $31.9 million on behalf of the settlement class, representing 22.5% of estimated maximum recoverable damages. This recovery would not have been achieved without two crucial evidentiary rulings won by Saxena White resulting in (1) the Court granting Plaintiffs' motion to compel the production of thousands of documents related to an advice-of-counsel defense and withheld by

Perrigo, and (2) the Court granting Plaintiffs' motion to preclude Perrigo's accounting expert from testifying. These two victories required aggressive and innovative legal advocacy, enabling Saxena White to obtain summary judgment—rare in securities litigation—on the key elements of falsity and materiality. Saxena White was prepared to proceed to trial with the case set on the Court's calendar for October 2021, when it successfully negotiated the settlement.

### ■ *Milbeck v. TrueCar*

Saxena White engaged in extensive litigation efforts on an exceptionally expedited case schedule, including defeating Defendants' motion to dismiss, reviewing over 200,000 documents produced by Defendants, and obtaining class certification. Thereafter, the parties participated in negotiations through which Saxena White ultimately obtained a $28.25 million cash settlement on behalf of the class.

TrueCar is an online car buying service that purports to provide consumers with the "true" price, or market price, for new and used cars. The settlement resolved allegations that the company and its senior executives misled investors about TrueCar's business and relationship with its most significant business partner, United States Automobile Association (USAA), which accounted for nearly one-third of TrueCar's annual revenues.

### ■ *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds v. Brixmor Property Group, Inc.*

Brixmor Property Group is a real estate investment trust that operates a wholly-owned portfolio of shopping centers across the country. This action alleged that Defendants purposefully falsified Brixmor's income for over two years to portray consistent quarterly same property net operating income growth; the company lacked adequate internal and financial controls; and as a result, Defendants' class period statements about Brixmor's business, operations, and prospects were false and misleading.

Saxena White obtained a $28 million settlement of this action. Significantly, the settlement embodied the Second Circuit's directive to promote "efficient prosecution and early resolution," as it secured an immediate and meaningful benefit for shareholders that avoided the risk, delay, and expense inherent in years of litigation, as it was achieved during the motion to dismiss stage.

### ■ *In re Sadia S.A. Securities Litigation*

Saxena White reached a $27 million settlement against Sadia, a Brazilian company specializing in poultry and frozen goods that exported a majority of its products. The company engaged in wildly speculative currency hedging while telling investors that its hedges were conservative and used to protect against sudden changes in currency fluctuation. Plaintiffs filed a securities fraud complaint against Sadia and its senior executives and Board members alleging violations of the federal securities laws. Because the individual Defendants in this case were also citizens of Brazil, they had to be served pursuant to the Inter-American Convention on Letters Rogatory. We successfully served the individuals, once again accomplishing what few other law firms have been able to do.

We prevailed on the motion to dismiss and on the motion for class certification. Discovery was greatly complicated by the fact that the vast majority of the documents were in Portuguese, and the Court had no subpoena power to force witnesses to appear for deposition. Despite these hurdles, we hired attorneys fluent in Portuguese to help us with the review and we were able to depose one of the company's executives.



### ▪ *Plymouth County Retirement System v. GTT Communications, Inc.*

In April 2021, a $25 million settlement was approved in this securities class action filed against a cloud networking company and four of its executives. Saxena White engaged in significant litigation efforts against GTT, including: drafting the initial complaint, an 88-page amended complaint, and a second, 115-page amended complaint incorporating newly uncovered accounting fraud claims; fully defeating defendants' motion to dismiss; reviewing over 400,000 pages of documents; obtaining certification of the class; and engaging in extensive expert discovery, including the submission of a detailed report by plaintiff's expert on loss causation and damages.

Saxena White was able to secure the $25 million recovery despite a rapidly dwindling D&O insurance tower and significant ability to pay issues stemming from GTT's financial distress (GTT would later declare bankruptcy and was delisted by the New York Stock Exchange). The court concluded that Saxena White had "conducted the litigation and achieved the [s]ettlement with skill, perseverance and diligent advocacy, and with considerable challenges from formidable opposition."

### ▪ *Plymouth County Retirement System v. Evolent Health, Inc.*

After three years of vigorous litigation, Saxena White obtained an excellent recovery of $23.5 million on behalf of the settlement class. This litigation concerned the partnership between Evolent, a provider of technology-enabled clinical and administrative services to health systems, and Passport Health Plan, a Kentucky-based non-profit Medicaid plan that represented as much as 20% of Evolent's annual revenues.

Saxena White's extensive efforts to obtain documents from Kentucky via open records requests led to our uncovering of critical, non-public documents supporting Plaintiffs' claims, including, *inter alia*, a series of letters assessing significant penalties against Passport as a result of Evolent's claims-processing failures. Moreover, Saxena White successfully amended the operative complaint to incorporate allegations based on information provided by a new confidential witness—a high ranking former Passport executive—that were critical to surviving Defendants' motion to dismiss. The Court's finding of scienter expressly hinged on the penalty letters and the facts provided by this confidential witness. Later, following an intensive review of Defendants' document productions, the Firm filed a Third Amended Complaint incorporating new allegations from some of these documents, and successfully defeated another motion to dismiss, thereby nearly doubling the length of the operative class period and significantly increasing the settlement class's maximum recoverable damages. Without these specific efforts, any recovery would have been far less.

### ▪ *In re Merit Medical Systems, Inc. Securities Litigation*

Through its effective advocacy, Saxena White achieved an $18.25 million settlement for the benefit of the class in this securities class action against Merit Medical Systems Inc. The settlement represents a substantial recovery of up to 55% of the settlement class's maximum realistic trial damages.

Merit is a medical device company that historically acquired companies that created "medical accessory" products, and in recent years began to acquire companies that create therapeutic devices. Merit announced its acquisition of Cianna, a company that sells SCOUT, a therapeutic device designed to treat breast cancer, for $200 million. Subsequently, Merit announced its acquisition of Vascular Insights, along with its product line ClariVein, which is marketed to treat varicose veins, for $60 million. The complaint alleged, generally, that Defendants made false statements regarding Merit's acquisitions of Cianna and ClariVein.



### ▪ *Teamsters Local 456 Pension Fund v. Universal Health Services, Inc.*

Saxena White's $17.5 million settlement with Universal Health Services, Inc., an owner and operator of health care facilities, was especially noteworthy considering that the action had been dismissed with prejudice by the U.S. District Court for the Eastern District of Pennsylvania twice and was on appeal to the Third Circuit Court of Appeals at the time of the settlement.

The case involved a disturbing fact pattern first reported by *Buzzfeed News*, whereby UHS allegedly engaged in a scheme to increase its bottom line by coaxing unwitting patients through its doors, manipulating and fabricating patient testimonials to make them appear dangerous to themselves or others, and then admitting them into the company's facilities—often involuntarily—for as many days as their insurance would provide reimbursement.

Notably, the $17.5 million settlement was more than double the inflation-adjusted median for securities class action settlements in the Third Circuit from 2011 through 2020.

### ▪ *City of Birmingham Retirement and Relief System v. Credit Suisse Group AG*

After more than two and a half years of litigation, Saxena White achieved a $15.5 million settlement for the class. The settlement represented up to 63% of the class's maximum estimated damages—a rate 11 to 30 times greater than the 2.1% median recovery for securities class actions in 2019. Lead Plaintiffs' claims centered on Credit Suisse's alleged misrepresentations related to the company's "binding" risk limits, which were alleged to have been raised to accommodate growing exposure to highly risky and illiquid positions in its fixed-income franchise. The company's alleged violations of its own risk control and risk-limit policies allegedly allowed Credit Suisse to amass $4.3 billion in exposure to these investments, which included collateralized loan obligations and distressed debt instruments. These securities, which were difficult to liquidate and consumed substantial amounts of regulatory capital, allegedly made the company susceptible to enormous losses in the volatile credit markets. Credit Suisse ultimately incurred over $1 billion in losses from these investments, the announcement of which allegedly led to a decline in the price of the company's ADRs.

### ▪ *Fernandez v. Knight Capital Group, Inc.*

Saxena White achieved a $13 million settlement on behalf of Knight Capital Group investors. As a result of the company's lack of internal controls and risk management practices, on August 1, 2012, the company accumulated an unintended market position of $7 billion worth of securities in the span of 45 minutes.

Notably, in approving the settlement, Judge Arleo of the District of New Jersey stated: "I look at the skill and efficiency of counsel. There are many lawyers that wouldn't touch this case or couldn't touch this case, didn't have the skill or expertise. Lead counsel here are national experts in the field of securities and complex litigation, and I am satisfied that their personal skill and efforts were the large reason why this case was able to settle on such favorable terms." Judge Arleo continued her praise of Saxena White's efforts in obtaining the settlement: "There were many complex issues attendant to this case, as in many security fraud cases, including scienter, including inflation damages, **et cetera**, and there's no question that we have skilled counsel on the defense end, and I think they met their match with Plaintiff's counsel, and their strong reputation for excellence also is not lost on this Court."

### ▪ *Julian Keippel v. Health Insurance Innovations, Inc.*

In this securities fraud class action, Saxena White asserted that health insurer Health Insurance Innovations, Inc. (HIIQ) and several of its top executives made false statements related to its compliance standards and

its level of customer complaints. An enforcement action by the FTC and related federal court receivership proceedings revealed that HIIQ's most lucrative call center, called "Simple Health"—which was responsible for as much as 50% of the company's revenue—was "a classic bait-and-switch scam whereby unwitting consumers were falsely led to believe that they were purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality were sold limited benefit indemnity plans that are not compliant with the ACA." In response to the FTC's action, HIIQ's stock price suffered steep declines, dropping more than 60% over six months.

After extensive litigation efforts, including the review and analysis of over 1.9 million pages of documents and several depositions, Saxena White secured an $11 million settlement on behalf of damaged investors.

### ■ *FindWhat Investor Group v. FindWhat.com.*

Saxena White has significant appellate experience. In this Eleventh Circuit appeal, we won a precedent-setting opinion: the court held that corporations and their executives who make fraudulent statements that prevent artificial inflation in a company's stock price from dissipating are just as liable under the securities laws as those whose fraudulent statements introduce artificial inflation into the stock price in the first place. The Eleventh Circuit rejected Defendants' position that the mere repetition of lies already transmitted to the market cannot damage investors. "We decline to erect a per se rule," wrote the court, that "once a market is already misinformed about a particular truth, corporations are free to knowingly and intentionally reinforce material misconceptions by repeating falsehoods with impunity."

The Eleventh Circuit's opinion is a significant win for aggrieved investors – the first such ruling from any of the Courts of Appeals in the nation, and it will continue to help defrauded investors seeking to recover damages due to fraud.

### ■ *In re Clear Channel Outdoor Holdings, Inc. Derivative Litigation*

Saxena White filed a derivative action on behalf of outdoor advertising company Clear Channel Outdoor Holdings ("Outdoor") against its majority stockholder, Clear Channel Communications, Inc. ("CCC"), certain current and former Outdoor directors, and other entities concerning a $1 billion unsecured loan by Outdoor to CCC. The action asserted that Outdoor's directors breached their fiduciary duties by approving the loan to its controlling stockholder on terms so favorable to CCC that no rational third party would have ever agreed to such terms. In response to Plaintiffs' action, the company's board of directors established a Special Litigation Committee (the "SLC") to investigate the claims.

After its investigation, the SLC engaged with Plaintiffs and certain Defendants to explore the prospects of settlement. After several months of working with the SLC, the parties reached a settlement providing that Outdoor would demand immediate repayment of $200 million outstanding under the loan, which Outdoor would then immediately pay out in dividends to its shareholders. The settlement also provided significant governance and procedural protections that allowed Outdoor's independent directors to more effectively monitor the loan and prevent uncontrolled growth in its balance.

### ■ *In re Palantir Technologies Class F Stock Litigation*

On March 31, 2021, Saxena White commenced direct class action litigation on behalf of Palantir Technologies Inc. stockholders in the Delaware Court of Chancery against the company and its three founder-directors, with our client alleging that the company's novel dual-class stock structure untethered the founders' voting power from their equity ownership. Specifically, the founders were given exclusive ownership over the



company's Class F stock, which gave them 49.999999% of the vote irrespective of the amount of stock they owned.

Following extensive litigation efforts, we secured a settlement that institutes numerous corporate reforms geared towards increased transparency in the company's corporate elections and towards limiting the founders' ability to use the Class F stock to force through significant corporate actions without an independent check. Among other measures, corporate actions that bring a personal benefit to the founders must now be approved by independent directors and/or a vote of the company's unaffiliated public shareholders. The settlement was approved by the Delaware Court of Chancery in September 2022.

■ *International Union of Operating Engineers of Eastern Pennsylvania and Delaware v. Ressler (J2 Global, Inc.)*

In this shareholder derivative action, Saxena White secured a settlement that relieved J2 Global, Inc. from paying over $86 million in future management fees and capital contributions in connection with a related party transaction.

Following an extensive books-and-records investigation, Saxena White worked closely with a Special Committee formed by J2. The result of these efforts was a settlement effectively relieving J2 of its obligation to pay any additional management fees or capital contributions to the allegedly conflicted investment fund, retaining for the company a combined total of more than $86 million that would otherwise have been contributed. The settlement also included a valuable corporate governance reform through a new policy that requires any future transactions with J2's chairman or his affiliates to be subjected to independent committee approval.



## SHAREHOLDERS & DIRECTORS



### MAYA SAXENA

Widely recognized as one of the nation's top securities litigators, Maya Saxena, Co-Founder of Saxena White P.A., has accomplished something remarkable. Under her direct leadership, since its founding in 2006, Ms. Saxena has grown the Firm into a national powerhouse. Instrumental in recovering billions of dollars on behalf of investors, Ms. Saxena has led trial teams in numerous major securities and shareholder actions and protected shareholders by prosecuting important corporate governance actions and obtaining meaningful reforms. Having built one of the nation's only woman- and minority-owned securities class action firms representing institutional investors, her emphasis on diversity and inclusion has become a model for the legal industry.

Ms. Saxena has been practicing exclusively in the securities litigation field for nearly 25 years, representing institutional investors in shareholder actions involving breaches of fiduciary duty and violations of the federal securities laws. Recently, Ms. Saxena played a key role in obtaining a $240 million settlement on behalf of Wells Fargo & Company. The cash payment from Defendants' insurers represents one of the largest insurance-funded monetary components of any shareholder derivative settlement. Ms. Saxena also led the litigation team that recovered $210 million from Wilmington Trust—one of the largest settlements in 2018. Other prominent recoveries for injured investors include: Rayonier, Inc. ($73 million settlement), SIRVA, Inc. ($53.3 million settlement), HD Supply ($50 million settlement—one of the largest ever achieved in the Northern District of Georgia), Aracruz Celulose ($37.5 million settlement), Perrigo Company plc ($31.9 million), and Sunbeam (settled with Arthur Andersen LLP for $110 million—one of the largest settlements ever with an accounting firm—and a $15 million personal contribution from former CEO Al Dunlap).

Prior to forming Saxena White, Ms. Saxena served as the Managing Partner of the Florida office of one of the nation's largest securities litigation firms, successfully directing numerous high-profile securities cases. Ms. Saxena gained valuable trial experience before entering private practice while serving as an Assistant Attorney General in Ft. Lauderdale, Florida. During her time in that role, Ms. Saxena represented the State of Florida in civil cases at the appellate and trial levels and prepared amicus curiae briefs in support of state policies at issue in state and federal courts. In addition, Ms. Saxena represented the Florida Highway Patrol and other law enforcement agencies in civil forfeiture trials.

Ms. Saxena is a frequent speaker at educational forums involving public pension funds and advises public and multi-employer pension funds on how to address fraud-related investment losses. She is an active member of the National Association of Public Pension Attorneys (NAPPA), and co-chairs its Securities Litigation Committee. As part of her professional endeavors, Ms. Saxena writes numerous articles on protecting shareholder rights, and works closely with other NAPPA members to author, update, and publish a white paper on post-Morrison international securities litigation.

For her professional achievements, Ms. Saxena is frequently recognized by top industry publications. She was named a *Law360* 2021 Securities MVP, one of only five attorneys chosen in the area. Ms. Saxena was also named a "500 Leading Plaintiff Financial Lawyer" by *Lawdragon* for the last several years. *The National Law Journal* named Ms. Saxena one of the "Elite Women in the Plaintiffs Bar" in 2023. She was recognized in the *South Florida Business Journal's* "Best of the Bar" as one of the top lawyers in South Florida and has been selected to the Florida *Super Lawyers* list for over a decade. She has also been named a Florida "Legal Elite" by *Florida Trend* magazine and a "Litigation Star" by *Benchmark Litigation.*

Ms. Saxena graduated from Syracuse University *summa cum laude* in 1993, with a dual degree in policy studies and economics, and graduated from Pepperdine University School of Law in 1996. Ms. Saxena is a member of the Florida Bar, and is admitted to practice before the United States District Courts for the Southern and Middle Districts of Florida, as well as the Fourth, Ninth, and Eleventh Circuit Court of Appeals, and the Supreme Court of the United States.



### JOSEPH E. WHITE, III

Joseph E. White, III, Co-Founder of Saxena White P.A., has represented shareholders in major securities fraud class actions and derivative actions for over 20 years. He has represented lead and representative plaintiffs in front-page cases, including actions against Wells Fargo, Bank of America, Lehman Brothers, Goldman Sachs, and Washington Mutual. He has successfully settled cases yielding billions of dollars against numerous publicly traded companies, including cases against DaVita Inc. ($135 million settlement), Goldman Sachs Group ($79.5 million case recovery – the second largest derivative settlement in Second Circuit history), Rayonier, Inc. ($73 million settlement), SIRVA, Inc. ($53.3 million settlement), and one of the largest settlements in 2018, Wilmington Trust ($210 million). Mr. White has also developed an expertise in litigating precedent-setting cases against foreign publicly traded companies, and settled two cases involving Brazilian corporations: Aracruz Celulose ($37.5 million), and Sadia, Inc. ($27 million).

Additionally, Mr. White has achieved meaningful corporate governance and monetary recoveries for shareholders in merger related and derivative lawsuits. Recently, Mr. White played an instrumental role in obtaining a $240 million settlement in *In re Wells Fargo & Company Shareholder Litigation*. The settlement included the $240 million cash payment from Defendants' insurers - representing the largest insurance-funded monetary component of any shareholder derivative settlement. In *In re Clear Channel Outdoor Holdings Derivative Litigation*, Mr. White's efforts obtained repayment of a $200 million loan from Outdoor's parent which was then paid as a special dividend to Outdoor shareholders. In addition, Mr. White has successfully settled cases that have presented important public health issues that are of serious concern across the nation, including cases against Novo Nordisk, Universal Health Services, and Patterson Companies.

Mr. White regularly lectures on topics of interest to pension trustees, and advises municipal, state, and international institutional investors on instituting effective systems to monitor and prosecute securities and related litigation. For the last several years, Mr. White has been named a "500 Leading Plaintiff Financial Lawyer" by *Lawdragon*. He was also named a Florida's "Legal Elite" by *Florida Trend* magazine, a Florida *Super Lawyers* award recipient, and has been recognized as a "Top Lawyer" by *Palm Beach Illustrated*. He is also a *Lawyers of Distinction* Certified Member.

Mr. White earned an undergraduate degree in Political Science from Tufts University before obtaining his Juris Doctor from Suffolk University School of Law.

Mr. White is a member of the Massachusetts, Florida, New York and Pennsylvania Bars. He is also admitted to the United States District Courts for the Southern, Northern, and Middle Districts of Florida, the Southern District of New York, the District of Massachusetts, the District of Colorado, the Western District of Michigan, and the Northern District of Illinois. Mr. White is also admitted to the United States Circuit Courts of Appeals for the First and Eleventh Circuits, and the Supreme Court of the United States.





### RACHEL A. AVAN

Rachel A. Avan, Director, has more than a decade of experience in securities litigation. She focuses on investigating and developing U.S. and non-U.S. securities fraud class, group, and individual actions, as well as advising institutional investors regarding alternatives for recovery for fraud-related investment losses.

Ms. Avan's analysis of new and potential matters is informed by her extensive experience as a securities litigator. Prior to joining Saxena White, Ms. Avan was of counsel at a nationally recognized securities litigation firm, where she assisted in prosecuting numerous high-profile securities class actions and corporate governance matters. She also served as a key member of the firm's case evaluation team and managed the firm's non-U.S. securities litigation practice for several years.

Ms. Avan has significant expertise analyzing the merits, risks, and benefits of potential claims outside the United States—in virtually all countries in which it is possible for injured shareholders to seek a recovery. She has played an essential role in ensuring that institutional investors receive substantial recoveries through non-U.S. securities litigation.

Ms. Avan brings valuable insight into corporate matters, having served as an associate at a corporate law firm, where she counseled domestic and international public companies regarding compliance with federal and state securities laws. Her analysis of corporate securities filings is also informed by her previous work assisting with the preparation of responses to inquiries by the U.S. Securities and Exchange Commission and the Financial Industry Regulatory Authority.

Ms. Avan has authored multiple articles relating to U.S. and non-U.S. securities litigation, which have been published in *The New York Law Journal, Financial Executive, Law360,* and *The NAPPA Report*, among other publications. For her achievements, Ms. Avan consistently has been selected as a "Rising Star" by *Super Lawyers*, a Thomson Reuters publication.

Ms. Avan earned her Juris Doctor from Benjamin N. Cardozo School of Law in 2006. She received her master's degree in English and American Literature from Boston University in 2002 and her bachelor's degree, *cum laude*, in Philosophy and English from Brandeis University in 2000. Ms. Avan is a member of the New York Bar and Connecticut Bar. She is admitted to the United States District Court for the Southern District of New York.



### THOMAS CURRY

Thomas Curry is a Director at Saxena White and manages the Firm's Delaware office and corporate governance litigation team. He represents institutional and individual investors in a wide variety of corporate governance and shareholder rights matters, with a particular focus on disputes arising under Delaware corporate law and litigation in the Delaware Court of Chancery.

Mr. Curry has played a leading role in several of the most significant corporate governance and shareholder rights matters to arise in recent years. He led the Saxena White team that litigated shareholder derivative claims on behalf of FirstEnergy Corp. in connection with a political bribery scandal, achieving a settlement that included a $180 million monetary recovery, as well as the departures of six defendants from the company's board of directors, and other wide-ranging governance reforms. The $180 million monetary recovery achieved represented the largest derivative recovery in the history of the Sixth Circuit.

In another recent shareholder derivative action, Mr. Curry led a Saxena White team that pursued claims on behalf of J2 Global, Inc. in connection with an allegedly-conflicted related party investment agreement, achieving a settlement relieving the company of obligations to pay more than $71 million in future management fees and capital contributions, and instituting a new board-level related party transactions policy. He also served as a key member of the Saxena White team that litigated shareholder derivative claims on behalf of Goldman Sachs in connection with its high-profile 1MDB scandal, achieving a settlement that included a $79.5 million monetary recovery and significant governance reforms.

Mr. Curry also maintains an active practice in matters seeking to protect shareholder voting rights. He led the Saxena White team that litigated a novel challenge to the validity of founder-entrenching voting provisions in Palantir Technologies Inc.'s certificate of incorporation, achieving a settlement reforming Palantir's voting procedures and implementing significant new governance protections designed to prevent future controller overreach at the company. Prior to joining Saxena White, Mr. Curry worked at a nationally recognized securities litigation firm.

Mr. Curry has been widely recognized for his work on behalf of investors. He was named a 2024 "Litigation Star" by *Benchmark Litigation* and a "Rising Star" by *Law360* in 2023, one of only six attorneys nationwide chosen in the area of securities law. Also in 2023, he was named a "Rising Star of the Plaintiffs Bar" by the *National Law Journal*. In both 2019 and 2020, he was recognized by *The Legal 500* as a "Rising Star" in the field of M&A litigation. He is a Board Member of the Institute for Law and Economic Policy, a policy and research educational foundation seeking to enhance consumer and investor access to the justice system.

Mr. Curry earned his Juris Doctor from Cornell Law School in 2013 and a Bachelor of Arts degree from Temple University in 2010. Mr. Curry is admitted to practice in Delaware, the United States District Court for the District of Delaware, and the United States Court of Appeals for the Sixth Circuit.



### MARISA N. DEMATO

Marisa DeMato, Director and Chief Diversity Officer, has more than 18 years of experience advising leading pension funds and other institutional investors on issues related to corporate fraud in U.S. securities markets, and provides representation in complex civil actions. Her work focuses on monitoring the well-being of institutional investments and counseling clients on best practices in corporate governance of publicly traded companies.

Prior to joining Saxena White, Ms. DeMato was a partner with a nationally recognized securities litigation firm where she represented institutional investors in shareholder litigation and achieved significant settlements on behalf of clients. She represented Seattle City Employees' Retirement System in a $90 million derivative settlement that achieved historic corporate governance reforms from Twenty-First Century Fox, Inc., following allegations of workplace harassment incidents at Fox News. Ms. DeMato also successfully represented investors in high-profile cases against LifeLock, Camping World, Rent-A-Center, and Castlight Health. In addition, Ms. DeMato was an integral member of legal teams that secured multimillion dollar securities and consumer fraud settlements, including *In re Managed Care Litigation* ($135 million recovery); *Cornwell v. Credit Suisse Group* ($70 million recovery); *Michael v. SFBC International, Inc.* ($28.5 million recovery); *Ross v. Career Education Corporation* ($27.5 million recovery); and *Village of Dolton v. Taser International Inc.* ($20 million recovery).

An accomplished speaker, Ms. DeMato has lectured on topics pertaining to securities fraud litigation, fiduciary responsibility, and corporate governance issues throughout the U.S. and Europe. Notably, Ms. DeMato has testified before the Texas House of Representatives Pensions Committee on the changing legal landscape for

17

public pensions following the Supreme Court's *Morrison* decision and best practices for non-U.S. investment recovery.

Ms. DeMato is Saxena White's Chief Diversity Officer, and one of the industry's leading advocates for institutional investing in women- and minority-owned firms. She also chairs Saxena White's Women's Alliance, which is designed to foster women-centered development and leadership in the pension, investment and legal communities. Ms. DeMato previously served as co-chair of an annual Women's Initiative Forum, which has been recognized by *Euromoney and Chambers USA* as one of the best gender diversity initiatives.

Recently, Ms. DeMato was recognized by *The National Law Journal* as a "Plaintiffs' Trailblazer" and was named a "Northeast Trailblazer" by *The American Lawyer*. Ms. DeMato was also named one of the "500 Leading Plaintiff Financial Lawyers in America" by *Lawdragon* for the last four consecutive years.

Ms. DeMato is an active member of the National Association of Securities Professionals (NASP), the American Association for Justice (AAJ), and the National Association of Public Pension Attorneys (NAPPA), where she serves on the NAPPA Securities Litigation Committee. As a member of the SACRS Education Committee, she is responsible for developing and planning educational programming for the State Association of County Retirement Systems (SACRS) in California.

Ms. DeMato earned her Juris Doctor from the University of Baltimore School of Law. She received her Bachelor of Arts from Florida Atlantic University.

Ms. DeMato is a member of the State Bars of Florida and the District of Columbia and is admitted to practice in the United States District Court for the Southern and Northern Districts of Florida.



## KYLA GRANT

Kyla Grant, Director, has extensive experience in federal securities class action suits, securities enforcement, and complex commercial litigation in both federal and state courts. Since joining Saxena White, Ms. Grant has played a key role on litigation teams that have successfully recovered hundreds of millions of dollars on behalf of injured shareholders in settlements totaling over $600 million. For example, recent notable settlements include:

- *In re Wells Fargo & Company Shareholder Litigation* ($240 million shareholder derivative settlement - one of the largest shareholder derivative settlements in history - in an action relating to well-known "fake account" scandal at Wells Fargo);

- *Peace Officers' Annuity and Benefit Fund of Georgia et al. v. DaVita Inc., et al.* ($135 million settlement in securities fraud class action involving allegations that DaVita improperly "steered" end-stage kidney patients off of Medicare/Medicaid and into private insurance plans);

- *Plymouth County Retirement System v. Patterson Companies, Inc. et al.* ($63 million settlement in securities fraud class action - ranking among the top-ten of all such settlements ever achieved in the District of Minnesota - involving alleged price-fixing scheme between Patterson and its main competitors in the dental supply industry); and

- *In re Perrigo Company plc Securities Litigation* ($31.9 million settlement in securities fraud class action regarding Perrigo's receipt of a nearly $2 billion tax bill from Irish Revenue, and involving significant victories at summary judgment rarely obtained by plaintiffs in a securities fraud case on the key elements of falsity andmateriality).

18

Ms. Grant was also involved in obtaining significant securities fraud class action settlements in cases involving Covetrus, Inc. ($35 million settlement), TrueCar, Inc. ($28.25 settlement), Brixmor Property Group, Inc. ($28 million settlement), and GTT Communications, Inc. ($25 million settlement).

Before joining Saxena White, Ms. Grant practiced securities litigation at two top-ranked global law firms, Shearman & Sterling LLP and WilmerHale.

Ms. Grant graduated from the University of Hawai'i at Mānoa with distinction in 2004, where she received a Bachelor of Arts degree in both English and Political Science. She received her Juris Doctor degree from the University of Virginia School of Law in 2008. While attending law school, she was a recipient of the Dean's Scholarship, was appointed as a Dillard Fellow (a role in which she worked with first year students to improve their persuasive writing skills), and was an Articles Editor for the *Virginia Journal of International Law.*

Ms. Grant is a member of the New York State Bar and the United States District Court for the Southern District of New York.



## LESTER R. HOOKER

Lester R. Hooker, Director, is involved in all of Saxena White's practice areas, including securities class action litigation and shareholder derivative actions. During his tenure at Saxena White, Mr. Hooker has obtained substantial monetary recoveries of over $1 billion and secured groundbreaking corporate governance reforms on behalf of institutional investors nationwide.

Mr. Hooker played a key role on the litigation teams that have successfully prosecuted numerous historic securities fraud class and derivative actions, including:

- *In re Wells Fargo & Company Shareholder Litigation* ($240 million settlement in a shareholder derivative action – one of the largest such settlements ever – relating to the well-known "fake account" scandal at Wells Fargo, which included the $240 million cash payment from Defendants' insurers as well as credit for valuable corporate governance reforms at the bank);

- *Employees Retirement System of the City of St. Louis v. Charles E. Jones et al. (FirstEnergy Corp. Derivative Litigation)* ($180 million settlement in a derivative action – the largest shareholder derivative recovery in Sixth Circuit history – which also included unprecedented corporate governance reforms);

- *Peace Officers' Annuity and Benefit Fund of Georgia, et al. v. DaVita Inc., et al.* ($135 million settlement of a securities class action);

- *Fulton County Employees Retirement System, derivatively on behalf of The Goldman Sachs Group, Inc., v. Blankfein et al.* ($79.5 million cash recovery in a shareholder derivative action, which represented the second largest derivative settlement in Second Circuit history and ranked among the top-twenty such settlements ever nationwide);

- *In re Rayonier Inc. Securities Litigation* ($73 million settlement, which at the time of settlement represented the second largest recovery from a securities class action achieved in the Middle District of Florida);

- *Plymouth County Retirement System v. Patterson Companies, Inc., et al.*, ($63 million settlement in a securities class action, ranking among the top ten of all settlements ever achieved in a securities class action in the District of Minnesota); and

• *In re HD Supply Holdings, Inc. Securities Litigation* ($50 million settlement, one of the largest securities class action settlements ever achieved in the U.S. District Court for the Northern District of Georgia).

Mr. Hooker was profiled in the February 2023 edition of *Lawdragon's Lawyer Limelight*, and named a "500 Leading Plaintiff Financial Lawyer" by *Lawdragon* for the fifth consecutive year. He was also named a "Plaintiffs' Attorney Trailblazer" by *The National Law Journal*, a "Rising Star" and a "Top Attorneys In Florida Rising Star" by *Super Lawyers*. Recently, Mr. Hooker received the 2023 *Profiles in Diversity Journal* Latino Leadership Award, an honor bestowed upon accomplished Latino leaders who have blazed new trails, welcomed challenges, mentored others, advanced diversity and inclusion in the workplace and the community, and excelled in their chosen fields. Mr. Hooker is a member of *Law360*'s 2023 Securities Editorial Advisory Board and provides expert insight on *Law360*'s coverage.

Mr. Hooker received a Bachelor of Arts degree with a Major in English from the University of California at Berkeley. Mr. Hooker earned his Juris Doctor from the University of San Diego School of Law, where he was awarded the Dean's Outstanding Scholar Scholarship. Mr. Hooker received his Master's Degree in Business Administration with an emphasis in International Business from the University of San Diego School of Business, where he was awarded the Ahlers Center International Graduate Studies Scholarship.

Mr. Hooker is a member of the State Bars of California, Florida, New York, and the District of Columbia, and is admitted to practice law in the United States District Courts for the Northern, Central, Southern and Eastern Districts of California, the Southern, Middle and Northern Districts of Florida, the Southern District of New York, the Western District of Michigan, the District of Colorado, and the Northern District of Illinois. Mr. Hooker is also admitted to practice law in the United States Court of Appeals for the Second, Sixth, and Ninth Circuits.



### DAVID KAPLAN

David Kaplan is a Director at Saxena White and manages the Firm's California office. Mr. Kaplan has over 20 years of experience in the field of securities and shareholder litigation. He has helped investors achieve hundreds of millions of dollars in recoveries in federal and state courts nationwide, including in securities class actions, direct "opt-out" actions, and shareholder derivative litigation.

Mr. Kaplan is currently leading teams prosecuting complex securities class actions in California, Texas, Virginia, and Pennsylvania federal courts. These cases involve a variety of industries – spanning oil and gas E&P, biopharmaceuticals, online technologies, to commercial insurance – and involve billions of dollars in investor losses.

Prior to joining Saxena White, Mr. Kaplan was a partner at another nationally recognized securities litigation firm, where he co-chaired its direct-action practice, represented lead plaintiffs in securities class actions, and counseled institutional investor clients on potential legal claims as a member of the firm's new matters department. Before that, Mr. Kaplan was a senior associate at Irell & Manella LLP, where he handled a variety of high-stakes business disputes and complex litigation matters.

In addition to leading teams prosecuting high-stakes securities class actions, a large part of Mr. Kaplan's day-to-day practice involves advising mutual funds, hedge funds, pension funds, sovereign wealth funds, insurance companies, and other institutional asset managers on whether to remain passive participants in securities class actions or opt out to protect and maximize their securities fraud recoveries. Mr. Kaplan has represented prominent institutional investor opt-out groups in federal courts nationwide.

Mr. Kaplan also has extensive experience advising institutional clients on pursuing securities fraud recoveries in international jurisdictions. His work in this area includes virtually all countries in which shareholder collective actions are authorized by law, including Canada, Australia, England, the Netherlands, Germany, Italy, France, Japan, Israel, and Brazil.

Mr. Kaplan is a frequent speaker at national conferences on issues of interest to the institutional investor community. He has authored multiple articles relating to class actions and the federal securities laws, which have been published in *The National Law Journal, The Daily Journal, Law360, Pensions & Investments, The D&O Diary,* and *The NAPPA Report*, among other publications. Mr. Kaplan is also an editor of the American Bar Association's Class Actions and Derivative Suits Committee's newsletter.

Mr. Kaplan was named a "500 Leading Plaintiff Financial Lawyer" by *Lawdragon* for the last four consecutive years, and has repeatedly been selected as a "Rising Star" by *Super Lawyers*.

Mr. Kaplan graduated with a Bachelor of Arts, *cum laude*, from Washington and Lee University, and earned his Juris Doctor, High Honors, from Duke University School of Law, where he was an editor of the *Duke Law Review*.

Mr. Kaplan is admitted to practice in California, United States District Courts for the Central, Northern, and Southern Districts of California, and the Eastern District of Wisconsin. He is also admitted to the United States Court of Appeals for the Ninth Circuit, and the United States Bankruptcy Court for the Central District of California.



### LISA RIVERA

Lisa Rivera, Director, serves as the Firm's Chief Financial and Operating Officer and brings over 30 years of experience in both the public and private sectors, having served in key positions with direct responsibility for fiscal management, policy and strategic planning, operations, and compliance. Ms. Rivera has represented commercial litigation clients in the area of forensic accounting, as well as served public accounting clients with their tax and business advisory needs.

Ms. Rivera graduated from New York University's Stern School of Business in 1994, where she received a Bachelor of Science degree, majoring in Accounting. She received her Juris Doctor degree from Rutgers University School of Law in 2003.



### JOSHUA H. SALTZMAN

Joshua H. Saltzman, Director, focuses his practice on securities and derivative litigation. Before joining Saxena White, Mr. Saltzman litigated investor class actions, opt-out securities actions, and derivative actions at two boutique law firms in New York City. Recently, Mr. Saltzman was a member of the respective litigation teams that achieved a $63 million settlement for shareholders of Patterson Companies, Inc., a $23.5 million settlement for shareholders of Evolent Health, Inc., and a $31.9 million settlement for shareholders of Perrigo Company, plc. Mr. Saltzman was also a member of the litigation team that obtained a $50 million settlement on behalf of shareholders of HD Supply Holdings, Inc. – one of the largest securities class action settlements ever achieved in the U.S. District Court for the Northern District of Georgia. He was a member of the litigation team that obtained a $53 million derivative settlement on behalf of New Senior Investment Group, which was the largest settlement of all time in a derivative lawsuit when measured as a percentage of the company's total market capitalization.

Additionally, Mr. Saltzman has been a member of litigation teams that have obtained numerous other substantial recoveries on behalf of investors, including cases involving American International Group ($40 million settlement on behalf of AIG employees who invested in AIG's company stock fund, representing one of the largest ERISA stock drop recoveries of all time), Cornerstone Therapeutics ($17.9 million for minority stockholders of Cornerstone Therapeutics whose shares were purchased in a controller buyout), and Petrobras (high percentage recovery on behalf of the state pension system in opt-out securities action).

Mr. Saltzman has been recognized for his work on behalf of investors, including being recognized by *Super Lawyers* as a 2022 "Rising Star" and a 2023 New York *Super Lawyer*.

Mr. Saltzman received a Bachelor of Arts degree in English from Rutgers University in 2002, and a Juris Doctor degree from Brooklyn Law School in 2011, graduating *magna cum laude*. During law school, Mr. Saltzman served as an editor on the Brooklyn Law Review, where he published a note and interned for the Honorable Victor Marrero in the United States District Court for the Southern District of New York.

Mr. Saltzman is a member of the New York Bar, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Third Circuit.



### STEVEN B. SINGER

Steven B. Singer, Director of Litigation, oversees the Firm's securities litigation practice. Mr. Singer brings his tireless advocacy on behalf of shareholders, as well as his nearly 30 years of trial and litigation experience at the top of the field.

During his career, Mr. Singer has been the lead partner responsible for prosecuting many of the most significant and high-profile securities cases in the country, which collectively have recovered over $12 billion for investors. He led the litigation against Bank of America relating to its acquisition of Merrill Lynch, which resulted in a landmark settlement shortly before trial ($2.43 billion), one of the largest recoveries in history. Mr. Singer's work on that case was the subject of extensive media coverage, including numerous articles published in *The New York Times*. He also has substantial trial experience and was one of the lead trial lawyers on the WorldCom securities litigation ($6 billion settlement after a four-week jury trial).

As demonstrated by recent wins and accomplishments, Mr. Singer has had another extraordinary year. Mr. Singer helped Saxena White achieve nearly $300 million in monetary recoveries alongside major corporate governance reforms, establishing valuable precedent to prevent future C-Suite misconduct. Recent settlements include cases involving FirstEnergy Corp. ($180 million recovery — the largest in Sixth Circuit history and among the largest derivative recoveries ever), DaVita Inc. ($135 million recovery), Goldman Sachs ($79.5 million monetary recovery—the second largest derivative recovery in the history of the Second Circuit) and Patterson Companies, Inc. ($63 million recovery). Mr. Singer also led the Saxena White litigation team that successfully recovered a $240 million cash payment in a derivative action involving Wells Fargo & Company. The settlement includes one of the largest insurance-funded monetary components of any shareholder derivative settlement.

In addition, Mr. Singer has been significantly involved in numerous other actions that have resulted in substantial settlements, including cases involving Citigroup Inc. ($730 million, representing the second largest recovery in a case brought on behalf of bond purchasers), Lucent Technologies ($675 million), Mills Corp. ($203 million), WellCare Health Plans ($200 million), Satyam Computer Services ($150 million), Biovail Corp. ($138 million), Bank of New York Mellon ($180 million), JP Morgan Chase ($150 million), and one of the largest settlements in 2018, Wilmington Trust ($210 million).



Mr. Singer has been consistently recognized by industry observers for his legal excellence and achievements. In 2023, Mr. Singer was named a "Titan of the Plaintiffs Bar" by *Law360*. Additionally, he has been selected as one of the "500 Leading Lawyers in America" by *Lawdragon* for the last several years, a "Litigation Star" by *Benchmark Litigation*, and as one of the "Leading Lawyers" in securities litigation by the *Legal 500 US Guide* — one of only seven plaintiffs' attorneys so recognized.

Mr. Singer graduated *cum laude* from Duke University in 1988, and from Northwestern University School of Law in 1991. He is a member of the New York State Bar, as well as the United States District Courts for the Southern and Eastern Districts of New York, and the Northern District of Illinois.



## ATTORNEYS



### MARIO ALVITE

Mario Alvite has been with the Firm since 2018. Mr. Alvite plays a key role in new case development by analyzing opportunities for recovery for injured investors and shareholders, including the viability of claims that may be advanced in securities fraud, derivative, and corporate governance-related actions. Mr. Alvite assembles and assesses information that helps support the theories behind Saxena White's litigation efforts, and he assists with formulating complaints and lead plaintiff motions. He also is an important member of the Firm's client services team, for which he protects the financial interests of our clients by advising them on settlement matters.

In his work, Mr. Alvite draws on over ten years of experience in e-discovery and project management in the corporate litigation, transactional, and regulatory areas. During his time at Saxena White, Mr. Alvite served on the litigation teams that successfully prosecuted securities fraud class actions and shareholder derivative actions involving Wells Fargo ($240 million settlement, among the largest derivative recoveries ever achieved in the United States), Wilmington Trust ($210 million settlement and one of the largest securities class action settlements of 2018), FirstEnergy Corp. ($180 million settlement), and Rayonier Inc. ($73 million settlement).

Mr. Alvite has been recognized as a "Top Lawyer" by *Palm Beach Illustrated* for the past three years. He has also served on Saxena White's Diversity and Social Responsibility Committee since 2019. In 2023, Mr. Alvite co-authored the article *The Supreme Court Considers Whether Innovation in Direct Securities Listings Can Coexist with Long-Standing Investor Protections* published in the American Bar Association's Class Actions and Derivative Suits Committee's Newsletter. In 2021, Mr. Alvite authored the article *ESG, Diversity, Enforcement – Turning the Page on Securities Regulation* published in Saxena White's newsletter.

Mr. Alvite received his Bachelor of Business Administration from Florida International University in 2001. He later earned his Juris Doctor from Nova Southeastern University in 2004.

Mr. Alvite is a member of the Florida Bar and is admitted to practice in the United States District Court for the Southern and Middle Districts of Florida.



### EMILY BISHOP

Emily R. Bishop is an Attorney at Saxena White's California office, where she focuses her practice on prosecuting securities fraud class and direct actions, as well as shareholder derivative and corporate governance matters. Prior to joining Saxena White, Ms. Bishop was an associate at a law firm in San Diego where she represented individual and institutional shareholders in a variety of complex shareholder litigation. For her achievements, Ms. Bishop has been recognized by *Super Lawyers* as a 2023 "Rising Star."

Ms. Bishop graduated from the University of San Diego in 2014, where she received a Bachelor of Business Administration degree, double majoring in Business Economics and Real Estate, and a Bachelor of Arts degree in Political Science. She received her Juris Doctor degree from the University of San Diego School of Law in 2017, graduating *cum laude*, and a Masters of Laws in Taxation in 2018. While attending law school Ms. Bishop served as an editor of the *San Diego International Law Journal*, and was president of Phi Delta Phi, the international legal honor society and oldest legal organization in continuous existence in the United States.

Ms. Bishop is a member of The State Bar of California and is admitted to practice in the United States District Court for the Northern, Southern and Eastern Districts of California.



### RHONDA CAVAGNARO

Rhonda Cavagnaro is Special Counsel to Saxena White and a member of the Firm's Institutional Outreach group. She brings extensive expertise in many areas of employee benefits and pension administration with nearly two decades of public fund experience. Ms. Cavagnaro frequently speaks at industry conferences to further trustee education on fiduciary issues facing institutional investors.

Ms. Cavagnaro began her legal career as an Assistant District Attorney in New York City, where she was instrumental in creating the office's General Crimes Unit, covering major crimes. As an Assistant District Attorney, Ms. Cavagnaro gained valuable trial experience and prosecuted hundreds of misdemeanor and felony cases.

Ms. Cavagnaro started her career serving public pensions as Assistant General Counsel at the New York City Employees' Retirement System. She then went on to become the first General Counsel to the New York City Police Pension Fund in February 2002, where she worked for over 11 years, providing advice to the Board of Trustees and 140-member staff with respect to benefits administration, fiduciary issues, employment issues, legislation, and transactional matters. Ms. Cavagnaro last served as the Assistant CEO for the Santa Barbara County Employee's Retirement System, where under the general direction of the CEO and Board of Trustees, she oversaw the day to day operations of the System.

Ms. Cavagnaro graduated with a Bachelor of Arts in Political Science and History from the University of Rochester, in Rochester, New York, and earned her Juris Doctor from the California Western School of Law in San Diego, California. She is a member of the New York and New Jersey State Bars, and is admitted to the United States District Court for the Southern and Eastern Districts of New York, and is a current member of the National Association of Public Pension Attorneys.



### OMAR D. DAVIS

Omar D. Davis has an extensive background as a retirement plan legal advisor and manager that has provided him with a deep understanding of the issues and challenges facing institutional investors. Mr. Davis has served in various capacities for several large retirement plans. Most recently, Mr. Davis was the Director of Employer Services at the Public School and Education Employee Retirement Systems of Missouri (PSRS/PEERS), a $50+ billion pension plan serving retired educators and school employees across the State of Missouri. His public retirement plan background extends to earlier roles at the Missouri Department of Transportation & Missouri State Highway Patrol Employees' Retirement System (MPERS), where he was General Counsel, and the Missouri State Employees' Retirement System (MOSERS), where he served as Investment Legal & Compliance Counsel.

Prior to his retirement system background, Mr. Davis worked for more than a decade in Missouri state government as an agency leader, including as the Director of the Department of Revenue and the Director of the Department of Labor & Industrial Relations. He has been recognized for his leadership and service numerous times throughout his career.



Prior to joining Saxena White, Mr. Davis offered client organizations a wealth of public sector experience as an executive search consultant, focusing on the public retirement, public agency, asset owner, and manager sectors.

Mr. Davis is a recipient of the 2022 *Profiles in Diversity Journal* Black Leadership Award, an honor bestowed upon accomplished leaders of color who have also supported and furthered the careers of others. He also serves on Saxena White's Diversity and Social Responsibility Committee.

Mr. Davis received his Bachelor of Science from Kansas State University in 1998 and his Juris Doctor from the University of Missouri School of Law in 2001.

Mr. Davis is a member of the Missouri Bar.



### SARA DILEO

Sara DiLeo has extensive experience in federal securities class action lawsuits, derivative litigation, and complex commercial litigation in both federal and state courts. Ms. DiLeo has served as a member of the litigation teams that achieved securities fraud class action settlements for shareholders of Evolent Health, Inc. ($23.5 million settlement), DaVita, Inc. ($135 million settlement, the second largest all-cash securities class action settlement in the U.S. District Court for the District of Colorado history), GTT Communications, Inc. ($25 million settlement), HD Supply Holdings, Inc. ($50 million settlement, one of the largest securities class action settlements ever achieved in the U.S. District Court for the Northern District of Georgia), and TrueCar, Inc. ($28.25 million settlement).

Ms. DiLeo also played a key role on the litigation teams that have successfully prosecuted significant derivative actions, including *In re Wells Fargo & Company Shareholder Litigation* ($240 million cash payment from Defendants' insurers, representing the largest insurance-funded monetary component of any shareholder derivative settlement), and *Employees Retirement System of the City of St. Louis v. Jones, et al.* ($180 million landmark monetary recovery as well as the departures of six defendants from the company's board of directors).

Before joining Saxena White, Ms. DiLeo practiced securities litigation for nine years at a top-ranked global law firm, Skadden, Arps, Slate, Meagher & Flom LLP.

Ms. DiLeo graduated from New York University's College of Arts & Sciences program in 2003, where she received a Bachelor of Arts degree with a double major in Political Science and Psychology. She received her Juris Doctor degree from Fordham University School of Law in 2008. While attending law school, Ms. DiLeo was an Articles Editor for the *Fordham Urban Law Journal* and interned for the Honorable Barbara Jones in the United States District Court for the Southern District of New York.

Ms. DiLeo is a member of the New York Bar.



### MARCO A. DUEÑAS

Marco A. Dueñas is a Senior Attorney at Saxena White and a lead member of the Firm's case development team. He focuses his practice on the identification, investigation, and commencement of complex securities litigation cases in trial courts throughout the United States and abroad.

Prior to joining Saxena White, Mr. Dueñas was an associate at a nationally recognized securities litigation firm where he investigated and commenced securities class actions, prosecuted direct and opt-out actions on behalf of institutional investors, and led efforts to prosecute securities claims related to public offerings in state courts following the U.S. Supreme Court's decision in *Cyan, Inc. v. Beaver County Employees Retirement Fund.*

Mr. Dueñas represents institutional investors in domestic and multinational securities cases to recover investment losses and vindicate shareholder rights. Skilled in all phases of litigation including pleadings, dispositive motions, discovery, trial, and appeal, he develops innovative, fact-based case theories to expose violations of the securities laws and recover clients' financial losses. Mr. Dueñas has represented dissenting shareholders in a foreign appraisal action in the Cayman Islands, securing a favorable judgment on behalf of his clients following a three-week bench trial.

Mr. Dueñas has played a key role prosecuting and resolving several high-profile cases, such as those against Nord Anglia Education (more than $130 million judgment following a $37.68 per share fair value appraisal—a 16% premium over the take-private transaction price), ADT Inc. ($30 million settlement), Benefitfocus, Inc. ($11 million settlement), Spectrum Brands Holdings, Inc. ($9 million settlement), Livent Corporation ($7.4 million settlement), and Fifth Third Bancorp ($5.5 million settlement).

For his achievements, Mr. Dueñas has been recognized as a New York Metro "Rising Star" by *Super Lawyers*.

Mr. Dueñas earned his Bachelor of Science, *summa cum laude*, from Farmingdale State College. Mr. Dueñas earned his Juris Doctor, *cum laude*, from Brooklyn Law School, where he served on the Brooklyn Journal of International Law and the Moot Court Honor Society, Appellate Division. Mr. Dueñas is a member of the New York State Bar. He is admitted to the United States District Court for the Eastern and Southern Districts of New York and the United States District Court of Appeals for the Ninth Circuit.

Mr. Dueñas is fluent in Spanish.



### WILLIAM FORGIONE

Prior to joining Saxena White, William Forgione served as a senior legal executive with Teachers Insurance and Annuity Association ("TIAA") and its subsidiaries for over 25 years. While at TIAA, he held a variety of leadership positions, including Executive Vice President and General Counsel with TIAA Global Asset Management and Nuveen, a leading financial services group of companies that provides investment advice and portfolio management through TIAA and numerous investment advisors. He oversaw the legal, compliance, and corporate governance aspects associated with the organization's $900 billion investment portfolios and asset management businesses, including TIAA's general account, various separate accounts, registered and unregistered funds, and institutional investment mandates.

Under Mr. Forgione's leadership, TIAA was actively involved in a number of significant investment litigation matters in order to recover the maximum amount for the benefit of its investment portfolios and the beneficial owners. These included acting as lead plaintiff in class action lawsuits, initiating proxy contests, pursuing direct actions where appropriate, and asserting appraisal rights when it felt the consideration to be paid to shareholders in connection with various merger and acquisition activity involving portfolio companies was inadequate.



Mr. Forgione also served as Deputy General Counsel to TIAA, where among his many responsibilities, he acted as a strategic partner and advisor to the heads of TIAA's pension and insurance business lines. He also served as a member of TIAA's Senior Leadership Team, actively participating on a number of management committees. In addition, Mr. Forgione has valuable corporate governance experience, having advised and served on a number of boards, including Nuveen, the Westchester Group, several foreign operating subsidiaries of TIAA, as well as various Risk Management, Investment, Asset-Liability, and Audit Committees. He also served as lead counsel on several large business acquisitions.

Prior to joining TIAA, Mr. Forgione was associated with Fried, Frank, Harris, Shriver & Jacobson LLP, and Csaplar & Bok, where he practiced in the areas of mergers and acquisitions and corporate finance.

After graduating *summa cum laude* from Binghamton University with a Bachelor of Science in Accounting, Mr. Forgione received his Juris Doctor degree from Boston University. Among many industry associations, he has served as President and a member of the Board of Trustees of the Association of Life Insurance Counsel, President and Trustee of the American College of Investment Counsel, and Chairman of the Investment Committee of the Life Insurance Council of New York. Mr. Forgione has spoken at many industry conferences and seminars, taught undergraduate and graduate courses in Accounting and Law, and has won awards such as *Charlotte Business Journal's* "Corporate Counsel Award" for his success in corporate law.

Mr. Forgione is a member of the New York State Bar.



### SCOTT GUARCELLO

Combining both legal and technical expertise, Scott Guarcello's practice focuses on e-discovery, including topics concerning information governance, preservation, ESI protocols, protective orders, data collection, large-scale document review workflows leveraging technology-based analytical tools, document requests and related responses and objections, and production analyses and management. With over 13 years of significant complex e-discovery experience, Mr. Guarcello brings an expertise honed by the numerous e-discovery services and training programs that he created, led, and contributed to in key roles while serving as a Senior Managing Attorney for a global e-discovery consulting and services provider.

As a core member of the firm's litigation practice group, Mr. Guarcello has contributed to the successful settlement recoveries obtained on behalf of investors, totaling over $800 million across numerous cases, including *City of Hollywood Police Officers' Retirement System and Pembroke Pines Pension Fund for Firefighters and Police Officers v. Henry Schein, Inc., et al., Plymouth County Retirement System v. Patterson Companies, Inc., et al., Peace Officers' Annuity and Benefit Fund of Georgia, et al. v. DaVita Inc., et al.,* and *In re Wells Fargo & Company Shareholder Derivative Litigation*.

Mr. Guarcello earned a Bachelor of Science from Stetson University and received a Juris Doctor from Florida International University where he graduated *cum laude* with a concentration in securities law. He was a regular recipient of the Dean's List Award and received the CALI Book Awards for the Complex Litigation and Corporate Tax courses. Mr. Guarcello has been awarded *Best Lawyers* "Ones to Watch!" 2023-2024, *Palm Beach Illustrated* "Top Attorney" 2020-2022, *Super Lawyers* "Rising Star" 2020, and the *Florida Trend* "Legal Elite" Award 2017-2018, and holds extensive e-discovery-related certifications. As an active participant in the e-discovery community, Mr. Guarcello has been a guest speaker for both small and large groups and is a member of The Sedona Conference.

Mr. Guarcello is a member of the Florida Bar.





## SCOTT KOREN

Scott Koren is an Attorney at Saxena White. Mr. Koren concentrates his practice on litigating securities actions and derivative actions involving publicly traded companies. Mr. Koren's efforts are focused on all stages of litigation including new case development, motion practice, and pre-trial discovery. Mr. Koren has served on various litigation teams that successfully prosecuted cases against HD Supply Holdings, Inc., DaVita, Inc., FirstEnergy Corp., Evolent Health, Inc., and ProAssurance Corp., each settling with a favorable recovery for investors.

Mr. Koren received his Bachelor of Science in Business Management and Entrepreneurship from the University of Arizona and earned his Juris Doctor degree from Pace University School of Law.

Mr. Koren is a member of the New York Bar.



## JUSTIN KRUMPER

Justin Krumper is an Attorney in Saxena White's New York office, where he works on complex securities fraud matters.

Mr. Krumper received his Juris Doctor degree from The George Washington University Law School in 2022, where he graduated with honors. During law school, he was an Associate Editor of the *American Intellectual Property Law Association Quarterly Journal*, where he had his note published. He received his Bachelor of Science in Finance and Political Science from Florida State University, *cum laude*, in 2019 and was a Presidential Scholar.

Mr. Krumper is a member of the New York Bar.

## JONATHAN D. LAMET

Jonathan D. Lamet has extensive experience in litigating direct securities actions and derivative actions involving publicly traded companies. Recently, Mr. Lamet was a member of the litigation teams that successfully recovered a $180 million derivative settlement for shareholders of FirstEnergy Corp. and a $79.5 million derivative settlement for shareholder of Goldman Sachs Inc. He was also part of the securities class action litigation teams that obtained a $63 million settlement for shareholders of Patterson Cos. and a $25 million settlement for shareholders of GTT Communications, Inc. Before joining Saxena White, Mr. Lamet practiced securities litigation and class action defense at an Am-Law 100 firm, Akerman LLP.

Mr. Lamet has been recognized for his work on behalf of investors, including being named a 2021 "Up and Comer" in Florida Trend's *Florida Legal Elite* and a 2023 "Rising Star" by *Super Lawyers.*

Mr. Lamet graduated from Yeshiva University, Sy Syms School of Business in 2010, where he received his Bachelor of Science in Business Management. He received his Juris Doctor degree from University of Miami School of Law in 2013, where he was a member of the *University of Miami Law Review.* While attending law school, Mr. Lamet interned for the United States Attorney's Office, Economic Crimes Division, for the Southern District of Florida, and for the Honorable William Turnoff in the United States District Court for the Southern District of Florida.

Mr. Lamet is a member of the Florida Bar and the United States District Courts for the Southern and Middle Districts of Florida.





## JILL MILLER

Jill Miller focuses her practice on e-discovery, including project management and litigation support services for securities fraud class and derivative actions. As Managing Discovery Attorney, she oversees the staff attorneys at the Firm and manages the document review process. Ms. Miller was a member of the litigation teams that secured one of the largest settlements in 2018, *In re Wilmington Trust Corporation Securities Litigation* ($210 million). She was also part of the litigation teams that successfully prosecuted Wells Fargo ($240 Million settlement), and DaVita ($135 million settlement, the second largest all-cash securities class action settlement in U.S. District Court for the District of Colorado history).

Prior to joining Saxena White, Ms. Miller served as team lead at various law firms for discovery in large, complex class actions and mass torts in the areas of securities fraud, software technology, pharmaceutical and patent infringement. Prior to her litigation experience, Ms. Miller was an associate at Ruden McClosky where she practiced real estate law. During her 11 years with the firm, she represented large developers of residential and commercial real estate throughout the South Florida area. Ms. Miller began her legal career as an associate in the real estate practice division of a major New Jersey law firm where she concentrated her practice on residential and commercial real estate transactions and development. She also dedicated a significant portion of her practice to casino licensing and compliance.

For the past 12 years, Ms. Miller has volunteered her time as a Guardian ad Litem, protecting the rights of abused and neglected children in Broward County, Florida. She has been recognized as a "Top Lawyer" by *Palm Beach Illustrated*.

Ms. Miller graduated from the University of Maryland, College Park with a Bachelor of Arts in Political Science in 1983. She received her law degree from Hofstra University in 1986, where she was the Articles Editor of the *International Property Investment Journal*. She also interned at the United States Federal Court, Eastern District of New York during law school.

Ms. Miller is a member of the Florida Bar and is admitted to the United States District Court for the Southern District of Florida.



## DIANNE PITRE

Dianne Pitre is a Senior Attorney at Saxena White and prosecutes securities fraud and corporate governance litigation on behalf of injured shareholders. With over a decade of experience litigating securities fraud class actions and shareholder derivative actions, Ms. Pitre has served on the litigation teams that successfully secured hundreds of millions of dollars in settlements, including in *In re Wells Fargo & Company Shareholder Litigation* ($240 million settlement), *Peace Officers' Annuity and Benefit Fund of Georgia, et al. v. DaVita Inc., et al.* ($135 million settlement, the second largest all-cash securities class action settlement in United States District Court for the District of Colorado history), *In re Rayonier Inc. Securities Litigation* ($73 million settlement), and *Plymouth County Retirement System v. Patterson Companies, Inc. et al.* ($63 million settlement).

Ms. Pitre is the Chair of Saxena White's Diversity and Social Responsibility Committee. She has been recognized as a 2024 *Best Lawyers* "Ones to Watch," a 2023 "Rising Star of the Plaintiffs Bar" by ALM's *The National Law Journal*, a *Super Lawyers* "Rising Star" for the last five years in a row, and a "Top Lawyer" by *Palm Beach Illustrated*.



Before joining Saxena White, Ms. Pitre was a legal intern for Jack in the Box, Inc. and Alliant Insurance Services, Inc., where she worked extensively with their in-house departments. Ms. Pitre was an intern for Jewish Family Service of San Diego and Housing Opportunities Collaborative, two San Diego pro bono legal organizations. Additionally, she served as a Legal Intern for the San Diego City Attorney's Office with their Advisory Division, Public Works Section.

Ms. Pitre graduated from the University of California, San Diego in 2008, where she received a Bachelor of Arts degree, majoring in Political Science with a minor in Law and Society. In 2012, she received her Juris Doctor degree from the University of San Diego School of Law. While attending law school, Ms. Pitre earned various scholarships and awards, including the San Diego La Raza Lawyers Association Scholarship and Frank E. and Dimitra F. Rogozienski Scholarship for outstanding academic performance in business law courses. She received two CALI Excellence for the Future Awards for receiving the top grade in her Fall 2011 International Sports Law and Entertainment Law classes. Ms. Pitre is an alumnus of Phi Delta Phi, the international legal honor society and oldest legal organization in continuous existence in the United States.

Ms. Pitre is a member of the Florida and California State Bars. She is admitted to practice before the United States District Courts for the Southern and Northern Districts of Florida and the Northern, Central, Southern, and Eastern Districts of California.

Ms. Pitre is fluent in Spanish.



### DAVID SCHWARTZ

David Schwartz is Of Counsel to Saxena White and focuses his practice on event-driven and special situation litigation using legal strategies to enhance clients' investment returns. His extensive experience includes prosecuting, as well as defending against, securities and corporate governance actions for an array of domestic and international clients, including hedge funds, merger arbitrageurs, retail investors, pension funds, mutual funds, and asset management companies.

Mr. Schwartz has played a pivotal role in some of the largest securities class action and corporate governance cases in recent years, achieving over $200 million in settlements in 2022 alone, including:

• *In re CannTrust, Inc. Securities Litigation* ($129.5 million settlement);
• *In re Resideo Securities Litigation* ($55 million settlement, one of the three largest in the Eighth Circuit);
• *Makris, et al. v. Ionis Pharmaceuticals, Inc., et al.* ($12.5 million settlement); and
• *In re Mindbody, Inc. Securities Litigation* ($9.75 million settlement).

Mr. Schwartz has helped secure leadership roles on behalf of his clients in some of the largest securities and Delaware breach of fiduciary duty class actions, including cases against Lordstown, Nikola, Alta Mesa, Novavax, Everbridge, QAD, and others.

Mr. Schwartz has been named a "Future Star" by *Benchmark Litigation* and was selected for three consecutive years to their "40 & Under Hot List," which recognized him as one of the nation's most accomplished attorneys. *Lawdragon* has recognized him as one of the country's "500 Leading Plaintiff Financial Lawyers" and he has also been featured in *Lawdragon's Lawyer Limelight* series.

Mr. Schwartz graduated *cum laude* from The University of Chicago in 2003 with a major in Economics and earned his Juris Doctor from Fordham University School of Law in 2008, where he served on the *Urban Law Journal*.



Mr. Schwartz is a member of the New York State Bar and is admitted to practice in the United States District Court for the Southern District of New York.



### DAVID L. WALES

David L. Wales is Senior Counsel at Saxena White P.A., focusing on corporate governance litigation. Mr. Wales is an experienced securities litigator and trial attorney, and a former Assistant United States Attorney for the Southern District of New York.

During his career, Mr. Wales has led numerous significant corporate governance actions, including the derivative action against the board of directors of Pfizer Inc., arising out of the off-label marketing of pharmaceuticals, resulting in a $75 million recovery and the first case requiring the establishment of a board-level regulatory compliance committee. Mr. Wales has been a leader in the fight against corporate abuse in the sale of opioids, including a derivative action on behalf of McKesson Corporation, achieving a $175 million recovery and substantial corporate governance reforms, and successfully tried a books and records action against Walmart Inc. He was a leader in the action against the board and senior management of Twenty-First Century Fox, Inc., arising out of workplace harassment, obtaining a $90 million recovery and ground-breaking corporate governance reforms. Mr. Wales has successfully litigated numerous actions arising out of mergers and acquisitions, as well as conflicted transactions, including *In re New Senior Investment Group, Inc. Derivative Litigation*, a $53 million recovery arising out of a conflicted transaction, and *In re Jefferies Group, Inc. Shareholders Litigation*, a $70 million settlement on behalf of shareholders in the sale of the company.

Mr. Wales currently plays a key role on litigation teams for several significant shareholder rights matters, including matters involving the misuse of "shareholder agreements" to undermine the rights of investors to have companies managed by their elected board of directors, and matters involving self-dealing transactions to benefit a company's largest shareholder at the expense of the company and its public shareholders.

Mr. Wales also has extensive experience successfully prosecuting class actions under the federal securities laws, including *In Re Merck & Co., Inc. Securities Litigation*, achieving a $1.06 billion settlement weeks before trial, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.,* obtaining a $315 million settlement after arguing the first successful class certification motion in an RMBS action, and *In re Sepracor Corp. Securities Litigation*, a $52.5 million recovery in a certified securities fraud class action.

Mr. Wales has been consistently recognized for his legal excellence. He is AV rated, the highest rating from *Martindale-Hubbell*®. He has also been named a top practitioner by *Legal 500*, a "New York Super Lawyer" in securities litigation by *Thomson Reuters*, and as one of the "500 Leading Plaintiff Financial Lawyers" by *Lawdragon*. Mr. Wales is a frequent speaker on corporate governance including ESG and securities fraud matters.

Mr. Wales graduated *magna cum laude* from the State University of New York at Albany and *cum laude* from the Georgetown University Law Center.

Mr. Wales is a member of the New York Bar and the District of Columbia Bar. He is admitted to the United States District Court for the Northern, Southern, Eastern and Western Districts of New York, the District of Columbia, the Eastern District of Michigan, and the Northern District of Illinois and the Trial Bar. He is also admitted to the United States Court of Appeals for the Second, Third and Fourth Circuits.





## ADAM WARDEN

Adam Warden is a Senior Attorney at Saxena White. His practice focuses on representing institutional and individual investors in litigation involving corporate governance matters, class and derivative actions alleging breaches of fiduciary duty, and disputes involving mergers and acquisitions.

Mr. Warden has served on the litigation teams prosecuting several of the largest shareholder derivative actions in history, including *Employees Retirement System of the City of St. Louis v. Jones* ($180 million settlement, along with valuable corporate governance reforms, in connection with FirstEnergy Corp.'s political bribery scheme in Ohio), *Fulton County Employees Retirement System v. Blankfein* (Goldman Sachs) ($79.5 million settlement and corporate governance reforms, in connection with Goldman Sachs's role in a Malaysian bribery scheme), and *In re Wells Fargo & Company Shareholder Litigation* ($240 million settlement, in connection with Wells Fargo's fake account scandal).

Mr. Warden has extensive experience litigating in the Delaware Court of Chancery, serving as a member of the litigation teams prosecuting *Cumming v. Edens* (New Senior Investment Group) ($53 million derivative settlement related to acquisition by senior living operator New Senior Investment Group, Inc., one of the largest recoveries by market cap in Delaware history), *In re Jefferies Group, Inc. Shareholders Litigation* (class action settlement of $70 million, challenging conflicted merger transaction), and many other cases.

Mr. Warden has also litigated several securities fraud class actions, including *City of Birmingham Retirement and Relief System v. Credit Suisse Group* ($15 million settlement) and *Keippel v. Health Insurance Innovations, Inc.* ($11 million settlement).

Mr. Warden has been recognized as a *Super Lawyers* "Rising Star," a *South Florida Legal Guide* "Up and Comer," and a *Palm Beach Illustrated* "Top Lawyer." He earned his Bachelor of Arts degree from Emory University in 2001 with a double major in Political Science and Psychology. He received his Juris Doctor from the University of Miami School of Law in 2004. During law school, Mr. Warden served as the Articles Editor of the *University of Miami International* and *Comparative Law Review*.

Mr. Warden is a member of the Florida Bar. He is admitted to the United States District Courts for the Southern, Middle, and Northern Districts of Florida.



## MARTI L. WORMS

Marti Lewis Worms focuses on prosecuting all forms of complex securities and shareholder litigation, including class actions, individual actions, and derivative actions. Ms. Worms has significant expertise in all manners of commercial litigation, ranging from discovery and other pre-trial litigation to representing clients at arbitration and trial. Ms. Worms practiced business litigation for seven years representing individual and corporate clients in employment matters, products liability disputes, and consumer class actions at several large firms, including Gibson, Dunn & Crutcher. She served for a decade as the Supervising Research Attorney for the Honorable William McCurine, Jr., a Magistrate Judge for the U.S. District Court for the Southern District of California, where she managed a broad docket of civil matters from civil rights complaints to intellectual property actions.

Ms. Worms' diverse legal background also includes teaching first-year law students as an Adjunct Professor of Law at the William & Mary Law School, where she created diversity-centered curriculum on professional identity development, cross-cultural competence and the elimination of bias in the law. She has also been an



avid speaker and presenter on leadership and professionalism from her role as the Assistant Dean for Career & Professional Development at the University of San Diego School of Law.

Ms. Worms received her Juris Doctor from UCLA School of Law where she was a Joseph Drown Foundation Scholar; a judicial intern for the Honorable Audrey B. Collins, Associate Justice for the California Second District Court of Appeal; and a Teaching Assistant for Constitutional Law and Lawyering Skills. Ms. Worms received her Bachelor of Arts in Public Relations from the University of Southern California's Annenberg School for Communication and Journalism.

Ms. Worms is a member of the California Bar. She is admitted to the United States District Courts for the Central, Eastern, and Southern Districts of California.



### WOLFRAM T. WORMS

Wolfram T. Worms works with Saxena White as a Case Starting Analyst. Mr. Worms has 20 years of experience in securities litigation and has assisted shareholders in recovering over a billion dollars.

Mr. Worms began his career practicing law at a nationally recognized securities litigation firm and at Gibson Dunn and Crutcher LLP, a national defense firm. Prior to joining Saxena White, Mr. Worms owned and operated a private investigation business specializing in securities fraud and related forms of corporate misconduct. In this capacity, Mr. Worms was engaged by court-appointed lead counsel, or prospective lead counsel, on hundreds of securities fraud cases. Representative examples of Mr. Worms' successful engagements as a private investigator include the securities class actions against Regions Financial Corporation ($90 million settlement), Hospira, Inc. ($60 million settlement), Sirva, Inc. ($53 million settlement), and Baxter International ($42.5 million settlement). Mr. Worms has also coordinated with the U.S. Securities Exchange Commission and the U.S. Department of Justice on major securities fraud investigations and advised the U.S. Senate Financial Crisis Inquiry Commission regarding the role of rating agencies in the mortgage crisis.

Mr. Worms leverages his extensive experience in the field of securities litigation to identify and investigate potential new matters.

Mr. Worms received his Bachelor of Arts degree with a major in History from Western Oregon University. He earned his Juris Doctor from the UCLA School of Law.

Mr. Worms is a member of the California Bar. He is admitted to the United States District Courts for the Northern, Southern, Central, and Eastern Districts of California.



## PROFESSIONALS



### SHERRIL CHEEVERS
*Health and Wellness Coordinator*

Sherril Cheevers is Saxena White's Health and Wellness Coordinator. In this role, she provides guidance and support to employees on how to optimize their overall health and achieve their wellness objectives. Ms. Cheevers develops and coordinates wellness programs, educational presentations, and events for our employees to participate in. Ms. Cheevers also assists with organizing charitable events and opportunities for the Firm to give back to the community.

In addition to her role as Health and Wellness Coordinator, Ms. Cheevers is also a member of the Firm's Institutional Outreach group. Ms. Cheevers attends industry conferences and events and helps maintain client relations.

Ms. Cheevers earned her Bachelor of Science in Physical Education from the University of Tampa where she minored in Sports Management.



### MICHAEL A. D'ALONZO
*Senior Investigator*

Michael A. D'Alonzo is a Senior Investigator at Saxena White. Prior to joining Saxena White, Mr. D'Alonzo served over 21 years with the FBI, most recently as the Assistant Special Agent in Charge of the FBI Miami Office. In this role, he was responsible for the oversight of the Miami Division's Resident Agencies and the Special Operations Group. As head of the Resident Agencies, he was responsible for both the counterterrorism and criminal investigations in the Fort Pierce, West Palm Beach, Homestead, and Key West Resident Agencies.

During his service with the FBI, Mr. D'Alonzo served as a Supervisory Special Agent for over nine years. While in the FBI Newark Division in New Jersey, he was responsible for Newark's Special Operations Group which provided support to covert and undercover operations, and Newark's Human Intelligence (HUMINT) Squad, responsible for identifying and addressing FBI intelligence gaps. In the Newark Division, he developed educational platforms for state and local law enforcement entities regarding the Newark Division Intelligence Program, while maintaining effective liaison with New Jersey colleges and universities, increasing domain awareness and intelligence production efforts.

Prior to his service with the FBI Newark Division, Mr. D'Alonzo served in the FBI New York Office as both a criminal and counterterrorism Supervisory Special Agent. In this role, he was responsible for New York's Civil Rights and Crimes Against Children programs. This role involved oversight of investigations related to human trafficking and kidnappings.

As a counterterrorism Supervisory Special Agent, Mr. D'Alonzo was responsible for a Joint Terrorism Task Force, ensuring coordination between other field offices, legal attaché offices, local law enforcement, state police, the Central Intelligence Agency, National Security Agency, Department of Homeland Security, and Department of Defense. Mr. D'Alonzo was also engaged with international terrorism cases that were worked hand in hand with foreign law enforcement organizations such as the Canadian Security Intelligence Service, Royal Canadian Mounted Police, New Scotland Yard, and British Security Services. He oversaw high profile

investigations including Operation High Rise, Operation Silent Digit, Aafia Siddiqui, and Syed Hashmi, all of whom were found guilty of terrorism related charges.

Mr. D'Alonzo was elevated to Supervisory Special Agent at FBI Headquarters in the Counterterrorism Division's International Terrorism Operations Section I. In this role, he served as a program manager for numerous FBI field offices and was responsible for the coordination and support for FBI forward operations in the field. As a Special Agent assigned to the FBI New York Office, Mr. D'Alonzo was part of the FBI's Special Operations Group and the Criminal Division, working South American, Columbian drugs. Prior to his FBI employment, Mr. D'Alonzo served as a police officer in the State of New Jersey for nine years following his graduation from Villanova University.



### SAM JONES
*Senior Financial Analyst*

Sam Jones is a Senior Financial Analyst with Saxena White's California office. Prior to joining Saxena White, Mr. Jones worked for over 10 years as a financial and securities analyst at a leading securities litigation law firm, where he specialized in developing techniques for data modeling and visualization. He worked on numerous landmark securities cases including *In re Bank of America Securities Litigation* ($2.425 billion recovery), *In re Lehman Brothers Equity/Debt Securities Litigation* ($735 million recovery), *In re Wachovia Corp. Securities Litigation* ($627 million recovery), and Merrill Lynch Mortgage Pass-Through Litigation ($315 million recovery).

In the fallout of the housing and credit crisis, Mr. Jones pioneered techniques in data management and analysis for the firm's then-developing RMBS and structured finance practice. He has worked on numerous individual and class action RMBS cases against most of the major Wall Street banks.

Since joining Saxena White in 2019, Mr. Jones has worked on numerous cases from initial analysis of the fraud, through litigation and settlement. He has helped the Firm reach many landmark settlements against major corporations, including Covetrus ($35 million settlement), Evolent Health ($23.5 million settlement), GTT Communications ($25 million settlement), Health Insurance Innovations ($11 million settlement), Merit Medical Systems ($18.25 million settlement), and United Health Services ($17.5 million settlement).

Mr. Jones currently works with the Firm's case-starting team, monitoring markets to identify and develop new litigation opportunities. In addition to identifying new cases, he also works with the Firm's opt-out practice group to identify possible opt-out cases and client outreach efforts.

Mr. Jones graduated from Vassar College in 1996, where he studied anthropology with a focus on history and economics. After graduation he worked extensively as a field archaeologist throughout the U.S. and in Israel before transitioning to a career in securities litigation and financial analysis.



### STEFANIE LEVERETTE
*Manager of Client Services*

Stefanie Leverette is Saxena White's Manager of Client Services and has been with the Firm for nearly two decades. In this role, she manages the Firm's client outreach and development programs and oversees the Firm's portfolio monitoring program, through which the Firm provides customized monitoring, claims evaluation, and litigation services to more than 200 institutional clients who manage trillions of dollars in assets. Ms. Leverette is the primary liaison between institutional clients and the Firm.



Since joining Saxena White, Ms. Leverette has been responsible for the Firm's presence at national industry conferences and has represented the Firm in numerous professional organizations across the United States. She has also been a member of the Firm's Case Starting Team, providing institutional clients with important information regarding potential litigation. She works closely with the Firm's attorneys to assist clients through litigation-related discovery and with Firm Management on strategic initiatives that impact the Firm. In addition, Ms. Leverette supervises the team that timely distributes all client reports, notifications, new cases, and class action settlements that may impact investment portfolios and oversees the Firm's proprietary online client portal.

Ms. Leverette is a founding member of the Firm's Diversity and Social Responsibility Committee and a member of the Women's Initiative Subcommittee. She manages Saxena White's involvement in local and national charities and organizations that are meaningful to the Firm and its clients.

Ms. Leverette earned her undergraduate degree in Business Administration with a focus on Management from the University of Central Florida and her Master's in Business Administration with an emphasis on International Business from Florida Atlantic University.



### JEROME PONTRELLI

*Chief of Investigations*

With over two decades of law enforcement experience, including 12 years with the Federal Bureau of Investigation, Jerome Pontrelli serves as Saxena White's Chief of Investigations. He oversees all of the Firm's efforts to detect, investigate, and prosecute securities cases. Prior to joining Saxena White, Mr. Pontrelli was Director of Investigations at a nationally recognized securities litigation firm, where his cases resulted in monetary relief for harmed investors in excess of $4 billion. He was also part of the firm's initial SEC Whistleblower Program.

Throughout his award-winning career in the FBI and in private practice, Mr. Pontrelli has led over 100 investigations of possible securities violations and has developed extensive experience in securities-related matters. Mr. Pontrelli began his career with the FBI in Covert Special Operations and was later assigned to the FBI/NYPD Joint Bank Robbery Task Force. Following the September 11th attacks, Mr. Pontrelli was assigned to the Joint Terrorism Task Force. He later transferred to the White Collar Crime Health Care Fraud Unit. Mr. Pontrelli has an extensive network of high-level relationships throughout the state and federal law enforcement communities.

Mr. Pontrelli has been recognized for his outstanding law enforcement service with the Director's Award, Agent of the Month Award, U.S. Customs Merit Award, Special Operations Award, and a 9-11 Commendation. He was also inducted into the New Jersey Police Honor Legion.

Mr. Pontrelli received a Bachelor of Arts degree from St. Thomas Aquinas College and a Master of Arts degree from Seton Hall University. He graduated from the FBI Academy in 1996.



### EDWARD STINSON

*Manager of Information Technology*

Edward Stinson has been Saxena White's Manager of Information Technology (IT) for over a decade. Mr. Stinson oversees all of Saxena White's various IT needs, projects, and maintenance,

and coordinates all internal and external IT partners. He is also responsible for managing the Firm's day-to day IT support, including all computer operations, cyber security, physical system maintenance, IT deliverables, and ongoing recommendations for risk mitigation. During his time with Saxena White, Mr. Stinson designed and built an entire network system spanning over four office locations, and including dozens of servers and the hosting of nearly 100 users. He also designed and implemented a SD-WAN solution utilizing FortiGate routers as a fault-tolerant component to an overall business continuity strategy.

Before joining Saxena White, Mr. Stinson was an aviation electrician in the United States Marines Corp. After honorably serving the military, he leveraged his skills and training to start his own Information Technology business in 1997. Mr. Stinson's specializes is in Network/System Administration and Engineering and has achieved multiple certifications in his field, including Certified Information Systems Security Professional, Microsoft Certified Systems Engineer, and Certified Network Administration. Mr. Stinson adheres to the "Semper Fidelis" motto and is committed to honing his expertise.

Mr. Stinson is a Certified Information Systems Security Professional and a Microsoft Certified Systems Engineer.



### DANIEL SUNDQVIST
*European Client Relations*

Daniel Sundqvist oversees Saxena White's European Client Relations, working to expand the Firm's footprint throughout Europe. Prior to joining the Firm, since 2010 Mr. Sundqvist has worked in senior sales roles for Nordic institutions. For the last 12 years, Mr. Sundqvist was Head of Sales, a member of the executive committee, and Partner at Lannebo Fonder, one of Sweden's largest asset managers.

Mr. Sundqvist has significant experience working with Nordic institutions and works closely in a Consultant role with the Firm's leadership on institutional investor outreach as well as corporate governance and ESG matters.

Mr. Sundqvist earned his MSc in Finance from Umeå School of Business.



### ANABELLE TUCHMAN
*Firm Administrator*

Anabelle Tuchman is Saxena White's Firm Administrator. In this role, she supervises Firm operations, including human resources, hiring and managing the support staff, overseeing administrative and billing matters, and handles other day-to-day Firm operation responsibilities. Ms. Tuchman also serves on Saxena White's Diversity and Social Responsibility Committee.

Ms. Tuchman brings nearly 20 years of experience in human resources in a law firm setting and has a strong background in talent acquisition, management, and training non-attorney staff members. She has distinctive interpersonal skills that aid her in identifying, attracting, and retaining highly qualified candidates.

Ms. Tuchman earned her Bachelor of Science from Emory University. She is a Society for Human Resource Management (SHRM) Certified Professional and is also certified by the Professional in Human Resources (PHR).





### RIAN WROBLEWSKI

*Head of Investigative Intelligence*

With over 21 years of intelligence gathering experience, Rian Wroblewski serves as Saxena White's Head of Investigative Intelligence. He oversees all of the Firm's efforts to generate proprietary sources of intelligence using advanced technological tools, systems, and methods. Prior to joining Saxena White, Mr. Wroblewski was Senior Manager of Investigative Intelligence at Labaton Sucharow LLP, where his cases resulted in monetary relief for harmed investors in excess of $4 billion. He was also part of the firm's initial SEC Whistleblower Program.

Over the years, Mr. Wroblewski has provided expert commentary to *The Washington Post, Investor's Business Daily*, Canadian Broadcasting Corporation, and other news outlets. Mr. Wroblewski has provided consulting to database providers, e-discovery vendors, corporate boards, and government entities throughout the world. He has extensive pro bono experience assisting political asylum seekers and targets of honor killings, working alongside the FBI and Department of State. Mr. Wroblewski is an active member of the FBI's InfraGard Program. He has an extensive network of high-level relationships within the global intelligence community.

Mr. Wroblewski received a Bachelor of Science degree from John Jay College of Criminal Justice in 2007.



## STAFF ATTORNEYS



### HOPE CAMPBELL

Hope Campbell focuses her practice on e-discovery for securities fraud class actions. Prior to working at Saxena White, Ms. Campbell practiced in the areas of personal injury and estate planning.

Ms. Campbell earned her Juris Doctor degree from WMU-Thomas M. Cooley Law School with honors, where she was awarded the Alumni Distinguished Student Award and the Law School Leadership Award. She earned her Master's Degree in Business Administration from José María Vargas University, and her Bachelor of Arts degree from Anderson University. During law school, Ms. Campbell was selected to join the Thomas M. Cooley Law Review in the capacity of Assistant Solicitation Editor. She also interned for two Federal District Court Judges along with two law firms. Ms. Campbell was later awarded the Pro Bono Student Honoree award by the Federal Bar Association for the Eastern District of Michigan.

Ms. Campbell is a member of the Florida Bar.



### CHRISTOPHER DONNELLY

Christopher Donnelly has extensive experience in the securities industry as both an attorney and a securities analyst for bond rating agencies, institutional investors, and investment banks. Mr. Donnelly has most recently dedicated his expertise to working for plaintiffs who have been the victims of securities fraud. His legal practice has focused primarily on early resolution of matters, with an objective toward achieving just results for clients through thorough pre-trial preparation and sound litigation strategy. He has extensive experience in e-discovery, project management, and litigation support services for class actions and other complex litigation. While at Saxena White, he has been part of the discovery teams that assisted the Firm in successfully obtaining settlements against DaVita ($135 million settlement) and Perrigo ($31.9 million settlement).

Mr. Donnelly received his Bachelor of Arts from Rutgers University and his Juris Doctor from the University of Pennsylvania. Mr. Donnelly also earned an LL.M. in Taxation from New York University.

Mr. Donnelly is a member of the California Bar, the Florida Bar, the New Jersey Bar and the New York Bar.



### MICHELE FASSBERG

Michele Fassberg focuses her practice on e-discovery and document review. She also performs legal research and assists attorneys with preparation for depositions and mediation. She was a member of the discovery teams that assisted the Firm in successfully obtaining settlements against Davita ($135 million settlement), TrueCar ($28.25 million settlement) and Perrigo ($31.9 million settlement).

Prior to working at Saxena White, Ms. Fassberg practiced in the areas of personal injury, worker's compensation, default, Fair Debt Collection Practices Act, and the Florida Deceptive and Unfair Trade Practices Act. She also worked as in-house counsel for a national lending institution.



Ms. Fassberg received her Bachelor of Arts from Florida International University and her Juris Doctor from St. Thomas University College of Law. Prior to beginning her legal career, Ms. Fassberg interned for the Honorable Michael H. Salmon in the 11th Judicial Circuit of Miami-Dade County, Florida.

Ms. Fassberg is a member of the Florida Bar and is admitted to the United States District Court for the Southern District of Florida.



### TARA HEYDT

With over 25 years of experience, Tara Heydt has extensive experience with e-discovery in class actions, securities fraud, and other complex litigation matters. At Saxena White, in addition to document review, Ms. Heydt's responsibilities include quality control, deposition and mediation preparation, and legal research. She was a member of the discovery teams that assisted the Firm in successfully obtaining settlements against DaVita ($135 million settlement), Wells Fargo ($240 million settlement), and GTT ($25 million settlement).

Ms. Heydt began her legal career in California, where her practice focused on civil litigation. After four years in private practice, Ms. Heydt served as a Research Attorney with the Los Angeles County Superior Court for 12 years, where she provided judges with recommended rulings on civil law and motion matters, both pre-trial and post-trial.

Ms. Heydt received her Bachelor of Arts, *magna cum laude*, from the University of Pennsylvania and her Juris Doctor from the University of California, Los Angeles School of Law.

Ms. Heydt is a member of the Florida Bar.



### VALERIE KANNER BONK

Valerie Kanner Bonk is experienced in e-discovery and litigation support services for class actions and other litigation. She has over 12 years of litigation experience in matters related to the Federal Trade Commission, U.S. Securities and Exchange Commission, Family Law, and Trusts & Estates. She was a member of the discovery team that assisted the Firm in successfully obtaining a settlement against Perrigo ($31.9 million settlement).

Ms. Kanner Bonk received her Bachelor of Arts from the University of Maryland, College Park and her Juris Doctor from the Catholic University of America, Columbus School of Law.

Ms. Kanner Bonk is a member of the Maryland Bar.



### REBECCA NILSEN

Rebecca Nilsen focuses her practice on e-discovery and litigation support services for class actions and other complex litigation. She was a member of the discovery teams that assisted the Firm in successfully obtaining settlements in Wilmington Trust ($210 million settlement), Wells Fargo ($240 million settlement), and DaVita ($135 million settlement). Prior to joining Saxena White, she was a litigator for 13 years in matters related to the Federal Trade Commission, the U.S Securities and Exchange Commission, the Fair Debt Collection Practices Act, and the Consumer Financial Protection Bureau.



Ms. Nilsen received her Bachelor of Arts, *cum laude*, from Florida Atlantic University and her Juris Doctor from Nova Southeastern University, Shepard Broad College of Law. While attending law school, Ms. Nilsen interned in the Pro Bono Honor Program earning the "Gold Award" for 2001 – 2002.

Ms. Nilsen is a member of the Florida Bar and is admitted to the United States District Court for the Southern and Northern Districts of Florida.



### CHRISTINE SCIARRINO

Christine Sciarrino has extensive experience in e-discovery and litigation support services for class action securities fraud litigation. Her legal practice has focused primarily on early resolution of matters, with an objective toward achieving optimum results for litigating parties through superb pre-trial preparation and informed decision making. As an experienced practitioner for plaintiffs who have been wronged by financial institutions and other entities, Ms. Sciarrino has most recently dedicated her expertise exclusively to this area. She was a member of the discovery teams that assisted the Firm in successfully obtaining settlements in Wilmington Trust ($210 million settlement), Wells Fargo ($240 million settlement), and DaVita ($135 million settlement).

Ms. Sciarrino received her Bachelor of Arts with a major in History from Florida Atlantic University. She received her Juris Doctor from the St. Thomas University School of Law. Ms. Sciarrino also earned a Master of Fine Arts in Creative Writing at Florida Atlantic University in 2004.

Ms. Sciarrino is a member of the Florida Bar.



### ZERIN TAHER

Zerin Taher has been involved in e-discovery matters since 2020. Some of Ms. Taher's responsibilities include assisting with the prosecution of complex securities fraud class actions and shareholder derivative actions, preparing for depositions, reviewing and analyzing documents produced in the course of litigation, performing legal research, and drafting memoranda and discovery-related materials. She was a member of the discovery team that assisted the Firm in successfully obtaining a settlement against Perrigo ($31.9 million settlement).

Ms. Taher received her Master of Business Administration and Bachelor of Science from Nova Southeastern University and her Juris Doctor from Western Michigan University. While attending law school, Ms. Taher was the President of the Florida Association for Women Lawyers (FAWL) for her school's student chapter. Ms. Taher speaks fluent Hindi, Urdu, and Bangla.

Ms. Taher is a member of the Florida Bar.



### COURTNEY WEISHOLTZ

Courtney Weisholtz has more than 20 years of professional experience in civil litigation focusing in the areas of insurance subrogation, collections, foreclosure, and family law. Ms. Weisholtz also has significant experience in e-discovery. At Saxena White, she focuses her practice on e-discovery and litigation support services for class actions and other complex litigation. She



was a member of the discovery team that assisted the Firm in successfully obtaining a settlement against TrueCar ($28.25 million settlement).

Ms. Weisholtz received her Bachelor of Arts from Northern Illinois University and her Juris Doctor from Nova Southeastern University.

Ms. Weisholtz is a member of the Florida Bar and is admitted to the United States District Court for the Southern District of Florida.



## OFFICES

**FLORIDA**
7777 Glades Road
Suite 300
Boca Raton, FL 33434
P: 561.394.3399
F: 561.394.3382

**NEW YORK**
10 Bank Street
Suite 882
White Plains, NY 10606
P: 914.437.8551
F: 888.631.3611

**CALIFORNIA**
505 Lomas Santa Fe Drive
Suite 180
Solana Beach, CA 92075
P: 858.997.0860
F: 858.369.0096

**DELAWARE**
824 N Market Street
Suite 1003
Wilmington, DE 19801
P: 302.485.0483
F: 888.424.8566

www.saxenawhite.com